## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*,

Plaintiffs-Appellees,

v.

NATIONAL INSTITUTES OF HEALTH, *et al.*,

Defendants-Appellants.

COMMONWEALTH OF MASSACHUSETTS, *et al.*,

Plaintiffs-Appellees,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Massachusetts

## TIME SENSITIVE MOTION FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY

BRETT A. SHUMATE
*Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

DANIEL TENNY
BENJAMIN C. WEI
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-2875*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE CASE ........................................................................... 2

    A.    Background ............................................................................... 2

    B.    Procedural History .................................................................. 6

ARGUMENT ..................................................................................................... 10

I.     The Government is Likely to Succeed On the Merits ....................... 10

    A.    The District Court Lacked Jurisdiction to Enforce a Contractual Obligation to Pay Money............................................. 11

    B.    The Grant Terminations Were Committed to Agency Discretion by Law..................................................................... 16

    C.    The Grant Terminations Were Reasonable and Reasonably Explained..................................................................... 18

II.    The Equitable Factors Favor a Stay Pending Appeal.......................... 20

CONCLUSION .................................................................................................. 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## INTRODUCTION

Defendants-Appellants respectfully request this Court stay pending appeal the district court's partial final judgment that orders the National Institutes of Health (NIH) to pay money to plaintiffs (or their members) based upon the government's alleged contractual obligation under certain research grants. This judgment was in error, most basically because this case should have been consigned to the Court of Federal Claims under the Tucker Act. As the Supreme Court explained, "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the [Administrative Procedure Act (APA)]." *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). Rather than heed that decision, the court chose to adopt the "views of the dissenters" in that case, along with the decision by this Court that case effectively reversed. App. 279. That was error justifying a stay.

Compounding its error, the district court concluded that NIH's discretionary decision of how to allocate lump-sum appropriations to best achieve its goals was subject to APA review, even though the APA makes clear that "agency action . . . committed to agency discretion by law"—like the grant terminations here—is nonjusticiable, 5 U.S.C. § 701(a)(2). App. 286. The court further erred in its application of APA review by relying again on the dissent in *California*, faulting the "abruptness in the robotic rollout" of the grant terminations, App. 502, even though

the terminations were the product of the individualized consideration and were explained.

The balance of the equities also justifies a stay. As the Supreme Court explained in *California*, the government would suffer irreparable harm because "it is unlikely to recover the grant funds once they are disbursed," while plaintiffs "can recover any wrongfully withheld funds through suit in an appropriate forum." 145 S. Ct. at 969.

In light of these exigencies, the government requests an immediate administrative stay or, absent that, a prompt decision on the stay motion.

## STATEMENT OF THE CASE

### A.    Background

1. This case arises from the termination of grants issued by NIH and its constituent institutes and centers (ICs). App. 177. NIH and its ICs—each with a specific research agenda, often focusing on a particular disease or body system, *e.g.*, National Cancer Institute—have broad statutory authority to conduct research and award grants in furtherance of their respective missions. NIH is authorized to "make grants-in-aid to universities, hospitals, laboratories and other public or private institutions, and to individuals," 42 U.S.C. § 241(a)(3), in order to "promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and

mental diseases and impairments of man," *id.* § 241(a). *See also id.* § 284(b)(2) (granting

that authority to the directors of NIH and its ICs).

The funds to award grants come from lump sum appropriations to each IC to

advance their respective missions. *See generally* 42 U.S.C. § 282a. The most recent

appropriation, for fiscal year 2024, is typical. Further Consolidated Appropriations

Act, 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 461. For example,

Congress appropriated $7,224,159,000 to the National Cancer Institute to carry out

the Public Health Services Act (PHSA) "with respect to cancer" and $3,982,345,000

to the National Heart, Lung, and Blood Institute to carry out the PHSA "with respect

to cardiovascular, lung, and blood diseases, and blood and blood products." *Id.* The

operative appropriation, which is a continuing resolution, carried forward these lump-

sum appropriations. Full-Year Continuing Appropriations and Extensions Act, 2025,

Pub L. No. 119-4, 139 Stat. 9.

2. NIH and its ICs award grants through a competitive process, which begins

with a public notice of funding opportunity that outlines the program goals and the

conditions for applying. App. 186-187. Interested entities submit a proposal, which

undergoes three layers of review. First, a "study section," which is a group of non-

federal scientists with expertise in the relevant field, review the proposal and eliminate

some grant applications from further consideration and assign a score to the rest.

App. 189. The second level of review is conducted by the relevant IC's advisory

council, which renders one of three decisions: recommended for funding, not

recommended for funding, or deferred for re-review by the study section.  App. 189.

A recommendation for funding is a prerequisite for any grant more than $50,000 but

does not guarantee that the grant will be funded.  42 U.S.C. § 284(b)(2).  The final

level of review is conducted by the director of the relevant IC, who exercises his or

her discretion to decide which grants, among those receiving a recommendation for

funding, to fund.  App. 191.  Only a small percentage of all applications are selected

to receive an award.  App. 109.

To make a grant award, NIH (or an IC) enters into an agreement with the

grantee called a Notice of Award ("NOA").  The NOA identifies the institutional

grantee and one or more principal investigators, and specifies the amount of the

award, its duration, and all other terms and conditions with which the grantee must

comply.  App. 109.  The NOA permits the grantee to draw funds but does not

"commi[t] or obligat[e] the United States in any way to make any additional,

supplemental, continuation, or other award with respect to any approved application

or portion of an approved application."  42 CFR § 52.6(c)(3).

The NOA explains the grant "is subject to the terms and conditions

incorporated either directly or by reference in the" agreement. App. 366.  A term

incorporated by reference is Section 8.5.2 of NIH's Grant Policy Statement, which

provides "NIH may also terminate the grant in whole or in part as outlined in 2 CFR

Part 200.340."  App. 415.  Part 200.340(a)(4) provides that the agency may terminate

an award in whole or in part "if an award no longer effectuates the program goals or agency priorities."

3. On February 10, 2025, the Acting Secretary of Health and Human Services directed agency personnel to "ensure that taxpayer dollars are used to advance the best interest of the government. This includes avoiding the expenditure of federal funds on programs . . . that promote or take part in diversity, equity, and inclusion (DEI) initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another perceived characteristic." App. 398. Consistent with that directive, the NIH Chief Grants Management Officer circulated a series of memoranda that provided guidance to ICs on how to exercise their discretion relating to grants to advance administration priorities. *See* App. 441 (Feb. 13, 2025, Supplemental Guidance); App. 446-447 (Feb. 21, 2025, Directive on NIH Priorities); App. 406-413 (Mar. 4, 2025, Award Assessment for Alignment with Agency Priorities); App. 375-386 (Mar. 13, 2025, Award Revision Guidance); App. 391-405 (Mar. 25, 2025, NIH Grants Management Staff Guidance). These memoranda, which the district court collectively referred to as the "Challenged Directives," described a set of subjects that are not agency priorities including, as relevant here: research based on "amorphous equity objectives," *i.e.*, DEI; research on gender identity; and research on why individuals are hesitant to be vaccinated. App. 401.

At around this time, NIH and its ICs reviewed their grant portfolios to identify and cancel specific grants that no longer serve agency priorities. Each grant termination was accompanied by a written explanation of the basis for the termination. *See, e.g.*, App. 414. NIH and its ICs also exercised their discretion to decline to renew grants that did not advance agency priorities. Each non-renewal was also accompanied by written explanation. *See, e.g.*, App. 368. Grantees had the right to appeal any termination or non-renewal and many did, with some appeals still pending. *See, e.g.*, App. 387.

### B.    Procedural History

1. The conduct of NIH and its ICs relating to grants described above was challenged in two lawsuits filed in the District of Massachusetts that both allege defendants violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, and the Constitution. The first was filed by several organizations and individuals[1] and captioned *American Public Health Association v. National Institutes of Health,* No. 25-cv-10787 (D. Mass.) (hereinafter the APHA case). App. 153-166. The other was filed

---

[1] The full list of plaintiffs is the American Public Health Association, Ibis Reproductive Health, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Dr. Brittany Charlton, Dr. Kate Edwards, Dr. Peter Lune, and Dr. Nicole Maphis.

two days later by several states[2] and captioned *Massachusetts v. Kennedy*, No. 25-cv-10814 (D. Mass.) (hereinafter the States case). App. 64. Plaintiffs in both cases moved for a preliminary injunction.

2. The government challenged the district court's jurisdiction, and the court addressed that issue first in the States case. The district court rejected the government's argument that the Tucker Act, which provides for judicial review of "any express or implied contract with the United States" in the Court of Federal Claims, 28 U.S.C. § 1491(a)(1), precluded APA review. According to the court, the "essence" of this case was an action to stop the agency from "violating the statutory grant-making architecture created by Congress . . . and exercising authority arbitrarily and capriciously, in violation of federal law and the Constitution." App. 282. In conducting its analysis, the court considered as "not binding" the Supreme Court's recent decision that "the Government [was] likely to succeed in showing the District Court lacked jurisdiction" under the APA to adjudicate a challenge to the termination of grants in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). App. 276. Instead, the court adopted the reasoning of the dissent in that case, along with the decision by this Court that the Supreme Court effectively reversed in *California*, as the basis for its conclusions. App. 268.

---

[2] Massachusetts, California, Maryland, Washington, Arizona, Colorado, Delaware, Hawaii, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Wisconsin.

The court also concluded that the grant terminations were not "committed to agency discretion by law," and were reviewable under the APA, 5 U.S.C. § 701(a)(2), because it believed "there is arguably review where [there is] a conflict with authorizing statutes and applicable regulations." App. 286.

3. The district court consolidated plaintiffs' motion for preliminary injunction in the States case with a trial on the merits and then bifurcated the proceedings. The first phase focused on the challenged grant terminations. The court directed the defendants to file the administrative record and scheduled a merits hearing.

4. In the APHA case, the district court likewise collapsed the motion for preliminary injunction into a trial on the merits. App. 289. The court construed the opposition to the preliminary injunction as a motion to dismiss, which it granted in part. App. 289. First, the court held it had jurisdiction to review plaintiffs' claims for the reasons it articulated in its ruling in the States case. App. 301. The court next ruled that the plaintiff organizations had standing to sue on behalf of their members. App. 308. Turning toward the merits, the court dismissed plaintiffs' freestanding constitutional claims, but held plaintiffs had plausibly pled a violation of the APA and let those claims proceed. App. 330-31.

5. The district court informally consolidated the two cases by holding a combined merits hearing. App. 418. At the hearing's conclusion, the court made oral findings and rulings, App. 334, promising that a "full written opinion" would follow, App. 333. Following the hearing, the district court issued partial final judgments

under Fed. R. Civ. P. 54(b) in both cases that: (1) the "Challenged Directives as a whole are arbitrary and capricious . . . and are hereby vacated and set aside," and (2) the grant terminations are "arbitrary and capricious . . . and are hereby vacated and set aside." App. 348 (states case); App. 351 (APHA case). The orders also contained a list of the grant terminations that were being reversed.

Nine days later, the district court issued its written opinion. Citing again the dissent in *California*, the court found there was "no reasoned decision-making at all with respect to the NIH's 'abruptness' in the 'robotic rollout' of this grant termination." App. 502. Largely discussing the guidance related to DEI initiatives, the court found there was "no definition of DEI." App. 503. Therefore, the court concluded, reliance on DEI as a reason to terminate grants was arbitrary and capricious because it would allow the agency to "arrive at whatever conclusion it wishes without adequately explaining the standard on which its decision is based." App. 504. The court found the other terms in the Challenged Directives, *e.g.*, gender identity and vaccine hesitancy, likewise lacked a definition and any decision relying upon those reasons was likewise arbitrary and capricious. App. 509-510.

6. Immediately following the entry of partial final judgment—and even before the issuance of the written decision—the government filed a notice of appeal. App. 353 (APHA case); App. 356 (states case). The government also moved for a stay pending appeal, which the court denied. App. 359. In denying a stay, the court stated that the questions about its jurisdiction were "fully addressed" in its prior opinion.

App. 361.  The court also held the balance of the equities weighed against a stay because a "denial means only that the executive defendants must comply with the Act of Congress rather than sequestering funds (probably forever) during the course of the appeal."  App. 364.

## ARGUMENT

A stay pending appeal is warranted.  The Supreme Court issued a stay of a materially indistinguishable order, and the district court responded by adopting the reasoning of the Supreme Court dissent.  Thus, the government is likely to succeed on the merits of its appeal.  The government will also face irreparable injury absent a stay, and the balance of equities and public interest support a stay.  *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.     The Government is Likely to Succeed On the Merits

"[T]he Government is likely to succeed in showing the District Court lacked jurisdiction" because "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here."  *California*, 145 S. Ct. at 968.  Even were this not so, plaintiffs' claims are nonjusticiable because the decision to discontinue funding programs to reallocate those funds to more productive uses is committed to agency discretion by law and not reviewable under the APA.  5 U.S.C. § 701(a)(2).  In any event, the government is likely to show the grant terminations at issue were reasonable and reasonably explained.

**A.** **The District Court Lacked Jurisdiction to Enforce a Contractual Obligation to Pay Money**

1. The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). The Tucker Act provides a waiver for "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a). Such claims seek monetary relief and must be brought in the United States Court of Federal Claims. *Id.* In contrast, the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *Crowley*, 38 F.4th at 1105, that does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.* Thus, the "Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This jurisdictional division ensures that contract claims against the government are channeled into the court that has "unique expertise" in that area, *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78

(D.C. Cir. 1985), and which Congress has generally not empowered to grant injunctive relief, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

As this Court has long recognized, the APA precludes suit in district court where "the essence of the action is in contract," and plaintiffs "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Ct. of the U.S.*, 340 F.2d 947, 948 (1st Cir. 1965)). To determine whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

The Supreme Court recently considered another case where a district court ordered the reversal of the government's termination of grants, and the Court concluded that the government was likely "to succeed in showing the District Court lacked jurisdiction." *California*, 145 S. Ct. at 968. In that case, several states challenged the Department of Education's termination of various education related grants for "discriminatory practices—including in the form of DEI." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir. 2025). The district court temporarily enjoined the challenged grant terminations.

The district court and this Court declined to stay that injunction, but the Supreme Court did not. In granting the government's request for emergency relief, the Supreme Court explained that while "a district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds," the essential point is "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted). That explanation applies equally here.

The source of plaintiffs' purported rights to payment are the grant agreements, which are effectively contracts. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many . . . federal grant programs" are "much in the nature of a contract") (quotation omitted); *see also Columbus Reg'l Hosp v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("[F]ederal grant agreements [are treated] as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound."). The grant agreements are written agreements, agreed to by both the government and grantee, and specify the amount the government agreed to pay, the work the grantee was to perform in exchange for the payment, the performance period for the work, and all applicable policies and procedures, including the conditions under which the grant could be terminated. *See, e.g.*, App. 366.

The type of relief plaintiffs seek is also contractual as the harm they invoke arises solely from the government's failure to pay. App. 217 (describing the "delays and other funding disruptions"); *see also* App. 173, 217-240; App. 132 (describing the harm as the "blast radius [] from these terminations"); *see also* App. 93-94, 132-153. The district court understood this, recognizing the essential effect of its order was the "forthwith [] disbursement of funds both appropriated by the Congress of the United States and allocated heretofore by the defendant agencies," App. 339-340, and denying a stay pending appeal over concerns about the "sequestering [of] funds (probably forever) during the course of the appeal," App. 364. The payment of money, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of plaintiffs' suit. *Crowley*, 38 F.4th at 1112 (quotation omitted). This suit is thus not a challenge to some regulatory action with monetary implications, but rather a suit for "past due sums" from the government. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Where, as here, "the alpha and omega of this dispute" is a contract claim for moneys allegedly owed, the district court lacks jurisdiction under the APA. *United States v. J & E Salvage Co.*, 55 F.3d 985, 989 (4th Cir. 1995).

2. The district court did not even attempt to harmonize its ruling with the Supreme Court's decision in *California*, viewing it as "not binding on this Court." App. 276. Instead, the court chose to adopt the "views of the dissenters" in *California* and the decision by this Court that *California* effectively reversed. App. 279. Applying

14

those views, the court concluded that these cases were "not an action for monetary damages," but rather an action to stop the government from "violating the statutory grant-making architecture created by Congress . . . and exercising authority arbitrarily and capriciously . . . ." App. 282. It was error for the court to ignore the clear signals from the Supreme Court that numerous other courts have heeded. *See, e.g., Sustainability Inst. v. Trump,* No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (staying injunction based on *California* where the grants "were awarded by federal executive agencies to specific grantees from a generalized fund").

But even on its own terms, the district court's analysis was flawed. The court ignored the fact that none of the statutes, regulations, or constitutional provisions invoked by the plaintiffs required the government to make payments to plaintiffs. "While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Sustainability Inst.*, 2025 WL 1587100, at *2. And it is an express grant term that gives the right to terminate grants that no longer advance "program goals or agency priorities." *See* App. 366, 415. This case is therefore about contracts, and whether those contracts were breached by their termination. This fact isn't changed by the court's focus on the Challenged Directives which, as the court itself explains, were only the "paper trail" left by the grant terminations. App. 493. Underscoring the point, compliance with contractual agreements, not compliance with the relevant

statutes and regulations, was the essence of what the court ordered. App. 348, 351 (ordering the grant terminations "hereby vacated and set aside").

Nor is the contractual nature of the case changed by the fact the district court ordered the "equitable" remedy of reversing the grant terminations. As a threshold matter, this was beyond the court's authority; federal courts "do not have the power to order specific performance by the United States of its alleged contractual obligations," because the United States has never waived its sovereign immunity as to that remedy. *See Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3-4 (1st Cir. 1989). Equally important, any breach-of-contract claim for failure to pay could be recast as seeking future compliance. Were this enough to give the district court jurisdiction, the Tucker Act's jurisdictional divide would be meaningless. *See U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-cv-00465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (When claims like plaintiffs' are "[s]tripped of [their] equitable flair, the requested relief seeks one thing: . . . the Court to order the Government to stop withholding the money due" under the grants. Such a claim for "the classic contractual remedy of specific performance" "must be resolved by the Claims Court." (quotation omitted)).

## B. The Grant Terminations Were Committed to Agency Discretion by Law

1. The district court also erred in rejecting the government's argument that the grant terminations were committed to agency discretion by law. App. 286. The

Supreme Court made clear in *Lincoln v. Vigil*, 508 U.S. 182 (1993), that agency decisions to discontinue a program funded by a lump sum appropriation to reallocate those resources toward more productive uses are "committed to agency discretion by law and therefore not subject to judicial review under the Administrative Procedure Act," *id.* at 184 (quoting 5 U.S.C. § 701(a)(2)). The "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. Of course, this discretion is not unbounded. "[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

Lump sum appropriations are at issue here, with the appropriations statute only directing NIH and its IC use the funds to carry out their purpose. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 461 (appropriating, for example, $7,224,159,000 to the National Cancer Institute to carry out NIH's mission "with respect to cancer"); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub L. No. 119-4, 139 Stat. 9 (carrying

17

forward the lump sum appropriations). These appropriations are functionally identical to those at issue in *Lincoln*, which authorized the agency to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians, for the relief of distress and conservation of health." 508 U.S. at 185.

2. The district court's conclusion to the contrary rests entirely upon the premise that "there is arguably review where [there is] a conflict with authorizing statutes and applicable regulations." App. 286. But the only statutes that could qualify are those defining research priorities, and the court expressly declined to "dive into the contours" of that issue. App. 516. If it had, the court would have seen that those authorities neither require any particular grant be funded nor purport to limit the agency's discretion to determine which grants best serve those priorities. Indeed, the court expressly found no conflict with the operative Strategic Plan, App. 101-102, which contains research priorities that plaintiffs claim are incompatible with the Challenged Directives, App. 182.

### C. The Grant Terminations Were Reasonable and Reasonably Explained

The grant terminations would, in any event, be upheld under the arbitrary-and-capricious standard, which "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review

under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

As explained, the challenged grant terminations came after an individualized review to identify those grants that no longer serve agency priorities. Each terminated grant recipient received a written notice detailing the reasons for termination. *See, e.g.,* App. 365 (Explaining that the terminated grant focuses "on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness."). This was "a satisfactory explanation" for each termination. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

The district court's conclusion otherwise again invoked the dissent in *California,* faulting the "abruptness in the robotic rollout" of the grant terminations. App. 502. What the court found most objectionable was the lack of definition for terms like DEI in the Challenged Directives. App. 503. But the Challenged Directives were only meant to provide guidance, not conclusively delineate every grant that should be terminated. Grants were not indiscriminately terminated by topic. For example, several dozen grants researching minority health related topics were not terminated. Thus, the lack of a comprehensive definition reflects individual review, not arbitrary and capricious action. *See* App.442 n.8 (citing testimony that ICs use their "scientific background" and knowledge of their programs to identify grants that should be

19

terminated for funding DEI activities).  The court also complained that reliance

interests were not taken into account, App. 510, yet ignored the fact the grant

terminations provided for additional funds, where necessary, to support patient safety

and animal welfare to support an orderly phaseout of the project, App. 367.  And, as

noted above, an individual explanation was provided for each grant that was

terminated.  Each termination was therefore reasonable and reasonably explained.

The district court and the plaintiffs clearly disagree with the agency's judgment

on this score.  But that does not give the court license to disregard the agency's

reasonable rationale, which would "represent[t] a substantial intrusion into the

working of another branch of Government" that the Supreme Court has cautioned

should normally be avoided.  *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019)

(citation omitted).  Plaintiffs' arbitrary-and-capricious claim therefore lacks merit.

## II.     The Equitable Factors Favor a Stay Pending Appeal

A stay is warranted here because the defendants "will be irreparably injured

absent a stay," that "issuance of the stay will [not] substantially injure the other parties

interested in the proceeding," and that the stay would be in "the public interest."

*Nken*, 556 U.S. at 434.  In particular, the district court's order will cause significant

and irreparable harm to the President's ability to execute core Executive Branch

policies and to the public fisc.  The order requires the government to reinstate

plaintiffs' access to grant funds, which will result in the immediate outflow of

significant amounts of money with limited prospects for recovery if it is ultimately

determined that the grant terminations were lawful—especially because the district court declined to order a bond. In contrast, the gravamen of plaintiffs' claim is monetary and plaintiffs' members will receive any funds they are owed if they ultimately prevail in an appropriate forum.

The Supreme Court assessed these factors in *California* and found that the balance weighed in the government's favor. As the Court explained, the government suffers irreparable harm because it is "unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. Conversely, nothing about a stay would prevent plaintiffs from "recover[ing] any wrongfully withheld funds through suit in an appropriate forum." *Id.*

Finally, a stay is in the public interest because the district court exceeded its authority by ordering specific performance by the United States of its alleged contractual obligations. *See Coggeshall*, 884 F.2d at 3-4. At most, the court could have ordered defendants to do what they are already doing, which is to "make available for obligation the full amount of funds" that would otherwise have been disbursed under the terminated grant awards. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-402, 2025 WL 752378, at *23 (D.D.C. Mar. 10, 2025).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be stayed pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

DANIEL TENNY

*s/*
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-2875*
  *benjamin.c.wei@usdoj.gov*

July 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5175 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/*_____
Benjamin C. Wei

# CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.


_s/_____
Benjamin C. Wei

# **Appendix**

# TABLE OF CONTENTS

Docket Report for *American Public Health Association, et al. v. National Institutes of Health, et al.*, Case No. 25-cv-10787 (APHA Case) ....... App.1

Docket Report for *Commonwealth of Massachusetts, et al. v. Robert F. Kennedy, Jr., at al.*, Case No. 25-cv-10814 (States Case) ............ App. 48

Complaint in APHA Case (APHA Case Dkt. No. 1) ............................................................ App. 90

Amended Complaint in States Case (States Case Dkt. No. 75) ........................................................... App. 168

Memorandum and Order on Subject Matter Jurisdiction (States Case Dkt. No. 105) ........................... App. 260

Memorandum and Order on Motion to Dismiss (APHA Case Dkt No. 84) ......................................... App. 288

Excerpts from Transcript of Consolidated June 16, 2025, Bench Trial .................................. App. 332

Partial Final Judgment States Case (States Case Dkt. No.151) ......................................................... App. 348

Partial Final Judgment APHA Case (APHA Case Dkt. No. 138) ...................................................... App. 351

Notice of Appeal APHA Case (APHA Case Dkt. No. 139) ...................................................... App. 353

Notice of Appeal States Case (States Case Dkt. No. 152) ....................................................... App. 356

Order Denying Motion to Stay Pending Appeal (APHA Case Dkt. No. 147) (States Case Dkt. No. 160) .......................... App 359

Excerpts from the Administrative Record ................................................. App. 365

Findings of Fact, Rulings of Law, and
Order for Partial Separate and Final Judgment
(APHA Case Dkt. No. 151) (States Case Dkt. No. 163)......................... App. 416

# 1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

US District Court Docket

United States District Court, Massachusetts

(Boston)

**This case was retrieved on 06/25/2025**

## Header

**Case Number:** 1:25cv10787
**Date Filed:** 04/02/2025
**Assigned To:** Judge William G. Young
**Nature of Suit:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** 1:25cv10814, USCA - First Circuit, 25-01611
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:702
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision

## Participants

### Litigants

American Public Health Association
**Plaintiff**

### Attorneys

Kenneth Parreno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Protect Democracy Project
15 Main Street Suite 312
Watertown, MA 02472
USA
202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY 10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC 20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                            ## Attorneys

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL  60652
USA
773-551-2411 Email:Michel-

App.002

| Litigants | Attorneys |
|-----------|-----------|
| | Ange.Desruisseaux@protectdemocracy.Org |
| | Olga Akselrod<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY  10004<br>USA<br>212-549-2659 Email:Oakselrod@aclu.Org |
| | Oscar Heanue<br>ATTORNEY TO BE NOTICED<br>Center For Science IN The Public Interest<br>1250 I Street Nw Suite 500<br>Washington, DC  20005<br>USA<br>202-777-8361 Email:Oheanue@cspinet.Org |
| | Rachel Anne Meeropol<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St.<br>New York, NY  10004<br>USA<br>929-585-0061 Email:Rmeeropol@aclu.Org |
| | Suzanne Schlossberg<br>ATTORNEY TO BE NOTICED<br>ACLU of Massachusetts<br>One Center Plaza Ste 850<br>Boston, MA  02108<br>USA<br>617-482-3170 Email:Sschlossberg@aclum.Org |
| | Sydney Kathryn Zazzaro<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>One Rockefeller Plaza 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Email:Szazzaro@ecbawm.Com |
| Ibis Reproductive Health<br>**Plaintiff** | Kenneth Parreno<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Protect Democracy Project<br>15 Main Street Suite 312<br>Watertown, MA  02472<br>USA<br>202-579-4582<br>Email:Kenneth.Parreno@protectdemocracy.Org |
| | Matthew Brinckerhoff<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Fax: 212-763-5001 |

| Litigants | Attorneys |
|---|---|

Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA

| Litigants | Attorneys |
| --- | --- |

212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL 60652
USA
773-551-2411 Email:Michel-
Ange.Desruisseaux@protectdemocracy.Org

Olga Akselrod
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
USA
212-549-2659 Email:Oakselrod@aclu.Org

Oscar Heanue
ATTORNEY TO BE NOTICED
Center For Science IN The Public Interest
1250 I Street Nw Suite 500
Washington, DC 20005
USA
202-777-8361 Email:Oheanue@cspinet.Org

Rachel Anne Meeropol
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
USA
929-585-0061 Email:Rmeeropol@aclu.Org

Suzanne Schlossberg
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Ste 850
Boston, MA 02108
USA
617-482-3170 Email:Sschlossberg@aclum.Org

Sydney Kathryn Zazzaro
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza 8th Floor
New York, NY 10020
USA
212-763-5000 Email:Szazzaro@ecbawm.Com

United Auto Workers
**Plaintiff**

Kenneth Parreno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Protect Democracy Project
15 Main Street Suite 312
Watertown, MA 02472
USA
202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

| Litigants | Attorneys |
|---|---|

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                                    ## Attorneys

USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL  60652
USA
773-551-2411 Email:Michel-
Ange.Desruisseaux@protectdemocracy.Org

Olga Akselrod
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
212-549-2659 Email:Oakselrod@aclu.Org

Oscar Heanue
ATTORNEY TO BE NOTICED
Center For Science IN The Public Interest
1250 I Street Nw Suite 500
Washington, DC  20005
USA
202-777-8361 Email:Oheanue@cspinet.Org

Rachel Anne Meeropol
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St.
New York, NY  10004
USA
929-585-0061 Email:Rmeeropol@aclu.Org

Suzanne Schlossberg
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Ste 850
Boston, MA  02108
USA
617-482-3170 Email:Sschlossberg@aclum.Org

Sydney Kathryn Zazzaro
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza 8th Floor
New York, NY  10020
USA

| Litigants | Attorneys |
|---|---|
| | 212-763-5000 Email:Szazzaro@ecbawm.Com |
| BRITTANY CHARLTON<br>**Plaintiff** | Kenneth Parreno<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Protect Democracy Project<br>15 Main Street Suite 312<br>Watertown, MA  02472<br>USA<br>202-579-4582<br>Email:Kenneth.Parreno@protectdemocracy.Org |
| | Matthew Brinckerhoff<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Fax: 212-763-5001<br>Email:Mbrinckerhoff@ecbawm.Com |
| | Shalini Goel Agarwal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Protect Democracy<br>2020 Pennsylvania Ave. Nw, Ste 163<br>Washington, DC  20006-1811<br>USA<br>850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org |
| | Alejandro Ortiz<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street Ste 18th Floor<br>New York, NY  10004<br>USA<br>646-885-8332 Email:Ortiza@aclu.Org |
| | Alexis Agathocleous<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY  10004<br>USA<br>646-885-8418 Email:Aagathocleous@aclu.Org |
| | Ilann Margalit Maazel<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Fax: 212-763-5001<br>Email:Imaazel@ecbawm.Com |
| | Jessie J. Rossman<br>ATTORNEY TO BE NOTICED<br>ACLU of Massachusetts<br>One Center Plaza Suite 850<br>Boston, MA  02108 |

App.008

| **Litigants** | **Attorneys** |
|---|---|
| | USA |
| | 617-482-3170 Fax: 617-451-0009 |
| | Email:Jrossman@aclum.Org |
| | |
| | Lisa Mankofsky |
| | ATTORNEY TO BE NOTICED |
| | Center For Science In The Public Interest |
| | 1250 I Street, Nw Suite 500 |
| | Washington, DC 20005-5979 |
| | USA |
| | 202-777-8381 Email:Lmankofsky@cspinet.Org |
| | |
| | Max Roller Selver |
| | ATTORNEY TO BE NOTICED |
| | Emery Celli Brinckerhoff Abady Ward & Maazel LLP |
| | One Rockefeller Plaza Ste 8th Floor |
| | New York, NY 10020 |
| | USA |
| | 212-763-5063 Email:Mselver@ecbawm.Com |
| | |
| | Michel-Ange Desruisseaux |
| | ATTORNEY TO BE NOTICED |
| | The Protect Democracy Project, Inc. |
| | 8226 S Mozart |
| | Chicago, IL 60652 |
| | USA |
| | 773-551-2411 Email:Michel-Ange.Desruisseaux@protectdemocracy.Org |
| | |
| | Olga Akselrod |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad Street |
| | New York, NY 10004 |
| | USA |
| | 212-549-2659 Email:Oakselrod@aclu.Org |
| | |
| | Oscar Heanue |
| | ATTORNEY TO BE NOTICED |
| | Center For Science IN The Public Interest |
| | 1250 I Street Nw Suite 500 |
| | Washington, DC 20005 |
| | USA |
| | 202-777-8361 Email:Oheanue@cspinet.Org |
| | |
| | Rachel Anne Meeropol |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad St. |
| | New York, NY 10004 |
| | USA |
| | 929-585-0061 Email:Rmeeropol@aclu.Org |
| | |
| | Suzanne Schlossberg |
| | ATTORNEY TO BE NOTICED |
| | ACLU of Massachusetts |
| | One Center Plaza Ste 850 |
| | Boston, MA 02108 |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | USA<br>617-482-3170 Email:Sschlossberg@aclum.Org<br><br>Sydney Kathryn Zazzaro<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>One Rockefeller Plaza 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Email:Szazzaro@ecbawm.Com |
| KATIE EDWARDS<br>**Plaintiff** | Kenneth Parreno<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Protect Democracy Project<br>15 Main Street Suite 312<br>Watertown, MA 02472<br>USA<br>202-579-4582<br>Email:Kenneth.Parreno@protectdemocracy.Org<br><br>Matthew Brinckerhoff<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Fax: 212-763-5001<br>Email:Mbrinckerhoff@ecbawm.Com<br><br>Shalini Goel Agarwal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Protect Democracy<br>2020 Pennsylvania Ave. Nw, Ste 163<br>Washington, DC 20006-1811<br>USA<br>850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org<br><br>Alejandro Ortiz<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>646-885-8332 Email:Ortiza@aclu.Org<br><br>Alexis Agathocleous<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY 10004<br>USA<br>646-885-8418 Email:Aagathocleous@aclu.Org<br><br>Ilann Margalit Maazel<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY 10020 |

## Litigants

## Attorneys

USA
212-763-5000 Fax: 212-763-5001
Email:lmaazel@ecbawm.Com

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA 02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC 20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY 10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL 60652
USA
773-551-2411 Email:Michel-
Ange.Desruisseaux@protectdemocracy.Org

Olga Akselrod
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
USA
212-549-2659 Email:Oakselrod@aclu.Org

Oscar Heanue
ATTORNEY TO BE NOTICED
Center For Science IN The Public Interest
1250 I Street Nw Suite 500
Washington, DC 20005
USA
202-777-8361 Email:Oheanue@cspinet.Org

Rachel Anne Meeropol
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St.

| Litigants | Attorneys |
|---|---|

New York, NY  10004
USA
929-585-0061 Email:Rmeeropol@aclu.Org

Suzanne Schlossberg
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Ste 850
Boston, MA  02108
USA
617-482-3170 Email:Sschlossberg@aclum.Org

Sydney Kathryn Zazzaro
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza 8th Floor
New York, NY  10020
USA
212-763-5000 Email:Szazzaro@ecbawm.Com

**Peter Lurie**
**Plaintiff**

Kenneth Parreno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED
Protect Democracy Project
15 Main Street Suite 312
Watertown, MA  02472
USA
202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street

| Litigants | Attorneys |
| --- | --- |

New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL  60652
USA
773-551-2411 Email:Michel-
Ange.Desruisseaux@protectdemocracy.Org

Olga Akselrod
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
212-549-2659 Email:Oakselrod@aclu.Org

Oscar Heanue
ATTORNEY TO BE NOTICED
Center For Science IN The Public Interest

| Litigants | Attorneys |
|-----------|-----------|

1250 I Street Nw Suite 500
Washington, DC  20005
USA
202-777-8361 Email:Oheanue@cspinet.Org

Rachel Anne Meeropol
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St.
New York, NY  10004
USA
929-585-0061 Email:Rmeeropol@aclu.Org

Suzanne Schlossberg
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Ste 850
Boston, MA  02108
USA
617-482-3170 Email:Sschlossberg@aclum.Org

Sydney Kathryn Zazzaro
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza 8th Floor
New York, NY  10020
USA
212-763-5000 Email:Szazzaro@ecbawm.Com

**Nicole Maphis**
**Plaintiff**

Kenneth Parreno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Protect Democracy Project
15 Main Street Suite 312
Watertown, MA  02472
USA
202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union

| Litigants | Attorneys |
|-----------|-----------|
| | 125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>646-885-8332 Email:Ortiza@aclu.Org<br><br>Alexis Agathocleous<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY 10004<br>USA<br>646-885-8418 Email:Aagathocleous@aclu.Org<br><br>Ilann Margalit Maazel<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5000 Fax: 212-763-5001<br>Email:Imaazel@ecbawm.Com<br><br>Jessie J. Rossman<br>ATTORNEY TO BE NOTICED<br>ACLU of Massachusetts<br>One Center Plaza Suite 850<br>Boston, MA 02108<br>USA<br>617-482-3170 Fax: 617-451-0009<br>Email:Jrossman@aclum.Org<br><br>Lisa Mankofsky<br>ATTORNEY TO BE NOTICED<br>Center For Science In The Public Interest<br>1250 I Street, Nw Suite 500<br>Washington, DC 20005-5979<br>USA<br>202-777-8381 Email:Lmankofsky@cspinet.Org<br><br>Max Roller Selver<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>One Rockefeller Plaza Ste 8th Floor<br>New York, NY 10020<br>USA<br>212-763-5063 Email:Mselver@ecbawm.Com<br><br>Michel-Ange Desruisseaux<br>ATTORNEY TO BE NOTICED<br>The Protect Democracy Project, Inc.<br>8226 S Mozart<br>Chicago, IL 60652<br>USA<br>773-551-2411 Email:Michel-Ange.Desruisseaux@protectdemocracy.Org<br><br>Olga Akselrod<br>ATTORNEY TO BE NOTICED |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY  10004<br>USA<br>212-549-2659 Email:Oakselrod@aclu.Org |
| | Oscar Heanue<br>ATTORNEY TO BE NOTICED<br>Center For Science IN The Public Interest<br>1250 I Street Nw Suite 500<br>Washington, DC  20005<br>USA<br>202-777-8361 Email:Oheanue@cspinet.Org |
| | Rachel Anne Meeropol<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St.<br>New York, NY  10004<br>USA<br>929-585-0061 Email:Rmeeropol@aclu.Org |
| | Suzanne Schlossberg<br>ATTORNEY TO BE NOTICED<br>ACLU of Massachusetts<br>One Center Plaza Ste 850<br>Boston, MA  02108<br>USA<br>617-482-3170 Email:Sschlossberg@aclum.Org |
| | Sydney Kathryn Zazzaro<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>One Rockefeller Plaza 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Email:Szazzaro@ecbawm.Com |
| National Institutes of Health<br>**Defendant** | Anuj K. Khetarpal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| Jay Bhattacharya<br>In his official capacity as Director of the National Institutes of Health |<br>**Defendant** | Anuj K. Khetarpal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| United States Department of Health and Human Services<br>**Defendant** | Anuj K. Khetarpal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| Robert  F. Kennedy, Jr. | Anuj K. Khetarpal |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| In his official capacity as Secretary of the United States Department of Health and Human Services \| **Defendant** | LEAD ATTORNEY;ATTORNEY TO BE NOTICED United States Attorney's Office 1 Courthouse Way Suite 9200 Boston, MA 02210 USA 617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| Association of American Medical Colleges **Amicus** | Stephanie A. Webster LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED Ropes & Gray LLP 2099 Pennsylvania Avenue, N.W. Suite 1200 Washington, DC 20006-6807 USA 202-508-4859 Fax: 202-383-9334 Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah ATTORNEY TO BE NOTICED Ropes & Gray LLP 2099 Pennsylvania Avenue, N.W. Washington, DC 20006 USA 202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Douglas Hallward-Driemeier ATTORNEY TO BE NOTICED Ropes & Gray LLP - DC 2099 Pennsylvania Avenue, Nw Washington, DC 20006 USA 202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com |
| | John P. Bueker ATTORNEY TO BE NOTICED Ropes & Gray - MA Prudential Tower 800 Boylston Street Boston, MA 02199-3600 USA 617-951-7000 Fax: 617-951-7050 Email:John.Bueker@ropesgray.Com |
| American Association of State Colleges and Universities **Amicus** | Stephanie A. Webster LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED Ropes & Gray LLP 2099 Pennsylvania Avenue, N.W. Suite 1200 Washington, DC 20006-6807 USA 202-508-4859 Fax: 202-383-9334 Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah ATTORNEY TO BE NOTICED Ropes & Gray LLP 2099 Pennsylvania Avenue, N.W. Washington, DC 20006 USA 202-508-4791 Email:Amish.Shah@ropesgray.Com |

| Litigants | Attorneys |
|---|---|
| | Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com<br><br>John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| American Council on Education<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com<br><br>Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com<br><br>Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com<br><br>John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| Association of American Universities<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA |

| Litigants | Attorneys |
|---|---|

202-508-4859 Fax: 202-383-9334
Email:Stephanie.Webster@ropesgray.Com

Amish Aajay Shah
ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
USA
202-508-4791 Email:Amish.Shah@ropesgray.Com

Douglas Hallward-Driemeier
ATTORNEY TO BE NOTICED
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, Nw
Washington, DC 20006
USA
202-508-4776 Email:Douglas.Hallward-
Driemeier@ropesgray.Com

John P. Bueker
ATTORNEY TO BE NOTICED
Ropes & Gray - MA
Prudential Tower 800 Boylston Street
Boston, MA 02199-3600
USA
617-951-7000 Fax: 617-951-7050
Email:John.Bueker@ropesgray.Com

Association of Governing Boards of Universities and Colleges
**Amicus**

Stephanie A. Webster
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W. Suite 1200
Washington, DC 20006-6807
USA
202-508-4859 Fax: 202-383-9334
Email:Stephanie.Webster@ropesgray.Com

Amish Aajay Shah
ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
USA
202-508-4791 Email:Amish.Shah@ropesgray.Com

Douglas Hallward-Driemeier
ATTORNEY TO BE NOTICED
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, Nw
Washington, DC 20006
USA
202-508-4776 Email:Douglas.Hallward-
Driemeier@ropesgray.Com

John P. Bueker
ATTORNEY TO BE NOTICED
Ropes & Gray - MA
Prudential Tower 800 Boylston Street

| Litigants | Attorneys |
|---|---|
| | Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| Association of Public and Land-Grant Universities<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com |
| COGR<br>**Amicus** | John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED |

## Litigants

## Attorneys

Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, Nw
Washington, DC  20006
USA
202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com

John P. Bueker
ATTORNEY TO BE NOTICED
Ropes & Gray - MA
Prudential Tower 800 Boylston Street
Boston, MA  02199-3600
USA
617-951-7000 Fax: 617-951-7050
Email:John.Bueker@ropesgray.Com

National Association of Independent Colleges and Universities
**Amicus**

Stephanie A. Webster
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W. Suite 1200
Washington, DC  20006-6807
USA
202-508-4859 Fax: 202-383-9334
Email:Stephanie.Webster@ropesgray.Com

Amish Aajay Shah
ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC  20006
USA
202-508-4791 Email:Amish.Shah@ropesgray.Com

Douglas Hallward-Driemeier
ATTORNEY TO BE NOTICED
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, Nw
Washington, DC  20006
USA
202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com

John P. Bueker
ATTORNEY TO BE NOTICED
Ropes & Gray - MA
Prudential Tower 800 Boylston Street
Boston, MA  02199-3600
USA
617-951-7000 Fax: 617-951-7050
Email:John.Bueker@ropesgray.Com

American Society for Biochemistry and Molecular Biology
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                    ## Attorneys

ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite
900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

American Society for Cell Biology          Megan Barbero
**Amicus**                                 LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite
900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

American Society for Microbiology          Megan Barbero
**Amicus**                                 LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                        ## Attorneys

Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite
900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

Federation of American Societies for Experimental Biology          Megan Barbero
**Amicus**                                                          LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite
900
Baltimore, MD  21202
USA

## Litigants

## Attorneys

410-244-7650 Email:Khkeraga@venable.Com

American Institute of Biological Sciences
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite 900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

American Sociological Association
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                    ## Attorneys

|  |  |
|---|---|
|  | ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |
| Association for Women in Science<br>**Amicus** | Megan Barbero<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-4540 Email:Mbarbero@venable.Com |
|  | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-8013 Email:Dlocaria@venable.Com |
|  | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA<br>804-229-2927 Email:Ermarcy@venable.Com |
|  | Kyle Keraga<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |
| Ecological Society of America<br>**Amicus** | Megan Barbero<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-4540 Email:Mbarbero@venable.Com |
|  | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-8013 Email:Dlocaria@venable.Com |
|  | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400 |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                    ## Attorneys

Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite
900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

Gerontological Society of America          Megan Barbero
**Amicus**                                 LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                           Venable LLP
                                           600 Massachusetts Avenue, Nw
                                           Washington, DC  20001
                                           USA
                                           202-344-4540 Email:Mbarbero@venable.Com

                                           Dismas Locaria
                                           ATTORNEY TO BE NOTICED
                                           Venable LLP
                                           600 Massachusetts Avenue, Nw
                                           Washington, DC  20001
                                           USA
                                           202-344-8013 Email:Dlocaria@venable.Com

                                           Emily Rose Marcy
                                           ATTORNEY TO BE NOTICED
                                           Venable LLP
                                           1850 Towers Crescent Plaza Suite 400
                                           Tysons, VA  22182
                                           USA
                                           804-229-2927 Email:Ermarcy@venable.Com

                                           Kyle Keraga
                                           ATTORNEY TO BE NOTICED
                                           Venable LLP
                                           Commercial Litigation Maryland 750 East Pratt Street Suite
                                           900
                                           Baltimore, MD  21202
                                           USA
                                           410-244-7650 Email:Khkeraga@venable.Com

Infectious Diseases Society of America     Megan Barbero
**Amicus**                                 LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                           Venable LLP
                                           600 Massachusetts Avenue, Nw
                                           Washington, DC  20001
                                           USA
                                           202-344-4540 Email:Mbarbero@venable.Com

                                           Dismas Locaria
                                           ATTORNEY TO BE NOTICED
                                           Venable LLP
                                           600 Massachusetts Avenue, Nw
                                           Washington, DC  20001
                                           USA
                                           202-344-8013 Email:Dlocaria@venable.Com

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA<br>804-229-2927 Email:Ermarcy@venable.Com |
| | Kyle Keraga<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |
| Society of Environmental Toxicology and Chemistry of North America<br>**Amicus** | Megan Barbero<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-4540 Email:Mbarbero@venable.Com |
| | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-8013 Email:Dlocaria@venable.Com |
| | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA<br>804-229-2927 Email:Ermarcy@venable.Com |
| | Kyle Keraga<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |

# Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 04/02/2025 | COMPLAINT For Declaratory and Injunctive Relief against All Defendants Filing fee: $ 405, receipt number AMADC-10928559 (Fee Status: Filing Fee paid), filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Civil Cover Sheet Exhibit A, # 2 Category Form Exhibit B)(Rossman, Jessie) Modified on 4/2/2025 to modify docket text (CEH). (Main Document 1 replaced on 4/4/2025) (MBM). (Entered: 04/02/2025) | |
| 2 | 04/02/2025 | ELECTRONIC NOTICE of Case Assignment. District Judge Patti B. Saris assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (JKK) (Entered: 04/02/2025) | |
| 3 | 04/02/2025 | Summons Issued as to Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service. (CEH) (Entered: 04/02/2025) | |
| 4 | 04/02/2025 | NOTICE of Appearance by Suzanne Schlossberg on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Schlossberg, Suzanne) (Entered: 04/02/2025) | |
| 5 | 04/02/2025 | District Judge Patti B. Saris: ENDORSED ORDER entered re 1 Complaint for Declaratory and Injunctive Relief against All Defendants filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards. "Pursuant to U.S. C. 455(a), I recuse myself on the ground my impartiality might reasonably be questioned." (CGK) (Entered: 04/02/2025) | |
| 6 | 04/02/2025 | District Judge Patti B. Saris: ORDER entered. ORDER OF RECUSAL. Pursuant to 28 U.S.C. 455(a), I recuse myself on the ground that my impartiality might reasonably be questioned and direct the clerk forthwith to reassign the case randomly to another District Judge.(CGK) (Entered: 04/02/2025) | |
| 7 | 04/02/2025 | ELECTRONIC NOTICE of Case Reassignment. Judge Brian E. Murphy assigned to case. (RN) (Entered: 04/02/2025) | |
| 8 | 04/07/2025 | NOTICE of Appearance by Anuj K. Khetarpal on behalf of United States Department of Health and Human Services, Robert F. Kennedy, Jr., National Institutes of Health, Jay Bhattacharya (Khetarpal, Anuj) (Entered: 04/07/2025) | |
| 9 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Olga Akselrod Filing fee: $ 125, receipt number AMADC-10945811 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 10 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Alexis Agathocleous Filing fee: $ 125, receipt number AMADC-10945813 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 11 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Shalini Goel Agarwal Filing fee: $ 125, receipt number AMADC-10945817 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 12 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Michel-Ange Desruisseaux Filing fee: $ 125, receipt number AMADC-10945818 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 13 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Oscar Heanue Filing fee: $ 125, receipt number AMADC-10945822 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 14 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Lisa S. Mankofsky Filing fee: $ 125, receipt number AMADC-10945823 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 15 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Rachel Meeropol Filing fee: $ 125, receipt number AMADC-10945828 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 16 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Alejandro Ortiz Filing fee: $ 125, receipt number AMADC-10945830 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 17 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 9 Motion for Leave to Appear Pro Hac Vice Added Olga Akselrod. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 18 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Alexis Agathocleous.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 19 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added Shalini Goel Agarwal.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 20 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 12 Motion for Leave to Appear Pro Hac Vice Added Michel-Ange Desruisseaux.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 21 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Oscar Heanue.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 22 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 14 Motion for Leave to Appear Pro Hac Vice Added Lisa S. Mankofsky.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 23 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 15 Motion for Leave to Appear Pro Hac Vice Added Rachel Meeropol.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 24 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice Added Alejandro Ortiz.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 25 | 04/14/2025 | NOTICE of Appearance by Alexis Agathocleous on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Agathocleous, Alexis) (Entered: 04/14/2025) | |
| 26 | 04/14/2025 | NOTICE of Appearance by Olga Akselrod on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Akselrod, Olga) (Entered: 04/14/2025) | |
| 27 | 04/14/2025 | NOTICE of Appearance by Rachel Anne Meeropol on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Meeropol, Rachel) (Entered: 04/14/2025) | |
| 28 | 04/14/2025 | MOTION for Leave to File Excess Pages  by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis.(Schlossberg, Suzanne) (Entered: 04/14/2025) | |
| 29 | 04/14/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 28 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MBM) (Entered: 04/14/2025) | |
| 30 | 04/15/2025 | NOTICE of Appearance by Oscar Heanue on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Heanue, Oscar) (Entered: 04/15/2025) | |
| 31 | 04/16/2025 | NOTICE of Appearance by Alejandro Ortiz on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Ortiz, Alejandro) (Entered: 04/16/2025) | |
| 32 | 04/16/2025 | NOTICE of Appearance by Lisa Mankofsky on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Mankofsky, Lisa) (Entered: 04/16/2025) | |
| 33 | 04/23/2025 | MOTION to Seal  by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis.(Schlossberg, Suzanne) (Entered: 04/23/2025) | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 34 | 04/23/2025 | MEMORANDUM in Support re 33 MOTION to Seal filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Schlossberg, Suzanne) (Entered: 04/23/2025) | |
| 35 | 04/24/2025 | NOTICE of Appearance by Shalini Goel Agarwal on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Agarwal, Shalini) (Entered: 04/24/2025) | |
| 36 | 04/24/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 33 Motion to Seal. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MBM) (Entered: 04/24/2025) | |
| 37 | 04/25/2025 | MOTION for Preliminary Injunction by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Proposed Order)(Rossman, Jessie) (Entered: 04/25/2025) | |
| 38 | 04/25/2025 | DECLARATION re 37 MOTION for Preliminary Injunction by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42)(Rossman, Jessie) (Additional attachment(s) added on 5/7/2025: # 43 Sealed - Exhibit 19, # 44 Sealed - Exhibit 23, # 45 Sealed - Exhibit 24, # 46 Sealed - Exhibit 28, # 47 Sealed - Exhibit 29, # 48 Sealed - Exhibit 32, # 49 Sealed - Exhibit 35, # 50 Sealed - Exhibit 36, # 51 Sealed - Exhibit 37, # 52 Sealed - Exhibit 38, # 53 Sealed - Exhibit 39, # 54 Sealed - Exhibit 42) (MAP). (Entered: 04/25/2025) | |
| 39 | 04/25/2025 | MOTION for Protective Order Regarding Certain Organizational Declarants by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Proposed Order)(Rossman, Jessie) (Entered: 04/25/2025) | |
| 40 | 04/25/2025 | MEMORANDUM in Support re 39 MOTION for Protective Order Regarding Certain Organizational Declarants filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Rossman, Jessie) (Entered: 04/25/2025) | |
| 41 | 04/25/2025 | MEMORANDUM in Support re 37 MOTION for Preliminary Injunction filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Rossman, Jessie) (Entered: 04/25/2025) | |
| 42 | 04/28/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered. Defendants are ordered to respond to the Motion for Protective | |

App.032

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Order (Dkt. 39 ) by 5 p.m. on May 5, 2025.(MBM) (Entered: 04/28/2025) | |
| 43 | 04/28/2025 | Amicus Curiae APPEARANCE entered by Amish Aajay Shah on behalf of Association of American Medical Colleges, American Association of State Colleges and Universities, American Council on Education, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities. (Shah, Amish) (Entered: 04/28/2025) | |
| 44 | 04/28/2025 | Amicus Curiae APPEARANCE entered by Douglas Hallward-Driemeier on behalf of American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities. (Hallward-Driemeier, Douglas) (Entered: 04/28/2025) | |
| 45 | 04/28/2025 | Amicus Curiae APPEARANCE entered by John P. Bueker on behalf of American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities. (Bueker, John) (Entered: 04/28/2025) | |
| 46 | 04/28/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephanie A. Webster Filing fee: $ 125, receipt number AMADC-10976480 by American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities.(Bueker, John) (Additional attachment(s) added on 4/29/2025: # 1 Certificate of Stephanie A. Webster) (MBM). (Entered: 04/28/2025) | |
| 47 | 04/28/2025 | MOTION for Leave to File AMICUS CURIAE BRIEF (Unopposed) by American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities. (Attachments: # 1 Proposed AMICUS CURIAE BRIEF)(Bueker, John) (Entered: 04/28/2025) | |
| 48 | 04/29/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 46 Motion for Leave to Appear Pro Hac Vice Added Stephanie A. Webster. Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/29/2025) | |
| 49 | 04/29/2025 | Amicus Curiae APPEARANCE entered by Stephanie A. Webster on behalf of American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, National Association of Independent Colleges and Universities. (Webster, Stephanie) (Entered: 04/29/2025) | |
| 50 | 04/29/2025 | NOTICE of Appearance by Michel-Ange Desruisseaux on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Desruisseaux, Michel-Ange) (Entered: 04/29/2025) | |
| 51 | 05/01/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER OF RECUSAL - In accordance with 28 U.S.C. 455(a), I hereby recuse myself from this proceeding. The Clerk is directed to return the case for reassignment.Associated Cases: 1:25-cv-10814-BEM, 1:25-cv-10787-BEM(BIB) (Entered: 05/01/2025) | |
| 52 | 05/01/2025 | ELECTRONIC NOTICE of Reassignment. Judge William G. Young added. Judge Brian E. Murphy no longer assigned to case. (CM) (Entered: 05/01/2025) | |
| 53 | 05/02/2025 | Amicus Curiae APPEARANCE by Megan Barbero on behalf of American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, Federation of American Societies for Experimental Biology, American Institute of Biological Sciences, American Sociological Association, Association for Women in Science, Ecological Society of America, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Barbero, Megan) Modified on 5/2/2025to Correct Filing Event as Counsel Filed Their Appearance Under the Wrong Event in CM/ECF (MAP). (Entered: 05/02/2025) | |
| 54 | 05/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Dismas Locaria Filing fee: $ 125, receipt number AMADC-10985379 by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit A - Certification of Dismas Locaria)(Barbero, Megan) (Entered: 05/02/2025) | |
| 55 | 05/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kyle H. Keraga Filing fee: $ 125, receipt number AMADC-10985410 by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit A - Certification of Kyle H. Keraga)(Barbero, Megan) (Entered: 05/02/2025) | |
| 56 | 05/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Emily R. Marcy Filing fee: $ 125, receipt number AMADC-10985426 by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit A - Certification of Emily R. Marcy)(Barbero, Megan) (Entered: 05/02/2025) | |
| 57 | 05/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 54 Motion for Leave to Appear Pro Hac Vice Added Dismas Locaria.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 05/02/2025) | |
| 58 | 05/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 55 Motion for Leave to Appear Pro Hac Vice Added Kyle H. Keraga.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 05/02/2025) | |
| 59 | 05/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 56 Motion for Leave to Appear Pro Hac Vice Added Emily R. Marcy.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 05/02/2025) | |
| 60 | 05/02/2025 | MOTION for Leave to File AMICUS CURIAE BRIEF by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit Proposed Amicus Curiae Brief)(Barbero, Megan) (Entered: 05/02/2025) | |
| 61 | 05/02/2025 | Assented to MOTION for Protective Order and Joint Motion for Briefing Schedule by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit Agreed Proposed Protective Order)(Rossman, Jessie) (Entered: 05/02/2025) | |
| 62 | 05/05/2025 | Judge William G. Young: ELECTRONIC ORDER entered allowed 61 Assented to MOTION for Protective Order and Joint Motion for | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Briefing Schedule. (Entered: 05/06/2025) | |
| 63 | 05/05/2025 | Judge William G. Young ORDER entered: PROTECTIVE ORDER Regarding Certain Organizational Declarants. (MAP) (Entered: 05/06/2025) | |
| 64 | 05/06/2025 | ELECTRONIC NOTICE Setting Hearing on Motion 37 MOTION for Preliminary Injunction : Motion Hearing set for 5/22/2025 11:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(KB) (Entered: 05/06/2025) | |
| 65 | 05/07/2025 | AFFIDAVIT OF SERVICE Executed by Nicole Maphis, Ibis Reproductive Health, American Public Health Association, Peter Lurie, United Auto Workers, Brittany Charlton, Katie Edwards. All Defendants. Acknowledgement filed by Nicole Maphis, Ibis Reproductive Health, American Public Health Association, Peter Lurie, United Auto Workers, Brittany Charlton, Katie Edwards. (Attachments: # 1 Exhibit A-National Institutes of Health, # 2 Exhibit B-Jay Bhattacharya, # 3 Exhibit C-U.S. Dept. of Health and Human Services, # 4 Exhibit D-Robert F. Kennedy Jr., # 5 Exhibit E-U.S. Attorney General, # 6 Exhibit F-U.S. Attorney, District of MA)(Schlossberg, Suzanne) (Entered: 05/07/2025) | |
| 66 | 05/12/2025 | Opposition re 37 MOTION for Preliminary Injunction filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Attachments: # 1 Lorsch Declaration, # 2 Exhibit A, # 3 Exhibit B)(Khetarpal, Anuj) (Entered: 05/12/2025) | |
| 67 | 05/13/2025 | Amicus Curiae APPEARANCE entered by Dismas Locaria on behalf of American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Locaria, Dismas) Modified on 5/13/2025 to Correct Docket as Counsel Filed the Appearance Under the Wrong Event in CM/ECF. (MAP). (Entered: 05/13/2025) | |
| 68 | 05/13/2025 | Amicus Curiae APPEARANCE entered by Kyle Keraga on behalf of American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Keraga, Kyle) Modified on 5/13/2025 to Correct Docket as Counsel Filed the Appearance Under the Wrong Event in CM/ECF. (MAP). (Entered: 05/13/2025) | |
| 69 | 05/13/2025 | Amicus Curiae APPEARANCE entered by Emily Rose Marcy on behalf of American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies | |

App.036

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Marcy, Emily) Modified on 5/13/2025 to Correct Docket as Counsel Filed the Appearance Under the Wrong Event in CM/ECF. (MAP). (Entered: 05/13/2025) |  |
| 70 | 05/16/2025 | STATUS REPORT Joint Status Report by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Schlossberg, Suzanne) (Entered: 05/16/2025) |  |
| 71 | 05/19/2025 | REPLY to Response to 37 MOTION for Preliminary Injunction filed by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Agarwal, Shalini) (Entered: 05/19/2025) |  |
| 72 | 05/19/2025 | DECLARATION re 71 Reply to Response to Motion, by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit 43 - NIH Contracts webpage, # 2 Exhibit 44 - 2/21/25 Directive on NIH Priorities, # 3 Exhibit 45 - S Delaney Suppl Decl, # 4 Exhibit 46 - J Berg Suppl Decl, # 5 Exhibit 47 - 3/31/25 Kirschstein NRSA NOFO, # 6 Exhibit 48 - 1/22/25 Kirschstein NRSA NOFO, # 7 Exhibit 49 - Updates to NIH Institutional Training Grant Applications webpage, # 8 Exhibit 50 - 3/11/25 Memo re: NIH's Initial Actions re EOs, # 9 Exhibit 51 - NIH Research General Terms and Conditions, # 10 Exhibit 52 - N Maphis Suppl Decl, # 11 Exhibit 53 - Mallapty Nature article, # 12 Exhibit 54 - K Edwards Suppl Decl)(Agarwal, Shalini) (Entered: 05/19/2025) |  |
| 73 | 05/20/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kenneth Parreno Filing fee: $ 125, receipt number AMADC-11019317 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Rossman, Jessie) (Entered: 05/20/2025) |  |
| 74 | 05/20/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 73 Motion for Leave to Appear Pro Hac Vice Added Kenneth Parreno. Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAP) (Entered: 05/20/2025) |  |
| 75 | 05/22/2025 | Judge William G. Young ELECTRONIC ORDER entered: allowed 47 MOTION for Leave to File Amici Curiae Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MAP) (Entered: 05/22/2025) |  |
| 76 | 05/22/2025 | AMICUS BRIEF filed by American Association of State Colleges and Universities, American Council on Education, American Institute of Biological Sciences, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, National Association of Independent Colleges and Universities . (Bueker, John) (Entered: 05/22/2025) |  |

App.037

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 77 | 05/22/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 5/22/2025 re 37 MOTION for Preliminary Injunction filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards. The motion is collapsed with trial on the merits in accordance with Rule 65(a). The parties agree to treat defendants' opposition as a motion to dismiss and wish to proceed with argument today. Court stands on its order on subject matter jurisdiction entered in related case 1:25-cv-10814-WGY. Court hears argument on the opposition treated as a motion to dismiss. Court takes the matter under advisement. Plaintiffs to provide spreadsheet of grants. Defendants to produce administrative records as to directives. The Court will hold a status conference in this case and the related case to coordinate case management. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Shalini Goel Agarwal, Jessie Rossman, Lisa Mankofsky, Olga Akselrod for plaintiffs and Anuj Khetarpal for defendants) (KB) (Entered: 05/23/2025) | |
| 78 | 05/23/2025 | ELECTRONIC NOTICE of Hearing. Status Conference re case management of related cases set for 6/3/2025 11:00 AM in Courtroom 18 (In person only) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 05/23/2025) | |
| 79 | 05/23/2025 | MEMORANDUM OF LAW by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers to 41 Memorandum in Support of Motion,. (Agarwal, Shalini) (Entered: 05/23/2025) | |
| 80 | 05/27/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 60 Motion for Leave to File Amici Curiae Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (KB) (Entered: 05/27/2025) | |
| 81 | 05/27/2025 | AMICUS BRIEF filed by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America in Support of Plaintiffs' Motion for Preliminary Injunction. (Barbero, Megan) (Entered: 05/27/2025) | |
| 82 | 05/30/2025 | Transcript of Status Conference/Motion to Dismiss Hearing held on May 22, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/20/2025. Redacted Transcript Deadline set for 6/30/2025. Release of | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Transcript Restriction set for 8/28/2025. (DRK) (Entered: 05/30/2025) | |
| 83 | 05/30/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/30/2025) | |
| 84 | 05/30/2025 | Judge William G. Young: ORDER entered: MEMORANDUM AND ORDER: The Motion to Dismiss, ECF No. 66 is ALLOWED in Part as to Counts IV, VI, and VII, Which Are Dismissed Without Prejudice, and DENIED In Part as to The Remaining Counts. (Sonnenberg, Elizabeth) (Entered: 05/30/2025) | |
| 85 | 06/02/2025 | Notice of Production of Administrative Record by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services (Attachments: # 1 Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/02/2025) | |
| 86 | 06/03/2025 | Amended Notice of Production of Administrative Record by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services (Attachments: # 1 Certification of Administrative Record)(Khetarpal, Anuj) Modified on 6/4/2025 (MAP). (Entered: 06/03/2025) | |
| 87 | 06/03/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference held on 6/3/2025. Government has produced administrative record in both cases. The Court hears from parties in both cases regarding schedule and June 16th hearing. Court will hear argument on Phase 1 from 10am-1pm on June 16th in both cases. The Court adopts the proposed schedule filed in 25-cv-10814 Document 113 at page 2. The Court modifies the proposed schedule at page 4 as follows: By June 20, 2025, defendants may move to dismiss plaintiffs' claims related to alleged reasonable delay. By July 9, 2025, defendants must lodge the administrative record. Court and parties discuss phase II. Record to be supplemented as to the challenged directives as directed by the Court. If the case(s) were to resolve the parties shall inform the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Suzanne Schlossberg, Gerard Cedrone, Katherine Dirks, Phoebe Lockhart for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/04/2025) | |
| 88 | 06/04/2025 | ELECTRONIC NOTICE of Hearing. Oral argument on Phase I set for 6/16/2025 10:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(KB) (Entered: 06/04/2025) | |
| 89 | 06/05/2025 | Transcript of Status Conference held on June 3, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | rhr3tubas@aol.com. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/05/2025) | |
| 90 | 06/05/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/05/2025) | |
| 91 | 06/05/2025 | STIPULATION Regarding Phase One Schedule Modifications by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Rossman, Jessie) (Entered: 06/05/2025) | |
| 92 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Ilann Maazel Filing fee: $ 125, receipt number AMADC-11054656 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 93 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Matthew Brinckerhoff Filing fee: $ 125, receipt number AMADC-11054673 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 94 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Max Selver Filing fee: $ 125, receipt number AMADC-11054681 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 95 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Sydney Zazzaro Filing fee: $ 125, receipt number AMADC-11054705 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 96 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 92 Motion for Leave to Appear Pro Hac Vice Added Ilann Maazel. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/09/2025) | |
| 97 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 93 Motion for Leave to Appear Pro Hac Vice Added Matthew Brinckerhoff. Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAP) (Entered: 06/09/2025) | |
| 98 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 94 Motion for Leave to Appear Pro Hac Vice Added Max Selver. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/09/2025) | |
| 99 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 95 Motion for Leave to Appear Pro Hac Vice Added Sydney Zazzaro. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/09/2025) | |
| 100 | 06/09/2025 | NOTICE of Appearance by Matthew Brinckerhoff on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Brinckerhoff, Matthew) (Entered: 06/09/2025) | |
| 101 | 06/09/2025 | TRIAL BRIEF Defendants' Merits Brief Concerning Phase 1 Claims by All Defendants. (Khetarpal, Anuj) (Entered: 06/09/2025) | |
| 102 | 06/09/2025 | MOTION Complete the Administrative Record by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Supplement Plaintiffs' Memorandum of Law in Support of Motion to Complete the Administrative Record, # 2 Affidavit of Matthew D. Brinckerhoff, Esq., # 3 Exhibit 1 - Letter, dated June 5, 2025, # 4 Exhibit 2 - Email Exchange Between Jessie Rossman and Anuj Khetarpal)(Brinckerhoff, Matthew) (Entered: 06/09/2025) | |
| 103 | 06/09/2025 | PRETRIAL MEMORANDUM by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A - Proposed Order, # 2 Affidavit of Matthew D. Brinckerhoff, Esq., # 3 Exhibit 55 - Scott Delaney Second Supplemental Declaration, # 4 Exhibit 56 - Katie Edwards Second Supplemental Declaration)(Brinckerhoff, Matthew) (Entered: 06/09/2025) | |
| 104 | 06/10/2025 | APHA Plaintiffs' Exhibit List and Witness List for Phase 1 Proceeding by All Plaintiffs.. (Schlossberg, Suzanne) (Entered: 06/10/2025) | |
| 105 | 06/11/2025 | ELECTRONIC NOTICE of Hearing. Final Pretrial Conference set for 6/12/2025 11:00 AM in Courtroom 18 (Remote only) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/11/2025) | |
| 106 | 06/11/2025 | NOTICE of Appearance by Max Roller Selver on behalf of Brittany | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Selver, Max) (Entered: 06/11/2025) | |
| 107 | 06/11/2025 | NOTICE of Appearance by Sydney Kathryn Zazzaro on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Zazzaro, Sydney) (Entered: 06/11/2025) | |
| 108 | 06/11/2025 | Certification of the Administrative Record (Updated) by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services re 86 Notice (Other),  (Attachments: # 1 Email, # 2 Certification, # 3 Ex A to certification, # 4 Ex B to certification, # 5 Ex C to certification, # 6 NIH_GRANTS_003825-3910, # 7 NIH_GRANTS_003911-3995, # 8 NIH_GRANTS_003996-4081, # 9 NIH_GRANTS_004082-4165, # 10 NIH_GRANTS_004166-4251, # 11 NIH_GRANTS_004252, # 12 NIH_GRANTS_004253-54, # 13 NIH_GRANTS_004255-57, # 14 NIH_GRANTS_004258-69, # 15 NIH_GRANTS_004270)(Khetarpal, Anuj) Modified on 6/12/2025 (MAP). (Entered: 06/11/2025) | |
| 109 | 06/12/2025 | Opposition re 102 MOTION Complete the Administrative Record filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Attachments: # 1 Exhibit Exhibit A)(Khetarpal, Anuj) (Entered: 06/12/2025) | |
| 110 | 06/12/2025 | Judge William G. Young: ELECTRONIC ORDER entered re 102 Motion MOTION Complete the Administrative Record by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Motion allowed in part and denied in part as follows: A. Grants not terminated- Denied as moot B. Termination forms- Allowed. "Guidance" is not "deliberation." C. HHS and DOGE imput: Denied on the representation that such search has been made. D. AI Use: Allowed. E. Metadata: Denied without prejudice to seeking such discovery beyond the APA claims. F. Certification. Denied as moot. SO ORDERED. (KB) (Entered: 06/12/2025) | |
| 112 | 06/12/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 6/12/2025. Court and the parties discuss the record in the case. Court has administrative record as it has been provided. Plaintiffs have also filed records. Court hears parties on the matter. Court will review defendants' opposition to the motions to Complete Record. Court will hear oral argument on phase 1 of the case on Monday, June 16th at 10am. Each side will have one hour for argument (plaintiffs in both cases will have one hour combined). Parties to discuss proposed phase 2 schedule on Monday. Court has off the record portion of hearing regarding possibility of settlement. If the case were to settle in part or in whole the parties shall inform the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Matthew Brinckerhoff, Jessie Rossman, Lisa Mankofsky, Max Roller Selver, Olga Akselrod, Rachel Anne Meeropol, Sydney Kathryn Zazzaro, Gerard Cedrone, Christopher Pappavaselio, Phoebe Lockhart, Rachel Brown, Vanessa Azniv Arslanian, Nimrod Pitsker Elias, Astrid Carrete, Jordan Broadbent for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/13/2025) | |
| 111 | 06/13/2025 | TRIAL BRIEF in Response to Plaintiffs' Opening Briefs by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 06/13/2025) | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 113 | 06/13/2025 | TRIAL BRIEF in Response to Defendants' Opening Brief on Phase 1 by All Plaintiffs. (Rossman, Jessie) (Entered: 06/13/2025) | |
| 114 | 06/13/2025 | Transcript of Final Pretrial held on June 12, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/7/2025. Redacted Transcript Deadline set for 7/14/2025. Release of Transcript Restriction set for 9/11/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/13/2025) | |
| 115 | 06/13/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/13/2025) | |
| 116 | 06/13/2025 | NOTICE of Appearance by Ilann Margalit Maazel on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Maazel, Ilann) (Entered: 06/13/2025) | |
| 117 | 06/13/2025 | NOTICE by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services of Production of Administrative Record (Attachments: # 1 Designation and Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/13/2025) | |
| 118 | 06/13/2025 | NOTICE by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers of Service (Agarwal, Shalini) (Entered: 06/13/2025) | |
| 119 | 06/16/2025 | ELECTRONIC NOTICE of Hearing. Hearing set for 6/16/2025 at 2:00pm. (In person with remote access provided) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/16/2025) | |
| 120 | 06/16/2025 | Judge William G. Young: STIPULATED PROTECTIVE ORDER entered. Granting (140) Joint Motion for Protective Order in case 1:25-cv-10814-WGY Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(KB) (Entered: 06/16/2025) | |
| 121 | 06/16/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial as to Phase 1 held on 6/16/2025.Court hears argument on Phase 1 of the case. Defendants ask Court to take Judicial Notice of the Federal Register Notices. Court takes Judicial Notice. Defendants move to admit into evidence 13 Certified records. No objection. Admitted as exhibit 1. Court takes the matter under advisement. Parties will inform the Court if they wish for the Court to reconvene in the afternoon or if they wish for the Court to hold off issuing a ruling as to Phase 1. The Court reconvenes in the afternoon. The Court announces the findings and rulings that it is able to make today. The challenged directives are vacated. A written order will issue. Defendants shall promptly comply with the order of the Court. Plaintiffs to submit a proposed partial but final judgment as to Phase 1 by June 17, 2025. The Court discusses evidence as to harm. The parties will meet and inform the Court if an evidentiary hearing regarding harm is necessary. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Rachel Anne Meeropol, Gerard Cedrone, Rachel Brown, Nimrod Pitsker Elias for plaintiffs | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/17/2025) | |
| 122 | 06/17/2025 | Proposed Document(s) submitted by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Document received: Rule 54(b) Partial Final Judgment. (Brinckerhoff, Matthew) (Entered: 06/17/2025) | |
| 123 | 06/18/2025 | ELECTRONIC NOTICE of Hearing. Status Conference set for 6/18/2025 02:00 PM in Courtroom 18 (Remote only) before Judge William G. Young. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |
| 124 | 06/18/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference re proposed judgments held on 6/18/2025. The Court hears from parties regarding proposed judgments and modifies judgments as stated. Plaintiffs' counsel shall re-submit the proposed judgments as modified by the Court. (Attorneys present: Olga Akselrod, Lisa Mankofsky, Suzanne Schlossberg, Jessie J. Rossman, Gerard Cedrone, Chris Pappavaselio, Phoebe Lockhart, Rachel M. Brown for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants)(Court Reporter: Richard Romanow at rhr3tubas@aol.com.) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |
| 125 | 06/18/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Leah Watson Filing fee: $ 125, receipt number AMADC-11076182 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A - Certificate)(Schlossberg, Suzanne) (Entered: 06/18/2025) | |
| 126 | 06/18/2025 | MOTION to Seal Lists of Grant Terminations by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers.(Brinckerhoff, Matthew) (Entered: 06/18/2025) | |
| 127 | 06/18/2025 | MEMORANDUM in Support re 126 MOTION to Seal Lists of Grant Terminations filed by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Brinckerhoff, Matthew) (Entered: 06/18/2025) | |
| 128 | 06/18/2025 | Proposed Document(s) submitted by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Document received: Rule 54(b) Partial Final Judgment. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Brinckerhoff, Matthew) (Entered: 06/18/2025) | |
| 129 | 06/19/2025 | BRIEF by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Health, United Auto Workers . (Meeropol, Rachel) (Entered: 06/19/2025) | |
| 130 | 06/20/2025 | MOTION to Dismiss for lack of jurisdiction and failure to state a claim by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services.(Khetarpal, Anuj) (Entered: 06/20/2025) | |
| 131 | 06/20/2025 | MEMORANDUM in Support re 130 MOTION to Dismiss for lack of jurisdiction and failure to state a claim filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 06/20/2025) | |
| 132 | 06/20/2025 | Opposition re 130 MOTION to Dismiss for lack of jurisdiction and failure to state a claim (Opposition as to Motion to Expedite) filed by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Parreno, Kenneth) (Entered: 06/20/2025) | |
| 133 | 06/22/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 125 Motion for Leave to Appear Pro Hac Vice Added Leah Watson. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/22/2025) | |
| 134 | 06/23/2025 | Judge William G. Young: ORDER entered. re 126 MOTION to Seal Lists of Grant Terminations filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards Motion to file under seal denied. Plaintiffs alternative proposal approved. (Sonnenberg, Elizabeth) (Entered: 06/23/2025) | |
| 135 | 06/23/2025 | Judge William G. Young: ELECTRONIC ORDER entered denying 126 Motion to Seal. See order 134 (Sonnenberg, Elizabeth) (Entered: 06/23/2025) | |
| 136 | 06/23/2025 | Judge William G. Young: ORDER entered. re 132 Opposition to Motion, filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards The presently agreed deadlines are satisfactory. Request denied. (Sonnenberg, Elizabeth) (Entered: 06/23/2025) | |
| 137 | 06/23/2025 | Proposed Document(s) submitted by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Document received: Revised Proposed Partial Final Judgment. (Attachments: # 1 Exhibit Exhibit A - May 27 Spreadsheet, # 2 Exhibit Exhibit B - June 13 Spreadsheet)(Schlossberg, Suzanne) (Entered: 06/23/2025) | |
| 138 | 06/23/2025 | Judge William G. Young: ORDER entered. RULE 54(b) PARTIAL FINAL JUDGMENT (Sonnenberg, Elizabeth) (Additional attachment(s) added on 6/23/2025: # 1 Exhibit A, # 2 Exhibit B) (MAP). (Main Document 138 replaced on 6/23/2025) (MAP). (Entered: 06/23/2025) | |
| 139 | 06/23/2025 | NOTICE OF APPEAL as to 138 Order, 84 Memorandum & ORDER, by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. Fee Status: US Government. NOTICE TO | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 7/14/2025. (Khetarpal, Anuj) (Entered: 06/23/2025) | |
| 140 | 06/23/2025 | MOTION to Stay re 138 Order by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services.(Khetarpal, Anuj) (Entered: 06/23/2025) | |
| 141 | 06/23/2025 | MEMORANDUM in Support re 140 MOTION to Stay re 138 Order filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 06/23/2025) | |
| 142 | 06/23/2025 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 139 Notice of Appeal. (MAP) (Entered: 06/23/2025) | |
| 143 | 06/23/2025 | Transcript of Bench Trial, Phase 1 (Closings) held on June 16, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 144 | 06/23/2025 | Transcript of Status Conference held on June 18, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 145 | 06/23/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 146 | 06/24/2025 | USCA Case Number 25-1611 for 139 Notice of Appeal,,, filed by Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services, Jay Bhattacharya. (MAP) (Entered: 06/24/2025) | |
| 147 | 06/24/2025 | Judge William G. Young: ORDER entered. (Sonnenberg, Elizabeth) (Entered: 06/24/2025) | |
| 148 | 06/24/2025 | Supplemental Record on Appeal transmitted to US Court of Appeals re 139 Notice of Appeal Documents included: ECF No. 147 (MAP) (Entered: 06/24/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

App.046

**End of Document**

# 1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

US District Court Docket

United States District Court, Massachusetts

(Boston)

**This case was retrieved on 06/27/2025**

## Header

**Case Number:** 1:25cv10814
**Date Filed:** 04/04/2025
**Assigned To:** Judge William G. Young
**Nature of Suit:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** 1:25cv10787, USCA - First Circuit, 25-01612
**Jurisdiction:** Federal Question

**Class Code:** Open
**Statute:** 05:702
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision

## Participants

### Litigants

Commonwealth of Massachusetts
**Plaintiff**

### Attorneys

Gerard J. Cedrone
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
One Ashburton Place 20th Floor
Boston, MA  02108
USA
617-963-2282 Email:Gerard.Cedrone@mass.Gov

Allyson T Slater
ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
1 Ashburton Place
Boston, MA  02108
USA
617-727-2200 Email:Allyson.Slater@mass.Gov

Chris Pappavaselio
ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA  02108
USA
213-219-0765 Email:Chris.Pappavaselio2@mass.Gov

Katherine B. Dirks
ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
1 Ashburton Pl. Ste 20th Floor
Boston, MA  02478

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | USA<br>617-963-2277 Email:Katherine.Dirks@mass.Gov<br><br>Phoebe Lockhart<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2663 Email:Phoebe.Lockhart@mass.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov<br><br>Vanessa Azniv Arslanian<br>ATTORNEY TO BE NOTICED<br>Office of Massachusetts Attorney General<br>1 Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2107 Email:Vanessa.Arslanian@mass.Gov |
| State of California<br>**Plaintiff** | Daniel Ambar<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>Healthcare Rights And Access Section 300 S. Spring St. Suite 1702<br>Los Angeles, CA  90013<br>USA<br>213-453-3598 Email:Daniel.Ambar@doj.Ca.Gov<br><br>Hilary Ann Burke Chan<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>Public Rights Division 1515 Clay Street<br>Oakland, CA  94612<br>USA<br>510-879-1499 Email:Hilary.Chan@doj.Ca.Gov<br><br>Sophia TonNu<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>Healthcare Rights & Access 455 Golden Gate Avenue Suite #11000<br>San Francisco, CA  94102<br>USA<br>415-510-3529 Email:Sophia.Tonnu@doj.Ca.Gov<br><br>Emilio Eugene Varanini , IV<br>ATTORNEY TO BE NOTICED<br>Office of the California Attorney General<br>455 Golden Gate Avenue Suite 11000 |

| Litigants | Attorneys |
|---|---|
| | San Francisco, CA  94102<br>USA<br>415-703-5908 Email:Emilio.Varanini@doj.Ca.Gov |
| | Kathleen Boergers<br>ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>1515 Clay Street Ste 20th Floor<br>Oakland, CA  94612<br>USA<br>510-879-0011 Email:Kathleen.Boergers@doj.Ca.Gov |
| | Ketakee Rajiv Kane<br>ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>1515 Clay Street<br>Oakland, CA  94612<br>USA<br>510-879-1519 Email:Ketakee.Kane@doj.Ca.Gov |
| | Nimrod Pitsker Elias<br>ATTORNEY TO BE NOTICED<br>Office of the Attorney General<br>1515 Clay Street Ste. 2000<br>Oakland, CA  94612<br>USA<br>510-879-0012 Email:Nimrod.Elias@doj.Ca.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Maryland<br>**Plaintiff** | James C. Luh<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of the Attorney General- State of Maryland<br>200 Saint Paul Place<br>Baltimore, MD  21202<br>USA<br>410-576-6411 Email:Jluh@oag.State.Md.Us |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Washington<br>**Plaintiff** | Andrew R.W. Hughes<br>ATTORNEY TO BE NOTICED<br>State of Washington Attorney General's Office<br>Complex Litigation 800 Fifth Avenue Suite 2000<br>Seattle, WA  98104<br>USA<br>206-464-7744 Email:Andrew.Hughes@atg.Wa.Gov |

App.050

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov<br><br>Tyler S. Roberts<br>ATTORNEY TO BE NOTICED<br>State of Washington Attorney General's Office<br>800 Fifth Avenue Suite 2000<br>Seattle, WA  98104<br>USA<br>206-521-3683 Fax: 206-587-4229<br>Email:Tyler.Roberts@atg.Wa.Gov |
| State of Arizona<br>**Plaintiff** | Joshua Nomkin<br>ATTORNEY TO BE NOTICED<br>Arizona Attorney General's Office<br>2005 N. Central Avenue<br>Phoenix, AZ  85004<br>USA<br>602-542-4288 Fax: 602-542-8308<br>Email:Joshua.Nomkin@azag.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Colorado<br>**Plaintiff** | Shannon Wells Stevenson<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE<br>NOTICED<br>Colorado Department of Law<br>Office Of The Attorney General 1300 Broadway<br>Denver, CO  80203<br>USA<br>720-508-6749 Email:Shannon.Stevenson@coag.Gov<br><br>Lauren Kelsey Peach<br>ATTORNEY TO BE NOTICED<br>Colorado Department of Law<br>1300 Broadway, 6th Floor<br>Denver, CO  80203<br>USA<br>720-508-6156 Fax: 720-508-6041<br>Email:Lauren.Peach@coag.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Delaware<br>**Plaintiff** | Ian Liston<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

App.051

| Litigants | Attorneys |
|---|---|

NOTICED
Delaware Department of Justice
Fraud And Consumer Protection Division, White Collar Crime
U 820 North French Street
Wilmington, DE  19801
USA
302-683-8875 Email:Ian.Liston@delaware.Gov

Vanessa L Kassab
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Delaware Department of Justice
Division Of Fraud And Consumer Protection Carvel State
Building 820 N. French St.
Wilmington, DE  19801
USA
302-683-8881 Email:Vanessa.Kassab@delaware.Gov

Rachel M. Brown
ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
Mccormack Building One Ashburton Place
Boston, MA  02108
USA
617-963-2382 Email:Rachel.Brown@mass.Gov

**State of Hawaii**
**Plaintiff**

David Dana Day
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
State of Hawaii - Department of the Attorney General
Appellate Division 425 Queen Street
Honolulu, HI  96813
USA
808-586-1346 Email:David.D.Day@hawaii.Gov

Kalikoonalani Diara Fernandes
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Department of the Attorney General, State of Hawaii
425 Queen Street
Honolulu, HI  96813
USA
808-586-1360 Email:Kaliko.D.Fernandes@hawaii.Gov

Rachel M. Brown
ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
Mccormack Building One Ashburton Place
Boston, MA  02108
USA
617-963-2382 Email:Rachel.Brown@mass.Gov

**State of Minnesota**
**Plaintiff**

Peter Farrell
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Office of the Minnesota Attorney General
445 Minnesota Street Suite 600
St. Paul, MN  55101-2127
USA
651-757-1424 Email:Peter.Farrell@ag.State.Mn.Us

Rachel M. Brown
ATTORNEY TO BE NOTICED

App.052

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Nevada<br>**Plaintiff** | Heidi Parry Stern<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Nevada Attorney General's Office<br>Solicitor General 1 State Of Nevada Way Ste 100<br>Las Vegas, NV  89119<br>USA<br>702-486-3594 Email:Hstern@ag.Nv.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of New Jersey<br>**Plaintiff** | BRYCE KELLY HURST<br>ATTORNEY TO BE NOTICED<br>NEW JERSEY OFFICE OF THE ATTORNEY GENERAL<br>25 Market Street P.O. Box 112<br>Trenton, NJ  08625<br>USA<br>609-376-2960 Email:Bryce.Hurst@law.Njoag.Gov |
| | Nancy Trasande<br>ATTORNEY TO BE NOTICED<br>New Jersey Office of the Attorney General<br>124 Halsey Street Ste 5th Floor<br>Newark, NJ  07102<br>USA<br>609-696-5371 Email:Nancy.Trasande@law.Njoag.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of New Mexico<br>**Plaintiff** | Astrid Carrete<br>ATTORNEY TO BE NOTICED<br>NEW MEXICO DEPARTMENT OF JUSTICE<br>201 3rd Street Ste 300<br>Albuquerque, NM  87102<br>USA<br>505-859-6356 Email:Acarrete@nmdoj.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |

| Litigants | Attorneys |
|---|---|
| State of New York<br>**Plaintiff** | Molly Thomas-Jensen<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>NYS Office of The Attorney General<br>28 Liberty Street 18th Floor<br>New York, NY 10005<br>USA<br>212-416-8679 Email:Molly.Thomas-Jensen@ag.Ny.Gov<br><br>Rabia Muqaddam<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>NYS Office of The Attorney General<br>28 Liberty St.<br>New York, NY 10005<br>USA<br>917-715-4172 Email:Rabia.Muqaddam@ag.Ny.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA 02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Oregon<br>**Plaintiff** | Christina Beatty-Walters<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Oregon Department of Justice<br>100 Sw Market St<br>Portland, OR 97201<br>USA<br>971-673-1880 Email:Tina.Beattywalters@doj.Oregon.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA 02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Rhode Island<br>**Plaintiff** | Jordan Broadbent<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>RI Department of Attorney General<br>150 South Main Street<br>Providence, RI 02903<br>USA<br>401-274-4400 Email:Jbroadbent@riag.Ri.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA 02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Wisconsin<br>**Plaintiff** | Lynn Kristine Lodahl<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Wisconsin Department of Justice |

App.054

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants                                    ## Attorneys

|  |  |
|---|---|
|  | 17 West Main Street<br>Madison, WI  53703<br>USA<br>608-264-6219 Email:Lodahllk@doj.State.Wi.Us |
|  | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| Robert  F. Kennedy, Jr.<br>in his official capacity as Secretary of Health and Human Services \|<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
|  | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| United States Department of Health and Human Services<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
|  | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| Jayanta Bhattacharya<br>in his official capacity as Director of the National Institutes of Health \|<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
|  | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institutes of Health<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED |

App.055

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Cancer Institute<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Eye Institute<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Heart, Lung, and Blood Institute<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Human Genome Research Institute | Thomas Ports , Jr |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| **Defendant** | LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute on Aging<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute on Alcohol Abuse and Alcoholism<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute of Allergy and Infectious Diseases<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |

App.057

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| National Institute of Arthritis and Musculoskeletal and Skin Diseases<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute of Biomedical Imaging and Bioengineering<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| Eunice Kennedy Shriver National Institute of Child Health and Human Development<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute on Deafness and Other Communication Disorders<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA |

App.058

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
| --- | --- |

617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

National Institute of Dental and Craniofacial Research
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

National Institute of Diabetes and Digestive and Kidney Diseases
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

National Institute on Drug Abuse
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

National Institute of Environmental Health Sciences
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|-----------|-----------|
| | USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute of General Medical Sciences<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute of Mental Health<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute on Minority Health and Health Disparities<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Institute of Neurological Disorders and Stroke<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200 |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| **National Institute of Nursing Research**<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| **National Library of Medicine**<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| **National Center for Advancing Translational Sciences**<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| **John E. Fogarty International Center for Advanced Study in the Health Sciences**<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | 1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| National Center for Complementary and Integrative Health<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| NIH Center for Scientific Review<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| The Association of American Medical Colleges (AAMC)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The American Association of State Colleges and Universities (AASCU)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants                                    ## Attorneys

|  |  |
|---|---|
| The American Council on Education (ACE)<br>**Amicus** | ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com<br><br>Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| The Association of American Universities (AAU)<br>**Amicus** | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com<br><br>Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| The Association of Governing Boards of Universities and Colleges (AGB)<br>**Amicus** | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com<br><br>Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| The Association of Public and Land-Grant Universities (APLU)<br>**Amicus** | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com<br><br>Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com<br><br>Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| COGR<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com<br><br>Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The National Association of Independent Colleges and Universities (NAICU)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com<br><br>Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 04/04/2025 | COMPLAINT For Declaratory and Injunctive Relief against All Defendants Filing fee: $ 405, receipt number AMADC-10933014 (Fee Status: Filing Fee paid), filed by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Colorado, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 Civil Cover Sheet, # 2 Category | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Form)(Cedrone, Gerard) Modified on 4/4/2025 to correct docket text (SP). (Entered: 04/04/2025) | |
| 2 | 04/04/2025 | ELECTRONIC NOTICE of Case Assignment. Judge Brian E. Murphy assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (NMC) (Entered: 04/04/2025) | |
| 3 | 04/04/2025 | Summons Issued as to All Defendants. Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service. (SP) (Entered: 04/04/2025) | |
| 4 | 04/04/2025 | NOTICE of Appearance by Rachel M. Brown on behalf of Commonwealth of Massachusetts (Brown, Rachel) (Entered: 04/04/2025) | |
| 5 | 04/04/2025 | NOTICE of Appearance by Chris Pappavaselio on behalf of Commonwealth of Massachusetts (Pappavaselio, Chris) (Entered: 04/04/2025) | |
| 6 | 04/04/2025 | NOTICE of Appearance by Vanessa Azniv Arslanian on behalf of Commonwealth of Massachusetts (Arslanian, Vanessa) (Entered: 04/04/2025) | |
| 7 | 04/04/2025 | NOTICE of Appearance by Allyson T Slater on behalf of Commonwealth of Massachusetts (Slater, Allyson) (Entered: 04/04/2025) | |
| 8 | 04/04/2025 | Emergency MOTION for Temporary Restraining Order  by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii. (Attachments: # 1 Text of Proposed Order)(Cedrone, Gerard) (Entered: 04/04/2025) | |
| 9 | 04/04/2025 | MEMORANDUM in Support re 8 Emergency MOTION for Temporary Restraining Order   filed by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii. (Cedrone, Gerard) (Entered: 04/04/2025) | |
| 10 | 04/04/2025 | MOTION for Leave to File Excess Pages (re ECF No. 9, Memorandum in Support of Motion for Temproary Restraining Order) by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii.(Cedrone, Gerard) (Entered: 04/04/2025) | |
| 11 | 04/04/2025 | NOTICE of Appearance by Katherine B. Dirks on behalf of Commonwealth of Massachusetts (Dirks, Katherine) (Entered: 04/04/2025) | |
| 12 | 04/04/2025 | DECLARATION re 8 Emergency MOTION for Temporary Restraining Order   by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii. (Attachments: # 1 Exhibit 1, EO 14151, # 2 Exhibit 2, EO 14168, # 3 Exhibit 3, EO 14173, # 4 Exhibit 4, HHS Directive 2.10.25, # 5 Exhibit 5, Lauer Memo 2.12.25, # 6 Exhibit 6, NIH Guidance 2.13.25, # 7 Exhibit 7, | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | DOGE Tweet 2.28.25, # 8 Exhibit 8, DEI Staff Guidance 3.4.25, # 9 Exhibit 9, Bulls Email 3.13.25, # 10 Exhibit 10, Staff Guidance and Appendices 3.25.25, # 11 Exhibit 11, NIHGPS Excerpts, # 12 Exhibit 12, MA Barton Dec., # 13 Exhibit 13, AZ Wilder Dec., # 14 Exhibit 14, CA Madanat Dec., # 15 Exhibit 15, CA Raman Dec., # 16 Exhibit 16, DE Garcia-Diaz Dec., # 17 Exhibit 17, HI Syrmos Dec., # 18 Exhibit 18, MD Pines Dec., # 19 Exhibit 19, MD Jarrell Dec., # 20 Exhibit 20, NJ Farmer Dec., # 21 Exhibit 21, NV Tracy Dec., # 22 Exhibit 22, NV Hatchett Dec., # 23 Exhibit 23, NY Murphy Dec., # 24 Exhibit 24, NY Shurtleff Dec., # 25 Exhibit 25, NY Hequembourg Dec., # 26 Exhibit 26, RI Jenkins Dec., # 27 Exhibit 27, WA Ostendorf Dec., # 28 Exhibit 28, WA Supp. Ostendorf Dec., # 29 Exhibit 29, WI Grejner-Brzezinska Dec., # 30 Exhibit 30, WI Moreno Dec., # 31 Exhibit 31, WI Nambisan Dec., # 32 Exhibit 32, WI OConnor Dec., # 33 Exhibit 33, WI Shorey Dec., # 34 Exhibit 34, OR Barr-Gillespie Dec., # 35 Exhibit 35, SF Philip Dec., # 36 Exhibit 36, CA Maldonado Dec., # 37 Exhibit 37, Berg Dec., # 38 Exhibit 38, Jaime Dec.)(Pappavaselio, Chris) (Entered: 04/04/2025) | |
| 13 | 04/04/2025 | NOTICE of Appearance by Gerard J. Cedrone on behalf of Commonwealth of Massachusetts (Cedrone, Gerard) (Entered: 04/04/2025) | |
| 14 | 04/04/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 10 Motion for Leave to File Excess Pages. (BIB) (Entered: 04/04/2025) | |
| 15 | 04/04/2025 | Judge Brian E. Murphy: SHORT ORDER OF NOTICE...Plaintiffs' Complaint, Motion for Temporary Restraining Order and all supporting documents filed in this case shall be served on the Defendants, with a copy of this Order no later than Monday, April 7, 2025. Defendants shall file a response to the 8 Motion for Temporary Restraining Order no later than Wednesday, April 9, 2025.A hearing is SCHEDULED for Tuesday, April 15, 2025 at 2:00 p.m. in Courtroom #12 before Judge Brian E. Murphy. (BIB) (Entered: 04/04/2025) | |
| 16 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of James C. Luh and Michael Drezner Filing fee: $ 250, receipt number AMADC-10934368 by State of Maryland.(Brown, Rachel) (Additional attachment(s) added on 4/4/2025: # 1 Certificate of James C. Luh, # 2 Certificate of Michael Drezner) (MBM). (Entered: 04/04/2025) | |
| 17 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Emilio Varanini, Sophia T. Tonnu, Daniel D. Ambar, Nimrod Pitsker Elias, and Ketakee R. Kane Filing fee: $ 625, receipt number AMADC-10934443 by State of California. (Attachments: # 1 Certificate of Daniel Ambar, # 2 Certificate of Emilio Varanini, # 3 Certificate of Ketakee R. Kane, # 4 Certificate of Nimrod Pitsker Elias, # 5 Certificate of Sophia T. Tonnu)(Brown, Rachel) (Entered: 04/04/2025) | |
| 18 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Peter J. Farrell Filing fee: $ 125, receipt number AMADC-10934469 by State of Minnesota. (Attachments: # 1 Certificate of Peter J. Farrell)(Brown, Rachel) (Entered: 04/04/2025) | |
| 19 | 04/04/2025 | Judge Brian E. Murphy: AMENDED SHORT ORDER OF NOTICE...Plaintiffs shall file a reply brief no later than 3:00 p.m. on Friday, April 11, 2025. (BIB) (Entered: 04/04/2025) | |
| 20 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Shannon Stevenson and Lauren Peach Filing fee: $ 250, receipt number AMADC-10934509 by State of Colorado. (Attachments: # 1 Certificate of Shannon Stevenson, # 2 Certificate of Lauren | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Peach)(Brown, Rachel) (Entered: 04/04/2025) | |
| 21 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Molly Thomas-Jensen and Rabia Muqaddam Filing fee: $ 250, receipt number AMADC-10934710 by State of New York. (Attachments: # 1 Certificate of Molly Thomas-Jensen, # 2 Certificate of Rabia Muqaddam)(Brown, Rachel) (Entered: 04/04/2025) | |
| 22 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Christina L. Beatty-Walters Filing fee: $ 125, receipt number AMADC-10934742 by State of Oregon. (Attachments: # 1 Certificate of Christina L. Beatty-Walters)(Brown, Rachel) (Entered: 04/04/2025) | |
| 23 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Andrew R.W. Hughes and Tyler S. Roberts Filing fee: $ 250, receipt number AMADC-10934780 by State of Washington. (Attachments: # 1 Certificate of Andrew R. W. Hughes, # 2 Certificate of Tyler S. Roberts)(Brown, Rachel) (Entered: 04/04/2025) | |
| 24 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Hilary Chan Filing fee: $ 125, receipt number AMADC-10934896 by State of California. (Attachments: # 1 Certificate of Hilary Chan)(Brown, Rachel) (Entered: 04/04/2025) | |
| 25 | 04/04/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice Added James C. Luh and Michael Drezner. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/04/2025) | |
| 26 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 18 Motion for Leave to Appear Pro Hac Vice Added Peter J. Farrell. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 27 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 22 Motion for Leave to Appear Pro Hac Vice Added Christina L. Beatty-Walters. Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/07/2025) | |
| 28 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 23 Motion for Leave to Appear Pro Hac Vice Added Andrew R.W. Hughes and Tyler S. Roberts. Attorneys admitted Pro Hac Vice | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 29 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 24 Motion for Leave to Appear Pro Hac Vice Added Hilary Chan. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 30 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 20 Motion for Leave to Appear Pro Hac Vice Added Shannon Stevenson and Lauren Peach.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 31 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 21 Motion for Leave to Appear Pro Hac Vice Added Molly Thomas-Jensen and Rabia Muqaddam.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 32 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 17 Motion for Leave to Appear Pro Hac Vice Added Emilio Varanini, Sophia T. Tonnu, Daniel D. Ambar, Nimrod Pitsker Elias, and Ketakee R. Kane.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac- | |

App.068

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 33 | 04/07/2025 | NOTICE of Appearance by James C. Luh on behalf of State of Maryland (Luh, James) (Entered: 04/07/2025) | |
| 34 | 04/07/2025 | NOTICE of Appearance by Anuj K. Khetarpal on behalf of Robert F. Kennedy, Jr., United States Department of Health and Human Services, Jayanta Bhattacharya, National Institutes of Health, National Cancer Institute, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute on Deafness and Other Communication Disorders, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute on Drug Abuse, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute on Minority Health and Health Disparities, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Library of Medicine, National Center for Advancing Translational Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, National Center for Complementary and Integrative Health, NIH Center for Scientific Review (Khetarpal, Anuj) (Entered: 04/07/2025) | |
| 35 | 04/07/2025 | NOTICE of Appearance by Molly Thomas-Jensen on behalf of State of New York (Thomas-Jensen, Molly) (Entered: 04/07/2025) | |
| 36 | 04/07/2025 | NOTICE of Appearance by Peter Farrell on behalf of State of Minnesota (Farrell, Peter) (Entered: 04/07/2025) | |
| 37 | 04/07/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua G. Nomkin Filing fee: $ 125, receipt number AMADC-10937197 by State of Arizona. (Attachments: # 1 Certificate of Joshua G. Nomkin)(Brown, Rachel) (Entered: 04/07/2025) | |
| 38 | 04/07/2025 | NOTICE of Appearance by Daniel Ambar on behalf of State of California (Ambar, Daniel) (Entered: 04/07/2025) | |
| 39 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 37 Motion for Leave to Appear Pro Hac Vice Added Joshua G. Nomkin. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 40 | 04/07/2025 | NOTICE of Appearance by Rabia Muqaddam on behalf of State of New York (Muqaddam, Rabia) (Entered: 04/07/2025) | |
| 41 | 04/07/2025 | NOTICE of Appearance by Sophia TonNu on behalf of State of California (TonNu, Sophia) (Entered: 04/07/2025) | |
| 42 | 04/07/2025 | NOTICE of Appearance by Emilio Eugene Varanini, IV on behalf of State of California (Varanini, Emilio) (Entered: 04/07/2025) | |
| 43 | 04/07/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kathleen Boergers Filing fee: $ 125, receipt number AMADC-10938287 by State of California. (Attachments: # 1 Certificate of | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Kathleen Boergers)(Brown, Rachel) (Entered: 04/07/2025) | |
| 44 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 43 Motion for Leave to Appear Pro Hac Vice Added Kathleen Boergers.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/08/2025) | |
| 45 | 04/08/2025 | NOTICE of Appearance by Lauren Kelsey Peach on behalf of State of Colorado (Peach, Lauren) (Entered: 04/08/2025) | |
| 46 | 04/08/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Lynn K. Lodahl Filing fee: $ 125, receipt number AMADC-10939698 by State of Wisconsin. (Attachments: # 1 Certificate of Lynn K. Lodahl)(Brown, Rachel) (Entered: 04/08/2025) | |
| 47 | 04/08/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Jordan Broadbent Filing fee: $ 125, receipt number AMADC-10939713 by State of Rhode Island. (Attachments: # 1 Certificate of Jordan Broadbent)(Brown, Rachel) (Entered: 04/08/2025) | |
| 48 | 04/08/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kalikoonlani D. Fernandes and David D. Day Filing fee: $ 250, receipt number AMADC-10940489 by State of Hawaii. (Attachments: # 1 Certificate of Kalikoonlani D. Fernandes, # 2 Certificate of David D. Day)(Brown, Rachel) (Entered: 04/08/2025) | |
| 49 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 46 Motion for Leave to Appear Pro Hac Vice Added Lynn K. Lodahl.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/08/2025) | |
| 50 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 47 Motion for Leave to Appear Pro Hac Vice Added Jordan Broadbent.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/08/2025) | |
| 51 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 48 Motion for Leave to Appear Pro Hac Vice Added Kalikoonlani D. Fernandes and David D. Day.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/08/2025) | |
| 52 | 04/08/2025 | NOTICE of Appearance by Jordan Broadbent on behalf of State of Rhode Island (Broadbent, Jordan) (Entered: 04/08/2025) | |
| 53 | 04/08/2025 | NOTICE of Appearance by Joshua Nomkin on behalf of State of Arizona (Nomkin, Joshua) (Entered: 04/08/2025) | |
| 54 | 04/08/2025 | SUMMONS Returned Executed by State of Delaware, State of California, Commonwealth of Massachusetts, State of Wisconsin, State of Oregon, State of Nevada, State of New Jersey, State of New York, State of Colorado, State of Maryland, State of Minnesota, State of New Mexico, State of Rhode Island, State of Hawaii, State of Washington, State of Arizona. (Attachments: # 1 Exhibit Declaration of Service)(Pappavaselio, Chris) (Entered: 04/08/2025) | |
| 55 | 04/08/2025 | NOTICE of Appearance by Kalikoonalani Diara Fernandes on behalf of State of Hawaii (Fernandes, Kalikoonalani) (Entered: 04/08/2025) | |
| 56 | 04/08/2025 | NOTICE of Appearance by David Dana Day on behalf of State of Hawaii (Day, David) (Entered: 04/08/2025) | |
| 57 | 04/08/2025 | NOTICE of Appearance by Thomas Ports, Jr on behalf of Robert F. Kennedy, Jr., United States Department of Health and Human Services, Jayanta Bhattacharya, National Institutes of Health, National Cancer Institute, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute on Deafness and Other Communication Disorders, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute on Drug Abuse, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute on Minority Health and Health Disparities, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Library of Medicine, National Center for Advancing Translational Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, National Center for Complementary and Integrative Health, NIH Center for Scientific Review (Ports, Thomas) (Entered: 04/08/2025) | |
| 58 | 04/08/2025 | Assented to MOTION to Set a Briefing Schedule on Plaintiffs' Motion for a Preliminary Injunction and NOTICE of Withdrawal of Plaintiffs' Motion for a Temporary Restraining Order re 8 Emergency MOTION for Temporary Restraining Order   by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Colorado, State of Delaware, State of Hawaii, State of Minnesota.(Cedrone, Gerard) (Entered: 04/09/2025) | |
| 59 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER GRANTING 58 Assented to MOTION to Set a Briefing Schedule on Plaintiffs' Motion for a Preliminary Injunction and NOTICE of Withdrawal of Plaintiffs' Motion for a Temporary Restraining Order. The 8 Emergency Motion for a Temporary Restraining Order is WITHDRAWN. Briefing schedule for the Motion for Preliminary | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Injunction is ADOPTED and hearing is set.BRIEFING SCHEDULE:Plaintiffs' Motion for Preliminary Injunction shall be filed 4/14/2025.Oppositions to Motion for Preliminary Injunction shall be filed by 4/30/2025.Replies shall be filed by 5/5/2025.NOTICE OF HEARING:Hearing on Motion for Preliminary Injunction is scheduled for 5/9/2025 at 1:30 p.m. in Courtroom 12 (In person only) before Judge Brian E. Murphy. (BIB) (Entered: 04/09/2025) | |
| 60 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Vanessa L. Kassab Filing fee: $ 125, receipt number AMADC-10942197 by State of Delaware. (Attachments: # 1 Certificate of Vanessa Kassab)(Brown, Rachel) (Entered: 04/09/2025) | |
| 61 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Astrid Carrete Filing fee: $ 125, receipt number AMADC-10942213 by State of New Mexico. (Attachments: # 1 Certificate of Astrid Carrete)(Brown, Rachel) (Entered: 04/09/2025) | |
| 62 | 04/09/2025 | NOTICE of Appearance by Nimrod Pitsker Elias on behalf of State of California (Elias, Nimrod) (Entered: 04/09/2025) | |
| 63 | 04/09/2025 | NOTICE of Appearance by Tyler S. Roberts on behalf of State of Washington (Roberts, Tyler) (Entered: 04/09/2025) | |
| 64 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Heidi Parry Stern Filing fee: $ 125, receipt number AMADC-10942950 by State of Nevada. (Attachments: # 1 Certificate of Heidi Parry Stern)(Brown, Rachel) (Entered: 04/09/2025) | |
| 65 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Nancy Trasande and Bryce K. Hurst Filing fee: $ 250, receipt number AMADC-10942961 by State of New Jersey. (Attachments: # 1 Certificate of Nancy Trasande, # 2 Certificate of Bryce K. Hurst)(Brown, Rachel) (Entered: 04/09/2025) | |
| 66 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 60 Motion for Leave to Appear Pro Hac Vice Added Vanessa L. Kassab.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/09/2025) | |
| 67 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 61 Motion for Leave to Appear Pro Hac Vice Added Astrid Carrete.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/09/2025) | |
| 68 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 64 Motion for Leave to Appear Pro Hac Vice Added Heidi Parry Stern.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/09/2025) | |
| 69 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 65 Motion for Leave to Appear Pro Hac Vice Added Nancy Trasande and Bryce K. Hurst. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/09/2025) | |
| 70 | 04/09/2025 | NOTICE of Appearance by Hilary Ann Burke Chan on behalf of State of California (Burke Chan, Hilary) (Entered: 04/09/2025) | |
| 71 | 04/10/2025 | NOTICE of Appearance by Shannon Wells Stevenson on behalf of State of Colorado (Stevenson, Shannon) (Entered: 04/10/2025) | |
| 72 | 04/10/2025 | NOTICE of Appearance by Heidi Parry Stern on behalf of State of Nevada (Stern, Heidi) (Entered: 04/10/2025) | |
| 73 | 04/14/2025 | NOTICE of Appearance by Bryce Kelly Hurst on behalf of State of New Jersey (Hurst, Bryce) (Entered: 04/14/2025) | |
| 74 | 04/14/2025 | NOTICE of Appearance by Nancy Trasande on behalf of State of New Jersey (Trasande, Nancy) (Entered: 04/14/2025) | |
| 75 | 04/14/2025 | AMENDED COMPLAINT for Declaratory and Injunctive Relief against All Defendants, filed by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Colorado, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 Exhibit 1 (Notice Pause Directive), # 2 Exhibit 2 (Secretarial Directive), # 3 Exhibit 3 (Lauer Memorandum), # 4 Exhibit 4 (Supplemental Lauer Memorandum), # 5 Exhibit 5 (Priorities Directive), # 6 Exhibit 6 (Award Revision Guidance), # 7 Exhibit 7 (Revised Priorities Directive))(Cedrone, Gerard) (Entered: 04/14/2025) | |
| 76 | 04/14/2025 | MOTION for Preliminary Injunction by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 Text of Proposed Order)(Cedrone, Gerard) (Entered: 04/14/2025) | |
| 77 | 04/14/2025 | DECLARATION re 76 MOTION for Preliminary Injunction by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 Exhibit 1, EO 14151, # 2 Exhibit 2, EO 14168, # 3 Exhibit 3, EO 14173, # 4 Exhibit 4, HHS Directive 2.10.25, # 5 Exhibit 5, Lauer Memo 2.12.25, # 6 Exhibit 6, NIH Guidance 2.13.25, # 7 Exhibit 7, DOGE Tweet 2.28.25, # 8 Exhibit 8, DEI Staff Guidance 3.4.25, # 9 Exhibit 9, Bulls Email 3.13.25, # 10 Exhibit 10, Staff Guidance and Appendices 3.25.25 (Updated), # 11 Exhibit 11, NIHGPS Excerpts (Updated), # 12 Exhibit 12, MA Barton Dec., # 13 Exhibit 13, AZ Wilder Dec., # 14 Exhibit 14, CA Madanat Dec., # 15 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Exhibit 15, CA Raman Dec., # 16 Exhibit 16, DE Garcia-Diaz Dec., # 17 Exhibit 17, HI Syrmos Dec. (Updated), # 18 Exhibit 18, MD Pines Dec., # 19 Exhibit 19, MD Jarrell Dec. (Updated), # 20 Exhibit 20, NJ Farmer Dec., # 21 Exhibit 21, NV Tracy Dec., # 22 Exhibit 22, NV Hatchett Dec., # 23 Exhibit 23, NY Murphy Dec., # 24 Exhibit 24, NY Shurtleff Dec., # 25 Exhibit 25, NY Hequembourg Dec., # 26 Exhibit 26, RI Jenkins Dec., # 27 Exhibit 27, WA Ostendorf Dec., # 28 Exhibit 28, WA Supp. Ostendorf Dec., # 29 Exhibit 29, WI Grejner-Brzezinska Dec., # 30 Exhibit 30, WI Moreno Dec., # 31 Exhibit 31, WI Nambisan Dec., # 32 Exhibit 32, WI OConnor Dec., # 33 Exhibit 33, WI Shorey Dec., # 34 Exhibit 34, OR Barr-Gillespie Dec., # 35 Exhibit 35, SF Philip Dec., # 36 Exhibit 36, CA Maldonado Dec., # 37 Exhibit 37, Berg Dec., # 38 Exhibit 38, Jaime Dec., # 39 Exhibit 39 Jan 21 Pause Guidance, # 40 Exhibit 40 Hutchings Dec, # 41 Exhibit 41 Bulls Deposition, # 42 Exhibit 42 Atlantic Article, # 43 Exhibit 43 Advisory Council Agendas, # 44 Exhibit 44 AACR Article, # 45 Exhibit 45 MA Barton Supp Dec, # 46 Exhibit 46 AZ Morton Dec, # 47 Exhibit 47 AZ Wilder Supp Dec, # 48 Exhibit 48 CA Crawford Dec, # 49 Exhibit 49 CA Kitchell Dec, # 50 Exhibit 50 WI Pool Dec, # 51 Exhibit 51 NJ Kean Dec, # 52 Exhibit 52 NJ Pelesko Dec, # 53 Exhibit 53 NJ Farmer Supp Dec, # 54 Exhibit 54 NM Reddi Dec, # 55 Exhibit 55 NM Lusetti Dec, # 56 Exhibit 56 NM Richards Dec, # 57 Exhibit 57 OR Forrest Dec, # 58 Exhibit 58 OR Tankersly Dec, # 59 Exhibit 59 OR Razdan Dec, # 60 Exhibit 60 RI Jenkins Supp Dec, # 61 Exhibit 61 Berg Supp Dec, # 62 Exhibit 62 CA Raman Supp Dec, # 63 Exhibit 63 CA Riggs Supp Dec, # 64 Exhibit 64 MN Shashank Dec, # 65 Exhibit 65 CA Collard Dec)(Pappavaselio, Chris) (Entered: 04/14/2025) | |
| 78 | 04/14/2025 | MEMORANDUM in Support re 76 MOTION for Preliminary Injunction filed by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii, State of Minnesota. (Cedrone, Gerard) (Entered: 04/14/2025) | |
| 79 | 04/17/2025 | MOTION for Leave to File Amici Curiae Brief (unopposed) by The Association of American Medical Colleges, The American Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR. (Attachments: # 1 Proposed Brief of Amici Curiae)(Bueker, John) (Entered: 04/17/2025) | |
| 80 | 04/17/2025 | Amicus Curiae APPEARANCE entered by John P. Bueker on behalf of The Association of American Medical Colleges, The American Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR. (Bueker, John) (Entered: 04/17/2025) | |
| 81 | 04/17/2025 | Amicus Curiae APPEARANCE entered by Douglas Hallward-Driemeier on behalf of The Association of American Medical Colleges, The American Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Colleges and Universities, COGR. (Hallward-Driemeier, Douglas) (Entered: 04/17/2025) | |
| 82 | 04/17/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephanie A. Webster Filing fee: $ 125, receipt number AMADC-10959319 by The Association of American Medical Colleges, The American Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR.(Bueker, John) (Entered: 04/17/2025) | |
| 83 | 04/17/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Amish A. Shah Filing fee: $ 125, receipt number AMADC-10959604 by The Association of American Medical Colleges, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR.(Bueker, John) (Entered: 04/17/2025) | |
| 84 | 04/18/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 79 Motion for Leave to File Amici Curiae Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MBM) (Entered: 04/18/2025) | |
| 85 | 04/18/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 82 Motion for Leave to Appear Pro Hac Vice Added Stephanie A. Webster. Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/18/2025) | |
| 86 | 04/18/2025 | AMICUS BRIEF filed by The Association of American Medical Colleges (AAMC), The American Association of State Colleges and Universities (AASCU), The American Council on Education (ACE), The Association of American Universities (AAU), The Association of Governing Boards of Universities and Colleges (AGB), The Association of Public and Land-Grant Universities (APLU), COGR, The National Association of Independent Colleges and Universities (NAICU) . (Bueker, John) (Entered: 04/18/2025) | |
| 87 | 04/18/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 83 Motion for Leave to Appear Pro Hac Vice Added Amish A. Shah. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/18/2025) | |
| 88 | 04/18/2025 | Amicus Curiae APPEARANCE entered by Stephanie A. Webster on behalf of The Association of American Medical Colleges (AAMC), The American Association of State Colleges and | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Universities (AASCU), The American Council on Education (ACE), The Association of American Universities (AAU), The Association of Governing Boards of Universities and Colleges (AGB), The Association of Public and Land-Grant Universities (APLU), COGR, The National Association of Independent Colleges and Universities (NAICU). (Webster, Stephanie) (Entered: 04/18/2025) | |
| 89 | 04/18/2025 | Amicus Curiae APPEARANCE entered by Amish Aajay Shah on behalf of The Association of American Medical Colleges (AAMC), The American Association of State Colleges and Universities (AASCU), The American Council on Education (ACE), The Association of American Universities (AAU), The Association of Governing Boards of Universities and Colleges (AGB), The Association of Public and Land-Grant Universities (APLU), COGR, The National Association of Independent Colleges and Universities (NAICU). (Shah, Amish) (Entered: 04/18/2025) | |
| 90 | 04/22/2025 | NOTICE of Appearance by Ketakee Rajiv Kane on behalf of State of California (Kane, Ketakee) (Entered: 04/22/2025) | |
| 91 | 04/24/2025 | NOTICE of Appearance by Lynn Kristine Lodahl on behalf of State of Wisconsin (Lodahl, Lynn) (Entered: 04/24/2025) | |
| 92 | 04/28/2025 | NOTICE of Appearance by Astrid Carrete on behalf of State of New Mexico (Carrete, Astrid) (Entered: 04/28/2025) | |
| 93 | 04/28/2025 | NOTICE of Appearance by Astrid Carrete on behalf of State of New Mexico (Carrete, Astrid) (Entered: 04/28/2025) | |
| 94 | 04/28/2025 | NOTICE of Appearance by Andrew R.W. Hughes on behalf of State of Washington (Hughes, Andrew) (Entered: 04/28/2025) | |
| 95 | 05/01/2025 | Opposition re 76 MOTION for Preliminary Injunction filed by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Attachments: # 1 Exhibit A - Examples of active, not terminated grants)(Ports, Thomas) (Entered: 05/01/2025) | |
| 96 | 05/01/2025 | Consent MOTION for Extension of Time to May 1, 2025 to file opposition by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  |  | National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services.(Ports, Thomas) (Entered: 05/01/2025) |  |
| 97 | 05/01/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 96 Consent MOTION for Extension of Time to May 1, 2025 to file opposition. (MBM) (Entered: 05/01/2025) |  |
| 98 | 05/01/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER OF RECUSAL - In accordance with 28 U.S.C. § 455(a), I hereby recuse myself from this proceeding. The Clerk is directed to return the case for reassignment.Associated Cases: 1:25-cv-10814-BEM, 1:25-cv-10787-BEM(BIB) (Entered: 05/01/2025) |  |
| 99 | 05/01/2025 | ELECTRONIC NOTICE of Reassignment. Judge William G. Young added. Judge Brian E. Murphy no longer assigned to case. (CM) (Entered: 05/01/2025) |  |
| 100 | 05/02/2025 | ELECTRONIC NOTICE Resetting Hearing on Motion 76 MOTION for Preliminary Injunction  : Motion Hearing reset for 5/8/2025 11:30 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young.  In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(KB) (Entered: 05/02/2025) |  |
| 101 | 05/05/2025 | REPLY to Response to 76 MOTION for Preliminary Injunction filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Attachments: # 1 Exhibit 1 (Declaration of Joshua Fessel), # 2 Exhibit 2 (Supp. Declaration of Ryan Hutchings), # 3 Exhibit 3 (Second Supp. Declaration of Jeremy M. Berg), # 4 Exhibit 4 (Supp. Declaration of Theresa A. Maldonado), # 5 Exhibit 5 (Declaration of Annika Barber))(Cedrone, Gerard) (Entered: 05/05/2025) |  |
| 102 | 05/06/2025 | NOTICE of Appearance by Kathleen Boergers on behalf of State of California (Boergers, Kathleen) (Entered: 05/06/2025) |  |
| 103 | 05/07/2025 | Notice of Supplemental Authorities re 76 MOTION for Preliminary Injunction  (Attachments: # 1 Exhibit A - Decision in Rhode Island v. Trump)(Cedrone, Gerard) (Entered: 05/07/2025) |  |
| 104 | 05/08/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 5/8/2025 re 76 MOTION for Preliminary Injunction. Court hears argument on subject matter jurisdiction. Court takes the matter under advisement. If the Court determines it does have subject matter jurisdiction it will hold a case management conference May 13, |  |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 2025 at 2:00pm. Court requests plaintiffs to submit spreadsheet as discussed at the hearing by Tuesday, May 13th. Case Management Conference set for 5/13/2025 02:00 PM in Courtroom 18 (In person only with Remote Access Provided) before Judge William G. Young.). In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Gerard J. Cedrone, Chris Pappavaselio, Katherine B. Dirks, Rachel M. Brown, Vanessa Azniv Arslanian, and Sophia TonNu for plaintiffs and Thomas Ports, Jr, and Anuj K. Khetarpal for defendants) (KB) (Entered: 05/08/2025) | |
| 105 | 05/12/2025 | Judge William G. Young: ORDER entered.  MEMORANDUM AND ORDER  ON SUBJECT MATTER JURISDICTION (Sonnenberg, Elizabeth) (Entered: 05/12/2025) | |
| 106 | 05/12/2025 | ELECTRONIC NOTICE of Hearing. Case Management Conference set for 5/13/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here. (KB) (Entered: 05/12/2025) | |
| 107 | 05/12/2025 | Transcript of Preliminary Injunction held on May 8, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/2/2025. Redacted Transcript Deadline set for 6/12/2025. Release of Transcript Restriction set for 8/11/2025. (DRK) (Entered: 05/12/2025) | |
| 108 | 05/12/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/12/2025) | |
| 109 | 05/13/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Case Management Conference held on 5/13/2025. Court discusses next steps for the case. Court hears from the parties. The first portion of the case will focus on termination of grants. The defendants to file administrative records by June 2, 2025. Parties may file briefs. The Court sets a further hearing June 16, 2025 at 10:00am. The parties shall inform the Court if the June 16th hearing will be on the record submitted or if there is a dispute about whether evidence should be entered at the hearing. On the unreasonable delay issue the parties shall propose schedule(s) on this issue and the Court will set a further status conference on it. <Hearing set for 6/16/2025 10:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Katherine Dirks, Rachel Brown, Daniel Ambar for the plaintiffs and Thomas Ports, Jr. and Anuj Khetarpal for the defendants) (KB) (Entered: 05/14/2025) | |
| 110 | 05/16/2025 | Transcript of Case Management Conference held on May 13, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/6/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025. (DRK) (Entered: 05/19/2025) | |
| 111 | 05/16/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/19/2025) | |
| 112 | 05/23/2025 | ELECTRONIC NOTICE of Hearing. Status Conference re case management of related cases set for 6/3/2025 11:00 AM in Courtroom 18 (In person only) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 05/23/2025) | |
| 113 | 05/29/2025 | JOINT STATEMENT of counsel regarding schedule for further proceedings. (Cedrone, Gerard) (Entered: 05/29/2025) | |
| 114 | 05/30/2025 | NOTICE of Appearance by Phoebe Lockhart on behalf of Commonwealth of Massachusetts (Lockhart, Phoebe) (Entered: 05/30/2025) | |
| 115 | 06/02/2025 | NOTICE of Appearance by Vanessa L Kassab on behalf of State of Delaware (Kassab, Vanessa) (Entered: 06/02/2025) | |
| 116 | 06/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Ian R. Liston Filing fee: $ 125, receipt number AMADC-11043181 by State of Delaware. (Attachments: # 1 Certificate of Ian R. Liston)(Brown, Rachel) (Entered: 06/02/2025) | |
| 117 | 06/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 116 Motion for Leave to Appear Pro Hac Vice Added Ian R. Liston.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAP) (Entered: 06/02/2025) | |
| 118 | 06/02/2025 | NOTICE of Production of Administrative Record by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services (Attachments: # 1 Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/02/2025) | |
| 119 | 06/03/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference held on 6/3/2025. Government has produced administrative record in both cases. The Court hears from parties in both cases regarding schedule and June 16th hearing. Court will hear argument on Phase 1 from 10am-1pm on June 16th in both cases. The Court adopts the proposed schedule filed in 25-cv-10814 Document 113 at page 2. The Court modifies the proposed schedule at page 4 as follows: By June 20, 2025, defendants may move to dismiss plaintiffs' claims related to alleged reasonable delay. By July 9, 2025, defendants must lodge the administrative record. Court and parties discuss phase II. Record to be supplemented as to the challenged directives as directed by the Court. If the case(s) were to resolve the parties shall inform the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Suzanne Schlossberg, Gerard Cedrone, Katherine Dirks, Phoebe Lockhart for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/04/2025) | |
| 120 | 06/04/2025 | NOTICE of Appearance by Ian Liston on behalf of State of Delaware (Liston, Ian) (Entered: 06/04/2025) | |
| 121 | 06/05/2025 | Transcript of Status Conference held on June 3, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/05/2025) | |
| 122 | 06/05/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/05/2025) | |
| 123 | 06/05/2025 | STIPULATION Regarding Phase One Schedule Modifications by | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/05/2025) | |
| 124 | 06/09/2025 | MOTION To Complete the Administrative Record  by State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin.(Brown, Rachel) (Entered: 06/09/2025) | |
| 125 | 06/09/2025 | TRIAL BRIEF  by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Ports, Thomas) (Entered: 06/09/2025) | |
| 126 | 06/09/2025 | MEMORANDUM OF LAW by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/09/2025) | |
| 127 | 06/09/2025 | APPENDIX/EXHIBIT re 126 Memorandum of Law, Proposed Order, Declaration, and Permanent Injunction by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/09/2025) | |
| 128 | 06/10/2025 | Judge William G. Young: ELECTRONIC ORDER entered allowed 124 MOTION To Complete the Administrative Record (MAP) (Entered: 06/10/2025) | |
| 129 | 06/10/2025 | NOTICE by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin regarding the June 16 Hearing (Cedrone, | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Gerard) (Entered: 06/10/2025) | |
| 130 | 06/11/2025 | ELECTRONIC NOTICE of Hearing. Final Pretrial Conference set for 6/12/2025 11:00 AM in Courtroom 18 (Remote only) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/11/2025) | |
| 131 | 06/11/2025 | Certification of the Administrative Record (Updated) by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services re 118 Notice (Other),,,,,, (Attachments: # 1 Email, # 2 Certification, # 3 Ex A to certification, # 4 Ex B to certification, # 5 Ex C to certification, # 6 NIH_GRANTS_003825-3910, # 7 NIH_GRANTS_003911-3995, # 8 NIH_GRANTS_003996-4081, # 9 NIH_GRANTS_004082-4165, # 10 NIH_GRANTS_004166-4251, # 11 NIH_GRANTS_004252, # 12 NIH_GRANTS_004253-54, # 13 NIH_GRANTS_004255-57, # 14 NIH_GRANTS_004258-69, # 15 NIH_GRANTS_004270)(Ports, Thomas) Modified on 6/11/2025 (MAP). (Entered: 06/11/2025) | |
| 132 | 06/12/2025 | Opposition re 124 MOTION To Complete the Administrative Record   filed by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human | |

App.082

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Services. (Attachments: # 1 Exhibit)(Khetarpal, Anuj) (Entered: 06/12/2025) | |
| 133 | 06/12/2025 | Judge William G. Young: ELECTRONIC ORDER entered vacating 128 Order on 124 Motion to Complete Administrative Record. Motion allowed in part and denied in part as follows: A. Grants not terminated- Denied as moot B. Termination forms- Allowed. "Guidance" is not "deliberation." C. HHS and DOGE imput: Denied on the representation that such search has been made. D. AI Use: Allowed. E. Metadata: Denied without prejudice to seeking such discovery beyond the APA claims. F. Certification. Denied as moot. SO ORDERED(KB) (Entered: 06/12/2025) | |
| 136 | 06/12/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 6/12/2025. Court and the parties discuss the record in the case. Court has administrative record as it has been provided. Plaintiffs have also filed records. Court hears parties on the matter. Court will review defendants' opposition to the motions to Complete Record. Court will hear oral argument on phase 1 of the case on Monday, June 16th at 10am. Each side will have one hour for argument (plaintiffs in both cases will have one hour combined). Parties to discuss proposed phase 2 schedule on Monday. Court has off the record portion of hearing regarding possibility of settlement. If the case were to settle in part or in whole the parties shall inform the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Matthew Brinckerhoff, Jessie Rossman, Lisa Mankofsky, Max Roller Selver, Olga Akselrod, Rachel Anne Meeropol, Sydney Kathryn Zazzaro, Gerard Cedrone, Christopher Pappavaselio, Phoebe Lockhart, Rachel Brown, Vanessa Azniv Arslanian, Nimrod Pitsker Elias, Astrid Carrete, Jordan Broadbent for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/13/2025) | |
| 134 | 06/13/2025 | TRIAL BRIEF in Response to Plaintiffs' Opening Briefs by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Ports, Thomas) (Entered: 06/13/2025) | |
| 135 | 06/13/2025 | MEMORANDUM OF LAW by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin to 125 Trial Brief,,,,,,. (Attachments: # 1 Appendix A - Plaintiffs' Response to Defendants' Identification of Grants)(Cedrone, Gerard) (Entered: 06/13/2025) | |
| 137 | 06/13/2025 | Transcript of Final Pretrial held on June 12, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/7/2025. Redacted Transcript Deadline set for 7/14/2025. Release of Transcript Restriction set for 9/11/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/13/2025) | |
| 138 | 06/13/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/13/2025) | |
| 139 | 06/13/2025 | NOTICE by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services of Production of Administrative Record (Attachments: # 1 Designation and Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/13/2025) | |
| 140 | 06/15/2025 | Joint MOTION for Protective Order by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin.(Cedrone, Gerard) (Entered: 06/15/2025) | |
| 141 | 06/16/2025 | ELECTRONIC NOTICE of Hearing. Hearing set for 6/16/2025 at 2:00pm. (In person with remote access provided) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/16/2025) | |
| 142 | 06/16/2025 | Judge William G. Young: STIPULATED PROTECTIVE ORDER entered. Granting (140) Joint Motion for Protective Order in case 1:25-cv-10814-WGY Associated Cases: 1:25-cv-10814-WGY, | |

App.084

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 1:25-cv-10787-WGY(KB) (Entered: 06/16/2025) | |
| 143 | 06/16/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial as to Phase 1 held on 6/16/2025.Court hears argument on Phase 1 of the case. Defendants ask Court to take Judicial Notice of the Federal Register Notices. Court takes Judicial Notice. Defendants move to admit into evidence 13 Certified records. No objection. Admitted as exhibit 1. Court takes the matter under advisement. Parties will inform the Court if they wish for the Court to reconvene in the afternoon or if they wish for the Court to hold off issuing a ruling as to Phase 1. The Court reconvenes in the afternoon. The Court announces the findings and rulings that it is able to make today. The challenged directives are vacated. A written order will issue. Defendants shall promptly comply with the order of the Court. Plaintiffs to submit a proposed partial but final judgment as to Phase 1 by June 17, 2025. The Court discusses evidence as to harm. The parties will meet and inform the Court if an evidentiary hearing regarding harm is necessary. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Rachel Anne Meeropol, Gerard Cedrone, Rachel Brown, Nimrod Pitsker Elias for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/17/2025) | |
| 144 | 06/17/2025 | Proposed Document(s) submitted by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. Document received: Proposed Rule 54(b) Final Judgment. (Cedrone, Gerard) (Entered: 06/17/2025) | |
| 145 | 06/18/2025 | ELECTRONIC NOTICE of Hearing. Status Conference set for 6/18/2025 02:00 PM in Courtroom 18 (Remote only) before Judge William G. Young. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |
| 146 | 06/18/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference re proposed judgments held on 6/18/2025. The Court hears from parties regarding proposed judgments and modifies judgments as stated. Plaintiffs' counsel shall re-submit the proposed judgments as modified by the Court. (Attorneys present: Olga Akselrod, Lisa Mankofsky, Suzanne Schlossberg, Jessie J. Rossman, Gerard Cedrone, Chris Pappavaselio, Phoebe Lockhart, Rachel M. Brown for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants)(Court Reporter: Richard Romanow at rhr3tubas@aol.com.) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |

App.085

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 147 | 06/18/2025 | Proposed Document(s) submitted by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. Document received: Proposed Rule 54(b) Final Judgment (Revised per Court's Instructions). (Attachments: # 1 Exhibit A - Spreadsheet)(Cedrone, Gerard) (Entered: 06/18/2025) | |
| 148 | 06/20/2025 | MOTION to Dismiss and to set an expedited response deadline of June 26 by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Ports, Thomas) Modified on 6/22/2025 (MAP). (Entered: 06/20/2025) | |
| 149 | 06/20/2025 | Opposition re 148 MOTION to Dismiss and to set an expedited response deadline of June 26 (Opposition as to Motion to Expedite) filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/20/2025) | |
| 150 | 06/22/2025 | MEMORANDUM in Support re 148 MOTION to Dismiss and to set an expedited response deadline of June 26 filed by Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National | |

App.086

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (MAP) (Entered: 06/22/2025) | |
| 151 | 06/23/2025 | Judge William G. Young: WGY RULE 54(b) FINAL JUDGMENT (Sonnenberg, Elizabeth) (Additional attachment(s) added on 6/23/2025: # 1 List of Grants) (MAP). (Main Document 151 replaced on 6/23/2025) (MAP). (Entered: 06/23/2025) | |
| 152 | 06/23/2025 | NOTICE OF APPEAL as to 105 Memorandum & ORDER, 151 Order by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. Fee Status: US Government. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 7/14/2025. (Ports, Thomas) (Entered: 06/23/2025) | |
| 153 | 06/23/2025 | MOTION to Stay Pending Appeal by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes | |

App.087

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services.(Ports, Thomas) (Entered: 06/23/2025) | |
| 154 | 06/23/2025 | MEMORANDUM in Support re 153 MOTION to Stay Pending Appeal filed by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Ports, Thomas) (Entered: 06/23/2025) | |
| 155 | 06/23/2025 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 152 Notice of Appeal. (MAP) (Entered: 06/23/2025) | |
| 156 | 06/23/2025 | Transcript of Bench Trial, Phase 1 (Closings) held on June 16, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 157 | 06/23/2025 | Transcript of Status Conference held on June 18, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 158 | 06/23/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 159 | 06/24/2025 | USCA Case Number 25-1612 for 152 Notice of Appeal, filed by National Institutes of Health, National Institute on Aging, Jayanta Bhattacharya, National Institute on Minority Health and Health Disparities, United States Department of Health and Human Services, National Institute of Mental Health, National Eye Institute, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute on Drug Abuse, National Institute of Diabetes and Digestive and Kidney Diseases, National Center for Advancing Translational Sciences, National Cancer Institute, National Heart, Lung, and Blood Institute, National Institute of Environmental Health Sciences, National Center for Complementary and Integrative Health, National Library of Medicine, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute of Nursing Research, National Institute of Neurological Disorders and Stroke, National Institute of General Medical Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., National Institute on Deafness and Other Communication Disorders, National Institute of Biomedical Imaging and Bioengineering, NIH Center for Scientific Review, National Human Genome Research Institute, National Institute of Dental and Craniofacial Research, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases. (MAP) (Entered: 06/24/2025) | |
| 160 | 06/24/2025 | Judge William G. Young:  ORDER entered.  (Sonnenberg, Elizabeth) (Entered: 06/24/2025) | |
| 161 | 06/24/2025 | Supplemental Record on Appeal transmitted to US Court of Appeals re 152 Notice of Appeal Documents included: ECF No. 160 (MAP) (Entered: 06/24/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

App.089

AMERICAN PUBLIC HEALTH
ASSOCIATION; IBIS REPRODUCTIVE
HEALTH; INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS (UAW); BRITTANY
CHARLTON; KATIE EDWARDS; PETER
LURIE; and NICOLE MAPHIS

        *Plaintiffs*,

     v.

NATIONAL INSTITUTES OF HEALTH;
JAY BHATTACHARYA, *in his official
capacity as Director of the National Institutes
of Health*; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and ROBERT F.
KENNEDY, JR.*, in his official capacity as
Secretary of the United States Department of
Health and Human Services*,

        *Defendants*.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

    1.    The National Institutes of Health ("NIH") is the world's leading funder of

biomedical and behavioral research, responsible for the discovery of new ways to diagnose,

prevent, and treat the most challenging diseases including cancer, strokes, diabetes, and

Alzheimer's disease. Long considered "the crown jewel" of the federal government, NIH has

1

funded research that has led to more than 100 Nobel Prizes and has supported more than 99 percent of the drugs approved by federal regulators from 2010 to 2019.[1]

2.     In late February 2025, Defendants upended NIH's enviable track record of rigor and excellence, launching a reckless and illegal purge to stamp out NIH-funded research that addresses topics and populations that they disfavor. Plaintiffs, who are leading health research organizations and research scientists, bring this case because they have been harmed by Defendants' unlawful grant terminations and midstream abandonment of grant application processes.

3.     Congress created NIH nearly 100 years ago and funds it through annual appropriations so that it can "improve health, revolutionize science, and serve society."[2] Congress has provided additional directives to NIH to ensure that its research accrues to the benefit of all Americans.

4.     NIH has carried out Congress's purpose and achieved its legendary successes through directing most of its budget to thousands of researchers at universities, medical schools, and other institutions in all 50 states. For decades, NIH has been guided by congressional mandate, regulatory requirements, and scientific expertise when determining what research to prioritize and fund. NIH also is subject to the Administrative Procedure Act's ("APA") requirement of reasoned decision-making, which it effectuates through rigorous grounding in scientific evidence. Pursuant to a congressional mandate, NIH develops and publishes a five-year Strategic Plan to direct its

---

[1] *See Nobel Laureates*, Nat'l Insts. of Health, (Oct. 9, 2024) https://www.nih.gov/about-nih/what-we-do/nih-almanac/nobel-laureates; E. Galkina Cleary et al., *Comparison of Research Spending on New Drug Approvals by the National Institutes of Health vs the Pharmaceutical Industry, 2010-2019*, 4 JAMA Health Forum e230511 (2023), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2804378.
[2] *Impact of NIH Research*, Nat'l Insts. of Health, https://www.nih.gov/about-nih/what-we-do/impact-nih-research.

App.091

priorities, "focused on science and good stewardship of research, guided by evidence, and informed by NIH's many stakeholders."[3]

5.       Under this legally established framework, thousands of researchers across the country regularly apply for NIH grants to fund their research. NIH makes grant decisions following a highly competitive and rigorous process involving layers of expert scientific review over many months. Consequently, for decades, terminations of ongoing NIH grants have been exceedingly rare.

6.       This all changed beginning in February of 2025, when Defendants issued a series of directives to terminate large numbers of grants and to refuse to consider certain categories of pending grant applications ("the Directives"). These Directives conflict with constitutional, statutory, and regulatory requirements. When issuing termination letters pursuant to the Directives, NIH has not referenced or met any of the standards in its governing statute or regulations. In fact, the sole legal basis that NIH cited for its authority to terminate the grants is inapplicable. It has not highlighted any genuine concerns with the rigor of projects or any underlying data; in a matter of weeks it has just declared them all "unscientific." More broadly, it has parroted the generalized and conclusory justification that the cancelled programs "no longer effectuate agency priorities." This is not a proper ground for termination under governing law.

7.       As a result of the Directives, hundreds of NIH-funded research projects—many of which have been underway for years, representing millions of hours of work and hundreds of millions of dollars in investment—have been abruptly cancelled without scientifically-valid explanation or cause. Grant application processes have been abandoned midstream and funding opportunities have been removed from NIH's website.

---

[3] *NIH-Wide Strategic Plan, Fiscal Years 2021–2025*, Nat'l Insts. of Health (July 2021), https://www.nih.gov/sites/default/files/about-nih/strategic-plan-fy2021-2025-508.pdf at 44.

8.      Defendants attempt to justify this ongoing ideological purge of hundreds of critical research projects because they assertedly have some connection to "gender identity" or "Diversity, Equity, and Inclusion" ("DEI") or other vague, now-forbidden language. Indeed, Defendants' campaign against peer-reviewed science has not stopped at topics deemed to be related to gender or DEI. Defendants' ideological purity Directives also seek to cancel research deemed related to "vaccine hesitancy," "COVID," and studies involving entities located in South Africa and China, among other things. Additionally, NIH has stopped considering submitted applications to programs designed to diversify the backgrounds of those in tenure-track positions at research universities. Defendants' actions have been taken in apparent disregard to Congress's express mandate that NIH fund research to address health equity and health disparities, include diverse populations in its studies, improve efforts to study the health of gender and sexual minorities, and enhance diversity in the biomedical research profession.

9.      The new arbitrary regime is not codified in any law or policy. The operative NIH Strategic Plan, developed in furtherance of congressional mandate, has been in effect since September 2021, and remains in effect today. Defendants have failed to develop any guidelines, definitions, or explanations to avoid arbitrary and capricious decision-making in determining the parameters of the agency's prohibitions against research with some connection to DEI, gender, and other topics that fail Defendants' ideological conformity screen. Nor do Defendants' actions take into consideration the vast harms they have caused to scientific research and public health.

10.     Plaintiffs are individual researchers and organizations whose members are researchers who have secured (or are in the process of securing) funding from NIH. For example, individual Plaintiffs have received NIH grants for research in the areas of Alzheimer's disease, disparities in pregnancy health, violence prevention among children, and the efficacy of

App.093

preventative HIV medications. Plaintiffs pursue careers in medical research to help discover new treatments, cure diseases, and improve the health of people and communities across the country.

11.     Plaintiffs have already suffered extensive harm from Defendants' unlawful actions, and those with grants that have yet to be cancelled wonder if they are soon to receive another vague, boilerplate termination letter. In just the past few weeks, for example, Plaintiffs and their members are facing the loss of jobs, staff, and income. Patients enrolled in NIH studies led by Plaintiffs face abrupt cancellations of treatment in which they have invested months of time with no explanation or plan for how to mitigate the harm. Over $2.4 billion is at stake just in grants recently purged, including $1.3 billion already spent on projects stopped midstream that is now wasted, and $1.1 billion—that Plaintiffs and others have acted in reliance on—has been revoked. As a result of Defendants' Directives, scientific advancement will be delayed, treatments will go undiscovered, human health will be compromised, and lives will be lost.

12.     Plaintiffs request that the Court declare unlawful Defendants' Directives; declare Defendants' termination of grants in this manner unlawful; order Defendants to end their arbitrary and capricious, unconstitutional, and unlawful actions; and order Defendants to restore funding to the terminated NIH grants.

<u>**JURISDICTION AND VENUE**</u>

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution and the Administrative

5

App.094

Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers and agencies of the United States, no real property is at issue in this case, and one or more Plaintiffs are residents of this District.

## PARTIES

*A. Plaintiffs*

15. Plaintiff Dr. Brittany Charlton is an Associate Professor at Harvard Medical School and Harvard T.H. Chan School of Public Health. She is a resident of Massachusetts and the Founding Director of the LGBTQ Health Center of Excellence, a partnership of the Harvard Pilgrim Health Care Institute and Harvard T.H. Chan School of Public Health. Dr. Charlton is a leading scholar of LGBTQ health inequities, particularly in cancer and reproductive health, and also focuses on contraception use and family planning among people of all sexual orientations and gender identities. She has received continuous funding for her research for the last 15 years from NIH. Since February 2025, Dr. Charlton has had five grants terminated by NIH because each, allegedly, "no longer effectuates agency priorities."

16. Plaintiff Dr. Katie Edwards is a professor at the University of Michigan School of Social Work. Dr. Edwards' research focuses on preventing sexual and related forms of violence among minority communities, using evidence-based, affirming, and culturally-grounded approaches. Her current work is focused on program development and evaluation with Indigenous youth and communities, as well as LGBTQ+ youth and young people. To date, she has published more than 220 peer-reviewed articles, which were made possible, in part, through obtaining millions of dollars in research funding over her career. Since February 2025, NIH has terminated

6

at least six grants in support of Dr. Edwards' research in projects where she is the principal investigator or co-investigator because, according to NIH, each of these grants "no longer effectuates agency priorities."

17.     Plaintiff Dr. Peter Lurie is an experienced research physician and the President and Executive Director of the Center for Science in the Public Interest, a 501(c)(3) nonprofit organization based in Washington, D.C. that advocates for improving public health through science-based policies and promoting scientific integrity. From 2014–17, he was an Associate Commissioner at the Food and Drug Administration, where he worked on the regulation of over-the-counter drugs, among other projects. Additionally, for decades, Dr. Lurie has participated in biomedical research and policy focused on the treatment and prevention of HIV and AIDS. Dr. Lurie was a consultant and advisor on an NIH-funded grant studying the impact of access to preventative HIV drugs that NIH terminated because, according to NIH, it "no longer effectuates agency priorities."

18.     Plaintiff Dr. Nicole Maphis is a postdoctoral fellow at the University of New Mexico's School of Medicine. Her research explores how alcohol usage affects the risk of developing Alzheimer's disease. She is the first and only person in her family to graduate college and comes from a low-income background. Dr. Maphis recently sought a grant through a program explicitly created to facilitate the transition of promising postdoctoral researchers from backgrounds underrepresented in the biomedical research workforce into independent, tenure-track or equivalent research-intensive faculty positions. Even though Dr. Maphis satisfies the eligibility criteria for the program and invested months into assembling her application, NIH is refusing to consider Dr. Maphis's grant application solely because the program is designed to help diversify the profession.

7

19.     Founded in 1872, Plaintiff American Public Health Association ("APHA") represents about 50,000 people through organizational and individual memberships and has more than 23,000 individual public health professional members. APHA acts to build capacity in the public health community and champions optimal, equitable health and well-being for all. APHA speaks out for public health issues and policies backed by science. APHA and its members also work to ensure that health services are distributed equitably to all communities and research how disease, injury, or health related issues affect marginalized populations. APHA receives grants from NIH for its *American Journal of Public Health*. In addition, APHA members conduct research that is funded by grants from NIH. APHA has members who have had NIH grants terminated because, according to NIH, each of the grants "no longer effectuates agency priorities." APHA also has members whose grant applications NIH refuses to consider, or who are unable to submit future NIH grant applications due to the uncertainty caused by NIH's actions.

20.     Founded in 2002, Plaintiff Ibis Reproductive Health ("Ibis") is a global research organization that drives change through bold, rigorous research and principled partnerships that advance sexual and reproductive autonomy, choice, and health worldwide. With offices in locations including Cambridge, Massachusetts, Ibis has a highly trained and committed staff of demographers, epidemiologists, and public health researchers leading projects with more than 100 partners in 30 countries. Research is core to the organization's work, and the organization's agenda is informed by a principled partnership approach with communities, including transgender and gender diverse community members, to identify key gaps in information and resources concerning reproductive health, autonomy, and health care access for these populations. In September 2023, Ibis was awarded a R01 grant providing about $2.5 million over five years, to study survey design

8

for diverse populations, including those who identify as transgender or gender diverse. In March 2025, NIH terminated the grant on the basis that it "no longer effectuates agency priorities."

21.     The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") is one of the largest and most diverse unions in North America, with members in the United States, Canada and Puerto Rico and in virtually every sector of the economy. From its earliest days, the UAW has been a leader in the struggle to secure economic and social justice for all people. It has a rich history of supporting inclusion, equity, and diversity in the higher education sector and in all workplaces. The UAW has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country including Northeastern University, Wellesley College, University of Southern California, Columbia University, Harvard University, University of Pennsylvania, Princeton University, and Worcester Polytechnic Institute, among many others. Tens of thousands of UAW members rely on NIH grant funding for their jobs and training. These members benefit from all NIH grant and fellowship types and play a variety of roles, including on NIH grant-funded projects as principal investigators. UAW has members whose grants have been cancelled because, according to NIH, each of the grants "no longer effectuates agency priorities." UAW also has members whose grant applications NIH refuses to consider, or who are unable to submit future NIH grant applications due to the uncertainty caused by NIH's actions.

9

*B. Defendants*

22.     Defendant the National Institutes of Health ("NIH") is an agency of the United States, established pursuant to 42 U.S.C. § 281, and is housed within the United States Department of Health and Human Services.

23.     Defendant Jay Bhattacharya is Director of NIH and is sued in his official capacity.

24.     Defendant the United States Department of Health and Human Services ("HHS") is an agency of the United States that houses NIH. HHS is a department of the executive branch of the United States.

25.     Defendant Robert F. Kennedy, Jr. is the Secretary of HHS and is sued in his official capacity.

## FACTUAL ALLEGATIONS

*A. Overview of the Structure and Priorities of NIH*

1. History of NIH

26.     In 1930, Congress enacted the Ransdell Act, establishing a "National Institute of Health" and appropriating funds to the newly-formed institute for the purpose of "ascertaining the cause, prevention, and cure of disease affecting human beings."[4] The Ransdell Act authorized the creation of "fellowships" for "individual scientists."

27.     Since then, Congress has repeatedly increased its investment in NIH, including by funding additional Institutes and Centers ("ICs") that operate within NIH.[5]

28.     Over these decades of expansion, research funded through NIH has led to medical breakthroughs. For example, NIH-funded research played a critical role in developing numerous lifesaving treatments, including chemotherapy drugs, heart valve transplants, medications for

---

[4] Ransdell Act, Pub. L. No. 71–251, 46 Stat. 379 (1930) (codified at 42 U.S.C. §§ 21 *et seq*.).
[5] *NIH Budget History*, Nat'l Insts. of Health (Aug. 2024), https://report.nih.gov/nihdatabook/category/1.

managing type 2 diabetes, and a clot-busting medicine that is used as a first-line treatment in stroke patients.[6]

29.     Today, NIH is the largest funder of biomedical research in the world, with an operating budget of $48 billion as allocated by Congress. The vast majority—83 percent—is allocated for funding research for institutions and organizations outside of the agency. NIH provides almost 50,000 competitive grants to more than 300,000 researchers at more than 2,500 universities, medical schools, and other research institutions in every state.[7]

2. NIH Structure and Funding

30.     NIH is comprised of the Office of the Director, as well as 27 ICs, which span a wide range of functions and focuses. Each of the ICs within NIH serves a particular purpose. For example, Congress established the National Cancer Institute to study and disseminate information about cancer causes, diagnosis, and treatment.

31.     Twenty-four of the 27 ICs, as well as several divisions within the Office of the Director, post opportunities for funding for researchers outside of the agency. Congress has also authorized the Director to set aside a portion of NIH's allocated budget for a "Common Fund" dedicated to research that spans across ICs.

32.     NIH is primarily funded through congressional appropriations, which includes both funding for agency-wide programs and dedicated budgets for each individual IC.[8] For example, each year, Congress delegates funding directly to the National Institute on Minority Health and Health Disparities to carry out specific legislative purposes, including to "conduct and support []

---

[6]*Impact of NIH Research: Improving Health*, Nat'l Insts. of Health (Dec. 30, 2024), https://www.nih.gov/about-nih/what-we-do/impact-nih-research/improving-health.

[7] *Budget*, Nat'l Insts. of Health (Oct. 3, 2024), https://www.nih.gov/about-nih/what-we-do/budget#:~:text=Research%20for%20the%20People,%2C%20maintenance%2C%20or%20operational%20costs.

[8] *See* Kavya Sekar, Cong. Research Serv., *NIH Funding FY1996-FY2025,* (June 25, 2024), https://www.congress.gov/crs-product/.

research, training, dissemination of information, and other programs with respect to minority health conditions and other populations with health disparities."[9]

33.     Congress has also defined mandates on the purposes and aims for which NIH and the ICs must fund research. Four such mandates are of particular relevance here.

34.     First, Congress has long mandated that NIH must expend its funds to promote health equity and reduce health disparities across diverse populations. For instance, the Public Service Health Act requires that each IC "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities."[10] The Minority Health and Health Disparities Research and Education Act of 2000 recognizes the presence of continuing racial disparities "in the burden of illness and death," and obligates NIH to identify and fund health equity research and to establish a center later reclassified as the National Institute on Minority Health and Health Disparities.[11] And the 21st Century Cures Act mandates that NIH consider "disease burden in the United States" and "biological, social, and other determinants of health that contribute to health disparities" in identifying "strategic research priorities and objectives across biomedical research."[12] This statute expressly expands NIH's congressional mandate to study diverse populations and the issues that affect them to encompass the LGBTQ+ population, that "[t]he Director of the National Institutes of Health *shall, as appropriate, encourage efforts to improve research related to the health of sexual and gender minority populations*."[13]

---

[9] 42 U.S.C. § 285t.
[10] 42 U.S.C. § 282(b)(8)(d)(ii).
[11] Affordable Care Act, Pub. L. No. 111-148, § 1707A(c), 124 Stat. 119, 973 (2010) (codified at 42 U.S.C. §§ 285t–285t-3). *See also* 42 U.S.C. § 285t(b) (National Institute on Minority Health and Health Disparities "shall in expending amounts appropriated under this subpart give priority to conducting and supporting minority health disparities research").
[12] *Id.* at § 282(m)(2)(b)(iii).
[13] 42 U.S.C. § 283p (emphasis added).

35. Second, Congress has also mandated that NIH address the underrepresentation of certain groups in the medical field. For example, Congress requires that NIH "provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research" when "conducting and supporting programs for research, research training, recruitment, and other activities."[14] Likewise, NIH must make the Ruth L. Kirschstein National Research Service Award ("Kirschstein-NRSA")—the largest congressionally-mandated NIH training program—available in "a manner that will result in the recruitment of women, and individuals from disadvantaged backgrounds (including racial and ethnic minorities), into fields of biomedical or behavioral research and in the provision of research training to women and such individuals."[15]

36. Third, Congress has required that NIH ensure "scientifically based strategic planning . . . through the development, implementation, and updating of [a] strategic plan," and that its resources "are sufficiently allocated for research projects identified in strategic plans."[16] Under this congressional mandate, NIH must develop its strategic plan no later than every six years and must submit that plan to Congress.[17] Congress also mandates specific strategic plans for each IC.[18] IC-specific strategic plans set forth research priorities within each institute, and by statute, each director must consider "the mission of the [IC] and . . . [its] strategic plan" "when review[ing] and mak[ing] the final decision with respect to making [a grant] award."[19]

37. Fourth, Congress mandates that, in creating its strategic plan for identifying its research priorities, NIH identify emerging scientific opportunities, flag near-, mid-, and long-term

---

[14] *Id.* at § 282(h) (emphasis added).
[15] 42 U.S.C. § 288(a)(4).
[16] 42 U.S.C. § 282 (b)(5), (6).
[17] *Id.* at (m)(1).
[18] 42 U.S.C. § 282(m)(3).
[19] 42 U.S.C. § 284(b)(3)(A)–(B).

13

scientific needs, assess opportunities for multi-institute research, and consider the "biological, social, and other determinants of health that contribute to health disparities."[20] These plans must be developed "in consultation with the directors of the national research institutes and national centers, researchers, patient advocacy groups, and industry leaders."[21]

38.     Thus, Congress has long required NIH and ICs to set their priorities through science-based plans, and to study, understand, and address health equities and disparities in the field.

### C. *Types of NIH Grants*

#### 1. Project-Based Grants

39.     Subject to the purposes and mandates articulated by Congress, NIH awards considerable funding for independent research through grants for scientific and biomedical research projects ("Project-Based Grants"), which usually are designated as part of the R-series of grants (*e.g.*, "R01," "R15," etc.). Though there are numerous categories of Project-Based Grants, the most typical designation for a Project-Based Grant is the R01, or "Research Project" grant. There are also certain grants that go to institutions that serve as coordinating centers that provide support, organize conferences, and assist researchers in applying for NIH funding in order to help advance studies in a particular field.

40.     Project-Based Grants are the lifeblood of American biomedical and public health research. The billions of dollars each year in funding they provide contribute to medical and scientific breakthroughs that save lives and vitalize the economy. NIH touts, for example, that its

---

[20] 42 U.S.C. § 282(m)(2)(iii).
[21] *Id.* at (m)(4).

funding supports scientists working on projects to develop new technologies for medical imaging, to prevent the spread of HIV/AIDS, and to understand the rising rates of colorectal cancer.[22]

41.     Such projects are critical to improving public health and have a demonstrable economic impact. For example, more than 30 percent of NIH-funded studies are later cited in an application for a commercial patent, demonstrating the vital role that Project-Based Grants play in fostering innovation.[23]

42.     The funding provided by NIH's Project-Based Grants also provides financial support for researchers and institutions who have devoted themselves to the study of important public health issues. Funding from a Project-Based Grant may cover everything from the salary and benefits paid to principal investigators and more junior researchers to the cost of the facilities in which research is conducted. As a result, the abrupt termination of Project-Based Grants can have catastrophic consequences for the individuals who rely on grant funding to make a living and the institutions where their work occurs, not to mention the participants enrolled in any study made possible by that funding.

2. Pipeline Grants

43.     In addition to Project-Based Grants, NIH also makes awards to institutions or individuals for career development or training ("Pipeline Grants"). Some Pipeline Grants are congressionally mandated, such as Kirschstein-NRSAs, which have the purpose of "training individuals" to conduct "biomedical and behavioral research . . . in matters relating to the cause,

---

[22] *NIH Science Highlights*, Nat'l Insts. of Health (Dec. 18, 2024), https://www.nih.gov/research-training/science-highlights.
[23] Elie Dolgin, *NIH research grants yield economic windfall*, 544 Nature 14 (2017).

diagnosis, prevention, and treatment of the diseases or other health problems to which the activities of the National Institutes of Health and Administration are directed."[24]

44.     There are numerous kinds of Pipeline Grants. For example, training awards— "institutional training grants" (T32s)—are typically applied for by the senior investigator who heads a training or research center on behalf of a larger set of researchers at an institution, and they can be used to cover the costs of predoctoral or postdoctoral students. There are also individual grants, typically classified as F-series ("Fellowship") grants, or K-series ("Career Development") grants, that can be used to provide stipends to researchers at all stages of their career, cover tuition and costs, and fund other expenses.

45.     Some Pipeline Grants are designed to promote recruitment of groups that are "underrepresented in the biomedical, clinical, behavioral and social sciences." For example, consistent with their congressional mandate, NIH protocols for Kirschstein-NRSA grants state that "[w]ithin the framework of the program's longstanding commitment to excellence and projected need for investigators in particular areas of research, attention must be given to recruiting prospective trainees from diverse backgrounds."[25]

46.     Another Pipeline Grant—Maximizing Opportunities for Scientific and Academic Independent Careers ("MOSAIC") K99/R00—is designed to help promising postdoctoral researchers from diverse backgrounds transition into independent, tenure-track or equivalent

---

[24] 42 U.S.C. § 288(a)(1)(A).
[25] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 11.3.3.3 (Apr. 2024). NIH identifies populations that are "underrepresented in the biomedical, clinical, behavioral and social sciences" to include racial and ethnic minorities, women, people with disabilities, and people from "disadvantaged backgrounds," determined by criteria such as current or prior homelessness, being in the foster care system, eligibility for free or reduced lunch or Pell grants, growing up in a rural area or low-income zip code, and having parents who did not complete higher education. *Id.* at § 11.3.3.4. All these categories are supported based on a reference to government data on educational or science workforce disparities. NIH's Grants Policy Statement further sets out the reasons for its policies to support the development of a diverse scientific workforce: "fostering scientific innovation, enhancing global competitiveness, contributing to robust learning environments, improving the quality of the research, advancing the likelihood that underserved or health disparity populations participate in, and benefit from health research, and enhancing public trust." *Id.*

research-intensive faculty positions. Likewise, the "F31 Diversity" grant provides a five-year fellowship to individuals from backgrounds "currently underrepresented in the biomedical, clinical, behavioral, and social sciences."[26] Still another is the "Faculty Institutional Recruitment for Sustainable Transformation (FIRST) initiative," which aims to transform culture at NIH-funded institutions through the recruitment of faculty cohorts who have a demonstrated commitment to diversity and inclusion.[27]

47.     Pipeline Grants are essential in shaping the careers of promising scientists, particularly those from disadvantaged backgrounds or from smaller institutions without significant private endowments. In 2022, more than 18,000 full-time graduate students received their primary federal funding support through NIH.[28] NIH funding programs provide essential support for promising undergraduate students at universities and colleges across the country.

48.     These awards also have substantial impacts on the productivity and long-term retention of promising scientists in the field. In a 2011 study, researchers found that "receipt of an NIH postdoctoral fellowship leads to about one additional publication over the next five years, which reflects a 20 percent increase in research productivity.[29] A later National Bureau of Economic Review working paper found that researchers who have received fellowship awards were significantly more likely to subsequently complete an NIH-funded research project, further

[26] *See, e.g.,* Nat'l Insts. of Health, *Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research (Parent F31-Diversity)* (July 6, 2020), https://grants.nih.gov/grants/guide/pa-files/PA-20-251.html.
[27] *Supra* note 4, at 17.
[28] Nat'l Insts. of Health, *National Statistics: Primary Source of Federal Support for Full-Time Graduate Students* (Mar. 2024), https://report.nih.gov/nihdatabook/category/20.
[29] Brian A. Jacob & Lars Lefgren, *The Impact of NIH Postdoctoral Training Grants on Scientific Productivity*, 40 Res. Policy 864 (2011).

concluding that "NRSA postdoctoral fellowship awards have the potential to promote retention of scientists in NIH-funded research and in the biomedical workforce pipeline."[30]

*D. The Grant Application Process*

49.     To offer funding for researchers outside of NIH, ICs post "Notices of Funding Opportunities" ("NOFOs"), alerting researchers to the availability of funds. While in some cases, grant-funded research is "investigator-initiated," meaning that the researcher comes to the funding IC with a proposed area of research, ICs "regularly identify specific research areas and program priorities to carry out their scientific missions."[31]

50.     Funding awards are determined through a rigorous and competitive application process in which researchers submit their proposal and lengthy supporting documentation for review. Grant applications are substantial documents, often requiring months of effort and totaling 100 or more pages, including a detailed research plan, justifications of the proposed budget, information about facilities/locations, and letters of support from other researchers. Among other requirements, all applications must address how their research complies with NIH public policy requirements related to "inclusion of genders, members of minority groups, and individuals across the lifespan in clinical research."[32]

51.     Upon completion of an application, the vast majority of grants—both Project-Based and Pipeline Grants—are subjected to a two-step, highly standardized peer-review process, as set forth in the Public Health Service Act, its enacting regulations, and detailed NIH protocols. Specifically, the NIH Director must "require appropriate technical and scientific peer review" of

---

[30] Misty L. Heggeness *et al., The Impact of Postdoctoral Fellowships on a Future Independent Career in Federally Funded Biomedical Research,* NBER Working Paper No. 24508 (Apr. 2018), https://www.nber.org/papers/w24508.
[31] Nat'l Insts. of Health, *New to NIH*, (2024), https://grants.nih.gov/new-to-nih.
[32] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.3.6 (Apr. 2024).

"applications made for grants" for "biomedical and behavioral research."[33] NIH's stated policy is that "applications for funding submitted to NIH" will be "evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner that strives to eliminate bias."[34]

52.   In the initial phase, the Center for Scientific Review receives applications, and then assigns applications to relevant scientific review groups, where groups of approximately twenty scientific reviewers who are experts in their field analyze and score each proposal.[35]

53.   Scored applications are then moved on to IC-specific advisory councils, made up of "senior scientists with broad experience and members of the public with general knowledge of, and interest in, the IC's mission" where the IC determines which projects to move forward with funding.[36]

54.   For Pipeline Grants, reviewers also "gauge the likelihood the fellowship will enhance [the applicant's] potential for and commitment to a productive research career. For postdoctorals, they also assess whether [the applicant] has what it takes to be an independent researcher."[37]

55.   HHS regulations provide that "all" applications "shall be evaluated" and that the agency will either "1) approve, 2) defer because of either lack of funds or a need for further evaluation, or 3) disapprove support of the proposed project in whole or in part."[38] NIH policies

---

[33] 42 U.S.C. § 289a.
[34] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.4 (Apr. 2024).
[35] *See* 42 C.F.R. § 52h (describing requirements for membership in scientific review groups).
[36] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.4.3 (Apr. 2024).
[37] *See, e.g.*, Nat'l Inst. of Allergy & Infectious Diseases, Fellowship Grants (F) (Mar. 7, 2025), https://www.niaid.nih.gov/grants-contracts/fellowship-grants.
[38] 42 C.F.R. § 52.5.

19

effectuate these regulations.[39] NIH policy solely contemplates the agency withdrawing an application for consideration for "non-conformity with application requirements."[40]

56.     There are no provisions in NIH guidelines that allow ICs to halt review of applications in specific grant lines because the agency has determined that a NOFO no longer effectuates agency priorities. Instead, NIH policy provides for the review of applications for "relevance to the IC's programs and priorities" at the IC advisory board stage of the process, which as discussed further below are set through the IC's strategic plan.[41]

57.     After undergoing this rigorous, two-step peer review process, only a small percentage of all applications are selected to receive an award. Final authority to make an award belongs to the Director of the IC responsible for the grant.[42]

58.     Upon selection, a successful applicant receives a Notice of Award ("NOA"). The NOA identifies the institutional grantee, one or more principal investigators, and specifies the amount of the award, its duration, and all other terms and conditions with which the grantee must comply.

59.     The NOA also provides the grantee and principal investigators with contact information for their program officer, who is the main point of contact throughout the lifespan of the award. Generally, program officers are trained scientists well-versed in handling the subjects covered by the grants for which they are responsible.

---

[39] *See, e.g.*, Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 11.3.4.1 (Apr. 2024) ("*Each* initial and competing continuation application *will be* evaluated for scientific merit by an NIH peer review group. Kirschstein-NRSA institutional research training grant applications also must be reviewed by the National Advisory Council or Board of the IC") (emphases added); *see also* Nat'l Insts. of Health, *First Level: Peer Review* (Sept. 9, 2024), https://grants.nih.gov/grants-process/review/first-level ("Each grant application submitted to NIH is evaluated according to established review criteria that must be stated clearly in a notice of funding opportunity").
[40] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.3.9.5 (Apr. 2024).
[41] *Id.* at § 2.4.3.
[42] 42 U.S.C. § 284(b)(2).

60.     Throughout the duration of the grant, grantees are required to provide annual progress reports to ensure compliance with grant terms. In response to these reports, program officers and grants management specialists conduct annual assessments to ensure that grantees are satisfying the grant's goals, terms, and conditions.

E.  *HHS Regulations Specify the Limited Grounds on Which Grant Terminations Must Be Based*

61.     The HHS regulations that are currently in effect significantly limit the termination of a grant, in whole or in part, during the duration of the award to specific circumstances: (1) if the grantee "fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of" the grantee.[43] Critically, NIH cannot terminate grants based on its determination that a grant "no longer effectuates the program goals or agency priorities." This is because the provision for terminating grants based on changes in goals or priorities appears in OMB guidance that HHS regulations did not adopt until a recent notice and comment rulemaking, and the *change to HHS regulations will not become effective until October of 2025*.

62.     In 2013, OMB published the "Office of Management and Budget Guidance for Federal Financial Assistance, at 2 CFR part 200 ("OMB Uniform Guidance"). Though part of the CFR, this content, published in subtitle A, is "guidance, not regulation. Each Federal agency that awards grants has its own regulations in subtitle B. Federal agency regulations in subtitle B may

---

[43] 75 C.F.R. § 75.372. NIH written protocols are consistent with this regulatory limitation, providing for the process for termination solely on the request of a grantee or "if a recipient has failed to comply with the terms and conditions of award." Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 8.5.2 (Apr. 2024); *see also id.* at § 11.2.13.2, Termination Provision for Kirschstein-NRSA (solely provides for termination for individual awards upon awardee or trainee request or "if it determines that the recipient has materially failed to comply with the terms and conditions of the award or to carry out the purpose for which it was made."); *id.* at § 11.3.16.2 (same, for institutional Kirschstein-NRSA); *id.* at § 12.13.3 (same for Research Career Development ("K") awards).

give regulatory effect to the OMB guidance, if the agency regulations require compliance with all or portions of the OMB guidance."[44]

63.    The 2013 version of the OMB Uniform Guidance allowed for termination of a federal award solely under three limited conditions: (1) if the award recipient "fails to comply with the terms and conditions of a Federal award," (2) "for cause", or (3) "with the consent" of the grantee.[45]

64.    HHS adopted this guidance in 2014 *as a regulation* and maintained the limitation that grants could be terminated only in those three narrow circumstances.[46] HHS subsequently revised its regulations in 2016 and retained the three limited conditions for termination in 45 C.F.R. § 75.372.[47]

65.    In 2020, OMB made substantive amendments to the termination provision of the OMB Uniform Guidance.[48] The new termination provision—which is still only guidance without the effect of an agency regulation—continued to allow for termination for failure "to comply with the terms and conditions" of the award or upon the consent of the grantee.[49] However, OMB removed the third circumstance, which allows termination "for cause," and replaced it with language allowing for termination "to the greatest extent authorized by law, if an award no longer

---

[44] 2 C.F.R. § 1.105 (b)–(c) (2024).
[45] *See* 2 C.F.R. § 200.339 (2024) (OMB Uniform Guidance, 2013 version, available with subsequent 2020 redlines at infra note 48).
[46] *See Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 79 Fed. Reg. 75871 (Dec. 19, 2014) ("The Federal award may be terminated in whole or in part as follows:" if the award recipient "fails to comply with the terms and conditions of a Federal award," "for cause", or "with the consent" of the award recipient.)
[47] *See Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards; Technical Amendments*, 81 Fed. Reg. 3004 (Jan. 20, 2016).
[48] *See Office of Mgmt. & Budget, 2 CFR Revision Redline* 5 (Aug. 12, 2020), https://trumpadministration.archives.performance.gov/CAP/20200812-2-CFR-Revision-Redline_Final.pdf.
[49] 2 C.F.R. §§ 200.340(a)(1), (3).

22

effectuates the program goals or agency priorities."[50] OMB added a fourth condition, that the agency could terminate "pursuant to termination provisions included in the Federal award," and stated that the agency "should clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section."[51]

66.    HHS amended its regulations in November 2020, *but did not adopt the changes that OMB made in 2020 to its termination provision*. Instead, HHS regulations continued to allow termination only under the three limited circumstances of non-compliance, for cause, or with the consent of the awardee.[52]

67.    In 2024, OMB again revised the termination provision in the OMB Uniform Guidance, effective October 1, 2025. Under the 2024 revision, agencies can terminate an award for non-compliance with the grant's terms and conditions, with the consent of the awardee, or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."[53] The OMB Uniform Guidance also states that the agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."[54]

68.    In October 2024, HHS published an interim final rule that will bring HHS regulations—*effective October 1, 2025*—into near total conformity with the OMB Uniform Guidance, including with 2 C.F.R. § 200.340. In the interim final rule, HHS stated that "HHS will forgo the separate codification, fully adopt 2 CFR part 200, reduce the total number of HHS-

---

[50] 2 C.F.R. § 200.340(a)(2) (2020).
[51] 2 C.F.R. §§ 200.340(a)(5), (b) (2020).
[52] *See* 45 C.F.R. § 75.373.
[53] 2 C.F.R. § 200.340(a) (1), (2), (4).
[54] 2 C.F.R. § 200.340(b).

23

specific changes, and codify those changes in 2 CFR part 300."[55] Therefore, beginning on October 1, 2025, *and not sooner*, HHS regulations will, for the first time, allow agencies to terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

69.     Notwithstanding the termination letters and revised NOAs described below that NIH has sent to Plaintiffs and their members citing that the grants "no longer effectuate[] agency priorities" as the authority to terminate their grants, NIH does not have such authority under current HHS regulations. Nor is there anything in the terms and conditions of the NOAs that Plaintiffs initially received when the awards were made that provide or can provide NIH with such authority. Plaintiffs' original NOA lists various terms and conditions and explicitly incorporate 45 C.F.R. Part 75. The NOAs do not list 2 C.F.R. Part 200 explicitly as an applicable term or condition.

70.     The NOAs also state that they incorporate the Grants Policy Statement, which is not a formal regulation, but is instead "an aid to the interpretation of statutory and regulatory requirements."[56] In the revised NOAs that NIH sent to Plaintiffs when it terminated their grants, NIH stated that "NIH is taking this enforcement action in accordance with 2 CFR § 200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2." But this is an inaccurate statement of applicable regulations. Section 8.5.2 of the Grants Policy Statement did *not* implement the revised 2020 version of 2 C.F.R. 200.340 because HHS did not implement that revised version in its regulations. NIH Grants Policy Statement states: "These terms and conditions are intended to be compliant with governing statutes and the requirements of 2 CFR Part 200, *as modified by previously approved waivers and deviations*. However, in the case of a conflict, the statutes and

---

[55] *Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 89 Fed. Reg. 80,055, 80,056 (Oct. 2, 2024).
[56] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 3 (Apr. 2024) (emphasis added).

24

regulations govern."[57] Because HHS's adoption of 2 C.F.R. § 200.340 is not yet in effect, HHS's current termination regulation remains a "deviation" from 2 C.F.R. § 200.340 and HHS's limited grounds for termination still apply.

71.     Terminations at NIH are historically rare. In response to noncompliance, "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision. However, NIH may decide to terminate the grant if the recipient does not take appropriate corrective action during the period of suspension. NIH may immediately terminate a grant when necessary, such as to protect the public health and welfare from the effects of a serious deficiency."[58]

72.     As one NIH official stated, "Terminations are the *final* option." Indeed, reporting indicates that, prior to January 2025, NIH terminated around 20 grants a year on average, "and usually only because of serious problems, such as flagrant misconduct, fraud, or an ethical breach that could harm study participants." The standard approach at NIH has long been to not terminate existing grants even if they address a low programmatic or agency priority. As a former NIH official who worked at the agency for several years described, "I have been involved with legitimate grant terminations," and, "I can count them on the fingers of one hand."[59]

   *F. NIH's Strategic Plan Guides the Review of Grants*

73.     The NIH-Wide Strategic Plan outlines NIH's vision for biomedical research direction, capacity, and stewardship by articulating the highest priorities of NIH for a 5-year

---

[57] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 3 (Apr. 2024).
[58] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 8.5.2 (Apr. 2024).
[59] Katherine J. Wu, *The NIH's Grant Terminations Are 'Utter and Complete Chaos,'* THE ATLANTIC (Mar. 14, 2025), https://www.theatlantic.com/health/archive/2025/03/nih-grant-terminations/682039/.

period. The plan is designed to complement and harmonize IC strategic plans across NIH, which address their individual missions.[60]

74.    The current NIH-Wide Strategic Plan governs from July 2021 until September 30, 2025, but creation of the plan began well before then, in September 2019. The four-phase strategic planning process involved: (1) pre-planning, (2) gathering internal input and development of the Strategic Plan framework, (3) gathering input from external stakeholders, and (4) drafting and publishing the Strategic Plan.[61]

75.    The NIH Strategic Plan sets forth three objectives: (1) advancing biomedical and behavioral sciences; (2) developing, maintaining, and renewing scientific research capacity; and (3) exemplifying and promoting the highest level of scientific integrity, public accountability, and social responsibility in the conduct of science—across which NIH has identified several "crosscutting themes," which include "improving minority health and reducing health disparities."[62]

76.    In line with the congressional mandate to consider health disparities, the NIH Strategic Plan "prioritizes research that addresses the needs of underserved populations to address the factors that contribute to health disparities" including by "identifying key gaps in prevention science related to health disparities and promoting targeted research on appropriately tailored public health, clinical, and community preventive services in diverse settings and contexts."[63]

77.    Similarly, the NIH Strategic Plan describes research to effectuate Congress's mandate to consider the "disease burden in the United States."[64] Suicide, for example, is

---

[60] *NIH-Wide Strategic Plan*, *supra* note 4.
[61] *Id.*
[62] *Id.* at 3.
[63] *Id.* at 11.
[64] 42 U.S.C. § 282 (2)(b)(iii).

disproportionately prevalent in specific populations, including sexual and gender minority populations, and NIH research into suicide prevention illustrates how improvements in care can save lives.[65]

78.     The NIH Strategic Plan also recognizes that the "strength of the NIH workforce depends on its sustainability and diversity."[66] Through the congressionally required "Next Generation Researchers Initiative," NIH aims to achieve sustainability by "enhanc[ing] opportunities for early-stage researchers by prioritizing funding of independent research applications" of early-stage researchers "such as policies to . . . enhance workforce diversity."[67]

79.     ICs also go through a strategic planning process and have plans currently in place. For example, the National Institute for Minority Health and Health Disparities' strategic plan summarizes evidence demonstrating health disparities faced by people from minority racial and ethnic backgrounds, sexual and gender minorities, rural residents, and individuals of less privileged socioeconomic status including shorter life expectancy; higher rates of cardiovascular disease, cancer, diabetes, infant mortality, stroke, cognitive impairment, asthma, sexually transmitted infections, and dental diseases; and differences in prevalence and outcomes of mental illness. That plan also sets forth "a commitment by NIH to support research aimed at addressing risk and protective factors that operate and interact on multiple levels to impact the well-being of health disparity populations."[68]

---

[65] *NIH-Wide Strategic Plan*, *supra* note 4, at 9.
[66] *Id.* at 16.
[67] 42 U.S.C. § 283o; *id.*
[68] Nat'l Insts. of Health, *Minority Health and Health Disparities Strategic Plan 2021–2025* (2021), https://nimhd.nih.gov/docs/strategic-plan/NIH-Wide_MHHD_Strategic_Plan_2021-2025_508.pdf at 4, 8. The current version of the plan available on NIH's website states that it "is being implemented through December 31, 2025," https://nimhd.nih.gov/about/strategic-plan/.

27

*G. President Trump Issues Executive Orders that Ignite Chaos at NIH*

80.     Starting on January 20, 2025, President Donald. J. Trump issued a series of executive orders broadly seeking to end all efforts related to "equity"—including specifically with respect to any federal grants. Even after being enjoined, these executive orders nonetheless prompted Defendants to issue the unlawful Directives at NIH.

81.     Executive Order No. 14151, dated January 20, 2025 and entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law, all… 'equity-related' grants or contracts" within 60 days.[69]

82.     The next day, on January 21, 2025, President Trump issued Executive Order No. 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." To address the purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]," the order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."[70] Provisions of

---

[69] *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).
[70] *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025).

this executive order and Executive Order No. 14151 were enjoined between February 21 and March 14, 2025.[71]

83.    On January 20, 2025, President Trump also issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."[72] Provisions of this executive order were enjoined on February 28, 2025.[73]

84.    On January 27, 2025, OMB issued a memorandum directing all federal agencies— including NIH—to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and all other relevant agency activities that may be implicated by," among others, "[Executive Orders above], including, but not limited to, financial assistance for… DEI, woke gender ideology, and the green new deal." Provisions of this memorandum were enjoined on January 31, 2025.[74]

---

[71] *See Nat'l Assn. of Diversity Officers in Higher Education v. Trump*, No. 25-cv-0333-ABA (D. Md. Feb. 21, 2025) ECF No. 45 (preliminarily enjoining provisions requiring agencies to terminate equity-related grants); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 (staying preliminary injunction pending appeal).

[72] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[73] *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025) ECF No. 50 (on February 28, 2025, preliminary enjoining sections that condition, withhold, or end federal funding in Plaintiffs states Colorado, Minnesota, Oregon, and Washington); *PFLAG, Inc. v. Donald J. Trump*, No. 8:25-cv-00337-BAH (D. Md. Mar. 4, 2025) ECF No. 116 (on March 4, 2025, preliminarily enjoining the same nationwide).

[74] *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I Jan. 31, 2025), ECF No. 50 (preliminarily enjoining federal agency defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations," based on both the OMB directive and Executive Orders, including the DEI and Gender Ideology executive orders).

*H. NIH Issues Directives to Purge Research Grants*

85.     Historically, the longstanding firewall between an administration's *political* choices and NIH's *scientific* peer review process ensured the agency avoided the massive waste and disruption to researcher careers, participant well-being, and public health that would accompany mid-stream research terminations. But since January 20, 2025, NIH has veered sharply from this deliberative, reasoned, and methodical approach.

86.     The Executive Orders, although enjoined in part, have prompted a massive purge in NIH grants and funding streams untethered to congressional mandates, the operative NIH Strategic Plan, or any reasoned review process. As explained below, in response to the Executive Orders, NIH has issued a series of documents vaguely articulating areas of research that purportedly "no longer effectuate[] agency priorities." These documents—titled as "guidance" but including mandatory language and referred to herein as the Directives—include memoranda developed by HHS and NIH (issued on or around February 28, 2025 and on March 25, 2025) and other versions of these documents that convey the same mandate.

87.     This process began on February 12, 2025, when NIH issued a memorandum stating that it "is in the process of reevaluating the agency's priorities based on the goals of the new administration."[75] That memorandum goes on to say that "NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in IC funding decisions at this time." The memorandum also indicates that, "[a]dditional details on future funding actions related to the agency's goals will be provided under a separate memo."

88.     NIH would provide those additional details over the next few weeks—including the very next day, when NIH issued another memorandum to IC chief grant management officers

---

[75] Judd Legum, *Breaking: NIH Admits Funding Freeze is Illegal,* POPULAR INFORMATION (Feb. 12, 2025), https://popular.info/p/breaking-nih-admits-funding-freeze.

("February 13 Memo"). That memo announced "hard funding restrictions" on "awards where the program promotes or takes part in diversity, equity, and incluedsion [sic] ('DEI') initiatives" with those restrictions applying "to new and continuation awards made on or after February 14, 2025."[76] The memorandum also states, "[i]f the sole purpose of the grant, cooperative agreement, other transaction award (including modifications), or supplement supports DEI activities, then the award must be fully restricted. The restrictions will remain in place until the agency conducts an internal review for payment integrity."

89.     Soon after, NIH took steps to inventory projects for its purge of disfavored grants—including the termination of Project-Based Grants and Pipeline Grants at issue here—across various ICs. As one NIH official described the agency's actions throughout this spree, "[i]t is such utter and complete chaos."[77] "In advance of the terminations… agency leadership solicited grants that might, for instance, 'promote gender ideology,' or that involved certain types of vaccine-behavior research."[78] NIH officials responded with lists of grants to terminate. One official described the lists as looking like "someone had performed a Ctrl+F search for certain terms, then copied and pasted the results" and directed the cancellation of those grants.[79]

90.     Directions to terminate grants came without warning to the typical NIH officials who would be involved in the process, without the usual level of rigor and deliberation that accompanies a potential termination, and without any allegations or findings of noncompliance by grantees. The directions "instructed grants-management officers to issue letters by the end of the

[76] Stephanie Mencimer, *NIH Is Defying a Federal Court and Freezing Research Funding Anyway*, MOTHER JONES (Feb. 24, 2025), https://www.motherjones.com/politics/2025/02/nih-defying-federal-court-freeze-research-funding-dei-temporary-restraining-order/; screenshot of February 13 Memo, MOTHER JONES (Feb. 24, 2025), https://substackcdn.com/image/fetch/f_auto,q_auto:good,fl_progressive:steep/https%3A%2F%2Fsubstack-post-media.s3.amazonaws.com%2Fpublic%2Fimages%2F7e116a29-f20d-435d-a8ba-ba18cea529d8_1182x1236.png.
[77] Wu, *supra* note 59.
[78] *Id.*
[79] *Id.*

day they received them . . . leaving no time to push back, or even react," eliminating any meaningful role the grants-management officers could have played in these decisions.[80] "In at least one case, . . . a program officer learned that their grantee's award had been terminated from the grantee," *not from the NIH*.[81]

91. Throughout February and March 2025, NIH issued Directives for assessing grant awards that expanded the scope of the purge.

92. On or around February 28, 2025, NIH issued staff "guidance" ("February 28 Guidance") that rescinded the February 13 Memo but expanded on its core anti-DEI messaging, stating: "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI) . . . Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims[,] assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities."[82] The memorandum also instructs officials to "completely excise all DEI activities[.]"

93. The February 28 Guidance identifies four categories of awards and mandates actions for each category deemed "DEI related":

- "Category 1" — the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above." For projects construed as Category 1, "ICs must not issue the award."

- "Category 2" — the project "partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this [sic] means DEI activities are

---

[80] *Id.*

[81] *Id.*

[82] *See* Max Kozlov and Smriti Mallapaty, *Exclusive: NIH to terminate hundreds of active research grants*, NATURE (Mar. 6, 2025), https://www.nature.com/articles/d41586-025-00703-1; *see also* Carolyn Y. Johnson and Joel Achenbach, *NIH reels with fear, uncertainty about future of scientific research*, THE WASHINGTON POST (Mar. 5, 2025), https://www.washingtonpost.com/science/2025/03/05/nih-trump-turmoil-grants/.

App.121

ancillary to the purpose of the project [sic]. In some cases, not readily visible [sic]." For projects construed as Category 2, "[i]f the IC and the applicant/recipient cannot reach an agreement" to renegotiate the scope of the project, "or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award." For any such ongoing project, "the IC must work…to negotiate a bilateral termination of the project," but "[w]here bilateral termination cannot be reached, the IC must unilaterally terminate the project."

- "Category 3" — the project "does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities and Other Resources' attachment and terminology related to structural racism—this is not all-inclusive)." For projects construed as Category 3, ICs "must request an updated [application or progress report] with the DEI language removed," and only once the language has been removed may the IC "proceed with issuing the award."

- "Category 4" — the project does "not support any DEI activities." ICs "may proceed with issuing the award."

94.     The February 28 Guidance also provides "[g]uidance for staff to use when terminating awards identified by HHS or the IC." In those circumstances, NIH officials must "issue a revise[d] NOA." The February 28 Guidance also instructs NIH officials to "[u]se the following termination term" in the revised NOA: "This award related to *[select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues* (sic)*]* no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated [Refer to Appendix 3 for language provided to NIH by HHS.]" (emphasis added). The document also instructs NIH officials that "[t]ermination actions taken based on agency priorities do not require appeals language because the action was *not* based on administrative nor [sic] programmatic noncompliance" (emphasis added). In addition, the February 28 Guidance directs, "[i]f the grant is a no cost extension, and the HHS requests a termination, the project must be terminated."

95.     Appendix 3, in turn, lists "[l]anguage provided to NIH by HHS" with "examples for research activities that NIH no longer supports," and outlines three forbidden topics:

33

- "China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives."

- "DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ('DEI') studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harm the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

- "Transgender issues: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs."

96.     On March 25, 2025, as part of its Directives, NIH issued another document (the "March 25 Guidance") with a header that warned, "INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT."[83]

97.     Like the February 28 Guidance, the March 25 Guidance outlines categories of projects and mandating action for certain forbidden categories:

- Category 1 projects remain the same, and the March 25 Guidance likewise requires that NIH officials terminate all such existing projects and not issue any such awards.

- Category 2 projects are those that "partially support[] non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are ancillary to the purpose of the project, in some cases, not readily visible [sic]." The document also notes that, "Activities required to comply with NIH inclusion policies are not considered DEI activities."

---

[83]Max Kozlov, *Exclusive: NIH to cut grants for COVID research, documents reveal*, NATURE (Mar. 26, 2025), https://www.nature.com/articles/d41586-025-00954-y.

- Category 3 projects have a different definition and "do[] not support any DEI activities." The memo states that the "IC may proceed with issuing the award."

- Category 4 projects have a different definition and are designated "HHS Department Authority Terminations." The "Director, NIH or designee" provides a list of these projects to NIH officials, and the officials must in turn "issue termination letters" for these projects.

- Category 5 projects are those awarded "to [e]ntities in certain foreign countries." According to that part of the document, "Additional guidance on awards to foreign entities is forthcoming. At this time, ICs should hold all awards to entities located" in certain countries, including South Africa.

98.    This document repeats much of the substance of the February 28 Guidance, including that "NIH will no longer prioritize research and research training programs that focus on [DEI]," but expands the topics of research NIH purports to "no longer prioritize" to include "Vaccine Hesitancy" and "COVID-related" research. It directs NIH officials to include the following language (or language substantially similar) in correspondence regarding grant reviews: "It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.]."

99.    The March 25 Guidance also identifies—in a section labeled "Appendix 3"—a list of forbidden topics for NIH grants and prescribes language to be included in termination letters. This document is identical to the March 25 Guidance with respect to identifying "China," "DEI," and "Transgender issues" as areas of forbidden research, but it also provides required language to terminate projects in the two additional forbidden topics—"Vaccine Hesitancy" and "COVID-related" research:

- "Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses [sic] gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in

35

ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria."

- "COVID: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary."

100.   Like the February 25 Guidance, the March 25 Guidance directs NIH officials to revise NOAs that are terminated pursuant to the Directives, and instructs NIH officials to include the following (or substantially similar) language in those revisions: "It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim]. Therefore, this project is terminated."

101.   The March 25 Guidance also has an FAQ section that includes, among other instructions: "6. When ICs issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term? Yes, ICs must use the exact language provided in Appendix 3, with no edits."

102.   In addition, regarding "Notice of Funding Opportunity (NOFO) Guidance," the document has only the following text: "[pending]."

103.   The Directives—comprised of the February 28 Guidance, the March 25 Guidance, and other versions of these documents that articulated areas of research that purportedly "no longer effectuate[] agency priorities"—fail to define critical terms, such as "diversity, equity, and inclusion" or "DEI"; "artificial and non-scientific categories"; "amorphous equity objectives"; "[t]ransgender issues"; "gender identity"; or "COVID-related."

104.   The lack of clarity about the meaning of these and other forbidden terms has contributed to widespread confusion among NIH staff on how to implement the mandates outlined

36

in the Directives.[84] For example, as one NIH official asked, "is a grant providing culturally appropriate care specifically to Hispanic and Latino population 'discrimination'?"[85]

*I. Pursuant to Directives, NIH Issues Boilerplate Notices to Terminate Hundreds of Grants*

105.　Pursuant to the Directives, NIH adopted a script for grant termination notices. It did so without regard for the limited circumstances in which terminations may be made and its legal obligation to individually and rigorously review the varied and diverse projects under consideration for termination.

106.　Each termination notice begins by identifying the project number, identifying which year's Grants Policy Statement applies to the grantee's project, and stating that the letter "constitutes a notice of termination" purportedly pursuant to that Grants Policy Statement and 2 C.F.R. § 200.340(a)(2). The notice also emphasizes that "obligations generally should be determined by reference to the law in effect when the grants were made."

107.　Citing the pertinent year's Grants Policy Statement, each notice states, "At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination '[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'"

108.　From there, each notice includes one of a few slightly different scripts stating, without explanation, that the grant "no longer effectuates agency priorities." The language in these notices repeats the mandatory language from the appendices, described above. Below are three examples:

- First, "This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of

---

NIH not to prioritize these research programs. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria." ("Termination Section 1"). In some notices, "DEI" is substituted for "gender identity."

- The second script is the same as the first but omits the last two sentences ("Termination Section 2").

- The third script provides, "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ('DEI') studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs." ("Termination Section 3").

109. After that, the language across all notices is once again nearly identical, stating the following or something substantially similar, "Although NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision, no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities."

110. After this emphasis on the futility of any appeal, each notice outlines the appeals process. But as one NIH staffer stated, "the language included in the terms of the terminated grants about the appeal process is CYA [to cover their asses] and any appeal will end up in the trash."[86]

111. For the vast majority, if not all, terminated grants since February 28, 2025—including all terminated Project-Based Grants and Pipeline Grants supporting the research of

---

[86] Max Kozlov, Bluesky (Mar. 31, 2025, 2:24 PM),
https://bsky.app/profile/maxkozlov.bsky.social/post/3llp6vhkvx22t.

Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members—the notices offer no other justifications for termination.

112.    The notices make no effort to explain how or why the relevant grant fails to "effectuate agency priorities" or otherwise warrant termination. The notices fail to cite any project-specific information or data, much less any reasons to disregard that information or data. Indeed, the assertions in the termination notices about the lack of scientific validity, rigor, or public health benefit of the studies contradict the conclusions of NIH and external scientists who previously reviewed these projects and helped award those grants in the first place, including the multiple panels of experts in the grantees' fields who judged the proposals on criteria such as the lead scientist's track record, the rigor of the study's design, and the project's likelihood of addressing a pressing biomedical-research issue.[87] These notices also do not address NIH's prior assessment that the projects *do* meet agency priorities and are aligned with the statutory mandate and goals of NIH and the pertinent IC.

113.    The notices also demonstrate that NIH failed to consider any reliance interests at stake for ongoing grants. For example, the notices say nothing about potential job losses that would result from the termination of the grant at issue or the effect the termination would have on study participants, the data being collected, the populations served by the research, or the broader goals furthered by the study. In short, the notices say nothing about how these terminations may affect the research endeavor or public health. Indeed, as one member of senior leadership at an NIH institute stated, grants are getting killed "without any scientific input anywhere."

114.    For grants that were terminated, NIH also issued revised NOAs with new end-of-project dates that reflected immediate or near-immediate termination. These revised NOAs also

---

[87] *See* Wu, *supra* at note 59.

included new termination language with statements that were substantively similar to the language included in Appendix 3 of the February 28 Guidance and March 25 Guidance, and made explicit reference to "2 C.F.R. §200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2" as its statutory authority for these terminations.

115. Evidence suggests the language in the termination notices did not originate with NIH or HHS staff but was instead drafted by staff from the Department of Government Efficiency ("DOGE"). For example, metadata associated with at least one such notice shows it was authored by "JoshuaAHanley." An attorney named Joshua A. Hanley, a 2021 law school graduate, works at DOGE.[88]

116. The terminations cut across diverse topics *that NIH is statutorily required to research*. At least 678 research projects have been terminated to date. These include projects on some of the most pressing public health issues of our time, including breast cancer, uterine cancer, anal cancer, stroke risk, cardiac health, Alzheimer's Disease, HIV prevention, suicide prevention, alcohol use disorder, smoking cessation, eating disorders, sexually transmitted infections, COVID-19, depression, psychopathology, pain, and many other conditions that disproportionately burden minority communities. Other terminated grants studied the harmful effects of discrimination, poverty, racism, loneliness, trans exclusionary policies, and social stress, as well as the health-protective effects of social support, education, and school-based mental health interventions. Still others have no clear or at most a tangential connection to DEI, gender identity, or the other now-disfavored topics that were the alleged basis for their termination. These terminations compromise

---

[88] Sara Reardon, *Trump officials will screen NIH funding opportunities*, SCIENCE (Mar. 26, 2025), https://www.science.org/content/article/trump-officials-will-screen-nih-funding-opportunities. More recently, media reported that after a two-month freeze on posting NOFOs, NIH will resume posting NOFOs, but only after review by HHS and DOGE for consistency with administration priorities.

NIH's ability to fulfill its statutory and other obligations. They also compromise the public's health and deprive minority communities of equal access to the benefits of government research.

117.    The terminations also directly conflict with NIH strategic priorities. For example, the 2021–25 Strategic Plan for the National Institute on Minority Health and Health Disparities prioritizes research, among other things, to "understand and to improve the health of racial/ethnic minority populations," to "[a]dvance scientific understanding of the causes of health disparities," and to "[d]evelop and test interventions to reduce health disparities."[89] Consistent with this goal, that institute issued Grant Number 5R01MD017509 for a five-year intervention beginning May 14, 2022, to test whether directly reducing the income gap among older African American men in rural communities enhances their health and wellbeing. The grant was scheduled to last through January 2027. However, on March 14, 2025, half-way through the project, the grant was terminated. In another instance, the institute funded a proposed multi-year grant entitled, "Development of a School-Based Prevention Intervention to Promote Adolescent Mental Health Equity." The grant began on January 31, 2025, but was terminated without explanation just 40 days later. These grants exemplify a pattern, in which IC-specific directors awarded grants consistent with their IC-specific strategic plans, after which the grants were summarily terminated despite no change to IC-specific or overall NIH strategic plans.

118.    The programs designed by NIH to implement Congress's statutory mandate to diversify the workforce are also being gutted. In the past four weeks, NIH has at least terminated seventeen F31 Diversity awards that support promising graduate students in their final years of dissertation research.

---

[89] *Nat'l Insts. of Health*, *supra* note 68 at 2.

119.     Similarly, NIH has paused all work under the Undergraduate Research Training Initiative for Student Enhancement ("U-RISE"), a $23.1 million NIH initiative launched in 2019, "to develop a diverse pool of undergraduates" who plan to pursue higher education and careers in biomedical research.[90] U-RISE is a mirror program to the Minority Access to Research Careers program ("MARC"), created in 1977.[91] Universities develop, apply for, receive, and administer MARC and U-RISE grants. For nearly 50 years, these programs have operated to diversify the biomedical workforce, supporting thousands of students from underrepresented backgrounds.

120.     In 2024, NIH supported 63 U-RISE and 34 MARC programs. On March 27, 2025, with no prior notice, NIH issued stop work orders for all U-RISE programs through an email stating that "NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities." The email instructs the program directors to "cease project activities as of the current budget period end date of 3/31/25" with an additional four days to reconcile all expenditures. It appears that all U-RISE program directors have received the same communication, regardless of how many years were left on these five-year awards. MARC program officers have no idea if or when their identical programs will be paused or terminated.

121.     U-RISE supports high-achieving undergraduate students, typically juniors and seniors, who have demonstrated academic promise in STEM disciplines. The program aims to increase the likelihood that these students will pursue and complete PhDs in biomedical research fields by providing tuition assistance, monthly stipends, research training, mentoring, and support

---

[90] Nat'l Insts. of Health, *Undergraduate Research Training Initiative for Student Enhancement* (expired) https://grants.nih.gov/grants/guide/pa-files/par-19-218.html.
[91] Nat'l Ctr. for Biotechnology Information, *Meeting the Nation's Needs for Biomedical and Behavioral Scientists, Appendix A, Historical Overview*, (1994), https://www.ncbi.nlm.nih.gov/books/NBK236727/. The program's name has since changed to "Maximizing Access to Research Careers," but its core goal has remained the same for 48 years, i.e., "to create and sustain inclusive [undergraduate] training environments for trainees from diverse backgrounds."

for lab-related expenses. The sudden termination of funding places participating students at immediate risk of losing housing, income, and academic continuity.

122.     Along with terminations, NIH is also violating its regulatory mandate to review all appropriately submitted applications.

123.     In February 2025, the F31 Diversity track opportunity disappeared from NIH websites.[92] While in the past NIH has maintained expired funding opportunities on its website with an indication that the opportunity has expired, links to the F31 Diversity track now result in a "page not found" message. NIH has not provided information on the fate of applications received for these unpublished opportunities, but the March Guidance indicates that applications "received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority" will not be funded.

124.     These losses will render NIH incapable of meeting its congressionally required responsibilities. And they will deeply compromise the next generation of scientists, denying the public the contributions to health their promising careers would have yielded.

*J.   Terminations of Plaintiffs' Grants Cause Confusion, Chaos, and Other Ongoing Harm*

125.     The termination of the research funding of Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members provides a window into the devastation to medical and scientific research playing out across the nation right now. Their stories—just a fraction of the chaos and harm caused by the Directives—show how large the blast radius is from these terminations. And although the subject matter of their research spans all types of subject matter and populations, each termination notice is identical except for ever-so slightly different scripts stating that the grant "no

---

[92] F31 Diversity grants are far from the only programs impacted. Additional unpublished funding opportunities include the MOSAIC, U-RISE, MARC and dozens of others.

longer effectuates agency priorities" (*see* above descriptions of Termination 1, Termination 2, and Termination 3).

126.    As detailed further below, across Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members, these terminations have resulted in studies being postponed or cancelled, putting at risk the health of participants. And the terminations have severely diminished—if not eviscerated—the reliability of any data or statistical analyses from those years-long research efforts, crippling scientific advancement for years to come. Whether weighing the effects on study participants or the broader field of study, the lost benefits to the populations served by their research, or even the financial consequences on themselves and their staff, each researcher has suffered severe distress because of the Directives. Science may be a collective endeavor, but the harms here have also struck Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members on a personal level.

127.    What's more, based on the Directives and the conclusory nature of the termination letters, Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members do not know which of their current remaining projects—if any—are still eligible for NIH grants, and they fear that at least some of their ongoing NIH-funded projects are at risk of being terminated on similar grounds. Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members are also uncertain about how they may need to change their current and future research, what terminology they must avoid, as well as which populations their research can focus on to remain eligible for NIH funding. As such, although they intend to apply for future NIH grants, they have no idea how to propose research in their areas of expertise that would satisfy the "agency priorities."

44

128.     Plaintiff Charlton has received terminations for her entire portfolio of five NIH grants, including a five-year $4.15 million R61 grant for an observational study of the mental health impact of legislative bills targeting the LGBTQ population; a five-year $4.42 million R01 grant for a longitudinal study of worse obstetrical outcomes for LGBQ women as compared to heterosexual women to inform targeted interventions to improve their health and the health of the approximately 800,000 children born each year to this population (a project that has nothing to do with gender identity and includes no transgender study participants); and an administrative supplement of $100,000 for the R01 grant to support an early-career trainee on the research team. These grants were terminated throughout March with notices that used Termination Section 2 (Gender Identity), Termination Section 3 (DEI), and Termination Section 2 (Gender Identity), respectively.

129.     Because of these terminations, Dr. Charlton has lost nearly all of her salary as well as the money to pay the salaries of 18 people on her staff. She had to terminate the LGBTQ Health Center's director the day after the terminations. And she has had to suddenly cancel appointments with impacted youth and other research subjects and wind down her projects.

130.     NIH has terminated at least six grants in support of Plaintiff Edwards' research. The total amount awarded across those grants is approximately $11.9 million. Included in those terminations is a five-year $3.8 million R01 grant for a longitudinal study among sexual minority men to identify factors predicting sexual assault experiences and outcomes to inform prevention and intervention efforts specific to this highly vulnerable group. Also among those cuts is a R34 research grant, titled *An Online Family-based Program to Prevent Alcohol Use and Dating and Sexual Violence among Sexual and Gender Minority Youth*, aiming to increase family support and

communication, enhance social-emotional skills, and increase awareness of accurate perceptions of alcohol and dating violence norms. Both programs were terminated in March 2025 with notices that used Termination Section 1 and 2 (Gender Identity), respectively.

131.    Due to the grant terminations, Dr. Edwards has had to suddenly stop or severely curtail research projects funded through the grants, potentially halting the intervention for the 22 families that are enrolled in one of her programs and impairing her ability to analyze data and build preventative interventions through the data collected in the projects. Further, one goal of her R34 research grant is to identify ways to implement programmatic recommendations for families in places like churches, community centers, and schools; now due to the termination, she will not have the data to evaluate or propose these types of recommendations from the project. Dr. Edwards has also lost a portion of her salary because of these terminations, as well as the ability to continue to pay a number of the approximately 50 staff members who are funded through her research grants.

132.    Plaintiff Lurie served as a paid consultant and advisor on a two-year $277,552 R21 grant to evaluate the impacts of over-the counter access to pre-exposure prophylaxis ("PrEP") on reduce the risk of HIV transmission. On March 21, 2025, the grantee institution, Harvard Pilgrim Healthcare, Inc., received a termination notice from NIH using Termination Section 2 (Gender Identity).

133.    As a result of the termination, the research into PrEP access being conducted under the grant has been discontinued, resulting in harms to public health in the form of reduced knowledge about how to effectively reduce the spread of HIV.

<u>2. Plaintiff APHA Members</u>

134.     Members of Plaintiff APHA have also received letters notifying them that NIH grants supporting their research had been terminated.

135.     For example, APHA Member 1 was awarded a five-year, $4 million grant in support of their research to study time-efficient ways to measure patients' exposure to discrimination based on race, sex, gender identity, sexual orientation, age, and weight. On February 28, 2025, APHA Member 1 received a notice of grant termination from NIH informing them that NIH would be terminating the last year installment of the grant, amounting to $650,000. That notice includes Termination Section 3 (DEI).

136.     Because of the termination, the study team, who were expecting to be employed until January 2026, have lost job security, and they cannot complete analyses of the study's key outcomes—measuring and analyzing the health impacts of discrimination—or share these findings with community health centers and study participants.

137.     APHA Member 2 served as principal investigator on a four-year, $6.8 million R24 grant establishing the Coordinating Center for National Pain Scientists ("Coordinating Center") with the purpose of connecting a growing network of nearly 5,000 pain researchers across the country to support collaboration, improve networking, and centralize trainings and educational resources.

138.     On March 21, 2025, APHA Member 2 received a notice of grant termination with Termination Section 3 (DEI). APHA Member 2 was alarmed and confused to see funding for the Coordinating Center cut because it does not support any study related to DEI and no hiring or scholarship decisions based on specific demographics have ever been made. To the contrary, the Coordinating Center is open to all researchers studying pain and no demographics have been

47

prioritized or excluded. The only reason APHA Member 2 can identify for why the grant was terminated is because the original NOFO required the Coordinating Center to include a diversity plan describing how its work would support the biomedical field broadly, including historically underrepresented researchers; however, this was ancillary to its operations and no financial resources have ever been devoted to it.

139.    As a result of this termination, four staff members working on the Coordinating Center have been furloughed, APHA Member 2 has lost nearly all of their salary, and approximately $1 million may now be wasted on pre-obligated spending toward an annual conference that can no longer occur. Without the Coordinating Center, fewer pain researchers will be trained to address chronic pain, and public health is harmed due to the reduced knowledge about how to treat and manage pain without running the risk of addiction.

140.    APHA Member 3 has had one grant terminated for which they are principal investigator, and three other grants terminated for which they are a co-investigator, including an R01 grant for a longitudinal study aimed at developing interventions to reduce drug use and promote mental and physical health in Black men. On March 20, 2025, with only five weeks left to complete this multi-year project, NIH canceled the grant, effective immediately, with a termination letter that includes Termination Section 3 (DEI).

141.    Due to the termination, APHA Member 3 has to wrap up a multi-year project five weeks early, and is unable to compensate three research team members who had already performed work on the project but had not yet submitted invoices for their hours worked. Collectively, these research assistants are owed compensation for their work on the grant for roughly 130 hours, an estimated $8,560.

142.    APHA Member 4 has had NIH terminate five grants that support their research, including an approximately $4 million grant for a randomized controlled trial with 375 participants using peer intervention to encourage the use of PrEP in order to address high rates of HIV in transgender men who have sex with men. On March 21, 2025, NIH terminated the grant through a notice including Termination Section 1 (Gender Identity).

143.    The impacts of the grant termination are severe. APHA Member 4 cannot pay their staff of six, has lost three months of their own salary, and will be restricted in their ability to work on a project that took years to develop and fund.

144.    NIH has terminated three grants supporting APHA Member 5's research, including an R01 grant aimed to develop new or modified caregiving measures for the nearly one million sexual and gender minority adults in the U.S. who are caregivers and to ensure that they are included in future research on caregiving for those with Alzheimer's disease. On March 21, 2025, NIH terminated this grant with a notice that includes Termination Section 1 (Gender Identity).

145.    The impacts of the grant termination are dire. APHA Member 5 has lost much of their salary and is in the process of laying off their staff of at least 35 people, and their co-investigators are doing the same. Beyond that, sudden termination of the study has broken the trust of the participants in the study—all LGBTQ caregivers for people with Alzheimer's who had each spent two years answering questions about their caregiving experiences for research that will now not be completed.

146.    NIH has also unlawfully terminated grants supporting the work of APHA Members 6 and 7, both principal investigators on a five-year, $2.45 million Kirschtein-NRSA T32 grant funding recruitment and training of postdoctoral scientists. The program increases the pipeline of scientists studying addiction and related conditions and provides training in treatments that reduce

49

overdose deaths by 50%, work critical to HHS priorities to address the opioid crisis. Consistent with the NOFO's listed purpose to ensure a "diverse and highly trained workforce," their grant proposal prioritized recruitment of postdoctoral fellows from groups excluded based on race and ethnicity, people with a disability, people who are LGBT+, people having a disadvantaged background, and those with "diverse training backgrounds." However, despite this intention, of the four offers made to postdoctoral trainees for acceptance into the training program to date, all four were made to white candidates. On March 21, 2025, before the conclusion of the first-year budget period, the APHA members received a notice that their grant was terminated including Termination Section 3 (DEI).

147. As a result of the grant termination, APHA Members 6 and 7 have rescinded offers to postdoctoral fellows for entry into the training program. Fewer clinical researchers will be trained to address substance abuse, and trainees will not be able to pursue scientific inquiries that could have led to novel non-pharmacological approaches to reducing the risk of substance use disorders.

148. APHA Member 8 is a postdoctoral fellow who had been in the first year of the three-year training program. The sudden withdrawal of the T32 grant funding has enormous consequences for their career path. The termination, at a time when the application period for most other T32 grants has ended, means they will be without employment in academia until at least July 2026.

149. NIH has terminated at least two grants that support the research of APHA Member 9, totaling approximately $3 million, to better understand efforts that could promote HIV prevention and treatment, and to address health inequity experienced by gay, elderly, and racial

minority populations and populations living with or without HIV. The grants were terminated in March using a notice of termination that includes Termination Section 3 (DEI).

150.    Due to the grant terminations, APHA Member 9 will likely have to lay off at least three staff members, will lose approximately 20% of their annual salary, and will have to conclude the study before completing sufficient recruitment to achieve the sample size needed to conduct valid—and meaningful—statistical analyses. Cutting off these studies will prevent their contribution to the understanding of HIV and comorbidities (e.g., heart attacks, diabetes, or mental illness) across racial groups.

151.    APHA Members 10 and 11 were awarded an R15 grant for over $450,000 in support of their research on ways to improve healing for sexual and gender minority survivors of sexual violence, given the high rates of sexual violence they experience, and creating opportunities to train student researchers. In March, within the first year of the three-year grant, they received a notice of grant termination from NIH including Termination Section 1 (Gender Identity). Tied to this R15 grant was an application for a diversity supplement of approximately $162,000 to support an early career trainee on the research team that has been in limbo for the last three months.

152.    As a result of the grant termination, these APHA members will not have funds to pay their students and will lose a quarter of their own salaries. Nor will they be able to realize the project's aim of training people to better respond when a sexual or gender minority discloses that they have been a victim of sexual violence.

153.    APHA Member 12 received a 4.75-year, $3.4 million R01 Research Project Grant from NIH to fund their research on stigma around HIV testing and PrEP use among U.S. Latino men who have sex with men. On March 20, 2025, only about 40 days before the project's end date, the member received notice that the grant was terminated. The grant termination notice includes

Termination Section 3 (DEI). Since not all participants completed interviews, it is impossible to complete the project's longitudinal analyses.

154.    As a result of the grant termination, almost $3,300,000 in sunk costs on the project have been wasted, two individuals hired to interview participants have already had their employment terminated, additional project team members may imminently lose their jobs and the 503 participants in the study will be harmed when they learn that the grant has been terminated, as it will create further stigma.

155.    APHA Member 13 was awarded an almost five-year, $1,487,916 International Research Training Grant from NIH funding the Malaysian Implementation Science Training program at the University of Malaya in collaboration with Yale University, a first of its kind initiative designed to address Malaysia's rapidly expanding HIV epidemic through training University of Malaya faculty and early career researchers.

156.    On March 21, 2025, in the fifth year of a five-year grant, the lead investigator received a notice that the grant was terminated. The grant termination notice includes Termination Section 1 (Gender Identity). A renewal of the grant was recently reviewed and received a highly competitive score that should have committed five years of continued funding; this will no longer happen.

157.    APHA Member 14 received a two-year, $428,270 R25 (research training and career development) award to fund training and mentorship of early-stage investigators on measurement rigor and ethical practices. The program's goal is to narrow the gap in research on perinatal intimate partner violence, which has marked effects on maternal health outcomes. It was proposed in response to a funding call for projects addressing intimate partner violence and intended to contribute to the NIH Implementing a Maternal Health and Pregnancy Outcomes Vision for

Everyone Initiative, launched in 2019 in response to high rates of pregnancy-related complications and deaths in the United States.

158.    On March 21, 2025, before the conclusion of the first-year budget period, APHA Member 14 received a notice that the award was terminated. The termination letter includes Termination Section 3 (DEI). As a result of the award termination, APHA Member 14 incurred over $50,000 in sunk costs on the project and forfeited valuable training and research outcomes. APHA Member 14 and another APHA Member working on the project may lose their jobs, as both positions are grant-funded.

159.    APHA Member 15 received a three-year, Kirschstein-NRSA fellowship aimed to develop and implement Rapid Start ART, an HIV treatment prescribed immediately after diagnosis. The fellowship's training component includes coursework, mentorship, and research on stigma, implementation science, and dyadic analysis. The fellowship bridges the gap between being a doctoral student and a professor. On March 18, 2025, only about a month after the project began, the member received a notice that the grant was terminated. The termination letter includes Termination Section 2 (DEI). Only a few hundred dollars of the grant funding had been withdrawn; the member has not yet received a paycheck. However, the member had already begun significant planning for the three-year grant, completing paperwork and meeting with the data collection team. The member had recently moved to live near the university and may lose their job.

3. Plaintiff Ibis

160.    In September 2023, Plaintiff Ibis was awarded a 5-year R01 research grant, with approximately $500,000 in funding per year for a project to study methods for improving the collection and quality of data in sexual and reproductive health research for people including those who identify as transgender and gender diverse. Plaintiff Ibis had applied for the grant two years

before that and scored in the top two percent of applications submitted. After years of developing and testing the survey methods, and on the eve of launch, Plaintiff Ibis received a termination notice from NIH in March 2025 using Termination Section 2 (Gender Identity). Even though the research supported by the grant specifically advances the priorities of NIH's National Institute of Child Health and Human Development, NIH terminated the grant for purportedly "no longer effectuat[ing] agency priorities."

161.    As a result of the grant termination, Plaintiff Ibis must restructure research teams because of staffing pressures and seek additional funding to cover the salaries of four employees staffed on the project. Plaintiff Ibis has also had to pause the next phase of the study, hindering collection of crucial data on sexual and reproductive health experiences and preferences from under-studied populations.

K.  *NIH's Refusal to Consider Individual Plaintiffs' and Associational Members' Pending Grants, Extensions and Renewals of Existing Grants, and Stop Work Orders*

162.    Pursuant to the Directives, NIH is refusing to consider pending Pipeline Grant applications that it deems DEI-related.

1. Plaintiff Maphis

163.    Plaintiff Maphis's MOSAIC application is one such grant. On November 12, 2024, Dr. Maphis applied for a MOSAIC grant, intended to help diversify the profession. Her proposed research would, if funded, study the link between Alcohol Use Disorder and Alzheimer's Disease. It would provide five years of funding and help her transition from her mentored postdoctoral research position at the University of New Mexico to a junior faculty member elsewhere. It would have, in short, helped launch her career as an independent researcher.

164.    Dr. Maphis's application was assigned to a study group scheduled to score her proposal on March 4, 2025. The morning of March 4, however, she learned that her proposal had

been reassigned to a new generic group that was not scheduled to meet. Later that day NIH notified her that her proposal, along with others, had been pulled from its original study group. When Dr. Maphis asked whether her proposal would be reviewed, she was told "unfortunately not." Dr. Maphis was told by a member of her original study group, which had reviewed her application before March 4, that her application was highly regarded and likely would have received funding had it not been for NIH's changes. Dr. Maphis's current funding expires on September 30, 2025. Without additional funding, which the MOSAIC award would have provided, she will lose her job. She will also lose out on the training she would have received from the MOSAIC program. As a consequence, Dr. Maphis will be less competitive on the faculty job market, unlikely to secure a faculty position, and potentially forced to abandon a career in academia, which she has been training for and working towards for the last 17 years.

### 2. Plaintiff APHA Members

165.    APHA Member 16, who researches zinc's impact on health, is the recipient of a MOSAIC grant. Member 16 has recently completed the two year (post-doctoral training) K portion of the grant and was slated to transition to the R portion of the grant, in which NIH would fund the first three years of their position as a tenure-track Assistant Professor. APHA Member 16 began their faculty position in January but never received their NOA for the R portion, which normally would have been received in January or February.

166.    APHA Member 16 has not been getting responses from NIH about the status of their application, which is particularly concerning for APHA Member 16 because NIH has cancelled the MOSAIC program, removed it from the National Institute of General Medical Sciences website, and terminated the NOFO early. As a result of not receiving the NOA, APHA

Member 16 has not been able to obtain the necessary funding for completing their lab setup, hiring staff, and continuing this important research.

### 3. Plaintiff UAW Members

167.    UAW Member 1, a PhD candidate at a private university in California, submitted an F31 dissertation proposal that, if funded, would help inform intervention efforts for suicide prevention among LGBTQ youth experiencing homelessness—the leading cause of death for this population. They received a high score (14th percentile) on the proposal. However, they learned the project would likely not be funded because of new restrictions on LGBTQ research. This will harm UAW Member 1's ability to progress through their PhD program.

168.    UAW Member 2, a postdoctoral researcher at a private university in New York, has a pending application for an NIH Diversity Supplement. They research affect, sleep, and processes of embodied change (sleep health). They have received no updates from NIH on their application. Without this funding opportunity, they cannot remain at their university to complete their program. They will have to stop ongoing projects and forfeit the rest of a supplemental grant they received because they will no longer have institutional support. They will have to apply for new postdoctoral positions elsewhere that would require them to change their project and lose the research investments they have already made. This will make them less competitive for the next step of their research career and require they spend longer as a postdoctoral scholar, earning a salary as much as $25,000 lower than they would have had they remained at their current institution.

169.    As a result of NIH's refusal to consider their application, UAW Member 2 is in the position of having to choose between leaving their career as an academic researcher, for which they have trained for over 10 years, or moving to a position in a different part of the country or outside the country, away from their family, their partner, and the medical care they need as a

person with a physical disability. If they do not find an alternative position, they face a period of unemployment in one of the most expensive cities in the world.

170.     UAW Member 3, a postdoctoral researcher at a private university in New York, applied to the MOSAIC K99 program through the National Institute of General Medical Sciences. This five-year career transition award of $1 million would launch their career studying mechanisms of behavior (evolution of behavior). Their proposal received an impact score of 10 (a perfect score) last fall. NIH, however, will no longer communicate with UAW Member 3 about this award. UAW Member 3 has aged out of eligibility for the main K99, so reapplying is not an option for them. Because they thought they had secured the MOSAIC K99 award, UAW Member 3 did not apply to the Simons Foundation Fellows-to-Faculty Award. Without the K99 award, UAW Member 3 is in a strained financial position to finish their postdoctoral studies and will be much less competitive on the job market.

171.     UAW Member 4 is a graduate student at a private university in New York, where they research neurophysiology, in particular, the neurobiological mechanisms underlying maternal caregiving. They were awarded a transition grant known as a D-SPAN (F99/K00) intended to support a defined pathway across career stages for outstanding graduate students from diverse backgrounds, including those from groups that are underrepresented in neuroscience research.

172.     Despite having received a NOA for this program, their NIH program officer has since encouraged them to apply for other funding programs, citing uncertainty surrounding the future of the funding program. Consistent with this messaging, UAW Member 4 also noticed that language on the D-SPAN program website has changed, now referring to the D-SPAN grant in the past tense, and the pictures and bios of previous and current awardees have been removed. UAW

57

Member 4's potential lack of funding has created significant challenges for them in securing a postdoctoral position.

173.     UAW Member 5 is a graduate student worker at a private university in California. They applied for a two-year NIH Diversity Supplement to an existing R01 grant. This supplement is intended to support underrepresented researchers, with the goal of expanding UAW Member 5's skillset and substantiating their potential to become a productive investigator. The project was part of a multi-university collaboration and would fund the bulk of UAW Member 5's dissertation research, covering direct and indirect costs, materials and supplies, travel, and other essentials.

174.     UAW Member 5 completed the application process and corresponded with NIH coordinators, understanding that the supplement was officially under review. However, on the day Executive Order 14151 was announced, all communication ceased. The NIH website pages related to the diversity supplement were scrubbed, and the coordinators became unreachable. No formal notice of cancellation or termination was ever provided—only a sudden disappearance of any evidence that the supplement application existed. To date, UAW Member 5 is left to assume that the grant as a whole no longer exists, despite never receiving any official update regarding its status while under review and with no clarity on how to proceed.

175.     UAW Member 6 is a postdoctoral student at a private university in New York and a MOSAIC K99/R00 scholar whose grant studies how social cues guide emotions. This study was motivated by the need to understand how social processing is impaired in several neuropsychiatric disorders. UAW Member 6 had begun the process of requesting a no-cost extension but has been unable to communicate with the NIH program officer since January 2025 to begin this process. UAW Member 6 was well-situated to receive this grant given their extensive service in mentoring

58

and advocacy while simultaneously performing high-quality science—a feat not many scientists successfully undertake.

176.    UAW Member 6 is relying on the R00 portion of their MOSAIC grant to kickstart their tenure-track faculty lab and to continue and expand on their work to develop novel treatments for psychiatric disorders. Given NIH's complete silence, UAW Member 6 fears they will not receive their R00 when they apply for it in this year's upcoming job cycle, which could potentially restrict their nation-wide job search. This has caused immense stress and has created uncertainty in their research career progression in securing a tenure-track faculty position.

177.    UAW Member 7, a graduate student at a private university in New York, was preparing an F31 parent grant proposal to study the impacts of anti-transgender structural stigma (anti-transgender legislation). That funding opportunity, however, was cancelled as of March 10, 2025, depriving UAW Member 7 of the potential funding that grant would have provided.

178.    UAW Member 8, a graduate student at a private university in New York, sought an F31 Diversity grant to study developmental neurobiology. This research is crucial to gain insight into early risk factors of neurodevelopmental and psychiatric disease and enable the identification of timepoints for effective prevention and treatment. UAW Member 8's proposal was highly scored (Impact score: 18, Percentile: 2.0) and, accordingly, NIH issued a notice of award in August 2024. Their supervisor, however, was notified in March 2025 that F31 had been cancelled. UAW Member 8's application status has since been changed to "pending" and the budget period has been significantly shortened from the initial accepted budget period. NIH's decision to cancel this grant will hinder development on learning the neurodevelopmental factors preceding psychiatric disease onset, which is relevant to nearly half of the U.S. population. The lack of funding will also undermine UAW Member 8's ability to progress through their PhD program.

59

179.    UAW Pre-Member 1 is a postdoctoral fellow at a private university in Massachusetts and has been awarded a MOSAIC K99/R00 fellowship.[93] They are finishing the K99 phase of the award. They study how cells respond to signals outside the cell. By better understanding how this process is dysregulated, UAW Pre-Member 1 hopes to improve cancer therapeutic strategies in the future.

180.    As is standard for K99/R00 fellows, UAW Pre-Member 1 has been planning to apply to activate their R00 funding this summer, once they have found an independent position as an assistant professor. They have discussed this plan with their NIH program officer. This should be a routine process, as the scientific component has already been evaluated and positively reviewed. However, the status of the MOSAIC program has become unclear—the website has been deleted, and the program is not seeking new applicants.

181.    UAW Pre-Member 1 has been unable to get information from NIH about their ability to activate the R00 funding. They fear, like other MOSAIC scholars, that their grant will be terminated. These changes to NIH policy have created uncertainty in UAW Pre-Member 1's transition to an independent position. Not having this award would significantly weaken their ability to negotiate a job offer and impair their ability to begin an independent lab.

182.    UAW Pre-Member 2 is a postdoctoral scholar at a private university in Pennsylvania, where they are tracking outbreaks of newly emerging multi-drug-resistant pathogens and investigating new ways to treat and prevent infections. They are funded by an NIH K12 training and career development grant awarded to their home institution which has a stated goal of improving diversity, equity, and inclusion in the biomedical sciences. As part of their

---

[93] "Pre-member" means UAW is their exclusive bargaining representative in ongoing negotiations with their employer and that they intend to become dues-paying members once a collective bargaining agreement is in place.

training under this grant, they also taught science classes at minority-serving colleges and universities in their metropolitan area.

183.    When UAW Pre-Member 2 was accepted into this postdoctoral training program, they were told the tenure of the program was three years. Since January 21, 2025, however, they have been told that the status of their funding in the near future is unknown. The principal investigators of the training grant at their home institution have been unable to reach the assigned program officer, and they do not know whether the regularly anticipated non-competing renewal will be completed this summer.

184.    To UAW Pre-Member 2's knowledge, there has been no communication from the federal government about the status of this entire category of training grants, nor of individual grants in this funding category. As a result, UAW Pre-Member 2 does not know whether they will lose their funding in the next few months. UAW Pre-Member 2 chose this funding path because they want to research infectious disease that directly informs clinical outcomes, and because they want to educate future generations of biomedical researchers. They had planned to spend three years developing an infectious disease research program which they could bring to a faculty position. Now, this future is uncertain as their research training time may be cut short by 30%.

185.    UAW Pre-Member 3 is a third-year graduate student in the Cell and Molecular Biology Ph.D. program at a private university in Pennsylvania. They are currently performing a research project that seeks to understand how heterochromatin associated proteins impede changes to cell fate and how mutations in these proteins lead to defects in neuronal development. They applied for the F31 Diversity grant on December 8, 2024. On February 13, 2025, their proposal was assigned to the Molecular and Cellular Sciences and Technologies ZRG1 F05-A (20) study section, scheduled for review on March 26–27, 2025. However, on March 12, 2025, UAW Pre-

61

Member 3 was informed that the study section information had been removed from their proposal's status. To date, the NIH has not provided any clarification or a timeline regarding when—or even if—the application will be reviewed.

186.    This change is particularly perplexing given that the only difference between the standard F31 and the F31 Diversity grant is the inclusion of an additional statement recognizing that the applicant comes from an underrepresented community in the sciences. For early-career scientists, obtaining such grants does more than support a research project financially; it represents recognition of their dedication, hard work, and potential to become future primary investigators.

187.    UAW Pre-Member 4 is a postdoctoral associate at a private university in New York. They applied for a diversity supplement for a project grant that seeks to improve transport of protective antibodies from mother to child during Cytomegalovirus infection. The study was motivated by the idea that Cytomegalovirus infection could prevent this transfer, leaving neonates vulnerable to a variety of congenital infections in utero.

188.    UAW Pre-Member 4 met the supplement's DEI requirements as a first-generation college student and a Latina. As of January 2025, the proposal was under review. However, the funding mechanism was abruptly cancelled due to its DEI requirements. This has been a significant setback for UAW Pre-Member 4 as a first-year postdoctoral student, as the supplement would support the majority of their postdoctoral salary. The lack of funding is a barrier to the start of this project and is delaying their expected timeline for gaining independence as a scientific investigator.

189.    The cancellation of this funding mechanism robs the field of study of diverse perspectives and ideas. Ultimately, restricting access to funding for researchers from diverse backgrounds will limit the impact that academic institutions can make to biomedical research.

190.    UAW Pre-Member 5 is a postdoctoral research scholar at a private university in Pennsylvania. They are working on their K99/R00 "Pathway to Independence Award" from the Helping to End Addiction Long term ("HEAL") Initiative—a program co-sponsored by the National Institutes of Mental Health and the National Institute of Drug Abuse. This five-year, approximately 1 million dollar grant provides two years of advanced postdoctoral training followed by three years of start-up funds for an investigator to begin an academic lab. One of the goals of the HEAL initiative is to develop new medicines to treat pain without propensity to cause addiction, an issue of great importance to the opioid crisis.

191.    On March 10, 2025, UAW Pre-Member 5 was made aware that the Request for Applications (RFA) RFA-NS-22-025 (which contained a diversity component), had been eliminated. This was not communicated by NIH. The program was designed to allow applicants from disadvantaged backgrounds to apply for evaluation in smaller study sections. UAW Pre-Member 5 was raised in an American "rust belt" city that has long struggled with the opioid epidemic. The cancellation of NIH's interest in diversity means that UAW Pre-Member 5 will be competing against a larger applicant pool, which limits their chance of success in an already competitive grant mechanism.

192.    UAW Pre-Member 6, a graduate student at a private university in Pennsylvania, studies the replication mechanisms of viral diseases spread by mosquitoes to identify targets for drug therapeutics. They sought this course of study because of the lack of existing or approved vaccines and antivirals to counter viral disease in humans. A warming climate has also increased the geographic spread of these diseases as a consequence of a broader habitat for mosquitos. UAW Pre-Member 6 applied to the F31 Diversity Fellowship for the August 2024 deadline. After receiving a score and percentile well within the fundable range in December 2024, UAW Pre-

Member 6 and their principal investigator waited for a just in time request for information from NIH and notice of award. However, after NIH funding freezes were announced in January 2025, UAW Pre-Member 6's study section was canceled.

193.     On March 18, 2025, UAW Pre-Member 6 reached out to their assigned NIH program officer to ask about the status of their application. The program officer then informed UAW Pre-Member 6 that their grant had been terminated. The award would have funded UAW Pre- Member 6 and their principal investigator for three years, covering stipends, conference travel, and materials for their project.

194.     Completing an F31 grant application is excellent practice for the development of scientific writing and project presentation. Aside from this, the Diversity F31 is built to uplift minority researchers through financial support. Although other grant pathways exist, this grant gave UAW Pre-Member 6 the opportunity to showcase a broader part of their identity that can enhance their scientific research. Part of the F31 Diversity application process is writing about how you plan to uplift other scientists. For UAW Pre-Member 6, the cancellation of diversity fellowships feels like a devaluation of their scientific research and of their sense of self as a scientist. Funding may still be provided by their lab, but the termination of the grant has, to their knowledge, caused the principal investigator to limit expenditure of funds, including conference travel and reagent purchase, which affects UAW Pre-Member 6's ability to carry out their research, gain experience presenting their work, and network with other scientists.

## CAUSES OF ACTION

195.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

**COUNT I**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**

196. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

197. Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

198. Defendants are acting in an arbitrary and capricious manner in violation of the APA.

*A. Grant Terminations*

199. Individual Plaintiffs, Plaintiff Ibis, and members of Associational Plaintiffs' members whose grants have been terminated ("Terminated Plaintiffs") assert this portion of this cause of action against all Defendants.

200. NIH's grant terminations pursuant to the Directives constitute final agency action under the APA for which there is no other adequate remedy in a court.

201. These terminations are arbitrary and capricious for at least seven reasons.

202. First, in its termination letters, NIH fails to provide adequate reasoning explaining how these studies fall below the agency's standards for scientific research. NIH's repetition of boilerplate and conclusory language across all the termination letters is not an adequate explanation as to how any specific study fails to meet agency priorities.

65

203.    Second, NIH fails to analyze any relevant data. The termination letters show that NIH did not consider individual, or any, data from the grants at issue or from any body of research that would contradict the value or rigor of the grants at issue.

204.    Third, NIH is not providing a reasoned explanation for its actions, as it is ignoring reliance interests. In the termination letters, NIH fails to mention, and does not appear to have considered, how these terminations will affect the reliance interests of researchers (including Plaintiffs), the institutions that host them, the participants in the terminated studies, and the body of research furthered by the terminated grants and the populations who would have benefitted from that research.

205.    Fourth, NIH relies on assertions contrary to its prior award review and policies, including the NIH Strategic Plan and IC Strategic Plans. NIH states that its terminations are based on an alleged change in priorities, but NIH has neither adopted, described, nor explained any new priorities, and the strategic plans under which the previous awards were made remain in effect.

206.    Fifth, the terminations run counter to available evidence and reflect NIH's failure to consider important aspects of the problems addressed by the terminated grants and the areas of research mandated by, among other things, Congress, NIH's Strategic Plan, and NIH's policy guidelines. As its stated change in priorities runs directly counter to congressional mandates, NIH is also relying on factors that Congress does not intend for NIH to consider.

207.    Sixth, NIH reliance on mandates by individuals outside the agency (including, for example, from DOGE individuals who drafted some number of the termination letters at issue), violates NIH's requirement to appropriately reach its own decision.

208.     Seventh, an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute. For the reasons expressed in Counts II, III, and IV, Defendants have acted contrary to their own regulations or congressional statutes.

209.     For those and other reasons consistent with the allegations herein, Defendants' grant terminations are arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).

*B. Refusal to Consider Applications*

210.     Individual Plaintiffs, Plaintiffs Ibis, and Associational Plaintiffs' members whose grant applications NIH has refused to consider pursuant to the Directives ("Applicant Plaintiffs") assert this portion of this cause of action against all Defendants.

211.     NIH's refusal to consider applications for published NOFOs that Defendants subsequently removed from publication constitutes final agency action under the APA.

212.     For the same reasons described above, NIH's refusal to consider properly submitted applications is arbitrary and capricious. That is, NIH (i) failed to adequately explain its reasons for this refusal; (ii) failed to analyze any relevant data; (iii) failed to consider reliance interests; (iv) has purported to rely on a change in priorities that has not occurred and that it has not explained; (v) failed to consider important aspects of the mandated areas of research addressed by the proposed grants and considered factors that Congress did not intend for it to consider; (vi) failed to appropriately reach its own decision; and (vii) acted contrary to its own regulations or congressional statute.

*C. The Directives*

213.     All Plaintiffs assert this cause of action against all Defendants.

214.     NIH's adoption of the Directives is final agency action under the APA.

67

215.    For the same reasons described above, NIH's adoption of the Directives is arbitrary and capricious. That is, NIH (i) failed to adequately explain its reasons for the adoption of the Directives; (ii) failed to analyze any relevant data; (iii) failed to consider reliance interests; (iv) has purported to rely on a change in priorities that has not occurred and that it has not explained; (v) failed to consider important aspects of the mandated areas of research addressed by the Directives and considered factors that Congress did not intend for it to consider; (vi) failed to appropriately reach its own decision; and (vii) acted contrary to its own regulations or congressional statute.

**COUNT II**
**Violation of the Administrative Procedure Act – Not in Accordance with Law**

216.    Terminated Plaintiffs assert this cause of action against all Defendants.

217.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A). Defendants fail to meet this standard in at least three ways.

218.    First, Defendants are purporting to terminate grants based on 2 C.F.R. § 200.340(a)(2) (2020), which allowed termination if an award "no longer effectuates the program goals or agency priorities." However, HHS did not adopt OMB guidance allowing for termination under 2 CFR Part 200.340 based on changes to agency priorities until October 2024, with an *effective date of October 1, 2025.* In the revised NOAs that NIH sent to Plaintiffs when it terminated their grants, NIH states that its action is "in accordance with 2 CFR § 200.340 as implemented in NIH GPS Section 8.5.2." But NIH Grants Policy Statement Section 8.5.2 did not implement the revised 2020 version of 2 CFR 200.340 because HHS did not implement that revised version in its regulations. This section purports "to be compliant with governing statutes

68

and the requirements of 2 CFR Part 200, *as modified by previously approved waivers and deviations*. However, in the case of a conflict, the statutes and regulations govern."[94]

219.     Second, even if 2 C.F.R. § 200.340(a)(2) (2020) applies, NIH's grant terminations are not in accordance with that regulation. 2 C.F.R. § 200.340(a)(2) (2020) provided that a federal award may be terminated in part or in its entirety "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." For the reasons stated in the preceding paragraph, NIH's termination was not "authorized by law." In addition, for the reasons already discussed in Count I (Arbitrary and Capricious), NIH's termination decisions were not consistent with the requirements of the APA—and therefore beyond "the extent authorized by law."[95]

220.     Further, the guidance accompanying the regulation indicates that any termination pursuant to 2 C.F.R. § 200.340(a)(2) must be based on the agency's consideration of evidence—and in particular, "additional evidence"—indicating that the "award no longer effectuates the program goals or agency priorities." *See* Guidance for Grants and Agreements, 85 FR 49506, 49507 (2020). But as already alleged, NIH's terminations are not based on *any* evidence regarding the specific grants.

221.     Moreover, 2 C.F.R. § 200.340(b) (2020) stated that the agency "should clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section." Likewise, the OMB Uniform Guidance that NIH recently adopted to go into effect October 1, 2025 only allows for termination based on changes to agency priorities "pursuant to the terms and conditions of the Federal award," and states that the agency "must clearly and unambiguously specify all termination provisions in the terms

---

[94] *See* Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 3 (Apr. 2024) (emphasis added).
[95] *See* 2 C.F.R. § 200.340(a)(2) (2020).

and conditions of the Federal award."[96] Yet the original NOAs that Plaintiffs received did not include reference to the OMB Uniform Guidance and did not state that an award could be terminated for shifting agency priorities.

222. Third, the terminations are not in accordance with the terms of the pertinent NIH Grants Policy Statements. Section 8.5.2 allows involuntary termination solely "if a recipient has failed to comply with the terms and conditions of award." Across its termination notices, NIH has acknowledged that it "generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," in accordance with the respective NIH Grants Policy Statement governing each award. While "NIH may immediately terminate a grant when necessary," "when necessary" is cabined by reference to circumstances "such as to protect the public health and welfare from the effects of a serious deficiency" and is only allowed under the limited circumstance where "a recipient has failed to comply with the terms and conditions of award."

223. NIH has failed to show that termination of any grants pursuant to the Directives met those circumstances. Defendants have not based termination of Plaintiffs' grants on a failure to comply with the terms and conditions of their awards. Even if termination were available to NIH where a grantee has met the terms and conditions of their award, NIH has failed to abide by its obligation under the NIH Grants Policy Statements to allow those grant recipients an opportunity to take appropriate corrective action before NIH terminated their grants.

224. Fourth, for the same reasons expressed below in Count III (APA – Exceeds Statutory Authority), Defendants' actions pursuant to the Directives—including the grant

---

[96] 2 CFR 200.340(a)(4),(b) (2024).

terminations and refusal to review submitted grant applications—run afoul of the mandates set forth by Congress.

225.    Thus, Defendants failed to act in accordance with law in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT III
**Violation of the Administrative Procedure Act – Exceeds Statutory Authority**

226.    All Plaintiffs assert this cause of action against all Defendants.

227.    A reviewing court must hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

228.    Through Section 301(a) of the Public Health Service Act, *see* 42 U.S.C. § 241(a), Congress delegated authority to NIH to "make grants-in-aid to universities" and other research institutions for the purpose of "promot[ing] the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." *Id.*

229.    In addition, Congress has mandated the expenditure of funds by NIH and ICs to promote health equity across health disparity populations, including racial and ethnic minority populations, less privileged socioeconomic status populations, underserved rural populations, sexual and gender minorities, and any subpopulations that that can be characterized by two or more of these descriptions. Among those statutory mandates are:

      a.    42 U.S.C. § 281(b)(24), which created the National Institute on Minority Health and Health Disparities to "conduct and support…research, training, dissemination of information, and other programs with respect to minority health and conditions and other populations with health disparities." *Id.* at § 285t(a).

b.  42 U.S.C. § 285t, which mandates that the Director of the National Institute on Minority Health and Health Disparities "shall[,] in expending amounts appropriated under this subpart give priority to conducting and supporting minority health disparities research," and "ensure that the plan and budget serve as a broad, binding statement of policies regarding minority health disparities research and other health disparities research activities…" *Id.* at § 285t(b); (f)(1)(G).

c.  42 U.S.C. § 282(b)(8)(D)(ii), which requires the Secretary, acting through the Director of NIH, to ensure that each of the ICs within NIH "utilize diverse study populations, with specific consideration to biological, social, and other determinants of health that contribute to health disparities."

d.  42 U.S.C. § 282(h), which mandates that "[t]he Secretary, acting through the Director of NIH…, shall, in conducting and supporting programs for research, research training, recruitment, and other activities, provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research."

e.  42 U.S.C. § 282(m), which requires NIH to develop a strategic plan that, among other things, "shall…(B) consider…(iii) biological, social, and other determinants of health that contribute to health disparities…" *Id.* at § 282(m)(1),(2). The Director of NIH must "ensure that the resources of the National Institutes of Health are sufficiently allocated for research projects identified in strategic plans." *Id.* at §282(b)(6).

f.  42 U.S.C. § 283p, which mandates that "the Director of the National Institutes of Health shall, as appropriate, encourage efforts to improve research related to the health of sexual and gender minority populations."

g.  42 U.S.C. § 283*o*(b)(2) which requires the Director of NIH to "develop, modify, or prioritize policies, as needed, within the National Institutes of Health to promote opportunities for new researchers and earlier research independence, such as policies to…enhance workforce diversity."

230.    Those mandates, and NIH's policies and regulations to effectuate them, apply to the funding and review of both Project-Based Grants and Pipeline Grants.

231.    But Defendants' actions pursuant to the Directives—including the grant terminations and refusal to review submitted grant applications—run afoul of those statutory mandates.

232.    Accordingly, Defendants acted "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

## COUNT IV
## Violation of Administrative Procedure Act – Contrary to Constitutional Right

233.    All Plaintiffs assert this cause of action against all Defendants.

234.    A reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

235.    Defendants' grant terminations and refusal to consider grant applications constitute final agency actions under the APA.

236.    For the reasons described in Count VI (Void for Vagueness), Defendants' actions are contrary to constitutional rights, and the Court must hold them unlawful and set them aside.

## COUNT V
### Violation of the Administrative Procedure Act –
### Unlawfully Withheld, Unreasonable Delay, or Failing to Conclude Matter Presented

237.    Applicant Plaintiffs assert this cause of action against all Defendants.

238.    An agency must "proceed to conclude a matter presented to it," 5 U.S.C. § 555(b); accordingly, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

239.    Defendants' refusal to consider submitted grant applications pursuant to the Directives constitutes final agency actions under the APA.

240.    Defendants' consideration of applications for Pipeline Grants has been unlawfully withheld or unreasonably delayed for the following reasons: (i) HHS regulations require NIH to accept, disapprove, or "defer because of either lack of funds or a need for further evaluation"; (ii) NIH policy requires that it consider each application submitted to it and does not allow the agency to withhold consideration of applications based on changes in agency priorities; (iii) large numbers of current and future biomedical researchers risk unexpected job loss that will harm not only them personally but also the development of biomedical research generally; and (iv) the applications' proposed research is essential to public health, making delays in this sphere less tolerable than in other spheres such as economic regulations. Thus, the Court must compel the agency to consider these applications.

## COUNT VI
### Violation of the Fifth Amendment – Void for Vagueness

241.    Terminated Plaintiffs assert this cause of action against all Defendants.

242.    Under the Fifth Amendment to the United States Constitution, a government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

243. Defendants' Directives are filled with vague language that do not give clear notice of what is covered: prohibiting "DEI research activities," or even "giv[ing] the perception that NIH funds can be used to support these activities" as well as research programs "based primarily on…amorphous equity objectives" or "based on gender identity" or relating to "transgender issues." Likewise, the language of the various scripts in NIH termination notices include many of these same undefined terms: "gender identity"; "so-called diversity, equity, and inclusion ('DEI') studies"; "amorphous equity objectives"; "vaccine hesitancy"; or "COVID-related" matters, for example. The language of these Directives and terminations notices is unconstitutionally vague, depriving grantees of fair notice and encouraging arbitrary and discriminatory enforcement.

244. Because of the vagueness in the language of Defendants' Directives and NIH's chaotic efforts to give effect to those Directives, Plaintiffs are unsure, for example, which areas of study they can pursue, which populations they can focus on as study subjects, what they might argue to appeal grant terminations, and what the demographics of study participants must be. This makes it impossible to determine how to reconfigure future research to stay within the bounds of NIH's newest "priorities."

245. Defendants' Directives and efforts to purge certain research thus violate the Due Process Clause because its termination notices and related documents provide inadequate notice of what types of research it purports to prohibit.

## COUNT VII
## Violation of Separation of Powers

246. All Plaintiffs assert this cause of action against all Defendants.

247. The Constitution vests exclusive power over federal spending and lawmaking with Congress; the Constitution likewise requires the Executive branch to faithfully execute the law. These distinct roles of the co-equal branches of government are of critical importance, and "the

carefully defined limits on the power of each Branch must not be eroded." *I.N.S. v. Chadha*, 462 U.S. 919, 958 (1983).

248.     The Executive Branch has no constitutional power to unilaterally amend or repeal parts of duly elected statutes.

249.     Congress has exercised its Article I legislative power to mandate NIH carry out specific functions. Defendants' actions unlawfully usurp congressional legislative authority, including by ignoring and running counter to the mandates outlined in Count III (APA—Excess of Statutory Authority).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the Directives—including the February 28 Guidance and March 25 Guidance—and Defendants' other actions to implement the Directives are unlawful and unconstitutional;

b. Declare that NIH's termination of grants pursuant to the Directives, beginning on February 28, 2025, is unlawful and unconstitutional;

c. Temporarily restrain and/or preliminarily and permanently enjoin Defendants from implementing or enforcing the Directives going forward, including from terminating any grants or withholding review of applications, based on allegedly no longer effectuating agency priorities or; in a manner that this Court has determined is unlawful;

d. Order NIH to restore the grant awards, retroactive to the respective termination date, that NIH has terminated pursuant to the Directives or in a manner this Court has determined is unlawful or unconstitutional, including the grant terminations based on allegedly no longer effectuating agency priorities;

76

e.  Order NIH and all ICs to review all properly submitted applications as required by NIH policy and consistent with priorities set forth in the currently operative NIH-Wide Strategic Plan and the ICs Strategic Plans;

f.  Order Defendants to file status reports at regular intervals confirming their compliance with the Court's order(s) and judgment(s) in this case;

g.  Enjoin Defendants from imposing any negative consequences on Individual Plaintiffs, Plaintiff Ibis, or Associational Plaintiffs' Members and Pre-Members for involvement in this litigation;

h.  Award Plaintiffs' reasonable costs and attorneys' fees; and

i.  Issue such other relief as the Court deems proper.

[signatures on following page]

Dated: April 02, 2025

Respectfully submitted,

Shalini Goel Agarwal*
**Protect Democracy Project**
2020 Pennsylvania Ave., NW, Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org

Michel-Ange Desruisseaux*
82 Nassau Street, #601
New York, NY 10038
michel-
ange.desruisseaux@protectdemocracy.org

Kenneth Parreno**
15 Main Street, Suite 312
Watertown, MA 02472
kenneth.parreno@protectdemocracy.org

Lisa S. Mankofsky*
Oscar Heanue*
**Center for Science in the Public Interest**
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

*/s/ Jessie J. Rossman*
Jessie J. Rossman
Suzanne Schlossberg
**American Civil Liberties Union**
**Foundation of Massachusetts, Inc.**
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Olga Akselrod*
Alexis Agathocleous*
Rachel Meeropol*
Alejandro Ortiz*
**American Civil Liberties Union**
**Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

*Attorneys for Plaintiffs*
*pro hac vice forthcoming*
**application for admission forthcoming*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF MARYLAND;
STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF DELAWARE; STATE OF
HAWAI'I; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO;
STATE OF NEW YORK; STATE OF
OREGON; STATE OF RHODE ISLAND;
and STATE OF WISCONSIN,

                        *Plaintiffs,*

      v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
JAYANTA BHATTACHARYA, in his
official capacity as Director of the National
Institutes of Health; NATIONAL
INSTITUTES OF HEALTH; NATIONAL
CANCER INSTITUTE; NATIONAL EYE
INSTITUTE; NATIONAL HEART, LUNG,
AND BLOOD INSTITUTE; NATIONAL
HUMAN GENOME RESEARCH
INSTITUTE; NATIONAL INSTITUTE ON
AGING; NATIONAL INSTITUTE ON
ALCOHOL ABUSE AND ALCOHOLISM;
NATIONAL INSTITUTE OF ALLERGY
AND INFECTIOUS DISEASES;
NATIONAL INSTITUTE OF ARTHRITIS
AND MUSCULOSKELETAL AND SKIN
DISEASES; NATIONAL INSTITUTE OF
BIOMEDICAL IMAGING AND
BIOENGINEERING; EUNICE KENNEDY
SHRIVER NATIONAL INSTITUTE OF
CHILD HEALTH AND HUMAN
DEVELOPMENT; NATIONAL INSTITUTE

No. 1:25-cv-10814-BEM

ON DEAFNESS AND OTHER
COMMUNICATION DISORDERS;
NATIONAL INSTITUTE OF DENTAL
AND CRANIOFACIAL RESEARCH;
NATIONAL INSTITUTE OF DIABETES
AND DIGESTIVE AND KIDNEY
DISEASES; NATIONAL INSTITUTE ON
DRUG ABUSE; NATIONAL INSTITUTE
OF ENVIRONMENTAL HEALTH
SCIENCES; NATIONAL INSTITUTE OF
GENERAL MEDICAL SCIENCES;
NATIONAL INSTITUTE OF MENTAL
HEALTH; NATIONAL INSTITUTE ON
MINORITY HEALTH AND HEALTH
DISPARITIES; NATIONAL INSTITUTE OF
NEUROLOGICAL DISORDERS AND
STROKE; NATIONAL INSTITUTE OF
NURSING RESEARCH; NATIONAL
LIBRARY OF MEDICINE; NATIONAL
CENTER FOR ADVANCING
TRANSLATIONAL SCIENCES; JOHN E.
FOGARTY INTERNATIONAL CENTER
FOR ADVANCED STUDY IN THE
HEALTH SCIENCES; NATIONAL
CENTER FOR COMPLEMENTARY AND
INTEGRATIVE HEALTH; and CENTER
FOR SCIENTIFIC REVIEW,

*Defendants.*

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the Commonwealth of Massachusetts, the State of California, the State of

Maryland, the State of Washington, the State of Arizona; the State of Colorado; the State of

Delaware; the State of Hawai'i, the State of Minnesota; the State of Nevada; the State of New

Jersey; the State of New Mexico; the State of New York; the State of Oregon; the State of Rhode

Island; and the State of Wisconsin allege as follows:

App.169

## INTRODUCTION

1.      The National Institutes of Health (NIH) is a federal agency responsible for conducting and supporting biomedical research.  Widely acknowledged as a "crown jewel" of America's scientific institutions—a characterization the agency's director recently reiterated[1]— NIH is the largest public funder of medical research in the world.

2.      NIH has "a long and illustrious history [of] supporting breakthroughs in biology and medicine."[2]  NIH scientists pioneered the rubella vaccine, eradicating a disease that, in the 1960s, killed thousands of babies and left thousands more with lifelong disabilities.[3]  NIH studies led to the discovery of the BRCA mutation, helping countless Americans reduce their risk of breast and ovarian cancer.[4]  And NIH research fueled the development of treatments for HIV and AIDS, transforming what was once a fatal disease into one with a nearly normal life expectancy.[5]  These are just a few of many, many examples: over the years, NIH-supported research has had a profound impact on Americans' health and wellbeing.  Indeed, it is hard to find a medical breakthrough in recent years that has *not* been assisted—whether directly or indirectly—by NIH.[6]

3.      NIH's activities have also contributed to our Nation's economic security and prosperity.  Today, the United States is a global leader in the health and life sciences—thanks, in

---

[1] Opening Statement of Dr. J. Bhattacharya, S. Comm. on Health, Educ., Lab. & Pensions (March 5, 2025), https://bit.ly/Bhattacharya-Statement.

[2] *Id.*

[3] Lyons M., *IRP Vaccine Research Stretches Back to the NIH's Birth*, NIH Intramural Rsch. Prog. (May 18, 2020), https://irp.nih.gov/blog/post/2020/05/a-long-tradition-of-vaccine-breakthroughs.

[4] *Enhancing Breast and Ovarian Cancer Care: The Discovery of BRCA1 and BRCA2*, Nat'l Cancer Inst. (March 7, 2014), https://www.cancer.gov/research/progress/discovery/brca.

[5] *HIV/AIDS Treatment*, Nat'l Inst. of Allergy & Infectious Disease (Jun. 16, 2020), https://www.niaid.nih.gov/diseases-conditions/hiv-treatment.

[6] *See, e.g.*, Cleary E.G. *et al.*, *Comparison of Research Spending on New Drug Approvals by the National Institutes of Health vs the Pharmaceutical Industry, 2010-2019*, 4 JAMA Health Forum, no. 4 (2023) (showing NIH funding contributing to 99.4% of FDA-approved drugs from 2010 to 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC10148199.

App.170

no small part, to NIH. The agency's grants have allowed America to train the next generation of doctors, researchers, and biomedical entrepreneurs. And they have ensured that crucial innovations take place in American institutions—allowing the United States to reap the economic benefits of those discoveries. The numbers speak for themselves: in Fiscal Year 2024 alone, NIH's more than $36 billion in awards spurred more than $94 billion in new economic activity—a return of $2.56 for every $1 invested. These investments supported more than 407,000 jobs across every State and the District of Columbia.

4.      That critical work is now in jeopardy. By law, NIH provides much of its support for scientific research and training in the form of grants to outside institutions. Since his inauguration, however, the President has issued a barrage of executive orders prohibiting federal agencies from supporting any initiatives with a perceived nexus to certain subjects he opposes, such as "DEI" and "gender ideology." Taking its cue from the executive orders, defendants have adopted a series of directives that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to these and other blacklisted topics.

5.      These directives are unlawful—as are defendants' actions in developing, implementing, and enforcing them. Plaintiffs bring this action to seek relief for the immediate harms that defendants and their directives are causing to state research institutions.[7]

6.      First, defendants' recent policies and actions violate the Administrative Procedure Act (APA). In promulgating directives that prohibit research into certain politically disfavored subjects, defendants have flouted express statutory and regulatory provisions, including statutory

---

[7] In recent months, a number of the plaintiff states have brought lawsuits challenging other unlawful policies and decisions that affect NIH grants. *See* Complaint, *Massachusetts v. NIH*, No. 1:25-cv-10338-AK (D. Mass. Feb. 10, 2025) (ECF No. 1) (challenging recent NIH guidance purporting to alter the methodology for calculating "indirect costs"); Complaint, *New York v. Trump*, No. 1:25-cv-39-JJM-PAS (D.R.I. Jan. 28, 2025) (ECF No. 1) (challenging an OMB directive instituting a temporary funding pause across federal agencies). The agency actions at issue in those cases are distinct from the acts and omissions at issue here.

4

provisions directing NIH to support diversity in the scientific workforce and to promote the health of racial, ethnic, sexual, and gender minorities.  In this way, NIH's directives are contrary to law. 5 U.S.C. §706(2)(A), (C).  Defendants have also departed from NIH's own prior position on the now-blacklisted topics, without acknowledging—let alone providing "good reasons for"—their change in position.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  And what little reasoning that defendants have offered in support of their new blacklisting directives fails to grapple with relevant considerations and runs counter to the available evidence.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  For these reasons, defendants' directives are also arbitrary and capricious.  5 U.S.C. §706(2)(A).  Defendants' recent actions also violate the APA because they have led to unreasonable and intentional delays in the grant-application process, including cancellation of the "study sections" and "advisory councils" that review and approve requests for NIH funding.  Accordingly, defendants have "unlawfully withheld" and "unreasonably delayed" required action.  *Id.* §706(1).

7.     Second, defendants' policies and actions contravene Spending Clause and other separation-of-powers constraints and constitute *ultra vires* executive action.  The Constitution "grants the power of the purse to Congress, not the President."  *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  The purpose and effect of defendants' new blacklisting policies, however, is to refuse to spend duly appropriated funds.  These new policies also work to retroactively alter the terms of federal programs.  For these reasons, the challenged policies violate the Constitution.  And federal courts have well-established equitable powers to enjoin federal officials from exceeding the bounds of their constitutional and statutory authority. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

App.172

8.      In implementing and enforcing the challenged policies, defendants have caused—and, left unchecked, will continue to cause—direct, immediate, significant, and irreparable harm to plaintiffs and their public research institutions.  Plaintiffs are collectively awaiting NIH's decisions on billions of dollars in requested research funding, including millions of dollars in funding for projects that received top marks from the relevant NIH study section.  Despite securing a "fundable" score, these applications remain in suspended animation—neither approved nor denied—making it impossible for plaintiffs to plan for the future.  And now, NIH's enforcement of the blacklisting policies has led to the termination of millions of dollars (and counting) in grants already issued to plaintiffs' public institutions.  The result of these disruptions has been, in a word, devastating.  In Massachusetts, for example, the growing uncertainty has forced the Commonwealth's flagship public research institution, the University of Massachusetts, to rescind several dozen offers from prospective biomedical-sciences graduate students for the upcoming academic year, decimating its graduate student program and jeopardizing important lines of research and risking adverse generational impacts on public health research and innovation.

9.      For all these reasons, plaintiffs seek swift relief from this Court.  The Court should set aside NIH's unlawful blacklisting policies—and the actions taken to implement those policies—and compel the review of applications that the agency has unlawfully withheld.

### JURISDICTION AND VENUE

10.      This action arises under U.S. Constitution; the APA, 5 U.S.C. §701 *et seq.*; the Public Health Service Act (PHSA), 42 U.S.C. §201 *et seq.*; and federal regulations governing NIH grants.  This Court has jurisdiction under 28 U.S.C. §1331.

11.      Venue is proper in this district under 28 U.S.C. §1391(e)(1).  Defendants are federal agencies and officers sued in their official capacities.  The Commonwealth of Massachusetts is a

App.173

resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

### I.     Plaintiffs

12.     The Commonwealth of Massachusetts is a sovereign state of the United States of America.   Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

13.     The State of California is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta, the State's chief legal officer.

14.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

15.     The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, the State's chief legal officer.

16.     The State of Arizona is a sovereign state of the United States of America.  Arizona is represented by Attorney General Kristin K. Mayes, the State's chief law enforcement officer.

17.     The State of Colorado is a sovereign state of the United States of America. Colorado is represented by and through its Attorney General Phil Weiser.  The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. §24-31-101 to pursue this action.

18.     The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the State's chief law enforcement officer.

7

App.174

19.    The State of Hawai'i is a sovereign state of the United States of America.  Hawai'i is represented by Attorney General Anne Lopez, who is the State's chief law enforcement officer.

20.    The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison, the State's chief legal officer.

21.    The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America.  The Attorney General is the chief law enforcement of the State and is authorized to pursue this action under Nev. Rev. Stat. §228.110 and Nev. Rev. Stat. §228.170.

22.    The State of New Jersey is a sovereign state in the United States of America.  New Jersey is represented by Attorney General Matthew Platkin, who is the State's chief law enforcement officer.

23.    The State of New Mexico is a sovereign state of the United States of America.  New Mexico is represented by Attorney General Raúl Torrez, the State's chief law enforcement officer.

24.    The State of New York is a sovereign state of the United States of America.  As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York.  Attorney General Letitia James is the chief law enforcement officer for New York.

25.    The State of Oregon is a sovereign state in the United States of America.  Oregon is represented by Attorney General Dan Rayfield, who is the State's chief legal officer.  Attorney General Rayfield is authorized by statute to file suit in federal court on behalf of the State of Oregon to protect the interests of the State.  Or. Rev. Stat. §180.060.

26.    The State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, the State's chief legal officer.

App.175

27.     The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin, who is the chief law enforcement officer of Wisconsin and is authorized to sue on behalf of the State, including its public universities.

## II.     Defendants

28.     Robert F. Kennedy, Jr., is the Secretary of Health and Human Services.  He is sued in his official capacity.

29.     The United States Department of Human and Health Services (HHS) is a federal cabinet department.

30.     Jayanta Bhattacharya is the Director of NIH.  He is sued in his official capacity.

31.     NIH is a federal agency organized under the PHSA, *see* 42 U.S.C. §§203, 281; it is housed within HHS.

32.     The following institutes and centers are federal agencies established under the PHSA, *see* 42 U.S.C. §281, and housed within NIH: the National Cancer Institute; the National Eye Institute; the National Heart, Lung, and Blood Institute; the National Human Genome Research Institute; the National Institute on Aging; the National Institute on Alcohol Abuse and Alcoholism; the National Institute of Allergy and Infectious Diseases; the National Institute of Arthritis and Musculoskeletal and Skin Diseases; the National Institute of Biomedical Imaging and Bioengineering; the Eunice Kennedy Shriver National Institute of Child Health and Human Development; the National Institute on Deafness and Other Communication Disorders; the National Institute of Dental and Craniofacial Research; the National Institute of Diabetes and Digestive and Kidney Diseases; the National Institute on Drug Abuse; the National Institute of Environmental Health Sciences; the National Institute of General Medical Sciences; the National Institute of Mental Health; the National Institute on Minority Health and Health Disparities; the

App.176

National Institute of Neurological Disorders and Stroke; the National Institute of Nursing Research; the National Library of Medicine; the National Center for Advancing Translational Sciences; the John E. Fogarty International Center for Advanced Study in the Health Sciences; the National Center for Complementary and Integrative Health; and the Center for Scientific Review.

## FACTUAL AND LEGAL BACKGROUND

### III.  Congressional Authorization and Appropriation for NIH Research

#### A.  Creation and Structure of NIH

33.  NIH traces its origins to the 1887 establishment of the Hygienic Laboratory, a component of the Marine Hospital Service dedicated to the study of epidemic diseases. Subsequent statutes have transformed that single laboratory into the multifaceted agency at the center of this suit.  In 1902, the laboratory assumed responsibility for testing and regulating vaccines and biologic products with the passage of the Biologics Control Act, ch. 1378, 32 Stat. 728.  In 1930, Congress redesignated the laboratory as the National Institute (singular) of Health and established fellowships for biological and medical research.  *See* Ransdell Act, ch. 251, 46 Stat. 379.  In 1937, Congress created the National Cancer Institute, authorizing the new institute to award research grants to nonfederal scientists and to fund fellowships for young researchers. *See* National Cancer Institute Act, ch. 565, 50 Stat. 559.  In 1944, Congress made the National Cancer Institute a division of NIH and expanded NIH's support for biomedical research.  PHSA, ch. 373, 58 Stat. 682.  And in 1948, following the creation of several additional subsidiary institutes, Congress gave the umbrella agency its current name: the National Institutes (plural) of Health.  *See* National Heart Act, ch. 481, 62 Stat. 464.

34.  Today, NIH is made up of 27 institutes and centers—or "ICs," in NIH parlance— that each specialize in discrete diseases or body systems or carry out distinct projects.  According to the agency, "NIH's mission is to seek fundamental knowledge about the nature and behavior of

App.177

living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability."[8]

35.    NIH carries out its mission through both "intramural" research (that is, research conducted in-house at NIH) and "extramural" research (that is, research conducted at outside institutions with NIH financial support).  Twenty-five of the agency's institutes and centers—all named as defendants in paragraph 32 above—are involved in issuing or reviewing applications for extramural funding opportunities.[9]

36.    NIH is the primary source of federal funding for biomedical and public health research in the United States.  In fiscal year 2024, NIH spent over $36 billion on over 60,000 research grants, awarded to recipients in each of the fifty States and the District of Columbia.[10]

37.    In addition to supporting numerous scientific breakthroughs (*see supra*, paragraph 2), NIH funds are also critical to the education and training of the next generation of scientists and researchers.  NIH's financial awards support postdoctoral fellows, graduate students, and early-career investigators whose work advances scientific discovery and innovation.  These funds not only provide financial support, but also enable mentorship, access to cutting-edge resources, and participation in collaborative research environments that are essential for developing the skills, experience, and professional networks needed to sustain the biomedical research enterprise.

---

[8] *Mission and Goals*, NIH (Oct. 24, 2024), https://www.nih.gov/about-nih/what-we-do/mission-goals.

[9] The remaining two are the NIH Clinical Center (a research hospital) and the NIH Center for Information Technology (an administrative component responsible for computing and information technology).

[10] *See* United for Medical Research, *NIH's Role in Sustaining the U.S. Economy*, United for Medical Research, at 5 (Mar. 2025), https://bit.ly/3Xz6Wry (tabulating NIH research grants awarded, FY2024); *see also NIH Awards by Location & Organization*, NIH, https://report.nih.gov/award/index.cfm (searchable results); *Research Project Grants*, NIH, https://report.nih.gov/nihdatabook/category/4 (Jan. 2024) (identifying historical data through 2023, and reporting more than 40,000 competitive grant awards in 2022 and 2023).

App.178

B.    **Congressional Authorization for NIH Research**

38.    NIH's extramural research activities stem from statutory directives: Congress has enacted laws authorizing NIH and its constituent institutes and centers to conduct research and award grants, and it has supplied funding for those activities through regular appropriations.

39.    Section 301 of the PHSA, 42 U.S.C. §241, contains Congress's overarching authorization for NIH (as a component of the "Public Health Service") to conduct research and award grants.  Subsection (a) of that paragraph states:

> The Secretary [of Health and Human Services] shall conduct in the Service, and encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man, including water purification, sewage treatment, and pollution of lakes and streams.

And subsection (a)(1) states that:

> The Secretary may make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals for such research projects as are recommended by the advisory council to the entity of the Department supporting such projects and make, upon recommendation of the advisory council to the appropriate entity of the Department, grants-in-aid to public or nonprofit universities, hospitals, laboratories, and other institutions for the general support of their research.

40.    Section 405 of the PHSA, 42 U.S.C. §284, imposes similar responsibilities and confers similar authority on the directors of NIH's institutes and centers.  Among other things, each director "shall encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences," *id.* §284(b)(1)(A), and, to that end, "may make grants and cooperative agreements . . . for research, training, or demonstrations," *id.* §284(b)(2)(A).  *See also* 42 U.S.C. §282 (similar, for the NIH director).

App.179

C.      **Congressional Authorization for Specific Programs and Priorities**

41.      Other sections of the PHSA provide more specific directives to each of NIH's constituent institutes and centers, detailing the ICs' general purposes and establishing initiatives and programs within each of them.  *Cf.* 42 U.S.C. §284(b)(1) (providing that, in carrying out the purposes of section 301 of the PHSA, the Secretary, acting through the Director of each research institute within NIH, "shall encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences" with respect to the human disease or disorder or other aspects of human health for which the national research institutes were established).  Some of these statutory provisions are directly at odds with the "agency priorities" articulated in defendants' new blacklisting policies.

42.      To take just one example, as described in greater detail below (*see infra*, paragraphs 94-117), defendants have adopted a policy blacklisting research projects with a perceived connection to "DEI."  This newly stated policy against diversity, equity, and inclusion is inconsistent with at least the following express statutory directives:

- Congress has provided that the NIH director "shall, in conducting and supporting programs for research, research training, recruitment, and other activities, provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research."  42 U.S.C. §282(h).

- Congress has provided that the NIH director shall "encourage efforts to improve research related to the health of sexual and gender minority populations, including by (1) facilitating increased participation of sexual and gender minority populations in clinical research supported by the National Institutes of Health, and reporting on such participation, as applicable; (2) facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations; and (3) addressing methodological challenges."  *Id.* §283p.

- Congress has directed various NIH institutes and centers to conduct research related to women's health or reproductive health.  For example, it has instructed the National Cancer Institute to "expand, intensify, and coordinate the activities of the Institute with respect to research on breast . . . cancers of the reproductive system of women."  *Id.* §285a-6.  And it has required the National Heart, Lung, and Blood Institute to conduct research into the

App.180

prevalence of certain heart conditions in women, "including African-American women and other women who are members of racial or ethnic minority groups." *Id.* §285b-7a(c)(1)

- Congress has established a National Institute on Minority Health and Health Disparities to support research and training "with respect to minority health conditions and other populations with health disparities." *Id.* §285t(a).[11]

- Congress has established an Office of Research on Women's Health within NIH to "determine the extent to which women are represented among senior physicians and scientists of the national research institutes and among physicians and scientists conducting research with funds provided by such institutes, and as appropriate, carry out activities to increase the extent of such representation." *Id.* §287d(e).

- Congress has instructed the Secretary of Health and Human Services to award Ruth L. Kirschstein National Research Service Awards "in a manner that will result in the recruitment of women, and individuals from disadvantaged backgrounds (including racial and ethnic minorities), into fields of biomedical or behavioral research and in the provision of research training to women and such individuals." *Id.* §288(a)(4).

### D.    Congressional Directives Regarding NIH Priority-Setting

43.    In addition to the above directives, Congress has also established a public process to identify the research priorities of NIH and its institutes and centers.  Every six years, the NIH director must "develop and submit to the appropriate committees of Congress and post on the [NIH's website] a coordinated strategy (to be known as the 'National Institutes of Health Strategic Plan') to provide direction to the biomedical research investments made by the National Institutes of Health, to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine."  42 U.S.C. §282(m)(1).  Each of NIH's institutes and centers similarly develops and promulgates a strategic plan that publicly articulates its research priorities.  *Id.* §282(m)(3).

---

[11] The statutory term "minority health conditions" is defined to mean conditions that are unique to, or more prevalent among, or treated differently in, or understudied with respect to "individuals who are members of" "racial and ethnic minority group[s]"—*i.e.*, "American Indians (including Alaska Natives, Eskimos, and Aleuts); Asian Americans; Native Hawaiians and other Pacific Islanders; Blacks; and Hispanics."  42 U.S.C. §§285t(c)(2)-(3), 300u-6(g)(1).

App.181

44.    NIH has previously followed Congress's direction and publicized its research priorities.  In September 2019, the NIH director began the process of updating the agency's priorities in biomedical and behavioral research areas, research capacity, and research conduct. Between October 2019 and July 2020, NIH gathered feedback from its institutes and centers, their advisory councils, external stakeholders, and the general public.  The final Strategic Plan, published in 2021, stated that, among other things, NIH would prioritize "improving minority health and reducing health disparities; enhancing women's health; addressing public health challenges across the lifespan; promoting collaborative science; and leveraging data science for biomedical discovery."[12]  Similarly, the plan stated that NIH "supports a comprehensive spectrum of immunology and infectious disease research focused on developing improved or novel vaccines, including the rapid development of new vaccines to mitigate emerging infectious disease outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)."[13]

E.    **Congressional Appropriations for NIH Extramural Research**

45.    Most of NIH's funding comes from annual discretionary appropriations from Congress.[14]  For years, Congress has made appropriations for NIH research with this statutory and regulatory framework in mind and generally has appropriated specific amounts to each of NIH's institutes and centers to carry out the purposes set forth in the authorizing statutory provisions described above.[15]

---

[12] NIH, *NIH-Wide Strategic Plan, Fiscal Years 2021-2025* at 3 (2021), https://bit.ly/NIHSP2125.

[13] *Id.* at 8.

[14] Some of NIH's funding is from mandatory funding sources or available due to specific transfer or budgetary rules, but the "vast majority" comes from annual discretionary appropriations.  *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

[15] *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. II, 136 Stat. 4459, 4861-65; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, tit. II, 136 Stat. 49, 448-52; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. H, tit. II, 134 Stat. 1182, 1573-77; Further Consolidated

46.     In recent years, Congress has specifically rejected efforts to significantly cut NIH's funding.  For example, in 2017, as part of its fiscal year 2018 budget proposal, the first Trump Administration sought to reduce NIH annualized spending by $5.8 billion, to $25.9 billion.[16]  The proposal's primary method of achieving these cuts was by slashing the "indirect cost rate" for NIH grants, capping it at 10% across the board.  This proposal drew bipartisan criticism.  The Senate Appropriations Committee reported that the proposal would "radically change the nature of the Federal Government's relationship with the research community," would "abandon[]" the Government's "long-established responsibility" for research infrastructure, and would jeopardize "biomedical research nationwide."  S. Rep. No. 115-150, at 109 (2017).  To avoid this possibility, Congress enacted statutory language (which it has readopted in every subsequent appropriations measure) barring NIH or any other agency from restructuring or modifying the existing approach to indirect costs.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, §226, 132 Stat. 348, 740.  And ultimately, rather than enacting the Administration's proposal of cutting NIH funding to $25.9 billion, Congress's all-in appropriation to NIH for fiscal year 2018 was $37.3 billion—higher than the prior fiscal year's appropriation.[17]

47.     In subsequent budget proposals, the Administration generally sought to increase, not decrease, NIH's funding.  Its Fiscal Year 2020 budget proposal touted the Administration's prioritization of "critical health research" and proposed a $33 billion appropriation to NIH—about

---

Appropriations Act, 2020, Pub. L. No. 116-94, div. A, tit. II, 133 Stat. 2534, 2562-65; Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3074-77; Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. II, 132 Stat. 348, 720-23; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, tit. II, 121 Stat. 135, 524-26; *see also, e.g.*, Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. G, tit. II, 121 Stat. 1844, 2173-77.

[16] *See* Off. of Mgmt. & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017), https://bit.ly/OMBFY18.

[17] NIH, *History of Congressional Appropriations, Fiscal Years 2010-2019*, at 1, https://bit.ly/42p9Lya.

$6 billion higher than its 2017 proposal.[18]  Similarly, the Fiscal Year 2021 budget reiterated the

Administration's commitment to prioritizing "critical health research" and "support[ing]

innovation," and proposed providing $38 billion to NIH.[19]  Ultimately, Congress appropriated even

more funds to NIH than the Administration requested for fiscal year 2021: about $42.9 billion.[20]

      48.    Overall, from Fiscal Years 2017 through 2023, NIH funding increased annually,

which is consistent with NIH's stable, and generally increasing, funding for more than 20 years:[21]



**Figure 1. NIH Funding, FY1998-FY2025 Request**
Program Level Funding in Current and Projected Constant (FY2023) Dollars.

---

[18] Off. of Mgmt. & Budget, *Budget of the U.S. Gov't, Fiscal Year 2020*, at 46, https://bit.ly/OMBFY20.

[19] Off. of Mgmt. & Budget, *A Budget for America's Future, Fiscal Year 2021*, at 54, bit.ly/OMBFY2021.

[20] NIH, *Supplementary Appropriation Data Table for History of Congressional Appropriations, Fiscal Years 2020-2025*, at 1, bit.ly/42dM1M4.

[21] *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

49.     Congress's appropriations to NIH for Fiscal Year 2024 were no different. Consistent with past appropriations for NIH activities, the Further Consolidated Appropriations Act of 2024 (2024 CAA) appropriates to each of NIH's Institutes and Centers specific amounts "for carrying out section 301 and title IV of the [Public Health Service] Act" with respect to their specific, respective statutory purposes.  Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 656-57.  For example, the 2024 CAA appropriates $7,224,159,000 to the National Cancer Institute "for carrying out section 301 and title IV of the [PHSA] with respect to cancer"; $3,982,345,000 to the National Heart, Lung, and Blood Institute to carry out the same statutory purposes "with respect to cardiovascular, lung, and blood diseases, and blood and blood products"; and $2,603,925,000 to the National Institute for Neurological Disorders and Stroke to carry out the same statutory purposes "with respect to neurological disorders and stroke."  *Id.*

50.     Congress has not enacted a Consolidated Appropriations Act for Fiscal Year 2025, but on March 15, 2025, the President signed the Full-Year Continuing Appropriations and Extensions Act, 2025, commonly known as a "Continuing Resolution" or "CR" (2025 CR).  Pub. L. 119-4, 139 Stat. 9.  Pursuant to the 2025 CR, Congress appropriated "[s]uch amounts as may be necessary . . . under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities . . . that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available" in the specific appropriations Acts.  *Id.*, div. A, §1101(a), 139 Stat. at 11.  Congress made limited changes in the 2025 CR with respect to the appropriation to NIH, including rescission of a portion of NIH funding ($221,000,000 of a $1.25 billion appropriation) previously appropriated to the "NIH Innovation Account, CURES Act," which is separate from Congress's discretionary appropriations to NIH's

institutes and centers. *Id.*, div. A, §1905, 139 Stat. at 32.[22]  Otherwise, Congress did not rescind

any amounts appropriated to NIH's ICs and maintained the same level of funding as set forth in

the 2024 CAA, through September 30, 2025. *See id.*, div. A, §1101(a)(8), 139 Stat. at 11.

## IV.    The Grant Application and Award Process

51.    NIH generally awards extramural grants through a competitive process.  At any

given time, NIH has over a thousand active funding opportunities supporting a broad range of

programs.

52.    HHS has promulgated regulations at 45 C.F.R. part 75, governing the award of

grants by HHS and its agencies, including NIH.  This includes 45 C.F.R. §52.6(c), which allows

HHS to notice a grant award for a "project period," during which HHS intends to support the

project "without requiring the project to recompete for funds."

53.    NIH uses three-character "activity codes" to group and classify these funding

opportunities, with the first character typically identifying the major funding category or program

type.  "For example, activity codes for research and development often start with 'R,' training with

'T,' fellowship with 'F,' and career development with 'K.'[23]  The "R01" code, for example,

denotes grants "[t]o support a discrete, specified, circumscribed project to be performed by the

named investigator(s) in an area representing his or her specific interest and competencies."

54.    The NIH competitive grantmaking process begins with a notice of funding

opportunity (NOFO)—*i.e.*, a public announcement in which NIH declares its intention to award

---

[22] Appropriations to the account created by the Cures Act are, "[i]n effect," "not subject to discretionary spending limits." *Nat'l Insts. of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www. congress.gov/crs-product/R43341.  Funds may be transferred from the Cures Act account to other NIH accounts "only for the purposes specified in the Cures Act." *Id.*  Congress exempted from any rescission amounts previously designated by Congress as for an "emergency requirement" under the Balanced Budget and Emergency Deficit Control Act of 1985.  2025 CR, div. A, §1101(a)(8), 139 Stat. at 11

[23] *Activity Codes*, NIH (March 28, 2025), https://grants.nih.gov/funding/activity-codes; *see Funding Categories*, NIH (Feb. 3, 2025), https://grants.nih.gov/funding/funding-categories.

19

funds and outlines the program goals and objectives and conditions for applying.  *See* NIH Grants Policy Statement, U.S. Dep't of Health & Hum. Servs. §2.3.5, at I-51 (Apr. 2024) (NIHGPS).

55.    A researcher interested in responding to a NOFO will typically work with the "sponsored research" department at his or her institution to understand what NIH requires in its application submission.  At UMass Medical School, for example, the Office of Sponsored Programs assists faculty and staff in locating sources of funding, reviewing and approving proposals, and negotiating grants and contracts.

56.    Once a researcher develops a project proposal, that person then submits an electronic grant application to NIH.  Applications must conform to 45 C.F.R. part 75, and must include a detailed research plan outlining the study's objectives, methodology, and significance; a proposed budget and justification; biosketches for key investigators; and any necessary compliance documentation, such as Institutional Review Board approval for human subject research.

57.    A submitted grant application undergoes two layers of evaluation: an initial layer of review by a "scientific review group" (also known as a "study section"), followed by a round of review by an "advisory council."  *See* 42 U.S.C. §§284a, 289a; *see also* NIHGS §2.4, at I-71 ("The peer review system used by NIH, often referred to as the 'dual review system,' is based on two sequential levels of review for each application—initial review by [a study section], and a second level of review for scientific merit by the IC National Advisory Council/Board."). According to NIH, this process "is intended to ensure that applications for funding submitted to NIH are evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner that strives to eliminate bias."  NIHGS §2.4, at I-71.

58.    As noted, the first level of application review is carried out by a study section.  The role of study sections is to assess applications' scientific merit and to determine the overall impact

App.187

that proposed projects will likely have on the relevant field.  Governing statutes and regulations require this layer of review—*i.e.*, a favorable study-section recommendation is a prerequisite to a final award of any NIH grant.  *See* 42 U.S.C. §§ 284(b)(2)(B), 289a(a); 42 C.F.R. pt. 52h.

59.    These groups consist primarily of non-federal scientists who have expertise in relevant scientific disciplines and current research areas.  42 C.F.R. §52h.4.  NIH has hundreds of study sections, organized by specialty.  In the field of Kidney, Urology, and Digestive Systems, for example, NIH maintains study sections on (a) Drug and Biologic Disposition and Toxicity; (b) Digestive System Host Defense, Microbial Interactions, and Immune and Inflammatory Diseases; (c) Digestive and Nutrient Physiology and Diseases; (d) Environmental Determinants of Disease (e) Hepatobiliary Pathophysiology; (f) Kidney and Urological Systems Function and Dysfunction; and Pathobiology of Kidney Disease, as well as two "special emphasis panels" on Digestive Sciences Small Business Activities and Renal and Urological Sciences Small Business Activities. Some study sections are housed in NIH's individual institutions and centers, while others are organized centrally in the agency's Center for Scientific Review.

60.    Study sections carry out their work—including review of pending applications—at regularly scheduled meetings.  These meetings must be noticed in advance in the Federal Register. *See* 42 C.F.R. §52h.3 ("To the extent applicable, the Federal Advisory Committee Act, as amended . . . shall govern the establishment and operation of peer review groups."); 5 U.S.C. §1009(a)(2) ("[T]imely notice of each meeting [subject to the Federal Advisory Committee Act] shall be published in the Federal Register . . . .").

61.    Study sections review and score each grant application according to established criteria set forth in regulations and the NOFO.  In particular, the study section assesses the overall impact that the project could have on the research field involved, taking into account:

App.188

(a) The significance of the goals of the proposed research, from a scientific or technical standpoint;

(b) The adequacy of the approach and methodology proposed to carry out the research;

(c) The innovativeness and originality of the proposed research;

(d) The qualifications and experience of the principal investigator and proposed staff;

(e) The scientific environment and reasonable availability of resources necessary to the research;

(f) The adequacy of plans to include both genders, minorities, children and special populations as appropriate for the scientific goals of the research;

(g) The reasonableness of the proposed budget and duration in relation to the proposed research; and

(h) The adequacy of the proposed protection for humans, animals, and the environment, to the extent they may be adversely affected by the project proposed in the application.

42 C.F.R. §52h.8; *see also* 42 C.F.R. §52a.5 (describing review criteria for NIH research center grants); 42 C.F.R. §52h.11 (describing review criteria for NIH research contracts).

62.    As a result of that review, each grant application receives an "overall impact score" from 10 (the best score, denoting high impact) to 90 (the worst score, denoting low impact). Each application also receives a percentile rank expressing the impact score in relation to other applications in that particular institute. Projects deemed "unfundable" by the study section are not given a score and are removed from further consideration.

63.    Each fiscal year, NIH's institutes and centers publish guidance called "paylines" to help applicants interpret their study-section results. These paylines reflect a sort of cutoff: for each category of grants, the payline shows the impact score (or percentile) above which a project is highly likely to be funded. In Fiscal Year 2025, for example, published guidance from the National Institute of Allergy and Infectious Diseases (NIAID) established a 12th-percentile payline for

App.189

"R01" awards with new or early-stage principal investigators.[24]  In other words, an applicant in that category who received a score from the relevant study section within the 12th percentile could anticipate that NIAID would likely fund his or her project.  Study-section scores that meet or exceed the payline in this way are commonly referred to as "fundable" scores.

64.    In addition to providing scores and percentiles, study sections also provide each applicant with a "summary statement" that contains, among other things, a brief summary of the study section's discussion, bulleted critiques from assigned reviewers, and any administrative comments.  Applicants can use these summary statements to revise applications and address concerns, if necessary.

65.    As noted, the second level of application review is carried out by an advisory council.  Unlike the numerous study sections, each NIH institute or center that funds grants has a single advisory council (*i.e.*, there is one advisory council for NIAID, one for the National Cancer Institute, and so on).  By statute, NIH advisory councils must meet at least three times per fiscal year.  42 U.S.C. §284a(3).  Like study section meetings, advisory council meetings must be noticed in advance in the Federal Register.  *See* 41 C.F.R. §102-3.150 (requiring 15 days' notice).

66.    Whereas a study section's review focuses on scientific merit, an advisory council's review weighs programmatic and institute-wide considerations.  A council considers, among other things, the extent to which an application aligns with the institute or center's priorities, public health needs, and overall funding availability.  The council also reviews the application for other potential barriers, such as ethical issues around human or animal test subjects.

67.    An advisory council makes one of three decisions on each application: an application is recommended for funding, not recommended for funding, or deferred for re-review

---

[24] *NIAID Paylines*, NIAID (Dec. 17, 2024), https://www.niaid.nih.gov/grants-contracts/niaid-paylines.

by the study section.  A favorable recommendation from the relevant institute's advisory council is a prerequisite to final award of any grant in excess of $50,000.  42 U.S.C. § 284(b)(2); *see also* §284a(a)(3)(A)(ii).

68.     The advisory council makes funding recommendations to the institute or center director, who ultimately makes the funding decision.  In making that decision, the institute or center director shall consider, consistent with the peer-review process: (i) the mission of the national research institute or national center and the scientific priorities identified in the institute or center's strategic plan; (ii) programs or projects funded by other agencies on similar research topics; and (iii) advice by staff and the advisory council or board of such national research institute or national center.  42 U.S.C. §284(b)(3).

69.     If the decision is in favor of funding, NIH issues a legally binding Notice of Award (NOA) to the selected grant recipients stating that funds may be requested.  NIHGMS §5, at IIA-59.

70.     NIH typically does not issue grants as lump-sum awards.  Instead, NIH uses a cost-based accounting system, under which grant recipients are authorized to recover their actual, documented costs for conducting research after the grant is awarded.  Institutions can then use awards—and indeed, rely on those awards—to obtain a line or letter of credit for the procurement of the resources needed for the project.

71.     If NIH approves a project with a multi-year period, the agency typically awards the grant for the first year (the "award year") at the outset, with funding for subsequent years (the "out years") subject to a renewal process.  In these "non-competing" renewals, the application does not undergo a fresh round of peer review—instead, applicants submit progress reports demonstrating that the grantee is making progress and complying with applicable policies and practices.  *See* 42

App.191

C.F.R. §52a.6.  So long as grantees demonstrate progress and compliance with applicable policies and practices, non-competing renewals are approved as a matter of course.

72.    NIH's application and award process follows a predictable calendar each year that is posted in advance.  The agency has three standard application cycles per year, with published schedules identifying application due dates, the timing of study section and advisory council review, and the earliest permissible start date for the project.  As reflected on the agency's website,[25] the current triannual schedule is as follows:

### Review and Award Cycles

| | Cycle I | Cycle II | Cycle III |
|---|---|---|---|
| Application Due Dates | January 25 - May 7 | May 25 - September 7 | September 25 - January 7 |
| Scientific Merit Review | June - July | October - November | February - March |
| Advisory Council Round | August or October * | January | May |
| Earliest Project Start Date | September or December * | April | July |

73.    According to Michelle Bulls, NIH's Chief Grants Management Officer, before 2025, NIH typically only terminated grants either with the consent of the award recipient or where the recipient failed to comply with the terms and conditions of the award and NIH was unable to identify corrective action.  Mutual terminations can occur when the principal researcher associated with a grant can no longer undertake research.  According to Ms. Bulls, since 2012, NIH has terminated less than five grants for non-compliance with the terms and conditions of the original grant award.

---

[25] *Standard Due Dates*, NIH (Aug. 23, 2024), https://grants.nih.gov/grants-process/submit/submission-policies/standard-due-dates.

## V.  Plaintiffs' Receipt of NIH Grants

74.    Plaintiffs' state universities and colleges, as well as other research institutions, depend heavily on NIH funding to support biomedical and public health research.  At any given time, individual research universities may depend on thousands of NIH grants that support independent research projects across multiple university facilities.

75.    Plaintiff Massachusetts operates the University of Massachusetts (UMass), the Commonwealth's flagship public research institution, which consists of the UMass Amherst, UMass Boston, UMass Dartmouth, UMass Lowell, and the UMass Chan Medical School.  *See generally* Mass. G.L. c. 75, §1.  In Fiscal Year 2024, UMass campuses collectively received $248 million in NIH funding, supporting at least 501 projects.

76.    The University of California (UC) is a corporation established under article IX, §9, of the California Constitution and located within the State of California; it is an exempt state government entity.  The UC system consists of 10 research-intensive campuses, 21 health professional sciences schools, 5 NCI-designated cancer centers, and 6 academic medical centers. The UC system's constituent schools and institutions are widely recognized as among the best in the nation, serving as international leaders in the education of health professionals, the development of new cures and treatments, and the provision of healthcare for all Californians regardless of ability to pay.  The University of California is one of the nation's leading research institutions, with almost 9% of all U.S. academic research being conducted by UC researchers. Biomedical advancements at UC include the first radiation treatment for cancer, research contributing to the first flu vaccine, the discovery of the role of LDL and HDL cholesterol in heart disease, the invention of modern gene editing, and much more.  Every year, UC system researchers submit thousands of NIH grant applications, and the world-leading researchers on UC's faculty serve on numerous NIH study sections and advisory councils to assess grant applications for

scientific and technical merit.  NIH contracts and grant funding support many of the clinical trial studies at UC's six medical centers.

77.    Federal funds are UC's single most important source of support for its research, accounting for more than half of UC's total research awards.  In Fiscal Year 2024, UC received a total of over $2 billion in NIH contract and grant funding to support more than 5000 research projects.  The estimated value of just the NIH grant proposals submitted by the five UC Health Centers as of December 31, 2024, that have not yet been acted upon is approximately $563 million.  Grant proposals awaiting study sections before July 1, 2025, have an annual value of approximately $312 million, while grants awaiting advisory councils and Notices of Awards have an annual value of approximately $251 million.  The UC Health Center in San Francisco (UCSF) alone is has 1,650 unique principal investigators with 4,110 active NIH awards.

78.    Plaintiff California also operates the California State Universities (CSU), the largest four-year public university system in the United States.  The purpose of the CSU system as established by statute is to provide access to education and the opportunity for educational success for all qualified Californians.  Cal. Educ. Code §66010.2.  CSU consists of 23 campuses, nearly a dozen off-campus centers, and over 90 auxiliary organizations (several dedicated to sponsored research).  During Fiscal Year 2024, the CSU expended nearly $90 million in NIH contract and grant funding to support approximately 250 projects across 18 universities with the total multi-year award funding in the hundreds of millions.

79.    Plaintiff Maryland operates the University System of Maryland (USM), a system of 12 constituent institutions, including leading research institutions at the University of Maryland, Baltimore (UMB), and the University of Maryland, College Park (UMCP).  In fiscal year 2024, UMB received $213.9 million in active NIH awards and an additional $34.2 million in NIH pass-

through funding; UMCP received $68 million in funding awarded directly by the NIH and $9 million in funding awarded on a pass-through basis from the NIH.

80.     Plaintiff Washington operates the University of Washington, the largest recipient of federal research funding of any public university in the country.  In Fiscal Year 2024, University of Washington received over $648 million in NIH funding, supporting over 1,220 projects.

81.     Arizona State University, Northern Arizona University, and the University of Arizona are instrumentalities of the State of Arizona.  In Fiscal Year 2024, those universities together managed approximately 426 NIH awards totaling over $286 million.

82.     Colorado established the University of Colorado Anschutz Medical Campus (CU Anschutz) as the only academic medical research campus in Colorado.  *See generally* Colo. Rev. Stat. §23-21-101, *et. seq.*  In Fiscal Year 2024, CU Anschutz received $360 million in NIH funding, which represented 48% of all sponsored awards for the year.

83.     Plaintiff Delaware's flagship research institution, The University of Delaware, received $66 million in NIH funding, supporting 135 projects in Fiscal Year 2024.

84.     Plaintiff Hawaiʻi operates the University of Hawaiʻi, which houses some 3,000 researchers and enrolls around 30,000 students across 10 campuses.  The University of Hawaiʻi includes the John A. Burns School of Medicine, the University of Hawaiʻi Cancer Center, the Daniel K. Inouye School of Pharmacy, the School of Nursing and Dental Hygiene, the Thompson School of Social Work, and several other schools that conduct fundamental, translational, clinical and community-based participatory research in health sciences and health care.  In Fiscal Year 2024, the University of Hawaiʻi received more than $65 million in direct NIH funding, supporting 75 projects.

App.195

85.    With respect to Plaintiff State of Minnesota, NIH has awarded tens of millions of dollars to the University of Minnesota.  For example, in Fiscal Year 2024 alone, the University of Minnesota received 808 awards directly from NIH which obligated funding to the University of approximately $355.6 million.

86.    Nevada operates the Nevada System of Higher Education, which includes the University of Nevada, Las Vegas, and the University of Nevada, Reno.  In Fiscal Year 2024, the University of Nevada, Las Vegas received $11.9 million and the University of Nevada, Reno received $9.5 million dollars in NIH funding.

87.    With respect to Plaintiff New Jersey, three major State research institutions—Rutgers, the State University of New Jersey (Rutgers), New Jersey Institute of Technology (NJIT), and Kean University (Kean)—have a significant academic and clinical health sciences presence across the State, including numerous research centers and institutes, academic medical centers, and colleges of liberal arts and sciences, schools of environmental and biological sciences, engineering, and other professional schools and graduate programs.  In Fiscal Year 2024, these three institutions and their affiliated campuses collectively received approximately $250 million in NIH funding to support approximately 1,200 projects, including grants that support undergraduate students from under-represented populations pursuing biomedical sciences and engineering degrees and graduate programs.

88.    Plaintiff New Mexico operates the University of New Mexico (UNM), which is the state's flagship research university with research centers spanning the fundamental sciences, technology and engineering research, education, humanities and social sciences, and human health. UNM is the only academic health system in the state; it pursues research on improving human health, including substance use disorders, cardiovascular and metabolic disease, infectious

diseases and immunity, Alzheimer's disease, kidney disease, cancer, and pediatrics, and more. This research was supported by $107 million from the NIH in Fiscal Year 2024 and, through early February 2025, estimated NIH funding for Fiscal Year 2025 is over $126 million. Plaintiff New Mexico also operates New Mexico State University (NMSU), a university with over sixty research facilities focusing on fundamental sciences, physical sciences, agriculture, the arts, humanities and social sciences, economics, engineering, and human health. This research was supported by over $10 million from the NIH in Fiscal Year 2024 and, through early February 2025, estimated NIH funding for Fiscal Year 2025 is over $30 million.

89.     New York operates the State University of New York (SUNY), which is comprised of 64 colleges and universities, of which four campuses are designated R1 research institutions. In fiscal year 2024, SUNY received $237.5 million from NIH to support 894 projects.

90.     The Oregon Health and Science University (OHSU) is a public corporation of the State of Oregon and is Oregon's only public academic health center. OHSU is not the only public recipient of NIH funding in Oregon, but it receives the largest amount of NIH funding. In fiscal year 2024, OHSU received over $350 million in NIH funding to support 784 projects and over 1,400 researchers. The University of Oregon, Oregon State University, and Portland State University are also public recipients of NIH funding.

91.     The University of Rhode Island (URI) is Rhode Island's flagship public university. *See* 16 R.I. Gen. Laws Ann. §16-32-3. In fiscal year 2024, URI received $22.1 million in NIH funding to support over 90 projects.

92.     Plaintiff Wisconsin operates the Universities of Wisconsin, which includes prominent research institutions at the University of Wisconsin-Madison (UW-Madison) and University of Wisconsin-Milwaukee (UW-Milwaukee). UW-Madison's research enterprise is

App.197

particularly robust, encompassing more than $1.7 billion in annual research expenditures. Approximately one third of sponsored research at UW-Madison is awarded by the NIH. In fiscal year 2024, UW-Madison received direct funding from NIH to support 588 projects, totaling more than $404 million. UW-Madison funds 4,942 researchers and staff through direct NIH grants, and its work on NIH-funded projects provides scientific education and research training in medical and health sciences, biology, public health, biochemistry, psychology, and other disciplines. In fiscal year 2024, UW-Milwaukee also received funding from NIH to support dozens of projects, totaling $7.9 million.

## CHALLENGED AGENCY ACTIONS

93.    This lawsuit arises because defendants are flouting the statutory and regulatory rules governing NIH grantmaking. As explained below, defendants have adopted a series of directives that blacklist certain topics—*e.g.*, "DEI," "gender," or "vaccine hesitancy"—that the Administration disfavors. In adopting, implementing, and enforcing those directives, defendants have systematically disrupted the review of pending grant applications, delayed the annual renewal of already-approved multi-year awards, and terminated huge tranches of grants in the middle of the project year. Those disruptions have caused—and will continue to cause—significant harm to plaintiffs and their institutions.

## I.    The Administration's Adoption of Executive Orders and OMB Directives Identifying Politically Disfavored Topics

94.    The NIH-specific directives that plaintiffs challenge here (*see infra*, paragraphs 102-117) in large part implement a series of executive orders and Administration directives issued on or shortly after Inauguration Day.

95.    On January 20, 2025, President Trump signed Executive Order 14151, entitled "Ending Radical Government DEI Programs and Preferencing" (DEI Order). The DEI Order aims

to terminate any federal programs that promote "diversity, equity, and inclusion," "diversity, equity, inclusion, and accessibility," and "environmental justice." The order does not define those terms. The order further directs "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" to "terminate, to the maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts." DEI Order §2(b)(1). The order does not define "equity-related."

96.    The same day, the President signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender Ideology Order). The order denies the existence of transgender, nonbinary, intersex, or other gender-nonconforming people and rejects "gender ideology," which it vaguely defines as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." Gender Ideology Order §§1-2. The order directs all federal agencies to "take all necessary steps, as permitted by law, to" strip federal funds from anyone who promotes "gender ideology," demanding that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* §3(e), (g).

97.    The following day, the President signed Executive Order 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (Discrimination Order). The order targeted what it called "race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA),'" but again failed to define those terms. The order requires that "[t]he head of each agency shall include in every contract or grant award . . . [a] term requiring" any federal grant "recipient

to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* §3(b)(iv)(B).  It also threatens civil False Claims Act enforcement against any grantee failing to comply with the Discrimination Order's vague and undefined terms. *Id.* §3(b)(iv)(A).  Likewise, the Discrimination Order threatens lawsuits against private entities that promote DEI.  *Id.* §4(b)(v).

98.     On January 27, the acting director of the Office of Management and Budget (OMB) issued OMB Directive M-25-13 (OMB Directive).  The OMB Directive targeted a broad swath of federal fund disbursements for a near-immediate freeze.  This directive stated that all federal agencies "must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders."  While this analysis is ongoing, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal" (emphasis in original).  The OMB Directive ordered that the temporary pause take effect the following day, on January 28, 2025, at 5:00 PM.

99.     On January 28, the U.S. District Court for the District of Columbia ordered an administrative stay of the OMB Directive pending a hearing on a motion for a temporary restraining order. Order of Administrative Stay (ECF No. 13), *Nat'l Council of Nonprofits, et al. v. Trump, et al.*, No. 1:25-cv-239-LLA (D.D.C. filed Jan. 28, 2025).  At approximately 1:00 PM Eastern Time on January 29, OMB issued M-25-14, a memorandum purportedly rescinding the OMB Directive in two sentences: "OMB Memorandum M-25-13 is rescinded.  If you have

33

App.200

questions about implementing the President's Executive Orders, please contact your agency General Counsel."

100.    Shortly after OMB purported to rescind the OMB Directive, however, White House Press Secretary Karoline Leavitt stated that the federal funding freeze remained in place, notwithstanding the rescission of the OMB Memorandum.  Leavitt announced on social media: "This is NOT a rescission of the federal funding freeze.  It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction.  The President's EO's on federal funding remain in full force and effect and will be rigorously implemented."

101.    At a press conference that same day, Leavitt stated: "So, what does this pause mean?  It means no more funding for illegal DEI programs. It means no more funding for the Green New Scam that has . . . cost American taxpayers tens of billions of dollars.  It means no more funding for transgenderism and wokeness across our federal bureaucracy and agencies.  No more funding for Green New Deal social engineering policies."

## II.    Defendants' Adoption of NIH-Specific Directives Blacklisting Politically Disfavored Topics

102.    Defendants have subsequently issued directives to and within NIH that carry out and expand upon the foregoing executive orders and policy objectives.  Specifically, defendants formulated, adopted, and executed a series of policies blacklisting entire categories of research that the Administration disfavors for political reasons.  These categories originally focused on "DEI-related" projects, but have evolved to include other disfavored categories, including projects related to gender identity, vaccine hesitancy, COVID-19, and climate change.

103.    On January 21, Acting Secretary of Health and Human Services Dorothy Fink issued a memorandum to all HHS subcomponents entitled "Immediate Pause on Issuing Documents and Public Communications" (Notice Pause Directive).  A copy of the Notice Pause

App.201

Directive is attached as Exhibit 1 to this Amended Complaint and is incorporated herein by reference. The Notice Pause Directive instructed, among other things, that no notices be submitted for publication to the Federal Register unless approved by a presidential appointee.

104.    On February 10, 2025, Acting Secretary of Health and Human Services Dorothy Fink issued a "Secretarial Directive on DEI-Related Funding" (Secretarial Directive). A copy of the Secretarial Directive is attached as Exhibit 2 to this Amended Complaint and is incorporated herein by reference.

105.    The Secretarial Directive stated, in relevant part:

> The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

The Secretarial Directive went on to state:

> For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. §75.371-372, the Secretary of Health and Human Services hereby DIRECTS as follows:
>
> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

The Secretarial Directive did not define the term "related to DEI and similar programs."

App.202

106.    On February 12, Dr. Michael Lauer, then NIH's Deputy Director for Extramural Research, issued a memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals" (Lauer Memorandum).  A copy of the Lauer Memorandum is attached as Exhibit 3 to this Amended Complaint and is incorporated herein by reference.  The memorandum stated that "NIH is in the process of reevaluating the agency's priorities based on the goals of the new administration," but that, "given recent court orders" in federal court actions related to funding freezes, NIH institutes and centers were "authorized, along with their respective grant management staff, to proceed with issuing awards for all competing, non-competing continuation, and administrative supplements . . . grants."

107.    On February 13, Dr. Lauer issued a memorandum entitled "Supplemental Guidance to Memo Entitled- NIH Review of Agency Priorities Based on the New Administration's Goals" (Supplemental Lauer Memorandum).  A copy of the Supplemental Lauer Memorandum is attached as Exhibit 4 to this Amended Complaint and is incorporated herein by reference.  The memorandum instructed the ICs' Chief Grants Management Officers that "[i]f the sole purpose of the grant . . . supports DEI activities, then the award must be fully restricted."  It also called for "hard funding restrictions" where the program promotes initiatives that "discriminate" on the basis of race, sex, or other protected characteristics, without defining what constituted such discrimination in a research program.  The Supplemental Lauer Memorandum did not refer to terminations of awards, but rather NIH's funding of programs more generally.  That day, Dr. Lauer resigned from his position with NIH.

108.    On or about March 4, NIH issued a directive entitled "Award Assessments for Alignment with Agency Priorities—March 2025" (Priorities Directive).  A copy of the Priorities Directive—including the several appendices attached to the Priorities Directive— is attached as

Exhibit 5 to this Amended Complaint and is incorporated herein by reference. The Priorities Directive "rescind[ed]" the Supplemental Lauer Memorandum, attached and reaffirmed the Secretarial Directive, and provided further instructions related to "DEI" research.

109. Specifically, the Priorities Directive stated that "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI)." To enforce that determination, the directive instructed that, "[p]rior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims [to] assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities." The directive further instructed ICs to "completely excise all DEI activities" using a list of predetermined categories, including awards that "ICs must not issue" (Category 1), awards that ICs could issue on certain conditions (Categories 2 and 3), and awards that ICs "may proceed with issuing" (Category 4).

110. The appendices to the Priorities Directive provided NIH staff with specific language "to use when terminating awards identified by HHS or the IC" related to politically disfavored topics. Among other things, NIH staff were instructed to inform grant recipients that "NIH is taking this enforcement action in accordance with 2 C.F.R. §200.340 as implemented in NIH GPS Section 8.5.2." The Priorities Directive's appendices also identified three specific disfavored topics by name: "China," "DEI," and "[t]ransgender issues."

111. The Priorities Directive classified "diversity supplements" as Category 1 awards—*i.e.*, it instructed that "ICs must not issue the award." Diversity Supplements are grants meant to increase diversity in the scientific profession by providing training, mentorship and career development opportunities to individuals from underrepresented populations. For recent notices of funding opportunity, NIH adopted a policy that defined diversity broadly, to include not only

"[i]ndividuals from racial and ethnic groups that have been shown by the [National Science Foundation] to be underrepresented in health-related sciences on a national basis," but also "[i]ndividuals with disabilities," and "[i]ndividuals from disadvantaged backgrounds," including those who have experienced homelessness, who were in foster care, who experienced poverty, or who are from rural areas.[26]

112.    By March 13, the list of scientific research disfavored by the Administration had grown to include yet another topic: vaccine hesitancy.  Specifically, Michelle Bulls, NIH's Chief Grants Management Officer, issued guidance entitled "Award Revision Guidance and List of Terminated Grants via letter on 3/12" (Award Revision Guidance).  A copy of the Award Revision Guidance is attached as Exhibit 6 to this Amended Complaint and is incorporated herein by reference.  The Award Revision Guidance again instructed the individual institutes on how to issue termination letters, and on what bases.  Ms. Bulls instructed that termination letters should include the following language: "It is the policy of NIH not to prioritize [insert termination category language].  Therefore, this project is terminated."  The termination category language that Ms. Bulls provided included terminations for a program's relation to China, DEI, gender, and vaccine hesitancy.  Hundreds of NIH grants were terminated in the ensuing days.[27]

113.    Upon information and belief, on or before March 19, the Office of Extramural Research and the Office of Policy for Extramural Research Administration provided additional guidance on how ICs should process grant terminations and communicate with grant recipients regarding such terminations.  Included in these instructions was the instruction to speak only of "changes in NIH and/or HHS priorities" and an instruction to "not refer to any Executive Orders."

---

[26] *PA-20-222: Research Supplements to Promote Diversity in Health-Related Research*, NIH, https://grants.nih.gov/grants/guide/pa-files/pa-20-222.html.

[27] *HHS Grants Terminated*, HHS, https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

114.    On March 25, NIH issued a directive entitled "NIH Grants Management Staff Guidance—Award Assessments for Alignment with Agency Priorities—March 2025" (Revised Priorities Directive).  The Revised Priorities Directive and its appendices are attached as Exhibit 7 to this Amended Complaint and are incorporated herein by reference.  The Revised Priorities Directive continued to blacklist research related to DEI, transgender issues, and vaccine hesitancy, but now included yet another topic—COVID-19.  As to COVID, the guidance stated that: "The end of the pandemic provides cause to terminate COVID-related grant funds.  These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic.  Now that the pandemic is over, the grant funds are no longer necessary."

115.    Upon information and belief, sometime during mid-March, defendants issued a further directive adding research related to the health effects of climate change as a blacklisted topic (Climate Change Directive).[28]

116.    Upon information and belief, on or after January 20, 2025, defendants have issued other directives, including nonpublic and undisclosed directives, that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to the blacklisted topics described above.

117.    For ease of reference, this Amended Complaint refers to the Secretarial Directive, the Lauer Memorandum, the Supplemental Lauer Memorandum, the Priorities Directive, the Award Revision Guidance, the Revised Priorities Directive, and the Climate Change Directive— as well as other nonpublic and undisclosed directives that curtail NIH's support for previously

---

[28] Waldman A., *NIH Ends Future Funding to Study the Health Effects of Climate Change*, ProPublica (March 24, 2025), https://www.propublica.org/article/nih-funding-climate-change-public-health.

advertised funding opportunities and previously awarded grants relating to those blacklisted topics—collectively as the "Challenged Directives."

III.    **Defendants' Implementation of the Challenged Directives Through Elimination of Funding Opportunities and Disruption of Pending Applications**

    A.    **Delay and Withholding of Advisory Council and Study Section Meetings**

118.    Defendants have also been systematically delaying and advisory council and study section meetings in a manner that contravenes prior regulatory notices and NIH's own guidance. As explained above, NIH's own guidance states that "Cycle II" grant applications, which underwent study-section review last fall, were originally scheduled to undergo advisory-council review in January of this year.  *See supra*, paragraph 72.  And "Cycle III" applications, which researchers submitted to NIH last fall, were scheduled to undergo study-section review in February and March of this year.  *See id.*  Almost none of that has happened.

119.    Although meetings for the advisory councils of 21 different institutes and centers had been scheduled for January and February 2025 via publications in the Federal Register, all but one were abruptly canceled after Inauguration Day.  (The remaining meeting, for the advisory council of the National Institute of Child Health and Human Development, had already taken place on January 13, 2025, *i.e.*, seven days before the change in Administration.)

120.    In total, over 250 grant-related meetings that had been scheduled for January and February 2025 via publications in the Federal Register were likewise cancelled after Inauguration Day—often with just a day's notice (and no notice of cancellation in the Federal Register).  In contrast, in prior years cancellations and amendments to noticed meetings were rare.  According to an analysis of Federal Register notices, only an average of four cancellation notices were issued each year between Fiscal Years 2010 and 2024, and even amendments—which typically provide a new date immediately—were uncommon, with an average of around 100 each year.

121.    Between January 22 and March 3, defendants also suspended the scheduling of future advisory-council or study-section meetings; no notices for future meetings appeared in the Federal Register during that time.  As discussed above, on January 21, Acting Secretary Fink issued the Notice Pause Directive, instructing among other things, that no notices be submitted for publication to the Federal Register unless approved by a presidential appointee.

122.    On February 7, 2025, upon information and belief, an NIH official emailed a researcher that submissions to the Federal Register "are now on hold indefinitely."  Throughout February (and continuing into March), multiple webpages from the NIH institutes stated: "At the present time, all Federal advisory committee meetings have been canceled until further notice. Additional information will be forthcoming as it becomes available.  We apologize for any inconvenience."

123.    Defendants resumed publishing notices of upcoming study-section and advisory-council meetings in the Federal Register in early March, but the number of meetings scheduled for this fiscal year remains at a level far below the number of such meetings in every fiscal year since 2010, and even further below the number that would be required to make up for the meetings not held in January and February.

124.    Based on an analysis of notices posted in the Federal Register, defendants have held around 930 meetings to review grant applications in Fiscal Year 2025 to date.  That represents a sharp and unprecedented drop from prior years.  From Fiscal Years 2010 through 2024, NIH held between approximately 1,410 and 1,700 meetings over the same period, with an average of about 1,540.  The Fiscal Year 2025 figure thus reflects a decline of nearly 40% relative to that historical baseline.

App.208

125.    Despite the shortfalls and cancellations, defendants are not picking up the pace. As shown in the following figure, defendants remain well below the historical average meetings held, and the pace of new meetings scheduled from April to May is similar to that of previous years, when it would need to be substantially higher to make up the pace and spend the money appropriated by Congress:



Note: Values are plotted on the day of the scheduled meeting.

126.    According to NIH's contemplated schedule, some Cycle II projects were to start in April 2025.  For example, multiple UMass grant applications from Cycle II—with anticipated project start dates on or around April 1, 2025—received fundable scores from their study sections and yet remain in limbo because the relevant January advisory-council meeting was canceled.

127.    Upon information and belief, the continued delays described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

42

App.209

**B.    Delay and Withholding of Final Disposition of Awards**

128.    In addition to their frustration of the activity of study sections and advisory councils, defendants have also been systematically delaying and withholding final decisions on applications that have already received favorable scores and recommendations from the relevant study section and/or advisory council.

129.    Upon information and belief, defendants maintained a total freeze on the issuance of new notices of award, including for non-competing renewals, from January 28, 2025, to February 28, 2025.

130.    Defendants appear to no longer maintain a total freeze on the issuance of all new NOAs.  However, upon information and belief, defendants are still delaying final decisions on applications in order to implement the Challenged Directives by conducting a review of applications for their relation to subjects and topics disfavored by the Administration.  This review process has resulted in a delay on rendering final dispositions and award decisions on pending applications.

131.    Upon information and belief, NIH's layoffs of the grant management, programmatic, and scientific staff that advance the grant application and peer review process have exacerbated, and will further exacerbate, these funding delays.  NIHGPS §2.1.1, at I-44.  The current Administration fired approximately 1,200 probationary workers at NIH, including those scientific, programmatic, and grant management staff members who worked directly on, and were

in charge of, grant approvals, renewals, and disbursements.  HHS has started to lay off an additional 1,200 NIH employees.[29]  A third round of layoffs is expected by September 30, 2025.[30]

132.    In addition, upon information and belief, the recent layoffs included the directors of individual NIH institutes and centers who are responsible for signing off on final grant funding decisions.  42 U.S.C. §284(b)(3).  On April 1, 2025, the directors, including acting directors, of the National Institute of Allergy and Infectious Diseases (NIAID), the Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD), the National Institute on Minority Health and Health Disparities (NIMHD), the National Institute of Nursing Research (NINR), and National Human Genome Research Institute (NHGRI) either were placed on administrative leave or offered reassignment to the Indian Health Service in distant States.  These institutes' directors were responsible for at least $9 billion in annual Congressional appropriations.[31]  These layoffs appear targeted at institutes and centers either established by Congress for purposes that conflict with policies disfavored by the Administration, or which have conducted research on topics disfavored by the Administration.

133.    As described in greater detail below (*see infra*, paragraphs 160-207), plaintiffs are awaiting a decision on hundreds of applications currently pending before the agency—including many applications that received favorable reviews from the relevant study section and/or advisory council.  For ease of reference, this Amended Complaint refers to the pending applications just described as the "Delayed Applications."

---

[29] Whyte L.E. *et al.*, *RFK Jr. Plans 10,000 Job Cuts in Major Restructuring of Health Department*, Wall Street J. (Mar. 27, 2025), https://www.wsj.com/politics/policy/rfk-jr-plans-10-000-job-cuts-in-major-restructuring-of-health-department-bdec28b0.

[30] Molteni M. *et al.*, *Five NIH Institute Directors and Numerous Lab Heads Ousted in Unprecedented Shake-up*, STAT (Apr. 2, 2025), https://www.statnews.com/2025/04/01/nih-rif-1200-layoffs-raise-concerns-health-medicine-biomedical-research.

[31] Kozlov M., *One of the Darkest Days': NIH Purges Agency Leadership amid Mass Layoffs*, Nature (Apr. 1, 2025), https://www.nature.com/articles/d41586-025-01016-z.

134.    Upon information and belief, the continued delays described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

### C.    Delay and Withholding of Renewal of Awards

135.    Upon information and belief, the Challenged Directives have likewise governed NIH's review of applications for grant renewals by current grant recipients.  Upon information and belief, defendants have required NIH staff to review grant renewal applications to determine whether they relate to subjects that are disfavored by the Administration, which itself has resulted in substantial delays in rendering decisions on applications for grant renewals.

136.    As of April 1, plaintiffs are awaiting decision on non-competing renewals that otherwise meet the criteria for renewal but that defendants have declined to process in the ordinary course.  For ease of reference, this Amended Complaint refers to the non-competing renewals just described as the "Delayed Renewals."

137.    For example, as of April 1, University of Washington is experiencing delayed renewal of 73 grants totaling over $61 million.  Some of these renewals have been delayed for months, with the resulting funding disruptions undermining the University's budgeting, forcing pauses in research, and requiring the University to resort to furloughs, staff reductions, and planned layoffs.

138.    Upon information and belief, the continued delays described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

### D.    Defendants' Removal of Notices of Funding Opportunities

139.    Upon information and belief, no later than January 31, NIH's institutes and centers were informed that specific Notices of Funding Opportunity were being withdrawn and cancelled.

App.212

Similarly, upon information and belief, NIH only published three NOFOs between January 20 and March 26.[32]

140.    The withdrawal of NOFOs continued on the grounds, *inter alia*, that the research opportunities involved DEI or gender.

141.    The withdrawal of NOFOs occurred in the form of "unpublishing" the NOFOs, referred at times to the "disappearing" of NOFOs.

142.    At least some of these NOFOs were withdrawn after grant applications had been submitted in response to them.

143.    Upon information and belief, the removal of NOFOs described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

## IV.    Defendants' Implementation of the Challenged Directives Through Termination of Already-Issued Grants

144.    Defendants' implementation and enforcement of the Challenged Directives has also directly resulted in the termination of more than one hundred grants to plaintiffs' instrumentalities on the grounds that they relate to topics now blacklisted by the Challenged Directives.  For ease of, this Amended Complaint refers to the terminated grants just described as the "Terminated Grants."

145.    On or about February 10, NIH provided individual institutes with a list of grants that were to be terminated.  Upon information and belief, the decision to terminate these grants was based on Acting Secretary Fink's Secretarial Directive and on direction from the Executive Office of the President.

---

[32] Reardon S., *Trump Officials Will Screen NIH Funding Opportunities*, Science (Mar. 26, 2025) (stating that "NIH only published three NOFOs between 20 January and 26 March, compared with 163 in 2023 and 147 in 2024 between the same dates"), https://www.science.org/content/article/trump-officials-will-screen-nih-funding-opportunities.

146.    Upon information and belief, the lists of to-be-terminated grants provided by NIH to its individual institutes reflect list of grants to be terminated and template letters provided by HHS and personnel affiliated with the so-called Department of Government Efficiency (DOGE) to NIH.   Upon information and belief, shortly after the change in Administration, personnel associated with the DOGE initiative obtained access to NIH's internal grants databases.

147.    On February 28, a post on DOGE's official X account announced the cancellation of numerous NIH grants related to China, racial health disparities, and gender-affirming care:



148.    The decision to terminate Diversity Supplements not only undermines Congress's and NIH's previously stated goal to promote diversity among scientists, but it also actively harms diverse candidates.   This is because, until recently, NIH has been issuing NOFOs for workforce development grants in pairs, with both a "standard" NOFO and a "diversity" NOFO, allowing individuals to self-identify as diverse.   But now that Diversity Supplements are being cancelled and not funded, people who identified as diverse in their applications are not even eligible for funding, while people who did not identify as diverse remain eligible.

App.214

149.    Upon information and belief, on or about March 4, HHS identified additional NIH grants that were to be terminated based on the Challenged Directives, which NIH's Office of Extramural Research then communicated to the individual institutes.

150.    Upon information and belief, on or about March 12, 2025, NIH provided staff at the individual institutes with a list of grants to be terminated, which were identified based on the factors identified in the Priorities Directive.  NIH has used the Priorities Directive staff guidance to implement and assess the grant research portfolios of each of the ICs.

151.    As already discussed, in the March 13 Award Revision Guidance, Michelle Bulls instructed the ICs' Chief Grants Management Officers on how to issue termination letters.  Bulls instructed that termination letters should include the following language: "It is the policy of NIH not to prioritize [insert termination category language].  Therefore, this project is terminated."  The instructions included the language that termination letters should include for the disfavored category on which the termination was based, including the following:

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Gender:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment.  NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in

App.215

ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

152.    Upon information and belief, on or about March 14, Bulls met with the ICs' Chief Grants Management Officers and reported approximately 945 terminated grants. Bulls forwarded the grant terminations to ICs in batches for issuance of termination letters.

153.    Upon information and belief, NIH has terminated more than 100 grants at plaintiffs' public institutions since January 20, 2025, in accordance with the Challenged Directives.

154.    Plaintiffs' universities have received grant termination letters that include the boilerplate termination language provided by Bulls to the ICs.

155.    These grants support a wide range of scientific inquiry and were awarded after a thorough review process for scientific merit, consistency with agency priorities, and other qualities.

156.    Upon information and belief, actors outside NIH have identified the grants that should be terminated based on the Challenged Directives and their broad implementation, and the grants have been terminated without the input—and sometimes without the knowledge—of the NIH program officers who ordinarily manage the grants. In other words, NIH terminated these grants without consulting with the NIH career scientists with scientific knowledge about the research being funded.

157.    Upon information and belief, to date, defendants have yet to identify any basis for its alleged priorities, as reflected in the Challenged Directives, other than the Executive Orders and the Administration's political views on certain subjects.

158.    Upon information and belief, defendants have not made or finalized any change in NIH agency or IC priorities as identified in either the NIH's strategic plan or NIHGPS.

App.216

## IMPACT OF THE CHALLENGED AGENCY ACTIONS

159.    Institutions in each of the plaintiff states have experienced delays and other funding disruptions as a result of defendants' adoption, implementation, and enforcement of the Challenged Directives and the other acts and omissions described above.

## I.    Harms to Massachusetts

160.    UMass has directly experienced harm as a result of defendants' treatment of the Delayed Applications.

161.    As of March 31, 2025, UMass has 353 applications for NIH funding that are overdue for review based on NIH's published schedule of cycles.  Of these, (a) 272 are awaiting study section review; (b) 43 have received fundable scores from study section review and are awaiting advisory council review; (c) 14 have received possibly fundable scores from study section review and are awaiting advisory council review; and (d) 18 have received fundable scores and been reviewed an advisory council but have not been notified of a final determination on funding. In total, $848,332,898 in sought funding is awaiting approval across all active applications, $133,234,318 of which is for projects that have already been scored as fundable.

162.    A project entitled, "Elucidation of the mechanisms by which Ms4a genes regulate neurodegeneration in Alzheimer's Disease and related disorders," grant number R01AG089801, is representative of the delays UMass has experienced.  One major obstacle of treating Alzheimer's disease is the paucity of genetic targets against which to direct therapeutic efforts; this project aims to investigate a recent and promising gene which could inform the development of new treatments for this and other neurodegenerative diseases.  UMass researchers submitted the application for this grant on July 9, 2024, with an anticipated start date of April 1, 2025.  Study section review placed it in the 13th percentile of all contemporaneous projects submitted to the IC, which has a payline of 17th percentile—thus, this was a fundable study with an overwhelming likelihood of

receiving funding. This project was scheduled for advisory council review on January 28, 2025; that session was canceled, then rescheduled for April 22, 2025, three weeks after the project was intended to begin. In preparation for the start date of this grant, UMass Chan Medical School hired two postdoctoral fellows, which is standard practice and timing for this manner of research. Additionally, a significant number of genetically modified mouse cell lines had to be bred and aged so that neurogenerative phenotypes would appear. Due to the delay in evaluating this grant, UMass must continue funding these preparatory steps well into the life of the project with the uncertainty that funding will arrive, or else scrap this promising research project entirely, foreclosing research into a promising area of new treatment for sufferers of Alzheimer's disease and related diseases.

163. Delays in funding decisions and evaluation of applications have already caused numerous and critical harms to UMass. Due to uncertainty of the funding of multiple projects ranked as fundable, UMass schools have made dramatic cuts to the size of programs that rely significantly on NIH support. UMass Chan Medical School has rescinded acceptances to the vast majority of students admitted to its PhD program in Biomedical Sciences, reducing that program from 70 to approximately 10. UMass Amherst has reduced Fall 2025 graduate admissions to its doctoral programs from 1099 admittees to 805, rescinding financial awards to 100 accepted applicants. UMass Medical School has arranged for emergency funding to continue paying stipends of current graduate students and post-baccalaureate scholars through June 30, 2025, but does not have emergency funds sufficient to replace those lost in terminated grants or to pay further costs associated with delayed grant awards. UMass Amherst will use available emergency funds to support students, staff, research faculty, and preservation of research materials for in-progress experiments until August 31, 2025, but projects that the funds will be exhausted by that date. This

App.218

relief is intended to soften the impacts to staff and research efforts but is incapable of replacing lost federal funding. These funds are being diverted from other important needs, such as deferred maintenance, strategic investments, and repayment of bond funds.

164. Additionally, numerous irreparable harms impend. Future recruitment of doctoral students, postdoctoral researchers, faculty, and staff will be negatively impacted by diminished funding. And without incoming streams of grant funds and the attached facilities costs used to oversee the research facilities which make these projects possible and economically viable, UMass will risk a reduced ability to meet existing obligations to repay bond funds used to construct those facilities. Any reduction in the university's bond rating will in turn increase the expense of augmenting research facilities in the future.

165. As a result of defendants' implementation and enforcement of the Challenged Directives, UMass has had at least five active grants and at least three additional passthrough awards terminated, without warning or cause, since March 21, 2025. UMass has also received "program cancellation notifications" related to three grants. Terminated grants include a study on the effects of the quality of behavioral health care on children, "Effect of Medicaid accountable care organizations on behavioral health care quality and outcomes for children," award number 3R01MH134176-02S1, funded for $99,974; and three studies aimed at understanding and reducing the spread of HIV amongst different vulnerable populations: "Optimizing an mHealth intervention to improve uptake and adherence of the HIV pre-exposure prophylaxis (PrEP) in vulnerable adolescents and emerging adults," award number 5R33HD107988-04, with an award of $278,952; "Adapting mHealth interventions to improve self-management of HIV and substance use among emerging adults in Zambia," award number 5R34MH124081-02, with an award of $671,459; and "Applying deep learning for predicting retention in PrEP care and effective PrEP use among key

populations at risk for HIV in Thailand," award number 5R03MH130275-02, with an award of $76,214.  In the two other terminated grants—"Faithful response II: COVID-19 rapid test-to-treat with African American churches," award number U01MD018310, with an award of approximately $126,000; and "Training the long-term services and supports dementia care workforce in provision of care to sexual and gender minority residents," award number 3R01AG075734-02S1, with an award of approximately $65,000—UMass was the subawardee.

166.    UMass has also had ten applications for grants summarily denied without any form of scientific review.  These include grants submitted in response to subsequently withdrawn NOFOs, including PAR-23-271, PAR-21-358, and PAR-24-077.

## II.    Harms to California

167.    California has experienced direct and irreparable harm as a result of the Challenged Directives.  Disruptions in the conduct of biomedical research and training in California directly impact the employment and economic well-being of the biotechnology and pharmaceutical industries headquartered in California.  NIH grant terminations and funding delays have deterred prospective students and faculty who would have otherwise worked at universities and companies in California.  Also, California has a direct interest in the health and safety of its residents, the prevention of both chronic and communicable diseases in the State, and in the State's economic wellbeing.  The termination of NIH funding into research interventions to prevent or treat the spread of HIV/AIDS, sexually transmitted illnesses, COVID-19, and other virus families of pandemic concern—including diseases of emerging concern such as Dengue, Chikungunya, and Zika—and shingles, increases the risk of and incidence of these diseases in California.  The terminations resulting from the enforcement of the Challenged Directives have specifically targeted some of the most vulnerable Californians, including women experiencing domestic violence, children at risk of suicide, and minorities at a higher risk of chronic or infectious diseases.

App.220

168.    Since February 20, 2025, as a result of the Challenged Directives, UC has had at least 52 NIH grants terminated, amounting to over $37 million.  The impact on UC Health Centers like UCSF that conduct clinical trials, its researchers, and the larger research community have been substantial.  When UCSF receives a research grant from the NIH, the funds must be used to support the specific research project identified in the grant consistent with the terms of the notice of award.  The grant funds are used to support all aspects of the grant, including personnel costs, drug and medication costs, technology, and equipment.  When a grant is terminated, there are no longer any funds available to pay the salaries of the research staff or to cover significant expenses.  When research staff are laid off, the institution loses the knowledge and experience those research staff members possess and that was attained through the research project.  Once canceled, most research projects cannot immediately resume.  Many of these projects entail longitudinal studies.  When scientific studies stop in full swing, their partial results often lose validity.

169.    Among these terminations apparently for "gender identity" and "vaccine hesitancy" are studies key for understanding the health of all Americans.  They included a grant for a UC Davis research project investigating the biological risk factors for dementia among target populations with early signs of cognitive dysfunction, including white, Hispanic, and black participants that had already enrolled over 1,700 participants, and a grant to UCSF Professor Nisha Acharya who studied the effectiveness and potential adverse effects of a vaccine for shingles, a disease that one in three Americans are likely to develop in their lifetimes that cancelled $1,248,374 in funding.  A third study involved the study of doxycycline, a common antibiotic used to treat sexually transmitted diseases and serious infections; defendants cancelled $3,243,539 in funding.  The doxycycline study assesses the metabolization of the drug in men and women, supporting insights into whether microbial resistance will undercut the utility of the drug.  While

the study, consistent with prior NIH policy, allows transgender individuals to participate, the focus of the study was not on gender identity. The harms from these terminations underscore the damage that flow from the abrupt nature of defendants' terminations. Safety monitoring during and after doxycycline dosing is critical to protecting the safety of participants already enrolled in the study. Doxycycline may cause liver injury and allergic reactions days to weeks after administration of the drug. As a result of these terminations, UCSF is preparing to lay off the staff members responsible for clinical monitoring, full-time postdoctoral researchers responsible for analyzing research data, and is unable to pay salary owed to senior scientists and principal researcher for research. Thus, these categorical terminations have already caused numerous and critical harms to the UC.

170.    The delays in funding decisions and evaluation of applications have further harmed the UC system. First, the UC system has instituted a system-wide hiring freeze on new faculty and staff. Top-ranked departments across UC campuses in chemistry, biology, public health, and more may reduce their graduate student classes. UC departments have had to consider rescinding offers of funding to some students admitted to doctoral programs. The expected grant funds are also necessary to the research facilities that make these projects possible and economically viable.

171.    Second, the delays in funding and terminations harm the UC's educational and research mission. Doctoral students, postdoctoral researchers, faculty, and staff from around the world collaborate with or come to California to join the UC research enterprise. Future recruitment of these young scientists and researchers will be negatively impacted by diminished funding and arbitrary terminations aimed at international collaboration and research projects. Further, terminations have specifically impacted the communities that come to the UC system for clinical trials and other community health interventions. Midstream terminations of long-term projects

meant to reduce health disparities in projects like maternal mortality, the spread of HIV/AIDS, and services to other underserved communities directly undermines the trust necessary to convince individuals to participate in UC research projects.

172.    Since February 20, 2025, the CSU has received over 17 termination notices, including 5 where it serves as the primary awardee.  They collectively amount to a loss of over $20.2 million in budgeted funding to the CSU, but CSU estimates the number may be much higher as grants continue to be cancelled.  One of its universities, San Diego State University (SDSU) alone currently has 23 non-competing renewals pending action by the grants office to authorize the next segment of funding, 34 new proposals and competing renewals totaling approximate $16 million awaiting NIH study section review, and 10 new proposals and competing renewals totaling approximately $3.2 million that received fundable scores awaiting NIH advisory council and Notice of Award.

173.    Unless funding of each NIH grant is restored to each of the affected CSU university campuses, neither the California State University nor any of its auxiliary organizations will have the financial resources to keep the research programs running.  Neither does the CSU's operating budget have any available funds to cover these programs, should additional federal funding be terminated.  The CSU's operating budget has two main funding sources: the state General Fund (as appropriated by the Legislature annually) and student tuition and fees to cover the educational budget.  Due to ongoing gaps in annual funding, the CSU system has in past years already had to reduce student enrollment and suspend degree programs.  However, because the statutory purpose of CSU to provide education to all qualified Californians, CSU does not have the discretionary option not to spend its funds as required to fulfill its educational mission.  There is hence no

App.223

additional funding available to cover another $20 million in lost NIH grant program funding which, up to this point, has been reliably predictable as a funding source over multiple years.

174.    NIH terminations are particularly egregious when budget planning must be done years in advance.  CSU's education budget includes many items that are based on long-term commitments and planning efforts, including phased campus development under multi-year master plans, deferred maintenance schedules, and bond financing repayments.  These funds are already committed are not available to replace lost funds from the NIH programs.  NIH grant funding is also sought and secured well in advance of its use, necessitating personnel and equipment purchases based on those commitments.

175.    Over the last fifteen years, CSU campuses have made concerted investments in student training, faculty hiring, and institutional support of medical and public health research. Delays in NIH funding decisions and evaluation of applications and terminations now endanger all of those efforts.  SDSU, for example, has instituted a hiring freeze on new faculty and staff, and will now defer long-term research projects.  Terminations over grants studying health disparities and sexual and minority health have directly impacted the salaries of SDSU staff, faculty, and students.  Without NIH funding, some students may need to discontinue their studies and in the case of international students, leave the country.

176.    The damage from grant terminations to CSU campuses' relationship with the surrounding community and patients is similarly irreparable.  For example, federally funded studies establish that sexual and gender minority youth are at a higher risk of suicide and suicide ideation.[33]  Yet one of the grants terminated funded suicide prevention services to sexual and

---

[33] Luk J.W. *et al.*, *Sexual Minority Status and Age of Onset of Adolescent Suicide Ideation and Behavior*, 148 Pediatrics, no. 4 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9446478.

gender minority youth, and was terminated in the middle of their multi-year period without any opportunity to bridge individuals at high-risk of suicide to new services providers.

177.    CSU campuses to date have received no funding or direction from NIH concerning the participants enrolled in terminated trials even where the potential for increased suicide attempts and subsequent death is high because every single participant in a study is at high risk for suicide. This is particularly damaging to CSU's relationship with the community health providers that often support enrollment in intervention studies.

178.    The termination of the grants often means that researchers cannot fully evaluate whether an intervention is statistically effective—essentially wasting the valuable resources already expended and delaying scientific progress, stifling innovation, and impeding the development of new medical treatments, technologies, and public health initiatives.

179.    Grant terminations, especially without warning, are also directly affecting students at the CSU. Graduate students, who are at the core of research laboratories, rely on NIH grants not only for resources to support research, but also for their own stipends, tuition support, and training programs. Sudden cuts have immediate and consequential impacts to these students, who often live paycheck to paycheck, putting their housing and basic needs at risk.

180.    NIH grants also support undergraduate students at CSU. For example, the CSU U-RISE program is funded through a grant from the National Institute of General Medical Sciences and is meant to broaden perspectives in future scientific and biomedical research by identifying students' interest in pursuing research as a career and by providing training opportunities to be competitive for entering graduate programs. Students accepted into the U-RISE program receive trainee stipends to defray living expenses during research training experiences, and also support student trainee travel expenses to attend scientific meetings with their mentors and help defray

App.225

university personnel expenses and supplies. At least 9 CSU universities received a notice from NIH stating that the university must "cease project activities as of the current budget period end date of 3/31/2025," and as a result these 9 CSU universities must immediately terminate stipends for students in the middle of the semester, causing participating students direct and significant harm, as their financial aid packages account for U-RISE stipends.

181.    The impact from the termination of grants funding training programs like U-RISE is also profound. It inflicts emotional and academic distress upon students, damaging the pipeline of future researchers. The CSU, with limited resources, bears a disproportionate burden, exacerbating financial strain and competitive disadvantages.

182.    At this point, delays in the review of NIH grant applications have also prevented the researchers from planning for the implementation of the grants and stalled important research programs from moving forward at multiple CSU campuses.

183.    A five-year grant designed for universities without significant NIH funding that serve historically underrepresented student populations in communities with significant populations with unmet health needs in Fresno, California, has been delayed multiple times in its review and currently has no advisory-council review date. A grant of this size requires many people working collaboratively. The grant application has 12 staff associated with it. Faculty working on this grant will receive time released from teaching ranging from 25 percent to 50 percent but cannot plan for this while the grant remains under review with changing implementation dates.

184.    Another five-year grant intended to study how cells differentiate themselves for specific uses, which would advance the understanding of certain genetically linked illnesses, has similarly been delayed. The proposal was written and submitted with review guidelines and

App.226

criteria that has since been changed after the grant has been submitted. Delays in review have similarly delayed graduate student hiring associated with the grant.

### III.    Harms to Maryland

185.    Delays in the grant review process and terminations of existing grants have disrupted valuable research at Maryland's research universities.

186.    UMB has nearly 500 proposals totaling $1.1 billion in the NIH review pipeline. This includes 380 proposals totaling $1.04 billion awaiting study section review, 32 proposals totaling $21.4 million that received fundable scores and are awaiting advisory council review, 12 proposals totaling $37.5 million that received fundable scores and have been reviewed by NIH advisory councils, and 44 proposals totaling $33.2 million that received possibly fundable scores and are awaiting advisory council review. UMCP has approximately 200 proposals pending with NIH, totaling about $354 million.

187.    The delays in the review process have harmed the universities in myriad ways, disrupting ongoing research, interfering with planning and budgeting, forcing the universities to divert resources from other needs, and restricting their ability to accept new graduate students and recruit and retain quality research trainees. The delays also directly harm patients and the public. Among the UMB studies that are stalled in the review process despite having already received fundable scores and undergone advisory council review are a clinical trial involving assisted living residents with Alzheimer's disease and related dementias and another study that seeks to assist selection of antidiabetic drugs for individual patients. One of UMCP's stalled submissions is the Bucharest Early Intervention Project, a landmark child development study that has followed a group of individuals, some of whom were raised in institutions, for more than 20 years. The study was reviewed by a study section in October 2024 and received a score of 12th percentile, but advisory council review has since been delayed three times.

188.    Arbitrary grant terminations have also devastated research at UMB and UMCP. UMB has received termination notices for 14 NIH awards representing about $33 million in lost research funding.  One terminated grant funded a study at UMB involving more than 1,000 human subjects who underwent diagnostic tests as part of the funded study.  The human subjects consented to the study based on the understanding that they would be provided with test results that could be important to their health.  The abrupt termination of the grant takes away federal funding for providing subjects with those test results.  Another affected UMB project examined differences in brain and hormonal mechanisms between males and females in relation to pain conditions.  The project earned the highest score in its study section.  UMCP has received notice of termination of nine grants, representing about $1 million in lost research funding.  Examples of the affected studies include a study examining alcohol use among sexual orientation and gender identity minority youth and another study assessing the needs of persons who suffer biological disorders in sex development.

## IV.    Harms to Washington

189.    The University of Washington has experienced significant harms as a result of defendants' implementation of the Challenged Directives.

190.    As of April 1, the University of Washington has more than 500 proposals awaiting NIH study section review.  It has 54 proposals for $138 million in total funding requested that received fundable scores, awaiting NIH advisory council and Notice of Award.  And it has 76 proposals for $260 million in total funding requested with fundable scores that for which the NIH advisory council has met or voted electronically to approve a grant for funding, but the NOA has not yet been issued.

191.    Additionally, the University of Washington has 73 overdue non-competing renewals totaling over $61 million that have yet to receive NOAs.  Delays in this funding has

App.228

already had potentially irreversible effects on the University of Washington. To take just one example, the University of Washington's Institute of Translational Health Sciences (ITHS) has been awaiting an overdue non-competing renewal on a $10.5 million annual grant for over a month.

192.    ITHS is a partnership between the University of Washington, Fred Hutchinson Cancer Center, Seattle Children's, and regional institutions to promote the translation of scientific discovery to clinical practice. One example of the innovative work performed at ITHS is the Gene & Cell Therapy Lab's (GCTL) accelerated development of a therapy to treat advanced ovarian cancer, called UltraCAR-T Cell therapy. Scientists in the GCTL worked with a biopharmaceutical company to transfer the technology so that the product could be made quickly and effectively. A separate unit of ITHS, the Translational Research Unit, conducted the rigorous clinical trials necessary to advance the technology towards a clinical use. But now, without funding for over thirty days, the University of Washington has been forced to institute staff reductions, furloughs, and elimination of positions at ITHS.

193.    Other important research centers that are at risk because of delays in the grants review and award processes at NIH include the University of Washington's Alzheimer's Disease Research Center (ADRC), the Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging, and the joint University of Washington /Allen Center. These Centers are funded by the National Institute on Aging (NIA) and received excellent scores during their reviews in study section in the fall. Because the NIA Council did not meet as scheduled in the January, these large grants were not approved for award. They all end in April or May and would leave large research teams without support. The work being done by these centers is longitudinal and lapse in funding will mean loss of critical cohorts that have been studied in some cases up to 40 years.

App.229

194.    On top of these, University of Washington researchers have also had at least 11 grants terminated by NIH, totaling over $3 million to support innovative work in trauma research for victims of sexual assault, prevention of chlamydia infections, and the impact of air pollution on Alzheimer's disease and related dementias, among other topics.

195.    The implementation of the Challenged Directives, and the resulting delays and terminations, have not only disrupted this critical research, they have also led to University-wide harms.  The failure of NIH to communicate deviation from the normal funding application cycle for reviews and approval of funding means that research team which often plan grant applications years in advance to maintain necessary funding to support their research teams are left without consistent funding and in some cases are needing to furlough or layoff research team members. The University of Washington has paused some new hires whose research programs depend on timely NIH awards, including several where candidate interviews were already underway, and programs have been forced to reduce graduate admissions between 25 and 50%.  Moreover, the terminations, delays, and unprecedented disruptions in funding have had a profoundly negative effect on morale University wide.  Faculty and staff don't know if their funding will be cut, if their research will be terminated, whether they will be able to attend conference, or even whether they will continue to have jobs.  The stress of these funding disruptions is palpable and has negatively affected the University of Washington's mission.  Research staff that are stressed about losing their jobs on a daily basis are not able to focus their full creative energy on innovation and discovery.

## V.    Harms to the Remaining Plaintiffs

196.    In Arizona, five of Arizona State University's NIH-funded projects have been paused or terminated, and the university continues to receive new grant-related notices on an ongoing basis.  Arizona State University has more than 450 proposals with an estimated amount

App.230

of $771 million that have been submitted to NIH but for which it has not received a response. Northern Arizona University received a termination notification of an award, "*Bridging Arizona Native American Students to Bachelor Degrees*," which funds a transfer program of students from two-year associate degree programs at Coconino Community College to four-year baccalaureate degree programs at Northern Arizona University. This program will cease for current students, jeopardizing the likelihood that they transfer to Northern Arizona University and complete a baccalaureate degree. Northern Arizona University will forgo recruitment of the final cohort of students who would have benefitted from this program, and program activities will cease on July 31, 2025. Northern Arizona University has 34 proposals, representing approximately $47 million, submitted to NIH for which it has not received a response.

197. CU Anschutz is Colorado's only public academic medical center. CU Anschutz has more than 500 research laboratories on campus pursuing their research mission. This work supports important basic science and clinical research, graduate students, clinical trials, and other work in a broad array of areas on the health spectrum. Currently, 479 doctoral graduate students are reliant on the grant funding of the institution to complete their education and work toward finding new discoveries. Upon information and belief, because of NIH's actions, CU Anschutz has experienced direct harm, including but not limited to (a) a 23% decline in NIH grant awards for the period of time from January through March 2025 as compared to the period of time from January through March 2024, and (b) termination of numerous existing grant awards. CU Anschutz has received 18 NIH grant terminations to date with a total loss of funds of at least $8,455,794.17. CU is a direct grantee of seven of those grants, totaling $2,921,217.25 in funding loss. These grants would have funded CU Anschutz's continued work on a variety of health studies including hormones, vaccines, Alzheimer's disease and other important studies. CU is a

App.231

subgrantee on 11 additional grants terminated by NIH, totaling a funding loss of at least $5,534,576.92. These grants would have continued to fund CU Anschutz's work and partnership with their grant sponsors on work related to antiviral measures, impact of environmental toxicants on diabetes, and adolescent medicine trials for HIV/AIDS interventions, among other studies.

198. The University of Delaware has directly experienced harm as a result of defendants' treatment of the Delayed Applications. As of March 31, 2025, the University of Delaware has (a) 77 proposals totaling $177 million awaiting NIH study section review; (b) at least 13 proposals totaling $59.8 million that received fundable scores, awaiting NIH advisory council and Notice of Award; and (c) 102 proposals totaling $234.9 million that received possibly fundable scores, awaiting NIH advisory council and Notice of Award. "Since late January 2025, the University of Delaware has seen an unusual number of delays in the processing of NIH grant applications. Researchers have had their grant application study sections and advisory councils be canceled or otherwise not scheduled, and grant application scoring has been significantly delayed." The University of Delaware uses information regarding NIH grant applications and award rates to inform its graduate admissions process. Due to uncertainty of incoming grant funding related to the delays in reviewing and awarding grants by NIH, the various PhD programs at the University of Delaware that rely on NIH funding for graduate student support have reduced admission offers for their incoming class of graduate students by up to 50%. Such instability in funding is affecting the recruitment and retention of high-caliber quality research trainees. The inability to retain quality research trainees will have ongoing effects on the research capabilities of the University of Delaware, including by limiting the individuals qualified to conduct certain research. The delays have disrupted ongoing research, as well as actively setting back the University of Delaware's ability to conduct critical research now and in the future. Funding gaps have already forced

App.232

researchers to abandon promising studies, miss key deadlines, or lose highly trained personnel. Some of these studies involve the use of animal test subjects, all of which would need to be terminated due to loss of funding. This results in not only ethical and financial losses but also wasted scientific opportunity, as experiments cannot simply be restarted once interrupted. In many cases, there is no way to recover the lost time, research continuity, or training value for graduate students and postdoctoral researchers once disrupted. Promising discoveries may be delayed indefinitely, and, in some cases, entirely lost.

199.    Between March 21 and 31, 2025, the University of Hawaiʻi received two notices of cancellation of direct NIH grants. The affected grants total approximately $344,000. In addition, since late January of 2025, pending University of Hawaiʻi grant applications have experienced unusual delays resulting in substantial uncertainty. As of March 30, 2025, the University of Hawaiʻi had approximately 65 proposals awaiting NIH study section review. As of the same date, the University of Hawaiʻi had 31 proposals that received fundable scores but are awaiting NIH advisory council review and a final decision whether to award the grant. These unusual delays in NIH processing are affecting University of Hawaiʻi budgeting and planning for fiscal year 2025-2026, creating uncertainty around department budgets, teacher workload, and the hiring of additional faculty, teaching assistants and graduate assistants. Although University of Hawaiʻi has deployed bridge funding for impacted students, those resources are limited. Long-term use of non-federal funding is not a viable option.

200.    In Minnesota, the University of Minnesota has had 21 NIH grants and subawards terminated. The terminations will result in the loss of approximately $8.5 million in research money to the University. In addition, NIH's delay and/or cancellation of study sections have had a negative impact because significant numbers of grant proposals due for funding have remained

unfunded for at least one grant cycle, and they will potentially be unfunded indefinitely. These actions have been very disruptive to the University of Minnesota's ongoing research—including research involving clinical trials for life-saving medications or procedures. For example, the University of Minnesota is a major partner in the NIH U01 Diabetes Prevention Programs Outcomes Study (DPPOS), serving as the central biochemistry lab for 25 clinical sites and serving on the project's Steering Committee. This project addresses the National Alzheimer's Project Act's goal to "prevent, halt or reverse Alzheimer's Disease" in the high-risk group of persons with pre-diabetes and type 2 diabetes, who represent over half of the population aged 60 years or older in the United States. The terminations and delays threaten the University of Minnesota's ability to proceed with important projects like DPPOS.

201.    As the result of three grant terminations, the University of Nevada, Las Vegas, has lost $2.4 million in research funding that supports projects focusing on, and advancing research related to, Alzheimer's disease. The funding losses limit access to research and findings on Alzheimer's disease. These grant terminations harm Nevada by defunding critical research that advances public health and educational opportunities in Nevada. And although the University of Nevada, Reno, has not reported receipt of any grant terminations, ongoing delays in review of numerous research proposals are negatively impacting the University's recruitment and retention efforts. This includes having to pause ongoing efforts to onboard new hires after the University had already provided those individuals with offer letters for positions with research programs that depend on timely NIH awards.

202.    In New Jersey, Rutgers has directly experienced harm stemming from its pursuit of scientific research blacklisted by defendants, specifically studies with a perceived connection to DEI and COVID. As of April 10, 2025, faculty and staff at Rutgers have received termination

notices for at least six NIH grants, resulting in a loss of more than $7 million in funding.  Rutgers will be unable to reallocate funds to offset these federal grant losses, triggering numerous irreparable harms.  Ongoing experiments have stopped, suspending hiring and reducing staff research hours—all due to research perceived to be related to DEI and/or COVID.  Such terminated grants relate to studies regarding HIV prevention, mental health, suicidal ideation, HPV vaccines, and COVID antiretroviral treatment.  More broadly, the Challenged Directives have resulted in the cancellation of programs funded by NIH grants directed at supporting minority and underrepresented students pursuing training and graduate degrees in biomedical sciences and engineering at Rutgers, NJIT, and Kean—with NJIT and Kean losing approximately $1.2 million, respectively, as a result.  Undergraduates at these institutions will lose out on opportunities to train in research excellence, unite in a diverse cohort to build identity, and prepare for the next phase of their biomedical research career pathway.  In addition, since late January of 2025, pending grant applications at Rutgers, Kean, and NJIT have experienced unusual delays resulting in substantial uncertainty.  As of April 11, 2025, Rutgers has approximately 13 proposals totaling $26,990,860 awaiting NIH study-section review; approximately six proposals totaling $19,608,265 that received fundable scores, awaiting NIH advisory-council review and Notice of Award; and 738 grant submissions under sponsor review with a total value of $1,387,066,143.  As of April 11, 2025, NJIT has approximately 40 proposals totaling $70,683,171.27 awaiting NIH study-section review; 4 proposals totaling $3,269,729.47 that received fundable scores, awaiting NIH advisory-council review and Notice of Award; and 17 proposals totaling $26,602,999.51 that received possibly fundable scores, awaiting NIH advisory-council review and Notice of Award.  As of April 11, 2025, Kean has six proposals totaling approximately $11 million awaiting NIH study-section review, advisory-council review and/or Notice of Award.  These unusual delays in NIH processing

App.235

are affecting budgeting and planning for fiscal year 2025 at Rutgers, NJIT, and Kean, creating uncertainty around department budgets, teacher workload, and the hiring of additional faculty, teaching assistants and graduate assistants.

203.    In New Mexico, NIH has terminated four research training grants at UNM representing over $9 million in lost research funding.  These prestigious grants support vital biomedical workforce development programs that provide advanced training for UNM's students: (a) the Institutional Research and Academic Career Development Award (IRACDA) Post-Doctoral program trains post-doctoral fellows for research and teaching careers in academia; (b) the Leading Equity and Diversity in the Medical Scientist Training Program (LEAD MSTP) supports biomedical research training of UNM's MD/PhD students for developing the clinical research workforce, (c) the Initiative to Maximize Student Diversity at the University of New Mexico Health Sciences (IMSD) grant supports predoctoral trainees in the Biomedical Sciences Graduate Program and (d) the Undergraduate Research Initiative for Student Enhancement (U-RISE) trains and prepares undergraduate students for doctoral programs and careers in biomedical research.  These training grants provide structured training and mentorship programs as well as financial support, including tuition and stipends, to advance students' education and career opportunities in biomedical research.  UNM currently has approximately 50 students enrolled at different stages in these programs.  Some of these programs have been at UNM for over 20 years. The aim of these training grants is to develop a group of professionals equipped with the technical, operational, and professional skills necessary for success as biomedical scientists, building capacity for groundbreaking research in New Mexico and representing our state's population in the biomedical workforce.  At NMSU, NIH has terminated three research grants representing approximately $6.7 million in lost research funding.  All three grants that were terminated funded

App.236

and promoted students' participation in the biomedical workforce by strengthening research training and preparing students for a successful transition into higher level biomedical degree programs and the biomedical workforce. NIH's termination of these grants impedes New Mexico's ability to continue developing breakthrough biomedical research and innovations.

204.    SUNY has experienced direct harm as a result of the delays and terminations of NIH grants. For example, NIH had committed to five years of funding—a total of $3,596,263— for a project that established a center to train and develop health equity researchers focused on health disparities in and around Buffalo. The grant had met and exceeded all of its milestones, but it was terminated on March 28, 2025. NIH also canceled grants funding research into HIV treatment and care in Ghana; the impact of peer victimization on health outcomes for LGBQ+ youth; improving inclusivity of Alzheimer's disease research; and cardiovascular disease risks among sexual and gender minorities. Additionally, SUNY has been harmed by unexplained delays and procedural breakdowns. The uncertainty has led to reduced staff hours and other harms.

205.    In Oregon, OHSU has experienced both NIH grant notices of terminations and delays in the processing of grant applications. Since March 24, 2025, OHSU received notices of termination of one NIH grant awarded directly to OHSU and seven NIH grants awarded to other institutions that issued subawards to OHSU. These terminations will result in the loss of $2.4 million in research funds to OHSU. OHSU has also experienced significant delay in its NIH application processing since January 2025. As of March 31, OHSU has approximately 280 proposals totaling over $730 million awaiting NIH study section review. As of March 31, OHSU has 70 proposals that received fundable scores totaling $172.4 million awaiting NIH advisory council meetings and notices of award. And it has 90 proposals that received possibly fundable scores totaling $194.9 million awaiting NIH advisory council meetings and notices of award.

App.237

These terminations and delays have disrupted ongoing research, graduate admissions processes, recruitment of key research personnel, and OHSU's ability to plan its operations.  In many cases, once a study is disrupted, it is impossible to recover the lost time, research continuity, or training value of the study.  As a result, studies with the potential to achieve breakthroughs in different disciplines and advance public health will simply not occur.

206.    In Rhode Island, as a result of defendants' implementation and enforcement of the Challenged Directives, NIH has terminated two research grants at URI representing $3.7 million in lost research funding.  One grant funded innovative research that was aimed at advancing the public health of those living with HIV by contributing to the investigation of causal mechanisms among networks of populations at high risk for HIV infection compounded by illicit substance use.  The other grant funded the University of Rhode Island's ESTEEMED Scholars Program, a program that provides students from underrepresented backgrounds with the skills and resources necessary to pursue advanced education and degree programs in bioengineering and related disciplines.  The impact on student achievement and the inclusive environment at URI will be hit particularly hard.  Without URI ESTEEMED, several of the current trainees would have had to drop out of URI due to the lack of academic support the program provided and the stipend that allowed them to focus on their academics and research instead of working an outside job.  These grants funded research aimed at advancing public health research for some of the most vulnerable in Rhode Island and allowing those from underrepresented backgrounds unparalleled academic opportunities.  NIH's termination of these grants harms Rhode Island by defunding research that advances public health and educational opportunities.

207.    In Wisconsin, as of March 31, 2025, NIH has terminated four research grants to UW-Madison.  The total amount of funding anticipated under these awards is $25,149,959, and of

App.238

that amount, $12,631,870 has not been disbursed to UW-Madison. These grants are to fund research on infectious disease, vaccine development, minority health disparities, and child health and human development. NIH has also terminated two research grants funding research at UW-Milwaukee regarding substance abuse, violence, and suicide prevention. In addition, since late January 2025, UW-Madison has seen an unusual number of delays in the processing of NIH grant applications, rendering institution-wide budgetary planning especially difficult as the budget process at UW-Madison relies upon the NIH grant application, review, and approval cycle. Delays in the review of pending grant applications creates uncertainty and disrupts the funding cycle necessary to maintain continuity of research projects and consistent staffing of trained researchers. In many cases, there is no way to recover the lost time, research continuity, or training value once research is disrupted. Some researchers at UW-Madison have already been unable to commit to bringing on graduate students or maintaining current trainees due to funding uncertainty, and if funding that historically would have been expected is not forthcoming, or funding is indeed terminated, certain research projects will need to be abandoned. For one particular award—an NIH Research Program Grant (P01) supporting three co-investigators—termination with no funding alternative would necessitate the termination of ten research staff (including a postdoctoral trainee) and interrupt the progress of forty undergraduate, graduate, and medical students towards their degrees. NIH's delays and/or cancellations of study sections and advisory council meetings and grant terminations have thus harmed Wisconsin's universities. These actions further harm Wisconsin through the likely reduction of the future scientific workforce and by depriving Wisconsin and the broader community of critical biomedical research.

## VI.  Impact on Appropriated Funds

208.    Notwithstanding Congress's appropriation to NIH, as a result of the implementation and enforcement of the Challenged Directives as described above, NIH has not

App.239

awarded billions of dollars in appropriated funding, with only a few months left of available funding.

209.    Based on the publicly available NIH RePORTER database, in Weeks 4-11 of 2024 (*i.e.*, January 20, 2024, through March 14, 2024), NIH awarded a total of $4.08 billion to 8,071 projects.  By comparison, in Weeks 4-11 of 2025 (*i.e.*, January 20, 2025 through March 14, 2025), NIH awarded a total of $2.45 billion to 4,961 projects—a reduction of approximately 40%.

210.    Narrowing the focus to awards (and competing renewals) that require study section and advisory council review prior to award, in those same weeks, NIH awarded $740 million to 1,756 projects in 2024 but only $360 million to 781 projects in 2025.  Focusing further still just on Weeks 6-11, the comparison is even more striking: 1,342 projects for $576 million in 2024, compared with 395 projects for $180 million in 2025, a reduction of nearly 70%.

211.    The impact on appropriated funds continues to worsen.  Looking at multi-year grant awards with April 1 budget start dates, the estimated difference for Weeks 12-13 (*i.e.*, the period from March 14, 2025, to April 1, 2025) is $1.04 billion.  Of this, $780 million is due to non-competitive renewal awards that were anticipatable during this period—since many grants were due for renewal by April 1, 2025.  In addition, based on the new and competitive renewal awards made during this same period in 2023 and 2024, there is a $260 million reduction in anticipatable new and competitive renewal awards in 2025.

## CAUSES OF ACTION

### Count 1—Against All Defendants
### Administrative Procedure Act, 5 U.S.C. §706(2):
### Agency Action Contrary to Statute

212.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

App.240

213.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. §706(2)(C), or "otherwise not in accordance with law," *id.* §706(2)(A).

214.    In reviewing agency action, a court cannot accept "the agency's policy judgments . . . if they conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *see Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress").

215.    The Challenged Directives adopt, as a matter of final agency policy, the determination that projects with a perceived connection to "DEI" and other blacklisted topics "no longer effectuate[] agency priorities."  The Challenged Directives order defendants not to fund projects with a perceived connection to those blacklisted topics, resulting in the elimination of funding opportunities, disruption of pending applications, and termination of ongoing grants described above.

216.    The Challenged Directives are contrary to law and beyond statutory authority because they defy Congress's statutory directives to NIH to support research through publicly promulgated priorities, including those directed to "DEI."

217.    Specifically, the Challenged Directives defy statutory directives requiring NIH and its respective ICs to encourage and support research and authorizing them to make grants to institutions and researchers for that purpose, *see* 42 U.S.C. §284(b)(1) (A), (b)(2)(A), as well as statutory directives requiring the NIH Director to, for example, "encourage efforts to improve

App.241

research related to the health of sexual and gender minority populations," in conducting and supporting research. *Id.* §283p.

218.    The Challenged Directives also defy statutory directives that require NIH to articulate its priorities via the NIH Strategic Plan, which NIH must develop, submit to the appropriate Committees of Congress, and post publicly. *See* 42 U.S.C. §282(m)(1).

219.    The Challenged Directives are also contrary to law because they defy Congress's consistent appropriation of funding to NIH's Institutes and Centers to carry out their respective statutory purposes and public priorities.    NIH is flouting its statutory responsibilities by terminating so many grants with a dwindling opportunity to reallocate them, which will result in a substantial portion of Congress's appropriation going unspent.    The Challenged Directives are therefore contrary to the statutes authorizing and appropriating funds for NIH research and beyond defendants' statutory authority.

220.    Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the Challenged Directives and enjoining any action taken to enforce or implement the Challenged Directives.

### Count 2—Against All Defendants
**Administrative Procedure Act, 5 U.S.C. §706(2):**
**Agency Action Contrary to Regulation**

221.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

222.    The APA authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law."    5 U.S.C. §706(2).

App.242

223.    As discussed above, the Challenged Directives instruct defendants to take adverse action on research projects with a perceived connection to blacklisted subjects under 2 CFR §200.340(a)(2) (2020).  However, that regulation does not apply here and does not authorize the termination of any ongoing grants because (1) HHS-specific regulations, not §200.340, govern the termination of NIH awards, and (2) neither 2 C.F.R. §200.340(a)(2) nor 2 C.F.R. §200.340(a)(4) independently authorizes an awarding agency to terminate awarded grants on the grounds that NIH identified "agency priorities" after the award of the grant which the grant does not effectuate.

224.    Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the Challenged Directives, and enjoining any action taken to enforce or implement the Challenged Directives.

<u>Count 3—Against All Defendants</u>
**Administrative Procedure Act, 5 U.S.C. §706(2):**
**Arbitrary and Capricious Agency Action**

225.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

226.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

227.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  An agency action is also arbitrary and capricious if, when departing from a prior policy, an agency does not "display awareness that it *is* changing position" or does not

App.243

"show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

228.    As described above, the Challenged Directives instruct defendants to take adverse action on research projects with a perceived connection to blacklisted subjects.

229.    The Challenged Directives are arbitrary and capricious because they do not acknowledge—let alone provide "good reasons for"—any official change in agency "priorities." *Fox Television Stations*, 556 U.S. at 515.  Indeed, upon information and belief, defendants have deliberately chosen not to expressly acknowledge any changes in agency priorities regarding research into the blacklisted topics.

230.    The Challenged Directives are arbitrary and capricious for the additional reason that, in adopting and implementing them, defendants have not engaged in reasoned consideration of any individual project before terminating a grant.

231.    The Challenged Directives are arbitrary and capricious for the additional reason that, in adopting and implementing them, defendants failed to consider several important aspects of the issues before them, including, at a minimum, (1) plaintiffs' reliance interests in any announced research opportunities and awarded research grants; (2) whether those projects could be adjusted, rather than terminated, to comply with defendants' new "priorities" (assuming those new "priorities" and their application to existing funding opportunities and awards were otherwise lawful); (3) whether defendants could have adopted a measure other than across-the-board delay of the grant awards process and elimination of entire categories of programs to effectuate their new "priorities" (assuming those new "priorities" and their application to existing funding opportunities and awards were otherwise lawful); and (4) as to ongoing research projects, the harm that eliminating those projects would inflict on human test subjects participating in the studies.

232.    The Challenged Directives are arbitrary and capricious for the additional reason that they rely on factors which Congress has not intended defendants to consider, including considerations in conflict with the PHSA's directives in favor of diversity, equity, and inclusion.

233.    Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the Challenged Directives and enjoining any action taken to enforce or implement the Challenged Directives.

### Count 4—Against All Defendants
### U.S. Constitution, Separation of Powers

234.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

235.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

236.    The Constitution "grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, §9, cl. 7 (Appropriations Clause); U.S. Const. art. I, §8, cl. 1 (Spending Clause). "Among Congress's most important authorities is its control of the purse." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023). "The Appropriations Clause is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.). If not for the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation." *Id.*

237.    Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." *See Clinton v.*

78

App.245

*City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

238.    The Constitution further provides that the executive must "take Care that the Laws be faithfully executed." U.S. Const. Art. II, Sec. 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them." (brackets and quotation marks omitted)).

239.    The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"); *see also Util. Air. Reg. Grp.*, 573 U.S. at 327 (noting that the President "act[s] at time through agencies").

240.    The Executive's authority vis-à-vis Congress is particularly limited where, as here, no statutes authorize the Executive's action. Congress consistently has appropriated funds to NIH's ICs to further their statutory purposes of advancing and promoting medical research and has not authorized the Executive to decline to spend vast swaths of funds. Further, Congress has provided for a procedure by which the Executive may propose to Congress to either rescind or cancel funds. *See* Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§682 *et seq.* That statute likewise does not permit the Executive to take unilateral action, instead requiring the President must "propose[]" any rescission to Congress (which Congress must then affirmatively approve) and may not defer funding for the policy reasons defendants explicitly

App.246

invoke here.  2 U.S.C. §§683, 684(a).  Accordingly, the Executive's authority is at its "lowest ebb."  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring).

241.    Defendants' adoption, implementation, and enforcement of the Challenged Directives—including their pattern and policy of systematic delays and terminations—violates the foregoing separation-of-powers constraints.  Through these actions, defendants have overridden the careful judgments of Congress by refusing to disburse duly appropriated funding.

242.    Accordingly, plaintiffs are entitled to a preliminary and permanent injunction holding unlawful and setting aside, and to a declaration pursuant to 28 U.S.C. §2201 declaring unlawful, the Challenged Directives and any action taken to enforce or implement the Challenged Directives.

**Count 5—Against All Defendants**
**U.S. Constitution, Spending Clause**

243.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

244.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong*, 575 U.S. at 326-27.

245.    The Spending Clause of the U.S. Constitution, art. I, §8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

246.    The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).  The funding conditions must be

App.247

set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). And the federal statute must be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal statute] funds and the obligations that go with those funds." *Id.*

247. Defendants' adoption, implementation, and enforcement of the Challenged Directives—including their pattern and policy of systematic delays and retroactive terminations— has altered the terms upon which grants were obligated and disbursed to plaintiffs, contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the myriad grants affected.

248. Defendants' adoption, implementation, and enforcement of the Challenged Directives—including their pattern and policy of systematic delays and retroactive terminations— are also contrary to the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987). Here, the delays and terminations are not related to the federal interest in NIH research—to support and encourage scientific research—and instead are related to policies and political factors. Indeed, the effect of these delays and terminations is to chill scientific research as they have subjected researchers and the administrators who support them to the fear that their ongoing research activities can and will be suspended based on shifting political objectives of the current Administration.

249. Accordingly, plaintiffs are entitled to a preliminary and permanent injunction holding unlawful and setting aside, and to a declaration pursuant to 28 U.S.C. §2201 declaring unlawful, the Challenged Directives and any action taken to enforce or implement the Challenged Directives.

App.248

## Count 6—Against All Defendants
### *Ultra Vires* Executive Action

250.    Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if set forth herein.

251.    The actions challenged herein are contrary to law and outside of defendants' authority because defendants lacked statutory or constitutional authority to issue or implement the Challenged Directives and because defendants' actions are contrary to statutory requirements.

252.    The Challenged Directives purport to restrict research on subjects that Congress has expressly required NIH to support. The PHSA requires NIH and its ICs to conduct research related to the health of women, racial and ethnic minorities, and sexual and gender minorities. 42 U.S.C. §§282(h), 283p, 285a-6, 285b-7a(c)(1). In declaring research related to DEI, gender identity, and transgender health off-limits, defendants' actions are contrary to congressional mandates.

253.    The Challenged Directives defy statutory provisions requiring NIH to articulate its research priorities through a formal and public strategic plan. The PHSA contains detailed requirements governing this plan. The agency must develop and formalize the plan every six years. 42 U.S.C. §282(m)(1). It must consult with relevant stakeholders in doing so. *Id.* §282(m)(4). The plan must contain a host of information, including "strategic research priorities and objectives," "priorities and objectives to advance the treatment, cure, and prevention of health conditions," and "near-, mid-, and long-term scientific needs." *Id.* §282(m)(2)(A). And the agency must submit the plan to Congress and post it on its website. *Id.* §282(m)(1). Defendants' promulgation and implementation of the Challenged Directives—which have effected large-scale changes in agencies priorities without the development and consultation called by for the creation of a new Strategic Plan—are contrary to this congressionally mandated process.

App.249

254.    The adoption and enforcement of the Challenged Directives exceed defendants' statutory authority because they conflict with duly enacted congressional appropriations.  Congress appropriated funds to NIH's ICs so that those funds would be spent in accordance with the statutory purposes and public priorities just discussed.  Congress allocated certain sums of money to NIH so that the agency could use those sums during the fiscal year.  In implementing the Challenged Directives, defendants have interrupted the flow of funding to existing projects and precluded the prompt awarding of new grants—with a dwindling opportunity to reallocate funds before they are no longer available at the end of the fiscal year.  These actions are contrary to the purpose for which the funds were appropriated and Congress's longstanding and well-established framework of NIH funding.  *See* 31 U.S.C. §1301(a) (funds "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law"); *Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 732 (S.D. Tex. 2024) ("While agencies are afforded discretion for certain lump-sum appropriations decisions, their actions still must remain within the bounds of the statute." (citation omitted)); *California v. Trump*, 379 F. Supp. 3d 928, 953 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020) (judicial review is available under the APA where plaintiffs allege that funds are being used "in a statutorily *impermissible* manner"); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . .")).

255.    Defendants cannot take any action that exceeds the scope of their constitutional and statutory authority.

256.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27. Indeed, the

App.250

Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

257.    Accordingly, plaintiffs are entitled to preliminary and permanent injunctive relief barring the actions challenged herein. Pursuant to 28 U.S.C. §2201, plaintiffs are also entitled to a declaration that the actions challenged herein are contrary to law and outside of defendants' authority.

<u>**Count 7—Against All Defendants**</u>
**Administrative Procedure Act, 5 U.S.C. §706(1):**
**Unlawful Withholding and/or Unreasonable Delay of Agency Action**

258.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

259.    The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis omitted); *see id.* at 63 n. 1.

260.    The APA provides that, "within a reasonable time, each agency *shall* proceed to conclude a matter presented to it." 5 U.S.C. §555(b) (emphasis added).

261.    The PHSA provides that applications for NIH research grants shall undergo "technical and scientific peer review" by a study section, and that a favorable review is a prerequisite to a final award of any grant. 42 U.S.C. §§284(b)(2)(B), 289a(a). The PHSA further states that each NIH institute's advisory council "*shall* meet . . . at least three times each fiscal year," *id.* §284(e) (emphasis added), and that it "*shall* advise, assist, consult with, and make recommendations to the Secretary and the Director of such institute" on areas within the council's

App.251

jurisdiction, *id.* §284(a)(1) (emphasis added).  The PHSA also provides that sign-off from an advisory council is a prerequisite to a final award of any grant in excess of $50,000.  *Id.* §284(b)(2); *see id.* §284a(a)(3)(A)(ii).

262.    Under NIH regulations, "[a]ll applications" for NIH grants "*shall* be evaluated by the [HHS] Secretary [or his designee] through such officers and employees and such experts or consultants engaged for this purpose as the Secretary determines are specially qualified in the areas of research involved in the project, including review by an appropriate National Advisory Council."  42 C.F.R. §52.5(a) (emphasis added); *see also id.* §52a.5 ("NIH grants may be awarded generally only after approval recommendations from both appropriate scientific peer review groups and national advisory councils or boards.").  The regulations further provide for the creation of study groups and reiterate that "no awarding official shall award a grant . . . unless the application has been reviewed by a peer review group . . . and the group has made recommendations concerning the scientific merit of that application."  *Id.* §52h.7; *see generally id.*, pt. 52h.  Moreover, the regulations provide that, "subject to approvals, recommendations or consultations by the appropriate National Advisory Council or other body as may be required by law, the Secretary *will* (1) approve, (2) defer because of either lack of funds or a need for further evaluation, or (3) disapprove support of the proposed project in whole or in part."  *Id.* §52.5(b) (emphasis added).

263.    For the foregoing reasons, the following are discrete agency actions that NIH is required to take: (a) the activities of NIH's advisory councils, including the holding of council meetings, the review of pending grant applications by the relevant council, and the making of a final recommendation on each application by the relevant council, (b) the activities of NIH's study sections, including the holding of section meetings, the review of pending grant applications by

the relevant study section, and the making of a final recommendation on each application by the relevant study section—are likewise discrete agency actions that NIH is required to take, and (c) the prompt review and issuance of a final decision on NIH grant applications and renewal requests.

264.    As discussed, in implementing the Challenged Directives, defendants have cancelled and/or substantially delayed the above-described required activities of NIH's advisory councils and study sections—a significant and unprecedented departure from the NIH's published review process and the agency's past practice.

265.    As discussed, in implementing the Challenged Directives, defendants have refused to process the Delayed Applications, including those of the Delayed Applications that have already received a "fundable" score from the relevant study section and/or a favorable recommendation from the relevant advisory council.

266.    As discussed, in implementing the Challenged Directives, defendants have failed to process the Delayed Renewals even though they meet the requirement for renewal.

267.    The above-described meeting cancellations and delays in application review constitute unlawful withholding and/or unreasonable delay of agency action within the meaning of §706(1). *See, e.g.*, *Rezaii v. Kennedy*, No. 1:24-cv-10838, 2025 WL 750215, at *5 (D. Mass. Feb. 24, 2025) (holding that a plaintiff had pleaded unreasonable delay where, among other things, the agency's delay in processing plaintiff's application was "at the outer edge of HHS's typical time for processing"); *Raouf v. U.S. Dep't of State*, 702 F. Supp. 3d 19, 33 (D.N.H. 2023) (finding that a plaintiff had pleaded unreasonable delay where she alleged that the "delay [was] attributable to . . . an *ultra vires* internal policy for intentionally delaying issuance of visas").

App.253

268.     As discussed above, the above-described meeting cancellations and delays in application review have caused, are causing, and imminently threaten to cause direct, concrete, and irreparable harm to plaintiffs.

269.     For the foregoing reasons, plaintiffs are entitled to an order, and to a preliminary and permanent injunction, compelling defendants to undertake: (a) the required unreasonably delayed and unlawfully withheld activities of NIH's advisory councils and study sections, and (b) the required unreasonably delayed and unlawfully withheld prompt review and issuance of a final decision on the Delayed Applications and Delayed Renewals.

### Count 8—All Defendants
### Declaratory Judgment

270.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

271.     An actual and substantial controversy exists between plaintiffs and defendants about whether 2 C.F.R. §200.340(a)(2) (2020) and 2 C.F.R. §200.340(a)(4) (2024) permit NIH to terminate awarded grants on the grounds that NIH identified "agency priorities" after the award of the grant which the grant does not effectuate.

272.     This action is presently justiciable because defendants have asserted: (a) that §200.340 permits NIH, as a matter of law, to terminate awarded grants on the grounds that NIH's "agency priorities" have changed since the award of the grant; and (b) that this interpretation of §200.340 permits NIH to terminate plaintiffs' awarded grants on the grounds that they relate to research areas that are no longer "agency priorities."

273.     Plaintiffs assert that while 2 C.F.R. §200.340(a)(2) (2020) and 2 C.F.R. §200.340(a)(4) (2024) permit the termination of a federal award if the award no longer effectuates agency priorities identified as of the time of the federal award, these provisions do not

87

independently permit or authorize such termination based on agency priorities identified after the time of the Federal award.

274.    Declaratory relief will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. §2201, is appropriate to resolve this controversy.

## PRAYER FOR RELIEF

Wherefore, plaintiffs pray that the Court:

I.    Enter an order pursuant to 5 U.S.C. §706(2) holding unlawful and setting aside the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, on the ground that they are (a) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and/or otherwise not in accordance with governing statutes; (b) not in accordance with governing regulations; and (c) arbitrary and capricious;

II.    Declare pursuant to 28 U.S.C. §2201 that the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, are unconstitutional because they violate (a) the separation of powers and (b) the Spending Clause;

III.    Enter a preliminary and permanent injunction barring defendants from carrying out the Challenged Directives and any actions to enforce or implement the Challenged Directives, including, without limitation, by directing defendants to: (a) reissue Notices of Funding Opportunities (NOFOs) withdrawn based on the Challenged Directives and to refrain from withdrawing NOFOs based on the Challenged Directives; (b) refrain from denying grant applications or renewal applications based on the Challenged Directives; (c) release reimbursements and other funding for awards that defendants have refused to pay based on the Challenged Directives; (d) rescind the termination of the Terminated Grants and refrain from eliminating funding for awards based on the Challenged Directives; and (e) promptly reschedule

App.255

and conduct all necessary steps in the review and disposition of plaintiffs' grant applications, including the Delayed Applications and Delayed Renewals;

IV.    Enter an order pursuant to 5 U.S.C. §706(1) compelling defendants to undertake: (a) the required unreasonably delayed and unlawfully withheld activities of NIH's advisory councils and study sections, and (b) the required unreasonably delayed and unlawfully withheld prompt review and issuance of a final decision on the Delayed Applications and Delayed Renewals;

V.    Declare pursuant to 28 U.S.C. §2201 that 2 C.F.R. §200.340(a)(2) (2020) and 2 C.F.R. §200.340(a)(4) (2024) do not independently permit or authorize termination of awarded grants based on agency priorities identified after the time of the Federal award; and

VI.    Award such additional relief as the interests of justice may require.

App.256

April 14, 2025

Respectfully submitted.

**ANDREA JOY CAMPBELL**
 *Attorney General of Massachusetts*

 /s/ Gerard J. Cedrone
Katherine B. Dirks (BBO No. 673674)
 *Chief State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
 *Deputy State Solicitor*
Allyson Slater (BBO No. 704545)
 *Deputy Director, Reproductive Justice Unit*
Rachel M. Brown (BBO No. 667369)
Vanessa A. Arslanian (BBO No. 688099)
Chris Pappavaselio (BBO No. 713519)
 *Assistant Attorneys General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the*
 *Commonwealth of Massachusetts*

**ANTHONY G. BROWN**
 *Attorney General of Maryland*

 /s/ James C. Luh
Michael Drezner*
James C. Luh*
 *Senior Assistant Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**ROB BONTA**
 *Attorney General of California*

 /s/ Emilio Varanini
Neli Palma
 *Senior Assistant Attorney General*
Emilio Varanini*
Kathleen Boergers*
 *Supervising Deputy Attorneys General*
Nimrod Pitsker Elias*
Daniel D. Ambar*
Ketakee R. Kane*
Sophia TonNu*
Hilary Chan*
 *Deputy Attorneys General*
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
emilio.varanini@doj.ca.gov

*Counsel for the State of California*

**NICHOLAS W. BROWN**
 *Attorney General of Washington*

 /s/ Andrew Hughes
Andrew Hughes*
Tyler Roberts*
 *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
andrew.hughes@atg.wa.gov

*Counsel for the State of Washington*

App.257

**KRISTIN K. MAYES**
  *Attorney General of Arizona*

 /s/ *Joshua G. Nomkin*
Joshua G. Nomkin*
  *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for the State of Arizona*


**KATHLEEN JENNINGS**
  *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
Ian R. Liston**
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**KEITH ELLISON**
  *Attorney General of Minnesota*

 /s/ *Pete Farrell*
Peter J. Farrell*
  *Deputy Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
peter.farrell@ag.state.mn.us

*Counsel for the State of Minnesota*

**PHILIP J. WEISER**
  *Attorney General of Colorado*

 /s/ *Lauren Peach*
Shannon Stevenson*
  *Solicitor General*
Lauren Peach*
  *First Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Lauren.Peach@coag.gov

*Counsel for the State of Colorado*


**ANNE E. LOPEZ**
  *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON D. FORD**
  *Attorney General of Nevada*

 /s/ *Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for the State of Nevada*

App.258

**MATTHEW J. PLATKIN**
 *Attorney General of New Jersey*

 /s/ *Nancy Trasande*
Nancy Trasande*
Bryce Hurst*
 *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 954-2368
Nancy.Trasande@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
 *Attorney General of New York*

 /s/ *Rabia Muqaddam*
Rabia Muqaddam*
 *Special Counsel for Federal Initiatives*
Molly Thomas-Jensen*
 *Special Counsel*
28 Liberty Street
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
 *Attorney General of Rhode Island*

 /s/ *Jordan Broadbent*
Jordan Broadbent*
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Counsel for the State of Rhode Island*

**RAÚL TORREZ**
 *Attorney General of New Mexico*

 /s/ *Astrid Carrete*
Astrid Carrete*
 *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
 *Attorney General of Oregon*

 /s/ *Christina L. Beatty-Walters*
Christina L. Beatty-Walters*
 *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
 *Attorney General of Wisconsin*

 /s/ *Lynn K. Lodahl*
Lynn K. Lodahl*
 *Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

* admitted *pro hac vice*
** application for *pro hac vice* admission forthcoming

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

COMMONWEALTH OF MASSACHUSETTS;       )
STATE OF CALIFORNIA; STATE OF        )
MARYLAND; STATE OF WASHINGTON;       )
STATE OF ARIZONA; STATE OF           )
COLORADO; STATE OF DELAWARE;         )
STATE OF HAWAI'I; STATE OF           )
MINNESOTA; STATE OF NEVADA;          )
STATE OF NEW JERSEY; STATE OF        )
NEW MEXICO; STATE OF NEW YORK;       )
STATE OF OREGON; STATE OF RHODE      )
ISLAND; and STATE OF WISCONSIN,      )
                                     )
                                     )
                                     )
                    Plaintiffs,      )    CIVIL ACTION NO.
          v.                         )    25-10814-WGY
                                     )
ROBERT F. KENNEDY, JR., in his       )
official capacity as Secretary of    )
Health and Human Services;           )
UNITED STATES DEPARTMENT OF          )
HEALTH AND HUMAN SERVICES;           )
JAYANTA BHATTACHARYA, in his         )
official capacity as Director of     )
the National Institutes of Health;  )
NATIONAL INSTITUTES OF HEALTH;       )
NATIONAL CANCER INSTITUTE;           )
NATIONAL EYE INSTITUTE;              )
NATIONAL HEART, LUNG, AND BLOOD      )
INSTITUTE; NATIONAL HUMAN GENOME     )
RESEARCH INSTITUTE; NATIONAL         )
INSTITUTE ON AGING; NATIONAL         )
INSTITUTE ON ALCOHOL ABUSE AND       )
ALCOHOLISM; NATIONAL INSTITUTE       )
OF ALLERGY AND INFECTIOUS            )
DISEASES; NATIONAL INSTITUTE OF      )
ARTHRITIS AND MUSCULOSKELETAL AND    )
SKIN DISEASES; NATIONAL              )
INSTITUTE OF BIOMEDICAL IMAGING      )
AND BIOENGINEERING; EUNICE KENNEDY   )
SHRIVER NATIONAL INSTITUTE OF        )
CHILD HEALTH AND HUMAN               )

App.260

```
DEVELOPMENT; NATIONAL INSTITUTE     )
ON DEAFNESS AND OTHER               )
COMMUNICATION DISORDERS;            )
NATIONAL INSTITUTE OF DENTAL        )
AND CRANIOFACIAL RESEARCH;          )
NATIONAL INSTITUTE OF DIABETES      )
AND DIGESTIVE AND KIDNEY            )
DISEASES; NATIONAL INSTITUTE        )
ON DRUG ABUSE; NATIONAL             )
INSTITUTE OF ENVIRONMENTAL          )
HEALTH SCIENCES; NATIONAL           )
INSTITUTE OF GENERAL MEDICAL        )
SCIENCES; NATIONAL INSTITUTE OF     )
MENTAL HEALTH; NATIONAL INSTITUTE   )
ON MINORITY HEALTH AND HEALTH       )
DISPARITIES; NATIONAL INSTITUTE     )
OF NEUROLOGICAL DISORDERS AND       )
STROKE; NATIONAL INSTITUTE OF       )
NURSING RESEARCH; NATIONAL LIBRARY  )
OF MEDICINE; NATIONAL CENTER FOR    )
ADVANCING TRANSLATIONAL SCIENCES;   )
JOHN E. FOGARTY INTERNATIONAL       )
CENTER FOR ADVANCED STUDY           )
IN THE HEALTH SCIENCES; NATIONAL    )
CENTER FOR COMPLEMENTARY AND        )
INTEGRATIVE HEALTH; and CENTER      )
FOR SCIENTIFIC REVIEW,              )
                                    )
                Defendants.         )
_____)
```

YOUNG, D.J.                                    May 12, 2025


### MEMORANDUM AND ORDER
### ON SUBJECT MATTER JURISDICTION

For the reasons stated below, after a full hearing and carefully considering the parties' submissions and arguments, the Court rules that it has subject matter jurisdiction over this action and, as is its duty, exercises that jurisdiction.

[2]

A case management conference is set for **Tuesday, May 13, 2025 at 2:00 p.m.**

I.   **BACKGROUND**

   A.   **Factual Allegations and Relief Sought in the Amended Complaint**

In this civil action, the Commonwealth of Massachusetts along with 15 other States[1] (referred to collectively as "the States", sue the Secretary of Health & Human Services, the Director of the National Institutes of Health ("NIH"), and several of those federal institutes and centers[2] (referred to

---

[1] In addition to the Commonwealth of Massachusetts, the State of California, the State of Maryland, the State of Washington, the State of Arizona, the State of Colorado, the State of Delaware, the State of Hawai'i, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico; the State of New York, the State of Oregon, the State of Rhode Island; and the State of Wisconsin join as plaintiffs.

[2] Those institutes and centers are: the National Cancer Institute, the National Eye Institute, the National Heart, Lung, and Blood Institute, the National Human Genome Research Institute, the National Institute on Aging,  the National Institute on Alcohol Abuse and Alcoholism, the National Institute of Allergy and Infectious Diseases, the National Institute of Arthritis and Musculoskeletal and Skin Diseases, the National Institute of Biomedical Imaging and Bioengineering, the Eunice Kennedy Shriver National Institute of Child Health and Human Development, the National Institute on Deafness and Other Communication Disorders, the National Institute of Dental and Craniofacial Research, the National Institute of Diabetes and Digestive and Kidney Diseases, the National Institute on Drug Abuse; the National Institute of Environmental Health Sciences, the National Institute of General Medical Sciences, the National Institute of Mental Health, the National Institute on Minority Health and Health Disparities, the National Institute of Neurological Disorders and Stroke, the National Institute of Nursing Research, the National Library of Medicine, the National Center for Advancing Translational Sciences, the

[3]

collectively as "the Public Officials") because all act through those persons in their official capacities.  Broadly, the States claim that "[s]ince his inauguration, . . . the President has issued a barrage of executive orders prohibiting federal agencies from supporting any initiatives with a perceived nexus to certain subjects he opposes, such as 'DEI' and 'gender ideology'."  Am. Compl. ¶ 4, ECF No. 75.  The States allege that the Public Officials "have adopted a series of directives [("the Challenged Directives")] that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to these and other blacklisted topics." Id.

The States claim that the Public Officials Challenged Directives and actions, including grant terminations ("Terminated Grants"), violate various sections of the Administrative Procedure Act (Counts 1 – 3, 7), violate the separation of powers of the three co-equal branches of government under the Constitution (Count 4), violate the Constitution's Spending Clause (Count 5), and constitute ultra vires Executive Branch action in excess of Constitutional and statutory authority (Count 6).

---

John E. Fogarty International Center for Advanced Study in the Health Sciences, the National Center for Complementary and Integrative Health, and the Center for Scientific Review.

[4]

App.263

The States seek the following relief:[3]

1. an order under the APA "holding unlawful and setting aside the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, on the ground that they are (a) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and/or otherwise not in accordance with governing statutes; (b) not in accordance with governing regulations; and (c) arbitrary and capricious;"

2. a declaration "that the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, are unconstitutional because they violate (a) the separation of powers and (b) the Spending Clause;"

3. issuance of "a preliminary and permanent injunction barring defendants from carrying out the Challenged Directives and any actions to enforce or implement the Challenged Directives, including, without limitation, by directing defendants to: (a) reissue Notices of Funding Opportunities (NOFOs) withdrawn based on the Challenged Directives and to refrain from withdrawing NOFOs based on the Challenged Directives; (b) refrain from denying grant applications or renewal applications based on the Challenged Directives; (c) release reimbursements and other funding for awards that defendants have refused to pay based on the Challenged Directives; (d) rescind the termination of the Terminated Grants and refrain from eliminating funding for awards based on the Challenged Directives; and (e) promptly reschedule and conduct all necessary steps in the review and disposition of plaintiffs' grant applications, including the Delayed Applications and Delayed Renewals;"

4. "an order pursuant to under the APA compelling defendants to undertake: (a) the required unreasonably delayed and unlawfully withheld activities of NIH's advisory councils and study sections, and (b) the required unreasonably delayed and unlawfully withheld prompt review and issuance of a final decision on the Delayed Applications and Delayed Renewals;" and

5. a declaration "that 2 C.F.R. §200.340(a)(2) (2020) and

---

[3] As a sixth request for relief the States seek catch-all, unspecified "additional relief as interests of justice may require"

[5]

C.F.R. §200.340(a)(4) (2024) do not independently permit or authorize termination of awarded grants based on agency priorities identified after the time of the Federal award."

Am. Compl. 88-89.

### B.   Procedural History

On April 14, 2025, the States filed their Amended Complaint, Am. Compl., and Motion for Preliminary Injunction, supported by a memorandum of law. Pls.' Mot. Prelim. Inj., ECF No. 76; Mem. Law. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem."), ECF No. 78. The motion is fully briefed. Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Opp'n"), ECF No. 95; Pls.' Reply Supp. Pls.' Mot. Prelim. Inj. ("Reply"), ECF No. 101.[4]

This action was randomly reassigned to this Session of the Court on May 1, 2025. Elec. Notice Reassignment, ECF No. 99. The Court rescheduled the hearing on the preliminary injunction from May 9, 2025 to May 8, 2025. Elec. Notice Hrg., ECF No. 100.

At the hearing, the Public Officials claimed that most of the case must properly be brought before the Court of Federal

---

[4] The Court also received a submission, ECF No. 86, from amici: the Association of American Medical Colleges, the American Association of State Colleges And Universities, the American Council on Education, the Association of American Universities, The Association Of Governing Boards of Universities And Colleges, the Association of Public and Land-Grant Universities, COGR, and the National Association of Independent Colleges and Universities. The Court is grateful for this helpful submission.

[6]

Claims and the remainder was no longer amenable to adjudication. The Court heard argument on the matter and took it under advisement.  This opinion sets forth this Court's reasoning.

## II.  ANALYSIS

### A. Standard of Review

"Federal courts . . . are courts of limited jurisdiction." Royal Canin U. S. A., Inc. v. Wullschleger, 604 U.S. 22, 26 (2025) (quoting Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994)).  This Court's jurisdiction is "[l]imited first by the Constitution," and also "by statute." Id.  Through statute, "Congress determines, through its grants of jurisdiction, which suits those courts can resolve."  Id. This Court must therefore satisfy itself as to its subject matter jurisdiction over an action.  Calamar Constr. Services, Inc. v. Mashpee Wampanoag Village LP, 749 F. Supp. 3d 241, 242–43 (D. Mass. 2024) (citing McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction.")); see Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Of course, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (quoting Taber Partners, I v.

[7]

Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)). Once
jurisdiction is established, however, this Court has a
"'virtually unflagging obligation' to exercise federal
jurisdiction." AUI Partners LLC v. State Energy Partners LLC,
742 F. Supp. 3d 28, 41 (D. Mass. 2024) (quoting Colorado River
Water Conservation Dist. v. U.S., 424 U.S. 800, 817 (1976)).

### B. This Court Has Subject Matter Jurisdiction

#### 1. The Tucker Act

Speaking of the Supreme Court, Justice Robert Jackson
famously said, "We are not final because we are infallible, but
we are infallible only because we are final." Brown v. Allen,
344 U.S. 443, 540 (1953) (Jackson, J., concurring). As always,
the determinations of the Supreme Court matter, only here the
most relevant Supreme Court determination is **not** final (at least
not yet) -- and therein lies the problem. Because the Supreme
Court, on a 5-4 vote, has seen fit to enter an emergency
interlocutory order in a somewhat similar case, its language
provides guidance in other cases but without full precedential
force.

So it is that this Court, after careful reflection, finds
itself in the somewhat awkward position of agreeing with the
Supreme Court dissenters and considering itself bound by the
still authoritative decision of the Court of Appeals of the

[8]

App.268

First Circuit (which decision the Supreme Court modified but did not vacate).  Here is this Court's analysis:

"The Court of Claims was established, and the Tucker Act enacted, to open a judicial avenue for certain monetary claims against the United States." United States v. Bormes, 568 U.S. 6, 11 (2012).  Prior to its enactment, "it was not uncommon for statutes to impose monetary obligations on the United States without specifying a means of judicial enforcement."  Id.  Thus, "Congress enacted the Tucker Act to 'suppl[y] the missing ingredient for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable.'"  Maine Community Health Options v. United States, 590 U.S. 296, 323 (2020) (citing Bormes, 568 U.S. at 12).

Under the Tucker Act, "the United States Court of Federal Claims . . . [has] . . . jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1); Department of Education v. California, 145 S. Ct. 966, 968 (2025) (per curiam) (California II).  "In suits seeking more than $10,000 in damages, the Court of Federal Claims' jurisdiction is exclusive of the federal district courts."

[9]

Massachusetts v. Natl. Institutes of Health, --- F. Supp. 3d ---
-, No. 25-CV-10338, 2025 WL 702163, at *4 (D. Mass. Mar. 5,
2025) (Kelley, J.) (citing Burgos v. Milton, 709 F.2d 1, 3 (1st
Cir. 1983)).

"The Supreme Court has made clear that 'not every claim
invoking the Constitution, a federal statute, or a regulation is
cognizable under the Tucker Act.'"  Massachusetts 2025 WL
702163, at *5 (quoting United States v. Mitchell, 463 U.S. 206,
216) (cleaned up).  "The fact that a judicial remedy may require
one party to pay money to another is not a sufficient reason to
characterize the relief as 'money damages.' " Bowen v.
Massachusetts, 487 U.S. 879, 893, (1988).  Also, "the mere fact
that a court may have to rule on a contract issue does not, by
triggering some mystical metamorphosis, automatically transform
an action ... into one on the contract and deprive the court of
jurisdiction it might otherwise have." California v. United
States Dept. of Educ., 132 F.4th 92, 96 (1st Cir. 2025)
("California I") (quoting Megapulse, Inc. v. Lewis, 672 F.2d
959, 968 (D.C. Cir. 1982)).  "The Claims Court does not have the
general equitable powers of a district court to grant
prospective relief." Bowen, 487 U.S. at 905.

Whether a claim is contractual in nature under the Tucker
Act is based upon a determination of the essence of the action.
"While the First Circuit has not formally adopted the 'rights

[10]

and remedies' test that is used by several other circuits, []
courts in this Circuit have adopted the test to determine if the
'essence' of an action is truly contractual in nature,"
Massachusetts, 2025 WL 702163, at *6 (D. Mass. Mar. 5, 2025)
(collecting cases); however, it appears the First Circuit is
open to such analysis, see California II, 132 F.4th at 96-97.
"The 'essence' of an action encompasses two distinct aspects —-
the source of the rights upon which the plaintiff bases its
claim and the type of relief sought (or appropriate)."
Massachusetts, 2025 WL 702163, at *5. (citations and quotations
omitted).  This Court adopts this test to determine whether the
Tucker Act applies here and concludes that it does not.

The States argue that the essence of the claims here do not
sound in contract because the claims attack the broad policies
and actions of the Public Officials. Pls.' Mem. 18; Reply 2-4.
The Public Officials counter that the Public Officials merely
"disguise their claims as APA claims.  Opp'n. 9.

The Public Officials rely on the recent Supreme Court
determination in California II, which granted an emergency stay
of a district court injunction.  In that case, Judge Joun, of
this District, issued a temporary restraining order, enjoining
the Department of Education from terminating certain grants, and
further ordered "the Government to pay out past-due grant
obligations and to continue paying obligations as they

[11]

App.271

accrue[d]." Id.; see California v. U.S. Dept. of Educ., No. CV
25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025) (Joun,
J.).

The government appealed to the First Circuit to stay the
injunction pending appeal. California I. The First Circuit
ruled the Tucker Act did not apply, that the actions were
reviewable under the APA, and that on the merits the Department
of Education had not met its burden to overturn the grant of the
injunction, and therefore a stay pending appeal was not
warranted. Id. at 96.

The Supreme Court accepted the government's application for
an immediate administrative stay of the injunction, which was
allowed per curiam. California II, 145 S.Ct. at 969.
Construing the ruling as an "appealable preliminary injunction,"
the Court reasoned that the government was "likely to succeed in
showing the District Court lacked jurisdiction to order the
payment of money under the" Administrative Procedure Act,
because "the APA's limited waiver of immunity does not extend to
orders 'to enforce a contractual obligation to pay money' along
the lines of what the District Court ordered" there. Id. at 968
(quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S.
204, 212 (2002). Further, according to the Supreme Court, the
Tucker Act likely applied. Id. The Court granted the stay

[12]

pending resolution of the appeal by the First Circuit.    Id. at

969.

Justice Kagan dissented, asserting that it was a "mistake"

to grant the emergency relief, noting among other things that:

> The remaining issue is whether this suit, brought
> under the Administrative Procedure Act (APA), belongs
> in an ordinary district court or the Court of Federal
> Claims.  As the Court acknowledges, the general rule
> is that APA actions go to district courts, even when a
> remedial order "may result in the disbursement of
> funds." Ante, at 968 (citing Bowen v. Massachusetts,
> 487 U.S. 879, 910 (1988)).  To support a different
> result here, the Court relies exclusively on Great-
> West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204,
> 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).  But Great-West
> was not brought under the APA, as the Court took care
> to note. See id., at 212, 122 S.Ct. 708
> (distinguishing Bowen for that reason).  So the
> Court's reasoning is at the least under-developed, and
> very possibly wrong.

California II, 145 S. Ct. at 969 (Kagan, J. dissenting).

Justice Jackson (with whom Justice Sotomayor joined), also

dissented asserting, among other things, that presuming the

Court could reach the merits, Judge Joun's assessment that "the

Department's mass grant terminations were probably unlawful is

not unreasonable."    Id. 145 S. Ct. 975 (Jackson, J.,

dissenting).  Indeed, the Department of Education's conduct

could be viewed as arbitrary and capricious under the APA where:

> [A] mere two days after the Acting Secretary
> instructed agency officials to review the TQP and SEED
> grants, the Department started issuing summary grant-
> termination letters that provide a general and
> disjunctive list of potential grounds for

[13]

cancellation, without specifying which ground led to the termination of any particular grant. Nor did the letters detail the Department's decisionmaking with respect to any individual termination decision. It also appears that the grant recipients did not receive any pretermination notice or any opportunity to be heard, much less a chance to cure, which the regulations seem to require.  See, e.g., 2 C.F.R. §§ 200.339, 200.208(c) (permitting grant termination only after an agency "determines that noncompliance cannot be remedied by imposing additional conditions," such as by "[r]equiring additional project monitoring," by requiring that the recipient obtain technical or management assistance, or by "[e]stablishing additional prior approvals").

The Department's robotic rollout of its new mass grant-termination policy means that grant recipients and reviewing courts are "compelled to guess at the theory underlying the agency's action." SEC v. Chenery Corp., 332 U.S. 194, 196-197 (1947).  Moreover, the agency's abruptness leaves one wondering whether any reasoned decisionmaking has occurred with respect to these terminations at all. These are precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decisionmaking was meant to address. See Prometheus Radio Project, 592 U.S. at 423, 141 S.Ct. 1150 (explaining that the APA requires a reviewing court to ensure that "the agency ... has reasonably considered the relevant issues and reasonably explained the decision").

It also seems clear that at least one of the items included on the Department's undifferentiated laundry list of possible reasons for terminating these grants -- that the entity may have participated in unspecified DEI practices -- would not suffice as a basis for termination under the law as it currently exists. That is because termination is only permissible for recipient conduct that is inconsistent with the terms of the grants and the statutes that authorize them. But the TQP and SEED statutes expressly contemplate that grant recipients will train educators on teaching "diverse populations" in "traditionally underserved" schools, and on improving students' "social, emotional, and physical development." 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1),

[14]

1022a(d)(1)(ii).[]  It would be manifestly arbitrary and capricious for the Department to terminate grants for funding diversity-related programs that the law expressly requires. Cf. Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983) (explaining that an agency acts arbitrarily and capriciously if it relies "on factors which Congress has not intended it to consider").

Id. 975-76.  That appeal has since been dismissed, the underlying motion for preliminary injunction has been withdrawn, and the action is now proceeding in the ordinary course with a motion to dismiss anticipated in the near future.  See Status Report, California, Civ No. 25-10548-MJJ, ECF No. 93.  At a status conference on April 9, 2025, Judge Joun indicated that "the Supreme Court stay was of the TRO. . . [and]  . . . the Court preliminarily weighed in on a couple of issues, but there [was] no ruling on anything other than granting a stay of the TRO." April 9, 2025 Hrg. Tr. 5-6, ECF No. 97.

The Public Officials argue that this Court ought follow the Supreme Court's analysis in California II.  In fact, at oral argument they argued California II is virtually indistinguishable from the instant case.

Not so.  California is somewhat different than the claims presented here.  In that case, "[t]heir only claim was to sums awarded to them in previously awarded discretionary grants."

[15]

<u>Widakuswara</u> v. <u>Lake</u>, No. 25-5144, 2025 WL 1288817, at *13 (D.C. Cir. May 3, 2025) (Pillard, J. dissenting).

While the Supreme Court's determination in <u>California II</u> may be an indicator of how the Supreme Court **might** someday view the merits, it is not binding on this Court.  As Chief Judge McConnell of the District of Rhode Island explained mere days ago facing a similar Tucker Act challenge by the government:

> To start, <u>California</u>'s precedential value is limited . . . [and] . . . does not displace governing law that guides the Court's approach to discerning whether the States' claims are essentially contract claims in order to direct jurisdiction to the Court of Claims.")see also <u>Merrill</u> v. <u>Milligan</u>, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target.  The stay will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do not have to decide the merits on the emergency docket.  To reiterate: The Court's stay order is not a decision on the merits.").

<u>Rhode Island</u> v. <u>Trump</u>, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *5 (D.R.I. May 6, 2025).

In <u>State of New York</u> v. <u>Trump</u>, 2025 WL 1098966 (D.R.I. Apr. 14, 2025), Chief Judge McConnell has earlier done an extensive analaysis:

> On a surface level, the facts in the <u>California</u> case may appear to be generally analogous to the facts here, as both cases involve states challenging federal agencies' decision-making regarding appropriated federal funds, but the similarities end there. When the Court delves deeper, however, it finds several significant and relevant differences that underscore

[16]

California's inapplicability to this case. In
California, the First Circuit Court of Appeals
determined that "the terms and conditions of each
individual grant award" were "at issue." California,
132 F.4th 92, 96-97 (1st Cir. 2025). On appeal, the
Supreme Court then granted the Department's
application for a stay because it concluded that the
district court issued an order "to enforce a
contractual obligation to pay money" and "the
Government is likely to succeed in showing the
District Court lacked jurisdiction to order the
payment of money under the APA." California, 2025 WL
1008354, at *1. That is not the case here.
In this case, the terms and conditions of each
individual grant that the States receive from the
Agency Defendants are not at issue. Rather, this case
deals with the Agency Defendants' implementation of a
broad, categorical freeze on obligated funds pending
determinations on whether it is lawful to end
disbursements of such funds. The categorical funding
freeze was not based on individualized assessments of
any particular grant terms and conditions or
agreements between the Agency Defendants and the
States; it was based on the OMB Directive and the
various Executive Orders that the President issued in
the early days of the administration. Therefore, the
Court's orders addressing the categorical funding
freeze were not enforcing a contractual obligation to
pay money.

Id. That Court also observed that the Court of Claims could not

provide the relief requested. Id. at n.2.

Similarly, Judge Woodcock of the District of Maine recently

wrote,

The Supreme Court's [California] decision to vacate
and stay a district court's TRO enjoining the U.S.
Department of Education from terminating various
education-related grants on the ground that the Tucker
Act provided exclusive jurisdiction to the United
States Court of Federal Claims does not change the
Court's determination that it is a proper forum for
this dispute under the APA  . . . .  While bearing
some similarities to the instant suit, the Supreme

[17]

Court issued this decision on its emergency docket, without full briefing or hearing, id. at ----, 145 S.Ct. at 969 (Kagan, J., diss.); id. at ----, 145 S.Ct. at 969-978 (Jackson, J., joined by Sotomayor, J., diss.), and its precedential value is thus limited. See Merrill v. Milligan, --- U.S. ----, 142 S. Ct. 879, 879, --- L.Ed.2d ---- (2022) (Kavanaugh, J., concurring).

Maine v. U.S. Dept. of Agric., No. 1:25-CV-00131-JAW, 2025

WL 1088946, at *19 (D. Me. Apr. 11, 2025).[5] The district courts'

---

[5] But see Massachusetts Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev., No. CV 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025)) (Stearns, J.):

The court begins, and ends, its analysis with plaintiffs' second argument (because, if the court likely lacks jurisdiction, there is no longer any likelihood of success on the merits -- at least, not for the purposes of this specific action in this specific forum -- which moots any inquiry into irreparable harm). Plaintiffs correctly note that, unlike the operative complaint here, the Complaint in California references "the terms of the grant agreements at issue." Id. What plaintiffs ignore, however, is that these references occur only in the context of buttressing the larger APA-based argument that the Department of Education did not terminate the grants in accordance with any statutory or regulatory authorization (the Department of Education simply cited to 2 C.F.R. § 200.340(a)(4) as authorizing the termination of the grants); the Complaint itself does not assert any independent claim based on the language of the grant agreement. The Supreme Court nonetheless found that the government was likely to succeed in showing that the plaintiffs in California sought to enforce a contractual obligation to pay money. Because plaintiffs assert essentially the same claim here -- that the agency did not terminate the grant in accordance with statutory or regulatory authority -- it follows that plaintiffs are likewise likely seeking to enforce a contractual obligation to pay money.

[18]

App.278

divergent views within the First Circuit of <u>California</u>'s
precedential value is not surprising given the unusual
interventional posture taken by the Supreme Court.  Indeed,
Justice Jackson's dissent observed that the Supreme Court's
"attempt to inject itself into the ongoing litigation by
suggesting new, substantive principles for the District Court to
consider in this case is unorthodox and, in [her] view,
inappropriate." <u>California II</u>, 145 S. Ct. at 978.  Whatever the
Supreme Court's motivations or intentions, the <u>California II</u>
decision is of little assistance to the district courts in
charting the intersection of the APA and the Tucker Act.

The views of the dissenters in <u>California II</u>, as well as
the fully developed reasoning of the decisions quoted above are
persuasive authority for the course this Court adopts.

Even more compelling is the guidance of the First Circuit
in <u>California</u> I.

_____

This decision should not be read as an endorsement of
the brusque and seemingly insensitive way in which the
terminations were announced nor as casting doubt on
the First Circuit's assessment that the plaintiffs in
the <u>California</u> case may well likely succeed on the
merits of at least some of their claims. The court is
merely deferring (as it must) to the Supreme Court's
unmistakable directive that, for jurisdictional
purposes, the proper forum for this case is the Court
of Federal Claims.

<u>Id.</u>  That decision is currently on appeal.

[19]

First, the Department claims that the district
court itself lacked jurisdiction to entertain this
lawsuit, which the Department argues belongs in the
Court of Federal Claims. See 28 U.S.C. § 1491(a)(1)
(granting jurisdiction to the Court of Federal Claims
for any action against the government "upon any
express or implied contract with the United States").
The Department points to the fact that each grant
award takes the form of a contract between the
recipient and the government.  "But the mere fact that
a court may have to rule on a contract issue does not,
by triggering some mystical metamorphosis,
automatically transform an action ... into one on the
contract and deprive the court of jurisdiction it
might otherwise have." Megapulse, Inc. v. Lewis, 672
F.2d 959, 968 (D.C. Cir. 1982). Here, although the
terms and conditions of each individual grant award
are at issue, the "essence," id., of the claims is not
contractual. Rather, the States challenge the
Department's actions as insufficiently explained,
insufficiently reasoned, and otherwise contrary to law
-- arguments derived from the Administrative Procedure
Act (APA), 5 U.S.C. § 706(2)(A). The States' claims
are, at their core, assertions that the Department
acted in violation of federal law -- not its
contracts. Simply put, if the Department breached any
contract, it did so by violating the APA.  And if the
Department did not violate the APA, then it breached
no contract.  In the words of the Tenth Circuit, "when
a party asserts that the government's breach of
contract is contrary to federal regulations, statutes,
or the Constitution, and when the party seeks relief
other than money damages, the APA's waiver of
sovereign immunity applies and the Tucker Act does not
preclude a federal district court from taking
jurisdiction." Normandy Apts., Ltd. v. HUD, 554 F.3d
1290, 1300 (10th Cir. 2009); see also Megapulse, 672
F.2d at 968, 970 (upholding a district court's
jurisdiction where "[a]ppellant's position is
ultimately based, not on breach of contract, but on an
alleged governmental infringement of property rights
and violation of the Trade Secrets Act").

Nor do the States seek damages owed on a contract
or compensation for past wrongs. See Megapulse, 672
F.2d at 968-70 (considering, in a Tucker Act analysis,
"the type of relief sought (or appropriate)"). Rather,

[20]

App.280

they want the Department to once again make available
already-appropriated federal funds for existing grant
recipients. And as the Supreme Court has made clear,
"[t]he fact that a judicial remedy may require one
party to pay money to another is not a sufficient
reason to characterize the relief as 'money damages.'
" Bowen v. Massachusetts, 487 U.S. 879, 893, 108 S.Ct.
2722, 101 L.Ed.2d 749 (1988). As a result, we see no
jurisdictional bar to the district court's TRO on this
basis. See id. at 900-01 (holding that a district
court could hear a claim for an injunction requiring
the government to pay certain Medicaid reimbursements
because it was "a suit seeking to enforce the
statutory mandate itself, which happens to be one for
the payment of money," and "not a suit seeking money
in compensation for the damage sustained by the
failure of the Federal Government to pay"); Megapulse,
672 F.2d at 970-71 (explaining, in a Tucker Act case,
that "the mere fact that an injunction would require
the same governmental restraint that specific
(non)performance might require in a contract setting
is an insufficient basis to deny a district court the
jurisdiction otherwise available").

California I, 132 F.4th at 96-97.

In the absence of a decision on the merits from the Supreme

Court, this Court takes to heart the First Circuit's admonition

that its pronouncements of law bind this Court.  United States

v. Moore-Bush, 963 F.3d 29, 37 (1st Cir. 2020) (holding "circuit

court decisions control federal district courts in their

circuits" and that the district court is "absolutely bound to

follow vertical precedents."), reh'g en banc granted, opinion

vacated, 982 F.3d 50 (1st Cir. 2020), and on reh'g en banc, 36

F.4th 320 (1st Cir. 2022).

[21]

App.281

This Court need not gild the lily: California I presented a closer question than the one before this Court, and the First Circuit did not hesitate to rule that the Tucker Act did not apply there.  The Court is not free to ignore the First Circuit's pronouncement of the law and chart new territory, even though it might not be the law for long -- either by action of the First Circuit itself or ultimately the Supreme Court.  This Court follows California I.

Applied here, the "essence" of this action is not one of contract.  This is not an action for monetary damages against the United States for which the Court of Claims was created.  Rather, at least as alleged, and taking all inferences in the States' favor, it is an action to stop the Public Officials from violating the statutory grant-making architecture created by Congress, replacing Congress' mandate with new policies that directly contradict that mandate, and exercising authority arbitrarily and capriciously, in violation of federal law and the Constitution.  See Am. Compl. ¶ 93 ("This lawsuit arises because [the Public Officials] are flouting the statutory and regulatory rules governing NIH grantmaking" by "adopting a series of directives that blacklist certain topics -- e.g., "DEI," "gender," or "vaccine hesitancy" -- that the Administration disfavors . . .[and by] . . . adopting, implementing, and enforcing those directives, defendants have

[22]

systematically disrupted the review of pending grant applications, delayed the annual renewal of already-approved multi-year awards, and terminated huge tranches of grants in the middle of the project year. Those disruptions have caused—and will continue to cause—significant harm to plaintiffs and their institutions."). The Tucker Act does not divest this Court of jurisdiction.

Similarly, the Public Officials' sovereign immunity claim falls flat. The Court need look no further than the First Circuit's binding guidance again, which, borrowing from the Tenth Circuit, explains "'when a party asserts that the government's breach of contract is contrary to federal regulations, statutes, or the Constitution, and when the party seeks relief other than money damages, the APA's waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction." California I, 132 F.4th at 97 (quoting Normandy Apts., Ltd. v. HUD, 554 F.3d 1290, 1300 (10th Cir. 2009)). So it is here. Sovereign immunity is not a bar to the APA challenges.

### 2. Programmatic attack

Under the APA, a claim is limited to "discrete agency action that it is required to take," and that "limitation to discrete agency action precludes the kind of broad programmatic attack [the Supreme Court] rejected in Lujan v. National

[23]

App.283

Wildlife Federation, 497 U.S. 871 (1990)." Norton v. South Utah
Wilderness All., 542 U.S. 55, 64 (2004).

    The Public Officials argue that the States claims
constitute a programmatic attack. Opp'n 13-14. The States
persuasively counter that "[t]he fact that [the Public
Officials] have enforced these directives against hundreds of
projects does not make this lawsuit programmatic, even if it is
large." Reply 11. The States cite the First Circuit's decision
in New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e
are not aware of any supporting authority for the proposition
that the APA bars a plaintiff from challenging a number of
discrete final agency actions all at once.") and this Court's
decision in American Association of University Professors v.
Rubio, No. CV 25-10685-WGY, 2025 WL 1235084, at *21 (D. Mass.
Apr. 29, 2025) (describing plaintiffs' claim as neither a
"constellation of independent decisions or a general drift in
agency priorities."). The States have the better of it. The
APA claim here is not a prohibited programmatic challenge.

### 3. Jurisdiction Over Individual Actions

    The Public Officials argue that two Challenged Directives
are expired and two did not cause any injuries. Opp'n 15 - 16.
The States concede that while "perhaps the administrative record
will bear this claim out, . . . the current record shows is that
[States] have experienced significant injury from a series of

[24]

App.284

overlapping and interlocking blacklisting directives that have
caused unprecedented delays and disruptions.  The secretive and
slapdash nature of these directives, which makes it hard to know
which are effective at any given time, is hardly a defense."
Reply 8.  At this stage, all inferences must be taken in favor
of the States, and the States' argument prevails for now.

       As for the remaining Challenged Directives, the Public
Officials argue that they are not final agency actions and
therefore not actionable under the APA.  Opp'n 17.  The Public
Officials characterize their actions as "merely order[ing] a
review of the grants to determine whether they were consistent
with the agency's priorities."  Id.

       The States argue that this "misstates the directives'
effects."  Reply. 7.  As the States persuasively argue, the
Public Officials' "own [alleged] conduct confirms that the
directives are not 'interlocutory': if they were, defendants
would not be implementing them by terminating hundreds of grants
around the country." Reply 7.  Furthermore, the terminations
themselves are final agency action.  Id.

       On balance, and at this stage, the States have the better
of it.

       C.    Agency Discretion

       Finally, the Public Officials argue that the States APA
"claims are unreviewable because they challenge funding

[25]

App.285

decisions that are 'committed to the agency discretion by law."
Opp. 19 (citing 5 U.S.C. § 701(a)(2). They argue that their
allocation of funds is committed to their sole discretion. Opp.
19-21 (citing Lincoln v. Vigil, 508 U.S. 182 (1993); Milk Train,
Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002).

The States counter that they are not seeking review of a
funding decision, but rather the Public Officials' "adoption of
enforcement of the overarching Challenged Directives." Reply 8.
The States point out that Lincoln stands for the unremarkable
proposition that review is precluded so "long as the agency
allocates funds from a lump-sum appropriation to meet
permissible statutory objectives." Id. (quoting Lincoln, 508
U.S. at 193). Thus, there is arguably review where the
Challenged Directives "conflict with authorizing statutes and
applicable regulations." Reply 9.

## III. CONCLUSION

As alleged, and at its core, the States' Amended Complaint
alleges conduct similar to what Justice Jackson describes in her
dissent in California II as the "robotic rollout of [a] new mass
grant-termination policy" that has left the States "and
reviewing courts . . . 'to guess at the theory underlying the
agency's action.'" California II, 145 S. Ct. at 975-76 (quoting
SEC v. Chenery Corp., 332 U.S. 194, 196-197 (1947)) (Jackson, J.
dissenting). Assuming the allegations of the Amended Complaint

[26]

App.286

as true for purposes of the jurisdictional inquiry, the Public Officials' alleged "abruptness leaves one wondering whether any reasoned decision making has occurred with respect to these terminations at all."  Id.  Indeed, this Court agrees in principle with Justice Jackson that "[t]hese are precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decision making was meant to address." Id.  Whether the States can prove their case -- at summary judgment or a bench trial -- is for another day and the Court expresses no opinion on the merits.  For now, the Court rules that subject matter jurisdiction exists in the United States District Court.

A case management conference is set for **Tuesday, May 13, 2025 at 2:00 p.m.**

SO ORDERED.

                                   _William G. Young_
                                   WILLIAM G. YOUNG
                                       JUDGE
                                      of the
                                   UNITED STATES[6]

---

[6] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[27]

App.287

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
AMERICAN PUBLIC HEALTH ASSOCIATION;)
IBIS REPRODUCTIVE HEALTH;       )
INTERNATIONAL UNION, UNITED     )
AUTOMOBILE, AEROSPACE, AND      )
AGRICULTURAL IMPLEMENT          )
WORKERS (UAW); BRITTANY CHARLTON;)
KATIE EDWARDS; PETER LURIE; and )
NICOLE MAPHIS,                  )
                               )
              Plaintiffs,       )      CIVIL ACTION NO.
       v.                       )      25-10787-WGY
                               )
NATIONAL INSTITUTES OF HEALTH;  )
JAY BHATTACHARYA, in his official)
capacity as Director of the     )
National Institutes of Health;  )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES; and ROBERT F.)
KENNEDY, JR., in his official   )
capacity as Secretary of the    )
United States Department of Health )
and Human Services,             )
                               )
              Defendants.       )
_____)
```

YOUNG, D.J.                                        May 30, 2025

**MEMORANDUM AND ORDER**

This civil action brought by the American Public Health
Association ("APHA"), IBIS Reproductive Health ("Ibis"), the
International Union, United Automobile, Aerospace, and
Agricultural Implement Workers ("UAW"), Dr. Brittany Charlton,
Dr. Katie Edwards, Dr. Peter Lurie, and Dr. Nicole Maphis

(collectively, "the Plaintiffs") seeks declaratory and injunctive relief against the National Institutes of Health, Director Jay Bhattacharya in his official capacity, and Secretary Robert F. Kennedy, Jr. in his official capacity (collectively, "the Public Officials").  It is one of many lawsuits across the nation that allege that the current Administration's policies have been implemented in an unlawful manner, in violation of the Administrative Procedure Act and the Constitution, by agencies of the Executive Branch.

The Plaintiffs filed a motion for a preliminary injunction, and, consistent with its usual practice, this Court promptly scheduled a hearing and collapsed the motion into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.  The Court construed the parties' submissions on that motion for preliminary injunction as a motion to dismiss, ECF No. 66, which, for the reasons stated below, is ALLOWED in part as to Counts IV, VI, and VII which are dismissed without prejudice, and DENIED in part as to the remaining Counts.

## I.   INTRODUCTION

### A.   Procedural History

The Plaintiffs filed suit against the Public Officials on April 2, 2025.  See Compl., ECF No. 1.   On April 25, 2025, the Plaintiffs filed a Motion for Preliminary Injunction, which has been fully briefed.  Pls.' Mot. Prelim. Inj., ("Pls.' Mot."),

ECF No. 37; Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Pls.'
Mem."), ECF No. 41; Defs.' Opp'n Pls.' Mot. Prelim. Inj.
("Defs.' Opp'n"), ECF No. 66; Pls.' Reply Supp. Pls.' Mot.
Prelim. Inj. ("Pls.' Reply"), ECF No. 71; Suppl. Br. Standing
Pl. UAW, ECF No. 79.[1]

On May 1, 2025 this action was randomly reassigned to this
session of the Court. Elec. Notice Reassignment, ECF No. 52.
This Court promptly scheduled a hearing on the preliminary
injunction motion for May 22, 2025. Elec. Clerk's Notes, ECF
No. 77. The motion for preliminary injunction was collapsed
into a trial on the merits pursuant to Rule 65(a) of the Federal
Rules of Civil Procedure, the opposition to the motion was
construed as a motion to dismiss, and the Plaintiffs' reply was
construed as an opposition. Id. The parties accepted the
Court's invitation to hear the motion at that time, the Court
heard argument on the motion to dismiss, and it took the matter
under advisement. Id.

**B.    Facts Alleged**

The Court takes the following facts almost verbatim from
the Complaint, and accepts them as true for purposes of the
motion to dismiss. Quotation marks are omitted for readability.

---

[1] The Court also received submissions from amici. See ECF
Nos. 76 and 81. The Court is grateful for these helpful
submissions.

App.290

The Court presumes familiarity with the history of the National Institutes of Health ("NIH"), the types of grants it awards, and the grant process, skipping to the salient allegations. Compl. ¶¶ 26-80.

## 1. Executive Orders 14151, 14168, and 14173

Beginning on January 20, 2025, President Trump issued a series of executive orders ("EOs"). Compl. ¶ 80. In the first EO mentioned in the Complaint, Executive Order No. 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," the President declared that the prior administration "forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military." See Exec. Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("EO 14151"). EO 14151 instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Id. ¶ 81 (citing EO 14151). Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law, all 'equity-related' grants or contracts" within 60 days. Id.

On January 21, 2025, President Trump issued Executive Order
No. 14173, entitled "Ending Illegal Discrimination and Restoring
Merit-Based Opportunity."  See Exec. Order 14173, 90 Fed. Reg.
8633 (Jan. 21, 2025) ("EO 14173").  Similar to EO 14151, to
address the purported "immoral race- and sex-based preferences
under the guise of so-called [DEI] or [DEIA]," the order
requires the Director of the OMB to "[e]xcise references to DEI
and DEIA principles, under whatever name they may appear, from
Federal acquisition, contracting, grants, and financial
assistance procedures" and to "[t]erminate all 'diversity,'
'equity,' 'equitable decision-making,' 'equitable deployment of
financial and technical assistance,' 'advancing equity,' and
like mandates, requirements, programs, or activities, as
appropriate." Compl. ¶ 82.

With respect to gender, on January 20, 2025, the President
also issued Executive Order 14168, "Defending Women from Gender
Ideology Extremism and Restoring Biological Truth to the Federal
Government," directing that "federal funds shall not be used to
promote gender ideology," instructing federal agencies to revise
grant conditions accordingly, and defining "gender ideology" as
a "false claim" that "replaces the biological category of sex
with an ever-shifting concept of self-assessed gender identity,"
and that "includes the idea that there is a vast spectrum of
genders that are disconnected from one's sex." Id. ¶ 83

[5]

App.292

(quoting Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("EO 14168")).

### 2. OMB Issues Guidance Based Upon the Executive Orders

On January 27, 2025, the Office of Management and Budget ("OMB") issued a memorandum directing all federal agencies -- including the NIH -- to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and all other relevant agency activities that may be implicated by [the Eos, supra], including, but not limited to, financial assistance for DEI, woke gender ideology, and the green new deal." Id. ¶ 84

### 3. The NIH Implements the Executive Orders and OMB Guidance

On February 12, 2025, the NIH issued a memorandum stating that it "is in the process of reevaluating the agency's priorities based on the goals of the new administration." Id. ¶ 87. That memorandum states that the "NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in [Institutions and Centers' ("ICs")] funding decisions at this time." Id. The memorandum also indicates that "[a]dditional details on future funding actions related to the agency's goals will be provided under a separate memo." Id.

On February 13, 2025, NIH issued another memorandum to IC
chief grant management officers ("February 13 Memo"), that
announced "hard funding restrictions" on "awards where the
program promotes or takes part in diversity, equity, and
includsion [sic] ('DEI') initiatives" with those restrictions
applying "to new and continuation awards made on or after
February 14, 2025." Id. ¶88. The memorandum also states that,
"[i]f the sole purpose of the grant, cooperative agreement,
other transaction award (including modifications), or supplement
supports DEI activities, then the award must be fully
restricted. The restrictions will remain in place until the
agency conducts an internal review for payment integrity." Id.

On February 28, 2025, the NIH issued staff "guidance"
("February 28 Guidance") that rescinded the February 13
memorandum, but expanded on its core anti-DEI messaging,
stating: "NIH will no longer prioritize research and research
training programs that focus on Diversity, Equity and Inclusion
(DEI) . . . . Prior to issuing all awards (competing and non-
competing) or approving requests for carryover, ICs must review
the specific aims[,] assess whether the proposed project
contains any DEI research activities or DEI language that give
the perception that NIH funds can be used to support these
activities." Id. ¶ 92. The memorandum also instructs officials
to "completely excise all DEI activities[.]" Id.

The February 28 Guidance identifies four categories of awards and mandates actions for each category deemed "DEI related":

- "Category 1" – the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a [Notice of Funding Opportunities] that was unpublished as outlined above." For projects construed as Category 1, "ICs must not issue the award."

- "Category 2" – the project "partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this [sic] means DEI activities are ancillary to the purpose of the project [sic]. In some cases, not readily visible [sic]." For projects construed as Category 2, "[i]f the IC and the applicant/recipient cannot reach an agreement" to renegotiate the scope of the project, "or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award." For any such ongoing project, "the IC must work.to negotiate a bilateral termination of the project," but "[w]here bilateral termination cannot be reached, the IC must unilaterally terminate the project."

- "Category 3" – the project "does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities and Other Resources' attachment and terminology related to structural racism-this is not all-inclusive)." For projects construed as Category 3, ICs "must request an updated [application or progress report] with the DEI language removed," and only once the language has been removed may the IC "proceed with issuing the award."

- "Category 4" – the project does "not support any DEI activities." ICs "may proceed with issuing the award."

- Category 5 projects are those awarded "to [e]ntities in certain foreign countries." According to that part of the document, "Additional guidance on awards to foreign

entities is forthcoming. At this time, ICs should hold all
awards to entities located" in certain countries, including
South Africa.

Id. ¶ 97.

On March 25, 2025, the NIH issued further guidance ("the
March 25 Guidance"). Id. ¶ 96. The March 25 Guidance also
identifies a list of forbidden topics for NIH grants and
prescribes language to be included in termination letters,
identifying "China," "DEI," and "Transgender issues," "Vaccine
Hesitancy" and "COVID-related" research. Id. ¶¶ 98-99. Like
the February 25 Guidance, the March 25 Guidance directs NIH
officials to revise Notices of Award that are terminated
pursuant to the Directives, and instructs them to include the
following (or substantially similar) language in those
revisions: "It is the policy of NIH not to prioritize [insert
termination category language from Appendix 3, verbatim].
Therefore, this project is terminated." Id. ¶ 100.

The March 25 Guidance also features an FAQ section that
includes, among other instructions:

> When ICs issue revised [Notices of Award ("NOAs")][ to
> terminate awards, do they have to use the exact
> language provided by HHS in the termination term?
> Yes, ICs must use the exact language provided in
> Appendix 3, with no edits.

Id. ¶ 101. In addition, regarding "Notice of Funding
Opportunity (NOFO) Guidance," the document has only the
following text: "[pending]." Id. ¶ 102.

In sum, the Plaintiffs allege that the Directives --
comprised of the February 28 Guidance, the March 25 Guidance,
and other versions of these documents that articulated areas of
research that purportedly "no longer effectuate[] agency
priorities" -- fail to define critical terms, such as
"diversity, equity, and inclusion" or "DEI"; "artificial and
non-scientific categories"; "amorphous equity objectives";
"[t]ransgender issues"; "gender identity"; or "COVID-related."
Id. ¶ 103.

The Plaintiffs allege that pursuant to the Directives, each
termination notice begins by identifying the project number,
identifying which year's Grants Policy Statement applies to the
grantee's project, and stating that the letter "constitutes a
notice of termination," purportedly pursuant to that Grants
Policy Statement and 2 C.F.R. § 200.340(a)(2). Id. ¶ 106. The
notice also emphasizes that "obligations generally should be
determined by reference to the law in effect when the grants
were made." Id. Citing the pertinent year's Grants Policy
Statement, each notice states, "[a]t the time your grant was
issued, 2 C.F.R. § 200.340(a)(2) permitted termination '[b]y the
Federal awarding agency or pass-through entity, to the greatest
extent authorized by law, if an award no longer effectuates the
program goals or agency priorities.'" Id. ¶ 107.

Each notice includes one of a few slightly different scripts stating that the grant "no longer effectuates agency priorities." Id. ¶ 108. The language in these notices repeats the mandatory language from the appendices, described above, and is nearly identical across notices. Id. ¶¶ 108-09. Each notice outlines the appeals process. Id. ¶ 110.

The Plaintiffs allege that for the vast majority, if not all, of the grants terminated since February 28, 2025, the notices: (1) offer no other justifications for termination, (2) fail to explain how or why the relevant grant fails to "effectuate agency priorities" or otherwise warrants termination, and (3) fail to cite any project-specific information or data, much less any reasons to disregard that information or data. Id. ¶¶ 111-12. Further, the Plaintiffs allege that the assertions in the termination notices about the lack of scientific validity, rigor, or public health benefit of the studies contradict the conclusions of NIH and the external scientists who previously reviewed these projects and chose to award those grants in the first place, including the multiple panels of experts in the grantees' fields who judged the proposals based on criteria such as the lead scientist's track record, the rigor of the study's design, and the project's likelihood of addressing a pressing biomedical-research issue. Id. ¶ 112. These notices also purportedly do not address NIH's

prior assessment that the projects do meet agency priorities and are aligned with the statutory mandate and goals of NIH and the pertinent IC. Id. Finally, the Plaintiffs claim the notices reveal that NIH failed to consider any reliance interests at stake for ongoing grants. Id. ¶ 113.

For grants that were terminated, the NIH also issued revised NOAs with new end-of-project dates that reflected immediate or near-immediate termination. Id. ¶ 114. These revised NOAs included new termination language with statements that were substantively similar to the language included in Appendix 3 of the February 28 Guidance and March 25 Guidance, and made explicit reference to "2 C.F.R. §200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2" as the regulatory authority for these terminations. Id.

According to the Plaintiffs, evidence suggests the language in the termination notices did not originate with NIH or the Department of Health and Human Services staff but was instead drafted by staff from the Department of Government Efficiency ("DOGE"). For example, metadata associated with at least one such notice shows it was authored by "JoshuaAHanley," apparently a 2021 law school graduate, who works at DOGE. Id. ¶ 115.

#### 4. Results of the Grant Terminations and Delays

The Plaintiffs allege that the terminations cut across diverse topics that NIH is statutorily required to research.

Id. ¶ 116.  These terminations purportedly compromise NIH's
ability to fulfill, among other things, its statutory
obligations.  Id. ¶¶ 118-24.  The Plaintiffs provide specific
examples of how the termination of the research funding of the
Individual Plaintiffs, Ibis, and the Associational Plaintiffs'
members affects medical and scientific research.  Id. ¶¶ 125-94.

## II.  ANALYSIS

### A. Standard of Review

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil
Procedure, a complaint "that states a claim for relief must
contain . . . a short and plain statement of the claim showing
that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).
To test the sufficiency of the pleading, a defendant can file a
motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and, to
test the subject matter jurisdiction of the Court, a motion to
dismiss pursuant to Fed. R. Civ. P. 12(b)(1).  "When faced with
motions to dismiss under both 12(b)(1) and 12(b)(6), a district
court, absent good reason to do otherwise, should ordinarily
decide the 12(b)(1) motion first."  Katz v. Pershing, LLC, 806
F. Supp. 2d 452, 456 (D. Mass. 2011) (Stearns, J.) (quoting
Northeast Erectors Ass'n of the BTEA v. Secretary of Labor,
Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir.
1995), aff'd, 672 F.3d 64 (1st Cir. 2012)).  Whether a motion is
brought under Rule 12(b)(1) or 12(b)(6), "the reviewing court

must take all of plaintiff's allegations as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff." Verlus v. Experian Info. Sols., Inc., No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025) (Casper, J.). The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up). Accordingly, the Court addresses the jurisdictional issues first, and then proceeds to the merits arguments.

### B. The Motion to Dismiss for Lack of Subject Matter Jurisdiction

As an initial matter, this Court rules that the motion to dismiss for lack of subject matter jurisdiction based on challenges relating to the Tucker Act, sovereign immunity, programmatic attack, jurisdiction over individual actions, and agency discretion, is DENIED substantially for the same reasons set forth in Massachusetts v. Kennedy, No. CV 25-10814-WGY, 2025

WL 1371785, at *5 (D. Mass. May 12, 2025), a related case before this Court.

That leaves standing.  Just a few weeks ago, this Court wrote at length about standing in American Ass'n of Univ. Professors v. Rubio, No. CV 25-10685-WGY, --- F.Supp. 3d ----, 2025 WL 1235084, at *13-18 (D. Mass. Apr. 29, 2025), so much of this will be familiar.

"As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: '"What's it to you?"'" Food & Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 379 (2024) (quoting Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)).  As the Supreme Court recently explained, "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute," and "courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" Id. (first quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021); and then quoting Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 487 (1982)).  "In particular, the standing requirement means that the federal courts decide some contested legal

[15]

questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process," and that "the federal courts may never need to decide some contested legal questions." Id. at 380. Indeed, "'[o]ur system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed.'" Id. (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974)).

Here, the Public Officials argue that the APHA and UAW lack associational standing. Defs.' Opp'n 21-22. The Public Officials do not contest that Ibis has standing, and this Court rules that it does.

In order to establish standing, the APHA and UAW must show that they each have suffered an "injury in fact" that is "concrete and particularized," and, if based on future action, "actual or imminent" rather than "conjectural" or "hypothetical"; (2) "fairly traceable" to the alleged conduct of the defendant; and (3) "likely" redressable by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (cleaned up). "The plaintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter,'" and "must support each element of standing 'with the manner and degree of evidence required at

the successive stages of the litigation.'" Murthy v. Missouri,
603 U.S. 43, 57 (2024) (alterations in original) (first quoting
Carney v. Adams, 592 U.S. 53, 59 (2020); and then quoting Lujan,
504 U.S. at 561). "'[P]laintiffs must demonstrate standing for
each claim that they press' against each defendant, 'and for
each form of relief that they seek.'" Id. at 61 (quoting
TransUnion LLC, 594 U.S. at 431). "At the pleading stage, [the
Court] 'appl[ies] [to questions of standing] the same
plausibility standard used to evaluate a motion under Rule
12(b)(6)"; the Plaintiffs, therefore, "'need not definitively
prove [their] injury or disprove ... defenses' but need only
'plausibly plead on the face of [their] complaint' facts
supporting standing." In re Fin. Oversight & Mgmt. Bd. for
P.R., 110 F.4th 295, 307-08 (1st Cir. 2024) (first quoting
Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7 (1st Cir. 2018);
and then quoting Tyler v. Hennepin Cnty., 598 U.S. 631, 637
(2023)).

Associational standing allows an organization to sue on
behalf of its members when "(a) its members would otherwise have
standing to sue in their own right; (b) the interests it seeks
to protect are germane to the organization's purpose; and (c)
neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit." Hunt v.
Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977);

see also In re Fin. Oversight, 110 F. 4th at 308. The Public

Officials challenge the second and third elements.

The Public Officials argue that "nothing in Plaintiffs'

Complaint . . . or in their PI motion establish that the

interests that organizational Plaintiffs seeks to protect are

germane to their purpose" and that this is so "particularly with

respect to the UAW, a labor union aimed at improving working

conditions for its members." Defs.' Opp'n. 22 & n. 13. Not so.

As APHA argues, the mission of APHA is to "[b]uild public health

capacity and promote effective policy and practice." Decl.

Georges C. Benjamin, M.D. ¶ 2, ECF No. 38-23; see also Compl. ¶

19 (describing APHA as, among other things, "act[ing] to build

capacity in the public health community and champion[ing]

optimal, equitable health and well-being for all."). The Public

Officials' alleged actions directly interfere with the APHA's

stated mission and core purpose as supported by the allegations

in the Complaint. This element is therefore easily met.

The UAW argument is more nuanced. The Public Officials

suggest a distinction between the UAW's core advocacy for

improved working conditions and the circumstances here, where,

as alleged, UAW members have lost grant funding, had previously

approved grants moved into administrative limbo, or had grant

programs they were prepared to apply for abruptly change,

requiring them to leave their current postdoctoral positions or

otherwise significantly alter their career paths. Compl. ¶¶
167-178. The UAW briefed this issue for this Court in response
to questioning at the hearing, and argued that the UAW **exist[s]**
to represent [its] members' interests in relation to their terms
and conditions of employment," pointing to cases where unions
have been held to have associational standing based on their
members' threatened jobs, benefits, or other conditions of
employment. Suppl. Br. Regarding Standing Pl. UAW, ECF No. 79
2-3.

This Court is persuaded by these arguments, and by the
reasoning of these prior decisions. See, e.g., New York v.
McMahon, No. 25-10601, 2025 WL 1463009, at *18 (D. Mass. May 22,
2025) (Joun, J.) (ruling that labor union plaintiffs have
standing to sue on behalf of their members regarding actions
taken to shut down the Department of Education where members
"rely on federal student aid to afford their education and on
positions created through federal work study, without which
Union Plaintiffs' members would be forced to forgo higher
education, default on existing loans, or potentially opt out of
careers in public service"). Although some of the cases cited
by UAW relate to issues with which the plaintiff unions were
more directly involved, see International Union, United Auto.,
Aerospace & Agric. Implement Workers of Am. v. Brock, 477 U.S.
274, 286 (1986) ("paus[ing] only briefly" to find germaneness

requirement satisfied where UAW had lobbied for the precise

benefits at issue in the suit), this Court is reminded that the

purpose of the Hunt germaneness test is not to nitpick subtle

gradations of harm, but rather to "raise[] an assurance that the

association's litigators will themselves have a stake in the

resolution of the dispute, and thus be in a position to serve as

the defendant's natural adversary," ensuring "adversarial

vigor," United Food & Com. Workers Union Local 751 v. Brown

Grp., Inc., 517 U.S. 544, 555-56 (1996). The UAW's submissions

regarding its purpose and the impact of the challenged actions

on its members, and its representations in court, reassure this

Court that its plaintiff members will not be prejudiced by a

lack of vigor here. See Decl. Neal Sweeney on Behalf of UAW,

ECF No. 38-25.

The Public Officials' argument that the organizations'

individual members must participate in this lawsuit fares no

better. The Public Officials argue that the "sheer number of

declarations submitted by the organizational Plaintiffs' members

in an attempt to show irreparable harm" demonstrates that those

"members must participate to show entitlement to injunctive

relief -- particularly if this Court follows the proper practice

of limiting any injunction to those that have shown that the

Directives will cause them irreparable harm." Defs.' Opp'n 21.

The Plaintiffs argue in response that the referenced

App.307

declarations were submitted not to show standing but "to demonstrate the breadth of devastation that [the Public Officals'] actions are causing the medical community and public health," and the "boilerplate" nature of the Public Officials' reasoning with respect to the challenged terminations. Pls.' Reply 7-8. This Court agrees that the Plaintiffs here have challenged sweeping agency actions with, as alleged, virtually indistinguishable reasoning as regards the individual grants affected, and thus that the participation of individual members in this suit is not required.

For these reasons, this Court rules that both the APHA and UAW have associational standing to sue on their members' behalf.

## C. The Motion to Dismiss on the Merits

### 1. The Administrative Procedure Act and Fifth Amendment Void for Vagueness Claims, Counts I - VI

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The codified scope of judicial review under this statutory right of judicial review acts as a guardrail against unlawful agency actions under

Section 706.[2]  The APA was enacted by Congress in 1946 "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices," Loper Bright Enters. v. Raimondo, 603 U.S. 369, 391 (2024) (quoting United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)), and "sets forth the procedures by

───────────────

[2] Section 706 provides in pertinent part:

   To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be—

   (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   (B)  contrary to constitutional right, power, privilege, or immunity;

   (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   . . . .

   In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

App.309

which federal agencies are accountable to the public and their actions subject to review by the courts," Department of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020) (quoting Franklin v. Massachusetts, 505 U.S. 788, 796 (1992)). Broadly, the APA establishes a rebuttable "presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" Id. (alteration in original) (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 140 (1967)). The rebuttal of this presumption is made "by a showing that the relevant statute 'preclude[s]' review, § 701(a)(1), or that the 'agency action is committed to agency discretion by law,' § 701(a)(2)."[3] Id. at 17. The first exception is self-explanatory, and the Supreme Court has read the second exception "quite narrowly," applying "it to those rare 'administrative decision[s] traditionally left to agency discretion.'" Id. (alteration in original) (first quoting Weyerhaeuser Co. v. United Staes Fish & Wildlife Serv., 586 U.S. 9, 23 (2018); and then quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)); Department of Com. v. New York, 588 U.S.

---

[3] Section 701 provides in pertinent part:

(a) This chapter applies, according to the provisions thereof, except to the extent that--
    (1) statutes preclude judicial review; or
    (2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a).

App.310

752, 772 (2019) ("[W]e have read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly, restricting it to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."'" (quoting Weyerhaeuser Co., 586 U.S. at 23)). Examples of decisions traditionally left to agency discretion include "a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." New York, 588 U.S. at 772 (citations omitted). The Court's review depends upon the type of claim made.

As to actions brought pursuant Section 706(2)(A), here Count I of the Complaint, the APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id. at 771 (quoting 5 U.S.C. § 706(2)(A)). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. Environmental Prot. Agency, 603 U.S. 279, 292 (2024) (quoting Federal Commc'ns Comm'n v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)).

Review by the Court under the arbitrary or capricious standard of Section 706(2)(A) is narrow, because all that is "required [is for] agencies to engage in 'reasoned

[24]

App.311

decisionmaking.'" Regents of the Univ. of Cal., 591 U.S. at 16
(quoting Michigan v. Environmental Prot. Agency, 576 U.S. 743,
750 (2015)). To be sure, this Court may not "substitute its
judgment for that of the agency," but rather "must ensure, among
other things, that the agency has offered 'a satisfactory
explanation for its action[,] including a rational connection
between the facts found and the choice made.'" Ohio, 603 U.S.
at 292 (alteration in original) (first quoting Federal Commc'ns
Com. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009);
and then quoting Motor Vehicle Mfrs. Ass'n of United States,
Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).
Said another way, this Court's review "simply ensures that the
agency has acted within a zone of reasonableness and, in
particular, has reasonably considered the relevant issues and
reasonably explained the decision." Prometheus Radio Project,
592 U.S. at 423.

This Court, as a general proposition, is "ordinarily
limited to evaluating the agency's contemporaneous explanation
in light of the existing administrative record." New York, 588
U.S. at 780. In the usual course, this is because "further
judicial inquiry into 'executive motivation' represents 'a
substantial intrusion' into the workings of another branch of
Government and should normally be avoided." Id. at 781 (quoting
Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S.

252, 268 n.18 (1977)).  Indeed, this Court may neither "reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons" nor "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."  Id.  This general rule recognizes the reality that "[a]gency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'"  Id. (quoting Sierra Club v. Costle, 657 F.2d 298, 408 (D.C. Cir. 1981)).  In fact, every Administration enjoys the benefit of the bully pulpit, and agency "decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)."  Id.  Such routine decisions are not within the purview of this Court, but rather appropriately within the exclusive realm of the Executive Branch.  The general rule presumes rational actors that are proceeding lawfully, as opposed to using lawful explanations as a means to unlawful ends.

Nevertheless, the Supreme Court has "recognized a narrow exception to the general rule against inquiring into the mental processes of administrative decisionmakers" upon a "strong showing of bad faith or improper behavior" -- such as a pretext

-- "where such an inquiry may be warranted" and, in appropriate

circumstances, "may justify extra-record discovery." Id.

(citations omitted). In particular, "unlike a typical case in

which an agency may have both stated and unstated reasons for a

decision," when "an explanation for agency action . . . is

incongruent with what the record reveals about the agency's

priorities and decisionmaking process," the Court is not

required to "ignore the disconnect between the decision made and

the explanation given." Id. at 784-85. While typically "review

is deferential," it does not require the Court to blind itself

to reality; it is "not required to exhibit a naiveté from which

ordinary citizens are free." Id. at 785 (quoting United States

v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly,

J.)). The whole point of "[t]he reasoned explanation

requirement of administrative law, after all, is . . . to ensure

that agencies offer genuine justifications for important

decisions, reasons that can be scrutinized by courts and the

interested public." Id. The explanation must be the one

invoked contemporaneously at the time of the action, not created

in hindsight. Regents of the Univ. of Cal., 591 U.S. at 20-23.

An APA claim that agency action is "not in accordance with

law" is a subpart of Section 706(2)(A), alleged here in Count II

of the Complaint. In reviewing this claim "a reviewing court

must uphold an agency's decision if it is: (1) devoid of legal

errors; and (2) "supported by any rational review of the record."  New York v. Trump, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *9 (D.R.I. Mar. 6, 2025) (quoting Mahoney v. Del Toro, 99 F.4th 25, 34 (1st Cir. 2024)).

An APA action brought under Section 706(2)(C), here Count III of the Complaint, challenges agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Id.  The "[C]ourt[] must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority."  Loper Bright, 603 U.S. at 412. "[T]he [C]ourt fulfills [its] role by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority. . .and ensuring the agency has engaged in '"reasoned decisionmaking"' within those boundaries."  Id. at 395 (citation omitted) (first quoting Henry P. Monaghan, Marbury and the Administrative State, 83 Colum. L. Rev. 1, 27 (1983); and then quoting Michigan, 576 U.S. at 750).  In sum, "Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch.  And to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute." Id. at 403.

App.315

A claim brought under Section 706(2)(B), here Count IV, seeks to contest agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). "An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." National Educ. Ass'n v. United States Dept. of Educ., --- F.Supp. 3d ----, No. 25-CV-091-LM, 2025 WL 1188160, at *27 (D.N.H. Apr. 24, 2025).

Finally, claims seeking to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Norton v. Southern Utah Wilderness All., 542 U.S. 55, 64 (2004) (emphasis omitted). This is a high standard inasmuch as "[t]he central question in evaluating such a claim is whether the agency's delay 'is so egregious that mandamus is warranted.'" Rezaii v. Kennedy, No. 1:24-CV-10838-JEK, 2025 WL 750215, at *4 (D. Mass. Feb. 24, 2025) (Kobick, J.) (quoting Kokajko v. Federal Energy Regul. Comm'n, 837 F.2d 524, 526 (1st Cir. 1988)).

With this outline of the law in mind, the Court proceeds to the parties' arguments.

The Public Officials first argue that the Section 706(2) claims (Counts I, II, III, IV) fail as matter of law because the

[29]

terminations complied with the terms of the agreements. Defs.'

Opp'n 22. The Public Officials argue that 2 C.F.R. § 200.340 is

incorporated into each Notice of Award, and that this regulation

permits the Public Officials to terminate an award "if an award

no longer effectuates the program goals or agency priorities."

Id. (citing 2 C.F.R. § 200.340(a)(4)). The Public Officials

omit the complete sentence, which provides significant context.

Under the cited regulation, an agency can terminate an award

"pursuant to the terms and conditions of the Federal award,

including, **to the extent authorized by law**, if an award no

longer effectuates the program goals or agency priorities." 2

C.F.R. § 200.340 (emphasis added). This is a distinction with a

difference, because "this regulation only allows agencies to

terminate . . . agreements 'to the extent authorized by law,'"

and "this regulation cannot authorize actions that contravene

statutory requirements, nor does it relieve [the Public

Officials] of [their] duty to follow the law." Pacito v. Trump,

No. 2:25-CV-255-JNW, 2025 WL 893530, at *9 (W.D. Wash. Mar. 24,

2025) (quoting 2 C.F.R. § 200.340(a)(4)).

As an initial matter, it is undisputed that this regulation

has not yet been adopted by HHS, and will not be adopted until

October 2025; accordingly, the regulation is apparently

inapplicable here. The Public Officials counter that the

regulation has been incorporated into the terms and conditions

[30]

of the grantees' awards. Even if the regulation applied as a
contractual term (which this Court need not decide), whether the
"award no longer effectuates the programs goals or agency
priorities" can **still** be challenged under the APA where the
Plaintiffs allege a failure to provide a reasonable explanation.
See American Ass'n of Colls. for Tchr. Educ. v. McMahon, No.
1:25-CV-00702-JRR, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025)
(ruling that even if termination letters invoked a valid reason
to terminate under 2 C.F.R. § 200.340, APA claims survived
because the letters "fail[ed] to provide [the plaintiffs] any
workable, sensible, or meaningful reason or basis for the
termination of their awards"). The Court need go no further at
the motion to dismiss stage.

The Public Officials next argue that their explanations
were reasoned and reasonable under the circumstances. Defs.'
Opp'n 26. At the motion to dismiss stage, the Complaint has
plausibly alleged otherwise -- that the explanations are
conclusory and vague. The first examples cite to undefined
gender identity issues untethered to the specific terminated
grants, with what looks more like a political statement than
reasoning about the grants, and without any explanation as to
why no corrective action is possible:

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-20 50; and again,

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-24 37; and again, this time with so-called "DEI" language,

[32]

App.319

This award no longer effectuates agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the

health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of Project Number ██████████ is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-28 146-47, and again,

App.320

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-32 34-35. The Public Officials argue that the Plaintiffs are merely disagreeing with actions of the agencies "designed to align with a democratically elected administration." Defs.' Opp'n. 25-26 & n. 15. While the Public Officials may prove this at a hearing or trial on the merits with a more fulsome record, taking all inferences in favor of the Plaintiffs, the Court cannot make this conclusion at this stage. Indeed, another session of this Court, and other courts, have recently found similar, and in some cases almost identical language in a different agency's terminations sufficient to issue a temporary restraining order. California v. United States Dep't of Educ., No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (Joun, J.) ("In the absence of any

App.321

reasoning, rationale, or justification for the termination of
the grants, the Department's action is arbitrary and
capricious."); see also Southern Educ. Found. v. United States
Dep't of Educ., No. CV 25-1079 (PLF), 2025 WL 1453047, at *17
(D.D.C. May 21, 2025) ("The Court finds that the Department's
Termination Letter provides no reasoned explanation for the
grant termination.  In fact, the Termination Letter's list of
possible bases 'is so broad and vague as to be limitless; devoid
of import, even.'") (citing McMahon, 2025 WL 833917, at *21)).[4]
The Public Officials' motion to dismiss is denied on this
ground.

Next, the Public Officials argue that their grant
terminations are consistent with the relevant statutes requiring
them to support research into "minority-related topics,"
claiming that there are other "DEI"-related grants that are

---

[4] The Court observes that neither the EOs, nor any of the
policy statements to follow, nor counsel for the Public
Officials, has, to date, provide a working definition of
Diversity, Equity and Inclusion.  The Court pressed this issue
at the hearing on this motion, but no satisfactory answer was
provided by the Public Officials.  This is not the first court
to grapple with the absence of a definition of DEI.  See
National Ass'n of Diversity Officers in Higher Educ. v. Trump,
No. 1:25-CV-00333-ABA, 2025 WL 573764, at *26 (D. Md. Feb. 21,
2025) ("[N]either [EO 14151] nor [EO 14173] gives guidance on
what the new administration considers to constitute 'illegal DEI
discrimination and preferences,' or '[p]romoting "diversity,"'
or 'illegal DEI and DEIA policies,' or what types of 'DEI
programs or principles' the new administration considers
'illegal' and is seeking to 'deter[.]'" (citations omitted)).

App.322

proceeding.[5]  Defs. Opp'n 27-28.  The Public Officials also point
to continued support of certain grants for the "training and
development of a diverse corp of health science researchers."
Opp'n Mem. 27.[6]  The Plaintiffs attack the substance of the
Public Officials' factual claims, Pls.' Reply 8-9, and at the
motion to dismiss stage, even if true the maintenance of some
so-called "DEI" programs or programs that promoted diversity in
research, does not necessarily mean agency action with respect
to other programs was neither arbitrary nor capricious.

---

[5] The Court observes that Public Officials appear to fold
"minority-related topics" into DEI. Defs.' Opp'n 27.  The
Plaintiffs also pick up on this definitional disparity.  Pls.'
Reply 8 ("Defendants fail to define 'DEI grants' or how, for
example, a grant that addresses specific challenges related to
kidney health faced by racial minorities constitutes 'DEI.'").
[6] Amici Curiae describe the importance of fostering a
diverse corp of health professionals, describing the
disadvantages of a homogenous research community, and explaining
advantages such as illuminating blind spots and fostering
innovation that a diverse research community brings.  See Br.
Amici Curae Biological and Biomedical Research Societies 6-8,
ECF No. 81.  As Amici posits:

> Science is about solving complex problems, and
> progress in scientific endeavors demands creativity,
> curiosity, and drive. Maintaining a rich and vibrant
> collaboration in science, and bringing different
> perspectives and skillsets to the forefront of
> discovery, is paramount to maintaining America's
> competitive edge in our evolving world.  As Congress—
> and NIH itself—have long understood, "[d]iversity
> enhances excellence and innovation." It does not
> stifle them.

Id.

App.323

The Public Officials also argue that they have complied
with the NIH's statutory requirement to develop a six year
strategic plan under 42 U.S.C. § 282(m)(1). The point of the
six-year plan, is "to provide direction to the biomedical
research investments made by the National Institutes of Health,
to facilitate collaboration across the institutes and centers,
to leverage scientific opportunity, and to advance biomedicine."
Id. The Public Officials are correct that, on the one-hand it
is not a "six-year straight jacket," but at the same time the
Plaintiffs persuasively argue that under a separate subsection
of that statute the as the Plaintiffs' argue that the NIH is
required to "ensure that the resources of the National
Institutes of Health are sufficiently allocated for research
projects identified in strategic plans." 42 U.S.C. § 282(b)(6).
While it is apparently undisputed that the NIH complied with
preparation of a six year plan, whether the Public Officials
have thwarted the operations of the statute is at least
plausibly pleaded. The Court is persuaded, in part, by Amici's
description of the complex, statutorily imposed stability in NIH
funding of priorities. See Br. Amici Curiae of the Association
of American Medical Colleges et al. 14, ECF 76. At the motion
to dismiss stage, the Court credits the allegations of the
Complaint, and the motion to dismiss is denied as to this
ground.

The Public Officials then challenge the Plaintiffs' Due Process, void-for vagueness claim, Counts IV and VI, arguing that the void-for-vagueness doctrine applies only to statutes or regulations forbidding or requiring primary conduct, that the Plaintiff's facial challenge fails as matter of law, that the Plaintiffs have alleged no protected liberty or property interest, and that vagueness standards are relaxed in the government funding context. Defs.' Opp'n 29-31. This Court agrees with the Public Officials' first argument. The Plaintiffs point to cases applying the void-for-vagueness doctrine to facially similar but factually distinguishable cases, all of which involve threatened penalties for violating vague standards. See National Educ. Ass'n v. United States Dep't of Educ., No. 25-cv-091, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) (evaluating letter threatening Title VI enforcement based on vague, DEI-based standard); National Ass'n for Advancement of Colored People v. United States Dep't of Educ., No. 25-cv-1120, 2025 WL 1196212, at *6 (evaluating certification requirement "threaten[ing] serious consequences for schools' failure to comply with vaguely-defined prohibitions on DEI initiatives"). That is not what the Plaintiffs have alleged here. Accordingly, for the reasons stated above, the motion to dismiss is ALLOWED as to Count VI, and as to Count IV, which incorporates the same void-for-vagueness argument.

App.325

The Public Officials also argue that the Plaintiffs' claim of unlawfully withheld or unreasonably delayed agency action fails as matter of law, because the Plaintiffs have not identified any discrete and mandatory agency action the agency has failed to take, the agency has discretion to defer deciding on grant applications and to hold meetings at its own pace, and any delays that might have occurred have ceased, because, after a brief pause, the agency has resumed meetings and processing applications at a rapid pace. Defs.' Opp'n 31-34.

As stated above, "a claim under §706(1) can proceed only where a plaintiff asserts that an agency failed to take **discrete** agency action that it is **required to take**," and "broad programmatic attack[s]" will not be entertained. <u>Norton</u> v. <u>Southern Utah Wilderness All.</u>, 542 U.S. 55, 64 (2004). There is some force to the Public Officials' argument that, as the Supreme Court has put it, "pervasive oversight" over the "manner and pace" of agency action "is not contemplated by the APA," <u>id.</u> at 67, but they do not deal with the entirety of what the Plaintiffs have alleged. Specifically, the Plaintiffs allege that NIH has not only withheld decisions on pending applications, but also removed submitted applications from study sections and withheld Notices of Award from previously approved submissions. <u>See</u> Pls.' Mem. 10-11.

[39]

As alleged, the Public Officials have failed, and given some indication that they will continue to fail, to complete their required task of evaluating all grant applications properly submitted and either approving, deferring, or disapproving them. 42 C.F.R. § 52.5 (providing that properly filed applications "**shall** be evaluated" and subject to one of these three dispositions). This raises a fact issue -- whether NIH is processing affected applications at all, as opposed to something else -- that would be improper for this Court to decide at this stage. Accordingly, the Public Officials' motion to dismiss is DENIED as to Count V.

### 2. Separation of Powers, Count VII

Repose of power in three separate branches of government -- the separation of powers -- is a check and balance system "designed to preserve the liberty of all the people." Collins v. Yellen, 594 U.S. 220, 245 (2021). The doctrine finds its roots right here in the Commonwealth of Massachusetts' Constitution, as recounted by Justice Scalia:

> It is the proud boast of our democracy that we
> have "a government of laws and not of men." Many
> Americans are familiar with that phrase; not many know
> its derivation. It comes from Part the First, Article
> XXX, of the Massachusetts Constitution of 1780, which
> reads in full as follows:
>
> > "In the government of this
> > Commonwealth, the legislative department
> > shall never exercise the executive and
> > judicial powers, or either of them: The

> executive shall never exercise the
> legislative and judicial powers, or either
> of them: The judicial shall never exercise
> the legislative and executive powers, or
> either of them: to the end it may be a
> government of laws and not of men."
>
> The Framers of the Federal Constitution similarly
> viewed the principle of separation of powers as the
> absolutely central guarantee of a just Government . .
> . . Without a secure structure of separated powers,
> our Bill of Rights would be worthless, as are the
> bills of rights of many nations of the world that have
> adopted, or even improved upon, the mere words of
> ours.

Morrison v. Olson, 487 U.S. 654, 697 (1988) (Scalia, J.,

dissenting). "So whenever a separation-of-powers violation

occurs, any aggrieved party with standing may file a

constitutional challenge." Collins, 594 U.S. at 245. "If the

constitutional structure of our Government that protects

individual liberty is compromised, individuals who suffer

otherwise justiciable injury may object." Bond v. United

States, 564 U.S. 211, 223 (2011). The Public Officials argue

that there is no separation-of-powers issue here because

Congress provides the Executive with broad discretion over grant

termination. Defs.' Opp'n 34-36. The Plaintiffs argue that the

NIH's general discretionary authority is limited by the agency's

statutory mandate, which requires research into certain topics

the agency now labels "DEI." Pls.' Reply 15. The Plaintiffs'

argument in their reply is limited largely to reference to their

APA argument, id., which addresses the many ways they believe

the Public Officials have "flouted congressional mandates," id. at 8.

The Plaintiffs' reference to their APA claims on this count is indicative of why this Court declines to analyze exhaustively the potential separation-of-powers issues here. As another court has observed in a similar context, "plaintiffs' concerns are better addressed by []other count[s] of their complaint," that is, their APA claims, and "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 40 (D.D.C. 2018) (quoting Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (Brandeis, J., concurring)). "[T]his is a classic APA claim," and, because "judging the constitutionality of action taken by a coequal branch of government is 'the gravest and most delicate duty that this Court is called on to perform,'" this Court "must take care not to transform every claim that an agency action conflicts with a statute into a freestanding separation of powers claim." Id. (quoting Northwest Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 204 (2009)). This Court declines to do so here.

The essence of the Plaintiffs' claims, broadly, is that the Public Officials have acted contrary to their statutory mandate

[42]

and in conflict with statutory and regulatory requirements, not that they have seized some general power never before permitted to the Executive Branch. This is the stuff of APA litigation, which appears to provide an avenue for complete relief in this matter. See id. at 40 ("As plaintiffs allege in their substantive APA claim the same infirmities that underlie their separation of powers claim, the Court will be able to consider the allegations fully in that context.").

The First Circuit has suggested, in a very different context, that a separation of powers claim might be viable were an agency "by its actions to repeal an act of Congress or displace a long standing power of the United States." United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 14 (1st Cir. 2005), but that is not what the Plaintiffs have alleged here. Instead, they have alleged several ways in which the agency's actions may be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

For these reasons, the motion to dismiss is ALLOWED as to Count VII.

## III. CONCLUSION

For the reasons stated above, the Motion to Dismiss, ECF No. 66, is ALLOWED in part as to Counts IV, VI, and VII, which

are dismissed without prejudice, and DENIED in part as to the

remaining Counts.

**SO ORDERED.**

                                        _William G. Young_
                                        WILLIAM G. YOUNG
                                            JUDGE
                                           of the
                                        UNITED STATES[7]

_____

    [7] This is how my predecessor, Peleg Sprague (D. Mass 1841-
1865), would sign official documents. Now that I'm a Senior
District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 47 years.

```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                                  No. 1:25-cv-10814-WGY

 4
    COMMONWEALTH OF MASSACHUSETTS, et al,
 5            Plaintiffs
    vs.
 6
    ROBERT F. KENNEDY, JR., et al,
 7            Defendants

 8
                                    No. 1:25-cv-10787-WGY
 9
    AMERICAN PUBLIC HEALTH ASSOCIATION, et al,
10            Plaintiffs
    vs.
11
    NATIONAL INSTITUTES OF HEALTH, et al,
12            Defendants

13
                        * * * * * * * *
14
                      For Hearing Before:
15                    Judge William G. Young

16
                      Bench Trial, Phase 1
17                         (Closings)

18
                      United States District Court
19                    District of Massachusetts (Boston.)
                      One Courthouse Way
20                    Boston, Massachusetts 02210
                      Monday, June 16, 2025
21

22                         * * * * * * * *

23            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
24                 United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
25                      rhr3tubas@aol.com
```

```
 1    about the contours of Phase 1, and when I say a
 2    "thorough written opinion," it's focused on Phase 1.
 3    And at an appropriate time, however it comes out, I
 4    would enter an order that the interests of justice are
 5    that there be a separate judgment so it can be
 6    immediately appealed by whoever wants to appeal.
 7          If you say you want to -- if you tell her you want
 8    me to stay my hand, the Court will honor it.  If any of
 9    you want to hear if I have anything to say, she'll tell
10    me that.  I don't need to know who.  It's up to me
11    whether I see my way clear to say anything at all today.
12          It goes without saying that I am very grateful
13    both for the briefing and the extraordinarily fine oral
14    arguments made by counsel.  We'll take the matter under
15    advisement.
16          We'll recess.
17          (Recess, 12:50 a.m.)
18          (Resumed, 2:00 p.m.)
19          THE COURT:  This case warrants and will receive a
20    full written opinion.  At the same time, this case
21    commenced with a request for a preliminary injunction,
22    and the Court takes that very seriously.  And the
23    parties, and I include all the parties, have stepped up
24    to afford the Court the chance to make findings and
25    rulings upon an adequate record.
```

1    I have worked on the case really since the day it

2    was filed.  I still must further reflect upon the

3    extensive record, the extensive administrative record

4    before the Court, and I intend to do so.

5    But there are some findings and rulings that the

6    Court's efforts, aided by you all, and aided by the

7    Court's law clerks, that I'm able to make today, and in

8    the interests of justice, I'm going to do it, right now.

9    These are -- well let me start really by saying

10   what I'm not going to address, and nothing I say now

11   should, um, implicate or suggest any finding yet to be

12   made, though the Court reserves its right to make such

13   findings upon a more thorough review of the record or,

14   as we will see, as the record comes to be more fully

15   developed.

16   So I am not -- well I have limited today's

17   remarks, at least the first phrase, because I'm going to

18   stop and let you ask questions, and then I have

19   something else to say.  But the first-phase remarks this

20   afternoon are limited entirely to the claims under the

21   Administrative Procedure Act, and nothing else.

22   Even as to the claims under the Administrative

23   Procedure Act, the Court makes no rulings.  I have the

24   data on which I could make them, but I do not today make

25   any ruling on conflicts with the challenged directives

1    or terminations and the governing statutes and

2    regulations save -- that is the Administrative Procedure

3    Act itself is a governing statute.  Likewise, um, I am

4    not today going to endeavor to interpret any of the

5    governing regulations.

6         There is evidence here that, um -- that these

7    directives are at least a part of the process that led

8    us to the terminations that, um, we are dealing with in

9    this case, there was some input of some sort by some

10   representative of DOGE.  The Court makes no finding

11   either way -- either way as to that, but reserves its

12   right further to consider that matter.

13        The Court has expressed a concern, a very real

14   concern about discrimination here.  I'll have more to

15   say about that after our break.

16        One of the things that concerns the Court is that

17   there is more than a little evidence here of, um,

18   discrimination on issues of women's health.  I make no

19   such finding.  I reserve the right to make that finding

20   should I come to be satisfied, by a fair preponderance

21   of the evidence, that such discrimination exists.  So

22   those are the things I'm not making any findings on.

23        As to my remarks today, they are necessarily

24   conclusory.  I've challenged the defendants for making

25   conclusory statements, and perhaps I'm going to make

some, but I do so only in the interests of justice and
for expedition, I am satisfied that everything I say now
is fully supported by the evidentiary record, and, um,
in the full written opinion I will, um, have ample
recourse to that record.  And I reserve my right to make
further subsidiary, um, factual determinations, and draw
further legal conclusions.  But what I say now decides
the points to which I speak, having in mind there's
going to be a full written opinion that will follow.  So
let me address the first part of what I want to say.

The Court, on the administrative record, rules
that the parties before it have standing.  The Court,
having carefully considered the briefs and the oral
arguments, treats the challenged directives as a whole,
as a process, does not break them down into discrete
paragraphs, and rules that when treated as a whole,
these directives constitute final agency action under
the Administrative Procedure Act, Sections 551 and 704.

When you look at these directives, 7 different
explanations are offered for agency action.  The law, as
to the adequacy of such explanations, I -- I would take
it, though there are many cases, but the one I want to
refer to specifically is Judge Gorsuch's opinion for the
Court in ***Ohio vs. Environmental Protection Agency***, found
at 603 United States at 279, um -- well the PIN cite

1    will be 144 Supreme Court 2040 at 2024.  And there,

2    speaking for the Court, Justice Gorsuch says:

3          "An agency" -- and I'm omitting citations.  "An

4    agency action qualifies as, quote, 'arbitrary' or,

5    quote, 'capricious' if it is not, quote, 'reasonable'

6    and 'reasonably explained.'  In reviewing an agency's

7    action under that standard, a Court is not, quote, 'to

8    substitute its judgment for that of the agency,' closed

9    quote, but it must ensure, among other things, that the

10   agency has offered a satisfactory explanation for its

11   action, including a rational connection between the

12   facts found and the choice made.  Accordingly, an agency

13   cannot simply ignore an important aspect of the

14   problem."

15         This Court finds and rules that the explanations

16   are bereft of reasoning virtually in their entirety.

17   These edicts are nothing more than conclusory,

18   unsupported by factual development.

19         Moreover, in -- as presented to this Court, there

20   is no reasoned argument as to the reliance interests of

21   the many parties affected.  It's well to have recourse

22   precisely to the statute under which this Court -- the

23   Act of Congress under which this Court draws its

24   authority for the conclusions and rulings that the Court

25   makes.

```
 1        I quote paragraph -- not paragraph, Section 706,
 2   "Scope of Review of the Administrative Procedure Act."
 3   This -- this defines, in this aspect of the case, the
 4   powers of this United States District Court in
 5   circumstances.  This power is derived directly from the
 6   statute enacted by the people's representatives in both
 7   Houses of Congress.  It trumps any regulation.  It
 8   trumps any order, directive, or edict.  Here is what it
 9   says:
10        "To the extent necessary to decision and when
11   presented, the reviewing Court shall decide all relevant
12   questions of law, interpret constitutional and statutory
13   provisions, and determine the meaning or applicability
14   of an agency action."
15        Then, in Paragraph 2, it empowers the Court to
16   "Hold unlawful and set aside agency action, findings,
17   and conclusions, found to be" -- and I here have
18   reliance on Subparagraph A, "arbitrary and capricious."
19        This Court rules that the determinations -- that
20   the challenged directives, excuse me, taken as a whole
21   are -- and each of them are, when taken as a whole,
22   arbitrary and capricious, they are of no force and
23   effect, they are void and illegal.  And so are each of
24   the terminations before this Court declared arbitrary
25   and capricious, void, and of no effect, they are illegal
```

1    and they are vacated and set aside.

2         I looked up and spotted Ms. Meeropol and I should

3    be specific.

4         I am not now deciding anything beyond the ruling I

5    just made.  That does not mean that in further

6    consideration of the NOFO claims, I could not, or I

7    could not further analyze the argument that was made by

8    those plaintiffs.  All I'm saying is I am not now doing

9    that, I'm not ready, nor am I sufficiently confident to

10   do it.  I'm speaking only to those things about which I

11   -- a careful review satisfies me that on that ground --

12   on the grounds I have announced, I am confident in the

13   action that the Court takes.

14        Having done that, the Court, um, at least sitting

15   this afternoon, accepts the representation of the

16   government counsel, I'm sure made after careful

17   consideration, that he expects that the defendants

18   promptly will comply with the, um, decisions as to the

19   law made by this Court, and I'm relying on that.  The

20   Court -- because the case goes on, the Court has

21   continuing jurisdiction.  And if these -- this vacation

22   of these particular grant terminations, the vacation of

23   these directives, taken as a whole, um, does not result

24   in forthwith, um, disbursement of funds both

25   appropriated by the Congress of the United States and

1   allocated heretofore by the defendant agencies, if that

2   doesn't happen forthwith, the Court has ample

3   jurisdiction.

4           But as I stated earlier, I do come from a kindler,

5   gentler period of jurisprudence when, if a Court of

6   competent jurisdiction -- and this Court is such a

7   court, declares the law authoritatively, executive

8   agencies are presumed to put that declaration into

9   effect, that's the authorization of the Congress in the

10  Administrative Procedure Act.  And based on the

11  representation of counsel, I have every reason to

12  believe that will be done.

13          Now to give effect to the few conclusory findings

14  I have made and the rulings I have thus-far made, the

15  plaintiffs are charged with, forthwith, tomorrow will be

16  soon enough, um, preparing a partial but final judgment

17  as to these issues.  I will enter that final judgment,

18  um, under Federal Rule of Civil Procedure 54(d), in the

19  interests of justice so that there is a basis for an

20  immediate appeal, should anyone wish to appeal.

21          There is more to this case.  I very much

22  understand that.  I both welcome any such appeal, but it

23  is my duty to move as rapidly as careful and

24  conscientious analysis permits, and I believe I have

25  given it to so much of this action as I have just spoken

1    to.

2         I have more to say on another topic, but this is a

3    good time to stop and simply go around and see if there

4    are any questions.  This is not a time to argue or seek

5    to reargue, just are there any questions about what the

6    Court has found and ruled.  Questions.  And we'll go in

7    the order of the argument.

8         Mr. Cedrone?

9         (Pause.)

10        MR. CEDRONE:  No, your Honor, I think it's clear.

11        THE COURT:  Fine.

12        Mr. Parreno?

13        MR. PARRENO:  No, your Honor, no questions.

14        THE COURT:  And, Mr. Ports, any questions?

15        MS. PORTER:  I want to make sure that we're clear

16   that this -- the order applies to all grants listed by

17   the plaintiffs, that's both sets of plaintiffs, as most

18   recently updated, um, any orders to set them aside and

19   terminate them, to vacate them, and set them aside.

20        So everything on that list?

21        THE COURT:  That is the list to which I have

22   referenced.  Your question is perfectly appropriate.

23   That's what I'm speaking about.

24        MS. PORTER:  Okay, thank you, your Honor.

25        THE COURT:  All right.

1        Any other questions?

2        MS. PORTER:  Does this apply to, I guess, the

3    status of, um, grants listed where there have been no

4    action, no affirmative action by the agency other than

5    maybe, um --

6        THE COURT:  I think I've made myself clear.  I

7    have a list and I've acted on it.

8        MS. PORTER:  Okay, thank you, your Honor.

9        THE COURT:  All right.

10       Now I have something else to say.

11       MR. PARRENO:  Your Honor, if I may?

12       THE COURT:  Yes.

13       MR. PARRENO:  What, um, just to make it clear,

14   what counsel on the other side has addressed has raised

15   another question for us, and perhaps if I may raise it

16   with the Court?

17       We wish to ask the Court for the opportunity to

18   provide one additional list of plaintiff members, grants

19   of plaintiff members that have not yet been provided to

20   the Court, and we're prepared to, um, provide that.

21       THE COURT:  Work it out with them.  If they

22   oppose, I will take that into account.  But work it out

23   with them.

24       MR. PARRENO:  Yes, thank you, your Honor.

25       THE COURT:  Now there's another aspect of this

case, a darker aspect, one that I take very seriously,
and it's this.

I could not -- I cannot, as a United States
District Judge, read this record without coming to the
conclusion, and I draw this conclusion -- I am hesitant
to draw this conclusion, but I have an unflinching
obligation to draw it, that this represents racial
discrimination and discrimination against America's
LGBTQ community, that's what this is. I would be blind
not to call it out. My duty is to call it out. And I
do so.

Now clearly I have no hesitancy in enjoining
racial discrimination, I said during the course of the
argument, and it is the law and I must uphold it, and I
have no hesitancy in upholding it. The extirpation of
affirmative action is a legitimate government policy.
It is not a license to discriminate on the basis of
color. It simply is not. That's what the Civil War
amendments are about. Any discrimination, any
discrimination by our government is so wrong that it
requires the Court to enjoin it, and at an appropriate
time I'm going to do it.

Having said that, I welcome -- if the parties
wish, though I don't require any extension of the
record, evidence as to harm so that I may more carefully

1    and accurately frame such an injunction.  That's racial

2    discrimination.

3         It is palpably clear that these directives and

4    that the set of terminated, um, grants here also are

5    designed to, um, frustrate, to stop research that may

6    bear on the health -- we're talking about health here,

7    the health of Americans, of our LGBTQ community.  That's

8    appalling.  Having said it, I have very real questions

9    about whether this Court has the power to enjoin it.  I

10   do not assert such a power, though I find the record

11   will be clear to anyone that it has and is occurring

12   under this, um, under what's going on.

13        Now I'm speaking only of health care, I'm speaking

14   only of the parties before me, nothing else.  I don't

15   have a record as to that.  It's not the province of this

16   Court just to invade against discrimination.  But on

17   this record, these two aspects of discrimination are so

18   clear that I would fail in my duty if I did not note it.

19        And so the parties are invited, as to those two

20   aspects and -- though I make no finding with respect to

21   it, any harm to the issues involving women's health.

22   Gender differences are an appropriate area of research

23   and research and, um, trying to advance the frontiers of

24   science so that all Americans have the best health care

25   that we can afford.

1    You will meet and inform the Court as to when --

2    if any party wishes -- I am bound by case-in-

3    controversy, I say what I will receive evidence on, but

4    I do not require anything.  I've said everything that I

5    am able to say.  And while there's another phase to this

6    case, on this discrimination issue, I am prepared to

7    receive evidence, but I do not require it.

8    If the parties wish to present evidence, you'll

9    inform me as to when you're prepared to begin such

10   evidentiary -- because defense counsel is correct, they

11   have the right to cross-examine as to that, and at least

12   as to any discrimination as to LGBTQ people, they -- it

13   may very well be that while I can recognize it and call

14   it out, I have no power to enter injunctions with

15   respect to it.  But I'm certainly open to considering

16   that.

17   But let me say something about racial

18   discrimination here.  I've never seen a record where

19   racial discrimination was so palpable.  I've sat on this

20   bench now for 40 years, I've never seen government

21   racial discrimination like this.  And I confine my

22   remarks to this record, to health care.  And I ask

23   myself, how -- how can this be, because on this record

24   anyway, I don't see anyone pushing back against it?

25   I don't -- take a look at the people who have been

1    named as defendants here, one of them is a cabinet-level

2    officer.  The other one is, not the same individual, but

3    is now the Director of the National Institutes of

4    Health.  And though I needed help as to what an "IC" is,

5    there are other distinguished, um, at the National

6    Institutes of Health level and their subsidiary

7    institutes, these are distinguished doctors, they are

8    people whose profession has been devoted to the American

9    people, to our society.  All our society.  They are all

10   American citizens.

11        Now I don't claim any high moral ground here.  I'm

12   a United States District Judge, I have the protections

13   that the Founders wrote into the Constitution, along

14   with imposing upon me a duty to speak the truth in every

15   case, and I try to do that.  And so I've asked myself,

16   what if I didn't have those protections?  What if my job

17   was on the line, my profession, all the career to which

18   I have devoted whatever poor skill I have, would I have

19   stood up against all of this?  Would I have said, "You

20   can't do this, you are bearing down on people of color

21   because of their color.  The Constitution will not

22   permit that."  I see nothing in this record.

23        And, you know, when I ask myself that question,

24   without the protections of --

25        (Phone rings.)

1        THE COURT:  I was going pretty well there.

2        (Laughter.)

3        THE COURT:  Okay.

4        -- without the protections of an independent

5    judiciary so necessary to our society, as I know my own

6    heart, I do not have an answer to that question, for

7    myself, and that makes me unutterably sad.

8        And so we're going to recess.  But is it true of

9    our society as a whole, have we fallen so low?  Have we

10   no shame?

11       We'll recess.

12       (Recess, 2:35 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT<br>
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; and NICOLE MAPHIS, | |
| *Plaintiffs,* | Case No. 1:25-cv-10787-WGY |
| v. | |
| NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, *in his official capacity as Director of the National Institutes of Health*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services,* | |
| *Defendants.* | |

**[PROPOSED] RULE 54(b) PARTIAL FINAL JUDGMENT**

For all the reasons stated on the record on June 16, 2025, Plaintiffs American Public Health Association ("APHA"), Ibis Reproductive Health, International Union, United Automobile, Aerospace, and Agricultural Implement Workers ("UAW"), Brittany Charlton, Katie Edwards, Peter Lurie, and Nicole Maphis (collectively, "Plaintiffs") are entitled to judgment on their claim that the challenged "Directives" (specified below in paragraphs 1(a)-(j)) and "Resulting Grant

1

App.348

Terminations"[1] are arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Pursuant to Federal Rule of Civil Procedure 54(b), and for all the reasons stated on the record, the Court finds that there is no just reason to delay entry of judgment on that claim.

It is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. The following Directives from the National Institute of Health ("NIH") and U.S. Department of Health & Human Services ("HHS"), taken as a whole, are **DECLARED** to be final agency action, arbitrary and capricious, and unlawful, in violation of 5 U.S.C. § 706(2)(A):

   a. The February 10, 2025 directive issued by the Acting Secretary of HHS entitled "Secretarial Directive on DEI-Related Funding." AR0004-05.[2]

   b. The February 12, 2025 memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals." AR0009.

   c. The February 13, 2025 memorandum entitled "Supplemental Guidance to Memo Entitled NIH Review of Agency Priorities Based on the New Administration's Goals." AR0016.

   d. The February 21, 2025 "Directive on NIH Priorities" entitled "Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards." AR2930-31.

   e. The March 4, 2025 memorandum issued by NIH, entitled "Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025." AR2136-42.

   f. The March 13, 2025 directive issued by Michelle Bulls, entitled "Award Revision Guidance and List of Terminated Grants via letter on 3/12." AR1957-68.

---

[1] The term "Resulting Grant Terminations" refers to any terminations of any grants (including subawards and supplements) of Plaintiffs or members of Plaintiff associations APHA and UAW by the National Institutes of Health (including any of NIH's constituent institutes and centers), on the basis of one or more of the Challenged Directives, the Challenged Directives as a whole, or any of the reasoning therein, but specifically limited to, those specific grant terminations, including non-competitive renewals, that Plaintiffs identified in the spreadsheets submitted to the Court and served upon defendants on May 27, 2025 and June 13, 2025, which spreadsheets are Attached hereto as Exhibits A and Exhibit B, respectively.

[2] References herein to the administrative record produced by Defendants on June 2, 2025 match the page numbers in the record (*e.g.*, "AR0004" corresponds to "NIH_GRANTS_000004").

g. The March 20, 2025 memorandum issued by Sean R. Keveney, the Acting General Counsel at HHS, entitled "Termination of COVID-19 Grants." AR2591.

h. The March 25, 2025 memorandum issued by NIH, entitled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025." AR3218.

i. The May 7, 2025 memorandum issued by Michelle Bulls, entitled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT." AR3547-77.

j. The May 15, 2025 memorandum issued by Michelle Bulls, entitled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT." AR3516-46.

k. The undated memoranda titled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – Draft." AR3231-3350.

2. Pursuant to 5 U.S.C. § 706(2), the Directives set forth in Paragraphs 1(a)-(j) of this Judgment are hereby **OF NO EFFECT, VOID, ILLEGAL, SET ASIDE AND VACATED.**

3. The Resulting Grant Terminations pursuant to the Directives are **DECLARED** to be unlawful, arbitrary and capricious final agency actions under 5 U.S.C. § 706(2)(A).

4. Pursuant to 5 U.S.C. § 706(2), the Resulting Grant Terminations are hereby **OF NO EFFECT, VOID, ILLEGAL, SET ASIDE AND VACATED.**

5. Judgment shall enter in favor of Plaintiffs and against Defendants on Count I.A and I.C of the Complaint.

6. The Court retains jurisdiction to enforce this Judgment.

The Clerk is directed to enter judgment in conformity with the foregoing forthwith.

June _23_, 2025

_William G. Young_
**HON. WILLIAM G. YOUNG**
Judge of the United States

3

App.350

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

COMMONWEALTH OF
MASSACHUSETTS, *et al.*,

                              *Plaintiffs,*

          v.                                          No. 1:25-cv-10814-WGY

ROBERT F. KENNEDY, JR., *et al.*,

                              *Defendants.*

---

## ~~[REVISED PROPOSED]~~ RULE 54(b) FINAL JUDGMENT

For all the reasons stated on the record on June 16, 2025, plaintiffs are entitled to judgment

on their claim that the Challenged Directives[1] and Resulting Grant Terminations[2] are arbitrary and

capricious in violation of the Administrative Procedure Act, 5 U.S.C. §706(2)(A).  Pursuant to

---

[1] The "Challenged Directives" consist of (1) the February 10, 2025, directive entitled "Secretarial Directive on DEI-Related Funding" reproduced at pp. 4–5 of the administrative record; (2) the February 12, 2025, memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals" reproduced at p. 9 of the administrative record; (3) the February 13, 2025, memorandum entitled "Supplemental Guidance to Memo Entitled – NIH Review of Agency Priorities Based on the New Administration's Goals" reproduced at p. 16 of the administrative record; (4) the February 21, 2025, memorandum entitled "Directive on NIH Priorities" and "Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards" reproduced at pp. 2930–2931 of the administrative record; (5) the March 4, 2025, directive entitled "Staff Guidance - Award Assessments for Alignment with Agency Priorities—March 2025" reproduced at pp. 2135–2172 of the administrative record; (6) the March 13, 2025, directive entitled "Award Revision Guidance and List of Terminated Grants via letter on 3/12" reproduced at pp. 1957–1968 of the administrative record; and (7) subsequent revisions to the "Award Assessments for Alignment with Agency Priorities" directive dated March 25 (reproduced at pp. 3216–3230 of the administrative record), May 7 (reproduced at pp. 3547–3581 of the administrative record), May 15 (reproduced at pp. 3516–3546 of the administrative record), and undated (reproduced at pp. 3231–3350 of the administrative record).

[2] The term "Resulting Grant Terminations" refers to any terminations of grants (including subawards) awarded by the National Institutes of Health (including any of NIH's constituent institutes and centers) to any plaintiff state (including any plaintiff state's instrumentalities, public colleges and universities, subdivisions, counties, and municipalities) on the basis of one or more of the Challenged Directives, the Challenged Directives as a whole, or any of the reasoning therein.  For purposes of this definition, a "termination" includes failure to award a non-competing continuation of a grant.  The Resulting Grant Terminations include those specific grant terminations that plaintiffs identified in the spreadsheet submitted to the Court and served upon defendants on June 13, 2025, which spreadsheet it attached hereto as Exhibit A.

Federal Rule of Civil Procedure 54(b), and for all the reasons stated on the record, the Court finds

that there is no just reason to delay entry of judgment on that claim.

It is therefore **ORDERED**, **ADJUDGED**, and **DECREED** that:

I.   The Challenged Directives as a whole are arbitrary and capricious in violation of 5
     U.S.C. §706(2)(A). Thus, the Challenged Directives as a whole are void, illegal,
     and of no force and effect and are hereby vacated and set aside pursuant to §706(2).

II.  The Resulting Grant Terminations are arbitrary and capricious in violation of 5
     U.S.C. §706(2)(A). Thus, the Resulting Grant Terminations are void, illegal, and
     of no force and effect, and are hereby vacated and set aside pursuant to §706(2).

III. Judgment shall enter in favor of plaintiffs and against defendants on Count 3 of the
     Amended Complaint.

IV.  The Court retains jurisdiction to enforce this judgment.

The Clerk is directed to enter judgment in conformity with the foregoing forthwith.

June _23_, 2025

*William G. Young*
**HON. WILLIAM G. YOUNG**
Judge of the United States

App.352

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL INSTITUTES OF HEALTH, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-10787-WGY |

## <u>NOTICE OF APPEAL</u>

Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, all Defendants[1]

hereby appeal to the United States Court of Appeals for the First Circuit from the order and

partial final judgment entered in this case on June 23, 2025, Doc No. 138, as well as from all

other interlocutory orders merged into that order and judgment.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

LEAH B. FOLEY
United States Attorney

KIRK T. MANHARDT
Director

MICHAEL J. QUINN
Senior Litigation Counsel

Dated: June 23, 2025                    */s/ Anuj Khetarpal*

---

[1] National Institutes of Health; Jay Bhattacharya, in his official capacity as Director of the National Institutes of Health, United States Department of Health and Human Services, and Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services.

1

App.353

ANUJ KHETARPAL
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3658
anuj.khetarpal@usdoj.gov

THOMAS W. PORTS, Jr. (Va. Bar No.
84321)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
(202) 307-1105
thomas.ports@usdoj.gov

*Attorneys for Defendants*

2

App.354

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 23, 2025      <u>*/s/ Anuj Khetarpal*</u>
              Anuj Khetarpal

App.355

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, *et al.*,

 Plaintiffs,

 v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services, *et al.*,

 Defendants.

Civil Action No. 1:25-cv-10814-WGY

## NOTICE OF APPEAL

Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, all defendants[1]

hereby appeal to the United States Court of Appeals for the First Circuit from the order and

partial final judgment entered in this case on June 23, 2025, Doc No. 151, as well as from all

other interlocutory orders merged into that order and judgment.

---

[1] Defendants Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services; United States Department of Health and Human Services; Jayanta Bhattacharya, in his official capacity as the Director of the National Institutes of Health; National Institutes of Health; National Cancer Institute; National Eye Institute;  National Heart, Lung, and Blood Institute; National Human Genome Research Institute; National Institute on Aging; National Institute on Alcohol Abuse and Alcoholism; National Institute of Allergy and Infectious Diseases; National Institute of Arthritis and Musculoskeletal and Skin Diseases; National Institute of Biomedical Imaging and Bioengineering; Eunice Kennedy Shriver National Institute of Child Health and Human Development; National Institute on Deafness and Other Communication Disorders; National Institute of Dental and Craniofacial Research; National Institute of Diabetes and Digestive and Kidney Diseases; National Institute on Drug Abuse; National Institute of Environmental Health Sciences; National Institute of General Medical Sciences; National Institute of Mental Health; National Institute on Minority Health and Health Disparities; National Institute of Neurological Disorders and Stroke; National Institute of Nursing Research; National Library of Medicine; National Center for Advancing Translational Sciences; John E. Fogarty International Center for Advanced Study in the Health Sciences; National Center for Complementary and Integrative Health; and Center for Scientific Review.

App.356

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

LEAH B. FOLEY
United States Attorney

KIRK T. MANHARDT
Director

MICHAEL J. QUINN
Senior Litigation Counsel

Dated: June 23, 2025                    _/s/ Thomas W. Ports, Jr._

THOMAS W. PORTS, Jr. (Va. Bar No. 84321)
_Trial Attorney_
U.S. Department of Justice
Civil Division, Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
Tel: (202) 307-1105
Email: thomas.ports@usdoj.gov

ANUJ KHETARPAL
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3658
Anuj.Khetarpal@usdoj.gov

_Attorneys for Defendants_

2

App.357

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 23, 2025                          *<u>/s/ Thomas W. Ports, Jr.</u>*
                                                   Thomas W. Ports, Jr.

```
                                   )
AMERICAN PUBLIC HEALTH ASSOCIATION;)
IBIS REPRODUCTIVE HEALTH;          )
INTERNATIONAL UNION, UNITED        )
AUTOMOBILE, AEROSPACE, AND         )
AGRICULTURAL IMPLEMENT             )
WORKERS (UAW); BRITTANY CHARLTON;  )
KATIE EDWARDS; PETER LURIE; and    )
NICOLE MAPHIS,                     )
                                   )
                   Plaintiffs,     )    CIVIL ACTION NO.
          v.                       )    25-10787-WGY
                                   )
NATIONAL INSTITUTES OF HEALTH;     )
JAY BHATTACHARYA, in his official  )
capacity as Director of the        )
National Institutes of Health;     )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES; and ROBERT F.  )
KENNEDY, JR., in his official      )
capacity as Secretary of the       )
United States Department of Health )
and Human Services,                )
                                   )
                   Defendants.     )
                                   )


                                   )
COMMONWEALTH OF MASSACHUSETTS;     )
STATE OF CALIFORNIA; STATE OF      )
MARYLAND; STATE OF WASHINGTON;     )
STATE OF ARIZONA; STATE OF         )
COLORADO; STATE OF DELAWARE;       )
STATE OF HAWAI'I; STATE OF         )
MINNESOTA; STATE OF NEVADA;        )
STATE OF NEW JERSEY; STATE OF      )
NEW MEXICO; STATE OF NEW YORK;     )
STATE OF OREGON; STATE OF RHODE    )
ISLAND; and STATE OF WISCONSIN,    )
                                   )
                                   )
                                   )
```

[1]

App.359

```
                    Plaintiffs,      )      CIVIL ACTION NO.
             v.                      )      25-10814-WGY
                                     )
ROBERT F. KENNEDY, JR., in his       )
official capacity as Secretary of    )
Health and Human Services;           )
UNITED STATES DEPARTMENT OF          )
HEALTH AND HUMAN SERVICES;           )
JAYANTA BHATTACHARYA, in his         )
official capacity as Director of     )
the National Institutes of Health;   )
NATIONAL INSTITUTES OF HEALTH;       )
NATIONAL CANCER INSTITUTE;           )
NATIONAL EYE INSTITUTE;              )
NATIONAL HEART, LUNG, AND BLOOD      )
INSTITUTE; NATIONAL HUMAN GENOME     )
RESEARCH INSTITUTE; NATIONAL         )
INSTITUTE ON AGING; NATIONAL         )
INSTITUTE ON ALCOHOL ABUSE AND       )
ALCOHOLISM; NATIONAL INSTITUTE       )
OF ALLERGY AND INFECTIOUS            )
DISEASES; NATIONAL INSTITUTE OF      )
ARTHRITIS AND MUSCULOSKELETAL AND    )
SKIN DISEASES; NATIONAL              )
INSTITUTE OF BIOMEDICAL IMAGING      )
AND BIOENGINEERING; EUNICE KENNEDY   )
SHRIVER NATIONAL INSTITUTE OF        )
CHILD HEALTH AND HUMAN               )
DEVELOPMENT; NATIONAL INSTITUTE      )
ON DEAFNESS AND OTHER                )
COMMUNICATION DISORDERS;             )
NATIONAL INSTITUTE OF DENTAL         )
AND CRANIOFACIAL RESEARCH;           )
NATIONAL INSTITUTE OF DIABETES       )
AND DIGESTIVE AND KIDNEY             )
DISEASES; NATIONAL INSTITUTE         )
ON DRUG ABUSE; NATIONAL              )
INSTITUTE OF ENVIRONMENTAL           )
HEALTH SCIENCES; NATIONAL            )
INSTITUTE OF GENERAL MEDICAL         )
SCIENCES; NATIONAL INSTITUTE OF      )
MENTAL HEALTH; NATIONAL INSTITUTE    )
ON MINORITY HEALTH AND HEALTH        )
DISPARITIES; NATIONAL INSTITUTE      )
OF NEUROLOGICAL DISORDERS AND        )
STROKE; NATIONAL INSTITUTE OF        )
NURSING RESEARCH; NATIONAL LIBRARY   )
```

[2]

OF MEDICINE; NATIONAL CENTER FOR      )
ADVANCING TRANSLATIONAL SCIENCES;     )
JOHN E. FOGARTY INTERNATIONAL         )
CENTER FOR ADVANCED STUDY             )
IN THE HEALTH SCIENCES; NATIONAL      )
CENTER FOR COMPLEMENTARY AND          )
INTEGRATIVE HEALTH; and CENTER        )
FOR SCIENTIFIC REVIEW,                )
                                      )
                    Defendants.       )
_____ )


YOUNG, D.J.                                    June 24, 2025


## ORDER

After careful consideration, the Court denies the motions
for stay.

**1. This Court has subject matter jurisdiction**

The issue of this Court's subject matter jurisdiction has
been fully addressed in its opinion <u>Massachusetts</u> v. <u>Kennedy</u>,
No. CV 25-10814-WGY, 2025 WL 1371785, at *3 (D. Mass. May 12,
2025) and it would be superogatory to rehearse it here.

Significantly, the defendants raise no question about the
full trial they have been accorded under the Administrative
Procedure Act nor about either this Court's findings of fact[1]

---

[1] *You have to listen to the bastards, Austin. They might just
have something.*

                                    -Hon. Franklin H. Ford

                        . . .

             Judicial fact-finding is … rigorous.
             Necessarily detailed, judicial fact-finding
             must draw logical inferences from the

record, and, after lucidly presenting the
subsidiary facts, must apply the legal
frame-work in a transparent written or oral
analysis that leads to a relevant
conclusion. Such fact-finding is among the
most difficult of judicial tasks. It is
tedious and demanding, requiring the
entirety of the judge's attention, all her
powers of observation, organization, and
recall, and every ounce of analytic common
sense he possesses. Moreover, fact-finding
is the one judicial duty that may never be
delegated to law clerks or court staff.
Indeed, unlike legal analysis, many judges
will not even discuss fact-finding with
staff, lest the resulting conclusions morph
into judgment by committee rather than the
personal judgment of the duly constituted
judicial officer.

Fair and impartial fact-finding is
supremely important to the judiciary…

While trial court legal analysis is
appropriately constrained by statutes and
the doctrine of stare decisis, the true
glory of our trial courts, state and
federal, is their commitment to fair and
neutral fact-finding. Properly done, facts
found through jury investigation or judicial
analysis truly are "like flint."

Yet there has been virtual abandonment
by the federal judiciary of any sense that
its fact-finding processes are exceptional,
or due any special deference. Federal
district court judges used to spend their
time on the bench learning from lawyers in
an adversarial atmosphere, and overseeing
fact-finding by juries or engaging in it
themselves. This was their job and they were
proud of it. Today, judges learn more
reflectively, reading and conferring with
law clerks in chambers. Their primary
challenge is the proper application of the
law to the facts—facts that are either taken
for granted, or sifted out of briefs and
affidavits, and, in the mode of the European
civil justice systems, scrutinized by judges

[4]

upon a comprehension and largely undisputed record of decision nor about this Court's rulings of law.[2]

### 2. A stay would cause irreparable harm to the plaintiffs

This is a case in equity concerning health research already bought and paid for by the Congress of the United States through funds appropriated for expenditure and properly allocated during this fiscal year. Even a day's delay further destroys the unmistakable legislative purpose from its accomplishment.

### 3. The balance of the equities strongly militates against a stay.

Again, it is worth noting that no question is here raised in the motions for stay about the scope of this Court's declarations under the APA. They are limited to the particular grants identified by the parties with standing before this Court which were arbitrarily and capriciously terminated by the defendants.[3]

---

and clerks behind closed doors. While judges do talk to lawyers in formal hearings, these hearings can be short, and usually serve to test and confirm a judge's understanding rather than develop it.

William G. Young, A Lament for What Was Once and Yet Can Be, 32 B.C. Int. & Comp. L. Rev. 312-314 (2009) (footnotes omitted)

[2] The full written decision will soon follow.

[3] Indeed, the Court notes with approbation that the NIH and related defendants appear to be - now that the law is clearly declared – moving quietly and expeditiously (this Court said "forthwith") to restore the specific terminated grants, see https://www.masslive.com/news/2025/06/20-nih-grants-restored-to-umass-system-after-judge-rules-against-trump-admin.html.

While the grant of a stay would throw the entire process into limbo during the course of the appeal, its denial means only that the executive defendants must comply with the Act of Congress rather than sequestering funds (probably forever) during the course of the appeal.

Far, far better were the defendants to seek expedited briefing and review so that a precedential decision may issue with ramifications beyond these parties and these grants.

**SO ORDERED.**

William D. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[4]

---

This is how our government ought function without demeaning injunctive orders.

[4] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

App.364



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

---

National Institutes of Health
National Institute of
General Medical Sciences
Bethesda, Maryland 20892-6200

http://www.nigms.nih.gov

April 2, 2025

Rebecca Valdez
UNIVERSITY OF NEW MEXICO
rvaldez3@unm.edu

Dear Rebecca Valdez,

Funding for Project Number **5T34GM145428-03** is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on April 1, 2024 and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4] According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

| Tuition & Fees | $96,000 |
|---|---|
| Trainee Travel | $6,000 |
| Training related Expenses | $60,000 |
| | |
| **Federal Direct Costs** | $349,344 |
| **Federal F&A Costs** | $18,828 |
| **Approved Budget** | $368,172 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $368,172 |
| **TOTAL FEDERAL AWARD AMOUNT** | $368,172 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $368,172 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | THIS AWARD | | | | CUMULATIVE TOTALS | | | |
| YR | Total | Pre | Post | Short Term | Cumulative Total | Pre | Post | Short Term |
| 1 | $368,172 | 6 | | | $368,172 | 6 | | |
| 2 | $368,172 | 6 | | | $368,172 | 6 | | |
| 3 | $368,172 | 6 | | | $368,172 | 6 | | |
| 4 | $368,172 | 6 | | | $368,172 | 6 | | |
| 5 | $368,172 | 6 | | | $368,172 | 6 | | |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1946036493A6 |
| **Document Number:** | TGM156671A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2025 |

| IC | CAN | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|
| GM | 8039713 | $368,172 | $368,172 | $368,172 | $368,172 | $368,172 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: T417JM / **OC**: 41010 / **Released**: 01/13/2025
**Award Processed**: 01/22/2025 12:14:55 AM

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1T32GM156671-01**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 1T32GM156671-01**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a. The grant program legislation and program regulation cited in this Notice of Award.
b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c. 45 CFR Part 75.
d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

no additional funding will be awarded for this project, and all future years have been removed. If appropriate, University of California Los Angeles may request funds to support patient safety and animal welfare to support an orderly phaseout of the project.

Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination (with proof of the date), or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

Please be advised that your organization, as part of the orderly phaseout process, will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project. NOTE: OPERA recognizes that the closeout letters will be automatically sent, so we are working internally with the closeout support center staff to manage this process. If you receive inquiries, please point the inquirer to: OPERALeadership@nih.gov

This action aligns with Termination - 2 C.F.R. § 200.340 (a)(4). This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to the funding ICO's Grants Management Official named in the NOA.

**THE FOLLOWING TERMS FROM THE PREVIOUS NOTICE OF AWARD LETTER ALSO APPLY TO THIS AWARD:**

**REQUIREMENT**: This award is subject to the conditions set forth in PA-20-185, NIH Research Project Grant (Parent R01 Clinical Trial Not Allowed), NIH Guide to Grants and Contracts, 05/05/2020, which is hereby incorporated by reference as special terms and conditions of this award.

Copies of this RFA may be accessed at the following internet address: https://grants.nih.gov/grants/guide/pa-files/PA-20-185.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

**REQUIREMENT**: The recipient is required to follow the data management and sharing plan dated September 15th, 2023 and may not implement any changes in the plan without the written prior approval of the NIMHD.

**INFORMATION**: This award reflects the NIMHD's acceptance of the certification that all key personnel have completed education on the protection of human subjects, in accordance with NIH policy, "Required Education in the Protection of Human Research Participants," as announced in the June 5, 2000 NIH Guide (revised August 25, 2000) (http://grants.nih.gov/grants/guide/notice-files/NOT-OD-00-039.html).

Any individual involved in the design and conduct of the study that is not included in the certification must satisfy this requirement prior to participating in the project. Failure to comply can result in the suspension and/or termination of this award, withholding of support of the continuation award, audit disallowances, and/or other appropriate action.

Data Management and Sharing Policy: Applicable

This project is expected to generate scientific data. Therefore, the Final NIH Policy for Data Management and Sharing applies. The approved Data Management and Sharing (DMS) Plan is hereby incorporated as a term and condition of award, and the recipient shall manage and disseminate scientific data in accordance with the approved plan. Any significant changes to the DMS Plan (e.g., new scientific direction, a different data repository, or a timeline revision) require NIH prior approval. Failure to comply with the approved DMS plan may result in suspension and/or termination of this award, withholding of support, audit disallowances, and/or other appropriate action. See NIH Grants Policy Statement Section 8.2.3 for more information on data management and sharing expectations.

App.367

Version: 23 - 2/15/2024 9:51 AM | Generated on: 5/6/2025 11:51 AM

NIH_GRANTS_000106



*RESEARCH EDUCATION PROJECT*
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING

**SECTION I – AWARD DATA – 5R25EB033075-03 REVISED**

**Principal Investigator(s):**
Tracey K Brown
Carlos  Luna Lopez (contact), PHD

**Award e-mailed to:** ospgrants@csusm.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to California State University San Marcos Corporation in support of the above referenced project.  This award is pursuant to the authority of 42  USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Biomedical Imaging And Bioengineering of the National Institutes of Health under Award Number R25EB033075. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,


Mutema  Nyankale
Grants Management Officer
NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING

Additional information follows

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| **Salaries and Wages** | $180,403 |
| **Fringe Benefits** | $18,448 |
| **Personnel Costs (Subtotal)** | $198,851 |
| **Travel** | $6,000 |
| **Other** | $15,000 |
| **Participant Travel** | $7,500 |
| **Participant Other** | $7,500 |
| | |
| **Federal Direct Costs** | $234,851 |
| **Federal F&A Costs** | $18,788 |
| **Approved Budget** | $253,639 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $253,639 |
| **TOTAL FEDERAL AWARD AMOUNT** | $253,639 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 3 | $253,639 | $253,639 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1330397688A1 |
| **Document Number:** | REB033075A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| EB | 8050007 | $253,639 |

**NIH Administrative Data:**
**PCC**: TEDT / **OC**: 41032 / **Released**: 04/17/2025
**Award Processed:** 04/18/2025 12:11:58 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R25EB033075-03  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R25EB033075-03  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

    a. The grant program legislation and program regulation cited in this Notice of Award.
    b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
    c. 45 CFR Part 75.
    d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
    e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
    f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2**.** As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that

some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R25EB033075. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted

electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

**SECTION IV − EB SPECIFIC AWARD CONDITIONS − 5R25EB033075-03  REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

## REVISED AWARD:
It is the policy of NIH not to prioritize research programs related to Diversity, equity, and inclusion. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the

health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

No additional funding will be awarded for this project, and all future years have been removed. The CALIFORNIA STATE UNIVERSITY SAN MARCOS may request funds to support patient safety and orderly closeout of the project, and remaining funds will be deobligated. Funds used to support any other research activities will be disallowed and recovered.

Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. **It shall be the final decision of the Department of Health and Human Services (HHS) unless <u>within 30 days</u> after receiving this decision you mail or email a written notice of appeal to MATTHEW MEMOLI, PhD. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than <u>30 days</u> after the date of this notice.**

*THE FOLLOWING TERMS AND CONDITIONS FROM THE PREVIOUS NOTICE OF AWARD REMAIN IN EFFECT:*

### RESTORATION OF FUNDS FROM CONTINUING RESOLUTION

In accordance with the Fiscal Year 2024 NIBIB Financial Management Plan, this revised award has been issued at 100% of the support recommended for this year on last year's Notice of Award.

*The following terms from the previous NOA dated 3/1/2024 remain in effect.*

### NON-COMPETING ESTEEMED GRANT - NUMBER OF PARTICIPANTS

This award is authorized for (5) new participants and (5) reappointed participants in year (03). Future years are anticipated to include 5 reappointed participants in year 4 (e.g. 5 total appointments in year -4).. The number of participants may not be increased without the prior written approval of the National Institute of Biomedical Imaging and Bioengineering (NIBIB) staff.

### PARTICIPANT APPOINTMENT

A Statement of Appointment form (PHS 2271) must be submitted for each participant, each year, prior to or at the time of appointment. No salary or other compensation may be paid until submission of the proper forms. Failure to submit these forms within 30 days of the start date of the appointment may result in an expenditure disallowance or a delay in continued funding.
 
These forms must be submitted electronically through xTrain, an eRA Commons Module. The National Institutes of Biomedical Imaging and Bioengineering (NIBIB) requires the use of xTrain Commons module to electronically prepare and submit the PHS 2271 Statement of Appointment form and PHS 416-7 Termination Notice for the Enhancing Science, Technology, EnginEering, and Math Educational Diversity (ESTEEMED) Research Education Experiences (R25) grants. For more information, see the NIH Funding Opportunity Announcement (FOA) Number PAR-20-223: [PAR-20-223: Enhancing Science, Technology, EnginEering, and Math Educational Diversity (ESTEEMED) Research Education Experiences (R25) (nih.gov)](PAR-20-223)
 
These forms and instructions are available at: [http://grants.nih.gov/grants/forms.htm#training](http://grants.nih.gov/grants/forms.htm#training)

This award is issued without definite human and vertebrate animal subject research plans but with the possibility of student-driven projects being added during the project period that may involve human and vertebrate animal subjects research. No human and vertebrate animal subject research is permitted to begin under this grant that has not been approved by the IRB or IACUC. Work on a project with human and/or vertebrate animals research shall not begin without submission and approval by the NIBIB Grants Management Officer of the required documentation, or the charges will be disallowed.

No funds may be drawn down from the Payment Management System and no obligations may be made against Federal funds for any research involving human and vertebrate animal subjects prior to the NIBIB Grants Management Officer's receipt and written approval of the following:

- Human and/or vertebrate animal subjects research plan (found at https://grants.nih.gov/grants/how-to-apply-application-guide/forms-e/general/g.500-phs-human-subjects-and-clinical-trials-information.htm and https://grants.nih.gov/grants/olaw/vertebrate_animal_section.htm) which must include discussion of sex as a biological variable (SABV), per NIH Guide Notice NOT-OD-15-102.
- IRB and/or IACUC approval, documentation of Federal-Wide Assurance and/or Animal Welfare Assurance.
- Documentation of Human Subject Education Training
- A planned human subjects enrollment table found at https://grants.nih.gov/grants/funding/phs398/enrollment.pdf.

Failure to comply with the above requirements may result in suspension and/or termination of this award, withholding of support, audit disallowances, and/or other appropriate action.

The recipient is responsible for maintaining valid certification of IRB/IACUC approval for each project that involves human and vertebrate animal subjects research.

See the NIH Grants Policy Statement section 4.1.15 Human Subjects Protections for specific requirements related to the protection of human subjects, and section 4.1.1 Animal Welfare Requirements for specific requirements related to the protection of animal subjects, which are applicable to and a term and condition of this award.

OTHER PROGRAM-RELATED EXPENSES

Other program related expenses must be specifically required for the ESTEEMED program and must not duplicate items generally available at the institution. Items such as consultant costs, equipment, and mentoring exclusively for the ESTEEMED program are allowable. Costs for items generally available at the applicant institution will be deemed unallowable as charges to this grant.

For additional other program-related expense information access the NIBIB ESTEEMED FAQs at the following URL: https://www.nibib.nih.gov/training-careers/training-opportunities/enhancing-science-technology-engineering-and-math-educational-diversity-esteemed-research-education-experiences-r25/FAQ

STUDENT ALLOWANCE

The per student allowance is expected to cover costs for materials, supplies, or services that are needed for each ESTEEMED program participant.

For additional student allowance information access the NIBIB ESTEEMED FAQs at the following URL: https://www.nibib.nih.gov/training-careers/training-opportunities/enhancing-science-technology-engineering-and-math-educational-diversity-esteemed-research-education-experiences-r25/FAQ

NO NEW PARTICIPANT APPOINTMENTS DURING FINAL BUDGET PERIOD

No new participants may be appointed to the grant during final budget period without the written prior approval of the National Institutes of Health awarding component. This award is authorized for (5) reappointed participants in year (04). If the grantee exercises its authority to extend this final budget period

of the project period, only participants supported at that time may be reappointed during the extension period and only if the grantee has unexpended funds available.

| KEY PERSONNEL | | |
|---|---|---|
| Name | Approved LOE | Prior approval required at or below this LOE |
| Luna, Lopez Carlos | 1.25 summer | 0.938  summer |
| Tracey Brown | 1 summer | .75 summer |

The recipient is required to submit a prior approval request to the GMO if there is a significant change in the status of the PD/PI or other Senior/Key Personnel specifically named in the NoA including but not limited to withdrawing from the project entirely, being absent from the project during any continuous period of 3 months or more, or reducing time devoted to the project by 25 percent or more from the level that was approved at the time of initial competing year award.

NIH GPS 8.1.2.6 Change in Status, Including Absence of PD/PI and Other Senior/Key Personnel Named in the NoA.

| PRIOR APPROVAL SUBMISSION |
|---|

Prior approval requests for Change of PD/PI, Carryover, and No-Cost Extensions must be submitted electronically through the eRA Commons Prior Approval Module. All other post award requests should be submitted to NIBIBGrantsPostAward@nih.gov. All electronically submitted requests will be tracked and forwarded to the appropriate Grants Management personnel.


**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R25EB033075-03 REVISED

**INSTITUTION:** California State University San Marcos Corporation

| Budget | Year 3 |
|---|---|
| Salaries and Wages | $180,403 |
| Fringe Benefits | $18,448 |
| Personnel Costs (Subtotal) | $198,851 |
| Travel | $6,000 |
| Other | $15,000 |
| Participant  Travel | $7,500 |
| Participant Other | $7,500 |
| TOTAL FEDERAL DC | $234,851 |
| TOTAL FEDERAL F&A | $18,788 |
| TOTAL COST | $253,639 |

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 8% |
| F&A Cost Base 1 | $234,851 |
| F&A Costs 1 | $18,788 |

| From: | Bulls, Michelle (NIH/OD) [E] |
|---|---|
| To: | Chief GMOs |
| Cc: | Bulls, Michelle (NIH/OD) [E]; Ta, Kristin (NIH/OD) [E] |
| Subject: | Award Revision Guidance and List of Terminated Grants via letter on 3/12 |
| Date: | Thursday, March 13, 2025 4:03:00 PM |
| Attachments: | Termination Categories 3.13.25.docx |
| | Terminated Grants 3-12_no subprojects.xlsx |

Chiefs,

Attached are two items: 1) updated categories for you to use when issuing NOAs to officially terminate the awards where letters were issued, and 2) the list of termination letters that were issued yesterday. Please revise your NOAs related to the attached list by next **Wednesday, March 13, 2025, cob**. It is extremely important that issue the revised awards timely. If there are delays, please let me know and we can try to help somehow/some way. I appreciate you all.

**Please save this guidance** until we can clear the updated staff guidance, and you will need this to issue revised awards. Note: If your IC is not listed on the attached spreadsheet – no action is required, at this time.

**Guidance** for IC staff to use when terminating awards identified by HHS or the IC due to DEI or other agency priorities.

- Issue a revised NOA.
    1. Change the budget and project period end dates to match the date of the termination letter.
    2. OPERA will place a hard funds restriction on all documents within the excel spreadsheet. Do not deobigate any funds when you issue the revised award to terminate the projects. If there are no animals and humans, FFR-C will deobligate the awards after the Final FFRs are submitted. No deoblgiation actions required from the ICs.
    3. Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated.
    4. Termination Term to be used **DELETE THE OLD TERM RELATED TO DOLLAR AMOUNTS FOR HARD FUNDS RESTRICTIONS – IT IS NO LONGER APPLICABLE**.

        It is the policy of NIH not to prioritize ==[insert termination category language]==. Therefore, this project is terminated. ==[RECIPIENT NAME]== may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

        NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a

copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

Thanks,
Michelle

NIH_GRANTS_001958

Project SummaryThe COVID-19 pandemic and the c

PROJECT SUMMARYThis project seeks to use real-ti

PROJECT SUMMARYThe goal of the proposed resear

PROJECT SUMMARY/ABSTRACTDisparities continue
The All of Us Research Program has an explicit goal t

PROJECT SUMMARY/ABSTRACT An unprecedented n

PROJECT SUMMARY.Sexual and gender minority (SC

Project SummaryTransgender and other gender min
Project summary/abstractThe 2024 National LGBTQ
The All of Us Research Program has an explicit goal

Project SummaryBackground/Objective: Transgend

PROJECT SUMMARYNo changes being proposed.IN
Project SummaryThe goal of this study is to test the effic

Project SummarySexual and gender minorities (SGM

Project SummaryNearly half of sexual minority (SM)

The "Patient-Responsive Initiatives for Diverse Enga
Project SummaryCategorization is a fundamental as

ABSTRACTOne in two Black men who have sex with

PROJECT SUMMARYRacial ethnic and sexual and ge
Project Summary/AbstractThe Stanford Genomics D

Project SummaryThis proposal seeks continued sup
PROJECT SUMMARYTHIRD COAST CFAR DEi PROGF
PROJECT SUMMARYDiversity enhances creativity ar

Project SummaryThe scope of this study is to engag

The University at Buffalo (UB) NIMHD Center of Exce
Project Summary/AbstractBackground: Structural ra

Background: Black women represent the largest gro

Background: Black women represent the largest gro

Project SummaryStress is associated with HIV risk b

Project Summary Overdose deaths are exponentiall

AbstractTransgender and gender diverse adults (TGDAs)

PROJECT SUMMARY/ABSTRACTStructural racism an

Project Summary/ AbstractSocial justice is the prim

Project SummaryBlack and Latinx gay and bisexual men

Project Summary/Abstract The goal of this R01 is to

PROJECT SUMMARY Inequities in health manifest as

PROJECT SUMMARY/ABSTRACTIt is estimated that r

Project SummaryBlack cisgender women (hereafter

PROJECT SUMMARY/ABSTRACTThere is evidence of

Sex differences in immunity are dynamic throughout the
PROJECT ABSTRACTHeadache has been one of the top th
Project SummaryThis project will elucidate the psycho
Sex Hormones and Identity affect Nociceptive Expressio
PROJECT SUMMARYThis R01 proposal responds to N

NIH_GRANTS_001960

This proposal will undertake preclinical studies to a

PROJECT ABSTRACTWounds have a sizable impact

The University of Georgia (UGA) proposes a renewal of Pl

Project Summary/Abstract Science is failing minorities in

ABSTRACTThe vision of the Utah Clinical & Translational

Project SummaryThe goal of this study is to test the

PROJECT SUMMARY/ABSTRACTSexual minorities (i.

NIH_GRANTS_001961

Sex Hormones and Identity affect Nociceptive Expression (SHINE)
Unequal Parenthoods: Population Perspectives on Gender Race and Sexual Minority Disparities in Family Stress and Health During Crises
Impact of Social Cohesion and Social Capital in PrEP Uptake and Adherence Among Transwomen of Color
Measures of structural stigmatization and discrimination for HIV research with Latine sexual and gender minorities
Exploring Stigma Social Support and Cancer Screenings among Sexual and Gender Diverse People Living with HIV in Georgia
PRIDEnet for the All of Us Research Program
Supportive and restrictive factors and mental health in LGBT adolescent and young adult populations
Project SMART: Social Media Anti-vaping Messages to Reduce ENDS Use Among Sexual and Gender Minority Teens
Development and Pilot Evaluation of an Online Mentoring Program to Prevent Adversities Among Trans and Other Gender Minority Youth
National LGBT Health Conference 2024
PRIDEnet for the All of Us Research Program
Development of a School-Based Prevention Intervention to Promote Adolescent Mental Health Equity
Effects of Social Networks and Policy Context on Health among Older Sexual and Gender Minorities in the US South
Efficacy of a Multi-level School Intervention for LGBTQ Youth

Training Program in Translational Science HIV and Sexual and Gender Minority Health
An Innovative Prospective Model to Understand Risk and Protective Factors for Sexual Assault Experiences and Outcomes Among Sexual Minority Men
PRIDE-CARES Center: Patient-Responsive Initiatives for Diverse Engagement - LGBTQ+ Community Action in Research to Eliminate Substance Use Disorder
Views of Gender in Adolescence
Intersectional Discrimination and Sexual Health Among Young Black Men who Have Sex with Men: A Mixed Methods Study
SILOS: Structural Inequities across Layers Of Social-Context as Drivers of HIV and Substance Use
Genomics Diversity Summer Program (GDSP) at Stanford
A Longitudinal Examination of Mechanisms Underlying Intersectional Health Disparities in the United States
Partnering and Programming for a BIPOC SGM Pathway to HIV Research
Faculty Initiative for Improved Recruitment Retention and Experience (FIIRRE)

NIH_GRANTS_001962

Ending the HIV Epidemic with Equity: An All-facility Intervention to Reduce Structural Racism and Discrimination and Its Impact on Patient and Healthcare Staff Wellbeing

Igniting Hope in Buffalo New York communities: Training the Next Generation of Health Equity Researchers

Developing Modules to Address Microaggressions and Discriminatory Behaviors

Monitoring Microaggressions and Adversities to Generate Interventions for Change (MMAGIC) for Black Women Living with HIV

Monitoring Microaggressions and Adversities to Generate Interventions for Change (MMAGIC) for Black Women Living with HIV

Health disparities stress pathways and stress-related comorbidities among MSM living with HIV

Exploring Historical Trauma Racial Discrimination PTSD and Substance Use Among Black Young Adults

An intersectional approach linking Minority Stressors Experienced by Transgender and Gender Diverse Adults to Alcohol and Drug Use and comorbid Mental and Physical Health Outcomes

Universal basic income and structural racism in the US South: Differences in health service utilization between older African American men with and without experiences of recent incarceration

Securing Health Equity: Philosophical Foundations for Equality and Social Justice in Public Health and Health Care

Theoretically Informed Behavioral Intervention to Enhance QOL and Prevent HIV-related Comorbidities in Ethnic and Racial Sexual Minority Men

Identifying multilevel facilitators of care outcomes among Positive Deviants to design an intervention for Black sexual minority men living with HIV

Multilevel Racism & Discrimination and PrEP Outcomes Among Black SMM in the Southeastern U.S.

Understanding the effects of cross-sex hormone therapy on vaginal mucosal immunity

A Multi-Level Trauma-Informed Approach to Increase HIV Pre-exposure Prophylaxis Initiation among Black Women

A multi-level study of the link between fear of deportation and mental health in Latinx young adults: The role of systemic inflammation and related risk and protective factors

Understanding transgender women's immune and behavioral responses to seasonal COVID-19 vaccines to improve their uptake

Effect of pubertal hormones on Headache in Transmasculine Adolescents

The psychological underpinnings of gender disparities in adolescent mental health

Sex Hormones and Identity affect Nociceptive Expression (SHINE)

Androgen effects on the reproductive neuroendocrine axis

NIH_GRANTS_001963

Gender-Affirming Testosterone Therapy on Breast Cancer Risk and Treatment Outcomes

Molecular Mechanisms of Hormone-Mediated Sex Differences in Wound Healing

PREP at University of Georgia

Culturally-focused HIV Advancements through the Next Generation for Equity (CHANGE) Training Program

CTSA UM1 Program at University of Utah

Efficacy of a Multi-level School Intervention for LGBTQ Youth

The Socioecology of Sexual Minority Stigma: Data Harmonization to Address Confounding Bias and Investigate Cross-Level MentalHealth Effects

| | | |
|---|---|---|
| 3R01NR019417-03S1 | UNIVERSITY OF ALABAMA AT BIRMINGHAM | $50,000 |
| 5U01HD108779-04 | UNIVERSITY OF MINNESOTA | $225,000 |
| 5R01MD013554-05 | COLUMBIA UNIVERSITY HEALTH SCIENCES | $507,062 |
| 1R01MD020284-01 | DREXEL UNIVERSITY | $812,946 |
| 3R01NR020154-04S1 | EMORY UNIVERSITY | $87,833 |
| 4OT2OD025276-03 | STANFORD UNIVERSITY | $1,444,263 |
| 1R61HD117134-01 | HARVARD PILGRIM HEALTH CARE, INC. | $838,837 |
| 5R01DA054236-04 | UNIVERSITY OF PENNSYLVANIA | $681,337 |
| 5R21MD018509-02 | UNIVERSITY OF NEBRASKA LINCOLN | $236,949 |
| 1R13MH138043-01 | EMORY UNIVERSITY | $20,000 |
| 4OT2OD025276-03 | STANFORD UNIVERSITY | $1,444,263 |
| 1R34MH136018-01A1 | BOSTON COLLEGE | $139,551 |
| 3R01AG063771-05S1 | VANDERBILT UNIVERSITY | $99,998 |
| 5R01MD016082-04 | WASHINGTON UNIVERSITY | $565,297 |
| 5T32MH130325-03 | NORTHWESTERN UNIVERSITY AT CHICAGO | $497,664 |
| 5R01MD016384-03 | UNIVERSITY OF NEBRASKA LINCOLN | $767,135 |
| 1R24DA061190-01 | UNIVERSITY OF SOUTH CAROLINA AT COLUMBIA | $503,095 |
| 3R01HD092347-08S1 | PRINCETON UNIVERSITY | $97,554 |
| 1F31MH138075-01 | DUKE UNIVERSITY | $42,014 |
| 1R01DA061247-01 | NORTHWESTERN UNIVERSITY AT CHICAGO | $777,568 |
| 5R25HG010857-05 | STANFORD UNIVERSITY | $285,283 |
| 2R01HD094081-06A1 | UNIVERSITY OF MINNESOTA | $672,168 |
| 3P30AI117943-10S1 | NORTHWESTERN UNIVERSITY AT CHICAGO | |
| 5U54CA272171-03 | UNIVERSITY OF SOUTH CAROLINA AT COLUMBIA | $4,386,670 |

App.383

| | | |
|---|---|---|
| 5R01NR020583-03 | COLUMBIA UNIVERSITY HEALTH SCIENCES | $798,648 |
| 1P50MD019473-01 | STATE UNIVERSITY OF NEW YORK AT BUFFALO | |
| 5R25GM149980-02 | CHILDREN'S HOSP OF PHILADELPHIA | $91,048 |
| 3R01MH121194-04S1 | UNIVERSITY OF MIAMI CORAL GABLES | $72,588 |
| 5R01MH121194-04 | UNIVERSITY OF MIAMI CORAL GABLES | $642,346 |
| 5R01MD013495-05 | JOHNS HOPKINS UNIVERSITY | $1,285,395 |
| 1R36DA058830-01A1 | NEW SCHOOL UNIVERSITY | $53,501 |
| 5R01AA030275-02 | GEORGIA STATE UNIVERSITY | $501,825 |
| 5R01MD017509-03 | UNIV OF ARKANSAS FOR MED SCIS | $760,276 |
| 1G13LM014426-01 | UNIVERSITY OF WASHINGTON | $47,535 |
| 1R01MD019956-01 | YALE UNIVERSITY | $1,054,907 |
| 1R01NR021691-01A1 | GEORGE WASHINGTON UNIVERSITY | $676,457 |
| 5R01MH130166-03 | US HELPING US, PEOPLE INTO LIVING, INC. | $601,194 |
| 5R21AI178913-02 | BOSTON MEDICAL CENTER | $222,500 |
| 5R01MD019178-02 | JOHNS HOPKINS UNIVERSITY | $1,105,281 |
| 1F31MD019521-01A1 | UNIVERSITY OF HOUSTON | $36,978 |
| 1R21AI183544-01A1 Already terminated 3/ | NEW YORK BLOOD CENTER | $267,121 |
| 5K23NS130143-02 | UNIVERSITY OF COLORADO DENVER | $224,924 |
| 5F32MH135634-02 | PRINCETON UNIVERSITY | $73,828 |
| 5R01NR019417-03 | UNIVERSITY OF ALABAMA AT BIRMINGHAM | $473,872 |
| 5R01HD111650-02 already terminated | UNIVERSITY OF CALIFORNIA, SAN DIEGO | $581,671 |

NIH_GRANTS_001966

| | | |
|---|---|---|
| 1R56CA284564-01 | BETH ISRAEL DEACONESS MEDICAL CENTER | $299,940 |
| 1R35GM157032-01 | BRIGHAM AND WOMEN'S HOSPITAL | $442,444 |
| 2R25GM109435-10 | UNIVERSITY OF GEORGIA | $343,158 |
| 5T32MH126772-04 | UNIVERSITY OF MIAMI SCHOOL OF MEDICINE | $286,511 |
| 5UM1TR004409-02 | UNIVERSITY OF UTAH | $5,424,809 |
| 5R01MD016082-04 | WASHINGTON UNIVERSITY | $565,297 |
| 5R01MH133821-02 | SAN DIEGO STATE UNIVERSITY | $447,178 |
| | | $32,563,719 |

NIH_GRANTS_001967

**Termination Categories**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- Gender: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

May 16, 2025

**Jay Bhattacharya, M.D., PhD.**

Director, National Institutes of Health

RE: Termination of Grant No. 5R25EB033075

Dear Dr. Bhattacharya:

I write on behalf of California State University San Marcos Corporation, an officially recognized auxiliary organization of California State University San Marcos, to formally appeal the decision by NIH to terminate Grant No. 5R25EB033075, as communicated in your notice dated April 17, 2025. A copy of the termination notice is enclosed.

Pursuant to 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2, we respectfully submit this appeal and request for reconsideration on the basis that, among other reasons:

- California State University San Marcos Corporation has complied with all grant requirements and regulations.
- Grant No. 5R25EB033075 is fully aligned with federal objectives.

**1. California State University San Marcos Corporation has complied with all grant requirements and regulations.**

California State University San Marcos Corporation has complied with all NIH requirements and regulations, including administrative requirements in the NIH Grants Policy Statement.

This grant followed the NIH requirements to support research education and foster the development of undergraduate students to pursue careers in Bioengineering.

At the time, the grant required us to encourage the participation of individuals from diverse backgrounds, including those underrepresented in the biomedical sciences. We followed the established requirements by the NIH; we did not come up with those requirements ourselves. Furthermore, it is important to note that we always verified that all students participating in our program were there based on merit, and we did not discriminate based on race, sex or other protected characteristics. In fact, when a scholar did not perform adequately academically, we terminated them from our program, independently of their race, gender or other protected characteristics.

At the time of the termination, we had 3 white (not Hispanic) and 5 Hispanic students, which is comparable to the general student population at CSUSM (Latino 47%, Caucasian 27%). Based on our general student population, we would have expected to have approximately 3.29 white (not Hispanic) students and 5.71 (Hispanic students), indicating that no special treatment was used to select students. Thus, this indicates that our specific grant did not engage in DEI-related discrimination.

NIH_GRANTS_002221

More importantly, we followed the requirements on promoting bioengineering research. We followed the 3 elements required by the grant: 1) Summer Bridge, 2) Academic Year Activities and 3) Summer Research Activities. These activities were meant to expose students to bioengineering in their first and second years and prepare them to join honors programs in their junior and senior years. The end goal being to prepare students to pursue a doctoral degree and a career in bioengineering.

We did not engage in DEI-related discrimination. We followed NIH guidelines for the grant and we followed the goals set by the NIH. These goals were to educate students in bioengineering and to prepare them for honors program and eventually a doctoral degree.

**2. Grant No. 5R25EB033075 is fully aligned with federal objectives.**

Our grant had the following goals:

GOAL 1: Empower BEARS Scholars to accumulate personal, academic and research skills necessary to persist and complete their B.S. degree program, enter an advanced honors program in their junior year, and apply to graduate school in the biomedical sciences.

GOAL 2: Provide a comprehensive mentoring team that supports the academic, research, career, and personal/social/peer needs of our Scholars during their critical first few years

GOAL 3: To aid in diversity recruitment (As per the NIH guidelines for this grant, not CSUSM guidelines), promote local awareness of biomedical and bioengineering careers, and develop leadership skills, BEARS Scholars will become STEM Ambassadors.

Clearly, Goal 1 and 2 have no relation to DEI and they composed 90% of the grant.

Goal 3 consisted of visiting local high schools and we did not discriminate against students. In fact, our scholars presented to any high school students interested in bioengineering. As the NIH goals changed, we could have simply modified the language of this aim.

Goals 1 and 2 allowed students to conduct research in a variety of topics that did not have any DEI relationship, such as: Nerve Repair Methods Using Biomechanics, Investigating the Role of Rad51 Strand Invasion Function on CCTG Breakage, and Quick 32r CGX EEG Cap Electroencephalography.

Students were going to learn computational and mathematical skills during workshops. They were going to be connected to tutoring services available for calculus-based courses, chemistry and biology. They were going to participate in seminars, to help them improve stress management, interviewing, oral and writing skills. Students were going to have access to researchers at CSUSM and UCSD, including research in:

- Neuromuscular Engineering
- Biomechanics
- Rheumatoid Arthritis Research
- Cardiovascular Disease Research

- Stem Cell Biology
- Skeletal Muscle Research
- Genetics
- Microbiology
- T-Cell Biology
- Nanoscale Bioengineering
- Biophysics

None of these research topics are DEI studies, and they do not support discrimination on the basis of race and other protected characteristics. Instead, these topics seek to better the health and wellbeing of Americans.

3. **Termination of Grant No. 5R25EB033075 will cause irreparable harm to students, faculty and the community.**

The grant was terminated just when our second cohort was set to engage in their summer research experiences, effectively ending their chances to do bioengineering research, affecting their probability to pursue doctoral degrees and to obtain bioengineering or related jobs.

The grant termination affected students that decided to come to CSUSM because of our BEARS grant. Everyone followed the NIH requirements established when we submitted and got awarded the grant, and yet we affected the life and career of students, and future bioengineering researchers.

We were preparing our students for bioengineering research, teaching them quantitative and computational skills, research and the latest technologies. We had seminars and workshops prepared, and we began conversations with faculty to take them into their labs. Unfortunately, the grant was terminated when 9 students were about to engage in their research activities (not DEI related). This results in a low return on investment for the American taxpayer and the effort already invested on these students.

Furthermore, the topics that all students were going to do research on had no relation to DEI, we had Biophysics, Cell Biology, Nanoscale Bioengineering, Biomechanics, etc. All of these projects seek to better the health of Americans, to expand our knowledge of biology, lengthen human life and prevent and reduce illnesses. These topics are not DEI, climate change or vaccine related, nothing outside of the priorities of the administration.

We strongly believe that the grant can be achieved without any DEI components, that anything believed to be DEI can be removed and the main goal of bioengineering research and education can be fulfilled.

We had email conversations with NIH after our year 3 RPPR about the budget we would receive for our last notice of award. We prepared for the last year of the grant based on this, with the idea that we had followed all NIH requirements. We had our grant terminated on 4/18/25 but the end date of

the grant is dated to 2/28/25, this fails to account the two months that we had no conversations other than what we had already received over email about the budget for our Year 4 NOA.

The total amount in dispute is $361,594 for Years 3 and 4.

**REQUEST FOR RECONSIDERATION**

In light of the foregoing, we respectfully request that NIH:

1. Hold in abeyance any action, including withholding of funds, pending appeal of the termination.
2. Rescind the termination of Grant No. 5R25EB033075, as the program remains fully compliant with federal laws and objectives.

We appreciate NIH's consideration of this appeal and look forward to a fair and reasonable resolution. Please advise us of the next steps in the appeal process at your earliest convenience.

Sincerely,

**Trina Beckwith, MBA, CRA**
Associate Executive Director, Administration
California State University San Marcos Corporation
333 S. Twin Oaks Valley Road
San Marcos, CA 92096
tbeckwith@csusm.edu
(760) 750-4724

Enclosure:

- April 17, 2025 Notice of Termination NOA

NIH_GRANTS_002224

## NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities- March 2025

## Issue Date: March 25, 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI). Terminations that result from science that no longer effectuates NIH's priorities related to DEI, gender identity and other scientific areas must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims/major goals of the project to assess whether the proposed project contains any DEI, gender identity or other research activities that are not an NIH/HHS priority/authority. To avoid issuing awards, in error, that support these activities ICs must take care to completely excise all non-priority activities using the following categories.

ICs should review the current application/RPPR under consideration, only. ICs should not request retroactive changes to previous RPPRs and competitive applications to modify language related to research that has already been conducted. Categories 1-3 are IC determinations not those ordered by HHS.

**Category 1:** The sole purpose of the project is related to an area that is no longer an NIH/HHS priority/authority (e.g., diversity supplements, diversity fellowships, or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority. This applies to all projects, including phased awards, etc.

- o **Action:** ICs must not issue the award (competing or non-competing).
- o For ongoing projects where NIH will not issue the next Type 5 (IC determination not HHS list), the IC must:
  - o Issue a revised award to remove all outyears.
  - o Add the action to the master spreadsheet located at: OD OPERA Grant Action Tracking (access limited to CGMOs).
- o Include the following term in the revised NOA:

  *Term of Award:*

  It is the policy of NIH not to prioritize research programs related to [insert category from Appendix 3, verbatim]. Therefore, no additional funding will be awarded for this project, and all future years have been removed. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project, and remaining funds will be deobligated. Funds used to support any

other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

o   Check PMS to determine amount of funds remaining, and if funds are available request a hard funds restriction of all funds except $1 in PMS.

o   **No cost extension requests:** For second and third NCE's, ICs must determine if the sole purpose of the grant was to support research activities that are no longer an NIH/HHS priority/authority and, if so, issue an award to end the grant project (use disapproved extension term below). If the non-NIH/HHS priority/authority research activities are ancillary to the project, approve the extension (use approved extension term below). Reminder – even if a grant project is in an NCE, IC staff must still determine if non-NIH/HHS priority/authority activities are proposed during the extension period. Extensions may only be approved for orderly closeout, and funds may not be used to support any non-NIH/HHS priority/authority research activities.

o   ICs may use the following term of award when approving/disapproving NCEs:
   ▪   **Term of Award (approved extension):** The no-cost extension has been approved for this project to support orderly closeout of the project, only. NIH grants funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs. Any funds used to support such activities will result in a disallowance of costs, and funds will be recovered.
   ▪   **Term of Award (disapproved extension**): The no cost extension request for this project has been denied. Please proceed with orderly closeout of the project. NIH grant funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs.

**Category 2**: Project partially supports non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are

ancillary to the purpose of the project, in some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the Restriction Term of Award in Section IV of the Notice of Award. No exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

- o Note: Activities required to comply with NIH inclusion policies are not considered DEI activities.
- o **Action 1:** Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file. The recipient/awardee cannot rebudget these funds, they must be recovered by the IC. OPERA is consulting with eRA on options to collect these application updates in a structured format.
    - Sample language for requesting application updates from the AOR: It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa.] [Funding IC] has identified [insert appropriate activity taken from the list above] activities within section [XXXX] of your application. Please work with the PD/PI to update the application sections and adjust the budget as appropriate to remove all [insert appropriate activity] activities and submit these updates to the Program Official and Grants Management Specialist for review and approval.
- o **Action 2:** Once the IC and the applicant/recipient have reached an agreement, issue the award and include the following Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.

  **Term of Award (Approved 2/28/2025 – Refer to Appendix 4 for the approval from Dr. Memoli):**

  NIH and the recipient have renegotiated the scope of this award. Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.] research or related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

  This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes

[select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa., etc.] or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

- **Unable to remove activities that are not an NIH/HHS priority/authority:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the non-compliant activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Category 4.
- **Diversity Supplements:** Type 5 Diversity supplements may no longer be awarded. For ongoing awards, ICs must remove the diversity supplement activities prior to issuing the next Type 5 for the parent award and include the DEI Term and Condition of Award in Section IV of the NOA of the parent grant. The IC must revise the Diversity Supplement award to remove all outyears. If diversity supplement outyears were included in the previous NOA, the IC must revise the prior year award to remove references to those outyear commitments.
- **Conference Grants:** If a conference supported by an NIH grant focuses on scientific topics that are unrelated to DEI, but the conference itself is targeted at a specific population (e.g., underrepresented groups), the IC must work with the applicant/recipient to open the conference up to all populations. If a negotiation to broaden the target audience is not feasible, or the conference is no longer viable, then the IC must terminate the award following the process in Category 4.
- **Diversity Reports (e.g., Ts, R25, K12, and any others):** NIH is modifying the application instructions and RPPR instructions to remove requirements for diversity reports (e.g., Trainee Diversity Report). If ICs receive these reports in applications or RPPRs, the IC should not review the report. These reports provide diversity related information, but do not involve specific DEI activities.  ICs must use the following term: "NIH no longer requires the [name of diversity table/plans]. Therefore, NIH did not review the [name of diversity table/plans] provided. NIH funding may not be used to support any diversity, equity or inclusion (DEI) activities". Note: this section applies to diversity related reports, only. Other areas that are no longer NIH/HHS priorities/authority must be addressed under category 2 negotiations.
- **Administrative Supplement Requests:** Administrative supplement applications should be reviewed for any activities that are no longer NIH/HHS priorities/authority and modified as needed. ICs do not need to retroactively review the competitive parent grant application– only the supplement application requires review.

**Category 2B:**

Prospective reviews by GM where the DEI language in certain sections of the application has to be removed even though the project itself is not focused on DEI but may have language or have been awarded from a DEI NOFO that is expired/taken down for revision to go back up once the language is appropriately excised.

Examples below, and in these cases, IC should consider using the Category 2 term of award but remove the negotiation language from the term:

- Resource Section
- Biosketch
- RPPRs

**Category 2C:**

Subprojects terminated by HHS.

- OPERA will restrict the funds associated with the project. No action required from the IC.

**Category 3:** Project does not support any DEI activities
- Action: IC may proceed with issuing the award.

**Category 4/HHS Departmental Authority Terminations:**

- OPERA receives a list from the Director, NIH or designee.
- OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
    - **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
    - **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
    - **Linked (or equivalent) Awards**: If one linked (or equivalent) award is terminated, the IC is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- When a termination letter is received, the IC must:

    - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
        - Change the budget and project period end dates to match the date of the termination letter.

5

NIH_GRANTS_003220

- OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICs.
  - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.
  - Include the following Termination Term in the revised NOA:

    It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim]. Therefore, this project is terminated. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

    NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

  - Note: Appeals language must be included **prior to** October 1, 2025. After October 1, 2025, when HHS will fully adopt 2 CFR 200, per 2 CFR 200.340, termination actions taken based on agency priorities are not appealable. This is different from terminations based on noncompliance (administrative and programmatic).
- eRA provides OPERA with daily reports on NOAs issued, so ICs do not need to report to OPERA on each action completed.

**Category 5: Awards to Entities in certain foreign countries**

- Additional guidance on awards to foreign entities is forthcoming. At this time, ICs should hold all awards to entities located in South Africa or countries identified on any of the following lists.
  - State Department Countries of Particular Concern
  - State Sponsors of Terrorism
  - Final Rule Restricting Transfer of Personal U.S. Data to Countries of Concern

- Office of Foreign Assets Control Sanctions List

**Separation of Duties Guidance:**

OPERA has issued a Separation of Duties (SOD) waiver for all CGMOs, specific to the HHS Departmental Authorities termination actions, to allow IC CGMOs to work up and issue termination actions. Copy available in Teams.



**DEPARTMENT OF HEALTH & HEALTH SERVICES**

Office of the Secretary

Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371-372, the Secretary of Health and Human Services hereby DIRECTS as follows:

**Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

NIH_GRANTS_003223

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary

NIH_GRANTS_003224

**Appendix 2 – Guidance for staff to use on specific programs, awards, supplements.**

- o **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
- o **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated.
- o **Linked (or equivalent) Awards**: If one linked award is terminated, the IC is only required to terminate the specific award noted in the letter. The is should review and determine whether terminating that ward will have a structural impact on the scientific outcome originally intended by the IC and act as appropriate on the remaining awards.
- o **Diversity Tables** – Ignore and issue the grant using the term provided above.
- o **Diversity Plans** – Ignore and issue the award using the term provided above.

NIH_GRANTS_003225

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports. Use this language for HHS terminations only.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

- COVID: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

App.401

# Appendix 4 - Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval. Please let us know if you approve and we will implement.

Thank you,
Liza

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 5 – Notice of Funding Opportunity (NOFO) Guidance**

**[pending]**

NIH_GRANTS_003228

**Appendix 6 – Frequently Asked Questions**

1. **When reviewing applications for activities that are no longer an NIH/HHS priority/authority, should ICs review the content of Other Support submissions?**

   Other Support is used to disclose the PIs ongoing activities and support and should not be modified. ICs do not need to review Other Support for alignment with NIH/HHS priorities/authority.

2. **For phased awards where the second phase (i.e., Type 4) will not be awarded due to NIH/HHS priority/authority, how should the IC notify the recipient that the Type 4 will not be issued?**

   OPERA is following up on this question, and will provide additional guidance, when available.

3. **When revising awards to terminate a project, how should the IC respond to red bars in SEAR?**

   The IC should not contact recipients to request any additional information to address SEAR flags, because the project is being terminated. ICs can clear the SEAR flag with a comment that the project is being terminated.

4. **If a project is terminated on an HHS list or a Type 5 is withheld because the project is no longer an NIH/HHS priority/authority, can the IC issue a subsequent Type 2 award?**

   No. If a project has been terminated due to agency priorities, it is no longer eligible for a renewal award.

5. **For recipients of K awards that are terminated due to NIH/HHS priority/authority, will eligibility requirements be modified to allow the individual to apply for another K award?**

   OER is reviewing this policy and will provide additional guidance, when available.

6. **When ICs issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?**

   Yes, ICs must use the exact language provided in Appendix 3, with no edits.

NIH_GRANTS_003229

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 7 – Managing PMS Hard Funds Restrictions**

OPERA directs PMS to hard funds restrict awards, when termination letter is issued.

Recipients are required to request approval from OPERA before any draw that occurs after the termination. The request must include details related to human subjects or animal welfare. These are the only approvals that will be issued. OPERA will work with the IC to facilitate approvals and facilitate lifting restrictions in PMS. After approval is issued, the recipient can request the drawdown in PMS.

Recipients are required to request approval from OPERA to lift the restriction for payments of costs incurred on or before the date of the termination. For costs on or before the date of the termination, OPERA will work with PMS to lift the restriction as appropriate.

Note: Balances reported to HHS will change, as drawdowns are approved as outlined above. Reports to HHS will be updated as balances are modified. OPERA is responsible for maintaining up to date information for HHS reporting.

App.405

NIH_GRANTS_003230

## NIH Grants Management Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI). Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

> **Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.
>
> o Action: ICs must not issue the award.
>
> **Category 2**: Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).
>
> o Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.
>
> o Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.
>
>> ▪ **Note:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- o Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- o Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- o Action: IC may proceed with issuing the award.

NIH_GRANTS_003455

 **DEPARTMENT OF HEALTH & HEALTH SERVICES**          Office of the Secretary

Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.


_Dorothy A. Fink_

Dorothy A. Fink, M.D., Acting Secretary

App.409

NIH_GRANTS_003457

**Appendix 2 – Guidance for staff to use when terminating awards identified by HHS or the IC.**

- Issue a revised NOA.

    - Change the budget and project period end dates to match the date of the termination letter.

    - Check PMS, determine amount of funds remaining, and deobligate the amount reflected in PMS. It is very important to notify the FFR-C: OPERAFFRInquiries@od.nih.gov on all IC deoblgiations prior to reducing the award, so the FFR-C can deobligate any remaining 'cents' to avoid challenges with financial closeout.

    - Note: This applies to Multi-Year Funded Awards, as well. Please contact the FFR-C if you have questions regarding deobligating funds to avoid placing the recipient in debt collection.

    - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and the HHS requests a termination, the project must be terminated

    - Use the following termination term: This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated. [Refer to Appendix 3 for language provided to NIH by HHS.] Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant to avoid unilateral closeout.

    - Insert restriction language that allows for the recipients to use a portion of funds to support the health and safety of patients and orderly closeout of the project.

        - Sample language for use: "Funds in the amount of $xxxxxxx [insert $ amount total cost] may be used to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered."

- Appeals language must be used (prior to October 1, 2025):
    - NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2.  This letter represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli.

        Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally,

the appeal must be signed by the institutional official authorized to sign award applications and must be postmarked no later than 30 days after the postmarked date of this notice.

- Termination actions taken based on agency priorities do not require appeals language because the action was not based on administrative nor programmatic noncompliance

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award. Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review

includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

CONFIDENTIAL

NIH_GRANTS_003460

| From: | Memoli, Matthew (NIH/OD) [E] |
| To: | Bundesen, Liza (NIH/OD) [E] |
| Cc: | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| Subject: | Re: Clean Version of DEI Restriction Term - Final |
| Date: | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval.  Please let us know if you approve and we will implement.

Thank you,
Liza

 

03/20/2025

Wendy Beaver
UNIVERSITY OF IOWA
nih@uiowa.edu

Dear Wendy Beaver:

Effective with the date of this letter, funding for Project Number 5R01HG012697-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

NIH_GRANTS_003607

before taking action unless public health or welfare concerns require immediate action. However, even if a recipient is taking corrective action, NIH may take proactive actions to protect the Federal government's interests, including placing specific conditions on awards or precluding the recipient from obtaining future awards for a specified period, or may take action designed to prevent future non-compliance, such as closer monitoring.

## 8.5.1 Specific Award Conditions: Modification of the Terms of Award

During grant performance, the GMO may include specific award conditions in the grant award to require correction of identified financial or administrative deficiencies as a means of protecting NIH's interests and effecting positive change in a recipient's performance or compliance. When specific conditions are imposed, the GMO will notify the recipient in writing of the nature of the conditions, the reason why they are being imposed, the type of corrective action needed, the time allowed for completing corrective actions, and the method for requesting reconsideration of the conditions. See 42 CFR Part 52.9 and 2 CFR Part 200.339.

The NIH awarding IC may withdraw approval of the PD/PI or other senior/key personnel specifically referenced in the NoA if there is a reasonable basis to conclude that the PD/PI and other such named senior/key personnel are no longer qualified or competent to perform the research objectives. In that case, the awarding IC may request that the recipient designate a new PD/PI or other named senior/key personnel.

Generally, the decision to modify the terms of an award (e.g., by imposing specific award conditions) is discretionary on the part of the NIH awarding IC and is not appealable.

## 8.5.2 Remedies for Noncompliance or Enforcement Actions: Suspension, Termination, and Withholding of Support

If a recipient has failed to comply with the terms and conditions of award, NIH may take one or more enforcement actions which include disallowing costs, withholding of further awards, or wholly or partly suspending the grant, pending corrective action. NIH may also terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. The regulatory procedures that pertain to suspension and termination are specified in 2 CFR Parts 200.340 through 200.343.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
AMERICAN PUBLIC HEALTH ASSOCIATION;)
IBIS REPRODUCTIVE HEALTH;          )
INTERNATIONAL UNION, UNITED        )
AUTOMOBILE, AEROSPACE, AND         )
AGRICULTURAL IMPLEMENT             )
WORKERS (UAW); BRITTANY CHARLTON;  )
KATIE EDWARDS; PETER LURIE; and    )
NICOLE MAPHIS,                     )
                                   )
                 Plaintiffs,       )     CIVIL ACTION NO.
         v.                        )     25-10787-WGY
                                   )
NATIONAL INSTITUTES OF HEALTH;     )
JAY BHATTACHARYA, in his official  )
capacity as Director of the        )
National Institutes of Health;     )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES; and ROBERT F.  )
KENNEDY, JR., in his official      )
capacity as Secretary of the       )
United States Department of Health )
and Human Services,                )
                                   )
                 Defendants.       )
_____ )


_____ )
COMMONWEALTH OF MASSACHUSETTS;     )
STATE OF CALIFORNIA; STATE OF      )
MARYLAND; STATE OF WASHINGTON;     )
STATE OF ARIZONA; STATE OF         )
COLORADO; STATE OF DELAWARE;       )
STATE OF HAWAI'I; STATE OF         )
MINNESOTA; STATE OF NEVADA;        )
STATE OF NEW JERSEY; STATE OF      )
NEW MEXICO; STATE OF NEW YORK;     )
STATE OF OREGON; STATE OF RHODE    )
ISLAND; and STATE OF WISCONSIN,    )
                                   )

App.416

```
                                    )
                                    )
                    Plaintiffs,     )     CIVIL ACTION NO.
            v.                      )     25-10814-WGY
                                    )
ROBERT F. KENNEDY, JR., in his      )
official capacity as Secretary of   )
Health and Human Services;          )
UNITED STATES DEPARTMENT OF         )
HEALTH AND HUMAN SERVICES;          )
JAYANTA BHATTACHARYA, in his        )
official capacity as Director of    )
the National Institutes of Health;  )
NATIONAL INSTITUTES OF HEALTH;      )
NATIONAL CANCER INSTITUTE;          )
NATIONAL EYE INSTITUTE;             )
NATIONAL HEART, LUNG, AND BLOOD     )
INSTITUTE; NATIONAL HUMAN GENOME    )
RESEARCH INSTITUTE; NATIONAL        )
INSTITUTE ON AGING; NATIONAL        )
INSTITUTE ON ALCOHOL ABUSE AND      )
ALCOHOLISM; NATIONAL INSTITUTE      )
OF ALLERGY AND INFECTIOUS           )
DISEASES; NATIONAL INSTITUTE OF     )
ARTHRITIS AND MUSCULOSKELETAL AND   )
SKIN DISEASES; NATIONAL             )
INSTITUTE OF BIOMEDICAL IMAGING     )
AND BIOENGINEERING; EUNICE KENNEDY  )
SHRIVER NATIONAL INSTITUTE OF       )
CHILD HEALTH AND HUMAN              )
DEVELOPMENT; NATIONAL INSTITUTE     )
ON DEAFNESS AND OTHER               )
COMMUNICATION DISORDERS;            )
NATIONAL INSTITUTE OF DENTAL        )
AND CRANIOFACIAL RESEARCH;          )
NATIONAL INSTITUTE OF DIABETES      )
AND DIGESTIVE AND KIDNEY            )
DISEASES; NATIONAL INSTITUTE        )
ON DRUG ABUSE; NATIONAL             )
INSTITUTE OF ENVIRONMENTAL          )
HEALTH SCIENCES; NATIONAL           )
INSTITUTE OF GENERAL MEDICAL        )
SCIENCES; NATIONAL INSTITUTE OF     )
MENTAL HEALTH; NATIONAL INSTITUTE   )
ON MINORITY HEALTH AND HEALTH       )
DISPARITIES; NATIONAL INSTITUTE     )
OF NEUROLOGICAL DISORDERS AND       )
```

[2]

App.417

```
STROKE; NATIONAL INSTITUTE OF       )
NURSING RESEARCH; NATIONAL LIBRARY   )
OF MEDICINE; NATIONAL CENTER FOR     )
ADVANCING TRANSLATIONAL SCIENCES;   )
JOHN E. FOGARTY INTERNATIONAL        )
CENTER FOR ADVANCED STUDY            )
IN THE HEALTH SCIENCES; NATIONAL     )
CENTER FOR COMPLEMENTARY AND         )
INTEGRATIVE HEALTH; and CENTER       )
FOR SCIENTIFIC REVIEW,               )
                                     )
                    Defendants.      )
_____)
```

YOUNG, D.J.                                    July 2, 2025

### FINDINGS OF FACT, RULINGS OF LAW, AND
### ORDER FOR PARTIAL SEPARATE AND FINAL JUDGMENT

## I.    INTRODUCTION

These consolidated actions are two of many in this

district, and across the Nation, claiming that current Executive

Branch policies, mostly through Executive Orders, have been

implemented by various agencies in violation of the

Administrative Procedure Act, statutory law, and the

Constitution.  Based upon the evidence presented at the hearing

on the APA claims and bench trial of the remainder, this Court

concludes what has been occurring at the Department of Health

and Human Services ("HHS") and the National Institutes of Health

("NIH") with respect to its disruption of grants, the grant

making process and the pipeline of future scientists by

[3]

App.418

forbidding by fiat certain topics, is on this Administrative
Record, illegal under the Administrative Procedure Act ("APA").

After this Court collapsed the separate motions for
preliminary injunctions into a single consolidated trial
pursuant to Rule 65(a), and after hearing on the Administrative
Procedure Act claims and a bench trial on the Constitutional
claims (Phase One), in both actions save -- for the APA delay
claims (Phase Two), the Court provides its findings of fact and
rulings of law pursuant to Rule 52(a) of the Federal Rules of
Civil Procedure as to Phase One.

## II.  PROCEDURAL HISTORY

In American Public Health Association et al. v. the
National Institutes of Health et al., Civ No. 25-10787 ("the
'10787 Action"), the American Public Health Association
("APHA"), Ibis Reproductive Health, the International Union,
United Automobile, Aerospace, and Agricultural Implement
Workers, Dr. Brittany Charlton, Dr. Katie Edwards, Dr. Peter
Lurie, and Dr. Nicole Maphis (collectively, "the APHA
Plaintiffs") seek declaratory and injunctive relief against the
National Institutes of Health ("the NIH"), NIH Director Jay
Bhattacharya in his official capacity, and Secretary of Health
and Human Services Robert F. Kennedy, Jr. in his official
capacity.

[4]

App.419

Similarly, in <u>Commonwealth of Massachusetts et al.</u> v.
<u>Kennedy et. al.,</u> Civ No. 25-10814 ("the '10814 Action"), the
Commonwealth of Massachusetts along with 15 other States[1]
(referred to collectively as "the State Plaintiffs"), sue
Secretary Kennedy, the Director Bhattacharya, and the federal
institutes and centers[2] (in both actions the defendants are
referred here collectively as "the Public Officials" and the
APHA Plaintiffs and State Plaintiffs referred to collectively as

---

[1]  In addition to the Commonwealth of Massachusetts, the
State of California, the State of Maryland, the State of
Washington, the State of Arizona, the State of Colorado, the
State of Delaware, the State of Hawai'i, the State of Minnesota,
the State of Nevada, the State of New Jersey; the State of New
Mexico; the State of New York, the State of Oregon, the State of
Rhode Island; and the State of Wisconsin join as plaintiffs.

[2]  Those ICs are: the National Cancer Institute, the
National Eye Institute, the National Heart, Lung, and Blood
Institute, the National Human Genome Research Institute, the
National Institute on Aging,  the National Institute on Alcohol
Abuse and Alcoholism, the National Institute of Allergy and
Infectious Diseases, the National Institute of Arthritis and
Musculoskeletal and Skin Diseases, the National Institute of
Biomedical Imaging and Bioengineering, the Eunice Kennedy
Shriver National Institute of Child Health and Human
Development, the National Institute on Deafness and Other
Communication Disorders, the National Institute of Dental and
Craniofacial Research, the National Institute of Diabetes and
Digestive and Kidney Diseases, the National Institute on Drug
Abuse; the National Institute of Environmental Health Sciences,
the National Institute of General Medical Sciences, the National
Institute of Mental Health, the National Institute on Minority
Health and Health Disparities, the National Institute of
Neurological Disorders and Stroke, the National Institute of
Nursing Research, the National Library of Medicine, the National
Center for Advancing Translational Sciences, the John E. Fogarty
International Center for Advanced Study in the Health Sciences,
the National Center for Complementary and Integrative Health,
and the Center for Scientific Review.

App.420

"the Plaintiffs"). Both actions arise from the NIH's newly-minted war against undefined concepts of diversity, equity and inclusion and gender identity, that has expanded to include vaccine hesitancy, COVID, influencing public opinion and climate change.

The actions were randomly reassigned to this Court on May 1, 2025. Elec. Notice Reassignment, ECF No. 99. The Court collapsed the motions into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.[3] The Court has ruled on jurisdictional issues and a broader motion to dismiss. See Mem. & Order, '10787 Action, ECF No. 84; Mem. & Order, '10817 Action, ECF No. 105.

The trial was divided into two phases largely based on the APA claims, but each phase including other claims: Phase One, APA Section 706(2) (primarily arbitrary and capricious claims) and concomitant statutory and constitutional claims), and Phase Two, Section 706(1) (primarily the delay claims).

The Court held a full hearing and bench trial as to Phase One. At the conclusion of the trial of Phase One, the Court

---

[3] The Court acknowledges that its usual process is expeditious, it observes that while this matter has proceeded to trial, injunctive relief has recently issued as to other actions relating to HHS's and the NIH's actions. See New York v. Kennedy, No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *13 (D.R.I. July 1, 2025); Massachusetts v. Nat'l Institutes of Health, 770 F. Supp. 3d 277 (D. Mass. 2025) (Kelley, J.), judgment entered, No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025).

App.421

ruled from the bench that the Challenged Directives taken as a whole, were arbitrary and capricious final agency action, as well as were the terminations of the grants in accordance therewith; the Court took the rest of the matter under advisement.  The Court now provides its complete findings of fact and rulings of law as to so much of Phase One as pertains to the APA claims raised therein and addressed from the bench[4] as

---

[4] Time is of the essence in this equity case.  For that reason, the Court entered a partial judgment under Fed. R. Civ. P. 54(b) to allow for a prompt appeal of a "clean" decision on the APA claims.  Partial Final Judgment, '10787 Action, ECF No. 138; Partial Judgment, '10814 Action, ECF No. 151.  Quite properly, the Public Officials have promptly appealed.  Notice of Appeal, '10787 Action, ECF No. 139; Notice of Appeal '10814 Action, ECF No. 152.  The Public Officials sought a stay pending the appeal, which this Court denied.  See Order, '10787 Action, ECF No. 147; Order, '10814 Action, ECF No. 160.

On the ground, while the HHS continues to repeat its now-familiar dirge of empty triumphalism, see https://www.reuters.com/business/healthcare-pharmaceuticals/federal-judge-says-trump-cuts-nih-grants-are-illegal-politico-reports-2025-06-16/, the NIH appears to be working in good faith to reassemble its grant-making machinery. See e.g., https://www.nytimes.com/2025/06/25/science/nih-grant-terminations-halted.html; https://www.science.org/content/article/nih-will-reinstate-900-grants-response-court-order; https://www.masslive.com/news/2025/06/20-nih-grants-restored-to-umass-system-after-judge-rules-against-trump-admin.html

More is required to be done on Phase One.  In addition to ruling on Constitutional law questions, the Court must address:

**Racial Discrimination – Constitutionally Prohibited**

The Court has found as fact that there was pervasive racial discrimination in selecting grants for termination.  It needs to

[7]

App.422

_____

fashion a permanent injunction to prevent any continuation of
this practice.

### Gender Discrimination — Statutorily Prohibited

Speaking from the bench following closing arguments, the
Court had not sufficient time to analyze and reflect on the
administrative record such that it could make a finding of
gender discrimination.  Now it has.

The Court finds by a fair preponderance of the evidence
that the grant terminations here at issue demonstrate an
unmistakable pattern of discrimination against women's health
issues.  The Court thus needs to afford the parties a chance to
present evidence of the harm resulting from such terminations
and, in the absence of such evidence, whether this is one of
those cases "likely of repetition but evading review."

### LGBTQ+ Discrimination — No Federal Remedy

This Court's factual finding that there has been extensive
discrimination against everyone whose lived experience of their
sexuality is in any way different from the executive orthodoxy
expressed in the President's fiat, see Exec. Order 14168, 90
Fed. Reg. 8615 (Jan. 20, 2025), is fully affirmed.  What changed
in the days following this Court's finding is the Supreme
Court's teaching concerning these matters.  I had thought the
factual finding warranted a more complete equal protection
analysis.  The decision in United States v. Skrmetti, 145 S. Ct.
1816, 1832 (2025) quite clearly forecloses such analysis.
Justice Barrett's concern about imprecision in language
addressing these matters, and the skepticism of Justices Thomas
and Alito about the role of science, Id. at 1851 (Barrett, J.,
concurring); 1852 (Thomas, J., concurring), 1867 (Alito, J.,
concurring) leads this Court to conclude that, while here there
is federal government discrimination based on a person's status,
not all discrimination is pejorative.  After all, setting the
voting age, excluding felons from the franchise, and regulating
a young person's access to obscene material, see Free Speech
Coal., Inc. v. Paxton, No. 23-1122, 2025 WL 1773625, at *9 (U.S.
June 27, 2025); Simmons v. Galvin, 575 F.3d 24, 42 (1st Cir.
2009), all "discriminate" based upon an individual's status.
They all fall within the state's police powers.  This Court is
thus not warranted in considering injunctive relief as to an
officer of the United States on this ground (despite the fact
that these grant determinations were here arbitrary and

[8]

App.423

required under Rule 52(a) of the Federal Rules of Civil

Procedure.

**III. FINDINGS OF FACT**

      **A.    The National Institutes of Health –- The World**
             **Standard of Research**

    The HHS is an Executive Agency of the United States.  See

generally, 42 U.S.C. § 3501a et seq.  The National Institutes of

Health is an agency of the HHS, and is comprised of 27 separate

institutes and centers ("ICs") that focus on certain diseases or

human body systems.

    The NIH is run by its Director.  Under the Director, there

are five deputy directors: (1) Principal Deputy Director; (2)

Deputy Director for Intramural Research; (3) Deputy Director of

Extramural Research; (4) Deputy Director for Management; and (5)

Deputy Director for Program Coordination, Planning, and

Strategic Initiatives.  See https://www.nih.gov/about-

nih/organization/nih-leadership.

    Congress, through the Public Health Service Act ("the

PHSA"), 42 U.S.C. § 201 et seq., mandates that the Secretary of

HHS promote research "relating to the causes, diagnosis,

---

capricious under the APA) because, at least as to puberty
blockers, what is a denial of equal protection of the laws in
some states is sound public policy in Tennessee.
    This Court regrets serving up matters for appeal on a
piecemeal basis but the exigencies of an equitable action and
unfolding reality require it.

App.424

treatment, control, and prevention of physical and mental diseases and impairments," including by, among other things and relevant here, offering "grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals." 42 U.S.C. §241(a)(3).  The NIH has similar statutory mandates.  42 U.S.C. §§ 282(b), 284(b).

Congress requires the NIH operate predictably and with stability, not just for its understanding of how the NIH is fulfilling its duties to the American people, but also to provide a predictable path for researchers.  Specifically, Congress by statute requires the NIH to provide a "National Institutes of Health Strategic Plan" (the "Strategic Plan") every six years in order "to provide direction to [the NIH's] biomedical research investments." Id. §282(m)(1).

The Strategic Plan's purpose is manifold: providing direction to NIH's research investment, increasing efficiencies across the ICs, leveraging scientific opportunity, and advancing biomedicine.  Id. [5]

---

[5] Section 282(m)(1) provides:

[A]t least every 6 years . . . the Director of the National Institutes of Health shall develop and submit to the appropriate committees of Congress and post on the Internet website of the National Institutes of Health, a coordinated strategy (to be known as the "National Institutes of Health Strategic Plan") to

App.425

The Strategic Plan forms the foundation of the NIH's work. Indeed, NIH is mandated to "ensure that **scientifically based** strategic planning is implemented in support of research priorities as determined by the agencies of the National Institutes of Health, and through the development, implementation, and updating of" the Strategic Plan.  42 U.S.C. § 282(b)(5) (emphasis added).

The Strategic Plan is required to "identify strategic priorities and objectives in biomedical research" of areas such as assessment of the "state of biomedical and behavioral research" and opportunities therein, "priorities and objectives to advance the treatment, cure and prevention of health conditions," "emerging scientific opportunities," "health challenges" and "scientific knowledge gaps."  42 U.S.C. § 282(m)(2)(A).  The Strategic Plan is also required to identify "near-.mid-,and long term scientific needs."  Id.

The Strategic Plan is a statutorily imposed collaboration, requiring the NIH to consult "with the directors of the national

---

**[(1)]** provide direction to the biomedical research investments made by the National Institutes of Health, **[(2)]** to **facilitate collaboration** across the institutes and centers, **[(3)]** to **leverage scientific opportunity**, and **[(4)]** to **advance biomedicine.**

42 U.S.C. § 282(m) (emphasis added).

App.426

research institutes and national centers, researchers, patient advocacy groups, and industry leaders." 42 U.S.C. § 282(m)(4)

Congress historically has paid close attention to its tax-dollar investments in medical, health and behavioral research. In some cases, it has expressed its research priorities directly in the PHSA, see e.g. Section 283(p). For example, Congress has by statute created ICs dedicated to certain systems, and minority populations.

The NIH is the primary source of federal funding for biomedical research in the United States, and is the largest public funder of biomedical research in the world. Due to its operations, NIH has contributed to profound medical breakthroughs and through its funding trains future generations of scientists. It is tax-payer investment in the health and welfare not just of Americans, but humanity. Broadly, the NIH performs research within federal facilities, also called "intramural" research. It also supports research through funding of competitive grants to researchers and institutions outside the federal system. This is known as "extramural" research, and is what is at issue in these consolidated actions.

The NIH's process to allocate funding from Congress for extramural research is covered by several statutes and regulations. See 42 C.F.R. § 52 et seq.; . The Court presumes the parties' familiarity with the process, but broadly, with

App.427

respect to extramural research, researchers must apply to the
NIH for funding.  The NIH, in line with its priorities, invites
proposals for grants through what is known as "Notice of Funding
Opportunity" ("NOFO").  In simple terms, the applications go
through a three-step process: a scientific review group, and if
successful, then to the advisory council.  If the application is
approved by the advisory council, their recommendation proceeds
to the IC's director who makes the ultimate funding decision.

Grants are, understandably, oftentimes not a one-time
event.  Research takes time, often requiring continuation grants
or multiple grants.  The NIH's framework of stability and
predictability has proven itself time and again over the past
several decades over multiple administrations.  It is one reason
the United States, through the support of the hard-working
government workers at HHS and the NIH, in partnership with the
scientific research community, has been unsurpassed in its
contributions to breakthroughs in science that have enhanced our
lives.  To be sure, there are priorities, as funding is not
unlimited, and administrations each have differing views on what
those priorities ought be, but the NIH's priority changes have
been predictable.  What is clear is that Congress intends for
the NIH to operate with Congressional oversight and certainly
some statutory direction, but by and large leaves the science to
the scientists.  Indeed, the American people have enjoyed a

[13]

historical norm of a largely apolitical scientific research agency supporting research in an elegant, merit-based approach that benefits everyone.

That historical norm changed on January 20, 2025. The new Administration began weaponizing what should not be weaponized -- the health of all Americans through its abuse of HHS and the NIH systems, creating chaos and promoting an unreasonable and unreasoned agenda of blacklisting certain topics, that on this Administrative Record, has absolutely nothing to do with the promotion of science or research.

### B.    Timeline of Events

1.    **January 20, 2025 – January 21, 2025 -- Executive Orders 14151, 14168, and 14173 are issued.**

The Executive Branch decided early on, through Executive Orders, to focus on eradicating anything that it labels as Diversity, Equity and Inclusion ("DEI"), an undefined enemy. No one has ever defined it to this Court -- and this Court has asked multiple times. Indeed, as will be demonstrated, while the Executive, HHS, and the NIH certainly identify the acronym DEI and its component words, it's definition is purely circular reasoning: DEI is DEI. It also is focused on gender identity as a priority, proclaiming through Executive Orders its concerns. The Executive Branch, of course, has every right to espouse its views, and this Court opines on neither their veracity nor

wisdom.  Nevertheless, the Executive Orders lay the groundwork
for what occurred at HHS and the NIH.

        **a.  Executive Order 14151**

On January 20, 2025, the President issued Executive Order
No. 14151, entitled "Ending Radical and Wasteful Government DEI
Programs and Preferencing."  Exec. Order 14151, 90 Fed. Reg.
8339 (Jan. 20, 2025) ("EO 14151").  EO 14151 focuses on ending
what the Executive views as a perceived "infiltration" of the
federal government  of "illegal and immoral discrimination
programs of the Biden Administration going by the name
'Diversity, Equity and Inclusion'".  Id.  EO 14151 posits that
DEI is mutually exclusive to "serving every person with equal
dignity and respect."  Id.  Under the guise of "making America
great," EO 14151 instructs the Attorney General and others to
"coordinate the termination of all discriminatory programs,
including illegal DEI and 'diversity, equity, inclusion, and
accessibility' (DEIA) mandates, policies, programs, preferences,
and activities in the Federal Government, under whatever name
they appear."  Id.  EO 14151 does not define DEI.  Additionally,
and pertinent here, EO14151 directs each federal agency head to
"terminate, to the maximum extent allowed by law, all 'equity-
related' grants or contracts" within 60 days.  Id.  This too has
broad, undefined contours.  As one Court recently noted, "'[t]he
vagueness of the term 'equity-related' grants or contracts

[15]

App.430

invites arbitrary and discriminatory enforcement and does not provide sufficient notice to grantees as to what types of speech or activity they must avoid to prevent termination of their grants or contracts -- compelling grantees and grant applicants to steer far too clear of the forbidden area of anything related to the broad and undefined term of equity.'" San Francisco A.I.D.S. Found. v. Trump, No. 25-CV-01824-JST, 2025 WL 1621636, at *21 (N.D. Cal. June 9, 2025) (cleaned up).

### b.  Executive Order 14168

On January 20, 2025, the President also issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  The President claims that women need protection from transgender persons:

> Efforts to eradicate the biological reality of sex
> fundamentally attack women by depriving them of their
> dignity, safety, and well-being.  The erasure of sex
> in language and policy has a corrosive impact not just
> on women but on the validity of the entire American
> system.  Basing Federal policy on truth is critical to
> scientific inquiry, public safety, morale, and trust
> in government itself.

Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("EO 14168").  The EO goes on to proclaim that "gender ideology" somehow "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," that it is a "false claim," and that "includes the idea that there is a vast

[16]

App.431

spectrum of genders that are disconnected from one's sex." Id. §2(f). Pertinent here, the Executive seeks to stamp "gender ideology" out: "Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Id. §3(f).

### c. Executive Order 14173

On January 21, 2025, President issued Executive Order No. 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("EO 14173"). Similar to EO 14151, EO 14173 purportedly seeks to end "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]," and the order requires the Director of the OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." Id. There is, conspicuously, no definition of DEI.

2.    **January 21, 2021, The Pause Directive.**

On January 21, 2025, HHS Acting Secretary Dorothy Fink ("Acting Secretary Fink"), appointed January 20, 2025, ordered an immediate communication pause until February 1, 2025.  R. 1. ("the Pause Directive").

[18]

App.433



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Washington, D.C. 20201

**TO:**       Heads of Operating Divisions Head
              Heads of Staff Divisions

**THROUGH:** Wilma M. Robinson, Ph.D., Deputy Executive Secretary

**FROM:**     Dorothy A. Fink, MD, Acting Secretary

**DATE:**     January 21, 2025

**SUBJECT:**  Immediate Pause on Issuing Documents and Public Communications – ACTION

As the new Administration considers its plan for managing the federal policy and public communications processes, it is important that the President's appointees and designees have the opportunity to review and approve any regulations, guidance documents, and other public documents and communications (including social media). Therefore, at the direction of the new Administration and consistent with precedent, I am directing that you immediately take the following steps through February 1, 2025:

1. Refrain from sending any document intended for publication to the Office of the Federal Register until it has been reviewed and approved by a Presidential appointee. Please note that the Office of the Executive Secretary (Exec Sec) withdrew from OFR all documents that had not been published in the Federal Register to allow for such review and approval.
2. Refrain from publicly issuing any document (e.g., regulation, guidance, notice, grant announcement) or communication (e.g., social media, websites, press releases, and communication using listservs) until it has been reviewed and approved by a Presidential appointee.
3. Refrain from participating in any public speaking engagement until the event and material have been reviewed and approved by a Presidential appointee.
4. Coordinate with Presidential appointees prior to issuing official correspondence to public officials (e.g., members of Congress, governors) or containing interpretations or statements of Department regulations or policy. Nothing in this guidance is intended to limit an employee's personal correspondence with members of Congress or other third parties, including an employee's whistleblower protected communications.
5. Notify Exec Sec promptly of any documents or communications that you believe should not be subject to the directives in paragraphs 1-4 because they are required by statute or litigation; affect critical health, safety, environmental, financial, or national security functions of the Department; or for some other reason. Please provide the title, a brief summary, the target release date, and the rationale for expedited release to your Exec Sec Policy Coordinator.

The President's appointees intend to review documents and communications expeditiously and return to a more regular process as soon as possible.

1

NIH_GRANTS_000001

App.434

If you identify any actions taken inconsistent with these requests, please know they shall not be considered impliedly ratified. These items should be immediately withdrawn or rescinded to deem them as void and without effect.

Thank you for your assistance in ensuring a smooth transition consistent with our nation's democratic principles.

*Dorothy A. Fink*

Dorothy A. Fink, MD, Acting Secretary

R. 1-2.[6]  Although referenced for completeness, this Challenged

Directive relates to Phase 2 of this Action, so will not be

discussed further at this time.

> 3.    **February 10, 2025 -- The Secretarial Directive --
>        Challenged Directive 2**

On February 10, 2025, Acting Secretary Fink, issued the

following "Secretarial Directive on DEI-Related Funding" ("the

Secretarial Directive"):

---

[6] Stylistically, this Court usually avoids inserting full
documents in its opinions lest bulk substitute for analysis.
Here, however, no paraphrasing can replace the originals and
convey what was actually going on.

App.435



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.

1

App.436

> This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.
>
> I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.
>
> *Dorothy A. Fink*
> Dorothy A. Fink, M.D., Acting Secretary

R. 4-5. In what will be a common theme throughout the agency action, Dr. Fink chose not to define DEI at all, but merely echoed the EOs, lumping DEI -- whatever DEI is -- as somehow "discriminatory" in nature. Id. Presumably, Dr. Fink, a highly educated physician and acclaimed researcher,[7] understood the downstream effects of the absence of definition. There is conspicuously nothing else in the Administrative Record concerning the Secretarial Directive.

---

[7] Dr. Fink is currently Deputy Assistant Secretary for Women's Health and Director of the Office of Women's Health in the Office of the Assistant Secretary for Health at HHS. Her biography is located https://womenshealth.gov/about-us/who-we-are/leadership/dr-dorothy-fink.

App.437

4.    **February 12, 2025 -- The Lauer Memoranda**

In the ensuing days, federal courts issued temporary restraining orders against, among others, the NIH.  In response, on February 12, 2025, Dr. Michael S. Lauer ("Dr. Lauer"), then-Deputy Director for Extramural Research at the NIH and Michelle G. Bulls, NIH Chief Grants Management Officer ("CGMO Bulls"), issued to the ICs a memorandum stating that NIH "is in the process of reevaluating the agency's priorities based on the goals of the new administration." R. 9.  That memorandum states that the "NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in [Institutions and Centers'] funding decisions at this time." Id.  The memorandum also promised "[a]dditional details on future funding actions related to the agency's goals will be provided under a separate memo."  Id.  The memorandum in full:

App.438



Date:       February 12, 2025

To:         Institute and Center Chief Grants Management Officers (IC CGMOs)

From:       Michael S. Lauer, MD   Michael S. Lauer -S  Digitally signed by Michael S. Lauer -S
                                                        Date: 2025.02.12 09:26:33 -05'00'
            Deputy Director for Extramural Research, National Institutes of Health (NIH)

            Michelle G. Bulls
            NIH Chief Grants Management Officer

Subject:    NIH Review of Agency Priorities Based on the New Administration's Goals


NIH is in the process of reevaluating the agency's priorities based on the goals of the new administration.
NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a
factor in IC funding decisions at this time. In consultation with NIH leadership and with the Office of
General Counsel (OGC), we recognize that NIH programs fall under recently issued Temporary
Restraining Orders (*New York et al. v. U.S. Office of Management and Budget* and *Commonwealth of
Massachusetts et al. v. National Institutes of Health et al* see attached). Therefore, with this memo, IC
CGMOs are authorized, along with their respective grants management staff, to proceed with issuing
awards for all competing, non-competing continuation, and administrative supplements (previously
cleared through Office of Extramural Research) grants. Until further notice, as awards are issued, ICs
must follow their existing FY25 IC funding policies and use the previously approved negotiated indirect
cost rates. Additional details on future funding actions related to the agency's goals will be provided
under a separate memo.

**Attachments**

1. Temporary Restraining Order, *New York et al. v. U.S. Office of Management and Budget* (Jan. 31, 2025)

2. Court Order Questions – HHS OGC Responses (February 4, 2025)

3. Temporary Restraining Order, *Commonwealth of Massachusetts et al. v. National Institutes of Health et al.,* (February 10, 2025)

4. Order Enforcing TRO, *New York et al. v. U.S. Office of Management and Budget* (February 10, 2025)

5. Office of General Counsel Note, *New York et al. v. U.S. Office of Management and Budget* (February 10, 2025)


R.9.   The Court views this memorandum as hardly a ringing
endorsement of HHS's Secretarial Directive of the Executive
Orders.

[24]

App.439

Nevertheless, that new guidance came the next day.  On February 13, 2025, Dr. Lauer and CGMO Bulls issued another memorandum to ICs Chief Grant Management Officers, that announced "hard funding restrictions" on "awards where the program promotes or takes part in diversity, equity, and includsion [sic] ('DEI') initiatives" with restrictions applying "to new and continuation awards made on or after February 14, 2025."  R. 16.  The memorandum also states that, "[i]f the sole purpose of the grant, cooperative agreement, other transaction award (including modifications), or supplement supports DEI activities, then the award must be fully restricted.  The restrictions will remain in place until the agency conducts an internal review for payment integrity."  Id.  The February 13, 2025 Memorandum is set forth in full:

App.440

  National Institutes of Health
Office of Extramural Research

Date:        February 13, 2025

To:          Institute and Center Chief Grants Management Officers (IC CGMOs)

From:        Michael S. Lauer, MD   Michael S. Lauer -S  Digitally signed by Michael S. Lauer -S
                                                         Date: 2025.02.13 15:06:52 -05'00'
             Deputy Director for Extramural Research, National Institutes of Health (NIH)

             Michelle G. Bulls
             NIH Chief Grants Management Officer

Subject:     Supplemental Guidance to Memo Entitled- NIH Review of Agency Priorities Based on
             the New Administration's Goals

The Office of Extramural Research is issuing supplemental guidance to the memo, dated February 12,
2025, to Institute and Center (IC) Chief Grants Management Officers (CGMOs) and their respective staff
to issue hard funding restrictions on awards and within the Payment Management System (PMS)/Program
Support Center (PSC) on awards where the program promotes or takes part in diversity, equity, and
includsion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion,
sex, national origin, or any other protected characteristics. The restriction requirement applies to new and
continuation awards made on or after February 14, 2025. If the sole purpose of the grant, cooperative
agreement, other transaction award (including modifications), or supplement supports DEI activities, then
the award must be fully restricted. The restrictions will remain in place until the agency conducts an
internal review for payment integrity. Such review shall include, but not be limited to a review for fraud,
waste, abuse, of all grants, cooperative agreements, and Other Transactions that determines the funding of
the activities/program are in the best interest of the government and consistent with current policy
priorities.

**Attachments**

1.  Memo NIH Review of Agency Priorities Based on the New Administration's Goals, February 12,
    2025

2.  UPDATE - Temporary Restraining Order in State of New York et al. v. Trump et al., 1:25-cv-
    00039 (D.R.I.), February 12, 2025

3.  Secretarial Directive on DEI Related Funding, February 10, 2025

R. 16.  It is unclear how the NIH could use this document to

determine the contours of DEI, where it does not define the

term, nor how to determine whether something "promotes or takes

[26]

part in diversity equity and inclusion . . . initiatives." Id.[8]

Further, it apparently relies upon the Secretarial Directive.

Id.

---

[8]  Consistent with the Administrative Record, NIH Chief
Grants Management Officer Michelle Bulls testified in another
federal action that she drafted the February 13, 2025 memorandum
with Dr. Lauer and acknowledged that the ICs would determine for
themselves what in fact DEI meant:

Q·  · Do you recognize this document?

A·  · Yes.

Q·  · And you wrote this document, right?

A·  · I wrote it with Dr. Lauer, yes.

Q·  · Okay.· And what is it?

A    It's the supplemental -- it's the beginning of the
     guidance providing agency - - I mean
     ICs with guidance on how to unpause funding.

Q·  · And it does say that there is a Restriction.· What's
     the restriction that it gives guidance about?

A·  · On spending funding related to DEI activities on
     grants.

Q    Was there a definition of DEI activities
     provided with this memo?

MS. ANDRAPALLIYAL:· Objection.· To the extent the
     information sought is deliberative and not final, I'm
     instructing the witness not to answer.

BY MR. McGINTY:
Q·  · How are ICs supposed to determine if something fell
     within DEI activities?

A·  · They have scientific, the scientific background and
     they know their programs, so the Grants Management

App.442

5.    **February 13, 2025 -- Deputy Director of Extramural Research, Dr. Lauer Resigns and Liza Bundensen is promoted as Acting Extramural Research Director.**

Deputy Director Lauer resigned that same day, effective February 14, 2025.  See Second top NIH official, who oversaw awarding of research grants, departs abruptly, Stat+ https:/, /www.statnews.com/2025/02/13/nih-michael-lauer-deputy-director-departs/.  Liza Bundesen ("Dr. Bundesen") became acting director of Extramural Research of the NIH after Dr. Lauer resigned.  That promotion was short-lived, as she resigned less three weeks later on March 5, 2025.  April 3, 2025 Depo. Liza Bundesen 5, State of Washington et al. v. Trump et al. , Civ No. 25-cv-00244, ECF No. 276-8.

6.    **February 21, 2025 -- The Memoli Directive – Challenged Directive 5**

On February 21, 2025, Dr. Matthew Memoli ("Acting Director Memoli"), Acting Director of NIH, appointed by Dr. Fink, from January 22, 2025 through March 31, 2025, see https://www.nih.gov/about-nih/nih-almanac/leadership/nih-

---

officials work with the program officials to identify DEI activities where it's not clear in the statute.

Dep. Michelle Bulls 99-100, Decl. Chris Pappavaselio, Ex. 41, ECF No. 77-41.  When asked about what statute, she assumed that Minority Health Disparity Institute had some language, but ultimately testified she did not know if "it ties directly, but I think that is being used.  And that's an assumption, that's not facts."  Id.

directors/matthew-j-memoli-md-ms, and currently Principal Deputy
Director of the NIH, sent an email to Nina Schor, Deputy
Director for Intramural Research, Alfred Johnson, Deputy
Director for Management, and Dr. Bundesen, Deputy Director of
Extramural Research:

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E]; Johnson, Alfred (NIH/OD) [E]; Schor, Nina (NIH/OD) [E] |
| **Subject:** | Memo on NIH priorities |
| **Date:** | Friday, February 21, 2025 2:54:40 PM |
| **Attachments:** | 2695_001.pdf |

Hello,

    After working with OGC we determined it was possible to set priorities at an NIH level,
which now allows us to proceed with the process of making sure our programs are
meeting these goals.  I will talk with you individually about the plan of action.

Thanks,
Matt

--
Matthew J. Memoli, MD, MS
Acting Director, National Institutes of Health
9000 Rockville Pike
Bethesda, MD 20892
matthew.memoli@nih.gov

R. 2929.  It is unclear what Dr. Memoli told the recipients of
his email about the supposed "plan of action," but on that same
date Dr. Memoli issued a Directive entitled "Restoring
Scientific Integrity and Protecting Public Investment in NIH

[29]

Awards" ("the Memoli Directive"), which was sent out by Deputy

Dr. Bundesen:

| From: | Bundesen, Liza (NIH/OD) [E] |
|---|---|
| To: | Kosub, David (NIH/OD) [E]; Roman, Laurie (NIH/OD) [E]; Bulls, Michelle G. (NIH/OD) [E]; Ta, Kristin (NIH/OD) [E]; Faenson, Inna (NIH/OD) [E]; Corbett, Dawn (NIH/OD) [E]; Boone, Ericka (NIH/OD) [E] |
| Cc: | Jacobs, Anna (NIH/OD) [E]; Bundesen, Liza (NIH/OD) [E]; Schwetz, Tara (NIH/OD) [E]; Joshi, Pritty (NIH/OD) [E] |
| Subject: | URGENT - FW: Memo on NIH priorities |
| Date: | Friday, February 21, 2025 4:19:52 PM |
| Attachments: | 2695_001.pdf |

Hi all,

I'm very sorry to once again be sharing an urgent task on a Friday afternoon (I've already talked to David), but **today**, we have to pull down all of the NOFOs that we previously pulled down and put back up (DEI, gender ideology, environmental justice, etc). The attached memo from the Acting NIH Director provides this directive. I understand that Matt Memoli discussed this with OGC.

There are other actions that we will need to take to address this memo, but we can discuss those at a calmer pace on Monday.

I have confirmation that this memo can be shared with other OER staff, and I'm sending to this group now because I think you have the most immediate need to know. Please note that the memo is not to be distributed outside of OER at this time. I will think through how to notify the ICs.

I appreciate you all.

Liza

R. 3823. The memorandum was attached:

App.445

**Directive on NIH Priorities**

Agency: National Institutes of Health

Office of the Director

Action: Directive

**FOR FURTHER INFORMATION CONTACT:**

National Institutes of Health

Office of the Director

EFFECTIVE DATE: February 21, 2025

**Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards**

The National Institutes of Health (NIH) is the largest public funder of biomedical and behavioral research in the world. The public trusts NIH with substantial funds to foster creative discoveries that will improve health and prevent disease in this Country. Accordingly, NIH is committed to promoting only the highest level of scientific integrity, public accountability, and social responsibility in the programs it funds. And NIH promises to prioritize the funding of projects that will generate a high return on the public's investment, so that taxpayer dollars are not going to waste. Every dollar should be used to make Americans live longer, healthier lives.

This mission requires NIH to ensure that it is not supporting low-value and off-mission research programs, including but not limited to studies based on diversity, equity, and inclusion (DEI) and gender identity. While this description of NIH's mission is consistent with recent Executive Orders issued by the President, I issue this directive based on my expertise and experience; consistent with NIH's own obligation to pursue effective, fiscally prudent research; and pursuant to NIH authorities that exist independently of, and precede, those Executive Orders.

Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, DEI studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Likewise, research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs either.

App.446

For these reasons and pursuant to, among other authorities, 42 U.S.C. § 282(b) and 45 C.F.R. Part 75 (45 C.F.R. §§ 75.207, 75.210, 75.371–373),[1] the Director of NIH hereby directs:

> NIH personnel shall conduct an internal review of all contract solicitations and notices of funding opportunities; applications pending Type 1 and Type 2 awards; existing awards; cooperative agreements; and other transactions. Such review shall be aimed at ensuring NIH grants, contracts, cooperative agreements, and other transactions do not fund or support low-value and off-mission research activities or projects – including DEI and gender identity research activities and programs. NIH personnel should also ensure grants, contracts, cooperative agreements, and other transactions are free from fraud, abuse, and duplication, and are being implemented consistent with federal law.

This Directive shall be implemented by all relevant NIH personnel, including but not limited to those in the Office of Extramural Research, Office of Intramural Research, and the Division of Program Coordination, Planning, and Strategic Initiatives. Grants, contracts, cooperative agreements, and other transactions deemed inconsistent with NIH's mission may, where permitted by applicable law, be subject to funding restrictions, terminated or partially terminated, paused, and/or not continued or renewed, in compliance with all procedural requirements.

Notwithstanding this Directive, and consistent with any court orders that may apply, no open award disbursements may be paused in reliance upon Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum. Previous instructions ordering the immediate release of such funds remain in effect. Also, consistent with any court orders that may apply, this Directive does not instruct personnel to condition or withhold federal funding pursuant to Section 4 of Executive Order 14,187 (Protecting Children from Chemical and Surgical Mutilation) based on the fact that a healthcare entity or health professional provides care or treatment.

Dated: February 21, 2025

Matthew J. Memoli, M.D.
Acting Director of NIH

R. 3821 - 3822.  The Memoli Directive notably picks up gender

identity language for the first time.

App.447

While Dr. Memoli claimed that this Directive is based upon his "expertise and experience" and attempts to make it appear the NIH was acting "independently" it is obvious that much, if not all, of the content was provided to him by HHS.  Indeed, the record reflects that HHS spoon-fed Dr. Memoli exactly what to say in his Directive as later drafts of guidance confirm that certain specific language was provided by HHS, even going so far as to putting it in quotations:

- DEI: "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs."

- Gender-Affirming Care: "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs."  **Reminder: At this time, do not terminate any grants related to gender identify/transgender without clearance from OER.  All such actions must be approved before any terminations.**

R. 3280.  There is evidence in the record that on that same date, Dr. Memoli was taking advice as to NOFOs that purportedly did not align with the new objectives from Brian M. Smith, an official in the so-called Department of Government Efficiency ("DOGE").  R. 3752-3753.

App.448

7.    **February 22, 2025 -- NOFOs Taken Down**

On Saturday, February 22, 2025, Brad Smith of DOGE sent a list to Dr. Memoli of NOFOs that in their view did not fall within the Memoli Directive:

**From:** Smith, Brad M. EOP/DOGE <Brad.M.Smith@doge.eop.gov>
**Date:** Saturday, February 22, 2025 at 11:36 AM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Subject:** [EXTERNAL] NOFOs

Matt,

Thanks so much for your time yesterday. Per our conversation, below are a number of NOFOs that it may be worth your team reviewing to make sure they align with your directive and priorities. We 100% defer to your team on whether each of these align with your directive, but I thought you might find this list helpful as you consider where to focus your review:

https://grants.nih.gov/grants/guide/pa-files/PAR-23-112.html
https://grants.nih.gov/grants/guide/pa-files/PAR-22-145.html

App.449

https://grants.nih.gov/grants/guide/pa-files/PAR-23-309.html
https://grants.nih.gov/grants/guide/pa-files/PAR-23-292.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-077.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-109.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-157.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-158.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-098.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-201.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-237.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-240.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-241.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-317.html
https://grants.nih.gov/grants/guide/pa-files/PAR-26-001.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-003.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-NR-25-004.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-005.html

Best,
Brad

Dutifully, Dr. Memoli instructed Director Bundesen to remove published NOFOs because of a lack of alignment:

[35]

App.450

| From: | Memoli, Matthew (NIH/OD) [E] |
|---|---|
| To: | Bundesen, Liza (NIH/OD) [E] |
| Cc: | Burklow, John (NIH/OD) [E] |
| Subject: | NOFOS that need to come down |
| Date: | Saturday, February 22, 2025 12:01:32 PM |

Hi Liza,

   I was sent a list of NOFOs to review that are still up.  After my review I have determined
these NOFOs in their current form  have issues that cause them to not be properly
directed at current NIH priorities.  Please take these NOFOs down.  Some of the projects
my be reconsidered after they are modified to address current priorities and definitions.

https://grants.nih.gov/grants/guide/pa-files/PAR-23-112.html
https://grants.nih.gov/grants/guide/pa-files/PAR-22-145.html
https://grants.nih.gov/grants/guide/pa-files/PAR-23-309.html
https://grants.nih.gov/grants/guide/pa-files/PAR-23-292.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-077.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-109.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-157.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-158.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-098.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-201.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-237.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-240.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-241.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-317.html
https://grants.nih.gov/grants/guide/pa-files/PAR-26-001.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-003.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-NR-25-004.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-005.html

Thank you,
Matt

Matthew J. Memoli, MD, MS
Acting Director, NIH

R. 3810.   Dr. Memoli then, equally dutifully, reported back to

DOGE:

[36]

App.451

From: Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
Sent: Saturday, February 22, 2025 12:05 PM
To: Smith, Brad M. EOP/DOGE <Brad.M.Smith@doge.eop.gov>
Subject: Re: NOFOs

Hi Brad,

  After my review these all need to come down.  Some of the projects may be able to be
modified to properly address our current priorities, but in their current form they are not
in line with what NIH would like to be doing right now.  I have instructed OER to take
them all down.

Thanks,
Matt

R. 3751.  DOGE acknowledged the response, providing what this

Court finds to be false deference by DOGE:

From:       Smith, Brad M. EOP/DOGE
To:         Memoli, Matthew (NIH/OD) [E]
Subject:    [EXTERNAL] RE: NOFOs
Date:       Saturday, February 22, 2025 4:34:04 PM

Matt,

Thanks for the update.  We are all very grateful for your leadership.

Best,
Brad

R. 3752.

        8.    **February 28, 2025 – The Grant Terminations Begin**

On February 28, 2025, the first batch-terminations

App.452

occurred.  R. 1403.  Dr. Memoli forwarded a spreadsheet to Dr.
Bundesen, who forwarded it to CMGO Bulls.[9]

---

[9] Consistent with the Administrative Record, Dr. Bundesen
testified that as for decisions on terminations, that DOGE was
involved in selecting the grants to be terminated, apparently
out of the blue:

Q    How did you first learn that grants were going to
     be terminated on February 28th?

A     I received a text message over Microsoft Teams
      from James McElroy. He said, Liza - - something to
      the effect of: Liza, can you please get in touch with
      Rachel Riley ASAP, she's been trying to reach you.

      I'm paraphrasing.

I said, James, I'm sorry, I do not know who Rachel
      Riley is. And then shortly thereafter, James called
      me over a Microsoft Teams video call, and so he was
      there and Rachel Riley was there. She - introduced
      herself as being part of DOGE, who was working with
      HHS.

And she informed me that a number of grants will need
      to be terminated and that Matt Memoli will be sending
      me an e-mail, a list of grants in an e-mail shortly
      thereafter.

Q Did she explain why the grants were being
     terminated?

A No.

Q Did you ask?

A She explained that -- excuse me, let me
     clarify.

     She said that the current administration's OGC has a
     different opinion from the previous administration's
     OGC on grant termination and, therefore, we will need
     to terminate grants by the end of the day.

App.453

That email and spreadsheet is part of the record:

| | |
|---|---|
| **From:** | Bundesen, Liza (NIH/OD) [E] |
| **To:** | Bulls, Michelle G. (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E] |
| **Subject:** | FW: Grants for immediate termination today |
| **Date:** | Friday, February 28, 2025 2:35:58 PM |
| **Attachments:** | 28 FEB Grants for Cancellation.xlsx |
| | NIH Termination Letter 022625[42].docx |

**From:** Memoli, Matthew (NIH/OD) [E]
**Sent:** Friday, February 28, 2025 2:34 PM
**To:** Bundesen, Liza (NIH/OD) [E]
**Cc:** Smith, Brad M. EOP/DOGE ; Rachel.Riley@hhs.gov; Keveney, Sean (HHS/OGC)
**Subject:** Grants for immediate termination today

Liza,

Please terminate the grants on the attached spreadsheet by COB today. Attached is an OGC cleared termination letter.

Thank you,

Matt

--

Matthew J. Memoli, MD, MS

Acting Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

---

I did not ask what, you know, what grants because I just literally was a little bit confused and caught off guard. And so I waited to see what I would receive by e-mail.

Q: And then what did you receive by e-mail?

A: I received an e-mail from Matt Memoli that said something to the effect of: Liza, the attached list of grants need to be terminated by COB today.  And there was an Excel file attached to the e-mail.

Bundesen Depo. 60 – 61.

App.454

R. 2295 – 2302.  Recall that Dr. Bundesen oversaw extramural

research.  There is no evidence of any discussion, rather, the

evidence in the Administrative Record that Dr. Bundesen followed

orders that apparently went from Riley to Dr. Memoli to Dr.

Bundesen and on down the chain.  Smith is copied on this email.

CGMO Bulls's testimony in another case confirms what the

Administrative Record reveals:

> Q· · This is one of those letters that you've been
> asked to send that you were just talking about?
>
> A· · Yes.
>
> Q· · And you signed this letter, right?
>
> A· · Yes.
>
> Q· · Okay.· And why did you send this letter?
>
> A· · I was asked to send it.
>
> Q· · Who asked you to send it?
>
> A    My supervisor.
>
> Q· · Okay.· And who is that?
>
> A· · At the time, Liza Bundesen.
>
>    * * *
>
> Q· · Did she tell you why she was asking you to
> send it?
>
> A· · Yes.
>
> Q· · Okay.· And what did she say?
>
> A· · That we were asked to terminate grants.
>
> Q· · Did she tell you why you were asked to

[40]

App.455

terminate grants?

A· · She did not.

Q· · Okay.

A· · Can I correct the statement?  The e-mail that I received from Liza Bundesen indicated that we needed to terminate the grants, and the language in the letters were provided so I didn't question, I just followed the directive.

Q· · Okay.

A· · She didn't say:· Terminate the grant because of.· She said:· The list below.· So I just wanted to be clear about that.

* * *

Q· · Okay.· And is that the same list that you were talking about earlier that came from Rachel Riley?

A· · That was on the same e-mail, yes.


Depo. Bulls 66-68.  CGMO Bulls describes the letters, accurately, as "template letters"  Id.  She also testified that but for her signature on the letters, she did not create any of the language, which was provided by Rachel Riley, and that she is unaware whether the NIH undertook any assessment at all as to whether a particular grant met the criteria being espoused in the letters.  Id.  The testimony concerning the February 28, 2025 letters comports with the Administrative Record, though the grant described is not one before this Court:

Q· · So it says here -- actually, can you read

[41]

App.456

the fourth paragraph, the one that starts with, "This
award no longer effectuates."

A· · "This award no longer effectuates agency
priorities.· NIH is obligated to carefully steward
grant awards to ensure taxpayer dollars are used in
ways that benefit the American people and improve
their quality of life.· Your project does not satisfy
these criteria.· Research programs based on gender
identity are often unscientific, have little
identifiable return on investment, and do nothing to
enhance the health of many Americans.· Many such
studies ignore, rather than seriously examine,
biological realities.· It is the policy of NIH not to
prioritize these research programs."

Q· · Okay.· And this was part of the template letter
that Rachel Riley provided?

A· · Yes.

* * *

· Q· · Was this edited in any way from the template
letter that Rachel Riley provided?

A· · No.

Q· · Okay.· It says, "Your project does not satisfy
these criteria."· Do you see that there?

A· · Yeah.

Q· · Are you aware of any assessment of Dr. Ahrens'
grant in particular that was made to see if her grant
satisfied the criteria?

A· · No.

Q· · Would you have been aware of such assessment if
one had been made?

A· · I don't know.

Q· · Okay.· Would you have been aware of such an
assessment if one had been made by NIH?
A· · Yes.

[42]

App.457

Q· · And it says, "Research programs based on
gender identity are often unscientific with little
identifiable return on investment, and do nothing to
enhance the health of many Americans." Did NIH do any
assessment of this particular grant to see if it was
unscientific?

A· I don't know.· The letter was provided and it was
sent.· I don't know what happened before ·8· ·that.

Q· · Well, did NIH do any assessment?

A· · I don't know.

Q· · You don't know if NIH did an assessment to
see if Dr. Ahrens' grant was scientific or not?

A· · Are you talking about -- I don't understand your
question, sorry.

Q· · Well, it says in this letter, and I
understand you didn't write it, but you signed it,
"Research programs based on gender identity are
often unscientific."· And that was the reason this
particular grant was terminated. ·Is that right?

A· · That's what the letter says.

Q· · That's what the letter says.· So I'm trying to
figure out whether or not there was any basis to think
that Dr. Ahrens' grant was unscientific.

A· · I don't know.

Q· · Okay.· And do you know if there was any

assessment to see if it had an identifiable return

on investment?

A· · No, I don't know.

Q· · Do you know if NIH did one?

A· · I don't know.

[43]

App.458

· Q· · Okay.· Would you have been aware if NIH
        did one?

A· · I'm not sure.

Q· · Okay.· And it also says, "and do nothing
      to enhance the health of many Americans."  Do you know
      if NIH did any assessment to see if Dr. Ahrens' grant
      would enhance the health of many Americans?

A· · I don't know.

* * *

Q ·  Did Rachel Riley provide any other template letters
      that were sent?

A· · Yes.

Q· · Okay.· What were those template letters about?

A· · In that [February 28, 2025] list, I don't recall.

Q· · How about any list for letters that had been sent?

A· · DEI activities, this language.· I think one on China.·
      I don't know.· That's it that I can recall, and I'm
      sure I'm blanking right now.

Q· · So what you remember is the gender identity language,
      the DEI language, and the China.  Was there language
      on vaccine hesitancy that was used?

A· · In that batch, no.

Bulls Depo. 72 – 74.  CMGO Bulls later testified, again,

consistent with the Administrative Record, that Rachel Riley

provided the following DEI language in template letters:

· · Q    And then it says, "DEI:· Research programs based
          primarily on artificial and non-scientific categories,
          including amorphous equity objectives, are
          antithetical to scientific inquiry, do nothing to
          expand our knowledge of living systems, provides low
          returns on investment, and ultimately do not enhance

[44]

App.459

> health, lengthen life, or reduce illness. · Worse, so
> called diversity, equity, and inclusion (DEI) studies
> are often used to support unlawful discrimination on
> the basis of race and other protected characteristics,
> which harms the health of Americans.  Therefore, it is
> the policy of NIH not to prioritize such research
> programs." ·That language also was provided by Rachel
> Riley?

>     A    Yes.

Id. 90 - 91.  Consistent with the Administrative Record, CMGO

Bulls testified that she was provided lists with the categorical

reasons for termination, and she executed based on those lists.

She had no input into which grants were terminated or for what

reasons:

>     Q· · Okay.· But it's your testimony that the reason that
>           the grant is going to be terminated is provided to
>           you.· Is that right?

>     A· · That's right.

>     Q· · And you don't have any input into that?

>     A· · I don't.

>     Q· · Okay.· And you're testifying that the template letter
>           for each reason is provided to you.  Is that right?

>     A· · Yes.

>     Q· · And you don't have any input into that either?
> ·
>     A· · I don't.

Id. 97 - 98.  From January 20, 2025 through April 2025, CMGO

Bulls had received "more than five lists" of grants to

terminate, and she estimated that at that time between 500 and

1,000 grants had been terminated.  Id.  98 – 99.  While there

App.460

had been a "handful" of noncompliance terminations of which the NIH had undertaken between 2012 through January 20, 2025, Bulls Depo. 46 ("My testimony is that it doesn't happen often, more than one and probably less than five."), the current type of terminations that were dictated from HHS had occurred only once before during the prior Trump Administration.  Id. 47 -48.  The Administrative Record is replete with a large number of these new, dictated terminations.

The templates for these letters are all variations on a theme, and has been dictated onto the NIH by Riley as a reason-for-termination menu.  A good example is provided in full, but the record is replete with examples of the templates being used:

[46]

PRIVILEGED, CONFIDENTIAL, PRE-DECISIONAL

**FOR GRANTS ISSUED DECEMBER 2022-MARCH 2024 (TO BE DELTED)**

[Address block & date]


[Grant recipient]:

Funding for Project Number [INSERT] is hereby terminated pursuant to the 2022 National Institutes of Health ("NIH") Grants Policy Statement,[13] and 2 C.F.R. § 200.340(a)(2) (2023). This letter constitutes a notice of termination.[14]

The 2022 Policy Statement applies to your project because NIH approved your grant on [INSERT DATE], and "obligations generally should be determined by reference to the law in effect when the grants were made."[15]

The 2022 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[16] According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[17] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria. [INSERT EXPLANATION—EXAMPLES BELOW]

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.
- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the

---

[13] https://grants.nih.gov/grants/policy/nihgps/nihgps_2022.pdf.
[14] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[15] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[16] 2022 Policy Statement at IIA-1.
[17] *Id.* at IIA-153.

App.462

PRIVILEGED, CONFIDENTIAL, PRE-DECISIONAL

health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.
- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.].

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[18] no corrective action is possible here.  The premise of Project Number [INSERT] is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[19]  Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390.  NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[20]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[21]  NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[22]

You must submit a request for such review to [the NIH Director or his designee] no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, [the NIH Director or his designee] may grant an extension of time.[23]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position.  In addition to the required written statement, you shall provide copies of any documents supporting your claim.[24]

Sincerely,

---

[18] 2022 Policy Statement at IIA-154.
[19] *See* 2 C.F.R. § 200.343 (2023).
[20] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c).
[21] *See* 45 C.F.R. § 75.374.
[22] See 42 C.F.R. Part 50, Subpart D.
[23] *Id.* § 50.406(a).
[24] *Id.* § 50.406(b).

App.463

R. 2482 - 2483.

9.   **March 2025 -- The NIH Priorities Directives
     Emerge**

Between March 4, 2025, and March 25, 2025 internal staff
guidance was issued.  See March 4, 2025 email from CMGO Bulls to
Chief GMOs, R. 345.



The guidance is provided in full:

App.464

## Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

### Background

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI). Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

**Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.

○ Action: ICs must not issue the award.

**Category 2**: Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

○ Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.

○ Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.

■ Note: If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

NIH_GRANTS_002152

App.465

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- ○ Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- ○ Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- ○ Action: IC may proceed with issuing the award.

R. 2152 -2153. Again, no definition is provided for DEI. Multiple appendices are provided, simply stating that it is "in accordance with the Secretarial Directive," which is included as an appendix. R. 2154 – 2155. It also includes the boilerplate language regarding DEI, "transgender issues," and China:

App.466

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs.  Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

R. 2157.  Notably, Appendix 4 delves into renegotiated awards

concerning DEI activities.  Anticipating questions about an

[52]

App.467

undefined DEI, the NIH invites recipients to inquire before drawing down funds.  Id.  Throughout March 2025, the Priorities directive was modified for certain procedures, but the boilerplate language of the reasons for termination did not substantially vary.

      10.    **Friday, March 7, 2025 -- Deputy Director Bundesen Resigns and Acting Director Memoli Appoints Himself Acting Deputy Director of Extramural Research**

On Friday, March 7, 2025, a mere three weeks after appointment as Acting Deputy Director of Extramural Research, Director Bundesen resigned from the NIH.

      11.    **March 10, 2025**

Dr. Memoli was in the thick of it, and he sent an email to his Deputies and general counsel, expressing that week was going to be busy:

App.468

| | |
|---|---|
| **From:** | Lorsch, Jon (NIH/NIGMS) [E] |
| **To:** | Bulls, Michelle G. (NIH/OD) [E] |
| **Subject:** | FW: OER |
| **Date:** | Monday, March 10, 2025 9:15:25 AM |
| **Attachments:** | 1VH Termination 3-10-25.xlsx |
| **Importance:** | High |

Do you want to send this out or do you want me to? I assume it should go to GMAC with CC to EPMC?

Let me know how you would like to proceed.

Thanks.

Jon

**From:** "Memoli, Matthew (NIH/OD) [E]"

**Date:** Monday, March 10, 2025 at 8:37 AM

**To:** "Lorsch, Jon (NIH/NIGMS) [E]" , "Jacobson, Ray (NIH/CSR) [E]" , "Schwetz, Tara (NIH/OD) [E]"

**Cc:** "McElroy, James (NIH/OD) [E]" , "Burklow, John (NIH/OD) [E]" , "Lankford, David (NIH/OD) [E]"

**Subject:** OER

Good morning,

This is going to be a busy week for OER. There will be many actions this week similar to this. Two things this morning:

1. I would like an updated list of all grants terminated so far.
2. I attached al list of 43 grants, OTA, and NOFOs that need to be terminated/taken down, preferably by COB today if possible. These are on the first tab of the spreadsheet. These no longer align with HHS priorities so we can use the termination letters we have been using regarding HHS priorities.

Please have someone confirm with me when this is complete.

Thank you all again for your efforts and taking OER on.

Matt

--

Matthew J. Memoli, MD, MS

Acting Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

App.469

R. 2352.  He wasn't wrong.

       **a.    The Columbia University Bulk Terminations  --**
            **Another Example of the Weaponization of the NIH**

Separate to the categorized grant terminations, there is a curious exchange in the Administrative Record concerning the NIH weighing in on the Columbia University campus unrest.  As best the Court can discern, the NIH was being required to come down hard on Columbia University and cancel their grants on the basis of campus unrest.  There is no evidence in the record that this had ever been done before.  Deputy Director Lorsch, perhaps understanding the implications of cancelling all grants to a research university, appeared to be trying to soften the blow recommending to Dr. Memoli to fire a warning shot across Columbia University's bow -- that Columbia be put on notice that NIH "intended" to terminate a list of grants.  Dr. Memoli provided that same recommendation to David Lankford, the NIH's General Counsel:

App.470

| | |
|---|---|
| From: | Memoli, Matthew (NIH/OD) [E] |
| To: | Lorsch, Jon (NIH/NIGMS) [E]; Lankford, David (NIH/OD) [E] |
| Subject: | Re: One more thought... |
| Date: | Monday, March 10, 2025 1:15:45 PM |
| Attachments: | NIH Termination Letter_Columbia (2024 Statement)_v3 (signed).docx |
| | Columbia Grants for Suspension or Termination.xlsx |

Jon,

   Attached is a termination letter that was drafted. I think the last paragraph is the relevant part we may need to use, but I defer to David and OGC.

David, we would like to send a single letter to the University telling them we intend to terminate the grants listed in the attached spreadsheet. We will the proceed with orderly terminations through our normal process.

We would like an approved letter sent by close of business today.

Thanks,
Matt

--
Matthew J. Memoli, MD, MS
Acting Director, National Institutes of Health
9000 Rockville Pike
Bethesda, MD 20892
matthew.memoli@nih.gov

---

**From:** Lorsch, Jon (NIH/NIGMS) [E] <jon.lorsch@nih.gov>
**Date:** Monday, March 10, 2025 at 1:03 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Subject:** One more thought...

What if we issued a letter to the VPR at the university saying we "intend to terminate the following awards..." with a list of the awards. That would make the point and then we could follow an orderly procedure for doing it. Perhaps there would be a resolution before that process finished?

R. 3462.  The email attached a list of Columbia's grants and a draft letter, dated March 7, 2025.[10]  The draft without the list is set forth in full here:

---

   [10] This draft letter date coincides with a March 7, 2025 Department of Justice/HHS, Department of Education and General Services Administration Press Release which stated "GSA will assist HHS and ED in issuing stop-work orders on grants and contracts that Columbia holds with those agencies. These stop-

**App.471**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

National Institutes of Health
Bethesda, Maryland 20892
www.nih.gov

March 7, 2025

President Katrina Armstrong
The Trustees of Columbia University in the City of New York
202 Low Library
535 W. 116 St.
New York, NY 10027

Dear President Armstrong:

Funding for Project Number [INSERT] is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2) (2024).  This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on [INSERT DATE], and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4]  According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities.  NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

NIH is responsible for ensuring that its limited resources are appropriately allocated. NIH policy is that grant dollars should support institutions that foster safe, equal, and healthy working and learning conditions conducive to high-quality research and free inquiry—and should not subsidize institutions that are not built on American values of free speech, mutual respect, and open debate.[6]  In this vein, NIH is aware of recent events at Columbia University involving antisemitic action that suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students. Columbia's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students has ground day-to-day campus operations to a halt, deprived Jewish students of learning and research opportunities to which they are entitled, and brought shame upon the University and our nation as a whole. Supporting research in such an

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement, Section 4.

---

work orders will immediately freeze the university's access to
these funds. Additionally, GSA will be assisting all agencies in
issuing stop work orders and terminations for contracts held by
Columbia University."  Mar. 7, 2025 Press Release,
https://www.hhs.gov/press-room/task-force-cancels-columbia-
university-grants.html

App.472

environment is plainly inconsistent with NIH's priorities and raison d'etre of funding and championing the very best American research and educational institutions.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[7] no corrective action is possible here. The premise of Project Number [INSERT] is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[8] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[9]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[10] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[11]

You must submit a request for such review to Director Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[12]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[13]

Sincerely,

*[signature]*

Matthew J. Memoli, M.D., M.S.
Acting Director, NIH

---

[7] 2024 Policy Statement at IIA-156.
[8] *See* 2 C.F.R. § 200.343 (2024).
[9] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[10] *See* 45 C.F.R. § 75.374.
[11] See 42 C.F.R. Part 50, Subpart D.
[12] *Id.* § 50.406(a).
[13] *Id.* § 50.406(b).

R. 3503-3504.

Drs. Lorsch's and Memoli's softer approach was apparently wholly rejected; the Administrative Record reflects a full termination:

[58]

App.473



**National Institutes of Health**
Office of Extramural Research

March 10, 2025

Angela V. Olinto, Ph.D.
Provost, Columbia University
Email: provost@columbia.edu

Dear Dr. Olinto:

NIH is hereby providing notice that funding for the projects in the attached spreadsheet will be terminated pursuant to the National Institutes of Health ("NIH") Grants Policy Statement (GPS),[1] and 2 C.F.R. § 200.340(a)(4).

As reflected in the Notices of Award for the most recent budget period of these projects, the NIH Grants Policy Statement is incorporated as a term and condition of award. The GPS "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[2] According to the GPS, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[3] At the time the Notices of Award were issued for the most recent budget period, 2 C.F.R. § 200.340(a)(4) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

These awards no longer effectuate agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

NIH is responsible for ensuring that its limited resources are appropriately allocated. NIH policy is that grant dollars should support institutions that foster safe, equal, and healthy working and learning conditions conducive to high-quality research and free inquiry[4]—and should not subsidize institutions that are not built on American values of free speech, mutual respect, and open debate. In this vein, NIH is aware of recent events at Columbia University involving antisemitic action that suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students. Columbia's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students has ground day-to-day campus operations to a halt, deprived Jewish students of learning and research opportunities to which they are entitled, and brought shame upon the University and our nation as a whole. Supporting research in such an

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] NIH GPS, Section 3.
[3] *Id.* at Section 8.5.2.
[4] NIH GPS, Section 4.

1

App.474

environment is plainly inconsistent with NIH's priorities and raison d'etre of funding and championing the very best American research and educational institutions.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[5] no corrective action is possible here. The actions described above are incompatible with agency priorities, and no modification of the projects could align the projects with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[6] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 200.344. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[7]

**Administrative Appeal**

You may object and provide information and documentation challenging these terminations. NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[8]

You must submit a request for such review to Director Memoli no later than 30 days after this letter is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[9]

The request for review must include a copy of this decision, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[10]


Sincerely,


Michelle G. Bulls
Director, Office Policy for Extramural Administration
Chief Grants Management Officer - National Institutes of Health
Email: michelle.bulls@nih.gov

cc:
William Berger, Assistant Vice President for Sponsored Projects Administration, Columbia University

---

[5] NIH GPS, Section 8.5.2.
[6] *See* 2 C.F.R. § 200.343.
[7] 2 C.F.R. § 200.341(c).
[8] See 42 C.F.R. Part 50, Subpart D.
[9] *Id.* § 50.406(a).
[10] *Id.* § 50.406(b).

R. 3805 – 3806. While the parties do not appear to assert claims based directly upon this letter, it was included in the Administrative Record, and in the Court's view is further

App.475

evidence of the NIH's grant process being abused as a bludgeon, this time to sanction Columbia University for the Administration's perception of inaction by Columbia with respect to campus unrest.  While the Court takes no position as to the merits of the Executive's perception or of the legality of its action, it is clear that Drs. Memoli and Lorsch at least had some pause as to a wholesale termination of Columbia's grants, numbering in the hundreds.  R. 3807 – 3809.  Indeed, how the scientific and research activities had any connection with unrest issues on Columbia's campus is conspicuously never explained.  The record evidence certainly reveals none.

### 12.    **March 10, 2025 Further Terminations**

The record is replete with termination activity.  On March 10, 2025, grants were terminated.  <u>See e.g.</u> R. 794 – 795; 1326 - 1333; 1357 –1363.  On March 11, 2025, Riley sent Dr. Memoli a list of grants to terminate, that were approved by Dr. Memoli within 2 minutes of the email having been sent:

App.476

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Riley, Rachel (OS/ASA); Bulls, Michelle G. (NIH/OD) [E] |
| **Subject:** | Re: Shortlist of SGM for Tonight |
| **Date:** | Tuesday, March 11, 2025 9:49:35 PM |

All of these grants can be terminated for being unaligned with current NIH /HHS priorities.

Matt

Get Outlook for Mac

---

**From:** Riley, Rachel (OS/ASA) <Rachel.Riley@hhs.gov>
**Date:** Tuesday, March 11, 2025 at 9:43 PM
**To:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>, Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Subject:** Shortlist of SGM for Tonight

Dr. Memoli –

Please see a short list below/attached; I have sent you 6 in case you find an issue with any one. If you are comfortable, the wonderful @Bulls, Michelle G. (NIH/OD) [E] will work to action tonight:


I will then get you an updated combined list for tomorrow!


Thanks,
Rachel

R. 3820.  There is record evidence of template letters being sent on that date.  R. 297 – 298; 653 -654  711- 712; 3508 - 3509; 3585 – 3586.

**App.477**

13.    **March 12, 2025 -- Further Terminations**

On March 12, 2025, Dr. Memoli sent an email to Deputy

Director Lorsch and Bulls with a list of grants to terminate.

R. 3631 - 3635.  Brad Smith of DOGE is copied on the email.  Id.



| From: | Memoli, Matthew (NIH/OD) [E] |
|---|---|
| To: | Lorsch, Jon (NIH/NIGMS) [E]; Bulls, Michelle G. (NIH/OD) [E] |
| Cc: | Smith, Brad M. EOP/DOGE; McElroy, James (NIH/OD) [E] |
| Subject: | Terminations |
| Date: | Wednesday, March 12, 2025 2:00:56 PM |
| Attachments: | Terminated Grants 3-12.xlsx |

Good afternoon,

Attached is a list of grants that should be terminated for not being aligned with current HHS/NIH priorities. If possible, please terminate by COB today.

Thank you,

Matt

--

Matthew J. Memoli, MD, MS

Acting Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

R. 2932-2933; 3631.  Terminations were issued on that date.  See

e.g.  R. 651 - 652 709 - 710.

On March 13, 2025, Dr. Memoli sent an email to Deputy

Director Lorsch and Bulls, directing them to terminate an

additional 530 grants.  Brad Smith of DOGE is copied on the

email, which is provided in full:

[63]

App.478

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Lorsch, Jon (NIH/NIGMS) [E] |
| **Cc:** | Cutler, Diane (HHS/IOS); Smith, Brad M. EOP/DOGE; Bulls, Michelle G. (NIH/OD) [E] |
| **Subject:** | New list for termination |
| **Date:** | Thursday, March 13, 2025 9:03:01 AM |
| **Attachments:** | Grants for Termination 3-13 to 3-24-25.xlsx |

Jon,

Here is an additional list of grants for termination There are 530 grants here. I do not expect these to get done today. Please complete these by COB next Friday if possible. A daily evening update on how many were terminated would be appreciated. I want to thank you and Michelle for your diligent work getting this done. Michelle has been doing a lot of heavy lifting and it has not gone unnoticed.

Thank you,
Matt

--

Matthew J. Memoli, MD, MS
Acting Director, National Institutes of Health
9000 Rockville Pike
Bethesda, MD 20892
matthew.memoli@nih.gov

R. 3122 – 3191. There is record evidence of multiple terminations of grants. See e.g., R. 3593 – 3630; March 14, 2025 (R. 289 – 290); March 18, 2025 (R. 440- 441; 601 – 602); March 19, 2025 (R. 391 – 392); March 20, 2025 (R. 158 – 159; 449- 450; 745 -746; 1348 -1349; 1371- 1375; 1392 – 1392; 1397- 1398); March 21, 2025 (R. 114 – 116; 152 – 153; 187 – 189; 757 - 759; 771- 773; 782 - 784; 810-814; 859 - 861; 871 – 873; 877 - 878; 995-996; 1195 -1197; 1237 -1242; 1268-1273; 1284 - 1292; 1380 – 1384; 1399 - 1401; 1416- 1421; 1483 – 1484; 1492 -1493; 1668 - 1670; 1689 -1694; 2415 – 2468); March 24, 2025 (R. 689-

[64]

App.479

691; 747 – 749; 844 – 846; 1218 - 1220; 1299 - 1301; 1309 -
1310; 2257 – 2258).

### 14.  **March 25, 2025 – Staff Guidance (Priorities Directive)**

On March 25, 2025, the NIH issued further guidance ("the
March 25 Guidance").  R 3216 -3230.  This is a continuation of
the Priorities Directive, which was changing on the fly over
March, though it is not clear whether any grants were terminated
based upon this guidance.

App.480

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities- March 2025

Issue Date: March 25, 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI). Terminations that result from science that no longer effectuates NIH's priorities related to DEI, gender identity and other scientific areas must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims/major goals of the project to assess whether the proposed project contains any DEI, gender identity or other research activities that are not an NIH/HHS priority/authority. To avoid issuing awards, in error, that support these activities ICs must take care to completely excise all non-priority activities using the following categories.

ICs should review the current application/RPPR under consideration, only. ICs should not request retroactive changes to previous RPPRs and competitive applications to modify language related to research that has already been conducted. Categories 1-3 are IC determinations not those ordered by HHS.

**Category 1:** The sole purpose of the project is related to an area that is no longer an NIH/HHS priority/authority (e.g., diversity supplements, diversity fellowships, or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority. This applies to all projects, including phased awards, etc.

- o **Action:** ICs must not issue the award (competing or non-competing).
- o For ongoing projects where NIH will not issue the next Type 5 (IC determination not HHS list), the IC must:
  - o Issue a revised award to remove all outyears.
  - o Add the action to the master spreadsheet located at: OD OPERA Grant Action Tracking (access limited to CGMOs).
  - o Include the following term in the revised NOA:

  *Term of Award:*

  It is the policy of NIH not to prioritize research programs related to [insert category from Appendix 3, verbatim]. Therefore, no additional funding will be awarded for this project, and all future years have been removed. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project, and remaining funds will be deobligated. Funds used to support any

1

App.481

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

- o  Check PMS to determine amount of funds remaining, and if funds are available request a hard funds restriction of all funds except $1 in PMS.

- o  **No cost extension requests:** For second and third NCE's, ICs must determine if the sole purpose of the grant was to support research activities that are no longer an NIH/HHS priority/authority and, if so, issue an award to end the grant project (use disapproved extension term below). If the non-NIH/HHS priority/authority research activities are ancillary to the project, approve the extension (use approved extension term below). Reminder – even if a grant project is in an NCE, IC staff must still determine if non-NIH/HHS priority/authority activities are proposed during the extension period. Extensions may only be approved for orderly closeout, and funds may not be used to support any non-NIH/HHS priority/authority research activities.

  - o  ICs may use the following term of award when approving/disapproving NCEs:
    - ▪  **Term of Award (approved extension):** The no-cost extension has been approved for this project to support orderly closeout of the project, only. NIH grants funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training programs. Any funds used to support such activities will result in a disallowance of costs, and funds will be recovered.
    - ▪  **Term of Award (disapproved extension):** The no cost extension request for this project has been denied. Please proceed with orderly closeout of the project. NIH grant funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs.

**Category 2:** Project partially supports non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are

App.482

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

ancillary to the purpose of the project, in some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the Restriction Term of Award in Section IV of the Notice of Award. No exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

- o  Note: Activities required to comply with NIH inclusion policies are not considered DEI activities.
- o  **Action 1:** Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.  The recipient/awardee cannot rebudget these funds, they must be recovered by the IC. OPERA is consulting with eRA on options to collect these application updates in a structured format.
  - ▪  Sample language for requesting application updates from the AOR: It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa.] [Funding IC] has identified [insert appropriate activity taken from the list above] activities within section [XXXX] of your application. Please work with the PD/PI to update the application sections and adjust the budget as appropriate to remove all [insert appropriate activity] activities and submit these updates to the Program Official and Grants Management Specialist for review and approval.
- o  **Action 2:** Once the IC and the applicant/recipient have reached an agreement, issue the award and include the following Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.

    **Term of Award (Approved 2/28/2025 – Refer to Appendix 4 for the approval from Dr. Memoli):**

    NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.] research or related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

    This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes

3

App.483

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

[select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa., etc.] or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

- **Unable to remove activities that are not an NIH/HHS priority/authority:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the non-compliant activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Category 4.
- **Diversity Supplements:** Type 5 Diversity supplements may no longer be awarded. For ongoing awards, ICs must remove the diversity supplement activities prior to issuing the next Type 5 for the parent award and include the DEI Term and Condition of Award in Section IV of the NOA of the parent grant. The IC must revise the Diversity Supplement award to remove all outyears. If diversity supplement outyears were included in the previous NOA, the IC must revise the prior year award to remove references to those outyear commitments.
- **Conference Grants:** If a conference supported by an NIH grant focuses on scientific topics that are unrelated to DEI, but the conference itself is targeted at a specific population (e.g., underrepresented groups), the IC must work with the applicant/recipient to open the conference up to all populations. If a negotiation to broaden the target audience is not feasible, or the conference is no longer viable, then the IC must terminate the award following the process in Category 4.
- **Diversity Reports (e.g., Ts, R25, K12, and any others):** NIH is modifying the application instructions and RPPR instructions to remove requirements for diversity reports (e.g., Trainee Diversity Report). If ICs receive these reports in applications or RPPRs, the IC should not review the report. These reports provide diversity related information, but do not involve specific DEI activities. ICs must use the following term: "NIH no longer requires the [name of diversity table/plans]. Therefore, NIH did not review the [name of diversity table/plans] provided. NIH funding may not be used to support any diversity, equity or inclusion (DEI) activities". Note: this section applies to diversity related reports, only. Other areas that are no longer NIH/HHS priorities/authority must be addressed under category 2 negotiations.
- **Administrative Supplement Requests:** Administrative supplement applications should be reviewed for any activities that are no longer NIH/HHS priorities/authority and modified as needed. ICs do not need to retroactively review the competitive parent grant application– only the supplement application requires review.

App.484

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Category 2B:**

Prospective reviews by GM where the DEI language in certain sections of the application has to be removed even though the project itself is not focused on DEI but may have language or have been awarded from a DEI NOFO that is expired/taken down for revision to go back up once the language is appropriately excised.

Examples below, and in these cases, IC should consider using the Category 2 term of award but remove the negotiation language from the term:

- Resource Section
- Biosketch
- RPPRs

**Category 2C:**

Subprojects terminated by HHS.

- OPERA will restrict the funds associated with the project. No action required from the IC.

**Category 3:** Project does not support any DEI activities
- o Action: IC may proceed with issuing the award.

**Category 4/HHS Departmental Authority Terminations:**

- o OPERA receives a list from the Director, NIH or designee.
- o OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
  - **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
  - **Supplement Terminated Only:** If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
  - **Linked (or equivalent) Awards:** If one linked (or equivalent) award is terminated, the IC is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- o When a termination letter is received, the IC must:

  - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.

App.485

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICs.
- Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.
- Include the following Termination Term in the revised NOA:

  It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim]. Therefore, this project is terminated. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

  NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

  - Note: Appeals language must be included prior to October 1, 2025. After October 1, 2025, when HHS will fully adopt 2 CFR 200, per 2 CFR 200.340, termination actions taken based on agency priorities are not appealable. This is different from terminations based on noncompliance (administrative and programmatic).

  o eRA provides OPERA with daily reports on NOAs issued, so ICs do not need to report to OPERA on each action completed.

### Category 5: Awards to Entities in certain foreign countries

  o Additional guidance on awards to foreign entities is forthcoming. At this time, ICs should hold all awards to entities located in South Africa or countries identified on any of the following lists.
    - State Department Countries of Particular Concern
    - State Sponsors of Terrorism
    - Final Rule Restricting Transfer of Personal U.S. Data to Countries of Concern

6

App.486

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- Office of Foreign Assets Control Sanctions List

**Separation of Duties Guidance:**

OPERA has issued a Separation of Duties (SOD) waiver for all CGMOs, specific to the HHS Departmental Authorities termination actions, to allow IC CGMOs to work up and issue termination actions. Copy available in Teams.

The March 25 Guidance settles on an examples list of: "China," "DEI," "Transgender issues," "Vaccine Hesitancy", "COVID-related" research:

App.487

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports. Use this language for HHS terminations only.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

- COVID: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

R. 3226.

     The March 25 Guidance also features an FAQ section that includes, among other instructions:

[73]

App.488

6.   **When ICs issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?**

Yes, ICs must use the exact language provided in Appendix 3, with no edits.

R. 3229.  In addition, "Notice of Funding Opportunity (NOFO)

Guidance," was listed as "[pending]."  R. 3228.

On May 15, 2025, it appears that Dr. Memoli was provided an

expanded list from the Office of General Counsel

App.489

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: "Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives."

- DEI: "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs."

- Gender-Affirming Care: "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs." **Reminder: At this time, do not terminate any grants related to gender identify/transgender without clearance from OER.  All such actions must be approved before any terminations.**

- Vaccine Hesitancy: "It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria."

- COVID (to be used for HHS/NIH OD directed terminations only): "The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary." **Note: ICO's may continue to support projects that funds general biology of coronavirus not linked to COVID-19. As ICO's conduct in-house analysis of project portfolios related to COVID the term may change. Please work with OPERA to develop standard terms based on the outcome of the analysis.**

- Climate Change: "Not consistent with HHS/NIH priorities particularly in the area of health effects of climate change."

- Influencing Public Opinion: "This project is terminated because it does not effectuate the NIH/HHS' priorities; specifically, research related to attempts to influence the public's opinion."

R. 3536.  Again, usage of this list was mandatory:

App.490

> **7.** When ICO's issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?
>
> Yes, ICO's must use the exact language provided in Appendix 3, with no edits.

3541.

   The terminations continued.  See March 26, 2025 (R. 1639 - 1641); March 31, 2025 (R. 2488); April 1, 2025 (R. 760-761; 1274-1276; 1376 – 1378; 1394 -1396); April 2, 2025 (R. 35 – 36; 3762 – 3803); April 7, 2025 (R. 1652); April 8, 2025 (R.  1653 - 1667); May 9, 2025 (R. 3452).

## IV.  RULINGS OF LAW

### A.    This Court Maintains Jurisdiction Save For Category of China which has not Harmed these Plaintiffs

   This Court retains jurisdiction.  The Public Officials press that the Court has no jurisdiction because their high-level activities are interlocutory and the grant terminations, claiming there is no final agency action under the APA.  With the exception of grant terminations on the basis of China, all of these arguments are rejected.

#### 1.    The Plaintiffs Have No Standing as to the "China" Category

   The parties do not dispute that action has not been taken concerning the category of "China."  Accordingly, the Court

[76]

App.491

**VACATES** its earlier order solely as to this category, that does not apply.

### 2.    **Final Agency Action**

Final agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C.A. § 551 (13), and a "rule" thereunder "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. § 551(4).  "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process. . . -- it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154 (1997).

The Challenged Directives, as a whole, constitute final agency actions at the macro-level, and the resultant, downstream individual terminations and other effects are also independent final agency action as to each of the affected grants.  The Public Officials attempts to narrow the action to grant terminations and characterization of the Priorities Directives

by CMGO Bulls "as not independently challengeable"
oversimplifies the record and is a myopic view of the
Administrative Record.

    Certainly, taking any particular document in isolation and
out of temporal context is superficially appealing.  But the
agency action here occurred in the context of a wholesale effort
to excise grants in 8 categories over a period of less than 90
days.  HHS directed NIH to cut without a plan and NIH, with the
assistance of DOGE, made it up as they went along, resulting in
a paper trail of the Challenged Directives.  The Public
Officials were trying to comply with an Executive Order 60-day
deadline.  See EO 14151 § 2 (B)(i) ("Each agency, department, or
commission head, in consultation with the Attorney General, the
Director of OMB, and the Director of OPM, as appropriate, shall
take the following actions within sixty days of this order: . .
. terminate, to the maximum extent allowed by law, all. .
.equity action plans," 'equity' actions, initiatives, or
programs, 'equity-related' grants or contracts").  Their
expedition in implementation included all of the Challenged
Directives.  The Public Officials argue "that this case is
nothing like Biden v. Texas, where the agency directed personnel
to take all necessary actions to shut down an entire program."
Trial Br. 11.  (citing Biden v. Texas, 597 U.S. 785, 808-09
(2022).  They are correct -- this is worse.

[78]

App.493

The pronouncements of HHS and NIH in the Challenged Directives are consistent: they are final agency action on their evolving "eradication" of DEI, gender identity, and other topics ostensibly under the Executive Orders as quickly as possible. While the President is not typically subject to the APA, Franklin v. Massachusetts, 505 U.S. 788, 801 (1992), the agencies implementing his orders certainly are. New York v. Trump, 133 F.4th 51, 70 n.17 (1st Cir. 2025) ("[T]he District Court did not review the President's actions for consistency with the APA. Rather, it reviewed—and ultimately enjoined—the Agency Defendants' actions under the Executive Orders."). Indeed, "[t]he APA contains no exception for agency actions . . . that carry out an executive order." Orr v. Trump, No. 1:25-CV-10313-JEK, 2025 WL 1145271, at *15 (D. Mass. Apr. 18, 2025) (Kobick, J.).

### B.    The Administrative Procedure Act

"[F]ederal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them." Trump v. Casa, Inc., No. 24A884, 2025 WL 1773631, at *15 (U.S. June 27, 2025).[11]  Congress has provided such authority, in part,

---

[11]    Nor should it.  As my colleague Chief Judge McConnell of the District of Rhode Island recently wrote about our system of government:

[79]

App.494

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701
et seq.  Specifically, the APA provides that any "person
suffering legal wrong because of agency action, or adversely
affected or aggrieved by agency action within the meaning of a
relevant statute, is entitled to judicial review thereof."  5
U.S.C. § 702.  It acts "as a check upon administrators whose
zeal might otherwise have carried them to excesses not
contemplated in legislation creating their offices," Loper
Bright Enters. v. Raimondo, 603 U.S. 369, 391 (2024) (quoting
United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)), and
"sets forth the procedures by which federal agencies are
accountable to the public and their actions subject to review by
the courts," Department of Homeland Sec. v. Regents of the Univ.

---

> Our founders, after enduring an eight-year war
> against a monarch's cruel reign from an ocean away,
> understood too well the importance of a more balanced
> approach to governance.  They constructed three co-
> equal branches of government, each tasked with their
> own unique duties, but with responsibilities over the
> other branches as a check in order to ensure that no
> branch overstepped their powers, upsetting the balance
> of the fledgling constitutional republic.  See
> Kilbourn v. Thompson, 103 U.S. 168, 191 (1880).  These
> concepts of "checks and balances" and "separation of
> powers" have been the lifeblood of our government,
> hallmarks of fairness, cooperation, and representation
> that made the orderly operation of a society made up
> of a culturally, racially, and socioeconomically
> diverse people possible.

New York v. Trump, 769 F. Supp. 3d 119, 127–28 (D.R.I. 2025).

[80]

App.495

*of Cal.*, 591 U.S. 1, 16 (2020) (quoting <u>Franklin</u> v.
<u>Massachusetts</u>, 505 U.S. 788, 796 (1992)).[12]  Broadly, the APA
establishes a rebuttable "presumption of judicial review [for]
one 'suffering legal wrong because of agency action.'"  <u>Id.</u>
(alteration in original) (quoting <u>Abbott Lab'ys</u> v. <u>Gardner</u>, 387
U.S. 136, 140 (1967)).  The rebuttal of this presumption is made

---

[12] Section 706 provides in pertinent part:

> To the extent necessary to decision and when
> presented, the reviewing court shall decide all
> relevant questions of law, interpret constitutional
> and statutory provisions, and determine the meaning or
> applicability of the terms of an agency action.  The
> reviewing court shall—
>
> (1)  compel agency action unlawfully withheld or
>      unreasonably delayed; and
>
> (2)  hold unlawful and set aside agency action, findings,
>      and conclusions found to be—
>
>      (A)  arbitrary, capricious, an abuse of discretion, or
>           otherwise not in accordance with law;
>
>      (B)  contrary to constitutional right, power,
>           privilege, or immunity;
>
>      (C)  in excess of statutory jurisdiction, authority,
>           or limitations, or short of statutory right;
>
>      . . . .
>
> In making the foregoing determinations, the court
> shall review the whole record or those parts of it
> cited by a party, and due account shall be taken of
> the rule of prejudicial error.

5 U.S.C. § 706.

[81]

App.496

"by a showing that the relevant statute 'preclude[s]' review, §
701(a)(1), or that the 'agency action is committed to agency
discretion by law,' § 701(a)(2)."[13]  Id. at 17.  The first
exception is self-explanatory, and the Supreme Court has read
the second exception "quite narrowly," applying "it to those
rare 'administrative decision[s] traditionally left to agency
discretion.'"  Id. (alteration in original) (first quoting
Weyerhaeuser Co. v. United Staes Fish & Wildlife Serv., 586 U.S.
9, 23 (2018); and then quoting Lincoln v. Vigil, 508 U.S. 182,
191 (1993));  Department of Com. v. New York, 588 U.S. 752, 772
(2019) ("[W]e have read the § 701(a)(2) exception for action
committed to agency discretion 'quite narrowly, restricting it
to "those rare circumstances where the relevant statute is drawn
so that a court would have no meaningful standard against which
to judge the agency's exercise of discretion."'" (quoting
Weyerhaeuser Co., 586 U.S. at 23)).  Examples of decisions
traditionally left to agency discretion include "a decision not
to institute enforcement proceedings, or a decision by an

---

[13] Section 701 provides in pertinent part:

(a) This chapter applies, according to the provisions
thereof, except to the extent that--
    (1) statutes preclude judicial review; or
    (2) agency action is committed to agency discretion by
    law.

5 U.S.C. § 701(a).

App.497

intelligence agency to terminate an employee in the interest of national security." New York, 588 U.S. at 772 (citations omitted).

### C.    The 706(2)(A) Claims –– Arbitrary and Capricious ('10787 Action Count I, '10814 Action Count III)

Section 706(2)(A) of the APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id. at 771 (quoting 5 U.S.C. § 706(2)(A)). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. Environmental Prot. Agency, 603 U.S. 279, 292 (2024) (quoting Federal Commc'ns Comm'n v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)).

Review by the Court under the arbitrary or capricious standard of Section 706(2)(A) is narrow, because all that is "required [is for] agencies **to engage** in 'reasoned decisionmaking.'" Regents of the Univ. of Cal., 591 U.S. at 16 (quoting Michigan v. Environmental Prot. Agency, 576 U.S. 743, 750 (2015)) (emphasis added). To be sure, this Court may not "substitute its judgment for that of the agency," but rather "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" Ohio, 603 U.S. at 292 (alteration in original) (first quoting Federal

[83]

App.498

Commc'ns Com. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009); and then quoting Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  Said another way, this Court's review "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  Prometheus Radio Project, 592 U.S. at 423.

"Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " Sierra Club v. United States Dep't of the Interior, 899 F.3d 260, 293 (4th Cir. 2018) (quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).  "Determining whether an agency action is 'reasonable and reasonably explained' is 'measured by what [the agency] did, not by what it might have done.'" Green & Healthy Home Initiatives, Inc. v. Env't Prot. Agency, No. 25-CV-1096-ABA, 2025 WL 1697463, at *20 (D. Md. June 17, 2025) SEC v. Chenery Corp., 318 U.S. 80, 93-94 (1943).  "And to this end,

[84]

App.499

conclusory statements will not do; an 'agency's statement must
be one of reasoning.'" Amerijet Int'l, Inc. v. Pistole, 753 F.3d
1343, 1350 (D.C. Cir. 2014)(quoting Butte Cnty., Cal. v. Hogen,
613 F.3d 190, 194 (D.C.Cir.2010).

    This Court, is "ordinarily limited to evaluating the
agency's contemporaneous explanation in light of the existing
administrative record." New York, 588 U.S. at 780.  In the
usual course, this is because "further judicial inquiry into
'executive motivation' represents 'a substantial intrusion' into
the workings of another branch of Government and should normally
be avoided." Id. at 781 (quoting Arlington Heights v.
Metropolitan Hous. Dev. Corp., 429 U.S. 252, 268 n.18 (1977)).
Indeed, this Court may neither "reject an agency's stated
reasons for acting simply because the agency might also have had
other unstated reasons" nor "set aside an agency's policymaking
decision solely because it might have been influenced by
political considerations or prompted by an Administration's
priorities." Id.  This general rule recognizes the reality that
"[a]gency policymaking is not a 'rarified technocratic process,
unaffected by political considerations or the presence of
Presidential power.'" Id. (quoting Sierra Club v. Costle, 657
F.2d 298, 408 (D.C. Cir. 1981)).  Agency "decisions are
routinely informed by unstated considerations of politics, the
legislative process, public relations, interest group relations,

[85]

App.500

foreign relations, and national security concerns (among others)." Id.

All that being said, while the Court's "review is deferential," it is certainly "'not required to exhibit a naiveté from which ordinary citizens are free.'" Dep't of Com. v. New York, 588 U.S. 752, 785 (2019) (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2nd Cir 1977) (Friendly, J.)).

The Public Officials argue as one of their reasons "[t]he change in democratically accountable leadership with different priorities is not a *post hoc* rationalization; it is historical fact" and that "[w]ith a new administration comes an appropriate opportunity to assess and reassess the agency's activities." 10787 Action, Defs. Resp. Trial Br. 4, ECF No. 111. True enough, but what the Public Officials fail to appreciate is that they have to work within the confines of the law. That is, a new administration certainly is entitled to make changes -- even unpopular or unwise changes. What it cannot do is undertake actions that are not reasonable and not reasonably explained. This is where the Public Officials miss the mark. Even under this narrow scope of review, the Public Officials' actions as evidence under the Challenged Directives are breathtakingly arbitrary and capricious.

A careful review of the Administrative Record confirms to this Court what Justice Jackson wondered aloud three months ago

[86]

App.501

(albeit from a different agency allegedly doing similar things):
that there is no reasoned decision-making at all with respect to
the NIH's "abruptness" in the "robotic rollout" of this grant-
termination action. Department of Education v. California, 145
S.Ct. 966, 975-76 (Jackson, J. dissenting); see also Thakur v.
Trump, No. 25-CV-04737-RFL, 2025 WL 1734471, at *14 (N.D. Cal.
June 23, 2025) ("The pace of the review and the resulting large
waves of terminations via form letters further suggests a
likelihood that no APA-compliant individualized review occurred.
These are precisely the kinds of concerns that the APA's bar on
arbitrary-and-capricious agency decisionmaking was meant to
address.").

The Court "cannot ignore the disconnect between the
decision made and the explanation given." New York, 588 U.S. at
785. Based upon a fair preponderance of the evidence and on the
sparse administrative record, the Court finds and rules that HHS
and, in turn NIH, are being force-fed unworkable "policy"
supported with sparse pseudo-reasoning, and wholly unsupported
statements.

Starting with DEI, the record is completely devoid of a
definition. This Court has been transparent on this issue, see
American Pub. Health Assn. v. Natl. Institutes of Health, No. CV
25-10787-WGY, 2025 WL 1548611, at *12 (D. Mass. May 30, 2025),

[87]

App.502

yet at trial the Public Officials can point only to the
**identification** of DEI, but not the **definition** of DEI:

> • DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

R. 3226; Tr. 58-59, ECF No. 156 (citing R. 3226).  It is not an
autological concept.  The Court questioned the Public Officials'
counsel in closing arguments: "So that's as close to a
definition [of DEI] as we've got?", to which the Public
Officials' counsel responded: "That is the agency's reasoning."
Id.  The Public Officials' counsel's response while
unsatisfactory in the sense that one would assume that DEI would
be defined somewhere, was accurate and responsive.[14]  The Public
Officials simply have no definition of DEI.

   How, then, can the Public Officials **act** on "DEI" if there
is no operative **definition** of "DEI"?  The answer is plain: they
cannot, at least within the confines of the APA.  See Firearms
Regul. Accountability Coal., Inc. v. Garland, 112 F.4th 507, 523

_____

   [14] The Court observes the Public Officials' counsel have
been consistent and responsive to this Court on this issue.
Id.; see also, May 22, 2025 Hrg Tr. 19-20, ECF No. 82;

(8th Cir. 2024) (rejecting as arbitrary and capricious an agency standard that relies on circular reasoning because it "allow[ed] the ATF to reach any decision is wish[ed] only looking to specific evidence of community misuse [of a weapon] while ignoring any other examples of the community's compliant use"). Reliance on an undefined term of DEI (or any other category) "is arbitrary and capricious because it allows the [Public Officials] to arrive at whatever conclusion it wishes without adequately explaining the standard on which its decision is based." Id. at 525 (cleaned up).  Unfortunately, the Public Officials did just that.

The Court need not delve deeply into the rudderless EOs concerning DEI: they do not even attempt to define DEI, but instead set it up as some sort of boogeyman.  This lack of clarity was (and is), in the first instance, wholly unfair to the career-HHS and NIH personnel, which must attempt to "align" themselves with the Executive through direction by partisan appointed public officials.  Without a definition of DEI, they embarked on a fool's errand resulting in arbitrary and capricious action.

Then-Acting Secretary of Health and Human Services Dr. Dorothy Fink, picked up the mantle first in the Secretarial Directive, equating without any stated-basis still-undefined DEI with "initiatives that **discriminate** on the basis of race, color,

[89]

App.504

religion, sex, national origin, or another protected characteristic." R. 5 (emphasis added). Further, she claims that "[c]ontracts and grants that support DEI and similar **discriminatory** programs **can** violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans." Id. (emphasis added)

What wordsmithing! Of course discriminatory programs, or initiatives that discriminate, **can** violate federal laws, but there is absolutely **nothing** in the record that demonstrates this is a reasonable statement in the context of DEI -- again undefined -- nor are her statements reasonably explained at all. The statement, respectfully, is utterly meaningless.

On February 13, 2025, the then-NIH Deputy Director of Extramural Research, Dr. Lauer, who provided supposed guidance with respect to still-undefined DEI, using the language of HHS, lumped in "DEI" with "initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic" and advised that if the "sole purpose" of the grants etc. "supports DEI activities" – again undefined – – "then the award must be fully restricted." R. 16. Again, this memorandum and the lack of a definition of DEI or what supporting DEI activities reveals a reluctance to engage. Indeed, though not determinative, Dr. Lauer resigned from a long career in government service the same day he penned the February

[90]

App.505

13, 2025 memorandum, effective Valentine's Day.  Notably, his successor, Ms. Bundesen lasted only 3 weeks after which she too resigned from government service as well.  While the Court makes no finding as to Dr. Lauer's or Ms. Bundesen's motivations or reasons for resigning, it is not lost on the Court that oftentimes people vote with their feet.[15]

Next, on February 21, 202k, Dr. Fink's appointee, Acting Director Matthew Memoli took the reins.  This time, there is evidence that HHS provided him with some circular and nonsensical boilerplate language that was used almost verbatim later on in the grant termination letters.  That aside, Dr. Memoli tripled down on the DEI mystery, and added -- in a truly hold-my-beer-and-watch-this moment -- "gender identity" to the mix.  The similar nonsensical phrasing appears.

Like his boss at HHS, and whoever drafted the Executive Orders for that matter, Dr. Memoli can certainly identify "diversity, equity and inclusion (DEI)," but is unable (or unwilling) to define it.  Instead, he follows Dr. Fink's lead, relegating it to a category "low-value and off-mission research

_____

[15] The lack of any demonstrable pushback on these nonsensical Challenged Directives in the Administrative Record belies the tremendous bureaucratic pressure at play here.  It is palpable.  While HHS and the NIH bureaucrats are scientists at heart, they are trying to keep their jobs.  Scientists cling to reason, not whim -- merit, not loyalty.

programs", including not only DEI, but also undefined gender identity.

Dr. Memoli then goes back in time, attempting to state that even though his "description of NIH's mission is consistent with recent Executive Orders issued by the President," his directive is "based on my expertise and experience; consistent with NIH's own obligation to pursue effective, fiscally prudent research; and pursuant to NIH authorities that exist independently of, and precede, those Executive Orders." See Memoli Directive. While intriguing, the regurgitation of the HHS language belies this separation. Indeed, his description obscures any definition of DEI. The first sentence is untethered to DEI, and is true in the abstract:

"Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness." Id. Simply put, non-scientific research is non-scientific research, and should not be an NIH priority.

Then Dr. Memoli goes on, "**Worse, DEI studies** are **often used** to **support** unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans." Id.

What does this mean?  Apparently, by using the transition
"worse," the term "DEI studies" -- again DEI is undefined -- are
somehow inherently "artificial and non-scientific."  Without
citing a single example, Dr. Memoli claims that DEI studies are
"often used in support of unlawful discrimination on the basis
of race and other protected characteristics," which he connects
with harm to the health of Americans.  So, is it the DEI studies
that are the problem or how others use them?  Who knows.  There
is not a shred of evidence supporting any of these statements in
the record.

Dr. Memoli then transitions to "gender identity", the next
boogeyman: "**Likewise,** research programs based on gender identity
are **often unscientific,** have **little identifiable return on
investment,** and **do nothing to enhance the health of many
Americans.  Many such studies ignore, rather than seriously
examine, biological realities**."  R. 3821 (emphasis added).
There is not a shred of evidence in the Administrative Record
backing this up either.  Phrases like "often unscientific" and
"many studies ignore" are unsupported with anything other than
(apparently) Dr. Memoli's experience.  Ironically, these kinds
of phrases would never survive peer review.

HHS's and the NIH's implementation of the EOs is based
literally upon nothing but an undefined term.  Without defining
it, DEI becomes whatever DEI means to the Public Officials

[93]

App.508

untethered to anything.  This is not reasoned decision-making, in fact it is just the opposite.  It is neither reasonable, nor reasonably explained.  Indeed, "the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." Kingdom v. Trump, No. 1:25-CV-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025).  The HHS and, in turn the NIH's, best possible (but losing) argument is on this record that they were simply following orders of the Administration (or DOGE), but this is an argument that simply falls flat.  Id. ("[I]f an agency could avoid the need to justify its decisions simply by gesturing to an Executive Order and claiming that it was just following the President's directions, the President could unilaterally eviscerate the judicial oversight that Congress contemplated in passing the APA simply by issuing a carbon-copy executive order mandating that an agency act in a particular way before it does so.").  That is essentially what has been done here.  This is evidenced by the lack of any reasoned decisionmaking at all in the Administrative Record.  The Public Officials have decided that they are going to "eradicate" something that they cannot define.  That agency action is arbitrary and capricious. Pivoting to gender affirming care, vaccine hesitancy, COVID, Climate Change and Influencing Public Opinion, these terms evolve in the Priorities Directive, evidence that the NIH was

App.509

trying to figure it out, all the while being tasked with using those same terms to wipe out grants. None of these terms have a reasonable explanation in the record. The Public Officials "must show that there are good reasons for the new policy. . . . that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." F.C.C. v. Fox Television Studios, 556 U.S. 502, 515 (2009). In plain terms, "this means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." Id. It must do more when, as here, "for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." Id. The HHS and NIH have not done so here, and with the exception of a scintilla of evidence with respect to potential disruptions of withdrawn NOFOs, there is no evidence that they even considered the reliance interests that naturally inure to NIH grant process. It is "arbitrary or capricious to ignore such matters." Id. The Public Officials "fail[ ] to provide an intelligible explanation," which "amount[ ] to a failure to engage in reasoned decisionmaking ..." Constellation Mystic Power, LLC v. FERC, 45 F.4th 1028, 1057 (D.C. Cir. 2022) (quoting FPL Energy Marcus Hook, L.P. v. FERC, 430 F.3d 441, 448 (D.C. Cir. 2005);

[95]

App.510

see Thakur, 2025 WL 1734471, at *15 ("The terminated grants were being used to pay Plaintiffs' and their staff's salaries, and to fund graduate student programs, field research, and community outreach.  These facts indicate significant reliance interests that cannot simply be ignored.").

As the Court has already ruled, the Court -- relying on the Certified Administrative Record -- rules that on a fair preponderance of the evidence that the Challenged Directives are arbitrary and capricious under Section 706(2)(A), as are the concomitant grant terminations, which action are all set aside and vacated.

### D.  Section 706(2)(A) Claims -- Not in Accordance with Law  ('10787 Action Count II; '10814 Action Count II)

The APA claim that agency action is "not in accordance with law" is a subpart of Section 706(2)(A).  In reviewing this claim "a reviewing court must uphold an agency's decision if it is: (1) devoid of legal errors; and (2) "supported by any rational review of the record."  New York v. Trump, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *9 (D.R.I. Mar. 6, 2025) (quoting Mahoney v. Del Toro, 99 F.4th 25, 34 (1st Cir. 2024)).

The Plaintiffs attack the Public officials claim that 2 C.F.R. § 200.340(a)(4) operates as a trump card and permits termination of and award that "no longer effectuates the programs goals or agencies priorities."  Id.

[96]

App.511

Section 340 is part of OMB's guidance, and that is all that is -- nonbinding guidance.  See 2 C.F.R. §1.105(b) ("Publication of the OMB guidance in the CFR does not change its nature—it is guidance, not regulation.").  That provision falls under the section entitled "Remedies for Noncompliance."  Section 200.339 provides "remedies for noncompliance."  2 C.F.R. §

That provision provides in pertinent part:

(a)  The Federal award may be terminated in part or its entirety as follows:

(1)  By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2)  By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3)  By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4)  By the Federal agency or pass-through entity **pursuant to the terms and conditions of the Federal award, including, to the extent**

[97]

App.512

> **authorized by law, if an award no longer effectuates the program goals or agency priorities.**

2 C.F.R. § 200.340(a).  That provision requires that an agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." Id. at § 200.340(b).  An agency terminating an award "must provide written notice of termination to the recipient or subrecipient . . . [which] should include the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable.  2 C.F.R. § 200.341 Section 200.340 is an OMB Regulation that provides only guidance to all agencies, and is not binding.  See 2 C.F.R. §1.105(b) ("Publication of the OMB guidance in the CFR does not change its nature -- it is guidance, not regulation.")

As an initial matter, HHS's adoption of the regulation is not effective until October 2025; accordingly, the regulation is wholly inapplicable here.  See Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 FR 80055-01 ("HHS will adopt all of the rest of 2 CFR part 200 with an effective date of October 1, 2025.").  Instead, a different statue, 45 C.F.R. § 75.372(a) (2024) allows for unilateral termination only where there is a failure "to comply with the terms and conditions of the award" or "for cause." 45 C.F.R. §

[98]

App.513

75.372(a)(1) (2024).  Plaintiffs argue that "the plain language of the regulation mandates that these are the exclusive conditions under which HHS and its sub-agencies may terminate a grant."  ECF 103 28 (citing Pol'y & Rsch., LLC v. United States Dep't of Health & Human Servs., 313 F. Supp. 3d 62, 76 (D.D.C. 2018); Healthy Teen Network v. Azar, 322 F. Supp. 3d 647, 651 (D. Md. 2018).  That in and of itself demonstrates legal error. Simply put, the Public Officials cannot rely on a regulation that does not yet apply to their respective agencies in their template.

But even if it applied, under the cited regulation, an agency can terminate an award "pursuant to the terms and conditions of the Federal award, including, **to the extent authorized by law**, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340 (emphasis added).  This is a distinction with a difference, because ""this regulation cannot authorize actions that contravene statutory requirements, nor does it relieve [the Public Officials] of [their] duty to follow the law." Pacito v. Trump, No. 2:25-CV-255-JNW, --- F.Supp. 3d ----, ----, 2025 WL 893530, at *9 (W.D. Wash. Mar. 24, 2025) (quoting 2 C.F.R. § 200.340(a)(4)).

The Public Officials counter that the regulation has been incorporated into the terms and conditions of the grantees' awards.  Even if the regulation applied as a contractual term,

[99]

App.514

whether the "award no longer effectuates the programs goals or agency priorities" can still be challenged under the APA where the underlying reasons violate the APA.  See Thakur v. Trump, No. 25-CV-04737-RFL, 2025 WL 1734471, at *14 (N.D. Cal. June 23, 2025) ("2 C.F.R. § 200.340, to the extent it applies, does not alter the requirement under the APA that Defendants must provide a reasoned decision for their termination."); American Ass'n of Colls. for Tchr. Educ. v. McMahon, 770 F. Supp. 3d 822, 851 (D. Md. 2025 (ruling that even if termination letters invoked a valid reason to terminate under 2 C.F.R. § 200.340, APA claims survived because the letters "fail[ed] to provide [the plaintiffs] any workable, sensible, or meaningful reason or basis for the termination of their awards").  Reliance on these inapplicable regulation as basis for template letter terminations in conjunction with meaningless descriptions is contrary to law under Section 706(2)(A) of the APA.

> **E.    Section 706(2)(C) Claims -- In excess of Statutory Authority ('10787 Action Count III; '10814 Action Count I)**

An APA action brought under Section 706(2)(C), challenges agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Id.  The "[C]ourt[] must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." Loper Bright, 603 U.S. at 412.  "[T]he [C]ourt fulfills [its]

App.515

role by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority. . .and ensuring the agency has engaged in '"reasoned decisionmaking"' within those boundaries." Id. at 395 (citation omitted) (first quoting Henry P. Monaghan, Marbury and the Administrative State, 83 Colum. L. Rev. 1, 27 (1983); and then quoting Michigan, 576 U.S. at 750).

The Plaintiffs identify a litany of statutes that they claim violate Congress's mandate to the Public Officials to conduct research various areas such as women's health, gender identity, COVID, vaccination. See DEI: 42 U.S.C. §§ 282(b)(4); 282(b)(8)(D)(ii), 282(h), 283o(b)(2), 285a-6; 285b-7a(c)(1), 285t(a), 285t(f)(1)(D); gender identity: 42 U.S.C. §283(p); COVID-19: 42 U.S.C. §285f-5(a); vaccine hesitancy: 42 U.S.C. §283d. They also contend the DEI provision conflicts with Congress's mandate to embrace diversity. See 42 U.S.C. §§ 282(h), 287d(e), 283o(b)(2), 285(t)(a), 288(a)(4), 285t-1(a), (b). To be sure the ill-defined categories certainly can be read to overlap these statutes. Inasmuch as the Court has declared the Public Officials' actions arbitrary and capricious and set them aside on that ground, it need not dive into the contours of the statutory overlap.

As for the Strategic Plan, as the Public Officials correctly argue, they have, in fact, complied with that statute. The Strategic Plan is evidence of how the NIH typically

[101]

App.516

proceeds, giving guidance and providing researchers with predictability on which to generally rely. The Court rules that the Challenged Directives do not contravene the statutory requirement under 42 U.S.C. § 282(m) of a Strategic Plan, under Section 706(2)(A), or Section 706(2)(C). At the same time, the Strategic Plan demonstrates that more than a sentence or two is necessary to change priorities that wipe out categories of research.

## V.    CONCLUSION

Every Administration has political priorities and enjoys the ability to make policy changes. But the agencies that implement those changes have to have a reasoned and reasonable explanation for doing so. The Public Officials are not prohibited from blacklisting a handful of categories of research. They must, however, comply with Congress's mandate as to research and other priorities, and even where the Public Officials have discretion, they must provide a reasoned and reasonable explanation. The Public Officials in their haste to appease the Executive, simply moved too fast and broke things, including the law. As previously ordered, partial separate and final judgments have entered in favor of the Plaintiffs in the '10787 Action, ECF No. 138, and in the '10814 Action, ECF No. 151. This Court was careful to limit the relief, as it must, only to the parties before it. See CASA, Inc., No. 24A884, 2025

[102]

App.517

WL 1773631, at *15 (U.S. June 27, 2025) ("When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power too.")

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[16]

---

[16] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[103]

App.518