# EXHIBIT 30

APHA App. 549

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN PUBLIC HEALTH
ASSOCIATION, *et al.*,

        *Plaintiffs*,

    v.

NATIONAL INSTITUTES OF HEALTH, *et al.*,

        *Defendants*.

Case No. 1:25-cv-10787-BEM

## <u>DECLARATION OF APHA MEMBER 4</u>

I, Sereno "Sari" Reisner, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. My name is Sari Reisner and I am an adjunct associate professor with tenure in the Department of Epidemiology at the University of Michigan School of Public Health, as well as an adjunct associate professor in the Department of Epidemiology at Harvard T.H. Chan School of Public Health. I am a transgender population health researcher and have been working in this field since 2009, with a focus on infectious diseases and mental health. My research aims to address health inequities among underserved communities, particularly in relation to mental health, substance use, HIV, and access to high-quality healthcare.

2. I am offering this declaration in my individual capacity and not on behalf of my employer.

3. I received my Doctor of Science from the Harvard T.H. Chan School of Public Health in 2013 and completed two years of post-doctoral training in infectious disease epidemiology in the Department of Epidemiology at the same institution. I have led a range of community-engaged research projects, and am a longtime collaborator with Fenway Health, an LGBT healthcare, research, and advocacy organization, where I have overseen major grants with a team made up largely of transgender research staff.

1

4.   Disenfranchised communities continue to face systemic barriers that lead to persistent health disparities, limiting their ability to thrive. My work is motivated by a desire to understand and help address these challenges. I focus on improving health and wellbeing in underserved populations, with the goal of supporting more effective and inclusive health systems that provide *everyone* with the opportunity to achieve their best possible health.

5.   This work addresses a critical gap in public health research. HIV continues to be a major societal and economic burden, and transgender people and men who have sex with men are among the most affected. By focusing research on these communities, my work not only improves individual and community health outcomes but also advances the national public health goals laid out in the National HIV Strategy for the United States 2022-2025. That Strategy was published in 2021 by the White House as part of the Ending the HIV Epidemic in the U.S. (EHE) initiative launched by President Trump in 2019. A true and correct copy of this report is attached hereto as Exhibit A.

6.   I have received NIH funding for my research for more than a decade, and I have applied for and received over a dozen grants from the NIH over the course of my career.

7.   Each application has involved months—sometimes years—of work, from conducting background research and refining the study design to collaborating with colleagues across disciplines and gathering community input. The grant review process is highly rigorous, and securing funding has become increasingly competitive over time, with many successful proposals scoring in the top tenth percentile or better. One of my current projects, for example, was ranked in the first percentile, reflecting its strength and scientific rigor. Despite the challenges and competitiveness, I value this process for helping to ensure that the most rigorous and impactful research is conducted to advance the scientific evidence-base to improve health outcomes.

8.   I am a member of the American Public Health Association (APHA) and pay $245 in annual dues.

9.   The NIH has terminated five grants that supported my research, including four R01 grants and one U01 grant. I was the Principal Investigator for four of the projects these grants supported.

10. Among these terminated grants was an R01 grant (5R01MH129175) of approximately $4 million awarded by the National Institute of Mental Health (NIM) on August 19, 2022, titled *Strategies to Prevent HIV Acquisition Among Transgender MSM in the US.* A true and correct copy of my NOA is attached hereto as Exhibit B.

2

11. Transgender men who have sex with men (MSM) are a critical population for this work, as they have an 11-fold higher risk of HIV transmission than transgender men who do not have sex with men. The project was a randomized controlled trial with 375 participants using peer intervention to encourage the use of pre-exposure prophylaxis (PrEP) in order to address these higher rates of HIV in transgender MSM. There are no evidence-based interventions to address HIV risk in this population, and the study aimed to fill that gap. The study focused on the 57 U.S. jurisdictions with the highest rates of new HIV cases, as identified and prioritized by the White House Office of National AIDS Policy. Ex. A at 16. Reducing infections in these areas not only helps this specific population, but it also has the potential to significantly reduce the burden of care nationwide.

12. This study also utilized peer-delivered digital interventions, a model that could be adapted and applied to a wide range of populations and thereby open new avenues for future research and public health efforts. It used a digital randomized trial to test two peer-delivered HIV prevention strategies—one-on-one peer navigation and a small group program—either on their own or combined. The 375 participants, all HIV-negative trans MSM eligible for PrEP, were randomly assigned to one of four groups (each receiving different peer-delivered HIV prevention strategies designed to increase PrEP uptake) and studied over 21 months. Every three months, participants completed surveys, did at-home HIV testing, and submitted samples to measure PrEP use. The study also included interviews to better understand how participants make decisions about PrEP and what their experiences were like in the program. The goal of the project was to evaluate the effectiveness of digitally delivered, peer-based HIV prevention strategies in increasing PrEP uptake. By engaging transgender MSM as active partners in the research process, the project aimed to develop culturally tailored, community-informed approaches to HIV prevention. Ultimately, the study seeks to fill critical gaps in HIV prevention for this underserved population, with implications for other at-risk population, and contribute to national efforts to end the HIV epidemic.

13. In filling that critical gap, the research directly contributes to reducing infectious disease disparities and promoting health equity. It also fills a critical gap in biomedical HIV prevention research, an area long prioritized by NIH due to the disproportionate burden of HIV among marginalized communities. The study also supports NIH's commitment to community-engaged research and inclusive public health innovation, and advances national efforts outlined in the

3

2021–2025 U.S. National Strategic Plan to End the HIV Epidemic, reinforcing NIH's broader public health mission. Ex. A.

14. The application for this grant was the culmination of over a decade of research, beginning with a formative study in 2009 and followed by multiple qualitative, quantitative, and intervention studies that informed the final design. Developing the application took nearly a year and involved close collaboration with a team of six co-investigators from different institutions. The process was intensive, with significant time devoted to refining the proposal—including 50 to 60 hours in the final week alone. The application underwent two rounds of rigorous NIH peer review; while the first submission scored well, it was not initially funded. After careful revision and resubmission, it ultimately received a highly competitive score (scoring in the first percentile), reflecting both the quality of the science and the depth of preparation behind it.

15. By year three of the five-year project, we had hired a team of six staff members and four consultants, and were actively running a randomized controlled trial with 96 participants receiving intervention. Intervention was delivered by peers whom our team had trained, and was built on two years of collaboration with a national community advisory board to ensure materials were implementation-ready. Preparing for launch involved extensive groundwork, including over six months of staff training in facilitation, motivational interviewing, and crisis response, and work on branding and development of recruitment advertisements with a community artist. The project also included HIV testing, PrEP adherence monitoring through remote biospecimen collection, and coordination with an external laboratory. We had established a comprehensive study protocol, safety procedures, IRB approvals, and data management systems, and were six months into the 15-month observation period.

16. On March 21, 2025, NIH issued a termination notice, which stated that the award for this grant "no longer effectuates agency priorities." A true and correct copy of my termination notice is attached hereto as Exhibit C. Three days later, on March 24, 2025, NIH issued a revised notice of award (NOA) reflecting the termination of the grant and echoing the language included in the termination notice. A true and correct copy of the revised NOA is attached hereto as Exhibit D.

17. I was never given any previous indication that my grant was in jeopardy, including when NIH twice approved my annual renewal request.

18. Neither the revised NOA nor the termination notice includes any individualized explanation for why the grant was cancelled, and both fail to discuss any of the data or analysis

4

from our application, annual progress reports, or other related material. Instead, the termination notice includes the following language about its decision:

> This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Ex. C at 2; *see* also Ex. D at 5.

19. I don't understand what the termination notice means by "gender identity" in relation to my project, nor did I understand how my project was "based on" "gender identity." I received no communication following up with clarification. While the project did involve transgender participants, the research ultimately centered on examining sexual risk behaviors for HIV and biomedical prevention, which is based in biological and anatomical sex. The primary focus was on encouraging the use of PrEP, which is a biomedical intervention aimed at reducing HIV acquisition risk.

20. Our project targeted enrollment to include 50% people of color, with a geographic focus on areas experiencing the highest rates of new HIV diagnoses in alignment with the White House Office of National AIDS Policy's national strategy. Ex. A at 16. We also worked with transgender men who have sex with men, the group with the highest HIV risk. While we included diverse populations in our research, the study itself was not centered around gender identity but rather on addressing the biomedical aspects of preventing HIV acquisition.

21. My other grant terminations were communicated in nearly identical ways, with no individualized explanations as to why the awards were canceled. In total, four of my other grants were terminated with references to "gender identity," with identical (or nearly identical) language as the termination notice discussed above. One grant was terminated with reference to "DEI." Across all of these grant terminations, key terms like "gender identity" were never defined, and their relevance to the specific canceled projects were unclear.

22. Generally, grant projects are required to submit annual progress reports. It is my understanding that it is extremely rare for a grant to be terminated or not renewed mid-project, especially after several years of work. To my knowledge, the only reasons for such a drastic action

5

would typically involve research misconduct or harm to participants. In my multi-decade career, I had never personally encountered a grant being terminated in the middle of a project before now.

23. The impacts of the grant termination have been severe. I cannot pay my staff of six people and have lost three months of my own salary.

24. I will be restricted in my ability to work on a project that took years to develop and receive funding for. Further, the early termination of the program with active participants will certainly damage the trust I have built with this community.

25. At the time of termination, we were only about halfway through the 15-month intervention period for our participants. The data we have collected will now be unusable for analysis to achieve the project aims, and the biospecimen samples collected have been discarded.

26. At the time of termination, we were approximately halfway through the 15-month observation period with our study participants. The sudden halt means that the data collected to date—midpoint data from an incomplete intervention—cannot be meaningfully analyzed and will not support valid conclusions. Similarly, the biospecimen samples collected under the study protocol have been discarded, representing a permanent loss of both scientific and financial investment. Because of the tightly controlled experimental design, pausing the study mid-course breaks the protocol's integrity—making it difficult to resume the study in an acceptable way.

27. The termination of this grant additionally raises serious ethical concerns due to the lack of a clear process for participants actively involved in the trial. Without the ability to bill or invoice, and with no plan for study close-out activities, participants—who were receiving an intervention as part of the study—are left in an uncertain and unsupported position. As a highly marginalized and at-risk population with mistrust of healthcare and research settings, the abrupt termination of the project may not only cause immediate harm and distress, but may also have long-term consequences. Research has found that stigma in healthcare settings, including interruptions in continuity of care, results in future avoidance of healthcare; thus, the immediate termination may adversely impact this population's future engagement in healthcare and research settings.

28. Typically, a study termination involves a plan to safely transition participants off the intervention, notify Institutional Review Boards, and ensure no harm. The abruptness of this termination, without a mission plan or proper procedures in place, is highly unusual—such actions are generally reserved for cases involving participant harm or researcher misconduct.

29. About 80 former participants in the study reached out to share their gratitude for the researchers' work contributing to health efforts relating to transgender populations and express dismay at the news that the project would be terminated. I am concerned that these former participants, who entrusted us with their stories and experiences, will feel abandoned—and that the trust we built with a highly marginalized population may now be irreparably damaged. Many of them described the study as one of the few times they felt seen and valued in a healthcare or research setting. At the very least, this termination cuts short a vital opportunity to extend the insights and positive outcomes experienced by those participants to the broader transgender community.

30. This grant supported predominantly transgender staff, meaning that the loss of this funding not only disrupts critical work but also undermines the capacity of a workforce that is both uniquely qualified and deeply connected to the populations they serve. The staff has also experienced severe emotional harm—many have expressed feelings of being devalued or targeted, and some are now questioning their place in public health entirely.

31. The termination of this portfolio of grants has left me uncertain about how to proceed, and it threatens my professional trajectory, ability to contribute to my field, and options for future career opportunities.

32. I worked with my university to file an appeal which was submitted April 18, 2025. Still, I do not know whether the appeal has any chance of success, given the termination notice's statement that modification of the project could align the project with agency priorities, and therefore no corrective action is possible. Ex. C at 2. I also did not know how to recharacterize my project in my appeal to fit within the asserted new agency priorities because I do not understand the terms used as the basis for termination.

APHA App. 556

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April, 2025.

Sari Reisner

8

# EXHIBIT A

# NATIONAL
# HIV/AIDS
## STRATEGY

★ ★ ★ ★ ★

for the **United States**
**2022–2025**



APHA App. 559



**Acknowledgments:** The National HIV/AIDS Strategy (NHAS or Strategy) was developed by the White House Office of National AIDS Policy (ONAP) in collaboration with federal partners and with input from the HIV community across the country. Interested parties and organizations throughout the federal government and those engaged in work in many different communities have helped shape the goals, objectives, and strategies in the Strategy. ONAP extends the gratitude and appreciation of the White House to everyone who made thoughtful recommendations and recommitted to the Strategy's vision and goals. ONAP also offers thanks to the team at the Office of Infectious Disease and HIV/AIDS Policy in the U.S. Department of Health and Human Services for its many contributions to developing the Strategy.

**Language used in the National HIV/AIDS Strategy:** The Strategy honors the lived experiences and choices of all people, regardless of age, sex, gender identity, sexual orientation, race, ethnicity, religion, disability, geographic location, or socioeconomic circumstance. To reflect this, authors made a concerted effort to use inclusive and person-first language throughout the strategy. Evidence-based, contemporary terminology is also used to convey respect  and to reduce stigma faced by communities and populations disproportionately impacted by HIV. This approach is intended to reflect the administration's vision for a collective, inclusive, and respectful national response. Despite these efforts, in certain instances, for example to accurately convey scientific meaning, specific terminology or language may be unintentionally offensive or stigmatizing to some individuals or populations.

Additional information regarding the Strategy and associated activities may be accessed at the White House website.

**Suggested citation:** The White House. 2021. *National HIV/AIDS Strategy for the United States 2022–2025.* Washington, DC.

The National HIV/AIDS Strategy is not a budget document and does not imply approval for any specific action under Executive Order 12866 or the Paperwork Reduction Act. The Strategy will inform the Federal budget and regulatory development processes within the context of the goals articulated in the President's Budget. All activities included in the Strategy are subject to budgetary constraints and other approvals, including the weighing of priorities and available resources by the Administration in formulating its annual budget and by Congress in legislating appropriations.

APHA App. 560

## VISION 

*The United States will be a place where new HIV infections are prevented, every person knows their status, and every person with HIV has high-quality care and treatment, lives free from stigma and discrimination, and can achieve their full potential for health and well-being across the lifespan.*

*This vision includes all people, regardless of age, sex, gender identity, sexual orientation, race, ethnicity, religion, disability, geographic location, or socioeconomic circumstance.*

APHA App. 561

# TABLE OF CONTENTS

Executive Summary ............................................................................................................ 1

NHAS At-A-Glance ........................................................................................................... 3

Introduction ..................................................................................................................... 12

    HIV Epidemic: Progress to Date ................................................................................... 12

    HIV in the United States Today.................................................................................... 13

National HIV/AIDS Strategy 2022−2025 ......................................................................23

    Overview ...................................................................................................................23

    Goal 1: Prevent New HIV Infections ............................................................................28

    Goal 2: Improve HIV-Related Health Outcomes of People with HIV ............................38

    Goal 3: Reduce HIV-Related Disparities and Health Inequities .................................. 47

    Goal 4: Achieve Integrated, Coordinated Efforts That Address the HIV Epidemic among All Partners and Interested Parties.................................................................................................58

Implementation and Accountability............................................................................... 66

    Federal Partners ........................................................................................................ 66

    Nonfederal Partners .................................................................................................. 66

Appendix A: Process for Developing the Strategy ...................................................... 67

Appendix B: Acronyms ................................................................................................... 81

Appendix C: References ...................................................................................................82

# TABLES, FIGURES, AND BOXES

## Tables

Table 1.    Proportion of People with HIV by Race/Ethnicity Compared to Proportion of U.S. Population, 2019 ................................................................................................................15

Table 2    HIV Transmissions in the United States, 2016 ...............................................19

Table 3    Definitions of Elements of the Strategy .......................................................... 24

Table A.1    Composition of NHAS Federal Steering Committee...................................... 67

Table A.2    Priority Populations and Summary National-Level Data, Calendar Year 2019 ...........................68

Table A.3    Hypothetical Data for Linkage to Care and Viral Suppression Calculations................................... 72

## Figures

Figure 1    Annual HIV infections in the United States, 2015–2019...............................14

Figure 2    New HIV infections by most impacted populations, United States, 2015 vs. 2019..........................14

Figure 3    HIV incidence by race/ethnicity, 2019 ..........................................................15

Figure 4    57 jurisdictions prioritized in the *Ending the HIV Epidemic* initiative.............................16

Figure 5    HIV prevention and treatment toolkits ...........................................................17

Figure 6    Prevalence-based HIV care continuum, 2019 ...............................................18

Figure 7    CDC's HIV status-neutral approach to HIV services ................................... 34

Figure 8    The HIV care continuum .................................................................................. 38

Figure 9    State criminal HIV exposure laws, as of 2021 ..............................................51

Figure A.1    New HIV diagnoses in the United States and dependent areas for the most-affected subpopulations, 2019...........................................................................70

## Boxes

Box 1    The National HIV/AIDS Strategy and *Ending the HIV Epidemic in the U.S.* Initiative................ 25

Box 2    Missed Opportunities for HIV Diagnosis ..................................................... 29

Box 3    Opportunities for Enhanced HIV Prevention Services in STI Specialty Clinics..............................31

Box 4    HIV Testing Recommendations....................................................................... 33

Box 5    Status-Neutral Approach to HIV Services .................................................... 34

Box 6    Pharmacists' Roles in HIV Prevention and Care.......................................... 37

Box 7    State HIV Criminalization Laws .................................................................... 50

Box 8    Addressing HIV Prevention and Care Across the Lifespan.......................... 54

Box 9    Leveraging Technology Innovations to Improve HIV Prevention and Treatment........................ 64

# EXECUTIVE SUMMARY

Building on lessons learned and progress made in the past 40 years, the United States now has the opportunity to end the HIV epidemic. This opportunity has been made possible by tireless advocacy, determined research, and dedicated delivery of diagnostic, prevention, care, treatment, and supportive services.

The nation's annual new HIV infections have declined from their peak in the mid-1980s, and people with HIV in care and treatment are living longer, healthier lives. In 2019, the estimated number of new HIV infections was 34,800 and 1.2 million people were living with HIV in the United States. However, not all groups have experienced decreases in HIV infections or improvements in health outcomes. Centers for Disease Control and Prevention data show that new HIV infections fell 8% from 2015 to 2019, after a period of general stability in new infections in the United States. This trend represents a hopeful sign of progress. But gains remain uneven, illuminating opportunities for geographic- and population-focused efforts to make more effective use of the powerful HIV prevention, care, and treatment tools now available.

This National HIV/AIDS Strategy (the Strategy), the nation's third national HIV strategy, updates the HIV National Strategic Plan (2021). The Strategy sets forth bold targets for ending the HIV epidemic in the United States by 2030, including a 75% reduction in new HIV infections by 2025 and a 90% reduction by 2030. For interested parties and organizations across the nation, the Strategy articulates goals, objectives, and strategies to prevent new infections, treat people with HIV to improve health outcomes, reduce HIV-related disparities, and better integrate and coordinate the efforts of all partners to achieve the bold targets for ending the epidemic. The Strategy also establishes evidence-based indicators to measure progress, with quantitative targets for each indicator, and designates priority populations.

The Strategy establishes the following vision:

> *The United States will be a place where new HIV infections are prevented, every person knows their status, and every person with HIV has high-quality care and treatment, lives free from stigma and discrimination, and can achieve their full potential for health and well-being across the lifespan.*
>
> *This vision includes all people, regardless of age, sex, gender identity, sexual orientation, race, ethnicity, religion, disability, geographic location, or socioeconomic circumstance.*

The vision, goals, objectives, and other components of the Strategy were developed and approved by a dedicated Steering Committee, composed of subject matter experts from across the federal government, with input from numerous and varied interested parties and organizations in the field. The Strategy is designed to be accessible to and useful for a broad audience, including people working in public health, health care, government, community-based organizations, research, private industry, and academia. It serves as a roadmap for all sectors of society to guide development of policies, services, programs, initiatives, and other actions to achieve the nation's goal of ending the HIV epidemic by 2030.

The Strategy is designed to facilitate a whole-of-society national response to the HIV epidemic in the United States that accelerates efforts to end the HIV epidemic in the United States by 2030 while supporting people with HIV and reducing HIV-associated morbidity and mortality. While not every objective or strategy will speak to or be actionable by all readers, the intent is that individuals and organizations from all sectors of society can find opportunities

APHA App. 564

where they can support necessary scale-up, expansion, and refinement efforts. All communities, regardless of HIV prevalence, are vital to ending the HIV epidemic in this country and private- and public-sector partners must work together with community-based, faith-focused, and advocacy organizations; governmental public health; mental health and substance use disorder treatment services; the criminal justice system; and providers of housing, food and nutrition, education, and employment services because we all have a role in reducing new HIV infections, improving outcomes and quality of life for people with HIV, and eliminating HIV disparities.

Interwoven throughout the Strategy are approaches to address the individual, community, and structural factors and inequities that contribute to the spread of HIV, such as stigma and social determinants of health. The Strategy highlights opportunities to integrate HIV prevention, care, and treatment into prevention and treatment for sexually transmitted infections, viral hepatitis, mental health and substance use disorders, and other public health efforts by leveraging capacity and infrastructure across the domains and breaking down operational and funding silos. A recurring theme is the need to bring to scale innovative solutions and data-driven approaches to address the ongoing and emerging challenges to HIV prevention, care, and treatment, including expanding the types of community and clinical sites that address HIV to help reach and engage people in need of services; supporting retention in HIV prevention and care services; continuing research into development of better prevention tools, therapeutics, and vaccines; and understanding how to make best use of available tools in real-world settings. Throughout this document, the term "care" is used as an umbrella term meant to encompass holistic services including treatment and supportive services.

To ensure implementation and accountability, a Federal Implementation Plan that documents the specific actions that federal partners will take to achieve the Strategy's goals and objectives will be developed in early 2022. Progress toward meeting the Strategy's goals will be monitored and reported annually.

The Strategy and the *Ending the HIV Epidemic in the U.S.* (EHE) initiative are closely aligned and complementary, with EHE serving as a leading component of the work by the U.S. Department of Health and Human Services (HHS), in collaboration with local, state, tribal, federal, and community partners, to achieve the Strategy's goals. The EHE initiative focuses on scaling up four strategies in the communities most affected by HIV. The Strategy covers the entire country, has a broader focus across federal departments and agencies beyond HHS and all sectors of society, and addresses the integration of several key components that are vital to our collective work, including stigma, discrimination, and social determinants of health.

APHA App. 565

# NHAS AT-A-GLANCE

This At-A-Glance section briefly summarizes the Goals, Objectives, and Strategies that are discussed in detail in the narrative that follows.



## Goal 1: Prevent New HIV Infections

**1.1 Increase awareness of HIV**

1.1.1 Develop and implement campaigns, interventions, and resources to provide education about comprehensive sexual health; HIV risks; options for prevention, testing, care, and treatment; and HIV-related stigma reduction.

1.1.2 Increase knowledge of HIV among people, communities, and the health workforce in geographic areas disproportionately affected.

1.1.3 Integrate HIV messaging into existing campaigns and other activities pertaining to other parts of the syndemic, such as STIs, viral hepatitis, and substance use and mental health disorders, as well as in primary care and general wellness, and as part of annual reproductive health visits and wellness visits.

**1.2  Increase knowledge of HIV status**

1.2.1 Test all people for HIV according to the most current USPSTF recommendations and CDC guidelines.

1.2.2 Develop new and expand implementation of effective, evidence-based, or evidence-informed models for HIV testing that improve convenience and access.

1.2.3 Incorporate a status-neutral approach to HIV testing, offering linkage to prevention services for people who test negative and immediate linkage to HIV care and treatment for those who test positive.

1.2.4 Provide partner services to people diagnosed with HIV or other STIs and their sexual and/or syringe-sharing partners.

**1.3  Expand and improve implementation of safe, effective prevention interventions, including treatment as prevention, PrEP, PEP, and SSPs, and develop new options**

1.3.1 Engage people who experience risk for HIV in traditional public health and health care delivery systems, as well as in nontraditional community settings.

1.3.2 Scale up treatment as prevention (i.e., U=U) by diagnosing all people with HIV, as early as possible, and engaging them in care and treatment to achieve and maintain viral suppression.

1.3.3 Make HIV prevention services, including condoms, PrEP, PEP, and SSPs, easier to access and support continued use.

1.3.4 Implement culturally competent and linguistically appropriate models and other innovative approaches for delivering HIV prevention services.

1.3.5 Support research into the development and evaluation of new HIV prevention modalities and interventions for preventing HIV transmissions in priority populations.

APHA App. 566

1.3.6 Expand implementation research to successfully adapt evidence-based interventions to local environments to maximize potential for uptake and sustainability.

**1.4  Increase the diversity and capacity of health care delivery systems, community health, public health, and the health workforce to prevent and diagnose HIV**

1.4.1 Provide resources, incentives, training, and technical assistance to expand workforce and systems capacity to provide or link clients to culturally competent, linguistically appropriate, and accessible HIV testing, prevention, and supportive services especially in areas with shortages that are geographic, population, or facility based.

1.4.2 Increase the diversity of the workforce of providers who deliver HIV prevention, testing, and supportive services.

1.4.3 Increase the inclusion of paraprofessionals on prevention teams by advancing training, certification, supervision, financing, and team-based care service delivery.

1.4.4 Include comprehensive sexual health and substance use prevention and treatment information in curricula of medical and other health workforce education and training programs.

APHA App. 567

 **Goal 2: Improve HIV-Related Health Outcomes of People with HIV**

**2.1  Link people to care immediately after diagnosis and provide low-barrier access to HIV treatment**

2.1.1  Provide same-day or rapid (within 7 days) start of antiretroviral therapy for persons who are able to take it; increase linkage to HIV health care within 30 days for all persons who test positive for HIV.

2.1.2  Increase the number of schools providing on-site sexual health services through school-based health centers and school nurses, and linkages to HIV testing and medical care through youth-friendly providers in the community.

**2.2  Identify, engage, or reengage people with HIV who are not in care or not virally suppressed**

2.2.1  Expand uptake of data-to-care models using data sharing agreements, integration and use of surveillance, clinical services, pharmacy, and social/support services data to identify and engage people not in care or not virally suppressed.

2.2.2  Identify and address barriers for people who have never engaged in care or who have fallen out of care.

**2.3  Increase retention in care and adherence to HIV treatment to achieve and maintain long-term viral suppression and provide integrative HIV services for HIV-associated comorbidities, coinfections, and complications, including STIs**

2.3.1  Support the transition of health care systems, organizations, and patients/clients to become more health literate in the provision of HIV prevention, care, and treatment services.

2.3.2  Develop and implement effective, evidence-based, or evidence-informed interventions and supportive services that improve retention in care.

2.3.3  Expand implementation research to successfully adapt effective evidence-based interventions, such as HIV telehealth, patient and peer navigators, accessible pharmacy services, community health workers, and others, to local environments to facilitate uptake and retention to priority populations.

2.3.4  Support ongoing clinical, behavioral, and other research to support retention in care, medication adherence, and durable viral suppression.

**2.4  Increase the capacity of the public health, health care delivery systems, and health care workforce to effectively identify, diagnose, and provide holistic care and treatment for people with HIV**

2.4.1  Provide resources, value-based and other incentives, training, and technical assistance to expand workforce and systems capacity to provide or link clients to culturally competent and linguistically appropriate care, treatment, and supportive services especially in areas with shortages that are geographic, population, or facility based.

2.4.2  Increase the diversity of the workforce of providers who deliver HIV care and supportive services.

2.4.3  Increase inclusion of paraprofessionals on teams by advancing training, certification, supervision, reimbursement, and team functioning to assist with screening/management of HIV, STIs, viral hepatitis, and mental and substance use disorders and other behavioral health conditions.

APHA App. 568

**2.5  Expand capacity to provide whole-person care to older adults with HIV and long-term survivors**

2.5.1  Identify, implement, and evaluate models of care that meet the needs of people with HIV who are aging and ensure quality of care across services.

2.5.2  Identify and implement best practices related to addressing psychosocial and behavioral health needs of older people with HIV and long-term survivors including substance use treatment, mental health treatment, and programs designed to decrease social isolation.

2.5.3  Increase HIV awareness, capability, and collaboration of service providers to support older people with HIV, including in settings such as aging services, housing for older adults, substance use treatment, and disability and other medical services.

2.5.4  Promote research, cross-agency collaborations, and sharing of research discoveries that address specific aging-related conditions in people with HIV, and other comorbidities and coinfections that can impact people with HIV of all ages.

2.5.5  Develop and optimize collaborative multi-agency and multi-sectoral approaches and strategies to address emergent and evolving challenges facing people living with HIV at various life stages to support healthy aging with HIV.

**2.6  Advance the development of next-generation HIV therapies and accelerate research for HIV cure**

2.6.1  Promote research and encourage public-private partnerships to accelerate new therapies to achieve sustained viral suppression and to address drug toxicity, viral resistance, adherence, and retention in care and stigma associated with ART use.

2.6.2  Increase investment in innovative basic and clinical research to inform and accelerate a research agenda to discover how to sustain viral suppression, achieve ART-free remission, reduce and eliminate viral reservoirs, and achieve HIV cure.

APHA App. 569

 **Goal 3: Reduce HIV-Related Disparities and Health Inequities**

**3.1 Reduce HIV-related stigma and discrimination**

    3.1.1  Strengthen enforcement of civil rights laws (including language access services and disability rights), promote reform of state HIV criminalization laws, and assist states in protecting people with HIV from violence, retaliation, and discrimination associated with HIV status, homophobia, transphobia, xenophobia, racism, substance use, and sexism.

    3.1.2  Ensure that health care professionals and front-line staff complete education and training on stigma, discrimination, and unrecognized bias toward populations with or who experience risk for HIV, including LGBTQI+ people, immigrants, people who use drugs, and people involved in sex work.

    3.1.3  Support communities in efforts to address misconceptions and reduce HIV-related stigma and other stigmas that negatively affect HIV outcomes.

    3.1.4  Ensure resources are focused on the communities and populations where the need is greatest, especially Black, Latino, and American Indian/Alaska Native and other people of color, particularly those who are also gay and bisexual men, transgender people, people who use substances, sex workers, and immigrants.

    3.1.5  Create funding opportunities that specifically address social and structural drivers of health as they relate to Black, Latino, and American Indian/Alaska Native and other people of color.

**3.2 Reduce disparities in new HIV infections, in knowledge of status, and along the HIV care continuum**

    3.2.1  Increase awareness of HIV-related disparities through data collection, analysis, and dissemination of findings.

    3.2.2  Develop new and scale up effective, evidence-based or evidence-informed interventions to improve health outcomes among priority populations and other populations or geographic areas experiencing disparities.

**3.3 Engage, employ, and provide public leadership opportunities at all levels for people with or who experience risk for HIV**

    3.3.1  Create and promote public leadership opportunities for people with or who experience risk for HIV.

    3.3.2  Work with communities to reframe HIV services and HIV-related messaging so that they do not stigmatize people or behaviors.

**3.4 Address social and structural determinants of health and co-occurring conditions that impede access to HIV services and exacerbate HIV-related disparities**

    3.4.1  Develop whole-person systems of care and wellness that address co-occurring conditions for people with or who experience risk for HIV.

    3.4.2  Adopt policies that reduce cost, payment, coverage, and/or access barriers to improve the delivery and receipt of services for people with or who experience risk for HIV.

    3.4.3  Improve screening and linkage to services for people with or who experience risk for HIV who are diagnosed with and/or are receiving services for co-occurring conditions.

APHA App. 570

3.4.4 Develop and implement effective, evidence-based and evidence-informed interventions that address social and structural determinants of health among people with or who experience risk for HIV including lack of continuous health care coverage, HIV-related stigma and discrimination in public health and health care systems, medical mistrust, inadequate housing and transportation, food insecurity, unemployment, low health literacy, and involvement with the justice system.

3.4.5 Increase the number of schools that have implemented LGBTQ-supportive policies and practices, including (1) having a Gay/Straight Alliance (GSA), Gender Sexuality Alliance, or similar clubs, (2) identifying safe spaces, (3) adopting policies expressly prohibiting discrimination and harassment based on sexual orientation or gender identity, (4) encouraging staff to attend professional development, (5) facilitating access to out-of-school health service providers, (6) facilitating access to out-of-school social and psychological service providers, and (7) providing LGBTQ-relevant curricula or supplementary materials.

3.4.6 Develop new and scale up effective, evidence-based or evidence-informed interventions that address intersecting factors of HIV, homelessness or housing instability, mental health and violence, substance use, and gender especially among cis- and transgender women and gay and bisexual men.

**3.5 Train and expand a diverse HIV workforce by further developing and promoting opportunities to support the next generation of HIV providers including health care workers, researchers, and community partners, particularly from underrepresented populations**

3.5.1 Promote the expansion of existing programs and initiatives designed to increase the numbers of non-White research and health professionals.

3.5.2 Increase support for the implementation of mentoring programs for individuals from diverse cultural backgrounds to expand the pool of HIV research and health professionals.

3.5.3 Encourage the implementation of effective recruitment of community partners through community-based participatory research and social networking approaches.

**3.6 Advance HIV-related communications to achieve improved messaging and uptake, as well as to address misinformation and health care mistrust**

3.6.1 Develop and test strategies to promote accurate creation, dissemination, and uptake of information and to counter associated misinformation and disinformation.

3.6.2 Increase diversity and cultural competence in health communication research, training, and policy.

3.6.3 Expand community engagement in health communication initiatives and research.

3.6.4 Include critical analysis and health communication skills in HIV programs to provide participants with the tools to seek and identify accurate health information and to advocate for themselves and their communities.

3.6.5 Expand effective communication strategies between providers and consumers to build trust, optimize collaborative decision-making, and promote success of evidence-based prevention and treatment strategies.

APHA App. 571



### Goal 4: Achieve Integrated, Coordinated Efforts That Address the HIV Epidemic among All Partners and Interested Parties

**4.1 Integrate programs to address the syndemic of HIV, STIs, viral hepatitis, and substance use and mental health disorders in the context of social and structural/institutional factors including stigma, discrimination, and violence**

4.1.1 Integrate HIV awareness and services into outreach and services for issues that intersect with HIV such as intimate partner violence, homelessness or housing instability, STIs, viral hepatitis, and substance use and mental health disorders.

4.1.2 Implement a no-wrong-door approach to screening and linkage to services for HIV, STIs, viral hepatitis, and substance use and mental health disorders across programs.

4.1.3 Identify and address funding, policy, data, workforce capacity, and programmatic barriers to effectively address the syndemic.

4.1.4 Coordinate and align strategic planning efforts on HIV, STIs, viral hepatitis, substance use disorders, and mental health care across national, state, and local partners.

4.1.5 Enhance the ability of the HIV workforce to provide naloxone and educate people on the existence of fentanyl in the drug supply to prevent overdose and deaths and facilitate linkage to substance use disorder treatment and harm reduction programs.

**4.2 Increase coordination among and sharing of best practices from HIV programs across all levels of government (federal, state, tribal, local, and territorial) and with public and private health care payers, faith-based and community-based organizations, the private sector, academic partners, and the community**

4.2.1 Focus resources including evidence-based and evidence-informed interventions in the geographic areas and priority populations disproportionately affected by HIV.

4.2.2 Enhance collaboration among local, state, tribal, territorial, national, and federal partners and the community to address policy and structural barriers that contribute to persistent HIV-related disparities and implement policies that foster improved health outcomes.

4.2.3 Coordinate across partners to quickly detect and respond to HIV outbreaks.

4.2.4 Support collaborations between community-based organizations, public health organizations, education agencies and schools, housing providers, and health care delivery systems to provide linkage to and delivery of HIV testing, prevention, care, and treatment services as well as supportive services.

**4.3 Enhance the quality, accessibility, sharing, and uses of data, including HIV prevention and care continua data and social determinants of health data**

4.3.1 Promote the collection, electronic sharing, and use of HIV risk, prevention, and care and treatment data using interoperable data standards, including data from electronic health records, in accordance with applicable law.

4.3.2 Use interoperable health information technology, including application programming interfaces (APIs), clinical decision support tools, electronic health records and health IT products certified by the Office of the National Coordinator's Health IT Certification Program, and health information exchange networks, to improve HIV prevention efforts and care outcomes.

APHA App. 572

4.3.3 Encourage and support patient access to and use of their individual health information, including use of their patient-generated health information and use of consumer health technologies in a secure and privacy supportive manner.

**4.4 Foster private-public-community partnerships to identify and scale up best practices and accelerate HIV advances**

4.4.1 Adopt approaches that incentivize the scale up of effective interventions among academic centers, health departments, community-based organizations, allied health professionals, people with HIV and their advocates, the private sector, and other partners.

4.4.2 Expand opportunities and mechanisms for information sharing and peer technical assistance within and across jurisdictions to move effective interventions into practice more swiftly.

4.4.3 Develop and optimize collaborative multi-agency and multi-sectoral approaches and strategies to address emergent and evolving challenges facing persons of all ages living with HIV.

**4.5 Improve mechanisms to measure, monitor, evaluate, and use the information to report progress and course correct as needed in order to achieve the Strategy's goals**

4.5.1 Streamline and harmonize reporting and data systems to reduce burden and improve the timeliness, availability, and usefulness of data.

4.5.2 Monitor, review, evaluate, and regularly communicate progress on the National HIV/AIDS Strategy.

4.5.3 Ensure that the National HIV/AIDS Strategy's goals and priorities are included in cross-sector federal funding requirements.

4.5.4 Strengthen monitoring and accountability for adherence to requirements, targets, and goals by funded partners.

4.5.5 Identify and address barriers and challenges that hinder achievement of goals by funded partners and other interested parties.

APHA App. 573

# INDICATORS AT-A-GLANCE

**Indicator 1:** Increase knowledge of status to 95% from a 2017 baseline of 85.8%.

**Indicator 2:** Reduce new HIV infections by 75% from a 2017 baseline of 37,000.

**Indicator 3:** Reduce new HIV diagnoses by 75% from a 2017 baseline of 38,351.

**Indicator 4:** Increase PrEP coverage to 50% from a 2017 baseline of 13.2%.

**Indicator 5:** Increase linkage to care within 1 month of diagnosis to 95% from a 2017 baseline of 77.8%.

**Indicator 6:** Increase viral suppression among people with diagnosed HIV to 95% from a 2017 baseline of 63.1%.

**Indicator 6a:** Increase viral suppression among MSM diagnosed with HIV to 95% from a 2017 baseline of 66.1%.

**Indicator 6b:** Increase viral suppression among Black MSM diagnosed with HIV to 95% from a 2017 baseline of 58.4%.

**Indicator 6c:** Increase viral suppression among Latino MSM diagnosed with HIV to 95% from a 2017 baseline of 64.9%.

**Indicator 6d:** Increase viral suppression among American Indian/Alaska Native MSM diagnosed with HIV to 95% from a 2017 baseline of 67.3%.

**Indicator 6e:** Increase viral suppression among Black women diagnosed with HIV to 95% from a 2017 baseline of 59.3%.

**Indicator 6f:** Increase viral suppression among transgender women in HIV medical care to 95% from a 2017 baseline of 80.5%.

**Indicator 6g:** Increase viral suppression among people who inject drugs diagnosed with HIV to 95% from a 2017 baseline of 54.9%.

**Indicator 6h:** Increase viral suppression among youth aged 13-24 diagnosed with HIV to 95% from a 2017 baseline of 57.1%.

**Indicator 7:** Decrease stigma among people with diagnosed HIV by 50% from a 2018 baseline median score of 31.2 on a 10-item questionnaire.

**Indicator 8:** Reduce homelessness among people with diagnosed HIV by 50% from a 2017 baseline of 9.1%.

**Indicator 9:** Increase the median percentage of secondary schools that implement at least 4 out of 7 LGBTQ-supportive policies and practices to 65% from a 2018 baseline of 59.8%.

In addition, quality of life for people with HIV was designated as the subject for a developmental indicator, meaning that data sources, measures, and targets will be identified and progress monitored thereafter.

APHA App. 574

# INTRODUCTION

## HIV EPIDEMIC: PROGRESS TO DATE

After nearly 40 years of tireless advocacy, determined research, and dedicated delivery of diagnostic, prevention, care, treatment, and supportive services, the United States now has the opportunity to end the HIV epidemic. Since it was first discovered in 1981, HIV has affected the lives of millions of people across the nation. Today, through the ongoing commitment of interested parties and organizations from many sectors, as well as landmark biomedical and scientific research advances, the nation has many effective HIV diagnostics, prevention strategies, and improved care and treatment models. New laboratory and epidemiological approaches enable us to identify where HIV is spreading most rapidly and to respond swiftly to stop the further spread of new HIV transmissions.

Over the past decade, the HIV response in the United States has been guided by the National HIV/AIDS Strategy (NHAS or Strategy), first released in 2010 and updated in 2015. The Strategy has changed the way that Americans talk about HIV, prioritize and coordinate resources, and deliver prevention and care services along with other clinical and nonclinical services that support people with or who experience risk for HIV. It has also led to increased collaboration among federal agencies; people with or who experience risk for HIV; state, local, tribal, and territorial governments; health care providers; researchers; faith communities; and many other community partners. Since the release of those first national strategies, several important achievements have bolstered the nation's HIV response:

- **Population-level viral suppression has increased.** After the NHAS was released, the Centers for Disease Control and Prevention (CDC) published its first national estimates of the share of all people with HIV who have achieved viral suppression, finding that only about one in four people with HIV (27.9%) in the United States was virally suppressed in 2010.[1] By 2019, however, viral suppression rates in the United States had doubled to 57%.[2] Although still too low, these rates represent real progress.

- **HIV diagnoses have declined, especially in key groups.** HIV diagnosis rates were relatively stable for many years prior to the release of the NHAS. CDC data suggest that annual new diagnoses declined by 14.3% from 2010 (42,938) when the Strategy was released to 2019 (36,337).[3, 4] Large declines occurred in some groups, including women. Deaths declined by 7.6% from 2010 (16,726) to 2019 (15,463).[3, 4]

- **Outcome disparities within the Ryan White HIV/AIDS Program have decreased.** Nearly 9 in 10 clients of the Health Resources and Services Administration's (HRSA's) Ryan White HIV/AIDS Program (RWHAP) were virally suppressed in 2019, and the program continues to show progress at reducing disparities across groups.[5] From 2010 to 2019, the gap between male and female clients decreased from nearly 5 percentage points to <1 percentage point. Similarly, the difference between viral suppression rates in Black clients and White clients was 13 percentage points in 2010 but 7 percentage points in 2019.[5, 6]

- **Policy changes ensure that federal money follows the epidemic.** Earlier in the epidemic, federal HIV resources to states and local governments were either allocated via a discretionary manner or via a formula that relied on cumulative AIDS cases, skewing resources toward early epicenters of the epidemic and not reflecting the current burden of HIV across the country. Prior to release of the Strategy, Congress changed the formulas used by the RWHAP to be based on living HIV/AIDS cases. The Strategy's call for federal money to follow the epidemic spurred further action. In fiscal year 2012, CDC changed the formula for its major HIV prevention program for state and local health departments to be based on living HIV/AIDS cases, and, in 2016, Congress modernized the law that authorized the Housing Opportunities for Persons With AIDS (HOPWA) program to be based on living HIV/AIDS cases.

- **The advent of pre-exposure prophylaxis (PrEP) has increased options for HIV prevention.** The first randomized controlled trial of PrEP reported results in 2010, and the U.S. Food and Drug Administration (FDA) approved the first PrEP medication in 2012. Several federal actions embraced this new biomedical

APHA App. 575

tool as an important part of comprehensive HIV prevention: for example, CDC issued interim and then final prescriber guidance; the expansion of PrEP access was a central component of the 2015 update to the NHAS; and the *Ending the HIV Epidemic in the U.S.* (EHE) initiative further sought to remove barriers to PrEP uptake, including through the establishment of the Ready, Set, PrEP program, which makes PrEP available at no cost to individuals without prescription drug coverage. Although uptake remains too low and disparities are large, the adoption of new medical technologies often takes decades, and the goal is to expedite widespread adoption of PrEP for people who can benefit from it.

- **Health insurance coverage rates for people with HIV have increased to match the general population.** In 2018, just 1 in 10 (11%) nonelderly people with HIV were uninsured, a rate on par with that of the general population (10%).[7] An estimated 42% of the adult population with HIV is covered by Medicaid, compared to 13% of the overall adult population.[8] Medicaid is the largest source of insurance coverage for people with HIV, covering a broad range of services from inpatient and outpatient care, to prescription medications, to preventive services.[9]

- **Strategic investments by the National Institutes of Health (NIH) in research have advanced efforts toward new prevention tools, next-generation therapies, a vaccine, and a cure.** NIH discovery science has been newly complemented by a suite of NIH implementation science projects designed to meet EHE initiative goals through improved use of proven HIV strategies.

- **States, cities, tribes, and local communities have developed their own HIV strategies.** These strategies (e.g., plans to end the HIV epidemic or achieve zero new infections) aligned with the NHAS and resulted in increased coordination across government agencies, nongovernmental organizations, and the private sector.

- **Interested parties and organizations have enhanced the focus on supports and support services such as housing and employment, which play key roles in enabling economic self-sufficiency and improving health outcomes.** With the effectiveness of early antiretroviral treatment (ART), many people with HIV can (and do) participate in the country's workforce. Employment is associated with improved HIV health outcomes, notably testing, linkage to care, and adherence to medication.[10] Coordination and collaboration at all levels of government and across the public and private sectors have led to an increased awareness of these supports. Moreover, the COVID-19 pandemic has led communities across the nation to employ new strategies in providing support services, improving access to food, housing, and employment services.

- **The *Ending the HIV Epidemic in the U.S.* initiative was launched in 2019.** This bold plan aims to end the HIV epidemic in the United States by 2030. EHE is the operational plan developed by agencies across the U.S. Department of Health and Human Services (HHS) to pursue that goal. The initiative leverages critical scientific advances in HIV prevention, diagnosis, treatment, and outbreak response by coordinating the highly successful programs, resources, and infrastructure of many HHS agencies and offices. The initiative is focused on areas where data show the highest numbers of new HIV infections, providing 57 geographic focus areas with a rapid infusion of additional resources, expertise, and technology to develop and implement locally tailored EHE plans.

- **President Biden issued an Executive Order on preventing and combating discrimination on the basis of gender identity or sexual orientation.** This Executive Order aims to prevent and combat discrimination on the basis of gender identity or sexual orientation, and to fully enforce Title VII and other laws that prohibit discrimination on the basis of gender identity or sexual orientation.

## HIV IN THE UNITED STATES TODAY

HIV persists as a serious public health challenge in the United States. An estimated 1.2 million people in the United States had HIV at the end of 2019, the most recent year for which this information is available.[11] National HIV prevention and care efforts have taken the nation from a peak of 130,000 HIV infections annually in the mid-1980s[12] to approximately 34,800 in 2019.[10] Although HIV infection rates have decreased in the United States, new infections continue in every U.S. state with 34,800 new infections occurring in 2019.

APHA App. 576

## HOPEFUL SIGNS OF PROGRESS EXIST.

The nation has seen hopeful signs of progress in recent years, but not everyone is benefiting equally from advances in HIV prevention and treatment. The latest CDC data show that new HIV infections declined by 8% from 2015 to 2019, after a period of general stability in new infections in the United States (see Figure 1). Much of this progress was due to larger declines among young gay and bisexual men in recent years.[13]





**Figure 1.** Annual HIV infections in the United States, 2015–2019

Despite this progress, important disparities persist. During this period, Black, Latino, and White gay and bisexual men and Black heterosexual women bore the greatest burden of new HIV infections.[11] (See Figure 2.)



**Figure 2.** New HIV infections by most impacted populations, United States, 2015 vs. 2019[11]

APHA App. 577

## EFFECTIVE TREATMENT AND PREVENTION ARE NOT ADEQUATELY REACHING PEOPLE WHO COULD BENEFIT MOST.

Although HIV remains a threat in every part of the United States, certain populations—and parts of the country—bear most of the burden, signaling where HIV prevention, care, and treatment efforts must be focused.

### HIV by Population

Black and Latino communities are disproportionately affected by HIV compared to other racial/ethnic groups (see Table 1).

**Table 1.** Proportion of People with HIV by Race/Ethnicity Compared to Proportion of U.S. Population, 2019

| Race/Ethnicity | % of People with HIV, 2019[11] | % of U.S. Population, 2019[14] |
|---|---|---|
| Black/African American | 40.3% | 13.4% |
| White | 28.5% | 60.1% |
| Hispanic/Latino | 24.7% | 18.5% |
| Asian | 1.5% | 5.9% |
| American Indian/Alaska Native | 0.3% | 1.3% |
| Native Hawaiian and Other Pacific Islander | 0.09% | 0.2% |

The disproportionate impact of HIV among Black and Latino communities is also evident in incidence (new infections). (See Figure 3.)



The latest incidence estimates indicate that effective **prevention and treatment are not adequately reaching people who could benefit most.**



| | |
|---|---|
| White | 8,600 |
| Hispanic/Latino | 10,200 |
| Black/African American | 14,300 |
| American Indian/Alaska Native | 230 |
| Asian | 550 |
| Mutiracial | 900 |

**Figure 3.** HIV incidence by race/ethnicity, 2019[11]

In all regions of the United States, gay and bisexual men are the most disproportionately affected group. They account for about 66% of new HIV infections each year, even though they account for only 2% of the population, with the highest burden among Black and Latino gay and bisexual men and young men.[14, 15] In 2019, 26% of new HIV infections were among Black gay and bisexual men, 23% among Latino gay and bisexual men, and 45% among gay and bisexual men under the age of 35.

APHA App. 578

Disparities persist among women. Black women are disproportionately affected compared to women of other races/ethnicities. Although annual HIV infections remained stable among Black women from 2015 to 2019, the rate of new HIV infections among Black women was 11 times that of White women and 4 times that of Latina women.[11]

Over 1 million people identify as transgender in the United States.[16] Adult and adolescent transgender people composed 2% (669) of new HIV diagnoses in the United States and dependent areas in 2019. Most of those new HIV diagnoses were among Black/African American people. Compared to all adults and adolescents with diagnosed HIV in 2019, transgender women had almost equal viral suppression rates, while transgender men had higher viral suppression rates.[2, 17, 18]

In 2019, youth aged 13–24 years composed 21% of the 36,398 new HIV diagnoses in the United States. Youth with HIV are the least likely of any age group to be retained in care and have a suppressed viral load.[3] However, in a national survey of students in grades 9–12 in the United States, significantly fewer students reported being tested for HIV in 2019 (9.4%) than in 2009 (12.4%). In addition, trends over the past 10 years (from 2009 to 2019) indicate significant decreases in the percentage of sexually active high school students who used condoms during last sexual intercourse (61.1% vs. 54.3%), and only 8.6% of sexually active students reported being tested for sexually transmitted infections (STIs) during the past year.[19] This despite the fact that almost half of the 26 million new STIs were estimated to occur in youth ages 15–24 in the United States in 2018.

In 2019, 7% of new HIV infections in the United States were among people who inject drugs (PWID). Men who inject drugs accounted for 4% of new HIV infections, and women who inject drugs accounted for 3%. Long-term declining trends in HIV incidence among people who inject drugs have stalled. For example, from 2015 to 2019, the number of new HIV infections remained stable among people who inject drugs.[11] Localized outbreaks have contributed to this trend. People who inject drugs are at high risk for acquiring hepatitis C virus infection, and, in fact, 62–80% of people who inject drugs and have HIV experience coinfection with HIV and hepatitis C.

## HIV by Geography

Most of the nation's HIV diagnoses are concentrated in certain geographic areas, that is, urban areas and southern states. In 2016 and 2017, more than half of new HIV diagnoses were concentrated in geographic hotspots across the United States: 48 counties plus Washington, DC, and San Juan, Puerto Rico.[4] Seven states also have a substantial number of HIV diagnoses in rural areas.[20] These 57 jurisdictions are prioritized for the EHE initiative. Southern states account for 38% of the U.S. population but bear the highest burden of HIV infection with 53% of annual HIV infections, 46% of people with HIV, and 52% of people with undiagnosed infections.[11] (See Figure 4.)

★ ★ ★ ★ ★



**Figure 4.** 57 jurisdictions prioritized in the *Ending the HIV Epidemic* initiative

APHA App. 579

This current landscape of HIV prevention, care, and treatment presents several opportunities and challenges that shape this 5-year Strategy.

## OPPORTUNITIES

More tools than ever before are available to end the HIV epidemic in the United States. People who initiate ART soon after diagnosis and remain adherent can live long, healthy lives.[21] In addition, people with HIV who take ART and achieve and maintain an undetectable viral load have effectively no risk of transmitting HIV through sex.[22-25] Thanks to a robust toolbox that includes syringe services programs (SSPs), PrEP, and post-exposure prophylaxis (PEP), and treatment as prevention, an individual's risk of acquiring HIV is significantly lower than ever (see Figure 5).

★ ★ ★ ★ ★



**Figure 5.** HIV prevention and treatment toolkits. Source: Eisinger et al.[26] Published by Oxford University Press for the Infectious Diseases Society of America 2019. This work is written by (a) U.S. Government employee(s) and is in the public domain in the U.S. Image modified with permission of authors.

To realize the full potential of these tools, several opportunities exist to expand the capacity of existing public health infrastructure, health care systems, and the health care and social service workforce. Engaging the diverse communities of people with and affected by HIV in planning for and delivery of HIV prevention and care services is essential. Further, expanding partnerships and training among traditional settings and parties, as well as identifying and working with nontraditional partners that are likely to engage people with or who experience risk for HIV, will better leverage the capacities of more interested parties and organizations to facilitate access to HIV diagnostics, prevention, care, treatment, and supportive services.

Importantly, the availability and use of data from a variety of sources, along with national, state, tribal, territorial, and local (and even clinic-level) indicators and targets, can help guide decision-making, service planning, and resource allocation.

Along with better use of data, ensuring that community-driven planning and decision-making include more diverse voices, expertise, and experiences can enhance how programs and services are tailored, implemented, and assessed to reach the populations that need them.

APHA App. 580

During the lifespan of this Strategy, other long-acting therapeutics and other simplified HIV drug regimens may become available. The overall value, potential impact, and cost-effectiveness of each new HIV testing, prevention, care, or treatment intervention must be demonstrated. Policy and program development should occur in parallel with the review and approval process for any new prevention or treatment options, such as long-acting injectable or implantable medications. These efforts should incorporate formative research and conversations with all relevant interested parties and organizations, especially patients, providers, and payers to identify challenges and opportunities to prevent gaps between the approval, implementation, and uptake stages.

Ongoing HIV research will facilitate progress toward HIV prevention and treatment, addressing of comorbid health conditions, and better understanding and addressing of HIV disparities and inequities, while advancing novel approaches toward long-term HIV remission and the ultimate goal of an HIV cure. Incorporating a strong implementation science framework in that research will support successful adaption and utilization of effective interventions that are acceptable to target communities.

These opportunities and developments, among others, will continue to transform and help guide the nation's approach to HIV through 2025.

| BIOMEDICAL HIV PREVENTION TOOLS |
|---|
| **PrEP** is medicine that people who experience risk for HIV take to prevent getting HIV from sex or injection drug use. |
| **PEP** is HIV medicine used in emergency cases for people who have possibly been exposed to HIV. People must start taking the pill within 72 hours of exposure. |
| **Treatment as Prevention** is a highly effective prevention method in which people with HIV take HIV medication daily as prescribed and get and keep an undetectable viral load. As a result, they have effectively no risk of sexually transmitting HIV to their HIV-negative partners. This is often referred to as U=U or "undetectable = untransmittable." |

## CHALLENGES

Although the United States is making significant progress in improving HIV outcomes, significant challenges remain. Gaps in the HIV care continuum (see Figure 6) are driving HIV transmission. By ensuring that everyone with HIV is aware of their status, receives the treatment they need, and achieves and maintains viral suppression—key steps in the HIV care continuum—we can preserve the health of people with HIV, improve the quality of their lives, and drive down new HIV infections.

★ ★ ★ ★ ★



**Figure 6.** Prevalence-based HIV care continuum, United States, 2019[2]

APHA App. 581

The most recent data available (2019) show the following:

- Less than one-half (39%) of the U.S. population has ever been tested for HIV.[27] Of people with HIV, an estimated 158,500 (13%) were unaware of their status,[11] meaning they are not receiving the care they need to stay healthy and prevent transmission to others. The number unaware is especially high in the South, likely contributing to the high burden of HIV in the region.
- One in three people with HIV (34%) is not receiving needed HIV care.[2]
- Only 57% of people with HIV were virally suppressed, meaning that 43% are not receiving the benefits of HIV treatment.[2]

These gaps in the care continuum are challenges to be addressed because, according to a CDC transmission model based on 2016 data, approximately 80% of new HIV infections were transmitted from the nearly 40% of people with HIV who either do not know they have HIV or who received a diagnosis but are not receiving regular care (see Table 2).[28]

**Table 2.** HIV Transmissions in the United States, 2016

| % of People with HIV | Status of Care | Accounted for X% of New Transmissions[a] |
|----------------------|----------------|------------------------------------------|
| 15% | Didn't know they had HIV | 38% |
| 23% | Knew they had HIV but weren't in care | 43% |
| 11% | In care but not virally suppressed | 20% |
| 51% | Taking HIV medicine and virally suppressed | 0% |

[a] Total does not equal 100% because of rounding. Source: CDC.[29]

In addition to these gaps in HIV diagnoses, care, and treatment, there are HIV prevention challenges. Only 23% of the approximately 1.2 million people indicated for PrEP are receiving it; in other words, about 3 in 4 people who could benefit from PrEP are not receiving it.[30] Further, significant disparities in PrEP coverage persist based on race/ethnicity, sex at birth, and age.[31, 32] Among those who initiate PrEP, daily pill adherence and long-term maintenance can be a challenge.[33, 34]

Although anyone can acquire HIV, the epidemic disproportionately affects specific populations, communities, and geographic areas across the United States. These disparities exist among gay, bisexual, and other men who have sex with men (MSM), especially Black, Latino,[*] and American Indian/Alaska Native men. They also exist among Black women, transgender women, youth (particularly gay and bisexual young men and transgender youth), and people who inject drugs. These gaps remain particularly troublesome not only among disproportionately affected populations, but also in some rural areas and the South. In 2019, it was estimated that more than one-half of new HIV infections occurred in the South.[11]

Inequities in the social determinants of health are significant drivers and contributors to health disparities and highlight the need to focus not only on HIV prevention and care efforts, but also on the ways that programs, practices, and policies affect communities of color and other populations that experience HIV disparities.

Persons from racial and ethnic minority groups are more likely to be uninsured compared to non-Hispanic Whites,[35] limiting their access to health care. Barriers to health care access include lack of transportation and childcare, inability to take time off work, experiences with housing instability or homelessness, communication and language barriers, racism, discrimination, and lack of trust in health care providers.

[*]For this Strategy, Black is defined as African American or Black, and Latino is defined as Latino or Hispanic.

APHA App. 582

Sexual and gender minorities also face health disparities.[36-40] Barriers to health care include stigma, discrimination, medical mistrust, safety, and lack of access to affirming mental health care.[41] Sexual and gender minorities face greater health challenges than heterosexual and cisgender people due in part to inequities such as stigma and discrimination.[37] Sexual and gender minority populations have lower levels of health insurance and access to regular health care compared to heterosexual/cisgender people.[42, 43]

**Stigma** is an attitude of disapproval and discontent toward a person or group because of the presence of an attribute perceived as undesirable.

**Discrimination** is often a consequence of stigma, occurring when unfair and often unlawful actions are taken against people based on their belonging to a particular stigmatized group.

Another threat to achieving national HIV prevention and care goals is the increase in drug use resulting from both the nation's opioid crisis and resurgent availability and use of methamphetamine and other stimulants among gay men and others who experience higher risk for HIV. Increases in drug use are linked to rising rates, and clusters, of several infectious diseases including hepatitis A, hepatitis B, hepatitis C, and HIV,[44] which threaten the progress to date to reduce HIV transmission, particularly among people who inject drugs. Recognizing this threat, in 2016 CDC identified 220 counties in 26 states that are vulnerable to HIV and viral hepatitis because of the opioid epidemic.[45] Many of those counties have taken steps to implement harm reduction services and strengthen their capacity to detect and respond to a potential outbreak. Half of the vulnerable counties were in the Appalachian region, where— along with other areas of the country—there have been multiple recent clusters and outbreaks of new HIV infections among people who inject drugs. Tailored technical assistance and support is needed to help these communities address the syndemic of HIV and hepatitis C virus fueled by substance use disorders. A particular focus should be on supporting them in resolving the local and state structural and systemic issues that get in the way of implementing evidence-based harm reduction and other services for the prevention of HIV and other infectious diseases and making best use of all available substance use disorder and infectious disease funding.

Using drugs or alcohol may lead to sexual behaviors (e.g., having sex without a condom, having multiple partners) that increase the risk of getting or transmitting HIV. In a recent large study of HIV-negative sexual and gender minorities who have sex with men, of whom a substantial proportion used crystal methamphetamine (crystal meth), this highly addictive drug emerged as the dominant risk factor associated with HIV seroconversion, with persistent methamphetamine users accounting for one-third of all observed HIV seroconversions in the study.[46] Further, a 2018 analysis of the National Notifiable Diseases Surveillance System found substantial overlap in reported substance use and sexual risk behaviors among primary and secondary syphilis cases.[47] For people with HIV, substance use can hasten disease progression and negatively affect care retention and treatment adherence.[48]

Rising rates of STIs also threaten efforts to reduce new HIV infections.[49] STIs are associated with a higher risk of transmitting or acquiring HIV.[50] A recent modeling analysis estimated that 7% of HIV infections were attributed to chlamydia, gonorrhea, syphilis, and trichomoniasis.[51, 52] Siloed program delivery leads to missed opportunities to screen, link, and provide navigation, care management, and treatment for people with HIV, STIs, viral hepatitis, and substance use and/or mental health disorders.

## HIV, STIs, VIRAL HEPATITIS, AND SUBSTANCE USE DISORDERS—A HOLISTIC APPROACH TO THE SYNDEMIC

A syndemic is a set of linked health conditions—such as HIV, viral hepatitis, STIs, and alcohol and substance use and mental health disorders—that adversely interact with one another and contribute to an excess burden of disease in a population. Addressing a syndemic can be challenging because it requires the implementation of integrated and sometimes simultaneous prevention, screening, diagnosis, and treatment efforts, as well as the rapid application of new scientific advances. To be successful, these efforts must go beyond disease-specific responses to identifying and

APHA App. 583

addressing root causes, with greater disease risk and poorer health outcomes often closely tied to employment, stable housing, access to health care and food, and other social determinants of health.

> A **syndemic** is a set of linked health problems that interact synergistically and contribute to excess burden of disease in a population.
>
> Social determinants of health and stigma also play a significant role in this syndemic.

A holistic approach to addressing the syndemic of HIV, viral hepatitis, STIs, and substance use and mental health disorders can only be effective if we also continue to explore the connection between mental health, experience of violence and other types of traumas, substance use, and infectious diseases. Past and present trauma, including experience of violence, homo- and transphobia, discrimination, and racism, contribute to the excess burden of disease in many communities at risk for or diagnosed with these health conditions. This burden challenges our collective efforts to provide prevention and care services because models of trauma-informed care are often not fully developed within many health care settings. In addition, ready access to substance use and mental health care, or health care in general, is lacking in many communities, exacerbating existing health disparities in communities of color.

The syndemic does not just appear in adulthood; the inter-relationship between sexual health, trauma, mental health, and substance use may have precursors in early childhood and coalesce in adolescence. Adverse childhood experiences have substantial effects on health and well-being through adolescence and into adulthood. In adolescence, sexual risk, substance use, experience of violence, and mental health problems co-occur and represent significant risk for STIs and HIV, particularly among sexual minority youth. The opportunity exists, however, to adopt trauma-informed approaches and bolster the coordination, capacity, and delivery of services to populations with and experiencing risk for these linked conditions.

To help drive a coordinated response to the syndemic, the Strategy complements the Viral Hepatitis National Strategic Plan (Viral Hepatitis Plan) and the Sexually Transmitted Infections National Strategic Plan (STI Plan), both released in early 2021. These plans mutually recognize that both the specific health conditions and the syndemic itself present opportunities to conduct relevant research and analyses, develop evidence-based interventions and policy options, and allocate resources to respond efficiently and effectively. The Strategy aligns with the Administration's statement of first-year drug control priorities and will also align with the comprehensive 2022 National Drug Control Strategy being developed by the White House Office of National Drug Control Policy.

## COVID-19 and the Syndemic

This Strategy is being released during the unprecedented COVID-19 pandemic. Since early 2020, SARS-CoV-2, the coronavirus that causes COVID-19 disease, has spread rapidly across the globe, causing more than 200 million confirmed cases worldwide and claiming the lives of more than 4 million individuals to date. The pandemic has caused great uncertainty, including for people with and who experience risk for HIV, STIs, viral hepatitis, and substance use and mental health disorders.

In the United States, the pandemic has exacerbated existing challenges in public health and health care systems, exposing longstanding and pervasive structural inequities. Many clinical and public health services focused on people with or who experience risk for HIV, viral hepatitis, STIs, and substance use and mental health disorders have been forced to reduce hours or close temporarily, with staff redeployed to address the public health emergency. These actions have particularly affected populations who are already disproportionately affected by these health conditions and who are most vulnerable to the economic and societal consequences of the pandemic, including loss of employment and insurance, the necessity to work in unsafe environments, housing and food insecurity, cutbacks to public transportation, lack of access to credible health information in multiple languages, and obstacles to practicing safe social distancing. Faced with these challenges, many individuals have not received necessary medical care or related services. Implementation of the Strategy should consider the potential long-term effects caused by these circumstances.

APHA App. 584

The Strategy accounts for the many lifesaving program innovations and policy changes that were developed to counteract the curtailment of in-person visits and other challenges posed by the COVID-19 pandemic. Examples include the use of telephone- and video-based telehealth visits to ensure that people who experience risk for HIV can access PrEP and that people with HIV can access ongoing care and treatment; exploration and implementation of tele-harm reduction approaches to substance use disorder treatment and HIV treatment; distribution of HIV self-tests and home specimen collection kits; multi-month dispensation of ART; condom delivery; and modification of policies to support mail order, home delivery, or curbside pick-up of medication. Further, community-based programs expanded their roles to ensure the safety of health care workers, clients, and community members by distributing timely and accurate information about COVID-19 testing and vaccinations; facilitating interactions with public health authorities; and serving as testing and vaccination sites.

These innovations in HIV prevention and care delivery prove that the nation can innovate and adapt to ensure that access to HIV prevention and treatment services continues uninterrupted—even in the presence of unprecedented circumstances. Although their outcomes must be studied, many of these innovations may prove worth sustaining as effective tools in our work to achieve our national HIV goals. Our tasks ahead are to carefully determine how to preserve these innovations over the long term for people who can benefit from them, adapt these innovations to achieve success with other populations, and leverage resources to deliver these innovations to larger audiences.

APHA App. 585

# NATIONAL HIV/AIDS STRATEGY 2022–2025

This Strategy, updated for 2022–2025, builds on the lessons learned and progress of previous iterations and seeks to leverage opportunities and address the challenges that remain. It provides a national roadmap for continuing the coordinated response to HIV and puts the country on the path to end the HIV epidemic in the United States by 2030. The Strategy is guided by this vision statement:

> *The United States will be a place where new HIV infections are prevented, every person knows their status, and every person with HIV has high-quality care and treatment, lives free from stigma and discrimination, and can achieve their full potential for health and well-being across the lifespan.*
>
> *This vision includes all people, regardless of age, sex, gender identity, sexual orientation, race, ethnicity, religion, disability, geographic location, or socioeconomic circumstance.*

## OVERVIEW

This Strategy includes the following:

- Four goals to achieve this vision, specific objectives for each goal, and strategies for each objective.
- Priority populations, identified by national-level data as being disproportionately affected by HIV, to help focus stakeholder efforts and resource allocation.
- Nine core indicators, one disparities indicator stratified for each priority population with quantitative targets to track progress toward achieving national HIV goals, and one developmental indicator to be established.

### OBJECTIVES AND STRATEGIES

The Strategy sets forth four goals, objectives for each goal, and strategies for each objective (see Table 3 for definitions). These objectives and strategies are designed to guide federal partners as well as nonfederal parties in achieving the Strategy's vision and goals. The objectives provide direction for the attainment of each goal. The strategies recommend approaches to achieve the objectives. Numerous objectives and strategies could fit under more than one goal. However, each one has been placed under the goal with which it most closely aligns.

APHA App. 586

**Table 3.** Definitions of Elements of the Strategy

| National HIV/AIDS Strategy | Federal Implementation Plan |
|---|---|
| **Goals:** Broad aspirations that enable a plan's vision to be realized<br><br>**Objectives:** Changes, outcomes, and impact a plan is trying to achieve<br><br>**Strategies:** Choices about how best to accomplish objectives | **Action Steps:** Specific activities that will be performed to implement the strategies and achieve the goals of the plan<br><br>**Progress Reports:** Reports on progress, successes, and challenges |

ᵃ Adapted from the HHS Office of the Assistant Secretary for Planning and Evaluation.

The Strategy's objectives and strategies are intended to be implemented by a broad mix of interested parties and organizations at all levels and across many sectors, both public and private. They also serve as a tool to foster a shared focus, enhance coordination of efforts across agencies and programs, and identify areas of synergy and new opportunities to sharpen collective efforts. The strategies are intended to be scalable by implementer type and size of population to be served.

## INDICATORS

The Strategy adopts bold targets for ending the HIV epidemic in the United States by 2030, calling for a 75% reduction in new HIV infections by 2025 and a 90% reduction by 2030. The Strategy's goals, objectives, and strategies focus on achieving national targets set for 2025, setting the stage to ultimately end the HIV epidemic by 2030. As such, the Strategy's vision, goals, objectives, strategies, indicators, and quantitative targets align with the EHE initiative, which complements and will serve as one of many important implementation elements of the Strategy (see Box 1).

The Strategy includes indicators for measuring progress and quantitative targets for each indicator. There are nine core indicators, one of which is stratified to measure progress in addressing HIV disparities in the priority populations (i.e., disparities indicators). In addition, one key issue, quality of life for people with HIV, was designated as the subject for a "developmental indicator," meaning that data sources, measures, and targets will be identified, and progress monitored thereafter. The Strategy's indicators and quantitative targets also align with *Healthy People 2030*. A detailed discussion of the indicators, including methodology, and specifications is found in Appendix A.

APHA App. 587



**BOX 1**
**THE NATIONAL HIV/AIDS STRATEGY AND THE *ENDING THE HIV EPIDEMIC IN THE U.S.* INITIATIVE**

The Strategy and *Ending the HIV Epidemic in the U.S.* (EHE) initiative are complementary, with EHE serving as a leading component of the work by the U.S. Department of Health and Human Services (HHS), in collaboration with federal, state, tribal, territorial, and local partners, to end the HIV epidemic in the United States by 2030. Both the Strategy and the EHE initiative aim to reduce new HIV transmissions in the United States by 75% by 2025 and by 90% by 2030, which would mean fewer than 3,000 new HIV infections per year.

EHE efforts focus on 57 priority jurisdictions, including 48 counties, Washington, DC, and San Juan, Puerto Rico, where greater than 50% of new HIV diagnoses occurred in 2016 and 2017, as well as 7 states with a disproportionate occurrence of HIV in rural areas. With additional funding appropriated by Congress, HHS is providing the 57 geographic focus areas with an infusion of additional resources, expertise, and technology to develop and implement locally tailored EHE plans. Those plans, developed and being implemented with significant community involvement, focus on four pillars:

- Diagnose all people with HIV as early as possible.
- Treat people with HIV rapidly and effectively to reach sustained viral suppression.
- Prevent new HIV transmissions by using proven interventions, including preexposure prophylaxis (PrEP) and syringe services programs (SSPs).
- Respond quickly to potential HIV outbreaks to get prevention and treatment services to people who need them.

The scope of the Strategy extends to agencies beyond HHS and encompasses the entire nation. The Strategy presents a holistic approach to engaging a broad range of interested parties and organizations across many sectors of society to not only end the HIV epidemic by 2030, but also address other components of the syndemic, stigma, discrimination, and social determinants of health.

## PRIORITY POPULATIONS

Although HIV affects people from all social, economic, and racial and ethnic groups, and from all parts of the United States, it disproportionately affects certain populations. The disproportionate prevalence of HIV in specific populations increases the risk for HIV transmission with each sexual or injection drug use encounter within those populations. In addition, a range of social, economic, and demographic factors—such as stigma, discrimination, socioeconomic status, income, education, age, and geographic region—affect people's risk for HIV or their ability to access or remain engaged in prevention or care services.

To focus effort and resources for the greatest impact, the Strategy uses national-level HIV surveillance data to identify populations disproportionately affected by HIV. The following factors were considered: (1) incidence of new HIV infections and trends; (2) prevalence of HIV; (3) HIV diagnoses; (4) outcomes along the HIV care continuum; and (5) potential impact of other major public health threats (e.g., opioid epidemic). Based upon this analysis, the Strategy prioritizes efforts to reduce disparities and improve HIV outcomes among

- gay, bisexual, and other men who have sex with men, in particular Black, Latino, and American Indian/Alaska Native men;

APHA App. 588

- Black women;
- transgender women;
- youth aged 13–24 years; and
- people who inject drugs.

Focusing efforts on these five priority populations will reduce the HIV-related disparities they experience, which is essential if the nation is to succeed on the path toward ending the HIV epidemic by 2030.

To drive action and measure progress toward reducing health inequities and disparities among the priority populations, the Strategy uses viral suppression, stratified by population, as an indicator. Viral suppression was selected as the disparities indicator because increasing and maintaining viral suppression among priority populations will improve health outcomes, reduce HIV-related deaths, and prevent new HIV transmissions. Monitoring progress on these disparities indicators also helps ensure that the nation is making progress with all populations, leaving no groups behind.

This Strategy acknowledges that other populations with unique circumstances warrant specific attention, such as sex workers, immigrants, older adults, people experiencing housing instability or homelessness, individuals with disabilities, and justice-involved individuals. For example, the risk of HIV among people who exchange sex for money, drugs, food, or shelter is high; however, little data exist for this population. The illegal—and often criminalized—nature of exchange sex complicates the collection of population-wide data on HIV risk among this population. Nevertheless, the high prevalence of HIV and STIs among people who participate in exchange sex warrants attention. Sex work is largely performed by transgender women, cisgender women, and men who have sex with men, and is also heavily concentrated among Black and African Americans. The convergence of gender, poverty, and racial and ethnic discrimination as social determinants of health within exchange sex must be examined further to fully understand the HIV epidemic.

Similarly, some non-U.S.-born people with or experiencing risk for HIV face unique challenges when accessing prevention, care, and treatment services. Discrimination, lack of culturally and linguistically competent service providers, and fear of interacting with health care systems and other authorities are often barriers to accessing needed services.

People involved in the justice system face a confusing/disparate system of prevention and care services, often for short time periods. These individuals experience a disproportionately high risk of HIV, as well as risk factors associated with under-utilization of prevention and treatment options, including substance use, mental health issues, and poor access to care.[53] Improving HIV prevention and management among justice-involved people requires innovative approaches to integrating care. HIV programs must work with state and local facilities to ensure that care services are provided throughout the justice system, particularly to people upon release back to their communities; pre- and post-transition planning is critical to decreasing barriers to care.

More than one-half of people diagnosed with HIV in the United States today are over age 50. Although an indicator of the success of modern HIV treatment, this statistic signals the need to tailor services to individuals within this population not only to continue their engagement in care and viral suppression but also to address the comorbidities and psycho-social needs often associated with aging.

Evidence suggests that some people with disabilities may experience higher risk of acquiring HIV than people who are not disabled. Some of the factors associated with this risk include poverty, vulnerability to sexual violence and abuse, limited access to education and health care, and social marginalization. Some people with disabilities may experience barriers to accessing the HIV prevention, testing, or care and treatment services they need.

People with HIV often have other disabilities, and people with disabilities can be at higher risk for acquiring HIV than the general population. Adopting syndemic approaches that place HIV in the context of multiply marginalized

APHA App. 589

communities and that seek to comprehensively leverage a variety of health care, social services, and other community supports to improve overall community health offers an important opportunity to strengthen health care outcomes and improve the quality of life.

Local partners and interested parties should use local surveillance and program data on HIV—as well as on STIs, viral hepatitis, and social determinants of health—to identify the populations most affected in their communities and to understand the outcomes for each population along the continuums of HIV prevention and care. Each state, tribe, community, program, or clinic will make its own assessment of relevant priority populations so that programs and services can be tailored and focused accordingly. In some jurisdictions, local surveillance and program data may indicate that additional populations not mentioned here are experiencing persistent HIV disparities that require focus from local efforts.

In addition, some partners and organizations may work with specific populations or communities in a limited area with data that vary somewhat from the national data. For example, on a federal level, agencies such as the Indian Health Service, CDC's Division of Adolescent and School Health, Department of Veterans Affairs, Federal Bureau of Prisons, and Administration for Community Living serve distinct populations with or who experience risk for HIV. Likewise, state, tribal, territorial, and local jurisdictions, as well as schools and other institutions, may serve distinct populations. For these and other interested parties, efforts should be guided by an assessment of health disparities within their purview and/or jurisdiction to determine how best to focus available resources to achieve results with the greatest impact.

## IMPLEMENTATION

A separate NHAS Federal Implementation Plan will be developed in early 2022 and will detail federal partners' plans and activities to implement the strategies set forth in this document. During development of that plan, the federal partners involved will explore opportunities to engage other federal departments or agencies that could expand services or that administer programs or support delivery of services that address social determinants of health and reduce health disparities and, as such, could make vital contributions to national efforts to end the HIV epidemic.

APHA App. 590

 # GOAL 1: PREVENT NEW HIV INFECTIONS

## THE OPPORTUNITY

The most effective ways to reduce new HIV infections are to ensure timely diagnosis and engagement in care and treatment for people with HIV so that they achieve and maintain viral suppression and therefore cannot transmit the virus; target prevention resources to the places with the largest disease burden and the populations experiencing greatest risk; and ensure that the most effective prevention strategies are prioritized and widely implemented. An array of HIV prevention options, for use in combination or on their own, is available to people with or experiencing risk for HIV.

- **HIV treatment as prevention.** Evidence has definitively shown that people with HIV who achieve and maintain an undetectable viral load by taking HIV medication as directed will not sexually transmit the virus to an HIV-negative partner.

- **HIV testing and engagement in care.** Nearly 40% of people with HIV are unaware of their status or are diagnosed but not receiving care. In 2016, people unaware or not receiving care accounted for nearly 80% of new HIV infections in the United States.[28]

- **PrEP.** Because of the 2019 USPSTF recommendation that clinicians offer PrEP with effective ART to persons who are at high risk of HIV acquisition, as of January 2021 HHS requires most insurance plans to cover PrEP without copay or cost-sharing as a result of the preventive care provisions of the ACA. Implementation guidance issued in July 2021 clarified that this coverage also includes a range of clinical services as part of PrEP clinical care.[54,55] In addition, in 2019 FDA approved a second PrEP drug for people assigned male at birth. A generic version of the original drug became available, increasing options for people who wish to use PrEP. Researchers are investigating a variety of non-vaccine HIV prevention products including long-acting injectable antiretrovirals, long-acting oral pills, vaginal rings, vaginal and rectal gels, and more. If found safe and effective and approved by FDA, these products would further expand the options in the prevention toolbox.

- **SSPs, medication for treatment of opioid use disorder, and other harm reduction services.** Nearly 30 years of research shows that comprehensive SSPs are safe, effective, and cost-saving; do not increase illegal drug use or crime; and play an important role in reducing the transmission of HIV, viral hepatitis, and other infections.[56] FDA has approved several different medications to treat alcohol and opioid use disorders. Certain medications for opioid use disorder relieve the withdrawal symptoms and psychological cravings resulting from opioid dependence. Research also shows that these medications and certain behavioral therapies can contribute to lowering a person's risk of contracting HIV or hepatitis C by reducing the potential for relapse. Appropriations language from Congress permits the use of funds from HHS, under certain circumstances, to support SSPs with the exception that funds may not be used to purchase needles or syringes. Multi-agency guidance was issued on this opportunity, and in 2020 CDC published a technical package on effective strategies and approaches for planning, design, and implementation of SSPs. The White

 **GOAL 1: PREVENT NEW HIV INFECTIONS**

Objectives

1.1 Increase awareness of HIV

1.2 Increase knowledge of HIV status

1.3 Expand and improve implementation of safe, effective prevention interventions, including treatment as prevention, PrEP, PEP, and SSPs, and develop new options

1.4 Increase the diversity and capacity of health care delivery systems, community health, public health, and the health workforce to prevent and diagnose HIV

APHA App. 591

House Office of National Drug Control Policy also included several actions related to increasing access to SSPs in its first-year policy priorities, including authorizing the use of federal funds to purchase syringes and other supplies.[57] In addition, in October 2021, the HHS released the new HHS Overdose Prevention Strategy in which evidence-based harm reduction services, including SSPs, are prioritized as a key target area of action.[58]

- **PEP, condoms, and other effective prevention interventions.** PEP is a short course of HIV medicines taken very soon after a possible exposure to HIV to prevent the virus from taking hold in the body. PEP should be used only in emergency situations and must be started within 72 hours after a recent possible exposure to HIV. Correct condom use remains one of the most effective methods to reduce the risk of HIV transmission during sexual activity. The CDC and USPSTF recommend intensive behavioral counseling on ways to prevent STIs (including HIV) in all adolescents and adults at increased risk for STIs.

In addition, a range of HIV prevention or multipurpose prevention products are under development or regulatory review, which could result in even more HIV prevention tools becoming available within the 5-year span of this Strategy.

## CHALLENGES

The following challenges hinder efforts to reduce new infections:

- HIV awareness remains too low.[59, 60]
- HIV testing and diagnosis opportunities are being missed (see Box 2).[61]
- STIs are surging in the United States (see Box 3).[62]
- A significant number of people with HIV are unaware of their status or are diagnosed in the later stages of their HIV disease.[3, 11]
- Retention in HIV care is suboptimal.[2]
- Uptake of PrEP is too low.[30, 63, 64]
- There are a range of policy, legal, and resource barriers that limit full implementation of SSPs, especially in the most needed areas.[65, 66]



## BOX 2
## MISSED OPPORTUNITIES FOR HIV DIAGNOSIS

Substantial numbers of people who are diagnosed with HIV and who had experienced high risk for HIV experienced missed opportunities for earlier diagnosis. For example, in one study, approximately one-half of newly diagnosed gay and bisexual men and people who inject drugs had been unaware of their infection until diagnosed during the study. They reported not being offered HIV testing by any health care provider despite having seen one within the past year.[61] Further, a retrospective study at an urban adolescent HIV clinic found that many youth recently diagnosed with HIV had prior primary and acute care encounters within the health care system but did not receive an HIV test.[67]

Other studies have highlighted missed opportunities by setting. For example, STI clinic patients experience increased risk for HIV, yet data from nine STI clinics across the United States revealed that three-quarters of STI clinic patients were not tested for HIV despite visiting the clinic within the past year.[68]

APHA App. 592



**BOX 2**
**MISSED OPPORTUNITIES FOR HIV DIAGNOSIS** *(CONTINUED)*

Similarly, more than two-thirds of missed opportunities for HIV diagnoses in a Louisiana health care system occurred at health care visits outside the primary care setting, including inpatient care, specialty care clinics, surgical specialties, ob-gyn visits, and emergency care facilities.[69] In addition, an infectious disease practice in New Jersey found that hospital emergency departments and subspecialty clinics were the two most common settings for missed testing opportunities, with between 37% and 45% of patients presenting with a new HIV diagnosis with an encounter in the institution in the year prior.[70] Dental facilities present another opportunity to provide point-of-care HIV screening and testing.[71] Pharmacies and retail clinics represent a vast, largely untapped potential for the delivery of HIV testing in settings that are more accessible and, for some people, less stigmatizing than traditional settings.[72] Finally, the Centers for Disease Control and Prevention recommends that HIV screening be provided upon entry into and before release from correctional settings and that voluntary (opt-out) HIV testing be offered periodically during incarceration.[73] Studies have shown that opportunities for HIV diagnosis and linking HIV-positive individuals with justice system involvement to community care after release are being missed in the majority of prison systems and jails.[74,75]

COVID-19 testing and vaccinations also present an opportunity to diagnose people who are unaware of their HIV status. One hospital in an urban setting saw a "considerable increase in acute HIV diagnoses" when it linked HIV screening with COVID testing in emergency departments.[76]

Missed opportunities for HIV testing result in diagnosis delays, disease progression, and lack of access to HIV care and treatment. They also prolong the time a person is unaware of their infection, increasing the potential for HIV transmission. For care and treatment to effectively reduce HIV incidence, improved testing coverage and frequency are needed to ensure that a large proportion of cases are diagnosed and treated soon after infection occurs.

APHA App. 593



## BOX 3
## OPPORTUNITIES FOR ENHANCED HIV PREVENTION SERVICES IN STI SPECIALTY CLINICS

STI specialty clinics have been an important health care setting for people who may not otherwise have access to health care services, including those who are uninsured, and for people seeking low-barrier (e.g., nontraditional hours, walk-in or express appointments, low or no cost), expert, and confidential services. STI clinics serve people who may not be engaged in HIV prevention programs or the primary health care system for their STI and HIV prevention, care, and treatment.[77-79] As such, they are suitable settings to (1) reach people who could benefit from HIV pre-exposure prophylaxis (PrEP) and nonoccupational post-exposure prophylaxis (PEP), including people diagnosed with an STI; and (2) identify people with HIV who are either unaware of their status or are not virally suppressed and could benefit from linkage to or reengagement in care.[80]

An evaluation of HIV testing events funded by the Centers for Disease Control and Prevention provided further evidence of STI clinics' important role in identifying people who experience increased risk for HIV. In 2019, STI clinics provided almost one-third of all CDC-funded HIV tests conducted among health care settings, and approximately 20% of all newly identified HIV-positive persons were diagnosed in STI clinics.[81]

## SUMMARY OF OBJECTIVES

The following objectives are critical to achieving the goal of preventing new HIV infections:

1.1     Increase awareness of HIV

1.2     Increase knowledge of HIV status

1.3     Expand and improve implementation of safe, effective prevention interventions, including treatment as prevention, PrEP, PEP, and SSPs, and develop new options

1.4     Increase the diversity and capacity of health care delivery systems, community health, public health, and the health workforce to prevent and diagnose HIV

## OBJECTIVES AND STRATEGIES

### Objective 1.1 Increase awareness of HIV

Nearly four decades into the HIV epidemic, too many people still lack essential information about HIV or hold misconceptions about the virus, including how it is prevented and transmitted. The resulting misperception of self-risk and perpetuation of HIV-related stigma and discrimination can deter people from learning their status, accessing prevention services, seeking or remaining in care, or supporting people who need diagnostic, prevention, care, or treatment services.

More must be done to increase HIV awareness among everyone, but especially among people, communities, and the health workforce where HIV is most heavily concentrated. Messaging must be clear, specific, consistent, and culturally and linguistically appropriate and must reflect today's scientific knowledge of HIV disease progression, its impact on community and individual health, the importance of early and sustained HIV treatment, and the health and prevention benefits of viral suppression. Once developed, the messaging should be broadly and persistently disseminated as educational campaigns using both traditional and social media delivered by trusted community members and community influencers.

APHA App. 594

School-based health programs that include sexual health education and connect youth to services serve to create safer and more supportive school environments, particularly for LGBTQI+ youth.[82] These environments help prevent HIV among adolescents by providing students with the knowledge and skills to help them be healthy and avoid HIV. Comprehensive school-based health programs ensure that students can access the services they need, and promote protective factors, such as school connectedness, that have long-term impact on risk for HIV. HIV prevention implemented in schools includes curricula that are medically accurate, developmentally appropriate, affirming, culturally relevant, accessible, and universally designed with content and skills that target key behavioral outcomes and promote healthy sexual development. Efforts to improve the safety and supportiveness of school environments include the provision of policies and practices that support LGBTQI+ students as well as activities that increase school connectedness and parent engagement.

Suitable primary prevention approaches focused on youth should be age-appropriate, linguistically and culturally informed, community-centered, accessible and universally designed, inclusive, stigma-reducing, and grounded in science and medicine. According to the American Academy of Pediatrics, developmentally appropriate and evidence-based education about human sexuality and sexual reproduction provided over time by pediatricians, schools, other professionals, and parents is important to help children and adolescents make informed, positive, and safe choices about healthy relationships, responsible sexual activity, and their reproductive health.[83] Similar recommendations were presented in a 2021 report issued by the National Academies of Sciences, Engineering, and Medicine, which called for the adoption of a holistic sexual health paradigm, among other actions, to reduce STIs.[84] School-based programs that use strategies to increase sexual health education, connect youth to needed services, and increase the safety and supportiveness of school environments have been demonstrated to reduce sexual risk behavior, experience of sexual violence, and substance use.[83] Primary prevention should be a part of comprehensive sexual education, particularly for youth, including delayed initiation of sexual activity for those who are not yet sexually active, and non-judgmental and affirming information about safer sexual activity for those who are sexually active.

These efforts must engage organizations and people who shape and influence knowledge, attitudes, beliefs, and behaviors, particularly among populations that experience risk of HIV, as well as leverage digital strategies and new technologies to reach the highest number of people at relevant access points.

### *Strategies*

1.1.1   Develop and implement campaigns, interventions, and resources to provide education about comprehensive sexual health; HIV risks; options for prevention, testing, care, and treatment; and HIV-related stigma reduction.

1.1.2   Increase knowledge of HIV among people, communities, and the health workforce in geographic areas disproportionately affected.

1.1.3   Integrate HIV messaging into existing campaigns and other activities pertaining to other parts of the syndemic, such as STIs, viral hepatitis, and substance use and mental health disorders, as well as in primary care and general wellness, and as part of annual reproductive health visits and wellness visits.

## Objective 1.2 Increase knowledge of HIV status

In addition to general knowledge about HIV, it is important for people with HIV to receive a diagnosis (also known as knowledge of HIV status), which would allow them to take control of their health. Full implementation of CDC and USPSTF screening and testing guidelines is critical to increasing knowledge of status (see Box 4). Innovative models and approaches that expand access to and availability of testing in various settings such as routine opt-out testing in clinical settings, testing in retail pharmacies, self-testing, testing in correctional facilities, mobile testing, and self-testing offered via social networks are required. Early detection coupled with prompt linkage to care and immediate initiation of treatment is also critical and can lead to improved individual and community

APHA App. 595

health outcomes. The U.S. Department of Veteran Affairs (VA) provides an innovative solution in which pharmacists developed a clinical dashboard that lists patients needing action, including a shared electronic medical record to span HIV, STI, viral hepatitis, and PrEP needs of VA patients. The dashboard enables staff to access quality improvement data, benchmarks against other comorbidities, and comparative analysis by year for improvement purposes.



## BOX 4
## HIV TESTING RECOMMENDATIONS

**U.S. Preventive Services Task Force (USPSTF) Recommendation (2019)**—USPSTF recommends that clinicians screen for HIV in adolescents and adults aged 15–65 years. Younger adolescents and older adults who experience increased risk of infection should also be screened. USPSTF also recommends that clinicians screen for HIV infection in all pregnant women, including those who present in labor or at delivery with unknown HIV status. Read the recommendation.

**Centers for Disease Control and Prevention (CDC) Recommendations (2006)**—CDC recommends that everyone aged 13–64 years get tested for HIV at least once as part of routine health care. For those with specific risk factors, CDC recommends testing at least annually. Read the recommendations.

Expansion of the status-neutral approach to HIV care allows for ongoing engagement in HIV prevention, care, and treatment regardless of a person's HIV status (see Box 5). Embracing a status-neutral approach helps improve care and service provision and eliminates structural HIV and other intersecting stigma by meeting people where they are, offering a "whole person" approach to care, and putting the needs of the person ahead of their HIV status. By embedding HIV prevention and care into routine care, this approach advances health equity by integrating HIV prevention and care with strategies that address social determinants of health and barriers to accessing and remaining engaged in care. HIV testing serves as the entry point to services—the pathway to prevention and treatment. In addition, people are assessed for and engaged in continuous care and supportive services if needed to improve health and prevent new infections (see Figure 7). Health care providers and public health partners play critical roles in a status-neutral approach.

### Strategies

1.2.1   Test all people for HIV according to the most current USPSTF recommendations and CDC guidelines.

1.2.2   Develop new and expand implementation of effective, evidence-based or evidence-informed models for HIV testing that improve convenience and access.

1.2.3   Incorporate a status-neutral approach to HIV testing, offering linkage to prevention services for people who test negative and immediate linkage to HIV care and treatment for those who test positive.

1.2.4   Provide partner services to people diagnosed with HIV or other STIs and their sexual and/or syringe-sharing partners.

APHA App. 596



## BOX 5
## STATUS-NEUTRAL APPROACH TO HIV SERVICES

Adoption of a status-neutral approach to HIV services—in which HIV testing serves as an entry point to services regardless of positive or negative result—can improve testing as well as prevention and care outcomes.

### Status-Neutral HIV Prevention and Care



People whose HIV tests are negative are offered powerful prevention tools like PrEP, condoms, harm reduction (e.g., SSPs), and supportive services to stay HIV negative.

People whose HIV tests are positive enter primary care and are offered effective treatment and supportive services to achieve and maintain viral suppression.

Follow CDC guidelines to test people for HIV. Regardless of HIV status, quality care is the foundation of HIV prevention and effective treatment. Both pathways provide people with the tools they need to stay healthy and stop HIV.

**Figure 7.** CDC's HIV status-neutral approach to HIV services

People who receive a negative HIV test result are offered powerful tools that prevent HIV, which may include pre-exposure prophylaxis (PrEP) and information about access to condoms and sexual health and harm reduction services. The prevention pathway emphasizes a consistent return to HIV testing and facilitates seamless entry to treatment for people who later receive a positive test result.

People who receive a positive HIV test result should be quickly engaged in HIV primary care and prescribed effective treatment to help them achieve and maintain an undetectable viral load and to tend to their other non-HIV-related health care. An undetectable viral load essentially eliminates the risk of sexual HIV transmission and enables people with HIV to live long, healthy lives.

### Objective 1.3 Expand and improve implementation of safe, effective prevention interventions, including treatment as prevention, PrEP, PEP, and SSPs, and develop new options

Today, a range of highly effective prevention methods are available for use in combination or on their own. However, they do not yet reach everyone who needs them. Scaling up combinations of scientifically proven, cost-effective interventions targeted to the right populations in the right geographic areas is key to preventing new HIV infections. Especially important is scaling up highly effective, biomedical interventions: treatment as prevention (U=U), PrEP, and PEP, along with other highly effective prevention interventions including delayed initiation of sexual

APHA App. 597

activity, correct and consistent condom usage, HIV and viral hepatitis testing, STI testing and treatment, SSPs and harm reduction services, universal HIV testing and linkage to care in primary care settings, and behavioral health services.[85-89]

These interventions must be available to people who need them in a variety of traditional health care and public health settings as well as nontraditional settings. Public health and health care systems can better meet the HIV prevention needs of the people they serve by developing or adopting culturally competent, linguistically appropriate, and accessible approaches and policies for service design and delivery. Examples of interventions include models that allow for low-barrier access to prevention and supportive services such as expanded service hours, drop-in appointments, telehealth, peer navigators, community health workers, and co-located service delivery.[90]

Schools can offer on-site sexual health services through their own health care infrastructure, such as school-based health centers  and school nurses, or can establish referral systems to community partners to provide services, such as periodic, school-wide HIV and STI screening events or mobile clinics. In addition, treatment for alcohol use disorder, other substance use disorders, and mental health conditions can also reduce HIV.[91]

Policy and other systemic changes can support the expansion or improvement of these prevention interventions and can often be cost-neutral or cost-saving, as resources are realigned and services are provided at focused hours and delivery is tailored to people seeking assistance.[92] For example, structural barriers such as state or local laws or policies may require review and revision to facilitate expanded access to HIV prevention services, such as permitting SSPs, working with law enforcement to strengthen training on harm reduction as an effective public health intervention, or expanding prescribing authority and reimbursement of services for PrEP and PEP to pharmacists and other providers.

Ongoing implementation research on how best to use new and existing HIV prevention tools is needed, as is continued research into new tools that make HIV prevention more convenient and accessible. Research must pursue biomedical interventions that simplify implementation, such as long-acting, extended-release tools that can protect against HIV infection without daily pills, as well as non-systemic tools that expand user options such as lubricant- or douche-based microbicides or multi-purpose tools that might protect women from both HIV and pregnancy. Research is needed to identify strategies to most effectively integrate such tools into HIV prevention services when they become available. Other prevention tools also warrant further investigation, including antibody-mediated protection strategies, effective vaccines, and behavioral and social-structural interventions.

### *Strategies*

1.3.1    Engage people who experience risk for HIV in traditional public health and health care delivery systems, as well as in nontraditional community settings.

1.3.2    Scale up treatment as prevention (i.e. U=U) by diagnosing all people with HIV, as early as possible, and engaging them in care and treatment to achieve and maintain viral suppression.

1.3.3    Make HIV prevention services, including condoms, PrEP, PEP, and SSPs, easier to access and support continued use.

1.3.4    Implement culturally competent and linguistically appropriate models and other innovative approaches for delivering HIV prevention services.

1.3.5    Support research into the development and evaluation of new HIV prevention modalities and interventions for preventing HIV transmissions in priority populations.

1.3.6    Expand implementation research to successfully adapt evidence-based interventions to local environments to maximize potential for uptake and sustainability.

APHA App. 598

## Objective 1.4 Increase the diversity and capacity of health care delivery systems, community health, public health, and the health workforce to prevent and diagnose HIV

Expanding awareness, access, uptake, and adherence to effective HIV prevention interventions and improving availability of HIV testing for people with undiagnosed infection or ongoing risk of acquisition are actions that fall largely under the purview of the health care and public health systems. Therefore, steps must be taken to strengthen and expand capacity to ensure that these services are more commonly available in clinical and nonclinical settings including primary care, health centers, community-based organizations, emergency departments, pharmacies (see Box 6), Title X family planning sites, STI specialty clinics (see Box 3), substance use disorder treatment facilities, correctional settings, home- and community-based services, and other settings.

One step involves training all staff, ranging from those performing administrative duties to those delivering direct care, on trauma-informed care, cultural competency, stigma and discrimination, and unrecognized bias. Health care services that are respectful of and responsive to the health beliefs, practices, and cultural, developmental, and linguistic needs of diverse patients can also help bring about positive health outcomes.[93] Another step involves providing resources, incentives, training, and technical assistance to organizations to expand workforce and systems capacity especially in areas with limited availability of prevention and other health care and supportive services.[94] Available mechanisms to increase the number of HIV providers include health professions training grants, the National Health Service Corps Scholarship and Loan Repayment Programs, financial incentives to compensate providers for HIV care management, and program coordination so that providers who are not HIV specialists are adequately equipped to provide prevention services to high-risk populations and link patients who test positive to HIV clinical care providers.

These efforts must seek to expand the number, variety, diversity, and distribution of health care providers who routinely provide HIV testing, prevention counseling, and linkage to specialty care. A recent study showed that a low proportion of primary care providers were familiar with PEP and PrEP.[95] In some settings, these efforts require addressing the "purview paradox," a contradiction in which primary care physicians and HIV specialists sometimes consider PrEP to be beyond their purview.[96] Thus, HIV prevention and testing must become the purview of providers of all types who care for patients who may experience risk. Further, health care providers in high HIV prevalence jurisdictions must understand the relationship of epidemiological context and HIV acquisition. In these jurisdictions, providers may be encouraged to offer universal opt-out HIV testing and integrate PrEP screening as a part of routine care for all clients.

The nation's more than 13,500 health center service delivery sites span every U.S. state, U.S. territory, and the District of Columbia, and serve 1 in 11 people across the country. In 2020, health centers logged nearly 2.5 million visits for HIV tests and provided more than 389,000 people with access to PrEP.[97] Further strengthening and supporting the capacity of health centers to respond to the needs of individuals experiencing risk for HIV or living with HIV, including creating affirming and welcoming environments and providing HIV services with integrated behavioral health and family support models, is a promising approach to increasing availability of high-quality HIV prevention and care services for those who need them.

APHA App. 599



**BOX 6**
**PHARMACISTS' ROLES IN HIV PREVENTION AND CARE**

Pharmacists' knowledge and accessibility in nearly every urban and rural community can be leveraged as part of a comprehensive HIV prevention and care strategy to expand access to care and improve population health. As trusted health care professionals, pharmacists develop a strong rapport with patients and may be the key to addressing current disparities in PrEP-prescribing patterns as well as serving as an essential liaison between patients and other members of the multidisciplinary care team.[98] Pharmacists and community pharmacies can also be utilized to expand rapid, point-of-care HIV testing in communities.[72] In addition, studies have shown that engaging pharmacists as key players in a care team can increase retention in care and adherence to ART and maintain viral suppression.[99-101]

*Strategies*

1.4.1    Provide resources, incentives, training, and technical assistance to expand workforce and systems capacity to provide or link clients to culturally competent, linguistically appropriate, and accessible HIV testing, prevention, and supportive services especially in areas with shortages that are geographic, population, or facility based.

1.4.2    Increase the diversity of the workforce of providers who deliver HIV prevention, testing, and supportive services.

1.4.3    Increase the inclusion of paraprofessionals on prevention teams by advancing training, certification, supervision, financing, and team-based care service delivery.

1.4.4    Include comprehensive sexual health and substance use prevention and treatment information in curricula of medical and other health workforce education and training programs.

## Indicators of Progress

Working together to pursue these objectives, the nation can achieve the following targets by 2025:

**Indicator 1**    Increase knowledge of status to 95% from a 2017 baseline of 85.8%.

**Indicator 2**    Reduce new HIV infections by 75% from a 2017 baseline of 37,000.

**Indicator 3**    Reduce new HIV diagnoses by 75% from a 2017 baseline of 38,351.

**Indicator 4**    Increase PrEP coverage to 50% from a 2017 baseline of 13.2%.

APHA App. 600



# GOAL 2: IMPROVE HIV-RELATED HEALTH OUTCOMES OF PEOPLE WITH HIV

## THE OPPORTUNITY

Starting and staying on HIV treatment as soon as possible following HIV diagnosis is necessary for all people with HIV to improve health outcomes and to prevent HIV transmissions.[102-104] People who start HIV treatment early and remain adherent to antiretroviral medications can live a normal lifespan. Improving the health of people with HIV requires continued focus on the HIV continuum of care to identify gaps and disparities at each step of the continuum to target resources and interventions (see Figure 8). Increasing access to comprehensive health care through expansion of Medicaid programs, counseling about private insurance through the Affordable Care Act and the American Rescue Plan, and implementing programs to support maintaining insurance such as co-pay and premium assistance through the RWHAP will increase access.

★ ★ ★ ★ ★



**Figure 8.** The HIV care continuum outlines the steps that people with HIV take from diagnosis to achieving and maintaining viral suppression. Source: HIV.gov.[105]

One common gap is the lack of understanding about the personal and public health benefits of entering treatment immediately and achieving and maintaining viral suppression. Increasing HIV education and available treatment along with strengthening relationships between patients and providers can play an even larger part in supporting people with HIV to begin, or reengage in, care and treatment and improve long-term health outcomes. Developing and expanding partnerships between providers of HIV specialty care and other providers (such as primary care and other health care providers as well as community organizations, health departments, community-based substance use and harm reduction programs, jails and prisons, and others) can leverage existing resources, allowing for seamless transitions between each step of the continuum from diagnosis to achieving and maintaining viral suppression. In addition, government, academic, and pharmaceutical industry research has provided simpler, more easily tolerated therapies than the initial generation of effective antiretroviral therapies. Continued advances such as long-acting injectables could result in the introduction of new HIV treatments during the course of this 5-year plan. These new options could help address challenges with adherence to a daily pill regimen.

APHA App. 601

Several approaches exist to support treatment initiation and adherence as well as retention in care across the continuum, including:

- **Rapid start programs.** Programs focusing on the immediate (ideally same day or within 7 days after diagnosis) initiation of ART have demonstrated success and are expanding in communities across the nation. Such "rapid start" or "red carpet" programs require structural or other changes to improve linkage to care, care coordination, patient navigation, adequate staffing, specialized services, and clinical provider evaluation.

- **Evidence-based strategies.** Every year evidence-informed best practices are added to the compendia of recommended interventions designed to improve treatment adherence and retention in care. Although interventions are often not a one-size-fits-all approach, health departments, clinics, and community organizations have additional tools to implement and receive a wide range of adaptations that have worked in different settings, in different population sizes, and for specific populations. Increasing the use of evidence-based strategies and best practices, coupled with community input, to reengage people who have fallen out of care, and people never in care, is necessary.

- **Health literacy.** Limited health literacy is associated with poorer health outcomes.[106] At all levels, further effort is needed to construct organizations, institutions, systems, and a workforce that embrace and implement the concepts and principles of health literacy. Efforts to create more health-literate public and private health systems at the federal, state, tribal, territorial, and local levels will help patients understand the health care system and the importance of HIV prevention, care, and treatment, and the benefits of viral suppression. Patient education is a necessary aspect of people-centered care, but it requires systems and providers to end the use of jargon, take the time to educate and explain in plain language, alter websites and brochures, proactively counter medical misinformation, use social media differently,

> **GOAL 2: IMPROVE HIV-RELATED HEALTH OUTCOMES OF PEOPLE WITH HIV**
>
> Objectives
>
> 2.1 Link people to care immediately after diagnosis and provide low-barrier access to HIV treatment
>
> 2.2 Identify, engage, or reengage people with HIV who are not in care or not virally suppressed
>
> 2.3 Increase retention in care and adherence to HIV treatment to achieve and maintain long-term viral suppression and provide integrative HIV services for HIV-associated comorbidities, coinfections, and complications, including STIs
>
> 2.4 Increase the capacity of the public health, health care delivery systems, and health care workforce to effectively identify, diagnose, and provide holistic care and treatment for people with HIV
>
> 2.5 Expand capacity to provide whole-person care to older adults with HIV and long-term survivors
>
> 2.6 Advance the development of next-generation HIV therapies and accelerate research for HIV cure

and consider other culturally appropriate and accessible ways to deliver key information. Understanding HIV, the importance of treatment, and the risks of transmission to others can also lead to less stigma and shame, which in turn can lead to increased interactions with the health system and positive health outcomes.[107] Efforts to increase health literacy can also aid in addressing the mistrust of the medical system prevalent among many minority groups because of the historical systemic racism in many health care settings.

- **Comprehensive array of clinical and support services.** Current systems of HIV care and treatment have produced tremendous results, and the nation has more providers treating people with HIV than ever before. Today, people with HIV who are on treatment are living longer and healthier lives, and more than one-half of the people with HIV in the United States are over age 50. Researchers and clinicians are identifying and providing services to address the comorbidities experienced by people aging with HIV as well as people with HIV across the entire lifespan whose health can be impacted by noncommunicable comorbidities or coinfections. Other key

APHA App. 602

population groups, such as youth, transgender people, people with substance use disorders, justice-involved people, people with disabilities, or people experiencing homelessness, require different combinations of tailored services to help improve their health outcomes.[108] Work continues to scale up evidence-based and evidence-informed programs that provide enhanced case and care management for people with HIV specific to their comorbidities or co-occurring conditions such as homelessness, food insecurity, and lack of employment.

• **Capacity of the health care delivery system.** As providers engage and reengage people in care and implement rapid start models, the number of people in care will increase. However, workforce needs may not be able to keep pace. The existing highly skilled and dedicated workforce, combined with a growing number of federally funded health centers of all types treating people with HIV, are key to ensuring positive health outcomes. There is an opportunity to examine ways to restructure staff and clinic workflows, implement technological solutions, enhance quality improvement programs, consolidate paperwork requirements, and examine task sharing to create new efficiencies and revamp the ability to use peers in key places along the HIV care continuum. Continuing to find innovative ways to encourage clinical and nonclinical providers to specialize in HIV care and treatment and engaging primary care providers in care and treatment of HIV, viral hepatitis, and STIs will remain important.

• **Meaningful involvement of people with HIV in program design and implementation.** People with HIV are central to the response to the epidemic and must be included in all elements of programming and service delivery to achieve the Strategy's goals. People with HIV must be included in program design and implementation, quality improvement initiatives, and campaigns; engaged as peers in prevention and care services; employed in HIV service delivery organizations; and involved in large-scale structural and policy initiatives. COVID-19 has presented opportunities for engaging people with HIV and communities in new and different ways, and program implementers must continue to create mechanisms for the meaningful engagement of interested individuals.

## CHALLENGES

The following challenges hinder efforts to improve HIV-related health outcomes:

• Health care capacity and workforce shortages exist in critical geographic areas, particularly in the Southern United States.

• Services to address intersecting conditions of mental health, substance use disorders, homelessness or housing instability, and incarceration are limited and/or fragmented.

• HIV-related stigma, other forms of stigma associated with people with HIV, and discrimination continue to impede optimal health outcomes for people with HIV.

• There is a need for new and innovative health care delivery strategies and therapeutics to better support and retain people most vulnerable to not adhering to or dropping out of care.

• There is a lack of ongoing, diverse, meaningful, and engaged community input in some HIV programs and services.

• Medical mistrust and medical misinformation must be addressed.

• Lack of Medicaid expansion, particularly in Southern states disproportionately affected by HIV, limits access to HIV prevention and care services for many who need them.

## SUMMARY OF OBJECTIVES

A concerted national effort to engage people with HIV in care is essential to achieving the Strategy's vision. The following steps are critical to achieving success:

2.1     Link people to care immediately after diagnosis and provide low-barrier access to HIV treatment.

2.2     Identify, engage, or reengage people with HIV who are not in care or not virally suppressed.

APHA App. 603

2.3    Increase retention in care and adherence to HIV treatment to achieve and maintain long-term viral suppression and provide integrative HIV services for HIV-associated comorbidities, coinfections, and complications, including STIs.

2.4    Increase the capacity of the public health, health care delivery systems, and health care workforce to effectively identify, diagnose, and provide holistic care and treatment for people with HIV.

2.5    Expand capacity to provide whole-person care to older adults with HIV and long-term survivors.

2.6    Advance the development of next-generation HIV therapies and accelerate research for HIV cure.

## OBJECTIVES AND STRATEGIES

### Objective 2.1 Link people to care immediately after diagnosis and provide low-barrier access to HIV treatment

Achieving improved health outcomes for people with HIV begins with ensuring that they are promptly linked to effective HIV care and treatment upon diagnosis. Linkage to HIV care and treatment immediately or as early as possible following HIV diagnosis leads to faster time to viral suppression, increased rates of retention in care and ongoing viral suppression, and reduction in transmission risk.[109-111] Programs must continue to build capacity and shrink the amount of time between diagnosis and linkage to care so that immediate linkage to care becomes the standard across the United States, allowing people to begin receiving care and treatment within hours or days of their diagnosis no matter where they live. This effort may require that some clinics and health departments work to reduce facility-based, government-based, workforce, or administrative barriers to initiating care and treatment. Red carpet and warm-handoff programs provide low-barrier access by linking newly diagnosed people to care and treatment services, often within the same day.[112, 113] For example, these programs, which often integrate robust navigation services, may schedule medical appointments on behalf of the patient, drive newly diagnosed people who lack transportation from an HIV testing site to a trusted clinic, or help people who need assistance complete required forms and paperwork.

#### *Strategies*

2.1.1    Provide same-day or rapid (within 7 days) start of antiretroviral therapy for persons who are able to take it; increase linkage to HIV health care within 30 days for all persons who test positive for HIV.

2.1.2    Increase the number of schools providing on-site sexual health services through school-based health centers and school nurses, and linkages to HIV testing and medical care through youth-friendly providers in the community.

### Objective 2.2 Identify, engage, or reengage people with HIV who are not in care or not virally suppressed

Although improvements have been made over time, only 58% of people with diagnosed HIV were retained in care in 2019[2] and 81% of people with diagnosed HIV were rapidly linked to care within 1 month of diagnosis. In addition, 23% of people with HIV who are not receiving care account for 43% of new infections.[28] This population often needs highly tailored approaches to identify, conduct outreach, ascertain barriers to care, and create individualized care plans to facilitate entry into care, followed by navigation and other services to support retention in care, such as short- or long-term housing assistance, benefits counseling across the social services spectrum, and employment counseling. New solutions must be identified to engage and reengage populations that, to date, systems have been unsuccessful in reaching and retaining in care. Feedback and evaluations of services from people with HIV are critical to understanding and improving how services are received by those who need them the most. Attention should also be paid to eligibility and other requirements placed on people seeking care such as eligibility processes and duplicative paperwork requests.

APHA App. 604

Data-to-care models based on solid, interwoven data points, and other evidence-based interventions focused on finding people not in care and people who are not yet virally suppressed, are proven strategies to reengage people over the long term.[114] Disparate data systems must first be linked to identify people who have tested HIV positive but do not have recent indicators of quality care, people who have fallen out of care, people in care who lack timely prescription refills, and people in care who have not achieved or maintained viral suppression. Entering into formal data sharing agreements ensures that the uses of the data, responsibilities, and protections are clearly delineated for all parties. Such agreements are needed among state public health surveillance systems, state and local health departments, tribes, tribal organizations, urban Indian organizations, the RWHAP, federally funded health centers of all types, community-based organizations, STI specialty clinics, HOPWA programs, Medicaid, Departments of Corrections, pharmacies and pharmacy benefits managers, and other components of the health system serving people with HIV in a geographic area. A goal of data sharing agreements is to reduce administrative burden on providers as well as individuals, thereby avoiding redundant intakes, increasing efficiency, and preparing providers to work alongside clients to develop comprehensive treatment plans without delay.

### Strategies

2.2.1    Expand uptake of data-to-care models using data sharing agreements, integration and use of surveillance, clinical services, pharmacy, and social/support services data to identify and engage people not in care or not virally suppressed.

2.2.2    Identify and address barriers for people who have never engaged in care or who have fallen out of care.

## Objective 2.3 Increase retention in care and adherence to HIV treatment to achieve and maintain long-term viral suppression and provide integrative HIV services for HIV-associated comorbidities, coinfections, and complications, including STIs

People with HIV need ongoing support to stay in care and adhere to ART to achieve and maintain viral suppression.[115] Approaches to increase retention in care include higher levels of personal contact with a patient navigator or community health worker to ensure care receipt; reminders about appointments and calls to discuss why appointments were missed; patient navigation services designed to help patients identify, apply for, and receive necessary services to bolster medical care; medical case management; financial incentives; and low-threshold care including walk-in appointments and on-site pharmacies.[116, 117] Among adherence interventions are those designed to ensure the efficiency of receiving and taking medications such as 90-day prescriptions, options for medication pick-up or receipt by mail, use of technology such as medication reminder apps, and adherence counseling. Other interventions must address common barriers to adherence and retention, such as providing co-located treatment for HIV and mental health and substance use disorders.

Ongoing research in a variety of disciplines is also needed to improve care retention, medication adherence, and sustained viral suppression. Research topics include next-generation therapeutics that are longer-acting, less toxic, and have fewer side effects and complications, as well as behavioral and social sciences to better understand and address barriers to treatment uptake and adherence, as well as disparities. Biomedical, behavioral, and implementation research approaches can be combined to increase viral suppression, reduce HIV transmission, and improve health for all affected populations. Basic, translational, and clinical research can increase understanding of HIV-related comorbidities, coinfections, and complications, which can interfere with retention, adherence, or viral suppression.

New and differentiated models of care, especially those that integrate HIV prevention, care, and supportive services, alongside broader structural interventions, must be tailored and implemented for priority populations. Many populations such as youth transitioning from pediatric to adult care, people without consistent and stable housing, and people released from correctional facilities need well-coordinated interventions that span systems, providers, and payers and address structural, medical, behavioral, and support service concerns.

APHA App. 605

*Strategies*

2.3.1    Support the transition of health care systems, organizations, and patients/clients to become more health literate in the provision of HIV prevention, care, and treatment services.

2.3.2    Develop and implement effective, evidence-based or evidence-informed interventions and supportive services that improve retention in care.

2.3.3    Expand implementation research to successfully adapt effective evidence-based interventions, such as HIV telehealth, patient and peer navigators, accessible pharmacy services, community health workers, and others, to local environments to facilitate uptake and retention to priority populations.

2.3.4    Support ongoing clinical, behavioral, and other research to support retention in care, medication adherence, and durable viral suppression.

## Objective 2.4 Increase the capacity of the public health, health care delivery systems, and health care workforce to effectively identify, diagnose, and provide holistic care and treatment for people with HIV

Increasing viral suppression requires expanded capacity of public health, health care and support service delivery systems, and the health workforce to be flexible and responsive to the needs of people with HIV. COVID-19 has strained HIV care and prevention systems and has highlighted gaps within our nation's response. Federal and state programs focused on HIV should work to identify opportunities to expand the HIV workforce, including partnerships with medical colleges, particularly Historically Black Colleges and Universities, and incentives for clinicians to provide HIV and related services. Increasing the diversity of providers offering HIV prevention and care services is one important capacity-building approach. In addition, publicly funded organizations can increase the diversity of their workforce and provide training to ensure culturally competent care and knowledge of best practices for caring for people from diverse backgrounds.[118] Health care and support systems can also take advantage of different types of health professionals such as nurses, advanced practice providers, pharmacists, and behavioral health specialists to ensure that any workforce shortages can be addressed. Innovative staffing models can also build capacity to better meet the needs of people with HIV including the use of community health workers, linkage to care and reengagement specialist teams, task sharing, integrated care teams, and use of peer mentors.[119] Organizations should also work to ensure that their staff represents the populations served, including hiring pathways for people with HIV and providing opportunities for leadership and leadership development. In addition, sustained continuous quality improvement programs must be utilized to ensure that up-to-date and high-quality care is being provided by integrated and diverse care teams.

In addition to the RWHAP, patient-centered medical homes and health homes create opportunities to address medical and support service needs of people with HIV through coordinated, team-based, and accessible programs including co-location of mental health, substance use, geriatric, reproductive, and other related health care services. Similar to HIV prevention, expanding care and treatment capacity must also include delivery of additional resources, incentives, training, and technical assistance to existing systems as well as development of new systems in areas with limited availability. For example, establishing new partnerships and advancing telehealth arrangements to expand access to professionals with specialized backgrounds should be explored to increase access to services in geographically underserved areas, as well as expanding broadband access, so that those in underserved and rural areas may have equitable access to telehealth arrangements. The design of programs to reach and engage people out of care, people never in care, and people who are challenged to stay in care may require novel approaches, services, and partnerships to address issues of trauma, poverty, and associated conditions that are obstacles to care. The creation and implementation of new programs should involve input and feedback from people with HIV because they have unique knowledge to share. Systems should also offer low-threshold capacity-building resources to organizations and retail health clinics led and staffed by local members of the priority populations to enhance their

APHA App. 606

ability to apply for and receive grants and foundation funds to increase the number of services being provided in and by affected communities.

In addition, to address the unique needs of people aging with HIV and long-term survivors, federal and state programs and community-based organizations must conduct analyses to identify gaps in service delivery for this population so that programs can be implemented to address shortfalls. This analysis should include federal programs such as Medicare and the RWHAP to ensure adequacy of care and support services, benefits, and policies.

### Strategies

2.4.1    Provide resources, value-based and other incentives, training, and technical assistance to expand workforce and systems capacity to provide or link clients to culturally competent and linguistically appropriate care, treatment, and supportive services especially in areas with shortages that are geographic, population, or facility based.

2.4.2    Increase the diversity of the workforce of providers who deliver HIV care and supportive services.

2.4.3    Increase inclusion of paraprofessionals on teams by advancing training, certification, supervision, reimbursement, and team functioning to assist with screening/management of HIV, STIs, viral hepatitis, and mental and substance use disorders and other behavioral health conditions.

## Objective 2.5: Expand capacity to provide whole-person care to older adults with HIV and long-term survivors

More than one-half (52%) of people in the United States with diagnosed HIV were aged 50 and older in 2019.[3] Of the more than 500,000 clients served by the RWHAP in 2019, 46.8% were aged 50 years and older—an increase from 31.6% in 2010. Of clients aged 50 years and older receiving RWHAP HIV medical care, 90.9% were virally suppressed, which was slightly higher than the national RWHAP average (88.1%).[120] The proportion of older adults with HIV is expected to continue to rise because of the effectiveness of ART, as well as new diagnoses within this age group, which accounts for approximately 17% of all diagnosed HIV in the United States.

People aging with HIV, many of whom are long-term survivors, have unique mental health and physical health needs.[121] Although people with HIV over age 50 have the highest viral suppression rates and the lowest incidence rates of any age group, the effects of aging, chronic inflammation, frailty, and distinctive behavioral health issues can compound the care and support service needs for this population.

Although modern antiretroviral therapies increase the life expectancy of people living with HIV, many challenges and opportunities for the treatment of HIV and HIV-associated comorbidities, coinfections, and complications across the lifespan persist. Even when long-term viral suppression is achieved, people living with HIV over age 50 are more likely than their peers without HIV to experience age-related complications such as cardiovascular disease, lung disease, infection-related and non-infection-related cancers, neurocognitive and neuropsychiatric disorders, osteopenia/osteoporosis, liver cirrhosis, and renal disease. In addition, people living with HIV infection may suffer from multiple morbidities, polypharmacy, declining physical and cognitive function, alterations in body composition, social isolation, and increased caregiver burden.

Older adults with HIV and long-term survivors of HIV often experience social isolation, loneliness, and a lack of social support, as well as HIV- and age-related stigma. These issues may prevent them from seeking or staying in care and can contribute to poor mental and physical health. The U.S. HIV care and treatment system must adapt to ensure that people aging with HIV can receive whole-person care that addresses their HIV- and aging-related health needs, along with support services such as mental health, transportation, housing, food and nutrition, and benefits counseling, among many others. Relatedly, our nation's programs designed to serve older adults—including Medicare, Medicaid, and programs supported through the HHS Administration for Community Living including

APHA App. 607

State Units on Aging, Area Agencies on Aging, and other community-based organizations and social service providers—must be prepared to meet the needs of people with HIV. Partnerships between HIV care providers and community-based organizations can greatly enhance the ability of people aging with HIV to maintain independence and experience improved quality of life (see Box 8 for a discussion of HIV Prevention and Care Across the Lifespan).

### *Strategies*

2.5.1    Identify, implement, and evaluate models of care that meet the needs of people with HIV who are aging and ensure quality of care across services.

2.5.2    Identify and implement best practices related to addressing psychosocial and behavioral health needs of older people with HIV and long-term survivors including substance use treatment, mental health treatment, and programs designed to decrease social isolation.

2.5.3    Increase HIV awareness, capability, and collaboration of service providers to support older people with HIV, including in settings such as aging services, housing for older adults, substance use treatment, and disability and other medical services.

2.5.4    Promote research, cross-agency collaborations and sharing of research discoveries that address specific aging-related conditions in people with HIV, and other comorbidities and coinfections that can impact people with HIV of all ages.

2.5.5    Develop and optimize collaborative multi-agency and multi-sectoral approaches and strategies to address emergent and evolving challenges facing people living with HIV at various life stages to support healthy aging with HIV.

## Objective 2.6: Advance the development of next-generation HIV therapies and accelerate research for HIV cure

Research and programmatic implementation of varied HIV therapeutic modalities that meet the needs of diverse communities of people with HIV is critical to reduce onward transmission and to achieve complete virus remission, eradication, and HIV cure. Collaboration must exist on a global scale, as much of the research on these new therapies is being done in highest incidence settings.

Novel ART classes and drugs that target the HIV lifecycle are in various stages of preclinical and clinical development and are under investigation in clinical trials. Next-generation therapeutics research includes basic and clinical studies to optimize efficient delivery of therapies and interventions that address drug toxicity, viral resistance, adherence, and retention in care and stigma associated with ART use.

Numerous novel diagnostic and delivery systems are similarly being developed and tested, including subcutaneous, intravenous, topical, implantable, and long-acting oral formulations. New delivery systems and technologies will improve adherence to drug regimens and reduce the burden on health systems.

Research toward safer, effective, and long-lasting therapeutics that successfully achieve viremic control in the absence of ART or completely eradicate the HIV infection (cure) must continue, and must seek a better understanding of the viral reservoir dynamics, persistent viral replication consequences, and the host immune system clearance capacity to remove residual infection.

In parallel to research efforts, safe, long-acting, more efficacious regimens must be rapidly approved and implemented to meet the needs of communities of people with HIV. Achieving these goals will benefit from robust public-private partnerships both in basic and clinical research as well as in implementation planning and delivery to ensure community involvement and advocacy.

APHA App. 608

*Strategies*

2.6.1     Promote research and encourage public-private partnerships to accelerate new therapies to achieve sustained viral suppression and to address drug toxicity, viral resistance, adherence, and retention in care and stigma associated with ART use.

2.6.2     Increase investment in innovative basic and clinical research to inform and accelerate a research agenda to discover how to sustain viral suppression, achieve ART-free remission, reduce and eliminate viral reservoirs, and achieve HIV cure.

## INDICATORS OF PROGRESS

Working together to pursue these objectives, the nation can achieve the following targets by 2025:

**Indicator 5**     Increase linkage to care within 1 month of diagnosis to 95% from a 2017 baseline of 77.8%.

**Indicator 6**     Increase viral suppression among people with diagnosed HIV to 95% from a 2017 baseline of 63.1%.

APHA App. 609



# GOAL 3: REDUCE HIV-RELATED DISPARITIES AND HEALTH INEQUITIES

## THE OPPORTUNITY

Advances in HIV prevention, testing, care, treatment, and supportive services have led to significant declines in new HIV transmissions and deaths. They also make it possible for the nation to envision ending the HIV epidemic. However, realizing this vision requires that every person across the United States with or who experiences risk for HIV has access to high-quality and culturally competent prevention, diagnostic, care, treatment, and supportive services that are non-stigmatizing, non-discriminatory, inclusive, and responsive to their needs. Further, issues such as discrimination and systemic racism that contribute to differences in the quality of and access to health care and other necessities such as housing and behavioral and substance use services, and lead to ongoing disparities among racial, ethnic, and sexual and gender minority populations, must be addressed.

The Strategy recognizes racism as a serious public health threat that directly affects the well-being of millions of Americans. Racism is not only the discrimination against one group based on the color of their skin or their race or ethnicity, but also the structural barriers that impact racial and ethnic groups differently to influence where a person lives, where they work, where they play, and where they gather as a community. Over generations, these structural inequities have resulted in racial and ethnic health disparities that are severe, far-reaching, and unacceptable.[122] Across the country, federal, state, and local leaders are declaring racism to be a public health crisis, an important step in the movement toward equity.[120] This recognition comes with the need for a more equitable HIV response that focuses on populations with the greatest need.

Reducing these disparities entails focusing on the needs of disproportionately affected populations, supporting racial justice, combating HIV-related stigma and discrimination, providing leadership and employment opportunities for people with or who experience risk for HIV, and addressing social determinants of health and co-occurring conditions to reduce health inequities and disparities. Therefore, the Strategy fully recognizes that the national HIV goals can only be achieved through collaborative efforts at the federal, state, tribal, territorial, and local levels that focus on reducing HIV-related disparities and by ongoing commitment to understand and address the central factors that create HIV inequities.

In recent years, the nation and individual states have made progress in the area of HIV-related disparities. For example:

- **The RWHAP significantly reduced viral suppression disparities among client populations**, particularly women, transgender people, youth, Blacks, and people with unstable housing. Overall, 88% of clients receiving medical care in the RWHAP were virally suppressed in 2019.[5] From 2010 to 2019, the gap between male and female clients decreased from nearly 5 percentage points to <1 percentage point. In addition, the gap between male and transgender clients decreased from 9 percentage points to 5 percentage points. Similarly, the disparity between viral suppression rates in Black clients and White clients was 13 percentage points in 2010 but 7 percentage points in 2019.[5, 6] HRSA and its RWHAP recipients have continued to use these data to drive programs and decision-making.

- **Disparities in rates of new infections declined in some populations.** From 2015 to 2019 the United States saw reductions of disparities in the rates of new HIV infections among gay and bisexual men, Black gay and bisexual men, and Black women.[11]

- **Since 2014, at least nine states (CA, CO, IA, IL, MI, MO, NV, NC, VA) have modernized or repealed their HIV criminal exposure laws.** Changes have included removing HIV prevention issues from the criminal code and including them instead under disease control regulations, requiring intent to transmit or actual HIV transmission, or providing for defenses for taking measures to prevent transmission.

APHA App. 610

## CHALLENGES

The following challenges hinder efforts to reduce HIV-related disparities and health inequities:

- Disparities in HIV prevalence persist.[124]
- The South bears a disproportionate HIV burden.
- Disparities are also evident in the proportion of people with HIV with viral suppression.[2]
- Significant disparities exist in PrEP uptake by age, race, sex at birth, and geographic location.[11, 63, 64]

Research to better understand and address such disparities and inequalities—including through community-based participatory research methods—can help improve HIV testing and engagement and retention in prevention and care services and can enhance the health and well-being of people with or who experience risk for HIV in underserved and marginalized communities.

Also important is consideration of and appropriate and proportional response to HIV among groups that represent a small share of both the population and of HIV infections. Although it is vital to focus national efforts in communities with the highest burden, HIV prevention, care, and treatment must continue to be supported in localities with concentrations of groups such as Asian Americans and Pacific Islanders and American Indians/Alaska Natives, and informed by the best available data.

### A Focus on Health Inequities

Certain racial and ethnic minority groups have higher rates of HIV incidence, prevalence, poor health outcomes (lower viral suppression), and mortality, compared to non-Hispanic Whites.[125] Health disparities can stem from inequities in the social determinants of health and highlight the need to focus on not only HIV prevention and care efforts, but also how programs, practices, and policies affect racial and ethnic minority communities. Persons from racial and ethnic minority groups are more likely to be uninsured compared to non-Hispanic Whites,[126] limiting their access to health care. Sexual and gender minorities also face health inequities. Sexual and gender minorities have lower levels of health insurance and access to regular health care compared to their heterosexual counterparts.[37, 38] Barriers to health care access include lack of transportation and childcare, inability to take time off from work, communication and language barriers, racism, discrimination, and lack of trust in health care providers.[127] Further, CDC's 2019 Youth Risk Behavior Survey data show that substantial health disparities exist among an estimated 2.6 million sexual minority students, placing them at risk for negative health outcomes, including HIV infection.

The Strategy recognizes the importance of addressing social determinants of health to improve health outcomes for racial, ethnic, and sexual and gender minority groups. By working to establish policies and programs that positively

### GOAL 3: REDUCE HIV-RELATED DISPARITIES AND HEALTH INEQUITIES

Objectives

3.1 Reduce HIV-related stigma and discrimination

3.2 Reduce disparities in new HIV infections, in knowledge of status, and along the HIV care continuum

3.3 Engage, employ, and provide public leadership opportunities at all levels for people with or who experience risk for HIV

3.4 Address social and structural determinants of health and co-occurring conditions that impede access to HIV services and exacerbate HIV-related disparities

3.5 Train and expand a diverse HIV workforce by further developing and promoting opportunities to support the next generation of HIV providers including health care workers, researchers, and community partners, particularly from underrepresented populations

3.6 Advance HIV-related communications to achieve improved messaging and uptake, as well as to address misinformation and health care mistrust

APHA App. 611

influence social and economic conditions and by supporting changes in individual behavior, health can be improved and sustained, and disparities reduced. Improving the conditions in which we live, learn, work, play, age, and worship and the quality of our relationships will create a healthier population, society, and workforce.[128] Application of a "health in all policies" strategy, a cross-sector collaborative approach to integrating health into policies and programs to close the health gaps,[129-130] can be implemented across all areas and levels of government and in the community to foster achievement of these aims.

## SUMMARY OF OBJECTIVES

The following objectives are critical to reducing HIV-related disparities and health inequities:

3.1     Reduce HIV-related stigma and discrimination

3.2     Reduce disparities in new HIV infections, in knowledge of status, and along the HIV care continuum

3.3     Engage, employ, and provide public leadership opportunities at all levels for people with or who experience risk for HIV

3.4     Address social and structural determinants of health and co-occurring conditions that impede access to HIV services and exacerbate HIV-related disparities

3.5     Train and expand a diverse HIV workforce by further developing and promoting opportunities to support the next generation of HIV providers including healthcare workers, researchers, and community partners, particularly from underrepresented populations

3.6     Advance HIV-related communications to achieve improved messaging and uptake, as well as to address misinformation and health care mistrust

## OBJECTIVES AND STRATEGIES

### Objective 3.1 Reduce HIV-related stigma and discrimination

Many people with HIV experience stigma and discrimination because of their HIV status. Stigma is an attitude of disapproval and discontent toward a person or group because of the presence of an attribute perceived as undesirable. Discrimination is often a consequence of stigma, occurring when unfair and often unlawful actions are taken against people based on their belonging to a particular stigmatized group. HIV stigma and discrimination can pose complex barriers for people with or who experience risk for HIV, preventing them from seeking prevention tools, learning their HIV status, and accessing medical care, treatment, and supportive services. Interested parties and organizations from all sectors of society, including government, faith communities, businesses, schools, and others, must work to combat stigma and discrimination in order to reduce new transmissions and improve health outcomes for people with HIV.

Ending the HIV epidemic requires addressing structural barriers to HIV prevention and care. HIV-specific criminal laws perpetuate HIV-related stigma, and discrimination can also deter individuals from getting tested. Some of these laws criminalize behavior that pose low or no risk for transmitting HIV and apply regardless of actual HIV transmission. These outdated laws do not reflect our current understanding of HIV and should be repealed or updated. At least nine states have done so since 2014. Such efforts must ensure that criminal laws and policies regarding HIV transmission are based on the latest scientific evidence and reflect effective public health strategies, and that legislators, prosecutors, and law enforcement officials have an accurate understanding of HIV transmission risks (see Box 7).

Discriminatory practices cause stress and play a role in the health outcomes of minorities.[131] Public health and health care systems should be respectful of and responsive to the health beliefs, practices, accessibility needs, and cultural and language needs of diverse patients.[132] At the community level, interested parties and advocates should

APHA App. 612

be equipped with knowledge and tools to address misconceptions and change norms that are associated with HIV-related stigma and discrimination. At the individual level, multiple approaches to address interpersonal and internalized stigma should be available to people with or who experience risk for HIV as well as their family, friends, health care providers, and others.

HIV-related stigma and discrimination and their effects on people with or who experience risk for HIV should not be viewed in a silo. Stigma and discrimination come in different forms and are often complicated when people also experience stigma and discrimination related to—among other identities or experiences—race and ethnicity, sexual orientation or sexual behavior, other STIs, gender identity, substance use, mental health, homelessness, socioeconomic circumstance, justice involvement, immigration status, age, disability, or sex work.[108, 133] Additional research, innovative solutions, and replication of global efforts, such as those from the President's Emergency Program for Emergency AIDS Relief (PEPFAR), to address the drivers, facilitators, and manifestations of stigma are needed.[134] These solutions should be integrated into the delivery of services that are responsive and sensitive to the unique needs of populations that face intersectional stigmas and intersectional discrimination.

*Strategies*

3.1.1   Strengthen enforcement of civil rights laws (including language access services and disability rights), promote reform of state HIV criminalization laws, and assist states in protecting people with HIV from violence, retaliation, and discrimination associated with HIV status, homophobia, transphobia, xenophobia, racism, substance use, and sexism.

3.1.2   Ensure that health care professionals and front-line staff complete education and training on stigma, discrimination, and unrecognized bias toward populations with or who experience risk for HIV, including LGBTQI+ people, immigrants, people who use drugs, and people involved in sex work.

3.1.3   Support communities in efforts to address misconceptions and reduce HIV-related stigma and other stigmas that negatively affect HIV outcomes.

3.1.4   Ensure resources are focused on the communities and populations where the need is greatest, especially Black, Latino, and American Indian/Alaska Native and other people of color, particularly those who are also gay and bisexual men, transgender people, people who use substances, sex workers, and immigrants.

3.1.5   Create funding opportunities that specifically address social and structural drivers of health as they relate to Black, Latino, and American Indian/Alaska Native and other people of color.



**BOX 7**
**STATE HIV CRIMINALIZATION LAWS**

During the early years of the HIV epidemic, many states implemented HIV-specific criminal exposure laws to discourage behavior that they believed might lead to transmission, promote safer sex practices, and, in some cases, receive funds to support HIV prevention activities. These laws were passed at a time when very little was known about HIV, including how it was transmitted and how best to prevent or treat it. For example, many were enacted before the advent of pre-exposure prophylaxis (PrEP), which reduces the risk of acquiring HIV sexually by 99% when taken daily, or the availability of antiretroviral therapy (ART), which—when taken as prescribed—helps an individual with HIV achieve and maintain a suppressed viral load so that they have effectively no risk of transmitting HIV to sexual partners. As such, many of these state laws criminalize behavior that cannot transmit HIV and apply regardless of actual transmission.

APHA App. 613

## BOX 7
## STATE HIV CRIMINALIZATION LAWS *(CONTINUED)*

Criminalization of potential HIV exposure is largely a matter of state law, with some federal legislation addressing criminalization in discrete areas, such as blood donation and sex work. In 2021, CDC assessed state laws and grouped them into four categories:

1. HIV-specific laws that criminalize or control behaviors that can potentially expose another person to HIV.
2. STI, communicable, contagious, infectious disease laws that criminalize or control behaviors that can potentially expose another person to STIs/communicable/infectious disease, perhaps including HIV.
3. Sentence enhancement laws specific to HIV or STI that do not criminalize a behavior but increase the sentence length when a person with HIV commits certain crimes.
4. No specific criminalization laws.



Criminalize or Control Behaviors Through HIV-Specific Statutes and Regulations (n=22)

Criminalize or Control Behaviors Through STD/Communicable/Infectious Diseases Specific Statutes (n=13)

Sentence Enhancement Statutes (n=4)

None/General Criminal Statutes (n=13)

**Figure 9.** State criminal HIV exposure laws, as of 2021

As shown in Figure 9, these laws vary as to what behaviors are criminalized or what behaviors result in additional penalties. Several states criminalize one or more behaviors that pose a low or negligible risk for HIV transmission. Only 9 of the 35 states with HIV criminalization laws account for HIV prevention measures that reduce transmission risk, such as condom use and ART.

APHA App. 614



**BOX 7**
**STATE HIV CRIMINALIZATION LAWS** *(CONTINUED)*

Since 2014, at least nine states have modernized or repealed their HIV criminal laws: California, Colorado, Illinois, Iowa, Michigan, Missouri, Nevada, North Carolina, and Virginia. Changes have included removing HIV prevention issues from the criminal code and including them under disease control regulations, requiring intent to transmit or actual HIV transmission, or providing defenses for taking measures to prevent transmission such as viral suppression or being noninfectious, condom use, and partner PrEP use.

**After more than 30 years of HIV research and significant biomedical advancements to treat and prevent HIV transmission, many state laws are still outdated and do not reflect our current understanding of HIV.** In many cases, this same standard is not applied to other treatable diseases. Further, these laws have not increased disclosure and may discourage HIV testing, increase stigma against people with HIV, and exacerbate disparities. To end the HIV epidemic, public health, criminal justice, and legislative systems must work together to ensure that laws protect the community, are evidence-based and just, and support public health efforts. When a law meant to protect the public is not working as intended, is unjust, and may be hurting efforts to keep communities healthy, common solutions must be found to better meet public health and public safety goals. States should repeal or update these outdated laws and practices.

*Source: CDC[135, 136]*

### Objective 3.2 Reduce disparities in new HIV infections, in knowledge of status, and along the HIV care continuum

Monitoring of progress toward HIV targets should identify, raise awareness of, and inform appropriately tailored interventions to respond to ongoing and emerging disparities among various populations and in geographic areas. With improved mechanisms to measure, monitor, and report data in a timely manner and enhanced quality, accessibility, sharing, and use of data (see Goal 4), governments and organizations can more quickly identify disparities and direct resources appropriately.

When disparities are identified, tailored interventions must be developed in partnership with the affected populations. Specific populations may have unique or specialized needs and face challenges that require more tailored approaches based on sociodemographic, geographic, cultural, and other characteristics that may be associated with HIV risk or health-promoting behaviors.

#### *Strategies*

3.2.1    Increase awareness of HIV-related disparities through data collection, analysis, and dissemination of findings.

3.2.2    Develop new and scale up effective, evidence-based or evidence-informed interventions to improve health outcomes among priority populations and other populations or geographic areas experiencing disparities.

### Objective 3.3 Engage, employ, and provide public leadership opportunities at all levels for people with or who experience risk for HIV

Achieving the goals of this Strategy and ending the HIV epidemic demand a whole-of-society effort that must include and elevate the diverse voices and experiences of people with or who experience risk for HIV, as well as

APHA App. 615

their partners, families, and communities. Jurisdictions and organizations must meaningfully engage and employ people with or who experience risk for HIV in the development, implementation, monitoring, and assessment of policies, programs, and services. This includes creating opportunities for employment and advancement, as well as fair compensation, wherever possible, particularly for individuals from the priority populations identified in this Strategy. Their experiences and expertise can inform efforts to remove barriers that hinder access to needed information or services and to design services that meet unique needs as well as enhance cultural competency. Governments and other institutions working to meaningfully engage people with or who experience risk for HIV must develop partnerships with networks of people with or who experience risk for HIV and other organizations that engage and serve populations most affected by HIV in each community, thereby identifying ways to optimize messages and services and to combat stigma and discrimination. This includes meaningful engagement of Black, Latinx, American Indian/Alaska Native, and other people of color communities—especially people with or experiencing risk for HIV, people who inject drugs, people with a history of justice involvement, immigrants, sex workers, transgender people, and gay and bisexual men—in HIV planning, service delivery, program monitoring/assessment, research, and policymaking.

### *Strategies*

3.3.1    Create and promote public leadership opportunities for people with or who experience risk for HIV.

3.3.2    Work with communities to reframe HIV services and HIV-related messaging so that they do not stigmatize people or behaviors.

### Objective 3.4 Address social and structural determinants of health and co-occurring conditions that impede access to HIV services and exacerbate HIV-related disparities

Addressing social determinants of health and co-occurring conditions, such as noncommunicable comorbidities and coinfections, is essential to reducing HIV-related health disparities and inequities. For many people with or who experience risk for HIV, addressing basic and immediate needs, such as safety and/or shelter, takes precedence over HIV testing, prevention, care, or treatment. Lack of continuous health insurance coverage, inability to pay for care and treatment, inadequate housing, food insecurity, under- and unemployment, medical mistrust, provider misconceptions and bias, low health literacy, language barriers, and involvement in the justice system all act as barriers to improved HIV outcomes.

In other cases, people may be interested in HIV services, but shortages of a skilled and competent workforce or lack of nearby HIV services hinder their ability to access them. These limitations are made worse by inadequate infrastructure, including limited or no broadband internet services and lack of public transportation.[94] Structural barriers such as laws or policies can also impede the availability of or access to HIV services. For example, support for the legalization or expansion of SSPs is needed in many jurisdictions, particularly in areas with a significant population of people who inject drugs.

Ending the HIV epidemic requires recognition of the need for interventions and pooled resources to address upstream factors often rooted in racism and other social and structural barriers.[137] Programs could destigmatize HIV services, increase service utilization, address social determinants of health, and improve health outcomes by integrating them in multi-disease, community-based testing, care, and treatment models.[138] Ultimately, the success of biomedical and behavioral interventions may be directly impacted by whether structural interventions are effectively integrated to support them. Such integration supports person-centered care that considers all of the patient's needs and lived experiences, including those separate from HIV that vary across the lifespan (see Box 8). Integration also includes establishing additional opportunities to engage in partnerships that make it possible to address clients' unmet needs, maximize reach, and promote efficiency and sustainability.

APHA App. 616



# BOX 8
## ADDRESSING HIV PREVENTION AND CARE ACROSS THE LIFESPAN

Responsive services that recognize and support variable and episodic needs across the lifespan are necessary to best support people with or who experience risk for HIV.

Much progress has been achieved in preventing perinatal transmission of HIV in the United States; only 65 HIV infections were attributed to perinatal transmission in 2018.[139] Although rare, perinatal transmission of HIV still occurs in the United States but disproportionately impacts Black children.[139] Limited antiretroviral therapy (ART) formulations for infants and children make HIV management in these age groups challenging. Questions remain about the impact of HIV and ART exposure in utero, as well as HIV infection and long-term ART on the growing and developing child. While early treatment reduces morbidity and mortality from HIV, whether very early ART can ameliorate complications of HIV and preserve neurodevelopment, optimal cognitive functioning, and mental health in children with HIV is unclear. Preventing mother-to-child transmission requires intensive case management and coordination across many systems and payors.

Youth experience worse HIV outcomes on status awareness, pre-exposure prophylaxis uptake, and health outcomes. Children and young adults with HIV need tailored and often more intensive medical and support services to support them as they grow and become young adults. Schools play an important role in the primary prevention of HIV in youth by offering comprehensive sexual health education and on-site sexual health services through school-based health centers and school nurses, or in collaboration with community partners that provide services, such as periodic, school-wide HIV and STI screening events or mobile clinics. Schools that cannot provide direct sexual health services can establish integrated referral systems that link students to youth-friendly providers in the community. There is a need for both primary prevention approaches and HIV care models that are tailored to groups of youth at disproportionate risk of HIV, including young gay, bisexual, and other men who have sex with men and people who inject drugs.

Across the lifespan, individuals with HIV will also experience a spectrum of non-HIV-specific needs, which may require coordination across various health and social services systems, such as sexual and reproductive health or transition-related care for transgender individuals, in order to ensure affirming whole-person care.

Similarly, tailored approaches are required to meet the HIV prevention, testing, and care needs of older adults. Older Americans are more likely than younger Americans to be diagnosed with HIV infection late in the course of their disease, meaning they get a late start to treatment and possibly experience more damage to their immune system. Thanks to effective HIV care and treatment, people with HIV who are diagnosed early in their infection, and who get and stay on ART, can keep the virus suppressed and live long and healthy lives. Therefore, the number of older adults with HIV is growing; more than one-half of people with diagnosed HIV in the United States were aged 50 and older in 2018.[125]

Older people with HIV, especially long-term survivors, face different health and psychosocial issues than their younger counterparts and thus require appropriately tailored HIV care and treatment services. These unique needs include screening for, assessment of, and treatment of HIV-associated, non-AIDS conditions as well as age-associated diseases for which people with HIV experience increased risk, and addressing social challenges such as social isolation or depression faced by many people aging with HIV and especially those who are long-term survivors of the disease. As this population continues to age, it will be necessary to research, develop, and implement effective interventions, and adapt and appropriately fund systems of care, with attention to comorbidities related to aging.

APHA App. 617



**BOX 8**
**ADDRESSING HIV PREVENTION AND CARE ACROSS THE LIFESPAN**
*(CONTINUED)*

HIV systems of care must incorporate and form partnerships with service providers for older adults, including local Area Agencies on Aging and housing for older adults, to ensure that older people with HIV can also access social services as well as qualified mental health and substance use services that are provided by people experienced in elder care and HIV. Ensuring that agencies focused on elder services can provide age-friendly, affirming care to LGBTQI+ individuals and those with HIV is imperative as the population in need of those services continues to grow.

There is a clear need for both primary prevention approaches and HIV care models tailored to different life stages. Cross-agency efforts are needed to develop, adapt, and implement treatments and interventions specific for the different life stages in order to improve and sustain HIV health outcomes.

Sources: Mandsager et al.[6], McNeil and Rowe[140]

*Strategies*

3.4.1    Develop whole-person systems of care and wellness that address co-occurring conditions for people with or who experience risk for HIV.

3.4.2    Adopt policies and laws that reduce cost, payment, coverage, and/or access barriers to improve the delivery and receipt of services for people with or who experience risk for HIV.

3.4.3    Improve screening and linkage to services for people with or who experience risk for HIV who are diagnosed with and/or are receiving services for co-occurring conditions.

3.4.4    Develop and implement effective, evidence-based and evidence-informed interventions that address social and structural determinants of health among people with or who experience risk for HIV including lack of continuous health care coverage, HIV-related stigma and discrimination in public health and health care systems, medical mistrust, inadequate housing and transportation, food insecurity, unemployment, low health literacy, and involvement with the justice system.

3.4.5    Increase the number of schools that have implemented LGBTQ-supportive policies and practices, including (1) having a Gay/Straight Alliance (GSA), Gender Sexuality Alliance, or similar clubs, (2) identifying safe spaces, (3) adopting policies expressly prohibiting discrimination and harassment based on sexual orientation or gender identity, (4) encouraging staff to attend professional development, (5) facilitating access to out-of-school health service providers, (6) facilitating access to out-of-school social and psychological service providers, and (7) providing LGBTQ-relevant curricula or supplementary materials.

3.4.6    Develop new and scale up effective, evidence-based or evidence-informed interventions that address intersecting factors of HIV, homelessness or housing instability, mental health and violence, substance use, and gender especially among cis- and transgender women and gay and bisexual men.

## Objective 3.5: Train and expand a diverse HIV workforce by further developing and promoting opportunities to support the next generation of HIV providers including healthcare workers, researchers, and community partners, particularly from underrepresented populations

Continuous building of a diverse HIV workforce is critical to achieve HIV epidemic control. Supporting and promoting equity and diversity is fundamentally important to adequately and effectively advance research and

APHA App. 618

enhance innovation. Diversity, inclusion, and community representation are key to achieving creative problem-solving perspectives, and to ensuring the comprehensive cultural spectrum necessary to understand epidemic dynamics.

Multiple obstacles, including the lack of opportunity for minority institutions and communities, paucity of adequate mentorship, and resource limitations, impede achieving equity and diversity in the health workforce. Such structural barriers create challenges at all levels of the workforce development ladder, from recruitment to education, promotion, and retention of HIV providers including researchers, community health workers, and other health care providers.

Together with the development of a diverse health workforce, research that effectively reduces and eliminates health disparities in HIV will require the participation of all sectors of the community. Inclusion of all sectors is fundamental to better understand current needs and develop effective actions to mitigate existing gaps in HIV research and service delivery.

A multipronged approach will be necessary to achieve the interrelated goals of a more diverse and appropriately trained research and health workforce and improved community engagement. Successful approaches should address both individual factors and social factors and involve funding agencies, academic institutions, professional societies, and peer collaboration.

### *Strategies*

3.5.1   Promote the expansion of existing programs and initiatives designed to increase the numbers of non-White research and health professionals.

3.5.2   Increase support for the implementation of mentoring programs for individuals from diverse cultural backgrounds to expand the pool of HIV research and health professionals.

3.5.3   Encourage the implementation of effective recruitment of community partners through community-based participatory research and social networking approaches.

## Objective 3.6: Advance HIV-related communications to achieve improved messaging and uptake, as well as address misinformation and health care mistrust

Accurate and accessible health communication is essential to ending the HIV epidemic. Communication science provides the tools and strategies for developing communications tailored to the needs of people with HIV and experiencing risk for HIV. Effective HIV communication science involves best practice principles applied to communicator choice and the design, content, tone, and timing of messages. Communications must be responsive to life contexts, community circumstances and feedback, and changes over time.

The U.S. Surgeon General's "Advisory on Building a Healthy Information Environment" states that the nation has the power to build a healthier information reality.[141] Such an environment improves health by enabling informed decision-making and bolsters trust. Dissemination of accurate and accessible health information has been pivotal in the success of HIV prevention and treatment strategies. HIV health communication plays a significant role in decreasing transmission, increasing treatment, and reducing stigma.

Health communication science is a key to understanding and addressing inaccurate health information, whether unintentional misinformation or deliberate and strategic disinformation. Increased investment in new communication implementation research will improve HIV-related health communication strategies and decrease vulnerability to misinformation and disinformation. Addressing communication challenges requires a sustained whole-of-government approach and engagement with multi-sector partnerships and communities.

APHA App. 619

*Strategies*

3.6.1    Develop and test strategies to promote accurate creation, dissemination, and uptake of information and to counter associated misinformation and disinformation.

3.6.2    Increase diversity and cultural competence in health communication research, training, and policy.

3.6.3    Expand community engagement in health communication initiatives and research.

3.6.4    Include critical analysis and health communication skills in HIV programs to provide participants with the tools to seek and identify accurate health information and to advocate for themselves and their communities.

3.6.5    Expand effective communication strategies between providers and consumers to build trust, optimize collaborative decision-making, and promote success of evidence-based prevention and treatment strategies.

## INDICATORS OF PROGRESS

Working together to pursue these objectives, the nation can achieve the following targets by 2025:

**Indicator 7**    Decrease stigma among people with diagnosed HIV by 50% from a 2018 baseline median score of 31.2 on a 10-item questionnaire.

**Indicator 8**    Reduce homelessness among people with diagnosed HIV by 50% from a 2017 baseline of 9.1%.

**Indicator 9**    Increase the median percentage of secondary schools that implement at least 4 out of 7 LGBTQ-supportive policies and practices to 65% from a 2018 baseline of 59.8%

In addition to these indicators, the Strategy identifies a disparities indicator to measure progress toward reducing significant HIV-related disparities. Core indicator 6 on viral suppression serves as this disparities indicator and is stratified by each of the priority populations identified in the Strategy:

**Indicator 6a**    Increase viral suppression among MSM diagnosed with HIV to 95% from a 2017 baseline of 66.1%.

**Indicator 6b**    Increase viral suppression among Black MSM diagnosed with HIV to 95% from a 2017 baseline of 58.4%.

**Indicator 6c**    Increase viral suppression among Latino MSM diagnosed with HIV to 95% from a 2017 baseline of 64.9%.

**Indicator 6d**    Increase viral suppression among American Indian/Alaska Native MSM diagnosed with HIV to 95% from a 2017 baseline of 67.3%.

**Indicator 6e**    Increase viral suppression among Black women diagnosed with HIV to 95% from a 2017 baseline of 59.3%.

**Indicator 6f**    Increase viral suppression among transgender women in HIV medical care to 95% from a 2017 baseline of 80.5%.

**Indicator 6g**    Increase viral suppression among people who inject drugs diagnosed with HIV to 95% from a 2017 baseline of 54.9%.

**Indicator 6h**    Increase viral suppression among youth aged 13–24 diagnosed with HIV to 95% from a 2017 baseline of 57.1%.

APHA App. 620

 # GOAL 4: ACHIEVE INTEGRATED, COORDINATED EFFORTS THAT ADDRESS THE HIV EPIDEMIC AMONG ALL PARTNERS AND INTERESTED PARTIES

## THE OPPORTUNITY

Since the NHAS was first published in 2010, it has inspired all sectors of society—including government agencies, nongovernmental organizations, and the private sector—to better coordinate the nation's response to the HIV epidemic. This iteration of the Strategy continues to recognize the importance of more integrated, coordinated efforts.

Even greater coordination is possible and essential to ending the HIV epidemic in America. Opportunities include partnerships to meet unmet needs, maximize reach, share best practices to overcoming common challenges, leverage available data, use new and evolving technologies, and promote efficiency and sustainability. Greater integration of services is crucial to meeting the nation's HIV testing, prevention, care, treatment, and supportive service needs, especially for people living in under-resourced areas and/or who are not effectively reached and engaged by existing programs and services.

It is also essential to address the syndemic of HIV, STIs, viral hepatitis, and alcohol and substance use and mental health disorders. Collaborative efforts cannot be a one-way street, only benefiting the goals of HIV programs; rather, they should address how HIV programs can facilitate the attainment of other programs' goals that contribute to the overall health and well-being of the populations served.

Activities that exemplify improved integration and coordination of efforts include the following:

- **CDC and HRSA's joint guidance to health departments and planning groups about single, multi-year Integrated HIV Prevention and Care Plans.** In June 2021, CDC and HRSA issued Integrated Plan Guidance for CY 2022-2026, which intends to accelerate progress toward meeting national goals while allowing each jurisdiction to design an HIV services delivery system that reflects local vision, values, and needs. This guidance built on the first such guidance issued in 2015;[142] reduced duplicative planning and reporting for grantees; streamlined the work of health department staff and HIV planning groups; and promoted improved collaboration and coordination in the use of data to inform HIV prevention and care program planning, resource allocation, evaluation, and continuous quality improvement.

- **Integration of CDC funding for health department HIV surveillance and prevention.** In 2018, CDC renewed and strengthened its flagship funding program to support HIV surveillance and prevention efforts led by state, territorial, and local health departments with 5-year funding awards that integrated HIV surveillance and prevention programs for the first time. Integration helps health departments plan and execute more efficient, coordinated, and data-driven prevention efforts.

- **Pilot programs that have demonstrated the effectiveness of collaborative data-to-care (D2C) approaches.** Using HIV surveillance and other data to improve continuity of HIV care, these CDC-supported pilot programs integrated data from public health and health care delivery to identify people with an HIV diagnosis who were not engaged in medical care and facilitated linkage to care. The pilots demonstrated effectiveness in achieving their goal of increasing the number of people with HIV who are reengaged in care and virally suppressed.[143]

- **Integration of data across programs to improve design and delivery of services.** HRSA and the Department of Housing and Urban Development collaborated to better coordinate HIV care and housing services for people with HIV through data integration and to ultimately improve health outcomes along the HIV care continuum.[144]

APHA App. 621

- **HRSA, NIH, and CDC Implementation Science Workgroup.** In 2018 the HRSA HIV/AIDS Bureau began a close collaboration with the CDC Division of HIV/AIDS Prevention and the National Institutes of Health's National Institute of Mental Health  to create a platform for dialogue across federal agencies working to apply implementation science in HIV, establishing the Federal Implementation Science Workgroup. The resulting funding opportunity announcements seek to strengthen research/service delivery collaborations between NIH investigators and implementers such as sites funded by CDC, HRSA, the Indian Health Service (IHS), the Substance Abuse and Mental Health Services Administration (SAMHSA), and other providers of HIV prevention and care services. Applicants develop creative, locally defined, and culturally sensitive concepts that align with the EHE jurisdictional plans.[145]

- **A growing awareness of the need to better integrate services for populations vulnerable to multiple health concerns.** For example, a 2019 National Academies of Sciences, Engineering, and Medicine workshop highlighted the importance of addressing infectious diseases as part of an improved, comprehensive opioid response and noted that separately administered substance use disorder treatment and infectious disease services often inhibit comprehensive care.[146] In addition, in 2020 SAMHSA published Prevention and Treatment of HIV Among People Living with Substance Use and/or Mental Disorders, a guide that addresses the co-occurrence of HIV and mental illness and/or substance use disorders and reviews effective programs and practices to prevent HIV and, for people with HIV, to increase linkage and retention in care in order to improve health outcomes.

- **Use of new HIV surveillance techniques.** CDC has supported several jurisdictions to detect possible HIV infection clusters more quickly and then coordinate swift responses across programs to deliver needed prevention and treatment services to people who need them. As work continues to expand the ability to identify and quickly respond to new HIV infections, health departments and communities must work together to collectively address the consent, privacy, and data use concerns.

- **Provisions in the 21st Century Cures Act on the interoperability of health information.** These provisions, including those related to social determinants of health, put the patient at the center of care and promote secure health information exchange to enable improved coordination, targeting of resources, and research that can support achieving the Strategy's goals. In March 2020, the Office of the National Coordinator for Health IT (ONC) issued a final rule to implement key interoperability provisions of the 21st Century Cures Act, including promoting patient access to their electronic health information, supporting provider needs, advancing innovation, and addressing industry-wide information blocking practices.[147]



**GOAL 4: ACHIEVE INTEGRATED, COORDINATED EFFORTS THAT ADDRESS THE HIV EPIDEMIC AMONG ALL PARTNERS AND INTERESTED PARTIES**

Objectives

4.1 Integrate programs to address the syndemic of HIV, STIs, viral hepatitis, and substance use and mental health disorders in the context of social and structural/institutional factors including stigma, discrimination, and violence

4.2 Increase coordination among and sharing of best practices from HIV programs across all levels of government (federal, state, tribal, local, and territorial) and with public and private health care payers, faith-based and community-based organizations, the private sector, academic partners, and the community

4.3 Enhance the quality, accessibility, sharing, and uses of data, including HIV prevention and care continua data and social determinants of health data

4.4 Foster private-public-community partnerships to identify and scale up best practices and accelerate HIV advances

4.5 Improve mechanisms to measure, monitor, evaluate, and use the information to report progress and course correct as needed in order to achieve the Strategy's goals

APHA App. 622

- **Partnerships with Medicaid programs.** Through these partnerships, several state HIV programs have been able to implement performance measures that reward providers who have increased the numbers of patients who have achieved and maintained viral suppression.

- **Enhanced efforts to integrate services and disciplines in health care delivery.** In recent years, greater emphasis has been placed on integrating behavioral health (mental health and substance use disorder) services and primary care and vice versa. Expanding availability of medications for treatment for substance use disorders in primary care settings is one example. Similarly, to serve the growing population of people with HIV over age 50, more clinics are adopting a geriatric multidisciplinary approach to health care, addressing the domains of medical problems, cognitive and functional abilities, psychiatric disorders, and social circumstances.[148]

- **Updating the United States Core Data for Interoperability (USCDI) as a Foundation for Interoperability.** In July 2021, ONC released version 2 of the USCDI. The update expands the standardized set of health data classes and elements for nationwide, interoperable health information exchange. The new data elements support efforts to advance health equity by addressing sexual orientation, gender identity, and social determinants of health.[149]

## THE CHALLENGES

The following challenges hinder efforts to achieve more integrated and coordinated efforts that address the HIV epidemic among all partners and interested parties:

- Rising rates of substance use have resulted in concurrent infectious diseases epidemics.
- Coordination at the federal, state, and local levels has not expanded to include other necessary government, community-based, and civic partners.
- Data sharing and integration is not timely across programs.
- Local HIV plans are not adequately supported.
- The COVID-19 pandemic continues to divert resources.
- Legislation, budget allocations, and payment systems are not aligned with models of integrated care.

## SUMMARY OF OBJECTIVES

The following objectives are critical to achieving integrated, coordinated efforts that address the HIV epidemic among all partners and interested parties:

4.1     Integrate programs to address the syndemic of HIV, STIs, viral hepatitis, and substance use and mental health disorders in the context of social and structural/institutional factors including stigma, discrimination, and violence.

4.2     Increase coordination among and sharing of best practices from HIV programs across all levels of government (federal, state, tribal, local, and territorial) and with public and private health care payers, faith-based and community-based organizations, the private sector, academic partners, and the community.

4.3     Enhance the quality, accessibility, sharing, and use of data, including HIV prevention and care continuum data and social determinants of health data.

4.4     Foster private-public-community partnerships to identify and scale up best practices and accelerate HIV advances.

4.5     Improve mechanisms to measure, monitor, evaluate, and use the information to report progress and course correct as needed in order to achieve the Strategy's goals.

APHA App. 623

## OBJECTIVES AND STRATEGIES

### Objective 4.1 Integrate programs to address the syndemic of HIV, STIs, viral hepatitis, and substance use and mental health disorders in the context of social and structural/institutional factors including stigma, discrimination, and violence

The syndemic of HIV, STIs, viral hepatitis, substance use and mental health disorders in the United States highlights overlapping risk factors as well as associations with social determinants of health such as poverty, lack of health insurance, housing instability, and other related inequities. An effective response to the syndemic requires integration of programs to enable increased flexibility in utilization of allocated resources; better coordinated policy and program planning, development, and delivery; and rapid adjustment to new data or scientific advances. For such integration to occur, major shifts in policy, systems, and societal norms and attitudes must occur, and the willingness to explore new and nontraditional approaches and strategies must increase.

A National Academies report recommends that the syndemic be addressed via integrated medical services in place of often siloed services.[146] Opportunities are missed every day to test people for multiple infections and to scale up HIV services in settings where people who experience risk receive other services. For example, in 2019 among health care settings and non-health-care settings, only 34% of CDC-funded HIV tests had at least one STI or hepatitis C test conducted concurrently.[150] These missed opportunities translate directly into lost time and resources and may result in harm to people who remain undiagnosed, untreated, and at risk of severe outcomes or of transmitting the infection to others. A reciprocal, integrated approach in responses to infectious diseases, the opioid crisis, and substance use and mental health disorders that puts patients first through a status-neutral and no-wrong-door approach will maximize their ability to access services that meet their health needs. In addition, creating a system that focuses on a whole-health approach and one that considers a myriad of needs can lead to enhanced life experiences for people living with HIV. For example, HIV testing programs can identify opportunities to screen for other STIs, viral hepatitis, substance use, and intimate partner violence. Similarly, STI, substance use disorder treatment, and viral hepatitis programs can integrate HIV testing and linkage to relevant HIV prevention or care services, as appropriate.

#### Strategies

4.1.1    Integrate HIV awareness and services into outreach and services for issues that intersect with HIV such as intimate partner violence, homelessness or housing instability, STIs, viral hepatitis, and substance use and mental health disorders.

4.1.2    Implement a no-wrong-door approach to screening and linkage to services for HIV, STIs, viral hepatitis, and substance use and mental health disorders across programs.

4.1.3    Identify and address funding, policy, data, workforce capacity, and programmatic barriers to effectively address the syndemic.

4.1.4    Coordinate and align strategic planning efforts on HIV, STIs, viral hepatitis, substance use disorders, and mental health care across national, state, tribal, territorial, and local partners.

4.1.5    Enhance the ability of the HIV workforce to provide naloxone and educate people on the existence of fentanyl in the drug supply to prevent overdose and deaths and facilitate linkage to substance use disorder treatment and harm reduction programs.

### Objective 4.2 Increase coordination among and sharing of best practices from HIV programs across all levels of government (federal, state, tribal, local, and territorial) and with public and private health care payers, faith-based and community-based organizations, the private sector, academic partners, and the community

Ending the HIV epidemic requires a whole-of-society approach. Increasing coordination across all sectors of society enables better delivery of services and resources to people with or who experience risk for HIV. Likewise,

APHA App. 624

establishing trusted partnerships enables coalitions to develop, implement, and regularly evaluate and update policies and programs that address the social, economic, and political environments that shape and constrain individual, community, and societal outcomes.

Increased coordination at the federal level includes expanding the partners engaged in the nation's HIV response. This effort includes leveraging existing programs whose primary purpose may not be HIV services, but that could provide supportive services such as employment training or nutrition assistance to people with or who experience risk for HIV. Such coordination helps to ensure that resources are allocated according to current burden of disease and that the most effective prevention and care strategies are tailored to local community needs to achieve maximal results.

Better coordination involves fostering strong linkages among community-based organizations, health departments, other public programs and services, education agencies, pharmacies, health care providers and systems, and community leaders. Collaboration with community partners is particularly important to developing locally relevant plans for providing testing, prevention, care, treatment, and supportive services, including those that engage people not yet reached by existing programs and services. Collaboration also involves engaging and building capacity and competencies among partners and communities that are interested in providing HIV services but may not have had the opportunity or resources to do so. Expanded and strengthened partnerships can better equip communities to respond swiftly and effectively to identified outbreaks of HIV, STIs, and/or viral hepatitis. Greater involvement by our nation's technology and other business communities can boost efforts to provide accurate information, reach key populations, and develop innovative tools.

Attention must also be focused on service delivery and payment methods. Fee-for-service and other payment models do not adequately support integrated, comprehensive health care delivery models, such as behavioral health and medical care integration, patient-centered medical homes, services provided by pharmacists in nontraditional roles, integration with support services, oral health care, and care coordination. Grant funding to support pilots or demonstrations of such integrated models is limited and time-bound. Scaling up and sustaining these effective care delivery models require evolutions in public and private payer systems.

### *Strategies*

4.2.1   Focus resources including evidence-based and evidence-informed interventions in the geographic areas and priority populations disproportionately affected by HIV.

4.2.2   Enhance collaboration among local, state, tribal, territorial, national, and federal partners and the community to address policy and structural barriers that contribute to persistent HIV-related disparities and implement policies that foster improved health outcomes.

4.2.3   Coordinate across partners to quickly detect and respond to HIV outbreaks.

4.2.4   Support collaborations between community-based organizations, public health organizations, education agencies and schools, housing providers, and health care delivery systems to provide linkage to and delivery of HIV testing, prevention, care, and treatment services as well as supportive services.

## Objective 4.3 Enhance the quality, accessibility, sharing, and uses of data, including HIV prevention and care continua data and social determinants of health data

High-quality data are essential to increasing coordination, integration, and seamless delivery of services that are required to end the HIV epidemic. The appropriate collection and use of data can inform efforts to focus prevention and testing services on populations that need them most, can help ensure that people newly diagnosed with HIV are promptly linked to care, and can facilitate retention in effective HIV care. However, jurisdictions need resources, guidance, and support to strengthen HIV surveillance systems and activities, in accordance with applicable law, to

APHA App. 625

obtain the data needed to improve our response to the HIV epidemic, including viral load reporting and disparities data to ensure that populations or communities are not being left behind.

Appropriate use of secure electronic health information exchange can help to engage and retain or reengage people in care and to facilitate transitions across care and community settings. Further, sharing of treatment and outcome data can drive the science needed to develop new and better treatments, approaches to retention in care, and prevention interventions. Better use of data on social determinants of health can optimize prevention and testing efforts for groups experiencing greater risk of acquiring HIV, engage and retain people with HIV in care, support adherence to treatment, and inform ongoing research efforts to develop better treatment and prevention. Use of modeling and other analytical approaches may yield novel insights and inform planning.

### *Strategies*

4.3.1   Promote the collection, electronic sharing, and use of HIV risk, prevention, and care and treatment data using interoperable data standards, including data from electronic health records, in accordance with applicable law.

4.3.2   Use interoperable health information technology, including application programming interfaces (APIs), clinical decision support tools, electronic health records and health IT products certified by the Office of the National Coordinator's Health IT Certification Program, and health information exchange networks to improve HIV prevention efforts and care outcomes.

4.3.3   Encourage and support patient access to and use of their individual health information, including use of their patient-generated health information and use of consumer health technologies in a secure and privacy-supportive manner.

## Objective 4.4 Foster private-public-community partnerships to identify and scale up best practices and accelerate HIV advances

Effective private-public-community partnerships are necessary to enhance responses to critical implementation challenges. Partnerships should ensure local relevance and emphasize the leadership role of community members, academic investigators, public health departments and other collaborators through intentional involvement in all stages of research, from conceptualization of the research question to dissemination of results.

There is growing interest in developing closer partnerships among the private sector to increase the appropriate application of evidence in policy and practice. Private-sector resources and approaches that integrate multidisciplinary HIV prevention and treatment service delivery in different settings can reach communities in ways that government cannot. Emphasis on cross-disciplinary collaboration and input by allied health and community service providers as partners with the private sector in HIV research, prevention, and care will optimize program acceptability, uptake, and rollout; improve outcomes; and maximize the impact of translation of research results.

The response to the HIV epidemic has generated significant scientific advances and best practices. Implementation science provides a framework to identify factors that facilitate application of relevant and effective public health interventions and services. Community-centric implementation research is one important approach to rapidly and effectively translate new discoveries into practice at the local level, with fidelity. Effective partnerships can achieve an impact at the population level, to efficiently disseminate evidence-based interventions at scale through culturally appropriate public health initiatives and clinical practice (see Box 9).

There is a need to develop more opportunities and mechanisms for timely information sharing and peer technical assistance to support replication of best practices and use of lessons learned to address common barriers within and across jurisdictions. Activities supporting replication and scale-up of proven interventions should address infrastructure needs and include intentional sustainability planning to ensure continuity of care and services across all participating service settings.

APHA App. 626

*Strategies*

4.4.1    Adopt approaches that incentivize the scale up of effective interventions among academic centers, health departments, community-based organizations, allied health professionals, people with HIV and their advocates, the private sector, and other partners.

4.4.2    Expand opportunities and mechanisms for information sharing and peer technical assistance within and across jurisdictions to move effective interventions into practice more swiftly.

4.4.3    Develop and optimize collaborative multi-agency and multi-sectoral approaches and strategies to address emergent and evolving challenges facing people of all ages living with HIV.



**BOX 9**
**LEVERAGING TECHNOLOGY INNOVATIONS TO IMPROVE HIV PREVENTION AND TREATMENT**

Technological innovations have rapidly altered many aspects of life in the past decade. Many Americans have transformed their digital toolbox to include systems such as Zoom or FaceTime, email, and other applications to stay informed on their health and connected to health care systems. These innovations prove the potential to leverage technology in the HIV response.

Telehealth has proven to be a reliable resource for reaching populations experiencing risk or who are living with HIV and can address many of the factors identified as barriers to retention in HIV care. Telehealth can also broaden access to pre-exposure prophylaxis (PrEP), HIV care and treatment, and mental health and substance use treatment in rural areas, which often face workforce shortages and transportation challenges.[151] Refining and sustaining telehealth services that were implemented in response to the COVID-19 pandemic will allow organizations to use these technological advances to improve the HIV response.

Expanded use of the internet and social media can help people involved in HIV prevention and treatment use mobile devices, websites, and applications as hubs for HIV information and collaboration to ensure that scientifically and medically accurate information is prioritized, and misinformation is combated. At the same time, these websites and applications can also make accessing information on HIV prevention, testing, and treatment more accessible and discrete. Wearable technology such as smartwatches can use health applications to provide real-time insights on an individual's health status and empower people to personalize and monitor their own health data. Electronic health records strengthen the HIV care continuum by providing accurate and timely information. Electronic health records can also use clinical decision support tools to help improve screening by identifying patients for whom an HIV test or PrEP might be recommended or facilitating reengagement in HIV care for those who may have left but present for other health care services elsewhere. Further advancements in the use of technology to improve HIV care could also be used to streamline patient pathways including enhanced remote patient monitoring techniques and other engagement opportunities made available through emerging fields such as digital therapeutics and at-home testing. Policymakers, clinicians, and private-sector partners must collaborate to uncover solutions and further innovation to leverage technology in the HIV response and improve patient engagement.

**Objective 4.5 Improve mechanisms to measure, monitor, evaluate, and use the information to report progress and course correct as needed in order to achieve the Strategy's goals**

There is a continued need to streamline and harmonize data reporting to reduce reporting burden and produce more regular, timely, and useful data. Support is also needed to adopt new analytic methods and approaches to

APHA App. 627

increase the timeliness of data, enhance the ability to characterize the burden of HIV across the nation, and use that information to allocate resources to achieve the greatest impact. In addition, complementary data sources such as health care payer databases, surveys, and linkages to electronic health records are necessary to ensure that robust information that can guide decision-making.

Timely data will improve accountability among federally funded organizations as they set and make progress toward measurable goals and targets aligned with this Strategy. Data for the indicators at the local, state, and national levels should be regularly and publicly reported and reviewed to identify successful efforts, indicate challenges, and facilitate ongoing dialogue about ways to continue moving forward. Such reporting and review require a monitoring plan that evaluates the implementation of the Strategy. A system of regular public reporting will help to sustain public attention and support at the national level. Organizations that struggle to engage new parties and organizations or fall short of expected outcomes should receive intensive capacity-building assistance and other supportive measures as a condition of continued funding. The nation can thus direct its funds to entities and initiatives that demonstrate the highest level of performance and accountability for high-impact HIV prevention.

### *Strategies*

4.5.1    Streamline and harmonize reporting and data systems to reduce burden and improve the timeliness, availability, and usefulness of data.

4.5.2    Monitor, review, evaluate, and regularly communicate progress on the National HIV/AIDS Strategy.

4.5.3    Ensure that the National HIV/AIDS Strategy's goals and priorities are included in cross-sector federal funding requirements.

4.5.4    Strengthen monitoring and accountability for adherence to requirements, targets, and goals by funded partners.

4.5.5    Identify and address barriers and challenges that hinder achievement of goals by funded partners and other interested parties.

APHA App. 628

# IMPLEMENTATION AND ACCOUNTABILITY

## FEDERAL PARTNERS

The Strategy provides a framework for ending the HIV epidemic in the United States. Development of the Strategy was a collaborative process led by the White House that engaged federal partners across multiple departments and agencies with input from a diverse range of interested parties and organizations from across the nation.

Federal partners will collaborate to develop an implementation plan to pursue the Strategy goals, objectives, and strategies. The NHAS Federal Implementation Plan will set forth federal partners' commitments to policies, initiatives, and activities to meet the goals of the Strategy and will be published for transparency and accountability.

As part of their ongoing commitment to reduce HIV in this nation, federal partners have committed to serve on a Strategy implementation working group. This working group will collaborate to address HIV in an integrated fashion by including other infectious diseases as components of the syndemic. The working group will meet regularly to coordinate activities across agencies and departments, apply lessons learned from epidemiological data and research findings, monitor progress toward the indicator targets, course correct as needed, and report on national progress. As scientific, medical, and public health advances and challenges emerge, new and innovative policies will be developed to complement the existing Strategy.

## NONFEDERAL PARTNERS

Addressing HIV is not solely a federal activity. Success depends on coordinated action by state, tribal, territorial, and local governments; community-based organizations and faith-based organizations; health plans and payers, health care providers, and other health-related organizations; private-sector partners; the criminal justice system; universities, schools, education agencies, and other venues for educational activities; researchers; families; and patients and their partners. Its success also depends on a holistic approach to the various parts of the syndemic, including STIs, viral hepatitis, substance use and mental health disorders, stigma and discrimination, and social and structural determinants of health.

Each community and stakeholder brings a unique perspective and plays a critical role in preventing and responding to HIV. Over the past several years many states and localities have engaged in community-wide efforts to develop their own plans to end the HIV epidemic. Interested parties and organizations are encouraged to use this Strategy to engage with others and build or update their own roadmap to reduce HIV and end the HIV epidemic among the populations and communities they serve. Interested parties and organizations should consider adopting the vision and goals of this Strategy; pursuing the objectives and implementing the strategies relevant to their role(s), populations served, and community circumstances; and identifying opportunities to adopt and use the Strategy's indicators and targets to measure their own progress. In doing so, communities and interested parties and organizations can also apply other evidence-based strategies that are appropriate for responding to HIV in their area and use all available data to identify where their resources and effort will have the most impact. A data-driven strategy will help interested parties and organizations focus efforts and efficiently and effectively use available resources. Integrating HIV testing, prevention, care, and treatment efforts with other components of the syndemic is also strongly encouraged.

APHA App. 629

# APPENDIX A: PROCESS FOR DEVELOPING THE STRATEGY

On June 5, 2021, the Biden-Harris administration re-established the Office of National AIDS Policy (ONAP) within the White House. After discussions with staff of the White House Domestic Policy Council, it was agreed that the HIV National Strategic Plan (HIV Plan) released in January 2021 provided a strong foundation for ending the HIV epidemic but required updates to reflect Administration priorities, the latest data and research, and community feedback specific to the HIV Plan.

ONAP consulted with the federal department and agency representatives who served on the interagency Steering Committee that developed the HIV Plan (see Table A.1) to obtain recommendations to fulfill this mandate. In addition, ONAP received feedback from a variety of parties from the HIV community that could strengthen the Strategy to end the HIV epidemic by 2030. ONAP reviewed, considered, and integrated much from these various inputs into this Strategy, with support from the White House Office of National Drug Control Policy and the Office of Infectious Disease and HIV/AIDS Policy (OIDP), within the Office of the Assistant Secretary for Health at the Department of Health and Human Services (HHS). Drafts were refined through successive rounds of review by the Steering Committee, Domestic Policy Council, inter-departmental clearance, and the White House.

**Table A.1.** Composition of NHAS Federal Steering Committee

| Federal Departments and Agencies | HHS Agencies/Offices | |
|---|---|---|
| • Department of Agriculture<br>• Department of Defense<br>• Department of Education<br>• Department of Justice<br>• Equal Employment Opportunity Commission<br>• Department of Health and Human Services<br>• Department of Housing and Urban Development<br>• Department of Labor<br>• Department of Veterans Affairs | • Administration for Community Living<br>• Agency for Healthcare Research and Quality<br>• Centers for Disease Control and Prevention<br>• Centers for Medicare & Medicaid Services<br>• Food and Drug Administration<br>• Health Resources and Services Administration<br>• Indian Health Service | • National Institutes of Health<br>• Office for Civil Rights<br>• Office of the Assistant Secretary for Health<br>• Office of the National Coordinator for Health Information Technology<br>• Substance Abuse and Mental Health Services Administration |

## IDENTIFICATION OF PRIORITY POPULATIONS BASED ON NATIONAL-LEVEL DATA

ONAP maintained in this Strategy the priority populations designated in the HIV National Strategic Plan. Priority populations are disproportionately affected populations, which are defined as groups of people with a higher burden of disease than others. HIV testing, prevention, care, and treatment interventions and resources can be delivered to priority populations for the greatest impact. An Indicators Subcommittee of the Steering Committee that developed

APHA App. 630

the HIV National Strategic Plan reviewed national HIV surveillance data available in 2020 to identify priority populations. In developing this Strategy, ONAP reviewed the most recent data and determined that it continued to support the designation of the identified priority populations.

**Table A.2.** Priority Populations and Summary National-Level Data, Calendar Year 2019 (unless otherwise indicated)

### Gay, Bisexual, and Other Men Who Have Sex with Men (MSM)

- Gay, bisexual, and other men who have sex with men are the population most affected by HIV in the United States. At the end of 2019, an estimated 1,189,700 people had HIV in the United States. Of those, 692,900 (58%) were gay and bisexual men.[11]
- In 2019, adult and adolescent gay and bisexual men represented 66% (23,100) of the 34,800 new HIV infections in the United States.[11]
- The incidence of many STIs in gay, bisexual, and other men who have sex with men—including primary and secondary syphilis and antimicrobial-resistant gonorrhea—is greater than that reported in women and men who have sex with women only.[152] Having another STI can greatly increase the chance of getting or transmitting HIV. Of new HIV infections among men who have sex with men, 10% are estimated to be attributable to gonorrhea and chlamydia, equating to 2,600 HIV infections each year.[51]

### Black MSM

- Black gay, bisexual, and other men who have sex with men are more affected by HIV than any other group in the United States.
- In 2019, Black gay and bisexual men accounted for 26% (8,900) of the 34,800 new HIV infections and 39% of the 23,100 new infections among all gay and bisexual men in the United States.[11]
- Of the 36,337 new HIV diagnoses among adolescents and adults ≥13 years in the United States and dependent areas in 2019, 25% were among Black gay and bisexual men.[3]
- From 2015 to 2019, HIV infections remained stable among Black gay and bisexual men overall. By age group, the annual number of new HIV infections declined in Black gay and bisexual men aged 13–24, while the number of new infections remained stable among all other age groups of Black gay and bisexual men.[11] In 2019 the largest percentage of new HIV infections among Black/African American gay and bisexual men was among those aged 25–34 years (46%), followed by those aged 13–24 years (33%).[11]
- Along the HIV care continuum, compared to all people with diagnosed HIV in 41 states and the District of Columbia, Black gay and bisexual men have lower viral suppression rates.[7] (See Figure A.1.)

### Latino MSM

- Latino gay, bisexual, and other men who have sex with men are heavily affected by HIV. In 2019, adult and adolescent Latino gay and bisexual men comprised 23% (7,900) of the 34,800 new HIV infections in the United States and 34% of 23,100 new HIV infections among all gay and bisexual men in the United States.[11]
- Of the 36,337 new HIV diagnoses among adolescents and adults ≥13 years in the United States and dependent areas in 2019, 22% were among Latino gay and bisexual men.[3]
- From 2015 to 2019, the annual number of new HIV infections declined in Hispanic/Latino gay and bisexual men aged 13-24, while the number of new infections remained stable among all other age groups of Hispanic/Latino gay and bisexual men.[11] In 2019 the largest percentage of HIV infections among Hispanic/Latino gay and bisexual men was among those aged 25-34 years (44%), followed by those aged 13–24 years (23%).[11]

APHA App. 631

## American Indian/Alaska Native MSM

- American Indian/Alaska Native men who have sex with men are disproportionately affected by HIV. In 2019, 62% (126/209) of diagnoses among adolescents and adults ≥13 years occurring among American Indian/Alaska Native people were among men who have sex with men.[3]
- HIV diagnoses among American Indian/Alaska Native gay and bisexual men increased 15% between 2015–2019, while diagnoses among gay and bisexual men of other races/ethnicities were either stable or declined.[125]

## Black Women

- Although data show a 22% decrease in new HIV infections among Black women between 2010 and 2019, among all women in the United States, Black women account for the largest share of 6,400 new HIV infections (3,400 or 53%) in 2019.[4, 11]
- The rate of new HIV infections among Black women (18.9 per 100,000) is nearly 11 times as high as the rate among White women (1.8 per 100,000) and nearly 4 times as high as the rate among Latinas (4.9 per 100,000).[11]

## Transgender Women

- A 2019 systematic review and meta-analysis found that an estimated 14% of transgender women have HIV.[14]
- By race/ethnicity, an estimated 44% of Black transgender women, 26% of Latina transgender women, and 7% of White transgender women have HIV.[2, 3, 153]
- Among the 3 million HIV testing events reported to CDC in 2017, the percentage of transgender people who received a new HIV diagnosis was three times the national average.[154]

## Youth Aged 13–24 Years

- In 2019, youth aged 13–24 years accounted for 21% (7,200) of the 34,800 new HIV infections in the United States and dependent areas. Most new HIV diagnoses among youth were among young gay and bisexual men.
- Only 9% of high school students have been tested for HIV and therefore do not know their HIV status. Among male students who had sexual contact with other males, only 15% have ever been tested for HIV.[155]
- In 2019, youth with diagnosed HIV were also the least likely of any age group to be linked to care within 1 month of diagnosis (79%).[2] Further, compared to all people with HIV, youth have the lowest rates of viral suppression. For every 100 youth with HIV, 45 received some HIV care, 33 were retained in care, and 35 were virally suppressed.[2]
- People aged 15–24 years account for approximately 50% of the 20 million new STIs in the United States each year, yet approximately 25% of the sexually active population.[152] Having another STI can greatly increase the chance of getting or transmitting HIV.

## People Who Inject Drugs (PWID)

- People who inject drugs are at high risk for getting HIV and/or HCV if they use and share needles, syringes, or other drug injection equipment that someone with HIV has used.

- New HIV infections among people who inject drugs have increased 8.7% in recent years (from 2,300 infections in 2015 to 2,500 infections in 2019) in the United States and dependent areas.[11]

- Although HIV incidence among people who inject drugs has declined substantially over many years, the ongoing use of opioids and other frequently injected substances including cocaine and methamphetamine are threatening this HIV prevention success. HIV diagnoses among people who inject drugs increased by 11% nationally from 2016 to 2018, with more pronounced increases among adults younger than age 40 and non-Hispanic White adults.[125] Injection drug use has contributed to multiple recent clusters and outbreaks of new HIV infections among people who inject drugs.[156]

- Among people with HIV who inject drugs, 62–81% were also living with hepatitis C.[157] People with HIV also living with hepatitis B or hepatitis C have higher liver-related morbidity and mortality, and higher overall mortality than patients only living with hepatitis B or hepatitis C.[158-160]

Figure A.1 depicts the subpopulations (defined by race, ethnicity, and gender) with the most new HIV diagnoses in 2019.

★ ★ ★ ★ ★



**Figure A.1.** New HIV diagnoses in the United States and dependent areas for the most-affected subpopulations, 2019

Notes: Black refers to people having origins in any of the Black racial groups of Africa. African American is a term often used for Americans of African descent with ancestry in North America. Hispanics/Latinos can be of any race. Subpopulations representing 2.0% or less of all people who received an HIV diagnosis in 2018 are not represented in this chart. Source: Centers for Disease Control and Prevention.[161]

APHA App. 633

The Strategy recognizes the importance of providing HIV services to all populations with or who experience risk for HIV. Therefore, even though they were not designated as priority populations, the Strategy discusses the importance of addressing the unique needs of other groups, such as long-term survivors and older people with HIV or people experiencing unstable housing or homelessness.

# INDICATORS TO MEASURE PROGRESS FOR THE NATIONAL HIV/AIDS STRATEGY

The Strategy includes 9 core indicators to monitor annual progress toward achieving Goals 1, 2, and 3. In addition, one of the core indicators is stratified by each of the priority populations to measure progress toward reducing disparities.

For each indicator, baseline measurements (2017) and targets for 2025 are provided. Indicators 1–6 are aligned with the EHE initiative and *Healthy People 2030* objectives. Alignment of the indicators between the HIV Plan and EHE allows for consistency and reduced burden on local and state health departments that report data as well as on federal partners who monitor and report on progress in measuring and reporting results across the indicators.

The methods for measuring progress and specifications for each of the indicators is detailed below.

## METHODS

CDC's National Center for Health Statistics describes the "percent of targeted change achieved," which quantifies progress for *Healthy People 2020* indicators that are moving toward their targets. The methods are described in full by Talih and Huang[162] and may be used for measuring progress in *Healthy People 2030*. To align methods for measuring progress across HHS, the percentage of targeted change achieved method is adapted for use to measure national progress annually for the National HIV/AIDS Strategy.

## METHODS

The "percent of targeted change achieved" used in *Healthy People 2020* is the difference between the baseline and the midcourse value as a percent of the targeted change between the baseline value and the *Healthy People 2020* target. To adapt for use in the National HIV/AIDS Strategy, annual results and National HIV/AIDS Strategy targets are used. This method also provides a way to compare percent of targeted change achieved by National HIV/AIDS Strategy indicator and highlights areas on which to focus. The formula is as follows:

$$\text{Percent of targeted change achieved} = \frac{\text{Annual result - Baseline result x 100}}{\text{2025 target - Baseline result}}$$

The magnitude of change for percent of targeted change achieved may be evaluated using statistical significance testing for indicators that are estimated.

APHA App. 634

An *example* using hypothetical data is provided below to illustrate the calculations for the percent of targeted change achieved for linkage to care within 1 month and viral suppression.

**Table A.3.** Hypothetical Data for Linkage to Care and Viral Suppression Calculations

| Indicator | 2017 | 2023 | 2025 Target |
|-----------|------|------|-------------|
| Linkage to Care within 1 Month | 78.4% | 82.3% | 95% |
| Viral Suppression | 54.4% | 65.5% | 95% |

Percent of targeted change achieved for *linkage to care within 1 month:*

$$= \quad \frac{82.3\% - 78.4\%}{95\% - 78.4\%} \quad = \quad \frac{3.9}{16.6} \quad = \quad 23.5\%$$

Achieving the 95% target for linkage to care within 1 month is 100% of the targeted change needed by 2025. *Interpretation:* By 2023, almost one-quarter or 23.5% of the targeted change has occurred for linkage to care within 1 month.

Percent of targeted change achieved for *viral suppression:*

$$= \quad \frac{65.5\% - 54.4\%}{95\% - 54.4\%} \quad = \quad \frac{11.1}{40.6} \quad = \quad 27.3\%$$

Achieving the 95% target for viral suppression is 100% of the targeted change needed by 2025. *Interpretation:* By 2023, a little more than one-quarter or 27.3% of the targeted change has occurred for viral suppression.

**Indicators that met or exceeded their targets**

When the desired direction is increase, an indicator has met or exceeded the target if the annual result is greater than or equal to the 2025 target.

**Annual result ≥ 2025 target**

When the desired direction is a decrease, an indicator has met or exceeded the target if the annual result is less than or equal to the 2025 target or the 2030 target.

**Annual result ≤ 2025 target**

Statistical significance is not factored into the determination of the target met or exceeded status.

APHA App. 635

**Indicators moving toward their targets**

For indicators that had not already met or exceeded their targets at baseline and are *moving toward* their 2025 targets, the percent of targeted change achieved measures the extent of movement toward the target. The formula is the same as that presented above and is calculated by:

$$\text{Percent of targeted change achieved} = \frac{\text{Annual result - Baseline result x 100}}{\text{2025 target - Baseline result}}$$

When the desired direction is an increase (i.e., increase to 95%), an indicator *is moving toward* its target when the most recent *annual result is higher than the baseline value but less than the 2025 target.*

**Baseline result < Annual result < 2025 target**

When the desired direction is a decrease (i.e., decrease by 75%), an indicator *is moving toward* its target when the most recent *annual result is less than the baseline value but greater than the 2025 target.*

**Baseline result > Annual result > 2025 target**

**Indicators moving away from their targets**

For indicators that had not already met or exceeded their targets at baseline and are moving away from their 2025 targets, the percent of targeted change achieved measures the extent of movement away from the target and is calculated by:

$$\text{Magnitude of percent change from baseline} = \frac{|\text{ Annual result - Baseline result }| \text{ x 100}}{\text{Baseline result}}$$

The absolute value of the percent change from baseline is used to measure movement in this instance. When indicator results are moving away from the 2025 targets, the indicator results will need to make up the deficit from the baseline (i.e., get back to baseline value). Additional work would be needed to see desired targeted change once the baseline value is regained.

## INDICATOR SPECIFICATIONS FOR THE NATIONAL HIV/AIDS STRATEGY

### Indicator 1: Increase knowledge of status

- Definition:
  - ◇ Numerator: Number of persons aged ≥13 years living with diagnosed HIV at end of a measurement year.
  - ◇ Denominator: Estimated number of persons aged ≥13 years living with diagnosed or undiagnosed HIV at the end of a measurement year.
- Baseline year: 2017
- Baseline result: 85.8%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS).[11] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Data availability: Data are published annually.

APHA App. 636

## Indicator 2: Reduce new HIV infections

- Definition: Incidence is the estimated number of new HIV infections among persons aged ≥13 years that occurred in the measurement year and includes diagnosed and undiagnosed infections.

- Baseline year: 2017

- Baseline result: 37,000

- Targets: By 2025, reduce incidence by 75% from baseline. By 2030, reduce incidence by 90% from baseline.

- Data source: National HIV Surveillance System (NHSS).[11] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.

- Data availability: Data are published annually.

## Indicator 3: Reduce new HIV diagnoses

- Definition: Number of persons ≥13 years who have received laboratory or clinical confirmation of HIV in a measurement year.

- Baseline year: 2017

- Baseline result: 38,351

- Targets: By 2025, reduce diagnoses by 75% from baseline. By 2030, reduce diagnoses by 90% from baseline.

- Data source: National HIV Surveillance System (NHSS). NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.[3]

- Data availability: Data are published annually. Preliminary data are also available quarterly.

- Notes: Provisional annual data (annual data with ≥12 months of reporting delay) will be used to measure progress.

## Indicator 4: Increase PrEP coverage

- Definition:
  ◇ Numerator: Number of persons ≥16 years who were classified as having been prescribed PrEP in a measurement year.
  ◇ Denominator: Estimated number of persons with indications for PrEP in a measurement year.

- Baseline year: 2017

- Baseline result: 13.2%

- Target: By 2025, increase to 50%.
  ◇ Numerator: IQVIA Real-World Longitudinal Prescriptions database
  ◇ Denominator: Uses three data sources:
    1. The American Community Survey from U.S. Census is used to estimate the number of men who have sex with men (MSM) in a jurisdiction.[163]
    2. Behavioral data from the National Health and Nutrition Examination Survey (NHANES) are used to estimate the proportion of HIV-negative MSM with indications for PrEP.[164]
    3. The National HIV Surveillance System (NHSS) diagnoses data are used.[2] The number of HIV-negative MSM with indications for PrEP are multiplied by the ratio of percentage of HIV diagnoses during the specified year attributed to persons who inject drugs (PWID) and heterosexual transmission risk groups compared to the percentage among MSM. The estimated number of persons with indications

APHA App. 637

for PrEP in the three major transmission risk groups (MSM, heterosexuals, PWID) in each jurisdiction are then summed to yield national estimates.

- Data availability: Data are published annually. Preliminary data are also available quarterly.
- Note: Prescriptions for PrEP or having indications for PrEP are not reportable conditions and therefore are not reported through the National HIV Surveillance System. Annual data will be used to measure progress.

## Indicator 5: Increase linkage to care

- Definition:
  ◇ Numerator:  Number of persons aged ≥13 years with HIV diagnosed in a measurement year and who had ≥1 viral load (VL) or CD4 test ≤1 month after HIV diagnosis.
  ◇ Denominator: Number of persons aged ≥13 years with HIV infection diagnosed during a measurement year.
- Baseline year: 2017
- Baseline result: 77.8%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS). NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.[2]
- Data availability: Data are published annually.  Preliminary data are also available quarterly.
- Notes: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results to CDC. The number of jurisdictions may vary each year. Provisional annual data (annual data with ≥12 months of reporting delay) will be used to measure progress.

## Indicator 6: Increase viral suppression

- Definition:
  ◇ Numerator: Number of persons aged ≥13 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
  ◇ Denominator:  Number of persons aged ≥13 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.
- Example: Denominator for 2019 viral suppression is the number of persons aged ≥13 years living with diagnosed HIV by the end of 2018 and alive at the end of 2019.
- Baseline year: 2017
- Baseline result: 63.1%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS). NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.[2]
- Data availability: Data are published annually.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results to CDC and with complete death ascertainment. The number of jurisdictions may vary each year.

## Indicator 7: Decrease stigma

- Definition: The median score of a 10-item stigma scale, ranging from 0 (no stigma) to 100 (high stigma), measured among persons aged >18 years living with diagnosed HIV infection living in the United States and Puerto Rico.

APHA App. 638

- Note: The stigma scale was revised for the 2018 data collection cycle and includes three questions with a 12-month reference period to allow participants to provide experiences in a defined and more recent period of time for one domain of stigma (personalized stigma).

- Baseline year: 2018

- Baseline result: 31.2 median score

- Target: By 2025, decrease by 50%.

- Data source: Medical Monitoring Project (MMP). MMP is a cross-sectional, nationally representative, complex sample survey that assesses the behavioral and clinical characteristics of adults with diagnosed HIV infection in the United States. MMP also provides information on behaviors and clinical outcomes affecting the risk of HIV transmission, morbidity, and mortality. In 2015, MMP sampling and weighting methods were revised to include all adults with diagnosed HIV infection regardless of HIV care status.

- Data availability: Data are published annually.

### Indicator 8: Reduce homelessness

- Definition:

  ◇ Numerator: Number of persons aged ≥18 years living with diagnosed HIV in a measurement year and report having been homeless during the 12 months prior to interview. Homelessness is defined as living on the street, living in a shelter, living in a single-room-occupancy hotel, or living in a car.

  ◇ Denominator: A sample of persons aged ≥18 years living with diagnosed HIV in a measurement year, as documented in the medical record.

- Baseline year: 2017

- Baseline result: 9.1%

- Target: By 2025, reduce by 50%.

- Data source: Medical Monitoring Project (MMP). MMP is a cross-sectional, nationally representative, complex sample survey that assesses the behavioral and clinical characteristics of adults with diagnosed HIV infection in the United States. MMP also provides information on behaviors and clinical outcomes affecting the risk of HIV transmission, morbidity, and mortality. In 2015, MMP sampling and weighting methods were revised to include all adults with diagnosed HIV infection regardless of HIV care status.

- Data availability: Data are published annually.

### Indicator 9: Increase LGBTQ-supportive school policies and practices

- Definition: This indicator is the median percentage of secondary schools that are implementing at least four of seven school policies and practices that are known to improve health outcomes for both LGBTQ youth and all students: (1) having a Gay/Straight Alliance (GSA) or similar club, (2) identifying safe spaces, (3) prohibiting harassment based on sexual orientation or gender identity, (4) encouraging staff to attend professional development; (5) facilitating access to out-of-school health service providers, (6) facilitating access to out-of-school social and psychological service providers, and (7) providing LGBTQ-relevant curricula or supplementary materials.

- Baseline year: 2018

- Baseline result: 59.8%

- Targets: By 2025, increase the median percentage of secondary schools that are implementing at least four of seven LGBTQ-supportive policies and practices to 65% from a 2018 baseline of 59.8%. By 2030, increase the median percentage of secondary schools to 68.7%.

APHA App. 639

- Data source: CDC School Health Profiles. The School Health Profiles is a system of surveys assessing school health policies and practices in states, large urban school districts, and territories.
- Data availability: Data are published bi-annually.

## Disparities Indicators

To monitor our progress in addressing HIV disparities, the viral suppression indicator is monitored for the following priority populations.

### MSM

- Definition:
  ◇ Numerator: Number of persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
  ◇ Denominator: Number of persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.
- Baseline year: 2017
- Baseline result: 66.1%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS).[2] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Data availability: Data are published annually.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results and with complete death ascertainment. The number of jurisdictions may vary each year.

### Black/African American MSM

- Definition:
  ◇ Numerator: Number of Black/African American persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
  ◇ Denominator: Number of Black/African American persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.
- Baseline year: 2017
- Baseline result: 58.4%
- Target: By 2025, increase to 95%.
- Data availability: Data are published annually.
- Data source: National HIV Surveillance System (NHSS).[2] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results and with complete death ascertainment. The number of jurisdictions may vary each year.

### Hispanic/Latino MSM

- Definition:
  - ◇ Numerator: Number of Hispanic/Latino persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
  - ◇ Denominator: Number of Hispanic/Latino persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.
- Baseline year: 2017
- Baseline result: 64.9%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS).[2] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Data availability: Data are published annually.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results and with complete death ascertainment. The number of jurisdictions may vary each year.

### American Indian/Alaska Native MSM

- Definition:
  - ◇ Numerator: Number of American Indian/Alaska Native persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
  - ◇ Denominator: Number of American Indian/Alaska Native persons with male-to-male sexual contact (MSM) aged ≥13 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.
- Baseline year: 2017
- Baseline result: 67.3%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS).[2] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Data availability: Data are published annually.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results and with complete death ascertainment. The number of jurisdictions may vary each year.

### Black Women

- Definition:
  - ◇ Numerator: Number of Black/African American females aged ≥13 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
  - ◇ Denominator: Number of Black/African American females aged ≥13 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.
- Baseline year: 2017
- Baseline result: 59.3%

- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS).[2] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Data availability: Data are published annually.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results and with complete death ascertainment. The number of jurisdictions may vary each year.

### Transgender Women in HIV Medical Care

- Definition:
    ◇ Numerator: Number of transgender women living with HIV ≥13 years who received from a Ryan White HIV/AIDS Provider at least one outpatient ambulatory health care (OAHC) visit and had at least one viral load test during the measurement year who was virally suppressed. Viral suppression was defined as the most recently reported HIV test result of <200 copies/mL.
    ◇ Denominator: Number of transgender women living with HIV ≥13 years who received from a Ryan White HIV/AIDS Provider at least one outpatient ambulatory health care (OAHC) visit and had at least one viral load test during the measurement year.
- Baseline year: 2017
- Baseline result: 80.5%
- Target: By 2025, increase to 95%.
- Data source: Ryan White HIV/AIDS Program Services Report[5]
- Data availability: Data are published annually.

### People Who Inject Drugs (PWID)

- Definition:
    ◇ Numerator: Number of persons who inject drugs aged ≥13 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
    ◇ Denominator: Number of persons who inject drugs aged ≥13 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.
- Baseline year: 2017
- Baseline result: 54.9%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS).[2] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Data availability: Data are published annually.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results and with complete death ascertainment. The number of jurisdictions may vary each year.

### Youth 13–24 years

- Definition:
    ◇ Numerator: Number of persons aged 13–24 years living with diagnosed HIV and have a viral load test result <200 copies/mL at the most recent viral load test during a measurement year.
    ◇ Denominator: Number of persons aged 13–24 years living with diagnosed HIV by the end of the year prior to the measurement year and alive at the end of the measurement year.

APHA App. 642

- Baseline year: 2017
- Baseline result: 54.9%
- Target: By 2025, increase to 95%.
- Data source: National HIV Surveillance System (NHSS).[2] NHSS is the primary source for monitoring trends in HIV in the United States. It is the data source for incidence, diagnoses, and other HIV care continuum data.
- Note: Data are reported for jurisdictions with complete laboratory reporting of CD4 and viral load test results and with complete death ascertainment. The number of jurisdictions may vary each year.

### *Developmental Indicator—Quality of life for people with HIV*

In addition, one key issue, quality of life for people with HIV, was designated as the subject for a "developmental indicator," meaning that data sources, measures, and targets will be identified, and progress monitored thereafter. Potential data sources and measures exist for this indicator, but further work must be done to assess them and craft the specifications for this developmental indicator. Working with parties and organizations, the federal government will develop an indicator.

APHA App. 643

# APPENDIX B: ACRONYMS

| | |
|---|---|
| AIDS | acquired immune deficiency syndrome |
| ART | antiretroviral therapy |
| CDC | Centers for Disease Control and Prevention (HHS) |
| COVID-19 | coronavirus disease 2019 |
| EHE | Ending the HIV Epidemic in the U.S. |
| FDA | Food and Drug Administration (HHS) |
| HHS | U.S. Department of Health and Human Services |
| HIV | human immunodeficiency virus |
| HOPWA | Housing Opportunities for Persons With AIDS |
| HRSA | Health Resources and Services Administration (HHS) |
| IHS | Indian Health Service (HHS) |
| MSM | men who have sex with men |
| NHAS | National HIV/AIDS Strategy |
| NIH | National Institutes of Health |
| OASH | Office of the Assistant Secretary for Health (HHS) |
| OIDP | Office of Infectious Disease and HIV/AIDS Policy (HHS) |
| ONAP | Office of National AIDS Policy (White House) |
| PEP | post-exposure prophylaxis |
| PrEP | pre-exposure prophylaxis |
| PWID | people who inject drugs |
| RWHAP | Ryan White HIV/AIDS Program (HRSA) |
| SAMHSA | Substance Abuse and Mental Health Services Administration (HHS) |
| SARS-CoV-2 | severe acute respiratory syndrome coronavirus 2 |
| SSP | syringe services program |
| STI | sexually transmitted infection |
| U=U | Undetectable = Untransmittable |
| USPSTF | U.S. Preventative Services Task Force |

APHA App. 644

# APPENDIX C: REFERENCES

1    Centers for Disease Control and Prevention. Vital Signs: HIV prevention through care and treatment—United States. *Morb Mortal Wkly Rep*. 2011 (December 2);60(47):1618-1623. https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6047a4.htm

2    Centers for Disease Control and Prevention. Monitoring selected national HIV prevention and care objectives by using HIV surveillance data—United States and 6 dependent areas, 2019. *HIV Surveillance Supplemental Report* 2021;26(2). Accessed October 30, 2021. https://www.cdc.gov/hiv/library/reports/hiv-surveillance/vol-26-no-2/index.html

3    Centers for Disease Control and Prevention. Diagnoses of HIV infection in the United States and dependent areas, 2019. *HIV Surveillance Report* 2019;32. Accessed October 30, 2021. https://www.cdc.gov/hiv/library/reports/hiv-surveillance/vol-32/index.html

4    NCHHSTP AtlasPlus: HIV, hepatitis, STD, TB, social determinants of health data. Centers for Disease Control and Prevention. Accessed September 23, 2021. https://www.cdc.gov/nchhstp/atlas/index.htm

5    Ryan White HIV/AIDS Program annual client-level data report 2019. Health Resources and Services Administration. Accessed September 23, 2021, https://hab.hrsa.gov/sites/default/files/hab/data/datareports/RWHAP-annual-client-level-data-report-2019.pdf

6    Mandsager P, Marier A, Cohen S, et al. Reducing HIV-related health disparities in the Health Resources and Services Administration's Ryan White HIV/AIDS Program. *Am J Public Health*. Nov 2018;108(S4):S246-S250. doi:10.2105/AJPH.2018.304689

7    Dawson L, Kates J. Insurance coverage and viral suppression among people with HIV, 2018. Kaiser Family Foundation. September 24, 2020. Accessed September 29, 2021. https://www.kff.org/hivaids/issue-brief/insurance-coverage-and-viral-suppression-among-people-with-hiv-2018/

8    Medicaid and HIV. Kaiser Family Foundation. Updated October 1, 2019. Accessed October 1, 2021. https://www.kff.org/hivaids/fact-sheet/medicaid-and-hiv/

9    Adamson B, Lipira L, Katz AB. The impact of ACA and Medicaid expansion on progress toward UNAIDS 90-90-90 goals. *Curr HIV/AIDS Rep*. Feb 2019;16(1):105-112. doi:10.1007/s11904-019-00429-6

10    Rajabiun S, Tryon J, Feaster M, et al. The influence of housing status on the HIV Continuum of Care: Results From a multisite study of patient navigation models to build a medical home for people living with HIV experiencing homelessness. *Am J Public Health*. Dec 2018;108(S7):S539-S545. doi:10.2105/AJPH.2018.304736

11    Centers for Disease Control and Prevention. Estimated HIV incidence and prevalence in the United States, 2015–2019. *HIV Surveillance Supplemental Report* 2021;26(1). Accessed October 30, 2021. https://www.cdc.gov/hiv/pdf/library/reports/surveillance/cdc-hiv-surveillance-supplemental-report-vol-26-1.pdf

12    Hall HI, Song R, Rhodes P, et al. Estimation of HIV incidence in the United States. *JAMA*. 2008 (August 6);300(5):520-529. doi:10.1001/jama.300.5.520

APHA App. 645

13   2019 National HIV Surveillance System Reports. Centers for Disease Control and Prevention. May 27, 2021. Accessed October 1, 2021. https://www.cdc.gov/nchhstp/newsroom/2021/2019-national-hiv-surveillance-system-reports.html

14   Quick facts—United States. U.S. Census Bureau. Accessed September 29, 2021. https://www.census.gov/quickfacts/fact/table/US/PST045219#PST045219

15   Centers for Disease Control and Prevention. *Sexual Orientation Information Statistics. Sexual Orientation and Health among U.S. Adults: National Health Interview Survey, 2018*. Accessed November 13, 2021. https://www.cdc.gov/nchs/nhis/sexual_orientation/statistics.htm

16   A.R. F, Herman JL, Gates GJ, Brown TNT. *How Many Adults Identify as Transgender in the United States?*; 2016. Accessed November 14, 2021. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Adults-US-Aug-2016.pdf

17   Centers for Disease Control and Prevention. Estimated HIV incidence and prevalence in the United States, 2014–2018. *HIV Surveillance Supplemental Report*. 2020;25(1). Accessed November 14, 2021. https://www.cdc.gov/hiv/pdf/library/reports/surveillance/cdc-hiv-surveillance-supplemental-report-vol-25-1.pdf

18   Annual estimates of the resident population: April 1, 2010 to July 1, 2019. U.S. Census Bureau. Accessed September 29, 2021. https://www.census.gov/quickfacts/fact/table/US/PST045219#PST045219

19   Szucs LE, Lowry R, Fasula AM, et al. Condom and contraceptive use among sexually active high school students—Youth Risk Behavior Survey, United States, 2019. *MMWR Suppl*. 2020(August 21);69(1):11-18. doi:10.15585/mmwr.su6901a2

20   Custom data analysis. Centers for Disease Control and Prevention.

21   Antiretroviral Therapy Cohort C. Survival of HIV-positive patients starting antiretroviral therapy between 1996 and 2013: a collaborative analysis of cohort studies. *Lancet HIV.* 2017(August);4(8):e349-e356. doi:10.1016/S2352-3018(17)30066-8

22   Bavinton B, Grinsztejn B, Phanuphak N, et al. HIV treatment prevents HIV transmission in male serodiscordant couples in Australia, Thailand and Brazil. Presented at: 9th IAS Conference on HIV Science; July 25, 2017 2017; Paris, France.

23   Cohen MS, Chen YQ, McCauley M, et al. Prevention of HIV-1 infection with early antiretroviral therapy. *N Engl J Med*. 2011(August 11);365(6):493-505. doi:10.1056/NEJMoa1105243

24   Cohen MS, Chen YQ, McCauley M, et al. Antiretroviral therapy for the prevention of HIV-1 transmission. *N Engl J Med*. 2016(September 1);375(9):830-839. doi:10.1056/NEJMoa1600693

25   Rodger AJ, Cambiano V, Bruun T, et al. Sexual activity without condoms and risk of HIV transmission in serodifferent couples when the HIV-positive partner is using suppressive antiretroviral therapy. *JAMA*. 2016(July 12);316(2):171-181. doi:10.1001/jama.2016.5148

26   Eisinger RW, Erbelding E, Fauci AS. Ending the Human Immunodeficiency Virus pandemic: Optimizing the prevention and treatment toolkits. *Clin Infect Dis*. 2019(November 27);69(12):2212-2217. doi:10.1093/cid/ciz998

27   National HIV Testing Day - June 27, 2019. *Morb Mortal Wkly Rep*. 2019(June 28);68(25):561. doi:10.15585/mmwr.mm6825a1

APHA App. 646

28    Li Z, Purcell DW, Sansom SL, et al. Vital Signs: HIV transmission along the continuum of care - United States, 2016. *Morb Mortal Wkly Rep.* 2019;68(11):267-272. doi:10.15585/mmwr.mm6811e1

29    Vital Signs. Centers for Disease Control and Prevention. Accessed 2021. https://www.cdc.gov/nchhstp/newsroom/images/2019/hiv/hiv-transmissions-in-2016_highres.png

30    Centers for Disease Control and Prevention. National HIV Surveillance System data reported through March 2021; and preexposure prophylaxis (PrEP) data reported through December 2020. *HIV Surveillance Data Tables* 2021;2(3). Accessed October 30, 2021. https://www.cdc.gov/hiv/library/reports/surveillance-data-tables/vol-2-no-3/index.html

31    Centers for Disease Control and Prevention. Core indicators for monitoring the Ending the HIV Epidemic initiative: HIV diagnoses and linkage to HIV medical care, 2019 (preliminary data, reported through December 2019); pre-exposure prophylaxis (PrEP)—2018, updated. *HIV Surveillance Data Tables* 2020;1(2). Accessed October 30, 2021. https://www.cdc.gov/hiv/library/reports/surveillance-data-tables/vol-1-no-2/index.html

32    Harris NS, Johnson AS, Huang YA, et al. Vital Signs: Status of Human Immunodeficiency Virus testing, viral suppression, and HIV preexposure prophylaxis - United States, 2013-2018. *Morb Mortal Wkly Rep.* 2019(December 6);68(48):1117-1123. doi:10.15585/mmwr.mm6848e1

33    Dodge B, Ford JV, Bo N, et al. HIV risk and prevention outcomes in a probability-based sample of gay and bisexual men in the United States. *J Acquir Immune Defic Syndr.* Dec 1 2019(December 1);82(4):355-361. doi:10.1097/QAI.0000000000002151

34    Rolle CP, Onwubiko U, Jo J, et al. PrEP implementation and persistence in a county health department setting in Atlanta, GA. *AIDS Behav.* 2019(October);23(Suppl 3):296-303. doi:10.1007/s10461-019-02654-x

35    Artiga S, Hill L, Orgera K, et al. Health coverage by race and ethnicity, 2010-2019. Kaiser Family Foundation. July 16, 2021. Accessed October 1, 2021. https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-coverage-by-race-and-ethnicity/

36    Buchmueller T, Carpenter CS. Disparities in health insurance coverage, access, and outcomes for individuals in same-sex versus different-sex relationships, 2000-2007. *Am J Public Health.* 2010(March);100(3):489-495. doi:10.2105/AJPH.2009.160804

37    Lesbian, gay, bisexual, and transgender health. HealthyPeople.gov. Accessed September 29, 2021. https://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-bisexual-and-transgender-health?topicid=25

38    Operario D, Gamarel KE, Grin BM, et al. Sexual minority health disparities in adult men and women in the United States: National Health and Nutrition Examination Survey, 2001-2010. *Am J Public Health.* 2015(October);105(10):e27-34. doi:10.2105/AJPH.2015.302762

39    National Institutes of Health. *Strategic Plan to Advance Research on the Health and Well-Being of Sexual & Gender Minorities: Fiscal Years 2021-2025.* Accessed October 30, 2021. https://dpcpsi.nih.gov/sites/default/files/SGMStrategicPlan_2021_2025.pdf

40    Trans 101: Transgender people in everyday work and life. UCSF Prevention Science. Accessed September 29, 2021. https://prevention.ucsf.edu/transhealth/education/trans101#Who-Are-Transgender-People

41    How COVID-19 impacts sexual and gender minorities. American Psychological Association. Accessed September 29, 2021. https://www.apa.org/topics/covid-19/sexual-gender-minorities

42    Cicero EC, Reisner SL, Silva SG, et al. Health care experiences of transgender adults: An integrated mixed research literature review. *Adv Nurs Sci*. 2019(April/June);42(2):123-138. doi:10.1097/ANS.0000000000000256

43    National Center for Transgender Equity. *The Report of the U.S. Transgender Survey*; 2015. Accessed October 30, 2021. https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

44    National Academies of Sciences, Engineering, and Medicine. *Integrating Responses at the Intersection of Opioid Use Disorder and Infectious Disease Epidemics: Proceedings of a Workshop*. The National Academies Press; 2018. Accessed October 31, 2021. https://www.nap.edu/catalog/25153/integrating-responses-at-the-intersection-of-opioid-use-disorder-and-infectious-disease-epidemics

45    Van Handel MM, Rose CE, Hallisey EJ, et al. County-level vulnerability assessment for rapid dissemination of HIV or HCV infections smong persons who inject drugs, United States. *J Acquir Immune Defic Syndr*. 2016(November 1);73(3):323-331. doi:10.1097/QAI.0000000000001098

46    Grov C, Westmoreland D, Morrison C, et al. The crisis we are not talking about: One-in-three annual HIV seroconversions among sexual and gender minorities were persistent methamphetamine users. *J Acquir Immune Defic Syndr*. 2020(November 1);85(3):272-279. doi:10.1097/QAI.0000000000002461

47    Copen CE, Brookmeyer KA, Haderxhanaj LT, et al. Sexual risk behaviors among persons diagnosed with primary and secondary syphilis who reported high-risk substance use: Data from the National Notifiable Diseases Surveillance System, 2018. *Sex Transm Dis*. 2021(August 31). doi:10.1097/OLQ.0000000000001546

48    HIV and substance use. Centers for Disease Controla and Prevention. Accessed September 29, 2021. https://www.cdc.gov/hiv/risk/substanceuse.html

49    Centers for Disease Control and Prevention. *Sexually Transmitted Disease Surveillance 2019*. U.S. Department of Health and Human Services; 2021. Accessed October 30, 2021. https://www.cdc.gov/std/statistics/2019/default.htm

50    Bernstein KT, Marcus JL, Nieri G, et al. Rectal gonorrhea and chlamydia reinfection is associated with increased risk of HIV seroconversion. *J Acquir Immune Defic Syndr*. 2010(April 1);53(4):537-543. doi:10.1097/QAI.0b013e3181c3ef29

51    Chesson HW, Song R, Bingham A, et al. The estimated number and lifetime medical cost of HIV infections attributable to sexually transmitted infections acquired in the United States in 2018: A compilation of published modeling results. *Sex Transm Dis*. 2021(April 1);48(4):292-298. doi:10.1097/OLQ.0000000000001358

52    Jones J, Weiss K, Mermin J, et al. Proportion of incident Human Immunodeficiency Virus cases among men who have sex with men attributable to gonorrhea and chlamydia: A modeling analysis. *Sex Transm Dis*. 2019(June);46(6):357-363. doi:10.1097/OLQ.0000000000000980

53    Westergaard RP, Spaulding AC, Flanigan TP. HIV among persons incarcerated in the USA: a review of evolving concepts in testing, treatment, and linkage to community care. *Curr Opin Infect Dis*. 2013 (February);26(1):10-16. doi:10.1097/QCO.0b013e32835c1dd0

54    Department of Labor. *FAQS About Affordable Care Act Implementation Part 47*. Accessed October 31, 2021. https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-47.pdf

APHA App. 648

55    U.S. Preventive Services Task Force. *Final Recommendation Statement: Prevention of Human Immunodeficiency Virus (HIV) Infection: Preexposure Prophylaxis*. June 2019. Accessed October 30, 2021. https://www.uspreventiveservicestaskforce.org/uspstf/document/RecommendationStatementFinal/prevention-of-human-immunodeficiency-virus-hiv-infection-pre-exposure-prophylaxis

56    Summary of information on the safety and effectiveness of syringe services programs (SSPs). Centers for Disease Control and Prevention. Accessed September 30, 2021. https://www.cdc.gov/ssp/syringe-services-programs-summary.html

57    Office of National Drug Control Policy. *The Biden-Harris Administration's Statement of Drug Policy Priorities for Year One*. 2021. Accessed October 30, 2021. https://www.whitehouse.gov/wp-content/uploads/2021/03/BidenHarris-Statement-of-Drug-Policy-Priorities-April-1.pdf

58    Overdose Prevention Strategy. U.S. Department of Health and Human Services. Accessed November 13, 2021. https://www.hhs.gov/overdose-prevention/

59    Southern AIDS Coalition and GLAAD. *2021 State of HIV Stigma.* Accessed October 30, 2021. https://www.glaad.org/sites/default/files/HIV-StigmaStudy_2021_081621%20%281%29.pdf

60    Kirzinger A, Lopes L, Wu B, et al. KFF Health Tracking Poll – March 2019: Public opinion on the domestic HIV epidemic, Affordable Care Act, and Medicare-for-all. March 26, 2019. Accessed September 30, 2021. https://www.kff.org/hivaids/poll-finding/kff-health-tracking-poll-march-2019/

61    Wejnert C, Prejean J, Hoots B, et al. Prevalence of missed opportunities for HIV testing among persons unaware of their infection. *JAMA*. 26 2018(June 26);319(24):2555-2557. doi:10.1001/jama.2018.7611

62    The state of STDs—infographic. Centers for Disease Control and Prevention. Accessed September 30, 2021. https://www.cdc.gov/std/statistics/2019/infographic.htm

63    Huang YA, Zhu W, Smith DK, et al. HIV preexposure prophylaxis, by race and ethnicity - United States, 2014-2016. *Morb Mortal Wkly Rep*. 2018(October 19);67(41):1147-1150. doi:10.15585/mmwr.mm6741a3

64    Sullivan P, et al. The impact of pre-exposure prophylaxis with TDF/FTC on HIV diagnoses, 2012-2016, United States. Presented at: 22nd International AIDS Conference (AIDS 2018); July 27, 2018; Amsterdam, Netherlands. Accessed October 30, 2021. https://www.natap.org/2018/IAC/IAC_17.htm

65    Canary L, Hariri S, Campbell C, et al. Geographic disparities in access to syringe services programs among young persons with hepatitis C virus infection in the United States. *Clin Infect Dis*. 2017(August 1);65(3):514-517. doi:10.1093/cid/cix333

66    Sharp A, Jones A, Honermann B, et al. 220 Vulnerable Counties: One year later. presented at: Conference on Retroviruses and Opportunistic Infections; March 4-7, 2018; Boston, MA. Accessed October 30, 2021. https://www.croiconference.org/abstract/220-vulnerable-counties-one-year-later/

67    Lazar NR, Salas-Humara C, Wood SM, et al. Missed opportunities for HIV screening among a cohort of adolescents with recently diagnosed HIV infection in a large pediatric hospital care network. *J Adolesc Health*. 2018(December);63(6):799-802. doi:10.1016/j.jadohealth.2018.07.010

68    Traynor SM, Rosen-Metsch L, Feaster DJ. Missed opportunities for HIV testing among STD clinic patients. *J Comm Health*. 43(6):1128-1136. doi:https://doi.org/10.1007/s10900-018-0531-z

69   Downing A, Garcia-Diaz JB. Missed opportunities for HIV diagnosis. *J Int Assoc Provid AIDS Care*. 2017(Jan/Feb);16(1):14-17. doi:10.1177/2325957416661423

70   DeRose J, Zucker J, Cennimo D, et al. Missed testing opportunities for HIV screening and early diagnosis in an urban tertiary care center. *AIDS Res Treat*. 2017:5708620. doi:10.1155/2017/5708620

71   Parish CL, Siegel K, Liguori T, et al. HIV testing in the dental setting: Perspectives and practices of experienced dental professionals. *AIDS Care*. 2018(March);30(3):347-352. doi:10.1080/09540121.2017.1367087

72   Weidle PJ, Lecher S, Botts LW, et al. HIV testing in community pharmacies and retail clinics: a model to expand access to screening for HIV infection. *J Am Pharm Assoc (2003)*.  2014(September-October);54(5):486-492. doi:10.1331/JAPhA.2014.14045

73   Branson BM, Handsfield HH, Lampe MA, et al. Revised recommendations for HIV testing of adults, adolescents, and pregnant women in health-care settings. *MMWR Recomm Rep*. 2006(September 22);55(RR-14):1-17; quiz CE1-4. Accessed October 30, 2021. https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5514a1.htm

74   Flanigan TP, Zaller N, Beckwith CG, et al. Testing for HIV, sexually transmitted infections, and viral hepatitis in jails: Still a missed opportunity for public health and HIV prevention. *J Acquir Immune Defic Syndr*. 1999;55(2):S78-S83. doi:10.1097/QAI.0b013e3181fbc94f1

75   Solomon L, Montague BT, Beckwith CG, et al. Survey finds that many prisons and jails have room to improve HIV testing and coordination of postrelease treatment. *Health Aff (Millwood)*. 2014(March);33(3):434-442. doi:10.1377/hlthaff.2013.1115

76   Stanford KA, McNulty MC, Schmitt JR, et al. Incorporating HIV screening with COVID-19 testing in an urban emergency department during the pandemic. *JAMA Intern Med*. 2021(July 1);181(7):1001-1003. doi:10.1001/jamainternmed.2021.0839

77   Barrow RY, Ahmed F, Bolan GA, et al. Recommendations for providing quality sexually transmitted diseases clinical services, 2020. *MMWR Recomm Rep*. 2020(January 3);68(5):1-20. doi:10.15585/mmwr.rr6805a1

78   Hoover KW, Parsell BW, Leichliter JS, et al. Continuing need for sexually transmitted disease clinics after the Affordable Care Act. *Am J Public Health*. 2015(November);105 Suppl 5:S690-S695. doi:10.2105/AJPH.2015.302839

79   Seth P, Wang G, Sizemore E, et al. HIV testing and HIV service delivery to populations at high risk attending sexually transmitted disease clinics in the United States, 2011-2013. *Am J Public Health*. 2015(November);105(11):2374-2381. doi:10.2105/AJPH.2015.302778

80   Cuffe KM, Esie P, Leichliter JS, et al. HIV services provided by STI programs in state and local health departments — United States, 2013–2014. *Morb Mortal Wkly Rep* 2017;66:355-358. doi:http://dx.doi.org/10.15585/mmwr.mm6613a2

81   Centers for Disease Control and Prevention. *CDC-Funded HIV Testing in the United States, Puerto Rico, and the U.S. Virgin Islands, 2019*. Accessed November 14, 2021. https://www.cdc.gov/hiv/pdf/library/reports/cdc-hiv-annual-HIV-testing-report-2019.pdf

82   Robin L, Timpe Z, Suarez NA, et al. Local Education Agency impact on school environments to reduce health risk behaviors and experiences among high school students. *J Adolesc Health*. 2021(September 13). doi:10.1016/j.jadohealth.2021.08.004

APHA App. 650

83   Breuner CC, Mattson G. Sexuality education for children and adolescents. *Pediatrics*. 2016(August);138(2). doi:10.1542/peds.2016-1348

84   National Academies of Science, Engineering, and Medicine. *Sexually Transmitted Infections: Adopting a Sexual Health Paradigm*. The National Academies Press; 2021. Accessed October 30, 2021. https://www.nap.edu/catalog/25955/sexually-transmitted-infections-adopting-a-sexual-health-paradigm

85   Preventing sexual transmission of HIV. HIV.gov. Accessed September 30, 2021. https://www.hiv.gov/hiv-basics/hiv-prevention/reducing-sexual-risk/preventing-sexual-transmission-of-hiv

86   MAT medications, counseling, and related conditions. Substance Abuse and Mental Health Services Administration. Accessed September 30, 2021. https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions

87   Male condom use. Centers for Disease Control and Prevention. Accessed September 30, 2021. https://www.cdc.gov/hiv/risk/estimates/preventionstrategies.html#anchor_1562942368

88   Satcher D. *Evidence-Based Findings on the Efficacy of Syringe Programs: Analysis from the Assistant Secretary of Health and Surgeon General of the scientific research completed since April 1998*. 2000.

89   Marks G, Crepaz N, Janssen RS. Estimating sexual transmission of HIV from persons aware and unaware that they are infected with the virus in the USA. *AIDS*. 2006(June 26);20(10):1447-1450. doi:10.1097/01.aids.0000233579.79714.8d

90   Rothman J, Rudnick D, Slifer M, et al. Co-located substance use treatment and HIV prevention and primary care services, New York State, 1990-2002: a model for effective service delivery to a high-risk population. *J Urban Health*. 2007(March);84(2):226-242. doi:10.1007/s11524-006-9137-3

91   Centers for Disease Control and Prevention. Sexual assault and abuse and STIs – adolescents and adults. *Sexually Transmitted Infections Treatment Guidelines, 2021*. Accessed October 30, 2021. https://www.cdc.gov/std/treatment-guidelines/sexual-assault-adults.htm

92   AIDS Education & Training Center (AETC) Program Rural Health Committee. *HIV/STI Post-Sexual Exposure Prophylaxis: Policy and Procedure Template*. 2018. Accessed October 30, 2021. https://cdn.ymaws.com/www.safeta.org/resource/resmgr/forms_library/npepsexualexposuretemplate_f.pdf

93   Agency for Healthcare Research and Quality. *2009 National Healthcare Quality Report*. March 2019. Accessed October 30, 2021. http://archive.ahrq.gov/research/findings/nhqrdr/nhqr09/Key.html

94   Douthit N, Kiv S, Dwolatzky T, et al. Exposing some important barriers to health care access in the rural USA. *Public Health*. 2015(June);129(6):611-620. doi:10.1016/j.puhe.2015.04.001

95   Henny KD, Duke CC, Geter A, et al. HIV-related training and correlates of knowledge, HIV screening and prescribing of nPEP and PrEP among primary vare providers in Southeast United States, 2017. *AIDS Behav*. 2019(November);23(11):2926-2935. doi:10.1007/s10461-019-02545-1

96   Pleuhs B, Quinn KG, Walsh JL, et al. Health care provider barriers to HIV pre-exposure prophylaxis in the United States: A systematic review. *AIDS Patient Care STDS*. 2020(March);34(3):111-123. doi:10.1089/apc.2019.0189

97   Macrae J. HRSA releases 2020 data on HIV prevention and treatment in health centers. HIV.gov. September 1, 2021. Accessed October 31, 2021. https://www.hiv.gov/blog/hrsa-releases-2020-data-on-hiv-prevention-and-treatment-health-centers

98    Farmer EK, Koren DE, Cha A, et al. The pharmacist's expanding role in HIV pre-exposure prophylaxis. *AIDS Patient Care STDS*. May 2019(May);33(5):207-213. doi:10.1089/apc.2018.0294

99    Cantwell-McNelis K, James CW. Role of clinical pharmacists in outpatient HIV clinics. *Am J Health Syst Pharm*. 2002(March 1);59(5):447-452. doi:10.1093/ajhp/59.5.447

100   Byrd KK, Hou JG, Bush T, et al. Adherence and viral suppression among participants of the patient-centered Human Immunodeficiency Virus (HIV) Care Model Project: A collaboration between community-based pharmacists and HIV clinical providers. *Clin Infect Dis*. Feb 14 2020;70(5):789-797. doi:10.1093/cid/ciz276

101   Byrd KK, Hardnett F, Clay PG, et al. Retention in HIV care among participants in the Patient-Centered HIV Care Model: A collaboration between community-based pharmacists and primary medical providers. *AIDS Patient Care STDS*. Feb 2019;33(2):58-66. doi:10.1089/apc.2018.0216

102   TEMPRANO ANRS Study Group, Danel C, Moh R, Gabillard D, et al. A trial of early antiretrovirals and isoniazid preventive therapy in Africa. *N Engl J Med*. 2015(August 27);373(9):808-822. doi:10.1056/NEJMoa1507198

103   INSIGHT Start Study Group, Lundgren JD, Babiker AG, Gordin F, et al. Initiation of antiretroviral therapy in early asymptomatic HIV infection. *N Engl J Med*. 2015(August 27);373(9):795-807. doi:10.1056/NEJMoa1506816

104   U.S. Department of Health and Human Services. *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents in HIV*. 2018. Accessed October 30, 2021. https://clinicalinfo.hiv.gov/en/guidelines/adult-and-adolescent-arv/initiation-antiretroviral-therapy

105   What is the HIV Care Continuum. HIV.gov. Accessed September 30, 2021. https://www.hiv.gov/federalresponse/policies-issues/hiv-aids-care-continuum

106   Osborn CY, Paasche-Orlow MK, Davis TC, et al. Health literacy: An overlooked factor in understanding HIV health disparities. *Am J Prev Med*. 2007(November);33(5):374-378. doi:10.1016/j.amepre.2007.07.022

107   Hutchinson P, Dhairyawan R. Shame and HIV: Strategies for addressing the negative impact shame has on public health and diagnosis and treatment of HIV. *Bioethics*.  2018(January);32(1):68-76. doi:10.1111/bioe.12378

108   Griffin A, Dempsey A, Cousino W, et al. Addressing disparities in the health of persons with HIV attributable to unstable housing in the United States: The role of the Ryan White HIV/AIDS Program. *PLoS Med*. 2020(March);17(3):e1003057. doi:10.1371/journal.pmed.1003057

109   Bacon O, Chin JC, Hsu L, et al. The Rapid Art Program Initiative For HIV Diagnoses (RAPID) in San Francisco. Presented at: Conference on Retroviruses and Opportunistic Infections; March 4-7, 2018; Boston, MA. Accessed October 30, 2021. https://www.natap.org/2018/CROI/croi_51.htm

110   Colasanti J, Sumitani J, Mehta CC, et al. Implementation of a rapid entry program decreases time to viral suppression among vulnerable persons living with HIV in the southern United States. *Open Forum Infect Dis*. 2018(June);5(6):ofy104. doi:10.1093/ofid/ofy104

111   Halperin J, Butler I, Conner K, et al. Linkage and antiretroviral therapy within 72 hours at a federally qualified health center in New Orleans. *AIDS Patient Care STDS*.  2018(February);32(2):39-41. doi:10.1089/apc.2017.0309

APHA App. 652

112    Red carpet. Whitman-Walker Health. Accessed September 30, 2021. https://www.whitman-walker.org/careprogram/hiv-care

113    Ruria EC, Masaba R, Kose J, et al. Optimizing linkage to care and initiation and retention on treatment of adolescents with newly diagnosed HIV infection. *AIDS*. 2017(July 1);31 Suppl 3:S253-S260. doi:10.1097/QAD.0000000000001538

114    Centers for Disease Control and Prevention. *Compendium of Evidence-Based Interventions and Best Practices for HIV Prevention*. June 28, 2021. Accessed October 30, 2021. https://www.cdc.gov/hiv/research/interventionresearch/compendium/index.html

115    Yehia BR, French B, Fleishman JA, et al. Retention in care is more strongly associated with viral suppression in HIV-infected patients with lower versus higher CD4 counts. *J Acquir Immune Defic Syndr*. 2014(March 1);65(3):333-339. doi:10.1097/QAI.0000000000000023

116    Dombrowski JC, Galagan SR, Ramchandani M, et al. HIV care for patients with complex needs: A controlled evaluation of a walk-in, incentivized care model. *Open Forum Infect Dis*. 2019(July);6(7):ofz294. doi:10.1093/ofid/ofz294

117    El-Sadr WM, Beauchamp G, Hall HI, et al. Brief report: Durability of the effect of financial incentives on HIV viral load suppression and continuity in care: HPTN 065 Study. *J Acquir Immune Defic Syndr*. 2019(July 1);81(3):300-303. doi:10.1097/QAI.0000000000001927

118    Saha S, Korthuis PT, Cohn JA, et al. Primary care provider cultural competence and racial disparities in HIV care and outcomes. *J Gen Intern Med*. 2013(May);28(5):622-629. doi:10.1007/s11606-012-2298-8

119    Target HIV. Accessed September 30, 2021. https://targethiv.org/

120    Older Adult Clients: HRSA's Ryan White HIV/AIDS Program, 2019. Accessed October 30, 2021. https://hab.hrsa.gov/sites/default/files/hab/Publications/factsheets/population-factsheet-older-adults.pdf

121    HRSA Ryan White HIV/AIDS Program. *Addressing the Health Care and Social Support Needs of People Aging with HIV*. Accessed October 30, 2021. https://hab.hrsa.gov/sites/default/files/hab/Publications/factsheets/hrsa-aging-tep-summary.pdf

122    Director's Commentary. Centers for Disease Control and Prevention. Accessed October 1, 2021. https://www.cdc.gov/healthequity/racism-disparities/director-commentary.html

123    Racism is a Public Health Crisis. American Public Health Association. Accessed October 1, 2021. https://www.apha.org/topics-and-issues/health-equity/racism-and-health/racism-declarations

124    Crepaz N, Hess Kl, Purcell DW, et al. Estimating national rates of HIV infection among MSM, persons who inject drugs, and heterosexuals in the United States. *AIDS*. 2019(March 15);33(4):701-708. doi:10.1097/QAD.0000000000002111

125    Centers for Disease Control and Prevention. Diagnoses of HIV Infection in the United States and Dependent Areas, 2018 (Updated). *HIV Surveillance Report* 31. Accessed October 30, 2021. https://www.cdc.gov/hiv/library/reports/hiv-surveillance/vol-31/index.html

126    Berchick ER, Barnett JC, Upton RD. *Health Insurance Coverage in the United States: 2018*. Current Population Reports, P60-267(RV). U.S. Government Printing Office; 2019. Accessed October 30, 2021. https://www.census.gov/content/dam/Census/library/publications/2019/demo/p60-267.pdf

APHA App. 653

127   Institute of Medicine. *Care Without Coverage: Too Little, Too Late*. National Academies Press; 2002. Accessed October 30, 2021. https://www.nap.edu/catalog/10367/care-without-coverage-too-little-too-late

128   Social determinants of health. HealthyPeople.gov. Accessed September 30, 2021. https://www.healthypeople.gov/2020/topics-objectives/topic/social-determinants-of-health

129   European Observatory on Health Systems and Policies and Ministry of Social Affairs and Health (Finland). *Health in All Policies: Prospects and Potentials*. 2006. Accessed October 30, 2021. https://www.euro.who.int/__data/assets/pdf_file/0003/109146/E89260.pdf

130   The National Prevention and Health Promotion Strategy. T*he National Prevention Strategy: America's Plan for Better Health and Wellness*. June 2011. Accessed October 30, 2021. https://www.hhs.gov/sites/default/files/disease-prevention-wellness-report.pdf

131   Flentje A, Heck NC, Brennan JM, et al. The relationship between minority stress and biological outcomes: A systematic review. *J Behav Med*. 2020(October);43(5):673-694. doi:10.1007/s10865-019-00120-6

132   Geter A, Herron AR, Sutton MY. HIV-related stigma by healthcare providers in the United States: A systematic review. *AIDS Patient Care STDS*. 2018(October);32(10):418-424. doi:10.1089/apc.2018.0114

133   Galarraga O, Rana A, Rahman M, et al. The effect of unstable housing on HIV treatment biomarkers: An instrumental variables approach. *Soc Sci Med*. 2018(October);214:70-82. doi:10.1016/j.socscimed.2018.07.051

134   Stangl AL, Earnshaw VA, Logie CH, et al. The Health Stigma and Discrimination Framework: A global, crosscutting framework to inform research, intervention development, and policy on health-related stigmas. *BMC Med*. 2019(February 15);17(1):31. doi:10.1186/s12916-019-1271-3

135   HIV and STD criminalization laws. Centers for Disease Control and Prevention. Accessed September 30, 2021. https://www.cdc.gov/hiv/policies/law/states/exposure.html

136   HIV criminalization and Ending the HIV Epidemic in the U.S. Centers for Disease Control and Prevention. Accessed October 1, 2021. https://www.cdc.gov/hiv/policies/law/criminalization-ehe.html

137   De Jesus M, Williams DR. The Care and Prevention in the United States Demonstration Project: A call for more focus on the social determinants of HIV/AIDS. *Public Health Rep*. 2018(Nov/Dec);133(2_suppl):28S-33S. doi:10.1177/0033354918801353

138   Search: Sustainable East Africa Research in Community Health. Accessed September 20, 2021. https://www.searchendaids.com/

139   HIV and pregnant women, infants, and children. Centers for Disease Control and Prevention. Accessed September 30, 2021. https://www.cdc.gov/hiv/group/gender/pregnantwomen/index.html

140   McNeil T, Rowe E. "Looking after the survivors": the health of a cohort of long-term human immunodeficiency virus patients 25 years on. *Intern Med J*. 2019(May);49(5):592-597. doi:10.1111/imj.14165

141   Murthy VH. *Confronting Health MisInformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*. 2021. Accessed October 30, 2021. https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf

APHA App. 654

142 Division of HIV/AIDS Prevention NCfHA, Viral Hepatitis, STD, and TB Prevention, Centers for Disease Control and Prevention and HIV/AIDS Bureau, Health Resources and Services Administration. *Integrated HIV Prevention and Care Plan Guidance, including the Statewide Coordinated Statement of Need, CY 2017- 2021*. June 2015. Accessed October 30, 2021. https://hab.hrsa.gov/sites/default/files/hab/Global/hivpreventionplan062015.pdf

143 Sweeney P, DiNenno EA, Flores SA, et al. HIV data to care-using public health data to improve HIV care and prevention. *J Acquir Immune Defic Syndr*. 2019(September 1);82(Suppl 1):S1-S5. doi:10.1097/QAI.0000000000002059

144 Towe VL, Stevens C, Fischer SH. Sharing and integrating HIV client data across provider organizations to improve service coordination: A toolkit. RAND Corporation; 2019. Accessed October 30, 2021. https://www.rand.org/pubs/tools/TL344.html

145 Psihopaidas D, Cohen SM, West T, et al. Implementation science and the Health Resources and Services Administration's Ryan White HIV/AIDS Program's work towards ending the HIV epidemic in the United States. *PLoS Med*. 2020(November);17(11):e1003128. doi:10.1371/journal.pmed.1003128

146 National Academies of Sciences, Engineering, and Medicine. *Opportunities to Improve Opioid Use Disorder and Infectious Disease Services: Integrating Responses to a Dual Epidemic*. The National Academies Press; 2020. Accessed October 30, 2021. https://www.nap.edu/catalog/25626/opportunities-to-improve-opioid-use-disorder-and-infectious-disease-services

147 HealthIT.gov. ONC's Cures Act Final Rule supports seamless and secure access, exchange, and use of electronic health information. Accessed October 29, 2021. https://www.healthit.gov/curesrule/

148 HRSA Ryan White HIV/AIDS Program. *Optimizing HIV Care for People Aging with HIV: Incorporating New Elements of Care Reference Guide for Aging with HIV*. Accessed October 30, 2021. https://hab.hrsa.gov/sites/default/files/hab/clinical-quality-management/aging-guide-new-elements.pdf

149 U.S. Department of Health and Human Services. HHS updates interoperability standards to support the electronic exchange of sexual orientation, gender identity and social determinants of health. Accessed October 29, 2021. https://www.hhs.gov/about/news/2021/07/09/hhs-updates-interoperability-standards-to-support-electronic-exchange-of-sogi-sdoh.html

150 Centers for Disease Control and Prevention. *PS18-1802: Integrated HIV Surveillance and Prevention Programs for Health Departments*. Monitoring and Evaluation Report; 2019. Accessed October 30, 2021. https://www.cdc.gov/hiv/pdf/funding/announcements/ps18-1802/cdc-hiv-ps18-1802-monitoring-evaluation-report-2019.pdf

151 Grove M, Brown LL, Knudsen HK, et al. Employing telehealth within HIV care: advantages, challenges, and recommendations. *AIDS*. 2021(July 1);35(8):1328-1330. doi:10.1097/QAD.0000000000002892

152 Centers for Disease Control and Prevention. S*exually Transmitted Disease Surveillance 2018*. U.S. Department of Health and Human Services; 2019. Accessed October 30, 2021. https://www.cdc.gov/std/stats18/STDSurveillance2018-full-report.pdf

153 Becasen JS, Denard CL, Mullins MM, et al. Estimating the prevalence of HIV and sexual behaviors among the US transgender population: A systematic review and meta-snalysis, 2006-2017. *Am J Public Health*. 2019(January);109(1):e1-e8. doi:10.2105/AJPH.2018.304727

APHA App. 655

154   Centers for Disease Control and Prevention. *CDC-Funded HIV Testing in the United, States, Puerto Rico and the U.S. Virgin Islands, 2018 Annual HIV Testing Report*. Access November 14, 2021. https://www.cdc.gov/hiv/pdf/library/reports/cdc-hiv-annual-HIV-testing-report-2018.pdf

155   Trends in the prevalence of sexual behaviors and HIV testing National YRBS: 1991—2019. Centers for Disease Control and Prevention. Accessed September 30, 2021. https://www.cdc.gov/healthyyouth/data/yrbs/factsheets/2019_sexual_trend_yrbs.htm

156   Recent HIV clusters and outbreaks across the United States among people who inject drugs and considerations during the COVID-19 pandemic. Centers for Disease Control and Prevention. Accessed October 1, 2021. https://emergency.cdc.gov/han/2020/han00436.asp

157   Spradling PR, Richardson JT, Buchacz K, et al. Trends in hepatitis C virus infection among patients in the HIV Outpatient Study, 1996-2007. *J Acquir Immune Defic Syndr*. 2010(March);53(3):388-396. doi:10.1097/QAI.0b013e3181b67527

158   Chen TY, Ding EL, Seage GR, et al. Meta-analysis: Increased mortality associated with hepatitis C in HIV-infected persons is unrelated to HIV disease progression. *Clin Infect Dis*. 2009(November 15);49(10):1605-1615. doi:10.1086/644771

159   Hoffmann CJ, Thio CL. Clinical implications of HIV and hepatitis B co-infection in Asia and Africa. *Lancet Infect Dis*. 2007(June);7(6):402-409. doi:10.1016/S1473-3099(07)70135-4

160   Lo Re Vr, Kallan MJ, Tate JP, et al. Hepatic decompensation in antiretroviral-treated patients co-infected with HIV and hepatitis C virus compared with hepatitis C virus-monoinfected patients: a cohort study. *Ann Intern Med*. 2014(March 18);160(6):369-379. doi:10.7326/M13-1829

161   HIV in the United States and dependent areas. Centers for Disease Control and Prevention. Accessed October 1, 2021. https://www.cdc.gov/hiv/statistics/overview/ataglance.html

162   Talih M, Huange DT. *Measuring Progress Toward Target Attainment and the Elimination of Health Disparities in Healthy People 2020*. Accessed October 30, 2021. https://www.cdc.gov/nchs/data/statnt/statnt27.pdf

163   Smith DK, Van Handel M, Grey J. Estimates of adults with indications for HIV pre-exposure prophylaxis by jurisdiction, transmission risk group, and race/ethnicity, United States, 2015. *Ann Epidemiol*. 2018(December);28(12):850-857, e9. doi:10.1016/j.annepidem.2018.05.003

164   NHANES questionnaires, datasets, and related documentation. Centers for Disease Control and Prevention. Accessed October 5, 2021. https://wwwn.cdc.gov/nchs/nhanes/Default.aspx

APHA App. 656

# EXHIBIT B

APHA App. 657



Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE OF MENTAL HEALTH

**Notice of Award**
FAIN# R01MH129175
**Federal Award Date**
09/10/2024

---

**Recipient Information**

**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF MICHIGAN
1109 GEDDES AVE, SUITE 3300
ANN ARBOR, MI 48109

**2. Congressional District of Recipient**
06

**3. Payment System Identifier (ID)**
1386006309A1

**4. Employer Identification Number (EIN)**
386006309

**5. Data Universal Numbering System (DUNS)**
073133571

**6. Recipient's Unique Entity Identifier**
GNJ7BBP73WE9

**7. Project Director or Principal Investigator**
Sari  Reisner, SCD
Assistant Professor
sreisner@umich.edu
734-647-3737

**8. Authorized Official**
Shandra White
cjharri@umich.edu
734-763-3800

**Federal Agency Information**

**9. Awarding Agency Contact Information**
Julie M. Bergerud
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH
julie.bergerud@nih.gov
301-827-6184

**10. Program Official Contact Information**
Michael J Stirratt
Chief, Adherence To Treatment & Prevention Program And Hiv Small Business Program (sbir/sttr)
NATIONAL INSTITUTE OF MENTAL HEALTH
stirrattm@mail.nih.gov
240-627-3875

**Federal Award Information**

**11. Award Number**
7R01MH129175-03

**12. Unique Federal Award Identification Number (FAIN)**
R01MH129175

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Strategies to Prevent HIV Acquisition Among Transgender MSM in the US

**15. Assistance Listing Number**
93.242

**16. Assistance Listing Program Title**
Mental Health Research Grants

**17. Award Action Type**
Change of Recipient Organization

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 08/12/2024 **– End Date** 06/30/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $676,347 |
| 20 a.  Direct Cost Amount | $635,010 |
| 20 b.  Indirect Cost Amount | $41,337 |
| 21. Authorized Carryover | |
| 22. Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $676,347 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $676,347 |
| ----------------------------------------------------- | |
| **26. Project Period Start Date** 05/15/2024 **– End Date** 06/30/2027 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $676,347 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Heather  Weiss

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

---

APHA App. 658



Notice of Award

RESEARCH
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE OF MENTAL HEALTH



---

**SECTION I – AWARD DATA – 7R01MH129175-03**

**Principal Investigator(s):**
Sari Reisner, SCD

**Award e-mailed to:** swhite-gov@umich.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $676,347 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to The Regents of the University of Michigan in support of the above referenced project. This award is pursuant to the authority of 42 USC 241 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Mental Health of the National Institutes of Health under Award Number R01MH129175. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F. The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Heather Weiss
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Salaries and Wages**                                                                 $47,562

APHA App. 659

| | |
|---|---|
| **Fringe Benefits** | $16,209 |
| **Personnel Costs (Subtotal)** | $63,771 |
| **Subawards/Consortium/Contractual Costs** | $571,239 |
| | |
| **Federal Direct Costs** | $635,010 |
| **Federal F&A Costs** | $41,337 |
| **Approved Budget** | $676,347 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $676,347 |
| **TOTAL FEDERAL AWARD AMOUNT** | $676,347 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $676,347 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 3 | $676,347 | $676,347 |
| 4 | $652,603 | $652,603 |
| 5 | $617,515 | $617,515 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1386006309A1 |
| **Document Number:** | RMH129175B |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 | 2025 | 2026 |
|---|---|---|---|---|
| MH | 8472592 | $676,347 | $652,603 | $617,515 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: 9A-ASGA / **OC**: 41025 / **Released**: 09/09/2024
**Award Processed**: 09/10/2024 12:13:26 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 7R01MH129175-03**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 7R01MH129175-03**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a.  The grant program legislation and program regulation cited in this Notice of Award.
b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c.  45 CFR Part 75.
d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that

APHA App. 660

some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01MH129175. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

This award provides support for one or more clinical trials. By law (Title VIII, Section 801 of Public Law 110-85), the "responsible party" must register "applicable clinical trials" on the ClinicalTrials.gov Protocol Registration System Information Website. NIH encourages registration of all trials whether required under the law or not. For more information, see http://grants.nih.gov/ClinicalTrials_fdaaa/

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

Version: 25 - 3/13/2024 9:57 AM | Generated on: 9/10/2024 12:13 AM

APHA App. 661

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV −  MH SPECIFIC AWARD CONDITIONS − 7R01MH129175-03**

Clinical Trial Indicator: Yes
This award supports one or more NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

## CHANGE OF RECIPIENT:
This award reflects an approved change of recipient organization for the above-named grant from **Brigham and Women's Hospital** in accordance with the relinquishing statement dated 2/8/24.

## AWARD NOTICE:
This award has been made in response to the application submitted under the Funding Opportunity Announcement PA-21-268 which can be referenced at: PA-21-268: Change of Recipient Organization (Type 7 Parent Clinical Trial Optional) (nih.gov)

## BUDGET ADJUSTMENT:
Inflationary increases have been discontinued for all competing and non-competing research grant awards (see NOT-OD-12-036). Therefore, this award is issued at the committed level but reflects a total rebudgeting of $44 direct costs from the Research Assistant's salary (University of Michigan) category/categories to the Other Costs category in Year-05.

## CONSORTIUM / CONTRACTUAL COSTS:
This award includes funds for consortium activity with**:**

**Johns Hopkins University**
**Drexel University**
**Fenway Community Health Center**
**Duke University**

Each consortium is to be established and administered in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/nihgps/index.htm). No foreign performance site may be added to this project without the written prior approval of the National Institute of Mental Health.

## PARTICIPANT RECRUITMENT - MILESTONES:
Future NIMH support for this study is contingent upon adequate participant recruitment based on projected milestones as approved in the Recruitment Milestone Reporting

APHA App. 662

system (RMR) on 8/4/22. It is expected that **300** of the **300** total projected participants will be recruited by 4/1/25. This tri-yearly recruitment report should be submitted electronically to NIMH after each milestone period of April 1, August 1 and December 1 at: http://wwwapps.nimh.nih.gov/rmr/displayHome.action. In the event that actual recruitment falls significantly below projected milestones, NIMH may consider withholding future support and/or negotiating an orderly phase-out of this study. Information regarding the NIMH Policy for the Recruitment of Participants in Clinical Research is available at: https://grants.nih.gov/grants/guide/notice-files/NOT-MH-19-027.html.

### GCP TRAINING:
NIH expects that all NIH-funded investigators and staff who are involved in the conduct, oversight, or management of clinical trials should be trained in Good Clinical Practice (GCP), consistent with principles of the International Conference on Harmonization (ICH) as stated in NOT-OD-16-148.

### CLINICAL TRIAL DISSEMINATION PLAN:
The clinical trial(s) supported by this award is subject to the plan within the competing application dated 1/6/2022 submitted to NIH and the NIH policy on Dissemination of NIH-Funded Clinical Trial Information. The plan states that the clinical trial(s) funded by this award will be registered in ClinicalTrials.gov not later than 21 calendar days after enrollment of the first participant and primary summary results reported in ClinicalTrials.gov, not later than one year after the completion date. The reporting of summary results is required by this term of award even if the primary completion date occurs after the period of performance.

### CLINICAL TRIAL REQUIREMENTS:
This award is subject to additional certification requirements with each submission of the Annual, Interim, and Final Research Performance Progress Report (RPPR). The recipient must agree to the following annual certification when submitting each RPPR. By submitting the RPPR, the AOR signifies compliance, as follows:
In submitting this RPPR, the SO (or PD/PI with delegated authority), certifies to the best of his/her knowledge that, for all clinical trials funded under this NIH award, the recipient and all investigators conducting NIH-funded clinical trials are in compliance with the recipient's plan addressing compliance with the NIH Policy on Dissemination of NIH-Funded Clinical Trial Information. Any clinical trial funded in whole or in part under this award has been registered in ClinicalTrials.gov or will be registered not later than 21 calendar days after enrollment of the first participant. Summary results have been submitted to ClinicalTrials.gov or will be submitted not later than one year after the completion date, even if the completion date occurs after the period of performance.

### DATA AND SAFETY MONITORING: Study ID 406698 and 514346
This grant is subject to the clinical research policies outlined in NOT-MH-19-027. The recipient will adhere to the NIH (NIH GPS 4.1.15) and NIMH policies (NOT-MH-19-027) including appropriately providing adequate data and safety monitoring and timely reporting of key events as defined in the NIMH Reportable Events Policy. The level and frequency of human subject data and safety monitoring should always be commensurate with the risk and nature of the research.

This grant requires a Data and Safety Monitoring Board (DSMB). The recipient and Principal Investigator(s) should review the NIMH Policy Governing Independent Safety Monitors and Independent Data and Safety Monitoring Boards (cited in NOT-MH-19-027) for details regarding roles, independence, responsibilities, and review reports. Each RPPR submitted must include, in Section **G.1 SPECIAL NOTICE OF AWARD TERMS AND FUNDING OPPORTUNITIES ANNOUNCEMENT REPORTING REQUIREMENTS**, copies of all DSMB review determinations for all meetings/reviews conducted during the

APHA App. 663

reporting period since the last annual award. The RPPR is expected to also include the following information: (1) the dates that the DSMB convened and name(s) of the DSMB members; (2) a summary of key safety indices (e.g., cumulative rates of AEs/SAEs) during the reporting period and cumulatively over the course of the project; and (3) a summary of any recommendations from the DSMB and any actions taken based <u>on the recommendations.</u>

### <u>OTHER SUPPORT TIME COMMITMENT:</u>
Commitment overlap is not permitted and occurs when an individual's time commitment exceeds 100 percent (I.e., 12 person months), whether or not salary is requested. Therefore, no individual's time commitment may exceed 100 percent. Reductions in NIH support due to commitment overlap must be made in accordance with NIH policy as outlined in the NIH Grants Policy Statement.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 7R01MH129175-03

**INSTITUTION:** The Regents of the University of Michigan

| Budget | Year 3 | Year 4 | Year 5 |
|---|---|---|---|
| Salaries and Wages | $47,562 | $48,882 | $45,967 |
| Fringe Benefits | $16,209 | $16,633 | $15,655 |
| Personnel Costs (Subtotal) | $63,771 | $65,515 | $61,622 |
| Other | | | $10,044 |
| Subawards/Consortium/Contractual Costs | $571,239 | $550,401 | $505,716 |
| TOTAL FEDERAL DC | $635,010 | $615,916 | $577,382 |
| TOTAL FEDERAL F&A | $41,337 | $36,687 | $40,133 |
| TOTAL COST | $676,347 | $652,603 | $617,515 |

| Facilities and Administrative Costs | Year 3 | Year 4 | Year 5 |
|---|---|---|---|
| F&A Cost Rate 1 | 56% | 56% | 56% |
| F&A Cost Base 1 | $73,816 | $65,513 | $71,666 |
| F&A Costs 1 | $41,337 | $36,687 | $40,133 |

APHA App. 664

# EXHIBIT C



**Sari Reisner <sreisner@umich.edu>**

---

## Fwd: Grant Termination Notification [AWD027880]
1 message

---

**Christy Bohensky** <cjharri@umich.edu>                  Fri, Mar 21, 2025 at 12:52 PM
To: Ute Lowery <ulowery@umich.edu>, Sari Reisner <sreisner@umich.edu>, Cathy Howell <cmhowell@umich.edu>

> Hi Sari and Cathy,
> I'm so sorry to be sharing unfortunate news. This just came in from NIH for AWD027880. Ute - please process the early termination mod.
>
> Sincerely,
> Christy
>
>
> **Christy J. Bohensky**
> Lead Sponsored Project Officer, Award Management
> University of Michigan | Office of Research and Sponsored Projects (ORSP)
> Phone: 734-763-3800 | Email: cjharri@umich.edu
>
>
> **U-M Personnel:**
> Help us deliver quality service by providing a PAF/AWD/UFA record number along with the PI's name whenever you
> contact ORSP. Up-to-date project status information is available in eRPM.
>
>
> ---------- Forwarded message ---------
> From: **Bulls, Michelle G. (NIH/OD) [E]** <michelle.bulls@nih.gov>
> Date: Fri, Mar 21, 2025 at 12:38 PM
> Subject: Grant Termination Notification
> To: cjharri@umich.edu <cjharri@umich.edu>

 

3/21/2025

Bohensky, Christy

University Of Michigan At Ann Arbor

cjharri@umich.edu

Dear Bohensky, Christy:

Effective with the date of this letter, funding for Project Number 7R01MH129175-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

APHA App. 666

Case: 25-1611    Document: 00118310433    Page: 119    Date Filed: 07/08/2025    Entry ID: 6734280

3/24/25, 10:19 AM    Case 1:25-cv-10787-BEM    Document 33-80... University of Michigan (Mail - Bud: Grant termination notification (2021299)...    Filed 04/25/25    Page 119 of 129

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/12/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. [5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.[8]*

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S


Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH

Director, Office of Policy for Extramural Research Administration

Office of Extramural Research

APHA App. 667

Case: 25-1611    Document: 00118310433    Page: 120    Date Filed: 07/08/2025    Entry ID: 6734280

3/24/25, 10:19 AM    Case 1:25-cv-10787-BEM    Document 38-80    Filed 04/25/25    Page 120 of 129
University of Michigan Mail - Subj: Grant termination/vacation (dup2.2280)

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT D

APHA App. 669



Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE OF MENTAL HEALTH

**Notice of Award**
FAIN# R01MH129175
**Federal Award Date**
03/24/2025

**Recipient Information**
**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF MICHIGAN
1109 GEDDES AVE STE 3300
ANN ARBOR, MI 48109

**2. Congressional District of Recipient**
06

**3. Payment System Identifier (ID)**
1386006309A1

**4. Employer Identification Number (EIN)**
386006309

**5. Data Universal Numbering System (DUNS)**
073133571

**6. Recipient's Unique Entity Identifier**
GNJ7BBP73WE9

**7. Project Director or Principal Investigator**
Sari  Reisner, SCD
Assistant Professor
sreisner@umich.edu
734-647-3737

**8. Authorized Official**
Shandra White
cjharri@umich.edu
734-763-3800

**Federal Agency Information**
**9. Awarding Agency Contact Information**
Candace Renee Owens
Grants Management Specialist
NATIONAL INSTITUTE OF MENTAL HEALTH
candace.owens@nih.gov

**10. Program Official Contact Information**
Michael J Stirratt
Chief, Adherence To Treatment & Prevention Program And Hiv Small Business Program (sbir/sttr)
NATIONAL INSTITUTE OF MENTAL HEALTH
stirrattm@mail.nih.gov
240-627-3875

**Federal Award Information**

**11. Award Number**
7R01MH129175-03

**12. Unique Federal Award Identification Number (FAIN)**
R01MH129175

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Strategies to Prevent HIV Acquisition Among Transgender MSM in the US

**15. Assistance Listing Number**
93.242

**16. Assistance Listing Program Title**
Mental Health Research Grants

**17. Award Action Type**
Change of Recipient Organization (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 08/12/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $676,347 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $676,347 |
| **26. Project Period Start Date** 05/15/2024 – **End Date** 03/21/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $676,347 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Theresa R. Jarosik

**30. Remarks**
Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

APHA App. 670



**RESEARCH**
Department of Health and Human Services
National Institutes of Health

Notice of Award



NATIONAL INSTITUTE OF MENTAL HEALTH

---

**SECTION I − AWARD DATA − 7R01MH129175-03 REVISED**

**Principal Investigator(s):**
Sari Reisner, SCD

**Award e-mailed to:** swhite-gov@umich.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to The Regents of the University of Michigan in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Mental Health of the National Institutes of Health under Award Number R01MH129175. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Theresa R. Jarosik
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Salaries and Wages**        $47,562

APHA App. 671

| | |
|---|---|
| **Fringe Benefits** | $16,209 |
| **Personnel Costs (Subtotal)** | $63,771 |
| **Subawards/Consortium/Contractual Costs** | $571,239 |
| | |
| **Federal Direct Costs** | $635,010 |
| **Federal F&A Costs** | $41,337 |
| **Approved Budget** | $676,347 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $676,347 |
| **TOTAL FEDERAL AWARD AMOUNT** | $676,347 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 3 | $676,347 | $676,347 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1386006309A1 |
| **Document Number:** | RMH129175B |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| MH | 8472592 | $676,347 |

**NIH Administrative Data:**
**PCC:** 9A-ASGA / **OC:** 41025 / **Released:** 03/24/2025
**Award Processed:** 03/25/2025 12:23:42 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 7R01MH129175-03  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 7R01MH129175-03  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a.  The grant program legislation and program regulation cited in this Notice of Award.
   b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
   c.  45 CFR Part 75.
   d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
   e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
   f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

APHA App. 672

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01MH129175. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

This award provides support for one or more clinical trials. By law (Title VIII, Section 801 of Public Law 110-85), the "responsible party" must register "applicable clinical trials" on the ClinicalTrials.gov Protocol Registration System Information Website. NIH encourages registration of all trials whether required under the law or not. For more information, see http://grants.nih.gov/ClinicalTrials_fdaaa/
 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted

APHA App. 673

electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – MH SPECIFIC AWARD CONDITIONS – 7R01MH129175-03 REVISED**

Clinical Trial Indicator: Yes
This award supports one or more NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**REVISION - TERMINATION**

It is the policy of NIH not to prioritize research activities based on gender identity no longer effectuates agency priorities. Therefore, this project is terminated. UNIVERSITY OF MICHIGAN may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

APHA App. 674

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

SUPERSEDES NOTICE OF AWARD ISSUED 9/10/2024

## CHANGE OF RECIPIENT:
This award reflects an approved change of recipient organization for the above-named grant from **Brigham and Women's Hospital** in accordance with the relinquishing statement dated 2/8/24.

## AWARD NOTICE:
This award has been made in response to the application submitted under the Funding Opportunity Announcement PA-21-268 which can be referenced at: PA-21-268: Change of Recipient Organization (Type 7 Parent Clinical Trial Optional) (nih.gov)

## BUDGET ADJUSTMENT:
Inflationary increases have been discontinued for all competing and non-competing research grant awards (see NOT-OD-12-036). Therefore, this award is issued at the committed level but reflects a total rebudgeting of $44 direct costs from the Research Assistant's salary (University of Michigan) category/categories to the Other Costs category in Year-05.

## CONSORTIUM / CONTRACTUAL COSTS:
This award includes funds for consortium activity with**:**

   **Johns Hopkins University**
   **Drexel University**
   **Fenway Community Health Center**
   **Duke University**

Each consortium is to be established and administered in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/nihgps/index.htm). No foreign performance site may be added to this project without the written prior approval of the National Institute of Mental Health.

## PARTICIPANT RECRUITMENT - MILESTONES:
Future NIMH support for this study is contingent upon adequate participant recruitment based on projected milestones as approved in the Recruitment Milestone Reporting system (RMR) on 8/4/22. It is expected that **300** of the **300** total projected participants will be recruited by 4/1/25. This tri-yearly recruitment report should be submitted electronically to NIMH after each milestone period of April 1, August 1 and December 1 at: http://wwwapps.nimh.nih.gov/rmr/displayHome.action. In the event that actual recruitment falls significantly below projected milestones, NIMH may consider withholding future support and/or negotiating an orderly phase-out of this study. Information regarding the NIMH Policy for the Recruitment of Participants in Clinical Research is available at: https://grants.nih.gov/grants/guide/notice-files/NOT-MH-19-027.html.

## GCP TRAINING:

Version: 25 - 3/15/2024 9:57 AM | Generated on: 3/25/2025 12:23 AM

NIH expects that all NIH-funded investigators and staff who are involved in the conduct, oversight, or management of clinical trials should be trained in Good Clinical Practice (GCP), consistent with principles of the International Conference on Harmonization (ICH) as stated in NOT-OD-16-148.

**CLINICAL TRIAL DISSEMINATION PLAN:**
The clinical trial(s) supported by this award is subject to the plan within the competing application dated 1/6/2022 submitted to NIH and the NIH policy on Dissemination of NIH-Funded Clinical Trial Information. The plan states that the clinical trial(s) funded by this award will be registered in ClinicalTrials.gov not later than 21 calendar days after enrollment of the first participant and primary summary results reported in ClinicalTrials.gov, not later than one year after the completion date. The reporting of summary results is required by this term of award even if the primary completion date occurs after the period of performance.

**CLINICAL TRIAL REQUIREMENTS:**
This award is subject to additional certification requirements with each submission of the Annual, Interim, and Final Research Performance Progress Report (RPPR). The recipient must agree to the following annual certification when submitting each RPPR. By submitting the RPPR, the AOR signifies compliance, as follows:
In submitting this RPPR, the SO (or PD/PI with delegated authority), certifies to the best of his/her knowledge that, for all clinical trials funded under this NIH award, the recipient and all investigators conducting NIH-funded clinical trials are in compliance with the recipient's plan addressing compliance with the NIH Policy on Dissemination of NIH-Funded Clinical Trial Information. Any clinical trial funded in whole or in part under this award has been registered in ClinicalTrials.gov or will be registered not later than 21 calendar days after enrollment of the first participant. Summary results have been submitted to ClinicalTrials.gov or will be submitted not later than one year after the completion date, even if the completion date occurs after the period of performance.

**DATA AND SAFETY MONITORING: Study ID 406698 and 514346**
This grant is subject to the clinical research policies outlined in NOT-MH-19-027. The recipient will adhere to the NIH (NIH GPS 4.1.15) and NIMH policies (NOT-MH-19-027) including appropriately providing adequate data and safety monitoring and timely reporting of key events as defined in the NIMH Reportable Events Policy. The level and frequency of human subject data and safety monitoring should always be commensurate with the risk and nature of the research.

This grant requires a Data and Safety Monitoring Board (DSMB). The recipient and Principal Investigator(s) should review the NIMH Policy Governing Independent Safety Monitors and Independent Data and Safety Monitoring Boards (cited in NOT-MH-19-027) for details regarding roles, independence, responsibilities, and review reports. Each RPPR submitted must include, in Section **G.1 SPECIAL NOTICE OF AWARD TERMS AND FUNDING OPPORTUNITIES ANNOUNCEMENT REPORTING REQUIREMENTS**, copies of all DSMB review determinations for all meetings/reviews conducted during the reporting period since the last annual award. The RPPR is expected to also include the following information: (1) the dates that the DSMB convened and name(s) of the DSMB members; (2) a summary of key safety indices (e.g., cumulative rates of AEs/SAEs) during the reporting period and cumulatively over the course of the project; and (3) a summary of any recommendations from the DSMB and any actions taken based on the recommendations.

**OTHER SUPPORT TIME COMMITMENT:**
Commitment overlap is not permitted and occurs when an individual's time commitment exceeds 100 percent (I.e., 12 person months), whether or not salary is requested. Therefore, no individual's time commitment may exceed 100 percent. Reductions in NIH

APHA App. 676

support due to commitment overlap must be made in accordance with NIH policy as outlined in the NIH Grants Policy Statement.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 7R01MH129175-03 REVISED

**INSTITUTION:** The Regents of the University of Michigan

| Budget | Year 3 |
|---|---|
| Salaries and Wages | $47,562 |
| Fringe Benefits | $16,209 |
| Personnel Costs (Subtotal) | $63,771 |
| Subawards/Consortium/Contractual Costs | $571,239 |
| TOTAL FEDERAL DC | $635,010 |
| TOTAL FEDERAL F&A | $41,337 |
| TOTAL COST | $676,347 |

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 56% |
| F&A Cost Base 1 | $73,816 |
| F&A Costs 1 | $41,337 |

APHA App. 677

# EXHIBIT 31

APHA App. 678

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-10787-BEM |

## <u>DECLARATION OF APHA MEMBER 5</u>

I, Jason "Jace" Flatt, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.  My name is Jace Flatt and I am an Associate Professor in the Department of Social and Behavioral Health at the University of Nevada, Las Vegas, School of Public Health. I am a member of the International Research Grants Program Council of the Alzheimer's Association, the Healthy Brain Initiative Road Map Workgroup on Equity for the Centers for Disease Control and Prevention, the Alzheimer's Association, the Gerontological Society of America, and the American Public Health Association (APHA).

2.  I am offering this Declaration in my individual capacity and not on behalf of my employer.

3.  I've spent nearly 30 years focused on how we support individuals and families affected by Alzheimer's and related conditions. I received my master's degree in public health at the University of South Carolina, and went on to receive my PhD from the University of Pittsburgh's School of Public Health, where I also completed my postdoctoral fellowship in the Epidemiology of Aging & Population Neuroscience. While pursuing my PhD, a close family member was diagnosed with Alzheimer's, which further strengthened my dedication to this work.

1

4.   My research focuses on understanding the experiences and health concerns related to Alzheimer's disease, Parkinson's disease, and other neurodegenerative conditions among LGBTQIA+ populations and their care partners. Prior to February 2025, I was Co-Principal Investigator of two National Institute on Aging-funded studies. The first was dedicated to recruiting and engaging LGBTQIA+ people with memory loss and their care partners into the RISE (Research Inclusion Supports Equity) Registry, and the second aimed to develop better ways of identifying and including LGBTQIA+ people who are taking care of someone with Alzheimer's disease so they're not left out of future research studies or support services. I study both risk and protective factors within these communities, as well as the needs of caregivers, healthcare providers, and those involved in long-term care.

5.   I have received NIH funding for my research for more than a decade, and I have applied for and received nine grants from NIH for which I was Principal Investigator over the course of my career.

6.   The application process for each grant was highly rigorous and time-intensive, often requiring months or even years of preparation. Writing a competitive application demands deep knowledge of the science, strategic team-building and experimental design, and careful alignment with NIH priorities through ongoing conversations with program officers. Once submitted, applications are reviewed by panels of field experts who assess the application's scientific significance, methodology, replicability, and overall rigor, typically with at least three in-depth reviewers per proposal. The process is extremely competitive—out of 40 to 50 reviewed proposals, only a few may be selected. The intensity of this process has historically served as a critical filter for supporting high-quality, meaningful research.

7.   I am a member of the APHA and pay $210 in annual dues.

8.   The NIH has terminated three grants that supported my research—grant numbers 5K01AG056669, 1R24AG066599, and 5R01AG083177.

9.   Among these was an R01 grant (5R01AG083177) awarded by the National Institute on Aging on July 31, 2023, of approximately $3.5 million, titled *Enhancing Measurement and Characterization of Roles and Experiences of Sexual and Gender Minority Caregivers of Persons Living with Alzheimer's Disease and Related Dementias*. A true and correct copy of the NOA for this R01 grant is attached hereto as Exhibit A.

2

APHA App. 680

10. Nearly one million sexual and gender minority adults in the U.S. are caregivers, with nearly half of those providing care to someone with Alzheimer's disease or related dementia— yet, existing caregiving measures are outdated and fail to reflect the diversity of modern caregiving relationships. Against this backdrop, the project aimed to understand caregiving by sexual and gender minorities (SGM) for those with Alzheimer's disease in order to develop new or modified caregiving measures (such as survey tools, assessments of caregiver burden, or frameworks for evaluating support needs) and ensure that SGM caregivers are included in future caregiving research. The end goal of the project was to create six-eight new or refined measures that can improve support, services, and future research for both SGM and non-SGM caregivers.

11. This project used a mixed-methods approach, combining both qualitative and quantitative research to develop and validate more inclusive measures of caregiving for SGM individuals. In the first phase, focus groups and interviews with SGM caregivers would help identify key themes and experiences related to caregiving for those with Alzheimer's disease and related dementia. These insights would guide the creation and refinement of new caregiving measures, with input from experts and community partners through an online feedback process. The revised measures would be refined based on cognitive interviews with caregivers to ensure they are clear, relevant, and accurately reflect their experiences. The research team would pilot-test the refined measures through a survey of an independent sample of SGM and non-SGM caregivers to evaluate their clarity, reliability, and validity across diverse caregiving experiences.

12. I applied for the award in response to a Request for Applications (RFA) posted by the National Institute on Aging on June 09, 2022. A true and correct copy of a printout of the RFA webpage, accessed April 18, 2025, is attached hereto as Exhibit B. The RFA invited Research Project Grant (R01) applications for "the development of methods and measures for capturing expanded definitions of 'family' and related concepts relevant to informal caregiving for people living with Alzheimer's disease (AD) and Alzheimer's disease-related dementias (ADRD), and for the implementation of these measures in new and existing studies." Ex. B. The RFA specifically notes, "Existing measures also may fail to capture family structure differences for specific populations. For example, despite increased acceptance and legal recognition of sexual and gender minority (SGM) individuals and their relationships, little is known about how family care patterns vary by SGM status." *Id.*

APHA App. 681

13. I developed the application, including its focus on SGM populations, in explicit response to NIH's specific call for research. Generally, the project was aligned with longstanding NIH goals of advancing health equity, supporting inclusive research, and improving the rigor and relevance of health measurement tools. By developing validated caregiving measures that reflect the experiences of SGM populations, the study supports the broader efforts of NIH and the National Institute on Aging to improve care and outcomes for those affected by Alzheimer's disease and related dementias.

14. After learning about the RFA in July 2022—just three months before the application deadline of October 20, 2022—I began developing the proposal while juggling a full-time teaching load and other ongoing research. The process was brutal—I worked on the application whenever I had a second to spare, often during early mornings, late nights, and weekends. The final application was over 200 pages long. After several months of review, NIH responded in April 2023 with a set of critiques, which required a careful, point-by-point written response.

15. The project had made strong progress, driven by a team of six graduate students, two full-time staff, and three principal investigators across institutions, each leading their own research teams. We'd established two active community advisory boards: one of national dementia caregiving experts, and another of LGBTQIA+ senior community leaders. Each board included 10–12 members, all who would receive $1,000 annual honorariums, totaling about $24,000 per year over five years. These boards meet multiple times a year and contributed to the study by reviewing materials, supporting participant recruitment, and promoting the project at community events. At the time of termination, we were still in the final data collection phase before interviews, and were preparing to launch the next stage, focused on measure development, with support from the community advisory boards.

16. Just over a year into the five-year R01 grant, on March 24, 2025, NIH revised the NOA to terminate the grant, stating that the award "no longer effectuates agency priorities." A true and correct copy of the revised NOA is attached hereto as Exhibit C.

17. I had never received any previous indication that my grant was in jeopardy, and there had been no indication that I was not meeting the required milestones in my last progress report.

18. The revised NOA does not include any individualized explanation for why the grant was canceled, and fails to discuss any of the data or analysis from our application or related materials. Instead, the revised NOA includes the following language about NIH's decision:

APHA App. 682

It is the policy of NIH not to prioritize Gender: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Therefore, this project is terminated.

Ex. C.

19. I don't understand what the revised NOA means by "gender identity" in relation to my project, or how it was "based on gender identity." I received no communication from NIH officials following up with clarification.

20. While the project did involve transgender participants, the research centered on guiding the creation and refinement of new caregiving measures to inform future aging and dementia research, and it was also focused on the development of these caregiving measures.

21. Even so, in October 2016, NIH, National Institute on Minority Health and Health Disparities (NIMHD), and the Agency for Healthcare Research and Quality (AHRQ) officially designated SGM as a health disparity population for research, indicating that research concerning this particular group was a priority for NIH. A true and correct copy of a printout of this NIH webpage, accessed April 18, 2025, is attached hereto as Exhibit D. I built expertise in this area of research concerning the SGM population because doing so was something NIH had indicated it wanted from researchers.

22. As a mid-career researcher familiar with NIH processes and norms, I know that early termination under these circumstances is highly unusual and inconsistent with established practice. It is extremely rare for a grant to be terminated or not renewed mid-project, especially after several years of work. To my knowledge, the only reasons for such a drastic action would typically involve misconduct or harm to participants. But I have never had any reported adverse events, concerns raised about the use of research funds, or issues related to scientific misconduct on this or any of my projects.

23. My other grant terminations were communicated in nearly identical ways, with no individualized explanations as to why the awards were canceled.

24. The impacts of the grant termination have been severe. In total, at least 35 people across teams will be losing their jobs or a portion of their income as a result of this grant termination.

5

This includes graduate students nearing the completion of their degrees, staff members, and collaborators across several institutions.

25. Administrative tasks related to the grant termination have overwhelmed my schedule, requiring countless hours of unpaid work to navigate meetings with staff, HR, and school leadership as I proceed with team layoffs.

26. The abrupt termination of these grants immediately stopped all work and billing conducted within the scope of the funded project. I am able to continue supporting two full-time staff and six graduate students for 30 days by using funding from a separate foundation grant. Previously, the work funded by this foundation grant had represented only a small portion of my team's time, but it now represents the majority of their workload. Not only has this shift been drastic and abrupt for my team, but it also will not be sustainable—the funding from this grant will dry up in a matter of months, and I do not anticipate being able to secure alternative funding to make up long-term for the salary of these team members.

27. I have lost my summer salary and will have to teach a higher course load to compensate, which will also make it harder for me to conduct research.

28. The grant termination means I can no longer take on new graduate students, undermining my ability to fulfill my role as a mentor and educator in training the next generation of scientists at my institution. I fear that, in the future, only those graduate students with the resources to self-fund or sustain themselves through their education and training will have the means to pursue research as a career, creating potential additional inequities in the field of public health and what projects are seen as most valuable.

29. The termination of the grant also led to the abrupt loss of ongoing engagement with the two community advisory boards composed of leaders in LGBTQIA+ aging and caregiving. These advisors brought invaluable lived experience and professional insight and participated in regular meetings, recruitment support, content review, and community outreach.

30. While progress on the project has ceased, the scale of these advisors' professional commitments means they must turn to other work and will likely be unavailable for future collaboration even if the project resumed. This represents a significant loss of community partnership, expertise, and trust, which will be difficult—if not impossible—to rebuild.

APHA App. 684

31. After spending nearly two decades building my career and securing an R01—one of the premier grants in my field—having NIH swiftly take it away is a significant personal and professional setback.

32. Beyond that, the participants in the study—all LGBTQIA+ caregivers for people with Alzheimer's disease—had each spent over a year answering questions about their caregiving experiences in an effort to develop measures that would be helpful for other caregivers in the future. Since we had to abruptly pause our data collection, we cannot draw conclusions and run analyses, and the anticipated research product focused on measurement development will not be completed.

33. Even if I were able to find funding to continue the work, I would almost certainly not be able to have the study's former participants work with me again—the LGBTQIA+ caregivers' trust with the researcher has been broken.

34. The loss of this R01 grant additionally undermines efforts to ensure that national data and public health interventions reflect the realities of today's caregiving landscape and account for non-traditional caregivers, such as chosen family members, non-married partners, or those providing care from a distance. As a result, individuals living with Alzheimer's disease or related dementias may be left without support systems that reflect their actual care networks, limiting the effectiveness of interventions designed to improve their quality of life and long-term outcomes.

35. I am appealing the terminations, but I do not know how to recharacterize my project in my appeal to fit within the asserted new agency priorities because I do not understand the terms used as the basis for termination. I also do not know whether the appeal has any chance of success, given the language of the termination notice states that the premise of my grant is incompatible with agency priorities.

36. I have no sense of whether my past work might be viewed as a liability when applying for future federal grants. This has led me to pause all current NIH grant applications while I await additional guidance, exacerbating my current funding issues.

APHA App. 685

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April, 2025.

Jace Flatt

APHA App. 686

# EXHIBIT A



Case 2:21-cv-01412-ART-EJY    Document 68-31    Filed 04/25/25    Page 11 of 28

Department of Health and Human Services

National Institutes of Health

NATIONAL INSTITUTE ON AGING

**Notice of Award**

FAIN# R01AG083177

**Federal Award Date**
07/31/2023

## Recipient Information

**1. Recipient Name**
BOARD OF REGENTS OF NEVADA SYSTEM
OF HIGHER EDUCATION
4505 S MARYLAND PKWY
LAS VEGAS, NV 89154

**2. Congressional District of Recipient**
01

**3. Payment System Identifier (ID)**
1886000024A3

**4. Employer Identification Number (EIN)**
886000024

**5. Data Universal Numbering System (DUNS)**
098377336

**6. Recipient's Unique Entity Identifier**
DLUTVJJ15U66

**7. Project Director or Principal Investigator**
JASON DANE FLATT, PHD (Contact)
Assistant Professor
jason.flatt@unlv.edu
702-895-5586

**8. Authorized Official**
Jill Tuley

## Federal Agency Information

**9. Awarding Agency Contact Information**
Lesa McQueen

NATIONAL INSTITUTE ON AGING
lesa_mcqueen@nih.gov
301-496-1472

**10. Program Official Contact Information**
Melissa S Gerald
Health Science Administrator
NATIONAL INSTITUTE ON AGING
geraldmel@nia.nih.gov
301-402-4156

## Federal Award Information

**11. Award Number**
1R01AG083177-01

**12. Unique Federal Award Identification Number (FAIN)**
R01AG083177

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Enhancing Measurement and Characterization of Roles and Experiences of Sexual and Gender Minority Caregivers of Persons living with Alzheimer's Disease and Related Dementias

**15. Assistance Listing Number**
93.866

**16. Assistance Listing Program Title**
Aging Research

**17. Award Action Type**
New Competing

**18. Is the Award R&D?**
Yes

### Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 08/01/2023 – End Date 04/30/2024 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $729,919 |
| 20 a.  Direct Cost Amount | | $542,474 |
| 20 b.  Indirect Cost Amount | | $187,445 |
| **21.** Authorized Carryover | | |
| **22.** Offset | | |
| **23.** Total Amount of Federal Funds Obligated this budget period | | $729,919 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | | $729,919 |
| **26. Project Period Start Date** 08/01/2023 – End Date 04/30/2028 | | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | | $729,919 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Ryan  Blakeney

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Version:13 - 8/3/2022 12:59 PM | Generated on: 7/31/2023 12:17 AM

APHA App. 688



Notice of Award

*RESEARCH*
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE ON AGING



**SECTION I – AWARD DATA – 1R01AG083177-01**

**Principal Investigator(s):**
Joel G. Anderson, PHD
Norca Maritza Dowling, PHD
JASON DANE FLATT (contact), PHD

**Award e-mailed to:** osp@unlv.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $729,919 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF NEVADA LAS VEGAS in support of the above referenced project. This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Aging of the National Institutes of Health under Award Number R01AG083177. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Ryan  Blakeney
Grants Management Officer
NATIONAL INSTITUTE ON AGING

Additional information follows

APHA App. 689

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| Salaries and Wages | $164,555 |
| Fringe Benefits | $36,385 |
| Personnel Costs (Subtotal) | $200,940 |
| Consultant Services | $6,800 |
| Materials & Supplies | $10,700 |
| Travel | $5,400 |
| Other | $48,484 |
| Subawards/Consortium/Contractual Costs | $264,350 |
| Publication Costs | $4,600 |
| ADP/Computer Services | $1,200 |
| | |
| Federal Direct Costs | $542,474 |
| Federal F&A Costs | $187,445 |
| Approved Budget | $729,919 |
| Total Amount of Federal Funds Authorized (Federal Share) | $729,919 |
| TOTAL FEDERAL AWARD AMOUNT | $729,919 |
| | |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | $729,919 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 1 | $729,919 | $729,919 |
| 2 | $702,329 | $702,329 |
| 3 | $693,417 | $693,417 |
| 4 | $678,056 | $678,056 |
| 5 | $666,077 | $666,077 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| Payment System Identifier: | 1886000024A3 |
| Document Number: | RAG083177A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2023 |

| IC | CAN | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|
| AG | 8033157 | $729,919 | $702,329 | $693,417 | $678,056 | $666,077 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: 2BFAMGE / **OC**: 41021 / **Released**: Blakeney, Ryan 07/20/2023
**Award Processed**: 07/31/2023 12:17:54 AM

SECTION II – PAYMENT/HOTLINE INFORMATION – 1R01AG083177-01

APHA App. 690

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 1R01AG083177-01**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project
and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a.   The grant program legislation and program regulation cited in this Notice of Award.
   b.   Conditions on activities and expenditure of funds in other statutory requirements, such as
        those included in appropriations acts.
   c.   45 CFR Part 75.
   d.   National Policy Requirements and all other requirements described in the NIH Grants Policy
        Statement, including addenda in effect as of the beginning date of the budget period.
   e.   Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final
        progress report when applicable.
   f.   This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain
references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the
definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH
awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor
should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that
some awards may have another classification for purposes of indirect costs. The auditor is not required to
report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but
non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other
than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management
Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity
identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a
consortium/subaward be issued under this award, a UEI requirement must be included.   See
http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this
requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AG083177. Recipients
must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act
subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions
that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional
award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For
more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

APHA App. 691

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – AG SPECIFIC AWARD CONDITIONS – 1R01AG083177-01**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

This award includes funds for twelve months of support.  The competing budget period is awarded for less than 12 months.  Continuation awards will cycle each year on 5/1. The Research Performance Progress Report (RPPR) is due 45 days prior to this date for SNAP awards or 60 days prior for non-SNAP awards

APHA App. 692

Funding for this award has been provided by Alzheimer's Disease Initiative funds.

None of the funds in this award shall be used to pay the salary of an individual at a rate in excess of the current salary cap. Therefore, this award and/or future years are adjusted accordingly, if applicable. Current salary cap levels can be found at the following URL:

http://grants.nih.gov/grants/policy/salcap_summary.htm

In accordance with the Notice: NOT-OD-02-017 entitled, "GRADUATE STUDENT COMPENSATION" published on December 10, 2001, in the NIH Guide for Grants and Contracts, total direct costs (salary, fringe benefits and tuition remission) for graduate students are provided at a level not to exceed the NIH maximum allowable amount (zero level of the Ruth L. Kirschstein National Research Service Award stipend in effect at the time of the competing award). Support recommended for future years has been adjusted accordingly, if applicable. The full guide Notice describing the level of compensation allowed for a graduate student can be found at:
http://grants.nih.gov/grants/guide/notice-files/NOT-OD-02-017.html

This award includes funds awarded for consortium activity with George Washington University in the amount of $57,786 ($45,862 direct costs + $11,924 facilities and administrative costs), University of Texas Knoxville in the amount of $70,157 ($45,854 direct costs + $24,303 facilities and administrative costs), Emory University in the amount of $71,076 ($45,416 direct costs + $25,660 facilities and administrative costs), Alzheimer's Disease and Related Disorders Association, Inc. in the amount of $65,331 ($51,850 direct costs + $13,481 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS). The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15_consortium_agreements.htm

*In keeping with NOT-OD-06-054 (http://grants.nih.gov/grants/guide/notice-files/NOT-OD-06-054.html), as this grant has multiple Principal Investigators (PIs), although the signatures of the PIs are not required on prior approval requests submitted to the agency, the grantee institution must secure and retain the signatures of all of the PIs within their own internal processes.*

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1R01AG083177-01

**INSTITUTION:** UNIVERSITY OF NEVADA LAS VEGAS

| Budget | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Salaries and Wages | $164,555 | $164,555 | $156,555 | $156,555 | $147,663 |
| Fringe Benefits | $36,385 | $36,385 | $34,209 | $34,209 | $32,164 |
| Personnel Costs (Subtotal) | $200,940 | $200,940 | $190,764 | $190,764 | $179,827 |
| Consultant Services | $6,800 | $4,000 | $6,800 | $4,000 | $7,030 |
| Materials & Supplies | $10,700 | $200 | $200 | $200 | $200 |
| Travel | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 |
| Other | $48,484 | $47,921 | $47,921 | $37,921 | $37,921 |
| Subawards/Consortium/Con | $264,350 | $308,406 | $309,603 | $313,428 | $313,428 |

| tractual Costs | | | | | |
|---|---|---|---|---|---|
| Publication Costs | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 |
| ADP/Computer Services | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| TOTAL FEDERAL DC | $542,474 | $572,667 | $566,488 | $557,513 | $549,606 |
| TOTAL FEDERAL F&A | $187,445 | $129,662 | $126,929 | $120,543 | $116,471 |
| TOTAL COST | $729,919 | $702,329 | $693,417 | $678,056 | $666,077 |

| Facilities and Administrative Costs | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| F&A Cost Rate 1 | 51% | 51% | 51% | 51.5% | 51.5% |
| F&A Cost Base 1 | $367,540 | $254,240 | $41,144 | $234,064 | $226,157 |
| F&A Costs 1 | $187,445 | $129,662 | $20,983 | $120,543 | $116,471 |
| F&A Cost Rate 2 | | | 51.5% | | |
| F&A Cost Base 2 | | | $205,720 | | |
| F&A Costs 2 | | | $105,946 | | |

# EXHIBIT B

APHA App. 695

This notice has expired. Check the **NIH Guide (https://grants.nih.gov/funding/searchguide/)** for active opportunities and notices.

# Department of Health and Human Services

# Part 1. Overview Information

**Participating Organization(s)**

National Institutes of Health (NIH (http://www.nih.gov))

**Components of Participating Organizations**

National Institute on Aging (NIA (https://www.nia.nih.gov/))

**Funding Opportunity Title**

Measures and Methods for Research on Family Caregivers for People Living with Alzheimer's Disease and Related Dementias (AD/ADRD) (R01 Clinical Trial Not Allowed)

**Activity Code**

R01 (//grants.nih.gov/grants/funding/ac_search_results.htm?text_curr=01&Search.x=0&Search.y=0&Search_Type=Activity) Research Project Grant

**Announcement Type**

New

**Related Notices**

NOT-OD-22-190 (/grants/guide/notice-files/NOT-OD-22-190.html) - Adjustments to NIH and AHRQ Grant Application Due Dates Between September 22 and September 30, 2022

**Funding Opportunity Announcement (FOA) Number**

RFA-AG-23-022

**Companion Funding Opportunity**

RFA-AG-23-023 (https://grants.nih.gov/grants/guide/rfa-files/RFA-AG-23-023.html), R21 (https://grants.nih.gov/grants/funding/ac_search_results.htm?text_curr=R21&&Search.x=0&&Search.y=0&&Search_Type=Activity) Exploratory/Developmental Grants

**Number of Applications**

See Section III. 3. Additional Information on Eligibility.

**Assistance Listing Number(s)**

93.866

**Funding Opportunity Purpose**

APHA App. 696

4/18/25, 1:18 PM     Case 1:25-cv-10787-BEM     Document 38-31     Filed 04/25/25     Page 20 of 44

Stephen A. McGonagle Measures and Methods to Understand Family Caregiving for People Living with Alzheimer's Disease and Related De…

This Funding Opportunity Announcement (FOA) invites Research Project Grant (R01) applications for the development of methods and measures for capturing expanded definitions of "family" and related concepts relevant to informal caregiving for people living with Alzheimer's disease (AD) and Alzheimer's disease-related dementias (ADRD), and for the implementation of these measures in new and existing studies.

High-risk/high-payoff projects that lack preliminary data may be more appropriate for the companion FOA, RFA-AG-23-023, (https://grants.nih.gov/grants/guide/rfa-files/RFA-AG-23-023.html) which invites Exploratory/Developmental Research Grant (R21) applications.

# Key Dates

## Posted Date
June 09, 2022

## Open Date (Earliest Submission Date)
September 20, 2022

## Letter of Intent Due Date(s)
September 20, 2022

| Application Due Dates | | | Review and Award Cycles | | |
|---|---|---|---|---|---|
| New | Renewal / Resubmission / Revision (as allowed) | AIDS | Scientific Merit Review | Advisory Council Review | Earliest Start Date |
| October 20, 2022 | Not Applicable | Not Applicable | February 2023 | May 2023 | July 2023 |

All applications are due by 5:00 PM local time of applicant organization.

Applicants are encouraged to apply early to allow adequate time to make any corrections to errors found in the application during the submission process by the due date.

No late applications will be accepted for this Funding Opportunity Announcement.

## Expiration Date
October 21, 2022

## Due Dates for E.O. 12372
Not Applicable

## Required Application Instructions
It is critical that applicants follow the instructions in the Research (R) Instructions in the SF424 (R&R) Application Guide (https://grants.nih.gov/grants/guide/url_redirect.php?id=82400), except where instructed to do otherwise (in this FOA or in a Notice from NIH Guide for Grants and Contracts (//grants.nih.gov/grants/guide/url_redirect.php?id=11164)).

Conformance to all requirements (both in the Application Guide and the FOA) is required and strictly enforced. Applicants must read and follow all application instructions in the Application Guide as well as any program-specific instructions noted in Section IV. When the program-specific instructions deviate from those in the Application Guide, follow the program-specific instructions.

**Applications that do not comply with these instructions may be delayed or not accepted for review.**

# Table of Contents

Part 1. Overview Information
  Key Dates
Part 2. Full Text of Announcement
  Section I. Funding Opportunity Description
  Section II. Award Information
  Section III. Eligibility Information
  Section IV. Application and Submission Information
  Section V. Application Review Information
  Section VI. Award Administration Information
  Section VII. Agency Contacts
  Section VIII. Other Information

# Part 2. Full Text of Announcement

## Section I. Funding Opportunity Description

**Background**

Family members, particularly spouses and children, are the major sources of unpaid care for adults living with Alzheimer's disease (AD) and Alzheimer's diseaserelated dementias (ADRD). Nevertheless, changes in family structure and composition over the past several decades — including lower rates of marriage and fertility, increased rates of divorce and cohabitation, the separation of marriage from child-raising, and growth in one-person households, as well as multigenerational and extended families — are altering the makeup of families and potentially the roles of family members as caregivers. An increasing share of more recent cohorts of adults are aging without spouses or biological children, leaving older adults with limited access to the most common current sources of unpaid care.

At the same time, the prevalence of other ties, such as step-kin and non-marital romantic partners, is increasing. Members of "blended families" (e.g., step-children), "families of origin" (e.g., surviving siblings), "families of choice" (e.g., personal communities of people such as friends, partners, and other people with whom individuals share a kin-like relationship, but are not connected by biological or legal ties), and other individuals may play a key role in providing informal care for people who do not have spouses or children, or whose spouses or children are unable or unwilling to serve in a caregiver role. Measures and methods to assess these families, including the types of ties that comprise these families and the expectations for, and exchanges of, care therein, are critical for identifying potential sources of unpaid care for individuals living with AD/ADRD, consistent with recommendations from the National Academy of Sciences, Engineering, and Medicine's (NASEM) Decadal Survey of Behavioral and Social Science Research on AD/ADRD (https://www.nia.nih.gov/research/dbsr/decadal-survey-behavioral-and-social-science-research-alzheimers-disease).

Existing surveys and current measures and methods are limited in their ability to assess many of the relationships that characterize today's families, or the differences in the criteria individuals use to define "family" (e.g., biological and/or legal ties, emotional closeness, etc.). The extent to which today's families provide, or are expected to provide, care for older adults may depend on factors such as the life course timing of the initiation of the relationship, the nature of the relationship and its quality, and the presence of competing relationships. These factors are also not often captured in existing studies. For example, though stepfamilies are increasingly common, which increases the number of family members who could *potentially* provide care, the extant literature suggests that step-relationships are not as emotionally close as biological relationships. This may translate into a lower *likelihood* of caregiving by a step-relative, or lower care recipient satisfaction with the caregiver. On the other hand, "less care" provided by more people may translate into more care overall — and less care provision per person. This might, in turn, reduce caregiver strain and burnout, and increase care recipient satisfaction and care quality. Yet, empirical tests of these possibilities require methods and measures to assess whom older adults consider family, whom they consider family who might provide care, and how to characterize those ties.

Existing measures also may fail to capture family structure differences for specific populations. For example, despite increased acceptance and legal recognition of sexual and gender minority (SGM) individuals and their relationships, little is known about how family care patterns vary by SGM status. The United States is also becoming more racially and ethnically diverse. Definitions of family, expectations and obligations regarding who should provide care, and even how "care" is defined may differ by sociocultural and acculturation factors.

Understanding the increasingly complex forms that families take on and their roles as caregivers for older people is especially important in the AD/ADRD context. As highlighted during the 2020 National Research Summit on Care, Services, and Supports for Persons with Dementia and Their Caregivers (https://www.nia.nih.gov/2020-dementia-care-summit), the monetary costs of dementia are large, and unpaid caregiving — primarily done by family members — accounts for a substantial share. Further, some of the same factors that predict elevated AD/ADRD risk are also associated with family relationships that are not currently fully captured in existing studies. For example, lower levels of education are associated with both an elevated risk for AD/ADRD and a greater likelihood of never marrying, having step-relatives, and cohabiting. Because some of the same factors (e.g., education) that are predictive of being in the kinds of families that are not well-captured

APHA App. 698

using existing measures *are also associated with* elevated AD/ADRD risk, a better characterization of these complex family relationships and dynamics is especially important for understanding AD/ADRD health disparities. In addition, complex family forms are more common among more recent birth cohorts. Thus, understanding these families will become increasingly important for capturing the demand for, and supply of, family caregivers, as well as for other necessary supports and services, including paid care. Fully characterizing the broad range of family types will also inform intervention development to support all family caregivers. Because most current caregiver interventions focus on "primary" caregivers and do not consider the unique needs of complex family care networks, including those for the complex families described above, advances in measurements hold potential for improving the reach of intervention efforts.

In sum, demographic changes in families raise key questions about who individuals consider to be "family" and the roles they play in care for persons living with AD/ADRD – questions that cannot be answered with existing measures and survey methods. As such, researchers and policymakers lack the tools to assess whether all persons living with AD/ADRD and their family care partners are getting the care and services they need. By better understanding family structure and the potential roles family members play in providing care for people living with AD/ADRD, policymakers will have the knowledge needed to enhance and/or modify Medicare and Medicaid, private health insurance plans, and services in long term services and supports (LTSS) to address issues related to unmet needs and care quality.

## Research Objectives

This Funding Opportunity Announcement (FOA) supports the development of methods and measures for capturing expanded definitions of "family" and related concepts relevant to informal caregiving for people living with AD/ADRD, and the implementation of these measures in new and existing studies.

Potential measures include, but are not limited to, those that capture the following:

- Population heterogeneity in how individuals define "family"
- Sense of obligation for caregiving, expectations of care to be given or received, and other aspects of the positive and negative "content" of relationships relevant for caregiving, such as trust in family members and concerns about burden that are not captured by standard social support measures, as well as relationship closeness indicators such as estrangement
- Dynamic aspects of relationships salient to caregiving, such as changes over time (or life course stage) in relationship quality or in who people expect/prefer will care for them versus who actually provides care
- Geographically proximate and distal family connections
- Step-kin, ex-kin, fictive kin
- Relationships that are alternatives to marriage, including living apart together (LAT) and cohabitation
- Attitudes, beliefs, and resources relevant for paid caregiving as a substitute or complement to unpaid family caregiving
- Self-identification of sexual and gender minority status in conjunction with the measures above

Methodological developments include, but are not limited to, the following:

- Tools across survey modes (e.g., web, telephone, mobile devices) to comprehensively capture family relationships in ways that do not overburden respondents
- Longitudinal analytical approaches to dynamically assess changes in family structure/composition and function relevant to caregiving
- Network-level approaches to characterize families and individuals' ties to unpaid care partners

Populations of interest include, but are not limited to the following health disparity populations:

- Sexual and gender minority individuals
- Low-socioeconomic individuals
- Racial and ethnic minorities
- Immigrant groups
- People living alone

Applicants are encouraged to refer to the National Institute on Aging (NIA) Health Disparities Research Framework (https://www.nia.nih.gov/research/osp/framework)to learn about NIA priority populations, the integration of multi-level factors, and the incorporation of a life course perspective.

Proposed projects may include those that implement new measures and methods into nationally-representative studies with existing family caregiver measures (e.g., Health and Retirement Study (HRS) and its international sister studies, National Health and Aging Trends Study (NHATS), National Survey of Caregiving (NSOC), Panel Study of Income Dynamics (PSID), Add Health Parents Study, and the Midlife Development in the United States (MIDUS) survey). Studies that will collect measures in populations not well-captured in existing studies (e.g., SGM populations, immigrant groups) are encouraged. Mixed methods studies that incorporate qualitative interviews to inform the development of survey instruments are also appropriate.

## Resources for Applicants

- Data Resources for Behavioral and Social Research on Aging (https://www.nia.nih.gov/research/dbsr/data-resources-behavioral-and-social-research-aging)

APHA App. 699

- **NASEM's Decadal Survey of Behavioral and Social Science Research on AD/ADRD (http://www.nia.nih.gov/research/dbsr/decadal-survey-behavioral-and-social-science-research-alzheimers-disease).** The committee conducted a decadal survey focusing on developing a research agenda for the next decade in the behavioral and social sciences as it relates to AD/ADRD. Drawing on extensive input from the scientific community and other stakeholders, the committee assessed the role of the social and behavioral sciences, including data sources and other resources, in reducing the burden of AD/ADRD.
- **2020 National Research Summit on Care, Services, and Supports for Persons with Dementia and Their Caregivers (https://www.nia.nih.gov/2020-dementia-care-summit).** The goal of the Summit was to bring together individuals with a variety of backgrounds to identify evidence-based programs, strategies, approaches, and other research that can be used to improve the care, services, and supports of persons living with AD/ADRD and their care partners.

### Non-Responsiveness Criteria

Applications that do not clearly articulate the proposed project's relevance to caregiving for people living with AD/ADRD will be considered non-responsive to this FOA and will be withdrawn prior to review.

### Frequently Asked Questions

Responses to frequently asked questions about this FOA will be posted on the following webpage:
https://www.nia.nih.gov/research/dbsr/behavioral-and-social-research-funding-opportunities-and-applicant-resources (https://www.nia.nih.gov/research/dbsr/behavioral-and-social-research-funding-opportunities-and-applicant-resources).
See Section VIII. Other Information for award authorities and regulations.

# Section II. Award Information

**Funding Instrument**

Grant: A support mechanism providing money, property, or both to an eligible entity to carry out an approved project or activity.

**Application Types Allowed**

New

The OER Glossary (//grants.nih.gov/grants/guide/url_redirect.php?id=11116) and the SF424 (R&R) Application Guide provide details on these application types. Only those application types listed here are allowed for this FOA.

**Clinical Trial?**

Not Allowed: Only accepting applications that do not propose clinical trials.

Need help determining whether you are doing a clinical trial? (https://grants.nih.gov/grants/guide/url_redirect.php?id=82370)

**Funds Available and Anticipated Number of Awards**

NIA intends to commit $3,960,000 in fiscal year 2023 to fund up to 6 awards.

**Award Budget**

Application budgets are not limited but need to reflect the actual needs of the proposed project.

**Award Project Period**

The scope of the proposed project should determine the project period. The maximum project period is 5 years.

NIH grants policies as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120) will apply to the applications submitted and awards made from this FOA.

# Section III. Eligibility Information

### 1. Eligible Applicants

APHA App. 700

## Eligible Organizations

Higher Education Institutions

- Public/State Controlled Institutions of Higher Education
- Private Institutions of Higher Education

The following types of Higher Education Institutions are always encouraged to apply for NIH support as Public or Private Institutions of Higher Education:

- Hispanic-serving Institutions
- Historically Black Colleges and Universities (HBCUs)
- Tribally Controlled Colleges and Universities (TCCUs)
- Alaska Native and Native Hawaiian Serving Institutions
- Asian American Native American Pacific Islander Serving Institutions (AANAPISIs)

Nonprofits Other Than Institutions of Higher Education

- Nonprofits with 501(c)(3) IRS Status (Other than Institutions of Higher Education)
- Nonprofits without 501(c)(3) IRS Status (Other than Institutions of Higher Education)

For-Profit Organizations

- Small Businesses
- For-Profit Organizations (Other than Small Businesses)

Local Governments

- State Governments
- County Governments
- City or Township Governments
- Special District Governments
- Indian/Native American Tribal Governments (Federally Recognized)
- Indian/Native American Tribal Governments (Other than Federally Recognized)

Federal Government

- Eligible Agencies of the Federal Government
- U.S. Territory or Possession

Other

- Independent School Districts
- Public Housing Authorities/Indian Housing Authorities
- Native American Tribal Organizations (other than Federally recognized tribal governments)
- Faith-based or Community-based Organizations
- Regional Organizations
- Non-domestic (non-U.S.) Entities (Foreign Institutions)

## Foreign Institutions

Non-domestic (non-U.S.) Entities (Foreign Institutions) **are** eligible to apply.

Non-domestic (non-U.S.) components of U.S. Organizations **are** eligible to apply.

Foreign components, as *defined in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11118)*, **are** allowed.

## Required Registrations

### Applicant Organizations

Applicant organizations must complete and maintain the following registrations as described in the SF 424 (R&R) Application Guide to be eligible to apply for or receive an award. All registrations must be completed prior to the application being submitted. Registration can take 6 weeks or more, so applicants should begin the registration process as soon as possible. The NIH Policy on Late Submission of Grant Applications (//grants.nih.gov/grants/guide/notice-files/NOT-OD-15-039.html) states that failure to complete registrations in advance of a due date is not a valid reason for a late submission.

- System for Award Management (SAM)– (https://grants.nih.gov/grants/guide/url_redirect.php?id=82390) Applicants must complete and maintain an active registration, **which requires renewal at least annually**. The renewal process may require as much time as the

APHA App. 701

4/18/25, 1:18 PM    RFA-AG-23-022: Multilevel and Multisystem Interventions on Family Caregiving to Improve Alzheimer's Disease and Related De…

Case 1:25-cv-10787-BEM    Document 38-31    Filed 04/25/25    Page 25 of 44

initial registration. SAM registration includes the assignment of a Commercial and Government Entity (CAGE) Code for domestic organizations which have not already been assigned a CAGE Code.

- NATO Commercial and Government Entity (NCAGE) Code (//grants.nih.gov/grants/guide/url_redirect.php?id=11176) – Foreign organizations must obtain an NCAGE code (in lieu of a CAGE code) in order to register in SAM.
- Unique Entity Identifier (UEI)- A UEI is issued as part of the SAM.gov registration process. The same UEI must be used for all registrations, as well as on the grant application.

- eRA Commons (https://grants.nih.gov/grants/guide/url_redirect.php?id=11123) - Once the unique organization identifier is established, organizations can register with eRA Commons in tandem with completing their full SAM and Grants.gov registrations; all registrations must be in place by time of submission. eRA Commons requires organizations to identify at least one Signing Official (SO) and at least one Program Director/Principal Investigator (PD/PI) account in order to submit an application.
- Grants.gov (//grants.nih.gov/grants/guide/url_redirect.php?id=82300) – Applicants must have an active SAM registration in order to complete the Grants.gov registration.

**Program Directors/Principal Investigators (PD(s)/PI(s))**

All PD(s)/PI(s) must have an eRA Commons account.  PD(s)/PI(s) should work with their organizational officials to either create a new account or to affiliate their existing account with the applicant organization in eRA Commons. If the PD/PI is also the organizational Signing Official, they must have two distinct eRA Commons accounts, one for each role. Obtaining an eRA Commons account can take up to 2 weeks.

## Eligible Individuals (Program Director/Principal Investigator)

Any individual(s) with the skills, knowledge, and resources necessary to carry out the proposed research as the Program Director(s)/Principal Investigator(s) (PD(s)/PI(s)) is invited to work with his/her organization to develop an application for support. Individuals from diverse backgrounds, including underrepresented racial and ethnic groups, individuals with disabilities, and women are always encouraged to apply for NIH support. See, Reminder: Notice of NIH's Encouragement of Applications Supporting Individuals from Underrepresented Ethnic and Racial Groups as well as Individuals with Disabilities, NOT-OD-22-019 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-22-019.html).

For institutions/organizations proposing multiple PDs/PIs, visit the Multiple Program Director/Principal Investigator Policy and submission details in the Senior/Key Person Profile (Expanded) Component of the SF424 (R&R) Application Guide.

## 2. Cost Sharing

This FOA does not require cost sharing as defined in the NIH Grants Policy Statement. (//grants.nih.gov/grants/guide/url_redirect.php?id=11126)

## 3. Additional Information on Eligibility

### Number of Applications

Applicant organizations may submit more than one application, provided that each application is scientifically distinct.

The NIH will not accept duplicate or highly overlapping applications under review at the same time, per 2.3.7.4 Submission of Resubmission Application (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_2/2.3.7_policies_affecting_applications.htm#Submissi). This means that the NIH will not accept:

- A new (A0) application that is submitted before issuance of the summary statement from the review of an overlapping new (A0) or resubmission (A1) application.
- A resubmission (A1) application that is submitted before issuance of the summary statement from the review of the previous new (A0) application.
- An application that has substantial overlap with another application pending appeal of initial peer review (see 2.3.9.4 Similar, Essentially Identical, or Identical Applications (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_2/2.3.9_application_receipt_information_and_deadlines.htm#Similar,))

# Section IV. Application and Submission Information

## 1. Requesting an Application Package

The application forms package specific to this opportunity must be accessed through ASSIST, Grants.gov Workspace or an institutional system-to-system solution. Links to apply using ASSIST or Grants.gov Workspace are available in Part 1 of this FOA. See your administrative office for instructions if you plan to use an institutional system-to-system solution.

## 2. Content and Form of Application Submission

It is critical that applicants follow the instructions in the Research (R) Instructions in the SF424 (R&R) Application Guide (https://grants.nih.gov/grants/guide/url_redirect.php?id=82400) except where instructed in this funding opportunity announcement to do

APHA App. 702

otherwise. Conformance to the requirements in the Application Guide is required and strictly enforced. Applications that are out of compliance with these instructions may be delayed or not accepted for review.

### Letter of Intent

Although a letter of intent is not required, is not binding, and does not enter into the review of a subsequent application, the information that it contains allows NIA staff to estimate the potential review workload and plan the review.

By the date listed in Part 1. Overview Information, prospective applicants are asked to submit a letter of intent that includes the following information:

- Descriptive title of proposed activity
- Name(s), address(es), and telephone number(s) of the PD(s)/PI(s)
- Names of other key personnel
- Participating institution(s)
- Number and title of this funding opportunity

The letter of intent should be sent to:

Amelia Karraker, Ph.D.
National Institute on Aging (NIA)
Telephone: 301-496-3136
Email: Amelia.Karraker@nih.gov (mailto:Amelia.Karraker@nih.gov)

### Page Limitations

All page limitations described in the SF424 Application Guide and the Table of Page Limits (//grants.nih.gov/grants/guide/url_redirect.php?id=11133) must be followed.

### Instructions for Application Submission

The following section supplements the instructions found in the SF424 (R&R) Application Guide and should be used for preparing an application to this FOA.

### SF424(R&R) Cover

All instructions in the SF424 (R&R) Application Guide must be followed.

### SF424(R&R) Project/Performance Site Locations

All instructions in the SF424 (R&R) Application Guide must be followed.

### SF424(R&R) Other Project Information

All instructions in the SF424 (R&R) Application Guide must be followed.

### SF424(R&R) Senior/Key Person Profile

All instructions in the SF424 (R&R) Application Guide must be followed.

### R&R or Modular Budget

All instructions in the SF424 (R&R) Application Guide must be followed.

### R&R Subaward Budget

All instructions in the SF424 (R&R) Application Guide must be followed.

### PHS 398 Cover Page Supplement

All instructions in the SF424 (R&R) Application Guide must be followed.

### PHS 398 Research Plan

All instructions in the SF424 (R&R) Application Guide must be followed, with the following additional instructions:

If the application includes new measures relevant to family caregiving for people living with AD/ADRD, the application must clearly articulate how these measures move beyond existing measures to reveal new insights.

If the application includes measurement or methodological developments focused on a particular population or implemented in an existing study, this choice must be justified.

**Resource Sharing Plan**: Individuals are required to comply with the instructions for the Resource Sharing Plans as provided in the SF424 (R&R) Application Guide.

APHA App. 703

- All applications, regardless of the amount of direct costs requested for any one year, must address a Data Sharing Plan (https://grants.nih.gov/grants/guide/url_redirect.php?id=11151). The plan should provide details for what will be shared - including data and data collection instruments and tools, how it will be organized to enhance the user experience, and any limitations/restrictions on access to resources and data produced by the project. The data sharing plan should ensure maximum availability to the research community beyond the study team (accounting for human subjects considerations).

## Appendix:

Only limited Appendix materials are allowed. Follow all instructions for the Appendix as described in the SF424 (R&R) Application Guide.

## PHS Human Subjects and Clinical Trials Information

When involving human subjects research, clinical research, and/or NIH-defined clinical trials (and when applicable, clinical trials research experience) follow all instructions for the PHS Human Subjects and Clinical Trials Information form in the SF424 (R&R) Application Guide, with the following additional instructions:

If you answered "Yes" to the question "Are Human Subjects Involved?" on the R&R Other Project Information form, you must include at least one human subjects study record using the **Study Record: PHS Human Subjects and Clinical Trials Information** form or **Delayed Onset Study** record.

**Study Record: PHS Human Subjects and Clinical Trials Information**

All instructions in the SF424 (R&R) Application Guide must be followed.

**Delayed Onset Study**

Note: Delayed onset (https://grants.nih.gov/grants/glossary.htm#DelayedOnsetStudy) does NOT apply to a study that can be described but will not start immediately (i.e., delayed start).All instructions in the SF424 (R&R) Application Guide must be followed.

## PHS Assignment Request Form

All instructions in the SF424 (R&R) Application Guide must be followed.

## Foreign Institutions

Foreign (non-U.S.) institutions must follow policies described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11137), and procedures for foreign institutions described throughout the SF424 (R&R) Application Guide.

## 3. Unique Entity Identifier and System for Award Management (SAM)

See Part 1. Section III.1 for information regarding the requirement for obtaining a unique entity identifier and for completing and maintaining active registrations in System for Award Management (SAM), NATO Commercial and Government Entity (NCAGE) Code (if applicable), eRA Commons, and Grants.gov.

## 4. Submission Dates and Times

Part I. Overview Information contains information about Key Dates and times. Applicants are encouraged to submit applications before the due date to ensure they have time to make any application corrections that might be necessary for successful submission. When a submission date falls on a weekend or Federal holiday (https://grants.nih.gov/grants/guide/url_redirect.php?id=82380), the application deadline is automatically extended to the next business day.

Organizations must submit applications to Grants.gov (//grants.nih.gov/grants/guide/url_redirect.php?id=11128) (the online portal to find and apply for grants across all Federal agencies). Applicants must then complete the submission process by tracking the status of the application in the eRA Commons (https://grants.nih.gov/grants/guide/url_redirect.php?id=11123), NIH's electronic system for grants administration. NIH and Grants.gov systems check the application against many of the application instructions upon submission. Errors must be corrected and a changed/corrected application must be submitted to Grants.gov on or before the application due date and time.  If a Changed/Corrected application is submitted after the deadline, the application will be considered late. Applications that miss the due date and time are subjected to the NIH Policy on Late Application Submission.

Applicants are responsible for viewing their application before the due date in the eRA Commons to ensure accurate and successful submission.

Information on the submission process and a definition of on-time submission are provided in the SF424 (R&R) Application Guide.

## 5. Intergovernmental Review (E.O. 12372)

This initiative is not subject to intergovernmental review. (https://grants.nih.gov/grants/policy/nihgps/html5/section_10/10.10.1_executive_orders.htm)

## 6. Funding Restrictions

APHA App. 704

4/18/25, 1:18 PM                    Case: 1:25-cv-10787-BEM    Document 38-31    Filed 04/25/25    Page 28 of 44
Stephanie ACV 1.1.0728 Maternal and Maternal Interaction in Family Caregivers of Living with Alzheimer's Disease and Related De…

All NIH awards are subject to the terms and conditions, cost principles, and other considerations described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120).

Pre-award costs are allowable only as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11143).

## 7. Other Submission Requirements and Information

Applications must be submitted electronically following the instructions described in the SF424 (R&R) Application Guide.  Paper applications will not be accepted.

Applicants must complete all required registrations before the application due date. Section III. Eligibility Information contains information about registration.

For assistance with your electronic application or for more information on the electronic submission process, visit How to Apply – Application Guide (https://grants.nih.gov/grants/how-to-apply-application-guide.html). If you encounter a system issue beyond your control that threatens your ability to complete the submission process on-time, you must follow the Dealing with System Issues (https://grants.nih.gov/grants/how-to-apply-application-guide/due-dates-and-submission-policies/dealing-with-system-issues.htm) guidance. For assistance with application submission, contact the Application Submission Contacts in Section VII.

> **Important reminders:**
>
> All PD(s)/PI(s) must include their eRA Commons ID in the Credential field of the Senior/Key Person Profile form. Failure to register in the Commons and to include a valid PD/PI Commons ID in the credential field will prevent the successful submission of an electronic application to NIH. See Section III of this FOA for information on registration requirements.
>
> The applicant organization must ensure that the unique entity identifier provided on the application is the same identifier used in the organization's profile in the eRA Commons and for the System for Award Management. Additional information may be found in the SF424 (R&R) Application Guide.
>
> See more tips (//grants.nih.gov/grants/guide/url_redirect.php?id=11146) for avoiding common errors.

Upon receipt, applications will be evaluated for completeness and compliance with application instructions by the Center for Scientific Review and responsiveness by NIA , NIH. Applications that are incomplete, non-compliant and/or nonresponsive will not be reviewed.

In order to expedite review, applicants are requested to notify the NIA Referral Office by email at Ramesh.Vemuri@nih.gov when the application has been submitted. Please include the FOA number and title, PD/PI name, and title of the application.

### Post Submission Materials

Applicants are required to follow the instructions for post-submission materials, as described in the policy (//grants.nih.gov/grants/guide/url_redirect.php?id=82299). Any instructions provided here are in addition to the instructions in the policy.

# Section V. Application Review Information

## 1. Criteria

Only the review criteria described below will be considered in the review process.  Applications submitted to the NIH in support of the NIH mission (//grants.nih.gov/grants/guide/url_redirect.php?id=11149) are evaluated for scientific and technical merit through the NIH peer review system.

### Overall Impact

Reviewers will provide an overall impact score to reflect their assessment of the likelihood for the project to exert a sustained, powerful influence on the research field(s) involved, in consideration of the following review criteria and additional review criteria (as applicable for the project proposed).

### Scored Review Criteria

Reviewers will consider each of the review criteria below in the determination of scientific merit and give a separate score for each. An application does not need to be strong in all categories to be judged likely to have major scientific impact. For example, a project that by its nature may not be innovative may be essential to advance a field.

#### Significance

Does the project address an important problem or a critical barrier to progress in the field? Is the prior research that serves as the key support for the proposed project rigorous? If the aims of the project are achieved, how will scientific knowledge, technical capability,

APHA App. 705

4/18/25, 1:18 PM                Case 1:25-cv-10787-BEM   Document 38-31   Filed 04/25/25   Page 29 of 44
Stepping-Stones ACWD to PMSI and Mastering Mechanistic Research on Family Caregiving for People Living With Alzheimer's Disease and Related De…

and/or clinical practice be improved? How will successful completion of the aims change the concepts, methods, technologies, treatments, services, or preventative interventions that drive this field?

Specific to this FOA:

If the study includes new measures relevant to family caregiving for people living with AD/ADRD, how likely is it that the study will yield new insights into aspects of family caregiving for people living with AD/ADRD?

If the study includes measurement or methodological developments focused on a particular population or implemented in an existing study, how well-justified is this choice?

### Investigator(s)

Are the PD(s)/PI(s), collaborators, and other researchers well suited to the project? If Early Stage Investigators or those in the early stages of independent careers, do they have appropriate experience and training? If established, have they demonstrated an ongoing record of accomplishments that have advanced their field(s)? If the project is collaborative or multi-PD/PI, do the investigators have complementary and integrated expertise; are their leadership approach, governance, and organizational structure appropriate for the project?

### Innovation

Does the application challenge and seek to shift current research or clinical practice paradigms by utilizing novel theoretical concepts, approaches or methodologies, instrumentation, or interventions? Are the concepts, approaches or methodologies, instrumentation, or interventions novel to one field of research or novel in a broad sense? Is a refinement, improvement, or new application of theoretical concepts, approaches or methodologies, instrumentation, or interventions proposed?

### Approach

Are the overall strategy, methodology, and analyses well-reasoned and appropriate to accomplish the specific aims of the project? Have the investigators included plans to address weaknesses in the rigor of prior research that serves as the key support for the proposed project? Have the investigators presented strategies to ensure a robust and unbiased approach, as appropriate for the work proposed? Are potential problems, alternative strategies, and benchmarks for success presented? If the project is in the early stages of development, will the strategy establish feasibility and will particularly risky aspects be managed? Have the investigators presented adequate plans to address relevant biological variables, such as sex, for studies in vertebrate animals or human subjects?

If the project involves human subjects and/or NIH-defined clinical research, are the plans to address 1) the protection of human subjects from research risks, and 2) inclusion (or exclusion) of individuals on the basis of sex/gender, race, and ethnicity, as well as the inclusion or exclusion of individuals of all ages (including children and older adults), justified in terms of the scientific goals and research strategy proposed?

Specific to this FOA:

Reviewers will comment on whether the Data Sharing Plan (https://grants.nih.gov/grants/guide/url_redirect.php?id=11151) is reasonable. How adequate are the applicant's plans to share, organize, and store resources, including data collection instruments and tools, and data?

### Environment

Will the scientific environment in which the work will be done contribute to the probability of success? Are the institutional support, equipment, and other physical resources available to the investigators adequate for the project proposed? Will the project benefit from unique features of the scientific environment, subject populations, or collaborative arrangements?

## Additional Review Criteria

As applicable for the project proposed, reviewers will evaluate the following additional items while determining scientific and technical merit, and in providing an overall impact score, but will not give separate scores for these items.

### Protections for Human Subjects

For research that involves human subjects but does not involve one of the categories of research that are exempt under 45 CFR Part 46, the committee will evaluate the justification for involvement of human subjects and the proposed protections from research risk relating to their participation according to the following five review criteria: 1) risk to subjects, 2) adequacy of protection against risks, 3) potential benefits to the subjects and others, 4) importance of the knowledge to be gained, and 5) data and safety monitoring for clinical trials.

For research that involves human subjects and meets the criteria for one or more of the categories of research that are exempt under 45 CFR Part 46, the committee will evaluate: 1) the justification for the exemption, 2) human subjects involvement and characteristics, and 3) sources of materials. For additional information on review of the Human Subjects section, please refer to the Guidelines for the Review of Human Subjects (//grants.nih.gov/grants/guide/url_redirect.php?id=11175).

APHA App. 706

## Inclusion of Women, Minorities, and Individuals Across the Lifespan

When the proposed project involves human subjects and/or NIH-defined clinical research, the committee will evaluate the proposed plans for the inclusion (or exclusion) of individuals on the basis of sex/gender, race, and ethnicity, as well as the inclusion (or exclusion) of individuals of all ages (including children and older adults) to determine if it is justified in terms of the scientific goals and research strategy proposed. For additional information on review of the Inclusion section, please refer to the Guidelines for the Review of Inclusion in Clinical Research (//grants.nih.gov/grants/guide/url_redirect.php?id=11174).

## Vertebrate Animals

The committee will evaluate the involvement of live vertebrate animals as part of the scientific assessment according to the following criteria: (1) description of proposed procedures involving animals, including species, strains, ages, sex, and total number to be used; (2) justifications for the use of animals versus alternative models and for the appropriateness of the species proposed; (3) interventions to minimize discomfort, distress, pain and injury; and (4) justification for euthanasia method if NOT consistent with the AVMA Guidelines for the Euthanasia of Animals. Reviewers will assess the use of chimpanzees as they would any other application proposing the use of vertebrate animals. For additional information on review of the Vertebrate Animals section, please refer to the Worksheet for Review of the Vertebrate Animal Section (//grants.nih.gov/grants/guide/url_redirect.php?id=11150).

## Biohazards

Reviewers will assess whether materials or procedures proposed are potentially hazardous to research personnel and/or the environment, and if needed, determine whether adequate protection is proposed.

## Resubmissions

Not Applicable

## Renewals

Not Applicable

## Revisions

Not Applicable

## Additional Review Considerations

As applicable for the project proposed, reviewers will consider each of the following items, but will not give scores for these items, and should not consider them in providing an overall impact score.

## Applications from Foreign Organizations

Reviewers will assess whether the project presents special opportunities for furthering research programs through the use of unusual talent, resources, populations, or environmental conditions that exist in other countries and either are not readily available in the United States or augment existing U.S. resources.

## Select Agent Research

Reviewers will assess the information provided in this section of the application, including 1) the Select Agent(s) to be used in the proposed research, 2) the registration status of all entities where Select Agent(s) will be used, 3) the procedures that will be used to monitor possession use and transfer of Select Agent(s), and 4) plans for appropriate biosafety, biocontainment, and security of the Select Agent(s).

## Resource Sharing Plans

Reviewers will comment on whether the following Resource Sharing Plans, or the rationale for not sharing the following types of resources, are reasonable: (1) Sharing Model Organisms (https://grants.nih.gov/grants/policy/model_organism/); and (2) Genomic Data Sharing Plan (GDS) (https://osp.od.nih.gov/scientific-sharing/policies).

## Authentication of Key Biological and/or Chemical Resources:

For projects involving key biological and/or chemical resources, reviewers will comment on the brief plans proposed for identifying and ensuring the validity of those resources.

## Budget and Period of Support

Reviewers will consider whether the budget and the requested period of support are fully justified and reasonable in relation to the proposed research.

APHA App. 707

## 2. Review and Selection Process

Applications will be evaluated for scientific and technical merit by (an) appropriate Scientific Review Group(s) convened by NIA, in accordance with NIH peer review policy and procedures (//grants.nih.gov/grants/guide/url_redirect.php?id=11154), using the stated review criteria (file:///C:/Users/mckenzie/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/13V4QPZR/Research%20Draft.doc#_1._Criteria). Assignment to a Scientific Review Group will be shown in the eRA Commons.

As part of the scientific peer review, all applications will receive a written critique.

Applications may undergo a selection process in which only those applications deemed to have the highest scientific and technical merit (generally the top half of applications under review) will be discussed and assigned an overall impact score.

Appeals (https://grants.nih.gov/grants/policy/nihgps/html5/section_2/2.4.2_appeals_of_initial_scientific_review.htm)of initial peer review will not be accepted for applications submitted in response to this FOA.

Applications will be assigned to the appropriate NIH Institute or Center. Applications will compete for available funds with all other recommended applications submitted in response to this FOA. Following initial peer review, recommended applications will receive a second level of review by the National Advisory Council on Aging. The following will be considered in making funding decisions:

- Scientific and technical merit of the proposed project as determined by scientific peer review.
- Availability of funds.
- Relevance of the proposed project to program priorities.

## 3. Anticipated Announcement and Award Dates

After the peer review of the application is completed, the PD/PI will be able to access his or her Summary Statement (written critique) via the eRA Commons (https://grants.nih.gov/grants/guide/url_redirect.php?id=11123). Refer to Part 1 for dates for peer review, advisory council review, and earliest start date.

Information regarding the disposition of applications is available in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120).

# Section VI. Award Administration Information

## 1. Award Notices

If the application is under consideration for funding, NIH will request "just-in-time" information from the applicant as described in the NIH Grants Policy Statement (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_2/2.5.1_just-in-time_procedures.htm).

A formal notification in the form of a Notice of Award (NoA) will be provided to the applicant organization for successful applications. The NoA signed by the grants management officer is the authorizing document and will be sent via email to the recipient's business official.

Recipients must comply with any funding restrictions described in Section IV.5. Funding Restrictions. Selection of an application for award is not an authorization to begin performance. Any costs incurred before receipt of the NoA are at the recipient's risk. These costs may be reimbursed only to the extent considered allowable pre-award costs.

Any application awarded in response to this FOA will be subject to terms and conditions found on the Award Conditions and Information for NIH Grants (https://grants.nih.gov/grants/policy/nihgps/HTML5/part_ii_subpart_b.htm) website.  This includes any recent legislation and policy applicable to awards that is highlighted on this website.

Institutional Review Board or Independent Ethics Committee Approval: Recipient institutions must ensure that protocols are reviewed by their IRB or IEC. To help ensure the safety of participants enrolled in NIH-funded studies, the recipient must provide NIH copies of documents related to all major changes in the status of ongoing protocols.

## 2. Administrative and National Policy Requirements

All NIH grant and cooperative agreement awards include the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120) as part of the NoA. For these terms of award, see the NIH Grants Policy Statement Part II: Terms and Conditions of NIH Grant Awards, Subpart A: General (//grants.nih.gov/grants/guide/url_redirect.php?id=11157) and Part II: Terms and Conditions of NIH Grant Awards, Subpart B: Terms and Conditions for Specific Types of Grants, Recipients, and Activities (//grants.nih.gov/grants/guide/url_redirect.php?id=11159), including of note, but not limited to:

- Federalwide Research Terms and Conditions (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_3/3.1_federalwide_standard_terms_and_conditions_for_research_grants.htm)
- Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-21-041.html)

APHA App. 708

- Acknowledgement of Federal Funding (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_4/4.2.1_acknowledgement_of_federal_funding.htm)

If a recipient is successful and receives a Notice of Award, in accepting the award, the recipient agrees that any activities under the award are subject to all provisions currently in effect or implemented during the period of the award, other Department regulations and policies in effect at the time of the award, and applicable statutory provisions.

Should the applicant organization successfully compete for an award, recipients of federal financial assistance (FFA) from HHS must administer their programs in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age and, in some circumstances, religion, conscience, and sex (including gender identity, sexual orientation, and pregnancy). This includes ensuring programs are accessible to persons with limited English proficiency and persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. Please see https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html (https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html) and https://www.hhs.gov/civil-rights/for-individuals/nondiscrimination/index.html (https://www.hhs.gov/civil-rights/for-individuals/nondiscrimination/index.html)

HHS recognizes that research projects are often limited in scope for many reasons that are nondiscriminatory, such as the principal investigator's scientific interest, funding limitations, recruitment requirements, and other considerations. Thus, criteria in research protocols that target or exclude certain populations are warranted where nondiscriminatory justifications establish that such criteria are appropriate with respect to the health or safety of the subjects, the scientific study design, or the purpose of the research. For additional guidance regarding how the provisions apply to NIH grant programs, please contact the Scientific/Research Contact that is identified in Section VII under Agency Contacts of this FOA.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html (https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html) and https://www.lep.gov/ (https://www.lep.gov/).
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including reasonable accommodations and making services accessible to them, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html (https://www.hhs.gov/ocr/civilrights/understanding/disability/index.html).
- HHS funded health and education programs must be administered in an environment free of sexual harassment, see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html (https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html). For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm (https://grants.nih.gov/grants/policy/harassment.htm).
- For guidance on administering programs in compliance with applicable federal conscience protection and associated anti-discrimination laws see https://www.hhs.gov/conscience/conscience-protections/index.html (https://www.hhs.gov/conscience/conscience-protections/index.html) and https://www.hhs.gov/conscience/religious-freedom/index.html (https://www.hhs.gov/conscience/religious-freedom/index.html).

Please contact the HHS Office for Civil Rights for more information about obligations and prohibitions under federal civil rights laws at https://www.hhs.gov/ocr/about-us/contact-us/index.html (https://www.hhs.gov/ocr/about-us/contact-us/index.html) or call 1-800-368-1019 or TDD 1-800-537-7697.

In accordance with the statutory provisions contained in Section 872 of the Duncan Hunter National Defense Authorization Act of Fiscal Year 2009 (Public Law 110-417), NIH awards will be subject to the Federal Awardee Performance and Integrity Information System (FAPIIS) requirements. FAPIIS requires Federal award making officials to review and consider information about an applicant in the designated integrity and performance system (currently FAPIIS) prior to making an award. An applicant, at its option, may review information in the designated integrity and performance systems accessible through FAPIIS and comment on any information about itself that a Federal agency previously entered and is currently in FAPIIS. The Federal awarding agency will consider any comments by the applicant, in addition to other information in FAPIIS, in making a judgement about the applicant's integrity, business ethics, and record of performance under Federal awards when completing the review of risk posed by applicants as described in 45 CFR Part 75.205 and 2 CFR Part 200.206 "Federal awarding agency review of risk posed by applicants." This provision will apply to all NIH grants and cooperative agreements except fellowships.

## Cooperative Agreement Terms and Conditions of Award

Not Applicable

## 3. Reporting

When multiple years are involved, recipients will be required to submit the Research Performance Progress Report (RPPR) (//grants.nih.gov/grants/rppr/index.htm) annually and financial statements as required in the NIH Grants Policy Statement. (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_8/8.4.1_reporting.htm)

APHA App. 709

A final RPPR, invention statement, and the expenditure data portion of the Federal Financial Report are required for closeout of an award, as described in the NIH Grants Policy Statement (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_8/8.6_closeout.htm). NIH FOAs outline intended research goals and objectives. Post award, NIH will review and measure performance based on the details and outcomes that are shared within the RPPR, as described at 45 CFR Part 75.301 and 2 CFR Part 200.301.

The Federal Funding Accountability and Transparency Act of 2006 (Transparency Act), includes a requirement for recipients of Federal grants to report information about first-tier subawards and executive compensation under Federal assistance awards issued in FY2011 or later.  All recipients of applicable NIH grants and cooperative agreements are required to report to the Federal Subaward Reporting System (FSRS) available at www.fsrs.gov (//grants.nih.gov/grants/guide/url_redirect.php?id=11170) on all subawards over $25,000.  See the NIH Grants Policy Statement (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_4/4.1.8_federal_funding_accountability_and_transparency_act_ffata_.htm) for additional information on this reporting requirement.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts from all Federal awarding agencies with a cumulative total value greater than $10,000,000 for any period of time during the period of performance of a Federal award, must report and maintain the currency of information reported in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently FAPIIS).  This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313).  As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.  Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75 – Award Term and Conditions for Recipient Integrity and Performance Matters.

# Section VII. Agency Contacts

We encourage inquiries concerning this funding opportunity and welcome the opportunity to answer questions from potential applicants.

## Application Submission Contacts
eRA Service Desk (Questions regarding ASSIST, eRA Commons, application errors and warnings, documenting system problems that threaten submission by the due date, and post-submission issues)

Finding Help Online: http://grants.nih.gov/support/ (//grants.nih.gov/support/) (preferred method of contact)
Telephone: 301-402-7469 or 866-504-9552 (Toll Free)

General Grants Information (Questions regarding application instructions, application processes, and NIH grant resources)
Email: GrantsInfo@nih.gov (mailto:GrantsInfo@nih.gov) (preferred method of contact)
Telephone: 301-480-7075

Grants.gov Customer Support (Questions regarding Grants.gov registration and Workspace)
Contact Center Telephone: 800-518-4726
Email: support@grants.gov (mailto:support@grants.gov)

## Scientific/Research Contact(s)
Amelia Karraker, Ph.D.
National Institute on Aging (NIA)
Telephone: 301-496-3136
Email:Amelia.Karraker@nih.gov (mailto:Amelia.Karraker@nih.gov)

Elena Fazio, Ph.D.
National Institute on Aging (NIA)
Telephone: 301-496-3136
Email: Elena.Fazio@nih.gov (mailto:Elena.Fazio@nih.gov)

Melissa Gerald, Ph.D.
National Institute on Aging (NIA)
Telephone: 301-496-3136
Email: Melissa.Gerald@nih.gov (mailto:geraldmel@mail.nih.gov)

Liz Necka, Ph.D.
National Institute on Aging (NIA)
Telephone: 301-496-3136
Email: Liz.Necka@nih.gov (mailto:Liz.Necka@nih.gov)

APHA App. 710

**Peer Review Contact(s)**

Ramesh Vemuri, Ph.D.
National Institute on Aging (NIA)
Telephone: 301-402-7700
Email: Ramesh.Vemuri@nih.gov (mailto:Ramesh.Vemuri@nih.gov)

**Financial/Grants Management Contact(s)**

Ryan Blakeney
National Institute on Aging (NIA)
Telephone: 301-451-9802
Email: Ryan.Blakeney@nih.gov (mailto:ryan.blakeney@nih.gov)

# Section VIII. Other Information

Recently issued trans-NIH policy notices (//grants.nih.gov/grants/guide/url_redirect.php?id=11163) may affect your application submission. A full list of policy notices published by NIH is provided in the NIH Guide for Grants and Contracts (//grants.nih.gov/grants/guide/url_redirect.php?id=11164). All awards are subject to the terms and conditions, cost principles, and other considerations described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120).

## Authority and Regulations

Awards are made under the authorization of Sections 301 and 405 of the Public Health Service Act as amended (42 USC 241 and 284) and under Federal Regulations 42 CFR Part 52 and 45 CFR Part 75.

Weekly TOC for this Announcement (/grants/guide/WeeklyIndex.cfm?06-10-22)
NIH Funding Opportunities and Notices (/grants/guide/index.html)

 National Institutes of Health (/grants/oer.htm)
Office of Extramural Research

 (https://www.hhs.gov/) Department of Health and Human Services (HHS)

 (https://www.usa.gov/)

NIH... Turning Discovery Into Health®

APHA App. 711

# EXHIBIT C



Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON AGING

**Notice of Award**
FAIN# R01AG083177
**Federal Award Date**
03/24/2025

| Recipient Information | Federal Award Information |
|---|---|
| **1. Recipient Name**<br>BOARD OF REGENTS OF NEVADA SYSTEM<br>OF HIGHER EDUCATION<br>4505 S MARYLAND PKWY<br>LAS VEGAS, NV 89154 | **11. Award Number**<br>5R01AG083177-02 |

**1. Recipient Name**
BOARD OF REGENTS OF NEVADA SYSTEM
OF HIGHER EDUCATION
4505 S MARYLAND PKWY
LAS VEGAS, NV 89154

**2. Congressional District of Recipient**
01

**3. Payment System Identifier (ID)**
1886000024A3

**4. Employer Identification Number (EIN)**
886000024

**5. Data Universal Numbering System (DUNS)**
098377336

**6. Recipient's Unique Entity Identifier**
DLUTVJJ15U66

**7. Project Director or Principal Investigator**
JASON DANE FLATT, PHD (Contact)
Assistant Professor
jason.flatt@unlv.edu
702-895-5586

**8. Authorized Official**
Jill Tuley

**Federal Agency Information**
**9. Awarding Agency Contact Information**
Morgan Amanda Granetz

NATIONAL INSTITUTE ON AGING
morgan.granetz@nih.gov

**10. Program Official Contact Information**
Melissa S Gerald
Health Science Administrator
NATIONAL INSTITUTE ON AGING
geraldmel@nia.nih.gov
301-402-4156

**Federal Award Information**

**11. Award Number**
5R01AG083177-02

**12. Unique Federal Award Identification Number (FAIN)**
R01AG083177

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Enhancing Measurement and Characterization of Roles and Experiences of Sexual and Gender Minority Caregivers of Persons living with Alzheimer's Disease and Related Dementias

**15. Assistance Listing Number**
93.866

**16. Assistance Listing Program Title**
Aging Research

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 05/01/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $702,329 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $702,329 |
| **26. Project Period Start Date** 08/01/2023 – **End Date** 03/21/2025 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $1,432,248 |
| **28. Authorized Treatment of Program Income**<br>Additional Costs | |
| **29. Grants Management Officer - Signature**<br>Philip E. Smith | |

| 30. Remarks |
|---|
| Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system. |

APHA App. 713



Notice of Award

**RESEARCH**
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE ON AGING



---

**SECTION I – AWARD DATA – 5R01AG083177-02 REVISED**

**Principal Investigator(s):**
Joel G. Anderson, PHD
Norca Maritza Dowling, PHD
JASON DANE FLATT (contact), PHD

**Award e-mailed to:** osp@unlv.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF NEVADA LAS VEGAS in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Aging of the National Institutes of Health under Award Number R01AG083177. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Philip E. Smith
Grants Management Officer
NATIONAL INSTITUTE ON AGING

Additional information follows

---

APHA App. 714

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| **Salaries and Wages** | $164,555 |
| **Fringe Benefits** | $36,385 |
| **Personnel Costs (Subtotal)** | $200,940 |
| **Consultant Services** | $4,000 |
| **Materials & Supplies** | $200 |
| **Travel** | $5,400 |
| **Other** | $47,921 |
| **Subawards/Consortium/Contractual Costs** | $308,406 |
| **Publication Costs** | $4,600 |
| **ADP/Computer Services** | $1,200 |
| | |
| **Federal Direct Costs** | $572,667 |
| **Federal F&A Costs** | $129,662 |
| **Approved Budget** | $702,329 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $702,329 |
| **TOTAL FEDERAL AWARD AMOUNT** | $702,329 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| YR | SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | |
|---|---|---|
| | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 2 | $702,329 | $702,329 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1886000024A3 |
| **Document Number:** | RAG083177A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| AG | 8033157 | $702,329 |

**NIH Administrative Data:**
**PCC**: 2BFAMGE / **OC**: 41025 / **Released**: 03/21/2025
**Award Processed**: 03/24/2025 12:04:16 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R01AG083177-02  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R01AG083177-02  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a.   The grant program legislation and program regulation cited in this Notice of Award.
b.   Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c.   45 CFR Part 75.
d.   National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e.   Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f.   This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the

APHA App. 715

definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).


An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.  See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AG083177. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

APHA App. 716

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

· Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
· For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
· HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
· For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – AG SPECIFIC AWARD CONDITIONS – 5R01AG083177-02  REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

It is the policy of NIH not to prioritize Gender:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.. Therefore, this project is terminated. UNIVERSITY OF NEVADA, LAS VEGAS may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

APHA App. 717

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

**Supersedes Notice of Award issued 05/07/2024 Previous terms and conditions apply:**

This award includes funds awarded for consortium activity with George Washington University. Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS). The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15_consortium_agreements.htm

In accordance with the Notice: NOT-OD-02-017 entitled, "GRADUATE STUDENT COMPENSATION" published on December 10, 2001, in the NIH Guide for Grants and Contracts, total direct costs (salary, fringe benefits and tuition remission) for graduate students are provided at a level not to exceed the NIH maximum allowable amount (zero level of the Ruth L. Kirschstein National Research Service Award stipend in effect at the time of the competing award). Support recommended for future years has been adjusted accordingly, if applicable. The full guide Notice describing the level of compensation allowed for a graduate student can be found at: http://grants.nih.gov/grants/guide/notice-files/NOT-OD-02-017.html

Funding for this award has been provided by Alzheimer's Disease Initiative funds.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R01AG083177-02 REVISED

**INSTITUTION:** UNIVERSITY OF NEVADA LAS VEGAS

| Budget | Year 2 |
|---|---|
| Salaries and Wages | $164,555 |
| Fringe Benefits | $36,385 |
| Personnel Costs (Subtotal) | $200,940 |
| Consultant Services | $4,000 |
| Materials & Supplies | $200 |
| Travel | $5,400 |
| Other | $47,921 |
| Subawards/Consortium/Contractual Costs | $308,406 |
| Publication Costs | $4,600 |
| ADP/Computer Services | $1,200 |
| TOTAL FEDERAL DC | $572,667 |
| TOTAL FEDERAL F&A | $129,662 |
| TOTAL COST | $702,329 |

| Facilities and Administrative Costs | Year 2 |
|---|---|
| F&A Cost Rate 1 | 51% |
| F&A Cost Base 1 | $254,240 |
| F&A Costs 1 | $129,662 |

APHA App. 718

# EXHIBIT D

APHA App. 719

Sexual and Gender Minority Populations in NIH-Supported Research

Notice Number: NOT-OD-19-139

**Key Dates**
**Release Date:** August 28, 2019

Related Announcements

- **September 6, 2024** - Updating the Definition of Sexual and Gender Minority Populations in NIH-Supported Research. See Notice NOT-OD-24-169.

Issued by
Sexual and Gender Minority Research Office (SGMRO)

Purpose

The purpose of this Notice is to announce the revision of the definition of sexual and gender minority (SGM) populations for research purposes at the NIH, as well as to provide a summary of information about SGM health research at the NIH. It is expected that this Notice will help to enhance the representation of SGM individuals in the agency's research portfolio and to stimulate the development of novel research projects and strategies to better understand and advance SGM health.

**Implementation Timeline**

This Notice is effective upon its release date.

**The Sexual & Gender Minority Research Office**

The NIH Fiscal Years 2016-2020 Strategic Plan to Advance Research on the Health and Well-Being of Sexual and Gender Minorities was released in 2015. The plan elucidated goals and objectives to encourage the advancement of basic, clinical, behavioral, population, and social sciences research to improve the health of SGM individuals. One of the objectives of the strategic plan was to establish a central office to coordinate SGM-related research and activities at the NIH. Established in 2015, the Sexual & Gender Minority Research Office (SGMRO) resides within the Division of Program Coordination, Planning, and Strategic Initiatives (DPCPSI) in the NIH Office of the Director.

The NIH laid out four overarching goals in its FY 2016-2020 SGM strategic plan: (1) Expand the knowledge base of SGM health and well-being through NIH-supported research; (2) Remove barriers to planning, conducting, and reporting NIH-supported research about SGM health and well-being; (3) Strengthen the community of researchers and scholars who conduct research relevant to SGM health and well-being; and (4) Evaluate progress on advancing SGM research. The SGMRO pursues these goals by convening and participating in events involving SGM health priorities, managing dissemination of information about SGM health research, and working with NIH Institutes, Centers, and Offices (ICOs) to leverage resources and develop initiatives to promote SGM health and research.

**Definition of Sexual and Gender Minorities**

At the NIH, the term sexual and gender minority originally encompassed individuals who identify as lesbian, gay, bisexual, transgender, queer, or intersex, as well as those who do not self-identify with one of these terms, but whose sexual orientation, gender identity, or reproductive development varies from traditional, societal, cultural, or physiological norms. The NIH has heretofore opted to use this definition to maintain inclusivity and consistency in reporting. However, after consultation with several NIH groups that possess contemporary expertise in SGM health and research, the NIH is releasing an updated SGM definition to foster and expand

APHA App. 720

inclusion of SGM individuals in health research by better clarifying the populations who fall under the SGM umbrella. The definition of SGM is revised to read as follows:

*SGM populations include, but are not limited to, individuals who identify as lesbian, gay, bisexual, asexual, transgender, Two-Spirit, queer, and/or intersex. Individuals with same-sex or -gender attractions or behaviors and those with a difference in sex development are also included. These populations also encompass those who do not self-identify with one of these terms but whose sexual orientation, gender identity or expression, or reproductive development is characterized by non-binary constructs of sexual orientation, gender, and/or sex.*

The SGMRO would like to make clear that this change in definition is not intended to exclude any person or population previously included under the former definition of SGM populations.

**SGM as a Health Disparity Population**

SGM individuals face unique health challenges, and a continually growing body of evidence suggests that SGM individuals suffer disproportionately from a variety of conditions and diseases. In October 2016, the National Institute on Minority Health and Health Disparities (NIMHD), in collaboration with the Agency for Healthcare Research and Quality (AHRQ), announced that SGM populations had been officially designated as a health disparity population for NIH and AHRQ research. This designation has since facilitated the creation of tailored research projects, programs, and activities intended to tackle the distinct issues encountered by SGM individuals. In addition, ascertainment of SGM status in ongoing and planned population studies has been enhanced. However, SGM-specific health disparities persist today, and novel methods to measure, address, and prevent them are still needed.

**Addressing SGM-Specific Health Disparities**

To help eliminate these disparities, the 21st Century Cures Act, which authorized funding to accelerate research in several key public health areas at the NIH, included provisions specifically intended to increase participation of SGM populations in NIH-supported clinical research and to facilitate the development of methods for conducting SGM research. In support of this, the NIH SGM Research Working Group (SGM RWG), a working group of the NIH Council of Councils, recommended in its 2019 Mid-Course Strategic Plan Review that the NIH encourage applicants for clinical research funding to demonstrate consideration of inclusion of SGM populations whenever appropriate. Increased data collection and analyses on SGM populations may help to illuminate important information needed to address the health of these communities.

Inquiries

Please direct all inquiries to:

Karen L Parker, PhD, MSW
Division of Program Coordination, Planning, and Strategic Initiatives
Sexual & Gender Minority Research Office
Telephone: 301-451-2055?
Email: klparker@mail.nih.gov

---

Weekly TOC for this Announcement
NIH Funding Opportunities and Notices

---

APHA App. 721

# EXHIBIT 33

APHA App. 722

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-10787-BEM |

<u>**DECLARATION OF APHA MEMBER 9**</u>

I, Jesus Ramirez-Valles, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.  I am the Division Chief of the Division of Prevention Science and Professor of Medicine in the Department of Medicine at the University of California San Francisco (UCSF). My work focuses on the challenges of health and healthcare for excluded communities including LGBTQ+ populations, people of color, women, and people living with HIV. My current work researches the extent to which structural racism and discrimination shapes older gay men's health.

2.  I am offering this declaration in my individual capacity and not on behalf of my employer.

3.  My interest in this area of research began during my work as a community organizer near El Paso, Texas during the HIV/AIDS epidemic in the 1980s, when I took care of countless LBGTQ+ individuals—including friends—as they died from HIV/AIDS. After that harrowing experience, I wanted to dedicate my career to learning how to prevent those harms in the future, and I discovered my passion for using research to advocate for the unmet health and healthcare

1

APHA App. 723

needs of excluded communities. Beginning early in my career, I began to study the particular harms of homophobia, racism, and stigma that Latine LGBTQ+ communities felt.

4.   Prior to working at the University of California San Francisco, I served as the director of the Healthy Equity Institute at San Francisco State University. Before that, I chaired the department of Community Health Sciences at the University of Illinois-Chicago School of Public Health, where I was a professor of public health for 22 years.

5.   I received my B.A. in Communications from the Monterrey Institute of Technology and Higher Education in 1988. I received my master's degree in 1993 and my PhD in 1997 in public health at the University of Michigan, where I studied the intersection of community organizing and public health issues such as reproductive maternal and child health and substance abuse prevention.

6.   To date, I have published at least 46 peer-reviewed journal articles and 2 scholarly books made possible, in large part, through significant research funding by NIH.

7.   I am a dues-paying member of the American Public Health Association (APHA).

8.   I have applied for and received 17 grants from the NIH over the course of my career. The application process for each of those grants required months, if not years, of preparation to ensure that the proposal would yield impactful research according to high standards through the rigorous NIH review process. To prepare each application, I completed significant preparation work including pilot research to assess feasibility, literature review, assembling a team including community partners, development of the research plan, and creating a prospective budget. On average, it takes at least one year to prepare. In my experience, the NIH review process involves an iterative series of communications with NIH officials to ensure my grants align with the priorities of the agency and the goals of the funding announcement.

2

9.   Prior to March 2025, I successfully renewed my grant funding every year without issue. To do so, I submitted a progress report, and our funding was disbursed without disruption.

10. But since March 2025, NIH has terminated at least two grants that supported my research. For each of these grants, NIH stated in a termination notice that the project "no longer effectuates agency priorities." The total amount awarded originally across those two grants is over $3.6 million.

11. One of those terminated grants is a project-based R01 grant awarded by the National Institute on Aging beginning on September 15, 2022. A true and correct copy of the notice of award (NOA) for that grant is attached hereto as Exhibit A. That grant—titled *Structural Racism and Discrimination in Older Men's Health Inequities* (Project Number 5R01AG077934)— originally had a total award value of approximately $3.25 million. *See* Ex. A.

12. The goal of this project was to shed light on the extent and the manner in which structural racism and discrimination shapes the health of older gay men (*i.e.*, over the age of 55). More specifically, our goal was to better understand how gay men's life experiences involving exodus from hostile environments (such as communities or work places) and the formation of support communities defined their long-term health prospects. This is important because older gay men's health (including HIV) fares worse than that of their heterosexual counterparts, as they experience higher structural discrimination and have less access to supportive resources on average. The grant aimed to assess the relationships among health, stigma, structural racism and discrimination, resources, and biomarkers of health and aging in older gay men to better understand the reasons for the disparity in health outcomes relative to similarly situated heterosexual men. This population has been historically understudied in aging research because, prior to this cohort, we did not have many older LGTBQ+ people, and because the HIV/AIDS

3

epidemic claimed the lives of so many gay men before they reached older adulthood, limiting the opportunity for study until now.

13. This project took the form of a study in the San Francisco Bay Area. The project originally aimed to recruit 600 older gay men from whom we would collect structural data (*i.e.*, about the community in which the subject lived), individual data (*i.e.*, about the social, economic and medical background of the subject), and biological data (*i.e.*, blood samples). We intended to use these data to test hypotheses about associations between structural discrimination, resources, and health (including mental health, HIV risk and treatment, and cognitive function) of older gay men. For example, we could study the biomarkers in blood samples to see the longterm effects of stress and trauma. Ultimately, the data and findings from this study were intended to constitute the baseline to demonstrate how different factors including HIV status, medications taken, race, and place of residence, could have long-term effects on the body as it aged. This data could be used for the basis of a longitudinal study tracking participants to continue to understand queer aging in more particular ways.

14. I designed the study in response to NIH's Request for Applications (RFA) titled "Understanding and Addressing the Impact of Structural Racism and Discrimination and Minority Health and Health Disparities." A true and correct copy of that RFA, last accessed April 23, 2025, is attached hereto as Exhibit B.  The RFA states that the funding opportunity purpose is to "support (1) observational research to understand the role of structural racism and discrimination [] in causing and sustaining health disparities, and (2) intervention research that addresses [structural racism and discrimination] in order to improve minority health or reduce health disparities."  Ex. B at 1.  According to the RFA, "[p]rojects must address [structural racism and discrimination] in one or more NIH-designated populations with health disparities in

4

the US and should address documented disparities in health outcomes." *Id.* at 3. Among those

NIH-designated populations with health disparities are "[r]acial and ethnic minorities" and

"sexual and gender minorities in the U.S." *Id.* at 1. The study also attends to the NIH Office of

AIDS Research Strategic Plan of addressing HIV comorbidities, complications, and health

disparities.

15. I spent a significant amount of time curating and successfully explaining the project's

relevance to structural discrimination in order to meet the funding program's stated objective. I

began to develop the study over fifteen years ago as we began to witness and experience the first

generation of HIV positive people living long enough to age. First, I conducted pilot research

and a literature review, through which I published a book and a couple of articles about queer

aging. After the publications, it took roughly one year for my team and I to develop our initial

proposal. Over the following years, I submitted several versions of the application to NIH and

refined the application in response to NIH reviews to highlight the public health significance of

studying HIV and aging, incorporated the emerging biomarkers, and centered the project in San

Francisco – a city with deep ties to the history of the HIV epidemic and a large population of

individuals living with HIV. The NIH grant was awarded in 2022.

16. Prior to March 2025, NIH officials never raised any concerns to me about this grant

during those renewal reviews, and the NIH Office of AIDS Research featured the project as an

exemplar project. In fact, just last year, NIH approved a supplemental grant for the project.

17. This grant was originally supposed to end in 2026. However, on March 21, 2025, NIH

issued a termination notice stating that the grant had been terminated. A true and correct copy of

this termination notice is attached hereto as Exhibit C. Prior to this notice, there was never any

indication that this grant was in jeopardy. Three days later, on March 24, 2025, I also received a

APHA App. 727

revised NOA reflecting the termination of the grant and echoing the language of the termination notice. A true and correct copy of the revised NOA is attached hereto as Exhibit D.

18. Neither the revised NOA nor the termination notice includes any individualized explanation for why the grant was cancelled, and both fail to discuss any of the data or analysis from our application, annual progress reports, or other related material. Instead, the termination notice includes the following language about its decision:

> This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Ex. C at 2; *see also* Ex. D at 5-6.

19. The termination notice also states that, although "'NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,' no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities." Ex. C. at 2.

20. I do not understand what the notice means by "amorphous equity objectives" or "diversity, equity, and inclusion" or "DEI." I also do not understand why NIH believes that this project is based on "artificial and non-scientific categories" or that it does "not enhance health, lengthen life, or reduce illness." I also am uncertain why NIH believes this project does not effectuate agency priorities.

6

21. This termination will severely hinder our ability to complete our study and develop recommendations based on any findings. The study had recruited only approximately three hundred (300) of the six hundred (600) intended participants. Of those participants, several selected for a qualitative data collective interview had not completed the full study at the time of termination. This sample size is not large enough to offer scientifically valid hypotheses (*e.g.*, such that an analysis could determine any associations between biomarkers and other variables in the study, such as racial or HIV status). The supplement to the project to study transgender women had recruited only fifteen (15) of the one hundred fifty (150) intended participants. For those participants mid-study or yet to be recruited, the time to collect data is of the essence, as participants by their nature are of older age. In addition, rebuilding the recruitment process will take significant start up time and effort.

22. The termination also harms our relationships with community members and partners. Recruiting participants for the study required building relationships and contacts within the community. The abrupt termination of the project harmed the trust we built with community partner organizations and members of the community who participated in the study.

23. The project had a staff of seven UCSF members including myself, one at San Francisco State University, one at Tulane University, and one at the University of Alabama. Because of the termination of this grant and the other grant terminated by NIH, I will likely have to lay off at least two staff members. These lost grants also accounted for approximately 20% of my salary, and although I am currently relying on reserve funding to make up the difference, I do not believe that will be a long-term solution for that loss. Several other co-investigators, including the three team members at our partner institutions and one at UCSF, will also be at risk of losing a portion of their salaries.

APHA App. 729

24. As we are witnessing the first generation of people with HIV living to reach old age, we also have our first opportunity to study how aging is affected by HIV, related medications, and other factors like discrimination. If studies like mine are unable to continue, we will lose a cohort of aging people and their experiences, as well as the opportunity to learn from them. Investigating how social and medical factors affect aging people from communities not often studied can directly lead us to answers about how those people can live longer. Such studies also help inform the body of science generally around how people age.

25. I have suffered substantial emotional distress about the termination of this project. This work was the culmination of a career-long effort to use public health research to help LGBTQ+ populations, especially those affected by the HIV/AIDS epidemic that I myself witnessed firsthand.

26. On April 7, 2025, we filed an appeal for the grant termination. I submitted an appeal for the grant because I do not anticipate being able to find replacement funding for the projects. But I also do not understand why the grant was terminated, and I had no idea how to address any agency concerns or recharacterize or revise my project for the purposes of appeal, especially in light of the lack of information provided by NIH. I also do not know how to submit new proposals in light of the vagueness of this language and in light of my current research portfolio and goals.

27. I received a substantially similar termination notice for another grant that supports my work (Project Number 1R01MD020284—Measures of Structural Stigmatization and Discrimination for HIV Research with Latine Sexual and Gender Minorities). NIH issued that termination on March 12, 2025. A true and correct copy of that termination notice is attached hereto as Exhibit E. Among other identical language, this notice uses the exact same paragraph

APHA App. 730

to explain the agency's decision to cut this grant, including that the "award no longer effectuates agency priorities."  Ex. E at 1.  An appeal for this grant was submitted, but I have the same concerns with this appeal as I do with the appeal described above.

28. I do not know whether any appeal has any chance of success, given the following language across the termination notices I received:  "The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities."

APHA App. 731

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of April, 2025.


_____

Jesus Ramirez-Valles

10

Case 1:25-cv-10787-BEM    Document 38-33    Filed 04/25/25    Page 12 of 57

# EXHIBIT A

APHA App. 733

 **Department of Health and Human Services**
National Institutes of Health
NATIONAL INSTITUTE ON AGING

**Notice of Award**
FAIN# R01AG077934
**Federal Award Date**
09-09-2022

## Recipient Information

**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF
CALIFORNIA, SAN FRANCISCO, THE
1855 FOLSOM ST STE 425

SAN FRANCISCO, 94143

**2. Congressional District of Recipient**
12

**3. Payment System Identifier (ID)**
1946036493A6

**4. Employer Identification Number (EIN)**
946036493

**5. Data Universal Numbering System (DUNS)**
094878337

**6. Recipient's Unique Entity Identifier**
KMH5K9V7S518

**7. Project Director or Principal Investigator**
Jesus  Ramirez-Valles, PHD
Professor And Director
jesus.ramirez-valles@ucsf.edu
415-405-4350

**8. Authorized Official**
Estrella Garcia
estrella.garcia@ucsf.edu
415-260-5128

## Federal Agency Information

**9. Awarding Agency Contact Information**
Lesa McQueen

NATIONAL INSTITUTE ON AGING
lesa_mcqueen@nih.gov
301-496-1472

**10. Program Official Contact Information**
Melissa S Gerald
Health Science Administrator
NATIONAL INSTITUTE ON AGING
geraldmel@nia.nih.gov
301-402-4156

## Federal Award Information

**11. Award Number**
1R01AG077934-01

**12. Unique Federal Award Identification Number (FAIN)**
R01AG077934

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Structural Racism and Discrimination in Older Men's Health Inequities

**15. Assistance Listing Number**
93.866

**16. Assistance Listing Program Title**
Aging Research

**17. Award Action Type**
New Competing

**18. Is the Award R&D?**
Yes

### Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 09-15-2022 **– End Date** 05-31-2023 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $844,201 |
| 20 a.  Direct Cost Amount | | $526,667 |
| 20 b.  Indirect Cost Amount | | $317,534 |
| **21.** Authorized Carryover | | |
| **22.** Offset | | |
| **23.** Total Amount of Federal Funds Obligated this budget period | | $844,201 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | | $0 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | | $844,201 |
| -------------------------------------------------------------- | | |
| **26. Project Period Start Date** 09-15-2022 **– End Date** 05-31-2026 | | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | | $844,201 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Ryan  Blakeney

**30. Remarks**
Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

APHA App. 734



Notice of Award

*RESEARCH*
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE ON AGING



---

**SECTION I – AWARD DATA – 1R01AG077934-01**

**Principal Investigator(s):**
Jesus  Ramirez-Valles, PHD

**Award e-mailed to:** cgrasteam@ucsf.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $844,201 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to The Regents of the UCSF in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Aging of the National Institutes of Health under Award Number R01AG077934. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Ryan  Blakeney
Grants Management Officer
NATIONAL INSTITUTE ON AGING

Additional information follows

---

APHA App. 735

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---:|
| Salaries and Wages | $279,042 |
| Fringe Benefits | $108,812 |
| **Personnel Costs (Subtotal)** | $387,854 |
| Materials & Supplies | $11,310 |
| Travel | $14,442 |
| Other | $33,149 |
| Subawards/Consortium/Contractual Costs | $77,912 |
| Publication Costs | $2,000 |

| | |
|---|---:|
| Federal Direct Costs | $526,667 |
| Federal F&A Costs | $317,534 |
| Approved Budget | $844,201 |
| Total Amount of Federal Funds Authorized (Federal Share) | $844,201 |
| TOTAL FEDERAL AWARD AMOUNT | $844,201 |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $844,201 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 1 | $844,201 | $844,201 |
| 2 | $807,774 | $807,774 |
| 3 | $800,878 | $800,878 |
| 4 | $798,781 | $798,781 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| Payment System Identifier: | 1946036493A6 |
| Document Number: | RAG077934A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2022 |

| IC | CAN | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| AG | 8470694 | $844,201 | $807,774 | $800,878 | $798,781 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: 2BPDIGE / **OC**: 41021 / **Released**: Blakeney, Ryan 08-31-2022
**Award Processed**: 09/09/2022 12:06:07 AM

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1R01AG077934-01**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 1R01AG077934-01**

APHA App. 736

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a. The grant program legislation and program regulation cited in this Notice of Award.
b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c. 45 CFR Part 75.
d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2**.** As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AG077934. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in

Version: 11 - 7/14/2022 8:27 PM | Generated on: 9/9/2022 12:06 AM

APHA App. 737

the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.
**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – AG SPECIFIC AWARD CONDITIONS – 1R01AG077934-01**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**RESTRICTION:** The present award is being made without a currently valid certification of IRB approval for this project with the following restriction: Only activities that are clearly severable and independent from activities that involve human subjects, including recruitment, may be conducted pending the National Institute on Aging's acceptance of the certification of IRB approval.
No funds may be drawn down from the payment system and no obligations may be made against Federal funds for any research involving human subjects prior to the National Institute on Aging's notification to the grantee that the identified issues have been resolved and this restriction removed.

Failure to respond within the 60-day period and/or to otherwise comply with the above requirements may result in suspension and/or termination of this award, audit/or disallowances, and/or other appropriate action.

See the NIH Grants Policy Statement, Chapter 4.1.15 Human Subjects Protections (http://grants.nih.gov/grants/policy/nihgps/HTML5/section_4/4_public_policy_requirements__objectives_and_other_appropriation_mandates.htm), for specific requirements related to the protection of human subjects, which are applicable to and a term and condition of this award.

_____

Funding for this award has been provided by Alzheimer's Disease Initiative funds.

This award includes funds awarded for consortium activity with SAN FRANCISCO STATE UNIVERSITY in the amount of $21,179 ($13,664 direct costs + $7,515 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of Alabama at Birmingham in the amount of $21,381 ($14,398  direct costs + $6,983   facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:

APHA App. 738

http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of Tulane Univ. School of Public Health and Tropical Medicine in the amount of $35,352  ($23,258 direct costs + $12,094 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at: http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds for twelve months of support.  The competing budget period is awarded for less than 12 months.  Continuation awards will cycle each year on 06/01. The Research Performance Progress Report (RPPR) is due 45 days prior to this date for SNAP awards or 60 days prior for non-SNAP awards.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1R01AG077934-01

**INSTITUTION:** The Regents of the UCSF

| Budget | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| Salaries and Wages | $279,042 | $260,538 | $273,776 | $299,238 |
| Fringe Benefits | $108,812 | $100,489 | $105,332 | $113,354 |
| Personnel Costs (Subtotal) | $387,854 | $361,027 | $379,108 | $412,592 |
| Materials & Supplies | $11,310 | $480 | $480 | $480 |
| Travel | $14,442 | $25,760 | $20,558 | $13,194 |
| Other | $33,149 | $71,155 | $50,150 | $11,052 |
| Subawards/Consortium/Contractual Costs | $77,912 | $59,197 | $69,146 | $86,859 |
| Publication Costs | $2,000 | $2,260 | $2,789 | $3,500 |
| TOTAL FEDERAL DC | $526,667 | $519,879 | $522,231 | $527,677 |
| TOTAL FEDERAL F&A | $317,534 | $287,895 | $278,647 | $271,104 |
| TOTAL COST | $844,201 | $807,774 | $800,878 | $798,781 |

| Facilities and Administrative Costs | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| F&A Cost Rate 1 | 61.5% | 61.5% | 61.5% | 61.5% |
| F&A Cost Base 1 | $516,315 | $468,122 | $453,085 | $440,819 |
| F&A Costs 1 | $317,534 | $287,895 | $278,647 | $271,104 |

APHA App. 739

# EXHIBIT B

Expired RFA & PAs: Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

This notice has expired. Check the **NIH Guide (https://grants.nih.gov/funding/searchguide/)** for active opportunities and notices.

# Department of Health and Human Services

## Part 1. Overview Information

**Participating Organization(s)**

National Institutes of Health (NIH (http://www.nih.gov))

**Components of Participating Organizations**

National Institute on Minority Health and Health Disparities (NIMHD (https://www.nimhd.nih.gov/))

National Eye Institute (NEI (https://www.nei.nih.gov/))

National Heart, Lung, and Blood Institute (NHLBI (https://www.nhlbi.nih.gov/))

National Human Genome Research Institute (NHGRI (https://www.genome.gov/))

National Institute on Aging (NIA (https://www.nia.nih.gov/))

National Institute on Alcohol Abuse and Alcoholism (NIAAA (https://www.niaaa.nih.gov/))

National Institute of Allergy and Infectious Diseases (NIAID (https://www.niaid.nih.gov/))

National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS (https://www.niams.nih.gov/))

National Institute of Biomedical Imaging and Bioengineering (NIBIB (https://www.nibib.nih.gov/))

Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD (https://www.nichd.nih.gov/))

National Institute on Deafness and Other Communication Disorders (NIDCD (https://www.nidcd.nih.gov/))

National Institute of Dental and Craniofacial Research (NIDCR (https://www.nidcr.nih.gov/))

National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK (https://www.niddk.nih.gov/))

National Institute on Drug Abuse (NIDA (https://www.drugabuse.gov/))

National Institute of Environmental Health Sciences (NIEHS (https://www.niehs.nih.gov/))

National Institute of General Medical Sciences (NIGMS (https://www.nigms.nih.gov/))

National Institute of Mental Health (NIMH (https://www.nimh.nih.gov/index.shtml))

National Institute of Neurological Disorders and Stroke (NINDS (https://www.ninds.nih.gov/))

National Institute of Nursing Research (NINR (https://www.ninr.nih.gov/))

National Center for Complementary and Integrative Health (NCCIH (https://nccih.nih.gov/))

National Cancer Institute (NCI (https://www.cancer.gov/))

Office of The Director, National Institutes of Health (OD (https://www.nih.gov/institutes-nih/nih-office-director))

All applications to this funding opportunity announcement should fall within the mission of the Institutes/Centers. The following NIH Offices may co-fund applications assigned to those Institutes/Centers.

Division of Program Coordination, Planning and Strategic Initiatives, Office of Disease Prevention (ODP (https://prevention.nih.gov/))

Office of Behavioral and Social Sciences Research (OBSSR (https://obssr.od.nih.gov/))

Sexual and Gender Minority Research Office (SGMRO (https://dpcpsi.nih.gov/sgmro))

Office of Research on Women's Health (ORWH (https://orwh.od.nih.gov/))

**Funding Opportunity Title**

Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Disparities (R01 Clinical Trial Optional)

**Activity Code**

R01 (//grants.nih.gov/grants/funding/ac_search_results.htm?text_curr=r01&Search.x=0&Search.y=0&Search_Type=Activity) Research Project Grant

**Announcement Type**

New

**Related Notices**

APHA App. 741

Expiration of Warranted Funding Announcement on the Impact of Structural Racism and Discrimination on Minority Health and Health Di...

- **April 23, 2021** - Notice of Pre-Application Technical Assistance Webinar for RFA-MD-21-004. See Notice NOT-MD-21-018 (https://grants.nih.gov/grants/guide/notice-files/NOT-MD-21-018.html).

---

**Funding Opportunity Announcement (FOA) Number**

RFA-MD-21-004

---

**Companion Funding Opportunity**

None

---

**Number of Applications**

See Section III. 3. Additional Information on Eligibility.

---

**Assistance Listing Number(s)**

93.307, 93.855, 93.172, 93.273, 93.399, 93.867, 93.866, 93.846, 93.242, 93.113, 93.865, 93.286, 93.310, 93.121, 93.279, 93.213, 93.853, 93.173, 93.361, 93.313, 93.837, 93.838, 93.839, 93.840, 93.233, 93.847

---

**Funding Opportunity Purpose**

This initiative will support (1) observational research to understand the role of structural racism and discrimination (SRD) in causing and sustaining health disparities, and (2) intervention research that addresses SRD in order to improve minority health or reduce health disparities.

## Key Dates

**Posted Date**

March 23, 2021

---

**Open Date (Earliest Submission Date)**

July 20, 2021

---

**Letter of Intent Due Date(s)**

July 20, 2021

---

| Application Due Dates | | | Review and Award Cycles | | |
|---|---|---|---|---|---|
| **New** | **Renewal / Resubmission / Revision (as allowed)** | **AIDS** | **Scientific Merit Review** | **Advisory Council Review** | **Earliest Start Date** |
| August 24, 2021 | Not Applicable | August 24, 2021 | November 2021 | January 2022 | April 2022 |

All applications are due by 5:00 PM local time of applicant organization. All types of non-AIDS applications allowed for this funding opportunity announcement are due on the listed date(s).

Applicants are encouraged to apply early to allow adequate time to make any corrections to errors found in the application during the submission process by the due date.

---

**Expiration Date**

August 25, 2021

---

**Due Dates for E.O. 12372**

Not Applicable

---

**Required Application Instructions**

It is critical that applicants follow the instructions in the Research (R) Instructions in the SF424 (R&R) Application Guide (//grants.nih.gov/grants/guide/url_redirect.htm?id=12000),except where instructed to do otherwise (in this FOA or in a Notice from NIH Guide for Grants and Contracts (//grants.nih.gov/grants/guide/)).

Conformance to all requirements (both in the Application Guide and the FOA) is required and strictly enforced. Applicants must read and follow all application instructions in the Application Guide as well as any program-specific instructions noted in Section IV. When the program-specific instructions deviate from those in the Application Guide, follow the program-specific instructions.

**Applications that do not comply with these instructions may be delayed or not accepted for review.**

## Table of Contents

Case: 25-1611     Document: 00118310433     Page: 195     Date Filed: 07/08/2025     Entry ID: 6734280

4/23/25, 11:40 PM         Case 1:25-cv-10787-BEM         Document 38-33         Filed 04/25/25         Page 32 of 57
RFA-MD-21-004: Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

Part 1. Overview Information
    Key Dates
Part 2. Full Text of Announcement
    Section I. Funding Opportunity Description
    Section II. Award Information
    Section III. Eligibility Information
    Section IV. Application and Submission Information
    Section V. Application Review Information
    Section VI. Award Administration Information
    Section VII. Agency Contacts
    Section VIII. Other Information

# Part 2. Full Text of Announcement

## Section I. Funding Opportunity Description

**Key Definitions for the FOA:**

*Discrimination:* A socially structured action that is unfair or unjustified and harms individuals and groups. Discrimination can be attributed to social interactions that occur to protect more powerful and privileged groups or institutions at the detriment of other groups. Racism refers to discrimination based on race or ethnicity.

*Structural discrimination* refers to macro-level conditions (e.g., residential segregation) that limit opportunities, resources, and well-being of less privileged groups (Healthy People 2020, https://www.healthypeople.gov/2020/topics-objectives/topic/social-determinants-health/interventions-resources/discrimination (https://www.healthypeople.gov/2020/topics-objectives/topic/social-determinants-health/interventions-resources/discrimination)).

*Structural racism and discrimination (SRD):* For the purposes of this FOA, SRD refers to structural discrimination on the basis of race/ethnicity and/or other statuses, including but not limited to gender, sexual orientation, gender identity, disability status, social class or socioeconomic status, religion, national origin, immigration status, limited English proficiency, or physical characteristics or health conditions.

*NIH-designated Populations with Health Disparities:* Racial and ethnic minorities, socioeconomically disadvantaged populations, underserved rural populations, and sexual and gender minorities in the U.S. (see https://www.nimhd.nih.gov/about/overview/ (https://www.nimhd.nih.gov/about/overview/)).

**Background**

There is increasing recognition that racism and discrimination contribute to poorer health outcomes for racial/ethnic minorities and other populations that experience health disparities. In fact, all populations with health disparities experience increased exposure to racism and/or other forms of discrimination over the life course. There is also a growing societal recognition that racism and discrimination extend beyond the behavior of individuals to include SRD, which is embedded in historical societal, institutional, organizational and governmental structures through formal and informal processes, procedures, and practices that limit both opportunities and resources to segments of the population. SRD is supported by the power structures that exist in society and in the institutions that are most likely to influence health outcomes.

Despite this enhanced awareness, racism and discrimination are not routinely included as determinants of health in biomedical research. Health research on racism and discrimination to date has largely focused on interpersonal interactions, and to a lesser extent, one specific form of SRD, residential segregation. Typically, such research focuses on the adverse health consequences of SRD exposures. Less research has explored the resilience among populations exposed to SRD or community strategies to resist or mitigate historic or contemporary SRD exposures. Additionally, intervention research has rarely emphasized reduction of SRD as a strategy to improve health and reduce disparities. Research on mitigation of SRD is needed to inform health care and social policies at all levels.

Health research and interventions need to routinely incorporate constructs and measurement of SRD across multiple socioecological domains and levels of influence in order to improve minority health, promote health equity, and eliminate health disparities (see the NIMHD Research Framework for more information: https://www.nimhd.nih.gov/about/overview/research-framework.html (https://www.nimhd.nih.gov/about/overview/research-framework.html)). Examples of domains in which SRD may occur include, but are not limited to, the following:

- **Organizational/Institutional**: Organizational-level climate; workplace hiring, promotion, or disciplinary practices; academic tracking, stigmatization, school disciplinary and admission practices; tolerance of abuse/harassment; health care system practices.
- **Neighborhood/Community**: Housing or lending practices and property value assessments; zoning laws; neighborhood distribution of public transportation, green spaces, grocery stores, hospitals and emergency departments, ambulatory health clinics, resource allocation for schools through local tax base, location of cellular towers, highways and major thoroughfares, and industrial or waste sites; criminal justice profiling; targeted social marketing of harmful or ineffective products; hate crimes.
- **Societal**: Criminal justice policies and sentencing practices, land/water use rights, self-governance or political representation for tribal communities and US territories, immigration and asylum policies and procedures, gerrymandering, voter suppression laws or practices, religious and cultural discrimination, depiction or representation in national media and social media.

**Research Objectives**

This initiative will support observational or intervention research to understand and address the impact of SRD on minority health and health disparities.

Projects must address SRD in one or more NIH-designated populations with health disparities in the US and should address documented disparities in health outcomes. Applications are expected to provide a justification for why the specific types of SRD included constitute SRD, such as how the racism or discrimination is structural rather than reflecting individual-level behavior and how the SRD results in differential treatment or outcomes for less advantaged individuals, groups or populations. For example, with a project examining discriminatory school disciplinary practices, documentation of different overall rates of student suspensions or expulsions by race/ethnicity would not be sufficient to label this pattern as SRD. However, different rates of student suspensions or expulsions by race/ethnicity for the same type of student behavior or violation could be evidence of SRD. Applications are also expected to **provide a conceptual model** identifying hypothesized pathways between the SRD and health outcomes. Potential health outcomes may reflect health status; health condition-specific or all-cause disability, quality of life, mortality and morbidity; biological measures that reflect cumulative exposures to and effects of SRD; health behaviors; or access to, utilization of, or quality of health care.

It is also expected that projects will collect data on SRD beyond individual self-reported perceptions and experiences to include data at organizational, community or societal levels. Potential data sources for SRD may include but are not limited to U.S. Census data, birth and mortality records; health surveillance data; crime statistics; traditional and social media data, school-based or educational data; labor statistics; voting records; local, state, and Federal law and policies; home ownership covenants; and organizational/institutional mission statements, policy guidance, operating procedures, or other relevant documents.

APHA App. 743

Projects are expected to involve collaborations with relevant organizations or groups or stakeholders, such as academic institutions, health service providers and systems, state and local public health agencies or other governmental agencies such as housing and transportation, criminal justice systems, school systems, patient or consumer advocacy groups, community-based organizations, and faith-based organizations. Multidisciplinary research teams, including researchers from areas outside of the health sciences, such as economics, education, history, criminology, law, and political science, are encouraged.

**Observational Studies:** Projects may (1) examine the impact of SRD on health, and/or (2) evaluate the impact that existing efforts to address SRD (e.g., laws, policies, programs, organizational practices and procedures) have on the health of individuals, families, and communities. Projects may involve collection of primary data and/or analysis of existing data and may involve quantitative or mixed methods approaches. Projects must be exclusively domestic, including U.S. territories. Projects using longitudinal designs or multiple sites are strongly encouraged, as are projects examining resilience in the face of exposure to SRD.

**Intervention Studies:** Projects may focus on health promotion, treatment, and/or prevention. Interventions may focus primarily on addressing SRD to improve health outcomes, or SRD may be included as one of several determinants of health addressed to improve health outcomes. For both types of intervention approaches, interventions must directly address the cause or source of SRD, not just help individuals or populations to cope with SRD. To this end, it is expected that investigators will collaborate with leadership from organizations, agencies, or programs where the SRD is originating from or being sustained (e.g., a project addressing SRD in the workplace should involve organizational leaders, human resource managers, or other relevant personnel involved in establishing, maintaining, or enforcing workplace policies and practices rather than only involving employees within a workplace). It is also expected that interventions will involve other relevant personnel or individuals within the setting (e.g., teachers, clinicians, co-workers, bystanders) as appropriate to enact changes to SRD, not just those who are directly experiencing SRD.

Research designs should allow for the assessment of mechanisms through which the intervention modifies SRD and how these changes result in improvement in the targeted health outcomes. Mechanisms of interest related to SRD include changes to behaviors, environments, or policies at the interpersonal, organizational, neighborhood/community, or societal level.

Cluster randomized designs for all types of intervention studies are strongly encouraged, as are research designs comparing interventions with and without SRD components. It is expected that the interventions will have potential for sustainability in the intervention setting after the project is over as well as scalability to be implemented in other settings.

**Design, Analysis, and Sample Size for Studies to Evaluate Group-Based Interventions:** Investigators who wish to evaluate the effect of an intervention on a health-related biomedical or behavioral outcome may propose a study in which (1) groups or clusters are assigned to study arms and individual observations are analyzed to evaluate the effect of the intervention, or (2) participants are assigned individually to study arms but receive at least some of their intervention in a real or virtual group or through a shared facilitator. Such studies may propose a parallel group- or cluster-randomized trial, an individually randomized group-treatment trial, a stepped-wedge design, or a quasi-experimental version of one of these designs. In these studies, special methods may be warranted for analysis and sample size estimation. Applicants should show that their methods are appropriate given their plans for assignment of participants and delivery of interventions. Additional information is available at https://researchmethodsresources.nih.gov/ (https://researchmethodsresources.nih.gov/).

Applicants are strongly encouraged to assess social determinants of health using measures available in the Social Determinants of Health Collection of the PhenX Toolkit (www.phenxtoolkit.org (http://www.phenxtoolkit.org)), as appropriate..

**Applications Not Responsive to the FOA**

- Projects without a focus on addressing SRD toward one or more NIH-designated populations with health disparities.
- Projects that are exclusively qualitative or that only use individual-level data.
- Projects that do not examine the impact of SRD on health-related outcomes.
- Projects that propose data collection or testing of interventions outside of the U.S.
- Projects that include prohibited policy lobbying or advocacy activities (see https://grants.nih.gov/grants/lobbying_guidance.htm (https://grants.nih.gov/grants/lobbying_guidance.htm) for more information).

Non-responsive applications will not be reviewed. Applicants are strongly encouraged to reach out to the relevant scientific contacts to discuss whether their applications are responsive.

**Specific Areas of Research Interest**

**NIMHD** encourages projects that use approaches that encompass multiple domains (e.g., biological, behavioral, socio-cultural, environmental, physical environment, health system) and multiple levels (e.g., individual, interpersonal, community, societal) to understand and address the impact of SRD on minority health and health disparities (see the NIMHD Research Framework, https://www.nimhd.nih.gov/about/overview/research-framework.html (https://www.nimhd.nih.gov/about/overview/research-framework.html), for examples of health determinants of interest).

Areas of specific interest to **NIMHD** include but are not limited to the following:

- Examination of the impact of structural racial/ethnic or socioeconomic status-based discrimination in the criminal justice system (e.g., police stops, arrests, bail and pre-trial detainment and diversion, sentencing, and probation and parole practices) on the health and well-being of individuals, families, and communities.
- Examination of the impact of SRD in health care settings on access to and quality of care and health outcomes.
- Identification of family, organizational, neighborhood, cultural and community protective factors that moderate the relationship between SRD exposures and health.
- Examination of how cumulative and chronic experiences of SRD impact biological processes (e.g., epigenome, allostatic load, inflammation, microbiome, neurological signatures) that contribute to poor health outcomes.
- Examination of the impact of SRD related to social and mass media practices and policies, such as stereotyping, targeted marketing, cyberbullying and hate speech, on community/population-level health.
- Interventions to improve mental and physical health by fostering positive interactions and more inclusive social climates in schools, workplaces, and other organizations/institutions.
- Interventions that address SRD in healthcare settings across multiple domains (clinicians and staff interacting with patients, physical space, service delivery structure, financing, access, and others) in order to improve health care outcomes.
- Place-based interventions to address SRD in multiple sectors (criminal justice, education, labor, transportation, parks and recreation, housing, and others) based on community priorities and strategies.
- Multi-level, multi-component interventions that address SRD as well as other determinants of health to prevent chronic disease, unintentional injury, or violence victimization and perpetration.

**NCCIH** promotes research on the use of complementary and integrative health approaches for improving minority health and eliminating disparities in health conditions such as mental health, emotional well-being, behavioral health, or pain. Complementary approaches include those with physical and/or psychological therapeutic inputs, often called mind and body approaches (e.g., acupuncture, yoga, tai chi, qi gong, meditation, hypnosis, music therapy, art therapy, spinal or chiropractic manipulation, and massage) as well as approaches with dietary or nutritional therapeutic inputs, or considered natural products (e.g., botanicals, probiotics/microbials, naturally derived peptides, dietary supplements, and special diets). Integrative approaches include therapies that combine complementary approaches with conventional medical interventions such as pharmacologic, surgery, or device-based treatments.

APHA App. 744

Expanding and Understanding Documenting the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

Areas of interest to **NCCIH** include but are not limited to:

- Studies to examine the impact of SRD on access to, implementation, adherence, dissemination, and adoption of evidence-based complementary and integrative health approaches for prevention and treatment of mental health, emotional well-being, behavioral health, or pain among health disparity populations.
- Multilevel interventions (e.g., interpersonal, community, societal) that address SRD in order to improve access to evidence-based complementary and integrative health approaches to address mental health, emotional well-being, behavioral health, or pain in diverse settings (e.g., schools, criminal justice, health care).

**NCI** is committed to eliminating cancer related disparities and promoting equity in cancer prevention, diagnosis, treatment, and survivorship. For this FOA, NCI will accept intervention projects focused on addressing structural/institutional racism/discrimination (SRD) that influence cancer-related outcomes -- from early detection through end of life. Projects submitted to NCI may focus on cancer prevention, diagnosis, treatment, and/or survivorship based and provide a conceptual model identifying hypothesized pathways or mechanisms between the SRD and cancer-related outcomes. Areas of specific interest to NCI include multilevel interventions focused on addressing SRD to improve cancer outcomes, or interventions that address several determinants of health in addition to SRD.

**NCI** areas of interest in intervention research include, but are not limited to:

- Multi-level, multi-component interventions that address SRD as well as other determinants of health to prevent cancer, improve cancer care for patients, and/or improve cancer outcomes.

- Intervention research examining family, organization, neighborhood, cultural and community factors that may moderate SRD exposure and cancer prevention and care.

- Intervention research focusing on the prevention of cancer that incorporates risk and resilience factors in response to structural racism such as historical trauma, immigration policies, school and language-based discrimination, housing and criminal justice practices, etc.

- Research on development of cancer treatment interventions and service delivery approaches that address systemic racism and structural barriers health services such as staff training, service delivery settings and schedules, use of digital platforms, language and health literacy barriers, costs, etc.

- Mechanistic studies of the effects of discrimination-based trauma and/or chronic experiences on biological processes (e.g., epigenome, inflammation, microbiome, or other molecular/cellular processes) that contribute to poorer cancer and overall health outcomes.

**NEI** will consider applications within our mission areas of preventing, treating, or reversing vision loss and addressing the special health problems and requirements of the visually impaired, with special emphasis on structural racism influences on the delivery of eye health care in underserved populations.

**NHGRI** is interested in supporting both observational and interventional research that 1) will advance understanding of how SRD intersects with and impacts the field of human genomics, the practice of genomic medicine, and other uses of genomic information that impact health outcomes; or 2) will identify effective strategies for addressing SRD at various levels of influence within and across organizations, institutions, or groups that directly and indirectly contribute to health disparities in genomic medicine. NHGRI defines genomic medicine as use of genomic information in clinical care and the health outcomes associated with that clinical use at an individual, group, and population levels. Areas of specific interest include but are not limited to the following:

1. Examination of the impact of SRD on views, behaviors or experiences of patients and/or providers about the risks and benefits of utilizing genomic information in healthcare to mitigate health disparities.
2. Examination of the role of SRD in whether and how genomic information is used within health care settings (e.g., hospital, health center, private practice) and outside of health care settings (e.g., insurance, labor, criminal justice, direct to consumer genetic testing) and the differential impact of that use on the health and well-being of individuals, families, and communities who experience health disparities.
3. Examination of laws, regulations, policies, guidelines, or interventions that prevent, discourage, or exacerbate racist and discriminatory practices in the use of genomic data, knowledge, and technologies within healthcare settings; and their effectiveness in achieving equity in health outcomes or health service delivery.
4. Interventions that address SRD within healthcare organizations, laboratories, and public health systems to ensure equity in the availability, accessibility, comprehensiveness, and quality of genomic medicine in one or more NIH-designated populations with health disparities in the US.
5. Examination of how SRD biases the design, implementation, and dissemination of genomic research and directly contributes to health disparities in genomic medicine across patient populations (e.g., scientifically valid health-related information, effectiveness of treatment options, evidence-informed care or advice, individual health status), especially for populations whose genetic ancestry is underrepresented in genomic research.

Applicants are encouraged to incorporate the measures from PhenX Toolkit (https://www.phenxtoolkit.org/ (https://www.phenxtoolkit.org/)), whenever possible.

In general, **NHGRI** supports studies that provide generalizable methods and knowledge that can be applied across genomics. Approaches that use a particular disease or organ system as a proof of principle, but can show that methods, outcomes and/or knowledge gained are generalizable, may be in scope for NHGRI. Approaches that are comprehensive across the genome or are generalizable across variants, tissues, diseases, or function also may be in scope for NHGRI.

Applications whose primary scientific objective is to understand a single biological or behavioral process, the pathophysiology of a disease, or the mechanism of action of an intervention, will not be in scope for NHGRI. Applications relevant only to a particular disease or organ system should be directed to the appropriate Institute or Center.

Applicants are strongly encouraged to contact the **NHGRI** program directors listed below to discuss the relevance of their proposed topic(s) to the research mission of NHGRI.

The **NHLBI** is interested in the following research topics:

- Observational studies to describe ways in which structural racism and discrimination is associated with disparities in heart, lung, and blood diseases and sleep disorders
- Investigations to uncover the mechanisms by which the multiple domains of structural racism (interpersonal, structural, cultural) impact heart, lung, and blood diseases and sleep disorders
- Hybrid implementation studies to address structural racism to improve heart, lung, and blood diseases and sleep disorders
- Investigations of implementation strategies to increase the uptake of evidence-based strategies to address structural racism
- Community-based research focused on existing practices that support strengths and resilience factors
- Studies to evaluate the impact of structural racism and discrimination in the context of health care settings on heart, lung, and blood diseases and sleep disorders

**NIA** promotes research related to aging and life course health and well-being, including research on Alzheimer's Disease and related dementias (AD/ADRD). A strategic priority of NIA is understanding the environmental, sociocultural, behavioral and biological drivers of health inequities and disparities related to aging and AD/ADRD. NIA also supports research to develop strategies for the improvement of health among midlife and older adults in racial minority and other populations that experience health inequities/disparities. These priorities are outlined in NIA's strategic directions for health disparities research (https://www.nia.nih.gov/about/aging-strategic-directions-research/goal-health-disparities-adults) and the NAPA Health Disparities milestones (https://www.nia.nih.gov/research/milestones/population-studies-precision-medicine-health-disparities) and reflected within NIA's Health Disparities framework (https://www.nia.nih.gov/research/osp/framework).

APHA App. 745

Case: 25-1611    Document: 00118310433    Page: 198    Date Filed: 07/08/2025    Entry ID: 6734280

4/23/25, 11:40 PM    Case 1:25-cv-10787-BEM    Document 38-33    Filed 04/25/25    Page 35 of 57
Explanation of Understanding and Addressing the Impacts of Structural Racism and Discrimination on Minority Health and Health Di…

**NIA** encourages investigations of the impacts of the multiple pathways of Structural Racism and Discrimination (SRD) and subsequent health consequences on individuals across the adult lifespan. NIA also encourages research that will investigate how SRD works synergistically with other mechanisms (or forms) of racism (e.g. individual or cultural racism) to influence health outcomes.

Applicants proposing to develop interventions are expected to proactively identify a theory or model that applies to the intervention proposed and the critical variables expected to result in change. Applications are required to use an appropriate experimental design to test the proposed theory, to identify the essential components of complex interventions, or to elucidate the mechanism(s) by which an intervention exerts its effects. For the development of behavioral interventions, applicants are encouraged to articulate their research aims and the stage of intervention development proposed using the NIH Stage Model (https://www.nia.nih.gov/research/dbsr/nih-stage-model-behavioral-intervention-development) framework.

**NIA** interests include, but are not limited to, the following:

- Research that examines the mechanisms that produce disparate health and well-being outcomes at older ages due to structural racism including incarceration, segregation, and inequity.
- Investigation of how cumulative and chronic experiences of SRD impact mechanisms related to premature aging or increased risk for AD/ADRD.
- Studies of structural or institutional factors that mitigate or exacerbate disparities in access to healthcare services in midlife and older age adults or healthcare services for AD/ADRD patients and their caregivers.
- Studies to elucidate whether and how mechanisms connecting structural racism to aging- relevant health outcomes, including well-being, independent function, cognition and AD/ADRD, operate on multiple levels (e.g., individual, interpersonal, societal).
- Multi-level, multi-component interventions that address SRD in healthcare settings to improve aging outcomes, prevent premature aging or AD/ADRD, and/or improve care for older adults, including those with AD/ADR.

**NIAAA** is interested in prevention, health services and treatment interventions that address the impact of structural racism and discrimination on the development, course and recovery from alcohol misuse and alcohol use disorders. While observational research might be part of formative work necessary to develop effective interventions, the focus of the proposed research **must** be on interventions to address alcohol problem. Areas of interest to NIAAA include but are not limited to:

- Research on prevention of early initiation of and/or continued alcohol use across the lifespan that incorporates risk and resilience factors in response to structural racism such as historical trauma, immigration policies, school and language-based discrimination, housing and criminal justice practices, etc.

- Research on development of treatment interventions and service delivery approaches that address systemic racism and structural barriers to alcohol use such as staff training, service delivery settings and schedules, use of digital platforms, language and health literacy barriers, costs, etc.

- Integration of culturally-grounded, culturally competent and/or bilingual alcohol prevention and treatment services that address effects of structural racism in general health and specialty services settings (including aftercare), school based settings, criminal justice settings, etc.

**NIAID** supports basic and applied research to better understand, treat, and prevent infectious, immunologic, and allergic diseases, with the goal of developing new therapies, vaccines, diagnostic tests, and other technologies. Research areas include microbiology and infectious diseases, HIV/AIDS and HIV/AIDS-related research, immunology, allergy, transplantation, and biodefense. NIAID is interested in intervention research within the scope of NIAID's mission that will develop and evaluate strategies that mitigate the impact of structural racism and discrimination (SRD).

Specific areas of interest to **NIAID** include, but are not limited to:

HIV/AIDS Research

- Strategies to identify and end structural racism in health care settings of relevance to persons with HIV (PWH) including structural racism that may impact the type of care that is offered to PWH, the way the care is delivered, and racism existent in care adjacent settings that may impact PWH.
- Strategies to identify and end structural racism in non-care settings that may impact the ability of PWH to engage in appropriate medical care and/or fully benefit from medical care.
- Research to address SRD at the health policy, organization and provider levels that fosters medical mistrust and impedes uptake and retention in HIV prevention and treatment programs.
- Research to identify and counter SRD and related intersectional stigma resulting from the impact of HIV, sexual/gender affiliation and/or common co-occurring medical and social conditions (e.g., mental health and substance abuse disorders, poverty).
- Characterization of targeted interventions that can be deployed as public health policies to mitigate the impact of SRD that exists in health systems and health care delivery strategies to improve engagement and retention in care among populations affected by SRD.
- Research to elucidate effective patterns of communications that enable healthcare providers of all races and ethnicities to overcome barriers of medical mistrust in healthcare and improve participation of racial minorities in research.
- Research to evaluate structural interventions that address disparities in access to research by both participants and researchers from racial and ethnic minorities; and, the role of racism and health disparities in terms of access to both accurate HIV prevention information and pre-exposure prophylaxis (PrEP) products, including the continued and consistent use of HIV PrEP.

Allergy, Immunology and Transplantation

- Role of SRD in sustaining disparities in the development, prevalence, and management of asthma, food allergies, allergic rhinitis, allocation of organs for transplantations, allograft function and survival in children from low-income families and racial and ethnic minorities.
- Examine the contribution of SRD to 1) the morbidity and mortality and 2) the hesitancy to participate in clinical research and methods to overcome the hesitancy, seen in some autoimmune diseases (e.g. Systemic lupus erythematosus (SLE) that are more common and potentially more severe in racial and ethnic minorities.
- Interventions to evaluate the impact of SRD on access to kidney transplantation among persons on renal dialysis.

Infectious Diseases

- Research that studies the impact of SRD on infectious disease (ID) prevalence and health outcomes, access to ID vaccines, diagnosis, prevention technologies and products, and treatment along with service delivery models to expand access and utilization in racial, ethnic, and sexual minorities.
- Effects of SRD on health outcome following respiratory and sexually transmitted diseases (e.g. COVID-19, gonorrhea, syphilis), vaccine uptake (e.g. COVID-19, HPV) and access to diagnosis and treatment especially Sexually Transmitted Infections (STIs).
- Innovative treatment options to address antimicrobial resistance (especially STIs and Tuberculosis (TB), supply chain limitations, and other barriers to effective treatment.

**NIAMS** encourages research designed to understand and address the impact of SRD on minority health and health disparities, among underserved and minority populations who also are at risk for or who are patients with NIAMS diseases of interest (arthritis, musculoskeletal, skin). NIAMS has interest in research understanding and addressing macro-level factors that underlie SRD and subsequent health consequences.

Areas of specific interest to **NIAMS** under this RFA include but are not limited to:

APHA App. 746

Case: 25-1611    Document: 00118310433    Page: 199    Date Filed: 07/08/2025    Entry ID: 6734280

4/23/25, 11:40 PM    Case: 1:25-cv-10787-BEM    Document 38-33    Filed 04/25/25    Page 36 of 57
Explanation of Intent Regarding Understanding the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

Observational research with focus on:

- Examination of the impact of SRD on access to and quality of care, including delays in diagnoses, treatment and rehabilitation.
- Identifying protective factors at multiple upstream levels (family, organizational, neighborhood, cultural and community) that are associated with less impact of SRD on health outcomes.
- Utilization of innovative design and analysis methods to evaluate natural experiments of existing efforts to mitigate SRD at a macro-level.

Intervention research with focus on:

- Projects that focus on prevention interventions that can reduce SRD and improve health-outcomes in NIAMS mission-relevant diseases.
- Projects that use multi-level and multi-component interventions that address SRD to improve health-outcomes in arthritis, musculoskeletal, and skin diseases.

**NIBIB** supports the development and integration of advanced bioengineering, sensing, imaging, and computational technologies for the improvement of human health and medical care.

Areas of specific interest to **NIBIB** under this FOA include. but are not limited to the following:

- Observational research to understand the role of structural racism and discrimination in causing and sustaining health disparities mediated through biomedical technologies (e.g., biomedical imaging, bioinformatics and bioengineering), such as
  a. the exclusion or inappropriate consideration of racial differences in needs finding, specification, design and testing of these technologies.
  b. the lack of availability, access, or insufficient/inappropriate application of such technologies in the prevention, diagnosis, and treatment of disease for certain groups or in certain settings, and
- Intervention research that addresses
  a. the eradication of implicit bias and racism in approaches and assumptions in needs finding, specification, design and testing of biomedical technologies,
  b. improving minority health, promoting health equity, and eliminating health disparities through the innovation of novel technologies or enhancement of existing technologies in biomedical imaging, bioinformatics and bioengineering.

**NIBIB** funding of clinical trials will be in accordance with NOT-EB-21-005 "NIBIB Guidance for Support of Clinical Trial Applications." Briefly, NIBIB will only support mission-focused (see NIBIB's program areas) early-stage clinical trial applications, i.e., feasibility, Phase I, first-in-human, safety, or other small clinical trials, that inform early-stage technology development. NIBIB will not support applications proposing pivotal, Phase II, III, IV, or trials in which the primary outcome is efficacy, effectiveness, or a post-market concern. Also, mechanistic trials are not supported unless the primary focus of the project is on technology development.

**NICHD** seeks applications that will address questions relevant to the NICHD mission and should align with the NICHD Strategic Plan (https://www.nichd.nih.gov/about/org/strategicplan).

**NICHD** is interested in the following **populations**: Infants, children, adolescents, and individuals in the transition from adolescence to adulthood; pregnant and lactating women; men and women of reproductive age with regards to reproductive health; girls and women from pre-puberty through perimenopause with regards to research on gynecological and/or reproductive health; individuals of any age with intellectual delays and/or disabilities. NICHD is also interested in how parents and other caretakers and/or family members exposure to SRD affects health outcomes for the NICHD populations of interest. In addition, NICHD is interested in research on how prospectively measured exposures to SRD in childhood affects adult health outcomes. NICHD is interested in both observational and intervention research, and, among observational research projects using longitudinal designs, is particularly interested in use of population-representative data.

**NICHD** is interested in the following **health and health-related outcomes**: Maternal and infant mortality and morbidity, adolescent and young adult mortality and morbidity; contraceptive use and non-use; reproductive health, gynecological health, and fertility; and, for NICHD populations of interest, access to health care and diagnosis and treatment of health problems. NICHD is interested in research on all the **domains** in which SRD may occur that are listed in this RFA, with particular interest in educational settings; the criminal justice system, including the juvenile justice system; and gynecological/reproductive health settings. NICHD is also interested in research on SRD that affects exposure to violence among NICHD populations of interest.

The **National Center for Medical Rehabilitation Research** within **NICHD** seeks applications for intervention research on individuals with physical disabilities. Areas of interest include but are not limited to referrals for and access to health care and inpatient and outpatient rehabilitation services for both primary and secondary conditions, and outcomes related to improving functional outcomes.

**NIDA** is interested in supporting observational/etiologic, prevention, treatment, and health services research to address the impact of structural racism and discrimination on substance use, substance use disorders, substance use consequences, and comorbid conditions including HIV. Topics of interest include but are not limited to:

- Research on the extent to which racial discrimination, systematic inequities, and segregation in housing, education, employment opportunities, and health resources contribute to and perpetuate disparities in access to substance use and HIV prevention, addiction treatment, and recovery services.
- Research on the effects of systematic racism and discrimination on behavioral, cognitive, and neurobiological markers known to increase vulnerability to substance use, substance use disorders, and HIV across the lifecourse.
- Studies of how bias in the criminal justice system, including arrest, incarceration, probation and post-sentencing practices, affect substance use trajectories, HIV/HCV risk, addiction-related health outcomes, and health disparities experienced by communities of color.
- Targeted efficacious, effective and scalable, culturally specific interventions to address social determinants of health by promoting resiliency and confronting structural racism, with a focus on stigma, discrimination, and prejudice in the context of SUD and HIV prevention and treatment services.
- Research partnerships with state and local officials to determine the impact of administrative and legislative measures to improve equity within housing, employment, and other areas of public policy on substance use outcomes in youth and adolescents.
- Research partnerships with state/local agencies and private or public health systems to develop models to eliminate systemic barriers to addiction care or addiction and HIV care, particularly those rooted in racism or structural discrimination.

**NIDCD** encourages either observational or interventional projects that aim to better understand and address the impact of SRD on minority health and health disparities as they relate to the mission areas of hearing, balance, taste, smell, voice, speech, and language across the lifespan. Areas of interest include but are not limited to applications that address the influence and mitigation of SRD on:

- the diagnosis, treatment, and re/habilitation of childhood hearing, voice, speech, and language disorders.
- the diagnosis, treatment, and rehabilitation of adults with communication disorders including but not limited to hearing loss and acquired neurologic communication disorders.
- the development and interpretation of tests/assessment approaches for voice, speech and language disorders and differences, including measures of dialectal code switching.

**NIDCR** is interested in observational research aimed at understanding the role of structural racism and discrimination (SRD) in contributing to oral health disparities. Additionally, interventional research that addresses SRD, with the goal of improving minority oral health and reduce oral health disparities, is of interest through this FOA.

Areas of specific interest to **NIDCR** include, but are not limited to, the following:

APHA App. 747

Case: 25-1611     Document: 00118310433     Page: 200     Date Filed: 07/08/2025     Entry ID: 6734280

4/23/25, 11:40 PM    Case 1:25-cv-10787-BEM   Document 38-33   Filed 04/25/25   Page 37 of 57
RFA-MD-21-004: Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

- Examination of racial/ethnic differences in management and treatment approaches for dental, oral, and craniofacial diseases/conditions, and the role of multi-level SRD factors (e.g. policies, organization characteristics, provider unconscious/implicit bias, etc.) in contributing to these differences.
- Examination of the impact of SRD on access to and quality of care and oral health outcomes, including the role residential segregation may play.
- Examination of the role of language barriers, cultural differences between patients and dental providers, or other impacts of multi-level SRD that may prevent minority groups from seeking oral health care.
- Identification of family, organizational, neighborhood, cultural, and community protective factors that moderate the relationship between SRD exposures and oral health.
- Interventions that address SRD in settings where oral health care is delivered across multiple domains (e.g. provider-patient interactions, service delivery, access to care, etc.) to improve oral health outcomes in minority groups that experience a higher prevalence of oral disease than their counterparts.

**NIDDK** is committed to promoting health equity and reducing and eliminating health disparities relevant to diabetes and other endocrine and metabolic diseases; digestive diseases, nutritional disorders, and obesity; and kidney, urologic, and hematologic diseases. For this FOA, NIDDK is interested in intervention projects focused on understanding and addressing the impact of structural racism and discrimination (SRD) on patients and populations disproportionately affected by conditions that fall within the mission of NIDDK. Meaningful stakeholder engaged approaches are encouraged to improve feasibility and maximum potential for sustainability of successful interventions beyond the funded project period. NIDDK is also interested in observational studies, such as deep characterization of SRD that will inform interventional studies and evaluation of natural experiments that employ appropriate designs and methodologies necessary to strengthen causal inferences.

**NIDDK** will not support studies that focus solely on training health care providers or testing communication and dissemination strategies to facilitate the use of health information.

The mission of **NIEHS** is to discover how the environment affects people to promote healthier lives. The NIEHS 2018-2023 Strategic Plan (https://www.niehs.nih.gov/about/strategicplan/index.cfm) emphasizes our ongoing commitment to the study of environmental health disparities and need for environmental justice among communities affected by toxic levels of exposure. Importantly, structural factors contribute to disproportionate exposure burdens affecting the health of racial, ethnic, immigrant, socioeconomically disadvantaged, and rural communities. Structural factors that intersect with environmental health include, for example, reversal of environmental protections that regulate harmful pollutants, and redlining practices or residential segregation that result in the location of racial/ethnic communities near industrial and/or heavily polluted areas.

**NIEHS** is interested in observational research examining the role of structural racism and discrimination (SRD) as a significant determinant in environmental health disparities, or evidence-based intervention research that mitigates or prevents the negative health outcomes attributable to environmental SRD. Applicants are **strongly encouraged** to utilize community engaged research approaches and include letters of support from community partners. Applications that demonstrate collaborative (i.e., community-academic partnerships) approaches to understand and/or address the negative health effects of environmental SRD across **multiple** health disparity communities will be prioritized. Areas of specific interest to NIEHS in environmental SRD include, but are not limited to: single or combined environmental exposures (i.e., mixtures) affecting the health of communities; health impacts of climate change, extreme weather and natural or human caused disasters; the built environment and greenspace, including green gentrification; studies grounded in community identified concerns around the intersection of environmental SRD and health outcomes; the impact of environmental SRD on health outcomes across the lifespan; and the role of environmental SRD in occupational exposures.

**NIGMS** supports basic research that increases our understanding of biological processes and lays the foundation for advances in disease diagnosis, treatment, and prevention. NIGMS' research mission (https://www.nigms.nih.gov/about/overview/) is aimed at understanding the principles, mechanisms, and processes that underlie living organisms, often using research models. NIGMS does not support research that is relevant to the diseases, organ systems, stages of life, or populations within the mission areas of other NIH Institutes and Centers. Areas of interest to NIGMS include but are not limited to studies that address:

- The impact of structural racism and discrimination (SRD) on health disparities that affect conditions related to clinical areas that NIGMS supports: sepsis (see NOT-GM-19-054 (NOT-GM-19-054)), injury and critical illness, anesthesiology, clinical pharmacology, wound healing, and innate immunity and inflammation.
- The sources of bias in computational research using electronic health records and other health-related data (e.g., artificial intelligence, machine learning, and development of improved algorithms and other methodologies), and/or the development of effective strategies to reduce these disparities.
- Computational modeling to understand the sources of SRD on health disparities in infectious disease spread, and/or to develop effective strategies to reduce these disparities.
- Mechanistic studies of the effects of discrimination-based social trauma on epigenetic and other molecular or cellular processes.

**NIMH** is interested in receiving applications that address research priority areas in translational, services and interventions research focused on mental health outcomes; and applications that address NIMH priority areas in HIV/AIDS research. Areas of interest include, but are not limited to, those below.

Translational Research:

- Elucidate mechanisms at the individual, community, and organizational levels by which structural racism and discrimination result in specific adverse mental health outcomes across the lifespan, especially those that can point towards therapeutic targets.

- Identify how structural racism and discrimination impact trajectories of mental health disorders across the lifespan, particularly focusing on sequential and integrative relationships across neural, behavioral, and environmental factors that lead to disparities in mental health outcomes.

- Studies that use or develop methods to systematically and reliably quantify individual exposure to structural racism and discrimination, including development of rigorous measures of environmental and sociocultural factors like neighborhood effects, access to and quality of healthcare, food and resource security, intersectionality, and cultural beliefs.

Interventions Research:

**NIMH** is interested in applications that focus on mental health as the primary outcome. Intervention research may include mental health promotion, prevention and/or treatment Interventions. Interventions may focus primarily on addressing structural racism and discrimination to improve mental health outcomes. Consistent with NIMH's experimental therapeutics approach, research designs should allow for the assessment of mechanisms through which the intervention modifies structural racism and discrimination and how these changes result in improvement in the targeted mental health outcomes. See the Support for Clinical Trials at NIMH (https://www.nimh.nih.gov/funding/opportunities-announcements/clinical-trials-foas/index.shtml)web page for additional information regarding dedicated FOAs for NIMH clinical trials research support.

Areas of interest include, but are not limited to:

- Interventions to address structural racism and discrimination by cultivating positive interactions and inclusive climates in schools, workplaces and other institutions, with the goal of improving mental health.
- Interventions to improve mental health and associated comorbidities by addressing structural racism and discrimination that takes place in different institutional settings (e.g., child welfare, juvenile and criminal justice, education, housing, etc.).
- Interventions to address structural racism and discrimination at the community level, with the goal of reducing risk for mental health and associated difficulties.

Services Research:

APHA App. 748

Case: 25-1611     Document: 00118310433     Page: 201     Date Filed: 07/08/2025     Entry ID: 6734280

4/23/25, 11:40 PM     Case: 1:25-cv-10787-BEM     Document 38-33     Filed 04/25/25     Page 38 of 57
RFA-MD-21-004: Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

- Non-intervention studies to identify specific, mutable factors indicative of structural racism and discrimination that may serve as targets of interventions to reduce structural racism as it impacts mental health outcomes.
- Non-intervention studies designed to examine structural factors that might be used to identify and/or measure systematic health disparities (e.g., use E.H.R. to examine patient, provider, and system level factors that represent systematic differences in identification, referral, quality of care).
- Studies testing the effectiveness of provider-, organization-, or systems-level interventions in reducing or eliminating structural racism and testing whether such reductions mediate improved mental health outcomes.
- Studies identifying structural aspects of provider, clinic, organization or systems processes in specific systems (e.g.: school or school systems, health care systems, justice systems, etc.) that may be associated with mental health outcomes and may serve as indicators of and measures of changes in structural racism.

HIV/AIDS Research:

- Studies to identify and address the mechanisms, pathways and negative impact of structural racism, discrimination, and intersectional stigma on HIV outcomes across the prevention, care and treatment continuum.
- Studies that examine the impact of bias and discrimination on patient-provider communication, informed decision-making, and HIV care outcomes in service delivery settings.
- Research to understand the role of structural racism and discrimination on uptake of HIV testing, PrEP and other biomedical prevention strategies on individuals from high-incidence populations.
- Research to explore strengths-based approaches, mechanisms for change and opportunities for trust-building and engagement in communities that have been historically impacted by racism and discrimination and are also disproportionately impacted by HIV.
- Studies to identify societal factors that contribute to persistent discrimination, polices or laws associated with HIV vulnerabilities or resiliencies (positive outcomes) over time.
- Studies to identify ways to combat HIV misinformation and poorly delivered communication that contributes to racism, xenophobia and other discriminatory practices that negatively impact HIV outcomes.

**NINDS** commits to reducing the disproportionate burden of neurological diseases experienced by underserved groups of society, including racial and ethnic minoritized, rural, and socioeconomically disadvantaged populations, by funding a spectrum of research from basic science through clinical studies and training the next generation of health equity investigators (https://www.ninds.nih.gov/Current-Research/Focus-Tools-Topics/Health-Disparities). NINDS supports research activities focused on understanding how structural racism and discrimination (SRD) contribute to inequalities in neurologic health, healthcare, and health outcomes in disparate populations, including racial and ethnic minorities, the geographically disadvantaged, sexual and gender minoritized individuals and others who have been historically unaddressed, marginalized, and adversely affected by persistent inequality and socioeconomic disadvantage.

**NINDS** is particularly interested in:

- Research on the impact of SRD on mechanisms related to increased risk of cognitive impairment and Alzheimer's Disease Related Dementias (Frontotemporal degeneration, Lewy Body dementia, mixed etiology dementias and vascular contributions to cognitive impairment and dementia).
- Research on structural or institutional factors that mitigate or exacerbate neurological inequalities in access to healthcare services for midlife and older age adults and/or ADRD patients and their caregivers/families.
- Studies to elucidate whether and how mechanisms connecting structural racism to neurological health outcomes, including well-being, independent function, cognition and ADRD, operate on multiple levels (e.g., individual, interpersonal, or societal).

A letter of intent and communication with **NINDS** program staff prior to submission of an application is strongly encouraged. Observational studies should be theory-based to enable the future development of actionable items and evidence-based interventions. Applicants proposing to develop interventions are expected to proactively identify a theory or model that applies to the intervention proposed and the critical variables expected to result in change. Applications are required to use an appropriate experimental design to test the proposed theory, identify the essential components of complex interventions, and/or elucidate the mechanism(s) by which an intervention exerts its effects. For the development of behavioral interventions, applicants are encouraged to articulate their research aims and a proposed framework.

**NINR** supports research that uses nursing's holistic perspective to improve individual and population health outcomes and eliminate health inequities by bridging biomedical science and provision of healthcare services with the realities of people's lives and living conditions (i.e., social determinants) across the clinical and community settings where nurses practice. These settings include hospitals, clinics, people's homes, long-term care facilities, schools, workplaces, criminal justice facilities, and the community at large. NINR recognizes the importance of engaging with and responding to the experiences of individuals, households, and populations.

Areas of specific interest to **NINR** include but are not limited to the following topics:

- Developmental, evaluation, and implementation research concerning interventions, programs, and policies aimed at addressing structural discrimination across clinical and community settings for their health effects. Studies adopting natural experiment, and clinical trial designs are all of interest, especially those adopting a holistic perspective on individual and population health.
- Studies aimed at better understanding factors moderating negative health effects of SRD. Studies of innovative models of care including social care and trauma-informed care are encouraged.
- Research on system level interventions to reduce negative effects of implicit bias in healthcare providers on health outcomes for NIH-designated populations with health disparities.

**NINR** will not support studies that focus solely on training nurses or other healthcare providers to reduce SRD.

The **OBSSR** is part of the Office of the Director of NIH and works in partnership with the 27 NIH Institutes and Centers to ensure that behavioral and social sciences research is well integrated into the NIH research enterprise. In alignment with its strategic priorities (https://obssr.od.nih.gov/about/strategic-plan/), **OBSSR** is interested in providing co-funding support for project(s) funded under this RFA that do one or more of the following: incorporate novel ways of assessing SRD; focus on the mechanisms through which SRD influence health outcomes; incorporate implementation science approaches; utilize innovative methods to evaluate natural experiments of existing efforts; identify protective factors and resiliency-based approaches. Note that OBSSR does not accept assignment of applications or manage awards that are funded. Please contact one of the ICs for inquiries regarding the suitability of the proposed project for the RFA and the IC's research portfolio.

The **ODP** is the lead office at NIH responsible for assessing, facilitating, and stimulating research in disease prevention, and disseminating the results of this research to improve public health. In partnership with the 27 NIH Institutes and Centers, ODP strives to increase the scope, quality, dissemination, and impact of NIH-supported prevention research. The ODP is interested in providing co-funding support for projects that have strong implications for disease prevention, promise for wide uptake, and that include innovative and appropriate design, measurement, and analysis methods. ODP has specific interests in projects seeking to do one or more of the following: develop analytic methods for rigorously measuring the structures and systems that sustain racial inequities; develop or adopt data sources and methods that accurately and appropriately represent minority and vulnerable communities; capitalize on community-based participatory research approaches for developing and testing interventions; assess for race/ethnic differences; incorporate implementation science approaches and strategies that will be responsive to community and health/service system needs; utilize innovative methods to evaluate natural experiments in healthcare and services delivery and health promotion interventions; and, increase uptake and long-term sustainability of evidence-based interventions and approaches. For additional information about ODP's research priorities and interests, please refer to the **ODP Strategic Plan for Fiscal Years 2019 2023** (https://prevention.nih.gov/about-odp/strategic-plan-2019-2023).

APHA App. 749

Applications must be relevant to the objectives of at least one of the participating NIH Institutes and Centers (IC) listed above. ODP does not award grants. Please contact the relevant IC Scientific/Research Contact(s) listed below for questions regarding IC research priorities and funding.

The **ORWH** is part of the Office of the Director of NIH and works in partnership with the 27 NIH Institutes and Centers to ensure that women's health research is part of the scientific framework at the NIH and is supported in the larger scientific community. Research in recent decades has adopted an intersectionality framework to study and explain the complex nature of inequality. Integrating the purposeful accounting of sex as a biological variable (SABV) and gender as a social variable, alongside race and social class considerations in biomedical research, will enhance understanding of the effects of discrimination and its magnitude on mental and physical health (i.e. impacts on maternal morbidity and mortality or multimorbidities among groups of women). **ORWH** is interested in providing support for interdisciplinary, behavioral, clinical, and/or translational studies incorporating intersectional analyses into studies of racism and discrimination exposure among populations experiencing health disparities, including groups of women who are understudied, underrepresented, and underreported in research. For additional guidance, please refer to the 2019-2023 Trans-NIH Strategic Plan for the Health of Women on the ORWH website (https://www.nih.gov/women/strategicplan (https://www.nih.gov/women/strategicplan)).

The **SGMRO** resides in the NIH Office of the Director and coordinates research and activities related to the health of sexual and gender minorities (SGMs; see NOT-OD-19-139 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-19-139.html) for more information) by working directly with the agency's Institutes, Centers, and Offices. A robust and growing body of evidence demonstrates that SGMs often face institutional discrimination and poorer health outcomes than their non-SGM peers. SGM people with intersecting identities, including those based on race, ethnicity, and/or other statuses highlighted in this FOA, may face distinct and exacerbated health issues and disparities, and structural racism and discrimination may act as key drivers, modifiers, and intensifiers of the health-related concerns and challenges of these individuals. **SGMRO** is interested in social, behavioral, clinical, translational, and health services research to investigate how structural racism and discrimination adversely affect the lives and well-being of the most vulnerable SGM populations and to develop sustainable long-term strategies to attend to these pressing issues.

See Section VIII. Other Information for award authorities and regulations.

## Section II. Award Information

**Funding Instrument**

Grant: A support mechanism providing money, property, or both to an eligible entity to carry out an approved project or activity.

**Application Types Allowed**

New

The OER Glossary (//grants.nih.gov/grants/guide/url_redirect.htm?id=11116) and the SF424 (R&R) Application Guide provide details on these application types. Only those application types listed here are allowed for this FOA.

**Clinical Trial?**

Optional: Accepting applications that either propose or do not propose clinical trial(s).

Need help determining whether you are doing a clinical trial? (https://grants.nih.gov/grants/guide/url_redirect.htm?id=82370)

**Funds Available and Anticipated Number of Awards**

APHA App. 750

Expiration of Funds for Understanding the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

NIMHD intends to commit $5,000,000 in FY2022 to fund 6-7 awards.

NCI intends to commit $1,000,000 in FY2022 to fund one award.

NCCIH intends to commit $850,000 in FY2022 to fund one award.

NEI intends to commit $1,000,000 in FY2022 to support one award.

NHGRI intends to commit $1,700,000 in FY2022 to fund 2 awards.

NHLBI intends to commit $1.5M to support up to 2 awards.

NIA intends to commit $4,500,000 in FY2022 to fund 6 awards, including $3,000,000 to fund 4 awards on Alzheimer's disease and related dementias and $1,500,000 to fund 2 awards on other topics.

NIAAA intends to commit $850,000 in FY2022 to fund one award.

NIDDK intends to commit $850,000 in FY 2022 to fund one award.

NIAID intends to commit $850,000 in FY2022 to fund one award.

NIAMS intends to commit $500,000 in FY2022 to fund one award.

NIBIB intends to commit $800,000 in FY2022 to fund one award.

NICHD intends to commit $850,000 in FY2022 to fund one award.

NIDA intends to commit $2,000,000 in FY2022 to fund 2 awards.

NIDCD intends to commit $700,000 in FY2022 to fund one award.

NIDCR intends to commit $750,000 in FY2022 to fund one award.

NIEHS intends to commit $850,000 in FY2022 to fund one award.

NIGMS intends to commit $2,000,000 in FY2022 to fund 4-6 awards.

NIMH intends to commit $850,000 in FY2022 to fund one award.

NINDS intends to commit $850,000 in FY2022 to fund one award.

NINR intends to commit $2,550,000 in FY2022 to fund 3 awards.

The OD, OBSSR, ODP, ORWH, and SGMRO have committed funds in FY2022 towards co-funding.

---

**Award Budget**

Application budgets are limited to $500,000 direct costs annually, not including consortia F&A.

---

**Award Project Period**

The scope of the proposed project should determine the project period. The maximum project period is 5 years.

NIH grants policies as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.htm?id=11120) will apply to the applications submitted and awards made from this FOA.

## Section III. Eligibility Information

### 1. Eligible Applicants

**Eligible Organizations**

Higher Education Institutions

- Public/State Controlled Institutions of Higher Education
- Private Institutions of Higher Education

The following types of Higher Education Institutions are always encouraged to apply for NIH support as Public or Private Institutions of Higher Education:

- Hispanic-serving Institutions
- Historically Black Colleges and Universities (HBCUs)
- Tribally Controlled Colleges and Universities (TCCUs)
- Alaska Native and Native Hawaiian Serving Institutions
- Asian American Native American Pacific Islander Serving Institutions (AANAPISIs)

Nonprofits Other Than Institutions of Higher Education

- Nonprofits with 501(c)(3) IRS Status (Other than Institutions of Higher Education)
- Nonprofits without 501(c)(3) IRS Status (Other than Institutions of Higher Education)

For-Profit Organizations

- Small Businesses
- For-Profit Organizations (Other than Small Businesses)

Local Governments

- State Governments
- County Governments

APHA App. 751

- City or Township Governments
- Special District Governments
- Indian/Native American Tribal Governments (Federally Recognized)
- Indian/Native American Tribal Governments (Other than Federally Recognized)

Federal Governments

- U.S. Territory or Possession

Other

- Independent School Districts
- Public Housing Authorities/Indian Housing Authorities
- Native American Tribal Organizations (other than Federally recognized tribal governments)
- Faith-based or Community-based Organizations
- Regional Organizations

**Foreign Institutions**

Non-domestic (non-U.S.) Entities (Foreign Institutions) **are not** eligible to apply.

Non-domestic (non-U.S.) components of U.S. Organizations **are not** eligible to apply.

Foreign components, as defined in the *NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.htm?id=11118)*, **are not** allowed.

**Required Registrations**
**Applicant organizations**

Applicant organizations must complete and maintain the following registrations as described in the SF 424 (R&R) Application Guide to be eligible to apply for or receive an award. All registrations must be completed prior to the application being submitted. Registration can take 6 weeks or more, so applicants should begin the registration process as soon as possible. The NIH Policy on Late Submission of Grant Applications (//grants.nih.gov/grants/guide/notice-files/NOT-OD-15-039.html) states that failure to complete registrations in advance of a due date is not a valid reason for a late submission.

- Dun and Bradstreet Universal Numbering System (DUNS) (http://fedgov.dnb.com/webform) - All registrations require that applicants be issued a DUNS number. After obtaining a DUNS number, applicants can begin both SAM and eRA Commons registrations. The same DUNS number must be used for all registrations, as well as on the grant application.
- System for Award Management (SAM) (https://www.sam.gov/portal/public/SAM/) Applicants must complete and maintain an active registration, which requires renewal at least annually. The renewal process may require as much time as the initial registration. SAM registration includes the assignment of a Commercial and Government Entity (CAGE) Code for domestic organizations which have not already been assigned a CAGE Code.
    - NATO Commercial and Government Entity (NCAGE) Code (//grants.nih.gov/grants/guide/url_redirect.htm?id=11176) Foreign organizations must obtain an NCAGE code (in lieu of a CAGE code) in order to register in SAM.
- eRA Commons (//grants.nih.gov/grants/guide/url_redirect.htm?id=11123) - Applicants must have an active DUNS number to register in eRA Commons. Organizations can register with the eRA Commons as they are working through their SAM or Grants.gov registration, but all registrations must be in place by time of submission. eRA Commons requires organizations to identify at least one Signing Official (SO) and at least one Program Director/Principal Investigator (PD/PI) account in order to submit an application.
- Grants.gov Applicants must have an active DUNS number and SAM registration in order to complete the Grants.gov registration.

**Program Directors/Principal Investigators (PD(s)/PI(s))**

All PD(s)/PI(s) must have an eRA Commons account. PD(s)/PI(s) should work with their organizational officials to either create a new account or to affiliate their existing account with the applicant organization in eRA Commons. If the PD/PI is also the organizational Signing Official, they must have two distinct eRA Commons accounts, one for each role. Obtaining an eRA Commons account can take up to 2 weeks.

**Eligible Individuals (Program Director/Principal Investigator)**

Any individual(s) with the skills, knowledge, and resources necessary to carry out the proposed research as the Program Director(s)/Principal Investigator(s) (PD(s)/PI(s)) is invited to work with his/her organization to develop an application for support. Individuals from underrepresented racial and ethnic groups as well as individuals with disabilities are always encouraged to apply for NIH support.

For institutions/organizations proposing multiple PDs/PIs, visit the Multiple Program Director/Principal Investigator Policy and submission details in the Senior/Key Person Profile (Expanded) Component of the SF424 (R&R) Application Guide.

**2. Cost Sharing**

This FOA does not require cost sharing as defined in the NIH Grants Policy Statement. (//grants.nih.gov/grants/guide/url_redirect.htm?id=11126)

**3. Additional Information on Eligibility**

**Number of Applications**

Applicant organizations may submit more than one application, provided that each application is scientifically distinct.

The NIH will not accept duplicate or highly overlapping applications under review at the same time. This means that the NIH will not accept:

- A new (A0) application that is submitted before issuance of the summary statement from the review of an overlapping new (A0) or resubmission (A1) application.
- A resubmission (A1) application that is submitted before issuance of the summary statement from the review of the previous new (A0) application.
- An application that has substantial overlap with another application pending appeal of initial peer review (see NOT-OD-11-101 (//grants.nih.gov/grants/guide/notice-files/NOT-OD-11-101.html))

# Section IV. Application and Submission Information

## 1. Requesting an Application Package

The application forms package specific to this opportunity must be accessed through ASSIST, Grants.gov Workspace or an institutional system-to-system solution. Links to apply using ASSIST or Grants.gov Workspace are available in Part 1 of this FOA. See your administrative office for instructions if you plan to use an institutional system-to-system solution.

APHA App. 752

## 2. Content and Form of Application Submission

It is critical that applicants follow the instructions in the Research (R) Instructions in the SF424 (R&R) Application Guide (//grants.nih.gov/grants/guide/url_redirect.htm?id=12000) except where instructed in this funding opportunity announcement to do otherwise. Conformance to the requirements in the Application Guide is required and strictly enforced. Applications that are out of compliance with these instructions may be delayed or not accepted for review.

### Letter of Intent

Although a letter of intent is not required, is not binding, and does not enter into the review of a subsequent application, the information that it contains allows IC staff to estimate the potential review workload and plan the review.

By the date listed in Part 1. Overview Information, prospective applicants are asked to submit a letter of intent that includes the following information:

- Descriptive title of proposed activity
- Name(s), address(es), and telephone number(s) of the PD(s)/PI(s)
- Names of other key personnel
- Participating institution(s)
- Number and title of this funding opportunity

The letter of intent should be sent to:

Yujing Liu, MD, PhD
National Institute on Minority Health and Health Disparities (NIMHD)
Telephone: 301-827-7815
Email: liuyujin@mail.nih.gov

### Page Limitations

All page limitations described in the SF424 Application Guide and the Table of Page Limits (//grants.nih.gov/grants/guide/url_redirect.htm?id=11133) must be followed.

### Instructions for Application Submission

The following section supplements the instructions found in the SF424 (R&R) Application Guide and should be used for preparing an application to this FOA.

### SF424(R&R) Cover

All instructions in the SF424 (R&R) Application Guide must be followed.

### SF424(R&R) Project/Performance Site Locations

All instructions in the SF424 (R&R) Application Guide must be followed.

### SF424(R&R) Other Project Information

All instructions in the SF424 (R&R) Application Guide must be followed.

### SF424(R&R) Senior/Key Person Profile

All instructions in the SF424 (R&R) Application Guide must be followed.

### R&R or Modular Budget

All instructions in the SF424 (R&R) Application Guide must be followed.

### R&R Subaward Budget

All instructions in the SF424 (R&R) Application Guide must be followed.

### PHS 398 Cover Page Supplement

All instructions in the SF424 (R&R) Application Guide must be followed.

### PHS 398 Research Plan

All instructions in the SF424 (R&R) Application Guide must be followed, with the following additional instructions:

**Research Strategy:** Identify the health disparity populations that will be the focus of the project and describe the documented health disparity that will be studied. Provide a justification for how the specific types of SRD to be studied constitute SRD. Provide a conceptual model that describes hypothesized causal pathways between SRD and health outcomes. Describe data sources that will be used to document SRD. Provide a data analytic plan that specifies how multi-level factors, intervention effects and interactions, or outcomes will be handled, as appropriate. Describe and specify the roles of collaborators. For intervention projects, describe how the intervention will directly address the cause or source of SRD. Specify how organizations, agencies, or programs where the SRD is originating from or being sustained will be involved in the project, including involvement of leadership from these organizations as well as other individuals or groups. Describe the potential of the intervention to be sustainable in the intervention settings after the project is over and scalable to other settings.

**Resource Sharing Plan**: Individuals are required to comply with the instructions for the Resource Sharing Plans as provided in the SF424 (R&R) Application Guide.

The following modifications also apply:

- All applications, regardless of the amount of direct costs requested for any one year, should address a Data Sharing Plan.

### Appendix:

Only limited Appendix materials are allowed. Follow all instructions for the Appendix as described in the SF424 (R&R) Application Guide.

### PHS Human Subjects and Clinical Trials Information

When involving human subjects research, clinical research, and/or NIH-defined clinical trials (and when applicable, clinical trials research experience) follow all instructions for the PHS Human Subjects and Clinical Trials Information form in the SF424 (R&R) Application Guide, with the following additional instructions:

If you answered Yes to the question are Human Subjects Involved? on the R&R Other Project Information form, you must include at least one human subjects study record using the **Study Record: PHS Human Subjects and Clinical Trials Information** form or **Delayed Onset Study** record.

**Study Record: PHS Human Subjects and Clinical Trials Information**

All instructions in the SF424 (R&R) Application Guide must be followed.

APHA App. 753

Expanding or Retending Existing Funding Opportunities to Promote Diversity in the Health-Related Sciences by Addressing Discrimination and Unlawful... | Health and Health Di...

**Delayed Onset Study**

Note: Delayed onset does NOT apply to a study that can be described but will not start immediately (i.e., delayed start).All instructions in the SF424 (R&R) Application Guide must be followed.

**PHS Assignment Request Form**

All instructions in the SF424 (R&R) Application Guide must be followed.

**3. Unique Entity Identifier and System for Award Management (SAM)**

See Part 1. Section III.1 for information regarding the requirement for obtaining a unique entity identifier and for completing and maintaining active registrations in System for Award Management (SAM), NATO Commercial and Government Entity (NCAGE) Code (if applicable), eRA Commons, and Grants.gov.

**4. Submission Dates and Times**

Part I. Overview Information contains information about Key Dates and times. Applicants are encouraged to submit applications before the due date to ensure they have time to make any application corrections that might be necessary for successful submission. When a submission date falls on a weekend or a Federal holiday (https://grants.nih.gov/grants/guide/url_redirect.htm?id=82380), the application deadline is automatically extended to the next business day.

Organizations must submit applications to Grants.gov (//grants.nih.gov/grants/guide/url_redirect.htm?id=11128) (the online portal to find and apply for grants across all Federal agencies). Applicants must then complete the submission process by tracking the status of the application in the eRA Commons (//grants.nih.gov/grants/guide/url_redirect.htm?id=11123), NIH's electronic system for grants administration. NIH and Grants.gov systems check the application against many of the application instructions upon submission. Errors must be corrected and a changed/corrected application must be submitted to Grants.gov on or before the application due date and time. If a Changed/Corrected application is submitted after the deadline, the application will be considered late. Applications that miss the due date and time are subjected to the NIH Policy on Late Application Submission.

Applicants are responsible for viewing their application before the due date in the eRA Commons to ensure accurate and successful submission.

Information on the submission process and a definition of on-time submission are provided in the SF424 (R&R) Application Guide.

**5. Intergovernmental Review (E.O. 12372)**

This initiative is not subject to intergovernmental review. (//grants.nih.gov/grants/guide/url_redirect.htm?id=11142)

**6. Funding Restrictions**

All NIH awards are subject to the terms and conditions, cost principles, and other considerations described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.htm?id=11120).

Pre-award costs are allowable only as described in the NIH Grants Policy Statement. (//grants.nih.gov/grants/guide/url_redirect.htm?id=11143).

**7. Other Submission Requirements and Information**

Applications must be submitted electronically following the instructions described in the SF424 (R&R) Application Guide. Paper applications will not be accepted.

Applicants must complete all required registrations before the application due date. Section III. Eligibility Information contains information about registration.

For assistance with your electronic application or for more information on the electronic submission process, visit How to Apply Application Guide (https://grants.nih.gov/grants/how-to-apply-application-guide.html). If you encounter a system issue beyond your control that threatens your ability to complete the submission process on-time, you must follow the Dealing with System Issues (https://grants.nih.gov/grants/how-to-apply-application-guide/due-dates-and-submission-policies/dealing-with-system-issues.htm) guidance. For assistance with application submission, contact the Application Submission Contacts in Section VII.

**Important reminders:**

All PD(s)/PI(s) must include their eRA Commons ID in the Credential field of the Senior/Key Person Profile Component of the SF424(R&R) Application Package. Failure to register in the Commons and to include a valid PD/PI Commons ID in the credential field will prevent the successful submission of an electronic application to NIH. See Section III of this FOA for information on registration requirements.

The applicant organization must ensure that the DUNS number it provides on the application is the same number used in the organization's profile in the eRA Commons and for the System for Award Management. Additional information may be found in the SF424 (R&R) Application Guide.

See more tips (//grants.nih.gov/grants/guide/url_redirect.htm?id=11146) for avoiding common errors.

Upon receipt, applications will be evaluated for completeness and compliance with application instructions by the Center for Scientific Review and responsiveness by components of participating organizations, NIH. Applications that are incomplete, non-compliant and/or nonresponsive will not be reviewed.

**Post Submission Materials**

Applicants are required to follow the instructions for post-submission materials, as described in the the policy (//grants.nih.gov/grants/guide/url_redirect.htm?id=82299). Any instructions provided here are in addition to the instructions in the policy.

# Section V. Application Review Information

**1. Criteria**

Only the review criteria described below will be considered in the review process. Applications submitted to the NIH in support of the NIH mission (//grants.nih.gov/grants/guide/url_redirect.htm?id=11149) are evaluated for scientific and technical merit through the NIH peer review system.

A proposed Clinical Trial application may include study design, methods, and intervention that are not by themselves innovative but address important questions or unmet needs. Additionally, the results of the clinical trial may indicate that further clinical development of the intervention is unwarranted or lead to new avenues of scientific investigation.

**Overall Impact**

Reviewers will provide an overall impact score to reflect their assessment of the likelihood for the project to exert a sustained, powerful influence on the research field(s) involved, in consideration of the following review criteria and additional review criteria (as applicable for the project proposed).

**Scored Review Criteria**

Reviewers will consider each of the review criteria below in the determination of scientific merit, and give a separate score for each. An application does not need to be strong in all categories to be judged likely to have major scientific impact. For example, a project that by its nature is not innovative may be essential to advance a field.

APHA App. 754

Case: 25-1611     Document: 00118310433     Page: 207     Date Filed: 07/08/2025     Entry ID: 6734280

4/23/25, 11:40 PM        Case 1:25-cv-10787-BEM   Document 38-33   Filed 04/25/25   Page 34 of 57
RFA-MD-21-004: Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

#### Significance

Does the project address an important problem or a critical barrier to progress in the field? Is the prior research that serves as the key support for the proposed project rigorous? If the aims of the project are achieved, how will scientific knowledge, technical capability, and/or clinical practice be improved? How will successful completion of the aims change the concepts, methods, technologies, treatments, services, or preventative interventions that drive this field?

**Specific to this FOA:** Does this project identify clearly and provide justification for study of the targeted health disparity populations? Does the project address a documented health disparity that is clearly specified and justified? Is an appropriate justification provided for how the types of SRD to be studied constitute SRD? Is an appropriate conceptual model provided that describes hypothesized causal pathways between SRD and health outcomes? For intervention projects, is a clear and compelling rationale provided for how the intervention will directly address the cause or source of SRD? Does the intervention have potential to be sustainable in the intervention settings after the project is over and scalable to other settings?

**In addition, for applications involving clinical trials**

Are the scientific rationale and need for a clinical trial to test the proposed hypothesis or intervention well supported by preliminary data, clinical and/or preclinical studies, or information in the literature or knowledge of biological mechanisms? For trials focusing on clinical or public health endpoints, is this clinical trial necessary for testing the safety, efficacy or effectiveness of an intervention that could lead to a change in clinical practice, community behaviors or health care policy? For trials focusing on mechanistic, behavioral, physiological, biochemical, or other biomedical endpoints, is this trial needed to advance scientific understanding?

#### Investigator(s)

Are the PD(s)/PI(s), collaborators, and other researchers well suited to the project? If Early Stage Investigators or those in the early stages of independent careers, do they have appropriate experience and training? If established, have they demonstrated an ongoing record of accomplishments that have advanced their field(s)? If the project is collaborative or multi-PD/PI, do the investigators have complementary and integrated expertise; are their leadership approach, governance and organizational structure appropriate for the project?

**Specific to this FOA:** Are the roles of collaborators clearly described and appropriate? For intervention studies, is the involvement of personnel from the organizations, agencies, or programs where the SRD is originating from or being sustained specified and appropriate?

**In addition, for applications involving clinical trials**

With regard to the proposed leadership for the project, do the PD/PI(s) and key personnel have the expertise, experience, and ability to organize, manage and implement the proposed clinical trial and meet milestones and timelines? Do they have appropriate expertise in study coordination, data management and statistics? For a multicenter trial, is the organizational structure appropriate and does the application identify a core of potential center investigators and staffing for a coordinating center?

#### Innovation

Does the application challenge and seek to shift current research or clinical practice paradigms by utilizing novel theoretical concepts, approaches or methodologies, instrumentation, or interventions? Are the concepts, approaches or methodologies, instrumentation, or interventions novel to one field of research or novel in a broad sense? Is a refinement, improvement, or new application of theoretical concepts, approaches or methodologies, instrumentation, or interventions proposed?

**In addition, for applications involving clinical trials**

Does the design/research plan include innovative elements, as appropriate, that enhance its sensitivity, potential for information or potential to advance scientific knowledge or clinical practice?

#### Approach

Are the overall strategy, methodology, and analyses well-reasoned and appropriate to accomplish the specific aims of the project? Have the investigators included plans to address weaknesses in the rigor of prior research that serves as the key support for the proposed project? Have the investigators presented strategies to ensure a robust and unbiased approach, as appropriate for the work proposed? Are potential problems, alternative strategies, and benchmarks for success presented? If the project is in the early stages of development, will the strategy establish feasibility and will particularly risky aspects be managed? Have the investigators presented adequate plans to address relevant biological variables, such as sex, for studies in vertebrate animals or human subjects?

If the project involves human subjects and/or NIH-defined clinical research, are the plans to address 1) the protection of human subjects from research risks, and 2) inclusion (or exclusion) of individuals on the basis of sex/gender, race, and ethnicity, as well as the inclusion or exclusion of individuals of all ages (including children and older adults), justified in terms of the scientific goals and research strategy proposed?

**Specific to this FOA:** Are the data sources used to document SRD identified and appropriate? Is an appropriate data analytic plan provided that specifies how multi-level factors, intervention effects and interactions, or outcomes will be handled, as applicable?

**In addition, for applications involving clinical trials**

Does the application adequately address the following, if applicable

*Study Design*

Is the study design justified and appropriate to address primary and secondary outcome variable(s)/endpoints that will be clear, informative and relevant to the hypothesis being tested? Is the scientific rationale/premise of the study based on previously well-designed preclinical and/or clinical research? Given the methods used to assign participants and deliver interventions, is the study design adequately powered to answer the research question(s), test the proposed hypothesis/hypotheses, and provide interpretable results? Is the trial appropriately designed to conduct the research efficiently? Are the study populations (size, gender, age, demographic group), proposed intervention arms/dose, and duration of the trial, appropriate and well justified?

Are potential ethical issues adequately addressed? Is the process for obtaining informed consent or assent appropriate? Is the eligible population available? Are the plans for recruitment outreach, enrollment, retention, handling dropouts, missed visits, and losses to follow-up appropriate to ensure robust data collection? Are the planned recruitment timelines feasible and is the plan to monitor accrual adequate? Has the need for randomization (or not), masking (if appropriate), controls, and inclusion/exclusion criteria been addressed? Are differences addressed, if applicable, in the intervention effect due to sex/gender and race/ethnicity?

Are the plans to standardize, assure quality of, and monitor adherence to, the trial protocol and data collection or distribution guidelines appropriate? Is there a plan to obtain required study agent(s)? Does the application propose to use existing available resources, as applicable?

*Data Management and Statistical Analysis*

Are planned analyses and statistical approach appropriate for the proposed study design and methods used to assign participants and deliver interventions? Are the procedures for data management and quality control of data adequate at clinical site(s) or at center laboratories, as applicable? Have the methods for standardization of

APHA App. 755

procedures for data management to assess the effect of the intervention and quality control been addressed? Is there a plan to complete data analysis within the proposed period of the award?

### Environment

Will the scientific environment in which the work will be done contribute to the probability of success? Are the institutional support, equipment and other physical resources available to the investigators adequate for the project proposed? Will the project benefit from unique features of the scientific environment, subject populations, or collaborative arrangements?

**In addition, for applications involving clinical trials**

If proposed, are the administrative, data coordinating, enrollment and laboratory/testing centers, appropriate for the trial proposed?

Does the application adequately address the capability and ability to conduct the trial at the proposed site(s) or centers? Are the plans to add or drop enrollment centers, as needed, appropriate?

If international site(s) is/are proposed, does the application adequately address the complexity of executing the clinical trial?

If multi-sites/centers, is there evidence of the ability of the individual site or center to: (1) enroll the proposed numbers; (2) adhere to the protocol; (3) collect and transmit data in an accurate and timely fashion; and, (4) operate within the proposed organizational structure?

## Additional Review Criteria

As applicable for the project proposed, reviewers will evaluate the following additional items while determining scientific and technical merit, and in providing an overall impact score, but will not give separate scores for these items.

### Study Timeline

**Specific to applications involving clinical trials**

Is the study timeline described in detail, taking into account start-up activities, the anticipated rate of enrollment, and planned follow-up assessment? Is the projected timeline feasible and well justified? Does the project incorporate efficiencies and utilize existing resources (e.g., CTSAs, practice-based research networks, electronic medical records, administrative database, or patient registries) to increase the efficiency of participant enrollment and data collection, as appropriate?

Are potential challenges and corresponding solutions discussed (e.g., strategies that can be implemented in the event of enrollment shortfalls)?

### Protections for Human Subjects

For research that involves human subjects but does not involve one of the categories of research that are exempt under 45 CFR Part 46, the committee will evaluate the justification for involvement of human subjects and the proposed protections from research risk relating to their participation according to the following five review criteria: 1) risk to subjects, 2) adequacy of protection against risks, 3) potential benefits to the subjects and others, 4) importance of the knowledge to be gained, and 5) data and safety monitoring for clinical trials.

For research that involves human subjects and meets the criteria for one or more of the categories of research that are exempt under 45 CFR Part 46, the committee will evaluate: 1) the justification for the exemption, 2) human subjects involvement and characteristics, and 3) sources of materials. For additional information on review of the Human Subjects section, please refer to the Guidelines for the Review of Human Subjects (//grants.nih.gov/grants/guide/url_redirect.htm?id=11175).

### Inclusion of Women, Minorities, and Individuals Across the Lifespan

When the proposed project involves human subjects and/or NIH-defined clinical research, the committee will evaluate the proposed plans for the inclusion (or exclusion) of individuals on the basis of sex/gender, race, and ethnicity, as well as the inclusion (or exclusion) of individuals of all ages (including children and older adults) to determine if it is justified in terms of the scientific goals and research strategy proposed. For additional information on review of the Inclusion section, please refer to the Guidelines for the Review of Inclusion in Clinical Research (//grants.nih.gov/grants/guide/url_redirect.htm?id=11174).

### Vertebrate Animals

The committee will evaluate the involvement of live vertebrate animals as part of the scientific assessment according to the following criteria: (1) description of proposed procedures involving animals, including species, strains, ages, sex, and total number to be used; (2) justifications for the use of animals versus alternative models and for the appropriateness of the species proposed; (3) interventions to minimize discomfort, distress, pain and injury; and (4) justification for euthanasia method if NOT consistent with the AVMA Guidelines for the Euthanasia of Animals. Reviewers will assess the use of chimpanzees as they would any other application proposing the use of vertebrate animals. For additional information on review of the Vertebrate Animals section, please refer to the Worksheet for Review of the Vertebrate Animal Section (//grants.nih.gov/grants/guide/url_redirect.htm?id=11150).

### Biohazards

Reviewers will assess whether materials or procedures proposed are potentially hazardous to research personnel and/or the environment, and if needed, determine whether adequate protection is proposed.

### Resubmissions

Not Applicable

### Renewals

Not Applicable

### Revisions

Not Applicable

## Additional Review Considerations

As applicable for the project proposed, reviewers will consider each of the following items, but will not give scores for these items, and should not consider them in providing an overall impact score.

### Applications from Foreign Organizations

Not Applicable.

Expiration of Understanding and Combating the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

### Select Agent Research

Reviewers will assess the information provided in this section of the application, including 1) the Select Agent(s) to be used in the proposed research, 2) the registration status of all entities where Select Agent(s) will be used, 3) the procedures that will be used to monitor possession use and transfer of Select Agent(s), and 4) plans for appropriate biosafety, biocontainment, and security of the Select Agent(s).

### Resource Sharing Plans

Reviewers will comment on whether the following Resource Sharing Plans, or the rationale for not sharing the following types of resources, are reasonable: (1) Data Sharing Plan (/grants.nih.gov/grants/guide/url_redirect.htm?id=11151); (2) Sharing Model Organisms (/grants.nih.gov/grants/guide/url_redirect.htm?id=11152); and (3) Genomic Data Sharing Plan (GDS) (/grants.nih.gov/grants/guide/url_redirect.htm?id=11153).

### Authentication of Key Biological and/or Chemical Resources:

For projects involving key biological and/or chemical resources, reviewers will comment on the brief plans proposed for identifying and ensuring the validity of those resources.

### Budget and Period of Support

Reviewers will consider whether the budget and the requested period of support are fully justified and reasonable in relation to the proposed research.

### 2. Review and Selection Process

Applications will be evaluated for scientific and technical merit by (an) appropriate Scientific Review Group(s) convened by NIMHD, in accordance with NIH peer review policy and procedures (/grants.nih.gov/grants/guide/url_redirect.htm?id=11154), using the stated review criteria (file:///C:/Users/mckenziene/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/13V4QPZR/Research%20Draft.doc#_1._Criteria). Assignment to a Scientific Review Group will be shown in the eRA Commons.

As part of the scientific peer review, all applications will receive a written critique.

Applications may undergo a selection process in which only those applications deemed to have the highest scientific and technical merit (generally the top half of applications under review) will be discussed and assigned an overall impact score.

Appeals (/grants.nih.gov/grants/guide/notice-files/NOT-OD-11-064.html) of initial peer review will not be accepted for applications submitted in response to this FOA.

Applications will be assigned on the basis of established PHS referral guidelines to the appropriate NIH Institute or Center. Applications will compete for available funds with all other recommended applications submitted in response to this FOA. Following initial peer review, recommended applications will receive a second level of review by the appropriate national Advisory Council or Board. The following will be considered in making funding decisions:

- Scientific and technical merit of the proposed project as determined by scientific peer review.
- Availability of funds.
- Relevance of the proposed project to program priorities.
- Representation of health disparity populations and/or types of SRD addressed.

### 3. Anticipated Announcement and Award Dates

After the peer review of the application is completed, the PD/PI will be able to access his or her Summary Statement (written critique) via the eRA Commons (/grants.nih.gov/grants/guide/url_redirect.htm?id=11123). Refer to Part 1 for dates for peer review, advisory council review, and earliest start date. Information regarding the disposition of applications is available in the NIH Grants Policy Statement (/grants.nih.gov/grants/guide/url_redirect.htm?id=11156).

## Section VI. Award Administration Information

### 1. Award Notices

If the application is under consideration for funding, NIH will request "just-in-time" information from the applicant as described in the NIH Grants Policy Statement (/grants.nih.gov/grants/guide/url_redirect.htm?id=11157).

A formal notification in the form of a Notice of Award (NoA) will be provided to the applicant organization for successful applications. The NoA signed by the grants management officer is the authorizing document and will be sent via email to the recipient's business official.

Awardees must comply with any funding restrictions described in Section IV.5. Funding Restrictions. Selection of an application for award is not an authorization to begin performance. Any costs incurred before receipt of the NoA are at the recipient's risk. These costs may be reimbursed only to the extent considered allowable pre-award costs.

Any application awarded in response to this FOA will be subject to terms and conditions found on the Award Conditions and Information for NIH Grants (/grants.nih.gov/grants/guide/url_redirect.htm?id=11158) website. This includes any recent legislation and policy applicable to awards that is highlighted on this website.

Individual awards are based on the application submitted to, and as approved by, the NIH and are subject to the IC-specific terms and conditions identified in the NoA.

ClinicalTrials.gov: If an award provides for one or more clinical trials. By law (Title VIII, Section 801 of Public Law 110-85), the "responsible party" must register and submit results information for certain applicable clinical trials on the ClinicalTrials.gov Protocol Registration and Results System Information Website (https://register.clinicaltrials.gov (https://register.clinicaltrials.gov/)). NIH expects registration and results reporting of all trials whether required under the law or not. For more information, see https://grants.nih.gov/policy/clinical-trials/reporting/index.htm (https://grants.nih.gov/policy/clinical-trials/reporting/index.htm)

Institutional Review Board or Independent Ethics Committee Approval: Recipient institutions must ensure that all protocols are reviewed by their IRB or IEC. To help ensure the safety of participants enrolled in NIH-funded studies, the awardee must provide NIH copies of documents related to all major changes in the status of ongoing protocols.

Data and Safety Monitoring Requirements: The NIH policy for data and safety monitoring requires oversight and monitoring of all NIH-conducted or -supported biomedical and behavioral intervention studies (clinical trials) to ensure the safety of participants and the validity and integrity of the data. Further information concerning these requirements is found at http://grants.nih.gov/grants/policy/hs/data_safety.htm and in the application instructions (SF424 (R&R) and PHS 398).

Investigational New Drug or Investigational Device Exemption Requirements: Consistent with federal regulations, clinical research projects involving the use of investigational therapeutics, vaccines, or other medical interventions (including licensed products and devices for a purpose other than that for which they were licensed) in humans under a research protocol must be performed under a Food and Drug Administration (FDA) investigational new drug (IND) or investigational device exemption (IDE).

APHA App. 757

## 2. Administrative and National Policy Requirements

All NIH grant and cooperative agreement awards include the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.htm?id=11120) as part of the NoA. For these terms of award, see the NIH Grants Policy Statement Part II: Terms and Conditions of NIH Grant Awards, Subpart A: General (//grants.nih.gov/grants/guide/url_redirect.htm?id=11157) and Part II: Terms and Conditions of NIH Grant Awards, Subpart B: Terms and Conditions for Specific Types of Grants, Recipients, and Activities (//grants.nih.gov/grants/guide/url_redirect.htm?id=11159). More information is provided at Award Conditions and Information for NIH Grants (//grants.nih.gov/grants/guide/url_redirect.htm?id=11158).

Recipients of federal financial assistance (FFA) from HHS must administer their programs in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age and, in some circumstances, religion, conscience, and sex. This includes ensuring programs are accessible to persons with limited English proficiency. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. Please see https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html (https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html) and http://www.hhs.gov/ocr/civilrights/understanding/section1557/index.html (https://www.hhs.gov/ocr/civilrights/understanding/section1557/index.html).

HHS recognizes that research projects are often limited in scope for many reasons that are nondiscriminatory, such as the principal investigator's scientific interest, funding limitations, recruitment requirements, and other considerations. Thus, criteria in research protocols that target or exclude certain populations are warranted where nondiscriminatory justifications establish that such criteria are appropriate with respect to the health or safety of the subjects, the scientific study design, or the purpose of the research. For additional guidance regarding how the provisions apply to NIH grant programs, please contact the Scientific/Research Contact that is identified in Section VII under Agency Contacts of this FOA.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. HHS provides guidance to recipients of FFA on meeting their legal obligation to take reasonable steps to provide meaningful access to their programs by persons with limited English proficiency. Please see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html (https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html) and https://www.lep.gov (https://www.lep.gov). For further guidance on providing culturally and linguistically appropriate services, recipients should review the National Standards for Culturally and Linguistically Appropriate Services in Health and Health Care at https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=2&lvlid=53 (https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=2&lvlid=53).

- Recipients of FFA also have specific legal obligations for serving qualified individuals with disabilities. Please see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html (https://www.hhs.gov/ocr/civilrights/understanding/disability/index.html).

- HHS funded health and education programs must be administered in an environment free of sexual harassment. Please see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html (https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html); https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html; and https://www.eeoc.gov/eeoc/publications/upload/fs-sex.pdf (https://www.eeoc.gov/eeoc/publications/upload/fs-sex.pdf). For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm (https://grants.nih.gov/grants/policy/harassment.htm).

- Recipients of FFA must also administer their programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws. Collectively, these laws prohibit exclusion, adverse treatment, coercion, or other discrimination against persons or entities on the basis of their consciences, religious beliefs, or moral convictions. Please see https://www.hhs.gov/conscience/conscience-protections/index.html (https://www.hhs.gov/conscience/conscience-protections/index.html) and https://www.hhs.gov/conscience/religious-freedom/index.html (https://www.hhs.gov/conscience/religious-freedom/index.html).

Please contact the HHS Office for Civil Rights for more information about obligations and prohibitions under federal civil rights laws at https://www.hhs.gov/ocr/about-us/contact-us/index.html (https://www.hhs.gov/ocr/about-us/contact-us/index.html) or call 1-800-368-1019 or TDD 1-800-537-7697.

In accordance with the statutory provisions contained in Section 872 of the Duncan Hunter National Defense Authorization Act of Fiscal Year 2009 (Public Law 110-417), NIH awards will be subject to the Federal Awardee Performance and Integrity Information System (FAPIIS) requirements. FAPIIS requires Federal award making officials to review and consider information about an applicant in the designated integrity and performance system (currently FAPIIS) prior to making an award. An applicant, at its option, may review information in the designated integrity and performance systems accessible through FAPIIS and comment on any information about itself that a Federal agency previously entered and is currently in FAPIIS. The Federal awarding agency will consider any comments by the applicant, in addition to other information in FAPIIS, in making a judgement about the applicant's integrity, business ethics, and record of performance under Federal awards when completing the review of risk posed by applicants as described in 45 CFR Part 75.205 Federal awarding agency review of risk posed by applicants. This provision will apply to all NIH grants and cooperative agreements except fellowships.

## Cooperative Agreement Terms and Conditions of Award

Not Applicable

## 3. Reporting

When multiple years are involved, awardees will be required to submit the Research Performance Progress Report (RPPR) (//grants.nih.gov/grants/rppr/index.htm) annually and financial statements as required in the NIH Grants Policy Statement. (//grants.nih.gov/grants/guide/url_redirect.htm?id=11161)

A final RPPR, invention statement, and the expenditure data portion of the Federal Financial Report are required for closeout of an award, as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.htm?id=11161).

The Federal Funding Accountability and Transparency Act of 2006 (Transparency Act), includes a requirement for awardees of Federal grants to report information about first-tier subawards and executive compensation under Federal assistance awards issued in FY2011 or later. All awardees of applicable NIH grants and cooperative agreements are required to report to the Federal Subaward Reporting System (FSRS) available at www.fsrs.gov (//grants.nih.gov/grants/guide/url_redirect.htm?id=11170) on all subawards over $25,000. See the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.htm?id=11171) for additional information on this reporting requirement.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts from all Federal awarding agencies with a cumulative total value greater than $10,000,000 for any period of time during the period of performance of a Federal award, must report and maintain the currency of information reported in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently FAPIIS). This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available. Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75 Award Term and Conditions for Recipient Integrity and Performance Matters.

APHA App. 758

Case: 25-1611     Document: 00118310433     Page: 211     Date Filed: 07/08/2025     Entry ID: 6734280

4/23/25, 11:40 PM                Case 1:25-cv-10787-BEM     Document 38-33     Filed 04/25/25     Page 38 of 57
Expiration of RFA-MD-21-004 Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

## Section VII. Agency Contacts

We encourage inquiries concerning this funding opportunity and welcome the opportunity to answer questions from potential applicants.

**Application Submission Contacts**

eRA Service Desk (Questions regarding ASSIST, eRA Commons, application errors and warnings, documenting system problems that threaten submission by the due date, and post-submission issues)

Finding Help Online: http://grants.nih.gov/support/ (//grants.nih.gov/support/) (preferred method of contact)
Telephone: 301-402-7469 or 866-504-9552 (Toll Free)

General Grants Information (Questions regarding application instructions, application processes, and NIH grant resources)
Email: GrantsInfo@nih.gov (mailto:GrantsInfo@nih.gov) (preferred method of contact)
Telephone: 301-945-7573

Grants.gov Customer Support (Questions regarding Grants.gov registration and Workspace)
Contact Center Telephone: 800-518-4726
Email: support@grants.gov (mailto:support@grants.gov)

**Scientific/Research Contact(s)**

Jennifer Alvidrez, PhD
National Institute on Minority Health and Health Disparities (NIMHD)
Telephone: 301-594-9567
Email:jennifer.alvidrez@nih.gov (mailto:jennifer.alvidrez@nih.gov)

Rochelle Long, PhD
National Institute Of General Medical Sciences (NIGMS)
Division of Pharmacology, Physiology, and Biological Chemistry (PPBC)
E-mail: longr@nigms.nih.gov (mailto:longr@nigms.nih.gov)

Kenneth D Gibbs, Jr., PhD, MPH
National Institute Of General Medical Sciences (NIGMS)
Division of Training, Workforce Development, and Diversity
Division of Genetics and Molecular, Cellular, and Developmental Biology
E-mail: kenneth.gibbs@nih.gov (mailto:kenneth.gibbs@nih.gov)

Ebony Madden
National Human Genome Research Institute (NHGRI)
Phone: 301 503-5620
E-mail: ebony.madden@nih.gov (mailto:hindorffl@mail.nih.gov)

Rene Sterling
National Human Genome Research Institute (NHGRI)
Phone: 301.435.1275
E-mail: rene.sterling@nih.gov (mailto:rene.sterling@nih.gov)

Paul Cotton, Ph.D., RDN
National Heart, Lung, and Blood Institute (NHLBI)
Phone: (301) 496-1051
Email: paul.cotton@nih.gov (mailto:paul.cotton@nih.gov)

Judith Arroyo, Ph.D.
National Institute On Alcohol Abuse And Alcoholism (NIAAA)
Phone: 301-402-0717
E-mail: jarroyo@mail.nih.gov (mailto:jfox@mail.nih.gov)

Richard T. Benson, M.D., Ph.D.
National Institute of Neurological Disorders and Stroke (NINDS)
Telephone: (301) 827-9071
E-mail: Richard.Benson@nih.gov (mailto:Richard.Benson@nih.gov)

Melissa C. Green Parker, Ph.D.
Office of Disease Prevention (ODP)
Telephone: 301-480-1161
Email: melissa.greenparker@nih.gov (mailto:melissa.greenparker@nih.gov)

Damiya Eve Whitaker
Office Of Research On Women's Health (ORWH)
Phone: 240-276-6170
E-mail: damiya.whitaker@nih.gov (mailto:damiya.whitaker@nih.gov)

Frank Bandiera, Ph.D.
Division of Behavioral & Social Research (DBSR)
National Institute on Aging (NIA)
Phone: 301-402-7629
Email: frank.bandiera@nih.gov (mailto:frank.bandiera@nih.gov)

Damali Martin, Ph.D.
Division of Neuroscience (DN)
National Institute on Aging (NIA)

APHA App. 759

4/23/25, 11:40 PM     Expiration of RFA-MD-21-004 Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

Phone: 301-402-8310
Email: martinda@mail.nih.gov (mailto:martinda@mail.nih.gov)

Lyndon Joseph, Ph.D.
Division of Geriatrics & Clinical Gerontology (DGCG)
National Institute on Aging (NIA)
Phone: 301-496-6761
Email: lyndon.joseph@nih.gov (mailto:lyndon.joseph@nih.gov)

Cheri Wiggs
National Eye Institute (NEI)
Phone: (301) 451-2020
E-mail: lcheri.wiggs@nih.gov (mailto:cheri.wiggs@nih.gov)

Stephanie M George
National Institute Of Arthritis And Musculoskeletal And Skin Diseases (NIAMS)
Phone: 301.594.4974
E-mail: stephanie.george@nih.gov (mailto:stephanie.george@nih.gov)

Kelly Anne King
National Institute On Deafness And Other Communication Disorders (NIDCD)
Phone: 301-402-3458
E-mail: kingke@nidcd.nih.gov (mailto:kingke@nidcd.nih.gov)

Zeynep Erim, Ph.D
National Institute Of Biomedical Imaging And Bioengineering (NIBIB)
Phone: (301) 451-4792
E-mail: zeynep.erim@nih.gov (mailto: zeynep.erim@nih.gov)

Della B. White, PhD
National Center for Complementary and Integrative Health (NCCIH)
Phone: 301-827-6358
Email: Della.White@nih.gov (mailto:Della.White@nih.gov)

Rob Rivers, PhD
National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)
Telephone: 301-443-8415
Email: robert.rivers@nih.gov (mailto: robert.rivers@nih.gov)

Shobha Srinivasan
National Cancer Institute (NCI)
Phone: (240) 276-6938
E-mail: sriniva2@mail.nih.gov (mailto:sriniva2@mail.nih.gov)

Elise L. Rice, PhD
National Institute Of Dental & Craniofacial Research (NIDCR)
Phone: 301-594-4814
E-mail: elise.rice@nih.gov (mailto: elise.rice@nih.gov)

Diane Adger-Johnson
National Institute of Allergy and Infectious Diseases (NIAID)
Phone: 240-669-2924
E-mail: DAdger@niaid.nih.gov (mailto:DAdger@niaid.nih.gov)

Aria Crump
National Institute On Drug Abuse (NIDA)
Phone: 301-443-6504
E-mail: aria.crump@nih.gov (mailto:aria.crump@nih.gov)

Dara R. Blachman-Demner, Ph.D.
Office of Behavioral and Social Sciences Research (OBSSR)
Telephone: 301-496-8522
Email: dara.blachman-demner@nih.gov (mailto:dara.blachman-demner@nih.gov)

Alexander M. Talkovsky
National Institute of Mental Health (NIMH (https://www.nimh.nih.gov/index.shtml)) Division of Translational Research
Telephone: 301-827-7614
Email: alexander.talkovsky@nih.gov (http://alexander.talkovsky@nih.gov)

Janani Prabhakar, Ph.D.
National Institute of Mental Health (NIMH (https://www.nimh.nih.gov/index.shtml)) Division of Translational Research
Telephone: 301-827-1321
Email: janani.prabhakar@nih.gov (http://janani.prabhakar@nih.gov)

Eve E. Reider, Ph.D.
National Institute of Mental Health (NIMH (http://www.nimh.nih.gov/index.shtml))
Telephone: 301-827-1496
Email: ereider@mail.nih.gov (mailto:ereider@mail.nih.gov)

APHA App. 760

Collene Lawhorn, Ph.D.
National Institute of Mental Health (NIMH (https://www.nimh.nih.gov/index.shtml)) Divsion of AIDS Research
Telephone: 301-451-4262
Email: collene.lawhorn@nih.gov (mailto:collene.lawhorn@nih.gov)

Lindsey Ann Martin
National Institute Of Environmental Health Sciences (NIEHS)
Phone: 984-287-4036
E-mail: lindsey.martin@nih.gov (mailto: lindsey.martin@nih.gov)

Rebecca Henry, PhD, RN
National Institute of Nursing Research (NINR)
Telephone: 301-594-5976
Email: rebecca.henry@nih.gov (mailto:rebecca.henry@nih.gov)

Christopher Barnhart, PhD
Sexual & Gender Minority Research Office (SGMRO)
Telephone: 301-594-8983
Email: christopher.barnhart@nih.gov (mailto:christopher.barnhart@nih.gov)

Juanita J. Chinn, PhD
*Eunice Kennedy Shriver* National Institute Of Child Health & Human Development (NICHD)
Phone: 301-827-4901
E-mail: juanita.chinn@nih.gov (mailto: juanita.chinn@nih.gov)

Hiroko Iida, DDS, MPH
National Institute of Dental and Craniofacial Research (NIDCR)
Telephone: 301-594-7404
Email: **hiroko.iida@nih.gov** (mailto:hiroko.iida@nih.gov)

**Peer Review Contact(s)**
Yujing Liu, MD, PhD
National Institute on Minority Health and Health Disparities (NIMHD)
Telephone: 301-827-7815
Email: liuyujin@mail.nih.gov (mailto:liuyujin@mail.nih.gov)

**Financial/Grants Management Contact(s)**
Priscilla Grant, JD
National Institute on Minority Health and Health Disparities (NIMHD)
Telephone: 301-594-8412
Email: pg38h@nih.gov (mailto:pg38h@nih.gov)

Kelly Aubrecht
National Institute Of General Medical Sciences (NIGMS)
E-mail: aubrechtk@mail.nih.gov (mailto:aubrechtk@mail.nih.gov)

Deanna L Ingersoll
National Human Genome Research Institute (NHGRI)
Phone: 301-435-7858
E-mail: Deanna.Ingersoll@nih.gov (mailto:Deanna.Ingersoll@nih.gov)

Shaheed Ziyout
National Heart, Lung, and Blood Institute (NHLBI)
Phone: (301) 827-8152
Email: shaheed.ziyout@nih.gov (mailto: shaheed.ziyout@nih.gov)

Judy Fox
National Institute On Alcohol Abuse And Alcoholism (NIAAA)
Phone: 301-443-4704
E-mail: jfox@mail.nih.gov (mailto:jfox@mail.nih.gov)

Chief Grants Management Officer
National Institute of Neurological Disorders and Stroke (NINDS))
Email: ChiefGrantsManagementOfficer@ninds.nih.gov (mailto:ChiefGrantsManagementOfficer@ninds.nih.gov)

Ryan Blakeney
for Division of Behavioral & Social Research (DBSR) inquiries
National Institute on Aging (NIA)
Telephone: 301-451-9802
Email: blakeneyr@mail.nih.gov (mailto:blakeneyr@mail.nih.gov)

Robin Laney
for Division of Neuroscience (DN) inquiries
National Institute on Aging (NIA)
Telephone: 301-496-1473
Email: laneyr@mail.nih.gov (mailto:laneyr@mail.nih.gov)

E.C. Melvin
for Division of Geriatrics & Clinical Gerontology (DGCG) inquiries
National Institute on Aging (NIA)

Telephone: 301-480-8991
Email: ec.melvin@nih.gov (mailto:ec.melvin@nih.gov)

Karen Robinsonsmith
National Eye Institute (NEI)
Phone: (301) 451-2020
E-mail: kyr@nei.nih.gov

Sahar Rais-Danai
National Institute Of Arthritis And Musculoskeletal And Skin Diseases (NIAMS)
Phone: 301-594-5032
E-mail: Sahar.Rais-danai@nih.gov (mailto:Sahar.Rais-danai@nih.gov)

Christopher Myers
National Institute On Deafness And Other Communication Disorders (NIDCD)
Phone: (301) 435-0713

Kwesi Wright
National Institute Of Biomedical Imaging And Bioengineering (NIBIB)
Phone: (301) 451-4789
E-mail: wrightnk@mail.nih.gov (mailto:wrightnk@mail.nih.gov)

Shelley Carow
National Center for Complementary and Integrative Health (NCCIH)
Phone: (301) 594-3788
Email: CarowS@mail.nih.gov (mailto:CarowS@mail.nih.gov)

Tommy Gunter
National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)
Telephone: 301-451-3447
Email: Tommy.Gunter@nih.gov (mailto: Tommy.Gunter@nih.gov)

Crystal Wolfrey
National Cancer Institute (NCI)
Phone: (240) 276-6277
E-mail: none

Diana Rutberg, MBA
National Institute Of Dental & Craniofacial Research (NIDCR)
Phone: (301) 594-4798
E-mail: rutbergd@mail.nih.gov (mailto:rutbergd@mail.nih.gov)

Ann Devine
National Institute of Allergy and Infectious Diseases (NIAID)
Phone: 240-669-2988
E-mail: ADEVINE@niaid.nih.gov (mailto:ADEVINE@niaid.nih.gov)

Amy M Bucheimer
National Institute On Drug Abuse (NIDA)
Phone: 301-827-6694
E-mail: bucheimera@mail.nih.gov (mailto:bucheimera@mail.nih.gov)

Tamara Kees
National Institute of Mental Health (NIMH)
Telephone: 301-443-8811
Email: tamara.kees@nih.gov (mailto:tamara.kees@nih.gov)
Jenny L Greer
National Institute Of Environmental Health Sciences (NIEHS)
Phone: 984-287-3332
E-mail: jenny.greer@nih.go (mailto: jenny.greer@nih.gov)

Ron Wertz
National Institute of Nursing Research (NINR)
Telephone: 301-594-2807
Email: wertzr@mail.nih.gov (mailto:wertzr@mail.nih.gov)

Bryan S. Clark, MBA
*Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD)
Telephone: 301-435-6975
Email: clarkb1@mail.nih.gov (mailto:clarkb1@mail.nih.gov)

# Section VIII. Other Information

Recently issued trans-NIH policy notices (//grants.nih.gov/grants/guide/url_redirect.htm?id=11163) may affect your application submission. A full list of policy notices published by NIH is provided in the NIH Guide for Grants and Contracts (//grants.nih.gov/grants/guide/url_redirect.htm?id=11164). All awards are subject to the terms and conditions, cost principles, and other considerations described in the NIH Grants Policy Statement (grants.nih.gov/grants/guide/url_redirect.htm?id=11120).

**Authority and Regulations**

APHA App. 762

Expiration of RFA-MD-21-004: Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Di…

Awards are made under the authorization of Sections 301 and 405 of the Public Health Service Act as amended (42 USC 241 and 284) and under Federal Regulations 42 CFR Part 52 and 45 CFR Part 75.

---

Weekly TOC for this Announcement (/grants/guide/WeeklyIndex.cfm?03-26-21)
NIH Funding Opportunities and Notices (/grants/guide/index.html)

---



National Institutes of Health  (/grants/oer.htm)
Office of Extramural Research

 (https://www.hhs.gov/) Department of Health and Human Services (HHS)

 (https://www.usa.gov/)

NIH… Turning Discovery Into Health®

APHA App. 763

# EXHIBIT C

APHA App. 764

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 9:28 AM
**To:** Takade, Tiffany <Tiffany.Takade@ucsf.edu>
**Subject:** Grant Termination Notification

---

**This Message Is From an External Sender**

This message came from outside your organization.

---

 

3/21/2025
Takade, Tiffany
University Of California, San Francisco
tiffany.takade@ucsf.edu

Dear Takade, Tiffany:

Effective with the date of this letter, funding for Project Number 5R01AG077934-03 is hereby
terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants
Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of
termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on
6/1/2024, and "obligations generally should be determined by reference to the law in effect
when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative
agreements and is incorporated by reference in all NIH grant and cooperative agreement
awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or
in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. §
200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity,
to the greatest extent authorized by law, if an award no longer effectuates the program goals or
agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10] You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11] The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Jeni Militano (Acting), Chief Grants Management Officer, NIA
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT D



Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON AGING

**Notice of Award**
FAIN# R01AG077934
**Federal Award Date**
03/24/2025

**Recipient Information**
**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF
CALIFORNIA, SAN FRANCISCO, THE
1855 FOLSOM ST STE 425
SAN FRANCISCO, CA 94103

**2. Congressional District of Recipient**
11

**3. Payment System Identifier (ID)**
1946036493A6

**4. Employer Identification Number (EIN)**
946036493

**5. Data Universal Numbering System (DUNS)**
094878337

**6. Recipient's Unique Entity Identifier**
KMH5K9V7S518

**7. Project Director or Principal Investigator**
Jesus  Ramirez-Valles, PHD
Professor And Director
jesus.ramirez-valles@ucsf.edu
3129721409

**8. Authorized Official**
Tiffany Takade
tiffany.takade@ucsf.edu
415-987-1546

**Federal Agency Information**
**9. Awarding Agency Contact Information**
Morgan Amanda Granetz

NATIONAL INSTITUTE ON AGING
morgan.granetz@nih.gov

**10. Program Official Contact Information**
Melissa S Gerald
Health Science Administrator
NATIONAL INSTITUTE ON AGING
geraldmel@nia.nih.gov
301-402-4156

**Federal Award Information**

**11. Award Number**
5R01AG077934-03

**12. Unique Federal Award Identification Number (FAIN)**
R01AG077934

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Structural Racism and Discrimination in Older Men's Health Inequities

**15. Assistance Listing Number**
93.866

**16. Assistance Listing Program Title**
Aging Research

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 06/01/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $800,878 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $800,878 |
| **26. Project Period Start Date** 09/15/2022 – **End Date** 03/21/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $2,554,402 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Philip E. Smith

**30. Remarks**
Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

APHA App. 769



RESEARCH
Department of Health and Human Services
National Institutes of Health

Notice of Award



NATIONAL INSTITUTE ON AGING

---

**SECTION I – AWARD DATA – 5R01AG077934-03 REVISED**

**Principal Investigator(s):**
Jesus  Ramirez-Valles, PHD

**Award e-mailed to:** cgrasteam@ucsf.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to The Regents of the UCSF in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Aging of the National Institutes of Health under Award Number R01AG077934. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Philip E. Smith
Grants Management Officer
NATIONAL INSTITUTE ON AGING

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| **Salaries and Wages** | $273,776 |
| **Fringe Benefits** | $105,332 |

Version: 25 - 2/15/2024 9:51 AM | Generated on: 5/24/2023 12:04 AM

APHA App. 770

| | |
|---|---|
| **Personnel Costs (Subtotal)** | $379,108 |
| **Materials & Supplies** | $480 |
| **Travel** | $20,558 |
| **Other** | $50,150 |
| **Subawards/Consortium/Contractual Costs** | $69,146 |
| **Publication Costs** | $2,789 |
| | |
| **Federal Direct Costs** | $522,231 |
| **Federal F&A Costs** | $278,647 |
| **Approved Budget** | $800,878 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $800,878 |
| **TOTAL FEDERAL AWARD AMOUNT** | $800,878 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTAL FEDERAL AWARD AMOUNT YEAR ( 3 ) (for this Document Number) | |
|---|---|
| **AWARD NUMBER** | **TOTAL FEDERAL AWARD AMOUNT** |
| 5R01AG077934-03 | $800,878 |
| 3R01AG077934-03S1 | $101,549 |
| **TOTAL** | **$902,427** |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 3 | $800,878 | $902,427 |

**Fiscal Information:**
| | |
|---|---|
| **Payment System Identifier:** | 1946036493A6 |
| **Document Number:** | RAG077934A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| AG | 8470694 | $800,878 |

**NIH Administrative Data:**
**PCC**: 2BPDIGE / **OC**: 41025 / **Released**: 03/21/2025
**Award Processed**: 03/24/2025 12:04:40 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R01AG077934-03  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R01AG077934-03  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a.   The grant program legislation and program regulation cited in this Notice of Award.
b.   Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c.   45 CFR Part 75.
d.   National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e.   Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f.   This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

Version: 25 - 2/15/2024 1:51 / SC / Generated on: 3/24/2025 12:04 AM

APHA App. 771

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AG077934. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures. It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm. This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data*

Version: 25 - 3/13/2024 9:57 AM | Generated on: 3/24/2024 12:04 AM

APHA App. 772

*reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- · Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- · For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- · HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- · For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV  –  AG SPECIFIC AWARD CONDITIONS – 5R01AG077934-03  REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

It is the policy of NIH not to prioritize DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to

Version: 25 - 3/13/2024 9:51 AM | Generated on: 3/24/2025 12:04 AM

APHA App. 773

expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.. Therefore, this project is terminated. UNIVERSITY OF CALIFORNIA-SAN FRANCISCO may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

**Supersedes Notice of Award issued 06/12/2024. Previous terms and conditions apply:**

Funding for this award has been provided by Alzheimer's Disease Initiative funds.

This award includes funds awarded for consortium activity with SAN FRANCISCO STATE UNIVERSITY. Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS). The referenced section of the NIH Grants Policy Statement is available at: http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of Alabama at Birmingham. Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS). The referenced section of the NIH Grants Policy Statement Page 6 of 6 Version: 13 - 8/3/2022 12:59 PM | Generated on: 5/12/2023 12:19 AM is available at: http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of Tulane Univ. School of Public Health and Tropical Medicine. Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS). The referenced section of the NIH Grants Policy Statement is available at: http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R01AG077934-03 REVISED

**INSTITUTION:** The Regents of the UCSF

| Budget | Year 3 |
|---|---|
| Salaries and Wages | $273,776 |
| Fringe Benefits | $105,332 |
| Personnel Costs (Subtotal) | $379,108 |
| Materials & Supplies | $480 |
| Travel | $20,558 |
| Other | $50,150 |
| Subawards/Consortium/Contractual Costs | $69,146 |
| Publication Costs | $2,789 |
| TOTAL FEDERAL DC | $522,231 |
| TOTAL FEDERAL F&A | $278,647 |
| TOTAL COST | $800,878 |

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 61.5% |
| F&A Cost Base 1 | $453,085 |
| F&A Costs 1 | $278,647 |

Version: 25 - 3/13/2024 9:57 AM | Generated on: 3/24/2025 12:04 AM

APHA App. 774

APHA App. 775

# EXHIBIT E



March 12, 2025

Drexel University
Susan Elkins
DUResearch@drexel.edu


Dear Susan Elkins:

Funding for Project Number 1R01MD020284-01 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

      The 2024 Policy Statement applies to your project because NIH approved your grant on August 22, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

      The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4]  According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

      This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373.
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of Project Number 5 1R01MD020284-01is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by
Michelle G. Bulls -S
Date: 2025.03.12
16:59:58 -04'00'

Michelle G. Bulls, *on behalf* of Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D.
[11] *Id.* § 50.406(a).
[12] *Id.* § 50.406(b).

# EXHIBIT 34

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*, *Plaintiffs*, v. NATIONAL INSTITUTES OF HEALTH, *et al.*, *Defendants*. | Case No. 1:25-cv-10787-BEM |

## DECLARATION OF APHA MEMBER 10

I, Annelise Mennicke, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. I am an Associate Professor at the University of North Carolina, Charlotte School of Social Work.

2. I am offering this declaration in my individual capacity and not on behalf of my employer.

3. I received my Doctor of Philosophy and Master of Social Work from Florida State University in 2015 and 2011, respectively, and my Bachelor of Science in Psychology from the University of Florida in 2008.

4. My research is primarily centered on violence prevention, with an emphasis on sexual assault on college campuses. My current work aims to develop strategies that mitigate interpersonal violence, support survivors of sexual assault, and evolve effective prevention methods.

5. My dedication to this field originates not only from my three years of firsthand experiences as a volunteer victim's advocate at a rape crisis center in Florida but also from a deeply personal place—my father was murdered. This life-altering loss instilled in me a profound understanding of the devastating impact of violence. Having both personal and professional experience observing the lasting impacts of violence on individuals solidified my commitment to finding and

implementing evidence-based solutions to best support the healing process of survivors and reduce the chances of revictimization.

6.   I have authored or co-authored over seventy peer-reviewed articles and book chapters. In addition to contributing to academic discourse, my work has also informed practical interventions and policies aimed at violence prevention.

7.   Over the years, I have received numerous awards recognizing both my research and teaching excellence. These include the 2022 Faculty Excellence Award in Research Excellence, a 2021 nomination for the same, the 2020 Research and Scholarship Award, and multiple nominations for Professor of the Year and the CHHS Faculty Award. In 2018, I received the Dean's Faculty Research Innovation Award and the Junior Investigator Scholarship from the Academic Consortium on Criminal Justice Health. In 2015, I received the Student Award for Leadership and Service from the Group for the Advancement of Doctoral Education in Social Work for my work in bringing the Green Dot violence prevention program to Florida State University.

8.   I have also received targeted funding to support my professional development and reduce student loan debt. I was a recipient of the NIH Loan Repayment Program from August 2022 through August 2024 and previously received the $40,000 Faculty Loan Repayment Program award from HRSA in 2017. Additional support includes a Safe States Scholarship in 2017 for CDC-led training and other awards that have strengthened my contributions to research and public health.

9.   I have served as Principal Investigator ("PI"), Co-PI, and Co-Investigator on a range of externally funded projects focused on violence prevention, substance use, and health equity. Currently, I'm a part of a $469,069 NIAAA-funded project to rebuild a peer support program for sexual and gender minority survivors of sexual violence. I am also Co-PI on a three-year, $415,769 grant from the National Institute on Alcohol Abuse and Alcoholism ("NIAAA") to develop and validate measures for the Bystander Intervention for Problematic Alcohol Use Model (BIPAUM), which is a phased approach that assesses the outcome and effectiveness of bystander intervention programs which aim to prevent problematic alcohol use. In addition, I serve as PI or Co-Investigator on major federally funded projects addressing suicide prevention, child sex trafficking, and women's health systems, including multi-year awards totaling more than $3 million.

2

10. I am a member of the American Public Health Association and pay $210 in annual dues.

11. On April 24, 2024, I received notice that my institution was awarded a R15 grant (a grant awarded to institutions with a small amount of NIH funding, to develop their research portfolio) from the NIAAA in support of my research, for over $450,000 over a three-year period, to support my project titled *Reconstruction of an SGM-specific sexual violence peer support program*. This grant, which I spent six years developing, would also help to train students interested in research.

12. A true and correct copy of the notice of award is attached as Exhibit A.

13. This project researched ways to improve healing for sexual and gender minority survivors of sexual violence, given the substantially higher rates of sexual violence this community experiences compared to their heterosexual, cisgender peers. The project expanded upon the successful findings from one of my colleagues, who developed more generalized intervention approaches. The project consisted of three phases. The first phase aimed to conduct focus groups with sexual and gender minorities to modify the general intervention program content created by my colleague. The second phase aimed to distribute interventions to the community to determine if they were workable. The third phase would pilot a clinical trial to improve social reactions in comparison to a group who did not receive the intervention. If it showed significance, the modified intervention could help the most vulnerable victims feel safe enough to seek formal support and minimize the chances of revictimization.

14. This project was staffed by five undergraduate students and one graduate student.

15. I have spent countless hours over six years developing this project. The preparation was so intense that after completing my first application, I went out to celebrate just the act of submitting the application. The preparation consisted of researching, writing, and editing sections of my proposal on significance, innovation, and approach, as well as training opportunities and securing data. But NIH did not grant the award in response to this initial submission. I applied at least five times before my application was granted. Each time the application was sent back, I worked to incorporate feedback from NIH to adjust the parameters of the project to be completely in line with NIH historic goals, which emphasize incorporating marginalized communities into specific studies. The NIAAA specifically works on the connection between sexual assault and substance abuse, which is directly addressed in this study.

16. So far, we have nearly completed the first phase of the project. During that first phase, the project students worked with twenty-nine focus group participants. The participants were

APHA App. 782

members of the minority communities we are aiming to create new interventions for, and we presented ideas of approaches to the participants to solicit feedback on how they would respond.

17. On March 20, 2025, less than a year after NIH awarded this grant, I received a notice of grant termination stating that the award "no longer effectuates agency priorities." A copy of this termination notice is attached as Exhibit B.

18. The termination notice does not include any individualized explanation for why the grant was cancelled, and it fails to discuss any of the data or analysis from our application, annual progress reports, or other related material. Instead, the notice includes the following language about its decision:

> This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.
>
> Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Ex. B.

19. Prior to receiving this termination letter I was never given any notice that my grant was in jeopardy. In fact, the grant was on track to get a diversity supplement awarded.

20. I do not understand what the termination notice means by "gender identity," nor do I understand how my project was "based on" "gender identity." I also do not know what "biological realities" means in the notice. My project includes transgender participants, but was focused on studying the effectiveness of intervention tools.

21. My project included an SGM component in accordance with the priorities of NIH, which designate SGM as a health disparity population for research, indicating that research concerning this group is an important focus area. My project directly addressed the effectiveness and development of tools of intervention on this population, but was centered on the actual development and effectiveness of the tools and not on the concept of gender identity.

4

APHA App. 783

22. In my decade of research experience, before February 2025, I had never heard of an NIH grant getting terminated for anything other than fraud and misconduct.

23. I have never had a grant terminated by NIH before this one.

24. The impact of this termination on myself, my co-researchers, and my student staff is severe.

25. It is now uncertain whether my co-researchers and I will have the necessary funding to continue our critical research. While our institution has agreed to temporarily cover the salaries of the students who were working under this grant, this support is only short-term. Currently, the university is funding only one of the six students—a graduate student—while the undergraduate students will only be paid through the beginning of May 2025. At that point, absent sufficient funding for the project, these students will no longer be able to continue their work, which may effectively end their budding careers in research. I do not at this time anticipate being able to secure sufficient funding for this project after this short-term funding ceases.

26. This uncertainty has had a profound impact on the morale and well-being of the team. The students are not only grappling with the loss of financial stability but many of them are now questioning their decisions to pursue careers in public health—a field they once felt passionately committed to. Several are themselves sexual or gender minorities and feel personally attacked by the government, which has undermined their sense of belonging within the field. The research field cannot afford to lose young and eager researchers, especially ones with diverse backgrounds, which has immeasurable benefits to the field of scientific research and understanding.

27. The loss of this grant has also eliminated the $4,728 that was allocated for my 2025 summer salary, meaning I will no longer be compensated for continuing this work during the summer months. As a result, I am faced with the difficult choice of either doing the work without compensation or seeking additional research contracts to make up for the lost income, taking away time to for this research. This disruption comes at a critical point in my career as I am actively working toward promotion from Associate Professor to Full Professor. This promotion is not only a recognition of my academic accomplishments, but also affects my future earning potential and academic prestige. The termination of this grant may impede the timely completion of my research, thereby jeopardizing my ability to achieve this promotion and negatively affecting my long-term career trajectory.

28. In addition to the uncertainty around my career and professional opportunities, the loss of funding is significantly impacting my personal life. I am having to reconsider significant life events

5

that I had planned, including a wedding and sending my child to pre-school, because I do not have an idea of how much money I will have after this termination.

29. This increased workload and lack of adequate funding makes it impossible to sustain the research project. If this project is not completed, I will be unable to achieve its essential goal—training individuals to respond more effectively when a sexual or gender minority discloses that they have been a victim of sexual violence.

30. Because of the termination of the award, we are not able to complete phase one of the project, meaning that we are unable to do anything with the data analyzed from our focus group responses. If we had sufficient funding, we would have been able to change the program based on the data and then track the effectiveness of the program adjustments. Instead, now that we have lost funding, the data will be analyzed but will not be able to be disseminated via publications and conference presentations, and we will not be able to effectively apply the lessons we have learned from the data, making it essentially useless for the purposes of this program intervention.

31. It is well documented that inadequate responses to such disclosures regularly retraumatize victims of sexual violence, which can, in turn, increase their vulnerability to further sexual violence. The cancellation of this grant has not only disrupted my professional trajectory but has also jeopardized vital work aimed at addressing an urgent public health issue.

32. There is currently a significant gap in interventions—particularly those that equip peers with the tools to respond effectively and compassionately to disclosures of sexual violence. While there are numerous formal interventions in place, when I speak to people on the ground, what I hear again and again is a yearning for something more practical and human: a training that truly prepares peers to handle these disclosures with care.

33. Our work aimed to fill that gap by creating an inclusive and genuinely effective intervention, designed with the most vulnerable members of our community in mind. If we can support those at greatest risk, the benefits will ripple outward—ultimately creating a safer, more empathetic environment for everyone. This approach not only aligns with values academic institutions claim to uphold, such as student well-being, equity, and community engagement, but also holds incredible potential for expansion. Once refined, it could be scaled into online programs and implemented broadly across college campuses, reaching students nationwide. The potential impact is both immediate and far-reaching. But now, because of this termination, the potential

APHA App. 785

benefits the research could provide will remain unrealized due to our inability to properly apply and assess data driven programmatic changes.

34. Tied to this R15 grant awarded is an application for a $162,000 research supplement to promote diversity in health-related research, designed to support an early career trainee on our research team. The NIH program officer assigned to our project initially expressed concern that the trainee's project might be too broad in scope, but after the initial NIH review, we received a very positive review from the same NIH program officer. Soon after, NIH began sending requests for additional documentation—typically a sign that a Notice of Award was being prepared. Then, abruptly, all communication about the diversity supplement ceased after January 30, 2025.

35. For the past three months, there has been no update on the supplement's status, and during this period, the funding opportunity announcement expired. This grant would have fully supported the trainee's tuition and stipend through the completion of their dissertation, and its absence leaves both the student and our research program in a state of uncertainty and disruption. This supplemental work cannot be accomplished without the funds. Not only will the young researcher lose out on valuable research experience and development, but the project will suffer from not having enough staffing to adequately implement and track the effectiveness of the potential new intervention strategies identified in the focus groups.

36. I supported the PI in appealing the termination of the R15 on April 17, 2025.

37. Even though we appealed the termination, I was uncertain how to address NIH's assessment that my project "no longer effectuates agency priorities," including because I do not understand in what sense my research is "*based on* gender identity."

38. I also do not know whether my appeal has any chance of success, given the language of the termination notice that "[t]he premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities." Ex. B.

APHA App. 786

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of April, 2025.

Annelise Mennicke

APHA App. 787

# EXHIBIT A



Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

**Notice of Award**
FAIN# R15AA030898
**Federal Award Date**
04/24/2024

---

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
UNIVERSITY OF NORTH CAROLINA AT
CHARLOTTE, THE
9201 UNIVERSITY CITY BLVD
CHARLOTTE, NC 28223

**2. Congressional District of Recipient**
12

**3. Payment System Identifier (ID)**
1560791228A1

**4. Employer Identification Number (EIN)**
560791228

**5. Data Universal Numbering System (DUNS)**
066300096

**6. Recipient's Unique Entity Identifier**
JB33DT84JNA5

**7. Project Director or Principal Investigator**
Jessamyn  Bowling
Assistant Professor
jbowlin9@uncc.edu
980-500-9965

**8. Authorized Official**
Stafford Farmer

**Federal Agency Information**

**9. Awarding Agency Contact Information**
Frann Gallogly

NATIONAL INSTITUTE ON ALCOHOL
ABUSE AND ALCOHOLISM
fgallogl@mail.nih.gov
(301) 443-4706

**10. Program Official Contact Information**
Deidra  Roach

NATIONAL INSTITUTE ON ALCOHOL
ABUSE AND ALCOHOLISM
droach@mail.nih.gov
301-443-5820

**Federal Award Information**

**11. Award Number**
1R15AA030898-01A1

**12. Unique Federal Award Identification Number (FAIN)**
R15AA030898

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Reconstruction of an SGM-specific sexual violence peer support program (SSS+)

**15. Assistance Listing Number**
93.273

**16. Assistance Listing Program Title**
Alcohol Research Programs

**17. Award Action Type**
New Competing

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 05/01/2024 – **End Date** 04/30/2027 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $469,069 |
| 20 a.  Direct Cost Amount | $304,590 |
| 20 b.  Indirect Cost Amount | $164,479 |
| 21. Authorized Carryover | |
| 22. Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $469,069 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $469,069 |
| **26. Project Period Start Date** 05/01/2024 – **End Date** 04/30/2027 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $469,069 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Jeffrey  Thurston

---

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

APHA App. 789



Notice of Award

ACADEMIC RESEARCH ENHANCEMENT AWARDS
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

**SECTION I – AWARD DATA – 1R15AA030898-01A1**

**Principal Investigator(s):**
Jessamyn  Bowling

**Award e-mailed to:** research@uncc.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $469,069 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF NORTH CAROLINA CHARLOTTE in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Alcohol Abuse And Alcoholism of the National Institutes of Health under Award Number R15AA030898. The content is solely the responsibility of the authors and does not necessarily represent the official views of   the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Jeffrey  Thurston
Grants Management Officer
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

Additional information follows

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

Version: 25 - 2/15/2024 9:51 AM | Generated on: 4/24/2024 12:14 AM

APHA App. 790

| | |
|---|---:|
| **Salaries and Wages** | $203,998 |
| **Fringe Benefits** | $33,662 |
| **Personnel Costs (Subtotal)** | $237,660 |
| **Materials & Supplies** | $1,800 |
| **Travel** | $6,472 |
| **Other** | $45,797 |
| **Subawards/Consortium/Contractual Costs** | $12,861 |
| | |
| **Federal Direct Costs** | $304,590 |
| **Federal F&A Costs** | $164,479 |
| **Approved Budget** | $469,069 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $469,069 |
| **TOTAL FEDERAL AWARD AMOUNT** | $469,069 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $469,069 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 1 | $469,069 | $469,069 |

**Fiscal Information:**
**Payment System Identifier:** 1560791228A1
**Document Number:** RAA030898A
**PMS Account Type:** P (Subaccount)
**Fiscal Year:** 2024

| IC | CAN | 2024 |
|---|---|---|
| AA | 8470421 | $469,069 |

**NIH Administrative Data:**
**PCC**: AC DD / **OC**: 41021 / **Released**: Thurston, Jeffrey 04/15/2024
**Award Processed:** 04/24/2024 12:14:17 AM

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1R15AA030898-01A1**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 1R15AA030898-01A1**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

  a.  The grant program legislation and program regulation cited in this Notice of Award.
  b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
  c.  45 CFR Part 75.
  d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
  e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
  f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that

APHA App. 791

some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

**MULTI-YEAR FUNDED AWARD:**  This is a multi-year funded award.  A progress report is due annually on or before the anniversary of the budget/project period start date of the award, in accord with the instructions posted at:  http://grants.nih.gov/grants/policy/myf.htm.

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R15AA030898. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

This award provides support for one or more clinical trials. By law (Title VIII, Section 801 of Public Law 110-85), the "responsible party" must register "applicable clinical trials" on the ClinicalTrials.gov Protocol Registration System Information Website. NIH encourages registration of all trials whether required under the law or not. For more information, see http://grants.nih.gov/ClinicalTrials_fdaaa/
 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

APHA App. 792

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.
**Treatment of Program Income:**
Additional Costs

---

**SECTION IV –  AA SPECIFIC AWARD CONDITIONS – 1R15AA030898-01A1**

Clinical Trial Indicator: Yes
This award supports one or more NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

SALARY LIMITATION:  None of the funds in this award shall be used to pay the salary of an individual at a rate in excess of the applicable salary cap. Therefore, this award and/or future years are adjusted accordingly, if applicable. Current salary cap levels can be found at https://grants.nih.gov/grants/policy/salcap_summary.htm..

APHA App. 793

Progress reports for multi-year funded awards are due annually on or before the anniversary of the budget/project period start date of award. The reporting period for multi-year funded award progress reports is the calendar year preceding the anniversary date of the award. Information on the content of the progress report and instructions on how to submit the report are posted at http://grants.nih.gov/grants/policy/myf.htm.

DATA AND SAFETY MONITORING: This grant has been identified as requiring a Data and Safety Monitoring Plan (DSMP) in accordance with the NIAAA Data and Safety Monitoring Guidelines at http://www.niaaa.nih.gov/research/guidelines-and-resources/data-and-safety-monitoring-guidelines. The NIAAA Program Official named below has approved the DSMP as submitted by the grant recipient. Any changes in the DSMP must be reviewed and approved by the NIAAA Program Official.

NIAAA DATA ARCHIVE (NIAAADA) DATA SHARING REQUIREMENT: This award is subject to the data sharing guidance outlined in NOT-AA-23-002 (https://grants.nih.gov/grants/guide/notice-files/NOT-AA-23-002.html).

ANNUAL REPORTING

In addition to the RPPR and on the same schedule as the RPPR submission, an annual report including the elements listed below should be submitted via email from the Institutional AOR to the NIAAA Grants Management Specialist and Program Official named below.

In addition to your RPPR, please submit the following:

• Cumulative listing (no PHI)
o adverse events
o serious adverse events
o protocol deviations since last reporting period
• DSMB meeting updates/minutes (if applicable)
• Target milestone updates, if applicable
• Issues that could impact the study/completion of the grant
• Proposed resolution of issues

The following target milestones have been established and approved by the PO. Any revisions to approved milestones require PO concurrence and approval. Recruitment is anticipated to begin mm/yy and complete in ## year(s) and ## month(s).

Enrollment Milestones (n=228):
25% (n=57) = 03/25
50% (n=114) = 06/25
75% (n=171) = 08/25
100% (n=228) = 10/25
Data lock: 10/25

Data Management and Sharing Policy: Applicable

This project is expected to generate scientific data. Therefore, the Final NIH Policy for Data Management and Sharing applies. The approved Data Management and Sharing (DMS) Plan is hereby incorporated as a term and condition of award, and the recipient shall manage and disseminate scientific data in accordance with the approved plan. Any significant changes to the DMS Plan (e.g., new scientific direction, a different data repository, or a timeline revision) require NIH prior approval. Failure to comply with the approved DMS plan may result in suspension and/or termination of this award, withholding of support, audit disallowances, and/or other appropriate action. See NIH Grants Policy Statement Section 8.2.3 for more information on data management and sharing expectations.

APHA App. 794

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1R15AA030898-01A1

**INSTITUTION:** UNIVERSITY OF NORTH CAROLINA CHARLOTTE

| Budget | Year 1 |
|---|---|
| Salaries and Wages | $203,998 |
| Fringe Benefits | $33,662 |
| Personnel Costs (Subtotal) | $237,660 |
| Materials & Supplies | $1,800 |
| Travel | $6,472 |
| Other | $45,797 |
| Subawards/Consortium/Contractual Costs | $12,861 |
| TOTAL FEDERAL DC | $304,590 |
| TOTAL FEDERAL F&A | $164,479 |
| TOTAL COST | $469,069 |

| Facilities and Administrative Costs | Year 1 |
|---|---|
| F&A Cost Rate 1 | 54% |
| F&A Cost Base 1 | $304,590 |
| F&A Costs 1 | $164,479 |

APHA App. 795

# EXHIBIT B



March 20, 2025

Stafford Farmer
The University of North Carolina at Charlotte
research@uncc.edu

Dear Stafford Farmer:

Effective with the date of this letter, funding for Project Number 1R15 AA030898-01A1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on May 1, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

1

APHA App. 797

agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,



Michelle G. Bulls, on behalf of Judy Fox, Chief Grants Management Officer, National Institute on Alcohol Abuse and Alcoholism
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

APHA App. 798

# EXHIBIT 40

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL INSTITUTES OF HEALTH, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-10787-BEM |

**DECLARATION OF UAW MEMBER 11**

I, Delaney K. Sullivan, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an MD/PhD student in the University of California Los Angeles ("UCLA")-Caltech Medical Scientist Training Program ("MSTP") currently pursuing a PhD in biology at the California Institute of Technology ("Caltech"). I study computational biology, writing software and algorithms for analyzing genomics sequencing data. I was motivated to pursue biology research from a curiosity for science and from wanting to specifically study biomedical sciences after my father passed away from colon cancer.

2. I hold a B.S. in biology and an M.S. in computer science, both from Stanford, and have completed two years of medical school at the David Geffen School of Medicine at UCLA. I am passionate about applying computer science towards solving problems in biology and medicine. I am in my fourth year of the biology PhD program at Caltech.

3. I am a dues-paying member of United Auto Workers ("UAW") Local 2478.

4. My research is in developing new algorithms, methods, software, and tools for analyzing single-cell RNA sequencing data ("RNA-seq data"). RNA-seq data is complex and large (often multiple terabytes) and a lot of it is produced from biology experiments. Methods that efficiently analyze such data while revealing both gene expression and genetic variants or mutations at the single-cell level will enable novel discoveries in biology and medicine, especially in contexts like cancer, where RNA can be abnormal in both sequence and expression. As someone with both a computer science degree and a biology background, I was motivated to take a data-driven approach to understanding complex diseases like cancer given how much data is already available and is being produced daily. My research, which involves studying genetic variation and analyzing massive datasets, aligns with the mission of the

1

National Institute of Health ("NIH"), National Human Genome Research Institute ("NHGRI"), which specifically seeks to both "maximally leverage the usability and utility of emerging datasets for genomic studies of human health and disease" and "characterize intraindividual genomic variation and understand its role in human disease." A true and correct copy of an NHGRI document announcing these principles is attached as Exhibit A.

5.    On April 8, 2024, I applied for the Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research ("F31-Diversity"), which was assigned application number 1F31HG014118-01.

6.    As described in the program announcement, PA-23-271, The purpose of the F31-Diversty award "is to enhance the diversity of the health-related research workforce by supporting the research training of predoctoral students from diverse backgrounds including those from groups that are underrepresented in the biomedical, behavioral, or clinical research workforce.  Through this award program, promising predoctoral students will obtain individualized, mentored research training from outstanding faculty sponsors while conducting well-defined research projects in scientific health-related fields relevant to the missions of the participating NIH Institutes and Centers.  The proposed mentored research training is expected to clearly enhance the individual's potential to develop into a productive, independent research scientist." A true and correct copy of the synopsis for PA-23-271 is attached hereto as Exhibit B. The online link to the full listing for PA-23-271 is no longer accessible online.

7.    On September 9, 2024, the advisory council met. The role of advisory councils is to meet to discuss applications and advise the NIH Institute (e.g. NHGRI) program director whether an application should advance to the funding stage.  The title of the proposal was "k-mer based local uniqueness exploration." This is the name of a novel method I am developing to pick out the parts of genes that distinguish one human being from another human being, or that distinguish a cancer cell from a normal cell.  It received an Impact Score: 26, Percentile: 15.0.

8.    I chose the F31 diversity because, prior to applying, I was informed, per NHGRI policies, that: (1) NHGRI does not participate in the F30 award (designed for MD-PhD students like me), and (2) the regular F31 would not fund my medical education (only my PhD studies).  That left the F31-Diversity award (which I was eligible for given that, in accordance with the NOFO, I am part of a group that is "underrepresented in the biomedical, behavioral, or clinical research workforce") as the only award that would have funded both my medical and PhD studies. With the choice of applying to the F31 (funding PhD-only) vs. F31-diversity, I elected the F31-diversity.

9.   It took me considerable effort and around 150 hours in total to assemble the grant application. The final PDF was 50 pages.  This effort also took a good chunk of time away from my research. I needed to secure three recommendation letters from people I had worked with in the past, write an extensive research strategy with preliminary data, write an NIH biosketch (which is the NIH variant of a curriculum vitae required as part of the application), and secure a sponsor letter (a document from the Ph.D. advisor stating their means of supporting of me and affirming my qualifications). I needed to communicate back-and-forth between myself, my advisor's lab manager, and the Caltech grants manager (with over a dozen emails exchanged) to ensure the application was in good shape and all necessary forms were complete.

10. On November 22, 2024, I was informed by NHGRI (via email from Temesgen Fufa) that it "has received programmatic concurrence for funding." I interpret this as meaning I received a fundable score, as I was later congratulated via NIH email on January 6, 2025, on my application being "approved for funding".  True and correct copies of the November 22 and January 6 emails are attached at Exhibits C and D.

11. As of April 12, 2025, however, I have not received a Notice of Award ("NOA"). I think I should have received an NOA award by now.  On an NIH webpage that answers questions about NRSA fellowships, https://www.cancer.gov/grants-training/training/funding/general-fellowships-faq, it says "The time between receipt of an application and funding is approximately 6-9 months."

12. The latest status history message on eRA commons was February 12, 2025, with the note (on page 3 of 4): "Award prepared: refer questions to Grants Management Specialist."  A true and correct copy of this message is attached as Exhibit E.  eRA Commons is the NIH website that grant applicants log into to check their grant status; the website can be found at https://public.era.nih.gov/commonsplus

13. I have never received any indication that my grant application was in jeopardy or that somehow my grant application was deficient.

14. I have received no specific explanation from NIH why my application has been delayed despite my inquiries.

15. On February 4, 2025, I wrote two NIH officials asking about the status of the NOA for my grant. I shared my understanding that F31 diversity no longer exists – an understanding I had because on that day (February 4, 2025), the grants.gov webpage on the F31-diversity NOFO PA-23-271 was edited with a "closing date" of "Current Closing Date for Applications:" and an "archive date" of Mar 06, 2025 – and my hope that I could be considered and funded through the traditional F31 mechanism.  I received

3

no response to my email.  A true and correct copy of this February 4 email is attached as Exhibit F and a true and correct copy of the webpage with the closing date information is attached as Exhibit G.

16. On April 9, 2025, now a year after my submission, I wrote NIH again.  I pointed out that my application was successful (as I was congratulated on being "approved for funding" via NIH email on January 6, 2025), and an award had been prepared ("award prepared" was the status indicated on my grant in eRA commons) but that I was never awarded the money.  I asked for a written statement in response.

17. The next day, April 10, 2025, the Program Director of NHGRI responded saying that my application is "still pending" and that "NHGRI Grants Management is currently understaffed" and that they would reach out "as soon as an update is available."

18. Based on what other applicants for F30/F31/F31-diversity grants have told me, NIH typically does not take over a year to issue a notice of award about funding with months of silence during the process.

19. The status of my application has caused me much emotional distress and has nearly entirely obliterated my dreams of pursuing an academic career, knowing that I could be treated so unfairly.

20. The distress could not have come at a worse time: This is my final year of my PhD where I'm already burdened with the dissertation writing process.  I have two ongoing projects that I have been unable to complete (one of which was the subject of the grant proposal), in part due to the anxiety of awaiting the news of whether the award would be funded or pulled and not receiving any communication or updates of any kind over the course of multiple months.

21. Now, it is nearly impossible that either project will be published in a peer-reviewed publication before I graduate, leaving me uncertain whether either project will ever be published.  Given my graduation timeline (I will graduate no later than the end of this year, as most MSTP students have been imposed with the expectation to graduate in 4 years), I cannot possibly submit another F31 application, because the time from submission to funding takes approximately nine months, after which I will have already graduated.

22. I will suffer both monetary loss and negative professional impact if this award is not funded. The UCLA-Caltech MSTP program provides a $3,500 stipend increase annually for students who receive sufficient extramural funding (such as the amount funded in an F31 award); thus I will not be able to receive this money. Moreover, NIH NRSA awards are important to include on applications to Physician-Scientist Training Program ("PSTP") residency programs.  As stated by one article, https://doi.org/10.1172/jci.insight.158467, 67% of PSTP directors in pediatrics programs consider such

4

awards "very important or fairly important" in terms of decision-making when evaluating applicants for their program; i.e. earning such an award will boost how "competitive" an applicant appears. Thus, it is evident that I will be impacted professionally.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 18th day of April, 2025.

Delaney K. Sullivan

APHA App. 804

# EXHIBIT A

**Perspective**

# Strategic vision for improving human health at The Forefront of Genomics

https://doi.org/10.1038/s41586-020-2817-4

Received: 30 June 2020

Accepted: 4 September 2020

Published online: 28 October 2020

 Check for updates

Eric D. Green[1✉], Chris Gunter[1], Leslie G. Biesecker[1], Valentina Di Francesco[1], Carla L. Easter[1], Elise A. Feingold[1], Adam L. Felsenfeld[1], David J. Kaufman[1], Elaine A. Ostrander[1], William J. Pavan[1], Adam M. Phillippy[1], Anastasia L. Wise[1], Jyoti Gupta Dayal[1], Britny J. Kish[1], Allison Mandich[1], Christopher R. Wellington[1], Kris A. Wetterstrand[1], Sarah A. Bates[1], Darryl Leja[1], Susan Vasquez[1], William A. Gahl[1], Bettie J. Graham[1], Daniel L. Kastner[1], Paul Liu[1], Laura Lyman Rodriguez[1], Benjamin D. Solomon[1], Vence L. Bonham[1], Lawrence C. Brody[1], Carolyn M. Hutter[1] & Teri A. Manolio[1]

Starting with the launch of the Human Genome Project three decades ago, and continuing after its completion in 2003, genomics has progressively come to have a central and catalytic role in basic and translational research. In addition, studies increasingly demonstrate how genomic information can be effectively used in clinical care. In the future, the anticipated advances in technology development, biological insights, and clinical applications (among others) will lead to more widespread integration of genomics into almost all areas of biomedical research, the adoption of genomics into mainstream medical and public-health practices, and an increasing relevance of genomics for everyday life. On behalf of the research community, the National Human Genome Research Institute recently completed a multi-year process of strategic engagement to identify future research priorities and opportunities in human genomics, with an emphasis on health applications. Here we describe the highest-priority elements envisioned for the cutting-edge of human genomics going forward—that is, at 'The Forefront of Genomics'.

Beginning in October 1990, a pioneering group of international researchers began an audacious journey to generate the first map and sequence of the human genome, marking the start of a 13-year odyssey called the Human Genome Project[1–3]. The successful and early completion of the Project in 2003, which included parallel studies of a set of model organism genomes, catalysed enormous progress in genomics research. Leading the signature advances has been a greater than one million-fold reduction in the cost of DNA sequencing[4]. This decrease has allowed the generation of innumerable genome sequences, including hundreds of thousands of human genome sequences (both in research and clinical settings), and the continuous development of assays to identify and characterize functional genomic elements[5,6]. These new tools, together with increasingly sophisticated statistical and computational methods, have enabled researchers to create rich catalogues of human genomic variants[7,8], to gain an ever-deepening understanding of the functional complexities of the human genome[5], and to determine the genomic bases of thousands of human diseases[9,10]. In turn, the past decade has brought the initial realization of genomic medicine[11], as research successes have been converted into powerful tools for use in healthcare, including somatic genome analysis for cancer (enabling development of targeted therapeutic agents)[12], non-invasive prenatal genetic screening[13], and genomics-based tests for a growing set of paediatric conditions and rare disorders[14], among others.

In essence, with growing insights about the structure and function of the human genome and ever-improving laboratory and computational technologies, genomics has become increasingly woven into the fabric of biomedical research, medical practice, and society. The scope, scale, and pace of genomic advances so far were nearly unimaginable when the Human Genome Project began; even today, such advances are yielding scientific and clinical opportunities beyond our initial expectations, with many more anticipated in the next decade.

Embracing its leadership role in genomics, the National Human Genome Research Institute (NHGRI) has developed strategic visions for the field at key inflection points, in particular at the end of the Human Genome Project in 2003[15] and then again at the beginning of the last decade in 2011[16]. These visions outlined the most compelling opportunities for human genomics research, in each case informed by a multi-year engagement process. NHGRI endeavoured to start the new decade with an updated strategic vision for human genomics research. Through a planning process that involved more than 50 events (such as dedicated workshops, conference sessions, and webinars) over the past two years (see http://genome.gov/genomics2020), the institute collected input from a large number of stakeholders, with the resulting input catalogued and synthesized using the framework depicted in Fig. 1.

Unlike the past, this round of strategic planning was greatly influenced by the now widely disseminated nature of genomics across biomedicine. A representative glimpse into this historic phenomenon is illustrated in Fig. 2. During the Human Genome Project, NHGRI was the primary funder of human genomics research at the US National Institutes of Health (NIH), but the past two decades have brought a greater than tenfold increase in the relative fraction of funding coming from other parts of the NIH.

[1]National Human Genome Research Institute, National Institutes of Health, Bethesda, MD, USA. ✉e-mail: egreen@nhgri.nih.gov

APHA App. 806

# Perspective



**Fig. 1 | Four-area strategic framework at The Forefront of Genomics.** Together, the indicated progressive and interrelated areas serve to organize the major elements in the strategic vision described here.

The planning process continually encountered the realities associated with the broad and extensive use of genomics and the impracticality of being comprehensive, which together served to focus attention on the most cutting-edge opportunities in human genomics. This experience affirmed NHGRI's recently rearticulated role in providing genomics leadership at the NIH, embodied by our newly conceived organizational mantra: 'The Forefront of Genomics'. We ultimately linked this mantra to the strategic planning process to help guide the formulation of input. From the ensuing discussions, it became apparent that responsible stewardship is a central aspect of being at (and pushing forward) The Forefront of Genomics, specifically in the four major areas detailed in Fig. 1, Boxes 1–4, and below.

## Principles and values for human genomics

As genomics has matured as a discipline, the field has embraced a growing set of fundamental principles and values that together serve as a guiding compass for the research efforts—some of these emerged organically within the field, whereas others have been adopted from the broader scientific community. The growing complexities of human genomics and its many applications (especially in medicine) at The Forefront of Genomics make it imperative to reaffirm, sharpen, and even extend these tenets, such as those highlighted in Box 1.

Many of these principles and values have been informed by the recognized area of genomics that focuses on ethical, legal, and social implications (ELSI) research[17], which was established at the beginning of the Human Genome Project to ensure that the eugenics movement and other misuses of genetics are not repeated. ELSI research has since grown to encompass a broad portfolio of studies that examine issues at the interface of genomics and society, the results of which have informed policies and laws related to genetic discrimination, intellectual property, data sharing, and informed consent[18]. Similar efforts seek to ensure that the benefits of genomics are available to all members of society[19]. Genomics, like other scientific fields, must reckon with systematic injustices and biases, fully mindful of their importance for health equity. In the future, ELSI research needs to focus on aspects of genomic medicine implementation that present challenging questions about legal boundaries, study governance, data control, privacy, and consent. Complex societal issues must also be studied, including the expanded application of genomics in non-medical realms (for example, ancestry testing, law enforcement, and genetics-based marketing of consumer goods)[20]. Finally, ELSI research should also examine the implications of studying genetic associations with bio-behavioural traits (such as intelligence, sexual behaviour, social status, and educational attainment)[21] and of a future in which machine learning and artificial intelligence are used to adapt risk communication and clinical decisions based on analysing an individual's genome sequence[22].

## Robust foundation for genomics

Genomics is now routinely and broadly used throughout biomedical research, with widespread reliance on a robust foundation for facilitating genomic advances. The foundation's integrity depends on several key elements, including infrastructure, resources, and dynamic areas of technology development and research. Sustaining and improving that foundation are key responsibilities at The Forefront of Genomics,



**Fig. 2 | Funding trends of NIH and NHGRI over the past 30 years.** The total funding levels for the NIH (top) and NHGRI (middle) are indicated for 1990, 2010, and 2020. Also shown (bottom) is the relative proportion of funds supporting human genomics research provided by NHGRI versus all of the NIH for the three corresponding time intervals (as derived from queries of the internal NIH Research, Condition, and Disease Categorization database for funds assigned to the 'human genome' category). During the 30-year period when the NHGRI budget increased roughly tenfold (middle), the proportion of total NIH funding for human genomics research actually increased more markedly, from less than 5% during the Human Genome Project to around 90% at the beginning of the current decade (bottom). In essence, these trends reflect a leveraging of NHGRI's funds that increased NIH's overall human genomics research funding by greater than tenfold.

APHA App. 807

**Box 1**

# Guiding principles and values for human genomics

• **Maintain an overarching focus on using genomics to understand biology, to enhance knowledge about disease, and to improve human health** — genomics is now foundational across the entire continuum of biomedical research, from deciphering fundamental principles of biology to translating that knowledge into disease prevention and medical advances.
• **Strive for global diversity in all aspects of genomics research, committing to the systematic inclusion of ancestrally diverse and underrepresented individuals in major genomic studies** — attention to diversity in genomics research is both socially just and scientifically essential, which includes meaningful, sustained partnerships with diverse communities in the design and implementation of research studies, the propagation of research findings, and the development and use of new technologies.
• **Maximize the usability of genomics for all members of the public, including the ability to access genomics in healthcare** — engagement, inclusion, and understanding the needs of diverse and medically underserved groups are required to ensure that all members of society benefit equitably from genomic advances, with particular attention given to the equitable use of genomics in healthcare that avoids exacerbating and strives towards reducing health disparities.
• **Champion a diverse genomics workforce** — the promise of genomics cannot be fully achieved without attracting, developing, and retaining a diverse workforce, which includes individuals from groups that are currently underrepresented in the genomics enterprise.
• **Provide a conceptual research framing that consistently examines the role of both genomic and non-genomic contributors to health and disease** — routinely considering the

importance of social and environmental factors that influence human health (and the interactions among those components and genomics) will be important for the comprehensive understanding of most human diseases.
• **Promote robust and consistently applied standards in genomics research** — the use of carefully defined standards



(for example, those for generating, analysing, storing, and sharing data) has benefited genomics in numerous ways, and this must include appropriate privacy and data-security protections for those participating in genomics research.
• **Embrace the interdisciplinary and team-oriented nature of genomics research** — starting with the Human Genome Project, some of the most challenging genomics endeavours have benefited from the creation and management of large, interdisciplinary research collaborations.
• **Adhere to the highest expectations and requirements related to open science, responsible data sharing, and rigor and reproducibility in genomics research** — the genomics enterprise has a well-respected history of leading in these areas, and that commitment must be built upon and continually reaffirmed.
• **Pursue advances in genomics as part of a vibrant global community of genomics researchers and funders** — the challenges in genomics require the collective energies and creativity of a collaborative international ecosystem that includes partnerships among researchers, funders, and other stakeholders from academia, government, and the commercial sector.

the major elements of which are highlighted in Box 2 and detailed in corresponding paragraphs below.

**Genome structure and function**

The past two decades have brought a greater than million-fold reduction in the cost of DNA sequencing[23] along with marked advances in technologies for functional genomics[6,24,25] (that is, the study of how elements in the genome contribute to biological processes). Further opportunities are anticipated as the generation and analysis of genomic data become even faster, cheaper, and more accurate. Near-term expectations include enhanced capabilities for generating high-quality and complete (for example, telomere-to-telomere and phased) genome sequences[26,27], and continued refinement and enhanced utilization of a human genome reference sequence(s) that increasingly reflects human variation and diversity on a global scale[28] and that serves as a substrate for genome annotation[29]. Technologies for generating DNA sequence and other data types (for example, transcriptomic data, epigenetic data, and functional readouts of DNA sequences) need to be enabled at orders-of-magnitude lower costs, at single-cell resolution, at distinct spatial locations within tissues, and longitudinally over time[30–32]. These genomic data should be integrated with other multi-omic data (for example, proteomes, metabolomes, lipidomes, and/or microbiomes) in sophisticated ways, including methods that collect many data types from a single sample[32]. Transformative approaches will become increasingly vital for assimilating, sharing, and analysing these complex and heterogeneous data types[33] and must expand to include the integration of environmental, lifestyle, clinical, and other phenotypic data. These capabilities should be incorporated into browsers, portals, and visualization tools for use by a broadening community of researchers and clinicians.

Genome sequences have now been generated for more than 1,000 vertebrate species and are increasingly accompanied by multi-species annotations[34]. Understanding natural genomic variation, the conservation of genomic elements, and the rapid evolutionary changes in genomic regions associated with specific traits is crucial for attaining a comprehensive view of genome structure and function. The study of a wide range of organisms continues to be instrumental for determining the effect of genomic variation on biological processes and phenotypes, providing insights about the interplay of genomic variants and environmental pressures[35] and the relevance of putative pathogenic variants identified in clinical studies[36]. It is essential that the generation of high-quality multi-species genomic data is accompanied by community-accepted standards for data, metadata, and data interoperability. New methods would allow for integrating functional data from diverse species with human data and visualizing increasingly complex comparative genomic datasets. Continued progress in this area would move the field closer to the long-term aspirational goal of understanding the evolutionary history of every base in the human genome.

**Genomic data science**

All major genomics breakthroughs so far have been accompanied by the development of ground-breaking statistical and computational methods. Accordingly, continued innovations in both traditional and advanced methods (including machine learning and artificial intelligence) should be prioritized[37]. These approaches must be considered from the early stages of study planning and data collection in ways that complement and enhance, rather than inhibit, technical progress. Furthermore, the biomedical research community requires accurate, curated, accessible, secure, and interoperable genomic data

APHA App. 808

**Perspective**



## Box 2

# Sustaining and improving a robust foundation for genomics

**Genome structure and function**
- Enable the routine generation and analysis of increasingly complex genomic data
- Use evolutionary and comparative genomic data to maximize understanding of genome function[38].

**Genomic data science**
- Develop new methods and build sustainable data resources for genomics research
- Ensure facile storing, sharing, and computing on large genomic datasets
- Develop integrated knowledgebases and informatics methods for genomic medicine

**Genomics and society**
- Understand the interrelationships between genomics and the social and environmental factors that influence human health
- Empower people to make well-informed decisions about genomic data and develop data-stewardship systems that reinforce their choices
- Increase the genomic literacy of all sectors of society

**Training and genomics workforce development**
- Ensure that the next generation of genomic scientists are sufficiently trained in data science
- Train healthcare providers to integrate genomics into the clinical workflow
- Foster a diverse genomics workforce

repositories and informatics platforms that benefit all populations. Approaches for improving the efficiency of such resources include the use of shared storage and computing infrastructure, the adoption of common data-management processes, and the development of increasingly automated data-curation methods[38]. Carefully considered funding strategies must be designed to support these methods and resources, including a global, multi-funder model that ensures their development, enhancements, and long-term sustainability[39].

Recent progress has brought substantial transformations in how the petabytes of genomic data being generated each year are assimilated and analysed, including the emergence of cloud-based and federated approaches. Effective and efficient management of increasingly complex genomic datasets requires addressing challenges with these emerging approaches as well as innovations in the use of hardware, algorithms, software, standards, and platforms[40]. Current barriers include the lack of interoperable genomic data resources (which limits downstream access, integration, and analyses) and the absence of controlled and consistently applied data and metadata vocabularies and ontologies[41,42]. User-friendly systems that capture metadata in a scalable, intelligent, and cost-effective manner and that allow for intuitive data visualizations are essential. Ever-improving routines and guidelines should be formulated to continue and even enhance responsible data sharing, requiring the collective efforts of researchers, funders, and publishers alike; similar attention should focus on ensuring the use of FAIR (findable, accessible, interoperable, and reusable) data standards and the reproducibility of data analyses[38]. Innovations in technology and policy must be integrated to develop data-stewardship models that ensure open science and reduce data-access burdens to advance research, including the use of optimally balanced and ethically sound approaches for respecting participant

preferences and consent as well as engaging communities. Such developments should be done in an open-source culture to build consensus and enable the development, maintenance, and use of best-in-class tools, pipelines, and platforms that can be applied to all datasets.

The full integration of genomics into medical practice will require informatics and data-science advances that effectively connect the growing body of genomic knowledge to clinical decision-making. To make genomic information readily accessible and broadly useful to clinicians, user-friendly electronic health record-based clinical decision support tools must be created to interact with a variety of clinical data from electronic health record and other data systems (for example, laboratory, pharmacy, and radiology) as well as non-computable reports, such as those provided as portable document format (PDF) files[43,44]. These efforts require well-curated, highly integrated, and up-to-date knowledgebases that connect genomic information to clinical characteristics, other phenotypic data, and information on family health history[45]. Reliable risk-stratification and prevention algorithms, including polygenic risk scores (PRSs)[46], must be developed and should incorporate both common and rare genomic variants from a broad range of population subgroups, phenotypic data, and environmental information into the risk modelling[47]. Such algorithms should be evaluated both for their validity across many populations and for their effect on patient outcomes and subsequent healthcare utilization. Finally, it will be important to evaluate new genomics-oriented clinical decision support tools to ensure that they are acceptable to practitioners across the spectrum of clinical disciplines.

### Genomics and society

Understanding the role of genomics in human health requires knowledge and insights about how social, environmental, and genomic risk factors interact to produce health outcomes[48,49] (Box 1). Given that such interactions are, in general, poorly understood, it is crucial that studies of genomic risk (particularly of common, complex diseases) account for the social and environmental factors that influence health and disease[50]. These factors must be properly described, measured, and incorporated in genomic studies[51]. Optimal implementation of genomic medicine will require an understanding of how the intersectional aspects of people's social and political identities influence the ways in which populations are described in research. Such knowledge will, in turn, provide clarity about the interrelationships among these many influences on health and disease.

People want to be able to make well-informed decisions about their genomic data, leading to the engagement efforts in initiatives such as the UK Biobank[52] and the 'All of Us' Research Program[53]. Partnering with communities and individuals is fundamental to engaging participants in such large-scale research. Genomics researchers must incorporate models and methods of community engagement in their experimental design. Such studies must be appropriately adapted for different cultures and designed to reduce inequities and healthcare disparities; they must also be accompanied by effective information dissemination[54]. An unrelenting focus on the optimal ways to conduct research in partnership with data stakeholders and communities would ensure the identification of the key issues and values influencing peoples' choices about the provision of personal data for research[55,56]. Data-stewardship infrastructures that integrate appropriate policies, technologies[57], and governance and legal frameworks must be developed and assessed to ensure alignment between communities' and individuals' decisions about their data and the practices of researchers and clinicians.

To fully realize the benefits of genomic advances, a working understanding of the basic concepts of genomics will be important for science educators[58], healthcare professionals[59], policymakers, and the public[60]. Several educational strategies will inevitably be required to enhance the genomic literacy of these heterogeneous groups, which points to the need for innovative approaches that are shared, assessed, and improved over time[58]. A growing evidence base shows that increasing the understanding

APHA App. 809

## Box 3

# Breaking down barriers that impede progress in genomics

**Laboratory and computational technologies**



- Transform the study of the functional consequences of genomic variation by enhancing the scale of DNA synthesis and editing
- Maximally leverage the usability and utility of emerging datasets for genomic studies of human health and disease

**Biological insights**

- Establish the means to determine the functional consequences of genomic variants affecting human health and disease
- Characterize intraindividual genomic variation and understand its role in human disease

**Implementation science**

- Develop and assess strategies for implementing the use of genomic information in clinical care
- Test public health approaches for implementing population-wide genomic screening

of key genomics concepts and applications attracts students to careers in genomics[61], assists with the use of genomics for addressing health disparities[62], and facilitates the uptake of genomic medicine[63]. Curricula for enhancing genomic literacy must be designed to be accessible, effective, and scalable for use in the full range of settings where genomics education is provided—including the primary and secondary schools, science museums, and informal science-education venues. Researchers and educators must also disseminate information about both the science of genomics as well as the key ethical and societal implications of genomics[64].

### Training and genomics workforce development

Appropriate skills in data science and data stewardship are now prerequisites for becoming a genomics researcher[65]. Furthermore, given the ever-expanding use of genomics in basic, translational, social, behavioural, and clinical research, a greater number of scientists will require fundamental data-science skills that are appropriate for the genomic applications being used[66]. Establishing and maintaining data-science competencies for conducting genomics research requires a series of interrelated educational and training efforts[67], including the recruitment of many data scientists into genomics and the reciprocal exchange of expertise between genomics researchers and data scientists.

Moving into healthcare, providers must be poised to manage questions from patients who receive genomic information, including that from direct-to-consumer (DTC) testing, and this applies to the full spectrum of medical professionals (including nurses, pharmacists, physicians, and other clinicians)[68]. Education modules tailored to specific user groups should be designed to adapt rapidly to advances in genomics and data-science technologies; these should be available on demand and, where appropriate, integrated into existing clinical systems[69]. Research on the methodologies for train-the-trainer approaches, implementation of standards and competency-based education, and strategies for enhancing genomic literacy among all healthcare providers at all career stages[70] should also be pursued. The involvement of patients, caregivers, educators, professional organizations[71], and accreditation boards will be crucial to ensure success. Importantly, cross-training in relevant aspects of genomics must also

be available for specialists working in or around healthcare systems, including (but not limited to) those involved in health services research, health economics, law, bioethics, and social and behavioural sciences.

In both research and clinical settings, the global genomics workforce— as with the general biomedical research workforce—falls considerably short of reflecting the diversity of the world's population (a vivid example of this is seen in the United States[72]), which limits the opportunity of those systematically excluded to bring their unique ideas to scientific and clinical research[73]. To attain a diverse genomics workforce, new strategies and programs to reduce impediments to career opportunities in genomics are required, as are creative approaches to promote workforce diversity, leadership in the field, and inclusion practices. Efforts must intentionally include women, underrepresented racial and ethnic groups, disadvantaged populations, and individuals with disabilities. Initiatives should not focus exclusively on early-stage recruitment; instead, they must also include incentives to recruit and retain a diverse workforce at all career stages[74] as well as new approaches for cultivating the next generation of genomics practitioners.

## Breaking down barriers in genomics

Genomics has benefited enormously from the proactive identification of major obstacles impeding progress and the subsequent focused efforts to break down those barriers. Prototypic successes include the call for a '[US]\$1,000 human genome sequence' after completion of the Human Genome Project[15] and proposed actions to facilitate genomic medicine implementation in 2011[16]; in these cases, both the risks of failure and the benefits of success were high. Once again, breaking down barriers, as highlighted in Box 3 and detailed below, would accelerate progress and create new research and clinical opportunities at The Forefront of Genomics.

### Laboratory and computational technologies

Advances in DNA synthesis and genome editing allow the field of genomics to progress from largely observational ('reading DNA') to more experimental ('writing' and 'editing' DNA) approaches. Enabling true 'synthetic genomics' (that is, the synthesis, modification, and perturbation of nucleic acid sequences at any scale) will allow for more powerful experimental testing of hypotheses about genome variation and function and improve opportunities for linking genotypes to phenotypes[75]. Genome editing is increasingly being used for practical applications in medicine (such as in gene therapy[76]), biotechnology, and agriculture. Despite recent triumphs, however, the current approaches are limited in their ability to interrogate genome function at the pathway or network level and to study important phenomena, such as gene regulation and chromosome organization and mechanics, that involve factors that act across large chromosomal (or genomic) distances. Furthermore, radically new capabilities for understanding how the full complement of genomic variation within any individual genome contributes to phenotypes should be pursued. Innovative approaches for generating nucleic acid molecules with defined sequences and of any size, coupled with technologies that allow for the concurrent and large-scale perturbation of many genes or simultaneous examination of multiple genomic variants, would be transformative. These advances would benefit from the development of methods to introduce large synthetic constructs into mammalian cells.

In recent years, large human genomics projects have often relied on data generated as part of existing research studies, and emerging approaches involve developing biobanks and organized cohorts[77–79]. Meanwhile, DTC companies are generating substantial amounts of genomic data, and those efforts are rapidly being eclipsed by that being generated in the clinical care setting[80]. Properly leveraged, these DTC and clinical data offer opportunities for genomics-based studies at unprecedented scales; however, these data are often heavily fragmented, siloed, and mostly outside the purview of genomics researchers and their typical funders[81]. Eliminating the barriers to accessing these sources of data for conducting research is essential, but this will require resolving issues

APHA App. 810

**Perspective**

## Box 4

# Compelling genomics research projects in biomedicine



- Acquire an increasingly comprehensive view of the roles and relationships of genes and regulatory elements in pathways and networks
- Determine the genetic architecture of most human diseases and traits
- Design studies that include diverse ancestral populations to enable scientific discoveries and genomic medicine for all
- Understand how the use of genomics can influence concepts of health, disease, responsibility, identity, family, and community
- Extend multi-omic studies of human disease and health into clinical settings
- Design and use genomic learning healthcare systems for knowledge generation and improvements in clinical care

related to governance, policy infrastructure, and informatics and workflow solutions. Approaches are needed to mitigate the resulting gaps, limitations, and biases within this highly distributed data environment (for example, with regards to population diversity, data-collection strategies, data standards, and data privacy), all while addressing concerns of the patients, participants, and groups. These challenges must be addressed globally[81] (Box 1), so as to accommodate differences in healthcare systems and views about data privacy. In addition, the healthcare stakeholders should take advantage of opportunities offered by genomics, thereby enabling virtuous-cycle routes between genomic learning healthcare systems and basic genomics research[82] (Fig. 3).

### Biological insights

Despite progress in identifying genomic variants that cause monogenic traits or are statistically associated with complex phenotypes, determining the connection of specific variants to phenotypes remains challenging[83]. Systematic approaches, including tactics that connect high-throughput molecular readouts of functional genomic assays to organismal phenotypes, are required to establish the phenotypic consequences of all genomic variants—individually and in combination—in a cell-type context across the life span[84]. Progress in this area requires global collaboration[85], advances in integrating several data types and performing perturbation assays, protein localization or interaction experiments, and animal models, as well as resources cataloguing information about the fitness consequences of de novo mutations and the clinical relevance of genomic variants[83]. Because it is not possible to directly test every variant in all cell types and states, developmental stages, and disease processes, new data-collection strategies and analytical approaches are needed that can generalize and adapt predictions to new contexts, handle sparse data, and prioritize variants for experimental follow-up.

Recent advances have led to a greater appreciation of the extent of mosaicism—that is, genomic variation among cells (both somatic and germline) within an individual. Although there have been remarkable advances in understanding the somatic genomic changes encountered in cancer[86], there is a paucity of detailed knowledge about other effects of mosaicism beyond a few well-studied examples[87]. Important areas of future research include investigating the prevalence and extent of different forms of mosaic variation in both nuclear and mitochondrial DNA, the mechanisms that generate mosaicism, and the roles of mosaicism in physiology and human disease. Such efforts might reveal whether

this form of genomic variation contributes to variable penetrance and expressivity, comprises a form of genetic epistasis, explains any currently undiagnosed diseases or sporadic cases (or apparent phenocopies) of known inherited diseases[9], or can inform the design of therapies for genetic diseases. Single-cell genomic technologies have extended knowledge about the functional effects of mosaicism in different experimental systems[88,89], with the next challenge being to translate such single-cell understanding to in vivo settings. The development of laboratory and clinical approaches to readily detect genomic mosaicism at high spatial and temporal resolutions, especially in non-invasive ways (for example, requiring minimal amounts of tissue), would be catalytic.

### Implementation science

A crucial barrier to using genomics for improving health and preventing disease is the lack of clinical uptake of proven genomic interventions. Implementation science approaches are needed to identify the most effective methods and strategies for facilitating the use of evidence-based genomic applications, most notably pharmacogenomics-based selection of medications[90], in routine clinical care. New experimental designs, such as genotype-specific participant recruitment[91] or integration of patient-provided genomic data[92] (captured during previous healthcare encounters or from DTC sources), should be explored for their potential to speed adoption and limit costs. The effectiveness of centralized resources for genomic referrals (for example, genomic medicine specialists, consult services[93,94], and centres of excellence in undiagnosed diseases—akin to transplantation centres or cancer centres) should be explored as potential steppingstones to the more generalized uptake of genomics in clinical care. Strategies for deploying the limited workforce of highly trained genetics or genomics specialists (for example, systematic referral networks or telemedicine or telecounseling) should also be evaluated for their effectiveness at increasing the availability of services broadly—as opposed to being limited to select, highly specialized centres.

Universal newborn genetic screening may represent the most visible and successful approach to population-based identification of serious and treatable inherited conditions, but population screening across the lifespan for other genetic conditions is less widely accepted. Standard public health screening approaches for the US Centers for Disease Control and Prevention Tier 1 conditions[95,96] (for example, Lynch syndrome, hereditary breast and ovarian cancer, and familial hypercholesterolemia) identify people at risk through blood relatives of affected individuals (referred to as 'cascade testing' by geneticists[97]). Implementation research methods, coupled with effective science communication, are primed for optimizing approaches to engage individuals in genetic testing for these disorders, in addition to other emerging indications, such as genetic predisposition to adverse drug effects (pharmacogenomics), carrier testing of prospective parents, use of PRSs in disease detection and prevention[46], and genomic indicators (for example, gene-expression and epigenetic patterns) of exposure to infectious pathogens[98] and other environmental agents.

### Compelling genomics research projects

The field of genomics has routinely benefited from a willingness to articulate ambitious—often audacious—research efforts that aim to address questions and acquire knowledge that (at the time) may seem out of reach. Such boldness has served to stimulate interest in emerging opportunities, recruit new expertise, galvanize international collaborations involving several funders, and propel the field forward. Although by no means comprehensive, the areas highlighted in Box 4 and detailed below illustrate the broadening range of compelling research projects that are ripe for pursuit at The Forefront of Genomics.

Advances in understanding gene regulation[5,24], the myriad functional roles of RNA[99], and the multi-dimensional nature of the nucleome[100]—coupled with the use of single-cell genomic approaches[30,31] and anticipated

APHA App. 811



**Fig. 3 | Virtuous cycles in human genomics research and clinical care.** As human genomics has matured as a discipline, productive and connected virtuous cycles of activity have emerged, each self-improving with successive rounds of new advances. The cycle on the left reflects basic genomics research, in which technology innovations spur the collection and analysis of genomics research data, often yielding new knowledge and further hypotheses for testing. The cycle on the right reflects a genomic learning healthcare system, in which the implementation of new genomic medicine practice innovations allows for the collection and analysis of outcomes data, often yielding new genomic knowledge and additional genomics-based strategies for improving the quality of clinical care. Note that the new knowledge emerging from either the left or the right cycle has the potential to feed into the other, creating opportunities for 'bench to bedside' and 'bedside back to bench' progressions[82]—both of which are expected to grow in the coming decade.

new technological and computational capabilities for analysing genomic datasets and variants—provide an unprecedented opportunity to decipher the individual and combined roles of each gene and regulatory element. This must start with establishing the function of each human gene, including the phenotypic effects of human gene knockouts. Because genes and regulatory elements do not function in isolation, it is imperative to build robust experimental and computational models that deduce causal relationships and accurately predict cellular and organismal phenotypes using pathway and network models[101,102]. Analysis methods must address functional redundancy as well as the nearly boundless experimental space and complexity, including cell states and fates, temporal relationships, environmental conditions, and individual genetic background.

Building on the recent successes in unravelling the genetic underpinnings of rare and undiagnosed diseases[9], the field is poised to gain a more comprehensive understanding of the genetic architecture of all human diseases and traits[10,85]. However, myriad complexities can be anticipated. For example, a given genomic variant(s) may affect more than one disease or trait (that is, pleiotropy); can confer disease risk or reduce it; and can act additively, synergistically, and/or through intermediates. New methods to analyse data that account for human diversity[103], coupled with a growing clarity about genotype–phenotype relationships, must be developed to deduce associations and interactions among genomic variants and environmental factors, improve estimates of penetrance and expressivity, and enhance the clinical utility of genomic information for predicting risk, prognosis, treatment response, and, ultimately, clinical outcomes.

Prioritizing the generation of genomic and corresponding phenotypic data from ancestrally diverse participants is a scientific imperative[104] and essential for achieving equitable benefits from genomic advances[105] (Box 1). However, this is an area in which genomics has repeatedly fallen short[19], leading to missed opportunities for understanding genome structure and function, identifying variants conferring risk for common diseases[106], and implementing genomic medicine for the benefit of all[107-109]. Ideally, studies should be designed for different groups, adapted for local sensibilities and situations, and consistent in capturing key information beyond participants' ancestry (for example, the physical and social environments in which they live and receive healthcare[110]). Leveraging new insights from studies of diverse populations will require the development of robust methods for identifying signatures of natural selection, performing genotype imputation, mapping disease loci, characterizing genomic variant pathogenicity, and calculating PRSs[103,109]. Success in these efforts will yield a more-complete understanding of how the human genome functions in different environments and offer benefit to those participating in genomics research. Attaining the level of population diversity that will truly benefit all people requires bold scientific and community-based leadership, dedicated resources from funders, highly committed researchers, and effective partnerships that earn the trust of diverse groups of participants and their communities.

As genomics has grown in medicine and society, its potential to influence people's actions has also expanded. Increasingly, genomics has affected concepts of health, disease, responsibility, family, identity, and community, raising many important and changing questions. When and how is genomic information shared and communicated within families[111]? Will the identification of a strong genetic risk for a disease change a person's perception of their health or others' perception of that person? As some genetic risks are more common in certain identifiable populations, what role does group affiliation have in how risk is communicated and perceived, including potential group stigmatization? Research that catalogues, analyses, and measures the effect of genomics on individuals, families, and communities is important to provide a more informed context to avoid future misrepresentations, misunderstandings, and misuses of genomics[54]. Finally, researchers must appreciate how their own backgrounds and experiences shape their interpretations of genomic data[112].

Extending genomics research in clinical settings beyond DNA sequence to include other multi-omic data, together with clinical variables and outcomes, would advance understanding of disease onset and progression and may also prove important for drug-discovery efforts[113,114]. This would require tissue- and cell-specific analyses that integrate these data, providing real-time snapshots of biological and disease processes. For clinical applicability and adoption, these high-dimensional, multi-omic data should be integrated with clinical decision support tools and electronic health records. Ultimately, such efforts could reveal important relationships among genomic, environmental, and behavioural variation and facilitate a transition of

APHA App. 812

**Perspective**

---

<div style="border:1px solid black; padding:10px">

Box 5

# Bold predictions for human genomics by 2030

Some of the most impressive genomics achievements, when viewed in retrospect, could hardly have been imagined ten years earlier. Here are ten bold predictions for human genomics that might come true by 2030. Although most are unlikely to be fully attained, achieving one or more of these would require individuals to strive for something that currently seems out of reach. These predictions were crafted to be both inspirational and aspirational in nature, provoking discussions about what might be possible at The Forefront of Genomics in the coming decade.

1. Generating and analysing a complete human genome sequence will be routine for any research laboratory, becoming as straightforward as carrying out a DNA purification.
2. The biological function(s) of every human gene will be known; for non-coding elements in the human genome, such knowledge will be the rule rather than the exception.
3. The general features of the epigenetic landscape and transcriptional output will be routinely incorporated into predictive models of the effect of genotype on phenotype.
4. Research in human genomics will have moved beyond population descriptors based on historic social constructs such as race.
5. Studies that involve analyses of genome sequences and associated phenotypic information for millions of human participants will be regularly featured at school science fairs.
6. The regular use of genomic information will have transitioned from boutique to mainstream in all clinical settings, making genomic testing as routine as complete blood counts.
7. The clinical relevance of all encountered genomic variants will be readily predictable, rendering the diagnostic designation 'variant of uncertain significance (VUS)' obsolete.
8. An individual's complete genome sequence along with informative annotations will, if desired, be securely and readily accessible on their smartphone.
9. Individuals from ancestrally diverse backgrounds will benefit equitably from advances in human genomics.
10. Breakthrough discoveries will lead to curative therapies involving genomic modifications for dozens of genetic diseases.

</div>

the use of genomics in medicine from diagnosing and treating disease to maintaining health.

Sharp barriers between research and clinical care obstruct the virtuous cycle of moving scientific discoveries rapidly into clinical care and bringing clinical observations back to the research setting[92] (Fig. 3). Learning healthcare systems—in which real-time data on outcomes of healthcare delivery are accessed and used to enhance clinical practice—can lead to continuous care improvement, but only if the barriers between research and clinical care are reduced[115]. For example, offering genome sequencing to all members of a healthcare system, performed in conjunction with research and participant engagement and provided in real time[81], could help to assess the clinical utility of genomic information and may allow providers to improve disease diagnosis and management. System-wide implementation of such an experiment requires not only extensive patient and provider education, sophisticated informatics capabilities, and genomics-based clinical decision support, but also the development and evaluation of data security and privacy protections to ensure patient confidentiality[116]. Patients should be engaged in the design of such systems and informed at entry to them (and periodically thereafter), so as to be fully aware of the nature of the ongoing research

with their clinical data and the goals and potential risks of their participation[117]. Extending such studies across many healthcare systems should reveal common challenges and solutions[118,119], thereby enhancing the learning healthcare model for genomic medicine more broadly (Fig. 3).

## Concluding thoughts

The dawn of genomics featured the launch of the Human Genome Project in October 1990[1]. Three decades later, the field has seen stunning technological advances and high-profile programmatic successes, which in turn have led to the widespread infusion of genomic methods and approaches across the life sciences and, increasingly, into medicine and society.

NHGRI has for the third time[15,16] since the Human Genome Project undergone an extensive horizon-scanning process to capture, synthesize, and articulate the most compelling strategic opportunities for the next phase of genomics—with particular attention to elements that are most relevant to human health. The now near-ubiquitous nature of genomics (including in the complex healthcare ecosystem) presented practical challenges for attaining a holistic assessment of the field. Another reality was that the NHGRI investment in genomics has now been multiplied many-fold by the seeding of human genomics throughout the broader research community. These changes reflect a continued maturation of both the field (in general) and NHGRI (more specifically), nicely aligning with the institute's evolving leadership role at The Forefront of Genomics.

Embracing that role, NHGRI formulated the strategic vision described here, which provides an optimistic outlook that the successes in human genomics over the past three decades will be amplified in the coming decade. Many of the details about what is needed to fulfil the promise of genomics have now come into focus. Major unsolved problems remain—among them determining the role for the vast majority of functional elements in the human genome (especially those outside of protein-coding regions), understanding the full spectrum of genomic variation (especially that implicated in human disease), developing data-science capabilities (especially those that keep pace with data generation), and improving healthcare through the implementation of genomic medicine (especially in the areas of prevention, diagnosis, and therapeutic development). The new decade also brings research questions related to the societal implications of genomics, including those related to social inequities, pointing to the continued importance of investigating the ethical, legal, and social issues related to genomics. But now more than ever, solutions to these problems seem to be within striking distance. Towards that end (and with the characteristic spirit of genomics audacity), we offer ten bold predictions of what might be realized in human genomics by 2030 (Box 5).

The strategic vision articulated here was crafted on behalf of the field of human genomics and emphasizes broad strategic goals as opposed to implementation tactics. The realization of these goals will require further planning in conjunction with the collective creativity, energies, and resources of the global community of scientists, funders, and research participants. NHGRI has taken some initial steps to implement this vision, although these will inevitably need to be adapted as advances occur and circumstances change. Indeed, the final words of this strategic vision were formulated as the world moved urgently to deal with the coronavirus disease 2019 (COVID-19) pandemic (see below), providing a vivid reminder of the need to be nimble and the importance of nurturing all parts of the research continuum—from basic to translational to clinical—for protecting public health and advancing medical science.

Despite the seismic changes seen in genomics since the inception of the field, the fundamental sense of curiosity, marvel, and purpose associated with genome science seems to be timeless. In concluding NHGRI's previous strategic vision[16]—published just under a decade ago—the then-envisioned opportunities and challenges were provided with "… a continuing sense of wonder, a continuing need for urgency, a continuing desire to balance ambition with reality, and a continuing responsibility

APHA App. 813

to protect individuals while maximizing the societal benefits of genomics…." With the 2020 strategic vision described here providing a thoughtful guide and with enduring feelings of wonder, urgency, ambition, and social consciousness providing unfettered momentum, we are ready to embark on the next exciting phase of the human genomics journey.

## Epilogue: COVID-19 and genomics

Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) emerged as a global threat to public health at the end of the multi-year process that generated the above strategic vision. Nonetheless, the COVID-19 pandemic provides a potent lesson about how a tiny string of nucleic acids can wreak global havoc on humankind. Understanding the mechanisms involved in the transmission of the virus, viral invasion and clearance, as well as the highly variable and at times disastrous physiological responses to infection, are fertile grounds for genomics research. Genomics rapidly assumed crucial roles in COVID-19 research and clinical care in areas such as (1) the deployment of DNA- and RNA-sequencing technologies for diagnostics, tracking of viral isolates, and environmental monitoring; (2) the use of synthetic nucleic acid technologies for studying SARS-CoV-2 virulence and facilitating vaccine development; (3) the examination of how human genomic variation influences infectivity, disease severity, vaccine efficacy, and treatment response; (4) the adherence to principles and values related to open science, data sharing, and consortia-based collaborations; and (5) the provision of genomic data science tools to study COVID-19 pathophysiology. The growing adoption of genome approaches and technologies into myriad aspects of the global response to the COVID-19 pandemic serves as another important and highly visible example of the integral and vital nature of genomics in modern research and medicine.

1. The Human Genome Project; https://www.genome.gov/human-genome-project (accessed 28 June 2019)
2. Lander, E. S. et al. Initial sequencing and analysis of the human genome. *Nature* **409**, 860–921 (2001).
3. International Human Genome Sequencing Consortium. Finishing the euchromatic sequence of the human genome. *Nature* **431**, 931–945 (2004).
4. NHGRI. The cost of sequencing a human genome; https://www.genome.gov/about-genomics/fact-sheets/Sequencing-Human-Genome-cost (accessed 12 June 2020)
5. Moore, J. E. et al. Expanded encyclopedias of DNA elements in the human and mouse genomes. *Nature* **583**, 699–710 (2020).
6. Shema, E., Bernstein, B. E. & Buenrostro, J. D. Single-cell and single-molecule epigenomics to uncover genome regulation at unprecedented resolution. *Nat. Genet.* **51**, 19–25 (2019).
7. The 1000 Genomes Project Consortium et al. A global reference for human genetic variation. *Nature* **526**, 68–74 (2015).
8. Karczewski, K. J. et al. The mutational constraint spectrum quantified from variation in 141,456 humans. *Nature* **581**, 434–443 (2020). **Analysis of a large dataset of exome sequences, yielding important descriptions of the extent and nature of human genomic variation and insights into protein evolution.**
9. Posey, J. E. et al. Insights into genetics, human biology and disease gleaned from family based genomic studies. *Genet. Med.* **21**, 798–812 (2019).
10. Claussnitzer, M. et al. A brief history of human disease genetics. *Nature* **577**, 179–189 (2020).
11. Manolio, T. A. et al. Opportunities, resources, and techniques for implementing genomics in clinical care. *Lancet* **394**, 511–520 (2019).
12. Mardis, E. R. The impact of next-generation sequencing on cancer genomics: from discovery to clinic. *Cold Spring Harb. Perspect. Med.* **9**, a036269 (2019).
13. Bianchi, D. W. & Chiu, R. W. K. Sequencing of circulating cell-free DNA during pregnancy. *N. Engl. J. Med.* **379**, 464–473 (2018).
14. Wright, C. F., FitzPatrick, D. R. & Firth, H. V. Paediatric genomics: diagnosing rare disease in children. *Nat. Rev. Genet.* **19**, 253–268 (2018).
15. Collins, F. S., Green, E. D., Guttmacher, A. E. & Guyer, M. S. A vision for the future of genomics research. *Nature* **422**, 835–847 (2003).
16. Green, E. D. & Guyer, M. S. Charting a course for genomic medicine from base pairs to bedside. *Nature* **470**, 204–213 (2011).
17. McEwen, J. E. et al. The Ethical, Legal, and Social Implications Program of the National Human Genome Research Institute: reflections on an ongoing experiment. *Annu. Rev. Genomics Hum. Genet.* **15**, 481–505 (2014).
18. Burke, W. et al. The translational potential of research on the ethical, legal, and social implications of genomics. *Genet. Med.* **17**, 1–9 (2014).
19. Popejoy, A. B. & Fullerton, S. M. Genomics is failing on diversity. *Nature* **538**, 161–164 (2016). **Comprehensive analysis of genome-wide association studies, demonstrating continued severe underrepresentation of individuals of African and Latin American ancestry and Indigenous peoples.**
20. Wolf, S. M. et al. Integrating rules for genomic research, clinical care, public health screening and DTC testing: creating translational law for translational genomics. *J. Law Med. Ethics* **48**, 69–86 (2020).

21. Adam, D. The promise and peril of the new science of social genomics. *Nature* **574**, 618–620 (2019). **Summary of recent studies examining the genetics of bio-behavioural traits, highlighting dangers to groups and society of over-interpreting results in this new field.**
22. Dias, R. & Torkamani, A. Artificial intelligence in clinical and genomic diagnostics. *Genome Med.* **11**, 70 (2019).
23. Schloss, J. A., Gibbs, R. A., Makhijani, V. B. & Marziali, A. Cultivating DNA sequencing technology after the human genome project. *Annu. Rev. Genomics Hum. Genet.* **21**, 117–138 (2020). **Retrospective overview of the NHGRI program for advancing DNA-sequencing technologies, the goal of which was to reduce the cost of sequencing a human genome to $1,000.**
24. ENCODE: Encyclopedia of DNA Elements; https://www.encodeproject.org/ (accessed 24 June 2020).
25. Risca, V. I. & Greenleaf, W. J. Unraveling the 3D genome: genomics tools for multiscale exploration. *Trends Genet.* **31**, 357–372 (2015).
26. Logsdon, G. A., Vollger, M. R. & Eichler, E. E. Long-read human genome sequencing and its applications. *Nat. Rev. Genet.* https://doi.org/10.1038/s41576-020-0236-x (2020).
27. Miga, K. H. et al. Telomere-to-telomere assembly of a complete human X chromosome. *Nature* **585**, 79–84 (2020). **Demonstration of the use of emerging DNA-sequencing technologies, analysis methods, and validation routines to produce the first gapless de novo assembly of a human chromosome sequence.**
28. Human Pangenome Reference Consortium. Diverse human references drive genomic discoveries for everyone; https://humanpangenome.org/ (accessed 29 June 2020)
29. Zerbino, D. R., Frankish, A. & Flicek, P. Progress, challenges, and surprises in annotating the human genome. *Annu. Rev. Genomics Hum. Genet.* **21**, 55–79 (2020).
30. Rood, J. E. et al. Toward a common coordinate framework for the human body. *Cell* **179**, 1455–1467 (2019).
31. Stuart, T. & Satija, R. Integrative single-cell analysis. *Nat. Rev. Genet.* **20**, 257–272 (2019).
32. Mimitou, E. P. et al. Multiplexed detection of proteins, transcriptomes, clonotypes and CRISPR perturbations in single cells. *Nat. Methods* **16**, 409–412 (2019).
33. Schreiber, J., Durham, T., Bilmes, J. & Noble, W. S. Avocado: a multi-scale deep tensor factorization method learns a latent representation of the human epigenome. *Genome Biol.* **21**, 81 (2020).
34. Cunningham, F. et al. Ensembl 2019. *Nucleic Acids Res.* **47** (D1), D745–D751 (2019).
35. Lewin, H. A. et al. Earth BioGenome Project: Sequencing life for the future of life. *Proc. Natl Acad. Sci. USA* **115**, 4325–4333 (2018).
36. Lindblad-Toh, K. What animals can teach us about evolution, the human genome, and human disease. *Ups. J. Med. Sci.* **125**, 1–9 (2020).
37. Schatz, M. C. Biological data sciences in genome research. *Genome Res.* **25**, 1417–1422 (2015).
38. Wilkinson, M. D. et al. The FAIR Guiding Principles for scientific data management and stewardship. *Sci. Data* **3**, 160018 (2016). **Description of foundational principles to improve data sharing and stewardship by ensuring that biomedical research data (including genomic data) are findable, accessible, interoperable, and reusable.**
39. Anderson, W. et al. Towards coordinated international support of core data resources for the life sciences. Preprint at https://www.bioRxiv.org/content/10.1101/110825v3 (2017).
40. Grossman, R. L. Data lakes, clouds, and commons: a review of platforms for analyzing and sharing genomic data. *Trends Genet.* **35**, 223–234 (2019).
41. Haendel, M. A., Chute, C. G. & Robinson, P. N. Classification, ontology, and precision medicine. *N. Engl. J. Med.* **379**, 1452–1462 (2018).
42. Martinez-Romero, M. et al. Using association rule mining and ontologies to generate metadata recommendations from multiple biomedical databases. *Database (Oxford)* **2019**, 59 (2019).
43. Levy, K. S. et al. Opportunities to implement a sustainable genomic medicine program: lessons learned from the IGNITE Network. *Genet. Med.* **21**, 743–747 (2019).
44. Williams, M. S. et al. Genomic information for clinicians in the electronic health record: Lessons learned from the clinical genome resource project and the electronic medical records and genomics network. *Front. Genet.* **10**, 1059 (2019).
45. Lemke, A. A. et al. Primary care physician experiences utilizing a family health history tool with electronic health record-integrated clinical decision support: an implementation process assessment. *J. Community Genet.* **11**, 339–350 (2020).
46. Khera, A. V. et al. Genome-wide polygenic scores for common diseases identify individuals with risk equivalent to monogenic mutations. *Nat. Genet.* **50**, 1219–1224 (2018). **Development and validation of genome-wide polygenic scores that identify population subsets with risk levels equivalent to monogenic genomic variants that are commonly reported and acted upon.**
47. Zeggini, E., Gloyn, A. L., Barton, A. C. & Wain, L. V. Translational genomics and precision medicine: Moving from the lab to the clinic. *Science* **365**, 1409–1413 (2019).
48. Koehly, L. M. et al. Social and behavioral science at the forefront of genomics: discovery, translation, and health equity. *Soc. Sci. Med.* **112450**, 112450 (2019).
49. Khan, S. S., Cooper, R. & Greenland, P. Do polygenic risk scores improve patient selection for prevention of coronary artery disease? *J. Am. Med. Assoc.* **323**, 614–615 (2020).
50. Mostafavi, H. et al. Variable prediction accuracy of polygenic scores within an ancestry group. *eLife* **9**, 1–52 (2020).
51. Morris, T. T., Davies, N. M., Hemani, G. & Smith, G. D. Population phenomena inflate genetic associations of complex social traits. *Sci. Adv.* **6**, eaay0328 (2020).
52. Bycroft, C. et al. The UK Biobank resource with deep phenotyping and genomic data. *Nature* **562**, 203–209 (2018).
53. Denny, J. C. et al. The "All of Us" Research Program. *N. Engl. J. Med.* **381**, 668–676 (2019).
54. Garrison, N. A. et al. Genomic research through an indigenous lens: understanding the expectations. *Annu. Rev. Genomics Hum. Genet.* **20**, 495–517 (2019). **Discussion of issues related to conducting genomics research with Indigenous peoples, coupled with suggestions for respecting tribal governance and protecting Indigenous people from group harms.**

APHA App. 814

## Perspective

55. Sanderson, S. C. et al. Public attitudes toward consent and data sharing in biobank research: a large multi-site experimental survey in the US. *Am. J. Hum. Genet.* **100**, 414–427 (2017).
**Survey results from 13,000 individuals regarding participation in research in which their data are shared with others, yielding insight into factors that predict a willingness of people to participate in research and concerns about data privacy.**

56. Milne, R. et al. Trust in genomic data sharing among members of the general public in the UK, USA, Canada and Australia. *Hum. Genet.* **138**, 1237–1246 (2019).

57. Grishin, D., Obbad, K. & Church, G. M. Data privacy in the age of personal genomics. *Nat. Biotechnol.* **37**, 1115–1117 (2019).

58. Genomic Literacy, Education and Engagement Initiative; https://www.genome.gov/leadership-initiatives/Genomic-Literacy-Education-Engagement-Initiative (accessed 29 June 2020)

59. Manolio, T. A. & Murray, M. F. The growing role of professional societies in educating clinicians in genomics. *Genet. Med.* **16**, 571–572 (2014).

60. Krakow, M., Ratcliff, C. L., Hesse, B. W. & Greenberg-Worisek, A. J. Assessing genetic literacy awareness and knowledge gaps in the US population: results from the health information national trends survey. *Public Health Genomics* **20**, 343–348 (2017).

61. LaRue, K. M., McKernan, M. P., Bass, K. M. & Wray, C. G. Teaching the genome generation: bringing modern human genetics into the classroom through teacher professional development. *J. STEM Outreach* **1**, 48–60 (2018).

62. Mbowa, G. & Sserwadda, I. Role of genomics literacy in reducing the burden of common genetic diseases in Africa. *Mol. Genet. Genomic Med.* **7**, e00776 (2019).

63. Veilleux, S., Bouffard, M. & Bourque Bouliane, M. Patient and health care provider needs and preferences in understanding pharmacogenomic and genomic testing: a meta-data analysis. *Qual. Health Res.* **30**, 43–59 (2020).

64. Kung, J. & Wu, C.-T. Leveling the playing field: closing the gap in public awareness of genetics between the well served and underserved. *Hastings Cent. Rep.* **46**, 17–20 (2016).

65. Stephens, Z. D. et al. Big data: astronomical or genomical? *PLoS Biol.* **13**, e1002195 (2015).

66. Attwood, T. K., Blackford, S., Brazas, M. D., Davies, A. & Schneider, M. V. A global perspective on evolving bioinformatics and data science training needs. *Brief. Bioinform.* **20**, 398–404 (2019).

67. Genomics Education Partnership; http://gep.wustl.edu/ (accessed 16 June 2020).

68. Campion, M., Goldgar, C., Hopkin, R. J., Prows, C. A. & Dasgupta, S. Genomic education for the next generation of health care providers. *Genet. Med.* **21**, 2422–2430 (2019).

69. McClaren, B. J. et al. Development of an evidence-based, theory-informed national survey of physician preparedness for genomic medicine and preferences for genomics continuing education. *Front. Genet.* **11**, 59 (2020).

70. Dougherty, M. J., Wicklund, C. & Johansen Taber, K. A. Challenges and opportunities for genomics education: Insights from an Institute of Medicine Roundtable Activity. *J. Contin. Educ. Health Prof.* **36**, 82–85 (2016).

71. NHGRI. Inter-Society Coordinating Committee for Practitioner Education in Genomics; https://www.genome.gov/For-Health-Professionals/Inter-Society-Coordinating-Committee-for-Practitioner-Education-in-Genomics (accessed 16 June 2020).

72. Valantine, H. A., Collins, F. S. & Verma, I. M. National Institutes of Health addresses the science of diversity. *Proc. Natl Acad. Sci.* USA **112**, 12240–12242 (2015).

73. Hofstra, B. et al. The diversity–innovation paradox in science. *Proc. Natl Acad. Sci. USA* **117**, 9284–9291 (2020).
**Study of the US doctorate recipients from 1977 to 2015, identifying new contributions by gender and racial or ethnic minority scholars, evidence for lower rates of recognition by majority scholars, and the resulting diversity–innovation paradox in science.**

74. Martinez, L. R., Boucaud, D. W., Casadevall, A. & August, A. Factors contributing to the success of NIH-designated underrepresented minorities in academic and nonacademic research positions. *CBE Life Sci. Educ.* **17**, ar32 (2018).

75. Schindler, D., Dai, J. & Cai, Y. Synthetic genomics: a new venture to dissect genome fundamentals and engineer new functions. *Curr. Opin. Chem. Biol.* **46**, 56–62 (2018).

76. Doudna, J. A. The promise and challenge of therapeutic genome editing. *Nature* **578**, 229–236 (2020).
**Review of the scientific, technical, and ethical aspects of using CRISPR technology for therapeutic applications in humans.**

77. UK Biobank; https://www.ukbiobank.ac.uk/ (accessed 14 June 2020).

78. NIH. All of Us; https://allofus.nih.gov/ (accessed 14 June 2020).

79. International HundredK+ Cohorts Consortium (IHCC). Linking cohorts, understanding biology, improving health; https://ihccglobal.org/ (accessed 14 June 2020).

80. Stark, Z. et al. Integrating genomics into healthcare: a global responsibility. *Am. J. Hum. Genet.* **104**, 13–20 (2019).

81. Birney, E., Vamathevan, J. & Goodhand, P. Genomics in healthcare: GA4GH looks to 2022. Preprint at https://www.bioRxiv.org/content/10.1101/203554v1 (2017).

82. Manolio, T. A. et al. Bedside back to bench: building bridges between basic and clinical genomic research. *Cell* **169**, 6–12 (2017).

83. Rehm, H. L. et al. ClinGen — The clinical genome resource. *N. Engl. J. Med.* **372**, 2235–2242 (2015).

84. Starita, L. M. et al. Variant interpretation: functional assays to the rescue. *Am. J. Hum. Genet.* **101**, 315–325 (2017).

85. International Common Disease Alliance; https://www.icda.bio/ (accessed 24 June 2020).

86. Welcome to the Pan-Cancer Atlas; https://www.cell.com/pb-assets/consortium/PanCancerAtlas/PanCani3/index.html (accessed 19 June 2020).

87. Steensma, D. P. et al. Clonal hematopoiesis of indeterminate potential and its distinction from myelodysplastic syndromes. *Blood* **126**, 9–16 (2015).

88. Baslan, T. & Hicks, J. Unravelling biology and shifting paradigms in cancer with single-cell sequencing. *Nat. Rev. Cancer* **17**, 557–569 (2017).

89. D'Gama, A. M. & Walsh, C. A. Somatic mosaicism and neurodevelopmental disease. *Nat. Neurosci.* **21**, 1504–1514 (2018).

90. Roden, D. M. et al. Pharmacogenomics. *Lancet* **394**, 521–532 (2019).

91. Corbin, L. J. et al. Formalising recall by genotype as an efficient approach to detailed phenotyping and causal inference. *Nat. Commun.* **9**, 711 (2018).

92. Savatt, J. M. et al. ClinGen's GenomeConnect registry enables patient-centered data sharing. *Hum. Mutat.* **39**, 1668–1676 (2018).

93. Eadon, M. T. et al. Implementation of a pharmacogenomics consult service to support the INGENIOUS trial. *Clin. Pharmacol. Ther.* **100**, 63–66 (2016).

94. Darnell, A. J. et al. A clinical service to support the return of secondary genomic findings in human research. *Am. J. Hum. Genet.* **98**, 435–441 (2016).

95. CDC. Public Health Genomics and Precision Health Knowledge Base (v6.4); https://phgkb.cdc.gov/PHGKB/tierStartPage.action (accessed 17 June 2020).

96. Dotson, W. D. et al. Prioritizing genomic applications for action by level of evidence: a horizon-scanning method. *Clin. Pharmacol. Ther.* **95**, 394–402 (2014).

97. Hopkins, P. N. Genotype-guided diagnosis in familial hypercholesterolemia: population burden and cascade screening. *Curr. Opin. Lipidol.* **28**, 136–143 (2017).

98. Bierne, H., Hamon, M. & Cossart, P. Epigenetics and bacterial infections. *Cold Spring Harb. Perspect. Med.* **2**, a010722 (2012).

99. Bhat, A. A. et al. Role of non-coding RNA networks in leukemia progression, metastasis and drug resistance. *Mol. Cancer* **19**, 57 (2020).

100. Sparks, T. M., Harabula, I. & Pombo, A. Evolving methodologies and concepts in 4D nucleome research. *Curr. Opin. Cell Biol.* **64**, 105–111 (2020).

101. Young, A. I., Benonisdottir, S., Przeworski, M. & Kong, A. Deconstructing the sources of genotype-phenotype associations in humans. *Science* **365**, 1396–1400 (2019).

102. Mitra, K., Carvunis, A.-R., Ramesh, S. K. & Ideker, T. Integrative approaches for finding modular structure in biological networks. *Nat. Rev. Genet.* **14**, 719–732 (2013).

103. Bien, S. A. et al. The future of genomic studies must be globally representative: perspectives from PAGE. *Annu. Rev. Genomics Hum. Genet.* **20**, 181–200 (2019).

104. Bentley, A. R., Callier, S. L. & Rotimi, C. N. Evaluating the promise of inclusion of African ancestry populations in genomics. *Genomic Med.* **5**, 5 (2020).

105. Hindorff, L. A. et al. Prioritizing diversity in human genomics research. *Nat. Rev. Genet.* **19**, 175–185 (2018).

106. Wojcik, G. L. et al. Genetic analyses of diverse populations improves discovery for complex traits. *Nature* **570**, 514–518 (2019).

107. Landry, L. G., Ali, N., Williams, D. R., Rehm, H. L. & Bonham, V. L. Lack of diversity in genomic databases is a barrier to translating precision medicine research into practice. *Health Aff. (Millwood)* **37**, 780–785 (2018).

108. Manrai, A. K. et al. Genetic misdiagnoses and the potential for health disparities. *N. Engl. J. Med.* **375**, 655–665 (2016).
**Demonstration of frequent erroneous classification of genomic variants as pathogenic among patients of African or unspecified ancestry that were subsequently re-categorized as benign, with considerable health implications of those misclassifications.**

109. Martin, A. R. et al. Clinical use of current polygenic risk scores may exacerbate health disparities. *Nat. Genet.* **51**, 584–591 (2019).

110. Horowitz, C. R. et al. Successful recruitment and retention of diverse participants in a genomics clinical trial: a good invitation to a great party. *Genet. Med.* **21**, 2364–2370 (2019).

111. Botkin, J. R., Mancher, M., Busta, E. R. & Downey, A. S. *Returning Individual Research Results to Participants* (National Academies Press, 2018).

112. Lázaro-Muñoz, G. et al. Issues facing us. *Am. J. Med. Genet. B. Neuropsychiatr. Genet.* **180**, 543–554 (2019).

113. Lloyd-Price, J. et al. Multi-omics of the gut microbial ecosystem in inflammatory bowel diseases. *Nature* **569**, 655–662 (2019).

114. Hasin, Y., Seldin, M. & Lusis, A. Multi-omics approaches to disease. *Genome Biol.* **18**, 83 (2017).

115. Chambers, D. A., Feero, W. G. & Khoury, M. J. Convergence of implementation science, precision medicine, and the learning health care system: a new model for biomedical research. *J. Am. Med. Assoc.* **315**, 1941–1942 (2016).

116. Sugano, S. International code of conduct for genomic and health-related data sharing. *HUGO J.* **8**, 1 (2014).

117. Clayton, E. W., Halverson, C. M., Sathe, N. A. & Malin, B. A. A systematic literature review of individuals' perspectives on privacy and genetic information in the United States. *PLoS One* **13**, e0204417 (2018).

118. Cavallari, L. H. et al. Multi-site investigation of strategies for the clinical implementation of CYP2D6 genotyping to guide drug prescribing. *Genet. Med.* **21**, 2255–2263 (2019).

119. Ginsburg, G. S. A global collaborative to advance genomic medicine. *Am. J. Hum. Genet.* **104**, 407–409 (2019).

**Acknowledgements** The strategic vision described here was formulated on behalf of the NHGRI. We are grateful to the many members of the institute staff for their contributions to the associated planning process (see http://genome.gov/genomics2020 for details) as well as to the numerous external colleagues who provided input to the process and draft versions of this strategic vision. The National Advisory Council for Human Genome Research (current members are J. Botkin, T. Ideker, S. Plon, J. Haines, S. Fodor, R. Irizarry, P. Deverka, W. Chung, M. Craven, H. Dietz, S. Rich, H. Chang, L. Parker, L. Pennacchio, and O. Troyanskaya) ratified the strategic planning process, themes, and priorities associated with this strategic vision.

**Author contributions** All authors contributed to the concepts, writing, and/or revisions of the manuscript.

**Competing interests** The authors declare no competing interests.

**Additional information**
**Correspondence and requests for materials** should be addressed to E.D.G.
**Peer review information** *Nature* thanks Jantina de Vries, Eleftheria Zeggini and the other, anonymous, reviewer(s) for their contribution to the peer review of this work.
**Reprints and permissions information** is available at http://www.nature.com/reprints.
**Publisher's note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

© Springer Nature Limited 2020

APHA App. 815

# EXHIBIT B



🇺🇸 An official website of the United States government    Here's how you know

GRANTS.GOV℠                                                              MENU

# VIEW GRANT OPPORTUNITY

PA-23-271

Ruth L. Kirschstein National Research Service Award (NRSA) Individual

Predoctoral Fellowship to Promote Diversity in Health-Related Research          **Apply**

(Parent F31-Diversity)

Department of Health and Human Services                                          **Subscribe**

National Institutes of Health

SYNOPSIS        VERSION HISTORY        RELATED DOCUMENTS        PACKAGE

## General Information



| | | | |
|---|---|---|---|
| **Document Type:** | Grants Notice | **Version:** | Synopsis 4 |
| **Funding Opportunity Number:** | PA-23-271 | **Posted Date:** | Sep 12, 2023 |
| | | **Last Updated Date:** | Feb 21, 2025 |
| **Funding Opportunity Title:** | Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research (Parent F31-Diversity) | **Original Closing Date for Applications:** | Sep 07, 2025 |
| | | **Current Closing Date for Applications:** | Feb 21, 2025 |
| | | **Archive Date:** | Feb 22, 2025 |
| **Opportunity Category:** | Discretionary | **Estimated Total Program Funding:** | |
| **Opportunity Category Explanation:** | | **Award Ceiling:** | $ |
| | | **Award Floor:** | $ |

APHA App. 817

| | |
|---|---|
| **Funding Instrument Type:** | Grant |
| **Category of Funding Activity:** | Education<br>Environment<br>Food and Nutrition<br>Health<br>Income Security and Social Services |
| **Category Explanation:** | |
| **Expected Number of Awards:** | |
| **Assistance Listings:** | 93.113 -- Environmental Health<br>93.121 -- Oral Diseases and Disorders Research<br>93.172 -- Human Genome Research<br>93.173 -- Research Related to Deafness and Communication Disorders<br>93.213 -- Research and Training in Complementary and Integrative Health<br>93.233 -- National Center on Sleep Disorders Research<br>93.242 -- Mental Health Research Grants<br>93.273 -- Alcohol Research Programs<br>93.279 -- Drug Abuse and Addiction Research Programs |

APHA App. 818

93.286 -- Discovery and Applied Research for Technological Innovations to Improve Human Health

93.307 -- Minority Health and Health Disparities Research

93.361 -- Nursing Research

93.398 -- Cancer Research Manpower

93.837 -- Cardiovascular Diseases Research

93.838 -- Lung Diseases Research

93.839 -- Blood Diseases and Resources Research

93.840 -- Translation and Implementation Science Research for Heart, Lung, Blood Diseases, and Sleep Disorders

93.846 -- Arthritis, Musculoskeletal and Skin Diseases Research

93.847 -- Diabetes, Digestive, and Kidney Diseases Extramural Research

93.853 -- Extramural Research Programs in the Neurosciences and Neurological Disorders

93.855 -- Allergy and Infectious Diseases Research

93.859 -- Biomedical Research and Research Training

APHA App. 819

93.865 -- Child Health and
Human Development
Extramural Research
93.866 -- Aging Research
93.867 -- Vision Research
93.879 -- Medical Library
Assistance

**Cost Sharing or Matching Requirement:**  No

# Eligibility

**Eligible Applicants:**  Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education
County governments
Native American tribal governments (Federally recognized)
State governments
Native American tribal organizations (other than Federally recognized tribal governments)
Nonprofits that do not have a 501(c)(3) status with the IRS, other than institutions of higher education
Special district governments
Private institutions of higher education
Independent school districts
Public housing authorities/Indian housing authorities
For profit organizations other than small businesses
Public and State controlled institutions of higher education
Small businesses
City or township governments
Others (see text field entitled "Additional Information on Eligibility" for clarification)

**Additional Information on Eligibility:**  Other Eligible Applicants include the following: Alaska Native and Native Hawaiian Serving Institutions; Asian American Native American Pacific Islander Serving Institutions (AANAPISISs); Eligible Agencies of the Federal Government; Faith-based or Community-based Organizations; Hispanic-

serving Institutions; Historically Black Colleges and Universities (HBCUs);
Indian/Native American Tribal Governments (Other than Federally
Recognized); Non-domestic (non-U.S.) Entities (Foreign Organizations);
Regional Organizations; Tribally Controlled Colleges and Universities (TCCUs)
; U.S. Territory or Possession.

# Additional Information

**Agency Name:** National Institutes of Health

**Description:** The purpose of this Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research award is to enhance the diversity of the health-related research workforce by supporting the research training of predoctoral students from diverse backgrounds including those from groups that are underrepresented in the biomedical, behavioral, or clinical research workforce.

Through this award program, promising predoctoral students will obtain individualized, mentored research training from outstanding faculty sponsors while conducting well-defined research projects in scientific health-related fields relevant to the missions of the participating NIH Institutes and Centers. The proposed mentored research training is expected to clearly enhance the individual's potential to develop into a productive, independent research scientist.

This Notice of Funding Opportunity (NOFO) does not allow candidates to propose to lead an independent clinical trial, a clinical trial feasibility study, or an ancillary clinical trial, but does allow candidates to propose research experience in a clinical trial led by a sponsor or co-sponsor.

**Link to Additional Information:** https://grants.nih.gov/grants/guide/pa-files/PA-23-271.html

**Grantor Contact Information:** If you have difficulty accessing the full announcement electronically, please contact:
NIH Grants Information
grantsinfo@nih.gov

See Section VII. Agency Contacts within the full opportunity announcement

APHA App. 821

for all other inquires.

Return to top

## Connect with Us

Blog

Twitter

YouTube

Alerts

RSS

XML Extract

Get Adobe Reader

## Health & Human Services

HHS.gov

EEOC / No Fear Act

Accessibility

Privacy

Vulnerability Disclosure Policy

Disclaimers

Site Map

## Community

USA.gov

WhiteHouse.gov

USAspending.gov

SBA.gov

SAM.gov

Report Fraud

## Additional Help

Chat now with Grant

Frequently Asked Questions



  

APHA App. 822

# EXHIBIT C

4/14/25, 1:32 AM



Delaney Sullivan <delaney.lin@gmail.com>

## RE: Inquiry about F31 NOA

1 message

**Walters, Angela (NIH/NHGRI) [E]** <angela.walters@nih.gov>                  Mon, Jan 6, 2025 at 4:44 AM
To: "Sullivan, Delaney K." <dksulliv@caltech.edu>

Good morning,

I sent the JIT request out this morning.  Once that information is received, I can begin to process the award.  It must be submitted in eRA commons by the sponsored programs office.  I put a submission date of January 10th, but if you need more time, please don't stress about the date.  I know many people are still on holiday leave and it make take some time to process.  Please let me know if you have any questions or concerns.

I hope you have a wonderful new years as well and congratulations on being approved for funding.

Angela

### Angela Walters

NHGRI Grant's Management Specialist

National Human Genome Research Insititute

6700B Rockledge Drive

Bethesda, MD  20892-6908

Phone:  (301) 402-0750

Email:  angela.walters@nih.gov

APHA App. 824

**From:** Sullivan, Delaney K. <dksulliv@caltech.edu>
**Sent:** Friday, January 3, 2025 11:02 AM
**To:** Walters, Angela (NIH/NHGRI) [E] <angela.walters@nih.gov>
**Subject:** [EXTERNAL] Inquiry about F31 NOA

Hello,

I was emailed that my grant (1F31HG014118-01) received NHGRI concurrence for funding. I'm wondering what the status of the NOA is, when will I receive an update regarding it, and will the update be emailed directly to me or will it appear on my eRA commons?

Thanks and hope you had a wonderful New Years,

Delaney K. Sullivan

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

APHA App. 825

# EXHIBIT D

 Outlook

---

**1F31HG014118-01**

---

**From** Fufa, Temesgen (NIH/NHGRI) [E] <temesgen.fufa@nih.gov>
**Date** Fri 11/22/2024 12:22 PM
**To** Sullivan, Delaney K. (Medical Student) <DSullivan@mednet.ucla.edu>; dksulliv@caltech.edu <dksulliv@caltech.edu>
**Cc** jenny.mercado@caltech.edu <jenny.mercado@caltech.edu>

---

> **Caution: External sender from outside our organization.**
> Proceed with caution with regard to links and attachments.
> [ Report Suspicious ]

Dear Delaney,

Your grant application (1F31HG014118-01) has received programmatic concurrence for funding. You should be hearing from our grants management staff soon if you have not already. It is our intention that the application will be funded. Please note, however, that this email is not an official notification of NHGRI funding. The official notification of funding will only be provided through the issuance of the Notice of Award (NOA). Please feel free to reach out to Ms. Angela Walters (E-mail: waltersar@mail.nih.gov), the grants management specialist assigned to your application for any questions related to the issuance of the NOA.

I am requesting that you provide additional information addressing the following concerns identified by the review panel, as outlined in the summary statement, including but not limited to:

- **The research plan is missing details about the core algorithm, how the snRNA-seq data would be integrated in Aim 3, and anticipated challenges impact on feasibility.**

- **COMMITTEE BUDGET RECOMMENDATIONS: Reviewers noted that less than 50% of the requested award period will be devoted to graduate research training for this dual degree applicant.**

Please have your Authorized Organizational Representative submit the requested information/responses to me via email.

Best regards,
Temesgen

--
**Temesgen D. Fufa, Ph.D.** | he/him/his

APHA App. 827

Program Director
Division of Genome Sciences
National Human Genome Research Institute
The National Institutes of Health

6700B Rockledge Drive, Rm 3130
Bethesda, Maryland 20817 USA
E-mail: temesgen.fufa@nih.gov
Phone: (301) 480-2280
https://genome.gov



APHA App. 828

# EXHIBIT E

APHA App. 829

 **GRANTFLDR** 

## Contacts

**Administration:** Scientific Review Officer (SRO)
**Name:** Jurata, Linda Wagner
**Phone:** (301) 496-8032
**Email:** linda.jurata@nih.gov

**Administration:** Grants Management Specialist (GMS)
**Name:** Walters, Angela
**Phone:** (301) 402-0750
**Email:** angela.walters@nih.gov

**Administration:** Program Official (PO)
**Name:** Fufa, TEMESGEN D
**Phone:** (301) 480-2280
**Email:** temesgen.fufa@nih.gov

### Latest Update

Application Source: Grants.gov
Opportunity Number: [PA-23-271] - Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research (Parent F31-Diversity)

## Status Information ?

### 1F31HG014118-01

**Status**
Pending administrative review. Refer any questions to Program Official or Grants Management Specialist.

**Project Title**
k-mer based local uniqueness exploration

**PI Name**
Sullivan, Delaney Kalcey

**NIH Appl. ID**
11071524

**Application ID**
1F31HG014118-01

### ⌄ Status

**Status**
Pending administrative review. Refer any questions to Program Official or Grants Management Specialist.

**Last Status Update Date**
02/19/2025

**PI Name**
Sullivan, Delaney Kalcey

**Institution Name**
CALIFORNIA INSTITUTE OF TECHNOLOGY
**School Name**
DIVISION OF BIOLOGY AND BIOLOGICAL ENGINEERING
**School Category**
SCHOOLS OF ARTS AND SCIENCES
**Division Name**
NONE
**Department Name**
NONE

**NIH Appl. ID**
11071524

**Proposal Receipt Date**
04/08/2024

**Proposal Title**
k-mer based local uniqueness exploration

APHA App. 830



**Project Period Begin Date**
09/01/2024
**Project Period End Date**

**Current Award Notice Date**

**Application Source**
Grants.gov

**eApplication Status**
Submission Complete

**Opportunity Number**
[PA-23-271] - Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research (Parent F31-Diversity)

### ⌄ Other Relevant Documents

e-Application

Summary Statement

Just In Time                                    01/06/2025 Times Revised(1)

eSubmission Cover Letter

eSubmission-PHS Assignment Request Form

### ⌄ Additions for Review

Document Event Log

No data available.

### ⌄ Review

| Application | Study Section | Advisory Council |
|---|---|---|

#### eRA Service Desk

Hours: Monday-Friday, 7:00 AM-8:00 PM EDT/EST

Web:
https://www.era.nih.gov/need-help

Toll-free: 866-504-9552

Phone: 301-402-7469

Contact initiated outside of business hours via Web or voice mail will be returned the next business day.

APHA App. 831

**Award Document Number:** FHG014118A

**FSR Accepted Code:** N

**Snap Indicator Code:**

**Impact Score:** 26

**Percentile:** 15.0

**For information about next steps:** Click  here

**Early Stage Investigator Eligible:**

**New Investigator Eligible:**

**Eligible for FFATA Reporting:** Yes

**Scientific Review Group:** ZRG1 F08-L (20)

**Council Meeting Date (YYYY/MM):** 2024/10

**Meeting Date:** 06/27/2024

**Meeting Time:** 10:00

**Study Roster:** View Meeting Roster

**(AC)**

**Meeting Date:** 09/09/2024

**Meeting Time:** 09:00

## Institute/Center Assignment

| Institute or Center | Assignment Date |
|---|---|
| NATIONAL HUMAN GENOME RESEARCH INSTITUTE (Primary) | 04/08/2024 |
| NATIONAL HUMAN GENOME RESEARCH INSTITUTE (Primary) | 04/19/2024 |

## Status History

| Effect Date | Status Message |
|---|---|
| 02/12/2025 | Award prepared: refer questions to Grants Management Specialist. |
| 11/12/2024 | Pending administrative review. Refer any questions to Program Official or Grants Management Specialist. |

| Effect Date | Status Message |
|---|---|
| 07/02/2024 | Scientific Review Group review completed. Refer any questions to Program Official. |
| 04/24/2024 | Scientific Review Group review pending. Refer any questions to the Scientific Review Administrator. |
| 04/08/2024 | Application entered into system |

## ⌄ Reference Letter(s)

This list shows Reference Letters associated with this particular Application. Principal Investigator can see a list of all Reference Letters within Personal Profile - Reference Letters section on eRA Commons

| Referee Name | Organization/Affiliation | Department | EMail | Submitted Date |
|---|---|---|---|---|
| Dawson, David | UCLA | Pathology and Laboratory Medicine | DDAWSON@MEDNET.UCLA.EDU | 04/03/2024 |
| Liefwalker, Dan | Oregon State University | Biochemistry and Biophysics | DAN.LIEFWALKER@OREGONSTATE.EDU | 04/03/2024 |
| Li, Yulin | Houston Methodist Research Institute | Neal Cancer Center | YLI@HOUSTONMETHODIST.ORG | 04/03/2024 |

eRA - End-to-End Grants Management Solutions

Resources

NIH Grants and Funding
National Institutes of Health
HHS - U.S. Dept. of Health and Human Services

Privacy Notice | Accessibility | Disclaimer
HHS Vulnerability Disclosure
04/13/2025 03:11:42 PM EST

https://public.era.nih.gov/grantfolder/viewCommonsStatus.era?applId=11071524    4/4

APHA App. 833

# EXHIBIT F

APHA App. 834



Delaney Sullivan <delaney.lin@gmail.com>

## 1F31HG014118-01 status?

1 message

---

**Delaney Sullivan** <delaneyk.sullivan@gmail.com>                         Tue, Feb 4, 2025 at 2:55 PM
To: angela.walters@nih.gov, temesgen.fufa@nih.gov

Hi,

Just wondering about the status of NOA for the grant.
As you know, the F31 diversity will no longer exist, and it would be great if my application can be considered and funded under the traditional mechanism, as I believe my qualifications are the same either way.

Look forward to hearing from you,
Delaney

# EXHIBIT G



An official website of the United States government    Here's how you know ⌄

![GRANTS.GOV℠]

MENU

# VIEW GRANT OPPORTUNITY

PA-23-271

Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research (Parent F31-Diversity)

Department of Health and Human Services

National Institutes of Health

Apply

Subscribe

**SYNOPSIS**    **VERSION HISTORY**    **RELATED DOCUMENTS**    **PACKAGE**

## Version History 

Click on Version Name to view previous versions of this grant opportunity. Modifications from the previous version are highlighted with a light gray background. For more information on versions, see Online Help.

### Synopsis History:

| Version | Modification Description | Updated Date |
|---------|--------------------------|--------------|
| Synopsis 4 | Closed | Feb 21, 2025 |
| Synopsis 3 | updated close date | Feb 11, 2025 |
| Synopsis 2 | updated close date | Feb 04, 2025 |
| Synopsis 1 | | Sep 12, 2023 |

APHA App. 837

# DISPLAYING: Synopsis 2

# General Information

| | | | | |
|---|---|---|---|---|
| **Document Type:** | Grants Notice | | **Version:** | Synopsis 2 |
| **Funding Opportunity Number:** | PA-23-271 | | **Posted Date:** | Sep 12, 2023 |
| | | | **Last Updated Date:** | Feb 04, 2025 |
| **Funding Opportunity Title:** | Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research (Parent F31-Diversity) | | **Original Closing Date for Applications:** | |
| | | | **Current Closing Date for Applications:** | Feb 04, 2025 |
| | | | **Archive Date:** | Mar 06, 2025 |
| **Opportunity Category:** | Discretionary | | **Estimated Total Program Funding:** | |
| | | | **Award Ceiling:** | |
| **Opportunity Category Explanation:** | | | **Award Floor:** | |
| **Funding Instrument Type:** | Grant | | | |
| **Category of Funding Activity:** | Education Environment Food and Nutrition Health Income Security and Social Services | | | |

APHA App. 838

**Category Explanation:**

**Expected Number of Awards:**

**Assistance Listings:**

93.113 -- Environmental Health

93.121 -- Oral Diseases and Disorders Research

93.172 -- Human Genome Research

93.173 -- Research Related to Deafness and Communication Disorders

93.213 -- Research and Training in Complementary and Integrative Health

93.233 -- National Center on Sleep Disorders Research

93.242 -- Mental Health Research Grants

93.273 -- Alcohol Research Programs

93.279 -- Drug Abuse and Addiction Research Programs

93.286 -- Discovery and Applied Research for Technological Innovations to Improve Human Health

93.307 -- Minority Health and Health Disparities Research

93.361 -- Nursing Research

93.398 -- Cancer Research Manpower

93.837 -- Cardiovascular Diseases Research

93.838 -- Lung Diseases Research

APHA App. 839

93.839 -- Blood Diseases and Resources Research

93.840 -- Translation and Implementation Science Research for Heart, Lung, Blood Diseases, and Sleep Disorders

93.846 -- Arthritis, Musculoskeletal and Skin Diseases Research

93.847 -- Diabetes, Digestive, and Kidney Diseases Extramural Research

93.853 -- Extramural Research Programs in the Neurosciences and Neurological Disorders

93.855 -- Allergy and Infectious Diseases Research

93.859 -- Biomedical Research and Research Training

93.865 -- Child Health and Human Development Extramural Research

93.866 -- Aging Research

93.867 -- Vision Research

93.879 -- Medical Library Assistance

**Cost Sharing or Matching Requirement:**    No

# Eligibility

APHA App. 840

**Eligible Applicants:**    Independent school districts

County governments

Nonprofits that do not have a 501(c)(3) status with the IRS, other than institutions of higher education

Small businesses

State governments

Native American tribal organizations (other than Federally recognized tribal governments)

Special district governments

Public housing authorities/Indian housing authorities

For profit organizations other than small businesses

City or township governments

Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education

Native American tribal governments (Federally recognized)

Others (see text field entitled "Additional Information on Eligibility" for clarification)

Public and State controlled institutions of higher education

Private institutions of higher education

**Additional Information on Eligibility:**    Other Eligible Applicants include the following: Alaska Native and Native Hawaiian Serving Institutions; Asian American Native American Pacific Islander Serving Institutions (AANAPISISs); Eligible Agencies of the Federal Government; Faith-based or Community-based Organizations; Hispanic-serving Institutions; Historically Black Colleges and Universities (HBCUs); Indian/Native American Tribal Governments (Other than Federally Recognized); Non-domestic (non-U.S.) Entities (Foreign Organizations); Regional Organizations; Tribally Controlled Colleges and Universities (TCCUs) ; U.S. Territory or Possession.

# Additional Information

**Agency Name:**    National Institutes of Health

**Description:**    Not Available

APHA App. 841

| | |
|---|---|
| **Link to Additional Information:** | https://grants.nih.gov/grants/guide/pa-files/PA-23-271.html |
| **Grantor Contact Information:** | If you have difficulty accessing the full announcement electronically, please contact: |
| | NIH Grants Information |
| | grantsinfo@nih.gov |
| | See Section VII. Agency Contacts within the full opportunity announcement for all other inquires. |

Return to top

## Connect with Us

Blog

Twitter

YouTube

Alerts

RSS

XML Extract

Get Adobe Reader

## Health & Human Services

HHS.gov

EEOC / No Fear Act

Accessibility

Privacy

Vulnerability Disclosure Policy

Disclaimers

Site Map

## Community

USA.gov

WhiteHouse.gov

USAspending.gov

SBA.gov

SAM.gov

Report Fraud

## Additional Help

Chat now with Grant

Frequently Asked Questions

APHA App. 842



APHA App. 843

# EXHIBIT 41

APHA App. 844

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-10787-BEM |

## DECLARATION OF UAW MEMBER 12

I, Amanda Danielle Perez, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. My name is Amanda Danielle Perez and I am a post-doctoral Research Fellow in the School of Public Health at University of California, Berkeley ("Berkeley"). I am in my fifth year of post-doctoral research, which was to be the first step in becoming an interdisciplinary health researcher and faculty member at a research 1 institution. I earned my BA, MA, and PhD from Berkeley in social psychology, and received three years of post-doctoral funding from the school.

2. I am offering this Declaration in my individual capacity and not on behalf of my employer.

3. I am represented by LOCAL 5810—United Auto Workers ("UAW").

4. I am the recipient of a Maximizing Opportunities for Scientific and Academic Independent Careers K99/R00 Postdoctoral Career Transition Award to Promote Diversity ("MOSAIC grant") awarded by the National Institute of Health ("NIH") through the National Institute on Minority Health and Health Disparities ("NIMHD"). The grant award number is K99MD018629, and the Notice of Award ("NOA") for the grant is dated 08/02/2023. A true and correct copy of the NOA is attached hereto as Exhibit A.

5. According to the program announcement, PAR-21-271, at 6, MOSAIC grants are issued by NIH "to enhance workforce diversity by facilitating a timely transition of promising

postdoctoral researchers from diverse backgrounds … from their mentored, postdoctoral research positions to independent, tenure-track or equivalent research-intensive faculty positions."  A true and correct copy of the expired PAR is attached hereto as Exhibit B.  The MOSAIC program is a specific type of the generic, or parent, K99/R00 award that is designed to increase the participation of scientists from underrepresented backgrounds in academic science, by facilitating the transition to faculty positions for scientists who will promote diversity in academia.  The MOSAIC grant provides up to five years of support through two phases, funding up to two years of the MOSAIC scholar's post-doctoral research position (the K99 or "mentored phase") and up to three years of independent research support in a tenure-track faculty position (the R00 or "independent phase").  MOSAIC scholars apply for tenure track positions at institutions in the last year of the mentored phase, and once accepted to a position, the institution at which the scholar will become faculty submits the application for the independent phase.  The program announcement for the MOSAIC grant states that receipt of the R00 phase of the award "is contingent on satisfactory progress during the K99 phase and an approved, independent, tenure-track (or equivalent) faculty position.  The two award phases are intended to be continuous in time."  Id. at 7.

6.  MOSAIC grants provide funding both for salary support and research support during the mentored phase.  During the independent phase of the award, the MOSAIC grant provides funding for salary and benefits, research costs, and indirect costs reimbursed to the R00 sponsoring institution.  The R00 sponsoring institution also commits to providing start-up funds to help the MOSAIC scholar set up their laboratory and some other institutional support.  In addition to funding, MOSAIC scholars are provided with mentoring, networking and professional development activities.

7.  I initially applied for the MOSAIC grant in October of 2022.  The grant is extremely prestigious and competitive, requiring me to go through a rigorous review process before I was selected.  The application process was highly demanding, involving several months of preparation, including extensive research, collaboration with colleagues, and multiple revisions to ensure the application met the program's standards.  I engaged in detailed discussions with NIH program officers, seeking guidance on aligning my proposal with the program's goals and expectations.  The review process itself involved multiple rounds of feedback and evaluation, underscoring the thoroughness and competitiveness of the grant application.  My submission

included a diversity statement that emphasized my background as Latina, highlighting how my experiences align with the program's focus on supporting individuals from underrepresented groups in the field of biomedical research science and fostering diversity and inclusion within the field.  Id. at 7.

8.   My research project focuses on the birth outcome disparities faced by Latinas and the mechanisms driving those disparities.  Specifically, my research partner and I propose two novel mechanisms as contributors to poor birth outcomes for Latinas: anticipatory racism threat ("aRT") and area-level racial bias.  The mentored phase of my project has involved creating and psychometrically validating the aRT-Latina scale, which is designed to measure anticipatory racism stress among Latina women.  The plan was to validate the scale over the next two months, but due to the unexpected funding changes, this process can no longer take place.  While the scale has not yet undergone full psychometric testing, it has been developed with expert input and is poised for testing to assess its reliability and validity.  Additionally, we are examining the associations between anticipatory racism threat and adverse birth outcomes, including low birth weight and preterm birth, in recent Latina mothers.  This project aims to provide a comprehensive understanding of how anticipatory racism may contribute to poor health outcomes for Latinas, offering a unique lens to study maternal health disparities.  We are also investigating the role of area-level racial bias, exploring how broader social and environmental factors—such as community-level racial bias—may further exacerbate the effects of individual-level racism and contribute to adverse birth outcomes for Latina women.  Ultimately, this work aims to inform interventions and policies that address both individual and systemic factors in the fight to reduce health disparities.

9.   My project has important implications for informing the types of interventions likely to ameliorate the longstanding and largely neglected area of Latina birth outcome disparities.  By identifying the novel mechanisms of anticipatory racism threat and area-level racial bias, this research sheds light on the unique and intersectional factors contributing to poor birth outcomes among Latina women.  Understanding these mechanisms allows for the development of targeted, culturally informed interventions that can directly address the stressors experienced by Latina mothers and the broader structural inequities they face.  Furthermore, by creating a validated tool to measure anticipatory racism stress, this project provides a new resource for health professionals, policymakers, and researchers working to reduce health disparities in maternal and

infant health.  The findings from this research can guide the creation of community-based programs and healthcare policies that prioritize the needs of Latina women, ultimately improving both prenatal care and maternal health outcomes.  In the long term, the work aims to foster systemic change by influencing healthcare systems and social policies to more effectively address the racial and ethnic disparities that continue to impact Latina communities.

10. My NOA states that the project period for the mentored phase of my grant runs from August 2, 2023 until February 28, 2025.  Exh. A at 1.  The award for my second year of funding was $135,943 (including direct and indirect costs), which was slightly more than the first-year funding.  Id. at 3.  Second year funding was explicitly made dependent upon "the availability of funds and satisfactory progress of the project."  Id.  As detailed above, I have made excellent progress on my project.

11. Because my K99 was set to end in February, in the middle of the academic year, my plan has always been to stretch my funding through a No Cost Extension ("NCE") with NIH through June, 2025.  This plan was endorsed by my mentors at Berkeley and my NIH contacts.  NCEs are routine and can be effectuated without significant administrative hurdle.  As my NIH Program Officer explained by email in response to our outreach on this topic in 2023, "Grantees can extend the final budget period once up to 12 months themselves without NIMHD's approval.  You can do this online in the last 90 days before your K99 grant period ends."  A true and correct copy of the 2023 email from my grant officer is attached hereto as Exhibit C.

12. Once I was within the 90-day window for a NCE, Berkeley submitted the request for an NCE to June 2025 as required.  I reached out to my contact at NIH repeatedly in early 2025 to check on the NCE and received no response.  NIH also never sent me a revised NOA, which should have been forthcoming, to formally document the NCE.

13. Instead, on April 10, 2025, I received an email from NIH stating that my K99 would end as of April 30, 2025, and my MOSAIC award currently shows up on NIH Reporter with an end date of April 30, 2025.  This makes no sense, as it is neither my original end date, nor the No Cost Extension end date.  In response to my subsequent inquiries to NIH, I have not received an explanation for why I did not receive the NCE through June.  A true and correct copy of the RePorter webpage for my grant is attached hereto as Exhibit D.

14. Based on the assurance from NIH that I would be able to complete a NCE at my discretion, I budgeted my award over the last two years to take a decreased monthly salary.  This

would have allowed me to work the three extra months necessary to complete my research and apply for faculty positions in a timely manner.  Now I do not have any salary coming in for the next two months, which has left me in a precarious financial position.  Without this income, I am unable to cover essential living expenses, including rent and groceries, which has caused significant stress and uncertainty in my personal life.  The abrupt change in funding has also severely hindered my ability to finalize my research and meet crucial deadlines for job applications, which were central to my career transition.  As a result, I may now be unable to pursue a career in academia, as I need a job immediately to secure financial stability and support myself in the interim.

15. In addition to the impacts of an unexpected lack of funding over the next two months to complete the mentored portion of my fellowship, I also have enormous uncertainty for my career because NIH has removed the ability to apply for the R00 independent phase of the MOSAIC program.  NIH closed out the most recent PAR for MOSAIC on February 21, 2025, two and a half years before the PAR's expected closing date, and has not issued a new PAR.  A true and correct copy of the grant opportunity webpage showing the closing date of the last MOSAIC PAR is attached hereto as Exhibit E.

16. I am in the process of applying for faculty positions, but my interviews have been negatively impacted by my change in funding.  Because the MOSAIC R00 opportunity has been removed from NIH's website, I can no longer apply for it.  When I applied for faculty positions, I indicated on the applications that I would bring that funding with me; this is no longer the case, which has placed me in a highly disadvantaged position.  The loss of this funding not only diminishes my immediate competitiveness for academic roles but also undermines the long-term trajectory of my career.  Without this funding, I am left with a significant gap in my financial and research resources, hindering my ability to sustain independent research projects, mentor students, and contribute to my field.  The change in funding also impacts my ability to develop a strong research program, which is a critical factor for securing tenure-track faculty positions.  As a result, this disruption has delayed my academic career advancement, causing me to reconsider my future in academia and leading to increased uncertainty about securing a permanent position. The long-term ramifications of this funding loss may significantly alter the course of my professional development and my ability to contribute meaningfully to the academic community.

17. This will also have a devastating impact on my research, which is critical in addressing health disparities among Latina women, particularly in maternal health. The loss of funding halts the psychometric validation of the aRT-Latina scale, delaying key data collection and analysis. This setback risks preventing me from generating findings that could inform interventions to improve birth outcomes. Additionally, it disrupts my ability to apply for future funding, stalling both my research progress and my academic career.

18. I am also deeply concerned about the long-term impact on my generation of scientists, especially those from underrepresented groups, who rely on programs like MOSAIC to launch careers dedicated to research and scientific progress. Without the MOSAIC program and similar NIH initiatives, far fewer scientists from diverse backgrounds will have the opportunity to pursue careers in biomedical research. This not only exacerbates the lack of diversity in a field in which many groups are already underrepresented, but also deprives the scientific community of unique perspectives crucial to addressing the core medical issues of our time. The loss of these funding opportunities undermines efforts to create a more inclusive and innovative scientific workforce, ultimately slowing progress in tackling health disparities and advancing solutions to pressing global health challenges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of April, 2025.

Amanda Danielle Perez

# EXHIBIT A

**Department of Health and Human Services**
National Institutes of Health
NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH
DISPARITIES

**Notice of Award**
FAIN# K99MD018629
**Federal Award Date**
08/02/2023

## Recipient Information

**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF
CALIFORNIA, THE
1608 4TH ST STE 201
BERKELEY, CA 94710

**2. Congressional District of Recipient**
13

**3. Payment System Identifier (ID)**
1946002123A1

**4. Employer Identification Number (EIN)**
946002123

**5. Data Universal Numbering System (DUNS)**
124726725

**6. Recipient's Unique Entity Identifier**
GS3YEVSS12N6

**7. Project Director or Principal Investigator**
Amanda Danielle Perez

adpc@berkeley.edu
510-643-1999

**8. Authorized Official**
Mr. Jason Cheung

## Federal Agency Information

**9. Awarding Agency Contact Information**
Sy Shackleford

NATIONAL INSTITUTE ON MINORITY
HEALTH AND HEALTH DISPARITIES
shacklefords@mail.nih.gov
301-402-1366

**10. Program Official Contact Information**
Deborah Elizabeth Linares
Health Science Administrator
NATIONAL INSTITUTE ON MINORITY
HEALTH AND HEALTH DISPARITIES
deborah.linares@nih.gov
301-402-1366

## Federal Award Information

**11. Award Number**
1K99MD018629-01

**12. Unique Federal Award Identification Number (FAIN)**
K99MD018629

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Racism-related stress and birth outcomes among Latinas: New tools for maximizing
conceptual and methodological validity

**15. Assistance Listing Number**
93.307

**16. Assistance Listing Program Title**
Minority Health and Health Disparities Research

**17. Award Action Type**
New Competing

**18. Is the Award R&D?**
Yes

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 08/02/2023 — **End Date** 02/29/2024 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $131,908 |
| 20 a.  Direct Cost Amount | $122,137 |
| 20 b.  Indirect Cost Amount | $9,771 |
| 21. Authorized Carryover | |
| 22. Offset | |
| **23. Total Amount of Federal Funds Obligated this budget period** | $131,908 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $131,908 |
| ------------------------------------------------------- | |
| **26. Project Period Start Date** 08/02/2023 — **End Date** 02/28/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period** | $131,908 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Priscilla  Grant

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise
requested from the grant payment system.

Version:13 - 8/3/2022 12:59 PM | Generated on: 8/2/2023 12:26 AM

APHA App. 852



Notice of Award

CAREER TRANSITION AWARD
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES

## SECTION I – AWARD DATA – 1K99MD018629-01

**Principal Investigator(s):**
Amanda Danielle Perez

**Award e-mailed to:** spoawards@berkeley.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $131,908 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF CALIFORNIA BERKELEY in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Minority Health And Health Disparities of the National Institutes of Health under Award Number K99MD018629. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Priscilla  Grant
Grants Management Officer
NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES

Additional information follows

APHA App. 853

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| Salaries and Wages | $90,000 |
| Fringe Benefits | $12,600 |
| Personnel Costs (Subtotal) | $102,600 |
| Consultant Services | $3,240 |
| Travel | $8,777 |
| Other | $7,520 |

| | |
|---|---|
| Federal Direct Costs | $122,137 |
| Federal F&A Costs | $9,771 |
| Approved Budget | $131,908 |
| Total Amount of Federal Funds Authorized (Federal Share) | $131,908 |
| TOTAL FEDERAL AWARD AMOUNT | $131,908 |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | $131,908 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 1 | $131,908 | $131,908 |
| 2 | $135,943 | $135,943 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| Payment System Identifier: | 1946002123A1 |
| Document Number: | KMD018629A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2023 |

| IC | CAN | 2023 | 2024 |
|---|---|---|---|
| MD | 8476640 | $131,908 | $135,943 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: IBB03DL / **OC**: 41033 / **Released**: Grant, Priscilla 07/26/2023
**Award Processed**: 08/02/2023 12:26:47 AM

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1K99MD018629-01**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 1K99MD018629-01**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a. The grant program legislation and program regulation cited in this Notice of Award.
b. Conditions on activities and expenditure of funds in other statutory requirements, such as

APHA App. 854

     those included in appropriations acts.
  c.  45 CFR Part 75.
  d.  National Policy Requirements and all other requirements described in the NIH Grants Policy
      Statement, including addenda in effect as of the beginning date of the budget period.
  e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final
      progress report when applicable.
  f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain
references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the
definition of "Research and Development" at 45 CFR Part§ 75.2**.** As such, auditees should identify NIH
awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor
should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that
some awards may have another classification for purposes of indirect costs. The auditor is not required to
report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but
non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other
than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which
requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management
Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity
identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a
consortium/subaward be issued under this award, a UEI requirement must be included.  See
http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this
requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) K99MD018629. Recipients
must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act
subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions
that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional
award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For
more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

Recipients must administer the project in compliance with federal civil rights laws that prohibit
discrimination on the basis of race, color, national origin, disability, age, and comply with applicable
conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the
basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and
pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to
persons with limited English proficiency and providing programs that are accessible to and usable by
persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights
laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-

APHA App. 855

obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.
**Treatment of Program Income:**
Additional Costs

---

**SECTION IV –  MD SPECIFIC AWARD CONDITIONS – 1K99MD018629-01**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**RESTRICTION**:  This award is issued without a currently valid certification of IRB approval for this project with the following special condition:  Only activities that are clearly severable and independent from activities that involve human subjects may be conducted under this award until the project has received IRB approval consistent with 45 CFR Part 46 and certification of IRB approval has been submitted to and accepted by the NIMHD in a revised Notice of Award.  The certification should be sent via email to pg38h@nih.gov and shacklefords@mail.nih.gov.

APHA App. 856

No funds may be drawn down from the payment system and no obligations may be made against Federal funds for research involving human subjects at any site engaged in such research for any period not covered by both (1) the recipient's OHRP-approved Assurance and if performance sites are involved, each performance site's OHRP-approved Assurance(s) and (2) appropriate IRB approvals consistent with all OHRP-approved Assurances.

Failure to comply with this special condition can result in the suspension and/or termination of this award, withholding of support, audit disallowances, and/or other appropriate action.

**RESTRICTION**: This award is issued subject to the following special condition: In accordance with NIH policy, no research involving human subjects may be conducted on this project until the NIMHD receives certification that all key personnel as defined in the June 5, 2000 NIH Guide announcement, (revised August 25, 2000), "Required Education in the Protection of Human Subjects" (http://grants.nih.gov/grants/guide/notice-files/NOT-OD-00-039.html), have completed education on the protection of human subjects; and the NIMHD removes this restriction. The certification(s) for key personnel involved in this project, clearly identifying the grant number, must be sent no later than November 1st, 2023 to pg38h@nih.gov and shacklefords@mail.nih.gov. If the certification(s) is not received by the date listed above, this award may be suspended and may be terminated. The award also may be subject to audit disallowances and/or other appropriate action.

**RESTRICTION**: Funds awarded are contingent upon the receipt and approval by the NIMHD of current other support information. If this item is not received by November 1st, 2023 and depending on what it shows, this award may be subject to reevaluation and adjustment of the period of support and the funds awarded.

**INFORMATION**: Funds awarded are contingent upon the receipt and approval by the NIMHD of the grantee's response to the Initial Review Group's critique of the protection of human subjects. It must be sent no later than November 1st, 2023 to pg38h@nih.gov and shacklefords@mail.nih.gov.

**REQUIREMENT**: This award is subject to the conditions set forth in PAR-21-271, Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00 Independent Clinical Trial Not Allowed), NIH Guide to Grants and Contracts, 08/17/2021, which is hereby incorporated by reference as special terms and conditions of this award.

Copies of this RFA may be accessed at the following internet address: https://grants.nih.gov/grants/guide/pa-files/PAR-21-271.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

**REQUIREMENT**: Use of humans and animals in any new activities must be requested prior to the start of the activity and must be approved in writing in advance by the NIMHD. See NOT-MD-08-002, "Guidance and Clarification on NCMHD Policy on Prior Approval for Subprojects and Pilot Projects Involving Human Subjects or Vertebrate Animals," NIH Guide to Grants and Contracts, April 29, 2008, which is hereby incorporated by reference as special terms and conditions of this award.  See also NOT-OD-15-129, "Prior NIH Approval of Human Subjects Research in Active Awards Initially Submitted without Definitive Plans for Human Subjects Involvement (Delayed Onset Awards): Updated Notice," and NIH-OD-15-128, "Guidance on Changes That Involve Human Subjects in Active Awards and That Will Require Prior NIH Approval: Updated Notice."

Copies of these Notices may be accessed at the following internet address: http://www.nih.gov/grants/guide/index.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

**INFORMATION**: Unobligated balances may be used by the NIMHD to reduce or offset funding for a subsequent budget period.

**INFORMATION**: In order to redistribute awards more evenly throughout the year, budget periods are being adjusted. This award is issued with a shortened budget period and with 12 months of support. Continuation awards will cycle each year on March 1st.

**INFORMATION**: Although the budget period start date for this award is August 2nd, this award includes funds for 12 months of support. Future year budget periods will cycle on March 1st. Allowable pre-award costs may be charged to this award, in accordance with the conditions outlined in the NIH Grants Policy Statement, and with institutional requirements for prior approval. The NIH GPS can be found on the internet at http://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1K99MD018629-01

**INSTITUTION:** UNIVERSITY OF CALIFORNIA BERKELEY

| Budget | Year 1 | Year 2 |
|---|---|---|
| Salaries and Wages | $90,000 | $90,000 |
| Fringe Benefits | $12,600 | $12,600 |
| Personnel Costs (Subtotal) | $102,600 | $102,600 |
| Consultant Services | $3,240 | |
| Travel | $8,777 | $7,473 |
| Other | $7,520 | $15,800 |
| TOTAL FEDERAL DC | $122,137 | $125,873 |
| TOTAL FEDERAL F&A | $9,771 | $10,070 |

APHA App. 858

| TOTAL COST | $131,908 | $135,943 |
|---|---|---|

| Facilities and Administrative Costs | Year 1 | Year 2 |
|---|---|---|
| F&A Cost Rate 1 | 8% | 8% |
| F&A Cost Base 1 | $122,137 | $125,873 |
| F&A Costs 1 | $9,771 | $10,070 |

# EXHIBIT B

4/17/25, 10:46 PM     Expired PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

Case 1:25-cv-10787-BEM     Document 38-41     Filed 04/25/25     Page 19 of 67

This notice has expired. Check the **NIH Guide (https://grants.nih.gov/funding/searchguide/)** for active opportunities and notices.

# Department of Health and Human Services

# Part 1. Overview Information

---

**Participating Organization(s)**

National Institutes of Health (NIH (http://www.nih.gov))

---

**Components of Participating Organizations**

National Institute of General Medical Sciences (NIGMS (https://www.nigms.nih.gov/))

National Eye Institute (NEI (https://www.nei.nih.gov/))

National Heart, Lung, and Blood Institute (NHLBI (https://www.nhlbi.nih.gov/))

National Human Genome Research Institute (NHGRI (https://www.genome.gov/))

National Institute on Aging (NIA (https://www.nia.nih.gov/))

National Institute on Alcohol Abuse and Alcoholism (NIAAA (https://www.niaaa.nih.gov/))

National Institute of Allergy and Infectious Diseases (NIAID (https://www.niaid.nih.gov/))

National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS (https://www.niams.nih.gov/))

National Institute of Biomedical Imaging and Bioengineering (NIBIB (https://www.nibib.nih.gov/))

National Institute on Deafness and Other Communication Disorders (NIDCD (https://www.nidcd.nih.gov/))

National Institute of Dental and Craniofacial Research (NIDCR (https://www.nidcr.nih.gov/))

National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK (https://www.niddk.nih.gov/))

National Institute on Drug Abuse (NIDA (https://www.drugabuse.gov/))

National Institute of Environmental Health Sciences (NIEHS (https://www.niehs.nih.gov/))

National Institute of Mental Health (NIMH (https://www.nimh.nih.gov/index.shtml))

National Institute of Neurological Disorders and Stroke (NINDS (https://www.ninds.nih.gov/))

National Institute of Nursing Research (NINR (https://www.ninr.nih.gov/))

National Institute on Minority Health and Health Disparities (NIMHD (https://www.nimhd.nih.gov/))

National Library of Medicine (NLM (https://www.nlm.nih.gov/))

National Center for Complementary and Integrative Health (NCCIH (https://nccih.nih.gov/))

Eunice Kennedy Shriver National Institute of Child Health and Human Development ( NICHD (https://www.nichd.nih.gov/))

All applications to this funding opportunity announcement should fall within the mission of the Institutes/Centers. The following NIH Offices may co-fund applications assigned to those Institutes/Centers.

Office of Research on Women's Health (ORWH (https://orwh.od.nih.gov/))

Office of Behavioral and Social Sciences Research (OBSSR (https://obssr.od.nih.gov/))

Applicants should carefully note which ICs participate in this announcement and view their respective areas of research interest and requirements at the Table of IC-Specific Information, Requirements and Staff Contacts (https://www.nigms.nih.gov/training/careerdev/mosaic/Pages/MOSAIC-K99-Independent-Clinical-Trial-Not-Allowed-PAR-21.aspx)

APHA App. 861

4/17/25, 10:46 PM

Expired PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career …

website. ICs that do not participate in this announcement will not consider applications for funding. Consultation with NIH staff before submitting an application is strongly encouraged.

---

**Funding Opportunity Title**

## Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00 Independent Clinical Trial Not Allowed)

---

**Activity Code**

K99 (//grants.nih.gov/grants/funding/ac_search_results.htm?text_curr=k99&Search.x=0&Search.y=0&Search_Type=Activity)/R00 (//grants.nih.gov/grants/funding/ac_search_results.htm?text_curr=r00&Search.x=0&Search.y=0&Search_Type=Activity) Career Transition Award/Research Transition Award

---

**Announcement Type**

Reissuance of PAR-19-343 (https://grants.nih.gov/grants/guide/pa-files/par-19-343.html) - Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00 - Independent Clinical Trial Not Allowed)

---

**Related Notices**

See Notices of Special Interest (https://grants.nih.gov/grants/guide/NOSIs_targetingList.cfm?GuideDocID=35766) associated with this funding opportunity

**July 23, 2024** - This PAR has been reissued as PAR-24-225 (//grants.nih.gov/grants/guide/pa-files/PAR-24-225.html).

**June 4, 2024** - Guidance Regarding Reduction of Effort for NIMHD Individual Mentored K Awards. See Notice NOT-MD-24-017 (//grants.nih.gov/grants/guide/notice-files/NOT-MD-24-017.html)

**May 7, 2024** - Notice of Information: NIAID to Increase K99, K25, and K01 Salary and Research Support and R00 Years of Support. See Notice NOT-AI-24-038 (//grants.nih.gov/grants/guide/notice-files/NOT-AI-24-038.html)

**December 5, 2023** - Notice of NIEHS Increase in Salary Support for "Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00)" Notice of Funding Opportunities. See Notice NOT-ES-24-003 (//grants.nih.gov/grants/guide/notice-files/NOT-ES-24-003.html)

**August 21, 2023** - Notice of Informational Webinar on the NIH Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Program Notices of Funding Opportunity (K99/R00 and UE5). See Notice NOT-GM-23-053 (https://grants.nih.gov/grants/guide/notice-files/NOT-GM-23-053.html).

NOT-OD-23-012 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-23-012.html) Reminder: FORMS-H Grant Application Forms and Instructions Must be Used for Due Dates On or After January 25, 2023 - New Grant Application Instructions Now Available

NOT-OD-22-190 (//grants/guide/notice-files/NOT-OD-22-190.html) - Adjustments to NIH and AHRQ Grant Application Due Dates Between September 22 and September 30, 2022

**September 7, 2022** - Notice of Increase to NIGMS K99 Support Levels. See Notice NOT-GM-22-045 (//grants.nih.gov/grants/guide/notice-files/NOT-GM-22-045.html)

**August 19, 2022** - Notice of Informational Webinar on the NIH Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Program Funding Opportunity Announcements (K99/R00 and UE5). See Notice NOT-GM-22-044 (https://grants.nih.gov/grants/guide/notice-files/NOT-GM-22-044.html).

**July 27, 2022** - Notification to the community of change in maximum salary provided by NINDS K award mechanisms for clinician-scientists. See Notice NOT-NS-23-005 (//grants.nih.gov/grants/guide/notice-files/NOT-NS-23-005.html)

APHA App. 862

Case: 25-1611      Document: 00118310433      Page: 315      Date Filed: 07/08/2025      Entry ID: 6734280

4/17/25, 10:46 PM          Case 1:25-cv-10787-BEM   Document 38-1   Filed 04/25/25   Page 20 of 67
Expired PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career …

**May 3, 2022** - Understanding the Basic Mechanisms of Immune-related Adverse Events (irAEs) in Cancer Immunotherapy. See Notice NOT-CA-22-063 (https://grants.nih.gov/grants/guide/notice-files/NOT-CA-22-063.html).

**March 4, 2022** - Notice of NICHD Participation in PAR-21-271. See Notice NOT-HD-22-005 (https://grants.nih.gov/grants/guide/notice-files/NOT-HD-22-005.html).

**December 8, 2021** - Notice to Extend Eligibility for Submission of "Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00)" Applications Due to COVID related Disruptions. See Notice NOT-GM-22-020 (//grants.nih.gov/grants/guide/notice-files/NOT-GM-22-020.html)

**October 28, 2021** - Reminder: FORMS-G Grant Application Forms & Instructions Must be Used for Due Dates On or After January 25, 2022 - New Grant Application Instructions Now Available. See Notice NOT-OD-22-018 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-22-018.html).

**September 13, 2021** - Updates to the Non-Discrimination Legal Requirements for NIH Recipients. See Notice NOT-OD-21-181 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-21-181.html).

**August 5, 2021** - New NIH "FORMS-G" Grant Application Forms and Instructions Coming for Due Dates on or after January 25, 2022. See Notice NOT-OD-21-169 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-21-169.html).

**August 5, 2021** - Update: Notification of Upcoming Change in Federal-wide Unique Entity Identifier Requirements. See Notice NOT-OD-21-170 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-21-170.html)

**April 20, 2021** - Expanding Requirement for eRA Commons IDs to All Senior/Key Personnel. See Notice NOT-OD-21-109 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-21-109.html)

See Notices of Special Interest (//grants.nih.gov/grants/guide/notice-files/NOT-MH-22-045.html) related to this opportunity

NOT-OD-22-013 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-22-013.html) - Notice of Participation of OBSSR in PAR-21-271

NOT-GM-21-061 (https://grants.nih.gov/grants/guide/notice-files/NOT-GM-21-061.html) - Notice of Informational Webinar on the NIH Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Program Funding Opportunity Announcements (K99/R00 and UE5)

NOT-GM-21-057 (https://grants.nih.gov/grants/guide/notice-files/NOT-GM-21-057.html) - Continuation of Temporary Extension of Applicant Eligibility in "Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00)" Funding Opportunity Announcements

---

**Funding Opportunity Announcement (FOA) Number**

## PAR-21-271

---

**Companion Funding Opportunity**

PAR-21-272 (https://grants.nih.gov/grants/guide/pa-files/PAR-21-272.html) - Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00 Independent Clinical Trial Required)

PAR-21-273 (https://grants.nih.gov/grants/guide/pa-files/PAR-21-273.html) - Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00 Independent Basic Experimental Studies with Humans Required (BESH))

PAR-21-277 (https://grants.nih.gov/grants/guide/pa-files/PAR-21-277.html) - Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Institutionally-Focused Research Education Award to Promote Diversity (UE5 Clinical Trial Not Allowed)

---

**Number of Applications**

See Section III. 3. Additional Information on Eligibility.

APHA App. 863

**Assistance Listing Number(s)**

93.859, 93.213, 93.867, 93.172, 93.837, 93.838, 93.839, 93.840, 93.233, 93.866, 93.273, 93.855, 93.846, 93.286, 93.279, 93.173, 93.121, 93.847, 93.113, 93.242, 93.307, 93.853, 93.361, 93.879, 93.313, 93.865

---

**Funding Opportunity Purpose**

The purpose of the Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00) program is to support a cohort of early career, independent investigators from diverse backgrounds conducting research in NIH mission areas. The long-term goal of this program is to enhance diversity in the biomedical research workforce. The MOSAIC K99/R00 program is designed to facilitate a timely transition of promising postdoctoral researchers from diverse backgrounds (e.g., see Notice of NIH's Interest in Diversity (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html)) from their mentored, postdoctoral research positions to independent, tenure-track or equivalent research-intensive faculty positions. The MOSAIC K99/R00 program will provide independent NIH research support before and after this transition to help awardees launch successful, independent research careers. Additionally, MOSAIC K99/R00 scholars will be part of organized scientific cohorts and will be expected to participate in mentoring, networking, and professional development activities coordinated by MOSAIC Institutionally-Focused Research Education Award to Promote Diversity (UE5) grantees.

This Funding Opportunity Announcement (FOA) is designed specifically for applicants proposing research that does not involve leading an independent clinical trial, a clinical trial feasibility study, or an ancillary clinical trial. Applicants to this FOA are permitted to propose research experience in a clinical trial led by a mentor or co-mentor. Applicants proposing a clinical trial or an ancillary clinical trial as lead investigator, should apply to the companion FOA PAR-21-272 (//grants.nih.gov/grants/guide/pa-files/PA-21-272.html).

## Key Dates

**Posted Date**

August 17, 2021

---

**Open Date (Earliest Submission Date)**

September 27, 2021

---

**Letter of Intent Due Date(s)**

Not Applicable

---

**Application Due Date(s)**

The first due date for New applications is October 27th, 2021 by 5:00 PM local time. The first due date for Resubmission applications is November 12, 2021 by 5:00 PM local time.

Standard dates (//grants.nih.gov/grants/guide/url_redirect.php?id=11111) apply, for all subsequent receipt dates, by 5:00 PM local time of applicant organization. All types of non-AIDS applications allowed for this funding opportunity announcement are due on these dates.

Applicants are encouraged to apply early to allow adequate time to make any corrections to errors found in the application during the submission process by the due date.

---

**AIDS Application Due Date(s)**

Standard AIDS dates (https://grants.nih.gov/grants/guide/url_redirect.php?id=11112) apply, by 5:00 PM local time of applicant organization. All types of AIDS and AIDS-related applications (https://grants.nih.gov/grants/guide/pa-files/PA-20-185.html#Application%20Types%20Allowed)allowed for this funding opportunity announcement are due on the listed dates. Applicants are encouraged to apply early to allow adequate time to make any corrections to errors found in the application during the submission process by the due date.

Case: 25-1611    Document: 00118310433    Page: 317    Date Filed: 07/08/2025    Entry ID: 6734280

4/17/25, 10:46 PM    Case 1:25-cv-10787-BEM    Document 38-1    Filed 04/25/25    Page 32 of 67
Expiration of PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K76 Independent Postdoctoral Career …

The first AIDS application due date for this FOA is January 7, 2022.

---

**Scientific Merit Review**

Standard dates (//grants.nih.gov/grants/guide/url_redirect.php?id=11113)apply

---

**Advisory Council Review**

Standard dates (//grants.nih.gov/grants/guide/url_redirect.php?id=11113) apply

---

**Earliest Start Date**

Standard dates (//grants.nih.gov/grants/guide/url_redirect.php?id=11113) apply

---

**Expiration Date**

**New Date** July 23, 2024 per issuance of PAR-24-225 (https://grants.nih.gov/grants/guide/pa-files/PAR-24-225.html) (Original Expiration Date: September 08, 2024 )

---

**Due Dates for E.O. 12372**

Not Applicable

---

**Required Application Instructions**

It is critical that applicants follow the instructions in the Career Development (K) Instructions in the SF424 (R&R) Application Guide (//grants.nih.gov/grants/guide/url_redirect.php?id=12000), except where instructed to do otherwise (in this FOA or in a Notice from the NIH Guide for Grants and Contracts (//grants.nih.gov/grants/guide/)). Conformance to all requirements (both in the Application Guide and the FOA) is required and strictly enforced. Applicants must read and follow all application instructions in the Application Guide as well as any program-specific instructions noted in Section IV. When the program-specific instructions deviate from those in the Application Guide, follow the program-specific instructions. **Applications that do not comply with these instructions may be delayed or not accepted for review.**

# Table of Contents

Part 1. Overview Information
    Key Dates
Part 2. Full Text of Announcement
    Section I. Funding Opportunity Description
    Section II. Award Information
    Section III. Eligibility Information
    Section IV. Application and Submission Information
    Section V. Application Review Information
    Section VI. Award Administration Information
    Section VII. Agency Contacts
    Section VIII. Other Information

# Part 2. Full Text of Announcement

## Section I. Funding Opportunity Description

The overall goal of the NIH Research Career Development program is to help ensure that a diverse pool of highly trained scientists is available in appropriate scientific disciplines to address the Nation's biomedical, behavioral, and clinical research needs. NIH Institutes and Centers (ICs) support a variety of mentored and non-mentored career development award programs

APHA App. 865

designed to foster the transition of new investigators to research independence and to support established investigators in achieving specific objectives. Candidates should review the different career development (K) award programs to determine the best program to support their goals. More information about Career programs may be found at the NIH Extramural Training Mechanisms (//grants.nih.gov/grants/guide/url_redirect.php?id=41159) website.

The objective of the NIH Pathway to Independence Award (K99/R00) is to help rigorous and promising postdoctoral researchers complete needed, mentored training and transition in a timely manner to independent, tenure-track or equivalent faculty positions. The K99/R00 award is intended to foster the development of a creative, independent research program that will be competitive for subsequent independent funding and that will help advance the mission of the NIH. The objective of the MOSAIC Postdoctoral Career Transition Award to Promote Diversity (K99/R00) is to enhance workforce diversity by facilitating a timely transition of promising postdoctoral researchers from diverse backgrounds (e.g., see Notice of NIH's Interest in Diversity (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html)) from their mentored, postdoctoral research positions to independent, tenure-track or equivalent research-intensive faculty positions.

**Background Information**

The National Institutes of Health (NIH) recognizes the need to diversify the scientific workforce by enhancing the participation of individuals from groups identified as underrepresented (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html) in the biomedical, clinical, behavioral and social sciences (collectively termed "biomedical") research workforce. Individuals from all backgrounds deserve an equitable opportunity to engage in the biomedical research enterprise, to pursue their scientific interests and further their careers. Moreover, diversity at all levels from the kinds of science to the regions in which it is conducted to the backgrounds of the people conducting it is integral to scientific excellence and strengthens the research enterprise. Research shows that diverse teams working together and capitalizing on innovative ideas and distinct perspectives outperform homogenous teams. Scientists and trainees from diverse backgrounds and life experiences bring different perspectives, creativity, and individual interests to address complex scientific problems. There are many benefits that flow from a diverse NIH-supported scientific workforce, including fostering scientific innovation, enhancing global competitiveness, contributing to robust learning environments, improving the quality of research, enhancing public trust, and increasing the likelihood that health disparities and the needs of underserved populations are addressed in biomedical research. NIH strives to ensure that future generations of researchers will be drawn from the entire pool of talented individuals, bringing different aptitudes, perspectives, interests, and experiences to address complex scientific problems. NIH seeks to enhance the diversity of the biomedical research workforce by supporting individuals from a variety of backgrounds at multiple training and career stages in a variety of institutions and educational settings across the country.

**Need for the Program**

Promoting diversity in the extramural scientific workforce is critical to the success of the NIH mission and is consistent with the mandates of the 21st Century Cures Act (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-17-101.html). While scientific workforce diversity supports and is integral to the NIH mission, expanding the pool of academic investigators from nationally underrepresented backgrounds in the biomedical research workforce has remained an elusive goal (see Policy Supporting Next Generation Researchers Initiative (https://grants.nih.gov/grants/guide/notice-files/not-od-17-101.html)). NIH has a longstanding commitment to training the next generation of biomedical scientists and supporting training of students from diverse backgrounds, for example groups underrepresented in biomedical research, through a variety of fellowships, career development awards, and institutional training and student development programs (https://extramural-diversity.nih.gov/building-participation/commitment-across-nih). In spite of recent advances, individuals from certain groups and backgrounds remain underrepresented in the biomedical sciences research workforce as described in the Notice of NIH's Interest in Diversity (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html). The severity of the underrepresentation of these groups increases throughout the training stages. For example, students from certain racial and ethnic groups, including Black or African American, Hispanic or Latina/o/x, American Indian or Alaska Native, Native Hawaiian or other Pacific Islander comprise ~38 percent of the college age population (Census Bureau (https://data.census.gov/cedsci/) data), but earn only ~22 percent of bachelor's degrees and ~14 percent of Ph.D. degrees in the life sciences (National Center for Science and Engineering Statistics (https://www.nsf.gov/statistics/data-tools.cfm)). Additionally, while the United States has seen a significant increase in the number of Ph.D. degrees in the biomedical sciences earned by scientists from historically underrepresented racial and ethnic groups in the biomedical research workforce, corresponding increases in the ranks of the faculty in basic science departments (Gibbs, et al., eLife 2016 (https://elifesciences.org/articles/21393); Valantine, Lund & Gammie, CBE-Life Sciences Education, 2016 (https://www.lifescied.org/doi/full/10.1187/)) or NIH-funded investigators (Hoppe et al, 2019 (https://advances.sciencemag.org/content/5/10/eaaw7238); Lauer, 2020 (https://nexus.od.nih.gov/all/2020/08/12/institute-and-center-award-rates-and-funding-disparities/)) have not occurred. Similarly, women have earned a majority of biomedical Ph.Ds. since 2008 (NSF data (https://ncses.nsf.gov/pubs/nsf19304/)), but only approximately 1/3 of NIH-funded principal investigators are women (NIH Databook (https://report.nih.gov/NIHDatabook/Charts/Default.aspx?showm=Y&chartId=218&catId=15)).

APHA App. 866

Case: 25-1611    Document: 00118310433    Page: 319    Date Filed: 07/08/2025    Entry ID: 6734280

4/17/25, 10:46 PM    Case 1:25-cv-10787-BEM    Document 38-1    Filed 04/25/25    Page 241 of 67
PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career ...

NIH supports individuals at this important transition point through the K99/R00 program (https://researchtraining.nih.gov/programs/career-development/k99-r00); however, the diversity of K99/R00 awardees not reflect the demographics of the available talent pool of well-trained Ph.D. biomedical scientists. For example, for the Parent K99/R00 funding announcement (https://grants.nih.gov/grants/guide/pa-files/PA-20-188.html), over 90% of NIGMS K99/R00 grantees have transitioned to independent faculty positions; however, only 7% of applicants have been from racial and ethnic groups historically underrepresented, and only 33% have been women.

NIH has undertaken a number of efforts to facilitate the career transition of postdoctoral scientists from diverse groups (https://extramural-diversity.nih.gov/career-pathways/infographic/career) into the professoriate, including the Institutional Research and Academic Career Development Awards (IRACDA) (https://www.nigms.nih.gov/Training/CareerDev/Pages/TWDInstRes.aspx), research supplements to promote diversity in health-related research (https://grants.nih.gov/grants/guide/pa-files/PA-21-071.html) and re-entry into biomedical research careers (https://www.nigms.nih.gov/Research/Mechanisms/Pages/PromoteReentry.aspx). Additionally, the NIH Common Fund supports the National Research Mentoring Network (NRMN) (https://www.nigms.nih.gov/training/dpc/pages/nrmn.aspx), a nationwide consortium of biomedical professionals and institutions collaborating to provide biomedical trainees from all backgrounds and at all levels with evidence-informed mentorship and professional development programming. These efforts have supported the development of highly trained biomedical scientists from diverse backgrounds who have the necessary knowledge and skills to pursue independent careers in the biomedical research workforce. NIH also recognizes that efforts aimed at achieving scientific workforce diversity are hindered by organizational structures, systems, and policies that perpetuate exclusion and inequity based on race and gender. Organizational structures, policies, practices, and social norms that perpetuate bias, prejudice, discrimination, and racism also limit the pace of scientific progress. Therefore, there remains a compelling need to develop additional strategies to promote transitions to independent, research-intensive faculty positions for scientists from diverse backgrounds.

**Program Goal**

The Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) program is part of NIH's efforts to enhance diversity within the academic biomedical research workforce, and is designed to facilitate the transition of promising postdoctoral researchers from diverse backgrounds, for example individuals from groups underrepresented in the biomedical research workforce at the faculty level, (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html)into independent, research-intensive faculty careers. The program has two components: an institutionally-focused research education cooperative agreement (UE5) and an individual postdoctoral career transition award (K99/R00) to enhance diversity. The objective of the MOSAIC Postdoctoral Career Transition Award to Promote Diversity (K99/R00) is to enhance workforce diversity by facilitating a timely transition of promising postdoctoral researchers from diverse backgrounds (e.g., see Notice of NIH's Interest in Diversity (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html) (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-18-210.html)) from their mentored, postdoctoral research positions to independent, tenure-track or equivalent research-intensive faculty positions.

**Program Considerations**

The MOSAIC K99/R00 program is intended to foster the development of creative, innovative, independent researchers who will be competitive for subsequent independent biomedical research funding, and who will enhance diversity in the biomedical research workforce. Additionally, it is widely recognized that scientists from underrepresented groups often assume disproportionate academic service and outreach loads, even during their training, and that these contributions to the research environment are generally not appropriately recognized and rewarded in the measures of career advancement (i.e., "the diversity tax"). The MOSAIC K99/R00 program seeks to support early career scientists with demonstrated leadership commitments and contributions to enhancing diversity in the biomedical sciences. The specific NIH Institute and Center scientific areas supported through this FOA can be found at the Table of IC-Specific Information, Requirements and Staff Contacts (https://www.nigms.nih.gov/training/careerdev/mosaic/Pages/MOSAIC-K99-Independent-Clinical-Trial-Not-Allowed-PAR-21.aspx).

*Individuals must be in mentored, postdoctoral training positions to be eligible to apply to the K99/R00 program.* The K99 is not intended to extend time in the postdoctoral lab while an individual is on the job market. If an applicant achieves independence (any faculty or non-mentored research position) before a K99 award is made, neither the K99, nor the R00 award, will be made.

The K99/R00 award will provide up to 5 years of support in two phases. The initial (K99) phase will provide support for up to 2 years of mentored postdoctoral career development. The second (R00) phase will provide up to 3 years of independent research support, which is contingent on satisfactory progress during the K99 phase and an approved, independent, tenure-track (or equivalent) faculty position. The two award phases are intended to be continuous in time. Although exceptions may be possible in limited circumstances, R00 awards will generally only be made to those K99 PDs/PIs who accept independent, tenure-track (or equivalent) faculty positions by the end of the K99 award period.

APHA App. 867

*Additional Information for Clinician Scientists:* For the purposes of this program, clinician scientists include individuals with an MD, DO, DDS/DMD, DVM/VMD, or nurses with research doctoral degrees who devote the majority of their time to biomedical research. The K99/R00 is intended for those clinician scientists who already have substantial research training and are dedicated to initiating a strong, research-intensive career as clinician scientists. The K99/R00 program is designed to facilitate a timely transition of rigorous clinician scientists from mentored, research positions to independent, tenure-track or equivalent faculty positions, and to provide independent NIH research support during the transition. Individuals who need a longer period of mentored career development before they are prepared to begin the transition to research independence should consider the K08 or K23 program (see: K Kiosk (https://researchtraining.nih.gov/programs/career-development)).

Applicants must have no more than **4 years** of postdoctoral research experience at the time of the initial or the subsequent Resubmission application. **Candidates are strongly encouraged to apply no later than the third year of their postdoctoral training to ensure awardees receive maximum benefit from both the K99 phase of the award, and to facilitate a timely transition to independence.** Because the program aims to support the career development of scholars early in their postdoctoral training, candidates who have not yet published a first-author manuscript during their postdoctoral training, but whose previous and current studies and future plans are likely to support a successful independent research career are encouraged to apply.

The K99/R00 award is intended for individuals who require at least 12 months of mentored career development (K99 phase) before transitioning to the R00 award phase of the program. Consequently, the strongest applicants will require and propose a well-conceived plan for 1 2 years of substantive mentored career development that will help them become competitive candidates for tenure-track faculty positions and prepare them to launch robust, independent research programs. *An individual who cannot provide a compelling rationale for at least one year of additional mentored career development at the time of award is not a strong candidate for this award.* If an applicant achieves independence (any faculty or non-mentored research position) before a K99 award is made, neither the K99, nor the R00 award, will be made.

MOSAIC K99/R00 scholars will be expected to participate in additional mentoring, networking, and and professional development activities coordinated by the institutionally-focused research education awardees (MOSAIC UE5) as part of the candidate's Plan for Career Development. Appropriate institutional leaders (e.g., K99 phase mentors and R00 phase department chairs) are also expected to participate in MOSAIC UE5 activities. Information about MOSAIC UE5 awards can be found on the MOSAIC website (https://www.nigms.nih.gov/training/careerdev/Pages/MOSAIC.aspx). The integrated program of research and mentoring is expected to provide awardees with the mentoring and professional networks that will prepare them to transition into, advance, and succeed in independent, tenure-track or equivalent research-intensive faculty positions.

**Pre-Submission Consultation**

Applicants are *strongly encouraged* to consult with NIH scientific/research staff when planning an application. Early contact provides an opportunity for NIH scientific/research staff to provide guidance on program scope and appropriateness of the proposed research and career development for potential funding in response to this FOA. Applicants should contact NIH scientific/research staff as early as possible before the due date.

**Note:** This Funding Opportunity Announcement (FOA) is designed specifically for applicants proposing research that does not involve leading an independent clinical trial, a clinical trial feasibility study, or an ancillary clinical trial. Applicants to this FOA are permitted to propose research experience in a clinical trial led by a mentor or co-mentor. Those proposing a clinical trial or an ancillary study to an ongoing clinical trial as lead investigator, should apply to the companion FOA, PAR-21-272 (https://grants.nih.gov/grants/guide/pa-files/PAR-21-272.html).

See Section VIII. Other Information for award authorities and regulations.

# Section II. Award Information

### Funding Instrument

Grant: A support mechanism providing money, property, or both to an eligible entity to carry out an approved project or activity.

### Application Types Allowed

New

Resubmission

The OER Glossary (//grants.nih.gov/grants/guide/url_redirect.php?id=11116) and the SF424 (R&R) Application Guide provide details on these application types.

Case: 25-1611     Document: 00118310433     Page: 321     Date Filed: 07/08/2025     Entry ID: 6734280

4/17/25, 10:46 PM        Case 1:25-cv-10787-BEM        Document 38-1        Filed 04/25/25        Page 26 of 67
Expired PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

**Clinical Trial?**

Not Allowed: Only accepting applications that do not propose clinical trials.

**Note:** Applicants may propose to gain experience in a clinical trial led by a mentor/co-mentor as part of their research career development.

Need help determining whether you are doing a clinical trial? (https://grants.nih.gov/grants/guide/url_redirect.php?id=82370)

---

**Funds Available and Anticipated Number of Awards**

The number of awards is contingent upon NIH appropriations and the submission of a sufficient number of meritorious applications.

---

**Award Budget**

Award budgets are composed of salary and other program-related expenses, as described below.

---

**Award Project Period**

The total project period may not exceed 5 years.

## Other Award Budget Information

**Salary**

**Mentored Phase (K99)**

Salary and fringe benefits may be requested to the level provided by the awarding Institute or Center. Candidates should consult the Table of IC-Specific Information, Requirements and Staff Contacts (https://www.nigms.nih.gov/training/careerdev/mosaic/Pages/MOSAIC-K99-Independent-Clinical-Trial-Not-Allowed-PAR-21.aspx) for IC-specific, programmatic and budgetary information.

**Intramural**: Mentored candidates in the NIH intramural program will be supported by intramural funds provided by the NIH Institute/Center intramural laboratory in which they are conducting their research. Budget details for the mentored phase will be negotiated with the sponsoring intramural laboratory. Salary will be consistent with that offered scientists in similar, intramural NIH positions.

**Extramural**: Mentored candidates at an extramural sponsoring institution/organization will be supported by NIH extramural funds. The requested salary must be consistent both with the established salary structure at the institution and with salaries actually provided by the institution from its own funds to other staff members with equivalent qualifications, rank, and responsibilities in the department concerned. Further guidance on budgeting for career development salaries is provided in the SF424 (R&R) Application Guide.

The total salary may not exceed the legislatively mandated salary cap. See: https://grants.nih.gov/grants/policy/salcap_summary.htm (https://grants.nih.gov/grants/policy/salcap_summary.htm).

**Independent Phase (R00)**

The total cost for the independent phase (R00) may not exceed $249,000 per year. This amount includes salary, fringe benefits, research costs, and applicable indirect costs. Indirect costs will be reimbursed at the extramural sponsoring institution's indirect cost rate. Indirect costs requested by consortium participants are included in the total cost limitation.

---

**Other Program-Related Expenses**

The participating NIH Institutes and Centers will provide research development support for the award recipient (see the Table of IC-Specific Information, Requirements and Staff Contacts (http://www.nigms.nih.gov/training/careerdev/mosaic/Pages/MOSAIC-K99-Independent-Clinical-Trial-Not-Allowed-PAR-21.aspx)). These funds may be used for the following expenses: (a) tuition and fees related to career development activities; (b) research-related expenses, such as supplies, equipment and technical personnel; (c) travel to research meetings or training (excluding MOSAIC associated meetings, the costs of which are covered by the UE5 awards); and (d) statistical services including personnel and computer time. Research development costs must be

APHA App. 869

justified and consistent with the stage of development of the candidate and the proportion of time to be spent in research or career development activities.

Salary for mentors, secretarial and administrative assistants, etc. is not allowed.

---

**Indirect Costs**

For the extramural K99 phase, Indirect Costs (also known as Facilities & Administrative [F&A] Costs) are reimbursed at 8% of modified total direct costs. For the R00 phase, indirect costs will be reimbursed at the extramural sponsoring institution's indirect cost rate.

NIH grants policies as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120) will apply to the applications submitted and awards made from this FOA.

# Section III. Eligibility Information

## 1. Eligible Applicants

### Eligible Organizations

Higher Education Institutions

- Public/State Controlled Institutions of Higher Education
- Private Institutions of Higher Education

The following types of Higher Education Institutions are always encouraged to apply for NIH support as Public or Private Institutions of Higher Education:

- Hispanic-serving Institutions
- Historically Black Colleges and Universities (HBCUs)
- Predominantly Black Institutions (PBI)
- Tribally Controlled Colleges and Universities (TCCUs)
- American Indian/Alaska Native Serving, Non-Tribal Institutions (AI/AN)
- Alaska Native and Native Hawaiian Serving Institutions
- Asian American Native American Pacific Islander Serving Institutions (AANAPISIs)

Nonprofits Other Than Institutions of Higher Education

- Nonprofits with 501(c)(3) IRS Status (Other than Institutions of Higher Education)
- Nonprofits without 501(c)(3) IRS Status (Other than Institutions of Higher Education)

For-Profit Organizations

- Small Businesses
- For-Profit Organizations (Other than Small Businesses)

Governments

- State Governments
- County Governments
- City or Township Governments
- Special District Governments
- Indian/Native American Tribal Governments (Federally Recognized)
- Indian/Native American Tribal Governments (Other than Federally Recognized)

- Eligible Agencies of the Federal Government

- U.S. Territory or Possession

Other

- Independent School Districts
- Public Housing Authorities/Indian Housing Authorities
- Native American Tribal Organizations (other than Federally recognized tribal governments)
- Faith-based or Community-based Organizations

APHA App. 870

- Regional Organizations

The sponsoring institution may be private (profit or nonprofit) or public, including the NIH Intramural Programs and other Federal laboratories.

The applicant institution will be the mentored phase (K99) institution. All institution/organization types listed above are eligible for both the mentored (K99) and independent (R00) phase, with the following exceptions: (1) Eligible agencies of the Federal government, such as the NIH intramural program, are eligible only for the mentored phase; and (2) Eligibility of organizations, other than institutions of higher education, for the R00 phase depends on the nature of the appointment, and the ability of the PD/PI to conduct independent research and apply for NIH research (R01 or R01-equivalent) grants.

## Foreign Institutions

Non-domestic (non-U.S.) Entities (Foreign Institutions) **are not** eligible to apply.
Non-domestic (non-U.S.) components of U.S. Organizations **are not** eligible to apply.
Foreign components, as defined in the *NIH Grants Policy Statement* (//grants.nih.gov/grants/guide/url_redirect.php?id=11118), **are** allowed.

## Required Registrations

**Applicant Organizations**

Applicant organizations must complete and maintain the following registrations as described in the SF 424 (R&R) Application Guide to be eligible to apply for or receive an award. All registrations must be completed prior to the application being submitted. Registration can take 6 weeks or more, so applicants should begin the registration process as soon as possible. The NIH Policy on Late Submission of Grant Applications (//grants.nih.gov/grants/guide/notice-files/NOT-OD-15-039.html) states that failure to complete registrations in advance of a due date is not a valid reason for a late submission.

- Dun and Bradstreet Universal Numbering System (DUNS) (http://fedgov.dnb.com/webform) - All registrations require that applicants be issued a DUNS number. After obtaining a DUNS number, applicants can begin both SAM and eRA Commons registrations. The same DUNS number must be used for all registrations, as well as on the grant application.
- System for Award Management (SAM) (https://www.sam.gov/portal/public/SAM/) (formerly CCR) Applicants must complete and maintain an active registration, which requires renewal at least annually. The renewal process may require as much time as the initial registration. SAM registration includes the assignment of a Commercial and Government Entity (CAGE) Code for domestic organizations which have not already been assigned a CAGE Code.
    - NATO Commercial and Government Entity (NCAGE) Code (//grants.nih.gov/grants/guide/url_redirect.php?id=11176) Foreign organizations must obtain an NCAGE code (in lieu of a CAGE code) in order to register in SAM.
- eRA Commons (//grants.nih.gov/grants/guide/url_redirect.php?id=11123) - Applicants must have an active DUNS number and SAM registration in order to complete the eRA Commons registration. Organizations can register with the eRA Commons as they are working through their SAM or Grants.gov registration. eRA Commons requires organizations to identify at least one Signing Official (SO) and at least one Program Director/Principal Investigator (PD/PI) account in order to submit an application.
- Grants.gov Applicants must have an active DUNS number and SAM registration in order to complete the Grants.gov registration.

**Program Directors/Principal Investigators (PD(s)/PI(s))**

All PD(s)/PI(s) must have an eRA Commons account. PD(s)/PI(s) should work with their organizational officials to either create a new account or to affiliate their existing account with the applicant organization in eRA Commons. If the PD/PI is also the organizational Signing Official, they must have two distinct eRA Commons accounts, one for each role. Obtaining an eRA Commons account can take up to 2 weeks.

## Eligible Individuals (Program Director/Principal Investigator)

Any candidate with the skills, knowledge, and resources necessary to carry out the proposed research as the Program Director/Principal Investigator (PD/PI) is invited to work with his/her mentor and organization to develop an application for support. Individuals from underrepresented racial and ethnic groups as well as individuals with disabilities, women and individuals from disadvantaged backgrounds are always encouraged to apply for NIH support. Multiple PDs/PIs (https://grants.nih.gov/grants/glossary.htm#MultipleProgramDirectorPrincipalInvestigator) are not allowed.

By the time of award, the individual must be a citizen or a non-citizen national of the United States or have been lawfully admitted for permanent residence (i.e., possess a currently valid Permanent Resident Card USCIS Form I-551, or other legal verification of such status).

APHA App. 871

Case: 25-1611    Document: 00118310433    Page: 324    Date Filed: 07/08/2025    Entry ID: 6734280

4/17/25, 10:46 PM    Case 1:25-cv-10787-BEM    Document 38-1    Filed 04/25/25    Page 29 of 67
PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

K99/R00 applicants must have no more than **4 years** of postdoctoral research experience as of the relevant application due date regardless of whether it is a New or Resubmission application. Individuals must be mentored, postdoctoral training positions to be eligible to apply to the K99/R00 program. If an applicant achieves independence (i.e., any faculty or non-mentored research position) before a K99 award is made, neither the K99 award, nor the R00 award, will be issued.

Consistent with the NIH Extension Policy for Early Stage Investigator Status (ESI), NIH will approve an extension of one year for childbirth within the 4-year K99 eligibility window. Applicants who will be PD/PIs on a K99 application must provide the child's date of birth in the extension request justification submitted to IC program officials and/or scientific/research contacts listed in the FOA at least 12 weeks before submitting an application.

Parental, medical, or other well-justified leave for personal or family situations is not included in the 4-year eligibility limit, nor is clinical training with no research involvement (e.g., full-time residency training). Part-time postdoctoral research training, related to personal or family situations or occurring during a research residency or fellowship, will be pro-rated accordingly. In addition, time spent conducting postgraduate clinical training that does not involve research is not considered as part of the 4-year research training eligibility limit. Only time dedicated to research activities counts toward the 4-year limit. Please refer to NIH Extension Policy for Eligibility Window for Pathway to Independence Awards (K99/R00) (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-011.html).

Candidates for the K99/R00 award must have a clinical or research doctorate (including PhD, MD, DO, DC, ND, DDS, DMD, DVM, ScD, DNS, PharmD or equivalent doctoral degrees). Clinicians (including those with MD, DDS, DVM and other licensed health professionals) in a clinical faculty position that denotes independence in clinical responsibilities but not in research may also be eligible for the K99/R00 award.

**Enhancing Diversity**

The overarching goal of this program is to enhance the diversity of independent investigators conducting research within the NIH mission. Fostering diversity by addressing underrepresentation in the scientific research workforce is a key component of the NIH strategy to identify, develop, support and maintain the quality of our scientific human capital. In spite of tremendous advancements in scientific research, information, educational and research opportunities are not equally available to all. NIH encourages institutions to diversify their student, postdoctorate and faculty populations to enhance the participation of individuals from groups identified as underrepresented in the biomedical sciences (e.g., see the Notice of NIH's of Interest in Diversity (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html)).

For the purpose of this announcement, institutions are strongly encouraged to identify candidates who will enhance diversity on a national basis. In addition, it is recognized that underrepresentation can vary from setting to setting; individuals from racial or ethnic groups that can be demonstrated convincingly to be underrepresented by the grantee institution should be encouraged to participate in this program.

*Individuals are NOT eligible if they:*

- Have currently or previously held an independent research faculty or tenure-track faculty position, or its equivalent, in academia, industry or elsewhere; or
- Have more than 4 years of related postdoctoral research training at the time of initial application or resubmission; or
- Have been an independent PD/PI on NIH research grants (e.g. R01, R03, R21), NIH career development awards (e.g., K01, K07, K08, K23, K25), or other peer-reviewed NIH or non-NIH research grants over $100,000 direct costs per year, or Project Leaders on sub-projects of program project (P01) or center (P50) grants or the equivalent.

*Ph.D. (or equivalent research doctorate degree) candidates in positions other than postdoctoral fellow positions:* It is recognized that some institutions appoint postdoctoral fellows in positions with other titles although they are still in non-independent, mentored training positions. Candidates in such positions are encouraged to obtain confirmation of their eligibility from the relevant IC **before** they begin to prepare their applications. It is incumbent upon the candidate to provide evidence that his or her position complies with the intent of this eligibility requirement. If a potential applicant is in a position that is not clearly identifiable as a postdoctoral training position, candidate should provide the relevant NIH Institute or Center an official statement of the institution's policy (e.g. published position description in an official institutional document) which documents the position as a mentored, postdoctoral training position.

*Clinicians (including those with M.D., D.D.S, D.V.M. and other licensed professionals) in positions not designated as postdoctoral positions:* Following clinical training or fellowship training periods, clinicians often obtain a clinical faculty position that denotes independence in clinical responsibilities but not in research. A clinical faculty member who does not hold an independent research faculty position may be eligible for the K99/R00 award, and should contact a Program Director at the relevant NIH Institute for guidance. Clinicians in such positions are encouraged to obtain confirmation of their eligibility before they

APHA App. 872

Expired PAR-21-278 Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

begin to prepare their applications. Such individuals may also wish to consider other career awards ([see K Kiosk](//grants.nih.gov/training/careerdevelopmentawards.htm)) available for junior faculty development.

***The following is provided as an aid to distinguish independent from non-independent positions:*** However, it is not sufficient merely to cite one or more of the following items to document eligibility.

*Evidence for non-independence may include:*

- The candidate's research is entirely funded by another investigator's grants.
- The candidate's research is conducted entirely in another investigator's assigned space.
- According to institutional policy, the candidate cannot hire postdoctoral fellows or technical staff or be the responsible supervisor of graduate students.
- According to institutional policy, the candidate is not allowed to submit an application as the PD/PI of an NIH research grant application (e.g., R01).
- The candidate lacks other rights and privileges of faculty, such as attendance at faculty meetings.

*Conversely, evidence for independence, and therefore lack of eligibility, includes:*

- The candidate has a full-time faculty position.
- The candidate received a start-up package for support of his/her independent research.
- The candidate has research space dedicated to his/her own research.
- The candidate may attend faculty meetings, be the responsible supervisor for graduate students, and/or hire technical support or postdoctoral fellows.
- The candidate is eligible to apply for independent research funding as the PD/PI of an NIH research grant.

## 2. Cost Sharing

This FOA does not require cost sharing as defined in the NIH Grants Policy Statement.

## 3. Additional Information on Eligibility

### Number of Applications

Applicant organizations may submit more than one application, provided that each application is scientifically distinct, and each is from a different candidate.

The NIH will not accept duplicate or highly overlapping applications under review at the same time. An individual may not have two or more competing NIH career development applications pending review concurrently. In addition, NIH will not accept:

- A new (A0) application that is submitted before issuance of the summary statement from the review of an overlapping new (A0) or resubmission (A1) application.
- A resubmission (A1) application that is submitted before issuance of the summary statement from the review of the previous new (A0) application.
- An application that has substantial overlap with another application pending appeal of initial peer review (see [NOT-OD-11-101](//grants.nih.gov/grants/guide/notice-files/NOT-OD-11-101.html)).

### Level of Effort

**K99 Phase.** At the time of award, the candidate must have a full-time appointment at the academic institution. Candidates are required to commit a minimum of 75% of full-time professional effort (i.e., a minimum of 9 person-months) to their program of career development. Candidates may engage in other duties as part of the remaining 25% of their full-time professional effort not covered by this award, as long as such duties do not interfere with or detract from the proposed career development program.

Candidates who have VA appointments may not consider part of the VA effort toward satisfying the full time requirement at the applicant institution. Candidates with VA appointments should contact the staff person in the relevant Institute or Center prior to preparing an application to discuss their eligibility.

After the receipt of the award, adjustments to the required level of effort may be made in certain circumstances. See [NOT-OD-09-036](https://grants.nih.gov/grants/guide/url_redirect.php?id=51125) for more details.

**R00 Phase.** Although candidates are required to devote no less than 75% of their full-time, 12-month professional effort to research (i.e., full-time for 9 person-months), the required 9 person-months of research effort need not be devoted exclusively to the R00-supported research.

APHA App. 873

### Mentor(s)

Before submitting the application, the candidate must identify a mentor who will supervise the proposed career development and research experience. The mentor should be an active investigator in the area of the proposed research and be committed both to the career development of the candidate and to the direct supervision of the candidate's research. The mentor must document the availability of sufficient research support and appropriate facilities for rigorous research. Candidates are encouraged to identify more than one mentor, i.e., a mentoring team, if this is deemed advantageous for providing expert advice in all aspects of the research career development program. In such cases, one individual must be identified as the primary mentor who will coordinate the candidate's research. Candidates also are encouraged to propose a mentoring team that will provide additional guidance, typically focused on professional aspects of the candidate's career development. Mentors are expected to promote inclusive, safe and supportive research environments (i.e., institutional and departmental environments where trainees from all backgrounds feel integrated into and supported by the biomedical community).

The candidate must work with the mentor(s) in preparing the application. The primary mentor, regardless of career stage, should be committed to ensuring that the scholar will receive the tailored mentorship needed to advance the scholar's career. If the primary mentor, or a member of the mentor team, is a well-established investigator, the mentor should have a successful track record of mentoring individuals at the candidate's career stage.

### Institutional Environment

The applicant institution must have a strong, well-established record of research and career development activities and faculty qualified to serve as mentors in biomedical, behavioral, or clinical research. The applicant institution should have a clear commitment to enhancing diversity in the biomedical research workforce and promoting inclusive and supportive scientific research environments, as described in the Institutional Environment Letter.

# Section IV. Application and Submission Information

## 1. Requesting an Application Package

Buttons to access the online ASSIST system or to download application forms are available in Part 1 of this FOA. See your administrative office for instructions if you plan to use an institutional system-to-system solution.

## 2. Content and Form of Application Submission

It is critical that applicants follow the instructions in the Career Development (K) Instructions in the SF424 (R&R) Application Guide (//grants.nih.gov/grants/guide/url_redirect.php?id=12000) except where instructed in this funding opportunity announcement to do otherwise. Conformance to the requirements in the Application Guide is required and strictly enforced. Applications that are out of compliance with these instructions may be delayed or not accepted for review.
For information on Application Submission and Receipt, visit Frequently Asked Questions Application Guide, Electronic Submission of Grant Applications (//grants.nih.gov/grants/guide/url_redirect.php?id=41137).

### Page Limitations

All page limitations described in the SF424 Application Guide and the Table of Page Limits (//grants.nih.gov/grants/guide/url_redirect.php?id=11133) must be followed.

### Instructions for Application Submission

Note: Effective for due dates on or after January 25, 2023, the Data Management and Sharing (DMS) Plan will be attached in the Other Plan(s) attachment in FORMS-H and subsequent application forms packages. For due dates on or before January 24, 2023, the Data Sharing Plan and Genomic Data Sharing Plan GDS) will continue to be attached in the Resource Sharing Plan attachment in FORMS-G application forms packages.

The following section supplements the instructions found in the SF424 (R&R) Application Guide and should be used for preparing an application to this FOA.

### SF424(R&R) Cover

All instructions in the SF424 (R&R) Application Guide must be followed.

### SF424(R&R) Project/Performance Site Locations

All instructions in the SF424 (R&R) Application Guide must be followed.

### Other Project Information

All instructions in the SF424 (R&R) Application Guide must be followed.

APHA App. 874

Case: 25-1611     Document: 00118310433     Page: 327     Date Filed: 07/08/2025     Entry ID: 6734280

4/17/25, 10:46 PM          Case 1:25-cv-10787-BEM     Document 38-41     Filed 04/25/25     Page 32 of 67
Expiring FY23 PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

**Other Attachments**

*Diversity Statement (1-page maximum).* The application must include a diversity statement from the candidate applying for the K99/R00 award (i.e., the postdoctoral fellow). The Diversity Statement should include a description of the individual's commitment to diversity in the biomedical sciences, and any past or present leadership, mentoring and outreach activities to enhance diversity especially involving groups underrepresented in the biomedical research enterprise (e.g., certain racial/ethnic groups, persons with disabilities, students from disadvantaged backgrounds, women, and other groups as described in the NIH [Notice of Interest in Diversity (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html)](https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-031.html)). Describe planned activities during the career award to develop or enhance skills in working effectively with talented scientists from a wide variety of backgrounds and to promote inclusive and equitable scientific biomedical research environments.

Applications lacking a Diversity Statement will not be reviewed.

The filename provided for each document added to the section Other Attachments will be the name used for the bookmark in the electronic application in eRA Commons.

**Project Summary/Abstract**

Include a description of your current research and the research you propose to continue in the independent phase.

## SF424(R&R) Senior/Key Person Profile Expanded
All instructions in the SF424 (R&R) Application Guide must be followed.

The Primary Mentor should address the following in the biosketch personal statement:

- Maintaining a record of, and training in rigorous and unbiased experimental design, methodology, analysis, interpretation and reporting of results;
- Efforts taken to enhance diversity in the biomedical research workforce, and to ensure the research environment is inclusive, safe, and supportive for trainees and early career scientists from all backgrounds.
- Commitment to fulfilling the need of the trainees to complete their training in a timely fashion with the skills, credentials and experiences to transition into independent careers in the biomedical research workforce.

## R&R Budget
All instructions in the SF424 (R&R) Application Guide must be followed.

Provide itemized budget information for each budget period covered under the K99 phase.

Itemized budget information is not required for the R00 phase; a total requested amount for each budget period is acceptable. However, some basic information must be completed in order for NIH to successfully process the budget form. For each budget period of the R00 phase:

- Select the appropriate Budget Type
- Provide the Budget Period Start Date and End Date
- In Section A: Senior/Key Persons provide an entry for the PD/PI, including the appropriate level of effort, $0 for Requested Salary and $0 for Fringe Benefits
- In Section F: Other Direct Costs add a line item titled R00 Independent Phase and provide the total request for that period (up to $249,000).

At the time of transition to the R00 phase, the R00 applicant institution will submit a detailed budget for each budget period of the R00 project period that reflects the direct and indirect costs at the R00 applicant institution.

## PHS 398 Cover Page Supplement
All instructions in the SF424 (R&R) Application Guide must be followed.

## PHS 398 Career Development Award Supplemental Form
**Other Plan(s):**

Note: Effective for due dates on or after January 25, 2023, the Data Management and Sharing Plan will be attached in the Other Plan(s) attachment in FORMS-H and subsequent application forms packages. For due dates on or before January 24, 2023, the Data Sharing Plan and Genomic Data Sharing Plan GDS) will continue to be attached in the Resource Sharing Plan attachment in FORMS-G application forms packages.

All applicants planning research (funded or conducted in whole or in part by NIH) that results in the generation of scientific data are required to comply with the instructions for the Data Management and Sharing Plan. All applications, regardless of the

APHA App. 875

Expired PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

amount of direct costs requested for any one year, must address a Data Management and Sharing Plan.

The PHS 398 Career Development Award Supplemental Form is comprised of the following sections:

Candidate
Research Plan
Other Candidate Information
Mentor, Co-Mentor, Consultant, Collaborators
Environment & Institutional
Commitment to the Candidate
Other Research Plan Sections
Appendix

All instructions in the SF424 (R&R) Application Guide must be followed.

## Candidate Section

All instructions in the SF424 (R&R) Application Guide must be followed, with the following additional instructions:

**Candidate Information and Goals for Career Development**

***Candidate's Background***

- Describe the candidate's commitment to a career in an independent biomedical research field specified in the Program Considerations section above.
- Describe the candidate's potential to develop into a successful, independent investigator.

***Career Goals and Objectives***

- Describe the candidate's current and long-term research and career objectives.
- Present a scientific history that: (1) shows a logical progression from the candidate's prior research and training experiences to the career development and research experiences proposed for the mentored phase of the award (K99) and subsequently to the independent phase of the award (R00); and (2) justifies the need for further mentored career development to become an independent research investigator.
- If currently supported by an institutional training grant or individual fellowship award (such as provided through the Ruth L. Kirschstein NRSA program), describe the candidate's current research training or fellowship program.
- Describe how the candidate plans to separate scientifically from his/her mentor and advance to research independence.
- If the candidate is applying for the first time in her/his fourth year of postdoctoral training, explain why support at this stage is appropriate.

***Candidate's Plan for Career Development/Training Activities During Award Period***

- A systematic plan should be presented for obtaining the biomedical science background, research experience, and career development activities necessary to launch the stated independent research career. Describe current activities and how they relate to the candidate's career development plans and career goals.
- Describe proposed activities, e.g., those that will lead to new and/or enhanced research skills and knowledge such as the development of quantitative, computational, or other technical skills, as well as development of professional skills such as grant-writing, communication, leadership, and laboratory management. The career development plan must be specifically tailored to meet the needs of the candidate and the goal of achieving independence as a researcher.
- Describe how the activities provided by the MOSAIC Institutionally-Focused Research Education Award (UE5) will be integrated into career development activities available at the candidate's home institution to create synergies. Information on the MOSAIC UE5 programs can be found on the MOSAIC program website: https://www.nigms.nih.gov/training/careerdev/Pages/MOSAIC.aspx (https://www.nigms.nih.gov/training/careerdev/Pages/MOSAIC.aspx).
- The candidate should provide a list of up to 10 keywords regarding their scientific area as well as a prioritized list of areas of professional development to aid in matching scholars into scientific and career development cohorts.
- Describe how the skills and knowledge obtained during the mentored phase will enhance research productivity and facilitate the development of new approaches and directions for investigation. Describe how the career development plan will promote the candidate's success and transition to scientific independence. Candidates must justify the need for the award, particularly the mentored (K99) phase, and must provide a convincing case that the proposed period

APHA App. 876

Case: 25-1611     Document: 00118310433     Page: 329     Date Filed: 07/08/2025     Entry ID: 6734280

4/17/25, 10:46 PM        Case 1:25-cv-10787-BEM   Document 38-1   Filed 04/25/25   Page 34 of 67
Expiring PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

of support (1-2 years as a mentored candidate followed by up to 3 years as an independent scientist) will substantially enhance her/his career and/or will allow the pursuit of a novel or promising approach to a particular research problem. Candidates should make clear why additional mentored career development is critical before transitioning to research independence and pursuit of the proposed independent phase research.

- The candidate must describe a plan, including a timeline with milestones, for evaluation of his/her progress during the mentored phase and for the transition to the independent phase.
- The candidate and K99-phase mentor (see below) must describe a specific plan for the transition to the independent phase.

## Research Plan Section

All instructions in the SF424 (R&R) Application Guide must be followed, with the following additional instructions:

### Research Strategy

- The research plan must span both phases of the K99/R00 award. The candidate should clearly indicate the research planned for each phase. This narrative should describe what the candidate will accomplish during the mentored phase research that will enable him/her to launch an independent research program (i.e., what does the candidate still need to accomplish during the mentored phase in order to compete successfully once independence is achieved).
- The research plan should state the significance, innovation and approach of the proposed research during the K99 and R00 phases of the award. The research plan should provide a detailed rationale, experimental approach, and expected/alternative outcomes for the proposed studies. Although it is anticipated that candidates will be best able to describe their current and past research, the research plan for the R00 phase of the award should be described in sufficient detail for reviewers to evaluate the merit of this component of the application.
- Describe the relationship between the mentor's research and the candidate's proposed research. Describe how the candidate will gain independence from his/her mentors and separate his/her scientific research program from that of the mentor(s).
- If the applicant is proposing to gain experience in a clinical trial, ancillary study to a clinical trial or a clinical trial feasibility study as part of his or her research career development, describe the relationship of the proposed research project to the clinical trial.

### Training in the Responsible Conduct of Research

- All applications must include a plan to fulfill NIH requirements for instruction in the Responsible Conduct of Research (RCR). See SF424 (R&R) Application Guide for instructions.

## Mentor, Co-Mentor, Consultant, Collaborators Section

All instructions in the SF424 (R&R) Application Guide must be followed, with the following additional instructions:

### Plans and Statements of Mentor and Co-mentor(s)

- The application must include a statement from the primary mentor that provides: 1) information on his/her research qualifications and previous experience as a research supervisor; 2) a plan describing the nature of the supervision and mentoring that will occur during the proposed K99 award period, including how the candidate's scientific and professional independence will be promoted; 3) a description of the elements of the planned career development activities, including any formal course-work; 4) a plan for transitioning the candidate from the mentored phase to the independent phase of the award and a description of how the mentor will help the candidate achieve scientific independence from his/her mentor(s); 5) a statement identifying the components of the proposed research that the K99 applicant can take when he/she transitions to research independence and that can be part of his/her independent (R00) phase award; and 6) when appropriate, a statement affirming any resources and reagents that can be taken by the applicant to the independent phase of the award.
- The mentor should have sufficient independent research support to cover the costs of the proposed K99 research project in excess of the allowable costs of this award, and should state that needed costs will be covered. If funds are needed beyond what will be provided by the mentor, the source of additional funds should be identified and documented in a letter signed by the responsible individual.
- Similar information must be provided by all co-mentors. If more than one mentor is proposed, the respective areas of expertise, the responsibility of each, and the nature of the involvement with the candidate should be explicitly described. Co-mentors should describe clearly how they will coordinate with the primary mentor and the candidate to provide an integrated mentoring effort.

APHA App. 877

Case: 25-1611     Document: 00118310433     Page: 330     Date Filed: 07/08/2025     Entry ID: 6734280

4/17/25, 10:46 PM     Case 1:25-cv-10787-BEM   Document 38-1   Filed 04/25/25   Page 35 of 67
Expiring FARs 2018 Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00) Postdoctoral Career …

- The primary mentor must agree to write and provide annual evaluations of the candidate's progress for the initial mentored phase as required in the annual progress report.
- The mentor must agree to assist the candidate in transitioning to an independent research position by guiding the candidate during the job search and negotiation process and by commenting on the R00 phase application.
- The mentor must describe their willingness to participate in conferences organized by the MOSAIC Institutionally-Focused Research Education Award to Promote Diversity (UE5) to exchange ideas and employ evidence-informed approaches to enhance diversity and improve mentoring relationships.
- If the applicant is proposing to gain experience in a clinical trial as part of his or her research career development, the mentor or a member of the mentoring team must include a statement to document leadership of the clinical trial, and appropriate expertise to guide the applicant in any proposed clinical trials research experience.

**Letters of Support from Collaborators, Contributors and Consultants**

- Signed statements must be provided by all collaborators and/or consultants confirming their participation in the project and describing their specific roles. Unless also listed as senior/key personnel, collaborators and consultants do not need to provide their biographical sketches. However, information should be provided clearly documenting the appropriate expertise in the proposed areas of consulting/collaboration.
- Advisory committee members (if applicable): Signed statements must be provided by each member of the proposed advisory committee. These statements should confirm their participation, describe their specific roles, and document the expertise they will contribute. Unless also listed as senior/key personnel, these individuals do not need to provide their biographical sketches.

## Description of Institutional Environment (2 pages maximum)

All instructions in the SF424 (R&R) Application Guide must be followed, with the following additional instructions:

### Description of Institutional Environment

- The sponsoring institution must document a strong, well-established research and career development program related to the candidate's area of interest, including a high-quality research environment with key faculty members and other investigators capable of productive collaboration with the candidate.
- Describe how the institutional research environment is particularly suited for the development of the candidate's research career and the pursuit of the proposed research plan.

- Describe any institutional career development resources and activities that will be available to contribute to the candidate's career development (e.g., an office of postdoctoral affairs, a seminar series for future faculty, etc.).
- Describe any institutional policies and practices that are expected to contribute to the candidate's research and career development success, such as policies and procedures to (a) promote diversity and inclusion in the research training environment, (b) ensure that the institution's facilities are accessible to those with disabilities, (c) foster a positive, supportive, and safe research and training environment, and (d) prevent discriminatory harassment and other discriminatory practices and to appropriately respond to allegations of such discriminatory practices, including providing any required notifications to NIH (e.g., requesting a change of PD/PI status; see NOT-OD-15-152 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-15-152.html) and NOT-OD-18-172 (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-18-172.html)).

Applicant's should disregard the following warning message "The Description of Institutional Environment attachment on the PHS 398 Career Development Award Supplemental Form is limited to 1 page." This FOA permits 2 pages for this attachment.

### Institutional Commitment to the Candidate's Research Career Development

- The sponsoring institution must provide a statement of commitment to the candidate's development into a productive, independent investigator, i.e. conducting the proposed mentored research and career development during the K99 phase and competing for, and transitioning to, a tenure-track assistant professor position at an academic institution. While the K99 phase sponsoring institution is not responsible for sponsoring the applicant during the R00 phase, it should be supportive of the candidate prior to initiation of the R00 phase.
- Provide assurance that the candidate will be able to devote a minimum of 9 person-months (75% of full-time professional effort) to the development of his/her research program. The remaining effort should be devoted to activities related to the development of the candidate's career as an independent scientist.
- Provide assurance that the research facilities, resources, and training opportunities, including faculty capable of productive collaboration with the candidate, will be available for the candidate's planned career development and research programs during the K99 award period.

- Provide assurance that appropriate time and support for any proposed mentor(s) and/or other staff consistent with the career development plan will be available during the K99 award period.
- For individuals in postdoctoral positions with other titles although still in non-independent, mentored training positions, provide evidence of eligibility for the K99/R00 program.

**Description of Candidate's Contribution to Program Goals.** As this is a diversity-related FOA, applications must include the [Description of Candidate's Contribution to Program Goals (https://grants.nih.gov/grants/how-to-apply-application-guide/forms-f/general/g.410-phs-398-career-development-award-supplemental-form.htm#12.)](https://grants.nih.gov/grants/how-to-apply-application-guide/forms-f/general/g.410-phs-398-career-development-award-supplemental-form.htm#12.) on the Career Development Award Supplemental form. The *Description of Candidate's Contribution to Program Goals* is distinct from the *Diversity Statement* in the *Other Attachments* Section, and it must be signed by an institutional official (in most cases the dean or the chair of the department). Applications lacking the Description of Candidate's Contribution to Program Goals attachment will be considered incomplete and will not be reviewed.

### Appendix

Limited items are allowed in the Appendix. Follow all instructions for the Appendix as described in the SF424 (R&R) Application Guide; any instructions provided here are in addition to the SF424 (R&R) Application Guide instructions.

## PHS Human Subjects and Clinical Trials Information

When involving NIH-defined human subjects research, clinical research, and/or clinical trials (and when applicable, clinical trials research experience) follow all instructions for the PHS Human Subjects and Clinical Trials Information form in the SF424 (R&R) Application Guide, with the following additional instructions:

If you answered Yes to the question Are Human Subjects Involved? on the R&R Other Project Information form, you must include at least one human subjects study record using the **Study Record: PHS Human Subjects and Clinical Trials Information** form or **Delayed Onset Study** record.

### Study Record: PHS Human Subjects and Clinical Trials Information

All instructions in the SF424 (R&R) Application Guide must be followed.

- For FOAs that do not allow independent clinical trials, do not complete Section 4 Protocol Synopsis information or Section 5 - Other Clinical Trial-related Attachments.

### Delayed Onset Study

All instructions in the SF424 (R&R) Application Guide must be followed.

## PHS Assignment Request Form

All instructions in the SF424 (R&R) Application Guide must be followed.

## Reference Letters

Candidates must carefully follow the SF424 (R&R) Application Guide, **including the time period for when reference letters will be accepted**. At least three, but no more than five, reference letters are required. The letters should be from individuals not directly involved in the application, but who are familiar with the applicant's qualifications, training, interests, and who can elaborate on the candidate's potential to contribute to program goals. *The sponsor/co-sponsor(s) of the application cannot be counted toward the three required references*. Applications lacking the appropriate required reference letters will not be reviewed. This is a separate process from submitting an application electronically. Reference letters are submitted directly through the [eRA Commons Submit Referee Information link (//grants.nih.gov/grants/guide/url_redirect.php?id=41146)](//grants.nih.gov/grants/guide/url_redirect.php?id=41146) and not through Grants.gov.

## 3. Unique Entity Identifier and System for Award Management (SAM)

See Part 1. Section III.1 for information regarding the requirement for obtaining a unique entity identifier and for completing and maintaining active registrations in System for Award Management (SAM), NATO Commercial and Government Entity (NCAGE) Code (if applicable), eRA Commons, and Grants.gov.

## 4. Submission Dates and Times

[Part I. Overview Information](#) contains information about Key Dates and Times. Applicants are encouraged to submit applications before the due date to ensure they have time to make any application corrections that might be necessary for successful submission. When a submission date falls on a weekend or [Federal holiday (https://grants.nih.gov/grants/guide/url_redirect.php?id=82380)](https://grants.nih.gov/grants/guide/url_redirect.php?id=82380), the application deadline is automatically extended to the next business day.

Organizations must submit applications to [Grants.gov (//grants.nih.gov/grants/guide/url_redirect.php?id=11128)](//grants.nih.gov/grants/guide/url_redirect.php?id=11128) (the online portal to find and apply for grants across all Federal agencies) using ASSIST or other electronic submission systems. Applicants must

APHA App. 879

Expiring Awards: Maintaining Opportunities for Scientific and Academic Independent Careers (K Award) Postdoctoral Career …

then complete the submission process by tracking the status of the application in the eRA Commons (//grants.nih.gov/grants/guide/url_redirect.php?id=11123), NIH's electronic system for grants administration. NIH and Grants.gov systems check the application against many of the application instructions upon submission. Errors must be corrected and a changed/corrected application must be submitted to Grants.gov on or before the application due date and time. If a Changed/Corrected application is submitted after the deadline, the application will be considered late. Applications that miss the due date and time are subjected to the NIH Policy on Late Application Submission.

**Applicants are responsible for viewing their application before the due date in the eRA Commons to ensure accurate and successful submission.**

Information on the submission process and a definition of on-time submission are provided in the SF424 (R&R) Application Guide.

### 5. Intergovernmental Review (E.O. 12372)

This initiative is not subject to (//grants.nih.gov/grants/guide/url_redirect.php?id=11142) intergovernmental review. (//grants.nih.gov/grants/guide/url_redirect.php?id=11142)

### 6. Funding Restrictions

All NIH awards are subject to the terms and conditions, cost principles, and other considerations described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120).

Pre-award costs are allowable only as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11143).

### 7. Other Submission Requirements and Information

Applications must be submitted electronically following the instructions described in the SF424 (R&R) Application Guide. Paper applications will not be accepted.

Applicants must complete all required registrations before the application due date. Section III. Eligibility Information contains information about registration.

For assistance with your electronic application or for more information on the electronic submission process, visit Applying Electronically (//grants.nih.gov/grants/guide/url_redirect.php?id=11144). If you encounter a system issue beyond your control that threatens your ability to complete the submission process on-time, you must follow the Guidelines for Applicants Experiencing System Issues (//grants.nih.gov/grants/ElectronicReceipt/support.htm#guidelines). For assistance with application submission, contact the Application Submission Contacts in Section VII.

**Important reminders:**

All PD(s)/PI(s) must include their eRA Commons ID in the Credential field of the Senior/Key Person Profile Component of the SF424(R&R) Application Package. Failure to register in the Commons and to include a valid PD/PI Commons ID in the credential field will prevent the successful submission of an electronic application to NIH. See Section III of this FOA for information on registration requirements.

The applicant organization must ensure that the DUNS number it provides on the application is the same number used in the organization's profile in the eRA Commons and for the System for Award Management. Additional information may be found in the SF424 (R&R) Application Guide.

See more tips (//grants.nih.gov/grants/guide/url_redirect.php?id=11146) for avoiding common errors.

Upon receipt, applications will be evaluated for completeness and compliance with application instructions by the NIH Center for Scientific Review. Applications that are incomplete or non-compliant will not be reviewed.

### Post Submission Materials

Applicants are required to follow the instructions for post-submission materials, as described in the policy (//grants.nih.gov/grants/guide/url_redirect.php?id=82299).

## Section V. Application Review Information

### 1. Criteria

Note: Effective for due dates on or after January 25, 2023, the Data Sharing Plan and Genomic Data Sharing Plan (GDS) as part of the Resource Sharing Plan will not be evaluated at time of review.

APHA App. 880

Expiring PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

Only the review criteria described below will be considered in the review process. Applications submitted to the NIH in support of the NIH mission (//grants.nih.gov/grants/guide/url_redirect.php?id=11149) are evaluated for scientific and technical merit through the NIH peer review system.

**For this particular announcement, note the following:** Reviewers should evaluate the candidate's potential for obtaining a tenure-track or equivalent faculty position and developing an independent research program that will make important contributions to the field. Reviewers should consider in their evaluation the likely value of the proposed K99 phase research and career development in facilitating transition to research independence, and the feasibility of the proposed research project as a vehicle for developing a successful, independent research program after transition to the R00 award phase. Reviewers should assess the candidate's demonstrated track record and proposed plans with respect to advancing and promoting diversity in the biomedical research enterprise. Reviewers should note that candidates are encouraged to apply early in their postdoctoral tenure in order to have sufficient time to develop their skills, knowledge and career plans during the mentored K99 phase of an award. Therefore, applicants should not be expected to already have publications from their postdoctoral work but should instead present evidence that their previous and current studies and future plans are likely to support a successful independent research career.

## Overall Impact

Reviewers should provide their assessment of the likelihood that the proposed career development and research plan will enhance the candidate's potential for a productive, independent scientific research career in a health-related field, taking into consideration the criteria below in determining the overall impact score.

## Scored Review Criteria

Reviewers will consider each of the review criteria below in the determination of scientific merit, and give a separate score for each. An application does not need to be strong in all categories to be judged likely to have major scientific impact.

### Candidate

- Based on the candidate's prior research and training experience, track record (relative to career stage), referee's evaluations, and the rigor of prior research and the current application, what is the candidate's potential to become a successful, independent investigator who will contribute to her/his/their chosen field of biomedical research?
- What is the suitability of the candidate's pre- and postdoctoral research training, with respect to development of appropriate scientific and professional skills?
- Given the candidate's prior training, proposed career development plan, and the referees evaluations, is it reasonable to expect that the candidate will be able to achieve an independent, tenure-track or equivalent faculty position within the time period requested for the K99 phase of this award?
- Has the candidate demonstrated a compelling commitment and contributions to enhancing diversity in the biomedical sciences?
- Does the candidate have robust plans to develop or enhance their skills in working effectively with scientists from diverse backgrounds and promoting inclusive and equitable scientific biomedical research environments?

### Career Development Plan/Career Goals and Objectives

- Are the content and duration of the proposed components of the career development plan appropriate and well-justified for the candidate's current stage of scientific and professional development and proposed research career goals?
- To what extent does the proposed career development plan enhance or augment the applicant's research training and skills acquisition to date?
- Will the plans to incorporate activities provided by the MOSAIC Institutionally-Focused Research Education Award (UE5) into the scholar's career development plans create synergies to enhance the scholar's career development?
- Is the proposed career development plan likely to contribute substantially to the scientific and professional development of the candidate, and facilitate her/his/their successful transition to independence?
- To what extent are the plans for evaluating the K99 awardee's progress adequate and appropriate for guiding the applicant towards a successful transition to the independent phase of the award?
- Is the timeline planned for transition to the independent phase of the award appropriate for the candidate's current stage of scientific and professional development, anticipated productivity, and the career development proposed for the K99 phase of the award? If the candidate is applying for the first time in her/his/their fourth year as a postdoctoral fellow, is this well justified and approrpriate?
- If proposed, will the clinical trial experience contribute to the applicant's research career development?

### Research Plan

APHA App. 881

- Does the research proposed in the K99 and R00 phases address an important problem or a critical barrier to progress in the field? Is the research proposed in the K99 and R00 phases scientifically sound? Will the proposed research goals, if achieved, improve scientific knowledge, technical capability, and/or clinical practice in one or more broad fields?
- Is the prior research that serves as the key support for the proposed project rigorous?
- Has the candidate included plans to address weaknesses in the rigor of prior research that serves as the key support of the proposed project?
- Has the candidate presented strategies to ensure a robust and unbiased approach, as appropriate for the work proposed?
- Has the candidate presented adequate plans to address relevant biological variables, such as sex, for studies in vertebrate animals or human subjects?
- Are the scientific and technical aspects of the K99 research appropriate for developing the research skills described in the career development plan, and appropriate for developing a successful R00 research program?
- Does the R00 phase research appropriately build upon the K99 phase research? Are the themes and/or topics of the R00 phase research plan substantive and appropriate for long-term pursuit?
- Does the project develop or employ, as appropriate, novel or innovative concepts, approaches, methodologies, tools, or technologies? Will creative strategies be employed as needed and appropriate to address the research questions posed?
- If proposed, will the clinical trial experience contribute to the research project?

### Mentor(s), Co-Mentor(s), Consultant(s), Collaborator(s)

- Are the research qualifications and mentoring plans of the mentor(s) appropriate for the candidate's career development needs?
- To what extent do(es) the mentor(s) describe clear and robust plans to ensure that the applicant will progress successfully to independence? For experienced mentors, to what extent does the mentor(s) have a strong track record in training future independent researchers at the candidate's career stage?
- Is the supervision proposed for the mentored phase of support adequate, and is the commitment of the mentor(s) to the applicant's career development appropriate and sufficient?
- Do(es) the mentors have a clear commitment to enhancing diversity in the biomedical research workforce and to ensuring the research environment is inclusive, safe and supportive to trainees from all backgrounds?
- Does the mentor describe their willingness to participate in meetings/conferences organized by the MOSAIC Institutionally-Focused Research Education Award to Promote Diversity (UE5) to exchange ideas, and employ evidence-informed approaches to enhance diversity and improve mentoring relationships?
- Does the mentor provide an appropriate plan that addresses the candidate's training needs, and that is likely to foster the candidate's continued development and transition to independence?
- Does the mentor describe an acceptable plan for clear separation of the candidate's research and research career from the mentor's research, including identifying the components of the research plan that the K99 candidate may take to an independent research position?
- If applicable, are the consultants /collaborators research qualifications appropriate for their roles in the proposed K99 phase of the award? Do they provide letters of support that affirm their commitment?

- If the applicant is proposing to gain experience in a clinical trial as part of her/his/their research career development, is there evidence of the appropriate expertise, experience, and ability on the part of the mentor(s) to guide the applicant during participation in the clinical trial?

### Environment & Institutional Commitment to the Candidate

- To what extent does the institution provide an appropriate environment for the candidate's development during the K99 phase of the award?
- To what extent are the research facilities and educational opportunities, including collaborating faculty, adequate and appropriate for the candidate's research and career development goals during the K99 phase of the award? Is adequate evidence provided that the K99 sponsoring institution is strongly committed to fostering the candidate's development and preparation for transition to independence?
- Is there adequate assurance that the required minimum of 9 person-months (75% of the candidate's full-time professional effort) will be devoted directly to the career development and research activities proposed for the K99 phase of the award?
- Does the institution have a clear commitment to enhancing diversity in the biomedical research workforce, and promoting inclusive, safe and supportive scientific research environments? Has it undertaken appropriate efforts to

APHA App. 882

Expira PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K01 - Postdoctoral Career … achieve these goals?

## Additional Review Criteria

As applicable for the project proposed, reviewers will evaluate the following additional items while determining scientific and technical merit, and in providing an overall impact score, but will not give separate scores for these items.

### Protections for Human Subjects

For research that involves human subjects but does not involve one of the categories of research that are exempt under 45 CFR Part 46, the committee will evaluate the justification for involvement of human subjects and the proposed protections from research risk relating to their participation according to the following five review criteria: 1) risk to subjects, 2) adequacy of protection against risks, 3) potential benefits to the subjects and others, 4) importance of the knowledge to be gained, and 5) data and safety monitoring for clinical trials.

For research that involves human subjects and meets the criteria for one or more of the categories of research that are exempt under 45 CFR Part 46, the committee will evaluate: 1) the justification for the exemption, 2) human subjects involvement and characteristics, and 3) sources of materials. For additional information on review of the Human Subjects section, please refer to the Guidelines for the Review of Human Subjects (//grants.nih.gov/grants/guide/url_redirect.php? id=11175).

### Inclusion of Women, Minorities, and Individuals Across the Lifespan

When the proposed project involves human subjects and/or NIH-defined clinical research, the committee will evaluate the proposed plans for the inclusion (or exclusion) of individuals on the basis of sex/gender, race, and ethnicity, as well as the inclusion (or exclusion) of individuals of all ages (including children and older adults) to determine if it is justified in terms of the scientific goals and research strategy proposed. For additional information on review of the Inclusion section, please refer to the Guidelines for the Review of Inclusion in Clinical Research (//grants.nih.gov/grants/guide/url_redirect.php?id=11174).

### Vertebrate Animals

The committee will evaluate the involvement of live vertebrate animals as part of the scientific assessment according to the following criteria: (1) description of proposed procedures involving animals, including species, strains, ages, sex, and total number to be used; (2) justifications for the use of animals versus alternative models and for the appropriateness of the species proposed; (3) interventions to minimize discomfort, distress, pain and injury; and (4) justification for euthanasia method if NOT consistent with the AVMA Guidelines for the Euthanasia of Animals. Reviewers will assess the use of chimpanzees as they would any other application proposing the use of vertebrate animals. For additional information on review of the Vertebrate Animals section, please refer to the Worksheet for Review of the Vertebrate Animal Section (//grants.nih.gov/grants/guide/url_redirect.php?id=11150).

### Biohazards

Reviewers will assess whether materials or procedures proposed are potentially hazardous to research personnel and/or the environment, and if needed, determine whether adequate protection is proposed.

### Resubmissions

For Resubmissions, the committee will evaluate the application as now presented, taking into consideration the responses to comments from the previous scientific review group and changes made to the project.

### Revisions

Not Applicable

## Additional Review Considerations

Note: Effective for due dates on or after January 25, 2023, the Data Sharing Plan and Genomic Data Sharing Plan (GDS) as part of the Resource Sharing Plan will not be evaluated at time of review.

As applicable for the project proposed, reviewers will consider each of the following items, but will not give scores for these items, and should not consider them in providing an overall impact score.

### Resource Sharing Plans

Reviewers will comment on whether the following Resource Sharing Plans, or the rationale for not sharing the following types of resources, are reasonable: (1) Data Sharing Plan (//grants.nih.gov/grants/guide/url_redirect.php?id=11151); (2) Sharing

APHA App. 883

Case: 25-1611     Document: 00118310433     Page: 336     Date Filed: 07/08/2025     Entry ID: 6734280

4/17/25, 10:46 PM     Case 1:25-cv-10787-BEM     Document 38-1     Filed 04/25/25     Page 41 of 67
Expiration Award: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00) - Postdoctoral Career …

Model Organisms (//grants.nih.gov/grants/guide/url_redirect.php?id=11152); and (3) Genomic Data Sharing Plan (GDS)
(//grants.nih.gov/grants/guide/url_redirect.php?id=11153).

**Training in the Responsible Conduct of Research**

All applications for support under this FOA must include a plan to fulfill NIH requirements for instruction in the Responsible
Conduct of Research (RCR). Taking into account the level of experience of the applicant, including any prior instruction or
participation in RCR as appropriate for the applicant's career stage, the reviewers will evaluate the adequacy of the proposed
RCR training in relation to the following five required components:

1) *Format* - the required format of instruction, i.e., face-to-face lectures, coursework, and/or real-time discussion groups (a
plan with only on-line instruction is not acceptable);

2) *Subject Matter* - the breadth of subject matter, e.g., conflict of interest, authorship, data management, human subjects and
animal use, laboratory safety, research misconduct, research ethics;

3) *Faculty Participation* - the role of the mentor(s) and other faculty involvement in the fellow's instruction;

4) *Duration of Instruction* - the number of contact hours of instruction (at least eight contact hours are required); and

5) *Frequency of Instruction* instruction must occur during each career stage and at least once every four years.

Plans and past record will be rated as *ACCEPTABLE* or *UNACCEPTABLE*, and the summary statement will provide the
consensus of the review committee. See "Update on the Requirement for Instruction in the Responsible Conduct of
Research" (https://grants.nih.gov/grants/guide/notice-files/NOT-OD-10-019.html) for more information about NIH requirements
for Responsible Conduct of Research.

## Select Agent Research

Reviewers will assess the information provided in this section of the application, including 1) the Select Agent(s) to be used in
the proposed research, 2) the registration status of all entities where Select Agent(s) will be used, 3) the procedures that will
be used to monitor possession use and transfer of Select Agent(s), and 4) plans for appropriate biosafety, biocontainment,
and security of the Select Agent(s).

## Authentication of Key Biological and/or Chemical Resources

For projects involving key biological and/or chemical resources, reviewers will comment on the brief plans proposed for
identifying and ensuring the validity of those resources.

## Budget and Period of Support

Reviewers will consider whether the budget and the requested period of support are fully justified and reasonable in relation
to the proposed research.

## 2. Review and Selection Process

Applications will be evaluated for scientific and technical merit by (an) appropriate Scientific Review Group(s), in accordance with
NIH peer review policy and procedures (//grants.nih.gov/grants/guide/url_redirect.php?id=11154), using the stated review criteria.
Assignment to a Scientific Review Group will be shown in the eRA Commons.

As part of the scientific peer review, all applications:

- May undergo a selection process in which only those applications deemed to have the highest scientific and technical merit
  (generally the top half of applications under review) will be discussed and assigned an overall impact score.
- Will recieve a written critique.

Applications will be assigned on the basis of established PHS referral guidelines to the appropriate NIH Institute or Center.
Applications will compete for available funds with all other recommended applications. Following initial peer review,
recommended applications will receive a second level of review by the appropriate national Advisory Council or Board.

The following will be considered in making funding decisions:

- Scientific and technical merit of the proposed project as determined by scientific peer review.
- Availability of funds.
- Relevance of the proposed project to program priorities.
- Contributions to portfolio breadth and diversity.

APHA App. 884

Expired PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

### 3. Anticipated Announcement and Award Dates

After the peer review of the application is completed, the PD/PI will be able to access his or her Summary Statement (written critique) via the eRA Commons (//grants.nih.gov/grants/guide/url_redirect.php?id=11123). Refer to Part 1 for dates for peer review, advisory council review, and earliest start date.

Information regarding the disposition of applications is available in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11156).

## Section VI. Award Administration Information

### 1. Award Notices

If the application is under consideration for funding, NIH will request "just-in-time" information from the applicant as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11157).

A formal notification in the form of a Notice of Award (NoA) will be provided to the applicant organization for successful applications. The NoA signed by the grants management officer is the authorizing document and will be sent via email to the recipient's business official.

Awardees must comply with any funding restrictions described in Section IV.5. Funding Restrictions. Selection of an application for award is not an authorization to begin performance. Any costs incurred before receipt of the NoA are at the recipient's risk. These costs may be reimbursed only to the extent considered allowable pre-award costs.

Any application awarded in response to this FOA will be subject to terms and conditions found on the Award Conditions and Information for NIH Grants (//grants.nih.gov/grants/guide/url_redirect.php?id=11158) website. This includes any recent legislation and policy applicable to awards that is highlighted on this website.

Awardees are expected to participate in career development activities and convenings coordinated by MOSAIC institutionally-focused research education awardees (UE5).

There will not be a formal Notice of Award (NoA) associated with the K99 phase of the award conducted in the NIH intramural program. The awarding Institute will transmit to the successful candidate an approval letter which will include the terms and conditions of the NIH intramural K99 award, as well as expectations for the transition to the R00 phase of the award.

### 2. Administrative and National Policy Requirements

All NIH grant and cooperative agreement awards include the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120) as part of the NoA. For these terms of award, see the NIH Grants Policy Statement Part II: Terms and Conditions of NIH Grant Awards, Subpart A: General (//grants.nih.gov/grants/guide/url_redirect.php?id=11157) and Part II: Terms and Conditions of NIH Grant Awards, Subpart B: Terms and Conditions for Specific Types of Grants, Recipients, and Activities (//grants.nih.gov/grants/guide/url_redirect.php?id=11159). More information is provided at Award Conditions and Information for NIH Grants (//grants.nih.gov/grants/guide/url_redirect.php?id=11158). More specifically, for K Awards, visit the Research Career Development ( K ) Awardees section of the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=51164).

Recipients of federal financial assistance (FFA) from HHS must administer their programs in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age and, in some circumstances, religion, conscience, and sex. This includes ensuring programs are accessible to persons with limited English proficiency. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. Please see https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html (https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html) and http://www.hhs.gov/ocr/civilrights/understanding/section1557/index.html (https://www.hhs.gov/ocr/civilrights/understanding/section1557/index.html).

HHS recognizes that research projects are often limited in scope for many reasons that are nondiscriminatory, such as the principal investigator's scientific interest, funding limitations, recruitment requirements, and other considerations. Thus, criteria in research protocols that target or exclude certain populations are warranted where nondiscriminatory justifications establish that such criteria are appropriate with respect to the health or safety of the subjects, the scientific study design, or the purpose of the research. For additional guidance regarding how the provisions apply to NIH grant programs, please contact the Scientific/Research Contact that is identified in Section VII under Agency Contacts of this FOA.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. HHS provides guidance to recipients of FFA on meeting their legal obligation to take reasonable steps to provide meaningful access to

APHA App. 885

their programs by persons with limited English proficiency. Please see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html (https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html) and https://www.lep.gov (https://www.lep.gov). For further guidance on providing culturally and linguistically appropriate services, recipients should review the National Standards for Culturally and Linguistically Appropriate Services in Health and Health Care at https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=2&lvlid=53 (https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=2&lvlid=53).

- Recipients of FFA also have specific legal obligations for serving qualified individuals with disabilities. Please see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html (https://www.hhs.gov/ocr/civilrights/understanding/disability/index.html).

- HHS funded health and education programs must be administered in an environment free of sexual harassment. Please see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html (https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html); https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html; and https://www.eeoc.gov/eeoc/publications/upload/fs-sex.pdf (https://www.eeoc.gov/eeoc/publications/upload/fs-sex.pdf). For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm (https://grants.nih.gov/grants/policy/harassment.htm).

- Recipients of FFA must also administer their programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws. Collectively, these laws prohibit exclusion, adverse treatment, coercion, or other discrimination against persons or entities on the basis of their consciences, religious beliefs, or moral convictions. Please see https://www.hhs.gov/conscience/conscience-protections/index.html (https://www.hhs.gov/conscience/conscience-protections/index.html) and https://www.hhs.gov/conscience/religious-freedom/index.html (https://www.hhs.gov/conscience/religious-freedom/index.html).

Please contact the HHS Office for Civil Rights for more information about obligations and prohibitions under federal civil rights laws at https://www.hhs.gov/ocr/about-us/contact-us/index.html (https://www.hhs.gov/ocr/about-us/contact-us/index.html) or call 1-800-368-1019 or TDD 1-800-537-7697.

In accordance with the statutory provisions contained in Section 872 of the *Duncan Hunter National Defense Authorization Act of Fiscal Year 2009* (Public Law 110-417), NIH awards will be subject to the Federal Awardee Performance and Integrity Information System (FAPIIS) requirements. FAPIIS requires Federal award making officials to review and consider information about an applicant in the designated integrity and performance system (currently FAPIIS) prior to making an award. An applicant, at its option, may review information in the designated integrity and performance systems accessible through FAPIIS and comment on any information about itself that a Federal agency previously entered and is currently in FAPIIS. The Federal awarding agency will consider any comments by the applicant, in addition to other information in FAPIIS, in making a judgement about the applicant's integrity, business ethics, and record of performance under Federal awards when completing the review of risk posed by applicants as described in 45 CFR Part 75.205 Federal awarding agency review of risk posed by applicants. This provision will apply to all NIH grants and cooperative agreements except fellowships.

## Transition to the Independent Phase

Transition from the mentored phase to the independent phase is intended to be continuous in time and, except in unusual, extenuating circumstances, the awarding NIH Institute/Center will not extend the K99 phase beyond the 2-year limit. ICs may, at their discretion, make exceptions to this time limitation when individuals have been invited for faculty job interviews but final decisions have not yet been made by the potential R00 institution or, rarely, because of unusual, extenuating circumstances. To activate the independent phase of the grant, individuals must have been offered and accepted a tenure-track, full-time assistant professor position (or equivalent) by the end of the K99 project period.

An eligible R00 institution will have appropriate infrastructure to support the proposed research program and a history of external research funding. Applicants are free to apply for independent research positions within the NIH intramural research program (IRP). However, should the individual accept such a position in the IRP, the independent phase of the award will not be activated. This is because NIH intramural scientists are supported directly by NIH intramural funds and are not eligible for NIH extramural grant awards. Eligibility of for-profit organizations for the R00 phase depends on the nature of the appointment, and the ability of the PD/PI to conduct independent research and apply for NIH R01 or R01-equivalent research grants. PIs are encouraged to discuss job offers at for-profit organizations with NIH Program staff well in advance of accepting such an offer.

To avoid potential problems in activating the independent phase, applicants are strongly encouraged to contact their NIH program official as soon as plans to apply for and, assume an independent position develop, and not later than 6 months prior to the termination of the K99 phase of the award.

APHA App. 886

Case: 25-1611    Document: 00118310433    Page: 339    Date Filed: 07/08/2025    Entry ID: 6734280

4/17/25, 10:46 PM    Case 1:25-cv-10787-BEM    Document 38-1    Filed 04/25/25    Page 340 of 67
Expiring PA-21-270 Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

At that time, individuals should discuss plans for transition to, and application for, the R00 phase with their NIH program official. The application for the R00 phase of the award should be submitted no later than 2 months prior to the proposed activation date of the R00 award by the R00 phase recipient organization.

The independent phase institution will submit an application on behalf of the candidate for the R00 award using the PHS 398 Application (//grants.nih.gov/grants/guide/url_redirect.php?id=22000). The R00 application must include:

- A new face page signed by the R00 phase institutional representative;
- A new project description page (the project summary or abstract should be updated to reflect current plans for the R00 phase);
- Detailed budget pages for a non-modular budget;
- Biographical sketches for the PD/PI and any other Key Personnel;
- A new Resources page;
- A brief description of progress made during the K99 phase that will serve as the Final Progress Report for the K99 phase;
- An updated research plan (the specific aims should be updated to reflect current plans for the R00 phase and the updated research plan should be briefly described in less than 5 pages);
- Updated Protections for Human Subjects and Inclusion of Women, Minorities and Individuals across the Lifespan (as appropriate);
- Authentication of Key Biological and/or Chemical Resources (as appropriate);
- Updated Vertebrate Animals (as appropriate);
- Updated Biohazards (as appropriate); and
- A new checklist.

These materials should be sent directly to the awarding Institute or Center (IC). The original application plus one copy (preferably in PDF format) are to be mailed (or e-mailed) to the Financial or Grants Management contact person of the awarding NIH Institute or Center listed in the Notice of Award. The R00 application will be evaluated by extramural Program staff of the awarding component for completeness and appropriateness to the program.

Two additional documents are included with the R00 application. A letter from the R00 Department or Division Chairman must be submitted that describes the R00 institution's commitment to the candidate and plans for his/her career development (see below). If not already provided, the final evaluation statement by the K99 phase mentor, must be provided.

In addition to space, facilities, resources, and other support needed to conduct the proposed research, the sponsoring institution must provide protected research time (minimum of 9 person-months or 75% of the candidate's full time professional effort) at least for the duration of the R00 award. The start-up package and other institutional support must be described in detail and must be comparable to that given to other faculty recently hired into tenure-track or equivalent faculty positions. Institutions must provide a startup and salary package equivalent to that provided to a newly hired faculty member who does not have a grant; R00 funds may not be used to offset the typical startup package or to offset the usual institutional commitment to provide salary for tenure-track (or equivalent) assistant professors who are hired without grant support. The R00 sponsoring institution must describe the candidate's academic appointment, bearing in mind that it must be tenure-track assistant professor (or equivalent), and confirm that the appointment is not contingent on the transfer of the award to the institution. The R00 phase institution must describe how the awardee's ability to apply for and secure independent research grant (e.g., R01, NIGMS R35 ESI MIRA, etc.) support will be fostered and supported during the R00 phase of the award. The R00 phase institution must describe its commitment to diversity, efforts taken to ensure research environments are inclusive, safe and supportive, and strategies it employs to promote the success of early-stage faculty.

The R00 award requires that a minimum of 9 person-months (75% of the candidate's full time professional effort) be devoted to research activities. Consequently, teaching, clinical duties and other non-research activities should be minimal during the R00 award period. NIH staff may review start-up packages and other commitments between the institution and candidate prior to activating the independent phase of the award. It is suggested that the applicant and/or the hiring institution discuss the institutional commitment with the relevant NIH institute Program Official prior to finalizing the offer. NIH will not activate the independent phase if the institutional commitment is deemed inadequate. Applicants who are approved to transition will receive a Notice of Award reflecting the new R00 grant mechanism, the dollar amount, and the new recipient organization (if applicable).

The K99/R00 award is intended to facilitate successful transition to independence. Consequently, a requirement for activation of the R00 phase is successful completion of this transition. Applicants are encouraged (but not required) to apply for independent positions at departments and institutions different from where they conducted their mentored research. It is important for all applicants, but especially so for applicants who intend to stay at the mentored phase institution for the independent phase, to provide a plan by which they will separate from their mentor and advance to independence. Awardees are also encouraged to

APHA App. 887

Case: 25-1611     Document: 00118310433     Page: 340     Date Filed: 07/08/2025     Entry ID: 6734280

4/17/25, 10:46 PM          Case 1:25-cv-10787-BEM     Document 38-1     Filed 04/25/25     Page 45 of 67
Expiring PAR-21-271. Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

include a plan and timeline for submitting an independent research grant application in a research area relevant to the mission of an NIH awarding component.

Candidates who are not approved to transition will receive written notification from the awarding component communicating the rationale for the disapproval. This notification typically will be sent within 60 days of receipt of the R00 application.

Although the financial plans of the NIH Institute or Center provide support for this program, awards pursuant to this funding opportunity are contingent upon the availability of funds.

### Termination of the K99 award phase

If transition from the K99 phase at an extramural institution to the R00 phase occurs at the originally scheduled end date of the K99 award, then no specific steps to terminate the K99 award are necessary. If the transition at an extramural institution occurs prior to the scheduled end date, then a revised Notice of Award will be issued to terminate the K99 phase award. Carry-over of unspent funds from a partially completed year in the K99 phase into the R00 phase may be permitted.

**Data Management and Sharing**

Note: The NIH Policy for Data Management and Sharing is effective for due dates on or after January 25, 2023.

Consistent with the NIH Policy for Data Management and Sharing, when data management and sharing is applicable to the award, recipients will be required to adhere to the Data Management and Sharing requirements as outlined in the NIH Grants Policy Statement (https://grants.nih.gov/grants/policy/nihgps/HTML5/section_8/8.2.3_sharing_research_resources.htm#Data). Upon the approval of a Data Management and Sharing Plan, it is required for recipients to implement the plan as described.

### 3. Reporting

When multiple years are involved, awardees will be required to submit the Research Performance Progress Report (RPPR) annually and financial statements as required in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120). The Supplemental Instructions for Individual Career Development (K) RPPRs must be followed. The Mentor's Report must include an annual evaluation statement of the candidate's progress.

A final RPPR, invention statement, and the expenditure data portion of the Federal Financial Report are required for closeout of an award, as described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11161).

The Federal Funding Accountability and Transparency Act of 2006 (Transparency Act), includes a requirement for awardees of Federal grants to report information about first-tier subawards and executive compensation under Federal assistance awards issued in FY2011 or later. All awardees of applicable NIH grants and cooperative agreements are required to report to the Federal Subaward Reporting System (FSRS) available at www.fsrs.gov (//grants.nih.gov/grants/guide/url_redirect.php?id=11170) on all subawards over $25,000. See the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11171) for additional information on this reporting requirement.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts from all Federal awarding agencies with a cumulative total value greater than $10,000,000 for any period of time during the period of performance of a Federal award, must report and maintain the currency of information reported in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently FAPIIS). This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available. Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75 Award Term and Conditions for Recipient Integrity and Performance Matters.

### 4. Evaluation

In carrying out its stewardship of human resource-related programs, the NIH may request information essential to an assessment of the effectiveness of this program from databases and from participants themselves. Participants may be contacted after the completion of this award for periodic updates on various aspects of their employment history, publications, support from research grants or contracts, honors and awards, professional activities, and other information helpful in evaluating the impact of the program.

APHA App. 888

Within ten years of making awards under this program, NIH will assess the program's overall outcomes, gauge its effectiveness in enhancing diversity, and consider whether there is a continuing need for the program. Upon the completion of this evaluation, NIH will determine whether to (a) continue the program as currently configured, (b) continue the program with modifications, or (c) discontinue the program.

The overall evaluation of the program will be based on metrics that will include, but are not limited to, the following:

- Aggregate number and demographic characteristics of applicants and awardees
- Successful transition of awardees to an independent tenure-track or equivalent faculty position
- Authorship of scientific publications during both mentored and independent career phases
- Subsequent independent research grant support from NIH or another source
- Subsequent participation in activities to enhance biomedical workforce diversity

# Section VII. Agency Contacts

We encourage inquiries concerning this funding opportunity and welcome the opportunity to answer questions from potential applicants.

Because of the difference in individual Institute and Center (IC) program requirements for this FOA, prospective applications **MUST** consult the **Table of IC-Specific Information, Requirements, and Staff Contacts (https://www.nigms.nih.gov/training/careerdev/mosaic/Pages/MOSAIC-K99-Independent-Clinical-Trial-Not-Allowed-PAR-21.aspx)** to make sure that their application is responsive to the requirements of one of the participating NIH ICs. Prior consultation with NIH staff is strongly encouraged.

## Application Submission Contacts

eRA Service Desk (Questions regarding ASSIST, eRA Commons, application errors and warnings, documenting system problems that threaten on-time submission, and post-submission issues)

Finding Help Online: http://grants.nih.gov/support/ (//grants.nih.gov/support/) (preferred method of contact)
Telephone: 301-402-7469 or 866-504-9552 (Toll Free)

General Grants Information (Questions regarding application processes and NIH grant resources)
Email: GrantsInfo@nih.gov (mailto:GrantsInfo@nih.gov) (preferred method of contact)
Telephone: 301-480-7075

Grants.gov Customer Support (Questions regarding Grants.gov registration and Workspace)
Contact Center Telephone: 800-518-4726
Email: support@grants.gov (mailto:support@grants.gov)

## Scientific/Research Contact(s)

Kenneth D. Gibbs, Jr., Ph.D., MPH
National Institute of General Medical Sciences (NIGMS)
Email: kenneth.gibbs@nih.gov (mailto:kenneth.gibbs@nih.gov)

Kalynda Gonzales Stokes, Ph.D.
National Institute of General Medical Sciences (NIGMS)
Email: kalynda.stokes@nih.gov (mailto:kalynda.stokes@nih.gov)

Lanay M. Mudd, Ph.D., FACSM
National Center for Complementary and Integrative Health (NCCIH)
Phone: 301-594-9346
Email: lanay.mudd@nih.gov (mailto:lanay.mudd@nih.gov)

Neeraj Agarwal, Ph.D.
National Eye Institute (NEI)
Phone: 301-451-2020
Email: agarwalnee@nei.nih.gov (mailto:agarwalnee@nei.nih.gov)

Heather Colley, M.S.
National Human Genome Research Institute (NHGRI)
Phone: 301-480-2332
Email: junkinsh@mail.nih.gov (mailto:junkinsh@mail.nih.gov)

APHA App. 889

Case: 25-1611   Document: 00118310433   Page: 342   Date Filed: 07/08/2025   Entry ID: 6734280

4/17/25, 10:46 PM          Case 1:25-cv-10787-BEM   Document 38-1   Filed 04/25/25   Page 47 of 67
                    Expiring PAR-21-271: Maximizing Opportunities for Scientific and Academic Independent Careers (K99/R00 Postdoctoral Career …

Wayne C. Wang, Ph.D.

National Heart, Lung, and Blood Institute (NHLBI)

Phone: 301-435-0535

Email: Wayne.wang2@nih.gov (mailto:Wayne.wang2@nih.gov )

Maria Carranza, Ph.D.

National Institute on Aging (NIA)

Email: NIAtraining@mail.nih.gov (mailto:NIAtraining@mail.nih.gov)

Jenica Patterson, Ph.D.

National Institute On Alcohol Abuse And Alcoholism (NIAAA)

Phone: 301-827-6166

Email: jenica.patterson@nih.gov (mailto:jenica.patterson@nih.gov)

Diane S. Adger-Johnson, MPH

National Institute of Allergy and Infectious Diseases (NIAID)

Telephone: 301-594-5945

Email: AITrainingHelpDesk@niaid.nih.gov (mailto:AITrainingHelpDesk@niaid.nih.gov)

Kristy Nicks, Ph.D.

National Institute Of Arthritis And Musculoskeletal And Skin Diseases (NIAMS)

Phone: 301-594-5055

Email: kristy.nicks@nih.gov (mailto: kristy.nicks@nih.gov)

Tina Gatlin, Ph.D

National Institute of Biomedical Imaging And Bioengineering (NIBIB)

Phone: 301-480-1608

Email: gatlincl@nih.gov (mailto:gatlincl@nih.gov)

Albert Avila, Ph.D.

National Institute On Drug Abuse (NIDA)

Phone: 301-496-8804

Email: aavila@nida.nih.gov (mailto:aavila@nida.nih.gov)

Alberto L Rivera-Rentas, Ph.D.

National Institute On Deafness And Other Communication Disorders (NIDCD)

Phone: 301-496-1804

Email: alberto.rivera-rentas@nih.gov (mailto:alberto.rivera-rentas@nih.gov)

Anissa J. Brown, PhD

National Institute Of Dental & Craniofacial Research (NIDCR)

Phone: 301-594-4805

Email: anissa.brown@nih.gov (mailto:anissa.brown@nih.gov)

Rob Rivers, Ph.D.

National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)

Phone: 301-443-8415

Email: robert.rivers@nih.gov (mailto:robert.rivers@nih.gov)

Carol A Shreffler, Ph.D.

National Institute of Environmental Health Sciences (NIEHS)

Phone: 984-287-3322

Email: shreffl1@niehs.nih.gov (mailto:shreffl1@niehs.nih.gov)

James Churchill, Ph.D.

National Institute of Mental Health (NIMH (http://www.nimh.nih.gov/))

Phone: 301-443-3621

Email: James.Churchill@nih.gov (mailto:James.Churchill@nih.gov)

Michelle Jones-London, Ph.D.

National Institute of Neurological Disorders and Stroke (NINDS)

Phone: 301-451-7966

Email: jonesmiche@ninds.nih.gov (mailto:jonesmiche@ninds.nih.gov)

APHA App. 890

David Banks, Ph.D., MPH, MSSW, RN
National Institute of Nursing Research (NINR)
Phone: 301-496-9558
Email: david.banks@nih.gov (mailto:david.banks@nih.gov)

Richard C. Palmer, DrPH, JD
National Library Of Medicine (NLM)
Phone: 301-496-4254
Email: richard.palmer@.nih.gov (mailto:simh@mail.nih.gov)

Xenia Tigno, Ph.D.
Office Of Research On Women's Health (ORWH)
Phone: 301-435-0202
Email: tignoxt@mail.nih.gov (mailto:tignoxt@mail.nih.gov)

Regine Douthard, M.D., M.P.H.
Office Of Research On Women's Health (ORWH)
Phone: 301-594-3283
Email: douthardr@mail.nih.gov (mailto:douthardr@mail.nih.gov)

Dennis A. Twombly, Ph.D.
Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD)
Phone: 301-451-3371
Email: dtwombly@mail.nih.gov (mailto:dtwombly@mail.nih.gov)

Dorothy M. Castille, PhD
National Institute on Minority Health and Health Disparities (NIMHD)
Phone: 301-594-9411
Email: NIMHDtraining@nih.gov (mailto:NIMHDtraining@nih.gov)

**Peer Review Contact(s)**

National Institute of General Medical Sciences (NIGMS)
Email: NIGMSReview@mail.nih.gov (mailto:NIGMSReview@mail.nih.gov)

Rudy O. Pozzatti
National Human Genome Research Institute (NHGRI)
Phone: 301-402-0838
Email:pozzattr@exchange.nih.gov (mailto:pozzattr@exchange.nih.gov)

John F. Connaughton, Ph.D.
National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)
Phone: 301-594-7797
Email:connaughtonj@extra.niddk.nih.gov (mailto:connaughtonj@extra.niddk.nih.gov)

Yujing Liu, Ph.D.
National Institute on Minority Health and Health Disparities (NIMHD)
Phone: 301-827-0493
Email: liuyujin@mail.nih.gov (http://<a href=)/

Ernest Lyons, Ph.D.
National Institute of Neurological Disorders and Stroke (NINDS)
Phone: 301-496-9223
Email: LyonsE@ninds.nih.gov (mailto:LyonsE@ninds.nih.gov)

Weiqun Li, M.D.
National Institute of Nursing Research (NINR)
Phone: 301-594-5966
Email: wli@mail.nih.gov (mailto:wli@mail.nih.gov)

Zoe E Huang, M.D.
National Library Of Medicine (NLM)
Phone: 301-594-4937
Email: huangz@mail.nih.gov (mailto:huangz@mail.nih.gov)

Mario Cerritelli, Ph.D.
National Institute of Allergy and Infectious Diseases (NIAID)
Telephone: 240-669-5199
Email: cerritem@mail.nih.gov (mailto:cerritem@mail.nih.gov (mailto:cerritem@mail.nih.gov)

**Financial/Grants Management Contact(s)**

Justin Rosenzweig
National Institute of General Medical Sciences (NIGMS)
Email: rosenzwj@nigms.nih.gov (mailto:rosenzwj@nigms.nih.gov)

Shelley Headley
National Center for Complementary and Integrative Health (NCCIH)
Phone: 301-594-3788
Email: shelley.headley@nih.gov (mailto:shelley.headley@nih.gov)

Karen Robinsonsmith
National Eye Institute (NEI)
Phone: 301-451-2020
Email: kyr@nei.nih.gov (mailto:kyr@nei.nih.gov)

Devon R Bumbrayquarles
National Human Genome Research Institute (NHGRI)
Phone: 301-451-7928
Email: db400w@nih.gov (mailto:db400w@nih.gov)

Shaheed Michael Ziyout
National Heart, Lung, And Blood Institute (NHLBI)
Phone: 301-827-8152
Email: shaheed.ziyout@nih.gov (mailto:shaheed.ziyout@nih.gov)

Jessi Perez
National Institute on Aging (NIA)
Phone: 301-403-7739
Email: jessi.perez@nih.gov (mailto:jessi.perez@nih.gov)

Lauren Early
National Institute On Alcohol Abuse And Alcoholism (NIAAA)
Phone: 301-443-2434
Email: earlyle@mail.nih.gov (mailto:earlyle@mail.nih.gov)

Kalaya M. Goffigan
Nation Institute of Allergy and Infectious Diseases (NIAID)
Phone: 301-761-7159
Email: kalaya.goffigan@nih.gov (mailto:kalaya.goffigan@nih.gov)

Leslie Littlejohn
National Institute Of Arthritis And Musculoskeletal And Skin Diseases (NIAMS)
Phone: 301-594-2545
Email: littlele@mail.nih.gov (mailto:littlele@mail.nih.gov)

Pamela G. Fleming
National Institute On Drug Abuse (NIDA)
Phone: 301-480-1159
Email: pfleming@mail.nih.gov (mailto:pfleming@mail.nih.gov)

Samantha Tempchin
National Institute on Deafness and Other Communication Disorders (NIDCD)
Telephone: 301-435-1404
Email: samantha.tempchin@nih.gov (mailto:samantha.tempchin@nih.gov)

Diana Rutberg, MBA
National Institute Of Dental & Craniofacial Research (NIDCR)

Phone: 301-594-4798
Email: rutbergd@mail.nih.gov (mailto:rutbergd@mail.nih.gov)

Aricia M. Ajose, MPA
National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK)
Phone: 301-594-9023
Email: ajosea@mail.nih.gov (mailto:ajosea@mail.nih.gov)

Jenny L. Greer
National Institute of Environmental Health Sciences (NIEHS)
Phone: 984.287.3332
Email: jenny.greer@nih.gov (mailto:jenny.greer@nih.gov)

Terri Jarosik
National Institute of Mental Health (NIMH (http://www.nimh.nih.gov/))
Phone: 301-443-3858
Email: tjarosik@mail.nih.gov (mailto:tjarosik@mail.nih.gov)

Priscilla Grant
National Institute on Minority Health and Health Disparities (NIMHD)
Phone: 301-594-8412
Email: pg38h@nih.gov (mailto:pg38h@nih.gov)

Chief Grants Management Officer
National Institute of Neurological Disorders and Stroke (NINDS)
Email: ChiefGrantsManagementOfficer@ninds.nih.gov (mailto:ChiefGrantsManagementOfficer@ninds.nih.gov)

Ron Wertz
National Institute of Nursing Research (NINR)
Phone: 301-594-2807
Email: wertzr@mail.nih.gov (mailto:wertzr@mail.nih.gov)

Andrea Culhane
National Library of Medicine (NLM)
Phone: 301-402-0069
E-mail: andrea.culhane@nih.gov (mailto:andrea.culhane@nih.gov)

# Section VIII. Other Information

Recently issued trans-NIH policy notices (///grants.nih.gov/grants/guide/url_redirect.php?id=11163) may affect your application submission. A full list of policy notices published by NIH is provided in the NIH Guide for Grants and Contracts (//grants.nih.gov/grants/guide/url_redirect.php?id=11164). All awards are subject to the terms and conditions, cost principles, and other considerations described in the NIH Grants Policy Statement (//grants.nih.gov/grants/guide/url_redirect.php?id=11120).

Please note that the NIH Loan Repayment Programs (LRPs) are a set of programs to attract and retain promising early-stage investigators in research careers by helping them to repay their student loans. Recipients of career development awards are encouraged to consider applying for an extramural LRP award.

## Authority and Regulations

Awards are made under the authorization of Sections 301 and 405 of the Public Health Service Act as amended (42 USC 241 and 284) and under Federal Regulations 42 CFR Part 52 and 45 CFR Part 75.

Weekly TOC for this Announcement (/grants/guide/WeeklyIndex.cfm?08-20-21)
NIH Funding Opportunities and Notices (/grants/guide/index.html)



 (https://www.hhs.gov/)  Department of Health
and Human Services (HHS)

  (https://www.usa.gov/)

NIH... Turning Discovery Into Health®

APHA App. 894

# EXHIBIT C

APHA App. 895

Case: 25-1611    Document: 00118310433    Page: 348    Date Filed: 07/08/2025    Entry ID: 6734280

4/22/25, 9:13 PM    Case 1:25-cv-10787-BEM    Document 38-41 bConnected Mail - K99/R00 Grant Extension Question    Filed 04/25/25    Page 53 of 67



Amanda Danielle Perez <adpc@berkeley.edu>

---

## K99/R00 Grant Extension Question

**Linares, Deborah (NIH/NIMHD) [E]** <deborah.linares@nih.gov>    Fri, Sep 1, 2023 at 6:11 AM
To: Amanda Danielle Perez <adpc@berkeley.edu>
Cc: Jessica M Luevano <jessicaluevano@berkeley.edu>

Hi Amanda,

Thanks for your email. Grantees can extend the final budget period once up to 12 months themselves without NIMHD's approval. You can do this online in the last 90 days before your K99 grant period ends.

Best,

Debbie

[Quoted text hidden]

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

# EXHIBIT D

APHA App. 897



‹ Back to Search Results

📋 Description

📄 Details                    ›

🔀 Sub-Projects

📖 Publications

💡 Patents

📁 Outcomes

🔬 Clinical Studies

📰 News and More

🕘 History

🔀 Similar Projects

# Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity

**Project Number**
5K99MD018629-02

**Contact PI/Project Leader**
PEREZ, AMANDA DANIELLE

**Awardee Organization**
UNIVERSITY OF CALIFORNIA BERKELEY

📋 ## Description

### Abstract Text

PROJECT SUMMARY/ABSTRACT Despite the well-known Latina birth paradox, recent data (2020) show that Latina mothers are 1.2-1.5 times more likely to have low birth weight infants compared to White mothers. Additionally, compared to White women, annual national vital statistics data from 1989 through 2020 show consistently higher rates of worse birth outcomes among Latinas. The longstanding focus on the Latina birth paradox has left a gap in the literature, resulting in a critical need for research on birth outcome disparities faced by Latinas, and the mechanisms driving those disparities. We propose two novel mechanisms as contributors to poor birth outcomes for Latinas: anticipatory racism threat and area-level racial bias. A strong body of evidence has demonstrated links between chronic social stress and poor birth outcomes. Racial discrimination, a chronic psychosocial stressor, is a prominent explanation for racial/ethnic disparities in birth outcomes. However, evidence is limited by the predominant focus on racism events and racism experiences at the individual-level. We previously developed and validated a measure of anticipatory racism threat (aRT) for African American women and found associations with hypertension, allostatic load and telomere length. These preliminary studies suggest that anticipating racism, above and beyond actual racism events, is related to biological dysregulation, including dysregulation of systems that have previously been

APHA App. 898

# Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity

**Project Number**
5K99MD018629-02

**Contact PI/Project Leader**
PEREZ, AMANDA DANIELLE

**Awardee Organization**
UNIVERSITY OF CALIFORNIA BERKELEY

- Description
- Details  >
- Sub-Projects
- Publications
- Patents
- Outcomes
- Clinical Studies
- News and More
- History
- Similar Projects

research is re-focusing attention on poor birth outcomes among Latinas, a long-standing disparity but largely neglected area of investigation; helping to elucidate some of the predictors and underlying mechanisms driving those disparities; and ultimately informing the types of interventions likely to ameliorate those disparities. These data will also provide preliminary data for a subsequent R01 application. Our central hypothesis is that higher anticipatory racism threat and more negative area-level racial bias toward Latines will predict worse birth outcomes (i.e., low birth weight and pre-term birth) for Latina mothers.

## Public Health Relevance Statement

PROJECT NARRATIVE The mechanisms driving poor birth outcomes for Latina mothers are understudied and not fully understood. This application will examine anticipatory racism stress and area-level racism as two proposed novel mechanisms predicting low birthweight and preterm birth among this group.

## NIH Spending Category

No NIH Spending Category available.

## Project Terms

APHA App. 899

# Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity

**Project Number**
5K99MD018629-02

**Contact PI/Project Leader**
PEREZ, AMANDA DANIELLE

**Awardee Organization**
UNIVERSITY OF CALIFORNIA BERKELEY

| | | | | | |
|---|---|---|---|---|---|
| Investigation | Latina | Latina Population | Latinx | Left | Length |
| Link | Literature | Low Birth Weight Infant | Maternal Health | | Measures |
| Read More | | | | | |

📄 **Details**

**Contact PI/ Project Leader**

Name
**PEREZ, AMANDA DANIELLE**🔗

Title

Contact

View Email

**Other PIs**

Not Applicable

**Program Official**

Name
**LINARES, DEBORAH ELIZABETH**

Contact

View Email

**Organization**

APHA App. 900

# Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity

**Project Number**
5K99MD018629-02

**Contact PI/Project Leader**
PEREZ, AMANDA DANIELLE

**Awardee Organization**
UNIVERSITY OF CALIFORNIA BERKELEY

## Other Information

| | | | |
|---|---|---|---|
| **Opportunity Number** PAR-21-271 | **Administering Institutes or Centers** National Institute on Minority Health and Health Disparities | **Project Start Date** | 02-August-2023 |
| **Study Section** ZMD1-DRI(M1)1 | | **Project End Date** | 30-April-2025 |
| **Fiscal Year** 2024 | **Award Notice Date** 26-June-2024 | **CFDA Code** 307 | **Budget Start Date** | 01-March-2024 |
| | | **DUNS Number** 124726725 **UEI** GS3YEVSS12 | **Budget End Date** | 30-April-2025 |

## Project Funding Information for 2024

**Total Funding**
$135,943

**Direct Costs**
$125,873

**Indirect Costs**
$10,070

| Year | Funding IC | |
|---|---|---|
| 2024 | National Institute on Minority Health and Health Disparities | $135,943 |

APHA App. 901

# Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity

**Project Number**
5K99MD018629-02

**Contact PI/Project Leader**
PEREZ, AMANDA DANIELLE

**Awardee Organization**
UNIVERSITY OF CALIFORNIA BERKELEY

No Publications available for 5K99MD018629-02

## 💡 Patents

No Patents information available for 5K99MD018629-02

## 📈 Outcomes

The Project Outcomes shown here are displayed verbatim as submitted by the Principal Investigator (PI) for this award. Any opinions, findings, and conclusions or recommendations expressed are those of the PI and do not necessarily reflect the views of the National Institutes of Health. NIH has not endorsed the content below.

No Outcomes available for 5K99MD018629-02

APHA App. 902

# Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity

**Project Number**
5K99MD018629-02

**Contact PI/Project Leader**
PEREZ, AMANDA DANIELLE

**Awardee Organization**
UNIVERSITY OF CALIFORNIA BERKELEY

**Related News Releases**

No news release information available for 5K99MD018629-02

## History

No Historical information available for 5K99MD018629-02

## Similar Projects

No Similar Projects information available for 5K99MD018629-02

- Description
- Details
- Sub-Projects
- Publications
- Patents
- Outcomes
- Clinical Studies
- News and More
- History
- Similar Projects

APHA App. 903

# EXHIBIT E



🇺🇸 An official website of the United States government   Here's how you know

GRANTS.GOV℠

MENU

# VIEW GRANT OPPORTUNITY

PAR-24-225

Maximizing Opportunities for Scientific and Academic Independent
Careers (MOSAIC) Postdoctoral Career Transition Award to Promote
Diversity (K99/R00 Independent Clinical Trial Not Allowed)

Department of Health and Human Services

National Institutes of Health

Apply

Subscribe

SYNOPSIS     VERSION HISTORY     RELATED DOCUMENTS     PACKAGE

## General Information



| | | | |
|---|---|---|---|
| **Document Type:** | Grants Notice | **Version:** | Synopsis 5 |
| **Funding Opportunity Number:** | PAR-24-225 | **Posted Date:** | Jul 23, 2024 |
| | | **Last Updated Date:** | Feb 21, 2025 |
| **Funding Opportunity Title:** | Maximizing Opportunities for Scientific and Academic Independent Careers (MOSAIC) Postdoctoral Career Transition Award to Promote Diversity (K99/R00 Independent Clinical Trial Not Allowed) | **Original Closing Date for Applications:** | Sep 07, 2027 |
| | | **Current Closing Date for Applications:** | Feb 21, 2025 |
| | | **Archive Date:** | Feb 22, 2025 |
| **Opportunity Category:** | Discretionary | **Estimated Total Program Funding:** | |
| **Opportunity Category Explanation:** | | **Award Ceiling:** | $ |
| | | **Award Floor:** | $ |

APHA App. 905

| | |
|---|---|
| **Funding Instrument Type:** | Grant |
| **Category of Funding Activity:** | Education<br>Environment<br>Food and Nutrition<br>Health<br>Income Security and Social Services |
| **Category Explanation:** | |
| **Expected Number of Awards:** | |
| **Assistance Listings:** | 93.113 -- Environmental Health<br>93.121 -- Oral Diseases and Disorders Research<br>93.172 -- Human Genome Research<br>93.173 -- Research Related to Deafness and Communication Disorders<br>93.213 -- Research and Training in Complementary and Integrative Health<br>93.233 -- National Center on Sleep Disorders Research<br>93.242 -- Mental Health Research Grants<br>93.273 -- Alcohol Research Programs<br>93.279 -- Drug Abuse and Addiction Research Programs |

APHA App. 906

93.286 -- Discovery and Applied Research for Technological Innovations to Improve Human Health

93.307 -- Minority Health and Health Disparities Research

93.313 -- NIH Office of Research on Women's Health

93.361 -- Nursing Research

93.837 -- Cardiovascular Diseases Research

93.838 -- Lung Diseases Research

93.839 -- Blood Diseases and Resources Research

93.840 -- Translation and Implementation Science Research for Heart, Lung, Blood Diseases, and Sleep Disorders

93.846 -- Arthritis, Musculoskeletal and Skin Diseases Research

93.847 -- Diabetes, Digestive, and Kidney Diseases Extramural Research

93.853 -- Extramural Research Programs in the Neurosciences and Neurological Disorders

93.855 -- Allergy and Infectious Diseases Research

93.859 -- Biomedical Research and Research

Training
93.865 -- Child Health and
Human Development
Extramural Research
93.866 -- Aging Research
93.867 -- Vision Research
93.879 -- Medical Library
Assistance

**Cost Sharing or**          No
**Matching**
**Requirement:**

# Eligibility

**Eligible**          County governments
**Applicants:**
Nonprofits having a 501(c)(3) status with the IRS, other than institutions of
higher education
Independent school districts
Others (see text field entitled "Additional Information on Eligibility" for
clarification)
Public and State controlled institutions of higher education
Public housing authorities/Indian housing authorities
Small businesses
Native American tribal governments (Federally recognized)
City or township governments
For profit organizations other than small businesses
Private institutions of higher education
State governments
Special district governments
Native American tribal organizations (other than Federally recognized tribal
governments)
Nonprofits that do not have a 501(c)(3) status with the IRS, other than
institutions of higher education

**Additional**          Other Eligible Applicants include the following: Alaska Native and Native
**Information on**    Hawaiian Serving Institutions; Asian American Native American Pacific
**Eligibility:**          Islander Serving Institutions (AANAPISISs); Eligible Agencies of the Federal

APHA App. 908

Government; Faith-based or Community-based Organizations; Hispanic-serving Institutions; Historically Black Colleges and Universities (HBCUs); Indian/Native American Tribal Governments (Other than Federally Recognized); Non-domestic (non-U.S.) Entities (Foreign Organizations); Regional Organizations; Tribally Controlled Colleges and Universities (TCCUs) ; U.S. Territory or Possession; Non-domestic (non-U.S.) Entities (Foreign Organizations) are not eligible to apply.Non-domestic (non-U.S.) components of U.S. Organizations are not eligible to apply.Foreign components, as defined in the NIH Grants Policy Statement, are allowed.

# Additional Information

**Agency Name:** National Institutes of Health

**Description:** The purpose of the MOSAIC Postdoctoral Career Transition Award to Promote Diversity (K99/R00) program is to support a cohort of early career, independent investigators from diverse backgrounds conducting research in NIH mission areas. The long-term goal of this program is to enhance diversity in the basic biomedical sciences research workforce. The MOSAIC K99/R00 program is designed to facilitate a timely transition of outstanding postdoctoral researchers from diverse backgrounds (e.g., see NIHs Interest in Diversity) from their mentored, postdoctoral research positions to independent, tenure-track or equivalent faculty positions at research-intensive institutions. The MOSAIC K99/R00 program will provide independent NIH research support during this transition to help awardees launch competitive, independent research careers. Additionally, MOSAIC K99/R00 scholars will be part of organized scientific cohorts that will be expected to participate in mentoring, networking, and professional development activities coordinated by MOSAIC Institutionally-Focused Research Education Award to Promote Diversity (UE5) grantees.

**Link to Additional Information:** https://grants.nih.gov/grants/guide/pa-files/PAR-24-225.html

**Grantor Contact Information:** If you have difficulty accessing the full announcement electronically, please contact:
NIH Grants Information
grantsinfo@nih.gov

APHA App. 909

See Section VII. Agency Contacts within the full opportunity announcement for all other inquires.

Return to top

| Connect with Us | Health & Human Services | Community | Additional Help |
|---|---|---|---|
| Blog | HHS.gov | USA.gov | Chat now with Grant |
| Twitter | EEOC / No Fear Act | WhiteHouse.gov | Frequently Asked Questions |
| YouTube | Accessibility | USAspending.gov | |
| Alerts | Privacy | SBA.gov | |
| RSS | Vulnerability Disclosure Policy | SAM.gov | |
| XML Extract | Disclaimers | Report Fraud | |
| Get Adobe Reader | Site Map | | |



  

APHA App. 910

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN PUBLIC HEALTH
ASSOCIATION; IBIS REPRODUCTIVE
HEALTH; INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS (UAW); BRITTANY
CHARLTON; KATIE EDWARDS; PETER
LURIE; and NICOLE MAPHIS,

               *Plaintiffs*,

      v.

NATIONAL INSTITUTES OF HEALTH;
JAY BHATTACHARYA, *in his official
capacity as Director of the National Institutes
of Health*; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and ROBERT F.
KENNEDY, JR*., in his official capacity as
Secretary of the United States Department of
Health and Human Services*,

               *Defendants*.

Case No. 1:25-cv-10787-BEM

Leave to File Excess Pages Granted
April 14, 2025 (ECF No. 29)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

i

APHA App. 911

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 2

   I.   Funding Structure of NIH ....................................................................................... 2

      A.  Statutes, Regulations, Policies, and Strategic Plans Govern Funding Priorities.............. 2

      B.  Funding Process for NIH and ICs ..................................................................... 4

         1.   Project-based Grants and Pipeline Grants ................................................. 4

         2.   Grant Application and Review Process ...................................................... 4

         3.   Termination Processes Prior to the Current Purge ..................................... 5

   II.   Defendants' Directives and Funding Purge ........................................................... 5

      A.  Defendants Issue Ideological Directives that Forbid Certain Research Topics .............. 5

      B.  Defendants Terminate Grants.......................................................................... 9

      C.  Defendants Delay and Suspend Grant-Awarding Processes........................... 10

   III.   The Directives and Terminations Cause Profound Harm ............................. 11

ARGUMENT .................................................................................................................. 12

   I.   Legal Standard ...................................................................................................... 12

   II.   Jurisdiction ............................................................................................................ 12

      A.  Plaintiffs Have Standing.................................................................................. 12

      B.  The Tucker Act Does Not Deprive This Court of Jurisdiction. ...................... 13

         1.   This Court Has Jurisdiction under the "Rights and Remedies" Test......................... 14

            a.   The Source of Plaintiffs' Rights Is Not a Contract. ................................. 14

            b.   Plaintiffs Seek Relief That Can Only Be Provided by the Court—the CFC Cannot Provide Adequate Relief. ....................................................................... 15

         2.   The Supreme Court's *Per Curiam* Order in *Department of Education v. California* Does Not Affect This Court's Jurisdiction. ......................................................... 17

   III.   Plaintiffs Have Established a Likelihood of Success on the Merits.............................. 17

      A.  Defendants' Directives and Terminations of NIH Grants Violate Separation of Powers Principles [Count VII]. ................................................................................ 17

      B.  Plaintiffs Are Likely to Succeed on Their APA Claims. ............................... 21

         1.   The Directives and Terminations Constitute Final Agency Actions. ......................... 21

         2.   Defendants' Directives and Terminations Are Arbitrary and Capricious [Count I]. . 22

         3.   Defendants' Directives and Terminations Are Contrary to Law Because They Violate Congress's Mandates and the HHS Regulations. [Counts II and III]. ............................ 26

APHA App. 912

4.    Defendants' Directives and Terminations Are Contrary to Constitutional Right [Count IV]............................................................................................................... 29

C.    The Directives and Terminations Are Unconstitutionally Vague [Count VI]. .............. 29

D.    Defendants Are Violating Plaintiffs' Rights under the APA and Constitution by Suspending or Delaying the Grant Application Process [All Counts]. .................................. 31

IV.    Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction...................... 33

V.    The Public Interest and the Balance of Equities Strongly Favor Entry of a Preliminary Injunction. .................................................................................................................. 37

CONCLUSION................................................................................................................. 39

APHA App. 913

## TABLE OF AUTHORITIES

**Cases**

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) .................................................................................. 35

*In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ................................................. 18

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon,* No. 1:25-CV-00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025) ......................................................................................... 16

*Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58 (1st Cir. 1978) .................................. 14

*Ark Initiative v. Tidwell*, 816 F.3d 119 (D.C. Cir. 2016) ............................................. 24

*Ashtari v. Pompeo*, 496 F. Supp. 3d 462 (D.D.C. 2020) .............................................. 33

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................... 21, 22

*Biden v. Texas*, 597 U.S. 785 (2022) ........................................................................... 21

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224 (D. Mass. 2021) ............................................................................................................. 29

*Bowen v. Massachusetts,* 487 U.S. 879 (1988) ................................................. 13, 14, 16

*Chi. Women in Trades v. Trump*, No. 25-C-2005, 2025 WL 1114466, (N.D. Ill. Apr. 14, 2025) 17

*Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC) 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ................................................................................................................... 17

*Clinton v. City of New York*, 524 U.S. 417 (1998) ....................................................... 18

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ............................................. 13, 22, 23

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) .................................................... 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................ 25

*Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785 (2001) .................................. 15

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................... 24, 29, 31

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................. 26

*Fed'l Commc'ns Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........... 29

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .... 13

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.*, 490 F.3d 940 (Fed. Cir. 2007) .................................................................................................................. 16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...................................................... 29

*Greater Bos. Legal Servs. v. United States Dep't of Homeland Sec.*, No. 21-CV-10083-DJC, 2023 WL 2540892 (D. Mass. Mar. 16, 2023) ............................................................. 21

*Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1 (D.D.C. 2008) .......... 32

*Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983) ................................ 18

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) ......................................................... 16

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............... 35, 38

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .......................................................................... 22

*Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ............................................................................................................. 17

APHA App. 914

*Marasco & Nesselbush, LLP v. Collins*, 6 F. 4th 150 (1st Cir. 2021) .......................................... 25

*Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025)............................................................................................................................ passim

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) .......................................................... 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................................................................... 23

*New York v. Trump,* 133 F.4th 51 (1st Cir. 2025) ..................................................................... 22

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................................... 12

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .............................................................. 32

*Papachristou v. Jacksonville*, 405 U.S. 156 (1972)............................................................... 29, 30

*Pineda v. Skinner Servs., Inc.*, 22 F.4th 47 (1st Cir. 2021) ......................................................... 38

*Pol'y & Rsch., LLC v. United States Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018)................................................................................................... 26, 27, 29

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005)................................ 37

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ............................................................... 38

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ............................ 37

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984).................................... 33

*Town of Wellesley v. FERC*, 829 F.2d 275 (1st Cir. 1987)......................................................... 33

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .................................................................. 12

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339 (1st Cir. 2024) ........... 12

*Union of Concerned Scientists v. Wheeler*, 377 F. Supp. 3d 34 (D. Mass. 2019) ....................... 13

*Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020) ..................................... 13

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ...................................... 35

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26 (1st Cir. 2011)....... 33

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 33

*Woonasquatucket River Watershed Council v. United States Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025)............................. 15, 16, 17, 22

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................................ 18

**Statutes**

2 C.F.R. § 52 ......................................................................................................................... 32

28 U.S.C. § 1491 ................................................................................................................... 13

42 U.S.C § 288 ........................................................................................................ 3, 4, 15, 18

42 U.S.C. § 241 ................................................................................................................. 3, 15

42 U.S.C. § 282 ................................................................................................................. 3, 19

42 U.S.C. § 283 ................................................................................................................. 3, 19

42 U.S.C. § 284 ................................................................................................................... 3, 5

42 U.S.C. § 289 ..................................................................................................................... 32

5 U.S.C. § 555 ....................................................................................................................... 32

5 U.S.C. § 701 ....................................................................................................................... 22

5 U.S.C. § 702 ....................................................................................................................... 13

APHA App. 915

5 U.S.C. § 704 ....................................................................................................... 13, 16
5 U.S.C. § 706 ....................................................................................... 22, 26, 29, 32

**Other Authorities**
78 Fed. Reg. 78590 (Dec. 26, 2013) ................................................................... 28
79 Fed. Reg. 75871 (Dec. 19, 2014) ................................................................... 28
89 Fed. Reg. 80,055, 80,056 (Oct. 10, 2024) ..................................................... 28

**Regulations**
2 C.F.R. § 1 ............................................................................................................. 27
2 C.F.R. § 200 ................................................................................................ passim
2 C.F.R. § 200.340 ................................................................................................. 27
45 C.F.R. § 75 ............................................................................................. 15, 27, 28
81 Fed. Reg. 3004 (Jan. 20, 2016) ...................................................................... 28
85 Fed. Reg. 49506 (Aug. 13, 2020) ................................................................... 27

APHA App. 916

## **INTRODUCTION**

For decades, the National Institutes of Health ("NIH") has fulfilled its congressionally mandated mission to advance scientific knowledge and improve public health through a robust system of research grants to external institutions. This system—developed over generations and governed by specific statutory and regulatory frameworks—follows rigorous procedures designed to ensure that taxpayer dollars fund the most promising scientific research without disruption.

That all changed in January 2025, when Defendants began an unprecedented and ideologically driven purge of hundreds of projects that, according to Defendants, "no longer effectuate[] agency priorities." Defendants have issued multiple overlapping directives to eradicate projects that purportedly involve forbidden topics including "DEI," "gender identity," and "transgender issues." Without defining what these terms encompass, Defendants have relied on them for boilerplate terminations of *years* of research on a wide span of health issues such as cancer, Alzheimer's, and brain injury. Likewise, Defendants have terminated en masse grants and programs designed to address the underrepresentation of racial minorities, women, and economically disadvantaged scientists in the biomedical field.

Plaintiffs Ibis, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis and members of Plaintiffs APHA and UAW (collectively, "Plaintiffs and Members") are researchers whose work was funded by grants that Defendants have terminated or for whom review of grant applications has been suspended. They seek this Court's intervention to stop the ongoing upheaval caused by Defendants' unlawful and unconstitutional actions. As set forth below, they are entitled to preliminary injunctive relief. First, Plaintiffs are likely to show that Defendants violated separation of powers principles by subverting congressional mandates around NIH funding priorities, acted contrary to law, regulation, and in an arbitrary and capricious manner in issuing the directives and

1

by terminating grants and suspending application review processes, and have issued directives that are unconstitutionally vague. Second, Plaintiffs and Members will suffer irreparable harm ranging from disruptions to their own careers to lost opportunities to contribute to science and public health. Finally, the balance of the equities and the public interest strongly favor an injunction. Accordingly, Plaintiffs request that the Court enjoin Defendants' implementation and enforcement of the directives, terminations, and suspension of application processes.

## FACTUAL BACKGROUND

### I.     Funding Structure of NIH

Since it was created by Congress nearly 100 years ago, NIH has been involved in countless medical breakthroughs, and has grown to comprise twenty-seven institutes and centers ("ICs"), each focusing on a different disease or biological system. Ex. 1.[1]

Operating under the United States Department of Health and Human Services ("HHS"), NIH is the primary source of federal funding for biomedical and public health research in the United States, providing almost 50,000 competitive grants to more than 300,000 researchers across the country at more than 2,500 universities, medical schools, and other research institutions outside the agency ("extramural research"). Ex. 2. NIH received annual appropriations from Congress of $48 billion in 2024 and nearly the same amount in a continuing resolution in 2025. *Id*. Ex. 3.

### A.  Statutes, Regulations, Policies, and Strategic Plans Govern Funding Priorities

Congress has authorized NIH's funding of extramural research through a number of express statutory mandates. For example, Section 301 of the Public Health Service Act ("PHSA") provides Congress's overarching authorization for NIH to "promote the coordination of[] research, investigations, experiments, demonstrations, and studies related to the causes, diagnosis,

---

[1] Citations to "Ex. []" refer to the numbered exhibits attached to the Declaration of Jessie J. Rossman dated April 25, 2025.

APHA App. 918

treatment, control, and prevention of physical and mental diseases and impairments," including through extramural research. 42 U.S.C. § 241(a), (a)(3); *see also* §§ 284(b)(1)(A), 284(b)(2)(A) (conferring similar authority on the directors of NIH's individual ICs).

Congress has also defined specific purposes for which NIH and the ICs must fund research, as discussed below. *See infra*, Argument Sections III.A and III.B.3. Statutes require NIH to fund research that promotes health equity and reduces health disparities across diverse populations. *See, e.g.*, 42 U.S.C. § 282(b)(8)(d)(ii) (special consideration given to biological, social, and other determinants of health that contribute to health disparities); 42 U.S.C. § 282(m)(2)(b)(iii); 42 U.S.C. § 283(p) (mandate to consider "disease burden in the United States," expressly including the LGBTQ+ population). And statutes require NIH to increase recruitment of groups underrepresented in the biomedical research field, including racial minorities, women, and those from economically disadvantaged backgrounds. *See* 42 U.S.C § 288(a)(4) (diversification of research field).

In addition, NIH is under statutory mandate to develop, submit to Congress, and publish a five-year strategic plan that identifies research priorities and facilitates collaboration across the ICs. 42 U.S.C. § 282(m)(1). NIH's Strategic Plan for 2021–2025 prioritizes "improving minority health and reducing health disparities"; "enhancing women's health"; "addressing public health challenges across the lifespan"; "promoting collaborative science"; "leveraging data science for biomedical discovery"; undergoing rapid vaccine development "to mitigate emerging infectious disease outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)"; and continuing to enhance the biomedical workforce through inclusion of underrepresented groups. Ex. 4 at 8, 16–17, 32–24. NIH must ensure its resources "are sufficiently allocated for" these priorities. 42 U.S.C. § 282(b)(6). ICs also promulgate their own strategic plans. *Id.* § 282(m)(3).

APHA App. 919

### B. Funding Process for NIH and ICs

### 1. Project-based Grants and Pipeline Grants

NIH awards considerable funding through grants for scientific and biomedical research projects ("Project-based Grants"). These grants provide *billions* of dollars each year to critical research, and fund everything from salaries to benefits to research supplies, as well as real research costs that are not readily attributed to specific projects. Ex. 26 ¶ 15.

In addition to Project-based Grants, NIH awards grants to institutions and individuals for career development or training ("Pipeline Grants"). Some Pipeline programs, such as Ruth L. Kirschstein National Research Service Awards ("Kirschstein-NRSA"), are congressionally mandated. 42 U.S.C. § 288(a)(1)(A). "Institutional training grants" ("T32s") cover the costs of pre- or postdoctoral students, while individual grants—typically classified as F-series ("Fellowship") or K-Series ("Career Development")—provide stipends to researchers at all stages of their career, cover tuition and costs, and fund research expenses. Ex. 26 ¶ 19; Ex. 32 ¶ 6. Programs under which pipeline grants are awarded to fulfill Congress's mandate that NIH diversify the research field include the Initiative for Maximizing Student Development ("IMSD"), Maximizing Opportunities for Scientific and Academic Independent Careers ("MOSAIC"), Institutional Research and Academic Career Development Award ("IRACDA"), Undergraduate Research Training for Student Enhancement ("U-RISE") and Maximizing Access to Research Careers ("MARC"). *See, e.g.*, Ex. 5 at 11.3.3.3; Ex. 27 ¶¶ 17–21; Ex. 23 ¶¶ 33, 50–51; Ex. 42 ¶ 5.

### 2. Grant Application and Review Process

NIH receives about 50,000 grant applications per year. Ex. 26 ¶ 26. All applications undergo a rigorous peer-review process, as required by statute, regulation and NIH protocols. *See, e.g.,* 42 U.S.C. § 289(a); 42 C.F.R. § 52.5; Ex. 5 at 2.4; Ex. 23; Ex. 26 ¶¶ 26, 38–39.

4

ICs post Notices of Funding Opportunities ("NOFOs"), which identify the criteria that will be used to assess each application. Ex. 5 at 2.4.1.3; Ex. 26 ¶ 27. Each application is assigned to a "study section," composed of 20–30 independent researchers with the expertise to review and score applications for scientific and technical merit. *Id.* ¶¶ 28–29. Fewer than half the applications proceed to the next stage of review, during which advisory councils of 10–12 scientists make recommendations based on each IC's priorities and portfolio. *Id.* at ¶¶ 29, 31; Ex. 5 at 2.4. Each IC's director makes the final funding decision. 42 U.S.C. § 284(b)(2); Ex. 5 at 2.4.4, Ex. 26 ¶ 32. Upon selection, a successful applicant receives a Notice of Award ("NOA") that specifies, among other things, the amount of the award and its duration. *Id.* Prior to 2025, NIH had three application cycles per year, with preset periods for study section and advisory council meetings and earliest project start dates. Ex. 5 at 11.3.3.2, Ex. 26 ¶ 34.

### 3. Termination Processes Prior to the Current Purge

Given the scientific rigor with which grants are awarded and the governing HHS regulations, terminations at NIH have historically been rare. *See, e.g.*, Ex. 6; Ex. 26 ¶ 38. In response to noncompliance, "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action." Ex. 5 at 8.5.2; *see also* Ex. 26 ¶ 39. While NIH may immediately terminate a grant for noncompliance, it can do so only in very limited circumstances, where termination is "*necessary*, such as to protect the public health and welfare from the effects of a *serious deficiency*." Ex. 5 at 8.5.2 (emphases added). Even where there are concerns about scientific misconduct, such as the fabrication or plagiarism, NIH still seeks to preserve the results of the research if possible. *Id.* at 4.1.27, Ex. 23 ¶ 40.

## II.     Defendants' Directives and Funding Purge

### A.   Defendants Issue Ideological Directives that Forbid Certain Research Topics

APHA App. 921

Since January 20, 2025, Defendants have abandoned this scientifically rigorous and methodical approach. Shortly after inauguration, President Trump issued Executive Order No. 14151, which instructs the Attorney General and others to "[c]oordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government"; Executive Order No. 14168, which directs that "federal funds shall not be used to promote gender ideology"; and Executive Order No. 14173 which requires the Director of the Office of Management and Budget ("OMB") to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial assistance, 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

On January 27, 2025, OMB responded with a memorandum directing all federal agencies—including NIH—to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and all other relevant agency activities that may be implicated by," among other things, the above-mentioned executive orders, including "financial assistance for . . . DEI, woke gender ideology, and the green new deal." Ex. 7 at 2.

HHS and NIH issued directives through various documents beginning January 2025 (hereinafter, "the Directives")[2] to curtail NIH support (and terminate billions of dollars of scientific funding) for previously published funding opportunities and previously awarded grants that purportedly "no longer effectuate[] agency priorities."

---

[2] As reflected in the proposed order, Plaintiffs include in "the Directives" all the directives referred to as the "Challenged Directives" in the related matter, *Massachusetts v. Kennedy*, No. 1:25-cv-10814-BEM (D. Mass.), Dkt. 76-1 at 2, including directives that remain nonpublic and undisclosed. For consistency, Plaintiffs rely on the same terminology for any directive mentioned here. Insofar as recent deposition testimony in another proceeding suggests that NIH-issued directives relied upon boilerplate language provided to NIH officials by HHS, *see* Ex. 8 at 17–33, 66–91, "the Directives" encompasses that boilerplate language. *See also* Ex. 9 at 36–38.

APHA App. 922

On February 10, 2025, the Acting HHS Secretary issued a "Secretarial Directive on DEI-related Funding," directing agencies to "briefly pause" payments made to grantees "related to DEI and similar programs" and stating that "grants may be terminated in accordance with federal law." Ex. 10 at 1. On February 12, the deputy director of extramural research issued a memorandum stating that NIH was "reevaluating the agency's priorities based on the goals of the new administration," and noting that "[a]dditional details on future funding actions . . . will be provided under a separate memo." Ex. 11 at 1. On February 13, the deputy director issued a memorandum announcing "hard funding restrictions" on "awards where the program promotes or takes part in diversity, equity, and includsion [sic] ('DEI') initiatives," and stating that, "[i]f the sole purpose of the grant . . . supports DEI activities, then the award must be fully restricted." Ex. 12 at 1.

On March 4, 2025, NIH issued staff guidance (the "Priorities Directives") stating that the agency would "no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI) . . . Prior to issuing all awards . . . or approving requests for carryover, ICs must review the specific aims [to] assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities." Ex. 13 at 1.[3] The document includes language directing NIH officials not to issue awards to projects whose "sole purpose . . . is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity)" and scripts "provided to NIH by HHS" to use in grant termination notices, including that "NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2." *Id.* at 6.

Specific topics were to be defunded based on the following pre-set rationales:

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing

---

[3] In their complaint, Plaintiffs alleged that the Priorities Directives were issued "on or around February 28, 2025." *See* Dkt. 1 ¶ 92.

APHA App. 923

to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harm the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

*Id.* at 7.[4]

On March 25, 2025, NIH issued updated guidance on grant terminations (the "Revised Priorities Directives"). Ex. 14. This document specifies NIH officials will receive lists of grants that are "HHS Department Authority Terminations" from the "Director, NIH, or designee," and must issue termination letters for these grants. *Id.* at 6. The Revised Priorities Directives repeats much of the Priorities Directives—including reliance on 2 C.F.R. § 200.340 for the agency's authority to terminate the grants (*see* Ex. 13 at 6; Ex. 14 at 7)—but it adds two other categories of topics of research NIH purports to "no longer prioritize" ("Vaccine Hesitancy" and "COVID") to be terminated with boilerplate language for these terminations. Ex. 14 at 9.

The Directives are still evolving. Just four days ago, on April 21, 2025, NIH announced a new term and condition on "new, renewal, supplement, or continuation awards." Ex. 15. The notice threatens termination if grantees promote DEI or "discriminatory equity ideology," or if they engage in a "prohibited boycott." *Id.*

---

[4] A third forbidden topic was "China," meaning research projects in China or in Chinese universities. *Id.*

APHA App. 924

## B. Defendants Terminate Grants

Beginning on February 28, 2025, NIH issued boilerplate termination notices consistent with the Directives, including to Plaintiffs and Members. Each notice purports to rely on 2 C.F.R. § 200.340(a)(2) and repeats the template language of the Directives. The following are examples:

- "This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria."[5]

- "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."[6]

The notices offer no explanation of how the agency reached its decision, no analysis of any data, and no individualized discussion of grants.[7] And as with the Directives, the notices fail to define critical terms including "diversity, equity, and inclusion" or "DEI"; "artificial and non-

---

[5] *See, e.g.*, Ex. 22 ¶ 12; Ex. 23 ¶¶ 17, 47; Ex. 24 ¶¶ 11, 20 (at Ex. C), 34 (at Ex. F); Ex. 30 ¶ 18; Ex. 31 ¶ 18; Ex. 34 ¶ 18.

[6] *See, e.g.*, Ex. 23 ¶ 34; Ex. 28 ¶ 16; Ex. 29 ¶ 23 (at Ex. E) (stating that "so-called diversity, equity, and inclusion ('DEI') studies are often used to support unlawful discrimination . . . which harms the health of Americans."); Ex. 32 ¶ 15 (at Ex. C) (same); Ex. 33 ¶ 18 (at Ex. C).

[7] *See, e.g.*, Ex. 20 ¶¶ 20 (at Ex. C), 34 (at Ex. F), 39 ("[E]ach of these termination notices failed to offer any individualized explanation of why the grant was cancelled and failed to discuss any of the data or analysis from our application, any annual progress report, or other related material."); Ex. 24 ¶ 13; Ex. 29 ¶ 23 (at Ex. E) (using stock language about "research programs based primarily on artificial and non-scientific categories . . ." to justify termination of a grant funding an online resource hub); Ex. 32 ¶ 15 (at Ex. C) (using stock language about "research programs based primarily on artificial and non-scientific categories . . ." to justify termination of a training grant); Ex. 33 ¶ 18 (at Ex. C). Several Plaintiffs and Members received revised NOAs that included substantially similar statements justifying the termination. *See* Ex. 19 ¶¶ 16–19 (at Ex. D), 31–32 (at Ex. F); Ex. 20 ¶¶ 21 (at Ex. D), 35 (at Ex. G), 38 (at Ex. D); Ex. 24 ¶ 11 (at Ex. D); Ex. 28 ¶ 17 (at Exs. E, F); Ex. 29 ¶ 28 (at Ex. F); Ex. 30 ¶ 16 (at Ex. D); Ex. 31 ¶¶ 16, 18 (at Ex. C); Ex. 32 ¶ 16 (at Ex. D); Ex. 33 ¶ 18 (at Ex. D).

APHA App. 925

scientific categories"; "amorphous equity objectives"; "[t]ransgender issues"; "gender identity";

or "COVID-related." Each notice then includes the following (or something substantially similar):

> Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.[8]

After stating no corrective action is possible, confusingly, each notice outlines an appeals

process.[9]

Defendants have also sent termination notices or orders to stop work en masse to grantees

for various pipeline programs such as MOSAIC, IMSD, IRCADA, U-RISE and MARC—all

programs that seek to address the underrepresentation of certain groups in the biomedical fields—

notifying them that the entire programs have been terminated prior to the project end dates.[10] This

has interrupted all ongoing grant work and means that grantees will no longer be able to obtain

non-competitive renewals in subsequent budget periods.[11] The notices provide no explanation for

the terminations other than "changes in NIH/HHS priorities."[12] No new priorities are listed, nor is

any explanation given of how the individual grant does not align with those unspoken priorities.[13]

### C. Defendants Delay and Suspend Grant-Awarding Processes

Defendants have withdrawn NOFOs for pipeline programs that seek to address diversity

and underrepresentation years ahead of scheduled end dates. For pending applications, Defendants

---

[8] *See, e.g.*, Ex. 34 ¶ 18.
[9] *See, e.g.,* Ex. 19 (at Exs. C, G, K); Ex. 20 ¶ 46 (at Exs. C, D); Ex. 24 ¶ 18 (at Ex. D); Ex. 28 ¶ 21 (at Ex. D); Ex. 30 (at Ex. C); Ex. 34 ¶ 38 (at Ex. B); Ex. 37 ¶ 19 (at Exs. C, F).
[10] *See, e.g.*, Ex. 36 ¶ 10 (at Ex. C); Ex. 38 ¶ 10 (at Ex. D); *see also* Ex. 23 ¶¶ 42–43 (describing how the MARC program has been terminated); Ex. 25 ¶ 10a–b; Ex. 27 ¶ 15; Ex. 35 ¶¶ 7, 11, 14, 19); Ex. 39 ¶¶ 11, 16; Ex. 42 ¶ 12 (at Ex. F) (describing how the IMSD program has been terminated).
[11] *See, e.g.*, Ex. 25 ¶ 10b; Ex. 35 ¶¶ 11, 14, 19; Ex. 36 ¶ 13; Ex. 38 ¶¶ 10–12.
[12] *See, e.g.*, Ex. 23 ¶¶ 43, 53; Ex. 25 ¶¶ 13–14; Ex. 35 ¶¶ 14–16; Ex. 36 ¶ 10 (at Ex. C); Ex. 38 ¶ 10 (at Ex. D); Ex. 39 ¶ 16; Ex. 42 ¶ 12.
[13] *See, e.g.*, Ex. 23 ¶¶ 43, 53; Ex. 25 ¶ 13; Ex. 35 ¶¶ 15–16; Ex. 36 ¶ 10 (at Ex. C); Ex. 38 ¶ 10 (at Ex. D); Ex. 39 ¶ 16; Ex. 42 ¶ 12.

APHA App. 926

have withheld decisions, removed submitted applications from study sections or withheld NOAs on previously approved submissions.[14] Defendants also suspended for some weeks the regularly scheduled study section and Advisory Committee meetings required to approve grant applications prior to funding. Ex. 26 ¶¶ 5; 33. Because NIH will not accept duplicate or highly overlapping applications under review at the same time, *see* Ex. 5 at 2.3.7.4, applicants for whom NIH has suspended review may be unable to pursue other funding opportunities for the same proposal. Despite largely similar appropriations to NIH in 2025 from prior years, *see supra*, Background Section I, NIH has significantly reduced funding new grants, including an approximately 69% reduction in the number of new awards from February to mid-March as compared to the same period in the prior year. Ex. 26 ¶ 9.

### III.    The Directives and Terminations Cause Profound Harm

Between February 28 and April 18, 2025, NIH terminated at least 755 grants. Ex. 27 ¶ 11. The total budget allocated across these grants was approximately $3.0 billion. *Id.* ¶ 15. Approximately $1.4 billion has already been spent, leaving an estimated $1.6 billion in unspent value. *Id.* Terminated projects span a range of health issues, including breast cancer, uterine cancer, anal cancer, stroke risk, cardiac health, Alzheimer's Disease, HIV prevention, suicide prevention, alcohol use disorder, smoking cessation, eating disorders, sexually transmitted infections, COVID-19, depression, psychopathology, pain, and many other conditions that very often disproportionally burden minority communities. *Id.* ¶ 13. These figures also include Pipeline Grants to support, train, and recruit scientists. *Id.* at ¶ 12 (Ex. A) (listing terminated grants included Pipeline Grants like FIRST, MARC, and U-RISE); *id.* ¶¶ 18-19, 22-25. Such grants have been terminated across the board, and future opportunities have disappeared from NIH's website. *Id.* ¶ 23.

---

[14] *See, e.g.*, Ex. 21 ¶¶ 9–14; Ex. 37 ¶¶ 11, 15.

APHA App. 927

Plaintiffs' and Members' grants were among Defendants' purge.[15] The termination of Project-based Grants has resulted in stalled, diminished, or ruined studies; staff jobs have been cut; and future contributions to public health are now limited or eviscerated. *See infra*, Argument Section IV. The terminations of Pipeline Grants have cut funding and programming for Plaintiffs and Members that is foundational for early scientific careers. *See id.* Plaintiffs and Members waiting on stalled applications are in limbo, with no idea how to recalibrate their career plans.

## **ARGUMENT**

### I.     Legal Standard

To issue a preliminary injunction, "[t]he district court must consider the 'movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (citation omitted). When the government opposes the injunction, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435–36 (2009).

### II.     Jurisdiction

#### A.  Plaintiffs Have Standing.

To establish standing, "a plaintiff must show (i) an injury in fact that is concrete, particularized, and actual or imminent; (ii) likely caused by the defendant; and (iii) likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). "[L]os[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article

---

[15] *See, e.g.*, Ex. 19 ¶ 6; Ex. 20 ¶¶ 8–10, 24–25, 38; Ex. 23 ¶¶ 43, 53; Ex. 25 ¶ 5 (UAW represents 75,000 workers who rely on funding from NIH), *id.* at ¶¶ 6, 10 (detailing disruption to members' careers), *id.* at ¶¶ 11, 13; Ex. 28 ¶ 15; Ex. 29 ¶ 23; Ex. 30 ¶ 9; Ex. 31 ¶ 8; Ex. 32 ¶ 15; Ex. 33 ¶¶ 10, 17, 27; Ex. 34 ¶ 17; Ex. 35 ¶ 14; Ex. 36 ¶ 10; Ex. 38 ¶ 10; Ex. 39 ¶ 16; Ex. 42 ¶ 12.

APHA App. 928

III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019); *Union of Concerned Scientists v. Wheeler*, 377 F. Supp. 3d 34, 41–42 (D. Mass. 2019) ("[i]t is clear that" co-investigator on EPA research grant forced to give up role as result of EPA directive "has standing to assert her claims"), *rev'd in part on other grounds by Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020). An associational plaintiff has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The termination of Plaintiffs' and Members' Project-based and Pipeline Grants and stalling of applications give rise to a sufficiently concrete injury. They have lost, and stand to lose, millions of dollars that will severely impact scientific research and cause untold harm. *See infra*, Argument Section IV.

### B. The Tucker Act Does Not Deprive This Court of Jurisdiction.

This Court has jurisdiction to hear this case under the APA, which provides that any "person suffering legal wrong because of agency action … is entitled to judicial review thereof" where they are "seeking relief other than money damages." 5 U.S.C. § 702. Where, as here, Plaintiffs seek equitable relief enjoining final agency action, the APA provides for judicial review in district court. *See generally* 5 U.S.C. § 704; *Bowen v. Massachusetts,* 487 U.S. 879 (1988).

Despite this black letter law, in several pending cases, the government has attempted to hide behind the Tucker Act, which confers jurisdiction to the Court of Federal Claims (CFC) over certain claims against the government that seek "liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491 (a)(1). But, as several district courts have recently held in

13

analogous situations, the Tucker Act presents no bar to this Court's jurisdiction because Plaintiffs

seek only equitable and prospective relief—*not* money damages. *See infra.* Note 18.

### 1. This Court Has Jurisdiction under the "Rights and Remedies" Test.

Generally, the Administrative Procedure Act ("APA") confers jurisdiction on the district

courts over suits against administrative agencies, except for limited cases which seek only "money

damages" and thus belong in the CFC. *Bowen,* 487 U.S. at 880. The critical inquiry is whether "the

essence of an action is in contract[.]'" *Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338,

2025 WL 702163, at *5 (D. Mass. Mar. 5, 2025) (quoting *Am. Sci. & Eng'g, Inc. v. Califano*, 571

F.2d 58, 63 (1st Cir. 1978)). Courts look to two factors: (1) the "source of the rights" and (2) the

"relief sought." *Massachusetts*, 2025 WL 702163, at *5–6 (adopting the framework set forth in

*Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Here, the default rule applies, as

the rights invoked and remedies sought make clear that this is not a contract claim.

### a. The Source of Plaintiffs' Rights Is Not a Contract.

The rights Plaintiffs seek to vindicate are not rooted in a contract with the government, but

rather in statutory, regulatory, and constitutional law. Counts I to V of the complaint assert that

three sets of actions by NIH and HHS—issuance of Directives mandating that grants be terminated

in response to an undefined "change in agency priorities," termination of grants, and refusal to

consider grant applications—are arbitrary, capricious, and unlawful under the APA. The final two

counts allege the Directives and terminations violate the Constitution (Count VI for void for

vagueness pursuant to the Fifth Amendment and Count VII for separation of powers).

None of these claims arises from violation of the terms and conditions of any contract with

Plaintiffs or Members. Indeed, "Plaintiffs have not requested the Court to examine any contract or

grant agreement created between the parties. Rather, they have asked this Court to review and

APHA App. 930

interpret the governing federal statute and regulations." *Massachusetts*, 2025 WL 702163, at *6;

*see also Woonasquatucket River Watershed Council v. United States Dep't of Agric.*, No. 1:25-

CV-00097-MSM-PAS, 2025 WL 1116157, at *6 (D.R.I. Apr. 15, 2025), *39–41. Because every

claim is rooted in Defendants' unlawful violation of a statute, regulation, or the U.S. Constitution,

"the gravamen of Plaintiffs' Complaint[] does not turn on terms of a contract between the parties;

it turns on federal [law]." *Massachusetts*, 2025 WL 702163, at *6.

Moreover, NIH grants are *not* contracts. NIH has consistently maintained that grants are a

legal instrument distinct from contracts. Ex. 16. And both statutes and regulations compel that

position. Congress, in granting Defendants the authority to issue grants out of their appropriated

funds, has repeatedly and explicitly differentiated between "grants" and "contracts."[16] HHS

regulations governing federal awards make clear that a "grant agreement" is an instrument, distinct

from a contract, designed to "carry out a public purpose authorized by a law of the United States .

. . and not to acquire property or services for the Federal awarding agency[.]" 45 C.F.R. § 75.2.

Given these repeated indications that neither NIH, Congress, nor HHS intended these grants to be

contracts or seek a direct benefit in exchange for offering them, the agreements themselves lack

the essential characteristics of a contract. *Dep't of Pub. Welfare v. United States,* 48 Fed. Cl. 785,

788–92 (2001) (detailing the elements of a contract necessary for Tucker Act jurisdiction).

### b. Plaintiffs Seek Relief That Can Only Be Provided by the Court— the CFC Cannot Provide Adequate Relief.

---

[16] *See, e.g.,* 42 U.S.C. § 241(a)(3, 7) (separately listing the Secretary's authority to "make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions" from the authority to "enter into contracts"); 42 U.S.C. § 288(b)(2) (differentiating between IC Directors' authority to enter into grants versus contracts); 42 U.S.C. § 289a(a) (distinguishing between "applications made for grants and cooperative agreements" and "applications made for biomedical and behavioral research and development contracts").

APHA App. 931

The relief sought also confirms this Court's jurisdiction. The APA provides for review in the district courts of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiffs seek declaratory and injunctive relief aimed at the unlawfulness of the Directives, terminations, and withholding of standard application review. Without equitable relief setting aside Defendants' actions, scientific research will go unpublished and undiscovered, research participants will be harmed, jobs will be lost, and emerging researchers' careers will be upended. *See infra*, Argument Section IV. The CFC is unable to remedy any of these ongoing injuries. *See Bowen*, 487 U.S. at 905 (holding CFC "does not have the general equitable powers of a district court"); *Katz v. Cisneros,* 16 F.3d 1204, 1209 (Fed. Cir. 1994) (CFC cannot provide "[a]n adjudication of the lawfulness of [an agency's] regulatory interpretation" that "will have future impact on the ongoing relationship between the parties"); *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec*., 490 F.3d 940 (Fed. Cir. 2007).

Any financial consequences from the relief sought do not transform this into a case for money damages. As the Supreme Court has long recognized, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.[17] Rather, "[t]o the extent that the Court's order 'engenders' the result of payment to [Plaintiffs], 'this outcome is a mere byproduct' of the Court's 'primary function of reviewing the [government's] interpretation of federal law.'" *Woonasquatucket*, 2025 WL 1116157, at *14 (quoting *Bowen*, 487 U.S. at 910). Here, Plaintiffs do not seek financial compensation for injuries suffered but rather seek to preserve their ongoing and prospective relationships with NIH. *See Massachusetts*, 2025 WL 702163, at *7.

---

[17] *See also Am. Ass'n of Colls. for Tchr. Educ. v. McMahon,* No. 1:25-CV-00702-JRR, 2025 WL 863319. at *3 (D. Md. Mar. 19, 2025) (citation omitted) ("[A] suit which does not seek monetary damages does not arise under the Tucker Act simply because the plaintiff's success will result in eventual monetary gain from the government.").

APHA App. 932

2. **The Supreme Court's *Per Curiam* Order in *Department of Education v. California* Does Not Affect This Court's Jurisdiction.**

The above analysis is not changed by the Supreme Court's recent *per curiam* order in *Dep't of Educ. v. California,* which dissolved a temporary restraining order requiring the disbursement of teacher training funds and noted, without deciding the jurisdictional issue, that the Tucker Act "grants the [CFC] jurisdiction over suits based on 'any express or implied contract with the United States.'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 969 (2025). Numerous courts have properly read the narrow nature of this order and concluded that district courts have jurisdiction over cases involving unlawful termination and withholding of grants consistent with longstanding Supreme Court precedent.[18] This Court should do the same. Unlike *Dep't of Educ.*, Plaintiffs assert *both* statutory and constitutional claims seeking prospective and equitable relief. Moreover, the Plaintiffs in *Dep't of Educ.* never argued that the grants were not contracts, and the claims here do not rely on the terms and conditions of grant documents. For all these reasons, the Tucker Act does not apply to Plaintiffs' claims.

III. **Plaintiffs Have Established a Likelihood of Success on the Merits.**

A. **Defendants' Directives and Terminations of NIH Grants Violate Separation of Powers Principles [Count VII].**

By issuing the Directives and terminating hundreds of NIH grants designed to diversify the biomedical workforce and address health disparities, Defendants have contravened congressional

---

[18] *See Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (finding that Supreme Court's *per curiam* opinion's "precedential value is … limited" and noting that *Bowen* and its progeny continue to govern); *see also Chi. Women in Trades v. Trump*, No. 25-C-2005, 2025 WL 1114466, *8–10 (N.D. Ill. Apr. 14, 2025) (distinguishing the *per curiam* opinion and rejecting Tucker Act argument because claims did not arise out of a contract, claims are not contract claims in essence given constitutional claims, plaintiffs sought exclusively injunctive relief, and CFC could not provide an adequate remedy); *Woonasquatucket*, 2025 WL 1116157, at *14 ("The Government overreads the three-page stay order . . . The Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional issues here."); *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC) 2025 WL 1131412, at *11 (D.D.C. Apr. 16, 2025) (finding that "reinstatement of [EPA] grants and recovery of specific money" constitutes equitable relief, and noting that Plaintiffs sought equitable and declaratory relief which CFC cannot grant).

APHA App. 933

mandates that NIH fund such research, usurping the legislative prerogative in violation of separation of powers principles. The Constitution grants and limits the powers of each branch of the federal government—these "carefully defined limits on the power of each Branch must not be eroded." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 958 (1983). The power of the President, and executive agencies by extension, is thus subject to certain constraints. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb[.]" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring).

The executive branch has a duty to "take care that" enacted laws are "faithfully executed" and "may not decline to follow a statutory mandate . . . simply because of policy objections." U.S. Const. art. II, § 3; *Aiken Cnty.*, 725 F.3d at 259. And "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Instead, the Executive's role in lawmaking is sharply circumscribed by the Presentment Clause. U.S. Const., art. I, § 7, cl. 2 & cl. 3. Presidents "may initiate and influence legislative proposals," and may veto a bill, *Clinton*, 524 U.S. at 438, but cannot strike or pick and choose among the provisions of a law that they find unappealing. *Id.* at 448–49.

Defendants' Directives and terminations not only fail to faithfully execute explicit congressional mandates—they fundamentally subvert them. The portion of the United States Code governing NIH, 42 U.S.C. Ch. 6A, is replete with language mandating that NIH make efforts to diversify the biomedical workforce. For example, Congress:

- Requires that NIH "shall" issue grants "in a manner that will result in the recruitment of women, and individuals from disadvantaged backgrounds (including racial and ethnic minorities)" through Kirschstein-NRSA, 42 U.S.C § 288(a)(4).

- Requires that NIH "shall" fund institutions to "support[] programs of excellence in biomedical and behavioral research training for . . . members of minority health disparity

APHA App. 934

populations or other health disparity populations" through the National Institute on Minority Health and Health Disparities (NIMHD) and grants made under this provision require applicants to agree to expend the grant for these purposes. *Id.* at § 285t-1(a), (b).[19]

- Mandates that the HHS Secretary and NIH Director "shall, in conducting and supporting programs for research, research training, recruitment, and other activities, provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research." *Id.* at § 282(h).

- Requires that NIH "shall" "develop, modify, or prioritize policies, as needed, within the National Institutes of Health to promote opportunities for new researchers and earlier research independence, such as policies to . . . enhance workforce diversity" via the Next Generation of Researchers Initiative. *Id.* at § 283*o*(b)(2). This includes "increas[ing] opportunities for new researchers to receive funding." *Id.*

Congress has also mandated that NIH fund research into health disparities. For example:

- The purpose of the NIMHD is to "conduct and support . . . research, training, dissemination of information, and other programs with respect to minority health conditions and other populations with health disparities." *Id.* at § 285t(a). To effectuate this mission, the NIMHD director "shall in expending amounts appropriated under this subpart give priority to conducting and supporting minority health disparities research," *id.* at § 285t(b), and "shall" develop a plan and budget that "give[s] priority in the expenditure of funds to conducting and supporting minority health disparities research." *Id.* at § 285t(f)(1)(D).

- The HHS Secretary and the NIH Director "shall" ensure that the ICs foster collaboration between their various clinical research projects and encourage such projects to "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities[.]" *Id.* at § 282(b)(8)(D)(ii).

- The NIH Director "shall develop and submit" to Congress a strategic plan that "shall . . . (B) consider . . . (iii) biological, social, and other determinants of health that contribute to health disparities . . ." *id.* at § 282(m)(2), and the NIH Director "shall ensure" funding is "sufficiently allocated for research projects identified in strategic plans[.]" *Id.* at § 282(b)(6).

- The NIH Director "shall . . . encourage efforts to improve research related to the health of sexual and gender minority populations, including by— (1) facilitating increased participation of sexual and gender minority populations in clinical research . . . ; (2) facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations; and (3) addressing methodological challenges." *Id.* at § 283p.

---

[19] Indeed, NIMHD's strategic plan explicitly sets out goals and research priorities to diversify the medical field. Ex. 16 at 17–31.

APHA App. 935

Defendants' Directives violate these mandates, unilaterally rewriting laws with which they disagree. The Directives and termination notices explicitly and categorically state that funding related to "amorphous equity objectives," "so-called diversity, equity, and inclusion ('DEI')," or "gender identity" "no longer effectuate[] agency priorities" and that "it is the policy of NIH not to prioritize such research programs."[20] Defendants claim that research into "DEI" or "gender identity" is "often unscientific" and "do[es] nothing to enhance the health of many Americans."[21] They assert that efforts to diversify the workforce "support unlawful discrimination."[22] Defendants have instructed NIH officials to "completely excise all DEI activities," demonstrating a wide-ranging effort to defund anything related to diversifying the biomedical research field and researching health disparities, despite Congress's clear instructions to the contrary. Ex. 13 at 1.

Defendants' across-the-board pipeline terminations similarly disregard Congress's lawmaking power. Kirschstein-NRSA grants *must* support the recruitment of women and people from disadvantaged backgrounds, but NIH has stripped all mention of workforce diversity from newly posted T32 Kirschstein-NRSA funding opportunities, cancelled those Kirschstein-NRSA and other programs designed to increase recruitment of underrepresented groups, and terminated the grants awarded under such programs.[23] These sweeping terminations directly violate Congress's instructions to NIH that it prioritize diversifying the biomedical workforce.

---

[20] *See, e.g.*, Ex. 19 ¶ 34; Ex. 20 ¶¶ 20, 34; Ex. 22 ¶ 12; Ex. 28 ¶ 16; Ex. 29 ¶ 23; Ex. 30 ¶ 18; Ex. 32 ¶ 15; Ex. 33 ¶ 18 (at Ex. E); Ex. 34 ¶ 17.

[21] *See, e.g.*, Ex. 19 ¶ 47; Ex. 20 ¶¶ 20, 34; Ex. 29 ¶ 23; Ex. 30 ¶ 18; Ex. 31 ¶ 18; Ex. 32 ¶ 15; Ex. 33 ¶ 18 (at Ex. E); Ex. 34 ¶ 18.

[22] *See, e.g.*, Ex. 29 ¶ 23; Ex. 32 ¶ 15; Ex. 33 ¶ 18 (at Ex. E).

[23] *See, e.g.*, Ex. 23 ¶¶ 31–56; Ex. 27 ¶¶ 17–25 (describing termination of eight separate programs designed to diversify the biomedical research field); Ex. 35 ¶¶ 14–16; Ex. 36 ¶ 10 (termination of MOSAIC); Ex. 38 ¶ 10 (termination of IRACDA); Ex. 39 ¶¶ 6–7; Ex. 40 ¶ 10–17 (inferring cancellation of F31 diversity program given notice in November 2024 that his application would be funded but, as of this filing, still no word and funding); Ex. 42 ¶¶ 9, 12 (termination of IMSD); *see also supra*, Background Section II.B.

20

NIH has also eliminated research that fulfills unequivocal congressional requirements to address health disparities, including a five-year grant to study reasons why Black women in the United States have higher rates of infertility than white women, a grant testing implications of a reduction in the income gap on the health and wellness of older African American men, grants that studied the harmful effects of societal or systemic stressors, and the health-protective effects of social support, education, and school-based mental health interventions, and many other disparity related studies.[24]

Defendants' failure to uphold their constitutional responsibility to take care that these laws are faithfully executed and their brazen attempt to strike the portions of the law with which they disagree violate separation of powers principles and must be enjoined.

**B. Plaintiffs Are Likely to Succeed on Their APA Claims.**

**1. The Directives and Terminations Constitute Final Agency Actions.**

Under the APA, final agency actions: (1) "mark the consummation of the agency's decision making process"; and (2) are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Such actions are sufficiently discrete to permit review if they have "an actual or immediately threatened effect." *Greater Bos. Legal Servs. v. United States Dep't of Homeland Sec.*, No. 21-CV-10083-DJC, 2023 WL 2540892 *2 (D. Mass. Mar. 16, 2023) (citations omitted); *see also Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (holding agency memoranda were final agency action, noting they "bound" agency staff by preventing them from continuing certain programs).

Here, the Directives meet both prongs by (1) articulating NIH's settled position to not fund research on certain topics and (2) resulting in direct legal consequences. *See Bennett*, 520 U.S. at

---

[24] *See, e.g.*, Ex. 19 ¶ 8; Ex. 20 ¶¶ 9–11, 24–27, 38; Ex. 22 ¶ 7; Ex. 28, ¶¶ 8 & 15; Ex. 24 ¶¶ 3–5; Ex. 27 ¶¶ 13, 14, 16, Ex. A; Ex. 30 ¶ 11; Ex. 31 ¶ 9; Ex. 33 ¶¶ 11–12, 27; Ex. 34 ¶¶ 11–12; Ex. 37 ¶¶ 10–12, 20; Ex. 41 ¶¶ 8–9, 17.

APHA App. 937

177–78. For example, the Priorities Directive reflects NIH's decision to "no longer prioritize research and research training programs that focus on [DEI]," describes grants that "must" be terminated, and gives mandatory instructions for implementation. Ex. 13 at 1. This had an obvious "actual or immediately threatened effect"—hundreds of grants, affecting billions of research dollars, have been terminated (and will continue to be terminated absent injunctive relief). As discrete, final agency actions, the Directives are therefore reviewable under the APA. *See New York v. Trump,* 133 F.4th 51 (1st Cir. 2025) (holding that implementation of "categorical funding freezes" constitutes "discrete final agency action"); *Woonasquatucket*, 2025 WL 1116157, at *15 (same for agency guidance that paused funding). Likewise, the terminations also announce the agency's decision to end each award or program, *Bennett*, 520 U.S. at 177, and have clear legal consequences, including immediate loss of funding. *See Massachusetts*, 2025 WL 702163, at *15.

And neither the Directives nor terminations are part of the "narrow[]" class of agency actions committed to agency discretion, and thus unreviewable in federal court. *Dep't of Com. v. New York*, 588 U.S. at 772; *see also* 5 U.S.C. § 701(a)(2). Because "meaningful standard[s]" in statute and regulation cabin agency discretion here, *see supra*, Argument Section III.A and *infra*, Argument Sections III.B.3 and III.D, the actions are reviewable. *Dep't of Com.*, 588 U.S. at 772; *see also Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities[.]"). Indeed, Defendants' claim to have acted in line with federal regulation—specifically, 2 C.F.R. § 200.340—is itself subject to review under the APA.

### 2. Defendants' Directives and Terminations Are Arbitrary and Capricious [Count I].

An agency's action is arbitrary and capricious under 5 U.S.C. § 706 (2)(A) if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

APHA App. 938

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts must ensure "that agency decisions are founded on a reasoned evaluation of the relevant factors" by "carefully reviewing the record and satisfying itself that the agency has made a reasoned decision." *Massachusetts*, 2025 WL 702163, at *16 (quotation omitted). Defendants' actions do not meet this standard.

First, the Directives and terminations fail to provide adequate reasoning. Agencies must offer "genuine justification for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com*., 588 U.S. at 785 (2019). Defendants' boilerplate statements that certain grants "no longer effectuate[] agency priorities," fall short because they "fail to provide basic notice by omitting any specificity about the reason that [NIH] found any individual grant 'inconsistent with . . . [its] priorities.'" *Am. Ass'n of Colls. for Teacher Educ.,* 2025 WL 833917, at *21.

Defendants' failure to include *any* data analysis is also damning. To support its decisions, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *State Farm*, 463 U.S. at 43 (cleaned up); *see also Am. Ass'n of Colls. for Teacher Educ.*, 2025 WL 833917, at *21 (use of boilerplate corroborates that agency has failed to "consider individual, or any, data or information," in violation of APA). The Directives and terminations cite no project-specific information or data to explain why each project no longer "effectuates agency priorities." This is especially egregious in light of the yearslong efforts by Plaintiffs and Members to apply for, refine,

APHA App. 939

implement, and report on their projects.[25] Moreover, the boilerplate language across the Directives and termination letters asserting that the projects, including research into serious health concerns like breast cancer, Alzheimer's Disease, and smoking cessation, lack "scientific validity," "rigor," or "public health benefit" directly contradict the reasoned previous conclusions of NIH and external scientists who reviewed and approved the projects through a rigorous process, and make no attempt to acknowledge—much less grapple with—this obvious inconsistency.[26] Ex. 26 ¶ 5.

Second, Defendants failed to articulate or explain any supposed changes in their policies and priorities. When an agency changes a policy or practice, it "is obligated to supply a reasoned analysis for the change." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127–28 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 42). Indeed, the APA "demand[s] that [the agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy," particularly when the "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

---

[25] *See, e.g.*, Ex. 2 ¶¶ 8, 19; Ex. 19 ¶ 12 (noting that time-sensitive research was "an intense and compressed process" for which Charlton set aside personal milestones); Ex. 20 ¶¶ 13–16, 29, 32, 39; Ex. 23 ¶ 36; Ex. 28 ¶ 12 ("the project was the result of four years of intensive effort"); Ex. 29 ¶ 13 ("During the final weeks [of assembling the application], I worked 196 hours over 11 days."); Ex. 30 ¶ 14 ("The application for this grant was the culmination of over a decade of research."); Ex. 31 ¶ 6 (noting that application process for each grant "often require[es] months or even years of preparation"); Ex. 32 ¶ 11 ("It is not an exaggeration to say that I spent thousands of hours working on the application . . . I spent about a 6-month period intensively writing the application, and in the end the application package was over 550 pages"); Ex. 33 ¶¶ 15–16; Ex. 34 ¶ 15 ("I have spent countless hours over six years developing this project. . . . I applied at least five times before my application was granted. Each time the application was sent back, I worked to incorporate feedback from NIH"); Ex. 35 ¶ 10; Ex. 37 ¶ 17; Ex. 39 ¶ 10; Ex. 40 ¶ 9; Ex. 41 ¶ 7.

[26] *See, e.g.*, Ex. 19 ¶ 23 (noting that reviewers scored grant in top seventh percentile); Ex. 20 ¶¶ 12–15, 28–30; Ex. 21 ¶ 14 (explaining that a study section member shared that Maphis's MOSAIC proposal was "highly regarded" and that "everyone was upset" when it was removed from consideration); Ex. 23 ¶ 39 ("Most applicants need to revise their entire application, which would include updating all tables and data presented, collecting new biosketches, and addressing any concerns raised in a completely new ~500-page application which would then be submitted for a subsequent round of the same rigorous review process"); Ex. 30 ¶ 14 (noting that grant scored in the first percentile); Ex. 32 ¶ 11 (describing how the proposal was revised after study section proffered constructive criticism on the program plan); Ex. 37 ¶¶ 12, 19 (explaining "perfect score" on MOSAIC proposal); Ex. 38 ¶ 15 ("Over the following years, I submitted several versions of the application to NIH and refined the application in response to NIH reviews to highlight the public health significance of studying HIV and aging[.]"); Ex. 40 ¶¶ 5, 7, 10, 12 (explaining notice he received that his F31 diversity proposal would be funded); Ex. 41 ¶ 7.

APHA App. 940

The Directives and termination notices do not clearly explain any departure from existing priorities—a fact made "even more egregious in light of the drastic change" from the existing policies under which the awards had been authorized. *Massachusetts*, 2025 WL 702163, at *18. The Directives and terminations run afoul of the priorities required by statute and NIH and IC strategic plans—all of which continue to bind the agency. This represents precisely the type of "inscrutable reasoning" that is "facially irrational." *Marasco & Nesselbush, LLP v. Collins*, 6 F. 4th 150, 173 (1st Cir. 2021).

Moreover, Defendants' purported change in priorities appears to be driven, at least in part, by actors outside of NIH in the so-called Department of Government Efficiency ("DOGE"). A reported analysis of metadata from NIH termination notices suggests that a DOGE employee authored the letter. Ex. 17 at 2. NIH staff have also described DOGE involvement in the terminations. Ex. 8 at 30-32; Ex. 9 at 36. It defies logic that NIH's rigorous decision-making process, including its two-step, highly standardized peer-review, can be undone by an outside actor who has no role in the agency's statutorily-defined processes.

Third, the Directives and terminations recklessly ignore "serious reliance interests that must be taken into account," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) and consequently unleash devastating consequences on Plaintiffs and Members, their research, study participants, and the populations that would benefit from the research findings. NIH is "not writing on a blank slate"—it must "assess whether there are reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Massachusetts*, 2025 WL 702163, at *19 (quoting *Regent*s, 591 U.S. 1, 33 (2020)).

Instead, NIH slashed grants with shocking disregard for the enormous impact of those actions. These terminations callously ignore the budgets that funded the staff on these projects,

APHA App. 941

"the risk to human life as research and clinical trials are suspended," "the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed," and most critically, "the health of those whose hopes rely on clinical trials and the financial investment that will be lost as research is disrupted." *Massachusetts*, 2025 WL 702163, at \*20 (issuing preliminary injunction regarding NIH's rate change notice). The Directives and terminations contain no evidence that Defendants weighed any—much less all—of these interests against their purported changes in policy. *See id.* at \*38 (quoting *Regents*, 591 U.S. at 33 (cleaned up)).

Fourth, and finally, in issuing and implementing the Directives and terminations, Defendants have acted "arbitrarily and capriciously" by "act[ing] in a manner that is contrary to [the agency's] own regulations or a congressional statute," for the reasons discussed below in Argument Section III.B.3. *Pol'y & Rsch., LLC v. United States Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018).

### 3. Defendants' Directives and Terminations Are Contrary to Law Because They Violate Congress's Mandates and the HHS Regulations. [Counts II and III].

The Directives and terminations are "not in accordance with law" and are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). As discussed above, Defendants' actions run directly counter to both congressional mandates and the priorities detailed in NIH and IC strategic plans to address health disparities and the underrepresentation of certain groups in the biomedical field. *See supra*, Argument Section III.A. They thus not only violate separation of powers principles but are also contrary to law and beyond Defendants' statutory authority. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("an administrative agency . . . may not exercise its authority 'in a manner inconsistent with the administrative structure Congress enacted into law.'") (internal citation omitted).

APHA App. 942

Defendants' actions are also contrary to law because HHS regulations do not authorize Defendants to terminate grants based on an assertion that the "award no longer effectuates agency priorities." *See, e.g.*, Ex. 13. HHS regulations allow NIH to unilaterally terminate a grant only if the grantee "fails to comply with the terms and conditions of the award" or "for cause," 45 C.F.R. § 75.372(a) (2024), and neither the Directives nor the termination letters rely on either of these grounds. *See supra*, Background Section II.A and II.B. These regulations also apply to termination of multi-year grants before their project end dates. *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 84.

As authority for terminating grants, Defendants erroneously rely on OMB's Guidance for Federal Financial Assistance at 2 C.F.R. § 200 (OMB Uniform Guidance)—and specifically 2 C.F.R. § 200.340, which since 2020 has included provisions allowing for termination under certain circumstances where "an award no longer effectuates the program goals or agency priorities."[27] But the OMB Uniform Guidance applies to a grantmaking agency only if the agency implements the guidance in its regulations and only in the form that the agency adopts. 2 C.F.R. § 1.105 (c) (2024) ("[T]he OMB guidance is not regulatory. Federal agency regulations . . . may give regulatory effect to the OMB guidance, to the extent that the agency regulations require compliance with all or portions of the OMB guidance.").

Critically, the provision of the OMB Uniform Guidance on which Defendants rely is *not* currently in effect for HHS. In 2014, HHS adopted the original version of 2 C.F.R. § 200.340, which—like HHS's governing regulations today—allowed for NIH to unilaterally terminate grants only where grantees violate an award's terms and conditions or for cause. *See* 78 Fed. Reg. 78590

---

[27] The 2020 version of the OMB Uniform Guidance allowed for unilateral termination "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." See 2 C.F.R. § 200.340(a)(2) (2020); 85 Fed. Reg. 49506 at 49559 (Aug. 13, 2020). In 2024, OMB renumbered the provision and revised it to allow for unilateral termination "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

APHA App. 943

(Dec. 26, 2013); 79 Fed. Reg. 75871 (Dec. 19, 2014). Although OMB subsequently revised 2 C.F.R. § 200.340 to allow for termination where "an award no longer effectuates the program goals or agency priorities," *HHS declined to adopt that language*, even when it subsequently adopted other revisions to its grant regulations,[28] and to this day HHS regulations do not give it the authority to terminate grants on that basis. HHS published an interim final rule in October 2024 that will bring HHS regulations into near total conformity with the OMB Uniform Guidance, including with 2 C.F.R. § 200.340, but that change is not effective *until October 1, 2025*. 89 Fed. Reg. 80,055, 80,056 (Oct. 10, 2024).

The Directives erroneously instruct NIH to inform grantees whose awards are being terminated that "NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2." Ex. 13 at 6. But Section 8.5.2 of the Grants Policy Statement currently only incorporates the 2 C.F.R. § 200.340 procedures for termination "if a recipient has failed to comply with the terms and conditions of award" Ex. 5 at 8.5.2. This is because the NIH Grants Policy Statement is "intended to be compliant with governing statutes and the requirements of 2 C.F.R. § 200, as modified by previously approved waivers and deviations;" and "in the case of a conflict, the statutes and regulations govern." Ex. 5 at 3. The NIH Grants Policy Statement did not adopt OMB's revisions to 2 C.F.R. § 200 allowing termination "if an award no longer effectuates the program goals or agency priorities" until HHS's October 2024 rulemaking, and as noted, that change will not be effective until October 2025.

The Directives' instruction to terminate NIH grants based on 2 C.F.R. § 200.340 because they "no longer effectuate[] agency priorities," and the termination letters' reliance on that basis,

---

[28] HHS revised its regulations in 2016 and retained the three limited conditions for termination in 45 C.F.R. § 75.372. *See* Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards; Technical Amendments, 81 Fed. Reg. 3004 (Jan. 20, 2016).

APHA App. 944

is therefore contrary to binding HHS regulations. 5 U.S.C. § 706(2)(A); *see also Massachusetts*, 2025 WL 702163, at *19 (issuing preliminary injunction against NIH where it issued policy directly conflicting with the language of HHS regulations, "disregarding an existing regulation and regulatory structure) (citing *FCC*, 556 U.S. at 515 (2009) ("An agency may not . . . simply disregard rules that are still on the books.")); *Pol'y. & Rsch., LLC*, 313 F. Supp. 3d at 72.

### 4. Defendants' Directives and Terminations Are Contrary to Constitutional Right [Count IV].

The Directives and terminations are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). When final agency action is contrary to constitutional rights, the APA requires it be "set aside." *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 243 (D. Mass. 2021) (citing 5 U.S.C. § 706(2)(B)). For reasons explained above in Argument Section III.A and below in Argument Section III.C, Defendants' actions violate separation of powers principles and the Due Process Clause—and thus violate the APA.

### C. The Directives and Terminations Are Unconstitutionally Vague [Count VI].

The Directives are void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law or policy is unconstitutionally vague if it (1) "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden" or (2) "encourages arbitrary and discriminatory enforcement." *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). This doctrine applies to administrative policies and federal agency guidelines. *Fed'l Commc'ns Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012) (holding that the FCC's indecency policy invited arbitrary enforcement).

Here, the "prohibitions" in the Directives "are not clearly defined," encouraging arbitrary enforcement by Defendants. *See Fox Television Stations*, 567 U.S. at 253. "[P]recision and

APHA App. 945

guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* Defendants fail to define any of the research areas or topics that purportedly "no longer effectuate[] agency priorities" in the Directives or termination notices, forbidding research using undefined terms such as "Diversity, Equity, and Inclusion" or "DEI"; "amorphous equity objectives," "Transgender issues," "gender identity," and "COVID-related research." *See supra*, Background Sections II.A and II.B.

Indeed, individuals working at NIH when the Directives went into effect have themselves explicitly noted the inherent vagueness of the Directives and termination notices. When asked about the boilerplate paragraphs in the termination notices that explained the basis of grant terminations, Liza Bundesen, the acting director of NIH's Office of Extramural Research between February 14 and March 7, 2025, *see,* Ex. 9 at 27:19–28:4, repeatedly stated that she found their operative language to be "vague" and that she did not "know what they mean" *see Id.* at 61:21–62:12. For example, when asked whether the statement "Research programs based on gender identity are often unscientific" is true, Ms. Bundeson responded, "I don't know. It's a – it's a vague phrase." *Id.* at 42:6–17; 46:8–14 ("this is a very vague statement"). When asked if she agreed with the statement, "Research programs based on gender identity do nothing to enhance the health of many Americans," she responded, "In my opinion, that's a very vague statement[.]" *Id.* at 48:9–17. And when asked about the statement that "many such studies ignore, rather than seriously examine, biological realities," she responded, "I don't understand the basis of the sentence. It's unclear to me." *Id.* at 49:16–24. As NIH officials themselves cannot explain the contours of these forbidden topics, the Directives "encourage[] arbitrary and discriminatory enforcement." *See Papachristou*, 405 U.S. at 162.

APHA App. 946

The Directives and terminations also fail to provide "fair notice" of what is prohibited. *See Fox Television Stations*, 567 U.S. at 254. There is no way for Plaintiffs and Members to know why or how their individual projects "fail[] to effectuate[] agency priorities."[29] This lack of notice limits Plaintiffs' and Members' ability to meaningfully address Defendants' concerns about their projects in their appeals, or—to the extent necessary—revise their projects to align with any purported agency priorities.[30] Because the Directives and terminations have not allowed Plaintiffs and Members to "know what is required of them so they may act accordingly," they must be enjoined. *See Fox Television Stations*, 567 U.S. at 253.

### D. Defendants Are Violating Plaintiffs' Rights under the APA and Constitution by Suspending or Delaying the Grant Application Process [All Counts].

Plaintiffs are also likely to succeed on the merits of their claims pertaining to Defendants' failure to review and decide Plaintiffs' grant applications. First, as explained above, Defendants are implementing the Directives by systemically suspending normal review processes for applications for pipeline grants. *See supra*, Background Section II.C These actions contravene congressional mandates to diversify the biomedical workforce—and thus violate separation of powers. *See supra*, Argument Section III.A.

---

[29] *See, e.g.*, Ex. 29 ¶ 25 ("[I]t is unclear to me what criteria NIH used to determine that the Coordinating Center 'no longer effectuates agency priorities.'"); Ex. 19 ¶ 18; Ex. 20 ¶¶ 22, 36, 39, 45–46; Ex. 21 ¶ 12 (explaining that NIH told her she will not receive comments on her MOSAIC application because "all review related data was deleted from the system[.]"); Ex. 27 ¶ 20; Ex. 28 ¶ 18; Ex. 30 ¶ 19; Ex. 31 ¶ 19; Ex. 33 ¶¶ 20, 26, 27; Ex. 34 ¶ 20; Ex. 35 ¶¶ 14–16; Ex. 37 ¶ 20.

[30] *See, e.g.*, Ex. 19 ¶ 59 ("I am actively appealing these terminations, but am at a loss for how to do so."); Ex. 20 ¶¶ 39 ("I am uncertain why the projects no longer effectuate agency priorities, how I can revise these projects to align with agency priorities, and how I can align future grant applications with these priorities."), 45–46; Ex. 24 ¶ 13; Ex. 28 ¶ 26 ("I remain uncertain about how to respond to NIH's assessment that my project 'no longer aligns with agency priorities,' especially since I do not understand how my research is considered 'based on DEI'); Ex. 30 ¶ 32 ("I also did not know how to recharacterize my project in my appeal to fit within the asserted new agency priorities because I do not understand the terms used as the basis for the termination."); Ex. 31 ¶ 35 (expressing confusion on "how to recharacterize my project in my appeal . . . because I do not understand the terms used as the basis for termination"); Ex. 32 ¶ 24 ("I have appealed this decision, however I found it very difficult to write the appeal because . . . I wasn't sure how to recharacterize [my project] to fit within the asserted new agency priorities"); Ex. 33 ¶¶ 20, 26 ("I also do not understand why the grant was terminated, and I had no idea how to address any agency concerns or recharacterize or revise my project for the purposes of appeal, especially in light of the lack of information provided by NIH"), 27, 28; Ex. 34 ¶ 37.

APHA App. 947

Second, Defendants' failure to review and decide grant applications pursuant to NIH's standard processes also violates the APA. This failure to act is itself reviewable final agency action, because it has the same impact on Plaintiffs' and Members' rights as would an express application denial. *See Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 10 (D.D.C. 2008) (allowing judicial review of an agency's failure to act under § 706(2)).

Defendants' failure to review Plaintiffs' and Members' grant applications violates § 706(2) under the same arbitrary and capricious analysis set forth in Argument Section III.B.2 above. Defendants' actions are contrary to constitutional right, *see supra*, Argument Section III.B.4, and statutes and regulations governing NIH's process of scientific review of applications. *See, e.g.*, 42 U.S.C. §§ 289a (requiring peer review of grant applications); §284a(e) (requiring that advisory councils meet at least three times each fiscal year); 42 C.F.R. §§ 52h.7 (requiring peer review of applications); 52.5 (requiring evaluation and disposition of all applications).

Defendants have also violated 5 U.S.C. §§ 706(1) and 555 (b) because they have unlawfully withheld or unreasonably delayed consideration of Plaintiffs' grant applications. To prevail under § 706(1), Plaintiffs must show that (1) the action in question is "a discrete agency action that it is required to take," and (2) the agency failed to take, or unreasonably delayed in taking, that action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Both are satisfied here. First, NIH is required by law and regulation to evaluate all applications through its standard scientific review process, including study-section and advisory-council review, and issue decisions on applications—discrete agency actions it is refusing to take. *See* Ex. 26 ¶ 5.

Second, to decide if an agency has unreasonably delayed a discrete and required action, courts look to the "*TRAC* factors," including whether the agency's timeline is governed by a "rule

32

of reason" and whether human health and welfare are at stake. *Town of Wellesley v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (applying *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*)).[31]

Here, NIH's own published timetables provide a "rule of reason" that NIH has defied. *See Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 470 (D.D.C. 2020) (evaluating rule of reason based in part on internal policy guidance). More fundamentally, "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Defendants' inaction is jeopardizing public health in the same ways their terminations are, as discussed above and *infra*, and as described in a related lawsuit before this Court. *See Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction*, ECF No. 78, at 36–38, *Massachusetts v. Kennedy*, 1:25-cv-10814-BEM (D. Mass.) Accordingly, the Court should order NIH to evaluate and decide Plaintiffs' and Members' applications pursuant to the standard NIH review process.

## IV.    Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction.

Plaintiffs and Members are "likely to suffer irreparable harm in the absence of preliminary relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Without reinstatement of terminated grant funding, many Plaintiffs and Members will be unable to continue

---

[31] The *TRAC* court explained that: "(1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" 750 F.2d at 80 (citations omitted).

APHA App. 949

their projects.[32] Some have already paused their studies, jeopardizing and, in some cases, eliminating the ability to perform statistical analyses on any data collected.[33] And although they are trying to secure replacement funding, most do not anticipate being able to raise nearly enough to allow their projects to continue absent restoration of the terminated grants.[34] This will also result in lost salaries, as well as the termination of other project staff.[35] Indeed, some staff have already been let go because of these cuts,[36] and some Plaintiffs and Members had planned to hire new staff but are no longer able to do so.[37] Many Plaintiffs and Members will have to take on additional responsibilities, taking away critical time from their research.[38] And applicants are in an administrative limbo: without funding but also unable to move forward with other applications.[39] Because this "loss is so great as to threaten the existence" of the work of Plaintiffs and Members,

[32] *See, e.g.*, Ex. 19 ¶ 56; Ex. 20 ¶¶ 37 ("And at this time, we do not anticipate being able to secure sufficient additional funding to allow us to resume this study for future cohorts."), 23, 40; Ex. 22 ¶ 17; Ex. 24 ¶ 17; Ex. 28 ¶ 21; Ex. 34 ¶ 25.

[33] *See, e.g.*, Ex. 30 ¶¶ 25–26 (data unusable for analysis and biospecimen samples discarded); Ex. 19 ¶ 54; Ex. 20 ¶¶ 23 ("[W]ithout sufficient additional funding, which at this time I do not anticipate securing, we will not have money to pay for an individual with the pertinent statistical background and expertise to analyze data."), 37 ("But because the termination forced us to prematurely begin the intervention for the control group, we can no longer use any of the data from this cohort for our analyses—at not as intended with a comparison group."), 40; Ex. 28 ¶ 21; Ex. 31 ¶ 30; Ex. 33 ¶ 21; Ex. 34 ¶ 30.

[34] *See, e.g.*, Ex. 20 ¶ 41 ("And although my co-investigators and I are scrambling to secure replacement funding, that endeavor is taking away time from our current research, and I do not anticipate being able to secure nearly enough to secure the amount of funding (millions of dollars) that we would have had with those terminated grants."); Ex. 21 ¶ 21; Ex. 29 ¶ 31 ("If [Business Name] is forced to pay these costs out-of-pocket, it would bankrupt the business"); Ex. 33 ¶¶ 23, 26; Ex. 34 ¶ 25; Ex. 35 ¶ 2; Ex. 36 ¶ 15; Ex. 37 ¶ 22; Ex. 42 ¶ 13.

[35] *See, e.g.*, Ex. 19 ¶¶ 51–52; Ex. 20 ¶ 41; Ex. 24 ¶ 17; Ex. 25 ¶¶ 10, 16; Ex. 28, ¶ 22; Ex. 29 ¶¶ 34–35; Ex. 30 ¶ 23; Ex. 31 ¶ 24 ("In total, at least 35 people across teams will be losing their jobs or a portion of their income as a result of this grant termination."), 25–27; Ex. 32 ¶ 21; Ex. 33 ¶ 23 ("Because of the termination of this grant and the other grant terminated by NIH, I will likely have to lay off at least two staff members."); Ex. 34 ¶¶ 25–27; Ex. 21 ¶ 21 (expressing worry over potential job loss because of lack of funding); Ex. 37 ¶ 25 ("I do not know how much longer my job will be safe.").

[36] *See, e.g.*, Ex. 19 ¶ 51; Ex. 20 ¶ 41 ("several staff have already been terminated, and more terminations are soon to happen because of a lack of funding resulting from the termination of these grants").

[37] *See, e.g.*, Ex. 20 ¶ 23; Ex. 28 ¶ 22; Ex. 31 ¶ 28 ("The grant termination means I can no longer take on new graduate students, undermining my ability to fulfill my role as a mentor and educator in training the next generation of scientists at my institution."); Ex. 32 ¶ 13.

[38] *See, e.g.*, Ex. 20 ¶¶ 41–42; Ex. 28 ¶ 23; Ex. 31 ¶¶ 27 ("I have lost my summer salary and will have to teach a higher course load to compensate, which will also make it harder for me to conduct research."), 30; Ex. 34 ¶¶ 27, 29 ("This increased workload and lack of adequate funding makes it impossible to sustain the research project.").

[39] *See, e.g.*, Ex. 21 ¶ 19; Ex. 29 ¶ 10; Ex. 34 ¶ 34–35; Ex. 37 ¶ 16; Ex. 40 ¶¶ 5, 10–17, 21.

it is "irreparable." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (internal citations omitted); *see also Aids Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *20 (D.D.C. Mar. 10, 2025).

That alone distinguishes this case from *Department of Education v. California*, 604 U.S. __ (2025). There, the district court had enjoined the federal government from terminating various education-related grants. *Id.* at 1. In staying the preliminary injunction, the Supreme Court emphasized that movants had "represented . . . that they have the financial wherewithal to keep their [grant-funded] programs going" during the pendency of the litigation. *Id.* at 2. By contrast, Plaintiffs and Members have not and cannot make any such representation.[40] *Id.* Thus, the "ensuing irreparable harm" from the project terminations would *not* "be of their own making." *Id.*

Further, "there can be no do over and no redress" for Plaintiffs' and Members' research. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation omitted). Most immediately, some study participants will have treatment or intervention interrupted.[41] With studies shutting down prematurely, data collected will be of little or no use for drawing statistical inferences or deriving programmatic or policy recommendations.[42] Research participants may lose

---

[40] *See, e.g.*, Ex. 20 ¶¶ 37, 41 ("I do not anticipate being able to secure nearly enough to secure the amount of funding (millions of dollars) that we would have had with those terminated grants."), 42 ("I don't see how else to fund these programs besides through the now-terminated NIH grants."); Ex. 31 ¶¶ 24, 26 ("I do not anticipate being able to secure alternative funding to make up long-term for the salary of these team members."); Ex. 33 ¶ 23; Ex. 34 ¶ 25 ("It is now uncertain whether my co-researchers and I will have the necessary funding to continue our critical research.").

[41] *See, e.g.*, Ex. 30 ¶¶ 27–28; Ex. 32 ¶ 13.

[42] *See, e.g.*, Ex. 20 ¶¶ 23 ("Collectively, these methodological and statistical issues will prohibit our ability to draw conclusions from the data we have collected and restrict the possible recommendations that can be developed to benefit sexual minority men (including racial/ethnic sexual minority men) across the U.S."), 37 ("We also will not have statistical power to conduct analyses given that our sample size will fall short of what was proposed/intended."), 40; Ex. 31 ¶ 32 ("Since we had to abruptly pause our data collection, we cannot draw conclusions and run analyses, and the anticipated research product focused on measurement development will not be completed."); Ex. 33 ¶ 21; Ex. 34 ¶ 30 ("[N]ow that we have lost funding, the data will be analyzed but will not be able to be disseminated via publications and conference presentations, and we will not be able to effectively apply the lessons we have learned from the data, making it essentially useless for the purposes of this program intervention.").

APHA App. 951

trust in the research process and experience heightened stigma.[43] More broadly, the public will miss out on the opportunity to benefit from the research Defendants have abruptly halted—important work on some of the most pressing public health issues, including breast cancer, uterine cancer, anal cancer, stroke risk, cardiac health, Alzheimer's Disease, HIV prevention, suicide prevention, alcohol use disorder, smoking cessation, eating disorders, sexually transmitted infections, COVID-19, depression, psychopathology, pain, and many other conditions that very often disproportionately affect minority communities.[44] *See* Ex. 27 ¶ 13.

Termination of grant funding also poses a risk to Plaintiffs' and Members' career progression, as NIH grants not only fund their research but are critical to securing faculty positions by demonstrating the scientific rigor and impact of their work.[45] Recipients of Pipeline Grants, meanwhile, are losing not only the external funding that is required to support their early career work but also the training, networking and collaboration with other grantees and mentors, as well as the expert affirmation of their work that comes from emerging through NIH's rigorous review

---

[43] *See, e.g.*, Ex. 19 ¶¶ 53–55; Ex. 30 ¶¶ 24, 27, 29; Ex. 31 ¶¶ 29, 33 ("Even if I were able to find funding to continue the work, I would almost certainly not be able to have the study's former participants work with me again—the LGBTQIA+ caregivers' trust in the researcher has been broken."); Ex. 33 ¶¶ 21, 22 ("Recruiting participants for the study required building relationships and contacts within the community. The abrupt termination of the project harmed the trust we built with community partner organizations and members of the community who participated in the study."); Ex. 34 ¶¶ 30–31.

[44] *See, e.g.*, Ex. 20 ¶¶ 23, 37, 40 ("My co-investigators and I will have an impaired—and in some cases, foreclosed—ability to . . . develop recommendations to address health disparities experienced by vulnerable subpopulations—including sexual and gender minority individuals, LGBTQ+ youth, and people of color."); Ex. 21 ¶¶ 22–24; Ex. 22 ¶ 17; Ex. 28 ¶ 23; Ex. 29 ¶ 37; Ex. 32 ¶ 23 ("There will be a dearth of important innovations designed to improve the lives of people experiencing these horrible conditions. We cannot even know what lifechanging treatments will now go undiscovered without this funding."); Ex. 33 ¶ 24 ("As we are witnessing the first generation of people with HIV living to reach old age, we also have our first opportunity to study how aging is affected by HIV, related medications, and other factors like discrimination. If studies like mine are unable to continue, we will lose a cohort of aging people and their experiences, as well as the opportunity to learn from them."); Ex. 34 ¶¶ 32–33; Ex. 35 ¶ 34 ("As a result, individuals living with Alzheimer's disease or related dementias may be left without support systems that reflect their actual care networks[.]"); Ex. 37 ¶¶ 25–27; Ex. 39 ¶¶ 17–18; Ex. 41 ¶ 17.

[45] *See, e.g.*, Ex. 20 ¶¶ 41-42; Ex. 21 ¶ 22; Ex. 25 ¶¶ 10, 16; Ex. 30 ¶ 31; Ex. 31 ¶ 31 ("After spending two decades building my career and securing an R01—one of the premier grants in my field—having NIH swiftly take it away is a significant personal and professional setback."); Ex. 32 ¶ 21; Ex. 34 ¶¶ 25, 27 ("This disruption comes at a critical point in my career as I am actively working toward promotion from Associate Professor to Full Professor."); Ex. 35 ¶¶ 20–21; Ex. 36 ¶ 15; Ex. 37 ¶¶ 22–24; Ex. 39 ¶¶ 17–18a; Ex. 40 ¶¶ 19–22 (first-time applicant for F31 diversity grant explaining impact of likely loss of this funding stream); Ex. 41 ¶ 16.

APHA App. 952

processes.[46] Undergraduate students have been left without money to pay for tuition and housing, and post-doctoral researchers have been deprived of promised funding just as they are applying for faculty positions dependent on bringing such funding to an institution.[47] Some could have initially applied for parallel programs that have not been terminated, but now they no longer meet the eligibility criteria.[48] "By its very nature injury to goodwill and reputation not easily measured or fully compensable in damages is often held to be irreparable." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (cleaned up).

Finally, as other courts in this District have emphasized when analyzing the irreparable harm that results from terminating NIH grants, "[i]t is impossible to accurately measure or compensate humans who lose their lives from a pause in research," and "[i]t is impossible to measure the value of discovery from scientists who choose to leave, or of the potential students who now never become scientists at all." *See Massachusetts*, 2025 WL 702163, at *31. Those "losses are compounding and will result in even greater disruption to ongoing research and clinical trials." *Id.* Thus, Plaintiffs' and Members' injuries "cannot be adequately compensated for by . . . a later-issued permanent injunction," and therefore they will suffer irreparable harm absent a preliminary injunction. *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005); *see also Ross-Simons of Warwick*, 102 F.3d at 19.

## V. The Public Interest and the Balance of Equities Strongly Favor Entry of a Preliminary Injunction.

---

[46] *See, e.g.*, Ex. 21 ¶¶ 18, 22; Ex. 23 ¶ 48; Ex. 25 ¶¶ 10, 16; Ex. 35 ¶¶ 20–21; Ex. 36 ¶¶ 7, 15, 17; Ex. 37 ¶¶ 22–24; Ex. 38 ¶¶ 5, 13; Ex. 39 ¶¶ 15, 17–18; *see* Ex. 40 ¶¶ 19–22 (first-time F31 diversity applicant explaining impact of likely loss of this opportunity).
[47] *See, e.g.*, Ex. 23 ¶ 46 (describing how undergraduate students rely on MARC funding to pay their tuition, food costs, and housing costs); Ex. 32 ¶ 21 (describing the consequences of funding termination for postdoctoral fellow); Ex. 36 ¶ 15; Ex. 41 ¶ 16.
[48] *See, e.g.*, Ex. 36 ¶ 18; Ex. 40 ¶ 21 ("I cannot possibly submit another F31 application, because the time from submission to funding takes approximately nine months, after which I will have already graduated.").

APHA App. 953

At the outset, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12. Moreover, the chaos from Defendants' actions threatens the public's interest in having an orderly and well-functioning government. "There is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (cleaned up). Defendants' sweeping, arbitrary, and sudden terminations of hundreds of grants comprising billions of dollars' worth of funding of important research flagrantly violates both statutory law and their own regulations. *See supra*, Argument Section III.A–C. Absent injunctive relief, this chaos will only continue. The research itself also has a clear public value as evidenced by the rigorous application and peer-review process. *See supra*, Background Section I.B.2; *see also Massachusetts*, 2025 WL 702163 at *32 ("Courts have consistently held there is a strong public interest in health and safety.") (collecting cases). And as discussed above, the harm from suddenly cutting off that research is just as clear. *See supra*, Argument Section IV; *see also Massachusetts*, 2025 WL 702163 at *28–29.

The balance of harms favors Plaintiffs. Defendants would merely be required to roll back their unlawful Directives and set aside their unlawful terminations. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12; *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the Government "cannot suffer harm from an injunction that merely ends an unlawful practice."). Because an injunction would merely prohibit and correct Defendants' unlawful conduct, the balance of the equities counsels in favor of such relief.

Finally, no security should be required, as Defendants will suffer no harm from the absence of a bond. *See Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (1st Cir. 2021).

APHA App. 954

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion

for a preliminary injunction.

[signatures on following page]

APHA App. 955

Dated: April 25, 2025

Shalini Goel Agarwal
shalini.agarwal@protectdemocracy.org
**Protect Democracy Project**
2020 Pennsylvania Ave., NW, Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org

Michel-Ange Desruisseaux
82 Nassau Street, #601
New York, NY 10038
michel-
ange.desruisseaux@protectdemocracy.org

Kenneth Parreno*
15 Main Street, Suite 312
Watertown, MA 02472
kenneth.parreno@protectdemocracy.org

Lisa S. Mankofsky
Oscar Heanue
**Center for Science in the Public Interest**
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

Respectfully submitted,

*/s/ Jessie J. Rossman*
Jessie J. Rossman
Suzanne Schlossberg
**American Civil Liberties Union
Foundation of Massachusetts, Inc.**
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Olga Akselrod
Alexis Agathocleous
Rachel Meeropol
Alejandro Ortiz
**American Civil Liberties Union
Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

*\* Admission forthcoming.*

40

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 25, 2025 a true and correct copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

April 25, 2025                                            */s/ Jessie J. Rossman*
                                                         Jessie J. Rossman

APHA App. 957

**APPENDIX A**

<u>TABLE OF ABBREVIATIONS</u>

| Abbreviation | Meaning |
|---|---|
| CFC | Court of Federal Claims |
| DOGE | Department of Government Efficiency |
| HHS | Department of Health and Human Services |
| ICs | Institutes and Centers |
| IMSD | Initiative for Maximizing Student Development program |
| IRACDA | Institutional Research and Academic Career Development Award program |
| Kirschstein-NRSA | Ruth L. Kirschstein National Research Service Award |
| MARC | Maximizing Access to Research Careers program |
| MOSAIC | Maximizing Opportunities for Scientific and Academic Independent Careers program |
| NIH | National Institutes of Health |
| NIHGPS | NIH Grants Policy Statement |
| NIMHD | National Institute on Minority Health and Health Disparities |
| NOA | Notice of Award |
| NOFO | Notice of Funding Opportunity |
| OMB | Office of Management and Budget |
| PHSA | Public Health Service Act, 42 U.S.C. Ch. 6A |
| U-RISE | Undergraduate Research Training Initiative for Student Enhancement |

## APPENDIX B

EXHIBITS IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

| EXH. NO. | TITLE & ACCOMPANYING EXHIBITS |
|---|---|
| 1 | National Institutes of Health (NIH), *Institutes at NIH* |
| 2 | NIH, *Budget* |
| 3 | NIH, *NIH Operates Under a Continuing Resolution (NOT-OD-25-084)* |
| 4 | NIH-Wide Strategic Plan 2021-2025 (2020) |
| 5 | NIH Grants Policy Statement (Apr. 2024) |
| 6 | Katherine J. Wu, *The NIH's Grant Terminations Are 'Utter and Complete Chaos,'* Atlantic (Mar. 14, 2025) |
| 7 | Memorandum for Heads of Executive Departments and Agencies (Jan. 27, 2025) |
| 8 | Transcript of April 3, 2025 Deposition of Michelle Bulls, *Washington v. Trump*, No. 2:25-cv-00244-LK (W.D. Wash. 2025) |
| 9 | Transcript of April 4, 2025 Deposition of Liza Bundesen, *Washington v. Trump*, No. 2:25-cv-00244-LK (W.D. Wash. 2025) |
| 10 | Department of Health & Human Services (HHS), Secretarial Directive on DEI-Related Funding (Feb. 10, 2025) |
| 11 | NIH Review of Agency Priorities Based on the New Administration's Goals (Feb. 12, 2025) |
| 12 | Supplemental Guidance to Memo Entitled- NIH Review of Agency Priorities Based on the New Administration's Goals (Feb. 13, 2025) |
| 13 | Staff Guidance—Award Assessments for Alignment with Agency Priorities – March 2025 |
| 14 | NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025 (Mar. 25, 2025) |
| 15 | NIH, *Notice of Civil Rights Term and Condition of Award (NOT-OD-25-090)* |
| 16 | NIH Minority Health and Health Disparities Strategic Plan 2021-2025 |
| 17 | Avi Asher-Schapiro et al., *Elon Musk's Demolition Crew*, ProPublica (Feb. 6, 2025) |

| 18 | Email from Michelle Bulls with Subject "Award Revision Guidance and List of Terminated Grants via letter on 3/12" (March 13, 2025) |
|----|----|
| 19 | Declaration of Plaintiff Brittany Charlton<br><br>A. R61 Notice of Award (Aug. 25, 2024)<br>B. R61 Funding Announcement (Sept. 1, 2022)<br>C. R61 Termination Notice (Mar. 12, 2025)<br>D. R61 Revised Notice of Award (Mar. 14, 2025)<br>E. R01 Notice of Award (May 16, 2021)<br>F. R01 No-Cost Extension (Feb. 18, 2025)<br>G. R01 Termination Letter (Mar. 21, 2025)<br>H. Sexual and Gender Minority Populations in NIH-Supported Research<br>I. R01 Administrative Supplement Grant Notice of Award (Sep. 3, 2024)<br>J. Notice of Special Interest (Dec. 2, 2021)<br>K. R01 Administrative Supplement Termination Notice (Mar. 21, 2025) |
| 20 | Declaration of Plaintiff Katie Edwards<br><br>A. R01 Notice of Award (Jul. 22, 2022)<br>B. CDC Webpage<br>C. R01 Grant Termination Notice (Mar. 12, 2025)<br>D. R01 Revised Notice of Award (Mar. 20, 2025)<br>E. R34 Notice of Award (Oct. 12, 2023)<br>F. R34 Grant Termination Notice (Mar. 21, 2025)<br>G. R34 Revised Notice of Award (Mar. 25, 2025) |
| 21 | Declaration of Plaintiff Nicole Maphis<br><br>A. NIH Notice of Interest in Diversity<br>B. MOSAIC PAR (Jul. 23, 2024)<br>C. NIH/NIAAA Email (Mar. 4, 2025)<br>D. Mulholland Post (Mar. 13, 2025)<br>E. Study Section Meeting Roster (Mar. 4, 2025)<br>F. NIH/NIAAA Email (Mar. 17, 2025)<br>G. K99/R00 PAR (Apr. 24, 2024)<br>H. NIH Standard Due Dates Webpage |
| 22 | Declaration of Plaintiff Peter Lurie<br><br>A. NIH-Wide Strategic Plan for Fiscal Years 2021-2025 |
| 23 | Declaration of Georges C. Benjamin on behalf of Plaintiff American Public Health Association (APHA)<br><br>A. MARC program PAR (Feb. 23, 2021)<br>B. MARC Termination Email (Apr. 2, 2025)<br>C. IMSD program PAR (Jan. 26, 2021)<br>D. IMSD Termination Email (Apr. 2, 2025) |

| 24 | Declaration of Plaintiff Ibis Reproductive Health<br><br>A.  R01 Notice of Award (Feb. 9, 2024)<br>B.  R01 Notice of Award (Aug. 20, 2024)<br>C.  R01 Notice of Award (Aug. 28, 2024)<br>D.  Termination Letter (Mar. 21, 2025)<br>E.  Revised Notice of Award (Mar. 25, 2025)<br>F.  Revised Notice of Award (Mar. 25, 2025) |
|---|---|
| 25 | Declaration of Neal Sweeney on behalf of Plaintiff United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) |
| 26 | Declaration of Jeremy Berg |
| 27 | Declaration of Scott Delaney<br><br>A.  List of Terminated Grants<br>B.  NRSA T32 PAR (Nov. 15, 2024)<br>C.  NRSA T32 PAR (Mar. 31, 2025) |
| 28 | Declaration of APHA Member 1<br><br>A.  NIMHHD Notice of Award (June 19, 2019)<br>B.  NIH-Wide Strategic Plan 2016-2020<br>C.  NIH-Wide Strategic Plan 2021-2025<br>D.  Grant Termination Letter (Feb. 28, 2025)<br>E.  Revised Notice of Award (Feb. 28, 2025)<br>F.  Revised Notice of Award (Mar. 6, 2025) |
| 29 | Declaration of APHA Member 2<br><br>A.  HEAL Initiative RFA (May 5, 2022)<br>B.  Notice of NIH's Interest in Diversity (Nov. 22, 2019)<br>C.  Notice of Award (Sept. 28, 2022)<br>D.  Notice of Supplemental Award (Aug. 26, 2024)<br>E.  Termination Letter (Mar. 21, 2025)<br>F.  Revised Notice of Award (Mar. 24, 2025)<br>G.  Revised Notice of Supplemental Award (Mar. 24, 2025) |
| 30 | Declaration of APHA Member 4 Sari Reisner<br><br>A.  National HIV Strategy for the United States 2022-2025<br>B.  R01 Notice of Award (Sept. 10, 2024)<br>C.  R01 Grant Termination (Mar. 21, 2025)<br>D.  R01 Revised Notice of Award (Mar. 24, 2025) |
| 31 | Declaration of APHA Member 5 Jace Flatt<br><br>A.  R01 Notice of Award (Jul. 31, 2023)<br>B.  R01 Funding Opportunity Announcement (June 9, 2022)<br>C.  R01 Revised Notice of Award (Mar. 24, 2025) |

|    | |
|----|----|
|    | D.  Sexual and Gender Minority Populations in NIH-Supported Research (Aug. 28, 2019) |
| 32 | Declaration of APHA Member 7<br><br>A.  NRSA PA (Mar. 20, 2020)<br>B.  Notice of Award (Jun. 14, 2024)<br>C.  Termination letter (Mar. 21, 2025)<br>D.  Revised Notice of Award (Mar. 21, 2025) |
| 33 | Declaration of APHA Member 9 Jesus Ramirez-Valles<br><br>A.  Notice of Award (Sept. 9, 2022)<br>B.  Understanding and Addressing the Impact of Structural Racism and Discrimination on Minority Health and Health Disparities RFA (Mar. 23, 2021)<br>C.  Termination Letter (Mar. 21, 2025)<br>D.  Revised Notice of Award (Mar. 24, 2025)<br>E.  Termination Letter (Mar. 12, 2025) |
| 34 | Declaration of APHA Member 10 Annelise Mennicke<br><br>A.  Notice of Award (Apr. 24, 2024)<br>B.  Notice of Grant Termination (Mar. 20, 2025) |
| 35 | Declaration of UAW Pre-Member 1<br><br>A.  MOSAIC Notice of Award<br>B.  MOSAIC PAR (Aug. 15, 2019)<br>C.  MOSAIC Termination Notice (Apr. 11, 2025) |
| 36 | Declaration of UAW Pre-Member 7<br><br>A.  MOSAIC Notice of Award<br>B.  MOSAIC PAR (Aug. 17, 2021)<br>C.  MOSAIC Termination (Apr. 2, 2025)<br>D.  NIGMS Training email |
| 37 | Declaration of UAW Member 3<br><br>A.  MOSAIC PAR (Aug. 17, 2021)<br>B.  NIA K99/ROO webpage (Mar. 25, 2025) |
| 38 | Declaration of UAW Member 9<br><br>A.  IRACDA NIH RePORTER Webpage<br>B.  IRACDA PAR (Sep. 19, 2019)<br>C.  IRACDA Fellowship Offer Letter<br>D.  IRACDA Termination Email (Apr. 2, 2025)<br>E.  IRACDA co-director Email (Apr. 3, 2025) |
| 39 | Declaration of UAW Member 10 |

Case 1:25-cv-10787-BEM    Document 41    Filed 04/25/25    Page 53 of 53

| | | |
|---|---|---|
| | | A. IRACDA project details, NIH RePORTER website<br>B. IRACDA PAR (Sept. 9, 2019)<br>C. Email terminating IRACDA Program (Apr. 2, 2025) |
| 40 | Declaration of UAW Member 11 Delaney Sullivan | A. Strategic Vision for Improving Human Health at The Forefront of Genomics<br>B. F31-Diversity PA (Sept. 12, 2023)<br>C. NIH/NHGRI email (Jan 6, 2025)<br>D. NIH/NHGRI email (Nov. 22, 2024)<br>E. eRA Status Information (Feb. 19, 2025)<br>F. Sullivan email to NIH (Feb. 4, 2025)<br>G. F31-Diversity PA (Mar. 6, 2025) |
| 41 | Declaration of UAW Member 12 Amanda Perez | A. Notice of Award (Aug. 2, 2023)<br>B. MOSAIC PAR (Aug. 17, 2021)<br>C. Email from NIH Program Officer (Sep. 1, 2023)<br>D. MOSAIC project details RePORTER website (June 26, 2024)<br>E. MOSAIC PAR (Jul. 23, 2024) |
| 42 | Declaration of UAW Member 13 | A. IMSD project details, NIH RePORTER website<br>B. IMSD PAR (Oct. 25, 2018)<br>C. IMSD Notice of Appointment (Oct. 1, 2024)<br>D. IMSD approval email (Jan. 7, 2025)<br>E. Revised IMSD Notice of Appointment (Jan. 31, 2025)<br>F. IMSD Termination Email (Apr. 2. 2025) |

APHA App. 963

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; and NICOLE MAPHIS,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, *in his official capacity as Director of the National Institutes of Health*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR*., in his official capacity as Secretary of the United States Department of Health and Human Services*,<br><br>*Defendants*. | Case No. 1:25-cv-10787-WGY |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

APHA App. 964

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

   I.   The Court has jurisdiction over Plaintiffs' suit................................................... 1

      A.   This Court has already rejected Defendants' Tucker Act arguments............... 1

      B.   Plaintiffs do not seek specific performance of a contract. ............................. 3

      C.   Plaintiffs' suit is not a programmatic challenge.............................................. 4

      D.   Defendants' actions are not "committed to agency discretion." ..................... 4

      E.   Plaintiffs' claims are justiciable. .................................................................... 5

      F.   Associational Plaintiffs have standing. .......................................................... 7

   II.   Plaintiffs are likely to succeed on the merits. .................................................. 8

      A.   Plaintiffs are likely to succeed on their Section 706(2) APA claims. ............ 8

         1.   Defendants' actions are contrary to law. .................................................. 8

           a.   Defendants flouted congressional mandates. ...................................... 8

           b.   Defendants violated HHS regulations.................................................. 10

         2.   Defendants' actions are arbitrary and capricious. .................................. 12

         3.   Defendants' actions are contrary to constitutional right.......................... 14

      B.   Plaintiffs are likely to succeed on their Section 706(1) APA claim............... 14

      C.   Defendants violate separation of powers principles. ..................................... 15

      D.   Defendants' Directives and terminations are unconstitutionally vague........ 16

   III.   Plaintiffs and their members will suffer irreparable harm. ............................ 17

   IV.   The balance of equities weighs in favor of an injunction. ............................. 19

   V.   Plaintiffs seek an injunction on behalf of themselves and their members. ................... 19

   VI.   The court should not require a bond and should not stay any injunction...................... 20

APHA App. 965

## TABLE OF AUTHORITES

**Cases**

*AAUP v. Rubio, No. 25-cv-10685,* 2025 WL 1235084 (D. Mass. Apr. 29, 2025)..................... 4, 6

*Adams v. Freedom Forge Corporation,* 204 F.3d 475 (3d Cir. 2000)........................................ 18

*AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. CV 25-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025)......................................................................................................................... 13

*Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484 (5th Cir. 2014) .............................. 4

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702, 2025 WL 833917 (D. Md. Mar. 17, 2025) ............................................................................................... 12, 13

*Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126 (D.D.C. 2023) ................................... 2

*Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ....................................................... 6

*Bd. of Regents of State Colleges. v. Roth*, 408 U.S. 564 (1972) ............................................... 17

*California v. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025)............................................................ 1

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986)............................................................................................................................... 8

*Career Colleges & Sch. of Texas v. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) .................... 19

*City of Evanston v. Barr*, 412 F. Supp. 3d 873 (N.D. Ill. 2019) ................................................. 20

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)........................................................... 16

*Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, (D.D.C. Apr. 16, 2025) .................. 3

*Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330 (Fed. Cir. 2021) .................................... 2

*Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978 (1st Cir. 1982)........................................................ 20

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025)................................................................... 2

*DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ................................ 12, 13, 14

*Doe v. Trump*, No. CV 25-10135, 2025 WL 485070, (D. Mass. Feb. 13, 2025) ........................ 17

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ......................................... 19

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................................ 13

*Env't Def. Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021) ........................................................... 14

*Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647 (D. Md. 2018)........................................... 11

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985).............................................. 3

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ........................................................................................... 4

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444 (D.N.H. 2023) ...................... 17

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ..................................................................... 4

*Maine v. USDA*, No. 1:25-CV-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025)..................... 19

*Massachusetts v. Kennedy*, No. 1:25-cv-10814, 2025 WL 1371785 (D. Mass. May 12, 2025) ............................................................................................................................ *passim*

*Massachusetts v. NIH*, No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025)... 12, 13, 18

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................................... 3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................... 13

ii

*NAACP v. Dep't of Educ.*, No. 25-CV-1120, 2025 WL 1196212 (D.D.C. Apr. 24, 2025) .... 16, 17

*Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) 20

*Nat'l Min. Ass'n v. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1988) .............................. 19

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co.*, 470 U.S. 451(1985) ....... 3

*NEA v. Dep't of Educ.*, No. 25-CV-091, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ..... 16, 17, 19

*New York v. Trump,* 133 F.4th 51, 68 (1st Cir. 2025) ................................................................. 4

*New York v. Trump*, No. 25-CV-39, 2025 WL 357368, (D.R.I. Jan. 31, 2025) ................... 19, 20

*Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785 (2001) ............................................. 2

*Pacito v. Trump*, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ............................................... 4

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ...................................................... 17

*PFLAG, Inc. v. Trump*, No. CV 25-337, 2025 WL 685124 (D. Md. March 4, 2025) ................. 15

*Playboy Enters. v. Public Serv. Comm'n*, 906 F.2d 25(1st Cir. 1990) ....................................... 19

*Policy & Rsch. LLC v. HHS*, 313 F.Supp. 3d 62 (D.D.C. 2018) ............................................... 11

*Rhode Island v. Trump*, 2025 WL 1303868 (D.R.I. May 6, 2025).............................................. 4

*St. Bernard Parish Gov't v. United States,* 134 Fed. Cl. 730 (2017)............................................ 2

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .............................................................. 17

*Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 415 (1995). .............................................. 2

*United States v. AVX Corp.*, 962 F.2d 108 (1st Cir.1992) ........................................................ 7

*United States v. Rodgers*, 461 U.S. 677 (1983) ....................................................................... 10

*Whitewater Draw Natural Resources Conservation District v. Mayorkas*, 5 F.4th 997 (9th Cir. 2021).................................................................................................................................... 6

## Statutes

42 U.S.C. § 282(b) ............................................................................................... 6, 10, 12

42 U.S.C. § 284a ....................................................................................................... 18

42 U.S.C. § 289a ....................................................................................................... 18

5 U.S.C. 701(a)(2) ...................................................................................................... 5

## Regulations

2 C.F.R. § 200 ........................................................................................................... 11

2 CFR § 200.340 ........................................................................................................ 11

42 C.F.R. § 52.5 ......................................................................................................... 15

45 C.F.R. § 75.371 ..................................................................................................... 10

45 C.F.R. § 75.372(a)............................................................................................. 10, 11

iii

## INTRODUCTION

Defendants have upended decades of precedent carefully designed to ensure scientific rigor in NIH grant processes. Even though this Court rejected Defendants' jurisdictional argument in *Massachusetts v. Kennedy*, No. 1:25-cv-10814 ("States' case"), Defendants recycle their arguments here to try to avoid judicial review of these indefensible changes. Defendants mischaracterize the legal framework governing NIH's funding obligations and distort the record. They do so without even trying to define the forbidden research topics. Plaintiffs respectfully request that this Court grant their motion, ECF No. 37.

## ARGUMENT

### I.    The Court has jurisdiction over Plaintiffs' suit.

In the States' case, which largely raises the same claims as here, this Court determined it has subject matter jurisdiction. Leaning heavily on a Supreme Court *per curiam* order, Defendants rehash essentially identical arguments, conspicuously ignoring this Court's on-point order in the States' case. (Case No. 1:25-cv-10814, ECF No. 105 (D. Mass. May 12, 2025)) ("SMJ Order"). For the same reasons explained in that order, the Court has subject matter jurisdiction here.

### A.  This Court has already rejected Defendants' Tucker Act arguments.

 Plaintiffs' "claims are, at their core, assertions that [Defendants] acted in violation of federal law—not its contracts." *California v. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir. 2025) ("*California I*")*; see* ECF No. 41 at 13–17. As in the States' case:

> This is not an action for monetary damages against the United States for which the Court of Claims was created. Rather . . . it is an action to stop the Public Officials from violating the statutory grant-making architecture created by Congress, replacing Congress's mandate with new policies that directly contradict that mandate, and exercising authority arbitrarily and capriciously, in violation of federal law and the Constitution.

SMJ Order at 23.

1

APHA App. 968

And as in the States' case, and unlike in *California*, Plaintiffs seek broad equitable and prospective relief, including enjoining the Directives, and do not seek an order that "requires the Government to pay out past-due grant obligations." *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (*per curiam*) ("*California II*"). Thus, this Court remains the appropriate jurisdiction to hear Plaintiffs' claims. *See* SMJ Order at 23.

The nature of the grants also forecloses application of the Tucker Act. These grants are *not* contracts—an argument unaddressed in *California*. Defendants inaccurately assert, ECF No. 66 at 16, that "[t]he standard contract conditions are all satisfied," but omit the element of "intent to contract." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1339 (Fed. Cir. 2021). Indeed, *NIH itself* has consistently maintained that grants are not contracts. *See* Ex. 43.[1]

Similarly, agreements, like grants, that serve to advance public policy interests or provide a public benefit lack the requisite consideration to be a contract. *Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132–33 (D.D.C. 2023); *see also St. Bernard Parish Gov't v. United States,* 134 Fed. Cl. 730, 736 (2017). In *Thermalon Indus., Ltd. v. United States*, Defendants' sole case on this point, the Government received "significant consideration" for an NSF award, in the form of "title to any equipment plaintiff . . . purchased with grant funds" and "a royalty-free license to the intellectual property resulting from the research." 34 Fed. Cl. 415, 414 (1995). There is no such consideration here. The basic elements of a contract are thus absent.

Moreover, "[e]ven assuming that the other requisite elements of a contract are present[,]" statutory authority to enter a contract is necessary. *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 791 (2001). Congress distinguishes between NIH authority to enter into "contracts" versus "grants." *See* ECF No. 41 at 21. "[A]bsent some clear indication that the legislature intends

---

[1] Citations to "Ex. []" refer to the numbered exhibits attached to the Declaration of Shalini Goel Agarwal dated May 19, 2025.

APHA App. 969

to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–70 (1985) (citation omitted). Congress's distinction between contracts and grants belies any clear indication of legislative intent to create contractual rights.

**B.  Plaintiffs do not seek specific performance of a contract.**

Plaintiffs challenge agency action as a violation of federal law, not for specific performance of a contract. The D.C. Circuit has emphasized this distinction:

> It is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract. It is quite another to claim, as the Government does in this case, that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract.

*Megapulse, Inc. v. Lewis*, 672 F.2d 959, 970–71 (D.C. Cir. 1982).

Defendants' reliance on *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985) is misplaced. ECF No. 66 at 17. That case involved claims by a private company over the termination of an Air Force procurement contract. 780 F.2d at 75. There was no grant, policy, or shift in agency priorities prompting the termination. The Air Force simply terminated the contract, the plaintiff sought "only the award of the contract," and the court concluded the dispute was "entirely contained within the terms of the contract." *Id.* at 77–80. By contrast, Plaintiffs challenge the Directives and resulting terminations, seek broad equitable relief, and do not seek to enforce any contractual terms. Several other courts have rejected similar challenges in cases seeking nearly identical relief.[2] This Court should do the same.

---

[2] *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *10 (D.D.C. Apr. 16, 2025) ("Plaintiffs seek equitable relief vindicating their rights to access their grant funds and to enjoin EPA's unlawful suspension and termination of their grants. Plaintiffs do not ask for specific performance, nor do they ask the court to interpret the

APHA App. 970

**C.  Plaintiffs' suit is not a programmatic challenge.**

This Court also already rejected Defendants' assertion that a challenge to the Directives is an impermissible programmatic challenge. SMJ Order at 24. Plaintiffs challenge "discrete agency actions"—NIH's Directives and terminations. *See id.* Defendants' cited authority only highlights the distinction between the "wholesale" challenges in those cases and the discrete final agency actions here. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014). As the Court noted in the States' case, "[t]he fact that [the Defendants] have enforced these directives against hundreds of projects does not make this lawsuit programmatic even if it is large." SMJ Order at 24; *New York v. Trump,* 133 F.4th 51, 68 (1st Cir. 2025); *AAUP v. Rubio*, No. 25-cv-10685, 2025 WL 1235084, at *21 (D. Mass. Apr. 29, 2025). The Court should likewise hold Plaintiffs' suit is *not* a programmatic attack.

**D.  Defendants' actions are not "committed to agency discretion."**

Defendants wrongly assert that Plaintiffs cannot pursue their claims because any "NIH actions to terminate existing grants or award future grants" are "committed to agency discretion by law." *See* ECF No. 66 at 24 (citing 5 U.S.C. § 701(a)(2)). First, this APA limitation, to the extent applicable, does not govern Plaintiffs' *constitutional* claims.

As to Plaintiffs' APA claims, once again, this Court has rejected Defendants' similar argument in the States' case. *See* SMJ Order at 26–27. Plaintiffs do not challenge NIH's "discretionary spending decisions." ECF No. 66 at 25. Instead, as in the States' case, Plaintiffs challenge specific Directives and terminations that defy limits set by Congress and Defendants themselves on that discretion. *See* Complaint at ¶¶ 195–249. Defendants cite *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), to argue "allocation of funds" is committed solely to agency discretion. *See*

---

terms of any contract."); *Pacito v. Trump*, 2025 U.S. Dist. WL 893530, at *13–14 (W.D. Wash. Mar. 24, 2025); *Rhode Island v. Trump*, 2025 U.S. Dist. WL 1303868, at *5–7 (D.R.I. May 6, 2025).

APHA App. 971

ECF No. 66 at 24–25. But as this Court observed, all *Lincoln* "stands for [is] the unremarkable proposition that review is precluded so long as the agency allocates funding from a lump-sum appropriation to meet permissible statutory objectives." SMJ Order at 27. Thus, review is available where, as here, the Directives and terminations conflict with statutes and regulations.

Defendants cite 42 U.S.C. § 282(b)(3) to argue that, because Congress instructed the NIH director to "conduct[] priority-setting reviews," the agency has discretion to bulk terminate hundreds of grants. ECF No. 66 at 25. Nothing in the statute supports Defendants' reading, nor did Defendants raise it in the grant termination notices. Nor is there evidence that any priority-setting reviews were done "in consultation with the heads of the national research institutes and national centers." Defendants also argue "NIH is not statutorily required to enter into *any* grant agreements." ECF No. 66 at 25. But Defendants *have* awarded grants to Plaintiffs and Members that cannot be terminated in ways that violate the APA.

### E. Plaintiffs' claims are justiciable.

Defendants question the justiciability of Plaintiffs' claims based on the nature of the challenged Directives, alleging that they are moot, unconnected to Plaintiffs' harms, or not final agency action. *See* ECF No. 66 at 20–24.[3] This Court already ruled on very similar arguments in the States' case, and its reasoning applies with full force here. *See* SMJ Order at 25–26.

Defendants argue that some Directives are irrelevant because they were rescinded or did not cause Plaintiffs' injuries. *See* ECF No. 66 at 20–21. But what "the current record shows is that [Plaintiffs] have experienced significant injury from a series of overlapping and interlocking blacklisting Directives that have caused unprecedented delays and disruptions." SMJ Order at 25–26. While the haphazard nature of the Directives "'makes it hard to know which [ones] are

---

[3] Defendants do not make this argument with respect to the grant terminations and thus have waived it.

APHA App. 972

effective at any given time . . . [a]t this stage, all inferences must be taken in favor of the [Plaintiffs]." SMJ Order at 26. Defendants also argue that Plaintiffs' challenges to some Directives are moot because NIH is now reviewing paused applications. *See* ECF No. 66 at 20–21. For the reasons discussed further in Section II.B., *infra*, Plaintiffs' applicant claims remain viable.

And Plaintiffs challenge final agency actions. Defendants acknowledge an action is final if it marks the consummation of the agency's decision-making and carries legal consequences. *See* ECF No. 66 at 21. The action need not be formal and, as this Court recently explained, even an "unwritten" policy compelling agency officers to "consider" certain "factor[s]" can be reviewed under the APA. *AAUP*, 2025 WL 1235084, at *21. The Directives memorialize Defendants' policy that certain research topics are off limits and detail the steps NIH officials must take to execute that policy. *See* Complaint at ¶¶ 85–104. The Directives obviously have legal consequences: Plaintiffs would not have been harmed but for their implementation.

Defendants argue the Directives are not final because they "merely ordered a *review* of the grants to determine whether they were consistent with the agency's priorities," and, like the manual in *Whitewater Draw Natural Resources Conservation District v. Mayorkas*, 5 F.4th 997, 1008 (9th Cir. 2021), did "not prescribe any particular option in any particular way." ECF No. 66 at 22, 24. But that misrepresents the Directives' text and effect—courts take a "pragmatic" approach to finality. *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). On their face and in practice, the Directives outline forbidden topics, based on which they direct review *and termination* of grants and prohibit new awards or funding requests. *See, e.g.*, ECF No. 38–13 at 2 ("ICs must take care to completely excise all DEI activities using the following categories."); ECF No. 38–14 (same as to "non-priority activities"), 6 (stating that, upon receipt of list of "HHS Departmental Authority Terminations," the "[Office of Policy for Extramural Research

6

Administration] will issue termination letters on behalf of the IC Chief Grants Management Officers."); Ex. 44 at 2 ("Such review shall be aimed at ensuring NIH grants . . . do not fund or support low-value and off-mission research activities or projects – including DEI and gender identity research activities and programs.").[4]

### F. Associational Plaintiffs have standing.

Defendants' assertion that Plaintiffs APHA and UAW do not seek to protect interests germane to their purpose borders on frivolous. ECF No. 66 at 27. APHA's mission is to "[b]uild public health capacity and promote effective policy and practice." ECF No. 38–23 ¶ 2. Defendants' decision to throw away billions of dollars of biomedical research mid-stream by terminating hundreds of grants to qualified researchers, including APHA members, certainly hinders APHA's stated mission. Meanwhile, UAW represents approximately 75,000 workers who "depend on funding from the [NIH] for their jobs including salary, benefits, research costs . . . training and mentoring opportunities." ECF No. 38–25 ¶ 5. Here, UAW seeks to protect the employment and training opportunities of the workers it represents, as funding terminations and delays put jobs and livelihoods at risk. *See* ECF No. 38–25 ¶ 15.

Second, Defendants argue that given "the sheer number of declarations" from associational Plaintiffs' members, "[i]ndividual members must participate to show entitlement to injunctive relief[.]" ECF No. 66 at 26. Plaintiffs included numerous member declarations not for standing, since one member would suffice, *see United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir.1992),

---

[4] Plaintiffs learned of this Directive after filing their motion and include it as one of the previously "nonpublic or undisclosed directives" they challenge through this suit. *Massachusetts v. Kennedy*, No. 1:25-cv-10814 (D. Mass.), Dkt. 76-1 at 3. The delayed reveal of this Directive underscores the need to include in Plaintiffs' claims any "non-public or undisclosed directives that curtail NIH support for previously advertised funding opportunities and previously awarded grants, on the grounds that the opportunities or grants relate to one or more of the [] topics identified as inconsistent with defendants' priorities after the opportunities or grants were issued[.]" *See id.* Defendants' complaints fall flat, ECF No. 66 at 19 n.10, as this description gives notice of the set of challenged Directives—a set uniquely known by Defendants. That Plaintiffs are still learning of additional Directives also counsels in favor of at least limited discovery into the full set of Directives.

APHA App. 974

but to demonstrate the breadth of devastation that Defendants' actions are causing the medical community and public health, *see, e.g.*, ECF No. 41 at 40–43, and the boilerplate "reasoning" given to each member for the termination of their grants, *see, e.g.*, ECF No. 41 at 15. Moreover, Defendants provide no citation for the idea that a plaintiff asserting associational standing cannot seek injunctive relief. *See* Section III, *infra*. And the First Circuit has long held the opposite. *See Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986) ("Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation.").

II.    **Plaintiffs are likely to succeed on the merits.**

A.    **Plaintiffs are likely to succeed on their Section 706(2) APA claims.**

1.    **Defendants' actions are contrary to law.**

a.    **Defendants flouted congressional mandates.**

As Plaintiffs have detailed, the Directives and terminations contradict congressional mandates regarding health disparities and underrepresentation in the biomedical field of racial minorities, women, and those from economically disadvantaged backgrounds. ECF No. 41 at 24–27, 32. Defendants do not and cannot dispute they are subject to these mandates.

Instead, Defendants hide behind a distorted account of their actions. First, Defendants allege that they *are* "preserving grants [researching] health disparities" by pointing to "at least 25" such grants that survived their purge of hundreds and asserting they terminated "DEI grants that [NIH] determined did not promote health." [5] ECF No. 66 at 32. Yet Defendants fail to define "DEI grants" or how, for example, a grant that addresses specific challenges related to kidney health faced by racial minorities constitutes "DEI." Ex. 45 ¶ 6. Even if the survival of a smattering of

---

[5] All twenty-five grants that Defendants cite were awarded by a single IC, the National Institute on Minority Health and Health Disparities, whereas Congress has mandated that ICs collectively foster collaboration between their various clinical research projects and encourage them to "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities[.]" 42 U.S.C. § 282(b)(8)(D)(ii).

APHA App. 975

disparities and minority health research grants could satisfy Congress's will that NIH prioritize such research, Defendants' table is misleading. First, of the 25 grants listed, at least 3 were terminated, 2 ended *before* the Lorsch Declaration was signed,[6] and 4 more projects will end this calendar year. Ex. 46 ¶ 3. By July of 2026, only 4 of the 25 grants will remain. *Id.* It is telling that NIH musters such scant evidence to attempt to show it is meeting Congress's mandate to consider "social and other determinants of health that contribute to health disparities" in identifying "strategic research priorities." ECF No. 66 at 40–41.

Defendants' claim that they are "supporting . . . the recruitment of researchers from disadvantaged backgrounds" is also belied by the evidence. Defendants assert they continue to fund Kirschstein-NRSA grants, ECF No. 66 at 32–33, listing over 5,170 "active NRSA grants"[7] and pointing to four with "diverse" in the title. This too is wholly misleading. While many NRSA opportunities remain, Defendants have categorically terminated those NRSA programs specifically intended to fulfill Congress' mandates to increase recruitment of underrepresented groups. ECF No. 41 at 26; Ex. 45 ¶¶ 9, 10 (of the 11 broadest NRSA training programs, the 5 that specifically recruit from underrepresented communities have been terminated); *id.* at Ex. B (demonstrating similar terminations of non-NRSA programs focused on increasing diversity). NIH has stripped all mention of workforce diversity from the newly posted T32 and T35 NRSA opportunities it highlights (ECF No. 66 at 32–33; No. 38–27 ¶19; Decl. of Shalini Agarwal ¶ 9), revised instructions for institutional training grant applications to state that Recruitment Plans to

---

[6] *Compare* ECF No. 38-27 at 33 (showing termination on Mar. 28, 2025 of "The ADELANTE Trial: Testing a multi-level approach for improving household food insecurity and glycemic control among Latinos with Diabetes") with ECF No. 66-2 at 3 (listing the same grant as a "NIH Minority-Related Health Project[] that [Was] Not Terminated.") *Compare* Ex. 45 at Ex. A (showing termination on May 5, 2025 of "Elucidating the high and heterogeneous risk of gestational diabetes among Asian Americans: an integrative approach of metabolomics, lifestyles, and social determinants") with ECF No. 66-2 at 2 (listing the same grant as a "NIH Minority-Related Health Project[] that [Was] Not Terminated").

[7] At least ten of these grants have already been terminated. Ex. 45 ¶ 8.

APHA App. 976

Enhance Diversity will no longer be required or considered, Ex. 49 at 3, and revised "peer review processes to eliminate consideration of Plans for Enhancing Diversity (PEDP) across all opportunities." Ex. 50 at 5.

Defendants' actions are also contrary to law because they run directly counter to the priorities Defendants set in their NIH and IC strategic plans. While Defendants argue these plans are not meant to be "a six-year straight jacket [sic]," ECF No. 66 at 33, Congress mandated that NIH "shall ensure" funding is "sufficiently allocated for research projects identified in strategic plans," *see* 42 U.S.C. § 282(b)(6), providing researchers and institutions with the stability and predictability needed for the pursuit of scientific endeavors. *See, e.g.*, Proposed Brief of Amici Curiae Association of American Medical Colleges et al, ECF No. 47-01 at 8–11.

### b.  Defendants violated HHS regulations.

Defendants make two arguments that the terminations are legal despite their violation of HHS regulations. ECF No. 66 at 31–33. Both are inapposite. First, Defendants argue that 45 C.F.R. § 75.372(a) (specifying two grounds for termination: "for cause" or "fail[ure] to comply with the terms and conditions of the award") sets out non-exclusive bases for termination because of its use of the word "may." ECF No. 66 at 28. But this is refuted by the regulation's structure and text, which set forth provisions for "termination" in its "Remedies for Noncompliance" section and prefaces its list of termination grounds by stating that "the Federal award may be terminated . . . *as follows*." (emphasis added).[8] The more natural reading of 45 C.F.R. § 75.372(a) is that "may" connotes that termination is not *required* for noncompliance. This is consistent with 45 C.F.R. § 75.371, which includes termination as *one among many* actions that HHS "may take" for

---

[8] Notably, in placing so much weight on the appearance of the word "may" in the regulation, Defendants ignore the holding of the very case they cite, *see* ECF No. 66 at 28, that an interpretation of the word "may" as connoting permissiveness "can be defeated by . . . obvious inferences from the structure and purpose of the statute." *United States v. Rodgers*, 461 U.S. 677, 706–07 (1983).

APHA App. 977

noncompliance. Courts have interpreted the list of termination grounds in 45 C.F.R.§ 75.372(a) as the "only" basis on which HHS regulations allow for termination. *See, e.g.*, *Policy & Rsch. LLC v. HHS*, 313 F.Supp. 3d 62, 76 (D.D.C. 2018); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 651 (D. Md. 2018). 45 C.F.R. § 75.372(a) simply does not give Defendants authority to terminate grants where the "award no longer effectuates agency priorities." *HHS declined to adopt that language* until an effective date of October 2025. If Defendants' reading were correct there would have been no reason for HHS's revision.

Second, Defendants argue their actions are lawful because Notices of Award incorporate the NIH Grants Policy Statement 8.5.2, which incorporates 2 CFR § 200.340. ECF No. 66 at 27–29. But Plaintiffs' case does not turn on award terms and conditions. Defendants' failure to follow HHS's regulations resolves this case. *See Policy & Rsch.*, 313 F.Supp.3d at 82 (holding that irrespective of what the Grants Policy Statement "might be read to authorize, its authority does not, and cannot, trump the agency's formal regulations"). Nevertheless, Defendants are wrong that 8.5.2 incorporates 2 C.F.R. § 200.340 to allow for unilateral termination without noncompliance. Defendants make much of the fact that termination is in a separate sentence from other enforcement actions and uses the word "also," ECF No. 66 at 28–29, but ignore the context, that it is in a section titled "8.5.2 *Remedies for Non-Compliance or Enforcement Actions*: Suspension, Termination, and Withholding of Support." (emphasis added). Further, the Grants Policy Statement makes clear it is "intended to be compliant with . . . 2 C.F.R. § 200, *as modified by previously approved waivers and deviations*" and that the regulations control if there is a conflict (emphasis added). ECF No. 38–5 at 12. HHS modified 2 C.F.R. § 200 by declining to adopt termination provisions "if an award no longer effectuates the program goals or agency priorities." In fact, another NIH document describing its terms and conditions underscores this. Ex. 51 at 2

11

("NIH *does not adopt* 2 CFR § 200.240(a)(2) [sic], stating that the Federal awarding agency may terminate a Federal award if the award no longer effectuates the program goals or agency priorities."(emphasis added)).[9]

### 2. Defendants' actions are arbitrary and capricious.

Defendants stress that they "provided the reasons for" grant terminations and "explained why" NIH would not prioritize the research. ECF. No. 66 at 31. But they cannot articulate how the boilerplate language in the Directives and termination letters based on undefined terms like "DEI" constitutes a "reasoned explanation for its action." *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020); *see also*, Section II.D, *infra*. Nor could they: "conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" *Massachusetts v. NIH*, No. 25-CV-10338, 2025 WL 702163, at *17 (D. Mass. Mar. 5, 2025) (citation omitted).

As courts have stressed, the use of "template or boilerplate" language "issued to all Grant Recipients further strengthens Plaintiffs' argument that [an agency] did not consider individual, or any, data or information." *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025); *see also Massachusetts*, 2025 WL 702163, at *18 (absence of reasoning renders directives "arbitrary and capricious.").[10] The lack of engagement with data underlying or resulting from the research supported by the terminated grants highlights that failure here. *DHS*, 140 S. Ct. at 1896, 1913 (agency "entirely failed to consider []

---

[9] The Lorsch Declaration misleadingly claims that NIH adopted OMB's 2020 revisions to the Uniform Guidance in a November 17, 2020 notice, *see* ECF No. 66-1 ¶ 9 (citing Ex. 51), yet wholly ignores that NIH specifically declined to adopt the disputed provision pertaining to termination "if an award no longer effectuates the program goals or agency priorities." Ex. 51 at 2.

[10] In asserting that they satisfy the arbitrary and capricious standard, Defendants also emphasize that the Directives and termination letters provided "the authority under which [NIH] was terminating [the] grants" and "the grantee's appeal rights." ECF No. 66 at 30. But neither constitutes any agency *reasoning* for its decision. And for the reasons discussed below and in Plaintiffs' opening brief, Defendants lacked authority under regulation, statute, and the U.S. Constitution for their actions. *See, e.g.*, ECF No. 41 at 23–27; *see* Section II.A.1, *supra*.

12

important aspect of the problem" because "rescission memorandum contains no discussion" of that aspect); *McMahon*, 2025 WL 833917, at *21.

Further, as stated, terminating NIH grants studying health disparities and diversifying the workforce runs afoul of congressional and other mandates. *See, e.g.*, ECF No. 41 at 23–27. Doing so reflects that Defendants "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Defendants cannot credibly argue that they "provide[d] a reasoned explanation for [their] change" in policy.[11] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *Massachusetts*, 2025 WL 702163, at *20. The Directives and termination letters "fail[ed] to address," among other things, "how [the] research will be conducted absent" government funding, a concern of particular importance "considering the number of [researchers] and associations that have made clear that research will have to be cut, as other funding sources will not be able to make up the shortfall." *Massachusetts*, 2025 WL 702163, at *17; *see also id.* at *20; *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. CV 25-00400, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025); *DHS*, 140 S. Ct. at 1896 (failure to "address whether there was 'legitimate reliance' on the DACA Memorandum" rendered agency action arbitrary and capricious).

Plaintiffs and Members whose applications have been delayed also have reliance interests NIH must consider: among other things, delays endanger the career progression of researchers who would diversify the field (a goal mandated by statute and regulation), *see* ECF No. 41 at 38–

---

[11] Defendants attempt to undercut the evidence suggesting that members of the so-called Department of Government Efficiency ("DOGE") played a role in issuing the Directives and terminations. ECF No. 66 at 31 n.15. But this is contradicted by deposition testimony by the former director of NIH's extramural research office indicating that DOGE members played a *significant* role in those efforts. ECF No. 38-9 at 38:3–20 ("Q: How did you first learn that grants were going to be terminated on February 28th? A: . . . [Rachel Riley] introduced herself as being part of DOGE, who was working with HHS. And she informed me that a number of grants will need to be terminated and that Matt Memoli will be sending me . . . a list of grants in an email shortly thereafter.").

APHA App. 980

39, and they are unable to move forward with parallel funding opportunities, *see* ECF No. 41 at 42–43. There is no evidence that NIH considered these reliance interests.

Defendants attempt to refute NIH's failure to consider reliance interests by asserting, without citation, that it "necessarily understood and considered that it was terminating funding on which the grantee relied to conduct research when it terminated the grant for that research." ECF No. 66 at 31. Defendants' sole declarant is silent as to this "fact" and no evidence supports the assertion. Instead, Defendants invite the Court to *assume* that NIH considered reliance interests. But "[a]n agency must defend its actions based on the reasons it gave when it acted," and Defendants cannot "rely upon reasons absent from [their] original decision[s]." *DHS*, 140 S. Ct. at 1909–10. Accordingly, Defendants may not now turn to *post hoc* justifications.

Finally, given "the seriousness of the . . . deficiencies" of the Directives and terminations, remand is inappropriate. *Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021).

### 3. Defendants' actions are contrary to constitutional right.

For reasons Plaintiffs have explained, at Section II.C–D, *infra*; ECF No. 41 at 23–27, 35–37, Defendants' actions also violate separation of powers principles and the Due Process Clause, and are thus "contrary to constitutional right, power, privilege, or immunity" under the APA. Defendants do not counter that constitutional violations give rise to a separate APA claim.

### B. Plaintiffs are likely to succeed on their Section 706(1) APA claim.

Defendants incorrectly argue that Plaintiffs' applicant claims are moot because delayed and suspended study sections and advisory councils allegedly are *generally* on track again. ECF No. 66 at 32–34. But Defendants fail to address the essential question raised by this claim: whether Plaintiffs' and their Members' applications are being reviewed. The evidence suggests they are not. Since Plaintiffs filed this motion, Defendants have begun to "administratively withdraw" applications for some programs purged as a result of the Directives, Ex. 52 ¶ 3, Ex. B, and others,

APHA App. 981

based on counsel's continued contact with declarants, appear to remain suspended, Ex. 46 ¶ 6–7.[12]

These discrete agency actions violate laws and regulations requiring that all applications "shall be evaluated," that the evaluation proceed through the peer review process, and that NIH "will" reach a disposition on their applications. 42 C.F.R. § 52.5; 42 U.S.C. §§ 289a, 284a; ECF No. 66 at 37.

Defendants' claim that they have discretion to defer applications under 42 C.F.R. § 52.5(b) and "[n]o statute or regulation mandates a decision," ECF No. 66 at 37, misstates the law. Under 42 C.F.R. § 52.5(b), Defendants may only defer disposition "because of either lack of funds or a need for further evaluation[.]" Defendants ignore these limits on their discretion.

Defendants fail to counter additional bases for Plaintiffs' applicant claims, as Defendants' actions also violate separation of powers principles, are arbitrary and capricious, and are contrary to law and constitutional right under Section 706(2). ECF No. 66 at 36–37.

### C.  Defendants violate separation of powers principles.

Along with the arguments discussed above in Section II.A.1, Defendants also claim they do not violate separation of powers principles because the Public Health Act "explicitly" confers broad discretion in the management and operation of NIH programs and activities. ECF No. 66 at 39–40. Yet they ignore both that this general discretionary authority is limited to fulfilling the overall purpose of the Public Health Act, and that other congressional mandates limit their authority by *requiring* research into health disparities and steps to address underrepresentation of certain groups in the medical profession. *See PFLAG, Inc. v. Trump*, No. CV 25-337, 2025 WL 685124 at *14–18 (D. Md. March 4, 2025) ("Defendants' attempt to transform statutory language providing agencies some limited discretion in determining research priorities into specific authorization for the action at issue here, which goes well beyond determining research priorities,

---

[12] Indeed, while NIH could easily have removed F31 diversity statements and considered F31 applicants for the parent grant, NIH is refusing to do so, severely disadvantaging those previously encouraged to self-report their identities.

APHA App. 982

'stretch[es] the statutory language beyond hope of recognition.'") (citing *City of Providence v. Barr*, 954 F.3d 23, 32 (1st Cir. 2020)).

**D. Defendants' Directives and terminations are unconstitutionally vague.**

Defendants cannot refute that the Directives and termination notices lack definitions for terms like "DEI," "gender identity," "transgender issues," "amorphous equity objectives," and "COVID-related research." *See* ECF No. 41 at 35–37. Nor can they explain away high-level NIH officials' testimony attesting to the vagueness of these terms. *See id.* at 36; *see also* ECF No. 38-9 at 44:6–17, 48:8–14, 50:9–17, 51:16–24, 63:21–64:12. Recent news exposes the resulting arbitrary enforcement. *See* Ex. 53 ¶ 3 ("NIH staff members have been given lists of terms . . . to be used as reasons to reject proposals or flag grants for investigation. They include 'inequity,' 'racism,' 'underserved,' 'SDOH,' which stands for social determinants of health."). Courts have held similar directives unconstitutionally vague, echoing this Court's concern about these undefined terms in the States' case. *See NEA v. Dep't of Educ.*, No. 25-CV-091, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) (collecting cases) ("The Letter does not make clear . . . what the Department believes constitutes a DEI program" and "does not even define what a 'DEI program' is."); *NAACP v. Dep't of Educ.*, No. 25-CV-1120, 2025 WL 1196212, at *6 (D.D.C. Apr. 24, 2025). Where a law or policy "regulates conduct based on 'wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings,' it is likely to be void for vagueness." *NEA*, 2025 WL 1188160, at *18.

Defendants try to distract the Court from these infirmities. For instance, Defendants assert that "the Directives do not regulate [the] conduct" of Plaintiffs and Members "but instead direct the agency to conduct a review." ECF No. 66 at 34. But the Directives regulate which grants are precluded from funding—and therefore govern Plaintiffs' and Members' own work and research. *See NEA*, 2025 WL 1188160, at *19 ("The Supreme Court has repeatedly struck down legal

16

APHA App. 983

prohibitions that sweep in a wide swath of conduct while leaving individual enforcement decisions to the subjective determinations of enforcement authorities.") (collecting cases).

Defendants' assertion that a facial challenge is improper likewise lacks merit. Courts in this Circuit enjoined agency directives based on facial void-for-vagueness challenges. *See NEA*, 2025 WL 1188160, at *23; *Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 454 (D.N.H. 2023); *see also NAACP*, 2025 WL 1196212, at *23. Regardless, Plaintiffs and Members have "identif[ied] specific [research] activities that they plan to engage in but are arguably barred" by the Directives, making a sufficient showing for an as-applied challenge. *See Edelblut*, 651 F. Supp. 3d at 454; *see also* ECF Nos. 38-21 ¶ 18–22; 38-38 ¶ 13–14, 38-32 ¶ 21–22.

Contrary to Defendants' argument, grants can constitute a property interest protected by the Due Process Clause. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576–77 (1972) (collecting cases); *see also NEA*, 2025 WL 1188160, at *21–23. Because the Directives are inherently vague and "encourage[] an arbitrary and discriminatory enforcement," they are unconstitutional. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972).

### III.    Plaintiffs and their members will suffer irreparable harm.

Defendants attempt to divert the Court's attention from Plaintiffs' substantial irreparable harm by demanding, without support, individualized showings of harm for each member. But associational standing exists precisely for this situation and only requires "specific allegations establishing that *at least one* identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added).

Recent cases in this District follow this approach. In *Doe v. Trump*, the court found that two associational plaintiffs demonstrated irreparable harm through "numerous" declarations that describe "one or more members facing the same type of injury." No. CV 25-10135, 2025 WL 485070 at *6, *13 (D. Mass. Feb. 13, 2025). Similarly, in a recent case challenging the slashing

17

APHA App. 984

and capping of indirect cost rates on NIH grant awards, the court analyzed irreparable harm without demanding evidence from every institution in the plaintiff states. *Massachusetts*, 2025 WL 702163, at *58–68. Defendants' reliance on *Adams v. Freedom Forge Corporation* is misplaced. There, the court sought individual showings from 136 *individual* plaintiffs—bearing no resemblance to the *associational* plaintiffs here. 204 F.3d 475, 485-86 (3d Cir. 2000). Here, each *Plaintiff* has demonstrated irreparable harm. *See* ECF No. 41 at 39–43.

Defendants also incorrectly assert that "the primary claimed injury is the delayed payment of money." ECF No. 66 at 42. The declarations address harms far beyond that. *See* ECF No. 41 at 39–43. Plaintiffs and Members have been forced to suspend critical scientific research, risking the usability of data, the credibility and outcomes of the research, and the well-being of research study participants. ECF Nos. 38-30 ¶¶ 25–27; 38-31 ¶ 32; 38-34 ¶ 30. Some study participants will have treatment or intervention interrupted. ECF Nos. 38-30 ¶¶ 27–28; 38-20 ¶ 37. Staff members have been or will be laid off. ECF Nos. 38-33 ¶ 23; 38-34 ¶ 25; 38-37 ¶ 21. These injuries amount to irreparable harm. *See Massachusetts*, 2025 WL 702163, at *31.

Defendants likewise wrongly assert that harm is speculative, cherry-picking statements from declarations. ECF No. 66 at 42–43. But the record conclusively demonstrates concrete, immediate harm from the Directives, terminations, *and* delays. *See, e.g.*, ECF Nos. 38-28 ¶ 23; 38-31 ¶ 24; 38-20 ¶ 37; 38-21 ¶ 16. Since the motion, these harms have continued, compounding the harm to public health research, institutional capacity, and scientific progress. *See, e.g.*, Ex. 52 ¶¶ 2–3 (previously pending application now "withdrawn"); Ex. 54 ¶ 3 (putting study on hold and additional reductions of team members' hours).

## IV.    The balance of equities weighs in favor of an injunction.

Defendants argue *solely* that "[t]he government has a strong interest in safeguarding the public fisc." ECF No. 66 at 43. But as multiple courts considering similar issues have recently noted, in the case of an injunction, "Federal Defendants 'merely would have to disburse funds that Congress has appropriated'" for grants. *Maine v. USDA*, No. 1:25-CV-00131, 2025 WL 1088946, at *29 (D. Me. Apr. 11, 2025) (quoting *New York v. Trump*, No. 25-CV-39, 2025 WL 357368, at *4, *17 (D.R.I. Jan. 31, 2025) ). Meanwhile, absent an injunction, Plaintiffs will suffer irreparable injury to their careers, valuable research will cease, and Defendants' unlawful actions will continue. *See id*. at *13. The balance of equities favors granting preliminary relief.

## V.    Plaintiffs seek an injunction on behalf of themselves and their members.

Contra Defendants, Plaintiffs do not seek a "nationwide injunction," but rather an injunction on behalf of Plaintiffs and their members.[13] Where an association has standing, an injunction as to all members is appropriate, even where "not every member may derive any immediate benefit from the injunction." *Playboy Enters. v. Public Serv. Comm'n*, 906 F.2d 25, 35 (1st Cir. 1990); *see also NEA*, 2025 WL 1188160, at *30–31 (holding proper scope of relief was on behalf of plaintiff association, its members, and institutions that employ them).

Defendants argue to limit relief, contending that "irreparable harm resulting from one grant termination" does not "warrant a preliminary injunction for all other terminations." ECF No. 66 at 44. Yet Defendants offer no support for the idea that injunctions for associational Plaintiffs should

---

[13] While not relevant to the pending motion, it is worth noting Plaintiffs' position that a nationwide injunction is unnecessary, as similarly broad relief should follow were the Court to issue a ruling setting aside the Directives as arbitrary and capricious. Section 706(2) of the APA empowers courts to "hold unlawful and set aside" final agency actions. Courts have repeatedly ruled that this requires vacatur of the unlawful agency action in its entirety. *See, e.g., E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *Nat'l Min. Ass'n v. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1988); *Career Colleges & Sch. of Texas v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

APHA App. 986

be limited to members who show some heightened individual harm. *Cf., City of Evanston v. Barr*, 412 F. Supp. 3d 873, 888 (N.D. Ill. 2019) ("[A]n association that establishes standing and prevails is entitled to obtain relief for all of its impacted members."). This Court should enter an injunction that provides relief to all Plaintiffs and their members.

### VI.    The court should not require a bond and should not stay any injunction.

Courts do not require bonds in "suits to enforce important federal rights or 'public interests.'" *Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). Plaintiffs seek to vindicate public interests by enjoining the Directives and terminations. *See* ECF No. 37-1. Where the federal government has withheld previously-awarded funding and defendants face no individual monetary harm, a bond would "hold Plaintiffs hostage for the resulting harm." *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025). Additionally, no stay should accompany preliminary relief, as Plaintiffs' irreparable harms are ongoing. Defendants are unlikely to succeed on appeal, Plaintiffs would suffer substantial injury, and a stay would not serve the public interest. *See New York v. Trump*, 133 F.4th at 65 (citation omitted)

### <u>CONCLUSION</u>

For the reasons discussed here and in Plaintiffs' opening brief, ECF No. 41, Plaintiffs respectfully request that the Court grant their motion for preliminary injunction, ECF No. 37.

APHA App. 987

Dated: May 19, 2025

Jessie J. Rossman
Suzanne Schlossberg
**American Civil Liberties Union**
**Foundation of Massachusetts, Inc.**
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Olga Akselrod
Alexis Agathocleous
Rachel Meeropol
Alejandro Ortiz
**American Civil Liberties Union**
**Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

Lisa S. Mankofsky
Oscar Heanue
**Center for Science in the Public Interest**
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

Respectfully submitted,

*/s/ Shalini Goel Agarwal*
Shalini Goel Agarwal
shalini.agarwal@protectdemocracy.org
**Protect Democracy Project**
2020 Pennsylvania Ave., NW, Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org

Michel-Ange Desruisseaux
82 Nassau Street, #601
New York, NY 10038
michel-
ange.desruisseaux@protectdemocracy.org

Kenneth Parreno*
15 Main Street, Suite 312
Watertown, MA 02472
kenneth.parreno@protectdemocracy.org

* *Pro hac vice* application forthcoming.

21

APHA App. 988

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 19, 2025 a true and correct copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

May 19, 2025                                     _/s/ Shalini Goel Agarwal_
                                                Shalini Goel Agarwal

APHA App. 989

# EXHIBIT 43

APHA App. 990

 An official website of the United States government   Here's how you know ⌄

 **NIH** **GRANTS & FUNDING**   🔍   ☰

**NEW TO NIH**

| **FUNDING** | ▼ |

**GRANTS PROCESS** ▼

**POLICY & COMPLIANCE** ▼

**NEWS & EVENTS** ▼

**ABOUT US** ▼

Home  >  Funding  >  Funding Categories  >  Contracts

# Contracts

## What is a Contract?

A contract is a legal agreement binding parties that has:

- Defined requirements
- Specific deliverables
- Defined schedule

A contract may be cost or price based.

## Grants vs. Contracts



| Grant | Contract |
|-------|----------|
| • Assistance | • Legally binding agreement |

↑ Back to Top

APHA App. 991

| Grant | Contract |
|---|---|
| mechanism to support research for the public good | acquire goods or services for the direct use or benefit of the government. |
| • Peer review of broad criteria | • Award based on stated evaluation factors |
| • Limited government oversight and control | • More government oversight and control |
| • Reports | • Deliverables |

# Finding a Contract Solicitation

All contract solicitations are posted on the Contract Opportunities page in Sam.gov. This site serves as the fed-wide portal that supports searching, monitoring, and retrieving contract opportunities for the federal government.

Or you can search for NIH specific opportunities in the NIH Request for Proposal Directory by the NIH institute or center of interest.

# Types of Contracts
## Fixed Price

- Firm price for delivery of a product or service
- May result from sealed bids or negotiations
- Most often for supplies and standard services

## Cost Reimbursement

- Contract contains a negotiated estimate
- May or may not have a fixed fee
- Used when
  - Uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy use any type of fixed-price contract

↑ Back to Top

- Used when costs cannot be estimated with sufficient accuracy to use any type of fixed-price contract
- Most Research and Development (R&D) contracts are cost-reimbursement

# How Contracts Are Evaluated

- Contract awards from proposals are usually made on the basis of best value.
- Evaluation factors for award
  - Technical criteria
  - Cost
  - Past performance
  - Small disadvantaged business participation
- Best value considers all factors based on the relative importance
- Technical evaluation criteria are reviewed by independent peer review
  - Sample technical evaluation criteria
    - Technical approach
    - Personnel
    - Facilities
- Technical criteria are often weighted
- Reviewers determine technical acceptability

# Submitting a Contract Proposal

Search for a contract opportunity on <u>Contract Opportunities</u>⧉ page in Sam.gov or <u>NIH Request for Proposal Directory</u>⧉.

**Read the solicitation carefully!** It should contain all the information needed to prepare a proposal.

- Registration requirements
- Statement of Work (SOW) or Statement of Objectives (SOO)
- Instructions to offerors

↑ Back to Top

Contracts | Grants & Funding                                                        https://grants.nih.gov/funding/funding-categories/contracts

- ○ Type of contract
- ○ Set- aside restrictions
- ○ How and where to submit the proposal
- Evaluation factors for award

**When Developing a Proposal**

1. Convince reviewers of your technical abilities!
   - ○ Demonstrate your understanding of the requirement
   - ○ Demonstrate the soundness of your technical approach
   - ○ Show the strengths of your technical team
   - ○ Present facilities
   - ○ See Technical Proposal Instructions ⬀
2. Ensure your proposal is cost competitive
   - ○ See Business Cost Proposal Instructions ⬀

# Review Criteria

To find the criteria reviewers will use to evaluate your application, see Section V of your funding opportunity.

## See Also

### Contract Regulations

Policies and procedures for acquisition by all executive agencies are codified in the Federal Acquisition Regulations (FAR) ⬀.

## Contact

These Acquisition Offices ⬀ service the NIH Institutes and Centers.

↑ Back to Top

APHA App. 994

This page last updated on: September 13, 2024
For technical issues E-mail OER Webmaster

Thank you for taking the survey. We will
use this information to continue to
improve your experience on our site.

Form Approved OMB# 0925-0648 Exp. Date 7/2027

Protected by reCAPTCHA: Privacy ⬀ & Terms ⬀

## Help, FAQs, And More

Nexus Blog ⬀

eRA ⬀

Glossary

FAQs

Help



National Institutes of Health
Bethesda, MD 20892

↑ Back to Top

APHA App. 995

## Stay Connected



Subscribe for Grant News

## Government Sites

Health and Human Services ⧉

National Institutes of Health ⧉

USA.gov - Government Made Easy ⧉

NIH Staff (Intranet 🔒) ⧉

## Web Policies and Notices

Accessibility

HHS Vulnerability Disclosure ⧉

FOIA ⧉

Privacy Notice

Disclaimer

Archive of this Page Since September 24, 2024 ⧉

Older Versions of this Website

## Site Map

↑ Back to Top

APHA App. 996

Contracts | Grants & Funding                                    https://grants.nih.gov/funding/funding-categories/contracts

Home

New To NIH

Funding

Grants Process

Policy & Compliance

News & Events

About Us

↑ Back to Top

APHA App. 997

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN PUBLIC HEALTH
ASSOCIATION; IBIS REPRODUCTIVE
HEALTH; INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS (UAW); BRITTANY
CHARLTON; KATIE EDWARDS; PETER
LURIE; and NICOLE MAPHIS,

        *Plaintiffs*,

        v.

NATIONAL INSTITUTES OF HEALTH;
JAY BHATTACHARYA, *in his official
capacity as Director of the National Institutes
of Health*; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and ROBERT F.
KENNEDY, JR*., in his official capacity as
Secretary of the United States Department of
Health and Human Services*,

        *Defendants*.

Case No. 1:25-cv-10787-WGY

## PLAINTIFFS' OPENING BRIEF FOR PHASE 1 PROCEEDING

APHA App. 998

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES .................................................................................... iii-vi

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

    I.    NIH Overview .............................................................................................2

    II.    Pursuant to the Directives, Defendants Terminate Grants and Withdraw or Refuse to Consider Applications .............................................................................3

        A.    Overview of the Directives ..............................................................3

        B.    Development and Implementation of the Directives ........................5

    III.    The Directives Decimate Grants and Funding Opportunities Critical to Public Health and Diversifying the Biomedical Workforce. ...........................................11

    IV.    The Directives Have Resulted in Discrete, Ongoing, and Widespread Harm. ......13

ARGUMENT ....................................................................................................................14

    I.    Jurisdiction ................................................................................................14

        A.    The Court Has Jurisdiction Over Plaintiffs' Suit. ......................14

        B.    Plaintiffs Have Standing. ..............................................................14

        C.    The Directives Constitute Final Agency Actions. ......................15

    II.    The Directives Are Arbitrary and Capricious. ......................................16

        A.    There is No Evidence of Reasoned Analysis for Issuance of the Directives. ..............................................................................................16

        B.    There is No Evidence of Reasoned Explanation for Defendants' About-face on Policies and Priorities. ..................................................20

        C.    There is No Evidence Defendants Considered Substantial Reliance Interests. ..........................................................................................21

    III.    The Directives Are Contrary to Statute. ................................................23

    IV.    The Directives Are Not in Accordance with Law. ................................28

    V.    The Directives Should Be Vacated and Enjoined. ................................29

i

CONCLUSION.............................................................................................................34

APHA App. 1000

TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advoc. U.S. Coal. v. Dep't of State*,
766 F. Supp. 3d 74 (D.D.C. 2025) .................................................................... 21

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ......................................................................... 31

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
No. 1:25-CV-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025) ............................ 18

*Ark Initiative v. Tidwell*,
816 F.3d 119 (D.C. Cir. 2016) ......................................................................... 20

*Ass'n of Am. Universities v. Dep't of Energy*,
No. 25-CV-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) ........ 16, 20, 21, 22

*Bennett v. Spear*,
520 U.S. 154 (1997) ......................................................................................... 15

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .................................................................................. 14, 31

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) .................................................................... 31

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ........................................................................... 32

*D.A.M. v. Barr*,
486 F. Supp. 3d 404 (D.D.C. 2020) .................................................................. 31

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................................................................. 17, 21, 22, 32

*Doe v. Rhode Island Interscholastic League*,
137 F.4th 34 (1st Cir. 2025) ............................................................................ 33

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ........................................................................... 32

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ......................................................................................... 20

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ......................................................................... 31

APHA App. 1001

*Harrington v. Chao,*
    280 F.3d 50 (1st Cir. 2002) ........................................................ 30

*Healthy Teen Network v. Azar,*
    322 F. Supp. 3d 647 (D. Md. 2018) .......................................... 28

*Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region,*
    75 F.4th 248 (1st Cir. 2023) ...................................................... 20

*Indep. U.S. Tanker Owners Comm. v. Dole,*
    809 F.2d 847 (D.C. Cir. 1987) .................................................. 30

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 14

*Marasco & Nesselbush, LLP v. Collins,*
    6 F. 4th 150 (1st Cir. 2021) ...................................................... 20

*Massachusetts Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.,*
    No. CV 24-10332-WGY, 2024 WL 2194260 (D. Mass. Apr. 16, 2024) .................. 30, 33

*Massachusetts v. Kennedy,*
    No. CV 25-10814-WGY, 2025 WL 1371785) ........................... 14, 15

*Massachusetts v. Nat'l Insts. of Health ("NIH"),*
    No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ..................... 20, 21, 22, 26

*Montana Wildlife Fed'n v. Haaland,*
    127 F.4th 1 (9th Cir. 2025) ........................................................ 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .............................................................. 16, 20

*Nat'l Env't. Dev. Ass'ns Clean Air Project v. Env't Prot. Agency,*
    752 F.3d 999 (D.C. Cir. 2014) .................................................. 29

*New York v. Trump,*
    133 F.4th 51 (1st Cir. 2025) ...................................................... 15

*NLRB v. Lily Transp. Corp.,*
    853 F.3d 31 (1st Cir. 2017) ...................................................... 20

*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019) .......................................... 32

*Ohio v. Env't Prot. Agency,*
    603 U.S. 279 (2024) .................................................................. 16

APHA App. 1002

*Orr v. Trump*,
    No. 1:25-CV-10313-JEK, 2025 WL 1145271 (D. Mass. Apr. 18, 2025)................... 21, 30

*Pol'y & Rsch., LLC v. United States Dep't of Health & Human Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................................ 28, 29

*Schiff v. U.S. Office of Pers. Mgmt.*,
    No. CV 25-10595-LTS, 2025 WL 1481997 (D. Mass. May 23, 2025)............... 17, 18, 19

*Victim Rts. L. Ctr. v. Cardona*,
    No. CIV 20-11104-WGY, 2021 WL 3516475 (D. Mass. Aug. 10, 2021) ...................... 30

**Statutes**
42 U.S.C. § 241 ......................................................................................................................... 2

42 U.S.C. § 282 ........................................................................................................ 3, 23, 24, 25

42 U.S.C. § 283 ............................................................................................................. 3, 23, 24

42 U.S.C. § 284 ....................................................................................................................... 25

42 U.S.C. § 285 ............................................................................................................. 3, 23, 24

42 U.S.C. § 288 ............................................................................................................... 2, 3, 24

42 U.S.C. § 289 ............................................................................................................... 2, 3, 24

5 U.S.C. § 706........................................................................................................ 22, 28, 30, 33

**Other Authorities**
*Impact of NIH Grant Terminations* (May 27, 2025), *available at* https://perma.cc/YF4W-
    GWKN. ...................................................................................................................... 11

*The Gutting of America's Medical Research: Here Are the 2,500 Medical Research Grants
    Canceled or Delayed by Trump*, N.Y. TIMES (June 4, 2025),
    https://www.nytimes.com/interactive/2025/06/04/health/trump-cuts-nih-grants-
    research.html ............................................................................................................... 12

Transcript of Oral Argument at 73, *Trump v Casa, Inc.* Case No. 24A884, available at
    www.supremecourt.gov/oral_arguments/argument_transcripts/2024/24a884_c07d.pdf . 33

**Rules**
2 C.F.R. § 200.340 .............................................................................................................. 28, 29

42 C.F.R. § 52.5 ....................................................................................................................... 2

45 C.F.R. § 75.372 ............................................................................................................... 3, 28

APHA App. 1003

# INTRODUCTION

This case challenges an ideological assault on science. Beginning in February 2025, Defendants created and implemented a series of Directives leading to the termination of hundreds of grants—totaling billions of dollars—funded by the National Institutes of Health ("NIH"). Terminated research includes projects essential to two fundamental, Congressionally-mandated goals: understanding and addressing health disparities among Americans and diversifying the biomedical workforce for the betterment of public health. Defendants have also refused to consider hundreds of funding applications, disrupting scientific progress for years to come.

As a result of this purge, funding for research in critical areas like cancer, heart disease, and Alzheimer's disease have been gutted or remain at risk, and programs designed to diversify the biomedical workforce have been eliminated wholesale. Plaintiffs Ibis Reproductive Health ("Ibis"), Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis, and members[1] of Plaintiffs APHA and UAW (collectively, "Plaintiffs and Members") are among the researchers caught in the crosshairs.

While Plaintiffs respectfully challenge the completeness of Defendants' administrative record by separate motion, the current record still shows that Defendants failed to develop—much less apply—any working definitions for the forbidden research topics; did not rely on any data or science when purging awards; did not consider the disruption that would ensue for researchers, study participants, and public health; and violated Congressionally-imposed requirements to research health disparities and diversify the workforce. Instead, the record shows that bare

---

[1] "Members" refers to all current members of the associational Plaintiffs, American Public Health Association ("APHA") and United Automobile, Aerospace, and Agricultural Implement Workers ("UAW"), including Pre-Members of UAW (individuals for whom UAW is their exclusive bargaining representative in ongoing negotiations with their employer, and who intend to become dues-paying members once a collective bargaining unit is in place).

termination lists were circulated with same-day deadlines, and actors *outside of NIH* provided lists of grants to be terminated through senior NIH officials' rubber-stamps, obliterating without any meaningful review research that had undergone years of rigorous peer review.

The Directives and their implementation violate the Administrative Procedure Act on three independent grounds, each of which is sufficient to require they be set aside: they are arbitrary and capricious, contravene statutory mandates, and violate HHS's own regulations governing grant terminations. To stop this sweeping assault on public health, Plaintiffs respectfully request that this Court declare the Directives unlawful, vacate them and their current implementation in their entirety, and permanently enjoin their further implementation. *See* Ex. A, Proposed Order.

## FACTUAL BACKGROUND

### I.    NIH OVERVIEW

Operated by HHS, NIH is the country's primary source of federal funding for biomedical and public health research. ECF Nos. 38-2, 38-3. It is comprised of 27 institutes and centers ("ICs") and provides almost 50,000 competitive grants, totaling billions of dollars, to more than 300,000 researchers outside the agency ("extramural research"). ECF Nos. 38-1, 38-2, 38-26 ¶ 15. NIH's extramural research awards include project-based grants for scientific and biomedical research projects, ECF No. 38-26 ¶ 15, and pipeline grants to institutions and individuals for career development or training, including congressionally mandated programs, 42 U.S.C. § 288(a)(1)(A), awarded through a rigorous two stage peer-review process that is likewise statutorily mandated. ECF Nos. 38-26 ¶¶ 19, 26; 38-32 ¶ 6; 38-27 ¶¶ 17–21; 38-23 ¶¶ 21, 31–46, 50–51, Ex. A, C; 38-42 ¶ 5; 38-5 at 2.4; 42 U.S.C. § 289(a); 42 C.F.R. § 52.5.

The Public Health Service Act ("PHSA") authorizes NIH to promote research into physical and mental diseases and impairments, including studies conducted by NIH and through extramural research. 42 U.S.C. § 241(a), (a)(3). Statutes require NIH and ICs to (1) conduct research that

2

promotes health equity and reduces health disparities; and (2) recruit underrepresented groups into the biomedical research field, including racial minorities, women, and those from economically disadvantaged backgrounds. 42 U.S.C. § 282 (b)(4), (b)(8)(d)(ii), (h), (m)(2)(b)(iii); 42 U.S.C. § 283(p); 42 U.S.C. § 283*o*(b)(2); 42 U.S.C. § 285(t); 42 U.S.C. § 285t-1(a), (b); 42 U.S.C § 288(a)(4); 42 U.S.C. § 289a-2. NIH must also, by statute, develop a five-year strategic plan that identifies research priorities and facilitates collaboration across the ICs, and must ensure its resources "are sufficiently allocated for" these priorities. 42 U.S.C. § 282(b)(6), (m).

Given the scientific rigor with which grants are awarded and the governing HHS regulations that allow for unilateral termination of grants only for non-compliance, terminations at NIH have historically been rare. *See, e.g.*, ECF Nos. 38-6, 38-26 ¶ 38; 45 C.F.R. § 75.372(a) (2024). Instead, NIH would generally pursue corrective action in response to concerns about performance of the grant and, even in instances of scientific misconduct, would take steps to preserve the results of research where possible. ECF Nos. 38-26 ¶¶ 39–40.

## II.    PURSUANT TO THE DIRECTIVES, DEFENDANTS TERMINATE GRANTS AND WITHDRAW OR REFUSE TO CONSIDER APPLICATIONS.

### A.    Overview of the Directives

In recent months, HHS and NIH have issued a series of directives ("the Directives") that suspended NIH funding and have resulted in the termination of billions of dollars in scientific research support for grants and granting programs, and the removal of previously published funding opportunities and applications submitted for the opportunities, all because they allegedly "no longer effectuate[] agency priorities." *See* AR3192-3203.[2] Over the course of all of these

---

[2] References to the administrative record produced by Defendants on June 2, 2025 will match the page numbers in the record (*e.g.*, "AR0004" corresponds to "NIH_GRANTS_000004").

3

Directives, the universe of topics to be defunded expanded, but the substance of the boilerplate

termination justifications remained the same, and came to include the following:

- **DEI**: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- **Transgender issues**: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

- **Vaccine Hesitancy**: It is the policy of NIH not to prioritize research activities that focuses [sic] gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

- **COVID**: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

- **Climate Change**: Not consistent with HHS/NIH priorities particularly in the area of health effects of climate change.

- **China**: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national security interests and hinders America's foreign-policy objectives.

- **Influencing Public Opinion**: This project is terminated because it does not effectuate the NIH/HHS' priorities; specifically, research related to attempts to influence the public's opinion.

AR3536. Other defunded grant categories for which boilerplate termination language does not

appear in the Directives include South Africa and any subawards to foreign entities. AR3523.

4

APHA App. 1007

Despite the massive disruption caused by these Directives, the record is devoid of *any* reasoning, analysis, or evidence to support the remarkable assertion that NIH research projects subject to rigorous review were actually "antithetical to the scientific inquiry" and "unscientific" or any other of the Directives' bald assertions. The record thus confirms that the Directives set forth categories of newly forbidden research and programs without any definition of what belongs in those categories, provide only boilerplate and conclusory justifications for why these are forbidden, and point to no research, data, or any other support to back up their justifications and their about-face from prior NIH priorities and determinations.

## B.    Development and Implementation of the Directives

Pursuant to these Directives, Defendants swiftly terminated hundreds of grants previously subjected to a rigorous selection process and found to align with NIH priorities, ECF No. 41 at 15-17, 39-43, including grants addressing research areas essential for public health and diversifying the workforce, *id.*; Ex. 55[3] (Ex. A).[4] The record—even with its limitations—shows that the purges occurred without any scientific or individualized review.

The Directives followed Executive Orders from President Trump requiring, among other things, that agency heads "terminate, to the maximum extent allowed by law, all … 'equity related' grants or contracts" within 60 days."[5]  On February 10, 2025, the "Secretarial Directive on DEI-related Funding" ("Secretarial Directive") instructed agencies to "briefly pause" payments made to grantees "related to DEI and similar programs" and stated that "grants may be terminated in accordance with federal law." AR0004.

---

[3] Citations to "Ex. []" refer to the numbered exhibits attached to the Declaration of Jessie J. Rossman dated June 9, 2025.
[4] In prior filings and supporting declarations, Plaintiffs have recounted just some of the chaos that ensued because of Defendants' actions. *See, e.g.*, ECF No. 71 at 11–18, 39–43.  But in light of the focus of the phase 1 proceeding on *the Directives* themselves, Plaintiffs respectfully reserve the right to fully address in any pre-hearing filings how the terminations and failure to consider applications unfolded, in the event there are subsequent phases for this case.
[5] *Ending Radical and Wasteful Government DEI Programs and Preferencing,* 90 Fed. Reg. 8339 (Jan. 20, 2025).

5

APHA App. 1008

On February 12, 2025, the Directive titled "NIH Review of Agency Priorities Based on the New Administration's Goals" ("Lauer Memorandum") informed grants-management officers that NIH was reevaluating the agency's priorities based on the new administration's goals, but court injunctions must limit immediate implementation. AR0009. However, that same day the Acting General Counsel "clarif[ied]" that agencies could "exercise their own lawful authorities to withhold funding," AR0010, and "Supplemental Guidance" issued the next day directed grants-management officers to "fully restrict[]" grants where the "sole purpose" is to support "DEI activities." AR0016. The Supplemental Guidance provided neither a definition of "DEI activities" nor discussion of how to discern whether a grant supports the same. *Id.*

On February 21, 2025, NIH issued a "Directive on NIH Priorities" requiring the agency to cease its support of "low-value and off-mission research programs," including studies based on "DEI" and "gender identity" (the "February 21 Directive"), neither of which were defined. AR2930, AR3821. The record reflects that the Directive stated, without citation or backing from any evidence, that "[r]esearch programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness." AR3821. A cover email from Matt Memoli—the Acting NIH Director—forwarding the Directive to a number of NIH staff indicated that NIH could "set priorities at an NIH level, which now allows us to proceed with the process of making sure programs are meeting these goals." AR3823. That same afternoon, Liza Bundesen—the former Deputy Director of NIH Office of Policy for Extramural Research Administration ("OPERA")—forwarded the Directive to NIH colleagues, stating that "**today**, we have to pull down all of the

APHA App. 1009

NOFOs[6] that we previously pulled down and put back up (DEI, gender ideology, environmental justice, etc.).” AR3823.

The next day, Brad Smith—an official at the so-called Department of Government Efficiency (“DOGE”)—emailed Memoli with a list of 18 NOFOs, stating “[p]er our conversation, below are a number of NOFOs that it may be worth your team reviewing to make sure they align with your directive and priorities.” AR3752–53. NIH’s review of these NOFOs lasted at most 25 minutes, at which point Memoli emailed the entire list to NIH officials with the subject line “NOFOs that need to come down,” stating “I was sent a list of NOFOs to review that are still up. After my review I have determined these NOFOs in their current form have issues that cause to not be properly directed at current NIH priorities.  Please take these NOFOs down.” AR3810.

The first wave of grant terminations soon followed. On February 28, 2025, Memoli emailed Bundesen (copying DOGE and HHS officials), attaching a spreadsheet of grants and instructing NIH to “[p]lease terminate the grants on the attached spreadsheet by COB today. Attached is an OGC cleared termination letter.” AR2295, AR2296, AR2469.[7] That evening, Rachel Riley—described in the record as an HHS official—sent multiple emails in a thread with the subject line, “Grants for immediate termination today.” AR2296. These and the hundreds of subsequent terminations used the template termination (or similar) language from HHS described above. *See* AR3192-3203.

On March 4, 2025, NIH issued the first iteration of what would become an ever-expanding memo describing “Award Assessments for Alignment with Agency Priorities” (the “Priorities

---

[6] A “NOFO” refers to a Notice of Funding Opportunity, which ICs post to identify the criteria that will be used to assess each application.  *See* ECF Nos. 41 at 11; 38-26 ¶ 27; 38-5 at 2.4.1.3.
[7] When Defendants produced excel versions of the spreadsheets, a different termination list was labeled “AR2296,” leading to confusion in the record that Defendants must clarify on reply.

APHA App. 1010

Directive"). AR2136. This Directive repeats that NIH would "no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI)" and creates a taxonomy of four categories to classify projects and determine actions "to completely excise all DEI activities." AR2136-37. The first category consists of projects for which "the sole purpose . . . is DEI related" and the award "must not issue," and the second category consists of projects that "partially support[] DEI activities" and requires that such activities be "negotiated out" or else the award must be terminated. AR2136-37. This Directive also includes three appendices, the third of which provides specific scripts for staff to use when terminating grants allegedly connected to China, "[t]ransgender issues," or DEI, the latter parroting the unsupported statements from the February 21 Directive. AR2138-41; *compare* AR2141 *with* AR3821.

That same day, Michelle Bulls—the Director of OPERA—instructed staff to move forward with "the process for terminating awards based in DEI *as provided to [NIH] by HHS*." AR3453 (emphasis added). Bulls also directed the NIH chief grant management officers who had "issued termination letters yesterday (and Friday[)]" to "review Appendix 2 – Guidance for staff to use when terminating awards identified by HHS or the IC related to DEI," and revise their previous terminations using the new guidance. AR3453. Bulk terminations followed. *See, e.g.*, AR2352; AR2353 (March 10 email attaching list of 43 grants and NOFOs "that need to be terminated/taken down, preferably by COB today if possible"); AR3512 (March 11 list of grants for potential termination); AR3820 (March 11 approval of terminations); AR3631–35 (email attaching March 12 list of grants to terminate).

On March 13, 2025, NIH issued another Directive (the "Awarded Revision Guidance"), which adds vaccine hesitancy to the list of deprioritized topics and provided the following termination boilerplate: "It is the policy of NIH not to prioritize [insert termination category

8

language]. Therefore, this project is terminated." AR1957 (bracketed placeholder in original). When sending this Directive to other NIH officials, Bulls attached a spreadsheet of termination letters sent on March 12 and provided "updated categories" that should be "use[d] when issuing NOAs to officially terminate the awards where letters were issued," and noted that her email constituted "[g]uidance" for NIH officials "to use when terminating awards identified by HHS or the IC due to DEI or other agency priorities." *Id.*; AR1968; AR1959. Resulting grant terminations parroted the boilerplate language from the Directives. *Compare* AR0709 *with* AR2136.

More terminations followed shortly after. On March 13, 2025, Memoli emailed NIH officials with a list of 450 grants to terminate over the following week. AR3122, AR3123. And on March 24, 2025, he sent another email stating "We have been asked to terminate the list of approximately 120 grants by COB today. The memo from HHS OGC defines the reason for the terminations so our letter should mirror this memo," AR2562 (referencing memorandum from HHS titled "Termination of COVID-19 Grants," AR2591).

On March 25, 2025, NIH issued the second iteration of the "NIH Grants Management Staff Guidance—Award Assessments for Alignment with Agency Priorities—March 2025" (the "Revised Priorities Directive"). AR3216. The Revised Priorities Directive expanded the categories of relevant projects, including by creating a category of terminations—"HHS Department Authority Terminations"—that consisted of any list of grants the "Director, NIH, or designee" sent to ICs to terminate.[8] AR3220. This Directive also expanded the topics of disfavored research to include climate change and added South Africa to a general topic of "countries of concern." AR3218. The Directive provides approved boilerplate termination language for nearly all the research topics. *See* AR3218.

---

[8] The Directive also created a subcategory for "Subprojects terminated by HHS," for which OPERA was to "restrict funds associated with the project" and "[n]o action [is] required from the IC." AR3220.

9

APHA App. 1012

The day after issuing this Directive, on March 26, Memoli sent an email identifying more grants to be terminated "ASAP." AR2563. On March 28, after speaking with the OGC, Memoli emailed again with another list of 34 grants to terminate. AR2488, AR2489–2561.

By May 7, 2025, NIH had further institutionalized these practices. Bulls circulated another iteration of the Directive (the "May 7 Directive"), which sought "to expand the scope of categories within to include other agency priorities that will be defined by the Director, NIH." AR3548. Among other changes, the May 7 Directive stated that awards could not be issued both for unpublished NOFOs and also for NOFOs that "expired naturally, if the sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities;" created a new category of "Directed Terminations" that encompasses the termination of entire programs, listing examples of COMPASS, FIRST, and MOSAIC K99/R00,[9] and stated there would "not be any other announcement" of program terminations except that "the NOFO will be unpublished"; and added several new appendices. AR3547–3548, AR3568–3577. A nascent "definitions" section appears in the Directive, still containing no definition of "gender identity/transgender issues," "DEI," or "COVID-related," and includes a placeholder for "Health Disparities," stating that a definition was "pending." AR3562–63. Appendix 3—providing the boilerplate explanation for each disfavored topic—replaced the phrase "Transgender Issues" with "Gender-Affirming Care." *Compare* AR3226 *with* AR3567.[10]

---

[9] "ComPASS" stands for "Community Partnerships to Advance Science for Society" and "FIRST" for "Faculty Institutional Recruitment for Sustainable Transformation." *See* https://commonfund.nih.gov/compass; https://commonfund.nih.gov/FIRST.

[10] The Gender-Affirming Care language includes a "reminder" not to "terminate any grants related to gender identity / transgender without clearance from OER." AR3567. Yet the boilerplate language for the terminations continues to state "research programs based on gender identity are often unscientific," and the May 7 Directive's definition of "Gender-Affirming Care" has no relevance to the research activities described in the boilerplate language. *Compare* AR3567 *with* AR3562. Nor does the definition of Gender-Affirming Care meaningfully relate to scores of grants previously terminated on the basis of "gender identity." *See, e.g.,* AR0155–0168 (appeal letter for grant terminated on the basis of "gender identity" where grant was studying biological changes in men and women associated with substance use exposure).

10

APHA App. 1013

Just two days later, on May 9, 2025, Jon Lorsch—Acting Deputy Director for Extramural Research—emailed "several additional grants" for potential termination to Memoli. AR3452. No more than 2 minutes later, Memoli responded, "Please terminate those grants for being inconsistent with agency priorities." *Id.* On May 15, 2025, NIH issued a slightly altered version of the May 7 document, but it does not change the forbidden research topics. *See* AR3517.[11]

## III.  THE DIRECTIVES DECIMATE GRANTS AND FUNDING OPPORTUNITIES CRITICAL TO PUBLIC HEALTH AND DIVERSIFYING THE BIOMEDICAL WORKFORCE.

This sweeping purge of NIH grants quickly reverberated through the field of biomedical research. As painstakingly documented by grant-watch.us, a website and series of databases that track terminated NIH grants, a total of 1,737 grants have been terminated based on vague "policy" assertions as of June 4, 2025. Ex. 55 ¶ 7; *see also* ECF Nos. 38-27 ¶¶ 5–12, Ex. A; 72-3 (Ex. A). The total budget allocated across these grants was approximately $7.2 billion. Ex. 55 ¶ 9. Approximately $3.8 billion has already been spent, leaving an estimated $3.4 billion in unspent value. *Id*. These terminations have touched every corner of the country, with institutions in 50 states and territories abruptly losing NIH funding.[12]

Terminated projects span a dizzying array of health issues, including breast cancer, uterine cancer, anal cancer, stroke risk, cardiac health, Alzheimer's Disease, HIV prevention, suicide prevention, alcohol use disorder, smoking cessation, eating disorders, sexually transmitted infections, COVID-19, depression, psychopathology, pain, and many other conditions that very often disproportionally burden minority communities. ECF No. 38-27 ¶ 13. Terminated grants tackled topics such as "Mitigating the Effects of Structural Racism on Chronic Kidney Disease

---

[11] Three additional spreadsheets of grants appear in the Administrative Record, without corresponding cover emails that would allow Plaintiffs to understand when or if they were terminated. *See* AR2311; AR2497; AR2564.

[12] *See* Association of American Medical Colleges (AAMC), *Impact of NIH Grant Terminations* (May 27, 2025), *available at* https://perma.cc/YF4W-GWKN.

APHA App. 1014

Disparities Among African Americans"; "Assessing Cervical Cancer Healthcare Inequities in Diverse Populations"; "Elucidating the High and Heterogeneous Risk of Gestational Diabetes Among Asian Americans"; and "The Epidemiology of Alzheimer's Disease and Related Dementias in Sexual and Gender Minority Older Adults: Identifying Risk and Protective Factors." ECF Nos. 38-27 (Ex. A), 72-3 (Ex. A). Scores of terminated grants involved clinical trials.[13]

Among these hundreds of terminations are Pipeline Grants to support, train, and recruit a diverse group of scientists into biomedical research.[14] *See*, *e.g.*, ECF No. 38-27 (Ex. A) (listing terminated grants including Pipeline Grants such as FIRST, MARC, and U-RISE), ¶¶ 18–19, 22–25; *see also* ECF Nos. 38-35, 38-36, 38-41 (MOSAIC terminations); 38-38, 38-39 (IRACDA terminations); 38-42 (IMSD termination); 38-23 (MARC termination); Ex. 55 ¶¶ 10–14 (describing terminated grants that have no apparent connection to forbidden topics). Defendants have systematically eliminated entire granting programs designed for this purpose,[15] and have administratively withdrawn or refused to review applications that had been submitted for such programs. *See*, *e.g.*, ECF No. 72-10.

---

[13] *Id.* at 2; *see also* Irena Hwang et al., *The Gutting of America's Medical Research: Here Are the 2,500 Medical Research Grants Canceled or Delayed by Trump*, N.Y. TIMES (June 4, 2025), https://www.nytimes.com/interactive/2025/06/04/health/trump-cuts-nih-grants-research.html (documenting breadth of research topics subjected to grant cancellations and delayed funding).

[14] As demonstrated in Plaintiffs' Reply in Support of Plaintiffs' Motion for a Preliminary Injunction, and discussed further *infra*, Defendants' efforts in prior filings to show that they continue to preserve grants addressing health disparities and the recruitment of researchers from disadvantaged backgrounds are either distorted or flatly belied by the record. *See* ECF 71 at 8–10. *See also infra*, Background Section IV.

[15] *See*, *e.g.*, AR3701 (F31-Diversity); AR3705 (IRACDA); AR3713 (MOSAIC); AR3717 (ReWARD); AR3721 (R01); AR3726 (PREP); AR3729 (Bridges to the Doctorate Program); AR3730 (G-RISE); AR3734 (LEAD MSTP); AR3735 (MARC); AR3747 (ARC); AR3749 (Short-Term Research Education Experiences to Attract Talented Students to Biomedical Informatics/Data Science Careers and Enhance Diversity); AR3787 (Bridges to the Baccalaureate); *see also* ECF 72-3 ¶¶ 9-10 (all five National Research Service Awards ("NRSA") training programs that specifically recruit from underrepresented communities have been terminated).

APHA App. 1015

IV.    **THE DIRECTIVES HAVE RESULTED IN DISCRETE, ONGOING, AND WIDESPREAD HARM.**

The terminations stemming from the Directives have caused widespread and ever-compounding harm. First, and most fundamentally, Plaintiffs' and Members' research addresses critical public health issues for the population at large. *See, e.g.*, ECF Nos. 38-22 ¶¶ 4–6, 11–15; 38-24 ¶¶ 3–4; 38-26 ¶ 11, 38-30 ¶ 4; 38-34 ¶ 33. The rapid, haphazard and sweeping implementation of the Directives has undermined these goals, as well as the transparency, stability, and reliability of biomedical research writ large. *See, e.g.*, ECF No. 47-1.

So too have the sudden terminations harmed grant recipients, those they employ, and their patients. Plaintiffs and Members rely on NIH funding for their salary, and have had their livelihoods upended, their lives destabilized, and their research jeopardized. *See, e.g.*, ECF Nos. 38-19 ¶ 51; 38-20 ¶¶ 17, 23; 38-21 ¶ 20; 38-24 ¶¶ 9–10, 17; 38-26 ¶ 45; 38-41 ¶ 14, 38-42 ¶ 13; Ex. 56 ¶¶ 6–7. Grant recipients have been forced to abruptly fire students and staffers and will likely have to continue to do so.  *See, e.g.*, ECF Nos. 38-28 ¶ 22; 38-31 ¶¶ 24–26; 72-12 ¶¶ 3–5.

The Directives also upended the critical trust and rapport Plaintiffs and Members have carefully built with their research subjects, likely making it difficult or impossible to rebuild subject groups and continue their research in the future. *See, e.g.*, ECF Nos. 38-19 ¶¶ 53–55; 38-28 ¶ 22; 38-30 ¶¶ 24–29; 38-31 ¶¶ 30–33; 38-33 ¶ 22. At the same time, researchers previously funded by programs designed to diversify the scientific workforce worry that their grant terminations will tar them as unqualified "DEI hires," notwithstanding that they underwent the same rigorous peer review process to obtain their awards, and make it more difficult for them to secure future positions or more likely to be fired from current positions. *See, e.g.*, ECF No. 38-35 ¶¶ 23–26. The sudden interruptions in their academic progress have made students less competitive job candidates, undermining their professional development and careers. ECF Nos. 38-40 ¶ 22,

13

38-41 ¶ 14.  Some fear being blacklisted from future grant applications or from employment consideration from universities seeking to avoid retaliation by the federal government. ECF Nos. 38-37 ¶¶ 28–31; 38-39 ¶¶ 19–22.

## ARGUMENT

### I.     JURISDICTION

#### A.     The Court Has Jurisdiction Over Plaintiffs' Suit.

This Court has already ruled that it has subject matter jurisdiction over this lawsuit, rejecting Defendants' challenges to Plaintiffs' suit "relating to the Tucker Act, sovereign immunity, programmatic attack, jurisdiction over individual actions, and agency discretion." ECF No. 84 at 14 (adopting reasoning set forth in *Massachusetts v. Kennedy*, No. CV 25-10814-WGY, 2025 WL 1371785 at *5). Plaintiffs have comprehensively addressed each of these issues in prior briefing, ECF No. 41 at 19–23; ECF No. 71 at 5–11, and the Court has ruled in their favor, ECF No. 84 at 14; *see also Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988); *see Kennedy*, 2025 WL 1371785 at *8–11. This Court's analysis should remain unchanged, and its jurisdiction is clear.

#### B.     Plaintiffs Have Standing.

By having their grants terminated and application withdrawn by Defendants, the individual plaintiffs and Ibis have (1) suffered an "injury in fact" that is "concrete and particularized"; (2) "fairly traceable" to the actions of defendants; and (3) "likely" redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). *See supra*, Background Section IV; ECF No. 41 at 18-19.

In addition, this Court already ruled that plaintiffs APHA and UAW adequately pled associational standing, and it has now been sufficiently proven. *See* ECF No. 84 at 21; ECF No. 41 at 19; ECF No. 71 at 11–12; ECF No. 79 at 2. The missions of both APHA and UAW are core to the interests they seek to protect here and each easily satisfies the 'undemanding' germaneness

14

test. *See* ECF No. 84 at 21; *see also* ECF Nos. 38-23 ¶ 2; 38-25 ¶¶ 10, 11, 13, 15; 79 at 3 n.1. Neither the claims asserted nor the relief requested require any individual member's participation in the action. As a result, "both the APHA and UAW have associational standing to sue on their members' behalf." ECF No. 84 at 21.

### C.    The Directives Constitute Final Agency Actions.

This Court has previously found at the pleading stage that the Directives constitute final agency action. *See Kennedy*, 2025 WL 1371785 at *10. The record now confirms that the Directives "mark the consummation of the agency's decisionmaking process" and determined "rights or obligations . . . from which legal consequences [flowed]." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotes omitted). The Directives articulated NIH's settled position to not fund research on certain topics and resulted in direct legal consequences in the form of, among other things, grant terminations and withdrawal of funding opportunities and applications for those opportunities.[16] These Directives reflect NIH's decision to no longer prioritize research on certain prohibited topics, which has the "actual or immediately threatened effect" of hundreds of grants being terminated and applications withdrawn and are clearly reviewable under the APA. *See New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) (implementation of "categorical funding freezes" constitutes "discrete final agency action").

The record bears out that the Directives are not "interlocutory": "if they were, defendants would not be implementing them by terminating hundreds of grants around the country." *Kennedy*, 2025 WL 1371785, at *10; *see also Supplemental Guidance*, AR0016 (noting that this Directive

---

[16] *See, e.g.*, *February 21 Directive*, AR2930–31 ("Such review shall be aimed at ensuring NIH grants . . . do not fund or support low-value and off-mission research activities or projects – including DEI and gender identity research activities and programs."); *March 25 Guidance*, AR3351 ("Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims/major goals of the project to assess whether the proposed project contains any DEI, gender identity or other research activities that are not an NIH/HHS priority/authority . . . ICs must take care to completely excise all non-priority activities using the following categories.")

15

APHA App. 1018

was being issued to "supplement[]" guidance provided in the Lauer Memorandum, and directing grants-management officers to "fully restrict[]" grants where the "sole purpose" is to support "DEI activities."). As described above, the Directives were not simply to review grants but provided concretized instructions requiring bulk terminations and pre-determined actions for certain categories of topics. *See supra*, Background Section II.

## II.    THE DIRECTIVES ARE ARBITRARY AND CAPRICIOUS.

The record proves that the Directives are arbitrary and capricious in violation of the APA in three ways: (1) there is *no* evidence that Defendants undertook any reasoned analysis to support the policies in the Directives; (2) Defendants failed to provide sufficient reasoning for the reversal of prior policy and prior agency decision making; and (3) Defendants failed to consider serious reliance interests. *See* also ECF No. 41 at 28–32; ECF No. 71 at 16–19.

### A.    There is No Evidence of Reasoned Analysis for Issuance of the Directives.

First, the record shows that Defendants failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). As this Court has explained, "[a]n agency action qualifies as 'arbitrary' or capricious' if it is not 'reasonable and reasonably explained.'"  ECF No. 84 at 24 (quoting *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024)). "Statements of aspirational goals . . . are not the same as reasoned explanations for why an action is chosen or how the chosen action will effectuate the stated goals." *Ass'n of Am. Universities v. Dep't of Energy*, No. 25-CV-10912-ADB, 2025 WL 1414135 at *12 (D. Mass. May 15, 2025). And "conclusory and vague" "explanations" by the agency are neither reasonable nor reasoned decision-making. ECF No. 84 at 24, 31. At the motion-to-dismiss stage, this Court explained that the language across the Directives and terminations described "undefined gender identity issues" and "DEI language"

16

APHA App. 1019

"untethered to the specific terminated grants, with what looks more like a political statement than reasoning about the grants, and without any explanation as to why no corrective action is possible." ECF No. 84 at 31–33.

That alone would render the Directives arbitrary and capricious, and the record proves the allegations to be true. *See* ECF No. 84 at 31–35. The record is devoid of "a working definition of Diversity, Equity, and Inclusion," "gender identity" or any of the other forbidden topics. *See* ECF No. 84 at 35 n.4; *cf. Schiff v. U.S. Office of Pers. Mgmt.*, No. CV 25-10595-LTS, 2025 WL 1481997 at *10 (D. Mass. May 23, 2025) ("Wholly absent from this process, it seems, was any consideration or reasoned explanation of what language 'promotes' or 'inculcates' gender identity[.]"). Indeed, the record shows that, *months* after this funding purge began, Defendants created a "Definition(s)" list that only lists two terms, "Health Disparities," for which a definition is "Pending" and "gender affirming care," which contains a definition with no obvious relationship to the grants that Defendants previously terminated under the name "gender identity" or "transgender issues." yet continues to use the same boilerplate justification. AR3562, 3567. Of course, Defendants cannot provide a *post hoc* definition or justification for their actions, so that definition cannot support Defendants' reasoning on cuts that preceded the May 7 Directive. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909–10 (2020). It is especially damning that Defendants have still provided "no satisfactory answer" on definitions despite "[t]he Court press[ing] this issue." ECF No. 84 at 35 n.4.

Further, there is no evidence in the record that Defendants undertook *any* kind of reasoned analysis to support the conclusory statements in each of the Directives. The record shows no data, study, or analysis to justify any aspect of the Directives, let alone specific assertions such as that "[r]esearch programs based on gender identity are often unscientific, have little identifiable return

17

APHA App. 1020

on investment, and do nothing to enhance the health of many Americans," *see, e.g.*, AR2930; AR2141; AR 3567; *see also* ECF No. 84 at 31–32, or that "DEI studies" are "based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness," *see, e.g.*, AR2930; AR2141; AR3567; *see also* ECF No. 84 at 31–34.

Instead of providing any reasoned analysis, Defendants made the Directives out of whole cloth, and parroted the conclusory statements across iterations of the Directives and in termination letters for individual grants and programs. *See, e.g.*, AR2930, AR2141, AR3567 (same "DEI" language); AR2930, AR2141, AR3567 (same "gender identity" language). That use of boilerplate language evinces Defendants' failure to "consider individual, or any, data or information." *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025). And when NIH officials put these Directives into practice, they *at most* tried to invoke the same talismanic words: grants or programs are "unaligned with current NIH/HHS priorities." AR3820; *see also* AR2352, AR3631, AR3810.

Further, "the time and manner in which the Defendants implemented the [Directives] belies any plausible claim that [Defendants] acted in anything but an arbitrary and capricious way." *Schiff*, 2025 WL 1481997 at *10. For example, on February 22, it took Memoli no more than *25 minutes* to purportedly review and conclude that 18 NOFOs "need[ed] to come down." *See* AR3752, AR3810 ("After my review I have determined these NOFOs in their current form have issues that cause them to not be properly directed at current NIH priorities."). In another instance, on March 11, it took Memoli no more than *6 minutes* after receiving an email with 6 grants identified by Riley, to respond, "All of these grants can be terminated for being unaligned with

18

current NIH/HHS priorities." AR3511, AR3820. And in another case, on May 9, it took Memoli just *2 minutes* to review a list of "several additional grants" and direct that all should be terminated "for being inconsistent with agency priorities." *See* AR3452.

In several other instances, NIH officials were instructed to pull down NOFOs, terminate grants, and/or revise NOAs pursuant to the Directives *the same day* they were identified. AR2295, AR2469, AR2562–63, AR3631.  Indeed, that deadline was often imposed even when the NIH officials received a list late in the evening. AR2296, AR3511, AR3820. *See Schiff*, 2025 WL 1481997 at *10 ("HHS relayed that directive internally on the day compliance was due, and by the end of that day, [the subagency] had searched [the database] and identified the content it would remove.").

The record also reflects that, at least in some instances, NIH program officers were "not consulted about" how the Directives were actually implemented. AR0125. At least for some ICs, "scientific program staff" "ha[d] no information about how awards are being identified for potential termination, what criteria are being used, or who is involved in making these decisions." *Id.*; *see Schiff*, 2025 WL 1481997, at *10 (noting that terminations were "apparently done without consulting any of [the website's] editors, and without advance notice to the authors.").

And in many instances, the record shows that individuals *outside of NIH* were involved in drafting and implementing the Directives.[17] Individuals outside of NIH also identified grants to terminate or NOFOs to take down.[18] Indeed, the Directives themselves explicitly spell out the

---

[17] *See* AR2296, (Riley—purportedly from HHS—writes "DRAFT LETTER ATTACHED" next to some grants and "I WILL DO NOW" next to others), AR2562 ("The memo from HHS OGC defines the reason for the termination so our letter should mirror this memo."); *May 7 Directive*, AR3573 ("For HHS directed terminations, the template letter and appeals language were provided by HHS, and must be used as is.").

[18] *See* AR2296 (Riley provides lists of grants to be terminated), AR2562 ("We *have been asked* to terminate the list of approximately 120 grants by COB today." (emphasis added); AR3752 (Smith—from DOGE—identifies 18 NOFOs), AR3820 (Riley provides list to Memoli).

process for handling some grants that HHS—*not* NIH—officials determined should be terminated pursuant to those Directives. *See, e.g.*, AR3220–21, AR3453, AR3554, AR3573.

And relatedly, the Directives run afoul of the priorities required by statute and NIH and IC strategic plans—all of which continue to bind the agency. Defendants' change therefore represents precisely the type of "inscrutable" reasoning that is "facially irrational," *Marasco & Nesselbush, LLP v. Collins*, 6 F. 4th 150, 173 (1st Cir. 2021), and based in "factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43. For these and the other reasons Plaintiffs previously asserted, the record shows that the Directives and resulting terminations are arbitrary and capricious *See* ECF No. 84 at 31–35; ECF No. 41 at 29–30; ECF No. 71 at 16–17.

**B.    There is No Evidence of Reasoned Explanation for Defendants' About-face on Policies and Priorities.**

Second, the record shows that Defendants failed to "supply a reasoned analysis for the change" in its policies or priorities. *Ark Initiative v. Tidwell*, 816 F.3d 119, 127–28 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 42)*; see also* ECF No. 41 at 30–31; ECF No. 71 at 17. The APA "demand[s] that [the agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy," particularly when the "new policy rests upon factual findings that contradict those which underlay its prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Massachusetts v. Nat'l Insts. of Health ("NIH")*, No. 25-CV-10338, 2025 WL 702163 at *20 (D. Mass. Mar. 5, 2025). Indeed, "an about-face . . . owing to facts changed from those underlying the prior view requests that the new facts be addressed explicitly by reasoned explanation for the change of direction." *NLRB v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) (Souter, J.). In those circumstances, a "more detailed justification" may be required. *See Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*, 75

20

F.4th 248, 270 (1st Cir. 2023) (quoting *F.C.C.*, 556 U.S. 502 at 515); *Ass'n of Am. Universities*, 2025 WL 1414135 at *12.

But the record fails to show *any* reasoning for the changes, especially in light of the reasoned previous conclusions of NIH and external scientists who reviewed and approved the projects through a rigorous process. *See supra*, Background Section I; *see also* ECF No. 41 at 8–11, 29–30 & nn. 25 & 26. Instead, the record reflects no more than "conclusory policy goals" parroted across the Directives and throughout their implementation. *Ass'n of Am. Universities*, 2025 WL 1414135 at *12. This is especially egregious in light of the years-long efforts by Plaintiffs and Members to apply for, refine, implement, and report on their projects. *See* ECF No. 29–30 & nn.25 & 26. Indeed, Defendants acknowledge that there are "thousands of additional pages in *each* grant file related to the grant application and approval process." ECF No. 86-1 at 1 n.1 (emphasis added). Their lack of reasoning is "even more egregious in light of the drastic change" from the longstanding existing policies and priorities under which NIH has awarded funding. *See NIH*, 2025 WL 702163 at *18.

### C.    There is No Evidence Defendants Considered Substantial Reliance Interests.

Third, the record shows that, in creating and implementing the Directives, Defendants ignored "serious reliance interests that must be taken into account." *DHS*, 140 S. Ct. 1891 at 1913; *Orr v. Trump*, No. 1:25-CV-10313-JEK, 2025 WL 1145271 at *18 (D. Mass. Apr. 18, 2025). Plaintiffs have previously submitted evidence describing some of the reliance interests at stake, and rely on that evidence here. *See* ECF No. 41 at 31, 39–43. The record confirms Defendants "fail[ed] to address" those interests, including, "how [the] research will be conducted absent" government funding, a concern of particular importance "considering the number of [researchers] and associations that have made clear that research will have to be cut, as other funding sources will not be able to make up the shortfall." *NIH*, 2025 WL 702163 at *17; *see also id*. at *20; *AIDS*

21

*Vaccine Advoc. U.S. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 82 (D.D.C. 2025). There is no evidence showing Defendants even considered "the risk to human life as research and clinical trials are suspended," "the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed," and most critically, "the health of those whose hopes rely on clinical trials and the financial investment that will be lost as research is disrupted." *NIH*, 2025 WL 702163 at \*20 (issuing preliminary injunction regarding NIH's rate change notice).

In fact, the only documents in the record that come close to reflecting *any* consideration of any reliance issues are the May 7 and May 15 Directives, which acknowledge the likely disruption to training and employability of NRSA fellows, and to the career trajectory and funding opportunities available to Early-Stage Investigators flowing from the Directives. AR3245, AR3531. But those were generated *after* the vast majority of NOFOs at issue were unpublished and are therefore at most impermissible *post hoc* papering for those actions. *See DHS*, 140 S. Ct. 1891, at 1909–10. And even for terminations that occurred after May 7, those Directives suggest minimal and wholly insufficient steps to mitigate a small part of the harm Defendants are causing and reflect no balancing of the reasons for terminating training opportunities against the impact on the careers of hundreds of early career researchers and the overall scientific endeavor.

This "lack of reasoned explanation is particularly troubling in light of decades of industry reliance on [NIH's] prior policy." *Ass'n of Am. Universities*, 2025 WL 1414135, at \*12–13 (quotation omitted) (no steps taken to identify reliance interests). Because Defendants did not "assess whether there are reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns," the Directives are arbitrary and capricious. *NIH*, 2025 WL 702163, at \*19 (quoting *DHS*, 140 S.Ct. 1891, at 1915).

APHA App. 1025

## III.    THE DIRECTIVES ARE CONTRARY TO STATUTE.

The Directives are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), for three independent grounds, each of which is sufficient to set the Directives aside. The Directives (1) flout congressional mandates to fund research into health disparities; (2) run counter to congressional mandates to address the underrepresentation of racial minorities, women, and those from economically disadvantaged backgrounds in the biomedical field; and (3) subvert the priorities identified in congressionally mandated strategic plans and the requirement that such priorities must be sufficiently funded. Defendants not only violate the relevant statutory requirements—they turn them on their head by *defunding* exactly what Congress has *required* to fund. And in a role not contemplated by the statutory scheme, DOGE individuals, not NIH officials, served as decision-makers in determining what NIH funds.

First, 42 U.S.C. Ch. 6A, which governs the NIH, mandates that the agency fund research into health disparities. Congress made this requirement clear by, for example:

- Establishing the National Institute on Minority Health and Health Disparities (NIMHD) with the purpose of "conduct[ing] and support[ing] . . . research, training, dissemination of information, and other programs with respect to minority health conditions and other populations with health disparities." 42 U.S.C. § 285t(a);

- Requiring that the NIMHD director "shall . . . give priority to conducting and supporting minority health disparities research," *id.* at § 285t(b), and "shall" develop a plan and budget that "give[s] priority in the expenditure of funds to conducting and supporting minority health disparities research," *id.* at § 285t(f)(1)(D);

- Mandating that the NIH Director "shall" ensure that the ICs foster collaboration between their various clinical research projects and encourage such projects to "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities[.]" *Id.* at § 282(b)(8)(D)(ii);

- Directing that the NIH Director "shall assemble accurate data" for the purposes of "assessing research priorities, including— (A) information to better evaluate . . . progress in reducing health disparities; and (B) data on study populations of clinical research, . . . which— (i) specifies the inclusion of— (I) women; [and] (II) members of minority groups[.]" *Id.* at § 282(b)(4);

23

- Requiring that the NIH Director "shall . . . encourage efforts to improve research related to the health of sexual and gender minority populations, including by— (1) facilitating increased participation of sexual and gender minority populations in clinical research . . . ; (2) facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations; and (3) addressing methodological challenges." *Id.* at § 283p; and

- Mandating that the NIH Director "shall . . . ensure that (A) women are included as subjects in each project of . . . [clinical] research; and (B) members of minority groups are included as subjects in . . . [clinical] research" unless inclusion of women and members of minority groups would be inappropriate to the health of the research subjects or to the purposes of the research, or is inappropriate for some other circumstance as designated by the NIH Director. *Id.* at § 289a-2(a)(1) & (b).

Second, Congress has mandated that NIH increase diversity within the biomedical field

by, for example:

- Requiring that NIH "shall" issue grants "in a manner that will result in the recruitment of women, and individuals from disadvantaged backgrounds (including racial and ethnic minorities)" through Kirschstein-NRSA, 42 U.S.C § 288(a)(4);

- Directing that NIH "shall" "develop, modify, or prioritize policies, as needed, within the National Institutes of Health to promote opportunities for new researchers and earlier research independence, such as policies to . . . enhance workforce diversity" via the Next Generation of Researchers Initiative. *Id.* at § 283*o*(b)(2), including by "increas[ing] opportunities for new researchers to receive funding." *Id.*;

- Mandating that the HHS Secretary and NIH Director "shall, in conducting and supporting programs for research, research training, recruitment, and other activities, provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research." *Id.* at § 282(h);

- Insisting that NIH "shall" fund institutions to "support[] programs of excellence in biomedical and behavioral research training for . . . members of minority health disparity populations or other health disparity populations" through the National Institute on Minority Health and Health Disparities (NIMHD) and grants made under this provision require applicants to agree to expend the grant for these purposes. *Id.* at § 285t-1(a), (b).

Third, Congress requires NIH to develop and submit to Congress a five-year strategic plan

that, among other things, "shall . . . (B) consider . . . (iii) biological, social, and other determinants

of health that contribute to health disparities . . ." and the NIH Director "shall ensure" funding is

24

"sufficiently allocated for research projects identified in strategic plans[.]" *Id.* at § 282(b)(5), (b)(6), (m)(1) & (m)(2)(b)(iii). Accordingly, the current 2021–2025 strategic plan prioritizes "improving minority health and reducing health disparities," "enhancing women's health," undergoing rapid vaccine development "to mitigate emerging infectious disease outbreaks, such as COVID-19," and continuing to enhance the biomedical workforce through inclusion of underrepresented groups. ECF No. 38-4 at 19, 27–28, 16–17, 32–24. In turn, NIMHD's current strategic plan explicitly sets out goals and research priorities to diversify the medical field.[19] ECF No. 38-16 at 17–31. Furthermore, the Director of each IC "shall take into consideration, as appropriate—(i) the mission of the . . . [IC] and the scientific priorities identified in the [NIH] strategic plan[.]" 42 U.S.C. § 284(b)(3)(B).

The Directives flagrantly violate each of these Congressional mandates. They recast research into health disparities as verboten "studies based on diversity, equity, and inclusion (DEI)," and condemn as "unscientific" any "research programs based on gender identity" and other disfavored topics.[20] The Directives require the identification and termination of research projects that purportedly fall within these categories, and forbid the issuance of further awards on these topics.[21] Similarly, they require the systemic identification and termination of programs designed

---

[19] ICs additionally promulgate their own strategic plans. 42 U.S.C. § 282(m)(3).

[20] *February 21 Directive*, AR2930 (NIH must "ensure that it is not supporting low-value and off-mission research programs, including but not limited to studies based on [DEI] and gender identity" and that "[r]esearch programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry[.]"); *Priorities Directive*, AR2171 (listing "China," "DEI," and "Transgender issues" as "research activities that NIH no longer supports"); *Revised Priorities Directive*, AR3221, AR3226 (stating that "ICs should hold all awards to entities located in South Africa . . ." and adding "Vaccine Hesitancy," and "COVID" to the list of research activities NIH no longer supports); *May 7 Directive*, AR3562–63, AR3567 (marking the definition of health disparities as "pending," changing "Transgender issues" to "Gender-Affirming Care," and adding "Climate Change" and "Influencing Public Opinion" to the list of research activities NIH no longer supports).

[21] *Secretarial Directive*, AR0004 ("Agency personnel shall briefly pause all payments made to . . . grantees related to DEI . . . for internal review[.] . . . Such review shall include . . . a review of . . . grants to determine whether [they] are in the best interest of the government and consistent with current policy priorities."); *Supplemental Guidance*, AR0016 ("If the sole purpose of the grant . . . or supplement supports DEI activities, then the award must be fully restricted."); *May 7 Directive*, AR3548 (directing ICOs to "review the specific aims/major goals of the project" to "completely excise all non-priority activities" and specifying that "[w]hether the NOFO was unpublished or expired naturally, if

25

APHA App. 1028

to diversify the biomedical field. *See, e.g.*, AR3548 ("ICO's must not issue the award" if "[t]he sole purpose of the project is related to an area that is no longer an NIH/HHS priority/authority (e.g., diversity supplements, diversity fellowships, . . . etc."). That is, rather than issue grants that fund disparities research and grants seeking to diversify the biomedical profession, Defendants are defunding grants precisely because they have identified the grants as serving those purposes.

The grant terminations pursuant to these Directives have been massive in scale and sweeping in their substantive scope. As detailed *supra*, and pursuant to the Directives, Defendants have terminated research on a startling array of health conditions, often because they examine health disparities in the population. *See supra*, Background Section III; *see also* Ex. 55 (Ex. A); ECF Nos. 38-27 ¶ 13, Ex. A; 72-3 (Ex. A). While Defendants have claimed in prior briefing that they *are* "preserving grants [researching] health disparities" and asserted they terminated "DEI grants that [NIH] determined did not promote health," ECF No. 66 at 32, they have failed to define "DEI grants"—and the record flatly contradicts their claim. Indeed, in attempting to show that NIH continues to fund disparities research, Defendants pointed to a smattering of 25 remaining grants, and of the grants they identified, at least five were already or have now been terminated, two ended before the Lorsch Declaration they proffered identifying these 25 grants was signed, and four more projects will end this calendar year.[22] By July of 2026, only four of the 25 grants will remain. *Id.*

Likewise, the mass termination of pipeline grants and programs pursuant to the Directives subverts Congress's direction that NIH address the underrepresentation of certain groups in the medical field. Defendants have systematically identified the very programs designed to do so,

---

the sole purpose was DEI or another category that does not effectuate NIH/HHS priorities, ICO's [sic] cannot make the award.").

[22] *See* ECF No. 72-4 ¶ 3, *see also Compare* Ex. 55 (Ex. A) (Showing termination on Mar. 28, 2025 of MD014127 *Achieving American Indian Youth Energy and Mental Health Balance* and MD016961 *Long-Term Effects of Hurricane Maria on Healthcare Delivery, Migration and Mortality Among People with Kidney Failure in Puerto Rico*) *with* ECF No. 66-2 (listing both grants as "Not Terminated").

26

unpublished funding opportunities for those programs, conducted sweeping terminations of existing grants, and withdrawn or refused to review pending applications for those programs. *See supra,* n.14. Entire grant programs specifically designed to diversify the biomedical workforce, in furtherance of Congressional mandates, *see supra*, have been categorically eliminated. *See id.* (detailing the termination of NRSA training programs); *May 7 Directive*, AR3575 (FAQ on "programs that have been terminated[] in whole (e.g., MOSAIC K99/R00)").[23] NIH has excised all references to workforce diversity from newly-posted T32 and T35 NRSA opportunities, *see* ECF No. 72-05, 72-06, has revised instructions for institutional training grant applications to eliminate previously required diversity recruitment plans, ECF No. 72-7 at 4, and has revised "peer review processes to eliminate consideration of Plans for Enhancing Diversity (PEDP) across all opportunities." ECF No. 72-8 at 6.

NIH's "hard funding restrictions" to grants that "promote[] or take[] part in diversity, equity, and includsion [sic] ('DEI')" AR0016, and its consistent instruction to staff to "completely excise all DEI activities" and/or "all non-priority activities," AR2166; AR3231; AR3548; AR3517, demonstrate that the Directives require the *full restriction* of awards that address health disparities and the underrepresentation of certain groups in the biomedical profession. Defendants have, and continue to, implement this full restriction and excision, actions that squarely conflict with Congressional mandates.

And finally, the record reveals that DOGE members, *not* NIH officials, dictate, inform, and guide decision-making around which grants and NOFOs are terminated and which grants and NOFOs avoid scrutiny. See *supra*, Argument Section II.A. Congressional authority flows

---

[23] As demonstrated in Plaintiffs' Reply in Support of Plaintiffs' Motion for a Preliminary Injunction, and discussed further *infra*, Defendants' efforts in prior filings to show that they continue to preserve grants addressing health disparities and the recruitment of researchers from disadvantaged backgrounds are either distorted or flatly belied by the record. *See* ECF 71 at 8–10.

APHA App. 1030

exclusively to HHS and NIH, not DOGE, an entity not contemplated within the statutory scheme. NIH's reliance on DOGE as arbiter of NIH policy is thus in excess of its statutory authority.

## IV.    THE DIRECTIVES ARE NOT IN ACCORDANCE WITH LAW.

Section 706(2)(A) of the APA requires a Court to "hold unlawful and set aside" final agency actions which are "not in accordance with law." 5 U.S.C. § 706(2)(A). A court must uphold agency action if it is "(1) devoid of legal errors; and (2) supported by any rational review of the record." ECF No. 84 at 27–28 (internal quotes and citations omitted).  Because the challenged actions are replete with legal errors, including that they violate relevant statutes and regulations, and also lack the requisite rational review, they must be set aside.

First, as Plaintiffs have previously argued, the Directives require terminations in a manner that fails to satisfy either of the requirements of the HHS regulation that governs unilateral grant terminations.  *See* 45 C.F.R. § 75.372(a) (2024); *see also* ECF No. 41 at 33; ECF No. 71 at 14–15. That regulation allows for unilateral termination only where the grantee "fails to comply with the terms and conditions of the award" or "for cause." 45 C.F.R. § 75.372(a)(1) (2024). As other courts have emphasized, the plain language of the regulation mandates that these are the exclusive conditions under which HHS and its sub-agencies may terminate a grant.  *See, e.g.*, *Pol'y & Rsch., LLC v. United States Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 651 (D. Md. 2018).

The record shows that the Directives instructed termination under 2 C.F.R. § 200.340 on the basis that "the award no longer effectuates agency priorities." *See supra*, Background Section II. But that is not a permissible basis for termination under HHS regulations. *See* ECF Nos. 84 at 30–31; 41 at 33–34; 71 at 14–16. As this Court noted, "it is undisputed that [2 C.F.R. § 200.340] has not yet been adopted by HHS, and will not be adopted until October 2025; accordingly, the regulation is apparently inapplicable here." ECF No. 84 at 30. And although Defendants have tried

APHA App. 1031

to rely on language in the NIH Grants Policy Statements to permit other justifications for terminations, those statements "do[] not, and cannot, trump the agency's formal regulations." *Pol'y & Rsch., LLC*, 313 F. Supp. 3d, at 82; *see also* ECF No. 41 at 34.

Thus, for the reasons already explained by Plaintiffs, the Directives are not in accordance with law because they fail to comply with requirements of 45 C.F.R. § 75.372(a). *See* ECF Nos. 41 at 32–35; 71 at 14–16; *Nat'l Env't. Dev. Ass'ns Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic . . . that an agency is bound by its own regulations . . . Although it is within the power of an agency to amend or repeal its own regulations, an agency is not free to ignore or violate its regulations while they remain in effect.") (cleaned up).

Second, as this Court has emphasized, even if 2 C.F.R. § 200.340 applied—and it does not—"this regulation only allows agencies to terminate . . . agreements 'to the extent authorized by law,'" and 'this regulation cannot authorize actions that contravene statutory requirements, nor does it relieve [the Public Officials] of [their] duty to follow the law.'" ECF No. 84 at 30 (internal case citation omitted). HHS regulations currently limit to non-compliance the circumstances under which unilateral terminations are allowed, and Defendants are bound by these regulations. *Env't Prot. Agency*, 752 F.3d at 1009. Further, this Court noted that the Directives "can **still** be challenged under the APA where the Plaintiffs allege a failure to provide a reasonable explanation." ECF No. 84 at 31 (emphasis in original). For the reasons expressed above in Argument Sections II and III, the Directives fail to satisfy any of those requirements. The record thus shows that the Directives are not in accordance with law.

## V.    THE DIRECTIVES SHOULD BE VACATED AND ENJOINED.

Plaintiffs seek a declaration that the Directives are unlawful, vacatur of those Directives as required under the APA, and a permanent injunction—independent of but overlapping with vacatur—to redress Plaintiffs' injuries. Vacatur, by its nature, voids the Directives and all efforts

APHA App. 1032

to implement them; restores the conditions that existed before the Directives issued including all grant and application-related obligations; and necessarily benefits non-parties, *i.e.*, everyone harmed by the Directives will necessarily benefit if the Directives are vacated.

Vacatur is warranted because the Directives violate 5 U.S.C. §706(2). *See* ECF No. 1 at ¶¶ 209, 212, 215, 225, 232 (alleging violations of §706(2), which if successful requires vacatur).[24] This Court has recognized and applied this standard practice: agency actions that violate Section 706(2) must be set aside, "as is the usual course in successful APA challenges." *Victim Rts. L. Ctr. v. Cardona*, No. CIV 20-11104-WGY, 2021 WL 3516475, at *1 (D. Mass. Aug. 10, 2021) (vacating Department of Education regulation upon concluding it was arbitrary and capricious). Vacatur is especially appropriate when, as here, "an agency fails to explain its reasoning adequately." *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002). Thus, the Directives must be set aside and cannot be relied upon by Defendants in any way.

Vacating the Directives also reinstates the status quo from before they issued. *See Orr*, 2025 WL 1145271, at *24 ("[w]hen a court vacates an agency's rules under 5 U.S.C. § 706(2), the vacatur restores the status quo before the invalid rule took effect") (cleaned up); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987) ("present rule will be vacated and conditions returned to the *status quo ante*, before the [unlawful rule] took effect"); *see also Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 51 (9th Cir. 2025) (requiring Bureau of Land Management to return $36 million to buyers of land leases after vacating lease sales made under unlawful policy). The same result should apply here. The Directives are unlawful, and Defendants

---

[24] *Cf. Massachusetts Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, No. CV 24-10332-WGY, 2024 WL 2194260 (D. Mass. Apr. 16, 2024), *rev'd and remanded sub nom. Massachusetts Lobstermen's Ass'n, Inc. v. Menashes*, 127 F.4th 398 (1st Cir. 2025) (vacating agency rule after consolidating the plaintiffs' Rule 65 motion seeking non-vacatur relief with expedited trial on the merits of their §706(2) claims); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("the D.C. Circuit—which handles the lion's share of the country's administrative law cases—has likewise long recognized vacatur as the usual relief when a court holds that agency rules are unlawful.").

APHA App. 1033

have terminated grants and failed to consider applications pursuant to those Directives; thus, if the Directives are vacated, actions taken pursuant to the Directives must be vacated.

Returning to the status quo here means that all efforts to implement the Directives must be vacated, including grant terminations and the withdrawal or refusal to review applications for research or programs targeted by the Directives. *See W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir. 1987) ("Agency action taken under a void rule has no legal effect."). NIH's obligation to honor formerly-existing awards and consider then-pending applications must, in the interest of justice, spring back to life. *See, e.g., Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed"). Although courts do not always nullify actions taken pursuant to vacated agency action,[25] neither the Supreme Court nor First Circuit has endorsed any such hesitation, and significant precedent exists in support of doing so to implement a return to the status quo.

The Ninth Circuit's analysis in *W.C.* is instructive. In that case, the district court vacated a set of adverse decisions to Social Security claimants, requiring not only benefits going forward but also restoring prior ALJ benefits decisions. *W.C.*, 807 F.2d at 1505. The Ninth Circuit affirmed, holding that, because the program under which the adverse decisions were made violated the APA,

---

[25] *See e.g. D.A.M. v. Barr*, 486 F. Supp. 3d 404, 414-416 (D.D.C. 2020) (declining to vacate removal orders despite vacatur of Transit Ban under which orders issued); *see also Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). But *D.A.M.*, for its part, is distinguishable. The court there emphasized that vacatur restored the prior regulatory status quo, *i.e.*, the invalid agency rule was replaced by any preexisting rule it had superseded. *Id*. at 415. Implicit in the court's reasoning is that under previously existing rules, ICE was authorized to issue removal orders. *See id.* at 416 ("order vacating the Transit Ban means the government cannot issue any more orders of removal *under that rule,* but it does not mean that petitioners' removal orders (along with thousands of others) were automatically extinguished[.]") (emphasis added). Indeed, the INA already conferred removal authority on the relevant agencies. *See Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 33-34 (D.D.C. 2020) (discussing removal authority before Transit Ban). The Transit Ban was thus an unlawful expression of existing authority. *Id*. at 57. That preexisting authority, however, allowed the court to tacitly justify the results (removal orders) despite the unlawful means (Transit Ban). Here, by contrast, the regulatory status quo required NIH to honor grant awards and consider properly submitted applications. No previous rule existed under which NIH was authorized to purge disfavored grants as it saw fit. *See supra*, Argument Section IV.

31

"the ALJ's decisions [that had been reversed by the review program] must be reinstated and the claimants provided disability benefits." *Id.* at 1506. This result flowed logically from the unique nature of vacatur; once the review program decisions were vacated, the regulatory status quo–the preexisting ALJ decisions awarding benefits–were reinstated. *See id.*

Vacatur necessarily provides relief to not only Plaintiffs and Members, but also to non-parties whose grants were terminated or applications withdrawn pursuant to the Directives.  The Supreme Court's decision in *DHS* illustrates this point. There, the then-Acting DHS Secretary rescinded the Deferred Action for Childhood Arrivals (DACA) program, which permitted work authorization and eligibility for Social Security and Medicare benefits to a specific subset of immigrants. 140 S. Ct. 1891, 1906–1910. The Acting Secretary explained that the desired effect of her recission was that no new applications would be accepted. *Id.* at 1903. The Supreme Court held that the Acting Secretary "violated the APA" because she had not adequately explained the reasons for her decision nor considered reliance interest in making her decision, and therefore "the rescission must be vacated." *Id.* at 1901. The unlawfully rescinded DACA program was reinstated and DHS was obligated to administer DACA as it had before. This included processing applications it had stopped accepting, because each such application had been an effort to implement the unlawful recission—regardless of whether the applicants were a party to the suit.

The same is true here. The Directives violate the APA and must be vacated; thus, relief must flow not only to Plaintiffs and Members, but to *all* researchers whose grants were terminated to implement the void-Directives regardless of whether they are party to this suit.[26]

---

[26] *See Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [the associational plaintiff] or its members"); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) ("Because of the broad equitable relief available in APA challenges, a successful APA claim by a single individual can affect an 'entire' regulatory program."); *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019) ("The D.C. Circuit has 'made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"");

APHA App. 1035

Vacatur alone, however, is insufficient to redress Plaintiffs' injuries. Although vacatur will void the Directives and actions taken to implement the Directives, Defendants continue to issue new similar directives, including since Plaintiffs filed their Complaint. *See* AR3548. Vacatur cannot stop NIH from issuing a new and similarly unlawful directive tomorrow, which would have the same pernicious effects as the Directives at issue here. Plaintiffs therefore ask for a permanent injunction as detailed in the accompanying proposed order.

To obtain a permanent injunction, a plaintiff must show:

(1) actual success on the merits of its claims; (2) that he/she would be irreparably injured in the absence of injunctive relief; (3) that the harm suffered from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction; and (4) that the public interest would not be adversely affected by an injunction.

*Doe v. Rhode Island Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025) (citation and internal quotation marks omitted).

Success on the merits is established as described above. On factor two, Plaintiffs and the broader public have suffered and will continue to suffer irreparable harm because of the Directives, including job loss, threatened job loss, loss of training and mentoring opportunities, compromised studies, data collection, and statistical analyses. See ECF No. 41 at 39–43; *see also supra*, Background Section IV. "As for the third and fourth factors, the Supreme Court has explained that when 'Congress has spoken in the plainest words, making it abundantly clear' what the public's priorities are, it is not the court's place to review such priorities." *Mass. Lobstermen's Ass'n*, 2024 WL 2194260, at *7. Congress has spoken here—through its requirement that agencies engage in reasoned decision-making, *see* 5 U.S.C. 706(2)(A) and, most fundamentally, through its numerous

---

*See also* Transcript of Oral Argument at 73, *Trump v Casa, Inc.* Case No. 24A884, available at www.supremecourt.gov/oral_arguments/argument_transcripts/2024/24a884_c07d.pdf (government describing vacatur as "indivisible remedy").

33

APHA App. 1036

mandates that NIH has violated here. *See* ECF No. 1 at ¶ 229 (describing relevant statutory provisions); *see also supra*, Argument Section III; ECF No. 84 at 37. Given the ongoing harm to Plaintiffs and the public caused by the Directives, factors three and four are easily satisfied.

## CONCLUSION

For the reasons discussed here and in Plaintiffs' prior briefing, ECF Nos. 41 and 71, Plaintiffs respectfully request that the Court grant their requested relief. *See* Ex. A.

APHA App. 1037

Dated: June 9, 2025

Shalini Goel Agarwal
shalini.agarwal@protectdemocracy.org
**Protect Democracy Project**
2020 Pennsylvania Ave., NW, Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org

Michel-Ange Desruisseaux
82 Nassau Street, #601
New York, NY 10038
michel-ange.desruisseaux@protectdemocracy.org

Kenneth Parreno
15 Main Street, Suite 312
Watertown, MA 02472
kenneth.parreno@protectdemocracy.org

Lisa S. Mankofsky
Oscar Heanue
**Center for Science in the Public Interest**
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

Respectfully submitted,

Jessie J. Rossman
Suzanne Schlossberg
**American Civil Liberties Union**
**Foundation of Massachusetts, Inc.**
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Olga Akselrod
Alexis Agathocleous
Rachel Meeropol
Alejandro Ortiz
**American Civil Liberties Union**
**Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

*/s/ Matthew D. Brinckerhoff*
Matthew D. Brinckerhoff
**Emery Celli Brinckerhoff Abady**
**Ward & Maazel LLP**
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
mbrinckerhoff@ecbawm.com

APHA App. 1038

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2025 a true and correct copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

June 9, 2025                                    */s/ Matthew D. Brinckerhoff*
                                               Matthew D. Brinckerhoff

APHA App. 1039

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL INSTITUTES OF HEALTH, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-10787-WGY |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' UNREASONABLE DELAY CLAIMS</u>

APHA App. 1040

**Table of Contents**

Introduction ................................................................................................................. 1

Background .................................................................................................................. 2

Procedural History........................................................................................................ 5

Legal Standard ............................................................................................................. 6

Argument .................................................................................................................... 7

    I.   Plaintiffs lack standing to challenge alleged agency delay related to grant applications. .. 7

        A. Plaintiffs cannot enforce the rights of nonparties…………………………………..9

        B. Plaintiffs also lack Article III standing……………………………………………..11

    II.  Plaintiffs' claims under 5 U.S.C. § 706(1) should be dismissed for three independent
        reasons........................................................................................................... 12

        A.  Plaintiffs' claims that NIH should be compelled to resume holding meetings and
            deciding awards are moot because NIH resumed before Plaintiffs sued................... 12

        B.  Any claims that NIH should not apply the Challenged Directives when considering
            and deciding Plaintiffs' applications about de-prioritized research topics are properly
            § 706(2) claims, not § 706(1) claims................................................................. 133

        C.  The Court cannot compel NIH to decide applications because doing so is not a
            discrete and mandatory duty............................................................................ 15

    III. Any unreasonable delay claim under 5 U.S.C. § 706(2) should be dismissed. ............. 177

        A.  Plaintiffs did not allege sufficient facts to state a plausible claim for relief from delay
            in considering specific applications. ................................................................. 177

        B.  In any event, an application remaining under review is not a final agency action... 177

    IV. All phase 2 claims should be dismissed because the consideration of applications is
        committed to agency discretion by law................................................................. 188

Conclusion ................................................................................................................. 19

APHA App. 1041

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AAUP, et al. v. U.S. Dep't of Justice, et*,
    No. 25-cv-2429 (MKV), 2025 WL 1684817 (S.D.N.Y. June 16, 2025) ........................ 10, 11

*ABC, Inc. v. Stewart*,
    360 F.3d 90 (2d Cir. 2004) ................................................................................ 13

*Ahadian & Fathollahzadeh v. Rubio*,
    No. 24-cv-12168, 2025 WL 1617224 (D. Mass. June 6, 2025) ........................................ 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 7

*Associated Builders & Contractors, Inc. v. Herman*,
    976 F. Supp. 1 (D.D.C. 1997) ........................................................................ 13

*Barrett v. United States*,
    105 F.3d 793 (2d Cir. 1996) ............................................................................ 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 7

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................ 18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ....................................................................................... 11, 12

*Delta Data Sys. Corp. v. Webster*,
    744 F.2d 197 (D.C. Cir. 1984) ........................................................................ 19

*Dep't of Educ. v. California*,
    604 U.S. ---, 145 S. Ct. 966 (2025) ................................................................. 11

*Dosmetova v. USCIS*,
    No. 3:24-cv-7409, 2025 WL 1663661 (D.S.C. Feb. 7, 2025) ............................. 19

*Edwards v. Aurora Loan Servs.*,
    791 F. Supp. 2d 144 (D.D.C. 2011) .................................................................. 9

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ............................................................................................ 7

ii

*Friends of the Wild Swan, Inc. v. EPA*,
    130 F. Supp. 2d 1184 (D. Mont. 1999)........................................................... 13

*Funds for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ......................................................................... 16

*Gonzalez v. Cuccinelli*,
    985 F.3d 357 (4th Cir. 2021)........................................................................ 20

*Haaland v. Brackeen*,
    599 U.S. 255 (2023)..................................................................................... 11

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
    593 F.3d 923 (9th Cir. 2010)........................................................................ 14

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*,
    747 F.3d 44 (2d Cir. 2014)............................................................................ 9

*Karst Env't Educ. and Prot., Inc. v. U.S. Env't Prot. Agency*,
    403 F. Supp. 2d 74 (D.D.C. 2005) ................................................................ 19

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 1999).................................................................. 9, 10

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)..................................................................................... 10

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992).................................................................................. 8, 12

*Maldonado-Coronel v. McElroy*,
    943 F. Supp. 376 (S.D.N.Y. 1996)................................................................ 19

*Merlonghi v. United States*,
    620 F.3d 50 (1st Cir. 2010).......................................................................... 7

*Murphy v. United States*,
    45 F.3d 520 (1st Cir. 1995).......................................................................... 7

*Murthy v. Missouri*,
    603 U.S. 43 (2024)....................................................................................... 11

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
    No. 1:20-cv-3706, 2024 WL 1344450 (D.D.C. Mar. 29, 2024)............................ 14

APHA App. 1043

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 67 (2004) ................................................................................... 13, 15, 16

*Planned Parenthood of Wisc., Inc. v. Azar*,
   316 F. Supp. 3d 291 (D.D.C. 2018) ................................................................. 18

*Powers v. Ohio*,
   499 U.S. 410 (1991) ...................................................................................... 8

*Rattlesnake Coal. v. EPA*,
   509 F.3d 1095 (9th Cir. 2007) ....................................................................... 18

*Rezaii v. Kennedy*,
   No. 1:24-cv-10838, 2025 WL 750215 (D. Mass. Feb. 24, 2025) ......................... 13

*Sardarian v. Fed. Emergency Mgmt. Agency*,
   No. 3:19-cv-00910, 2022 WL 4080325 (D. Conn. Apr. 1, 2022) ......................... 10

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,
   674 F.3d 97 (1st Cir. 2012) ........................................................................... 15

*Taber Partners, I v. Merit Builders, Inc.*,
   987 F.2d 57 (1st Cir. 1993) ............................................................................. 7

*Touarsi v. Mueller*,
   538 F. Supp. 2d 447 (D. Mass. 2008) .............................................................. 19

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
   435 U.S. 519, (1978) .................................................................................... 19

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...................................................................................... 8

*West v. Lynch*,
   845 F.3d 1228 (D.C. Cir. 2017) ..................................................................... 12

**Statutes**

5 U.S.C. § 551(13) ......................................................................................... 16

5 U.S.C. § 701 .............................................................................................. 19

5 U.S.C. § 706(1) ............................................................................. 1, 12, 14, 16

5 U.S.C. § 706(2) ..................................................................................... 1, 18

5 U.S.C. § 1009 ............................................................................................. 4

APHA App. 1044

42 U.S.C. § 241 ................................................................................................. 2

42 U.S.C. § 282 ................................................................................................. 2

42 U.S.C. § 284a ......................................................................................... 3, 13

42 U.S.C. § 284 ............................................................................................... 19

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 7

**Regulations**

42 C.F.R. § 52h.2 ............................................................................................... 3

42 C.F.R. § 52h.8 ............................................................................................... 3

42 C.F.R. § 52.5 .......................................................................................... 4, 17

42 C.F.R. § 52.6 .......................................................................................... 2, 4

**Other Authorities**

90 Fed. Reg. 11175-01 (Mar. 4, 2025) ...................................................... 5, 12

90 Fed. Reg. 11323-02 (Mar. 5, 2025) ...................................................... 5, 12

90 Fed. Reg. 11324-01 (Mar. 5, 2025) ............................................................ 5

90 Fed. Reg. 11422-01 (Mar. 6, 2025) ...................................................... 5, 12

90 Fed. Reg. 12325 (Mar. 17, 2025) ......................................................... 5, 12

90 Fed. Reg. 12333 (Mar. 17, 2025) ......................................................... 5, 12

90 Fed. Reg. 13175 ......................................................................................... 13

90 Fed. Reg. 13182 (Mar. 20, 2025) ......................................................... 5, 12

90 Fed. Reg. 13187 (Mar. 20, 2025) ......................................................... 5, 12

90 Fed. Reg. 13376 ......................................................................................... 13

90 Fed. Reg. 13379 ......................................................................................... 13

APHA App. 1045

90 Fed. Reg. 13604....................................................................................................... 13

90 Fed. Reg. 13755....................................................................................................... 13

90 Fed. Reg. 14143....................................................................................................... 13

90 Fed. Reg. 14267....................................................................................................... 13

90 Fed. Reg. 14454....................................................................................................... 13

90 Fed. Reg. 15009....................................................................................................... 13

APHA App. 1046

## INTRODUCTION

Defendants respectfully move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' Phase 2 claims.

First, Plaintiffs lack both Article III and prudential standing to raise these claims. Plaintiffs attempt to assert the legal rights of nonparties, and their allegations of harm are too attenuated to support jurisdiction.

Plaintiffs' 5 U.S.C. § 706(1) claim should also be dismissed for three independent reasons. First, Plaintiffs acknowledge that NIH's delay in holding meetings and approving applications ended before Plaintiffs sued, thus rendering Plaintiffs' § 706(1) claim moot. Second, Plaintiffs' § 706(1) claim is an improper attempt to circumvent the final agency action requirement. Alternatively, if the Court rules that its phase 1 order under § 706(2) about the challenged Directives encompasses NIH's consideration of Plaintiffs' grant applications, applying the phase 1 ruling would remedy the alleged harms that Plaintiffs seek to redress in phase 2. This would mean—if phase 2 can proceed at all—the Court would need to consider Plaintiffs' remaining claims under 5 U.S.C. § 706(2), which courts recognize is the appropriate and preferred approach. Finally, even if the foregoing were not true, and the Court applies § 706(1), Plaintiffs cannot compel the actions that they seek to compel because those actions are not discrete and mandatory.

Any unreasonable delay claim pursued under 5 U.S.C. § 706(2) should also be dismissed. First, continued consideration of an application is not a final agency action. Second, to the extent Plaintiffs intend to argue that NIH has delayed or ended consideration of certain grants because of the challenged Directives, that claim should be dismissed under Rule 12(b)(6) because Plaintiffs failed to plead facts sufficient to state a claim for relief. They failed to put NIH on notice of which applications they allege are unreasonably delayed because Plaintiffs did not identify the allegedly delayed applications, and the few examples provided are insufficient.

1

Finally, all claims should be dismissed for phase 2 because considering applications and entering grant agreements is committed to agency discretion by law.

## BACKGROUND

NIH's mission is to "seek fundamental knowledge about the nature and behavior of living systems" in order to enhance health, lengthen life, and reduce illness and disability.[1] To further this mission, NIH spent more than $35 billion in Fiscal Year 2023 on almost 50,000 competitive grants to more than 300,000 researchers at more than 2,500 universities, medical schools, and other research institutions across all 50 states and the District of Columbia. *See* Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates, NOT-OD-25-068 (Feb. 7, 2025).

Congress gave NIH broad discretion in awarding grants. 42 U.S.C. § 241(a)(3); 42 U.S.C. § 282(b)(3), (12). The Health and Human Services ("HHS") Secretary awards grants "to those applicants whose approved projects will *in the Secretary's judgment* best promote the purposes of the statute authorizing the grant and the regulations of this part." 42 C.F.R. § 52.6(a) (emphasis added). NIH also maintains broad discretion when administering grants. *See, e.g.*, 42 C.F.R. § 52.6(f).

Before approving any grant, NIH subjects grant applications to two levels of review; the first, by "peer review groups" and the second, by the funding institute's "Advisory Council." Peer review groups are composed of "primarily nongovernment experts qualified by training and experience in particular scientific or technical fields, or as authorities knowledgeable in the various disciplines and fields related to the scientific areas under review, to give expert advice on the scientific and technical merit of grant applications or contract proposals, or the concept of contract

---

[1] NIH, Mission and Goals, available at https://www.nih.gov/about-nih/what-we-do/mission-goals (last visited Feb. 14, 2025).

APHA App. 1048

projects[.]" 42 C.F.R. § 52h.2(k). Annually, NIH engages roughly 25,000 peer reviewers. Advisory Councils are also composed of primarily non-government experts, and they "advise, assist, consult with, and make recommendations to the Secretary and the Director of such institute on matters related to the activities carried out by and through the institute and the policies respecting such activities." 42 U.S.C. § 284a. Among other responsibilities, Advisory Councils "review applications for grants and cooperative agreements for research or training and for which Advisory Council approval is required . . . and recommend for approval applications for projects which show promise of making valuable contributions to human knowledge[.]" *Id.*

The regulations governing the first level of NIH peer review process provide, in part, that each "scientific peer review group shall assess the overall impact that the project could have on the research field involved, taking into account a variety of factors." 42 C.F.R. § 52h.8. If the peer review group advises approval, the recommendation of the proposal then goes to the Advisory Councils. These bodies are *not* subject to specific review criteria identified in regulation; their role focuses on the prioritization of funding in light of NIH's budget and other competing grant applications. The Advisory Councils broadly consider whether applications "show promise of making valuable contributions to human knowledge," 42 U.S.C. § 284a, consistent with the priorities, missions, and purposes of the institute they advise.

Following review, if a project is approved by the relevant peer review group and Advisory Council, NIH may award that grant. 42 C.F.R. § 52.5(b). For any grant, NIH may also deny the application or take additional time to review. *Id.*

When NIH awards a grant, it enters an agreement with the grantee through the issuance of a Notice of Award (NOA), and the terms of that NOA govern the relationship between the grantee and NIH. Although a grant agreement permits the grantee to draw funds, it does not "commit[] or

APHA App. 1049

obligate[] the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application." 42 CFR § 52.6(c)(3).

Following the 2024 Presidential election, NIH's priorities shifted. Consistent with past practice when NIH comes under new management, on January 21, 2025, the Administration issued a temporary freeze on the publication of any documents in the Federal Register until they had been reviewed by a presidential appointee. NIH_GRANTS_000001. Because NIH must post a notice to the Federal Register when it schedules a peer review meeting for grant applications, it scheduled no meetings for the duration of the temporary pause. 5 U.S.C. § 1009(a)(2). NIH also cancelled all peer review meetings for that brief period.

NIH also began exercising its broad discretion to make and administer grants in alignment with its priorities. On February 10, 2025, the Acting Secretary of Health and Human Services directed agency personnel to "briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs" to allow time for an internal review, including "to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities." Feb. 10, 2025 Secretarial Directive, NIH_GRANTS_000004.[2] On February 21, 2025, then-Acting Director Dr. Matthew Memoli announced a shift in NIH's priorities. NIH_GRANTS_002930-1. Consistent with these priorities, the head of NIH, exercising the delegated authority of the Secretary, reviewed lists of grants and directed the termination of grants that did not effectuate agency priorities. *See, e.g.*,

---

[2] NIH stopped and re-started its processes to comply with court orders. See Feb. 12, 2025 NIH Review of Agency Priorities Based on the New Administration's Goals, NIH_GRANTS_000009 (directing agencies to resume issuing grants without restriction); Feb. 13, 2025 Supplemental Guidance, NIH_GRANTS_00016 (providing guidance about NIH priorities review).

APHA App. 1050

NIH_GRANTS_003752–3. Additionally, various Institutes and Centers did not award renewals of certain grants following their investigation and review of individual grants. *See, e.g.*, NIH_GRANTS_001444-50.

While NIH continued to review and terminate grants, by March 23, 2025, NIH's pause on holding peer review meetings and awarding new grants ended.[3] Working to make up for lost time, NIH increased the rate at which it scheduled and held peer review meetings. From March 23, 2025, to June 30, 2025, NIH scheduled 837 peer review group meetings, according to publicly available NIH data.[4] That is a faster pace than NIH maintained in 2023 or 2024. For comparison, during the same period in 2024, NIH held 651 peer review group meetings. In 2023, it held 665. *Id.* Publicly available public documents thus show that, at present, NIH is not delaying consideration and award of grants, in general.

Plaintiffs nonetheless allege that NIH has delayed consideration of Plaintiffs' grants due to the challenged Directives. Compl. Doc No. 1 ¶¶ 237-40.

## PROCEDURAL HISTORY

Plaintiffs sued on April 2, 2025, over a month after grant terminations started and after NIH resumed holding meetings and deciding grants. *See* Compl., Doc No. 1. More than three weeks later, Plaintiffs moved for a Preliminary Injunction. *See* Doc No. 37. Defendants opposed the Preliminary Injunction Motion on May 12, 2025. Doc. No. 66. On May 22, 2025, the Court collapsed the request for a Preliminary Injunction with a trial on the merits and treated the

---

[3] *See, e.g.*, 90 Fed. Reg. 11175-01 (Mar. 4, 2025); 90 Fed. Reg. 11324-01 (Mar. 5, 2025); 90 Fed. Reg. 11323-02 (Mar. 5, 2025); 90 Fed. Reg. 11422-01 (Mar. 6, 2025); 90 Fed. Reg. 12333 (Mar. 17, 2025); 90 Fed. Reg. 12325 (Mar. 17, 2025); 90 Fed. Reg. 13187 (Mar. 20, 2025); 90 Fed. Reg. 13182 (Mar. 20, 2025).

[4] https://www.csr.nih.gov/RevPanelsAndDates/RevDates.aspx

Defendants' Opposition as a Motion to Dismiss. Doc No. 77. On May 30, the Court entered a Order dismissing Counts IV, VI, and VII, but allowing the remaining Counts to proceed.

On June 3, 2025, the Court held a status conference in which it consolidated the proceedings in *Massachusetts, et al. v. Kennedy, et al.*, 1:25-cv-10814 (D. Mass.), with this case. *See* Doc No. 87. The Court decided that it would consider Plaintiffs' allegations in two phases, with the first phase considering the "challenged Directives" and terminations and the second phase considering Plaintiffs' unreasonable delay claims. Defendants timely filed administrative records by June 13, 2025. Doc No. 117. On the phase 2 proceedings, the Court ordered Defendants to produce an administrative record by July 9 and allowed Defendants to file this Motion to Dismiss by June 20. Doc. No. 87. [5]

On June 16, 2025, after briefing and a hearing on phase 1, the Court ruled from the bench that the challenged Directives, taken as a whole, and related grant terminations were arbitrary, capricious, and unlawful under the APA. It ruled that it would vacate the grant terminations listed on Plaintiffs' spreadsheets.

## LEGAL STANDARD

A district court must dismiss claims under Rule 12(b)(1) when it lacks subject-matter jurisdiction to decide them. That includes claims for which the United States has not waived its sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature"). "When a district court considers a Rule 12(b)(1) motion, it credits the plaintiff's well-pled factual allegations and draws all reasonable inferences in the plaintiff's favor"

---

[5] Defendants understand the Court's scheduling order provided Defendants the opportunity to file a proper motion to dismiss in this case, not just the States case. Although APHA disagrees, Defendants file this motion because—regardless—12(b)(1) arguments can be raised at any time and many remaining arguments apply to APHA as well as the States, thus APHA should have opportunity to respond.

APHA App. 1052

*Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). "A plaintiff, however, may not rest merely on unsupported conclusions or interpretations of law." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (citation omitted). Moreover, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993).

A suit also must be dismissed if the complaint fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To defeat a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the pleaded facts allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. When evaluating a Rule 12(b)(6) motion, the Court must accept all material factual allegations in the complaint as true and draw any reasonable inferences in the non-moving party's favor. *Id.* However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

**I.    Plaintiffs lack standing to challenge alleged agency delay related to grant applications.**

As an initial matter, the Court should dismiss all of Plaintiffs' claims because Plaintiffs lack both prudential and Article III standing. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, and not conjectural or hypothetical, (2) a causal connection between the injury and defendants' challenged

APHA App. 1053

conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992). Moreover, courts adhere to the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499 (1975). Court disfavor granting third-party standing in the absence of a "hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 410, 411 (1991).[6]

A.    **Plaintiffs cannot enforce the rights of nonparties.**[7]

Plaintiffs allege that the Defendants are delaying or suspending review of grant applications in which neither Plaintiffs nor their members have a legally cognizable interest. Indeed, all of Plaintiffs' § 706(1) claims are aimed at challenging NIH's handling of grant applications for *other nonparty entities*. Therefore, Plaintiffs lack prudential standing to assert these claims.

"In order to establish standing to" enforce rights related to a government contract, a plaintiff must show that they are party to the putative contract or an intended third-party beneficiary. *Edwards v. Aurora Loan Servs.*, 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000) ("Before a third party can recover under a contract, it must

---

[6] As the Court has already ruled that associational Plaintiffs have associational standing, Defendants do not reassert those arguments here but preserve the issue for any potential appeal.

[7] Although not raised in "phase 1" of this case, the same reasoning for Plaintiffs' lack of standing here applies to all grant terminations at issue in phase 1 for all Plaintiffs other than Ibis. And, importantly, as it is a jurisdictional matter, standing cannot be waived.

8

show that the contract was made for its direct benefit—that it is an intended beneficiary of the contract."). Plaintiffs can show neither.

Other than Ibis, each Plaintiff in this case is either a researcher that works for a nonparty entity or membership organization whose members are individual researchers. None of the individual or associational Plaintiffs or their members have directly applied for a grant themselves; rather, they work for institutions who may have applied for NIH grants. They therefore have no legally cognizable interest in the grant applications. Ibis has not itself submitted a grant application consideration of which was delayed. Doc No. 1 ¶¶ 20, 160-61. [8]

As the Administrative Record in Phase 1 of this case makes clear, each of the grant applications that Plaintiffs claim to have an interest in are for grants that would be awarded to *their employer* institutions, none of which are parties to this suit. *See, e.g.*, NIH_Grants_004271; 5570.; *see also* Doc No. 38-21 (Maphis Decl.) ¶ 20 ("*My institution* (UNM) has lost out on the opportunity to train me for the next two years"); Doc No. 38-26 (Berg Decl) at ¶ 13 (noting that Congress authorized grants to "universities, hospitals, laboratories, and other public or private institutions" – but not to researchers); ¶ 28 (noting that a scientist submits a grant "*through their organization*" (emphasis added)). Plaintiffs and their members were not party to any of the grant applications whose consideration they allege were delayed.

Nor have Plaintiffs alleged in their complaint or elsewhere that they are intended beneficiaries. *See Klamath*, 204 F.3d at 1211 ("[T]he third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party.").

---

[8] The only named individual Plaintiff who alleges that they submitted a grant application that NIH refuses to consider is Plaintiff Nicole Maphis. *See* Doc No. 1 ¶ 18. However, any such grant is awarded to the institution for which she works, University of New Mexico School of Medicine, and not Plaintiff Maphis. *Id.*; *see also* Doc No. 38-21 at ¶ 20. And, as explained below, as a "Principal Investigator," she is not an intended beneficiary of the grant.

APHA App. 1055

While the nonparty institutions may list an individual researcher as a "Principal Investigator or Project Director" on their grants, *see, e.g.*, NIH_Grants_004278, the researchers are not themselves intended beneficiaries of any awarded contract. *See AAUP v. U.S. Dep't of Justice*, No. 25-cv-2429, 2025 WL 1684817, at *5, 6, 12 n.7 (S.D.N.Y. June 16, 2025) (finding "principal investigators" lacked legal interest in terminated NIH grants). The researchers therefore lack standing to sue for NIH's alleged delay in considering their employers' grant applications. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (noting that only parties, or select nonparties (intended beneficiaries), may seek to enforce their rights); *see also Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-00910 (OAW), 2022 WL 4080325, at *1–2 (D. Conn. Apr. 1, 2022) (dismissing suit for lack of standing because FEMA awarded "the grant in question" to the State of Connecticut and to the Town of Westport, and plaintiff was not the recipient of the Federal grant).

Recently, the Southern District of New York dismissed a similar jurisdictional overreach by Plaintiff UAW and another organizational plaintiff claiming their members had an interest in Columbia University's terminated NIH research grants. *See AAUP v. U.S. Dept'of Justice*, No. 25-cv-02429-MKV, 2025 WL 1684817 (S.D.N.Y. June 16, 2025). The district court recognized that these associational plaintiffs lack prudential standing to challenge NIH grant terminations:

> Neither the Executive Branch nor the Legislature ever awarded the grants and contracts at issue to Plaintiffs or any of their members. The funding that Plaintiffs ask this Court to commandeer was awarded to Columbia, which is conspicuously absent from this case. If any funds have been wrongfully withheld, such funds may be recovered at the end of a successful lawsuit by the appropriate plaintiff in an appropriate forum. *See Dep't of Educ. v. California*, 604 U.S. ---, 145 S. Ct. 966, 969 (2025).

*Id.* at *1. Here too, the institutions that employ Plaintiffs may themselves file suit (and in some instances have in the related matter), but Plaintiffs and their members lack prudential standing.

APHA App. 1056

**B.      Plaintiffs also lack Article III standing**

Plaintiffs alleged harms are also too attenuated to support jurisdiction because any asserted harms must flow from independent choices made by their employers, or their injury is otherwise too speculative. A "federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Courts are "'reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment,'" *id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)), and have rejected theories of redressability that depend on such guesswork, *id.*, 603 U.S. at 73; *Haaland v. Brackeen*, 599 U.S. 255, 293-94 (2023).

Plaintiffs claim that NIH delays in considering may cause "large numbers of current and future biomedical researchers risk unexpected job loss that will harm them personally." Doc No. 1 ¶ 240. It is, however, the choice of *their employers*, nonparties to this case who are taking such actions. *See, e.g.*, Doc No. 38-21 ("My institution . . . may not have the money to support my salary."). If, for example, their employer chooses to continue funding their project despite any delays on the part of NIH, then no harm flows to Plaintiffs' members. Thus, the choices of nonparties who have "broad and legitimate discretion," interrupt any link between any alleged harms. *See Lujan*, 504 U.S. at 562. When this kind of "conjecture is necessary, redressability is lacking." *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) (internal citation omitted).

Plaintiffs also contend that "they may not be able to continue their projects," have had to "take on additional responsibilities," are in "administrative limbo," and other vague and undefined alleged harms. *See* Doc No. 41 at 33-34. But such claims are far too speculative to satisfy Article III standing. *See Clapper*, 568 U.S. at 409 (explaining that any allegation of "threatened injury must be *certainly impending*" (citation omitted)); *see also* Doc No. 41 at 34 (noting that Plaintiffs' members are trying to secure replacement fund but "do not anticipate" being able to raise enough).

11

II.      **Plaintiffs' claims under 5 U.S.C. § 706(1) should be dismissed for three independent reasons.**

A.      **Plaintiffs' claims that NIH should be compelled to resume holding meetings and deciding awards are moot because NIH resumed before Plaintiffs sued.**

Plaintiffs cannot obtain an order requiring NIH to "refrain from delaying" meetings and procedural steps needed to issue awards "based on the Challenged Directives" because the relevant directives ended before Plaintiffs even sued. Defendants have resumed holding meetings and taking the procedural steps needed to review new applications and issue awards. NIH did cancel previously scheduled meetings and refrained from setting new meetings based on the January 21, 2025 Notice Pause Directive. APHA Doc No. 66-1 ¶ 20. But that Directive—by its own terms—expired on February 1, 2025. NIH_GRANTS_000001. Since then, from March 24 through June 30, NIH has scheduled or held 837 peer review meetings. This is 186 more peer review meetings than NIH held for this same time period last year.[9] NIH is also on track to complete at least three advisory council meetings this fiscal year, as contemplated by 42 U.S.C. § 284a(e).[10] APHA Doc No. 66-1 ¶ 24. Peer reviews are also ongoing. APHA Doc No. 66-1 ¶ 22. So, although NIH briefly paused certain processes upon the change in administrations, NIH has been conducting all necessary steps in the review and disposition of grant applications.

Once an agency resolves a challenged delay, the issue becomes moot. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 67, 68 (2004) (holding two claims moot because they sought creation of Bureau of Land Management plans, which were later created); *Friends of the Wild Swan, Inc. v.*

---

[9] This is shown by searching the relevant date range through NIH's public calendar of peer review meetings: https://www.csr.nih.gov/RevPanelsAndDates/RevDates.aspx; see also, e.g., 90 Fed. Reg. 11175; 90 Fed. Reg. 11324; 90 Fed. Reg. 11323; 90 Fed. Reg. 11422; 90 Fed. Reg. 12333; 90 Fed. Reg. 12325; 90 Fed. Reg. 13187; 90 Fed. Reg. 13182.

[10] *See, e.g.*, 90 Fed. Reg. 14267; 90 Fed. Reg. 13755; 90 Fed. Reg. 13175; 90 Fed. Reg. 14454; 90 Fed. Reg. 13376; 90 Fed. Reg. 15009; 90 Fed. Reg. 14143; 90 Fed. Reg. 13379; 90 Fed. Reg. 13604.

12

*EPA,* 130 F.Supp.2d 1184, 1192 (D. Mont. 1999) (APA claim moot when the EPA, thirteen years after its alleged duty arose, cured its failure to act by finally acting); *Associated Builders & Contractors, Inc. v. Herman,* 976 F. Supp. 1, 8 (D.D.C. 1997) (holding an APA claim challenging an agency's delay moot because the agency had finally acted). The Second Circuit has explained that "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, [the court] must dismiss the case" as moot "rather than issue an advisory opinion." *ABC, Inc. v. Stewart,* 360 F.3d 90, 97 (2d Cir. 2004); *see also Barrett v. United States*, 105 F.3d 793, 794 (2d Cir. 1996); *Rezaii v. Kennedy*, No. 1:24-cv-10838, 2025 WL 750215 at *3 (D. Mass. Feb. 24, 2025) (holding unreasonable delay claim moot where agency took the allegedly delayed action). The Challenged Directives relating to the pause about which Plaintiffs complain have expired, and so too have the temporary pauses themselves. This claim is moot and should be dismissed.

### B.    Any claims that NIH should not apply the Challenged Directives when considering and deciding Plaintiffs' applications about de-prioritized research topics are properly § 706(2) claims, not § 706(1) claims.

Plaintiffs cannot evade the § 706(2)'s final-agency-action requirement by disguising § 706(2) claims as § 706(1) claims. Courts routinely reject such efforts, especially when plaintiffs bring both § 706(2) claims and § 706(1) claims that are based on the same legal theory. *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 934 (9th Cir. 2010) (rejecting effort to bring a § 706(1) claim where the "argument is better phrased as" a § 706(2) claim.); *see Ahadian & Fathollahzadeh v. Rubio.*, No. 24-cv-12168, 2025 WL 1617224 at *4 (D. Mass. June 6, 2025) (refusing to "separately consider" claims brought pursuant to § 706(1) and § 706(2) where the two claims rely "on the same theory."); *Nat'l Parks Conservation Ass'n v. United States Dep't of the Interior*, No. 20-cv-3706, 2024 WL 1344450 at *9 (D.D.C. Mar. 29, 2024) (emphasizing that "because [plaintiff's] Section 706(2)(A) claims assert that what [defendant] has already done is

13

impermissible, it is better to resolve that question before deciding whether [defendant] must be compelled to do anything else under Section 706(1).”). *Hells Canyon Preservation Council v. U.S. Forest Service*, is instructive. 593 F.3d 923 (9th Cir. 2010). There, the Ninth Circuit rejected an effort to cast a § 706(2) claim as a § 706(1) claim. *Id.* at 933. In doing so, it emphasized that the defendant *had* engaged in final agency action, and that plaintiffs’ contentions under § 706(1) were actually a challenge to a final agency action. *Id.* at 930. As such, § 706(2), not § 706(1), was the only proper avenue for relief. *Id.* at 933.

Ultimately, Plaintiffs’ § 706(1) claims are simply another assault on the Challenged Directives. They styled their admitted § 706(2) claims as attacks on these directives in phase 1. APHA Compl. Doc No. 1 ¶ 215; Sates Am. Compl. Doc No. 75 ¶ 215. And their purported § 706(1) claims are just another volley on that front in phase 2. State Plaintiffs’ § 706(1) claim in their amended complaint emphasizes “in implementing the *Challenged Directives*, defendants have cancelled and/or substantially delayed … NIH’s advisory councils and study sections—a significant and unprecedented departure from the NIH’s published review process and the agency’s past practice.” States’ Am. Compl. Doc No. 75 ¶ 264 (emphasis added). Indeed, the *entirety* of Count 7, State Plaintiffs’ § 706(1) claim, emphasizes that the delays flow from the Challenged Directives. *Id.* ¶ 264-66. APHA plaintiffs take the same approach. APHA Compl. Doc No. 1 ¶ 239. Just as in *Hells Canyon Preservation Council*, Plaintiffs here are still attacking the Challenged Directives, which the Court has already determined to be final agency action.[11] If so, law of the case holds that the Court’s recent conclusion in phase 1 extends to the alleged delays to be examined in phase 2. Thus, at this stage, no § 706(1) claim exists.

---

[11] Defendants respectfully disagree with this conclusion and include a no-final-agency-action argument below to preserve their arguments.

APHA App. 1060

C.     **The Court cannot compel NIH to decide applications because doing so is not a discrete and mandatory duty.**

To establish a claim under § 706(1), Plaintiffs must show that the agency "failed to take a discrete agency action that it is required to take." *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 99 (1st Cir. 2012) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)). As the Supreme Court recognized, "[t]his is a high standard," and the "central question in evaluating such a claim is whether the agency's delay is so egregious that mandamus is warranted." APHA Doc. 84 at 29 (quotations omitted). Plaintiffs have failed to identify a discrete and mandatory agency action that the Court can compel under § 706(1).

Plaintiffs assert that NIH was required to (1) hold study section and advisory council meetings to consider and make final recommendations on grant applications, and (2) make a final decision on grant applications and requests for renewals. States Doc No. 75 at 85-87; APHA Doc No. 1 at 74. In previous briefing, Plaintiffs maintained that they also assert that the withholding of consideration of grant applications for withdrawn Notices of Funding Opportunities was unlawful.[12] APHA Doc No. 66 at 18-19. Putting aside that NIH is holding meetings and deciding applications, none of these is a discrete and mandatory agency action.

First, holding meetings is not "agency action" at all. As the Supreme Court explained in *Norton*, a failure to act under § 706(1) is "properly understood as a failure to take an agency action—that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." 542 U.S. at 62. That earlier APA section, 5 U.S.C. § 551(13), defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the

---

[12] In fact, Plaintiffs omit this theory in the portions of their complaints that asserted a § 706(1) claim. *See* States Doc No. 75 at 84-87; APHA Doc No. 1 at 74.

APHA App. 1061

equivalent or denial thereof, or failure to act." Holding meetings—even meetings established by statute—fall well outside this definition.

Moreover, holding meetings is not a *discrete* action. It is part of NIH's "common business of managing government programs," rather than a discrete action that can be compelled. *Funds for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19-20 (D.C. Cir. 2006) ("Much of what an agency does is in anticipation of agency action."). Plaintiffs acknowledge that NIH resumed holding the study section and advisory council meetings, but Plaintiffs still take issue and ask this Court to monitor how many meetings are being scheduled and how quickly. This is precisely the sort of invasive supervision that the Supreme Court has said to avoid. *Norton*, 542 U.S. at 67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA."). The APA does not permit the Court to compel the pace of NIH's meetings.

Second, making a final decision on grant applications and requests for renewal is not a mandatory agency action. To the contrary, HHS regulations expressly authorize the agency to "defer" making a final decision "because of either lack of funds or a need for further evaluation." 42 C.F.R. § 52.5(b). That is exactly what NIH briefly did here (before resuming issuing notices of award): NIH deferred decisions on grant applications due to a need to evaluate whether such applications were consistent with revised agency priorities following a change in administration. Making a final decision cannot be mandatory when the regulations permit deferring that decision.

Finally, Plaintiffs argued in previous briefing that, even though NIH had resumed holding meetings and resumed issuing notices of award, NIH continued to withhold consideration of certain applications. *See* APHA Doc No. 71 at 18. Specifically, Plaintiffs alleged that NIH had "begun to 'administratively withdraw' applications for some programs purged as a result of the

APHA App. 1062

Directives." *Id*. This allegation refers to applications that were mooted when NIH withdrew the Notice of Funding Opportunity ("NOFO"). But maintaining a NOFO is neither discrete nor mandatory. A NOFO is merely a notice that invites applications for a *potential* grant, not an agency action. And Plaintiffs do not cite any authority that requires NIH to maintain—and that denies NIH any discretion to withdraw—a NOFO. Thus, no basis exists for the Court to compel NIH to restore a NOFO and revive a mooted application.[13]

**III.    Any unreasonable delay claim under 5 U.S.C. § 706(2) should be dismissed.**

> **A.    Plaintiffs did not allege sufficient facts to state a plausible claim for relief from delay in considering specific applications.**

Plaintiffs fail to state a claim for relief related to unreasonable delay because they do not allege that Ibis Reproductive Health—the only plaintiff that applies for and receives grants—submitted an application that has been delayed. *See* APHA Compl., Doc No. 1 ¶¶ 20, 160, 161. The Complaint alleges delayed applications related only to Plaintiff Maphis, APHA Members 1 and 6, UAW Members 1-8, and UAW Pre-Members 1-6. *See* APHA Compl., Doc No. 1 ¶¶ 162-194. As explained above, none of these people have standing to challenge alleged agency inaction related to the grants. *See supra* Part I. Accordingly, Plaintiffs have failed to state any claim for which relief could be granted, and their complaint should be dismissed for purposes of phase 2.

> **B.    In any event, an application remaining under review is not a final agency action.**

Even if Plaintiffs had sufficiently alleged that NIH has not scheduled reviews for certain applications, doing so is not a final agency action subject to judicial review because it neither (1) "marks the consummation of the agency's decision-making process," nor (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*

---

[13] Following the Court's entry of partial judgment on phase 1, absent a stay, NIH will restore NOFOs related to terminated programs listed on Plaintiffs' spreadsheet.

APHA App. 1063

*v. Spear*, 520 U.S. 154, 177-78 (1997). In the context of agency grant-making in particular, no final agency action exists "until the [agency] has reviewed a grant application and decided to disburse the funds." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007); *Planned Parenthood of Wisc., Inc. v. Azar*, 316 F. Supp. 3d 291, 300-01 (D.D.C. 2018), *vacated as moot on other grounds*, 942 F.3d 512, 519 (D.C. Cir. 2019) (emphasizing that, in the grant application context, "courts usually recognize final agency action only after grant awards issue."). Before the agency makes an award, 'the federal money is but an expectancy that has not yet materialized.'" *Karst Env't Educ. and Prot., Inc. v. U.S. Env't Prot. Agency*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005); *see Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 206 (D.C. Cir. 1984) ("award procedures are not designed to establish private entitlements to public contracts but to produce the best possible contracts for the government."). Indeed, State Plaintiffs admit that while a review is not scheduled "the grant remains under review." States Doc No. 75 at 44, ¶ 183. Not scheduling review of an application neither denies nor establishes any rights, obligations, or legal consequences since NIH can schedule review at any time.

IV.    **All phase 2 claims should be dismissed because the consideration of applications is committed to agency discretion by law.**

For many of the same reasons that holding meetings does not constitute a discrete agency action, NIH's management of its grant review process is also "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "Internal agency procedures are committed to the agency's discretion." *Maldonado-Coronel v. McElroy*, 943 F. Supp. 376, 381 (S.D.N.Y. 1996) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, (1978)). In the context of application processes, Plaintiffs must show that NIH "has a nondiscretionary duty to adjudicate" grant applications "within a certain timeframe. *Dosmetova v. USCIS*, No. 3:24-cv-7409, 2025 WL 1663661 *2 (D.S.C. Feb. 7, 2025) (collecting cases).

18

Otherwise, the APA provides no opportunity to review. *Id.*; *see Touarsi v. Mueller*, 538 F. Supp. 2d 447, 452 (D. Mass. 2008) (holding claim to compel agency action under 706(1) precluded where statute imposed no timing requirements on agency).

NIH has no nondiscretionary duty to process applications, or hold peer review meetings, within a certain timeframe. Indeed, it need not process grant applications *at all*. 42 U.S.C. §§ 284(b)(2) ("Support for an activity or program under this subsection *may* be provided through grants, contracts, and cooperative agreements.") (emphasis added); 284(b)(2)(A)–(B) (providing that the agency "*may* enter into a contract for research" and "*may* make grants and cooperative agreements") (emphasis added). This statutorily discretionary approach to grant review is fatal to Plaintiffs' 706(1) claims, because "where an agency is not required to do something, [the Court] cannot compel the agency to act—let alone to act faster." *Gonzalez v. Cuccinelli*, 985 F.3d 357, 466 (4th Cir. 2021). And even if the Court determines NIH must process grant applications, Plaintiffs can point to nothing that requires it to do so on any particular timeline.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all Plaintiffs' phase 2 claims.

Defendants respectfully request that the Court enter an expedited deadline for Plaintiffs' response of June 26, 2025, which is the same amount of time the Court provided for Defendants to move to dismiss after the phase 1 hearing concluded. Defendants had four business days (and four calendar days) to move. Defendants propose that Plaintiffs be provided four business days (six calendar days) to respond. This promotes the interests of justice and efficiency, since the Court's ruling on the motion to dismiss could impact the administrative record that is being prepared for phase 2. Plaintiffs informed Defendants' counsel that they oppose the request for expedited briefing.

19

Defendants respectfully submit ten days as proposed by Defendants' in the related case is inappropriate based on the expedited nature of this case and because Defendants in that case proposed more reciprocal deadlines (Defendants had 7 days to move while Plaintiffs had 10 days to respond) which Plaintiffs opposed. Most important, in Defendants' proposal, the decision on the motion to dismiss triggered the deadline for the administrative record. Without an expedited response deadline, Defendants will need to produce the administrative record shortly after Plaintiffs' respond to their motion to dismiss, and potentially before the Court has opportunity to rule.

APHA App. 1066

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

LEAH B. FOLEY
United States Attorney

KIRK T. MANHARDT
Director

MICHAEL J. QUINN
Senior Litigation Counsel

Dated: June 20, 2025                          */s/ Anuj Khetarpal*

ANUJ KHETARPAL
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3658
anuj.khetarpal@usdoj.gov

THOMAS W. PORTS, Jr. (Va. Bar No. 84321)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
(202) 307-1105
thomas.ports@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 20, 2025                          */s/ Anuj Khetarpal*
                                               Anuj Khetarpal

APHA App. 1067

# EXHIBIT A

APHA App. 1068

*American Public Health Association, et al. v. National Institutes of Health, et al.*, No. 1:25-cv-10787-WGY
**Plaintiffs' List of Grants Impacted by the Directives (May 27, 2025)**

This demonstrative is provided by Plaintiffs' counsel, pursuant to the Court's order on May 22, 2025, and to aid the Court in its understanding of the manner in which the Directives have been implemented as to Plaintiffs in *APHA, et al  v. NIH, et al* .  It contains information that Plaintiffs' counsel have been able to obtain and compile to date as to grant and program terminations. Inclusion of a grant or program on this list indicates that Plaintiffs' counsel have a good faith basis to believe that the *entire* grant or program and/or a supplement, parent, subpart, program or other award related to the grant or program has been terminated.  Plaintiffs' counsel are continuing to analyze information regarding the grants that have been impacted by the Directives and will plan to provide supplemental lists as verification occurs. Plaintiffs reserve all rights to provide additional information regarding the impacts of the Directives on Plaintiffs and maintain that the resolution of Plaintiffs' claims—both as to liability and as to remedy—does not require the identification or individualized review of all impacted grants.

The Directives and terminations are unlawful in each of the following ways ("REASONS FOR EVERY GRANT"):

(1) They are in excess of statutory authority and contrary to statute (42 U.S.C. §§ 282(b)(4)–(6), 282(m)(1), 284(b)(1)(A), 284(b)(3)), in violation of 5 U.S.C. §§ 706(2)(A), 706(2)(C).

(2) They are contrary to regulation (45 C.F.R. § 75.372), in violation of 5 U.S.C. § 706(2)(A).

(3) They are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

(4) They violate the separation-of-powers principle and the Due Process Clause of the U.S. Constitution, and they accordingly violate 5 U.S.C. § 706(2)(B).

1:25-cv-10787-WGY: APHA v. NIH                Plaintiffs' Spreadsheet of Grant Terminations                5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 1R61HD117134-01 | Supportive and restrictive factors and mental health in LGBT adolescent and young adult populations | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01DA054236 | Project SMART: Social media Anti-vaping Messages to Reduce ENDS Use Among Sexual and Gender Minority Teens | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01HD115551 | Understanding multilevel predictors affecting family formation among sexual and gender minority couples | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD015256-05 | Sexual orientation-related disparities in obstetrical and perinatal health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD015256-05S1 | Sexual orientation-related disparities in obstetrical and perinatal health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01HD109320-02 | Advancing novel survey tools to increase participation and improve sexual and reproductive health data quality | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3R01HD109320-02S1 | Advancing novel survey tools to increase participation and improve sexual and reproductive health data quality | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD016384-03 | An Innovative, Prospective Model to Understand Risk and Protective Factors for Sexual Assault Experiences and Outcomes Among Sexual Minority Men | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R21MD018509-02 | Development and Pilot Evaluation of an Online Mentoring Program to Prevent Adversities Among Trans and Other Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AA031213-02 | The Impact of Minority Stress on Alcohol-Related Sexual Assault among Sexual Minority College Students: An Intersectional, Mixed-Methodological Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD017573-03 | Sexual Assault Recovery Among Sexual Minority Women: A Longitudinal, Multi-Level Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R15AA030898-01A1 | Reconstruction of an SGM-specific sexual violence peer support program (SSS+) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R34AA030662-01A1 | An Online Family-based Program to Prevent Alcohol Use and Dating and Sexual Violence among Sexual and Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R21MH136855-01 | Over-the-Counter PrEP: Acceptability, Feasibility, and Potential Impact of Access without a Prescription (OFFSCRIPT) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R33TW011665-06 | Development and Testing of a Mobile Application to Enhance HIV Prevention Cascade in Malaysian MSM | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3U24MD017250-04S1 | Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases (RCC RD-MCD) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

1

1:25-cv-10787-WGY:  APHA v. NIH                    Plaintiffs' Spreadsheet of Grant Terminations                    5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 5U24MD017250-04 | Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases (RCC RD-MCD) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5T32MH019139-35 | Behavioral Sciences Research in HIV Infection | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t,  285t-1(e)(b), 288(a)(4), and/or 289a-2. |
| 3U01MD019398-03S1 | Increasing financial and health equity among low income black youth and young adults - DEIA Supplement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3U01MD019398-03S2 | Increasing financial and health equity among low income black youth and young adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3U01MD019398-03S3 | Increasing financial and health equity among low income black youth and young adults - Supplement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5U01MD019398 | Increasing financial and health equity among low income black youth and young adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01MD020284-01 | Measures of structural stigmatization and discrimination for HIV research with Latino sexual and gender minorities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3R01AA029076-04S1 | Improving Measurement of Alcohol Use and Other Disparities by Sex, Sexual Orientation, and Gender Identity through Community Engagement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AA029076-04 | Project Recognize: Improving Measurement of Alcohol Use and Other Disparities by Sex, Sexual Orientation, and Gender Identity through Community Engagement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AA030017 | A Randomized Controlled Trial of a Game-Based Intervention to Reduce Alcohol Use among Sexual and Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R21AA031548-01A1 | Daily Impact of Sexual Minority Stress on Alcohol-Related Intimate Partner Violence among Bisexual+ Young Adults: A Couples' Daily Diary Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01AA031637-01A1 | The Role of Local Structural Stigma in Alcohol Related Inequities among SGM Young Adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1T32DA057926-01A1 | Building an Interprofessional and diverse workforce in substance use and pain | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(e)(b), 288(a)(4), and/or 289a-2. |
| 1R01DA059240-01A1 | Characterizing Intersectional Geospatial Stigma and Affirmation Landscapes and Their Influence on Black and Latino Bisexual Men At Risk for Substance Abuse and HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01DA059480-01A1 | Elucidating minority stress influences on tobacco use at the intersection of sexual orientation and rurality | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01DA060066-01 | Combination of THC and CBD as a Novel Treatment for Co-Occurring Opioid Addiction and Chronic Pain | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(e)(b), and/or 288(a)(4). |

2

APHA App. 1071

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 1R01DA061661-01 | Optimizing a Just-in-Time Adaptive Intervention to Increase Uptake of Chemsex Harm Reduction Services in MSM: A Micro-randomized Trial | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R21DA062591 | Optimizing long-acting injectable PrEP strategies for sexual minority men who use methamphetamine | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3R01AG063771-05S1 | Effects of Social Networks and Policy Context on Health among Older Sexual and Gender Minorities in the US South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AG063771-05 | Effects of Social Networks and Policy Context on Health among Older Sexual and Gender Minorities in the US South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| K12GM068524 | San Diego IRACDA Scholars Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 3R01AG077934-03S1 | Structural Racism and Discrimination in Sexual and Gender Minority Health Inequities - Supplement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AG077934-03 | Structural Racism and Discrimination in Older Men's Health Inequities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5UM2HD111102-03 | Adolescent Medicine Trials Network for HIV/AIDS Interventions (ATN) Scientific Leadership Center | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R34MH126894 | Making Universal, Free-of-Charge Antiretroviral Therapy Work for Sexual and Gender Minority Youth in Brazil | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MH128049-04 | Tcher, Take Charge: Increasing PrEP Awareness, Uptake, and Adherence Through  Health Care Empowerment and Addressing Social Determinants of Health Among  Racially Diverse Trans Women in the Deep South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R34MH129208-03 | 3T-Prevent: Piloting a multi-level, combination intervention strategy to expand HIV and bacterial STI prevention | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3R24NS132283-01S1 | PURPOSE: Positively Uniting Researchers of Pain to Opine, Synthesize, and Engage | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R24NS132283-01 | PURPOSE: Positively Uniting Researchers of Pain to Opine, Synthesize, and Engage | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1RF1MH132360-01 | Brief digital intervention to increase COVID-19 vaccination among individuals with anxiety or depression | See REASONS FOR EVERY GRANT. |
| 5R01MH133821-02 | The Sociecology of Sexual Minority Stigma: Data Harmonization to Address Confounding Bias and Investigate Cross-Level Mental Health Effects | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01MH138335-01 | Bisexual adolescents' and young adults' risk for depression and suicidal ideation: Developmental trajectories, risk and protective factors, and underlying mechanisms | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

3

APHA App. 1072

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Spreadsheet of Grant Terminations                    5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 5K23DK139454-02 | Structural Racism as a "Third hit" on kidney outcomes of Black individuals with APOL1 risk alleles | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 282(m)(2)(B)(iii), 283a(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5T32GM141862-04 | iBioSTeP: NIH G-RISE program at UC Merced | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1R01GM155395-01 | Promoting Inclusive Excellence | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(h), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 1K99GM155594-01 | Characterization of the metastatic TIME by subcellular spatial profiling | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1U19AI171110-01 | QCRG Pandemic Response Program | See REASONS FOR EVERY GRANT. |
| 5R01AI172092-03 | Enhanced COhort methods for HIV Research and Epidemiology (ENCORE) among transgender women in the United States | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AI174862-03 | Cabotegravir PrEP: Actionable Robust Evidence for Translation Into Practice (CABARET) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1F31AI181431-01A1 | Prevention of Chlamydia trachomatis infections: Evaluation of vaccination and post-exposure prophylactic antibiotic use as population-level strategies | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| R01CA265945 | Testing effective methods to recruit sexual and gender minority cancer patients for cancer studies | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5K99NS129753-02 | Cell type-specific mechanisms of history-dependent perceptual biases in sensory cortex | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| F31GM151838-02 | Understanding the role of coiled-coil domains in regulating liquid-liquid phase separation of protein assemblies in cell division | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K99AG086530-01 | Alzheimer's Disease and Related Dementia Neuropathologies and Exposures to Traffic Pollution Mixtures | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| R25MH129290 | Short Trainings on Methods for Recruiting, Sampling, and Counting Hard-to-Reach Populations: The H2R Training Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| DP2AI164315 | One Ballroom: Understanding Intersectional Stigma to Optimize the HIV Prevention Continuum among Vulnerable Populations in the United States | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1F31DA060046-01 | Dopamine Projections to the Amygdala in Goal-Directed and Habit Learning | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| U54DA060049-02 | Advancing Tobacco Regulatory Science to Reduce Health Disparities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R24DA061190-01 | PRIDE-CARES: Patient-Responsive Initiatives for Diverse Engagement – LGBTQ+ Community Action in Research to Eliminate Substance Use Disorder | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

4

APHA App. 1073

1:25-cv-10787-WGY: APHA v. NIH    Plaintiffs' Spreadsheet of Grant Terminations    5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 1R01DA061345-01 | Race & Place: The Impacts of Racial Inequity on Substance Use and HIV Outcomes in Los Angeles | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(6)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1F31DA061593-01 | Community and big-data system approaches to identifying and understanding the health impact of xylazine | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K99DA062328-01 | The role of valence encoding amygdala ensembles in avoidance behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 8K00DA062570-02 | Investigating the role of microglia molecular rhythms in the nucleus accumbens in OUD | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| R01AG073440-03 | Examining Health Comorbidities and Healthcare Utilization Disparities among Older Transgender and Cisgender Adults in the U.S. | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01AG089099-01 | Social Networks and Cognitive Health among Black and Latino sexual minority men in NJ | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01HD105655-04S1 | Understanding and Supporting Reproductive Decisions Among Women with Developmental Disabilities that Affect Cognition | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5K12GM106996-09 | IRACDA at UCLA | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5U01HD108738-03 | Harnessing the power of text messaging to reduce HIV incidence in adolescent males across the United States | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R21HD109536 | Evaluating Teen-Parent Dynamics in Adolescent COVID-19 Vaccine Acceptance and Uptake | See REASONS FOR EVERY GRANT. |
| 1R01HD110428-01A1 | Modeling Adolescent Health Care Decision-Making for Vaccines: A Community-Based Participatory Approach | See REASONS FOR EVERY GRANT. |
| 1R21HD110617-01A1 | Development and Initial Trial of Brief Interventions to Help Parents of Stigmatized Youth Reduce Distress and Strengthen Attachment | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01MH115765 | A couples-based approach to HIV prevention for transgender women and their male partners | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01HD115985-01 | The California Abundant Birth Project Evaluation: Advancing Birth Equity through Guaranteed Income for Pregnant People | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R25HD116367 | Restoring equity to measuring and preventing perinatal intimate partner violence (Remap-IPV) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3P30AI117943-10S1 | Third Coast Center for AIDS Research | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MH118245-05 | Biopsychosocial mechanisms underlying internalizing psychopathology in a prospective, population-based cohort of sexual minority young adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

5

APHA App. 1074

1:25-cv-10787-WGY: APHA v. NIH                  Plaintiffs' Spreadsheet of Grant Terminations                  5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| R25MH119858 | SHINE Strong: Building the pipeline of HIV behavioral scientists with expertise in trans population health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5R33MH120236-04 | Suicide Prevention for Sexual and Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MH121194-04 | Monitoring Microaggressions and Adversities to Generate Interventions for Change (MMAGIC) for Black Women Living with HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5K99NS126639/R00NS126639 | Mitochondrial fidelity in mammalian neurons | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o-(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5R25MH126703-05 | Pipeline to Graduate Education and Careers in Behavioral and Social Science Research for URM Undergraduates: Addressing HIV in Sexual and Gender Minority Communities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283o-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5T32MH126772-04 | Culturally-focused HIV Advancements through the Next Generation for Equity (CHANGE) Training Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5R21MH128114-02 | Strengthening the HIV care continuum for transgender women living with HIV in Malaysia | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MH128130-04 | STI Response and Recommendations Under PrEP (STIRRUP) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3R01MH128729-03S2 | Project STRIVE (STudents Rising above) - Offsetting the health and mental health costs of resilience | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(h), 282(m)(2)(B)(iii), 283o-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 7R01MH129175-03 | Strategies to Prevent HIV Acquisition Among Transgender MSM in the US | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R34MH129187 | Brothers building brothers by breaking barriers (B6): A resilience-focused intervention for young Black gay and bisexual men living with HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R34MH129189-03 | Data-driven, peer-led messaging using social media influencers to increase PrEP awareness and uptake among transgender women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01MH129285 | A multi-level approach to improve HIV prevention and care for transgender women of color | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MH130375-02 | A longitudinal and experience sampling investigation of rejection sensitivity and its role in sexual minority adolescents' mental health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R34MH132405-01 | MyPrEP Plus: Development and Pilot Testing of Novel Pre-Exposure Prophylaxis Support Tools for Transgender Women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MH132415 | Understanding the Regional Ecology of a Future HIV Vaccine | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

6

1:25-cv-10787-WGY: APHA v. NIH               Plaintiffs' Spreadsheet of Grant Terminations               5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 5R01MH133543-02 | Implementing sustainable evidence-based mental healthcare in low-resource community settings nationwide to advance mental health equity for sexual and gender minority individuals | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R61MH133710-01A1 | Targeting Minority Stressors to Improve Eating Disorder Symptoms in Sexual Minority Individuals with Eating Disorders | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 4R00DK133804 | Utilizing a human stem cell model of the esophagus to understand racial disparities during injury repair | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 1K23MH134111-01 | Using youth-engaged methods to develop and evaluate a measure for disordered eating behaviors in transgender and gender-diverse youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1F31MH134720-01A1 | Understanding Patient Level Implementation Determinants Related to Long-acting Injectable HIV Pre-Exposure Prophylaxis among Young Men Who Have Sex with Men Living in Rural Areas | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5R01MH134721-02 | A randomized clinical trial of client-centered care coordination to improve pre-exposure prophylaxis use for Black men who have sex with men | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R21DK134815-01A1 | Transforming motivational interviewing into a computable model for automated patient diabetic counseling. | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R34MH134912-01A1 | Youth Empowerment and Safety Intervention for Systems-involved Sexual and Gender Minority Youth at Risk of Suicide | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5K99MH135061-02 | Oxytocin receptor signaling modulates social attachment via hippocampal CA2/3 function | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 3R01DK135099-02S1 | Diversity Supplement for: Impact of a Healthy Checkout Policy on Healthfulness of Grocery Environments and Sales | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| R36MH135619 | Transcriptomic contributions to the development and evolution of the human cerebral cortex | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5F32MH135634-02 | The psychological underpinnings of gender disparities in adolescent mental health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| R01MH135738 | Know your status: A cluster randomized controlled trial comparing healer-initiated HIV counseling and testing to standard of care in rural South Africa | See REASONS FOR EVERY GRANT. |
| 5F99NS135767-02 | Neural basis of movement in health and disease | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K99MH135993-01 | Neural circuit dynamics of spatial reward memory | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |

APHA App. 1076

1:25-cv-10787-WGY: APHA v. NIH — Plaintiffs' Spreadsheet of Grant Terminations — 5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 1R21DK136084-01A1 | Mobile pop-up units for diabetes prevention among Hispanics in rural Indiana | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1F31MH136729-01A1 | Determining the role of discrimination in clinical presentation and treatment response among sexual minority people with OCD: A machine learning approach | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(h), 282(m)(2)(B)(iii), 283o('b)(2), 283p, 285t, 285t-1(e)(b), 288(a)(4), and/or 289a-2. |
| 5U01DK137259-02 | Renal transplant Equity through Partnership And Structural Transformation (REPAST) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1U01DK137262 | CommunityRx - Chronic Kidney Disease (CRx-CKD): An EMR-integrated community resources referral intervention to address structural racism and kidney health disparities in rural North Carolina | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5U01DK137269-02 | Mitigating the Effects of Structural Racism on Chronic Kidney Disease Disparities among African Americans | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5U01DK137272-02 | NAVIGATE Kidney: A Multi-Level Intervention to Reduce Kidney Health Disparities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| K23MH137389-01 | ALIVE: Development and feasibility of a psychosocial intervention for sexual and gender minority autistic adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(e)(b), 288(a)(4), and/or 289a-2. |
| 1R01MH137695-01 | Measuring and Mapping Trajectories of Risk and Resilience for Suicidal Thoughts and Behaviors in Sexual and Gender Minority Preteens | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R34MH137753-01 | Developing and pilot testing an eHealth decision support tool for young trans women to improve informed decision making about PrEP | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01MH140023-01 | Mental Health Effects of Marriage Policy: Evidence from Linked Administrative Data in New Zealand | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R00GM140269-04 | Evolution of Cargo Transport | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 1K99DK140511-01 | Fcγ Receptor-Mediated Pharmacogenomics of Antibody Therapies in Type 1 Diabetes | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 5T34GM141986-04 | Maximizing Access to Research Careers (MARC) at University of Hawaii at Manoa | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 5K99GM146016/4R00GM146016-03 | Regulation of zinc-dependent lysosome morphological restructuring, zinc trafficking and low zinc homeostasis in C. elegans and human model systems | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| K99GM146243-01 | The genetic control of neuronal number and behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 5K99GM147825-02 | Understanding and rewiring cellular behavior with synthetic biology approaches | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(e)(b), and/or 288(a)(4). |

8

APHA App. 1077

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Spreadsheet of Grant Terminations                    5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 5K99GM148819-02 | Elucidating the epigenetic regulation of extracellular matrix and virus-induced fibroblast activation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5R01HL149778-05 | Cardiovascular Health of Sexual and Gender Minorities in the Hispanic Community Health Study/Study of Latinos (SGM HCHS/SOL) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| K99GM151467-02 | Nuclear and chromatin aberrations during non-apoptotic cell death in C. elegans and mammals | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| K99GM151473 | Characterizing the role of tumor suppressor phase separation and chromatin organization in maintaining genomic integrity | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5K99GM152834-02/4R00GM152834-03 | Regulation of oxidative stress signaling by tyrosine phosphorylation of antioxidant enzymes | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5K99GM152835-02 | Testing the functional consequences of rapid centromeric DNA and protein evolution | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K99GM154059-01A1 | RNA and genome regionalization in giant single cells: implications for cellular patterning | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| K99GM154061 | Investigating UPF3 paralog function in Nonsense-Mediated mRNA Decay and Genetic Compensation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 3R01AI155739-04S1 | Diversity Supplement - Environmental surveillance of albendazole resistance markers in human infective helminths using dual amplicon metabarcoding | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K99GM157463-01 | Building Dendrite Architecture via Microtubule Nucleation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| K99GM157504 | Understanding eukaryotic proteasome assembly regulation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K99GM159354-01A1 | Metabolic regulation of pancreatic metaplasia and neoplasia | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5R01HL160326-05 | Stigma and the non-communicable disease syndemic in aging HIV positive and HIV negative MSM | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3P01AI165075-01S1 | Broad neutralization of pandemic threat co | See REASONS FOR EVERY GRANT. |
| R01AI169239 | Uptake, safety and effectiveness of COVID-19 Vaccines during Pregnancy | See REASONS FOR EVERY GRANT. |
| 5K99HL169908-02 | Examining the Role of Structural Factors in Racial and Ethnic Disparities in Cardiovascular Disease | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5K99AI173544-02 | Improving phage-based medicine with immunoengineering | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K99HL173668-01 | Resistance Exercise in the Prevention and Treatment of Heart Failure with Preserved Ejection Fraction (HFpEF) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |

9

APHA App. 1078

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Spreadsheet of Grant Terminations                    5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 1K99AI182451-01 | Molecular understanding of maternal humoral responses to pregnancy | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| R01CA237670 | Project RESIST: Increasing Resistance to Tobacco Marketing Among Young Adult Sexual Minority Women Using the Inoculation Message Approaches | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1U54CA267730-01 | Fostering Institutional Resources for Science Transformation: The FLORIDA-FIRST Health-science Brigade | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5U54CA267776-04 | NIH FIRST Cohort Cluster Hiring Initiative at Icahn School of Medicine at Mount Sinai | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1UC2CA293786 | ComPASS Health Equity Research Hub at Yale | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| U54MD007598 | Accelerating Excellence in Translational Science (AXIS) | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o/ b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5T37MD008636-10 | Transdisciplinary Health Disparities Research Training for Native Hawaiians and Pacific Students | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5D43TW012274-03 | Integrated Networks of Scholars in Global Health Research Training (INSIGHT) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1R01HG013145-01 | Trans/Forming Genomics: Guidance for Research Involving Transgender and Gender Diverse People | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD013495-05 | Health disparities, stress pathways, and stress-related comorbidities among MSM living with HIV | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD016864-03 | K-VAC: Kentucky Vaccinating Appalachian Communities | See REASONS FOR EVERY GRANT. |
| R01MD016880-03 | Increasing COVID-19 vaccine uptake among Latinos through a targeted clinical and community-behavioral intervention | See REASONS FOR EVERY GRANT. |
| 4R00MD016964-03 | Comprehensive computational analysis of genetic and regulatory differences between individuals with African and European ancestries across four brain regions | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o/ b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| P50MD017349 | Chicago Chronic Condition Equity Network | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD017364-03 | REDES: a peer network and mobile health (mHealth) enhanced CHW model to maximize COVID-19 vaccination among low income Latinos | See REASONS FOR EVERY GRANT. |
| 1K99MD018451-01A1 | Advancing Indigenous Cancer Health Equity through a Community-Centered Framework | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o/ b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| R01MD018459 | Elucidating the high and heterogeneous risk of gestational diabetes among Asian Americans: an integrative approach of metabolomics, lifestyles, and social determinants | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

APHA App. 1079

1:25-cv-10787-WGY: APHA v. NIH                Plaintiffs' Spreadsheet of Grant Terminations                                5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| R01MD018523 | A Multilevel, Multiphase Optimization Strategy for PrEP: Patients and Providers in Primary Care | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD018679-02 | Understanding the Role of Structural Oppression for Suicide Risk among Black Sexual and Gender Minority Adolescents and Young Adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5K99MD019060 | A Digital Health Intervention to Increase Condom Use Among Adolescent Sexual Minority Males | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o/b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 1K99MD019292-01 | A Multilevel Social Capital Approach to Address Cervical Cancer Screening and Follow Up Delays among Latinas in Safety-Net Settings | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o/b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| R21MD019345-01A1 | Ecological momentary assessment of daily minority stressors and cannabis and tobacco co-use among sexual minority adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1P50MD019475-01 | The Institute for Health Equity Research Catalyst Center | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o/b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 1R21MD019829-01 | The Roles of Parental Mental Health and Help-Seeking: Utilizing a Family Systems Approach to Upstream Suicide Prevention for Sexual Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1F31MD019996-01 | Advancing Perinatal Health Equity through a Community-engaged Model of Healthcare Services | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o/b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 1F31MD020261-01 | Understanding the Macrosocial Drivers of Cardiovascular Health in the Rural South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o/b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5R01NR020309-04 | Harnessing the power of technology to develop a population-based HIV prevention program for trans girls | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5K99DC020570-02/4R00DC020570-03 | Identifying neural circuits that support effortful listening | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o/b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5R01NR020846-02 | #TranscendentHealth - Adapting an LGB+ inclusive teen pregnancy prevention program for transgender boys | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1U24NR021014-02 | Advancing Health Equity Through Innovative Community Capacity Building, Data Science & Delivering Community-Centered Structural Interventions & Outcomes: Drexel's ComPASS Coordinating Center (C3) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| OT2OD025276 | PRIDEnet for the All of Us Research Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AA029044-04 | Intersectional Approaches to Population-Level Health Research: Role of HIV Risk and Mental Health in Alcohol Use Disparities among Diverse Sexual Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

11

APHA App. 1080

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Spreadsheet of Grant Terminations                    5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 5R01AA029088-03 | A unified protocol to address sexual minority women's minority stress, mental health and hazardous drinking | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 4R00AA030601-03 | Stigma, Romantic Relationships, and Alcohol Use Among Transgender and Nonbinary Young Adults | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o'b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5F31AA030722-02 | Examining differential effects of state equality-promoting policies on harmful alcohol use among sexual and gender minority adults in the U.S.: an econometrics approach for causal inference | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o'b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 1R15AA030898-01A1 | Reconstruction of a SGM-specific sexual violence peer support program (SSS+) | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1F31AA031420-01A1 | Examining Proximal Associations between Minority Stress, PTSD Symptoms, and Alcohol Use among Bi+ College Students with Trauma Histories | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5R01ES034303-03 | Research Employing Environmental Systems and Occupational Health Policy Analyses to Interrupt the Impact of Structural Racism on Agricultural Workers and Their Respiratory Health (RESPIRAR) | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| OT2OD035659-01 | Macro-level Health Considerations of Community and Criminal Justice System Relationships in North Texas | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 1K99EB036553-01 | AN ADAPTIVE FRAMEWORK TO SYNTHESIZE AND RECONFIGURE BACTERIAL VIRUSES (PHAGES) TO COUNTER ANTIBIOTIC RESISTANCE | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o'b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5U01DA036939-10 | Multilevel Influences on HIV and Substance Use in a YMSM cohort | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3P2CHD041023-24S1 | "Minnesota Population Center" (Note: this is a Diversity Supplement of the Parent Grant) | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o'b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 3P30AI050409-26S1 | Center for AIDS Research at Emory University | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01DA052016 | Substance use and DNA methylation at the intersection of sex and gender | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R03DA052651 | Improving Sexual Minority Health: Differences in Substance Use, Substance Use Treatment, and Associated Chronic Diseases among Rural versus Urban Populations | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3R01DA055673-03S1 | Supplement entitled, "Exploring the accessibility, acceptability, and utilization of a community-based harm reduction vending machine among persons with limited opportunity structures." | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o'b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| R01DA056235 | Structural Influences on Methamphetamine Use among Black Gay and Bisexual Men in Atlanta | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

12

1:25-cv-10787-WGY: APHA v. NIH                     Plaintiffs' Spreadsheet of Grant Terminations                              5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 5R01DA056287-02 | Comparative- and cost-effectiveness research determining the optimal intervention for advancing transgender women living with HIV to full viral suppression | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01DA056888-03 | Optimizing PrEP Implementation and Cost-effectiveness among Sexual and Gender Minority Individuals with a Substance Use Disorder | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01DA058642-02 | Testing a multistage model of risk factors for cannabis use utilizing a measurement burst design among sexual minority women, sexual minority gender diverse individuals, and heterosexual women | *See* REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01MD012793-05 | Advancing novel methods to measure and analyze multiple types of discrimination for population health research | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3R01MD015165-04S1 | Multilevel Physical Activity Intervention for Low Income Public Housing Residents | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5T32MH020004 | Research Training in Late-Life NeuroPsychia | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1R01NR020583-01 | Ending the HIV Epidemic with Equity: An All-facility Intervention to Reduce Structural Racism and Discrimination and its Impact on Patient and Healthcare Staff Wellbeing | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01NR021098 | Evaluating the Implementation and De-Implementation of Pandemic Era SNAP Expansion Policies on Diet and Health: A Mixed Methods Project | See REASONS FOR EVERY GRANT. |
| 1F31NR021239-01 | Personal Healthcare Networks of Transgender and Gender-Diverse Adults After Gender-Affirming Surgery | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R00AA028049 | A mixed-methods approach to understanding stress and hazardous drinking among same-sex female couples | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| T32DA031099-13 | Substance Abuse Epidemiology Training Program (SAETP) at Columbia University | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 1K01DE033040-01A1 | Developmental mechanisms in the formation and function of sensory-motor circuits responsible for suckling and mastication. | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| U01OD033248 | TransHealthGUIDE: Transforming Health for Gender-Diverse Youth Using Interventions to Drive Equity | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 3OT2OD035592 | Proyecto Juntos | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5UM1AI068619-19 | Integrating HIV Prevention, Gender-Affirmative Medical Care, and Peer Health Navigation for Transgender Women in the Americas: A Vanguard Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(iii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

APHA App. 1082

1:25-cv-10787-WGY: APHA v. NIH                     Plaintiffs' Spreadsheet of Grant Terminations                                      5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| 3R01AG075734 | Training the Long-Term Services and Supports Dementia Care Workforce in Provision of Care to Sexual and Gender Minority Residents | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5UM2HD111076-03 | Operations and Collaborations Center - Adolescent Medicine Trials Network for HIV/AIDS Interventions (ATN) Operations and Collaborations Center (UM2 Clinical Trial Optional) | See REASONS FOR EVERY GRANT. |
| 1K23HD112599-01A1 | Caregiver decision making for seasonal respiratory vaccines for children | See REASONS FOR EVERY GRANT. |
| 1R21HD116080-01 | Confidentiality in use of health insurance coverage for reproductive health services | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| R01MH130007 | Understanding the Interplay between Parent and Child Contributions in Parent-Child Anxiety Transmission | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(B)(iii), 282(h), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(e)(4), and/or 289a-2. |
| 5K99MH133994-02 | Computational and neurodevelopmental mechanisms of memory-guided decision-making | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 1R36MH135609-01 | An intersectional approach to transgender and/or nonbinary college student mental health: The role of gender identity, race/ethnicity, socioeconomic status, and campus policy | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5K99NS135649-02 | Computational Methods for Precise Holographic Control and Mapping of Neural Circuits | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 5K99GM144750-02 | Dynamic mechanisms of transcriptional coactivator function in Notch signaling | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 5K99GM148723-02 | Stress tolerant annual killifish: a new model for the cellular stress response | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 1R15GM152943-01 | "Mathematical Modeling and Scientific Computing for Infectious Disease Research." | See REASONS FOR EVERY GRANT. |
| 5K99GM153720-02 | Dissecting the synaptic and circuit mechanisms underlying olfactory-driven social behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 1K99GM154060-01 | TULP3 integrates essential ciliary functions | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 1K99GM157508-01 | Unraveling the role of molecular capacitors that obscure cryptic genetic variation in Astyanax mexicanus during the evolution of eye loss | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 5K99HL166700-02 | Investigating relationships between naturalistic light exposure and sleep | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(e)(4). |
| 5P01AI168148-02 | Leptospiral-Phagocyte Dynamics in Leptospirosis | See REASONS FOR EVERY GRANT. |
| 1U19AI171401-01 | Metropolitan AntiViral Drug Accelerator | See REASONS FOR EVERY GRANT. |
| R01CA251478 | Local Flavor Policies to enhance equity in tobacco | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(e)(4), and/or 289a-2. |

14

1:25-cv-10787-WGY: APHA v. NIH          Plaintiffs' Spreadsheet of Grant Terminations          5/27/2025

| Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|
| R34CA283483-02 | Multi-level school-based intervention to improve HPV vaccine uptake and completion in South Africa | See REASONS FOR EVERY GRANT. |
| 5K99MD018629-02 | Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 5K01AG056669-05 | The Epidemiology of Alzheimer's Disease and Related Dementias in Sexual and Gender Minority Older Adults: Identifying Risk and Protective Factors | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R24AG066599-03 | Building Community and Research Engagement among Sexual and Gender Minority Older Adults at Risk for Alzheimer's Disease and Related Dementias | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01AG083177-02 | Enhancing Measurement and Characterization of Roles and Experiences of Sexual and Gender Minority Caregivers of Persons living with Alzheimer's Disease and Related Dementias | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 2T32GM135742-06 | UCSC IMSD | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 5R01MD018250-03 | Assessing Cervical Cancer Healthcare Inequities in Diverse Populations: The ACHIEVE Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 5R01CA274564-03 | Impact of Allostatic Load and Neighborhood Contextual Factors on Breast Cancer in the Women's Health Initiative | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

APHA App. 1084

# EXHIBIT B

APHA App. 1085

*American Public Health Association, et al. v. National Institutes of Health, et al.*
**No. 1:25-cv-10787-WGY**
**Plaintiffs' Supplemental List of Grants Impacted by the Directives (June 13, 2025)**

This demonstrative is provided by Plaintiffs' counsel, as a supplement to the original demonstrative provided on May 27, 2025 pursuant to the Court's order on May 22, 2025, to aid the Court in its understanding of the manner in which the Directives have been implemented as to Plaintiffs in *APHA, et al v. NIH, et al*. It contains information that Plaintiffs' counsel have been able to obtain and compile to date as to grant and program terminations. The terminations that were included in Plaintiffs' May 27, 2025 submission are contained in rows 1–234. Rows 235–367 contain the supplemental submissions. Inclusion of a grant or program on this list indicates that Plaintiffs' counsel have a good faith basis to believe that the entire grant or program and/or a supplement, parent, subpart, program or other award related to the grant or program has been terminated.

This list likely does not represent the complete universe of terminated grants and grant programs impacting Plaintiffs. Plaintiffs reserve all rights to provide additional information regarding the impacts of the Directives on Plaintiffs and maintain that the resolution of Plaintiffs' claims—both as to liability and as to remedy—does not require the identification or individualized review of all impacted grants.

The Directives and terminations are unlawful in each of the following ways ("REASONS FOR EVERY GRANT"):

(1) They are in excess of statutory authority and contrary to statute (42 U.S.C. §§ 282(b)(4)–(6), 282(m)(1), 284(b)(1)(A), 284(b)(3)), in violation of 5 U.S.C. §§ 706(2)(A), 706(2)(C).

(2) They are contrary to regulation (45 C.F.R. § 75.372), in violation of 5 U.S.C. § 706(2)(A).

(3) They are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

(4) They violate the separation-of-powers principle and the Due Process Clause of the U.S. Constitution, and they accordingly violate 5 U.S.C. § 706(2)(B).

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| Row Number | Project Number | Grant Title | Reason Termination is Illegal |
|---|---|---|---|
| 1 | 1R01HD117134-01 | Supportive and restrictive factors and mental health in LGBT adolescent and young adult populations | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 2 | R01DA054236 | Project SMART: Social media Anti-vaping Messages to Reduce ENDS Use Among Sexual and Gender Minority Teens | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 3 | R01HD115551 | Understanding multilevel predictors affecting family formation among sexual and gender minority couples | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 4 | 5R01MD015256-05 | Sexual orientation-related disparities in obstetrical and perinatal health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 5 | 5R01MD015256-05S1 | Sexual orientation-related disparities in obstetrical and perinatal health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 6 | 5R01HD109320-02 | Advancing novel survey tools to increase participation and improve sexual and reproductive health data quality | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 7 | 3R01HD109320-02S1 | Advancing novel survey tools to increase participation and improve sexual and reproductive health data quality | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 8 | 5R01MD016384-03 | An Innovative, Prospective Model to Understand Risk and Protective Factors for Sexual Assault Experiences and Outcomes Among Sexual Minority Men | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 9 | 5R21HD018509-02 | Development and Pilot Evaluation of an Online Mentoring Program to Prevent Adversities Among Trans and Other Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 10 | 5R01AA031213-02 | The Impact of Minority Stress on Alcohol-Related Sexual Assault among Sexual Minority College Students: An Intersectional, Mixed-Methodological Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 11 | 5R01MD017573-03 | Sexual Assault Recovery Among Sexual Minority Women: A Longitudinal, Multi-Level Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 12 | 1R15AA030898-01A1 | Reconstruction of an SGM-specific sexual violence peer support program (SSS+) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 13 | 1R34AA030662-01A1 | An Online Family-based Program to Prevent Alcohol Use and Dating and Sexual Violence among Sexual and Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 14 | 1R21MH136855-01 | Over-the-Counter PrEP: Acceptability, Feasibility, and Potential Impact of Access without a Prescription (OFFSCRIPT) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 15 | 5R33TW011665-06 | Development and Testing of a Mobile Application to Enhance HIV Prevention Cascade in Malaysian MSM | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 16 | 3U24MD017250-04S1 | Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases (RCC RD-MCD) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 17 | 5U24MD017250-04 | Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases (RCC RD-MCD) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 18 | 5T32MH019139-35 | Behavioral Sciences Research in HIV Infection | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 19 | 3U01MD019398-03S1 | Increasing financial and health equity among low income black youth and young adults - DEIA Supplement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 20 | 3U01MD019398-03S2 | Increasing financial and health equity among low income black youth and young adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 21 | 3U01MD019398-03S3 | Increasing financial and health equity among low income black youth and young adults - Supplement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 22 | 5U01MD019398 | Increasing financial and health equity among low income black youth and young adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                                Plaintiffs' Supplemental Spreadsheet of Grant Terminations                                June 13, 2025

| # | Grant ID | Title | Reason |
|---|---|---|---|
| 23 | 1R01MD020284-01 | Measures of structural stigmatization and discrimination for HIV research with Latino sexual and gender minorities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 24 | 3R01AA029076-04S1 | Improving Measurement of Alcohol Use and Other Disparities by Sex, Sexual Orientation, and Gender Identity through Community Engagement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 25 | 5R01AA029076-04 | Project Recognize: Improving Measurement of Alcohol Use and Other Disparities by Sex, Sexual Orientation, and Gender Identity through Community Engagement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 26 | 5R01AA030017 | A Randomized Controlled Trial of a Game-Based Intervention to Reduce Alcohol Use among Sexual and Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 27 | 1R21AA031548-01A1 | Daily Impact of Sexual Minority Stress on Alcohol-Related Intimate Partner Violence among Bisexual+ Young Adults: A Couples' Daily Diary Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 28 | 1R01AA031637-01A1 | The Role of Local Structural Stigma in Alcohol Related Inequities among SGM Young Adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 29 | 1T32DA057926-01A1 | Building an interprofessional and diverse workforce in substance use and pain | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282b, 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 30 | 1R01DA059240-01A1 | Characterizing Intersectional Geospatial Stigma and Affirmation Landscapes and Their Influence on Black and Latino Bisexual Men At Risk for Substance Abuse and HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 31 | R01DA059480-01A1 | Elucidating minority stress influences on tobacco use at the intersection of sexual orientation and rurality | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 32 | 1R01DA060068-01 | Combination of THC and CBD as a Novel Treatment for Co-Occurring Opioid Addiction and Chronic Pain | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 33 | 1R01DA061661-01 | Optimizing a Just-in-Time Adaptive Intervention to Increase Uptake of Chemsex Harm Reduction Services in MSM: A Micro-randomized Trial | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 34 | R21DA062591 | Optimizing long-acting injectable PrEP strategies for sexual minority men who use methamphetamine | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 35 | 3R01AG063771-05S1 | Effects of Social Networks and Policy Context on Health among Older Sexual and Gender Minorities in the US South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 36 | 5R01AG063771-05 | Effects of Social Networks and Policy Context on Health among Older Sexual and Gender Minorities in the US South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 37 | K12GM068524 | San Diego IRACDA Scholars Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 38 | 3R01AG077934-03S1 | Structural Racism and Discrimination in Sexual and Gender Minority Health Inequities - Supplement | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 39 | 5R01AG077934-03 | Structural Racism and Discrimination in Older Men's Health Inequities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 40 | 5U2HD111102-03 | Adolescent Medicine Trials Network for HIV/AIDS Interventions (ATN) Scientific Leadership Center | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 41 | R34MH126894 | Making Universal, Free-of-Charge Antiretroviral Therapy Work for Sexual and Gender Minority Youth in Brazil | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 42 | 5R01MH128049-04 | Tcher, Take Charge: Increasing PrEP Awareness, Uptake, and Adherence Through Health Care Empowerment and Addressing Social Determinants of Health Among Racially Diverse Trans Women in the Deep South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 43 | 5R34MH129208-03 | 3T-Prevent: Piloting a multi-level, combination intervention strategy to expand HIV and bacterial STI prevention | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 44 | 3R24NS132283-01S1 | PURPOSE: Positively Uniting Researchers of Pain to Opine, Synthesize, and Engage | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 45 | 1R24NS132283-01 | PURPOSE: Positively Uniting Researchers of Pain to Opine, Synthesize, and Engage | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 46 | 1RF1MH132360-01 | Brief digital intervention to increase COVID-19 vaccination among individuals with anxiety or depression | See REASONS FOR EVERY GRANT. |
| 47 | 5R01MH133821-02 | The Sociosexuality of Sexual Minority Stigma: Data Harmonization to Address Confounding Bias and Investigate Cross-Level Mental Health Effects | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 48 | 1R01MH138335-01 | Bisexual adolescents' and young adults' risk for depression and suicidal ideation: Developmental trajectories, risk and protective factors, and underlying mechanisms | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 49 | 5K23DK139454-02 | Structural Racism as a "Third hit" on kidney outcomes of Black individuals with APOL1 risk alleles | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 50 | 5T32GM141862-04 | iBioSTeP: NIH G-RISE program at UC Merced | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 51 | 1R01GM155395-01 | Promoting Inclusive Excellence | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 52 | 1K99GM155594-01 | Characterization of the metastatic TIME by subcellular spatial profiling | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 53 | 1U19AI171110-01 | QCRG Pandemic Response Program | See REASONS FOR EVERY GRANT. |
| 54 | 5R01AI172092-03 | Enhanced COhort methods for HIV Research and Epidemiology (ENCORE) among transgender women in the United States | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 55 | 5R01AI174862-03 | Cabotegravir PrEP: Actionable Robust Evidence for Translation into Practice (CABARET) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 56 | 1F31AI181431-01A1 | Prevention of Chlamydia trachomatis infections: Evaluation of vaccination and post-exposure prophylactic antibiotic use as population-level strategies | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 57 | R01CA265945 | Testing effective methods to recruit sexual and gender minority cancer patients for cancer studies | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 58 | 5K99NS129753-02 | Cell type-specific mechanisms of history-dependent perceptual biases in sensory cortex | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 59 | F31GM151838-02 | Understanding the role of coiled-coil domains in regulating liquid-liquid phase separation of protein assemblies in cell division | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 60 | 1K99AG086530-01 | Alzheimer's Disease and Related Dementia Neuropathologies and Exposures to Traffic Pollution Mixtures | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 61 | R25MH129290 | Short Trainings on Methods for Recruiting, Sampling, and Counting Hard-to-Reach Populations: The H2R Training Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 62 | DP2AI164315 | One Bathroom: Understanding Intersectional Stigma to Optimize the HIV Prevention Continuum among Vulnerable Populations in the United States | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 63 | 1F31DA060046-01 | Dopamine Projections to the Amygdala in Goal-Directed and Habit Learning | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 64 | U54DA060049-02 | Advancing Tobacco Regulatory Science to Reduce Health Disparities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 65 | 1R24DA061190-01 | PRIDE-CARES: Patient-Responsive Initiatives for Diverse Engagement – LGBTQ+ Community Action in Research to Eliminate Substance Use Disorder | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 66 | 1R01DA061345-01 | Race & Place: The Impacts of Racial Inequity on Substance Use and HIV Outcomes in Los Angeles | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 67 | 1F31DA061593-01 | Community and big-data system approaches to identifying and understanding the health impact of xylazine | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 68 | 1K99DA062328-01 | The role of valence encoding amygdala ensembles in avoidance behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |

1:25-cv-10787-WGY: APHA v. NIH                     Plaintiffs' Supplemental Spreadsheet of Grant Terminations                     June 13, 2025

| # | Grant Number | Title | Reasons |
|---|---|---|---|
| 69 | 8K00DA062570-02 | Investigating the role of microglia molecular rhythms in the nucleus accumbens in OUD | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 283o (b)(2), 285t-1(a)(b), and/or 266(a)(4). |
| 70 | R01AG073440-03 | Examining Health Comorbidities and Healthcare Utilization Disparities among Older Transgender and Cisgender Adults in the U.S. | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 71 | 1R01AG089099-01 | Social Networks and Cognitive Health among Black and Latino sexual minority men in NJ | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 72 | R01HD105655-04S1 | Understanding and Supporting Reproductive Decisions Among Women with Developmental Disabilities that Affect Cognition | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 73 | 5K12GM106996-09 | IRACDA at UCLA | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 74 | 5U01HD108738-03 | Harnessing the power of text messaging to reduce HIV incidence in adolescent males across the United States | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 75 | R21HD109536 | Evaluating Teen-Parent Dynamics in Adolescent COVID-19 Vaccine Acceptance and Uptake | See REASONS FOR EVERY GRANT. |
| 76 | 1R01HD110428-01A1 | Modeling Adolescent Health Care Decision-Making for Vaccines: A Community-Based Participatory Approach | See REASONS FOR EVERY GRANT. |
| 77 | 1R21HD110817-01A1 | Development and Initial Trial of Brief Interventions to Help Parents of Stigmatized Youth Reduce Distress and Strengthen Attachment | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 78 | R01MH115765 | A couples-based approach to HIV prevention for transgender women and their male partners | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 79 | 1R01MH115985-01 | The California Abundant Birth Project Evaluation: Advancing Birth Equity through Guaranteed Income for Pregnant People | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 80 | R25HD116367 | Restoring equity to measuring and preventing perinatal intimate partner violence (Remap-IPV) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 81 | 3P30AI117943-10S1 | Third Coast Center for AIDS Research | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 82 | 5R01MH118245-05 | Biopsychosocial mechanisms underlying internalizing psychopathology in a prospective, population-based cohort of sexual minority young adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 83 | R25MH119858 | SHINE Strong: Building the pipeline of HIV behavioral scientists with expertise in trans population health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 84 | 5R33MH120236-04 | Suicide Prevention for Sexual and Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 85 | 5R01MH121194-04 | Monitoring Microaggressions and Adversities to Generate Interventions for Change (MMAGIC) for Black Women Living with HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 86 | 5K99NS126639/R00NS126639 | Mitochondrial fidelity in mammalian neurons | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 283o (b)(2), 285t-1(a)(b), and/or 266(a)(4). |
| 87 | 5R25MH126703-05 | Pipeline to Graduate Education and Careers in Behavioral and Social Science Research for URM Undergraduates: Addressing HIV in Sexual and Gender Minority Communities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 88 | 5T32MH126772-04 | Culturally-focused HIV Advancements through the Next Generation for Equity (CHANGE) Training Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 89 | 5R21MH128114-02 | Strengthening the HIV care continuum for transgender women living with HIV in Malaysia | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 90 | 5R01MH128130-04 | STI Response and Recommendations Under PrEP (STRRRUP) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 91 | 3R01MH128729-03S2 | Project STRIVE (STudents Rising above) - Offsetting the health and mental health costs of resilience | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 92 | 7R01MH129175-03 | Strategies to Prevent HIV Acquisition Among Transgender MSM in the US | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 93 | R34MH129187 | Brothers building brothers by breaking barriers (B6): A resilience-focused intervention for young Black gay and bisexual men living with HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 94 | 5R34MH129189-03 | Data-driven, peer-led messaging using social media influencers to increase PrEP awareness and uptake among transgender women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 95 | R01MH129285 | A multi-level approach to improve HIV prevention and care for transgender women of color | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 96 | 5R01MH130375-02 | A longitudinal and experience sampling investigation of rejection sensitivity and its role in sexual minority adolescents' mental health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 97 | R34MH132405-01 | MyPrEP Plus: Development and Pilot Testing of Novel Pre-Exposure Prophylaxis Support Tools for Transgender Women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 98 | 5R01MH132415 | Understanding the Regional Ecology of a Future HIV Vaccine | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 99 | 5R01MH133543-02 | Implementing sustainable evidence-based mental healthcare in low-resource community settings nationwide to advance mental health equity for sexual and gender minority individuals | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 100 | 1R61MH133710-01A1 | Targeting Minority Stressors to Improve Eating Disorder Symptoms in Sexual Minority Individuals with Eating Disorders | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 101 | 4R00DK133804 | Utilizing a human stem cell model of the esophagus to understand racial disparities during injury repair | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 102 | 1K23MH134111-01 | Using youth-engaged methods to develop and evaluate a measure for disordered eating behaviors in transgender and gender-diverse youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 103 | 1F31MH134720-01A1 | Understanding Patient-Level Implementation Determinants Related to Long-acting Injectable HIV Pre-Exposure Prophylaxis among Young Men Who Have Sex with Men Living in Rural Areas | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 104 | 5R01MH134721-02 | A randomized clinical trial of client-centered care coordination to improve pre-exposure prophylaxis use for Black men who have sex with men | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 105 | 1R21DK134815-01A1 | Transforming motivational interviewing into a computable model for automated patient diabetic counseling. | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 106 | 1R34MH134912-01A1 | Youth Empowerment and Safety Intervention for Systems-Involved Sexual and Gender Minority Youth at Risk of Suicide | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 107 | 5K99MH135061-02 | Oxytocin receptor signaling modulates social attachment via hippocampal CA2/3 function | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 108 | 3R01DK135099-02S1 | Diversity Supplement for: Impact of a Healthy Checkout Policy on Healthfulness of Grocery Environments and Sales | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 109 | R36MH135619 | Transcriptomic contributions to the development and evolution of the human cerebral cortex | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 110 | 5F32MH135634-02 | The psychological underpinnings of gender disparities in adolescent mental health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 111 | R01MH135738 | Know your status: A cluster randomized controlled trial comparing healer-initiated HIV counseling and testing to standard of care in rural South Africa | See REASONS FOR EVERY GRANT. |
| 112 | 5F99NS135767-02 | Neural basis of movement in health and disease | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 113 | 1K99MH135993-01 | Neural circuit dynamics of spatial reward memory | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 114 | 1R21DK136084-01A1 | Mobile pop-up units for diabetes prevention among Hispanics in rural Indiana | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 115 | 1F31MH136729-01A1 | Determining the role of discrimination in clinical presentation and treatment response among sexual minority people with OCD: A machine learning approach | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-b)(2), 283p, 285t, 285t-1(e)(b), 288(a)(4), and/or 289a-2. |
| 116 | 5U01DK137259-02 | Renal transplant Equity through Partnership And Structural Transformation (REPAST) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 117 | 1U01DK137262 | CommunityRx- Chronic Kidney Disease (CRx-CKD): An EHR-integrated community resources referral intervention to address structural racism and kidney health disparities in rural North Carolina | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 118 | 5U01DK137269-02 | Mitigating the Effects of Structural Racism on Chronic Kidney Disease Disparities among African Americans | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 119 | 5U01DK137272-02 | NAVIGATE Kidney: A Multi-Level Intervention to Reduce Kidney Health Disparities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 120 | K23MH137389-01 | ALIVE: Development and feasibility of a psychosocial intervention for sexual and gender minority autistic adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283o-b)(2), 283p, 285t, 285t-1(e)(b), 288(a)(4), and/or 289a-2. |
| 121 | 1R01MH137695-01 | Measuring and Mapping Trajectories of Risk and Resilience for Suicidal Thoughts and Behaviors in Sexual and Gender Minority Preteens | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 122 | 1R34MH137753-01 | Developing and pilot testing an eHealth decision support tool for young trans women to improve informed decision making about PrEP | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 123 | 1R01MH140023-01 | Mental Health Effects of Marriage Policy: Evidence from Linked Administrative Data in New Zealand | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 124 | 5R00GM140269-04 | Evolution of Cargo Transport | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 125 | 1K99DK140511-01 | Fcy Receptor-Modiated Pharmacogenomics of Antibody Therapies in Type 1 Diabetes | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 126 | 5T34GM141986-04 | Maximizing Access to Research Careers (MARC) at University of Hawaii at Manoa | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 127 | 5K99GM146016/4R00GM 146016-03 | Regulation of zinc-dependent lysosome morphological restructuring, zinc trafficking and low zinc homeostasis in C. elegans and human model systems | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 128 | K99GM146243-01 | The genetic control of neuronal number and behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 129 | 5K99GM147825-02 | Understanding and rewiring cellular behavior with synthetic biology approaches | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 130 | 5K99GM148819-02 | Elucidating the epigenetic regulation of extracellular matrix and virus-induced fibroblast activation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 131 | 5R01HL149778-05 | Cardiovascular Health of Sexual and Gender Minorities in the Hispanic Community Health Study/Study of Latinos (SGM HCHS/SOL) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 132 | K99GM151467-02 | Nuclear and chromatin aberrations during non-apoptotic cell death in C. elegans and mammals | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 133 | K99GM151473 | Characterizing the role of tumor suppressor phase separation and chromatin organization in maintaining genomic integrity | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 134 | 5K99GM152834-02/4R00GM152834-03 | Regulation of oxidative stress signaling by tyrosine phosphorylation of antioxidant enzymes | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 135 | 5K99GM152835-02 | Testing the functional consequences of rapid centromeric DNA and protein evolution | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 136 | 1K99GM154059-01A1 | RNA and genome regionalization in giant single cells: implications for cellular patterning | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |
| 137 | K99GM154061 | Investigating UPF3 paralog function in Nonsense-Mediated mRNA Decay and Genetic Compensation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o-b)(2), 285t-1(e)(b), and/or 288(a)(4). |

1:25-cv-10787-WGY: APHA v. NIH          Plaintiffs' Supplemental Spreadsheet of Grant Terminations          June 13, 2025

| | | | |
|---|---|---|---|
| 138 | 3R01AI155739-04S1 | Diversity Supplement - Environmental surveillance of albendazole resistance markers in human infective helminths using dual amplicon metabarcoding | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 139 | 1K99GM157463-01 | Building Dendrite Architecture via Microtubule Nucleation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 140 | K99GM157504 | Understanding eukaryotic proteasome assembly regulation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 141 | 1K99GM159354-01A1 | Metabolic regulation of pancreatic metaplasia and neoplasia | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 142 | 5R01HL160326-05 | Stigma and the non-communicable disease syndemic in aging HIV positive and HIV negative MSM | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(m)(2)(B)(ii), 283p, 285l, and/or 289a-2. |
| 143 | 3P01AI165075-01S1 | Broad neutralization of pandemic threat coronaviruses | See REASONS FOR EVERY GRANT. |
| 144 | R01AI169239 | Uptake, safety and effectiveness of COVID-19 Vaccines during Pregnancy | See REASONS FOR EVERY GRANT. |
| 145 | 5K99HL169908-02 | Examining the Role of Structural Factors in Racial and Ethnic Disparities in Cardiovascular Disease | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285l, 285l-1(a)(b), 288(a)(4), and/or 289a-2. |
| 146 | 5K99AI173544-02 | Improving phage-based medicine with immunoengineering | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 147 | 1K99HL173668-01 | Resistance Exercise in the Prevention and Treatment of Heart Failure with Preserved Ejection Fraction (HFpEF) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 148 | 1K99AI182451-01 | Molecular understanding of maternal humoral responses to pregnancy | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 149 | R01CA237670 | Project RESIST: Increasing Resistance to Tobacco Marketing Among Young Adult Sexual Minority Women Using the Inoculation Message Approaches | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(m)(2)(B)(ii), 283p, 285l, and/or 289a-2. |
| 150 | 1U54CA267730-01 | Fostering Institutional Resources for Science Transformation: The FLORIDA-FIRST Health-science Brigade | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 151 | 5U54CA267776-04 | NIH FIRST Cohort Cluster Hiring Initiative at Icahn School of Medicine at Mount Sinai | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 152 | 1UC2CA293786 | ComPASS Health Equity Research Hub at Yale | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(m)(2)(B)(ii), 283p, 285l, and/or 289a-2. |
| 153 | U54MD007598 | Accelerating Excellence in Translational Science (AXIS) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c (b)(2), 285l-1(a)(b), and/or 288(a)(4). |
| 154 | 5T37MD000636-10 | Transdisciplinary Health Disparities Research Training for Native Hawaiians and Pacific Students | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285l, 285l-1(a)(b), 288(a)(4), and/or 289a-2. |
| 155 | 5D43TW012274-03 | Integrated Networks of Scholars in Global Health Research Training (INSIGHT) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(m)(2)(B)(ii), 283p, 285l, and/or 289a-2. |
| 156 | 1R01HG013145-01 | Trans/Forming Genomics: Guidance for Research Involving Transgender and Gender Diverse People | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(m)(2)(B)(ii), 283p, 285l, and/or 289a-2. |
| 157 | 5R01MD013495-05 | Health disparities, stress pathways, and stress-related comorbidities among MSM living with HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(m)(2)(B)(ii), 283p, 285l, and/or 289a-2. |
| 158 | 5R01MD016864-03 | K-VAC: Kentucky Vaccinating Appalachian Communities | See REASONS FOR EVERY GRANT. |
| 159 | R01MD016880-03 | Increasing COVID-19 vaccine uptake among Latinos through a targeted clinical and community-behavioral intervention | See REASONS FOR EVERY GRANT. |
| 160 | 4R00MD016964-03 | Comprehensive computational analysis of genetic and regulatory differences between individuals with African and European ancestries across four brain regions | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285l-1(a)(b), 288(a)(4), and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 161 | P50MD017349 | Chicago Chronic Condition Equity Network | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 162 | 5R01MD017364-03 | REDES: a peer network and mobile health (mHealth) enhanced CHW model to maximize COVID-19 vaccination among low income Latinos | See REASONS FOR EVERY GRANT. |
| 163 | 1K99MD018451-01A1 | Advancing Indigenous Cancer Health Equity through a Community-Centered Framework | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, 281a(b), 288(a)(4), and/or 289a-2. |
| 164 | R01MD018459 | Elucidating the high and heterogeneous risk of gestational diabetes among Asian Americans: an integrative approach of metabolomics, lifestyles, and social determinants | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 165 | R01MD018523 | A Multilevel, Multiphase Optimization Strategy for PrEP: Patients and Providers in Primary Care | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 166 | 5R01MD018679-02 | Understanding the Role of Structural Oppression for Suicide Risk among Black Sexual and Gender Minority Adolescents and Young Adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 167 | 5K99MD019060 | A Digital Health Intervention to Increase Condom Use Among Adolescent Sexual Minority Males | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, 285t-1a(b), 288(a)(4), and/or 289a-2. |
| 168 | 1K99MD019292-01 | A Multilevel Social Capital Approach to Address Cervical Cancer Screening and Follow Up Delays among Latinas in Safety-Net Settings | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, 285t-1a(b), 288(a)(4), and/or 289a-2. |
| 169 | R21MD019345-01A1 | Ecological momentary assessment of daily minority stressors and cannabis and tobacco co-use among sexual minority adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 170 | 1P50MD019475-01 | The Institute for Health Equity Research Catalyst Center | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, 281a(b), 288(a)(4), and/or 289a-2. |
| 171 | 1R21MD019829-01 | The Roles of Parental Mental Health and Help-Seeking: Utilizing a Family Systems Approach to Upstream Suicide Prevention for Sexual Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 172 | 1F31HD019996-01 | Advancing Perinatal Health Equity through a Community-engaged Model of Healthcare Services | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o(-b)(2), 283p, 285t, 285t-1a(b), 288(a)(4), and/or 289a-2. |
| 173 | 1F31MD020261-01 | Understanding the Macrosocial Drivers of Cardiovascular Health in the Rural South | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o(-b)(2), 283p, 285t, 285t-1a(b), 288(a)(4), and/or 289a-2. |
| 174 | 5R01NR020309-04 | Harnessing the power of technology to develop a population-based HIV prevention program for trans girls | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 175 | 5K99DC020570-02/4R00DC020570-03 | Identifying neural circuits that support effortful listening | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o(-b)(2), 285t-1a(b), and/or 288(a)(4). |
| 176 | 5R01NR020846-02 | #TranscendentHealth - Adapting an LGB+ inclusive teen pregnancy prevention program for transgender boys | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 177 | 1U24NR021014-02 | Advancing Health Equity Through Innovative Community Capacity Building, Data Science & Delivering Community-Centered Structural Interventions & Outcomes: Drexel's ComPASS Coordinating Center (C3) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 178 | OT2OD025276 | PRIDEnet for the All of Us Research Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 179 | 5R01AA029044-04 | Intersectional Approaches to Population-Level Health Research: Role of HIV Risk and Mental Health in Alcohol Use Disparities among Diverse Sexual Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 180 | 5R01AA029088-03 | A unified protocol to address sexual minority women's minority stress, mental health and hazardous drinking | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 181 | 4R00AA030601-03 | Stigma, Romantic Relationships, and Alcohol Use Among Transgender and Nonbinary Young Adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o(-b)(2), 283p, 285t, 285t-1a(b), 288(a)(4), and/or 289a-2. |
| 182 | 5F31AA030722-02 | Examining differential effects of state equality-promoting policies on harmful alcohol use among sexual and gender minority adults in the U.S.: an econometrics approach for causal inference | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o(-b)(2), 283p, 285t, 285t-1a(b), 288(a)(4), and/or 289a-2. |
| 183 | 1F31AA031420-01A1 | Examining Proximal Associations between Minority Stress, PTSD Symptoms, and Alcohol Use among Bi+ College Students with Trauma Histories | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o(-b)(2), 283p, 285t, 285t-1a(b), 288(a)(4), and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                                   Plaintiffs' Supplemental Spreadsheet of Grant Terminations                                   June 13, 2025

| # | Grant Number | Title | Reasons |
|---|---|---|---|
| 184 | 5R01ES034303-03 | Research Employing Environmental Systems and Occupational Health Policy Analyses to Interrupt the Impact of Structural Racism on Agricultural Workers and Their Respiratory Health (RESPIRAR) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 185 | OT2OD035659-01 | Macro-level Health Considerations of Community and Criminal Justice System Relationships in North Texas | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 186 | 1K99EB036553-01 | AN ADAPTIVE FRAMEWORK TO SYNTHESIZE AND RECONFIGURE BACTERIAL VIRUSES (PHAGES) TO COUNTER ANTIBIOTIC RESISTANCE | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283c(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 187 | 5U01DA036939-10 | Multilevel Influences on HIV and Substance Use in a YMSM cohort | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 188 | 3P2CHD041023-24S1 | "Minnesota Population Center" (Note: this is a Diversity Supplement of the Parent Grant) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(h), 282(m)(2)(B)(iii), 283c(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 189 | 3P30AI050409-26S1 | Center for AIDS Research at Emory University | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 190 | R01DA052016 | Substance use and DNA methylation at the intersection of sex and gender | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 191 | R03DA052651 | Improving Sexual Minority Health: Differences in Substance Use, Substance Use Treatment, and Associated Chronic Diseases among Rural versus Urban Populations | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 192 | 3R01DA055673-03S1 | Supplement entitled, "Exploring the accessibility, acceptability, and utilization of a community-based harm reduction vending machine among persons with limited opportunity structures." | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(h), 282(m)(2)(B)(iii), 283c(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 193 | R01DA056235 | Structural Influences on Methamphetamine Use among Black Gay and Bisexual Men in Atlanta | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 194 | 5R01DA056287-02 | Comparative- and cost-effectiveness research determining the optimal intervention for advancing transgender women living with HIV to full viral suppression | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 195 | 5R01DA056888-03 | Optimizing PrEP Implementation and Cost-effectiveness among Sexual and Gender Minority Individuals with a Substance Use Disorder | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 196 | 5R01DA058642-02 | Testing a multistage model of risk factors for cannabis use utilizing a measurement burst design among sexual minority women, sexual minority gender diverse individuals, and heterosexual women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 197 | 5R01MD012793-05 | Advancing novel methods to measure and analyze multiple types of discrimination for population health research | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 198 | 3R01MD015165-04S1 | Multilevel Physical Activity Intervention for Low Income Public Housing Residents | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(h), 282(m)(2)(B)(iii), 283c(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 199 | 5T32MH020004 | Research Training in Late-Life NeuroPsychiatric Disorders | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 200 | 1R01NR020563-01 | Ending the HIV Epidemic with Equity: An All-facility Intervention to Reduce Structural Racism and Discrimination and its Impact on Patient and Healthcare Staff Wellbeing | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 201 | R01NR021098 | Evaluating the Implementation and De-implementation of Pandemic Era SNAP Expansion Policies on Diet and Health: A Mixed Methods Project | See REASONS FOR EVERY GRANT. |
| 202 | 1F31NR021239-01 | Personal Healthcare Networks of Transgender and Gender-Diverse Adults After Gender-Affirming Surgery | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 203 | R00AA028049 | A mixed-methods approach to understanding stress and hazardous drinking among same-sex female couples | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |
| 204 | T32DA031099-13 | Substance Abuse Epidemiology Training Program (SAETP) at Columbia University | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 205 | 1K01DE033040-01A1 | Developmental mechanisms in the formation and function of sensory-motor circuits responsible for suckling and mastication. | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283c(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 206 | U01OD033248 | TransHealthGUIDE: Transforming Health for Gender-Diverse Youth Using Interventions to Drive Equity | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(D)(i), 282(m)(2)(B)(i), 283p, 285t, and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 207 | 3OT2OD035592 | Proyecto Juntos | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 208 | 5UM1AI068619-19 | Integrating HIV Prevention, Gender-Affirmative Medical Care, and Peer Health Navigation for Transgender Women in the Americas: A Vanguard Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 209 | 3R01AG075734 | Training the Long-Term Services and Supports Dementia Care Workforce in Provision of Care to Sexual and Gender Minority Residents | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 210 | 5UM2HD111076-03 | Operations and Collaborations Center - Adolescent Medicine Trials Network for HIV/AIDS Interventions (ATN) Operations and Collaborations Center (UM2 Clinical Trial Optional) | See REASONS FOR EVERY GRANT. |
| 211 | 1K23HD112599-01A1 | Caregiver decision making for seasonal respiratory vaccines for children | See REASONS FOR EVERY GRANT. |
| 212 | 1R21HD116080-01 | Confidentiality in use of health insurance coverage for reproductive health services | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 213 | R01MH130007 | Understanding the Interplay between Parent and Child Contributions in Parent-Child Anxiety Transmission | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 214 | 5K99MH133994-02 | Computational and neurodevelopmental mechanisms of memory-guided decision-making | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 215 | 1R36MH135609-01 | An intersectional approach to transgender and/or nonbinary college student mental health: The role of gender identity, race/ethnicity, socioeconomic status, and campus policy | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 216 | 5K99NS135649-02 | Computational Methods for Precise Holographic Control and Mapping of Neural Circuits | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 217 | 5K99GM144750-02 | Dynamic mechanisms of transcriptional coactivator function in Notch signaling | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 218 | 5K99GM148723-02 | Stress tolerant annual killifish: a new model for the cellular stress response | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 219 | 1R15GM152943-01 | "Mathematical Modeling and Scientific Computing for Infectious Disease Research." | See REASONS FOR EVERY GRANT. |
| 220 | 5K99GM153720-02 | Dissecting the synaptic and circuit mechanisms underlying olfactory-driven social behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 221 | 1K99GM154060-01 | TULP3 integrates essential ciliary functions | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 222 | 1K99GM157508-01 | Unraveling the role of molecular capacitors that obscure cryptic genetic variation in Astyanax mexicanus during the evolution of eye loss | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 223 | 5K99HL166700-02 | Investigating relationships between naturalistic light exposure and sleep | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 224 | 5P01AI168148-02 | Leptospiral-Phagocyte Dynamics in Leptospirosis | See REASONS FOR EVERY GRANT. |
| 225 | 1U19AI171401-01 | Metropolitan AntiViral Drug Accelerator | See REASONS FOR EVERY GRANT. |
| 226 | R01CA251478 | Local Flavor Policies to enhance equity in tobacco | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 227 | R34CA283483-02 | Multi-level school-based intervention to improve HPV vaccine uptake and completion in South Africa | See REASONS FOR EVERY GRANT. |
| 228 | 5K99MD018629-02 | Racism-related stress and birth outcomes among Latinas: New tools for maximizing conceptual and methodological validity | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 229 | 5K01AG056669-05 | The Epidemiology of Alzheimer's Disease and Related Dementias in Sexual and Gender Minority Older Adults: Identifying Risk and Protective Factors | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH | Plaintiffs' Supplemental Spreadsheet of Grant Terminations | June 13, 2025

| | | | |
|---|---|---|---|
| 230 | 5R24AG066599-03 | Building Community and Research Engagement among Sexual and Gender Minority Older Adults at Risk for Alzheimer's Disease and Related Dementias | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 231 | 5R01AG083177-02 | Enhancing Measurement and Characterization of Roles and Experiences of Sexual and Gender Minority Caregivers of Persons living with Alzheimer's Disease and Related Dementias | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 232 | 2T32GM135742-06 | UCSC IMSD | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 233 | 5R01HD018250-03 | Assessing Cervical Cancer Healthcare Inequities in Diverse Populations: The ACHIEVE Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 234 | 5R01CA274564-03 | Impact of Allostatic Load and Neighborhood Contextual Factors on Breast Cancer in the Women's Health Initiative | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 235 | T32GM141882 | Genetic Approaches to Development and Disease | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 236 | U01AI156875-04 | Digital, Limited Interaction Efficacy Trial of LifeSkills Mobile to Reduce HIV Incidence in Young Transgender Women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 237 | 5R01MH134051-02 | A Strengths-Based, Intersectional Approach to Suicide Prevention Among Black Sexual and Gender Minority Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 238 | 1R01HL169503-01A1 | Geographically-Explicit Ecological Momentary Assessment Protocol to Assess the Linkages Between Intersectional Discrimination and CVD Risk Among Sexual and Gender Minorities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 239 | 1OT2OD037655-01 | Building a Diverse Network to Support and Build Pathways for Historically Underrepresented Students in Quantitative-Focused Research Areas Within the All of Us Research Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 240 | 1K99NS133031-01A1 | A comparative approach to uncovering the cellular and circuit basis of the role of the corticospinal tract in motor skill | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 241 | 1K99EY034700-01 | Processing of visual information by spatial memory circuits in the avian brain | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 242 | 5R01MH131475-02 | Intervention to Enhance PrEP Persistence Among African-American Men Who Have Sex with Men | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 243 | 5R21MD019388 | Integrated Network Analysis of RADxUP Data to Increase COVID-19 Testing and Vaccination Among Persons Involved with Criminal Legal Systems (PCLS) | See REASONS FOR EVERY GRANT. |
| 244 | 1RF1MH132348-01 | Improving Mental Health Among the LGBTQ+ Community Impacted by the COVID-19 Pandemic | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 245 | 5T32MH013043-53 | Research Training Program in Psychiatric Epidemiology | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 246 | 5T32AI148099-04 | Training in Translational Immunology Research | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 247 | 1K01DA057880-01A1 | Stigma, drug use, and HIV vulnerability among Hispanic and Latino sexual minority men | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 248 | K24DA057874 | Mentoring the next generation of substance use, HIV, and epigenetic researchers in sexual and gender minority health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 249 | 5K00NS115338-05 | Circuit reconstruction of functionally-identified neurons in deep brain regions: application to grid cells | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 250 | R01MH138297-01 | The SUSTAIN 2 study - SUStained HIV treatment for adherence after interruption in care | See REASONS FOR EVERY GRANT. |
| 251 | 5R01MH130277-05 | Transgender-Specific Differentiated HIV Care: An Implementation Science Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 252 | 5R01MD016755-05 | Creating Access to Resources and Economic Support (CARES) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 253 | 5R01MH133260-02 | Integration of a collaborative care model for mental health services into HIV care for pregnant and postpartum women in Kenya (the Tunawiri Study) | See REASONS FOR EVERY GRANT. |
| 254 | 4R00AI166094-03 | Stress-induced transposon mobilization in the human fungal pathogen Cryptococcus | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 255 | 5R01NR021019-03 | Enhancing Structural Competency in School-Based Health Centers to Address LGBTQ+ Adolescent Health Equity | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 256 | T32DC000038 | Training for Speech and Hearing Sciences | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 257 | OT2OD035645-01 | Humanitarian Health Care Network: Bringing the Most Vulnerable to Care | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 258 | 1R21AI183807-01A1 | Applying a Behavioral Economic Approach on PrEP and Hormone Options among Transgender Women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 259 | 5P30CA015704-49 | Cancer Center Support Grant | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 260 | R25LM014575 | Advancing Gender and Health Justice Research and Education | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 261 | OT2OD035877-01 | Achieving Optimal Sexual and Reproductive Health (SRWH Project) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 262 | 4R00HL157611-03 | Toward Accurate Cardiovascular Disease Prediction in Hispanic/Latinos: Modeling Risk and Resilience Factors | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 263 | 1OT2OD035935-01 | Leveraging a community-driven approach to address the impact of social determinants of health on structural inequities among Miami-Dade County's intergenerational LGBTQ+ Community | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 264 | 5K00MH132569-06 | Developing multimodal biomarkers of cognitive ability in a genetic model of neurodevelopment | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 265 | 5K01MD019325-02 | Enlace Familiar: Combating Mental Health Stigma, Improving Mental Health Literacy, Supporting Mental Health Discussions at Home, and Access to care among Latinx Adolescents from Mixed Status Families | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 266 | 5F31EY035165-02 | Linking endoplasmic reticulum calcium handling to neuronal function in vivo in the Drosophila visual system | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 267 | 5R01MH123282-05 | NEXUS: A novel social network approach to study the effects of intersectional stigma on HIV prevention among Latino MSM | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 268 | 1K99MH135212-01A1 | Mapping Neural Dynamics in Hormone-sensitive Networks | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 269 | T32GM135751 | IMSD at the University of Massachusetts Chan Medical School | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 270 | 1K99HG013676-01 | Using the continuum of genetic causality to investigate trans regulatory mechanisms | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 271 | K99EY036650 | Delineating the neural computational network for object recognition | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 272 | 5K99DA059613 | Decoding Neuropeptide S Modulation of OFC-mediated Reward Seeking | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 273 | D43TW011324 | Malaysian Implementation Science Training (MIST) Program in HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 274 | 5R01TW012674-02 | Reducing Stigma in People Who Inject Drugs with HIV Using a Rapid Start Antiretroviral Therapy Intervention | See REASONS FOR EVERY GRANT. |
| 275 | K99MD018671 | Delineating the Role of the Homocysteine-Folate-Thymidylate Synthase Axis and Uracil Accumulation in African American Prostate Tumors | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |

1:25-cv-10787-WGY: APHA v. NIH — Plaintiffs' Supplemental Spreadsheet of Grant Terminations — June 13, 2025

| # | Grant Number | Title | Reasons |
|---|---|---|---|
| 276 | T32GM148391-02 | IMSD at Emory University | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 277 | 5T34GM149511-02 | MARC at Emory University | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 278 | 1R25A175048-01A1 | Infectious Diseases Summer Program Integrating Research at Emory (INSPIRE) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 279 | 5K12GM000680 | IRACDA Fellowships in Research and Science Training (FIRST) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 280 | 1R01MH135498-01A1 | Using digital photovoice to explore the relationships between social media content and suicidality among transgender adolescents | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 281 | 1R34MH129782 | CA-LINC: A Culturally Adapted Care Coordination Suicide Detection and Intervention Model for Black Youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 282 | K99/R00DC021581 | Neural circuitry and population dynamics for perception of social vocalizations in the auditory pathway | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 283 | R01TW012392 | Buddhism and HIV Stigma in Thailand: An Intervention Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 284 | R01TW012392-03S1 | Buddhism and HIV Stigma in Thailand: An Intervention Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 285 | 3R37MH119194-05S1 | Neurodevelopmental Mechanisms Underlying Stress Vulnerability during Adolescence | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283a-(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 286 | 1R01HD112464-01A1 | Health and economic consequences of changing federal and state policies on reproductive health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 287 | 5R25GM142065-04 | Project SCORE (Student-Centered Outcomes Research Experience) | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 288 | 1R01DK135838-01 | The Role of Structural Racism on Disparities in Clinical Outcomes for Diabetes: A Mixed Methods Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 289 | 1R36MH134774-01A1 | The Effects of Structural Inequities and Syndemics on Willingness to Participate in HIV Research among Black Women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 290 | 5T34GM145511 | U-RISE @ UC Merced | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 291 | 5U54HG013243-02 | Administrative Core: Pacific Center for Genomic Research - Centers in Genomic Research | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 292 | 3U24MD016258-03S2/5U24MD016258-03 | RADx-UP CDCC | See REASONS FOR EVERY GRANT. |
| 293 | 3T34GM141986-03S1 | One Health Research Training for Health Disparities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 294 | F31AG087648-01 | Network drivers of regional vulnerability to early Alzheimer's disease pathology | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 295 | 1F31HD113328-01A1 | Mapping the cellular impacts of Chd8 haploinsufficiency and characterizing microglial activity in Chd8 mutant mice | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 296 | 1K99AG088361-01 | Patterns and Mechanisms Underlying Somatic Mutations Across Long-Lived Bats | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(iii), 283a-(b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 297 | 5K99EY035758-02 | Understanding how mitochondrial interaction with other organelles in the retinal pigment epithelium (RPE) affect its function in the outer retina | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 298 | 3R01GM141329-04S1 | Investigating the metal-dependent function, allostery and inhibition of CRISPR-Cas9 | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-(b)(2), 285t-1(a)(b), and/or 288(a)(4). |

1:25-cv-10787-WGY: APHA v. NIH | Plaintiffs' Supplemental Spreadsheet of Grant Terminations | June 13, 2025

| # | Grant ID | Title | Reasons |
|---|---|---|---|
| 299 | 5F31MD018931-02 | Hardship and Survival: The Impact of Migration-Related Trauma, Communal Coping, and Social Stressors on the Suicide and Mental Health Outcomes of Latina Immigrant Women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283a-1(a)(b), 288(a)(4), and/or 289a-2. |
| 300 | 1F31DA059262-01A1 | Exploration of the unique neurobehavioral profile of sequential opioid-stimulant polysubstance use disorders | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 283a-1(a)(b), 288(a)(4), and/or 289a-2. |
| 301 | F31NR021235-01 | Examining Health Disparities in the use of Hematopoietic Cell Transplants for HIV- related Lymphoma | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283a-1(a)(b), 288(a)(4), and/or 289a-2. |
| 302 | 5T32DK007647 | Graduate Training in Nutrition | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 303 | 1R36DA061635-01 | Dissecting the role of loneliness on substance use- and HIV-related outcomes among sexual minority men in the United States and Canada | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 304 | T32HD049339-16 | GSH Training Grant | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283a-1(a)(b), 288(a)(4), and/or 289a-2. |
| 305 | T34GM136450 | U-RISE Training the Next Generation of Basic Biomedical Researchers a Holistic Approach | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 306 | T32MH128395 | Social Determinants of HIV | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 307 | 5F31HL166956-02 | Mechanisms Underpinning Afterload-Induced Atrial Fibrillation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283a-1(a)(b), 288(a)(4), and/or 289a-2. |
| 308 | R21MH135489-02 | Leveraging Latinx Adolescents, Photovoice, and Longitudinal Data to Disentangle the Bidirectional Effects of Social Media and Mental Health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 309 | T32GM145440 | Medical Scientist Training Program | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 310 | F99NS134207 | Neurocomputational Mechanisms of Affective Semantic Memory Development | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283a-1(a)(b), 288(a)(4), and/or 289a-2. |
| 311 | 1F31HL178310-01 | Investigating cellular adaptation to one-carbon metabolism perturbation | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), 288a-1(a)(b), and/or 288(a)(4). |
| 312 | 3R01GM072551-19S1 | Synaptonemal complex assembly and function in meiosis | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 313 | 1F31DC022153-01 | Leveraging human intracranial recordings to quantitatively characterize basal ganglia output during speech | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 314 | 1F31EY036742-01 | Transcriptional and Developmental Basis of the Human X-linked Homeotic Hotspot | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283a-1(a)(b), 288(a)(4), and/or 289a-2. |
| 315 | 5T32MH096679-12 | Research Training in Biobehavioral Disturbances of Eating Disorders | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 316 | R01MD016417 | Contextual Determinants of Sexual Minority Health in the United States | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 317 | 1R01CA276594-01 | Randomized Controlled Trial of Dyadic Financial Incentive Treatment for Dual Smoker Couples: Evaluation of Efficacy, Mechanisms, and Cost Effectiveness | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 318 | 1F31CA281083-01A1 | Understanding and Exploiting Apoptotic Dysregulation in Ovarian Cancer | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |
| 319 | K23MH137389-01 | ALIVE: Development and feasibility of a psychosocial intervention for sexual and gender minority autistic adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 320 | 5R25GM142044-03 | Frugal Science Academy: Training K-12 innovators and democratizing synthetic biology tools | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(ii), 282(h), 282(m)(2)(B)(ii), 283p, 285t, 288(a)(4), and/or 289a-2. |
| 321 | K99ES035895 | Spatiotemporal effects and associations between deforestation and alcohol and tobacco use in Indonesia | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283a-1(a)(b), and/or 288(a)(4). |

APHA App. 1100

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 322 | L60AA031839 | A mixed-methods approach to understanding depression, suicide risks, and alcohol and other drug use among same-sex female couples | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 323 | UH3AI169655-03 | Multilevel strategies to understand and modify the role of structural and environmental context on HIV inequities for sexual and gender minorities of color | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 324 | R01DA056264-03 | Measuring the impact of structural racism and discrimination during adolescence on substance use, psychological distress | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 325 | R01NR019512-03 | Harnessing the power of peer navigation and mHealth to reduce health disparities in Appalachia | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 326 | R37AG076057 | How spouses influence each other's health in same-and different-sex marriages: A longitudinal and dyadic assessment from mid to later life | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 327 | T32GM141862 | G-RISE at UC Merced | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 328 | 5K99ES034819-02 | Impact of Biomass Burning Aerosol and Humic-like Substances on Iron Homeostasis and Atherosclerosis | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 329 | T32MH018870 | Training in Schizophrenia and Psychotic Disorders: From Animal Models to Patients | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 330 | 1F31MD019985-01 | Characterizing Economic Determinants of Violence and Safety Disparities Among Sexual and Gender Diverse Populations | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 331 | 5K99EY034700 | Processing of visual information by spatial memory circuits in the avian brain | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 332 | 5R00CA260718-04 | Testing the effect of anti-tobacco message framing on polytobacco use in lesbian, gay, bisexual, and transgender young adult adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 333 | 1R01CA284032 | Evaluating Centralizing Interventions to Address Low Adherence to Lung Cancer Screening Follow-up in Decentralized Settings | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 334 | 5R25GM142087-04 | Engineering Solutions for Better Health: Genetic Technology and Biomedical Engineering for Secondary Classrooms | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 335 | 1R25GM154387-01 | The Biology of Climate Change: Impacts on Human Health and the Science of Solutions | See REASONS FOR EVERY GRANT. |
| 336 | T34GM149493 | U-Rise at Cal State Fullerton | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 337 | 5K99NS129759-02 | Investigating Descending Control of Walking | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 338 | R21MH133755-01 | The TAIL-PrEP Study: Acceptability and Feasibility of a Tailored Adherence Intervention for safe discontinuation of Long-acting PrEP | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 339 | 5U54CA132381-16 | Partnership for the Advancement of Cancer Research: NMSU & Fred Hutch | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 340 | 5T32GM138075-04 | Bridges to the Doctorate Research Training Program at California State University Long Beach | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 341 | T32ES007142 | Graduate Training in Biostatistics | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(b), 282(m)(2)(B)(iii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 342 | 4R00DA055508-03 | A Gender-Affirming Stigma Intervention to Improve Substance Misuse and HIV Risk among Transgender Women | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(iii), 283p, 285t, and/or 289a-2. |
| 343 | F99NS129176-02 | Mechanistic description of tolerance/withdrawal from opioids in the paraventricular nucleus of the thalamus | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 344 | 1K99DC021727-01 | Neuroplasticity and early cochlear implant use | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |

1:25-cv-10787-WGY: APHA v. NIH                    Plaintiffs' Supplemental Spreadsheet of Grant Terminations                    June 13, 2025

| | | | |
|---|---|---|---|
| 345 | 1F99NS139546-01 | Neuro-Evolutionary Basis of Vertebrate Social Behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 346 | 5F31CA275157 | The Role of the Fructose-1,6-Bisphosphatase 2 and c-Myc Interaction in Sarcoma Progression | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 347 | R00DA056842 | Native Spirit: Culturally-grounded substance use prevention for indigenous adolescents | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 348 | 5R01HD018051-03 | Modeling Resilience as a Multidimensional Protective Factor for Transgender Health Disparities: Measure Development and Longitudinal Evaluation of Resilience | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 349 | 5F31AA030907-02 | Hitting Close to Home: A Multi-Method Investigation of Neighborhood Characteristics and Drinking Motives on Alcohol-Related Health Disparities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 350 | U01NR021576 | Meet Me on the Pitch: Developing and testing a community-based sports and behavioral health intervention for newcomer youth | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 351 | K99/R00K99MH127471 | Distributed neural activity patterns underlying practice-based learning | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 352 | 5K99HD108801-02 | Sex, Physiological State, and Genetic Background Dependent Molecular Characterization of CircuitsGoverning Parental Behavior | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 353 | 5R01AI179873-02 | The basis of Influenza A virus strain-dependent reassortment potential | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 354 | 5T34GM149492-02 | U-RISE at Cal Poly | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 355 | 3R01DK133453-02S1 | Leveraging early-life microbes to prevent type 1 diabetes | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 356 | 5R01CA276500-02 | Smoking and Cancer-Related Health Disparities among Sexual and Gender Minority Adults | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 357 | 3R01HL161049-03S1 | Addressing System-level Barriers to COPD Guideline Concordant Care | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 358 | 1F31GM154412-01 | The Role of Post-Translational Modifications in Bacterial Responses to Methylglyoxal | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 359 | 5R01HG011405-04 | Elucidating the phenome-wide impact of sex and gender on disease | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 360 | R01MD019763-01 | A community driven modeling approach for identifying community & policy-level interventions to address the impact of structural racism and discrimination on adolescent substance use and mental health | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 361 | 5R01AA029989-04 | Long-term and Daily Associations among Intersectional Minority Stress, Structural Oppression, and Alcohol Use and Misuse among Sexual Minority Adolescents of Color | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 362 | 5T32ES007322-23 | Advanced training in environmental health and data science: molecules to populations | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 363 | 1R01DC021839-01 | Family language planning and language acquisition among deaf and hard of hearing children | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(h), 282(m)(2)(B)(ii), 283o (b)(2), 283p, 285t, 285t-1(a)(b), 288(a)(4), and/or 289a-2. |
| 364 | 1P50MH129708-01A1 | UW Practice-based Suicide Prevention Research Center | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(h), 283o (b)(2), 285t-1(a)(b), and/or 288(a)(4). |
| 365 | 3R01DK135638-02 | The Role of Structural Racism on Disparities in Clinical Outcomes for Diabetes: A Mixed Methods Study | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 366 | R25MH067127 | Training for Scientists Conducting Research to Reduce HIV/AIDS Health Disparities | See REASONS FOR EVERY GRANT. In addition, the Directives and terminations are also in excess of statutory authority and contrary to statute—and also violate the separation-of-powers principle of the U.S. Constitution—because of, among other statutes: 42 U.S.C. §§ 282(b)(8)(D)(i), 282(m)(2)(B)(ii), 283p, 285t, and/or 289a-2. |
| 367 | 5R01MH133266-02 | Integration of stepped care for Perinatal Mood and Anxiety Disorders among Women Living with HIV in Kenya | See REASONS FOR EVERY GRANT. |



**Department of Health and Human Services**
National Institutes of Health
NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH
DISPARITIES

**Notice of Award**
FAIN# U24MD017250
**Federal Award Date**
03/23/2025

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF
CALIFORNIA, SAN FRANCISCO, THE
1855 FOLSOM ST STE 425
SAN FRANCISCO, CA 94103

**2. Congressional District of Recipient**
11

**3. Payment System Identifier (ID)**
1946036493A6

**4. Employer Identification Number (EIN)**
946036493

**5. Data Universal Numbering System (DUNS)**
094878337

**6. Recipient's Unique Entity Identifier**
KMH5K9V7S518

**7. Project Director or Principal Investigator**
STUART A GANSKY, DRPH (Contact)
Professor
stuart.gansky@ucsf.edu
415-502-8094

**8. Authorized Official**
Annie Gregory

**Federal Agency Information**

**9. Awarding Agency Contact Information**
Chantell Stevenson-Brown
Grants Management Specialist
NATIONAL INSTITUTE ON MINORITY
HEALTH AND HEALTH DISPARITIES
Chantell.Stevenson-brown@nih.gov
(301) 402-1366

**10. Program Official Contact Information**
Nathaniel Stinson
Director
NATIONAL INSTITUTE ON MINORITY
HEALTH AND HEALTH DISPARITIES
stinsonn@mail.nih.gov
301-594-8704

**Federal Award Information**

**11. Award Number**
5U24MD017250-04

**12. Unique Federal Award Identification Number (FAIN)**
U24MD017250

**13. Statutory Authority**
42 USC 241  31 USC 6305  42 CFR 52

**14. Federal Award Project Title**
Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases (RCC RD-MCD)

**15. Assistance Listing Number**
93.307

**16. Assistance Listing Program Title**
Minority Health and Health Disparities Research

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 07/01/2024 **– End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $4,475,000 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $4,475,000 |
| **26. Project Period Start Date** 09/24/2021 **– End Date** 03/21/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $18,443,323 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Priscilla  Grant

| **30. Remarks** |
|---|

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

APHA App. 1103



Notice of Award
*RESOURCE-RELATED COOPERATIVE AGREEMENT PROJECTS*
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES

---

**SECTION I – AWARD DATA – 5U24MD017250-04 REVISED**


**Principal Investigator(s):**
Edwin Duncan Charlebois, PHD
STUART A GANSKY (contact), DRPH
Kim Felder Rhoads, MD

**Award e-mailed to:** cgrasteam@ucsf.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to The Regents of the UCSF in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  31 USC 6305  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Minority Health And Health Disparities of the National Institutes of Health under Award Number U24MD017250. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,


Priscilla  Grant
Grants Management Officer
NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES

Additional information follows

---

Version: 25 - 2/15/2024 9:18 AM  Generated on 3/25/2025 12:20 AM

APHA App. 1104

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| **Salaries and Wages** | $1,771,736 |
| **Fringe Benefits** | $743,882 |
| **Personnel Costs (Subtotal)** | $2,515,618 |
| **Consultant Services** | $16,600 |
| **Materials & Supplies** | $70,885 |
| **Travel** | $46,000 |
| **Other** | $101,109 |
| **Subawards/Consortium/Contractual Costs** | $50,333 |
| **Publication Costs** | $5,000 |
| | |
| **Federal Direct Costs** | $2,805,545 |
| **Federal F&A Costs** | $1,694,455 |
| **Approved Budget** | $4,500,000 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $4,475,000 |
| **Cumulative Authorized Carryover and Offset for this Budget Period** | $25,000 |
| **TOTAL FEDERAL AWARD AMOUNT** | $4,475,000 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 4 | $4,475,000 | $4,475,000 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1946036493A6 |
| **Document Number:** | UMD017250A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| MD | 8010837 | $4,475,000 |

**NIH Administrative Data:**
**PCC:** CPS10NS / **OC:** 41029 / **Released:** 03/23/2025
**Award Processed:** 03/25/2025 12:20:03 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5U24MD017250-04  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5U24MD017250-04  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

  a.  The grant program legislation and program regulation cited in this Notice of Award.
  b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
  c.  45 CFR Part 75.
  d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
  e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
  f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

Version: 25 - 2/15/2024 9:11:45 Generated on: 3/25/2025 12:20 AM

APHA App. 1105

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is excluded from Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) U24MD017250. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

Version: 25 - 2/15/2024 5:15:22 PM Printed on: 3/25/2025 12:20 AM

APHA App. 1106

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – MD SPECIFIC AWARD CONDITIONS – 5U24MD017250-04  REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**INFORMATION**: It is the policy of NIH not to prioritize research activities that focus on DEI. This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to

expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, this project is terminated. University of California, San Francisco may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

THE FOLLOWING TERMS FROM THE PREVIOUS NOTICE OF AWARD LETTER ISSUED ON 7/8/2024 ALSO APPLY TO THIS AWARD:

**REQUIREMENT** This award is subject to the conditions set forth in RFA-MD-21-008, NIMHD Multiple Chronic Disease Disparities Research Coordinating Center (RCC) (U24 Clinical Trial Not Allowed), NIH Guide to Grants and Contracts, 04/14/2021, which are hereby incorporated by reference as special terms and conditions of this award.

Copies of this RFA may be accessed at the following internet address: https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-20-007.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

**INFORMATION** $25,000 of the unobligated balance has been used to partially pay this award.

**REQUIREMENT** The recipient is required to follow the data sharing plan included in the application and may not implement any changes in the plan without the written prior approval of the NIMHD.

**INFORMATION**  This award reflects the NIMHD's acceptance of the certification that all key personnel have completed education on the protection of human subjects, in accordance with NIH policy, "Required Education in the Protection of Human Research Participants," as announced in the June 5, 2000 NIH Guide (revised August 25, 2000) (http://grants.nih.gov/grants/guide/notice-files/NOT-OD-00-039.html).

Any individual involved in the design and conduct of the study that is not included in the certification must satisfy this requirement prior to participating in the project.  Failure to comply can result in the suspension and/or termination of this award, withholding of support of the continuation award, audit disallowances, and/or other appropriate action.

**REQUIREMENT**  Use of humans and animals in any new activities must be requested prior to the start of the activity and must be approved in writing in advance by the NIMHD.  See NOT-MD-08-002, "Guidance and Clarification on NCMHD Policy on Prior Approval for Subprojects and Pilot Projects Involving Human Subjects or Vertebrate Animals," NIH Guide to Grants and Contracts, April 29, 2008, which is hereby incorporated by reference as special terms and conditions of this award.  See also NOT-OD-15-129, "Prior NIH Approval of Human Subjects Research in Active Awards Initially Submitted without Definitive Plans for Human Subjects Involvement (Delayed Onset Awards): Updated Notice," and NIH-OD-15-128, "Guidance on Changes That Involve Human Subjects in Active Awards and That Will Require Prior NIH Approval: Updated Notice."

Copies of these Notices may be accessed at the following internet address:  http://www.nih.gov/grants/guide/index.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

APHA App. 1108

**REQUIREMENT** Prior approval requests (signed by an Authorized Organizational Representative) must be submitted either online (through eRA's prior approval submission system) or by email to pg38h@nih.gov with a copy to the Grants Management Specialist, as appropriate.

**INFORMATION**    Project Scientist: Dr. Priscah Mujuru, at (301) 594-9765.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5U24MD017250-04 REVISED

**INSTITUTION:** The Regents of the UCSF

| Budget | Year 4 |
|---|---|
| Salaries and Wages | $1,771,736 |
| Fringe Benefits | $743,882 |
| Personnel Costs (Subtotal) | $2,515,618 |
| Consultant Services | $16,600 |
| Materials & Supplies | $70,885 |
| Travel | $46,000 |
| Other | $101,109 |
| Subawards/Consortium/Contractual Costs | $50,333 |
| Publication Costs | $5,000 |
| TOTAL FEDERAL DC | $2,805,545 |
| TOTAL FEDERAL F&A | $1,694,455 |
| TOTAL COST | $4,475,000 |

| Facilities and Administrative Costs | Year 4 |
|---|---|
| F&A Cost Rate 1 | 61.5% |
| F&A Cost Base 1 | $2,755,212 |
| F&A Costs 1 | $1,694,455 |

Version: 25 - 2/15/2024 8:30 AM. Generated on: 3/25/2025 12:20 AM

APHA App. 1109

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Lorsch, Jon (NIH/NIGMS) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Bhattacharya, Jayanta (NIH/OD) [E] |
| **Subject:** | Re: Additional Influencing Public Opinion Grants |
| **Date:** | Friday, May 09, 2025 10:03:01 AM |

Thanks Jon,

Please terminate those grants for being inconsistent with agency priorities.

Matt

--

Matthew J. Memoli, MD, MS

Principal Deputy Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

**From:** Lorsch, Jon (NIH/NIGMS) [E]

**Date:** Friday, May 9, 2025 at 10:01 AM

**To:** Memoli, Matthew (NIH/OD) [E]

**Cc:** Bulls, Michelle G. (NIH/OD) [E]

**Subject:** Additional Influencing Public Opinion Grants

Matt,

As discussed, here are several additional grants that appear to focus on studies aimed at influencing public opinion. Please let us know how you would like to proceed.

Many thanks.

Jon

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Riley, Rachel (OS/ASA); Bulls, Michelle G. (NIH/OD) [E] |
| **Subject:** | Re: Shortlist of SGM for Tonight |
| **Date:** | Tuesday, March 11, 2025 9:49:35 PM |

All of these grants can be terminated for being unaligned with current NIH /HHS priorities.

Matt

Get Outlook for Mac

---

**From:** Riley, Rachel (OS/ASA) <Rachel.Riley@hhs.gov>
**Date:** Tuesday, March 11, 2025 at 9:43 PM
**To:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>, Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Subject:** Shortlist of SGM for Tonight

Dr. Memoli —

Please see a short list below/attached; I have sent you 6 in case you find an issue with any one. If you are comfortable, the wonderful @Bulls, Michelle G. (NIH/OD) [E] will work to action tonight:

I will then get you an updated combined list for tomorrow!

Thanks,
Rachel



**Department of Health and Human Services**
National Institutes of Health
NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH
DISPARITIES

**Notice of Award**
FAIN# R01MD015256
**Federal Award Date**
03/23/2025

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
HARVARD PILGRIM HEALTH CARE INC
1 WELLNESS WAY
CANTON, MA 02021

**2. Congressional District of Recipient**
08

**3. Payment System Identifier (ID)**
1042452600A1

**4. Employer Identification Number (EIN)**
042452600

**5. Data Universal Numbering System (DUNS)**
071721088

**6. Recipient's Unique Entity Identifier**
NZVVQ8GNVX65

**7. Project Director or Principal Investigator**
Brittany Michelle Charlton, DSC
Assistant Professor
bcharlton@mail.harvard.edu
617-466-9262

**8. Authorized Official**
Charlotte Johnson
research_admin@harvardpilgrim.org

**Federal Agency Information**

**9. Awarding Agency Contact Information**
MICHELLE MAE Phillips
Grants Management Specialist
NATIONAL INSTITUTE ON MINORITY
HEALTH AND HEALTH DISPARITIES
michelle.phillips@nih.gov
(301) 402-1366

**10. Program Official Contact Information**
Priscah  Mujuru
Program Officer
NATIONAL INSTITUTE ON MINORITY
HEALTH AND HEALTH DISPARITIES
priscah.mujuru@nih.gov
301-594-9765

**Federal Award Information**

**11. Award Number**
5R01MD015256-05

**12. Unique Federal Award Identification Number (FAIN)**
R01MD015256

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Sexual orientation-related disparities in obstetrical and perinatal health

**15. Assistance Listing Number**
93.307

**16. Assistance Listing Program Title**
Minority Health and Health Disparities Research

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 03/01/2024 **– End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| **23. Total Amount of Federal Funds Obligated this budget period** | $802,428 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $802,428 |
| **26. Project Period Start Date** 05/16/2021 **– End Date** 03/21/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period** | $3,917,674 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Priscilla  Grant

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

APHA App. 1112



Notice of Award

*RESEARCH*
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES

---

**SECTION I – AWARD DATA – 5R01MD015256-05 REVISED**

**Principal Investigator(s):**
Brittany Michelle Charlton, DSC

**Award e-mailed to:** research_admin@hphci.harvard.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to HARVARD PILGRIM HEALTH CARE in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Minority Health And Health Disparities of the National Institutes of Health under Award Number R01MD015256. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Priscilla  Grant
Grants Management Officer
NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

Version: 20 - 2/15/2024 9:11 PM. Generated on: 3/25/2025 12:07 AM

APHA App. 1113

| | |
|---|---|
| Salaries and Wages | $246,010 |
| Fringe Benefits | $68,883 |
| Personnel Costs (Subtotal) | $314,893 |
| Travel | $6,729 |
| Subawards/Consortium/Contractual Costs | $260,235 |
| Publication Costs | $5,000 |
| | |
| Federal Direct Costs | $586,857 |
| Federal F&A Costs | $215,571 |
| Approved Budget | $802,428 |
| Total Amount of Federal Funds Authorized (Federal Share) | $802,428 |
| TOTAL FEDERAL AWARD AMOUNT | $802,428 |
| | |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 5 | $802,428 | $802,428 |

Fiscal Information:
Payment System Identifier:     1042452600A1
Document Number:              RMD015256B
PMS Account Type:             P (Subaccount)
Fiscal Year:                  2024

| IC | CAN | 2024 |
|---|---|---|
| MD | 8472687 | $802,428 |

NIH Administrative Data:
PCC: CPS01PM / OC: 41025 / Released: 03/23/2025
Award Processed: 03/25/2025 12:07:27 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R01MD015256-05  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R01MD015256-05  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a.  The grant program legislation and program regulation cited in this Notice of Award.
   b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
   c.  45 CFR Part 75.
   d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
   e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
   f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2**.** As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-

research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01MD015256. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Version: 25 - 2/15/2024 9:19:01; Generated on: 3/25/2025 10:07 AM

APHA App. 1115

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

· Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
· For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
· HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
· For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – MD SPECIFIC AWARD CONDITIONS – 5R01MD015256-05 REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**INFORMATION**: It is the policy of NIH not to prioritize research activities that focus on DEI. This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, this project is terminated. Harvard Pilgrim Health Care, Inc may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

THE FOLLOWING TERMS FROM THE PREVIOUS NOTICE OF AWARD LETTER ISSUED ON 2/19/2025 ALSO APPLY TO THIS AWARD:

**INFORMATION**: This revised award's end date has been adjusted to 4/30/25 due to the large unobligated balance.

**THE FOLLOWING TERMS FROM THE PREVIOUS NOTICE OF AWARD LETTER ISSUED ON 05/30/2024 ALSO APPLY TO THIS AWARD:**

**INFORMATION**: This revised award has been issued in accordance with NIMHD's Fiscal Year 2024 funding policy for non-competing awards.

**THE FOLLOWING TERMS FROM THE PREVIOUS NOTICE OF AWARD LETTER ISSUED ON 02/03/2024 ALSO APPLY TO THIS AWARD:**

**REQUIREMENT**: This award is subject to the conditions set forth in PA-20-185, NIH Research Project Grant (Parent R01 Clinical Trial Not Allowed), NIH Guide to Grants and Contracts, 05/05/20, which is hereby incorporated by reference as special terms and conditions of this award.

Copies of this RFA may be accessed at the following internet address:
http://www.nih.gov/grants/guide/index.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

**REQUIREMENT**: The recipient is required to follow the data sharing plan included in the application and may not implement any changes in the plan without the written prior approval of the NIMHD.

**INFORMATION**: This award reflects the NIMHD's acceptance of the certification that all key personnel have completed education on the protection of human subjects, in accordance with NIH policy, "Required Education in the Protection of Human Research Participants," as announced in the June 5, 2000 NIH Guide (revised August 25, 2000) (http://grants.nih.gov/grants/guide/notice-files/NOT-OD-00-039.html).

Any individual involved in the design and conduct of the study that is not included in the certification must satisfy this requirement prior to participating in the project.  Failure to comply can result in the suspension and/or termination of this award, withholding of support of the continuation award, audit disallowances, and/or other appropriate action.

**REQUIREMENT**: Use of humans and animals in any new activities must be requested prior to the start of the activity and must be approved in writing in advance by the NIMHD.  See NOT-MD-08-002, "Guidance and Clarification on NCMHD Policy on Prior Approval for Subprojects and Pilot Projects Involving Human Subjects or Vertebrate Animals," NIH Guide to Grants and Contracts, April 29, 2008, which is hereby incorporated by reference as special terms and conditions of this award.  See also NOT-OD-15-129, "Prior NIH Approval of Human Subjects Research in Active Awards Initially Submitted without Definitive Plans for Human Subjects Involvement (Delayed Onset Awards): Updated Notice," and NIH-OD-15-128, "Guidance on Changes That Involve Human Subjects in Active Awards and That Will Require Prior NIH Approval: Updated Notice."

Copies of these Notices may be accessed at the following internet address:  http://www.nih.gov/grants/guide/index.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

Version 25 - 2/19/2025 9:16 PM. Generated on 3/25/2025 12:07 AM

APHA App. 1117

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R01MD015256-05 REVISED

**INSTITUTION:** HARVARD PILGRIM HEALTH CARE

| Budget | Year 5 |
|---|---|
| Salaries and Wages | $246,010 |
| Fringe Benefits | $68,883 |
| Personnel Costs (Subtotal) | $314,893 |
| Travel | $6,729 |
| Subawards/Consortium/Contractual Costs | $260,235 |
| Publication Costs | $5,000 |
| TOTAL FEDERAL DC | $586,857 |
| TOTAL FEDERAL F&A | $215,571 |
| TOTAL COST | $802,428 |

| Facilities and Administrative Costs | Year 5 |
|---|---|
| F&A Cost Rate 1 | 66% |
| F&A Cost Base 1 | $326,622 |
| F&A Costs 1 | $215,571 |

Version: 25 - 2/15/2024 9:57 AM; Generated on: 3/25/2025 12:07 AM

APHA App. 1118



**Department of Health and Human Services**
National Institutes of Health
NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

**Notice of Award**
FAIN# U19AI171110
**Federal Award Date**
04/07/2025

---

**Recipient Information**

**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF
CALIFORNIA, SAN FRANCISCO, THE
1855 FOLSOM ST STE 425
SAN FRANCISCO, CA 94103

**2. Congressional District of Recipient**
11

**3. Payment System Identifier (ID)**
1946036493A6

**4. Employer Identification Number (EIN)**
946036493

**5. Data Universal Numbering System (DUNS)**
094878337

**6. Recipient's Unique Entity Identifier**
KMH5K9V7S518

**7. Project Director or Principal Investigator**
Nevan J Krogan, PHD
Professor
nevan.krogan@ucsf.edu
415-476-2980

**8. Authorized Official**
Gavin Rynne
gavin.rynne@ucsf.edu
415-502-1846

---

**Federal Agency Information**

**9. Awarding Agency Contact Information**
KATHERINE ANNE Matheson

NATIONAL INSTITUTE OF ALLERGY AND
INFECTIOUS DISEASES
katherine.matheson@nih.gov
301-594-4218

**10. Program Official Contact Information**
DIPANWITA  Basu
Program Officer
NATIONAL INSTITUTE OF ALLERGY AND
INFECTIOUS DISEASES
dipanwita.basu@nih.gov
(240) 627-3469

---

**Federal Award Information**

**11. Award Number**
1U19AI171110-01

**12. Unique Federal Award Identification Number (FAIN)**
U19AI171110

**13. Statutory Authority**
42 USC 241 31 USC 6305  42 CFR 52

**14. Federal Award Project Title**
QCRG Pandemic Response Program

**15. Assistance Listing Number**
93.855

**16. Assistance Listing Program Title**
Allergy and Infectious Diseases Research

**17. Award Action Type**
New Competing (REVISED)

**18. Is the Award R&D?**
Yes

---

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 05/16/2022 **– End Date** 04/30/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| **23. Total Amount of Federal Funds Obligated this budget period** | $67,452,049 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $67,452,049 |
| **26. Project Period Start Date** 05/16/2022 **– End Date** 04/30/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period** | $67,452,049 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Emily  Linde

---

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Version:25  2/15/2023 6:51 AM | Generated on: 4/8/2025 12:02 AM

APHA App. 1119

Notice of Award



R ESEAR CH PR OJECT COOPER AT IV E AG R EEM EN T
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

---

**SECTION I – AWARD DATA – 1U19AI171110-01 REVISED**

**Principal Investigator(s):**
Nevan J Krogan, PHD

**Award e-mailed to:** cgrasteam@ucsf.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to The Regents of the UCSF in support of the above referenced project. This award is pursuant to the authority of 42 USC 241 31 USC 6305 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Allergy And Infectious Diseases of the National Institutes of Health under Award Number U19AI171110. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F. The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Emily Linde
Grants Management Officer
NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

Version: 25 - 2/15/2024 2:01:47 AM - Generated on 4/8/2025 12:02 AM

APHA App. 1120

| | |
|---|---:|
| **Salaries and Wages** | $12,922,347 |
| **Fringe Benefits** | $3,760,061 |
| **Personnel Costs (Subtotal)** | $16,682,408 |
| **Consultant Services** | $9,600 |
| **Equipment** | $1,616,522 |
| **Materials & Supplies** | $3,104,202 |
| **Travel** | $2,372,584 |
| **Other** | $6,101,516 |
| **Subawards/Consortium/Contractual Costs** | $19,617,425 |
| **Publication Costs** | $94,850 |
| **Tuition Remission** | $116,244 |
| | |
| **Federal Direct Costs** | $49,715,351 |
| **Federal F&A Costs** | $17,736,698 |
| **Approved Budget** | $67,452,049 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $67,452,049 |
| **TOTAL FEDERAL AWARD AMOUNT** | $67,452,049 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 1 | $67,452,049 | $67,452,049 |

**Fiscal Information:**

| | |
|---|---|
| Payment System Identifier: | 1946036493A6 |
| Document Number: | UAI171110AC6 |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2022 |

| IC | CAN | 2022 |
|---|---|---|
| AI | 8051125 | $67,452,049 |

**NIH Administrative Data:**
**PCC**: M51E SR / **OC**: 41026 / **Released**: 04/07/2025
**Award Processed:** 04/08/2025 12:02:27 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1U19AI171110-01  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 1U19AI171110-01  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a.  The grant program legislation and program regulation cited in this Notice of Award.
   b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
   c.  45 CFR Part 75.
   d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
   e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
   f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the

APHA App. 1121

definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

Carry over of an unobligated balance into the next budget period requires Grants Management Officer prior approval.

**MULTI-YEAR FUNDED AWARD:**  This is a multi-year funded award.  A progress report is due annually on or before the anniversary of the budget/project period start date of the award, in accord with the instructions posted at:  http://grants.nih.gov/grants/policy/myf.htm.

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.  See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) U19AI171110. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data*

APHA App. 1122

*reported w thin Section I of the Interim  and Final R FFR  form s w ll be m ade public and should be w ritten for a lay person audience*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

· Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
· For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
· HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
· For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV –  AI SPECIFIC AWARD CONDITIONS – 1U19AI171110-01  REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**Revised Award:** In compliance with the Temporary Restraining Order issued on April 3, 2025, in the United States District Court for the District of Rhode Island, Notices of

APHA App. 1123

Award (NOAs) issued on or after March 24, 2025, that instructed termination of certain COVID-19 funding and ceasing of activities under this award for reasons related to the end of the COVID-19 pandemic are officially **rescinded**. Activities and funding under this award are no longer terminated through April 17, 2025, or the Court rules on the Plaintiffs' motion for a preliminary injunction whichever comes first. Accordingly, award activities may continue consistent with the existing terms and conditions of the award, including applicable regulations.

Therefore, effective with the date of this revised Notice of Award, funding for Project Number 1U19AI171110-01 is hereby fully reinstated; therefore, the termination letter dated 03/24/2025 is rescinded. Funds made available to UNIVERSITY OF CALIFORNIA, SAN FRANCISCO used to support "QCRG Pandemic Response Program" are no longer restricted and are available for use in accordance with the terms and conditions of the award.

Supersedes previous Notice of Award dated **03/26/2025**. All other terms and conditions still apply to this award.

+++++

REVISED AWARD: This award is revised to update the terms and conditions of award that have been accepted by the recipient on 9/7/2023.

### TERM 1 – Redirection of funds & Clarification of Experimental Approaches- What work may be conducted and what may require further review

No funds provided by this award may be used to support research reasonably anticipated to create, transfer, or use an enhanced potential pandemic pathogen per the Department of Health and Human Services (HHS) Framework for Guiding Funding Decisions about Proposed Research Involving Enhanced Potential Pandemic Pathogens (HHS P3CO Framework). Detailed descriptions of all proposed experiments that are determined to or may be reasonably anticipated to meet this scope, must be submitted to NIAID for review and approval prior to any work commencing. Any work that is conducted without prior approval could result in improper payments of such work that is charged to the project. If NIAID determines that HHS review of the proposed studies is required, NIAID may request additional information for inclusion in materials, including but not limited to, supporting evidence for the anticipated phenotypic characteristics of each resulting pathogen, for submission to HHS.

The following studies have been approved by NIAID:

- Studies, including resistance studies, involving the creation, use, or transfer of SARS-CoV-2 viruses that use the Δ3678 SARS-CoV-2 or double ORF-deficient (Δ3a/Δ6, Δ3a/Δ7a, and Δ3a/Δ7b) SARS-CoV-2 viruses as a backbone. Any work with an attenuated virus different from those identified above requires prior approval from NIAID, and may require HHS review.
- Use or transfer of naturally-occurring clinical isolates of circulating viruses.

The following studies, when conducted using strains other than the Δ3678 SARS-CoV-2 or double ORF-deficient (Δ3a/Δ6, Δ3a/Δ7a, and Δ3a/Δ7b) SARS-CoV-2 viruses as backbones, meet the scope of the HHS P3CO Framework, require review by HHS, and no funds from this award may be used to support this research:

- Studies involving the creation, use, or transfer of viruses, that are resistant to approved or authorized drugs, or components thereof, including, but not limited to, Paxlovid$^{TM}$/nirmatrelvir, Lageviro$^{TM}$/molnupiravir, and Veklury$^{TM}$/remdesivir.
- Studies with candidate compounds that bind to the same active site and/or have similar chemical structure to approved or authorized drugs, or components thereof, including but not limited to Paxlovid$^{TM}$/nirmatrelvir, Lageviro$^{TM}$/molnupiravir, and Veklury$^{TM}$/remdesivir, that may generate viruses, that are resistant to approved or authorized drugs, or components thereof.

APHA App. 1124

**TERM 2 – Potential Unanticipated Viral Outcomes**

The currently proposed research funded under this award is not reasonably anticipated to create, transfer, or use an enhanced potential pandemic pathogen. However, should research conducted under this award have unanticipated outcomes potentially falling within this scope, the recipient must stop work immediately on the day the potential unanticipated outcome(s) are observed. On that same day, the institution must notify the NIAID Program Officer, Grants Management Specialist, and appropriate institutional biosafety committee. After review of the unanticipated outcomes, NIAID will communicate to the institution what, if any, actions should be taken with respect to the virus and research-related virus containing materials. NIAID funds cannot be used to resume these experiments unless a revised Notice of Award (NOA) with the approval has been received. Examples of unanticipated outcomes that would meet this scope include:

*In vitro* Studies

·        If applicable - Experiments that result in a virus that has increased infectivity as assessed by assays in cell culture when compared to a parental strain in the presence or absence of an approved or authorized drug. Evidence of increased infectivity can include but is not limited to, a one (1) log decrease in the multiplicity of infection (m.o.i) required to observe clear cytopathic effect, a 50% increase in cell syncytia formation, and/or changes in cell morphology not observed with the parental virus, such as rounding, detaching, and/or clumping of adherent cells.

*In vivo* Studies

·        If applicable - Experiments involving vertebrate animals infected with a modified/mutated virus (e.g., viruses generated during the course of deep mutational scanning studies or viruses with resistance to a therapeutic candidate in development) that display unanticipated increases in disease severity (e.g., weight loss, viral titer, disease progression, or mortality) and/or transmissibility when compared to parental strains in the presence or absence of an approved or authorized drug.

**TERM 3 – Publication Notification**

·   The recipient is strongly encouraged to submit to the NIAID Program Officer all materials to be published or publicly disseminated, and to inform the NIAID Program Officer about the deposition of genomic data in publicly available databases, resulting from this award at least 10 business days prior to submission or public dissemination.  The acknowledgement section should state the specific research studies that were supported by this award.

Supersedes previous Notice of Award dated 05/17/2022. All other terms and conditions still apply to this award.

*****

**TRANSITION APPLICATION**: Continuation of the program for years 4 and 5 is dependent upon an expected appropriation.  If funds are available, to be considered for additional funding after the end of the current project period, the recipient must submit a Non-competing Continuation Progress Report form.  Recipients must follow the instructions for the PHS 2590
found  at https://grants.nih.gov/grants/funding/2590/2590.htm ;;;;;to complete the form.
All applicable sections must be completed.

APHA App. 1125

The continuation application package is due 03/15/2025 and should be sent via email to the **NIAID GMP Inbox** at niaidgmpinbox@mail.nih.gov and vandhana.khrauna@nih.gov.  When submitting the continuation application package please include "**AViDD Application"** in the subject line of the email and copy the program official identified on the Notice of Award.

Funding for the continuation application will be contingent upon 1) availability of supplemental funds; and then 2) assessment of the progress report and determination if the goals were achieved, 3) review and approval of other documents necessary for continuation.  If the extension request is not approved, the awardee will be advised of the decision in writing.

\*\*\*

This award provides funds to prevent, prepare for, and respond to coronavirus, domestically or internationally.  These funds are restricted for the emergency response to COVID-19 only and may not be rebudgeted or used for any other purpose without NIAID prior approval.

\*\*\*

This award is issued as a Cooperative Agreement, a financial assistance mechanism in which substantial NIH scientific and/or programmatic involvement is anticipated in the performance of the activity.  This award is subject to the Terms and Conditions of Award set forth in Section VI:  Award Administrative Information of RFA-AI-21-050, which are hereby incorporated by reference as special terms and conditions of award.

The RFA may be accessed at: http://grants.nih.gov/grants/guide/index.html

\*\*\*

This award is issued with direct costs based on NIAID recommended funding levels.

\*\*\*

In accordance with the NIAID Financial Management Plan, NIAID does not provide funds for inflationary increases. Future budget year(s) committed amounts were adjusted accordingly. See: https://www.niaid.nih.gov/grants-contracts/financial-management-plan.

\*\*\*

This Notice of Award (NoA) includes funds for J. David Gladstone Institutes in the amount of **$433,629**
This Notice of Award (NoA) includes funds for Icahn School of Medicine at Mount Sinai in the amount of **$1,774,500**
This Notice of Award (NoA) includes funds for Texas Biomedical Research Institute in the amount of **$1,782,000**
This Notice of Award (NoA) includes funds for University of California, Berkeley in the amount of **$722,250**
This Notice of Award (NoA) includes funds for Icahn School of Medicine at Mount Sinai in the amount of **$1,521,000**
This Notice of Award (NoA) includes funds for J. David Gladstone Institutes in the amount of **$1,379,961**
This Notice of Award (NoA) includes funds for J. David Gladstone Institutes in the amount of **$855,993**
This Notice of Award (NoA) includes funds for Icahn School of Medicine at Mount Sinai in the amount of **$2,281,500**
This Notice of Award (NoA) includes funds for University of California, Berkeley in the amount of **$1,685,250**
This Notice of Award (NoA) includes funds for Rutgers in the amount of **$1,150,224**

Version: 25 - 2/15/2024 Original Completion: 4/8/2025 12:02 AM

APHA App. 1126

This Notice of Award (NoA) includes funds for Northwestern University in the amount of **$480,000**
This Notice of Award (NoA) includes funds for J. David Gladstone Institutes in the amount of **$567,000**
This Notice of Award (NoA) includes funds for Massachusetts Institute of Technology in the amount of **$1,534,892**

\*\*\*

This Notice of Award (NoA) includes funds for Instituto Gulbenkian de Ciencia  -  PORTUGAL in the amount of **$372,600**
This Notice of Award (NoA) includes funds for University College of London  -  UNITED KINGDOM in the amount of **$971,466**
This Notice of Award (NoA) includes funds for Institute Pasteur Paris  -  FRANCE in the amount of **$485,580**
This Notice of Award (NoA) includes funds for Institute Pasteur Paris  -  FRANCE in the amount of **$485,580**
This Notice of Award (NoA) includes funds for University of Alberta  -  CANADA in the amount of **$486,000**
This Notice of Award (NoA) includes funds for University of Toronto  -  CANADA in the amount of **$648,000**

\*\*\*

Research conducted at the following site(s) must be reported in the Research Performance Progress Report (RPPR), Section G.9 (Foreign component):

- University of Alberta, CANADA
- University of Toronto, CANADA
- Insitut Pasteur, FRANCE
- Instituto Gulbenkian De Ciencia, PORTUGAL
- University  College London, UNITED KINGDOM

\*\*\*

Dissemination of study data must be in accord with the recipient's genomic data sharing plan as stated in the  letter/e-mail from Gavin Rynne of UCSF dated April 15, 2022. Failure to adhere to the sharing plan may result in Enforcement Actions as described in the NIH Grants Policy Statement.

\*\*\*

Recipients conducting research involving Select Agents (see 42 CFR 73 for the relevant human Select Agents and Toxins; and 7 CFR 331 and 9 CFR 121 for the relevant animal and plant Select Agents and Toxins at  https://www.selectagents.gov/regulations/) must complete registration with CDC (or APHIS, depending on the agent) before using NIH funds. No funds can be used for research involving Select Agents if the final registration certificate is denied.

Prior to conducting a restricted experiment with a Select Agent or Toxin, recipients must notify the NIAID and must request and receive approval from CDC or APHIS.

Be advised that the recipient is responsible for having its subrecipients comply with the requirements pertaining to the use of Select Agents and/or Highly Pathogenic Agents.

\*\*\*

Highly Pathogenic Agents:
NIAID defines a Highly Pathogenic Agent as an infectious Agent or Toxin that may warrant a biocontainment safety level of BSL3 or higher according to the current edition of the CDC/NIH Biosafety in Microbiological and Biomedical Laboratories (BMBL) (https://www.cdc.gov/labs/BMBL.html). Research funded under this grant must adhere to the BMBL, including using the BMBL-recommended biocontainment level at a minimum. If the Institutional Biosafety Committee (IBC) (or equivalent body) or designated institutional

biosafety official recommends a higher biocontainment level, the higher recommended containment level must be used.

When submitting future Progress Reports indicate at the beginning of the report:

If no research with a Select Agent (see 42 CFR 73 for the relevant human Select Agents and Toxins; and 7 CFR 331 and 9 CFR 121 for the relevant animal and plant Select Agents and Toxins at https://www.selectagents.gov/regulations/ and https://www.selectagents.gov/sat/list.htm) and/or has been performed or is planned to be performed under this grant.

If the IBC or equivalent body or official has determined, for example, by conducting a risk assessment, that the work being planned or performed under this grant may be conducted at a biocontainment safety level that is lower than BSL3.

If the work involves Select Agents and/or Highly Pathogenic Agents, also address the following points:

Any NIAID pre-approved changes in the use of the Select Agents and/or Highly Pathogenic Agents including its restricted experiments that have resulted in a change in the required biocontainment level, and any resultant change in location, if applicable, as determined by the IBC or equivalent body or official.

If work with a new or additional Select Agents and/or Highly Pathogenic Agents is proposed in the upcoming project period, provide:

- A list of the new and/or additional Agent(s) that will be studied;
- A description of the work that will be done with the Agent(s), and whether or not the work is a restricted experiment;
- The title and location for each biocontainment resource/facility, including the name of the organization that operates the facility, and the biocontainment level at which the work will be conducted, with documentation of approval by the IBC or equivalent body or official. It is important to note if the work is being done in a new location;
- Any biosafety incidents that occurred and were reported to NIH/NIAID.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1U19AI171110-01 REVISED

**INSTITUTION:** The Regents of the UCSF

| Budget | Year 1 |
|---|---|
| Salaries and Wages | $12,922,347 |
| Fringe Benefits | $3,760,061 |
| Personnel Costs (Subtotal) | $16,682,408 |
| Consultant Services | $9,600 |
| Equipment | $1,616,522 |
| Materials & Supplies | $3,104,202 |
| Travel | $2,372,584 |
| Other | $6,101,516 |
| Subawards/Consortium/Contractual Costs | $19,617,425 |
| Publication Costs | $94,850 |
| Tuition Remission | $116,244 |
| TOTAL FEDERAL DC | $49,715,351 |
| TOTAL FEDERAL F&A | $17,736,698 |
| TOTAL COST | $67,452,049 |

| Facilities and Administrative Costs | Year 1 |
|---|---|
| F&A Cost Rate 1 | 61.5% |
| F&A Cost Base 1 | $28,840,160 |
| F&A Costs 1 | $17,736,698 |

Version: 25 - 2/15/2023 11:23 AM | Generated on 4/8/2025 12:02 AM

APHA App. 1128



**Department of Health and Human Services**
National Institutes of Health
EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD
HEALTH & HUMAN DEVELOPMENT

**Notice of Award**
FAIN# R21HD109536
**Federal Award Date**
03/13/2025

| | |
|---|---|
| **Recipient Information** | **Federal Award Information** |
| **1. Recipient Name** | |
| UNIVERSITY OF SAN FRANCISCO | **11. Award Number** |
| 2130 FULTON ST | 5R21HD109536-02 |
| SAN FRANCISCO, CA 94117 | |
| | **12. Uniq ue Federal Award Identification Number (FAIN)** |
| **2. Congressional District of Recipient** | R21HD109536 |
| 11 | |
| | **13. Statutory Authority** |
| **3. Payment System Identifier (ID)** | 42 USC 241  42 CFR 52 |
| 1941156628A1 | |
| | **14. Federal Award Project Title** |
| **4. Employer Identification Number (EIN)** | Evaluating Teen-Parent Dynamics in Adolescent COVID-19 Vaccine Acceptance and Uptake |
| 941156628 | |
| | **15. Assistance Listing Number** |
| **5. Data Universal Numbering System (DUNS)** | 93.865 |
| 078770294 | |
| | **16. Assistance Listing Program Title** |
| **6. Recipient`s Uniq ue Entity Identifier** | Child Health and Human Development Extramural Research |
| EA2TGNNYQZ36 | |
| | **17. Award Action Type** |
| **7. Project Director or Principal Investigator** | Non-Competing Continuation (REVISED) |
| Annette Karena Regan, PHD | |
| Assistant Professor | **18. Is the Award R&D?** |
| akregan@usfca.edu | Yes |
| 714.221.6208 | |

**8. Authorized Official**
Rachel Castillo

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 05/01/2023 **– End Date** 03/10/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| **21. Authorized Carryover** | |
| **22. Offset** | |
| **23. Total Amount of Federal Funds Obligated this budget period** | $171,456 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $171,456 |
| | --------------- |
| **26. Project Period Start Date** 08/15/2022 **– End Date** 03/10/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period** | $366,573 |

**Federal Agency Information**
**9. Awarding Agency Contact Information**
Melinda Bixby

EUNICE KENNEDY SHRIVER NATIONAL
INSTITUTE OF CHILD HEALTH & HUMAN
DEVELOPMENT
mindy.bixby@nih.gov
(301) 402-3204

**10. Program Official Contact Information**
Tracy  King
Program Officer
EUNICE KENNEDY SHRIVER NATIONAL
INSTITUTE OF CHILD HEALTH & HUMAN
DEVELOPMENT
tracy.king@nih.gov
(301) 496-1383

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Melinda  Bixby

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

APHA App. 1129



Notice of Award

*EXPLORATORY/DEVELOPMENT GRANT*
Department of Health and Human Services
National Institutes of Health



EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH & HUMAN DEVELOPMENT

**SECTION I – AWARD DATA – 5R21HD109536-02 REVISED**

**Principal Investigator(s):**
Annette Karena Regan, PHD

**Award e-mailed to:** grants@usfca.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF SAN FRANCISCO in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the Eunice Kennedy Shriver National Institute Of Child Health & Human Development of the National Institutes of Health under Award Number R21HD109536. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Melinda  Bixby
Grants Management Officer
EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH & HUMAN DEVELOPMENT

Additional information follows

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

APHA App. 1130

| | |
|---|---|
| **Federal Direct Costs** | $135,388 |
| **Federal F&A Costs** | $36,068 |
| **Approved Budget** | $171,456 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $171,456 |
| **TOTAL FEDERAL AWARD AMOUNT** | $171,456 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 2 | $171,456 | $171,456 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1941156628A1 |
| **Document Number:** | RHD109536A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2023 |

| IC | CAN | 2023 |
|---|---|---|
| HD | 8049307 | $171,456 |

**NIH Administrative Data:**
**PCC**: CDBB -TK / **OC**: 41025 / **Released**:  03/13/2025
**Award Processed:** 03/14/2025 12:04:55 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R21HD109536-02  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R21HD109536-02  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a.  The grant program legislation and program regulation cited in this Notice of Award.
b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c.  45 CFR Part 75.
d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2**.** As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

APHA App. 1131

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R21HD109536. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.


Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to

Version: 25 - 2/15/2024 8:11:34 AM Generated on: 3/14/2025 12:04 AM

APHA App. 1132

persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

### SECTION IV – HD SPECIFIC AWARD CONDITIONS – 5R21HD109536-02 REVISED

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

### TERMINATION

It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. no longer effectuates agency priorities. Therefore, the award is terminated.

### CLOSEOUT

Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

You may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Funds used to support the orderly closeout of the study may include and must occur within 120 days (if applicable):

- Assuring all consent forms, case report forms, and source documentation for the study are completed as necessary and are present in the study files.

APHA App. 1133

- Final data collection: Conducting any necessary final study visits or data collection procedures for enrolled participants.
- Data cleaning and review: Thoroughly reviewing and cleaning collected data for accuracy and completeness.
- Statistical analysis: Performing final statistical analyses of the study data.
- Final study report: Preparing a comprehensive final study report summarizing findings, including any deviations from the protocol and GCP compliance.
- Creating a cleaned and locked dataset (that is suitable for sharing, if required).
- Completing all adverse event reporting and reconciliation as per protocol.
- Notifying the IRB, DSMB, FDA, and/or other monitoring bodies of the study's closure.
- Informing all enrolled study participants of the study's termination and what study closure means for them.
- Informing study participants of their options pertaining to receiving further intervention, continuing follow-up, as appropriate.
- Confirming final disposition of investigational product(s)
- Handling any biospecimens collected and preparing them for sharing, if required.
- Updating the study record in ClinicalTrials.gov.

The institutional official should confirm that the investigators:

- Have updated ClinicalTrials.gov with the update in study status completion
- The records management and retention plan by the institution that follows the NICHD process.
- Reconcile and ensure all study invoices and trial-related contracts or costs are paid and closed.

## **APPEALS**

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R21HD109536-02 REVISED

**INSTITUTION:** UNIVERSITY OF SAN FRANCISCO

| Budget | Year 2 |
|---|---|
| TOTAL FEDERAL DC | $135,388 |
| TOTAL FEDERAL F&A | $36,068 |
| TOTAL COST | $171,456 |

| Facilities and Administrative Costs | Year 2 |
|---|---|
| F&A Cost Rate 1 | 60.1% |
| F&A Cost Base 1 | $60,013 |
| F&A Costs 1 | $36,068 |

Version: 25 - 2/15/2025 9:5... PST Generated on: 3/14/2025 12:04 AM

APHA App. 1134