Nos. 25-1611, 25-1612

# In the United States Court of Appeals for the First Circuit

(No. 25-1611)

AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; NICOLE MAPHIS,

*Plaintiffs-Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

*Defendants-Appellants*.

(Caption continued on inside cover)

Appeals from the United States District Court for the District of Massachusetts

## BRIEF OF AMERICAN ASSOCIATION OF PHYSICIANS FOR HUMAN RIGHTS, INC. d/b/a GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ+ EQUALITY AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES

Elizabeth P. Hecker
**Crowell & Moring LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
(202) 624-2500

Matthew J. Stanford
**Bryan Cave Leighton Paisner LLP**
2 N. Central Ave., Suite 2100
Phoenix, AZ 85004-4406
(602) 364-7000

Omar Gonzalez-Pagan
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

*Additional counsel listed on page 32.*

*Counsel for Amicus Curiae*

(No. 25-1612)

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF
MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO;
STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK;
STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human
Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAY
BHATTACHARYA, in his official capacity as Director of the National Institutes of
Health; NATIONAL INSTITUTES OF HEALTH; NATIONAL CANCER INSTITUTE;
NATIONAL EYE INSTITUTE; NATIONAL HEART, LUNG, AND BLOOD INSTITUTE;
NATIONAL HUMAN GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON
AGING; NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL
INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES; NATIONAL INSTITUTE OF
ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF
BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER
NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT; NATIONAL
INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS; NATIONAL
INSTITUTE OF DENTAL AND CRANIOFACIAL RESEARCH; NATIONAL INSTITUTE OF
DIABETES AND DIGESTIVE AND KIDNEY DISEASES; NATIONAL INSTITUTE ON DRUG
ABUSE; NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES; NATIONAL
INSTITUTE OF GENERAL MEDICAL SCIENCES; NATIONAL INSTITUTE OF MENTAL
HEALTH; NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES;
NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE; NATIONAL
INSTITUTE OF NURSING RESEARCH; NATIONAL LIBRARY OF MEDICINE; NATIONAL
CENTER FOR ADVANCING TRANSLATIONAL SCIENCES; JOHN E. FOGARTY
INTERNATIONAL CENTER FOR ADVANCED STUDY IN THE HEALTH SCIENCES;
NATIONAL CENTER FOR COMPLEMENTARY AND INTEGRATIVE HEALTH; NIH CENTER
FOR SCIENTIFIC REVIEW,

*Defendants-Appellants*.

## RULE 26.1 DISCLOSURE STATEMENT

*Amicus curiae* **American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality** is a nonprofit corporation operating under Section 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT.............................................................I

TABLE OF CONTENTS........................................................................II

TABLE OF AUTHORITIES ................................................................ IV

GLOSSARY.................................................................................... xi

INTERESTS OF *AMICUS CURIAE* ......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ..................................................................................4

I.    FEDERALLY FUNDED RESEARCH IS CRITICALLY IMPORTANT TO THE HEALTH OF LGBTQI+ INDIVIDUALS AND THE BROADER PUBLIC..........................................................4

A.    NIH-funded research is vital to address LGBTQI+ people's health and the health disparities affecting them. ...........................................4

B.    Research into the health needs of LGBTQI+ communities has led to scientific breakthroughs that benefit the population at large........................9

    1.    HIV research prompted advances in public health. ...................................10

    2.    Studies focused on LGBTQI+ health have led to wide-ranging impacts in health, social, and economic policy. ..........................................13

II.    THE CHALLENGED DIRECTIVES ARE ARBITRARY AND CAPRICIOUS. .......................................................................14

A.    The Directives disregard statutory obligations to prioritize SGM health research and to not discriminate in health research. ...........................15

B.    Defendants gave no reasonable explanation for the Directives.......................17

C.    The Directives disregard the benefits of federally funded LGBTQI+ health research and ignore the agencies' change in position. ...........................19

D.    The Directives ignore the reliance interests of researchers and participants and resulting harm from lost funding..........................................22

E.     The Challenged Directives serve a discriminatory purpose. ...........................24

III.    THE AUGUST 15 STATEMENT DOES NOT MOOT
        APPELLEES' CHALLENGE TO THE CHALLENGED DIRECTIVES. ..25

A.     The August 15 Statement does not supersede or replace the
       Challenged Directives. ........................................................................26

B.     The voluntary cessation doctrine bars mootness here. ...................................28

C.     Automatic vacatur on remand does not apply. ................................................30

CONCLUSION .................................................................................31

CERTIFICATE OF SERVICE ..............................................................33

# TABLE OF AUTHORITIES

## Cases

*ACLU of Massachusetts v. U.S. Conf. of Cath. Bishops*,
  705 F.3d 44 (1st Cir. 2013).................................................................28

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013)............................................................... 28, 29

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*,
  No. 25-CV-01620, 2025 WL 2377705 (D. Md. Aug. 14, 2025)................. *passim*

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
  145 F.4th 39 (1st Cir. 2025)................................................................14

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017)...................................................... 19, 22

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020)...........................................................................16

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)...........................................................................17

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  140 S.Ct. 1891 (2020)........................................................................22

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ..............................................................16

*Env't Health Tr. v. F.C.C.*,
  9 F.4th 893 (D.C. Cir. 2021)..............................................................18

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...........................................................................22

*F.C.C. v. Prometheus Radio Project*,
  592 U.S. 414 (2021)................................................................. 14, 17

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................. 28, 29, 30

*In re Cigar Ass'n of Am.*,
   812 F. App'x 128 (4th Cir. 2020) ........................................................26

*Los Angeles Cnty. v. Davis*,
   440 U.S. 625 (1979) ..........................................................................29

*Motor Vehicle Manufacturers Ass'n of the United States, Inc.*
   *v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................19

*New Hampshire Lottery Comm'n v. Rosen*,
   986 F.3d 38 (1st Cir. 2021) ................................................................26

*Nat'l Black Police Ass'n v. D.C.*,
   108 F.3d 346 (D.C. Cir. 1997) ...........................................................31

*Orr v. Trump*,
   778 F.Supp.3d 394 (D. Mass. 2025) ...................................................25

*Penobscot Air Servs., Ltd. v. FAA*,
   164 F.3d 713 (1st Cir. 1999) ..............................................................19

*PFLAG, Inc. v. Trump*,
   769 F.Supp.3d 405 (D. Md. 2025) ......................................................25

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
   601 F.3d 1096 (10th Cir. 2010) .........................................................26

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
   123 F.4th 1 (1st Cir. 2024) .................................................................14

*Sierra Club v. Dep't of Interior*,
   899 F.3d 260 (4th Cir. 2018) .............................................................19

*Talbott v. United States*,
   775 F.Supp.3d 283 (D.D.C. 2025) ......................................................25

v

*Town of Newburgh v. Newburgh EOM LLC*,
  151 F.4th 96 (2d Cir. 2025) .......................................................... 30, 31

