Nos. 25-1611, 25-1612

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
(No. 25-1611)

AMERICAN PUBLIC HEALTH ASSOCIATION, IBIS REPRODUCTIVE HEALTH;
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE
EDWARDS; PETER LURIE; NICOLE MAPHIS,

*Plaintiffs-Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, in his official
capacity as Director of the National Institutes of Health; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in
his official capacity as Secretary of the United States Department of Health
& Human Services,

*Defendants-Appellants*.
(Caption continued on inside cover)

Appeals from the U.S. District Court for the District of Massachusetts

**BRIEF OF THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES;
THE ASSOCIATION OF AMERICAN UNIVERSITIES; AND OTHER
HIGHER EDUCATION ASSOCIATIONS AS *AMICI CURIAE* IN
SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Lindsay C. Harrison
Ishan K. Bhabha
Betsy Henthorne
Sophia W. Montgomery
Logan Wren
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com
*Counsel for Amici Curiae*

———————————————

(No. 25-1612)

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAII; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health & Human Services, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAY BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; NATIONAL INSTITUTES OF HEALTH; NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE; NATIONAL HEART, LUNG, AND BLOOD INSTITUTE; NATIONAL HUMAN GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON AGING; NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES; NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT; NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS; NATIONAL INSTITUTE OF DENTAL AND CRANIOFACIAL RESEARCH; NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES; NATIONAL INSTITUTE ON DRUG ABUSE; NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES; NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES; NATIONAL INSTITUTE OF MENTAL HEALTH; NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES; NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE; NATIONAL INSTITUTE OF NURSING RESEARCH; NATIONAL LIBRARY OF MEDICINE; NATIONAL CENTER FOR ADVANCING TRANSLATIONAL SCIENCES; JOHN E. FOGARTY INTERNATIONAL CENTER FOR ADVANCED STUDY IN THE HEALTH SCIENCES; NATIONAL CENTER FOR COMPLIMENTARY AND INTEGRATIVE HEALTH; NIH CENTER FOR SCIENTIFIC REVIEW,

*Defendants-Appellants*.

———————————————

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* submit the following corporate disclosure statement:

The Association of American Medical Colleges has no parent corporation, and no publicly held company has any ownership interest in it.

The Association of American Universities has no parent corporation, and no publicly held company has any ownership interest in it.

The Association of Public and Land-grant Universities has no parent corporation, and no publicly held company has any ownership interest in it.

The American Council on Education has no parent corporation, and no publicly held company has any ownership interest in it.

The National Association of Independent Colleges and Universities has no parent corporation, and no publicly held company has any ownership interest in it.

COGR has no parent corporation, and no publicly held company has any ownership interest in it.

The American Association of State Colleges and Universities has no parent corporation, and no publicly held company has any ownership interest in it.

The Association of Governing Boards of Universities and Colleges has no parent corporation, and no publicly held company has any ownership interest in it.

November 19, 2025

*/s/ Lindsay C. Harrison*
Lindsay C. Harrison

## RULE 29 STATEMENT

All parties have consented to the filing of this brief. No part of this brief was authored, in whole or in part, by counsel for any party. No person, including but not limited to any party or party's counsel, other than *Amici*, contributed any money to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

November 19, 2025                    */s/ Lindsay C. Harrison*
                                     Lindsay C. Harrison

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................. i

RULE 29 STATEMENT ........................................................................ iii

TABLE OF AUTHORITIES ..................................................................... v

IDENTITY AND INTEREST OF *AMICI CURIAE*................................... 1

INTRODUCTION ................................................................................... 4

ARGUMENT ......................................................................................... 6

I.    Decisions About Funding Scientific Research Traditionally
      Have Been and Should Be Made Using Scientific
      Methodology and Expertise. ........................................................... 6

      A.    NIH has long been guided by scientific principles in
            its grant process. ................................................................... 7

      B.    What NIH has done here deviates from this
            longstanding practice of scientific decisionmaking. ............. 10

II.   NIH's Actions Here Threaten to Upend the Longstanding
      Collaborative Relationship Between the Federal
      Government and Research Institutions. ......................................... 17

      A.    NIH grants are core to the government-higher
            education relationship. ......................................................... 17

      B.    NIH's mass grant terminations have shattered
            institutions' reliance on this collaborative
            relationship and squandered U.S. taxpayer dollars............. 19

III.  The Court of Federal Claims Is Not the Appropriate Forum
      for Relief from NIH Grant Terminations. ...................................... 27

CONCLUSION ..................................................................................... 33

# TABLE OF AUTHORITIES

**CASES**

*APHA v. NIH*, 791 F. Supp. 3d 119 (D. Mass. 2025)..............12, 13, 14-15

*Ass'n of American Universities v. Department of Energy*, 789 F. Supp. 3d 118 (D. Mass. 2025), *appeal docketed*, No. 25-1727 (1st Cir. July 31, 2025) ........................................................17, 18

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)..................................29, 32

*Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) .......................................................................................28

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020) ...........................................................20

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) .....................................32

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ..................................................................................16

*Tootle v. Secretary of Navy*, 446 F.3d 167 (D.C. Cir. 2006).....................28

*United States v. Tohono O'Odham Nation*, 563 U.S. 307 (2011) ..................................................................................................28

**STATUTES**

42 U.S.C. § 282(b) ...................................................................................14

42 U.S.C. § 283p ......................................................................................14

42 U.S.C. § 284a........................................................................................8

42 U.S.C. § 284a(a)(3)(A)..........................................................................8

42 U.S.C. § 285t(b).....................................................................................13

42 U.S.C. § 287d(d)(4)(A)..........................................................................13

42 U.S.C. § 289a.........................................................................................8

Public Health Service Act, ch. 373, § 301, 58 Stat. 682, 691-92 (1944) .................................................................... 7, 27

Ransdell Act, ch. 320, 46 Stat. 379 (1930) ................................................ 7

**LEGISLATIVE MATERIALS**

Reauthorization of Health Legislation: Hearing Before the S. Comm. on Labor and Human Resources on S.2311, 97th Cong. 70 (1982) ........................................................ 8

**OTHER AUTHORITIES**

42 C.F.R. § 52h.7 ................................................................ 8, 12

42 C.F.R. § 52h.8(f) ........................................................... 14

45 C.F.R. § 75.372(a) .................................................. 9, 11, 12

AAMC, *Impact of NIH Grant Terminations* (May 6, 2025), https://www.aamc.org/media/83356/download [https://perma.cc/2HMD-63UW] ........................................ 10

