# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

(No. 25-1611)

AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; NICOLE MAPHIS,

*Plaintiffs-Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

*Defendants-Appellants*.

(Caption continued on inside cover)

Appeals from the U.S. District Court for the District of Massachusetts

## APHA PLAINTIFFS' ANSWERING BRIEF IN NO. 25-1611

JESSIE J. ROSSMAN
SUZANNE SCHLOSSBERG
JENNIFER M. HERRMANN
  *American Civil Liberties Union
  Foundation of Massachusetts, Inc.*
One Center Plaza, Suite 850
Boston, MA 02018
617-482-3170

*Counsel for APHA Plaintiffs*
*Additional counsel listed at page 59*

(No. 25-1612)

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAY BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; NATIONAL INSTITUTES OF HEALTH; NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE; NATIONAL HEART, LUNG, AND BLOOD INSTITUTE; NATIONAL HUMAN GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON AGING; NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES; NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT; NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS; NATIONAL INSTITUTE OF DENTAL AND CRANIOFACIAL RESEARCH; NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES; NATIONAL INSTITUTE ON DRUG ABUSE; NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES; NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES; NATIONAL INSTITUTE OF MENTAL HEALTH; NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES; NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE; NATIONAL INSTITUTE OF NURSING RESEARCH; NATIONAL LIBRARY OF MEDICINE; NATIONAL CENTER FOR ADVANCING TRANSLATIONAL SCIENCES; JOHN E. FOGARTY INTERNATIONAL CENTER FOR ADVANCED STUDY IN THE HEALTH SCIENCES; NATIONAL CENTER FOR COMPLEMENTARY AND INTEGRATIVE HEALTH; NIH CENTER FOR SCIENTIFIC REVIEW,

*Defendants-Appellants.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................iv

REQUEST FOR ORAL ARGUMENT.................................................. xii

INTRODUCTION...............................................................................1

STATEMENT OF JURISDICTION ...................................................3

STATEMENT OF THE ISSUES .........................................................3

STATEMENT OF THE CASE ............................................................3

   I. Factual background .....................................................................3

      A.    Statutory and regulatory framework.........................................3

      B.    Mechanics of NIH grant award funding ....................................5

      C.    Development and implementation of the Directives .................5

      D.    Impact of the Directives.........................................................10

   II. Procedural history......................................................................11

      A.    Plaintiffs file suit...................................................................11

      B.    Plaintiffs prevail at Phase 1 trial............................................12

      C.    Defendants appeal and the Supreme Court grants a partial stay. ............12

STANDARD OF REVIEW.................................................................13

SUMMARY OF ARGUMENT............................................................14

ARGUMENT .....................................................................................17

   I. The District Court has jurisdiction to order reinstatement of
      terminated grants.......................................................................17

      A.    The intersection of the APA and the Tucker Act ....................18

      B.    The Tucker Act is irrelevant to the District Court's jurisdiction to reinstate
         terminated grants as relief for the Directives claims. ................................21

C.   The Tucker Act does not deprive the District Court of jurisdiction over Plaintiffs' termination claims. ......................................................25

1.   The sources of Plaintiffs' rights are statutory and regulatory..................25

i.   Source of rights for arbitrary and capricious claim ..............................25

ii.   Source of rights for contrary to regulation claim ..............................28

iii.   Source of rights for contrary to statute claim ....................................29

2.   The grant agreements are not contracts. ....................................................29

3.   The type of relief sought and received is not contractual. ........................34

i.   The relief ordered is not money damages or specific performance......35

ii.   Defendants mischaracterize the District Court's order. ....................38

4.   Defendants' arguments would foreclose any relief on most Plaintiffs' claims. ..................................................................................................40

II. The District Court otherwise has jurisdiction over the Directives claims. .......41

A.   Plaintiffs have standing to challenge the Directives. ...............................42

B.   Defendants have failed to prove the Directives are moot. .......................44

C.   The Directives are reviewable final agency action. ..................................46

D.   Defendants' actions are not committed to agency discretion. .................49

III. Defendants' actions were unlawful. ...............................................................51

A.   Defendants' actions were arbitrary and capricious. ..................................51

B.   Alternative bases to affirm the Judgment that grant terminations violate the APA ..........................................................................................................55

1.   Defendants acted contrary to regulation. .................................................55

2.   Defendants acted contrary to statute. .......................................................56

CONCLUSION ........................................................................................................58

CERTIFICATE OF COMPLIANCE ........................................................................60

CERTIFICATE OF SERVICE.................................................................................60

# TABLE OF AUTHORITIES

**Cases**

*Adia Holdings, Inc. v. United States*,
170 Fed. Cl. 296 (2024) ................................................................. 33

*Airport Impact Relief, Inc. v. Wykle*,
192 F.3d 197 (1st Cir. 1999) ........................................................ 13

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ...................................................... 13

*American Bankers Ass'n v. U.S.*,
932 F.3d 1375 (Fed. Cir. 2019) ................................................... 30

*American C.L. Union of Massachusetts v. U.S. Conf. of Cath. Bishops*,
705 F.3d 44 (1st Cir. 2013) .................................................... 44, 45

*American Near E. Refugee Aid v. United States, Agency for Int'l Dev.*,
703 F. Supp. 3d 126 (D.D.C. 2023) ............................................ 33

*APHA v. NIH*,
145 F.4th 39 (1st Cir. 2025) ................. 17, 27, 43, 49, 50, 52, 55

*Atterbury v. U.S. Marshals Serv.*,
805 F.3d 398 (2d Cir. 2015) ....................................................... 25

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................. 16, 46

*Biden v. Texas*,
597 U.S. 785 (2022) .................................................................. 46

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ..................................... 14, 23, 35, 36, 37, 39

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) .................................................. 22

*Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*,
153 F.3d 155 (4th Cir. 1998) ..................................................... 57

iv

*California v. Texas*,
593 U.S. 659 (2021) ......................................................................42

*Cienega Gardens v. United States*,
194 F.3d 1231 (Fed. Cir. 1998) ....................................................41

*Citizens Awareness Network, Inc. v. Nuclear Regul. Comm'n*,
59 F.3d 284 (1st Cir. 1995)...........................................................56

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ...............................................................13, 51

*Coggeshall Dev. Corp. v. Diamond*,
884 F.2d 1 (1st Cir. 1989)..............................................................19

*Cole County Reg'l Sewer Dist. v. U.S.*,
22 Cl. Ct. 551 (1991) .....................................................................30

*Colorado v. HHS*,
783 F. Supp. 3d 641 (D.R.I. 2025) ................................................56

*CBS  v. United States*,
316 U.S. 407 (1942) .......................................................................49

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ................................................29, 32

*Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025) ........................................................41

*Conservation L. Found. v. Evans*,
360 F.3d 21 (1st Cir. 2004)......................................................16, 44

*Crowley Gov't Srvs., Inc. v. Gen. Srvs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022)............................................29, 35, 38

*D.A.M. v. Barr*,
486 F. Supp. 3d 404 (D.D.C. 2020)..........................................22, 23

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......................................................................42

*Department of Com. v. New York*,
  588 U.S. 752 ................................................................46, 50, 51, 54

*Department. of Ed. v. California*,
  604 U.S. 650 (2025) ........................................................22, 38

*Department of Homeland Sec. v. Regents of the Univ. of California*,
  140 S. Ct. 1891 (2020).....................................................52, 54

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................52

*Frozen Food Exp. v. United States*,
  351 U.S. 40 (1956) ...............................................................49

*Hanlin v. United States*,
  316 F.3d 1325 (Fed. Cir. 2003) .........................................32

*Hebah v. United States*,
  192 Ct. Cl. 785 (1970).........................................................41

*Hymas v. United States*,
  810 F.3d 1312 (Fed. Cir. 2016) .........................................34

*I.C.C. v. Union Pac. R. Co.*,
  222 U.S. 541 (1912) .............................................................26

*Imaginarium, LLC v. United States*,
  166 Fed. Cl. 234 (2023)..............................................30, 31, 32, 33

*Independent U.S. Tanker Owners Comm. v. Dole*,
  809 F.2d 847 (D.C. Cir. 1987).............................................22

*International Jr. Coll. of Bus. & Tech., Inc. v. Duncan*,
  802 F.3d 99 (1st Cir. 2015)..................................................13

*Interstate Com. Comm'n v. Illinois Cent. R. Co.*,
  215 U.S. 452 (1910) .............................................................26

*Katz v. Cisneros*,
  16 F.3d 1204 (Fed. Cir. 1994) ...........................................39

*L.M.M. v. Cuccinelli*,
442 F. Supp. 3d 1 (D.D.C. 2020) ....................................................23

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) .........................................................................18

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ....................................................................50, 51

*Los Angeles Cnty. v. Davis*,
440 U.S. 625 (1979) ...................................................................16, 44

*Lummi Tribe of the Lummi Reservation, Wash. v. United States*,
870 F.3d 1313 (Fed. Cir. 2017) .......................................................37

*Mach Mining LLC v. E.E.O.C.*,
575 U.S. 480 (2015) .........................................................................41

*Maine Cmty. Health Options v. United States*,
590 U.S. 298 (2020) ...................................................................35, 37

*Mangual v. Rotger-Sabat*,
317 F.3d 45 (1st Cir. 2003) ..............................................................44

*Marshall N. Dana Constr., Inc. v. United States*,
229 Ct. Cl. 862 (1982) .....................................................................31

*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
763 F.2d 1441 (D.C. Cir. 1985) .......................................................21

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ...............................................14, 19, 20, 21, 24

*Megapulse, Inc. v. Lewis*,
672 F.2d 968 ...........................................14, 20, 21, 25, 35

*Metzger, Shadyac & Schwarz v. United States*,
12 Cl. Ct. 602 (1987) .......................................................................33

*Montana Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ..............................................................22

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................13, 52, 53

*National Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ......................................................................43

*National R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry.*,
  470 U.S. 451 (1985) ......................................................................30

*New Hampshire Lottery Comm'n v. Rosen*,
  986 F.3d 38 (1st Cir. 2021).............................................................45

*New York v. Kennedy*,
  155 F.4th 67 (1st Cir. 2025) ..........................................................48

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) ..........................................................47

*NIH v. APHA*,
  145 S. Ct. 2658 (2025)....................................12, 21, 23, 26, 38, 39, 40, 43, 49

*NLRB v. Lily Transportation. Corp.*,
  853 F.3d 31 (1st Cir. 2017).............................................................54

*Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*,
  554 F.3d 1290 (10th Cir. 2009) .......................................................28

*Pennsylvania Dep't of Pub. Welfare v. United States*,
  48 Fed. Cl. 785 (2001)........................................................30, 31, 34

*Penobscot Air Servs., Ltd. v. F.A.A.*,
  164 F.3d 713 (1st Cir. 1999)...........................................................13

*Power Density Sols. LLC v. United States*,
  159 Fed. Cl. 208 (2022)..................................................................34