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
  513 U.S. 18 (1994) ......................................................................30

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) .....................................................................25

*Washington v. Trump*,
  768 F.Supp.3d 1239 (W.D. Wash. 2025) .......................................25

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F.Supp.3d 1 (D.D.C. 2020) .............................................. 18, 19

**Statutes**

5 U.S.C. § 706(2)(A) ......................................................................15

42 U.S.C. § 283p ...........................................................................15

42 U.S.C. § 289a-2(a) ...................................................................15

42 U.S.C. § 18116(a) .....................................................................16

42 U.S.C. §§ 282(b)(8)(d)(ii), (m)(2)(b)(iii) ...................................15

Section 501(c)(3) of the Internal Revenue Code ........................ i

**Rules**

Fed. R. App. P. 29(a)(2) ..................................................................1

Fed. R. App. P. 29(a)(4)(E) .............................................................1

Fed. R. App. P. 32(a)(5)-(6) ..........................................................33

Fed. R. App. P. 32(a)(7)(B) ...........................................................33

Fed. R. App. P. 32(f) .....................................................................33

**Regulations**

2 C.F.R. § 300.300(c) ................................................................................16

45 C.F.R. § 92.4 .......................................................................................16

*Nondiscrimination in Health Programs and Activities*,
    89 Fed. Reg. 37,522 (May 6, 2024) ...................................................16

**Other References**

Bastian Rosner, et al., *Substance use among sexual minorities in the US – Linked
    to inequalities and unmet need for mental health treatment? Results from the
    National Survey on Drug Use and Health (NSDUH)*, 135 J. Psychiatric Research
    107-118 (2020)........................................................................................6

*The Broad Benefits of AIDS Research*, amfAR,
    https://www.amfar.org/research/broad-benefits-of-aids-research/ (accessed Nov.
    11, 2025). ...................................................................................... 11, 13

Carl W. Peterson, *HIV-specific CAR T cells return to the clinic*,
    131 J. Clin. Invest. e153204 (2021)....................................................11

CDC, *ABES Table: Sexual Identity* (2022),
    https://www.cdc.gov/healthyyouth/data/abes/tables/sexual_identity.htm.............5

CDC, *HIV Surveillance Supplemental Report: Estimated HIV Incidence and
    Prevalence in the United States, 2018–2022* (2024),
    https://stacks.cdc.gov/view/cdc/156513. ...........................................7

Charlotte Morabito, *How HIV research paved the way for the Covid mRNA
    vaccines*, CNBC (Dec. 1, 2021), https://www.cnbc.com/2021/12/01/how-hiv-
    research-paved-the-way-for-the-covid-mrna-vaccines.html. .............................12

Craig Mellis, *Lives saved by COVID-19 vaccines*,
    J. Paediatr. Child Health (2022), https://doi.org/10.1111/jpc.16213.................13

Dominique Mosbergen, *Medical Studies Are Too White. How Science Is Working
    to Get Better Data*, Wall St. J. (Nov. 16, 2023),
    https://www.wsj.com/health/healthcare/medical-studies-too-white-14e60b22 ..13

Dylan Felt, et al., *Differential Decline in Illicit Drug Use by Sexual Identity Among United States High School Students, 2005-2017*, 7 LGBT Health 420-430 (2020). ...........................................................6

G. Nic Rider, et al., *Scientific Integrity and Pediatric Gender Healthcare: Disputing the HHS Review*, Sexuality Research & Social Policy (2025), https://doi.org/10.1007/s13178-025-01221-5. ....................................................27

Grace Medley, et al., SAMHSA, *Sexual Orientation and Estimates of Adult Substance Use and Mental Health: Results from the 2015 National Survey on Drug Use and Health*, NSDUH Data Review (Oct. 2016), https://www.samhsa.gov/data/sites/default/files/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015.htm...5

*HIV/AIDS Research Yields Dividends Across Medical Fields*, NIH (Aug. 28, 2018), https://www.nih.gov/news-events/news-releases/hivaids-research-yields-dividends-across-medical-fields. ................................................... 10, 12

Inst. of Med., THE HEALTH OF LESBIAN, GAY, BISEXUAL, AND TRANSGENDER PEOPLE: BUILDING A FOUNDATION FOR BETTER UNDERSTANDING (Nat'l Acad. Press, 2011), https://doi.org/10.17226/13128........................... 10, 20

Jay Bhattacharya, *Advancing NIH's Mission Through a Unified Strategy*, NIH (Aug. 15, 2025), https://www.nih.gov/about-nih/nih-director/statements/advancing-nihs-mission-through-unified-strategy................3

Jeffrey M. Jones, *LGBTQ+ Identification in U.S. Rises to 9.3%*, Gallup (Feb. 20, 2025), https://news.gallup.com/poll/656708/lgbtq-identification-rises.aspx. .......4

Jessica Halem, et al., *A Legacy of Cruelty to Sexual and Gender Minority Groups*, 391 New England J. Med. 385 (2024)....................................4

Jonathon W. Wanta, et al., *Mental Health Diagnoses Among Transgender Patients in the Clinical Setting: An All-Payer Electronic Health Record Study*, 4 Transgender Health 313-315 (2019)...................................................6

Junjie Anderson Lu, et al., *Mental Health Disparities by Sexual Orientation and Gender Identity in the All of Us Research Program*, 8 JAMA Network Open e2456264 (2025). ...........................................5

Katrina Miller & Roni Caryn Rabin, *Ban on D.E.I. Language Sweeps Through the Sciences*, N.Y. Times (Feb. 9, 2025), https://www.nytimes.com/2025/02/09/science/trump-dei-science.html. ....................................................................................................13

Lawrence Corey, et al., *How HIV research drives health innovation in multiple diseases*, Nature Med. (2025). ........................................ 10, 19

Mandi L. Pratt-Chapman, *Mental Health Disparities Among LGBTQ People in the US—Time to End the Stigma*, 8 JAMA Network Open e2456228 (2025). ........4,5

Maureen M. Goodenow, *Benefits of HIV Research Go Beyond HIV*, HIV.gov Blog (Jan. 18, 2018), https://www.hiv.gov/blog/benefits-hiv-research-go-beyond-hiv. ....................................................................................................11

Max Kozlov & Chris Ryan, *How Trump 2.0 is slashing NIH-backed research — in charts*, Nature (Apr. 10, 2025), https://www.nature.com/articles/d41586-025-01099-8. ....................................................................................................2, 19

Myeshia Price-Feeney, et al., *Understanding the Mental Health of Transgender and Nonbinary Youth*, 66 J. Adolescent Health 684-690 (2020)..........................6

Nadia Dowshen, et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, 77 J. Adolescent Health 342-345 (2025). ..........................................27

Nat'l Acad. of Sci., Eng'g, and Med., MEASURING SEX, GENDER IDENTITY, AND SEXUAL ORIENTATION (Nat'l Acad. Press, 2022), https://doi.org/10.17226/26424....................................................................21