Rinad S. Beidas et al., *Implementation Science Grant Terminations in the United States*, Implementation Sci. (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC 12057266/ [https://perma.cc/BDW5-HB5V] ................................ 25

*Budget*, NIH, https://www.nih.gov/about-nih/organization/ budget [https://perma.cc/F7YY-48E7] (last updated June 13, 2025) .................................................................... 7

Chandelis Duster, *Countries Boost Recruitment of American Scientists Amid Cuts to Scientific Funding*, NPR (Mar. 29, 2025), https://www.npr.org/2025/03/29/nx-s1-5343966/ countries-boost-recruitment-of-american-scientists-amid- cuts-to-scientific-funding [https://perma.cc/LJ3W-QRPK] ................ 22

Sandro Galea & Kristen Bibbins-Domingo, *The Value of Academic Health Research*, 333 JAMA 1039 (2025), https://jamanetwork.com/journals/jama/fullarticle/2830676 ........................................................................................ 21

Nicholas W. Gilpin, *The NIH Is a Sound Investment for the US Taxpayer*, 14 eLife e106710 (2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC11936414/ [https://perma.cc/L9QN-HGGT] .......................................... 19

Government's Stay Application, *NIH v. APHA*, 145 S. Ct. 2658 (2025) (No. 25A103), 2025 WL 2146619 .............................. 29

Grants Policy Statement § 8.5.2 ......................................... 9, 11

Grant Witness: NIH Data, https://grant-witness.us/nih-data.html (last accessed Nov. 19, 2025) ............................... 10

Marcelo Jauregui-Volpe, *As American Science Faces Cuts, Other Countries See an Opportunity*, AAU (June 27, 2025), https://www.aau.edu/newsroom/leading-research-universities-report/american-science-faces-cuts-other-countries-see [https://perma.cc/LXG9-679W] ..................... 22

*Markey's NCI Designation: A Decade of Impact on Cancer Research*, University of Kentucky Research (May 25, 2012), https://research.uky.edu/news/markeys-nci-designation-decade-impact-on-cancer-research [https://perma.cc/L2FT-E7D7] .......................................................................... 18

NIH, *2018 Research Highlights – Clinical Advances* (Dec. 18, 2018), https://www.nih.gov/news-events/nih-research-matters/2018-research-highlights-clinical-advances [https://perma.cc/E2TA-V52X] ............................................ 16

NIH, *2019 Research Highlights – Human Health Advances* (Dec. 18, 2019), https://www.nih.gov/news-events/nih-research-matters/2019-research-highlights-human-health-advances [https://perma.cc/5Y24-74AT] ................................ 16

Press Release, University of Maryland School of Public Health, *NIH Funds First-of-Its-Kind Center to Study Resilience and Aging* (Sept. 8, 2025), https://sph.umd.edu/news/nih-funds-first-its-kind-center-study-resilience-and-aging [https://perma.cc/K429-BTDN]..............18

E.A. Reece et al., *Four Opportunities to Revitalize the US Biomedical Research Enterprise*, 44 Health Affs. 140 (2025) ....................................................................................... 3

*Robust NIH Funding Saves Lives, Strengthens America*, AAMC (Sept. 18, 2025), https://www.aamc.org/about-us/aamc-leads/robust-nih-funding-saves-lives-strengthens-america [https://perma.cc/KV3W-ZTX3] ......................................18

United for Medical Research, *NIH's Role in Sustaining the U.S. Economy* (2025 update), https://www.unitedformedicalresearch.org/wp-content/uploads/2025/03/UMR_NIH-Role-in-Sustaining-US-Economy-FY2024-2025-Update.pdf..............................18

Annie Waldman et al., *Science Shattered*, ProPublica (June 12, 2025), https://projects.propublica.org/nih-cuts-research-lost-trump/ [https://perma.cc/B8HY-ZHT9].......................11

*Why Diverse Representation in Clinical Research Matters and the Current State of Representation Within the Clinical Research Ecosystem, in Improving Representation in Clinical Trials and Research: Building Research Equity for Women and Underrepresented Groups* 23 (Kirsten Bibbins-Domingo & Alex Helman eds., 2022), https://www.ncbi.nlm.nih.gov/books/NBK584403/pdf/Bookshelf_NBK584403.pdf [https://perma.cc/MW88-GSX2] ....................15

Katherine J. Wu, *The NIH's Grant Terminations Are "Utter and Complete Chaos,"* Atlantic (Mar. 14, 2025) .................................10

Katherine J. Wu, *The NIH's Most Reckless Cuts Yet*, Atlantic (Mar. 27, 2025), https://www.theatlantic.com/health/archive/2025/03/trump-nih-clinical-trials-patient-safey/682217/ [https://perma.cc/QF9Q-YTHG]..............................24

Sen. Todd Young & Matthew Pottinger, Opinion, *Funding for R&D Isn't a Gift to Academia*, Wash. Post (Mar. 24, 2025), https://www.washingtonpost.com/opinions/2025/03/24/ research-development-china-national-security/ [https://perma.cc/ZB3D-LRCK] ........................................................... 17

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae*'s member institutions are collectively responsible for the vast majority of scientific research sponsored by the National Institutes of Health (NIH):

- The **Association of American Medical Colleges** (AAMC) is a nonprofit association of 162 accredited U.S. medical schools, nearly 500 academic health systems and teaching hospitals, and more than 70 academic societies dedicated to improving the health of people everywhere through medical education, research, care, and community collaboration.

- The **Association of American Universities** (AAU) is composed of 69 leading public and private research universities, which collectively earn the majority of competitively awarded federal funding for research that improves public health, seeks to address national challenges, and contributes significantly to our economic strength while educating and training tomorrow's visionary leaders and innovators.

- The **Association of Public and Land-grant Universities** (APLU) consists of more than 240 public research universities, land-grant institutions, and state university systems across all 50 states, the District of Columbia, and six U.S territories that conduct $64 billion in research.

- The **American Council on Education** (ACE), representing all types of U.S. accredited, degree-granting colleges and universities, serves as the major coordinating body for the nation's colleges and universities, with a diverse membership of nearly 1,600 colleges and universities, related associations, and other organizations.