*Purpose Built Fams. Found., Inc. v. United States*,
  167 Fed. Cl. 714 (2023)..................................................................34

*Ransom v. United States*,
  900 F.2d 242 (Fed. Cir. 1990) .........................................................41

*Richardson v. Morris*,
    409 U.S. 464 (1973) ...................................................................18

*Robins v. U.S. Bureau of Land Mgmt.*,
    438 F.3d 1074 (10th Cir. 2006) ...............................................28

*Rodrique v. Hearst Commc'ns, Inc.*,
    126 F.4th 85 (1st Cir. 2025) ...........................................28, 55

*Schillinger v. United States*,
    155 U.S. 163 (1894) ...................................................................27

*Smith & Wesson, Div. of Bangor Punta Corp. v. United States*,
    782 F.2d 1074 (1st Cir. 1986).................................................46

*St. Bernard Parish Gov't v. United States*,
    134 Fed. Cl. 730 (2017).............................................................33

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ...................................................................52

*Teamsters, Chauffeurs, Warehousemen & Helpers Union, Loc. No. 59 v.*
    *Superline Transp. Co.*,
    953 F.2d 17 (1st Cir. 1992)......................................................56

*Thermalon Indus., Ltd. v. U.S.*,
    34 Fed. Cl. 411 (1995)..............................................................31

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006)................................................41

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992).................................................24

*Trout Unlimited v. Pirzadeh*,
    1 F.4th 738 (9th Cir. 2021) ......................................................51

*Trump v. Boyle*,
    145 S. Ct. 2653 (2025)..............................................................13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ...................................................................48

*Union of Concerned Scientists v. Wheeler*,
　954 F.3d 11 (1st Cir. 2020)..........................................................17, 50

*United States v. Skrmetti*,
　605 U.S. 495 (2025) ............................................................................52

*United States v. Storer Broad. Co.*,
　351 U.S. 192 (1956) .............................................................................49

*W.C. v. Bowen*,
　807 F.2d 1502 (9th Cir. 1987) ...........................................................22

*Walsh v. TelTech Sys., Inc.*,
　821 F.3d 155 (1st Cir. 2016)..............................................................55

*Wilson v. Hayes*,
　77 A.3d 392 (D.C. 2013) .....................................................................37

**Statutes**

5 U.S.C. §§ 702 ....................................................................18, 19, 24, 26

5 U.S.C. §§ 706 ................................................ 3, 12, 14, 26, 29, 55

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1491 ............................................................................18, 18

31 U.S.C. § 6301 ..................................................................................33

31 U.S.C. § 6303 ..................................................................................34

31 U.S.C. § 6304 ..................................................................................34

42 U.S.C. § 201 ......................................................................................3

42 U.S.C. §§ 241 ..............................................................4, 26, 31, 18

42 U.S.C. §§ 282 ............................................................................4, 50

42 U.S.C. § 283 ..............................................................................4, 50

42 U.S.C. §§ 284 ..................................................................................31

42 U.S.C. §§ 285 ...................................................................4, 50

**Rules**

2 C.F.R. § 200.340 ............................................................54, 56

42 C.F.R. § 52.5 ........................................................................4

42 C.F.R. §§ 52.6 ................................................................ 5, 37

45 C.F.R. § 75.372(a) (2020) ................................. 5, 28, 50, 56

Fed. R. Civ. P. 65 ..................................................................11

**Other Materials**

71 Am. Jur. 2d Specific Performance § 1 (2025) ...................37

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (2025)..................5

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (2025) .................5

Exec. Order No. 14,173, 90 Fed. Reg. 8633 (2025) .................6

Jay Bhattacharya, *Advancing NIH's Mission Through A Unified Strategy*,
NIH, (Aug. 15, 2025)......................................................45

Pub. L. No. 95-224, 92 Stat. 3 (1978) ...................................33

Staff of S. Comm. on the Judiciary, 79th Cong., Administrative Procedure
(Comm. Print June 1945) ..............................................26

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and First Circuit Rule 33.0(a), Plaintiffs respectfully submit that oral argument will assist the Court in resolving this appeal.

**<u>INTRODUCTION</u>**

Beginning in February 2025, the National Institutes of Health ("NIH") and Department of Health and Human Services ("HHS") ("Defendants") issued a series of directives restricting support of purported "DEI studies" and other disfavored research topics and systematically dismantling programs addressing the underrepresentation of racial minorities, women, and scientists with disabilities or from economically disadvantaged backgrounds in the biomedical field (the "Directives"). A0105–0149. In just a few months, NIH terminated over 1,700 grants pursuant to the Directives. A1323–1324 ¶ 7.

Defendants' purge marked a drastic departure from NIH's traditional practices. Previously, NIH operated predictably, consistently funding multi-year biomedical research projects after a rigorous, multi-stage peer review process. Those processes helped establish NIH as the world's leading innovator in the diagnosis and treatment of conditions like cancer, stroke, diabetes, and Alzheimer's disease.

Researchers and organizations ("Plaintiffs") filed suit challenging the Directives and their implementation in the District of Massachusetts under the Administrative Procedure Act ("APA"), seeking to halt and set aside Defendants' unprecedented assault on the scientific enterprise. As part of this suit, Plaintiffs asserted claims to challenge both the lawfulness of the Directives ("Directives

claims") *and* the lawfulness of the grant terminations ("termination claims"). A0444–0447; A0455. After a trial on the first phase of the case, the District Court issued detailed findings of fact and entered a final partial judgment under Rule 54(b) (the "Judgment") setting aside and vacating both the Directives and the resulting grant terminations as "arbitrary and capricious, and unlawful, in violation of 5 U.S.C. § 706(2)(A)[.]" A0076.

This appeal follows the Supreme Court's issuance of a temporary order staying vacatur of the grant terminations while leaving intact vacatur of the Directives. The sole basis of the stay was a finding that the District Court likely lacked jurisdiction to vacate the terminations because the Tucker Act limits suit to review or enforce research grants to the Court of Federal Claims ("CFC").

But the Tucker Act solely applies to *contractual claims*. Neither the Supreme Court's partial stay nor Defendants' arguments on appeal address the repercussions of that fundamental limitation. There is no question that the Directives claims are non-contractual and subject to district court review; this means the District Court also had authority under the APA to set aside actions taken to implement the Directives, including the terminations, as a remedy. The Court also had jurisdiction to review the termination claims directly because neither the source of the right nor nature of the relief is contractual.

Defendants' remaining arguments are unavailing. This Court should affirm the Judgment.

## STATEMENT OF JURISDICTION

Plaintiffs sued to challenge the Directives and resulting terminations under 28 U.S.C. § 1331 and 5 U.S.C. § 706(2). *See infra* Argument, Sections I and II. The Judgment is appealable under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the District Court properly vacated and set aside the Directives and resulting grant terminations in accordance with 5 U.S.C. § 706(2).

## STATEMENT OF THE CASE

### I.     Factual background

NIH is the primary source of federal funding for biomedical research in the United States. A0089. NIH-funded research has led to critical medical advancements and trains the next generation of scientists. *Id.*

### A. Statutory and regulatory framework

Congress has supplied careful instructions for this endeavor. The Public Health Service Act, 42 U.S.C. § 201 *et seq.* ("PHSA"), mandates research "relating to the causes, diagnosis, treatment, control and prevention of physical and mental

diseases and impairments," including by offering "grants-in-aid to universities . . .

and other institutions[.]" 42 U.S.C. § 241(a)(3).

Congress requires NIH to prioritize certain objectives, including the:

- study of "minority health conditions" and "minority health disparities," 42 U.S.C. § 285t(a), (b);

- "improve[ment of] research related to the health of sexual and gender minority populations," 42 U.S.C. § 283p; *see also* 42 U.S.C. § 285f-5(a); and

- investment in vaccines, 42 U.S.C. § 283d.

NIH funding flows through Institutes and Centers ("ICs"). These ICs must

"utilize diverse study populations, with special consideration to biological, social,

and other determinants of health that contribute to health disparities[.]"

42 U.S.C. § 282(b)(8)(D)(ii). And HHS, through NIH, must take steps to "provide

for an increase in the number of women and individuals from disadvantaged

backgrounds (including racial and ethnic minorities)" in the biomedical research

workforce. 42 U.S.C. § 282(h); *see also id.* §§ 283*o*(b)(2), 285t–1, 288(a)(4).

Regulations also cabin NIH funding decisions, mandating rigorous analysis

of grant applications based on scientific merit, feasibility, and competency.

*See* 42 C.F.R. § 52.5. For the grants at issue here, regulations allowed unilateral

termination only for failure to comply with grant requirements or "for cause[.]"

45 C.F.R. § 75.372(a)(2) (2020). Grant terminations have thus historically been rare. A1004 ¶ 38.

## B. Mechanics of NIH grant award funding

Medical research takes time, so when NIH approves a project grant, it is "programmatically approved for support" for an entire "project period," which usually spans multiple years. A2453–2454; A0996; 42 C.F.R. § 52.6(c). After project approval, NIH issues a Notice of Award ("NOA") to the recipient listing the maximum funds available for the first "budget period" of the project (usually twelve months). A2454. The NOA notes that "anticipated levels of future support" and future budget amounts are "[r]ecommended . . . subject to the availability of funds and satisfactory progress of the project." *See, e.g.*, A1161; A2454. Grantees must annually submit continuation applications for the next budget period, and those are usually approved; if approved, NIH then issues a new NOA. A2454; A0977–0999; A1003–1004; *see* 42 C.F.R. § 52.6(c).

## C. Development and implementation of the Directives

In January 2025, the new administration issued executive orders directing agencies to "terminate, to the maximum extent allowed by law, all 'equity-related' grants or contracts," Exec. Order No. 14,151, 90 Fed. Reg. 8339 (2025), "ensure grant funds do not promote gender ideology," Exec. Order No. 14,168, 90 Fed. Reg. 8615 (2025), and end "immoral race- and sex-based preferences under

the guise of so-called [DEI]," Exec. Order No. 14,173, 90 Fed. Reg. 8633 (2025). A0091–0094.

A series of NIH Directives targeting forbidden research topics followed. The District Court's 67-page findings of fact details the chaos wrought by their implementation. A0086–0153.

**On February 10, 2025**, the **"Secretarial Directive on DEI-related Funding"** instructed agencies to "briefly pause" payments to grantees "related to DEI and similar programs[.]" A0098–0099 (citing AR0004–0005).[1] That pause was lifted two days later. A0100.

On **February 13, 2025**, the **"NIH Review of Agency Priorities Based on the New Administration's Goals"** "announced 'hard funding restrictions' on 'awards where the program promotes or takes part in diversity, equity, and includsion [sic] ('DEI') initiatives[.]'" A0102–0103 (quoting AR0016). Under that Directive: "[i]f the sole purpose of the grant . . . supports DEI activities, then the award must be fully restricted." *Id.* (quoting AR0016).