Nat'l Acad. of Sci., Eng'g, and Med., UNDERSTANDING THE WELL-BEING OF LGBTQI+ POPULATIONS (Nat'l Acad. Press, 2020), https://doi.org/10.17226/25877....................................................................7, 21

Nat'l All. Mental Illness, *Identity and Cultural Dimensions: LGBTQ+*, https://www.nami.org/your-journey/identity-and-cultural-dimensions/lgbtq/ (accessed Nov. 15, 2025). ..........................................................................6

Sharita Gruberg, et al., *How a lack of LGBTQI+ data harms gender justice*, Nat'l Partnership for Women & Families Blog (June 6, 2024), https://nationalpartnership.org/lack-of-lgbtqi-data-harms-gender-justice/. . 13, 14

Tara A. Schwetz & Anthony S. Fauci, *The Extended Impact of HIV/AIDS Research*, 219 J. Infect. Diseases 6 (2018). ........................................................11

Vincenzo F. Malo, et al., *To Whom It May Affirm: Considerations for Advancing LGBTQIA+ Equity in Research*, RTI Press (Aug. 2023), https://doi.org/10.3768/rtipress.2023.op.0088.2308 ..............................................8

Virginia B. Bowen, et al., CDC, *Sexually transmitted disease surveillance 2018* (2019), https://stacks.cdc.gov/view/cdc/79370 ......................................................7

# GLOSSARY

| | |
|---|---|
| Add. | Addendum to Defendants' Brief (filed Oct. 9, 2025) |
| APA | Administrative Procedure Act |
| App. | Appendix (filed Oct. 9, 2025) |
| CDC | U.S. Centers for Disease Control and Prevention |
| GLMA | American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality |
| HHS | U.S. Department of Health and Human Services |
| LGBTQI+ | Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex |
| NIH | National Institutes of Health |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SGM | Sexual and Gender Minorities |
| Supp.App. | Supplemental Appendix (Volume I, filed Nov. 12, 2025; Volume II, filed Nov. 13, 2025, along with Plaintiffs' Motion to Supplement the Record) |

## INTERESTS OF *AMICUS CURIAE*[1]

*Amicus curiae* **American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality** ("GLMA" or "*amicus*") is a national nonprofit organization, whose members include physicians, researchers and academics, students, and other health professionals. GLMA's mission is to ensure health equity for LGBTQI+ people and equality for LGBTQI+ health professionals in their work and learning environments. Several GLMA members had their NIH funding terminated pursuant to the Challenged Directives or had their applications for such funding denied, delayed, or withheld from review.

GLMA is the lead plaintiff in *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*, No. 25-CV-01620, 2025 WL 2377705 (D. Md. Aug. 14, 2025) ("*GLMA*"), where on behalf of its members and healthcare provider members' LGBTQI+ patients, it has asserted claims under the APA like those at issue in these appeals. GLMA therefore has an interest in the proper adjudication of the APA claims at issue here.

---

[1] All parties consent to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for a party authored any portion of this brief, and no person or entity other than *amicus* or its counsel made any monetary contribution to its preparation or submission. Fed. R. App. P. 29(a)(4)(E).

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

NIH has long been the global leader in funding the world's most important medical research, which for years, included research focused on health disparities and the health needs of LGBTQI+ people, also known as sexual and gender minorities ("SGM"). Recently, however, the President issued several executive orders and directives targeting LGBTQI+ people—particularly those who are transgender—for discrimination. Following these actions, Defendants abruptly cancelled hundreds of research grants—totaling more than $800 million in funding—dedicated to the health of LGBTQI+ people and decreed that the government will not fund such research.[2]

These grants, which provided critical funding for evidence-based research on mental health, suicide prevention, intimate partner violence, youth development, autism, cancer, tobacco use, antibiotic resistance, pregnancy outcomes, and HIV/AIDS care (to name just a few), were terminated because they related to the health and well-being of LGBTQI+ people. Defendants' actions have both upended the lives of scientists and healthcare providers who have devoted years of specialized education, training, and research to this work, and endangered countless LGBTQI+ people whose lives depend on inclusive, data-driven health research. Without

---

[2] Max Kozlov & Chris Ryan, *How Trump 2.0 is slashing NIH-backed research — in charts*, Nature (Apr. 10, 2025), https://www.nature.com/articles/d41586-025-01099-8.

intervention, NIH's betrayal of its mission and funding commitments has resulted and will continue to result in incalculable harm, including the midstream abandonment of life-saving research and the silencing of vital academic voices.

*Amicus* GLMA submits this brief to elaborate on three points. *First*, *amicus* explains the importance of federally funded research to the health of LGBTQI+ people and the public. *Second*, *amicus* addresses why the Challenged Directives and resulting terminations are arbitrary and capricious under the APA, particularly as it pertains to LGBTQI+ health research. *Third*, *amicus* explains why the August 15 Statement by the NIH Director[3] *does not* supersede the Challenged Directives and has not rendered these cases moot.

Based on these arguments as well as those presented by the Plaintiffs in these cases, *amicus* GLMA joins Plaintiffs in asking the Court to affirm the district court's judgment.[4]

---

[3]    Jay Bhattacharya, *Advancing NIH's Mission Through a Unified Strategy*, NIH (Aug. 15, 2025), https://www.nih.gov/about-nih/nih-director/statements/advancing-nihs-mission-through-unified-strategy (hereinafter "August 15 Statement").

[4]    GLMA agrees with Plaintiffs' arguments that the district court and this Court have jurisdiction to hear the APA claims regarding the Challenged Directives *and* the resulting terminations of grants.

## ARGUMENT

I.    **Federally funded research is critically important to the health of LGBTQI+ individuals and the broader public.**

A.    **NIH-funded research is vital to address LGBTQI+ people's health and the health disparities affecting them.**

Terminating funding to Plaintiffs' and GLMA members' critical research will stymie the significant gains researchers have made into LGBTQI+ health. Despite representing over 9% of the total population in the United States, the LGBTQI+ community has remained significantly underrepresented in scientific research until recent years.[5] In addition to underrepresentation, biased research has contributed to a historically deficient knowledge base. For example, in 2024, the New England Journal of Medicine published a retrospective chronicling the journal's "medical injustices against members of sexual and gender minority groups," including the publication of articles pathologizing homosexuality and gender nonconformity, which has contributed to the health disparities faced by the LGBTQI+ community.[6]

It is widely recognized that LGBTQI+ individuals suffer disproportionately from mental health issues compared to their heterosexual and cisgender peers. This is in large part due to structural bias, including pathologization of SGM groups,

---

[5]    Jeffrey M. Jones, *LGBTQ+ Identification in U.S. Rises to 9.3%*, Gallup (Feb. 20, 2025), https://news.gallup.com/poll/656708/lgbtq-identification-rises.aspx.