- The **National Association of Independent Colleges and Universities** (NAICU) is the unified national voice of private,

nonprofit higher education in the United States, which includes more than five million students attending 1,700 independent colleges and universities.

- **COGR**, an association of over 225 public and private research universities, affiliated medical centers, and independent research institutes, is a national authority on federal policies and regulations affecting U.S. research institutions.

- The **American Association of State Colleges and Universities** (AASCU) is a higher education association that represents over 500 regional public colleges, universities, and systems.

- The **Association of Governing Boards of Universities and Colleges** (AGB) has, for nearly 100 years, remained the premier organization centered on governance in higher education, serving more than 1,200 member boards, 1,900 institutions, and almost 40,000 board members.

As critical components of their missions, *Amici*'s member institutions have made significant investments in infrastructure, equipment, researchers, and staff to pursue groundbreaking scientific research, relying in large part on research grants secured through NIH's competitive funding processes and the stability those processes provide. Institutions have enrolled individuals in multi-year clinical trials designed to create and test life-saving treatments, they have built laboratories designed to conduct experiments to develop novel therapies, and they have developed education and training programs to support the next generation of biomedical researchers.

The research conducted by *Amici*'s members—with NIH's longstanding support—has yielded discoveries that have transformed health care and improved the lives of millions of Americans. It "has led to transformative scientific and societal breakthroughs, establishing the United States as a global leader in research and acting as a vital engine of the nation's economy" while providing "advanced biomedical training to countless talented global scholars every year." E.A. Reece et al., *Four Opportunities to Revitalize the US Biomedical Research Enterprise*, 44 Health Affs. 140 (2025). This success is possible only because of NIH's longstanding commitment to funding research according to scientific principles.

*Amici* submit this brief to provide the research community's perspective on the importance of NIH's continued adherence to scientific principles in grantmaking, the dire consequences—for institutions, individual researchers, and the entire research enterprise—of upholding NIH's recent *en masse* grant terminations, and the inability of the Court of Federal Claims to provide complete, or even meaningful, relief from NIH's actions here.

## INTRODUCTION

For decades, NIH has partnered with researchers at public and private institutions to encourage, advance, and support the study of health and medicine by providing grants for research and career training programs. In issuing those grants, NIH has consistently engaged in a methodological, exacting, and peer-reviewed process to fund scientifically sound projects.

Then, starting in February 2025, NIH began abruptly terminating grants for allegedly failing to align with policy priorities of the new administration. This was not just unusual—it was unheard of. Prior to this year, grants were rarely terminated midstream, and even then, only for serious problems that could not otherwise be remedied, such as research misconduct. The arbitrary and blunt process NIH undertook to identify grants for termination was wholly at odds with the scientific rigor that has been a cornerstone of the NIH grant-funding processes.

Because NIH grants are part of a symbiotic relationship between the government and the research community, forged over decades of mutual reliance in pursuit of innovation and scientific progress, far more is at stake than lost funding. Grant terminations *en masse*, for reasons

4

wholly unconnected to science, threaten to destabilize the entire system and, with it, the future health of the nation. If federal research grants can be cancelled midstream based on fluctuating political views or policy preferences, that will undermine the government's longstanding collaborative relationship with academic institutions to advance scientific progress and improve health. In particular, allowing such abrupt and inadequately justified terminations will undermine the careers of early-stage researchers; the ability of researchers to leverage prestigious NIH funding to build research programs that benefit the public; and the continued investment of academic institutions in research advancing scientific progress and understanding for all.

The government's attempt to channel any challenge to its actions through the Court of Federal Claims is both unworkable and legally flawed. Its view mistakes NIH grants for procurement contracts, and researchers for bidders to those contracts, and belies a fundamental misunderstanding of the nature of these grants, the role they play in the research ecosystem, and their significance to grant recipients. It is also wrong as matter of law. The Court of Federal Claims can neither adjudicate Plaintiffs' challenge—a classic Administrative Procedure Act

(APA) suit—nor grant the equitable relief they seek. Federally funded researchers do not seek a payout; they want to keep working on the research that NIH selected them to carry out with federal support. The Court of Federal Claims is powerless to offer such relief, and the district court therefore properly exercised its jurisdiction.

For the reasons that follow, *Amici* request that the district court's judgment be affirmed.

## ARGUMENT

### I.    Decisions About Funding Scientific Research Traditionally Have Been and Should Be Made Using Scientific Methodology and Expertise.

For decades, as required by statutes and regulations, NIH has engaged in science-based decisionmaking about research funding. This has helped ensure that NIH awards fund only methodologically sound research projects that move their scientific disciplines forward and that these projects will proceed to conclusion unless the same scientific principles support termination. As a result, institutions and researchers are able to plan long-term projects without fear that work will be upended midstream, forcing them to halt their research and waste taxpayer dollars. NIH's actions here—issuing top-down termination directives

without any individualized inquiry or scientific justification—are utterly inconsistent with this decisionmaking system grounded in and guided by scientific principles. Allowing those actions to stand risks upending that system by injecting uncertainty in place of the stability Plaintiffs and *Amici*'s members rely on.

### A.    NIH has long been guided by scientific principles in its grant process.

NIH is the world's preeminent funder of scientific research. Nearly a century ago, Congress established the agency to "ascertain[] the cause, prevention, and cure of disease affecting human beings." Ransdell Act, ch. 320, 46 Stat. 379 (1930). Since 1944, NIH has advanced that goal through "extramural" funding for external research at universities and other institutions. *See* Public Health Service Act, ch. 373, § 301, 58 Stat. 682, 691-92 (1944). Today, more than 80% of NIH's annual budget is dedicated to extramural funding, supporting more than 300,000 research personnel at over 2,500 institutions.[1]  In fiscal year 2024, NIH spent over $36 billion on over 60,000 research grants.

---

[1]  *Budget*, NIH, https://www.nih.gov/about-nih/organization/budget [https://perma.cc/F7YY-48E7] (last updated June 13, 2025).