On **February 21, 2025**, the **"Directive on NIH Priorities"** instructed the agency to cease supporting "low-value and off-mission research programs," including studies deemed to be based on "DEI" and "gender identity." A0108–0109

---

[1] References to the administrative record produced by Defendants on June 2, 2025 in the District Court match the page numbers in the record (*e.g.*, "AR0098" corresponds to "NIH_GRANTS_000098").

(quoting AR3821–3822). That same afternoon, Deputy Director Liza Bundesen ordered the removal of multiple Notices of Funding Opportunity ("NOFOs")[2] pursuant to this Directive. A0107 (quoting AR3823).

On **February 22, 2025**, Brad Smith—a detailee from the Department of Government Efficiency (DOGE)—emailed Acting Director Matthew Memoli with eighteen additional NOFOs to delete. A0111–0112 (quoting AR3752–3753). Memoli directed Bundesen to "take [those] NOFOs down" within twenty-five minutes. A0113 (quoting AR3810).

On **February 28, 2025**, NIH ordered the first wave of terminations pursuant to the Directives. Memoli emailed Bundesen to "terminate the grants on [an] attached spreadsheet by COB today." A0116. That evening, Rachel Riley—who "introduced herself as being part of DOGE" and wrote the template letters used for the terminations, A0115 n.9; A0115–0125—sent multiple emails identifying grants to be terminated that day. A0115–0125; A2714; *see also* A2098–2109.

On **March 4, 2025,** NIH issued **"Award Assessments for Alignment with Agency Priorities."** A0126–0130 (citing AR2152–2157). This Directive mandated that "ICs must . . . completely excise all DEI activities." A0127 (quoting AR2152). It also required that projects for which "[t]he sole purpose" "is DEI related" "and/or the application was received in response to a NOFO that was unpublished as

---

[2] NIH "invites proposals for grants through" NOFOs. A0090.

outlined" "must not" be funded and that projects that "partially support[] DEI activities" must be renegotiated or terminated. *Id.* (quoting AR2152).

That same day, another NIH official, Michelle Bulls, instructed staff to "terminat[e] awards based in [sic] DEI as provided to [NIH] by HHS." A2262. Bulk terminations followed, *see, e.g.*, A2017; A0141 (530 grants); A2080 (120 grants); A2720; A0139–0142 (collecting examples of bulk terminations), with review of grant lists taking mere minutes, *see*, *e.g.*, A0138–0139 (two minutes for decision).

On **March 25, 2025**, NIH issued another Directive, A0143 (citing AR3216), adding a new termination category for grants sent by the "Director, NIH or designee" to ICs to terminate, A0147 (quoting AR3220). This Directive emphasized, "[w]hen ICs issue revised NOAs," they "must use the exact language provided in" the Directive "with no edits." A0151 (quoting AR3229).

Further rounds of bulk terminations followed. *See, e.g.*, A2081 (identifying grants to be terminated "ASAP"); A2079; A2730–2731; A0153 (collecting examples).

On **May 7, 2025**, Bulls circulated another Directive "to expand the scope of categories." A2302–2303. This Directive listed examples of entire programs to be terminated, including those designed to diversify the biomedical workforce. A2302–2303; A2330. Again, more terminations followed. A2261. On May 15, 2025, NIH

issued a slightly expanded version of the May 7 Directive. *See* A0151–0153 (quoting AR3536).

\* \* \*

The mass terminations, including of the grants at issue here, resulted from and were required by the Directives. *See* A0154–0155 (describing the terminations as "resultant" and "downstream" of the Directives); *see also* A0122–0123; A2080. The Directives required ICs "to completely excise all" research related to the forbidden topics. *See, e.g.*, A0127. And "NIH's abruptness in the robotic rollout of this grant-termination action" demonstrated that the terminations necessarily flowed from that mandate. *See* A0164 (quotation omitted).

The Directives also required that boilerplate justifications appear in all termination letters and revised NOAs, including:

- **DEI**: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- **Transgender issues**: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

- **Vaccine Hesitancy**: It is the policy of NIH not to prioritize research activities that focuses [sic] gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

*See, e.g.*, A0152 ("Again, usage of this list was mandatory[.]"); *see also* A0115–0125; A0147–0153; A2098–2109. Additional boilerplate purported to justify the termination of studies deemed related to "COVID," "Climate Change," and "Influencing Public Opinion." A0152. The boilerplate represents the entirety of Defendants' explanation, reasoning, and factual basis for the restriction of future research funding and the termination of hundreds of grants. A0164–0171.

### D. Impact of the Directives

The Directives and resulting terminations jeopardized—and in many cases eliminated—projects that Congress funded for the benefit of public health. *See, e.g.*, A0780 ¶ 56; A0887 ¶ 17; A1209 ¶¶ 29–32. Research—including clinical treatment studies—was interrupted midstream, ruining data already collected, upending participant trust, and jeopardizing future efforts. *See, e.g.*, A0869 ¶ 23; A0872 ¶ 37; A1123 ¶ 32; A0779–0780 ¶¶ 53–55; A1096 ¶¶ 21–22. The sudden interruption in training grants halted researchers' careers, impacting U.S. research capacity for generations to come. A0873–0874 ¶¶ 41–42; A0882 ¶ 22; A0990 ¶ 16; A1121–1123 ¶¶ 24, 25–27, 31; A1245–1246 ¶¶ 19–22.

## II. Procedural History

### A. Plaintiffs file suit.

On April 2, 2025, Plaintiffs filed suit under the APA and U.S. Constitution contending that the Directives and their implementation—including grant terminations and delay, denial, and withdrawal of pending grant applications—were arbitrary and capricious, contrary to regulation and statute, and violated separation of powers and the Due Process Clause. A0380–0457.

Plaintiffs promptly moved for a preliminary injunction, which the District Court collapsed into a partial trial on the merits under Federal Rule of Civil Procedure 65(a), construing Defendants' opposition as a motion to dismiss. A0029–0072. The Court *sua sponte* segmented the case into "Phase 1," addressing the Directives and grant terminations, and "Phase 2," addressing issues specific to applications. A0083. Plaintiffs alleged that the Directives caused both the grant terminations and the delays, withdrawals, and denials of pending applications. A0443–0452; A0530–0544.

The District Court dismissed Plaintiffs' constitutional claims but held it had subject matter jurisdiction over Plaintiffs' APA claims. A0049–0072.

**B. Plaintiffs prevail at Phase 1 trial.**

At the close of the Phase 1 trial, the District Court set aside the Directives and resulting terminations as "arbitrary and capricious," "void," and "illegal." A0264–0265.

The Judgment states:

> (1) "the [] Directives . . . are declared . . . arbitrary and capricious, and unlawful, in violation of 5 U.S.C. § 706(2)(a)";
>
> (2) "the Directives . . . are [] of no effect, void, illegal, set aside, and vacated";
>
> (3) [t]he Resulting Grant Terminations pursuant to the Directives are declared to be unlawful"; and
>
> (4) "the Resulting Grant Terminations are . . . of no effect, void, illegal, set aside, and vacated."

A0073–0074.

**C. Defendants appeal and the Supreme Court grants a partial stay.**

Defendants appealed and moved to stay the Judgment. A0550; A0181–0186. The District Court declined, and Defendants sought a stay in this Court. *See* Defs.' App. for Stay (July 3, 2025). After this Court denied that motion, Defendants sought an emergency stay from the Supreme Court. In a one-and-a-half page *per curiam* order, the Supreme Court left intact the District Court's ruling regarding the Directives but stayed vacatur of the grant terminations. *NIH v. APHA,* 145 S. Ct.

2658 (2025). The justices issued four separate partial concurrences and dissents, and Justice Barrett alone concurred in full.

## STANDARD OF REVIEW

In reviewing agency decisions, "both the district court and this court are bound by the same standard of review." *International Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015). Although "a court is not to substitute its judgment for that of the agency," *Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), the Court must "undertake 'a thorough, probing, in-depth review' . . . into the record," *Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 720 (1st Cir. 1999) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971))."[S]ome degree of deference . . . may be appropriate . . . if a district court's determination turns on factual findings[.]" *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 203 (1st Cir. 1999) (quotations omitted).

The District Court's jurisdictional finding is subject to *de novo* review. The Supreme Court has issued a temporary order indicating a likelihood of success on Defendants' argument that the Tucker Act deprived the District Court of jurisdiction over Plaintiffs' challenge to the grant terminations, but that order is not "conclusive on the merits." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

The District Court properly vacated and set aside both the Directives and the resulting grant terminations under 5 U.S.C. § 706(2).

With respect to vacating the grant terminations, the Tucker Act does not deprive the District Court of jurisdiction for five reasons:

*First*, Defendants concede that the District Court had jurisdiction to review Plaintiffs' Directives claims. Because the Directives were arbitrary and capricious, section 706 of the APA allowed the District Court to set aside the Directives *and* all actions taken pursuant to the Directives—including grant terminations. The Tucker Act has no bearing on this APA claim or its remedy. *Bowen v. Massachusetts*, 487 U.S. 879, 911 (1988); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012).

*Second*, the District Court had jurisdiction to hear the termination claims. The Tucker Act does not "impliedly forbid" bringing such a challenge under the APA because it is not a contract claim. Under both *Patchak* and *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), whether an APA claim is "in essence" contractual turns on the source of rights upon which the claim is based. Here, the source of Plaintiffs' rights is NIH's statutory authority to issue grants-in-aid and the APA, which codifies long-standing precedent establishing that arbitrary and capricious agency action is, by definition, beyond an agency's statutory mandate.

The terminations were also contrary to regulation and statute, providing this Court with two alternate bases to affirm the District Court's vacatur of the grant terminations.

*Third*, the source of Plaintiffs' termination claims is not contractual for the independent reason that the only agreements that Defendants identify lack three elements necessary to establish a contract: statutory authorization, mutual intent, and consideration.

*Fourth*, the relief ordered confirms that Plaintiffs do not bring a disguised contract claim. The District Court never identified any sum past due, much less ordered payment of the same. Vacatur of the grant terminations merely informs NIH that it cannot terminate the grants on the grounds given. This is prototypical APA relief, not money damages or specific performance of any contract term.

*Fifth* and finally, Defendants fail to grapple with the fact that most Plaintiffs are researchers, not institutional grantees. Defendants' arguments would mean Plaintiffs cannot seek relief in the CFC or District Court. That outcome is contrary to Congress's intent when amending the APA to ensure judicial review for those wronged by agency action.

As to vacatur of the Directives, Defendants argue that Plaintiffs lack standing; their claims are moot; Defendants' actions are not final; and their actions are

committed to agency discretion and thus unreviewable. Finally, they argue Plaintiffs' claims fail on the merits. They are wrong on each point.

*First*, Plaintiffs have standing to challenge the Directives. While the District Court will address *claims* related to applicant injuries in Phase 2 of the proceedings, those *injuries* exist and were caused by the Directives. Moreover, the future harms stemming from the Directives are not speculative, and both those future harms and the harms caused by the grant terminations are traceable to the Directives.