[6]    Jessica Halem, et al., *A Legacy of Cruelty to Sexual and Gender Minority Groups*, 391 New England J. Med. 385, 385, 389 (2024).

social erasure, discrimination, including in health care, hate crimes, and other social and political determinants of health.[7] As a result, LGBTQI+ adults face more than twice the average adult risk of experiencing a mental health condition; for transgender people, the risk is almost four times as likely.[8] Compared to heterosexual and cisgender people, LGBTQI+ people are 39% more likely to experience feelings of depression, 33.2% more likely to seriously consider attempting suicide, and 21.1% more likely to actually attempt suicide.[9]

---

[7]    Mandi L. Pratt-Chapman, *Mental Health Disparities Among LGBTQ People in the US—Time to End the Stigma*, 8 JAMA Network Open e2456228 (2025).

[8]    Grace Medley, et al., SAMHSA, *Sexual Orientation and Estimates of Adult Substance Use and Mental Health: Results from the 2015 National Survey on Drug Use and Health*, NSDUH Data Review (Oct. 2016), https://www.samhsa.gov/data/sites/default/files/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015.htm; *see also* Junjie Anderson Lu, et al., *Mental Health Disparities by Sexual Orientation and Gender Identity in the All of Us Research Program*, 8 JAMA Network Open e2456264 (2025).

[9]    CDC, *ABES Table: Sexual Identity* (2022), https://www.cdc.gov/healthyyouth/data/abes/tables/sexual_identity.htm.

These disparities are particularly pronounced in young people. LGBTQI+ youth are more than twice as likely to report feeling persistently sad or hopeless.[10] Transgender youth are twice as likely to attempt suicide as their cisgender peers.[11]

Relatedly, research shows that substance-use disorders are markedly more common among LGBTQI+ adults than their non-LGBTQI+ counterparts, with LGBTQI+ adults nearly twice as likely to experience such challenges.[12] The risk is even higher among transgender people, who are almost four times more likely to develop substance-use disorders than cisgender people.[13] Again, these disparities are evident among LGBTQI+ youth, who report far greater rates of illicit drug use than their peers.[14]

---

[10]    Nat'l All. Mental Illness, *Identity and Cultural Dimensions: LGBTQ+*, https://www.nami.org/your-journey/identity-and-cultural-dimensions/lgbtq/ (accessed Nov. 15, 2025).

[11]    Myeshia Price-Feeney, et al., *Understanding the Mental Health of Transgender and Nonbinary Youth*, 66 J. Adolescent Health 684-690 (2020).

[12]    Bastian Rosner, et al., *Substance use among sexual minorities in the US – Linked to inequalities and unmet need for mental health treatment? Results from the National Survey on Drug Use and Health (NSDUH)*, 135 J. Psychiatric Research 107-118 (2020).

[13]    Jonathon W. Wanta, et al., *Mental Health Diagnoses Among Transgender Patients in the Clinical Setting: An All-Payer Electronic Health Record Study*, 4 Transgender Health 313-315 (2019).

[14]    Dylan Felt, et al., *Differential Decline in Illicit Drug Use by Sexual Identity Among United States High School Students, 2005-2017*, 7 LGBT Health 420-430 (2020).

Physical health disparities are also prominent within the LGBTQI+ community. HIV remains a significant public health concern for certain segments of LGBTQI+ people, particularly gay and bisexual men. The CDC reports that while LGBTQI+ people are a small minority, they represent a disproportionate share of new HIV diagnoses.[15] Similarly, men who have sex with men are overrepresented among STI incidence and prevalence figures overall.[16]

Beyond HIV and other STIs, studies show that LGBTQI+ adults tend to report worse health, lower health-related quality of life, and greater prevalence of disabilities than non-LGBTQI+ people.[17] Current research also indicates that certain cancers occur at higher rates within specific subgroups of the LGBTQI+ community.[18] For instance, gay and bisexual men face an increased risk of anal cancer, while lesbian and bisexual women experience a higher incidence of breast cancer.[19]

---

[15]    CDC, *HIV Surveillance Supplemental Report: Estimated HIV Incidence and Prevalence in the United States, 2018–2022* (2024), https://stacks.cdc.gov/view/cdc/156513.

[16]    Virginia B. Bowen, et al., CDC, *Sexually transmitted disease surveillance 2018* (2019), https://stacks.cdc.gov/view/cdc/79370.

[17]    Nat'l Acad. of Sci., Eng'g, and Med., UNDERSTANDING THE WELL-BEING OF LGBTQI+ POPULATIONS 289 (2020), https://doi.org/10.17226/25877 (hereinafter "*Understanding LGBTQI+ Populations*").

[18]    *Id*. at 295.

[19]    *Id*.

Public health research that excludes or ignores the LGBTQI+ lived experience exacerbates these disparities.[20] For this reason, researchers, governments, and health organizations around the world encourage equity-centered research, which can help improve the accuracy of health screenings and other protocols and give better guidance to medical professionals.[21] Plaintiffs' research is an important part of this effort.[22]

Take the NIH-funded study of one of APHA's members, which investigates how structural discrimination and stigma shape the mental and physical health outcomes of older gay men—a population that faces heightened rates of depression, social isolation, HIV, and other chronic health conditions. The study's findings were poised to inform targeted interventions and public health strategies to reduce disparities and improve the quality of life for aging LGBTQI+ people, particularly those living with HIV or facing social marginalization.[23] Similarly, another APHA member's NIH-funded project develops inclusive measurement tools that capture the unique experiences and support needs of nearly one million LGBTQI+

---

[20]    Sheldon Decl. ¶23, *GLMA v. NIH*, No. 25-CV-01620 (D. Md. filed May 28, 2025) (ECF 64-3).

[21]    Vincenzo F. Malo, et al., *To Whom It May Affirm: Considerations for Advancing LGBTQIA+ Equity in Research*, RTI Press (Aug. 2023), https://doi.org/10.3768/rtipress.2023.op.0088.2308.

[22]    *E.g.*, App.1110.

[23]    App.1148-55.

caregivers—many of whom face increased mental health stress, social isolation, and barriers to accessing adequate support services compared to non-LGBTQI+ peers.[24] The cancellation of these grants disrupts crucial research progress and threatens to leave these urgent health disparities unaddressed.

Research focusing on LGBTQI+ populations is critical in addressing the health needs of LGBTQI+ communities, and relatedly, in eradicating the widespread health disparities facing these marginalized individuals. Terminating the grants supporting that research would have an immediate and long-term impact on the health of LGBTQI+ people.

### B.    Research into the health needs of LGBTQI+ communities has led to scientific breakthroughs that benefit the population at large.

The Challenged Directives do not merely harm members of the LGBTQI+ community; they undermine the health of the broader public. Decades of federally funded research addressing LGBTQI+ health and health disparities have seeded innovation in the study of infectious diseases, mental health, cardiovascular health, and beyond. The downstream benefits, illustrated most starkly through HIV research, have proven integral to the development of modern medicine.

---

[24]    App.1117-23.