Consistent with its congressional mandate, NIH's efforts are driven by scientific methodology and the health needs of the nation. That includes the processes by which NIH awards, administers, and, if necessary, terminates grants. Pursuant to statutes and regulations, grant applications undergo three layers of scientific evaluation: *First*, review by a "scientific review group" or "study section" composed of peer reviewers who are established scientists, 42 U.S.C. § 289a; 42 C.F.R. § 52h.7; *second*, review by an external "advisory council" made up largely, again, of "leading representatives of the [relevant] health and scientific disciplines," 42 U.S.C. §§ 284a, 289a; and *third*, review by the relevant Institute or Center's director—again, typically a leading scientist in the Institute's area of focus. *See* Gov't Br. at 4 (acknowledging this process). This process was designed to "prevent[] funding [for] 'questionable projects'" without "scientific merit," Reauthorization of Health Legislation: Hearing Before the S. Comm. on Labor and Human Resources on S.2311, 97th Cong. 70 (1982) (written responses by Assistant Secretary of HHS Edward Brandt), and to ensure that only "projects which show promise of making valuable contributions to human knowledge" receive funding, 42 U.S.C. § 284a(a)(3)(A).

8

In the very rare circumstances in which it is necessary to terminate a grant, that process, too, follows scientific principles in a way that promotes stability for specific research projects and the system overall. The applicable regulations provide that NIH may unilaterally terminate an award only: (1) "if the [awardee] fails to comply with the terms and conditions of the award," or (2) "for cause." 45 C.F.R. § 75.372(a). NIH's Grants Policy Statement (GPS) makes clear that unless immediate termination is "necessary, such as to protect the public health and welfare from the effects of a serious deficiency," NIH "generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action." GPS § 8.5.2.

Consistent with these policies, before 2025, NIH typically terminated grants only with the recipient's consent or where the recipient failed to comply with the terms and conditions of the award and NIH was unable to identify corrective action. *See* A0122-23 (citing deposition testimony of NIH Chief Grants Management Officer). All told, since 2012, NIH has terminated "probably less than five" grants for noncompliance with the terms and conditions of the original award. *Id*.

9

**B.    What NIH has done here deviates from this longstanding practice of scientific decisionmaking.**

NIH's actions here—unceremoniously terminating over 4,500 grants over a period of months[2]—are an alarming departure from the agency's longstanding adherence to the scientific principles just described. In the words of current and former NIH officials, these directives and resulting blanket terminations are "unprecedented in the history of the agency": Until now, NIH "was not in the business of canceling its grants," and especially not "in the middle of a project."[3] This

---

[2] Plaintiffs identified 1,200 terminated grants (nearly 850 in *Massachusetts* and 367 in *APHA*). Partial Final Judgment, *Massachusetts v. Kennedy*, No. 25-cv-10814 (D. Mass. June 23, 2025), ECF No. 151; A1619-35. That figure is underinclusive. It does not include any grants to researchers or institutions other than Plaintiffs or members of the associational Plaintiffs in *APHA* and *Massachusetts*, including many of *Amici's* member institutions, who have had myriad grants terminated on the grounds challenged in these cases. *See* Grant Witness: NIH Data, https://grant-witness.us/nih-data.html (last accessed Nov. 19, 2025) (tracking over 4,500 NIH grants canceled in 2025, totaling over $14 billion).

[3] *See, e.g.*, AAMC, *Impact of NIH Grant Terminations* (May 6, 2025), https://www.aamc.org/media/83356/download [https://perma.cc/2HMD-63UW]; Katherine J. Wu, *The NIH's Grant Terminations Are "Utter and Complete Chaos,"* Atlantic (Mar. 14, 2025), at A1424-38; Ex. 28 ¶ 20, *APHA*, No. 25-cv-10787 (D. Mass. Apr. 25, 2025), ECF No. 38-28 (declaration of anonymous epidemiology professor) ("In my decades-long career, I have never personally experienced a grant being discontinued

departure from longstanding NIH practice, without reasoned explanation and without taking into account the serious reliance interests engendered by that practice, was arbitrary and capricious in violation of the APA. And not only are these sweeping terminations unprecedented, they are also contrary to congressional mandates, binding agency regulations, and NIH's own policies.

*First*, NIH's longstanding policy is that grant termination is to be used only as a last resort, *see* GPS § 8.5.2, and in any event, is only an option under narrow circumstances that NIH did not even attempt to demonstrate were present here. *See* 45 C.F.R. § 75.372(a). With its blanket terminations, NIH entirely sidestepped the requisite process and limitations on grounds for termination.

*Second*, decisions regarding grant terminations—other than those relating to financial or other misconduct—must be guided by scientific principles and methodology. *See supra* Part I.A; 45 C.F.R. § 75.372(a). But NIH's process here pushed these principles aside, as is evident from

---

in the middle of a project—until now."); *see also* Annie Waldman et al., *Science Shattered*, ProPublica (June 12, 2025), https://projects. propublica.org/nih-cuts-research-lost-trump/ [https://perma.cc/B8HY-ZHT9].

its failure to engage in any meaningful individualized inquiry regarding the terminated grants. NIH simply compared language in titles and project descriptions to a list of proscribed topics. *See APHA v. NIH*, 791 F. Supp. 3d 119, 151 (D. Mass. 2025). It did not evaluate the quality of individual study designs or compare projects to other existing research to determine whether the projects were likely to advance understanding in a particular research discipline. *Cf.* 42 C.F.R. § 52h.7. Nor did it evaluate whether a particular research project had made sufficient progress toward pre-approved aims to contribute to scientific understanding. *Cf.* 45 C.F.R. § 75.372(a). That approach led to the termination of grants studying, for example, Alzheimer's disease, cancer, overdose risk, and cutting-edge AI-based treatments. *See, e.g.*, Pl. States' Resp. Br. at 10-12 (describing numerous examples).

NIH did not rely on—or even solicit—the views of scientific experts before terminating thousands of grants. And it failed to do so despite having access to thousands of internal and external scientists across every field related to the grants at issue, including those who, at three distinct stages of rigorous scientific review, had already evaluated the research at issue and determined that it would advance scientific

understanding in areas NIH prioritized for funding. *See supra* Part I.A. Instead, NIH's process was dictated by political appointees—some from outside the agency and/or lacking any science background—rather than the staff closest to grants, who would be tasked with making these kinds of decisions in the normal course. *Compare* Ex. 8 at 46:10-11, *APHA v. NIH*, No. 25-cv-10787 (D. Mass. Apr. 25, 2025), ECF No. 38-8 (testimony by NIH grants manager explaining that, in the normal course, she "work[s] with the Institutes and Centers to help them determine how to develop corrective actions" before resorting to termination), *with APHA*, 791 F. Supp. 3d at 148 (same grant manager's testimony that the Acting NIH Director ordered the terminations at issue here).