*Second*, Defendants fail to offer any evidence that Plaintiffs' claims are moot, much less meet their "heavy burden" of showing the Directives are no longer in effect and intervening events "have completely and irrevocably eradicated the effects of the alleged violation." *Conservation L. Found. v. Evans*, 360 F.3d 21, 26 (1st Cir. 2004); *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).

*Third*, the Directives are reviewable final agency action because they reflect the agency's settled decision to categorically eradicate disfavored topics from public health research. They therefore "mark the consummation of the agency's decision making process" and determine "rights or obligations" "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

*Fourth,* the relevant statutory and regulatory scheme provides "appropriate, 'judicially manageable standards' for evaluating [Defendants'] action[s]'" such that

those actions are reviewable. *See APHA v. NIH*, 145 F.4th 39, 53 (1st Cir. 2025) (quoting *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 21 (1st Cir. 2020)).

*Fifth*, the District Court properly concluded, based on the record, that Defendants' actions were arbitrary and capricious. Defendants offered no reasoning whatsoever supporting the decisions set forth in the Directives or their about-face in agency priorities, nor did they consider Plaintiffs' reliance interests.

For all these reasons, the Court should affirm.

## ARGUMENT

### I. The District Court has jurisdiction to order reinstatement of terminated grants.

Defendants' main argument is that the District Court lacked jurisdiction to adjudicate Plaintiffs' termination claims or order the reinstatement of terminated grants. Defs.' Br. at 20. This argument rests on an untenable overreading of the Tucker Act and misrepresentation of Plaintiffs' claims.

Plaintiffs' Complaint advanced several different grounds for setting aside the grant terminations, including: (1) the *Directives* that led to the terminations were arbitrary and capricious, A0446–0447; A0455(a) & (d); and (2) the *grant terminations* themselves were arbitrary and capricious, A0444–0446; A0455 (b) & (d). The Tucker Act is irrelevant to non-contractual claims, and not even Defendants argue that the Directives claims are contractual. Therefore, the Tucker Act does not bar the District Court from remedying Plaintiffs' Directives claims, even if that

17

remedy includes the reinstatement of grants. The District Court also had jurisdiction over Plaintiffs' termination claims because the essence of those claims is not contractual.

### A. The intersection of the APA and the Tucker Act

The APA waives sovereign immunity for those "suffering a legal wrong because of agency action" and "seeking relief other than money damages." 5 U.S.C. § 702. However, it does not "confer authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* § 702(2). Defendants argue that the Tucker Act is one such "other statute," and impliedly prohibits Plaintiffs' "contract" claims. Defs.' Br. at 19–20.

The Tucker Act provides the CFC with jurisdiction over "any claim against the United States founded upon . . . any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The CFC lacks jurisdiction to order most equitable relief, *Richardson v. Morris*, 409 U.S. 464, 465 (1973) (*per curiam*), so the Tucker Act has been interpreted to allow contract claims only for money damages, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 705 (1949). Thus, courts have held the Tucker Act impliedly forbids any contract action against the United States

for specific performance. *See Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989).[3]

Under the Supreme Court's decision in *Patchak*, implicit prohibition under section 702(2) depends on the nature of the claim asserted, not the relief sought. *Patchak*, 567 U.S. at 216 n.3. There, a neighboring landowner filed suit under the APA to challenge as contrary to law the Secretary of the Interior's acquisition of real property in trust for a Tribe. The Supreme Court considered whether the Quiet Title Act ("QTA") impliedly forbid the APA claim, because that statute authorizes suits asserting a real property interest that conflicts with the United States' real property interest, but explicitly excepts suits involving "restricted Indian lands." *Id.* at 215 (quotations omitted).

Because of this exception, the Court reasoned that an APA action seeking to *quiet title* over tribal land would be impliedly forbidden by the QTA. *Id.* at 216. But the plaintiff in *Patchak* did not seek to "quiet title"—*i.e.*, he did not seek to establish his ownership of the land in question. Instead, he sought to enjoin the United States' assertion to title over the land as contrary to law under the APA. *Id.* at 213, 217.

---

[3] Defendants assert that "the Tucker Act 'impliedly forbids' bringing 'contract actions' against the government in a federal district court' under the APA." Defs.' Br. at 20 (quoting *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67–68 (D.C. Cir. 2004)). But this is imprecise. While the Tucker Act impliedly forbids bringing contract actions *for specific performance* in federal district court, it is the APA itself that forbids such claims for money damages. *See* 5 U.S.C. § 702.

The dissent argued that it is not the type of "grievance" that matters. *Id.* at 233 (Sotomayor, J. dissenting). Rather, because the relief sought was "to oust the Government of title to Indian trust land," which "is identical" to the relief the QTA impliedly forbids, the QTA impliedly forbids the *relief* sought and the APA suit should be barred. *Id.*

Critically, the majority disagreed that seeking *relief* forbidden by a statute addressing a *similar claim* can trigger the APA's carve-out. *Id.* at 216 n.3. When a statute that is asserted to impliedly forbid relief "'is not addressed to the *type of grievance* which the plaintiff seeks to assert,' the statute cannot prevent an APA suit." *Id.* at 216 (emphasis added) (quoting May 10, 1976, letter of Assistant Atty. Gen. A. Scalia.). Thus, the plaintiff's suit could go forward in district court. *Id.* at 217.

While *Patchak* did not involve the Tucker Act, its focus on the nature of a plaintiff's grievance is consistent with the *Megapulse* test used by Defendants (Defs.' Br. at 20) and established by the D.C. Circuit to determine whether the Tucker Act impliedly forbids an APA claim. *See Megapulse*, 672 F.2d at 968. Under *Megapulse*, when a defendant asserts that an APA claim is actually a contract claim in disguise, the analysis focuses on two prongs: (1) the source of the rights upon which the claim is based and (2) the type of relief sought. *Id.*

For a suit to be impliedly prohibited, both the source of the right *and* the type of relief must be contractual—meaning that, as with *Patchak*, the type of relief alone cannot determine the result. *Id.* at 971. Courts need not address whether relief sought is contractual unless it "is a claim over which Tucker Act jurisdiction could be invoked. If it is not such a claim, then there is no possibility that the preclusive effects of the Tucker Act, whatever their scope, can come into play." *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985).

### B. The Tucker Act is irrelevant to the District Court's jurisdiction to reinstate terminated grants as relief for the Directives claims.

Under this framework, this Court can affirm the District Court's order reinstating terminated grants regardless of whether the APA's waiver of sovereign immunity provides jurisdiction over the *termination* claims. This is because the District Court had jurisdiction over the *Directives* claims—and therefore could set aside agency action taken to implement the unlawful Directives. This argument was not presented to the Supreme Court, though the Chief Justice embraced it in his concurrence. *NIH*, 145 S. Ct. at 2663. It rests on three irrefutable propositions.

*First*, the Directives claims were unambiguously within the jurisdiction of the District Court. *Id.* at 2661 (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary and capricious grounds in district court"); *id.* at 2662–63 (Roberts, C.J., concurring in part and dissenting in part)

(challenge to the Directives distinguishes *NIH* from *Department of Education v. California*, 604 U.S. 650 (2025) and falls within District Court's APA jurisdiction). Defendants do not argue otherwise.

*Second*, Defendants admit, and the District Court found, that the Directives caused the terminations at issue. *See* A2621–2622; A2642 (Defendants stating: "the guidance led to the termination[s]"); A0154–0155 (describing terminations as "resultant" and "downstream" from the Directives).

*Third*, APA authority to "set aside" "agency action" that is "arbitrary, capricious . . . or otherwise not in accordance with law" includes the "uncontroversial proposition that, when a court with jurisdiction finds that the plaintiffs before it were harmed by an agency decision issued under an illegal rule, the court should vacate that wrongful decision *as a remedy*." *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 416 (D.D.C. 2020) (emphasis added).

Because "[a]gency action taken under a void rule has no legal effect," *W.C. v. Bowen*, 807 F.2d 1502, 1505–06 (9th Cir. 1987), complete relief under the APA frequently includes vacatur of agency actions taken under illegal agency guidance, *see, e.g.*, *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890–91 (D.C. Cir. 2024); *Independent U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987) ("present rule will be vacated and conditions returned to the *status quo ante*, before the [unlawful rule] took effect"); *Montana Wildlife Fed'n v. Haaland*, 127

F.4th 1, 51 (9th Cir. 2025) (vacating lease sales made under unlawful policy). As the Supreme Court has explained, "[a]s long as [the district court] had jurisdiction under § 702 to review [agency action] it also had the authority to grant the *complete relief* authorized by § 706." *Bowen*, 487 U.S. at 911 (emphasis added).

Therefore, the District Court's jurisdiction to review the Directives provided it with statutory authority to set aside the terminations. Defendants cite no precedent indicating otherwise.

Nor did Justice Barrett address this point. *See NIH*, 145 S. Ct. at 2661–62. Rather, Justice Barrett noted that vacatur of the Directives would not "necessarily void" decisions made under those Directives, including the terminations. *Id.* at 2661 (citing *D.A.M.*, 486 F. Supp. at 414). This is correct but does not end the inquiry. That vacatur of agency implementation is not automatic does not predetermine its factual or legal appropriateness.

Indeed, *D.A.M.*, cited by Justice Barrett, itself relied on *L.M.M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020), to show how a court may vacate a directive under the APA "and then proceed[] to a separate analysis of whether to vacate [individual examples of past implementation] under the invalid directives." *D.A.M.,* 486 F. Supp. 3d at 414. Although *L.M.M.* did not include a claim challenging implementation, the court expressed no concern regarding whether vacatur could unwind actions taken under the directive challenged in that case. 442 F. Supp. 3d at

36. Here, the District Court could unwind all implementation of the Directives—including the terminations.

Defendants may argue that the Tucker Act forbids setting aside terminations, no matter the claim. But *Patchak*—which is binding on this Court and was not addressed in the stay order in this case or in *Department of Education v. California*—forecloses that argument. When another statute bars a *certain remedy* for a *particular type of claim*, section 702(2)'s carve-out is only triggered if the *claim* is the same, regardless of whether the remedy is the same. *Patchak*, 567 U.S. at 216 n.3; *see supra* Argument, Section I.A.

The Tucker Act thus does not strip the District Court of jurisdiction to grant equitable relief on the non-contractual Directives claims—even if the same relief would be foreclosed for a breach of contract claim brought in the CFC. *Id.* That is, "under § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992). A decision otherwise would require the nonsensical holding "that statutory and constitutional claims involving contracts are 'founded upon an express or implied contract with the United States.' 28 U.S.C. § 1491(a)(1)." *Id.* at 611. Because

Defendants do not argue that the Directives claims are contract claims in disguise, the argument ends here; there is no need to apply the *Megapulse* test.