### 1.    HIV research prompted advances in public health.

It is no secret the HIV/AIDS crisis disproportionately affected LGBTQI+ people, resulting in large numbers of gay men and transgender women, particularly people of color, dying as most of the government looked away.[25] Yet, NIH's historic commitment to science over politics meant that since the 1980s, "NIH has invested widely in HIV research."[26] NIH first funded HIV/AIDS research in 1981. And in 1988, Congress established NIH's Office of AIDS Research to coordinate activities aimed at stopping the epidemic.[27] Between 1981 and 2018, NIH invested more than $69 billion into understanding, treating, and preventing HIV/AIDS.[28] And because of the disproportionate impact of HIV/AIDS in the LGBTQI+ community, this research has focused primarily on SGM populations—the very type of research targeted by the Challenged Directives.

---

[25]    Inst. of Med., THE HEALTH OF LESBIAN, GAY, BISEXUAL, AND TRANSGENDER PEOPLE: BUILDING A FOUNDATION FOR BETTER UNDERSTANDING 39, 67-69 (Nat'l Acad. Press, 2011), https://doi.org/10.17226/13128.

[26]    Lawrence Corey, et al., *How HIV research drives health innovation in multiple diseases*, Nature Med., at 1 (2025).

[27]    *See* Compl. ¶¶44-45, *GLMA v. NIH*, No. 25-cv-01620 (D. Md. filed May 20, 2025) (ECF 1).

[28]    *HIV/AIDS Research Yields Dividends Across Medical Fields*, NIH (Aug. 28, 2018), https://www.nih.gov/news-events/news-releases/hivaids-research-yields-dividends-across-medical-fields.

The return on NIH's investment in HIV research goes well beyond HIV itself. As NIH has highlighted, researchers have "gleaned critical insights from the devastation HIV can unleash on the immune system."[29] HIV/AIDS research has led to collateral innovations throughout medicine, including immunology, structural biology, treating immune-mediated diseases, and cancer therapies,[30] impacting public health globally.

HIV research involving LGBTQI+ people laid the foundation for curative therapies in diseases like hepatitis C virus (HCV), leukemia, and lymphoma. The development of protease and nucleoside polymerase inhibitors for HIV yielded pivotal knowledge in creating effective treatments for HCV.[31] This has helped expand therapeutic options, lower drug costs, and enable more generics for HCV, thus improving cure rates for this liver disease affecting millions.[32] Similarly, "CAR T-Cell" therapy pioneered for treating HIV is now being used to treat certain blood cancers.[33] Furthermore, scientists have utilized disabled HIV as carriers in gene

---

[29]    *Id.*

[30]    Tara A. Schwetz & Anthony S. Fauci, *The Extended Impact of HIV/AIDS Research*, 219 J. Infect. Diseases 6 (2018).

[31]    Maureen M. Goodenow, *Benefits of HIV Research Go Beyond HIV*, HIV.gov Blog (Jan. 18, 2018), https://www.hiv.gov/blog/benefits-hiv-research-go-beyond-hiv.

[32]    *Id.*

[33]    Carl W. Peterson, *HIV-specific CAR T cells return to the clinic*, 131 J. Clin. Invest. e153204 1 (2021).

therapies leading to promising results in patients with cancer or genetic autoimmune disorders.[34]

Similarly, insights gained from HIV research have also contributed substantially to the broader fields of immunology and cardiovascular health. Scientists now better understand the "vital role of CD4+ T cells—immune cells that HIV selectively infects and destroys—in thwarting other infectious diseases and certain cancers."[35] Observations about inflammation increasing the risk of heart disease in people living with HIV prompted inquiry into the role of inflammation in heart disease generally.[36] HIV research also has provided insight into other HIV-associated comorbidities, including kidney disease, cancer, and tuberculosis.[37]

Finally, the COVID-19 vaccine's development built on decades of work by HIV researchers on mRNA technology.[38] Specifically, researchers developed a lipid shell to protect the delivery of mRNA to the immune cells which were later

---

[34] *The Broad Benefits of AIDS Research*, amfAR, https://www.amfar.org/research/broad-benefits-of-aids-research/ (accessed Nov. 11, 2025).

[35] NIH, *supra* note 28.

[36] *Id.*

[37] *Id.*

[38] Charlotte Morabito, *How HIV research paved the way for the Covid mRNA vaccines*, CNBC (Dec. 1, 2021), https://www.cnbc.com/2021/12/01/how-hiv-research-paved-the-way-for-the-covid-mrna-vaccines.html.

incorporated into the mRNA COVID-19 vaccine.[39] The COVID-19 mRNA vaccines saved tens of millions of lives.[40]

### 2. Studies focused on LGBTQI+ health have led to wide-ranging impacts in health, social, and economic policy.

The positive impact of SGM research extends to broader health, social, and economic policy questions. Scientists attest to how including diverse populations in medical studies improves the quality of results and advances scientific discovery.[41] Eliminating inclusive data harms not just LGBTQI+ people, but all people.

The addition of sexual orientation and gender identity questions in federal surveys enabled identification of food insecurity gaps, economic inequality, and reproductive health needs across racial and ethnic lines, shaping policies nationwide.[42] And data generated from LGBTQI+-specific studies on paid family

---

[39]     amfAR, *supra* note 34.

[40]     Craig Mellis, *Lives saved by COVID-19 vaccines*, J. Paediatr. Child Health (2022), https://doi.org/10.1111/jpc.16213.

[41]     Dominique Mosbergen, *Medical Studies Are Too White. How Science Is Working to Get Better Data*, Wall St. J. (Nov. 16, 2023), https://www.wsj.com/health/healthcare/medical-studies-too-white-14e60b22; Katrina Miller & Roni Caryn Rabin, *Ban on D.E.I. Language Sweeps Through the Sciences*, N.Y. Times (Feb. 9, 2025), https://www.nytimes.com/2025/02/09/science/trump-dei-science.html.

[42]     Sharita Gruberg, et al., *How a lack of LGBTQI+ data harms gender justice*, Nat'l Partnership for Women & Families Blog (June 6, 2024), https://nationalpartnership.org/lack-of-lgbtqi-data-harms-gender-justice/.

medical leave, wage gaps, and food insecurity have not only advanced LGBTQI+ equity but also informed broader reform efforts.[43]

## II.    The Challenged Directives are arbitrary and capricious.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

> An agency action or inaction is arbitrary or capricious if the agency relied on factors Congress did not intend it to consider, failed to consider an important aspect of the problem, explained the decision in terms that run counter to the evidence, or reached a decision so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 15 (1st Cir. 2024). Here, Defendants' "actions bear all the hallmarks of arbitrary and capricious decision-making." *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 145 F.4th 39, 54 (1st Cir. 2025).