*Third*, NIH's directives and resulting terminations flout statutory and regulatory imperatives relating to the study of health and other related disparities. These areas of study now evidently prohibited by NIH due to "changed priorities" are precisely those topics on which Congress instructed NIH to conduct research, recognizing that they have scientific merit and that the public interest warrants such study. *See, e.g.*, 42 U.S.C. § 285t(b) (establishing National Institute on Minority Health and Health Disparities and directing Institute's director to "give priority to

13

conducting and supporting minority health disparities research"); *id.* § 287d(d)(4)(A) (similar with respect to Office of Research on Women's Health, requiring "research on gender differences" in "clinical drug trials" and "disease etiology"); *id.* § 283p (instructing NIH director to "encourage efforts to improve research related to the health of sexual and gender minority populations"); *id.* § 282(b) (similar). And agency regulations require, for example, scientific review groups evaluating grant applications to consider "[t]he adequacy of plans to include both genders, minorities, children and special populations as appropriate for the scientific goals of the research," 42 C.F.R. § 52h.8(f), because building a representative sample is a hallmark of sound science. The challenged directives cannot be reconciled with these statutory and regulatory mandates because they prohibit the funding of research that Congress and binding agency regulation requires. *See* Pl. States' Resp. Br. at 11-12 (describing examples of grants that fulfill these statutory and regulatory mandates but were terminated).

The government's contention that a study's focus on the impact of a disease or treatment on a specific minority or underserved population somehow renders it nonscientific, *see APHA*, 791 F. Supp. 3d at 131, 150-

51, 181-82 (discussing government's boilerplate statement that DEI is "antithetical to scientific inquiry"), is belied by scientific consensus, inconsistent with Congressional mandates, and at odds with NIH's own longstanding position, across presidential administrations. Scientific experts have long recognized the many important reasons to study specific populations. And so has Congress—that is why it has mandated that NIH fund health-disparities research. Failure to study minority and underserved populations can, for instance, compound existing health disparities, especially when certain conditions occur more frequently in certain populations, and reduce access to effective medical treatments or interventions for those groups.[4] Additionally, research seeking to understand why certain populations have different treatment outcomes or suffer disparate rates of disease can help scientists and doctors understand the scientific basis for those diseases in new ways, resulting

---

[4] *See, e.g.*, *Why Diverse Representation in Clinical Research Matters and the Current State of Representation Within the Clinical Research Ecosystem, in Improving Representation in Clinical Trials and Research: Building Research Equity for Women and Underrepresented Groups* 23, 23-35 (Kirsten Bibbins-Domingo & Alex Helman eds., 2022), https://www.ncbi.nlm.nih.gov/books/NBK584403/pdf/Bookshelf_NBK584403.pdf [https://perma.cc/MW88-GSX2].

in information that improves care and treatments for every population and individual. Indeed, across administrations, NIH has in the past touted its findings from such studies.[5]

***

The Executive Branch has discretion to determine its policy priorities, including ones that depart from those of prior administrations, *see Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983), but it must do so in accordance with law, including the APA, *see id.* at 41-43. Such a significant departure by NIH from its longstanding, rigorous adherence to scientific principles in grantmaking requires observance of its own procedures and those mandated by the APA. That is especially true since the relationship between NIH and the research community depends on stability in

_____

[5] *See, e.g.*, NIH, *2018 Research Highlights – Clinical Advances* (Dec. 18, 2018), https://www.nih.gov/news-events/nih-research-matters/2018-research-highlights-clinical-advances [https://perma.cc/E2TA-V52X] (highlighting study on factors contributing to higher incidence of diabetes for African Americans); NIH, *2019 Research Highlights – Human Health Advances* (Dec. 18, 2019), https://www.nih.gov/news-events/nih-research-matters/2019-research-highlights-human-health-advances [https://perma.cc/5Y24-74AT] (highlighting study on asthma treatments for African-American children).

grantmaking and on adherence to scientific methodology. It is not an overdramatization to say that, if any future administration may simply terminate NIH grants midstream based on whether the grant titles sound like research it believes should continue, scientific progress will be set back decades, delaying or preventing entirely discoveries that would have improved the health of the American public.

## II. NIH's Actions Here Threaten to Upend the Longstanding Collaborative Relationship Between the Federal Government and Research Institutions.

### A. NIH grants are core to the government-higher education relationship.

In the words of Senator Todd Young of Indiana, NIH grants are not "gift[s]" or "handouts."[6] They are a mutual investment by the government and research institutions to drive progress and innovation that benefits patients, communities, and the broader American public. The public, through the federal government, invests in the research and training carried out in universities and their hospitals. *See, e.g.*, *Ass'n of Am.*

---

[6] Sen. Todd Young & Matthew Pottinger, Opinion, *Funding for R&D Isn't a Gift to Academia*, Wash. Post (Mar. 24, 2025), https://www.washingtonpost.com/opinions/2025/03/24/research-development-china-national-security/ [https://perma.cc/ZB3D-LRCK].

*Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 150 (D. Mass. 2025), *appeal docketed*, No. 25-1727 (1st Cir. July 31, 2025). In return, universities and medical schools train future researchers and physicians, provide the community health care, and improve that care through medical and scientific advances.[7] In literal terms, every dollar invested in NIH-funded research returns $2.56 in economic activity—generating, in 2024, over 400,000 jobs and $94.58 billion in new economic activity across the country.[8] This relationship between the government and higher education has been aptly characterized as "symbiotic." *Id.*

---

[7] *See, e.g.*, Press Release, University of Maryland School of Public Health, *NIH Funds First-of-Its-Kind Center to Study Resilience and Aging* (Sept. 8, 2025), https://sph.umd.edu/news/nih-funds-first-its-kind-center-study-resilience-and-aging [https://perma.cc/K429-BTDN]; *Robust NIH Funding Saves Lives, Strengthens America*, AAMC (Sept. 18, 2025), https://www.aamc.org/about-us/aamc-leads/robust-nih-funding-saves-lives-strengthens-america [https://perma.cc/KV3W-ZTX3]; *Markey's NCI Designation: A Decade of Impact on Cancer Research*, University of Kentucky Research (May 25, 2012), https://research.uky.edu/news/markeys-nci-designation-decade-impact-on-cancer-research [https://perma.cc/L2FT-E7D7].