### C. The Tucker Act does not deprive the District Court of jurisdiction over Plaintiffs' termination claims.

That said, this Court should also affirm the District Court's jurisdiction over Plaintiffs' termination claims. Application of the *Megapulse* test shows that the termination claims are based on statutory—not contractual—rights. No contract is at issue because Plaintiffs' claims are not based on the terms of any grant agreement, the grant agreements are not legally binding, and Plaintiffs did not receive contractual relief.

### 1. The sources of Plaintiffs' rights are statutory and regulatory.

Where there are "competing bases of jurisdiction"—the APA and the Tucker Act—jurisdiction is only limited to the Tucker Act for claims that "clearly present[] a disguised contract action." *Megapulse*, 672 F.2d at 968. Here, because Plaintiffs' grievances are not "based on rights derived from a contract," "the first prong of the *Megapulse* test is determinative." *Atterbury v. U.S. Marshals Serv.,* 805 F.3d 398, 408 (2d Cir. 2015). The Tucker Act does not bar Plaintiffs' termination claims.

### i. Source of rights for arbitrary and capricious claim

The legal wrong at the heart of Plaintiffs' termination claims is not a failure to abide by some contractual obligation to pay out a particular grant, but rather NIH's

exercise of its statutory authority in an unreasonable, and thus unlawful, manner. The source of the right that gives rise to such claims lies in two federal statutes:

- 42 U.S.C. § 241(a)(3), which authorizes NIH to make "grants-in-aid" to universities, institutions, and individuals to support research; and

- 5 U.S.C. § 706(2)(A), which ensures that grants will not be terminated in an arbitrary and capricious manner.

Defendants might rely on Justice Gorsuch's assertion that there is no "free-floating right under the APA to . . . reasoned decisionmaking." *NIH*, 145 S. Ct. at 2664 n.1 (2025) (Gorsuch, J., concurring in part and dissenting in part) (quotations omitted). But the APA's "right of review" for one suffering a legal wrong because of agency action is not free floating. 5 U.S.C. § 702. As the APA's legislative history makes clear, judicial review of arbitrary and capricious decision-making codified long-standing precedent establishing that unreasoned agency action is, by definition, beyond the agency's statutory authority. *See* Staff of S. Comm. on the Judiciary, 79th Cong., Administrative Procedure, at 39 (Comm. Print June 1945) (citing *Interstate Com. Comm'n v. Illinois Cent. R. Co*., 215 U.S. 452, 470 (1910) (agency action falls outside statutorily delegated authority when it is "manifested in . . . an unreasonable manner")); *I.C.C. v. Union Pac. R. Co*., 222 U.S. 541, 547 (1912) (agency acts "beyond its statutory power" when acting "arbitrarily," "unjustly," or without evidentiary support).

Because NIH's statutory authority to award grants under section 241 is not committed to agency discretion, *see infra* Argument, Section II.D, the APA's "right of review" defines the substantive limits of NIH's power. In other words, arbitrary and capricious action violates an agency's statutory authority.

Defendants ignore the statutory landscape entirely, arguing that "plaintiffs' core complaint—that their grant agreements were improperly terminated[]—self-evidently arises from the grant agreements." Defs.' Br. at 20. But the termination of a grant may be "improper" for any number of reasons. If termination is improper because it violates the terms of the grant agreement, then the source of the right is, indeed, the grant agreement. If termination is improper because it was carried out in a discriminatory manner, the source of the right is the Equal Protection Clause. And if termination is improper because, as here, it is "arbitrary, capricious . . . or otherwise not in accordance with law," the source of the right is the APA and authorizing statute.

Defendants insist that Plaintiffs' claim is "at its essence, contractual." Defs.' Br. at 20. But they nowhere identify what *type* of contract claim is involved or, if the claim is in nature of a breach of contract, what term may have been breached. *APHA*, 145 F.4th at 52 n.5. For the CFC to have jurisdiction, "[s]ome element of contractual liability must lie at the foundation" of the action. *Schillinger v. United States*, 155 U.S. 163, 167 (1894). None is identified here.

## ii. Source of rights for contrary to regulation claim

While the District Court based its vacatur of the grant terminations on Plaintiffs' arbitrary and capricious claim (Count I), this Court is free to affirm the Judgment on any ground presented. *Rodrique v. Hearst Commc'ns, Inc*., 126 F.4th 85, 89 (1st Cir. 2025). Count II challenged NIH's failure to follow HHS regulations, which, during the relevant period, allowed for unilateral grant termination only upon a failure "to comply with the terms and conditions of the award" or "for cause." 45 C.F.R. § 75.372 (a)(1)–(2) (2020); A0173–0177.

The "source of the right" underlying this contrary-to-regulation claim is the federal regulation itself. *See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009) (some relevance of a contract "does not convert a claim asserting rights based on federal regulations into one which is, 'at its essence,' a contract claim") (quoting *Robins v. U.S. Bureau of Land Mgmt.,* 438 F.3d 1074, 1083 (10th Cir. 2006)).

Although the District Court ruled for Plaintiffs on Count II, it did not order any relief based on this claim, having already set aside and vacated the terminations when ruling on Count I. A0173–0177. Consequently, the Supreme Court did not consider this alternate ground for finding the District Court had jurisdiction over Plaintiffs' termination claims. It remains available to this Court. *See infra* Argument, Section III.B.1.

### iii. Source of rights for contrary to statute claim

Similarly, in Count III, Plaintiffs alleged that the Directives and terminations are beyond NIH's statutory authority under 5 U.S.C. § 706(2)(C) because Congress has required NIH to prioritize and support the type of research and programs terminated under the Directives. A0450–0452. The District Court found it unnecessary to decide the issue, having set aside the Directives and terminations on other grounds. A0178. Thus, the Supreme Court also did not consider this claim, which is in no way contractual. *See, e.g.*, *Crowley Gov't Srvs., Inc. v. Gen. Srvs. Admin.*, 38 F.4th 1099, 1108 (D.C. Cir. 2022) (in challenge to agency action beyond congressional authority, source of the right is statutory). Count III therefore provides another alternative basis to find the District Court had jurisdiction to vacate the terminations. *See infra* Argument, Section III.B.2.

## 2. The grant agreements are not contracts.

Plaintiffs' claims are not based on any *contractual* rights for an independent reason: NOAs are the only "grant agreements" Defendants even arguably point to, *see* Defs.' Br. at 4–5, and they do not satisfy the standard conditions required for a binding contract.

As Defendants concede, "'federal grant agreements [are treated] as contracts when the standard conditions for a contract are satisfied[.]'" Defs.' Br. at 21 (quoting *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021)). The

federal government has regularly taken the position that grant agreements do *not* satisfy these conditions. *See, e.g.*, *Imaginarium, LLC v. United States*, 166 Fed. Cl. 234, 240 (2023). For good reason. Here, (1) Defendants are not statutorily authorized to enter into contracts for the type of grants at issue in this case; (2) there is no objective evidence that Defendants intended the NOAs to be binding; and (3) the NOAs lack consideration.

**First, authority:** an enforceable agreement requires "actual authority to bind the government in contract . . . in unambiguous terms" by the Constitution, statute, or regulation. *Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 788 (2001). "[T]he presumption is that a law is not intended to create private contractual or vested rights" and "there must be a clear indication that the legislature intended to create contractual rights enforceable against the government." *American Bankers Ass'n v. U.S.*, 932 F.3d 1375, 1381 (Fed. Cir. 2019) (internal quotation marks omitted) (quoting *National R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry.*, 470 U.S. 451, 465 (1985)).

To overcome that presumption, a program's authorizing statute must explicitly provide the authority to create contractual rights. *See id.*; *Pa. Dep't of Pub. Welfare*, 48 Fed. Cl. at 790–91 (collecting cases); *Cole County Reg'l Sewer Dist. v. U.S.*, 22 Cl. Ct. 551, 553 (1991), *aff'd*, 949 F.2d 404 (Fed. Cir. 1991) (statute describes grants for waste treatment plants as "a contractual obligation of the United States");

*Thermalon Indus., Ltd. v. U.S.*, 34 Fed. Cl. 411, 413 (1995) (relying on similar language). In contrast, in *Pennsylvania Department of Public Welfare*, the CFC held that an agreement between HHS and a grant recipient was *not* binding, because the relevant grant program did *not* contain any statutory provisions authorizing HHS to enter into a contract. 48 Fed. Cl. at 791. Instead, the grant agreement at issue "implement[ed] a public benefit program [to] assist[] the States . . . 'in its role as sovereign[;] the moneys promised are gifts or gratuities which do not establish any contractual obligation, express or implied, on the part of the United States.'" *Id.* (quoting *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862 (1982)).

Here, the relevant authorizing statutes do not grant NIH authority to bind the government; they simply authorize NIH to make grants-in-aid to institutions "for the general support of their research[.]" 42 U.S.C. § 241(a)(3); *see also* 42 U.S.C. § 284(b)(2)(B). Congress separately addressed NIH's authority to "enter into contracts" for other purposes. 42 U.S.C. § 241(a)(7); *see also* 42 U.S.C. § 284(b)(2)(A).

**Second, intent:** To establish mutual intent to contract, there must be "objective evidence of the parties' intent to be bound." *Imaginarium*, 166 Fed. Cl. at 241. Where the government is a party, intent "may be found in the statute and/or regulations," or established through "other documentary evidence" or the agency's

custom and practice. *Id.* at 242; *see also Hanlin v. United States*, 316 F.3d 1325, 1329 (Fed. Cir. 2003).

Here, NIH's public-facing materials are "objective evidence" that NIH does *not* intend NOAs to be binding. NIH explicitly distinguishes a grant (an "assistance mechanism to support research for the public good") from a contract (a "legally binding agreement" NIH uses "to acquire goods or services for the direct use or benefit of the government"):

## Grants vs. Contracts

| Grant | Contract |
|---|---|
| • Assistance mechanism to support research for the public good | • Legally binding agreement to acquire goods or services for the direct use or benefit of the government. |
| • Peer review of broad criteria | • Award based on stated evaluation factors |
| • Limited government oversight and control | • More government oversight and control |
| • Reports | • Deliverables |

A1499–1500; *see Columbus Reg'l Hosp.*, 990 F.3d at 1339 (agency description regarding whether an agreement "imposes binding obligations" is "objective evidence of the parties' intent to be bound").

Similarly, NIH's grant policy describes an NOA as "the legal document issued to *notify* the recipient that an award has been made and that funds *may be* requested" rather than a contractually binding agreement. *See* A2451 (emphases added). It is simply "an informational notice" that "does not establish mutual obligations" or

"contain any other indications of intent to bind the United States to contract." *See Imaginarium*, 166 Fed. Cl. at 243–44. The "mere fact that [grantees] must comply with certain requirements as a condition of a grant does not mean that the United States has somehow manifested its intent to contract[.]" *Adia Holdings, Inc. v. United States*, 170 Fed. Cl. 296, 304 (2024) (quoting *Imaginarium*, 166 Fed. Cl. at 244).