The Challenged Directives and resulting terminations are arbitrary and capricious for several reasons. <u>First</u>, the Directives disregard statutory obligations to *prioritize* LGBTQI+ health research and not discriminate in administering grant funding. <u>Second</u>, as the district court found, the Directives provide *no* reasoned explanation for why federal funding should be categorically prohibited or

---

43    *Id.*

deprioritized. <u>Third</u>, the Directives disregard the benefits of federally funding LGBTQI+ health research and ignore the agencies' change in position. <u>Fourth</u>, the Directives ignore the serious reliance interests of researchers and research participants as well as the harms caused by not funding LGBTQI+ health research. <u>Fifth</u>, the Directives were adopted for an improper discriminatory purpose.

### A. The Directives disregard statutory obligations to prioritize SGM health research and to not discriminate in health research.

The APA requires that agency actions be set aside if they are "not in accordance with law." 5 U.S.C. § 706(2)(A). It is certainly unreasonable and, thus, arbitrary and capricious, to disregard statutory obligations when adopting a policy.

Here, the Directives and resulting terminations disregarded statutory obligations requiring NIH to *prioritize* SGM health research. Congress commanded expressly that NIH funds be used "to improve research related to the health of sexual and gender minority populations," 42 U.S.C. § 283p, address health disparities, 42 U.S.C. §§ 282(b)(8)(d)(ii), (m)(2)(b)(iii), and ensure that "members of minority groups" are included in the clinical research it funds, 42 U.S.C. § 289a-2(a). The record is devoid of any indication that Defendants accounted for these obligations when formulating the Directives or any explanation of how the Directives are congruent with these statutory obligations.

Moreover, Section 1557 of the Affordable Care Act prohibits discrimination in health programs or activities, any part of which receives federal funding, based

15

on sex, among other grounds. *See* 42 U.S.C. § 18116(a). This includes health research. *See* 45 C.F.R. § 92.4 (defining "health program or activity" to mean, *inter alia*, "[e]ngage in health or clinical research"); *see also* HHS, *Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522, 37,540 (May 6, 2024). Under the Directives, researchers are *being excluded from participating* in federally funded health research because the research relates to LGBTQI+ health, gender identity, or looks at health disparities by measuring intersectional aspects of people's identities like sexual orientation, race, or ethnicity. *See GLMA*, 2025 WL 2377705, at *11. Similarly, LGBTQI+ patients are *being denied the benefits of* federally funded research that relates to their health. *Id.*

And lest there be any doubt, "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020). This reasoning applies to Section 1557. *See Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022); *GLMA*, 2025 WL 2377705, at *11. HHS's own regulations confirm this. *See*, *e.g.*, 2 C.F.R. § 300.300(c) (interpreting statutes administered by HHS that prohibit discrimination based on sex "to include a prohibition against discrimination on the basis of sexual orientation and gender identity").

16

It was arbitrary and capricious for Defendants to ignore their statutory obligations to prioritize LGBTQI+ health research and prohibit funding for such research in contravention of nondiscrimination statutory obligations.

**B. Defendants gave no reasonable explanation for the Directives.**

NIH's actions were also arbitrary and capricious because NIH and HHS failed to provide a "reasonable explanation" for their actions as the APA requires. *Prometheus Radio*, 592 U.S. at 423. To be reasonable, the explanation must "includ[e] a rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quotation omitted). The Challenged Directives and resulting terminations fail that test, as they include no "facts found" whatsoever. As the district court found, "there is no reasoned decision-making at all with respect to the NIH's 'abruptness' in the 'robotic rollout' of this grant-termination action." Add.0252.

The Directives and resulting terminations do not explain how any specific project failed to meet agency priorities, or how the particular project related to "DEI" or "gender identity," was "unscientific," had "little identifiable return on investment," or ignored "biological realities." *E.g.*, App.0610. But "[s]uch conclusory statements cannot substitute for a reasoned explanation, for they provide neither assurance that the [agencies] considered the relevant factors nor do they

17

reveal a discernable path to which the court may defer." *Env't Health Tr. v. F.C.C.*, 9 F.4th 893, 905 (D.C. Cir. 2021) (quotations omitted).

Not only are the statements unexplained, but they are contrary to all existing evidence and common sense. For example, it is demonstrably false that health research pertaining to LGBTQI+ people "do[es] nothing to enhance the health of many Americans." App.0610; *see also supra* pp. 14-19. Through their actions, Defendants halted important research on pressing public health issues, such as cardiovascular health, dementia, depression, suicidal ideation, HIV prevention, intimate partner and sexual violence, substance use, tobacco-related disease, and disordered eating behaviors.[44] This research not only addresses the health of LGBTQI+ Americans; it can lead to innovation and discovery benefitting *all* Americans. *Cf. Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 60-61 (D.D.C. 2020) (noting how "threatening the health of LGBTQ individuals at large" can "impair … public-health programs").

The example of HIV/AIDS is particularly illustrative. As noted (*supra* Section I.B.1), "[t]he achievements of US-funded HIV research stand among the most

---

[44]    *See*, *e.g.*, Plaintiff and GLMA Member Declarations in *GLMA v. NIH*, No. 25-CV-01620 (D. Md., filed May 28, 2025) (ECF Nos. 64-5 (Streed Decl. ¶¶12, 25), 64-9 (Ribisl Decl. ¶12), ECF 64-12 (Birkett Decl. ¶9), 64-13 (Moe Decl. ¶16), 64-15 (Garofalo Decl. ¶10), 64-16 (Arayasirikul Decl. ¶15), 64-18 (Littleton Decl. ¶9), 64-20 (Roe Decl. ¶11), 64-21 (Peitzmeier Decl. ¶11)).

consequential scientific accomplishments of the modern era."[45] And "the cross-cutting insights from HIV research into immunology, cancer, cardiovascular disease, neurodegeneration, and aging offer vital tools to confront the broader health challenges facing an aging American population."[46] Yet, nearly a third of the grants terminated under the Directives were for HIV/AIDS research.[47] The reason? They related to LGBTQI+ health, i.e., they "focus on specific groups" (Gov't Br. 39; App.0563) or relate to "transgender issues" (App.0610).

Simply put, Defendants' decisions and actions are "not accompanied by any explanation, let alone a satisfactory one." *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018).

### C. The Directives disregard the benefits of federally funded LGBTQI+ health research and ignore the agencies' change in position.

The APA demands that an agency considering regulatory action "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). The reviewing court must "determine whether the agency has examined the pertinent evidence" and "considered the relevant factors." *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 719 (1st Cir. 1999). And, at a minimum, the agency "cannot entirely fail[] to consider an important aspect of

---

[45] Corey, *supra* note 26, at 3.

[46] *Id.*

[47] Kozlov & Ryan, *supra* note 2.

the problem." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In determining that funding relating to LGBTQI+ health is categorically prohibited or deprioritized because it is "equity-related" or relates to "transgender issues," Defendants failed to consider the benefits of such research, for LGBTQI+ people and the general public. This alone suffices to render their actions arbitrary and capricious.