[8] United for Medical Research, *NIH's Role in Sustaining the U.S. Economy* (2025 update), https://www.unitedformedicalresearch.org/wp-content/uploads/2025/03/UMR_NIH-Role-in-Sustaining-US-Economy-FY2024-2025-Update.pdf.

Universities and medical schools play a critical role in the research ecosystem because they conduct fundamental research that may not be obviously or immediately marketable commercially.[9] Innovations and discoveries from federally funded research provide the foundations of further inquiry that is, in many cases, advanced by or combined with industry-sponsored research to develop treatments or diagnostics. These components of the research enterprise as a whole are neither interchangeable nor successful without each other.

### B. NIH's mass grant terminations have shattered institutions' reliance on this collaborative relationship and squandered U.S. taxpayer dollars.

Through this longstanding symbiotic relationship, NIH has induced reliance on its systems of scientific decisionmaking. Because funding recipients understand that grantmaking is governed by scientific principles and that grant terminations are exceedingly rare, they can

_____

[9] Nicholas W. Gilpin, *The NIH Is a Sound Investment for the US Taxpayer*, 14 eLife e106710 (2015), https://pmc.ncbi.nlm.nih.gov /articles/PMC11936414/ [https://perma.cc/L9QN-HGGT] (explaining that private sector cannot simply "replace the work that NIH does, … because the private sector is concerned mainly with profits," and providing as example "the abandonment of neuroscience R&D by several major pharmaceutical companies due to high drug development failure rates"— leaving a "gap … filled by" NIH).

confidently plan long-term projects without fear that work will be prematurely canceled based solely on changes in Executive Branch leadership. This certainty enables grantees, researchers, research participants, and other stakeholders to commit to, invest in, and conduct the research activities necessary to accomplish NIH's research mission. By terminating grants *en masse*, NIH has turned this relationship on its head, to everyone's detriment. Because NIH did not consider any of these reliance interests—or the serious consequences that would follow—in effecting these mass terminations, its actions are arbitrary and capricious and cannot stand. *See Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (agency action arbitrary and capricious for failure to address "legitimate reliance" interests by regulated parties).

In particular, if allowed to stand as precedent for future administrations, NIH's actions would undercut the ability of institutions, like *Amici*'s members, to plan, build, and equip critical research and clinical infrastructure. Upfront costs for such capital expenditures are often unrecoverable, so institutions rely on government assurances and the historical availability of research funding to plan and fund such

projects.[10] For instance, building a cancer research center requires significant upfront and sustained investments to secure state-of-the-art equipment and the facilities needed for diagnosis, treatment, and research. If, going forward, NIH can simply terminate grants midstream, *en masse*, and without any scientific basis, such investments will become much riskier and may be less likely to occur, or to occur at the same scope and scale. That is especially true for novel or ambitious projects, or those with longer time horizons—the very sorts of projects that NIH has long made possible.[11]

The systemwide uncertainty and precarity resulting from these terminations—and the prospect of a sea change in NIH's approach to funding if they are allowed to stand—will also make it more difficult for universities and research institutions to recruit and support high-quality

---

[10] *See, e.g.*, Pl. States' Resp. Br. at 16 ("Planning at research universities often occurs years in advance, and universities organize their affairs around the grants they receive.").

[11] *See* Sandro Galea & Kristen Bibbins-Domingo, *The Value of Academic Health Research*, 333 JAMA 1039 (2025), https://jamanetwork.com /journals/jama/fullarticle/2830676 (explaining NIH funding "allow[s] for large-scale research projects … that are simply not possible with smaller funders).

21

scientists. Without the stability of a system of research grants grounded in and governed by science, talented researchers may flee to other countries where they can more reasonably count on the consistency of research programs and funding.[12]

But institutions are far from the only stakeholders negatively affected. As described in Plaintiffs' briefs, the blanket terminations have had a devastating impact on individual recipients engaged in research, as well as their teams, including research staff, graduate students, and postdoctoral fellows. Pl. States' Resp. Br. at 16-17, 38-41; APHA Pls.' Answering Br. at 10, 42-43. For example, the AAMC is aware, based on conversations with its members, that some institutions have already reduced training programs and numbers of admitted graduate students as a direct result of terminated NIH grants. And if this is the new normal,

---

[12] *See, e.g.*, Chandelis Duster, *Countries Boost Recruitment of American Scientists Amid Cuts to Scientific Funding*, NPR (Mar. 29, 2025), https://www.npr.org/2025/03/29/nx-s1-5343966/countries-boost-recruitment-of-american-scientists-amid-cuts-to-scientific-funding [https://perma.cc/LJ3W-QRPK]; Marcelo Jauregui-Volpe, *As American Science Faces Cuts, Other Countries See an Opportunity*, AAU (June 27, 2025), https://www.aau.edu/newsroom/leading-research-universities-report/american-science-faces-cuts-other-countries-see [https://perma.cc/LXG9-679W].

many more researchers will suffer in the years to come. NIH funding is often a precursor to additional funding, because everyone throughout the research landscape understands that research chosen through NIH's rigorous review process has demonstrated promise to advance scientific understanding and rose above many other applications for that funding. Without continued funding, many researchers have had to abandon their projects midstream, leaving the American public without the benefit of the knowledge gained from the work done thus far.[13] That includes the clinical trials that have abruptly halted, depriving the participating individuals of potentially life-saving diagnoses and treatments.[14] Some of

---

[13] *See, e.g.*, A0872 (researcher did "not anticipate being able to secure sufficient funding to allow us to resume" study); A1114 (project was ended "about halfway through" a 15-month intervention period, resulting in "unusable" data and "biospecimen samples" that had to be discarded).