**Third, consideration:** "In the context of government contracts," consideration "must render a benefit to the government, and not merely a detriment to the contractor." *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017) (quoting *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987)). "The crucial distinction is between an *incidental* and a *direct* benefit." *Id.* at 736. That is, the "benefit to the federal government must be 'tangible' and 'direct,' rather than 'generalized' or 'incidental.'" *See American Near E. Refugee Aid v. United States*, *Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132–33 (D.D.C. 2023) (quoting *St. Bernard Parish*, 134 Fed. Cl. 730 at 736).

Under the Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6301, *et seq.* ("FGCAA"), which Congress passed with the express purpose of "distinguish[ing] Federal grant and cooperative agreement relationships from Federal procurement relationships," Pub. L. No. 95-224, 92 Stat. 3 (1978), agencies must use contracts when acquiring "property or services *for the direct benefit* or use

of the United States Government." 31 U.S.C. § 6303 (emphasis added). However, when "the principal purpose of the relationship is . . . to carry out a public purpose of support or stimulation authorized by a law of the United States," agencies must use either a grant agreement or cooperative agreement. 31 U.S.C. § 6304; *see also* 31 U.S.C. § 6303. *Cf. Power Density Sols. LLC v. United States*, 159 Fed. Cl. 208, 215–16 (2022) (noting government's reliance on FGCCA to argue that "activities the research institutions performed pursuant to grants or cooperative agreements are, by definition, not performed 'for the government'"); *see also Hymas v. United States*, 810 F.3d 1312, 1329 (Fed. Cir. 2016).

NIH supports research aimed at "protecting and improving human health" and training "the biomedical research workforce." A1371. Such a public purpose of "advanc[ing] the agency's overall mission" does not directly benefit the government. *Hymas*, 810 F.3d at 1328; *see also Pennsylvania Dep't of Pub. Welfare*, 48 Fed. Cl. at 791; *Purpose Built Fams. Found., Inc. v. United States*, 167 Fed. Cl. 714, 718 (2023). Consistent with these requirements, NIH awards funds "for the general support of [grantees'] research" under grant agreements—not contracts. 42 U.S.C. § 241(a)(3).

### 3. The type of relief sought and received is not contractual.

Because the first prong of the *Megapulse* test (source of rights) is determinative and Plaintiffs' grievances are not contractual, the Court need not

address the second prong of the test, namely, "the type of relief sought." *Megapulse*, 672 F.2d at 968; *see supra* Argument, Section I.A. Nevertheless, the second prong also confirms that Plaintiffs' claims are non-contractual because Plaintiffs did not seek or receive "the prototypical contract remedy of damages, nor the classic contractual remedy of specific performance." *See Crowley*, 38 F.4th at 1110 (quotations omitted).

   i. <u>The relief ordered is not money damages or specific performance.</u>

  Plaintiffs sought and the District Court issued a declaration that the Directives and "Resulting Grant Terminations" are "illegal" and an order that they "are vacated and set aside." *See* A0074. The Judgment, like that in *Bowen*, "'[told] the United States that it may not [act] on the grounds given.' . . . Thus, it simply effectuated the court's 'primary function of reviewing the [agency's] interpretation of federal law.'" *APHA*, 145 F.4th at 51 (citing *Bowen*, 487 U.S. at 910).

  This specific relief is not "money damages nor would such declaratory relief be available in the [CFC]." *Id.* at 22 (quotations omitted). Money damages entail "compensatory relief . . . to substitute for a suffered loss," *Bowen*, 487 U.S. at 895, and the jurisdiction of the CFC is limited to "specific sums already calculated, past due, and designed to compensate for completed labors," *Maine Cmty. Health Options v. United States*, 590 U.S. 298, 327 (2020).

A lawsuit based on NIH's failure to pay "past due" sums would identify contractual terms violated by a failure to pay and include a calculation of uncompensated past and anticipated costs along with other specific financial losses resulting from the alleged breach. That is not this lawsuit. Instead, Plaintiffs requested vacatur of Defendants' decisions to bulk terminate grants as a violation of statute and regulation, and the Judgment provides the inherently "prospective relief, fashioned in the light of the rather complex ongoing relationship between the parties" of reversing those termination decisions. *Bowen*, 487 U.S. at 905.

Indeed, reinstatement of a grant does not even mean a grantee will receive money. The award amounts shown in NOAs constitute "NIH's *maximum* financial obligation to the recipient," both for a given budget year and for subsequent years of the project, contingent on approval of continuation applications. A2704. Grantees generally access funding "on an as-needed basis" for eligible costs. A2453–2454; A2701; A2703–2704. Reinstatement of grants means Plaintiffs once again have the *ability* to request payments through the government's Payment Management Services for an existing budget year, subject to compliance with numerous rules and regulations governing matters such as the kinds of costs that are reimbursable and financial management system requirements. A2701–2702.

Reinstatement also allows grantees to submit applications to continue their awards for subsequent years of their projects (which NIH may approve or deny based

on applicable rules and regulations, 42 C.F.R. § 52.6(c)(2), and disallows further reliance on the Directives for any future application decisions. NOAs merely set forth recommended funding for future budget years; grantees must submit continuation applications and receive new NOAs to receive funding. A1161; A2451–2454. This means that reinstatement of a grant *cannot* provide Plaintiffs with "specific sums already calculated" with respect to the entire project. *Me. Cmty. Health Options,* 590 U.S. at 298.

That the Judgment may lead to payment to grantees by the federal government down the road does not convert Plaintiffs' claim for specific relief into one for money damages. *See Bowen*, 487 U.S. at 893 ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"); *cf. Lummi Tribe of the Lummi Reservation, Wash. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017) ("Here, the underlying claim is not for presently due money damages. It is for larger strings-attached NAHASDA grants—including subsequent supervision and adjustment—and, hence, for equitable relief.").

Likewise, the relief Plaintiffs requested and the District Court ordered was not specific performance. Specific performance "is available only to protect contract rights," 71 Am. Jur. 2d Specific Performance § 1 (2025), and "compels the performance of the contract in the precise terms agreed upon," *Wilson v. Hayes*, 77

A.3d 392, 405 (D.C. 2013) (quotations omitted). The District Court vacated the decisions to terminate the grants, but did not analyze, let alone order, specific performance of any grant terms. When specific relief is not contractual, it is not specific performance. *See Crowley*, 38 F.4th at 1107 (describing specific performance as an "explicitly contractual remedy" that is "specific to actions that sound in contract" (quotations omitted)).

ii.   <u>Defendants mischaracterize the District Court's order.</u>

In Defendants' telling, the District Court did not order declaratory relief or vacatur of the decision to terminate grants based on the Directives; instead, it ordered Defendants "to pay money to plaintiffs." Defs.' Br. at 1. Defendants even stated repeatedly to the Supreme Court that the District Court ordered the Defendants to pay the specific sum of $783 million. *See, e.g.*, A2599; A2630. No order to pay anything—much less a specific sum—appears below.[4] Considering Defendants' inaccurate representations, it is unsurprising the Supreme Court found that the District Court ordered relief "designed to enforce" an "'obligation to pay money[.]'" *NIH*, 145 S. Ct. at 2658 (quoting *California*, 604 U.S. at 651).

---

[4] Defendants also claim that the District Court "denied a stay pending appeal out of concern that funds would be 'sequester[ed] (probably forever) during the course of the appeal.'" Defs.' Br. 29–30 (quoting A0186). That misstates the Court's order, which noted in assessing the balance of equities that granting a stay would significantly disrupt the public health research process, while "denial means only that the executive defendants must comply with the Act of Congress rather than sequestering funds (probably forever) during the course of the appeal." A0186.

Justice Barrett relied on Defendants' assertions to conclude that the District Court "ordered the Government to pay plaintiffs sums due under the agreements forthwith." *Id.* at 2661 (Barrett, J., concurring) (quotations omitted); *see* A2619. But the reference to payment "forthwith" is taken out of context: the District Court expressed an expectation in its oral ruling that funding would be available as a consequence of having "declare[d] the law authoritatively," because "executive agencies are presumed to put that declaration into effect." A0266. "[I]f" its order did "not result" in disbursement of funds "forthwith," the District Court noted that it "has ample jurisdiction" to order money to flow under the grants. A0265–0266. Correct or not, that hypothetical scenario was not a part of the Judgment or the findings. *See* A0075–0180.

Expressing an expectation that the government will act in accordance with a declaratory judgment, even if compliance may have downstream financial implications, is not the same as ordering money to be paid for purposes of the Tucker Act. *See Bowen,* 487 U.S. at 909–10; s*ee also Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (district court had jurisdiction in case involving housing contract despite the "presum[ption] . . . that once the propriety of HUD's interpretation of the regulation has been adjudicated it will act accordingly, and any monetary consequences will flow through the contractual scheme."). "To the extent that the district court's judgment [results in a reimbursement] this outcome is a mere by-

product of that court's primary function of reviewing the . . . interpretation of federal law." *Bowen*, 487 U.S. at 910.

Nevertheless, to the extent that this Court reads the District Court's order as requiring specific payments in a manner outside the jurisdiction of the District Court, this Court can remand to the District Court with instructions to clarify that its order solely requires reinstatement of the grants.

### 4. Defendants' arguments would foreclose any relief on most Plaintiffs' claims.

Defendants' argument that the termination claims belong in the CFC has one final infirmity: it runs headfirst into their previous argument that Plaintiffs do not have standing to bring a contract claim in the CFC because individual researchers like Plaintiffs are generally not parties to grant agreements between NIH and institutions. A2577; A1002.[5] This would mean no court has jurisdiction to hear most Plaintiffs' claims. Justice Barrett assumed otherwise, explaining that Plaintiffs would not be left without prospect of relief, because "[i]f the CFC concludes that the Government breached a grant agreement, it may award relief to the *grantee.*" *NIH*, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring) (emphasis added).

Indeed, Defendants' standing argument is fatal to their Tucker Act argument. To bring a cause of action pursuant to the Tucker Act, "the contract must be between

---

[5] Defendants did not raise this argument with respect to Plaintiff Ibis, which is a grantee. *See* A2577; A2578 n.8.

the plaintiff and the government," *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (quoting *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990)), or the plaintiff must be "an intended third-party beneficiary." *Hebah v. United States*, 192 Ct. Cl. 785, 792 (1970). And the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the [CFC]." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006).

The Ninth Circuit recently relied on this precedent to find that the Tucker Act does not impliedly forbid an APA claim brought in district court by legal services subcontractors who lacked standing to sue the United States in the CFC. *Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932 (9th Cir. 2025). "[T]he result requested by the Government would mean that no court has jurisdiction to hear plaintiffs' claims. Not only is this result contrary to common sense, but it also conflicts with the 'strong presumption favoring judicial review of administrative action' that is embodied in the APA." *Id.* at 939 (quoting *Mach Mining LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015)).