The record also shows no consideration of the multiple strategic documents, consensus reports, and agency directives that called for *more, not less* research relating to LGBTQI+ people. The Institute of Medicine's 2011 report, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*, identified several areas as being "especially important" for future research, including research into "social influences on the lives of LGBT people," "inequities in healthcare," and "transgender-specific health needs."[48] A 2020 consensus study report by the National Academies of Sciences, Engineering, and Medicine, entitled *Understanding the Well-Being of LGBTQI+ Populations* followed, recommending that the federal government and other relevant stakeholders "fund and conduct methodological research to develop, improve, and

---

[48]    Inst. of Med., *supra* note 25, at 296-98.

expand measures that capture the full range of sexual and gender diversity in the population … as well as determinants of well-being for sexual and gender diverse populations."[49]

Also in 2020, NIH launched a *Strategic Plan to Advance Research on the Health and Well-being of Sexual and Gender Minorities: Fiscal Years 2021-2025*, emphasizing the need for LGBTQI+ health research.[50] This strategic plan, which set NIH priorities through 2025, stated that "NIH is committed to its core mission of turning discovery into health for all Americans, including those who identify as sexual and gender minorities."[51]

In 2022, NIH supported the National Academies to issue a consensus study report, *Measuring Sex, Gender Identity, and Sexual Orientation*, which noted that "LGBTQI+ populations experience differential and inequitable treatment and outcomes in many areas of everyday life, including in health," and that "[a] lack of data on the characteristics, needs, and experiences of LGBTQI+ populations is a major barrier [] to better understandings of these disparities."[52] Accordingly, it set

---

[49]     *Understanding LGBTQI+ Populations*, *supra* note 17, at 402.

[50]     Exh. 11 to Gonzalez-Pagan Decl., *GLMA v. NIH*, No. 25-CV-01620 (D. Md. filed May 28, 2025) (ECF 65-11), https://tinyurl.com/3z8xv4j5.

[51]     *Id.* at 14.

[52]     Nat'l Acad. of Sci., Eng'g, and Med., MEASURING SEX, GENDER IDENTITY, AND SEXUAL ORIENTATION 26-27 (2022), https://doi.org/10.17226/26424.

forth "recommendations for how best to measure the concepts of sex, gender identity, and sexual orientation in the United States."[53]

Thus, when it comes to LGBTQI+ health research, the Directives represent a change in course that demands Defendants to "display awareness that [they are] changing position" and provide "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Defendants have not done so.

### D. The Directives ignore the reliance interests of researchers and participants and resulting harm from lost funding.

Under the APA, an agency is required to "adequately analyze … the consequences" of its actions, *Am. Wild Horse*, 873 F.3d at 932, and "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.Ct. 1891, 1913 (2020) (cleaned up). "It would be arbitrary or capricious to ignore such matters." *Fox Television*, 556 U.S. at 515. Yet that is what Defendants have done here.

First, "the wholesale exclusion of the LGBTQI+ community from the NIH Grant Program irreparably harms them and the LGBTQI+ community, because the

---

[53]      *Id.* at 27.

lack of funding will make it very difficult for the Plaintiffs to provide adequate healthcare to this community." *GLMA*, 2025 WL 2377705, at *15.

Second, "the loss of Grant funds for LGBTQI+ health-related research topics will prevent [researchers] from continuing and completing their research projects, thereby adversely impacting [their] ability to publish studies and to secure tenured positions in academia." *Id.* at *15. For early-career researchers, losing a grant often means the collapse of preliminary independent research projects, critical for building a publication record, establishing professional credibility, and securing tenure-track positions.[54] For established researchers, Defendants' actions have resulted in the dismantling of their life's work, the demolition of the infrastructure of their research, and their inability to continue the lifesaving research to which they have dedicated their careers.[55]

Beyond the human toll, the broader scientific enterprise suffers as vital training pathways are severed, and specialized knowledge is lost. As one GLMA member warned in a similar challenge, "without ongoing funding to support LGBTQI+ health research, we will lose an entire generation of researchers and health specialists."[56]

---

[54]     Sheldon Decl. ¶21, *supra* note 20; *see also*, *e.g.*, App.1007; App.1212-17; App.1286-91.

[55]     Sheldon Decl. ¶20, *supra* note 20.

[56]     Streed Decl. ¶27, *supra* note 47.

23

Third, "[t]he abrupt termination of the Grants, and the withholding of all federal funding for LGBTQI+-related health research, also irreparably harms the LGBTQI+ participants in the [] research." *GLMA*, 2025 WL 2377705, at *15. Many research participants have committed their time and trust to such research with the expectation of continuity, so leaving critical health interventions incomplete effectively endangers their health.[57] As a GLMA member has explained, "[e]xcluding research specifically with transgender and gender-diverse people is inherently creating bias amongst research literature," making it harder for healthcare providers to care for their LGBTQI+ patients.[58]

In sum, the Directives are arbitrary and capricious because Defendants failed to consider the consequences of them, including their negative impact on researchers, institutions, study participants, fields of academic study, bodies of research, and the communities that would benefit from such research.

### E. The Challenged Directives serve a discriminatory purpose.

Finally, it was arbitrary and capricious to prohibit funding for LGBTQI+ health for a discriminatory purpose. The Challenged Directives are "part of a constellation of close-in-time executive actions directed at transgender Americans

---

[57]    *See*, *e.g.*, Spinelli Decl. ¶¶10, 14; Streed Decl. ¶¶10, 22, 26; Littleton Decl. ¶14; Moe Decl. ¶23, *supra* note 47; *see also*, *e.g.*, App.0864-75; App.1114-15.

[58]    Roe Decl. ¶17, *supra* note 47.

that contained powerfully demeaning language," which "in tone and language, conveys a fundamental moral disapproval of transgender Americans." *Orr v. Trump*, 778 F.Supp.3d 394, 417 (D. Mass. 2025) (subsequent history omitted); *see also Talbott v. United States*, 775 F.Supp.3d 283, 331 (D.D.C. 2025). They "den[y] the very existence of transgender people and instead seek[] to erase them from the federal vocabulary altogether." *Washington v. Trump*, 768 F.Supp.3d 1239, 1250 (W.D. Wash. 2025). One "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405, 444 (D. Md. 2025).

## III.  The August 15 Statement does not moot Appellees' challenge to the Challenged Directives.

The Government argues the August 15 Statement superseded the Challenged Directives, thereby rendering this case moot. Gov't Br. 24-27. It is mistaken. <u>First</u>, the August 15 Statement did not supersede, rescind, or otherwise replace the Directives. <u>Second</u>, even if it did, the voluntary cessation exception bars the Government's attempt to moot the case through post-appeal conduct because it cannot meet the longstanding and "heavy" burden that applies in such circumstances. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). <u>Third</u>, even if the August 15 Statement successfully mooted the case (it does not), the government is not entitled to automatic vacatur of the district court's order on remand.