[14] *See* Suppl. App., *Massachusetts v. Kennedy*, No. 25-1612, at 101 (1st Cir. July 8, 2025) (study on suicide risk and prevention involving over 85 active participants was terminated midway, halting "essential suicide prevention care and regular suicide risk assessments, putting every active participant at very high risk for death or injury due to suicide"); *id.* at 327 (describing delays in "clinical trials for life-saving medications or procedures" that "harm lives of patients"—including a trial involving assisted living residents with Alzheimer's disease and related dementias and a trial using genetics to determine who will respond best to different classes of antibiotics).

these individuals may even "be left worse off than when they started" with the trial.[15]

The government downplays the reliance it engendered, and these ripple effects for research, by stating that NIH "invited grantees to request transition funds 'to support an orderly phaseout of the project,' mitigating any reliance concern." Gov't Br. at 42. But "transition funds," or closeout costs, cover only those expenses incurred before termination or that are needed to complete required activities to "close out" the grant. So they do not come close to accounting for grantees'—or institutions'—reliance interests in the ongoing progress and completion of their work, which has informed their decisionmaking, planning, and investments throughout the course of a funded project (and for many, their careers).

---

[15] Katherine J. Wu, *The NIH's Most Reckless Cuts Yet*, Atlantic (Mar. 27, 2025), https://www.theatlantic.com/health/archive/2025/03/trump-nih-clinical-trials-patient-safey/682217/ [https://perma.cc/QF9Q-YTHG] ("End a trial too early, and researchers might not be able to figure out if it worked—or participants may be left worse off than when they started.").

Among those harmed by the government's actions, researchers in the early stages of their careers are hit particularly hard.[16] By ending pathway training grants, NIH has removed critical opportunities for these developing scientists to advance and gain research experience, and institutions have been forced to rescind offers of admission to highly qualified graduate students and to reduce graduate program slots due to gaps in funding. NIH funding is also an invaluable career accelerant for early-stage researchers. Employers and other funders understand NIH support as a signal that a researcher shows particular promise. And without the early experiences, mentorship, connections with federal resources and scientists, and research-skill development all these

---

[16] *See, e.g.*, Rinad S. Beidas et al., *Implementation Science Grant Terminations in the United States*, 20 Implementation Sci. 20 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12057266/ [https://perma.cc /BDW5-HB5V] ("The fact that … the grant terminations affected trainees via individual and institutional training awards … [is] a setback for investments in the next generation of researchers. Training and career development awards support emerging scientists at a vulnerable moment in scientific development before their areas of expertise and institutional roles are firmly set.").

opportunities provide, young scientists' future employment and career prospects suffer, perhaps irrevocably.[17]

Finally, NIH's actions have wasted taxpayer dollars by requiring projects to end midstream. Some halted projects cannot easily be resumed once stopped (including, notably, many clinical trials that operate on prescribed timelines and testing parameters) and even those that could restart in theory simply will not due to lack of funding. That means there will be nothing to show for the government funds already spent, as the research lifecycle generally realizes "payoff" activities only at the end of a grant—*e.g.*, final result gathering, data analysis, and publication.

Ultimately, the full extent of the grant terminations' harms has yet to be seen. If allowed to stand, these terminations will work an existential change to the entire research landscape: If grants may simply be terminated midstream, outside the procedures outlined by Congress and binding agency regulations, institutions and researchers will stop

_____

[17] *See, e.g.*, A0902 (describing APHA members' "concerns about being able to continue research in their chosen area of study based on the termination notices they have received from NIH").

viewing NIH grants as a viable, dependable funding source. But institutions cannot sustain their research enterprises via self-funding or non-federal sources. The American public will suffer as a consequence. None of that is what Congress intended when it established NIH and authorized it to advance its mission via extramural research funding. *See* Public Health Service Act, ch. 373, § 301, 58 Stat. 682, 691-92 (1944).

## III.  The Court of Federal Claims Is Not the Appropriate Forum for Relief from NIH Grant Terminations.

The Court of Federal Claims (CFC) does not have jurisdiction over the quintessential APA challenges Plaintiffs bring, nor does it have the power to grant the relief they seek. Plaintiffs seek tried-and-true APA remedies, including vacating and setting aside the NIH grant terminations flowing from the unlawful agency directives. The injuries they have suffered from the government's unlawful actions are not reducible to monetary damages—far from it. Nor do they even seek such damages. What matters to them—and the thousands of NIH-funded researchers like them—is not the money to continue research in isolation, but the impact that comes along with NIH grants; the vetted, impactful research studies such grants help make possible; and the federal resources that increase the chances that research results will be

27

incorporated into clinical practice or widely disseminated scientific literature.

The CFC is the wrong forum for these claims. The CFC is a court of limited jurisdiction and, significantly, limited remedial jurisdiction: It can provide only contract-like remedies (*i.e.*, monetary damages)—not the declaratory and injunctive relief Plaintiffs seek. "Unlike the district courts, … the CFC has no general power to provide equitable relief against the Government or its officers." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011); *see also Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 830 (D.C. Cir. Sept. 2, 2025) ("Congress has explicitly channeled breach of government contract claims to the Court of Federal Claims and limited remedies to damages."). Because courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims," *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006), jurisdiction over Plaintiffs' APA claims *must* therefore rest in the district courts. That analysis does not change because the equitable relief sought—which can only be obtained in district court—may result in the payment of money to the party

28

aggrieved by the government's unlawful action. *See Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988).[18]

The government's argument to the contrary fundamentally misapprehends the nature and purpose of federal grant programs. In the government's estimation, Plaintiffs and other grant recipients who have suffered abrupt and unlawful terminations just want "the Government to keep paying up." Gov't Stay Application at 27, *NIH v. APHA*, 145 S. Ct. 2658 (2025) (No. 25A103), 2025 WL 2146619 (citation omitted). But that blinkered view overlooks the significant and irreplaceable role that NIH grants play in the lives and careers of researchers and the continued existence and primacy of this country's research infrastructure. Researchers want to do the work made possible through their hard-earned grants,[19] and to have access to the professional opportunities that come with and doors that are opened by conducting *NIH-funded* research.

_____

[18] *See* APHA Pls.' Answering Br. at 34-38; Pl. States' Resp. Br. at 56-64.

[19] The grant application process, in addition to involving a rigorous scientific, peer-reviewed process, requires significant dedication, time, and energy. *See, e.g.*, A1118 ("The application process for each grant [of nine received over the course of the researcher's career] was highly rigorous and time-intensive, often requiring months or even years of preparation.").

They are not looking for a payout, and the district court awarded no such relief.[20]

Nor would a monetary award remotely redress the injuries researchers and institutions have faced. As discussed, *supra* Part II.B, NIH grants play a crucial role at every level of the research enterprise. They are irreplaceable steppingstones for young researchers to start off and launch their careers.[21] They support the research infrastructure of institutions across the country. And they support the advancement of cutting-edge science aimed at improving global health. The research community reasonably relies on NIH grants—reliance the government

---

[20] *See* APHA Pls.' Answering Br. at 38 ("No order to pay anything—much less a specific sum—appears below."); Pl. States' Resp. Br. at 60 (similar). Indeed, as Plaintiffs explain at length, reinstating Plaintiffs' grants would not even necessarily result in the full range of compensation the government simply assumes. *See* APHA Pls.' Answering Br. at 36-37 ("[R]einstatement of a grant does not even mean a grantee will receive money.").

[21] *Cf.* A0776 ("This grant would have enabled [a postdoctoral fellow] to have the necessary final year of postdoctoral training before moving into a faculty role, providing a sound footing for her career. This opportunity is now lost to her."); A1130 ("[Due to terminated grant, t]he one fellow that is in the middle of the program has had all their funding terminated. Beyond the financial hardship they are suddenly thrust into, in a field where NIH funding is critical to longer term career growth and finding institutions to support your research, this is devastating.").

has induced for decades by fostering such research partnerships.[22] And the toll of abruptly terminating these grants has been deeply felt by researchers, staff, students, institutions, and patients, undermining the trust and the incentives necessary to engage in research endeavors in the first place.[23]

The upshot is this: NIH grants are about much more than dollars and cents. The system-wide, compounding effects of these terminations on the research community and our country's efforts to combat illness

---

[22] *See* A0995 ("Since the 1930s, the NIH and its predecessor agencies have supported the advancement of the United States' understanding of human disease and disability by funding training and research."); *see also* NIH-Wide Strategic Plan (Fiscal Years 2021-2025), at A1371 ("NIH works to support innovative research ultimately aimed at protecting and improving human health; train the biomedical research workforce[;] and develop scientific infrastructure.").

[23] *See, e.g.*, A0779 ("The termination of this research has upended the lives and careers of dozens of my team members—master's students, doctoral students, postdoctoral fellows, faculty, and staff, many of whom relocated or made life-altering commitments to pursue this work. One student has taken medical leave for mental health reasons following our grant terminations and may never return to the field. Another team member—this one more senior in their career—is also on leave, partly due to the stress this upheaval has caused."); A1122 (describing the effects of the grant termination as representing "a significant loss of community partnership, expertise, and trust, which will be difficult—if not impossible—to rebuild").

and disease cannot be remedied by money payments alone. Instead, Plaintiffs' claims are grounded in precisely the kind of "complex ongoing relationship" that the Supreme Court has said is unfit for the CFC because it demands equitable relief. *Bowen*, 487 U.S. at 905; *see Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994) ("An adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing relationship between the parties. The Court of Federal Claims cannot provide this relief.").

Vacating unlawful grant terminations and preventing future unlawful terminations pursuant to the same or similarly unlawful policies is a key component of that equitable relief. Research cannot simply be revived by an infusion of funds: researchers and staff have been terminated, clinical trials have been stopped, and critical infrastructure projects have been put on hold.[24] And even if grant recipients were able

---

[24] Wu, *supra* note 3, at A1436 ("Many studies, once terminated, would be difficult, if not outright impossible, to restart .... Medical interventions in clinical trials[] ... can't simply be paused and picked back up[].... [P]articipants released from a study won't always be willing to come back[.]"); *see also, e.g.*, Declaration ¶ 17, *Massachusetts v. NIH*, No. 25-10338 (D. Mass. Feb. 10, 2025), ECF No. 6-34 ("If trials are forced to undergo a significant pause, they might be difficult, if not impossible, to restart, where the lack of continuity compromises the scientific results.");

to obtain monetary relief at the CFC in separate proceedings, any damages they receive are very likely to be undercompensatory, *see supra* Part II.B, and would only be obtained after years of additional, protracted, and costly litigation. Researchers cannot wait—equitable and APA-based relief is necessary to prevent ongoing harm to individual researchers and their institutions. Dual-track litigation is not the answer, and, for the reasons above and explained in Plaintiffs' briefs, would result in *no* court having jurisdiction to hear the claims of recipients of unlawfully terminated grants, even if there were no dispute about the illegality of those terminations.[25]

For these reasons, the CFC cannot provide the relief NIH grant recipients seek, and this case properly belongs in district court.

## CONCLUSION

The district court's judgment should be affirmed.

---

Declaration ¶ 17, *Massachusetts v. NIH*, No. 25-10338 (D. Mass. Feb. 10, 2025), ECF No. 6-40 (explaining long pauses in funding to animal studies cannot be remedied after the fact because, "[e]ven if some funding could later be restored, the massive loss of animal life cannot be easily replaced, and some projects are unlikely to restart").

[25] *See* APHA Pls.' Answering Br. at 40-41; Pl. States' Resp. Br. at 63-64.

Respectfully submitted,

November 19, 2025

*/s/ Lindsay C. Harrison*

Lindsay C. Harrison
Ishan K. Bhabha
Betsy Henthorne
Sophia W. Montgomery
Logan Wren
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7), I certify that the foregoing brief has been prepared in Microsoft Word using 14-point Century Schoolbook typeface and is double-spaced (except for headings, footnotes, and block quotations). I further certify that the text is proportionally spaced and contains 6,495 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). Microsoft Word was used to compute the word count.

November 19, 2025                    */s/ Lindsay C. Harrison*

                                        Lindsay C. Harrison
                                        Ishan K. Bhabha
                                        Betsy Henthorne
                                        Sophia W. Montgomery
                                        Logan Wren
                                        JENNER & BLOCK LLP
                                        1099 New York Avenue NW
                                        Suite 900
                                        Washington, DC 20001
                                        (202) 639-6000
                                        lharrison@jenner.com

**CERTIFICATE OF SERVICE**

I certify that, on November 19, 2025, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.


November 19, 2025                    /s/ Lindsay C. Harrison

                                     Lindsay C. Harrison
                                     Ishan K. Bhabha
                                     Betsy Henthorne
                                     Sophia W. Montgomery
                                     Logan Wren
                                     JENNER & BLOCK LLP
                                     1099 New York Avenue NW
                                     Suite 900
                                     Washington, DC 20001
                                     (202) 639-6000
                                     lharrison@jenner.com