## II. The District Court otherwise has jurisdiction over the Directives claims.

Defendants' other arguments for why the District Court lacks jurisdiction to hear a challenge to the Directives—standing, ripeness, mootness, final agency action, and committed to agency discretion—are equally unavailing.

**A. Plaintiffs have standing to challenge the Directives.**

The Directives caused numerous injuries, any one of which is adequate to establish standing. Those injuries include the terminations themselves; delays, administrative withdrawals, and denials of pending grant applications; and the possibility of future grant terminations or application denials. All of these injuries are "fairly traceable" to the Directives and "likely to be redressed by the requested relief." *California v. Texas*, 593 U.S. 659, 669 (2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).

Defendants argue otherwise based on three assumptions: first, that injuries stemming from actions to be addressed in Phase 2 are somehow irrelevant to standing for the Directives claims; second, that prospective injuries are speculative and not traceable to the Directives; and third, that the District Court should ignore the grant terminations. They are wrong about each.

*First*, that the District Court will address the legality of delayed, withdrawn, and denied applications in "later proceedings," Defs.' Br. at 29, does not negate the fact—as certified by Defendants—that the Directives caused those injuries. *E.g.*, A2790, row 38 (application "further delayed pursuant to the Challenged Directives for review of alignment with agency priorities . . ."); A2772, row 1 (NIH withdrew application to NOFO that NIH unpublished "pursuant to the Challenged Directives

because it no longer aligned with agency priorities"); A2800–2801 (NOFOs withdrawn by NIH). This alone confers Article III standing.

*Second*, Defendants' argument that the risk of future grant terminations is speculative and not traceable to the Directives is counterfactual. Defendants certified under oath that they "may apply the Challenged Directives" to grant applications prospectively "absent further Court order or judgment." *See* A2771; A2778, row 60. And at the time suit was filed, the District "Court clearly had jurisdiction to grant prospective relief" to govern the "rather complex ongoing relationships between the Department and grant recipients." *APHA*, 145 F.4th at 50 (quotations omitted); *see also NIH*, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring) (two-track scheme preserves Plaintiffs' ability to seek prospective relief).

*Third*, Defendants apparently assume that, if the Tucker Act deprives the District Court of jurisdiction over Plaintiffs' termination claims, the terminations themselves cannot constitute injuries for Plaintiffs' Directives claims. *See* Defs.' Br. at 28. Not so. The Directives caused the terminations, and the District Court has jurisdiction under the APA to vacate the terminations as complete relief for the unlawful Directives, regardless of whether it has jurisdiction to hear a direct challenge to the terminations.[6] *See supra* Argument, Section I.B.

---

[6] By a single sentence, Defendants appear to assert that any challenge to "intra-governmental directives" is not ripe. Defs.' Br. at 28. The cases Defendants cite stand only for the unremarkable proposition that an agency directive is not ripe for

**B. Defendants have failed to prove the Directives are moot.**

Plaintiffs' Directives claims are not moot because the legality of those Directives remains an "actual controversy" subject to remedy by the Court. *American C.L. Union of Massachusetts ("ACLUM") v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) (quoting *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003)). A case is moot only "when the court cannot give any effectual relief to the potentially prevailing party," *id.* (quotation omitted), because intervening events "have completely and irrevocably eradicated the effects of the alleged violation," *Davis*, 440 U.S. at 631. The party alleging mootness bears the "heavy burden" of establishing it. *Evans*, 360 F.3d at 26.

Defendants cannot make this showing. Much of the implementation of the Directives remains in effect, including unpublishing of NOFOs and denial and administrative withdrawal of grant applications. Defendants cannot say they have "completely and irrevocably eradicated the effects" of the Directives. *Davis*, 440 U.S. at 631.

Defendants ignore this, arguing instead that (1) they are not applying the Directives; (2) a revised priorities statement entitled "Advancing NIH's Mission

---

challenge until harm therefrom is imminent. *See, e.g.*, *National Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809 (2003) (challenge not ripe where agency issued guidance on statute that it was not empowered to administer). Defendants have already implemented the Directives and certified they will continue to implement them. *See, e.g.*, A2778 (rows 37, 40, 60). Plaintiffs' challenge is therefore ripe.

Through A Unified Strategy" issued by Director Bhattacharya on August 15, 2025 (the "August 15 Statement," available at: https://perma.cc/V5E2-4ED2) superseded the Directives; and (3) the August 15 Statement cures the Directives' illegality. None of these satisfies Defendants' heavy burden.

*First*, contrary to their unsworn suggestion to this Court that they will no longer apply the Directives, Defs.' Br. at 26, Defendants stated *under oath* in ongoing Phase 2 proceedings that they may apply the Directives to Plaintiffs absent a court order. *See* A2771; A2778, row 60. This is the opposite of a "showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *ACLUM*, 705 F.3d at 55 (quotation omitted).

*Second,* the record contains no evidence showing the August 15 Statement superseded the Directives. *See New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021). ("The April 2019 Memo did not rescind the government's adoption of the 2018 Opinion" and therefore did not moot challenge). On its face, the August 15 Statement does not supersede anything; it states only that it is "intended to clarify specific issues that currently require additional guidance." August 15 Statement, at "Priorities." And Defendants offer no evidence of supersession; to the contrary, Defendants' certification of continued intent to apply the Directives was served on August 19—four days *after* the August 15 Statement— demonstrating the Directives continue to have force. *See* A2771.

*Third*, Defendants assert that the August 15 Statement cures the arbitrary-and-capricious nature of the Directives, but that too is without factual support and is not properly before this Court. Because the administrative record predates the August 15 Statement, it does not provide evidence of any contemporaneous reasoning supporting that statement. *See Department of Com. v. New York*, 588 U.S. 752, 780, 785 (2019). Where, as here, "evidentiary matters [are] not first presented to the district court," they "are, as the greenest of counsel should know, not properly before" an appellate court. *Smith & Wesson, Div. of Bangor Punta Corp. v. United States*, 782 F.2d 1074, 1084 (1st Cir. 1986).

Alternatively, Defendants lament that allowing the Judgment to stand would "create[] uncertainty as to whether [it] might be read to restrict reliance on the [August 15 Statement] to the extent it incorporates the original." Defs.' Br. at 26. But to the extent the August 15 Statement incorporates the defective Directives, it too is defective—yet more evidence the claims are not moot.

## C. The Directives are reviewable final agency action.

Agency actions are "final" when they (1) "mark the consummation of the agency's decisionmaking process" and (2) are actions "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (quotations omitted). The District Court correctly held that the Directives meet both requirements. *See* A0154–0156; *see also Biden v.*

*Texas*, 597 U.S. 785, 808–09 (2022) (holding agency memoranda were final agency action that "bound" agency staff by preventing them from continuing certain programs).

*First*, the Directives reflect the consummation of the decision-making process because categorical decisions regarding grant funding constitute final agency action. *See New York v. Trump*, 133 F.4th 51, 67–69 (1st Cir. 2025). Defendants describe the Directives as "guidance" that "merely instructed NIH staff to review existing grants for consistency with administrative priorities." Defs.' Br. at 32. But the Directives reflect the agency's settled decision to categorically eradicate disfavored topics from public health research. *See, e.g.*, A0558 ("Therefore, it is the policy of NIH not to prioritize [DEI and gender identity] research programs."); A0561 ("ICs must take care to completely excise all DEI activities using the following categories.").

The Directives *require* NIH personnel to review grants for any connection to forbidden topics and *mandate* certain actions. *See, e.g.*, A0557 ("If the sole purpose of the grant . . . supports DEI activities, then the award must be fully restricted."). For example, the "ICs must not issue the award[,]" "ICs must negotiate with the applicant/recipient to address the activities that are non-compliant," and ICs "must request an updated application/RPPR with the DEI language removed." A0561–

0562. The Directives also *mandate* the termination of diversity fellowships and supplements. A0600.

Contrary to Defendants' contention, the District Court analyzed the Directives separately from the grant terminations and correctly found that each constituted final agency action. *See* A0154 ("The Challenged Directives, as a whole, constitute final agency actions at the macro-level, and the resultant, downstream individual terminations and other effects *are also independent* final agency action as to each of the affected grants." (emphasis added)).

That other final agency actions—including terminations and the withdrawal of NOFOs—flowed from the implementation of the Directives does not negate their finality. *See New York v. Kennedy*, 155 F.4th 67, 76 (1st Cir. 2025) (statement of intention to restructure administrative agency was consummation of decision-making process even when immediately followed by elimination of sub-agencies and termination of 10,000 employees). Nor does revision of the Directives "make an otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). The February 21 Directive definitively manifested Defendants' decision to eliminate disfavored categories of grants. *See* A0558–0559. Every Directive that followed reiterated that policy, merely providing additional detail and direction. *See* A0560–0567; *see also* A0650–0680; *compare* A0560–0562 *with* A0650–0666.

*Second*, the Directives had "immediate and practical impact[s]" on grant holders—notably, they *mandated* the termination of grants and the withdrawal of NOFOs, causing research to stop, and they resulted in delays and denials of grant applications. *Frozen Food Exp. v. United States*, 351 U.S. 40, 44 (1956); *see also United States v. Storer Broad. Co*., 351 U.S. 192, 198 (1956) (finding regulation stating FCC's intention not to issue licenses is final agency action prior to FCC denial of respondent's application).

Defendants argue that the Directives "did not prohibit plaintiffs from conducting any research they wished," Defs.' Br. at 33, but a remarkably similar argument was rejected decades ago. *See CBS v. United States,* 316 U.S. 407, 419 (1942) (FCC order prohibiting issuance of broadcasting license to station using specific contract provisions was final agency action even though "stations [were] left free to enter into contracts or not as they choose.").

### D. Defendants' actions are not committed to agency discretion.

This Court already correctly concluded that the Directives are not committed to agency discretion by law—and therefore are reviewable. *APHA*, 145 F.4th at 53. The Supreme Court left this Court's conclusion undisturbed. *NIH*, 145 S. Ct. at 2658. Defendants present no new arguments justifying a different result.

The Supreme Court "read[s] the § 701(a)(2) exception" for agency discretion "quite narrowly, restricting it to those rare circumstances where the relevant statute

is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772 (quotation omitted). Here, "[t]here are numerous statutory provisions that direct NIH to prioritize or to consider certain research objectives – including many that would seem to fall within the categories proscribed by the Challenged Directives." *APHA*, 145 F.4th at 53; *see also* 42 U.S.C. §§ 282(b)(8)(D)(ii), 283p, 285t(a)–(b), (f)(1)(D). Defendants are also subject to explicit statutory mandates to diversify the biomedical workforce. *See* 42 U.S.C. §§ 282(h), 285t–l(a), (b). And HHS regulations operative at the time of the terminations "provide[d] an exclusive list of reasons that NIH can unilaterally terminate grants," further cabining agency discretion. *See APHA*, 145 F.4th at 53; *see also* 45 C.F.R. § 75.372(a) (2020).

This statutory and regulatory scheme provides "appropriate, 'judicially manageable standards' for evaluating [Defendants'] actions[.]'" *APHA*, 145 F.4th at 53 (quoting *Union of Concerned Scientists*, 954 F.3d at 21). As this Court emphasized in rejecting Defendants' reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993), "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes[.]" *APHA*, 145 F.4th at 53 (quoting *Lincoln*, 508 U.S. at 193).

That the District Court ruled "on APA grounds, rather than based on . . . statutory violations, does not mean its determination that those statutory provisions

limit the agency's discretion was incorrect or irrelevant." *Id.* at 53 n.6; *see also Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 759 (9th Cir. 2021). In any event, the District Court *did* conclude that Defendants' actions violated NIH's regulatory framework. A0173–0177.

"Because this is not a case in which there is no law to apply," Defendants' actions are subject to judicial review. *See Dep't of Com.*, 588 U.S. at 774 (quoting *Volpe*, 401 U.S. at 410.

## III. Defendants' actions were unlawful.

### A. Defendants' actions were arbitrary and capricious.

As an initial matter, Defendants have failed to develop (and thus waived) any argument that the grant terminations were not arbitrary and capricious. Defs.' Br. at 38–43. Regardless, the District Court correctly found the Directives and terminations to be "breathtakingly arbitrary and capricious." A0163. This Court should do the same.

Defendants' primary argument is that the Directives reflect "quintessential policy judgments" that "should not be subject to judicial second-guessing." Defs.' Br. at 39; *see also* at 40–42. But as the District Court emphasized, the problem here is not the political nature of any priority change, A0162, but that Defendants' actions "are not reasonable and not reasonably explained," A0163; A0179. "To assess reasonableness, [courts] look to whether the agency 'examine[d] the relevant data

and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *APHA*, 145 F.4th at 53 (quoting *State Farm*, 463 U.S. at 43). "[W]hen the agency enacts a decision that 'rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests,' it must offer a 'more detailed justification' than usual." *Id.* (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)).

The District Court found "not a shred of evidence supporting any of [the] statements" regarding the forbidden topics in the Directives, including claims that "research programs based on gender identity are often unscientific" or that "DEI studies are 'often used to support unlawful discrimination on the basis of race[.]'" A0169–0170. Defendants' invocations here of Supreme Court precedent, Defs.' Br. at 39–40 (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181 (2023) and *United States v. Skrmetti,* 605 U.S. 495 (2025)), are not "contemporaneous explanations for agency action" found in the record, and are at most "impermissible *post hoc* rationalizations." *Department of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020). Further, Defendants make no effort to establish a connection between the Directives and those cases' reasoning regarding college admissions or the appropriate standard of review for regulations of medical treatment for minors. The terminated programs

did not utilize "an explicit racial preference." A2649–2650. Rather, the programs addressed the demonstrated underrepresentation of various populations in the biomedical profession, including racial minorities, people with disabilities, women, and people from socioeconomically disadvantaged backgrounds. A0395; A1102; A1422–1423.

Defendants insist that the Directives stemmed from the acting director's "expertise and experience" and required NIH staff to "use their 'scientific background and knowledge of their programs'" to "identify problematic grants." Defs.' Br. at 30, 40. But the record shows that language in the Directives was dictated to NIH by officials outside the agency, *see* A0110; A0123–0126; A0164, and officials implemented the Directives by terminating grants with lightning speed, A0138. The use of boilerplate across the Directives and terminations further belies this assertion, and far from demonstrating even-handedness, Defs.' Br. at 42, reveals the sweeping scope of NIH's failure "to justify the choice made" and the "basis on which the [agency] exercised its expert discretion," *State Farm*, 463 U.S. at 48.

Defendants press that the District Court's concern with NIH's failure to define "DEI" amounts to a requirement that agencies must "define every term in internal guidance." Defs.' Br. at 40–41. But the District Court suggested no such thing. *Id*. Rather, the lack of *key* definitions allowed Defendants "to arrive at whatever conclusion" they wished "without adequately explaining the standard on which its

decision is based." A0166 (quotation omitted). Defendants quip that Plaintiffs "seem to know what 'DEI' is." Defs.' Br. at 41. But the record must show what the *agency* was thinking. A0164–0173; *cf. Dep't of Com.*, 588 U.S. at 756 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.").

Further, there is no evidence of a reasoned explanation for Defendants' "about-face" on agency priorities. *NLRB. v. Lily Transportation. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017). Nor can Defendants show that they assessed the reliance interests at stake—namely, the impact to researchers' career progression, the risk to human life, and the damage to the overall scientific endeavor and the body of public health—much less that they "determine[d] whether [those interests] were significant" or "weigh[ed] any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915. A0172–0173.

Defendants instead argue that there is "no valid basis" for reliance interests here given OMB guidance allowing for grant terminations based on a change in agency priorities. Defs.' Br. at 42–43 (citing C.F.R. § 200.340(a)(4)). Setting aside the fact that such guidance is inapplicable to these grants, *see infra* Argument, Section III.B.1, the guidance does not change that Plaintiffs had reliance interests the agency had to consider. *Regents*, 140 S. Ct. at 1913 (rejecting argument that there

are "no legally cognizable reliance interests" where DACA Memorandum stated it "conferred no substantive rights and provided benefits only in two-year increments"). And as this Court has already held, the possible availability of "transition funds," Defs.' Br. at 42, "does not account for the broad scope of financial and non-financial interests staked on the grant awards" or "have any bearing on whether the Department considered those myriad interests" as required. *APHA*, 145 F.4th at 54.

Accordingly, the District Court correctly concluded that Defendants' actions were arbitrary and capricious.

## B. Alternative bases to affirm the Judgment that grant terminations violate the APA

As explained in Argument Section I.C.1.ii–iii, this Court can also affirm the Judgment on the grounds that Defendants' grant terminations were contrary to regulation and statute. *See* A0530–0533; 5 U.S.C. §§ 706(2)(A), (C); *Rodrique*, 126 F.4th at 90 (appellate court may "affirm the district court's ruling 'on any ground made manifest by the record, including one not reached by the District Court.'" (quoting *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 161 (1st Cir. 2016))).

### 1. Defendants acted contrary to regulation.

Under HHS regulations in effect when the grants at issue were terminated, HHS could unilaterally terminate a grant on only two grounds: (1) "fail[ure] to comply with the [award's] terms and conditions," or (2) "for cause[.]"

45 C.F.R. § 75.372(b), (a)(2) (2020). Defendants have repeatedly relied on 2 C.F.R. § 200.340(a)(4) as the ground for termination, but at the relevant time period, that provision constituted only non-binding OMB Guidance; it was not set to be incorporated into HHS regulation until *after* the Directives and resulting terminations. A0175–0177. The District Court thus correctly determined Defendants' reliance on 2 C.F.R. § 200.340(a)(4) was contrary to law. *Id.*

Defendants argue that NIH could have treated "inconsistency with agency priorities" as "cause," Defs.' Br. at 38, but their failure to raise this argument below constitutes waiver. *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Loc. No. 59 v. Superline Transp. Co*., 953 F.2d 17, 21 (1st Cir. 1992). Moreover, it fails on its own terms. Nothing in the record reflects NIH terminated any grant "for cause"; the Directives and termination notices rely on only 2 C.F.R. § 200.340(a)(4). And Defendants' argument is inconsistent with their own prior interpretations of the "for cause" provision. *See Colorado v. HHS*, 783 F. Supp. 3d 641, 647 n.2 (D.R.I. 2025) (per HHS guidance and past agency adjudications, "[f]or cause means a grantee has materially failed to comply with the terms of the grant").

### 2. Defendants acted contrary to statute.

An agency cannot take actions that disregard "substantive statutory commands[.]" *Citizens Awareness Network, Inc. v. Nuclear Regul. Comm'n*, 59 F.3d

284, 290–91 (1st Cir. 1995) (setting aside agency actions "inconsistent with the plain terms of [the agency's] enabling statute"). Defendants have done just that.

Congress requires that NIH support research into minority health, health disparities, sexual and gender minority populations, and vaccines. *See supra* Statement of the Case, Section I.A. Likewise, Congress requires that NIH improve diversity in the biomedical research workforce. *Id.* Defendants have leeway to determine which specific studies or programs to support to accomplish these goals, but here, Defendants have targeted for termination the *exact topics* Congress has required NIH to fund. *See* A0561 ("ICs must not issue" awards deemed to support "DEI," including diversity supplements); *see supra*, Statement of the Case, Section I.C (describing termination of entire programs aimed at diversifying the biomedical research workforce).

Defendants' attempt to justify their defiance of Congressional mandates borders on facetious. For example, Defendants argued at trial that refusing to study the health of transgender individuals is the improvement in research into the health of sexual and gender minorities that the statute requires. A0249–0251. Defendants may not "substitute their policy judgments for those of Congress" by blacklisting entire categories of research Congress has mandated. *Brown & Williamson Tobacco Corp. v. Food & Drug Admin.,* 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000).

## **CONCLUSION**

For the foregoing reasons, the Judgment should be affirmed.

Date: November 13, 2025

Respectfully submitted,

Shalini Goel Agarwal**
Emily Gilman (No. 1218805)
  PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., NW,
Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org
emily.gilman@protectdemocracy.org

Michel-Ange Desruisseaux
(No. 1218422)
  PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
202-579-4582
michel-ange.
desruisseaux@protectdemocracy.org

Kenneth Parreno (No. 1218416)
  PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
202-579-4582
kenneth.parreno@protectdemocracy.org

Matthew D. Brinckerhoff (No. 1218417)
Ilann M. Maazel (No. 1218419)
Max Selver (No. 1218421)
Sydney Zazzaro (No. 1218425)
  EMERY CELLI BRINCKERHOFF ABADY
  WARD & MAAZEL LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
mbrinckerhoff@ecbawm.com
imaazel@ecbawm.com
mselver@ecbawm.com
szazzaro@ecbawm.com

*/s/ Jessie J. Rossman*
Jessie J. Rossman (No. 1161236)
Suzanne Schlossberg (No. 1217988)
Jennifer M. Herrmann (No. 1201755)
  AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org
jherrmann@aclum.org

Olga Akselrod (No. 1218423)
Rachel Meeropol (No. 115840)
Alexis Agathocleous (No. 1158452)
Alejandro Ortiz (No. 1190415)
  AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

Lisa S. Mankofsky (No. 1218420)
Oscar Heanue**
  CENTER FOR SCIENCE IN THE PUBLIC
  INTEREST
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

** *Admission forthcoming*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,984 words. This word count includes the 54 words in the image on Page 32 of this brief. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Times New Roman, 14-point font, a proportionally spaced typeface.

Dated: November 13, 2025        */s/ Jessie J. Rossman*
                                       Jessie J. Rossman


## CERTIFICATE OF SERVICE

I certify that on November 13, 2025, the foregoing response was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

Dated: November 13, 2025        */s/ Jessie J. Rossman*
                                         Jessie J. Rossman