25

**A.    The August 15 Statement does not supersede or replace the Challenged Directives.**

By its own terms, the August 15 Statement "is not an exhaustive list of all agency priorities," and nothing in it refers to the Challenged Directives. Further, the government admitted, under oath, *after* the August 15 Statement was issued, that the Challenged Directives remain in effect. *See*, *e.g.*, Supp.App.2772-99 (sworn August 19 statement that "NIH may apply the Challenged Directives" to grant applications). This alone forecloses a finding of mootness. Because the government "refuses to disavow" the Directives, Plaintiffs' challenge remains justiciable. *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 54 (1st Cir. 2021).

To successfully supersede the Directives, the August 15 Statement needed to "replace[]" them, not merely modify or add to them. *In re Cigar Ass'n of Am.*, 812 F. App'x 128, 136 (4th Cir. 2020). NIH had to take the "concrete step" of issuing new guidance that "rendered obsolete" the Directives. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1118 (10th Cir. 2010). That didn't happen. The August 15 Statement instead supplemented the same problematic language that plagues the Directives—like the instruction against funding "low-value and off-mission research activities or projects – including DEI and gender identity research activities and programs," Gov't Br. 7-8 (quoting Add.0108-09)—with vague and subjective instructions to fund such research only "when scientifically justified" and free of "poorly measured concepts like systemic racism." Gov't Br. 25.

26

The August 15 Statement expands upon (but does not override) NIH's *false* statement that "research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans," App.0610, by citing a deeply flawed HHS report purporting to review the research pertaining to treatment for gender dysphoria in minors. *See* Gov't Br. 25.[59] But the August 15 Statement does not address the categorical defunding or de-prioritization of *other* research pertaining to "transgender issues" pursuant to the Directives. And what's more, even the flawed HHS report on which Defendants rely points to a need for *more* research pertaining to gender-affirming medical care for minors, not less.

Nothing in the August 15 Statement can reasonably be read as overriding the Challenge Directives. Far from mooting this case, the vague and arbitrary language introduced by the August 15 Statement underscores the continued need for this Court's review.

---

[59]    *See*, *e.g.*, Nadia Dowshen, et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, 77 J. Adolescent Health 342-345 (2025); G. Nic Rider, et al., *Scientific Integrity and Pediatric Gender Healthcare: Disputing the HHS Review*, Sexuality Research & Social Policy (2025), https://doi.org/10.1007/s13178-025-01221-5.

**B.    The voluntary cessation doctrine bars mootness here.**

Even if the Government could show that the August 15 Statement replaced the Challenged Directives (it did not), Plaintiffs' case still would not be moot. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). Absent this sensible and broad grant of authority, the government would be "free to return to [its] old ways." *Id.* (quotation omitted). The voluntary cessation doctrine accordingly empowers courts to retain jurisdiction over a case to prevent a perpetual game of cat and mouse in which "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off, repeating this cycle until [it] achieves all [its] unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

Where a defendant invokes mootness based on its own voluntary cessation of the offending activity, that defendant alone "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quotation omitted). To satisfy this heavy burden, a defendant must show (1) "the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation" and (2) there is "no reasonable expectation of recurrence." *ACLU of Massachusetts v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44,

28

55-56 (1st Cir. 2013). Unless "it can be said with assurance" that recurrence is unlikely and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," the matter remains justiciable. *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979). The government cannot meet this exacting standard. It doesn't even try.

*First*, the government has not once claimed that the purported change effected by the August 15 Statement was motivated by anything other than this litigation. Thus, the government fails the first prong of the voluntary cessation exception and, for that reason alone, cannot establish mootness.

*Second*, the government has not provided the required "assurance" that the conduct challenged by Plaintiffs, including its effects, will not recur. *Davis*, 440 U.S. at 631. "The heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 189 (quotation omitted). Again, the government has not met its burden. If anything, the August 15 Statement's supplementation of the Challenged Directives' already-problematic provisions bespeaks an intent to moot this case without having to "completely and irrevocably eradicate[] the effects of" the Challenged Directives. *Davis*, 440 U.S. at 631; *see also Already, LLC*, 568 U.S. at 93. The August 2015 Statement does nothing to undo the unlawfulness identified by the district court and provides no assurance that "the

challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189. The government accordingly fails to meet the second prong of the voluntary cessation exception.

### C.    Automatic vacatur on remand does not apply.

The government's attempt to convert its unpersuasive mootness argument into automatic vacatur on remand also fails. The government mechanically recites the general rule that a case mooted on appeal should be dismissed with orders to vacate the district court's order. But it ignores settled Supreme Court precedent that "vacatur must be decreed for those judgments whose review is … prevented through happenstance—that is to say, where a controversy presented for review has become moot due to circumstances unattributable to any of the parties." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994) (cleaned up). Undisputedly, that is not the case here.

Any purported mootness here (there isn't any) is attributable to the government's issuance of "new guidance" aimed at mooting the district court's decision. Gov't Br. 25. Indeed, the "principal condition" courts consider in deciding whether to order vacatur on remand is "whether the party seeking relief from the judgment below caused the mootness by voluntary action." *Id.* at 24. Where, as here, an appellant "intentionally moots the case," the appropriate remedy is to "dismiss the appeal without vacating the district court's order or judgment." *Town of*

*Newburgh v. Newburgh EOM LLC*, 151 F.4th 96, 103 (2d Cir. 2025). Otherwise, "the appellant would be able to eliminate its loss without an appeal and deprive the [appellee] of the judicial protection it has fairly won." *Id.*

Put simply, vacatur is an "equitable remedy, not an automatic right." *Nat'l Black Police Ass'n v. D.C.*, 108 F.3d 346, 351 (D.C. Cir. 1997) (citing *Bancorp Mortg.*, 513 U.S. at 23-25). It follows that "where mootness results from voluntary action, vacatur should not be granted unless to do so would serve the public interest." *Id.*

The government has not identified any public interest in vacating the district court's order. It is not in the public interest for the government to flagrantly break the law or recklessly endanger people's futures and livelihoods, all to serve its own politically motivated and discriminatory purpose. Nor is it in the public interest for the government to unilaterally moot its own appeal and obtain swift vacatur of its loss. Even if the government had mooted this case—and it did not—fairness and justice require maintaining the judgment of the district court.

## CONCLUSION

The Court should affirm the district court's judgment.

Dated: November 19, 2025.

Respectfully submitted,

*/s/ Omar Gonzalez-Pagan*

Elizabeth P. Hecker
**CROWELL & MORING LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
(202) 624-2500
ehecker@crowell.com

Omar Gonzalez-Pagan
**LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Matthew J. Stanford
**BRYAN CAVE LEIGHTON
PAISNER LLP**
2 N. Central Ave., Suite 2100
Phoenix, AZ 85004-4406
(602) 364-7000
matt.stanford@bclplaw.com

Karen L. Loewy
**LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.**
815 16th Street NW, Suite 4140
Washington, DC 20006
(202) 804-6245
kloewy@lambdalegal.org

Carlie Tenenbaum
**BRYAN CAVE LEIGHTON
PAISNER LLP**
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
(415) 675-3400
carlie.tenenbaum@bclplaw.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,491 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: November 19, 2025.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan